James A. Patten (1191)
**PATTEN, PETERMAN, BEKKEDAHL & GREEN, PLLC**
2817 2nd Avenue North, Suite 300
Billings, MT 59101
Phone: (406) 252-8500
Fax: (406) 294-9500
E-Mail: japatten@ppbglaw.com

ATTORNEY FOR DEBTOR


## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| IN RE: | ) | Case No. 08-61570 |
| | ) | |
| YELLOWSTONE MOUNTAIN | ) | |
| CLUB, LLC, | ) | |
|      Debtor. | ) | |
| | ) | |
| IN RE: | ) | Case No. 08-61571 |
| | ) | |
| YELLOWSTONE DEVELOPMENT, | ) | |
| LLC, | ) | |
|      Debtor. | ) | |
| | ) | |
| IN RE: | ) | Case No. 08-61572 |
| | ) | |
| BIG SKY RIDGE, LLC, | ) | |
| | ) | |
|      Debtor. | ) | |
| | ) | |
| IN RE: | ) | Case No. 08-61573 |
| | ) | |
| YELLOWSTONE CLUB | ) | |
| CONSTRUCTION CO., LLC, | ) | |
| | ) | |
|      Debtor. | ) | |
| | ) | |

**MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363
AND 364 AND BANKRUPTCY RULES 2002, 4001, AND 9014 FOR INTERIM AND
FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION
FINANCING (II) AUTHORIZING DEBTORS TO UTILIZE CASH COLLATERAL,
(III) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDERS
AND (IV) SCHEDULING INTERIM AND FINAL HEARINGS**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors") hereby move for entry of an interim order (the "Interim Order") and a final order (the

"Final Order"), under sections 105, 361, 362, 363, and 364 of title 11 of the United States Code

(the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and the Local Rules for the United States Bankruptcy Court

for the District of Montana (the "Local Rules"), (i) authorizing the Debtors to obtain postpetition

financing (ii) authorizing the Debtors to utilize cash collateral, (iii) granting adequate protection

to the Prepetition Lenders (as defined below), and (iv) scheduling a final hearing on this motion

(the "Motion").  In support of the Motion, the Debtors, by and through their undersigned

counsel, respectfully represent:

## I.  BACKGROUND

**A.      The Chapter 11 Filing.**

1.      On November 9, 2008 (the "Petition Date"), Yellowstone Mountain Club, LLC,

Yellowstone Development, LLC and Big Sky Ridge, LLC (the "Company" or the "Debtors")

each commenced a case by filing a petition for relief under chapter 11 of the title 11 of the

United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code").  The

Debtors continue to operate their businesses and manage their properties as debtors and debtors-

in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have

requested that these chapter 11 cases (the "Chapter 11 Cases") be jointly administered.

2.     No creditors' committee has been appointed in these Chapter 11 Cases by the United States Trustee. No trustee or examiner has been appointed in any of the Debtors' Chapter 11 Cases.

3.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.     The statutory predicates for the relief requested herein are Bankruptcy Rule 1015 and Local Rule 1015-1.

**B.     Background and Current Business Operations**

5.     Each of the Debtors is a limited liability company organized under the laws of Montana, where they also maintain their primary place of business. Upon its formation, Yellowstone Mountain Club was the owner of a certain plot of land located in Big Sky, Montana which is described in greater detail below (the "**Development Property**"). Yellowstone Mountain Club, with the assistance of Yellowstone Development and certain other affiliates, has subdivided the Development Property and has sold certain lots to, among others, Yellowstone Development and Big Sky, to develop ski trails, a golf course, lodges, residences, restaurants and other resort facilities. Because all three of the Debtors provide interrelated products and services with one common business goal – to provide resort services to residents and members who purchase interests in the Development Property – the Debtors are commonly and collectively referred to as "Yellowstone Club."

6.     Yellowstone Club was established by Edra Blixseth and Tim Blixseth in late 2000. As of the Petition Date, the owners of each of the Debtors consisted of:

3

(a)  Yellowstone Mountain Club:  85% owned by Blixseth Group, Inc. ("**BLX**")
9% owned by Non-Voting B Unit Holders
("**B Unit Holders**")
6% owned by Blixseth Family Investments, LLC ("**BFI**")

(b)  YellowstoneDevelopment:  85% owned by BLX
9% by B Unit Holders
6% owned by BFI

(c)  Blue Sky:  50% owned by Edra Blixseth
50% owned by Development

Pursuant to section 101 of the Bankruptcy Code, each of the Debtors is an affiliate of the other two Debtors.

7.  Each of Yellowstone Mountain Club and Yellowstone Development own interests in several other affiliates which comprise Yellowstone Club (collectively, the "**Affiliates**"), which are not debtors in these Chapter 11 Cases, including, as follows:

| **Affiliate** | **Relationship to Debtor** |
|---|---|
| Yellowstone Hotel Management | 100% Interest Held By Mountain Club |
| Sunrise Ridge at Yellowstone Club, LLC | 11.73% Interest Held By Mountain Club |
| Yellowstone Construction Co., LLC | 100% Interest Held By Development |
| Yellowstone Utilities, LLC | 100% Interest Held By Development |
| St. Andrew's Int'l Golf Club Ltd | 100% Interest Held By Development |
| Cosborn Investments B.V. | 100% Interest Held By Development |

8.  Yellowstone Club is a world-class private ski and golf community located in Big Sky, Montana, approximately 50 miles from Bozeman, Montana.  Yellowstone Club is situated on more than 13,600 acres of land adjacent to the Big Sky ski resort and approximately 20 miles from Yellowstone National Park.  As of June 28, 2008, the value of the Development Property was appraised by Cushman Wakefield at approximately $778,000,000 not including the unsold memberships which are valued at $336,000,000.

9.  Yellowstone Club provides both residential units for sale on the Development Property along with membership interests relating to the use of the Development Property's

4

world-renowned skiing, golfing and related resort facilities. According to current plans, residential development at Yellowstone Club is limited to 864 residential units and 1,014 membership interests. The private skiing component of Yellowstone Club encompasses more than 2,200 acres of skiable terrain with more than 60 trails, 13 lifts, and a 2,700 foot vertical drop. Members have direct access to an additional 5,500 acres of skiable terrain at the adjacent public ski areas of Big Sky and Moonlight Basin which, when combined, create the largest skiable terrain in North America.

10.     Yellowstone Club also functions as a resort, offering world-class services and amenities such as hotel accommodations, restaurants, spas, business center, exercise facilities, ski and golf shop, and retail and office space. In connection with the operation of these and related services (e.g., fire and EMT personnel, property managers, maintenance staff, office personnel, etc.), Yellowstone Club employs approximately 521 employees

11.     On September 30, 2005, the Debtors entered into that certain Credit Agreement dated September 30, 2005 (the "**Prepetition Loan**") with Credit Suisse, as Administrative Agent and Collateral Agent (the "**Prepetition Agent**") and Lenders (including any successors, the "**Prepetition Lenders**").

12.     Without prejudice to the rights of any other party, but subject to the provisions of paragraph 18 of the proposed Interim Order, the Debtors admit, stipulate and agree that: (a) as of the Petition Date, (i) the Debtors were truly and justly indebted and liable to (i) the Prepetition Lenders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $307,000,000.00 in respect of loans made by the Prepetition Lenders pursuant to, and in accordance with the terms of, the Prepetition Credit Agreement and related documents (the "Prepetition Credit Documents"), plus, accrued and unpaid interest thereon and fees,

5

expenses and other obligations incurred in connection therewith as provided in the Prepetition

Credit Documents (the "Prepetition Secured Obligations"); (b) the Prepetition Secured

Obligations constitute the legal, valid and binding obligations of the Debtors, enforceable in

accordance with their terms (other than in respect of the stay of enforcement arising from section

362 of the Bankruptcy Code); (c) no portion of the Prepetition Secured Obligations are subject to

avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or

applicable nonbankruptcy law; and (d) the Debtors do not have, and forever release, any claims,

counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy

Code or otherwise, against the Prepetition Agent, the Prepetition Lenders and their affiliates,

agents, officers, directors, employees, attorneys and advisors with respect to the Prepetition

Secured Obligations; and the liens and security interests granted to the Prepetition Agent and the

Prepetition Lenders pursuant to and in connection with the Prepetition Credit Documents

(including, without limitation, all security agreements, pledge agreements, mortgages, leasehold

mortgages, deeds of trust and other security documents executed by any of the Debtors in favor

of the Prepetition Lenders) are (i) valid, binding, perfected, enforceable first priority liens on and

security interests in the Prepetition Collateral, (ii) not subject to avoidance, recharacterization or

subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject

and subordinate only to (x) after giving effect to the Interim Order, the DIP Liens, (y) after

giving effect to the Interim Order, the Carve Out and (z) valid, perfected and unavoidable liens

permitted under the Prepetition Credit Documents to the extent such permitted liens are senior to

or pari passu with the liens of the Prepetition Agent and the Prepetition Lenders on the

Prepetition Collateral (the "Permitted Prepetition Liens").

     13.     In order to secure the Prepetition Obligation, the Borrowers granted the

Prepetition Lender a security interest and mortgage interest in, and lien on, all or substantially all of their assets including, without limitation, the Development Property (the "**Prepetition Lien**").

14.    The Prepetition Lender asserts that, as of the Petition Date, the Borrowers are in default under the Prepetition Loan and a notice of default has been issued.

15.    Additionally, several creditors have asserted construction liens in connection with materials and services provided to some or all of the Debtors.  As of October 23, 2008, the following liens, totaling approximately $340,342, had been asserted against the Debtors:

| Creditor | Alleged Obligation/Lien | Date Alleged |
|---|---|---|
| Thyssenkrupp Elevator | $ 113,692.50 | 8/22/2008 |
| Security Fire Protection | $  74,722.37 | 9/30/2008 |
| Dovetail Design | $   6,182.66 | 10/6/2008 |
| Bridger Tile & Stone | $  26,866.84 | 10/9/2008 |
| Dependable Paint | $ 114,730.50 | 10/15/2008 |
| We Dust Control | $   4,147.01 | 10/20/2008 |
| TOTAL | $ 340,341.88 | |

16.    In addition to the above-listed secured debt aggregating approximately $323 million, as of October 31, 2008, the Debtors estimate that they, or any of them, may owe approximately: (a) $857,512 for other secured obligations which is secured by the value of the underlying property to which such loan or lease relates; (b) $11,834,000 to other lenders secured by real estate; (c)  $6,310,000 for ordinary course trade debt; and (d) $1,245,000 for contractual unsecured obligations, including, without limitation, payments owed under a settlement agreement, liability under an unsecured note and sales and brokerage commissions owed.  These estimates do not include claims which the Debtors believe are contingent, unmatured and/or disputed.

17.    Due to Yellowstone Club's decreasing revenues brought on by, among other things, economic factors causing both difficulties in obtaining credit and declines in the real

7

estate market, Yellowstone Club was again faced with problems relating to its credit which impaired its ability to pay its creditors.  Moreover, in or around September, 2008, Yellowstone Club assessed that it would need to make repairs and improvements to the Development Property in preparation for its busiest time of the year, the period from Thanksgiving to each January (the "**Peak Period**").  Because Yellowstone Club generates a substantial portion of its operating income during the Peak Period, the need for an infusion of funds was both immediate and critical.

18.     Yellowstone Club commenced these Chapter 11 Cases in order to address its liquidity shortfalls, preserve and maximize its business as a going concern, for the benefit of all stakeholders, restructure and reorganize its business affairs and develop a reorganization plan.

19.     With the credit facility requested in this motion, Yellowstone Club will resolve its liquidity problems and drastically improve its profitability for the benefit of its creditors, its members and its shareholders.

20.     As set forth above, the Prepetition Obligation is secured by the Prepetition Liens, which includes the Debtors' "cash collateral" as such term is defined in Section 363 of the Bankruptcy Code (the "**Cash Collateral**").  Thus, the Debtors do not have any unencumbered cash with which to operate their businesses during these Chapter 11 Cases.  Moreover, the Prepetition Lenders, Credit Suisse, as agent, are prepared to consent to permit the Debtors to use the Cash Collateral on terms other as set forth herein, in the Interim Order (hereinafter defined), and in the DIP Loan Agreement (hereinafter defined).

21.     At this time, the Debtors have an immediate need to use Cash Collateral, without which they would be unable to operate their businesses at this critical time in their business cycle.  Moreover, although the use of Cash Collateral is necessary to this process, Cash

8

Collateral alone is insufficient to afford the Debtors the ability to manage their businesses, and generate revenues, during these Chapter 11 Cases. Therefore, the Debtors also have an immediate need for additional liquidity that can only be obtained through a secured debtor in possession financing facility (hereinafter the "**DIP Facility**," as further defined below).[1] The Debtors use of Cash Collateral and the funds provided under the DIP Facility shall be limited to expenditures described in the terms and conditions of the Interim Order and the DIP Loan Agreements during the period commencing on the date of the Interim Order through and including the date of the Final Hearing (the "**Interim Financing Period**"), in such amounts as may be made available to the Debtors by Agent and Lenders in accordance with the Budget and the terms and conditions set forth in the DIP Loan Agreements and the Interim Order.

## II.   RELIEF REQUESTED

22.   The Debtors intend to finance the operations of their businesses during the initial three weeks of these Chapter 11 Cases through the continued use of cash collateral and by entering into an interim postpetition debtor-in-possession credit facility with the DIP Agent and the DIP Lenders (the "DIP Facility"). The Debtors intend to use the proceeds of the DIP Facility (i) to fund the costs and expenses of the Debtors in respect of the Project, (ii) to fund their general corporate needs, including working capital needs; and (ii) to pay fees and expenses related to the financing and these chapter 11 cases, in accordance with the terms set forth in the DIP Term Sheet and in accordance with the DIP Budget.

23.   The Debtors have negotiated the specific terms of the proposed DIP Facility and use of cash collateral with the DIP Agent, the DIP Lenders, the Prepetition Agent and the

---

[1]   All defined terms contained herein without definitions shall have the definitions set forth in the Debtor-in-Possession Term Sheet annexed to the Interim Order.

Prepetition Lenders. Accordingly, by this Motion, the Debtors request entry of interim and final

orders authorizing the Debtors to enter into the DIP Facility on the terms set forth on the Interim

Order and the DIP Term Sheet. The proposed Interim Order with the DIP Term Sheet annexed

thereto, is attached hereto as Exhibit 1.

24.     Additionally, with this Motion, the Debtors request entry of an order scheduling,

pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, within 30 days of the Petition Date, a

Final Hearing for this Court to consider entry of a final order authorizing such additional

postpetition financing for which the Debtors obtain a commitment on a final basis and on such

terms as shall be set forth in definitive debtor-in-possession loan documentation.

**DIP Facility**

25.     The Debtors request approval of the DIP Facility, authorizing:

(a)     the Borrowers to obtain an initial 3 week superpriority postpetition term

loan financing facility pursuant to a DIP Term Loan Facility (the "DIP Facility") in an aggregate

principle amount of $4,450,000 on the terms set forth on the term sheet attached as an exhibit to

the Interim Order (the "DIP Term Sheet"), and for each existing and subsequently acquired or

organized domestic subsidiary of any Borrower (the "Subsidiary Guarantors") to guaranty the

Borrowers' obligations in connection with the DIP Facility from Credit Suisse (the "DIP

Agent"), acting as sole administrative agent and collateral agent, and Credit Suisse Securities

(USA) LLC, acting as sole bookrunner and sole lead arranger for a syndicate of banks, financial

institutions and other institutional lenders that agree to make loans under the DIP Facility (the

"DIP Lenders"), with such DIP Facility:

(i)     having priority, pursuant to section 364(c)(1) of the

Bankruptcy Code, over any and all administrative expenses of the kind specified in sections

503(b) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out;

(ii)        being secured, pursuant to section 364(c)(2) of the

Bankruptcy Code, by perfected first priority security interests in and liens, not subject to

subordination, upon all unencumbered prepetition and postpetition property of the Debtors

including, but not limited to, Cash Collateral, inventory, accounts receivable, other rights to

payment whether arising before or after the Petition Date, property, plants, equipment, general

intangibles, instruments, interests in leaseholds, real property, patents, copyrights, trademarks,

trade names, other intellectual property and the proceeds of all the foregoing, but excluding

claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 or 551 of the

Bankruptcy Code (collectively, the "Avoidance Actions"), and  subject to the Carve-Out.

(iii)        being secured, pursuant to Section 364(d)(1) of the

Bankruptcy Code, by perfected first priority senior priming and security interests and mortgage

liens on substantially all of the property of the Debtors and the Subsidiary Guarantors whether

owned on the Closing Date (as defined in the DIP Term Sheet) or thereafter acquired (the

"Collateral"), except for prepetition liens of third parties on the Collateral as to which such third

parties have a valid, perfected and unavoidable existing lien (excluding any liens securing

obligations relating to the Credit Agreement dated as of September 30, 2005, as amended, (the

"Prepetition Credit Agreement") (the "Prepetition Third Party Liens"); and all existing liens,

rights and interests granted to or for the benefit of the Prepetition Agent and Prepetition Lenders

under the Prepetition Credit Agreement and other related documents (the "Prepetition Credit

Agreement Liens") shall be primed and made subject to and subordinate to the perfected first

priority senior liens to be granted to the DIP Agent, for the benefit of the DIP Lenders, which

11

senior priming liens in favor of the DIP Agent (the "Priming DIP Liens") shall also prime any liens granted after the commencement of the Cases to provide adequate protection in respect of any of the Prepetition Credit Agreement Liens, subject to the Carve-Out, and

(iv)    being secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by perfected second priority security interests in and liens, not subject to subordination, upon all Collateral that is subject to the Prepetition Third Party Liens (the "Second Priority DIP Liens"), subject to the Carve-Out,

(b)    the Debtors to use the Cash Collateral (as defined in the Prepetition Credit Agreement) pursuant to sections 361, 362 and 363 of the Bankruptcy Code, and all other collateral on which the Prepetition Lenders have a lien or security interest (together with the Cash Collateral, the "Prepetition Collateral") and provide adequate protection with respect to any diminution in the value of the Prepetition Lenders' interests in the Prepetition Collateral resulting from the implementation of the DIP Facility and the priming of the Prepetition Agent's liens on the Prepetition Collateral to secure the DIP Facility set forth herein, the use of the Cash Collateral and the use, sale or lease by the Debtors (or other decline in value) of the Prepetition Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code;

(c)    the scheduling, pursuant to Bankruptcy Rule 4001, of an interim hearing (the "Interim Hearing") on this Motion for this Court to consider entry of an interim order annexed to the Motion (the "Interim Order") (i) authorizing the Borrowers, on an interim basis, to forthwith borrow up to the aggregate amount of $4,450,000 from the DIP Lenders under the DIP Facility, (ii) authorizing the use by the Debtors of Cash Collateral, and

12

(iii) granting the adequate protection hereinafter described of.

## III.  BASIS FOR RELIEF

### A.    The Debtors' Need For DIP Financing

26.    As noted above, the Debtors face severe liquidity constraints.  The Debtors have

exhausted their options for addressing their liquidity issues.  Thus, without the DIP Facility and

use of cash collateral, the Debtors do not have sufficient available sources of working capital and

financing to operate their business during the initial three weeks of these Chapter 11 Cases.  The

Debtors need approval of the DIP Facility to, among other things, satisfy its costs and expenses

in connection with the Project, and other routine operating expenses such as payroll, contractor

costs, or other obligations.  Without the proposed source of postpetition financing, the Debtors

will be forced to discontinue their operations.  The DIP Facility and use of cash collateral will

avoid such a result and provide a basis upon which the Debtors can continue ordinary course

operations while affording them the opportunity to secure commitments for longer term

postpetition financings and affording the DIP Lenders the opportunity to thoroughly conduct due

diligence the Debtors' business and make an informed determination as to whether to provide

longer term financing to fund the balance of the Debtors' reorganization.

27.    Moreover, access to such additional financing will provide the Debtors'

contractors, Homeowners, customers and vendors with the needed assurance that the Debtors

will be able to continue conducting their business in the ordinary course without interruption

while the Debtors are pursuing commitments for longer term debtor-in-possession financing.  In

the absence of immediate approval of the DIP Facility and use of cash collateral on an interim

basis, the Debtors will have no choice but to immediately discontinue operations, resulting in

immediate and irreparable harm to the Debtors and their estates.  For these reasons, the Debtors

13

have an immediate need for adequate postpetition financing.

**B.      The Debtors' Search For DIP Financing**

28.     Prior to the Petition Date, the Debtors sought postpetition financing proposals

from several sources.  Indeed, the Debtors, with the help of their advisors, contacted multiple

parties, and received preliminary interest from two parties.  Ultimately, however, the Debtors

were unable to obtain post-petition financing in the form of unsecured credit allowable as an

administrative expense under section 503(b)(1) of the Bankruptcy Code, unsecured credit

allowable under sections 364(a) and 364(b) of the Bankruptcy Code, or secured credit pursuant

to section 364(c) of the Bankruptcy Code on terms and conditions more favorable to the Debtors'

estates than those offered by the DIP Lenders.  In light of the Debtors' search, and given the

current credit markets, the Debtors do not believe that any lender would be willing to loan new

money to the Debtors on terms more favorable to the Debtors than the terms of the DIP Facility.

29.     After reviewing the proposals submitted by the DIP Lenders and engaging in

vigorous, arm's-length, and good-faith negotiations, the Debtors determined, in the exercise of

their business judgment, that the financings offered by the DIP Lenders are in the best interests

of the Debtors' estates.  The Debtors believe that the terms of the DIP Facility are fair and

reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their

fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

30.     The Debtors believe that the proposed adequate protection will be sufficient to

protect the Prepetition Lenders from any diminution in value of their interest in the Prepetition

Collateral.  The adequate protection terms are fair and reasonable under the circumstances,

reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties

14

and are supported by reasonably equivalent value and fair consideration.

### IV. TERMS OF THE DIP FACILITY

31.     The terms of the proposed DIP Facility and Cash Collateral uses are more specifically set forth in the proposed Interim Order (and the DIP Term Sheet annexed thereto) attached hereto as Exhibit 1. The Debtors submit that the terms of the proposed order are reasonable for financings of this type. Certain key terms of the financing and the justifications therefor are mentioned below.

32.     The proposed DIP Facility requires the Debtors to waive the estate's 506(c) rights upon entry of Final Orders. Although the Debtors have negotiated that point with the DIP Lenders, the DIP Lenders have insisted upon the same as a condition to funding. Given the dire credit market conditions and the Debtors' critical need for the DIP Facility, the Debtors submit that such a waiver is necessary and appropriate under the circumstances.

33.     The DIP Facility also provides for "priming" liens. However, the Debtors are seeking priming liens only to a limited extent and exclusively on a consensual basis. The Debtors are proposing to prime only those liens of the Prepetition Lenders. Moreover, the Prepetition Lenders have consented to the priming. No liens of any Prepetition Third Party are being primed by the DIP Facility. The Debtors are proposing to provide the Prepetition Lenders adequate protection in the form of junior replacement liens on the Collateral (the "Adequate Protection Liens"), subject and subordinate only to (i) the Permitted Prepetition Liens, (ii) the Priming Liens and any liens on the Collateral to which such liens so granted to the DIP Agent are junior and (iii) the Carve Out. Because no other parties are primed by the DIP Facility and the Debtors are offering the Prepetition Lenders adequate protection, the Debtors submit that the priming of the Prepetition Lenders' liens is appropriate under the circumstances.

## V. APPLICABLE AUTHORITY

34.     Sections 364(c) and (d) of the Bankruptcy Code provide:

(a)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —

(i)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(ii)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(iii)     secured by a junior lien on property of the estate that is subject to a lien.

(b)     The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

(i)     the trustee is unable to obtain such credit otherwise; and

(ii)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(c)     In any hearing under this subsection, the trustee has the burden of

16

proof on the issue of adequate protection.

           35.   Bankruptcy Rule 4001(c) governs the procedures for securing authorization to obtain debtor-in-possession financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2). The Debtors are seeking approval of the interim DIP Facility to avoid immediate and irreparable harm to the estate. Without the relief requested, the Debtors will suffer immediate and irreparable harm because the Debtors will not be able to fund payroll, will no longer be able to operate in the ordinary course of business and will likely be forced to cease operations in a non-orderly manner. Accordingly, pursuant to Bankruptcy Rule 4001, the Court is authorized to grant the relief requested herein.

## A.    The DIP Financings Should Be Approved

           36.   The Debtors were unable to obtain adequate postpetition financing in the form of unsecured credit or unsecured debt with an administrative priority on a consensual basis. The circumstances of these cases instead require the Debtors to obtain interim financing under section 364(c) and (d) of the Bankruptcy Code. Having determined that financing was available only under section 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Facility at arm's length and pursuant to their business judgment, which is to be accorded deference so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor-in-possession financing necessary to

sustain seasonal business); In re Ames Dept. Stores, Inc., 115 B.R. 34, 40 (S.D.N.Y. 1990)

("cases consistently reflect that the court's discretion under section 364 is to be utilized on

grounds that permit reasonable business judgment to be exercised so long as the financing

agreement does not contain terms that leverage the bankruptcy process and powers or its purpose

is not so much to benefit the estate as it is to benefit parties in interest").

37.    The proposed DIP Facility is required to preserve and maintain the Debtors' going

concern value during the initial weeks of this case while the Debtors continue to seek longer

term financing and continue to negotiate with the DIP Lenders regarding the same.  Therefore,

the proposed DIP Facility is in the best interests of the Debtors' estates and creditors.  The

availability of credit pursuant to the DIP Facility is necessary to provide working capital for the

Debtors to continue to operate their business.  Moreover, the available credit will afford the

Debtors' vendors, customers and contractors the necessary confidence to continue ongoing

relationships with the Debtors, including the extension of credit terms for the payment of goods

and services, and also will be viewed favorably by the Debtors' employees.

38.    Accordingly, the Debtors request that this Court authorize the Debtors to obtain

the DIP Facility to the extent and pursuant to the terms set forth herein, in the Interim Order and

the DIP Term Sheet, while they continue to pursue additional longer term postpetition financing

on a final basis and on such terms as shall be set forth in definitive debtor-in-possession loan

documentation (the "DIP Financing Documents").

**B.      Approval of Priming Liens**

39.    If a debtor is unable to obtain credit under the provisions of section 364(c) of the

Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of

the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. §

364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition

debt secured by priming liens, provides that the court may authorize the obtaining of credit or the

incurring of debt secured by a senior or equal lien on property of the estate that is subject to a

lien only if-

>    (A)     the trustee is unable to obtain credit otherwise; and
>
>    (B)     there is adequate protection of the interest of the holder of the lien
>
>    on the property of the estate on which such senior or equal lien is
>
>    proposed to be granted.

40.     As noted above, the Debtors performed an exhaustive search for debtor-in-

possession financing.  In light of that search, and given the current credit market, the Debtors

have concluded that financing comparable to that provided by the DIP Lenders is currently

unobtainable without the priming of the prepetition liens of the Prepetition Lenders.  See In re

Utah 7000, L.L.C., Case No. 08-0991146, 2008 WL 2654919, *2 (Bankr. D. Utah July 3, 2008)

(finding that debtor unable to obtain financing without priming of prepetition liens); In re

Mosello, 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996) (same); In re 495 Central Park Ave. Corp.,

136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (same); In re Beker Indus. Corp., 58 B.R. 725,

736 (Bankr. S.D.N.Y. 1986) (same).  In addition, the Debtors submit that the adequate protection

to be provided to the Prepetition Lenders, as detailed below, is sufficient to approve the priming

of their liens under section 364(d) of the Bankruptcy Code.

**C.     Approval of Adequate Protection**

41.     In exchange for the Debtors' use of the Prepetition Collateral, including Cash

Collateral, and its priming of the Prepetition Lenders' own prepetition liens, the Debtors propose

to provide the Prepetition Lenders with adequate protection in accordance with sections 364(d)

19

and 361 of the Bankruptcy Code.  To that end, the Debtors request that the Court approve and authorize the Debtors' proposed adequate protection of each Prepetition Lender's interest in its respective Prepetition Collateral in respect of any diminution in value resulting from (i) use of the cash collateral, (ii) the use, sale, or lease of the Prepetition Collateral, (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and (iv) the implementation of the DIP Facility and the priming of the Prepetition Lenders' prepetition liens.

42.     Adequate Protection.  The adequate protection proposed by the Debtors includes (a) Adequate Protection Liens constituting junior replacement liens (the "Replacement Liens") on the Collateral, subject and subordinate only to (i) the Permitted Prepetition Liens, (ii) the Priming Liens and any liens on the Collateral to which such liens so granted to the DIP Agent are junior and (iii) the Carve Out; and (b) the resultant increase in value of the Prepetition Lenders' interests in their collateral associated with the DIP Facility effects of increasing the Debtors' liquidity and facilitating continuity of their ongoing ordinary course operations during the initial weeks of the case.

43.     The Debtors submit that the proposed adequate protection package is more than sufficient to adequately protect each Prepetition Lender against the risk of any diminution in value of each such Prepetition Lender's interest in its respective Prepetition Collateral during the Chapter 11 case.

44.     Where a debtor is seeking to prime prepetition lienholders, section 364(d) of the Bankruptcy Code must be satisfied.  Specifically, section 364(d)(1)(B) of the Bankruptcy Code provides that in order to obtain postpetition financing secured by a "priming" lien, the Debtors must establish that "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C.

20

364(d)(1)(B).

  45. Section 361 of the Bankruptcy Code, which identifies a non-exhaustive list of

forms of adequate protection, states:

> When adequate protection is required under section 362, 363, or 364 of
> this title of an interest of an entity in property, such adequate protection
> may be provided by—
>
> > (1) requiring the trustee to make a cash payment or periodic cash
> > payments to such entity, to the extent that the stay under section
> > 362 of this title, use, sale, or lease under section 363 of this title,
> > or any grant of a lien under section 364 of this title *results in a
> > decrease in the value of such entity's interest in such property*;
> >
> > (2) providing to such entity an additional or replacement lien to
> > the extent that such stay, use, sale, lease, or grant *results in a
> > decrease in the value of such entity's interest in such property*; or
> >
> > (3) granting such other relief, other than entitling such entity to
> > compensation allowable under section 503(b)(1) of this title as an
> > administrative expense, as will result in the realization by such
> > entity of the indubitable equivalent *of such entity's interest in
> > such property*.

11 U.S.C. § 361 (emphasis added).  Although adequate protection can be provided in a number

of ways, a secured creditor is entitled to protection against diminution in value of its interest in

its collateral during the period of use and on account of the granting of the priming lien.  See In

re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (purpose of adequate

protection is "to safeguard the secured creditor from diminution in the value of its interest during

the Chapter 11 reorganization"); see also Swedeland, 16 F.3d at 564 ("Whether protection is

adequate 'depends directly on how effectively it compensates the secured creditor for loss of

value' caused by the superpriority given to the post-petition loan.") (quoting In re American

Mariner Inds., Inc., 734 F.2d 426, 435 (9th Cir. 1984)).

  46. Each of the Prepetition Lenders is entitled to protection against diminution in the

value of its interest during the Chapter 11 case under section 362 (because each of the Prepetition Lenders is prevented from exercising its state law rights with respect to its collateral due to the imposition of the automatic stay), 363 and/or 364 of the Bankruptcy Code. For the reasons set forth below, the Debtors submit that each of the Prepetition Lenders is adequately protected and the proposed relief is therefore necessary and reasonable.

### (i)   The Replacement Liens Adequately Protect the Prepetition Lenders' Interest in their Collateral

47.     Section 361 of the Bankruptcy Code identifies a non-exhaustive list of different forms of protection that constitute adequate protection. Subsection 361(2) expressly recognizes replacement liens as a form of adequate protection. As such, the Replacement Liens contemplated by the DIP Facility will afford the Prepetition Lenders adequate protection to the extent that the section 362 automatic stay, the use of Cash Collateral and the Prepetition Collateral, and the granting of priming liens result in a decrease in the value of the Prepetition Lenders' interests in their respective collateral. The Debtors submit that granting the Replacement Liens provides adequate protection of their interests within the meaning of sections 361 and 364(d) of the Bankruptcy Code. See In re Utah 7000, L.L.C., Case No. 08-0991146, 2008 WL 2654919, *3-4 (Bankr. D. Utah July 3, 2008) (approving adequate protection of prepetition creditor's interests based, in part, on fact that debtor offered replacement liens in additional collateral not subject to prepetition liens). In light of the foregoing, and for the reasons set forth below, the Replacement Liens will afford the Prepetition Lenders substantial protection.

### (ii)   The DIP Facility Increases the Value of the Prepetition Lenders' Interests in Their Collateral

48.     These Chapter 11 Cases were precipitated by the Debtors' severe liquidity

22

problems. Without the proposed financing and cash collateral usage, the Debtors will run out of

cash and be forced to immediately cease operations, in a non-orderly manner. The value of the

Prepetition Lenders' interest in their collateral is greatly increased by the DIP Facility because it

ensures the continued operation of the Debtors' facilities during the initial weeks of these chapter

11 cases and affords the Debtors the opportunity to secure commitments for longer term

postpetition financing.

      49.     For purposes of adequate protection in the context of postpetition financing, a

secured creditor's "interest" in collateral is not valued by the amount owed to the secured

creditor, but rather the value of the collateral absent the postpetition superpriority financing. See

Swedeland, 16 F.3d at 564 ("In other words, the [proposed adequate protection] should provide

the pre-petition secured creditor with the same level of protection it would have had if there had

not been post-petition superpriority financing."); see also In re Hubbard Power & Light, 202

B.R. 680, 685 (Bankr. E.D.N.Y. 1996) (holding that because the proposed DIP financing would

allow the debtor to remove environmental hazards from its facility, lift the injunction, and

resume operation of its business, the DIP financing would greatly increase the value of the

prepetition creditor's collateral.) It follows that, in valuing any Prepetition Lenders' interests, the

Court must look not to the amount of the prepetition debt, but rather at what the Prepetition

Collateral would be worth without the DIP Facility and cash collateral usage. Here, the value of

each of the Prepetition Lenders' interests in their respective collateral is the value of such

collateral absent the DIP Facility and Cash Collateral usage – i.e. the value of the Debtors'

facilities if operations are ceased and such facilities are shut down. By allowing the Debtors to

continue to operate, the Debtors submit that the DIP Facility will greatly increase the value of

the Prepetition Lenders' collateral. Therefore, the Prepetition Lenders are adequately protected.

23

See In re Sky Valley, Inc., 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("[A]n increase in the value of the collateral . . . resulting from the superpriority financing could constitute adequate protection.") (citing In re First South Sav. Ass'n, 820 F.2d 700, 710 (5th Cir. 1987))

50.     In light of the foregoing, the Debtors submit that the forms of protection proposed by the Debtors more than adequately protect the interests of the Prepetition Lenders and, therefore, the relief sought herein should be granted. Moreover, the Debtors have demonstrated herein and will demonstrate through testimony, that absent such relief, the Debtors will suffer immediate and irreparable harm.

**D.     Approval of Use of Cash Collateral**

51.     In addition to the need for the postpetition financing, the Debtors have a critical need for the immediate use of the Cash Collateral. The Debtors require use of the Cash Collateral to pay present operating expenses including payroll and to pay vendors to ensure a continued supply of services and materials essential to the Debtors' continued viability. If unable to use the Cash Collateral pending the Final Hearing, the Debtors will be unable to operate their business.

52.     Under section 363(c)(2) of the Bankruptcy Code, the Debtor may not use Cash Collateral without the consent of the Prepetition Lenders or authority granted by the Court. Section 363(e) of the Bankruptcy Code provides that on request of an entity that has an interest in property to be used by a debtor, the Court shall prohibit or condition such use as necessary to provide adequate protection of such interest. The Debtors submit that the proposed adequate protection to be provided to the Prepetition Lenders, as detailed above, is sufficient to approve the emergency use of the Cash Collateral under section 363 of the Bankruptcy Code.

**E.     Interim Approval Orders Should Be Entered**

53.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy and to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estate.

54.     On an interim basis, the Debtors request that this court authorize the Debtors to enter into the DIP Facility pursuant to the Interim Order, for the period from the Petition Date through the Final Hearing. Such interim authorization of the DIP Facility is necessary for the Debtors to meet payroll and continue uninterrupted operations while the Debtors continue to negotiate longer term postpetition financing and document the same in definitive debtor-in-possession loan documentation. Absent the granting of interim relief, the Debtors will not be able to meet their working capital needs, substantial enterprise value will be at risk of loss and the Debtors' facilities cannot remain operational. Discontinuation of the Debtors' operations would result in a substantial loss of value for the Debtors' estates and their stakeholders.

**F.      Notice With Respect To Emergency Hearing on DIP Facility**

55.     Notice of this Motion has been given by facsimile and/or email to the following parties, or in lieu thereof, to their counsel: (i) the United States Trustee; (ii) the Prepetition Lenders and their counsel; and (iii) those persons filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in these cases. The Debtors submit that under the circumstances, no further notice of the hearing on the interim financing set forth in the Interim Order is necessary and request that any further notice be dispensed with and waived.

25

## G.   Interim Hearing and Final Hearing

56.     The Debtors respectfully request that the Court (a) schedule the Final Hearing within 30 days of the Petition Date, and (b) authorize the Debtors to serve any interim order which fixes the time and date for filing objections to this Motion, and the Final Order, by email, facsimile or first class mail upon the following parties, or in lieu thereof, to their counsel: (i) the United States Trustee; (ii) the Prepetition Lenders and their counsel; (iii) the Creditors' Committee; (iv) those persons filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in these cases; and (v) all other parties ordered by the Court.  The Debtors request that the Court deem such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

### NO PRIOR REQUEST

57.     No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the proposed Interim Order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

DATED this 10th day of November, 2008.

_/s/ __James A. Patten_____
James A. Patten
Patten, Peterman, Bekkedahl & Green, PLLC
2817 2nd Avenue North Suite 300
Billings, MT 59101
Attorneys for Debtors

26