John H. Grant
JACKSON, MURDO & GRANT, P.C.
203 N. Ewing
Helena, MT 59601
Telephone: 406.442.1300
Facsimile: 406.443.7033
E-mail: jgrant@jmgm.com

Jonathan B. Alter
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT 06103
Telephone: 860.240.2700
Facsimile: 860.240.2800
Email: jonathan.alter@bingham.com

Attorneys for Ad Hoc Committee of
Yellowstone Club Members

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| IN RE: | ) | Case No. 08-61570 |
| YELLOWSTONE MOUNTAIN CLUB, LLC, | ) | |
| Debtor. | ) | |
| IN RE: | ) | Case No. 08-61571 |
| YELLOWSTONE DEVELOPMENT, LLC, | ) | |
| Debtor. | ) | |
| IN RE: | ) | Case No. 08-61572 |
| BIG SKY RIDGE, LLC, | ) | |
| Debtor. | ) | |
| IN RE: | ) | Case No. 08-61573 |
| YELLOWSTONE CLUB CONSTRUCTION COMPANY, LLC, | ) | |
| Debtor. | ) | |

A/72747016.3

## LIMITED OBJECTION OF THE AD HOC COMMITTEE OF YELLOWSTONE CLUB MEMBERS TO DEBTORS' MOTION TO APPROVE DEBTOR IN POSSESSION FINANCING

The Ad Hoc Committee of Yellowstone Club Members owning in aggregate more than 150 individual properties and club memberships at the Yellowstone Club (the "Ad Hoc Committee") objects to the above-captioned debtors' (collectively, the "Debtors" or "Yellowstone Club") Motion Pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364 and Bankruptcy Rules 2002, 4001, and 9014 for Interim and Final Orders (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Authorizing Debtors to Utilize Cash Collateral, (III) Granting Adequate Protection to Pre-petition Secured Lenders and (IV) Scheduling Interim and Final Hearings (the "DIP Motion") to the extent set forth herein.

In consideration for no more than a mere 3 weeks of financing from a subset of the Pre-Petition Lenders (the "DIP Lenders") (a quarter of which is set aside for fees, costs and interest), the DIP Lenders demand releases, surcharge waivers, indemnifications, adequate protection, and good faith findings in addition to interest at 15% per annum plus loan fees and costs that, together, would correlate to an interest rate of 93% per annum. The proffered financing does not provide the Debtors, their employees or their creditors with any degree of assurance that there will be normal operations, or that the estates are on a path to resolve the financial challenges facing the Debtors, only that we will all be back before this Court in a very short period of time at the mercy of the allegedly secured lenders who appear to want to run this case solely for their own short term benefit.

## BACKGROUND

1. The Debtors' operations can be described as real estate sales and member services. Historically, the Yellowstone Club has provided its members (each, a

A/72747016.3

"Member") with a unique experience in a private ski and golf environment. Each Member separately purchased individual real estate lots and homes, and separately joined the Yellowstone Club as a Member pursuant to the promise and vision that the advertised services would be provided. In reliance on that promise, each Member purchased and paid for a refundable membership deposit of $250,000 ("Member Deposits") to join the Yellowstone Club, and each Member pays annual membership dues totaling $18,000 per year. Together, the Member Deposits have provided the Debtors with approximately $88 million in capital, and membership dues provide the Debtors over $5 million per year. In joining the Yellowstone Club, Members were told that the refundable member deposits would be placed into a separate account and that the interest income from that account would be used as the primary source of additional working capital to supplement the annual membership dues.

2. Upon information and belief, in 2005, the Debtors borrowed $375 million (the "Pre-Petition Loan") pursuant to a certain Credit Agreement dated September 30, 2005 with Credit Suisse, as Administrative Agent and Collateral Agent (the "Pre-Petition Agent"), and Lenders (the "Pre-Petition Lenders").

3. Together, the membership deposits and the Pre-Petition Loan have provided the Debtors with over $460 million in financing. Today, that money seems to be gone and the Members want to know why.

**PROPOSED DIP LOAN**

4. The DIP Motion proposes that the DIP Lenders (who previously participated in the pre-petition funding of the Debtors) would become debtor-in-possession lenders, providing up to $4.45 million in DIP funding (the "DIP Loan") for a period of no more than 3 weeks. The budget reflects that at least $1.1 million, or at *least 25%* of the DIP

A/72747016.3

Loan's proceeds, would immediately fund fees, costs, interest and charges, including the fees and expenses of the DIP Lenders' legal counsel and an appointed chief restructuring officer, for a loan that covers 21 days at most.

5. The Ad Hoc Committee files this limited objection (this "Objection") because the proposed DIP Loan provides much to the DIP Lenders but provides very little, if anything, to the Debtors in addressing their myriad problems. It only succeeds in delaying the day of reckoning and unnecessarily burdening the Debtors' estates with exorbitant fees and costs and onerous terms.

6. The Debtors allege that they were unable to get better terms from any other potential DIP lender. However, upon information and belief, the Debtors did, in fact, receive at least one additional proposal with a higher loan amount and a longer term, but sought to avoid a contest with the Pre-Petition Agent on whether the financing could prime the interests of the Pre-Petition Lenders. Ironically, the very DIP Loan proffered for approval requires priming of the interests of the non-participating Pre-Petition Lenders. While the Debtors assert that such lenders consent to the priming of their interests, that has yet to be established. So, we are left with the inevitable conclusion that although the Pre-Petition Agent does not want to be primed by a third party on terms that are more advantageous for the estate, it is more than willing to prime members of its own Pre-Petition Loan to put a three week stranglehold on the estate.

7. The Ad Hoc Committee does not object to financing for the Debtors. The Ad Hoc Committee wants to see employees paid, services provided, and jobs saved for the local community. If, indeed, this is the only financing available, there may be little alternative. However, the terms of the DIP Loan are troubling and place the Debtors and their estates in an untenable position.

A/72747016.3

## DISCUSSION

A.   **The Debtors' Core Business**

8.   The Debtors develop and sell real estate within the setting of a private ski and golf resort. The vast majority of the planned memberships in the Yellowstone Club are memberships that are tied to the purchase of real estate. As a result, the Debtors' main source of revenue are the proceeds from the sale of real estate and revenues from operations, including refundable Member Deposits, annual dues and purchases of goods and services while at the Yellowstone Club.

B.   **The Members**

9.   As noted above, the Members have paid in aggregate approximately $88 million into the Yellowstone Club in the form of refundable Member Deposits (in addition to their separate purchases of homes and building lots). Interest on these funds were supposed to be used to subsidize the annual operating expenses in conjunction with annual Member dues. The Members were extremely disappointed and concerned to learn that the $88 million from Member Deposits have disappeared so quickly from the Yellowstone Club. In addition, it also appears that a large portion of the $375 million Pre-Petition Loan was diverted for non-Yellowstone Club purposes. Had the funds been properly used, it is likely that the Debtors would not find themselves in the position they do today.

C.   **The Proposed DIP Loan**

10.   The Ad Hoc Committee objects to the following terms of the proposed DIP Loan:

    *a.*   *Term and Amount.* The term and amount of the DIP Loan provides minimal operations for not more than 3 weeks, which results in nothing more than a bridge loan to allow the DIP Lenders the time and fees to pay their own lawyers to figure out

whether they want to fund the Debtors for a longer period. The term and amount is not sufficient to provide the Debtors, the Members or employees any confidence that the Debtor will continue operating through the ski season.

        b.    *Interest*. Interest would accrue at the rate of 15%.

        c.    *Fees*. A $150,000 arrangement fee and a $50,000 agency fee would be payable. These fees amount to 4.5% of the DIP Loan amount for a 3 week financing. On an annualized basis, these fees alone correlate to a 78% interest rate. In addition to these fees, the DIP Loan provides for the payment of legal fees in the amount of $742,000 and fees for a planned chief restructuring officer in the amount of $150,000, even though the Debtors recently hired a top-tier resort management company. Together, all fees and costs push the correlated annualized interest rate to 425%. This is indefensible.

        d.    *Section 506(c) waiver*. The DIP arrangement would include a waiver of the Debtors' rights under section 506(c). That is inappropriate. The Pre-petition Lenders funded the Debtors with $375 million 3 years ago and the Members have deposited with the Debtors more than $88 million in Member Deposits and annual dues. Where did all that money go? The DIP Lenders are allegedly secured lenders acting to protect their position in collateral. Many expenses to be incurred may well be construed later as having served that interest. Further, if and when Member dues are paid into the estate upon adequate assurance that the funds will be used to help maintain and run the property, that money may enhance the value of the Pre-Petition Lenders' and DIP Lenders' collateral and give the Debtor rights under Section 506(c). Accordingly, the Debtors should not waive rights here.

        e.    *Priming Liens*. The Ad Hoc Committee does not object to priming liens *per se*, but to the fact that the DIP Lenders have asserted a willingness to fight a third party priming lien coming in over them on a DIP proposal with far better terms for the

estates as a whole, while at the same time priming the Pre-Petition Lenders that are not participating in the DIP Loan.

    *f.*  *Agreement to Negotiate.* The DIP Lenders' contention that the Debtors must fund over $1 million of their fees before the DIP Lenders will negotiate or decide whether they will actually fund the Debtors as a going concern is absurd. Extensive negotiations occurred prior to the filing of these cases and at least one other lender was already prepared to fund a longer term DIP facility, without burdening the estates with due diligence fees that do not benefit the estate. There is no reason to allow the DIP Lenders time on the Debtors' dollar, especially when the stated position of the DIP Lenders was to force the Members to finance the Debtors with what amounts to unsecured financing through increasing the Members' dues rather than funding the Debtors themselves with a priming lien.

  **D.**  **The Competing DIP Proposal**

  11.  Upon information and belief, the Debtors had negotiated with CIP Yellowstone Lending LLC on the terms of an $18 million, 13-week alternative DIP proposal (the "Alternative DIP Proposal") that would have bridged the Debtor to a sale or plan confirmation process. Negotiations were discontinued when the Debtors learned that the Pre-Petition Agent would contest any attempt by the Debtor to grant priming liens to a third-party lender. Although some of the terms of the Alternative DIP Proposal would have raised some concerns of the Ad Hoc Committee, the Alternative DIP Proposal had the benefit of at least allowing the Debtors out of the starting block (i) to begin the ski season with three months of financing and (ii) to begin negotiations on the Debtors' restructuring plan and exit strategy. The DIP Loan's terms hamstring the Debtors into a *possible* ski season and occupy the Debtors' limited resources in negotiating yet another DIP facility in two to three weeks' time.

### E. Debtors' Financing Needs

12. The value of the Debtors lies in their successful operations. Successful operations fulfill the promises made to Members, keep many hundreds of individuals employed and contribute to continued lot sales which is the main source of revenue for the Debtors. The proposed DIP Loan ensures none of these objectives.

### Grounds for Objection

13. In deciding whether, and on what terms to borrow money, a debtor's board of directors has "an obligation to the community of interest that sustained the corporation, to exercise judgment in an informed, good-faith effort to maximize the corporation's long-term wealth creating capacity." *See In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58 (Bankr. N.D.N.Y. 2005), *citing to In re Global Service Group, LLC*, 316 B.R. 451, 460 (Bankr. S.D.N.Y. 2004). A loan must not be approved by the Court unless, among other things, it is shown to be in the best interests of the estate and the creditors, and shown to be necessary, essential and appropriate for the continued operation of the Debtor's businesses. *See In re Farmland Industries, Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003); *Mid-State Raceway*, 323 B.R. at 60 (following *Farmland* factors). Entry into the proposed DIP Loan upon the existing terms would not constitute an appropriate exercise of the Debtors' business judgment, and therefore cannot be approved.

14. There is almost no funding provided in the DIP Loan for the ongoing business. Instead, the DIP Lenders merely ensure the payment of their professionals' fees while extracting exorbitant fees for themselves. The Court should not permit terms of a lending arrangement where they benefit a party-in-interest, but not the estate. *See In re Ames Department Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

A/72747016.3

15. Indeed, in light of the apparent uses of the funds, it is highly unlikely that the Debtors could show at a hearing that they could not obtain funds without these onerous provisions. Upon information and belief, the Debtors did, in fact, receive at least one additional proposal, but sought to avoid a contest with the Pre-Petition Agent on whether the alternate financing could prime the interests of the Pre-Petition Lenders. The Debtors therefore discontinued negotiations of a competing DIP proposal.

16. As to each of (i) the interest rate, (ii) the fees, (iii) the section 506(c) waiver, (iv) the priming liens, and (v) other provisions, the Debtors have not shown that they cannot obtain credit otherwise than by agreeing to these provisions. *See generally, Ames Department Stores, supra.*

17. Additionally, the short DIP proposal does not give the Members or employees any assurance of a ski season that is essential to preserving the going-concern value of the Debtors. According to information the Ad Hoc Committee has received, the DIP Lenders seek to have the Members pay their "fair share" of the Debtors' operating deficits, notwithstanding the Members' pre-payment of operating expenses to the tune of $88 million. The Members object to any strategy employed by the DIP Lenders that leaves the status of the Yellowstone Club's many valued employees in question. The Members' fair share is their commitment to pay the scheduled dues, which they are prepared to do provided a DIP Loan is also in place to ensure normal operations and payment of operating expenses for the period covered by the dues payment (until next June, when the next dues payment is due).

18. The Ad Hoc Committee reserves the right to supplement this objection as may be appropriate.

**WHEREFORE**, the Ad Hoc Committee requests:

      A.      That the Court consider the Alternative DIP Proposal;

      B.      That the Court order that the proposed terms of the DIP Loan be improved substantially to aid in the Debtors' restructuring process; and

      C.      That the Court grant to the Ad Hoc Committee such other and further relief as may be just and proper.

Dated: Hartford, CT
      November 12, 2008

                  Respectfully submitted,

                  **BINGHAM McCUTCHEN LLP**

                  /s/ Jonathan Alter
                  Jonathan Alter, Esq.
                  One State Street
                  Hartford, CT 06103
                  Tel: 860-240-2700

                  -and-

                  JACKSON, MURDO & GRANT, P.C.

                  John H. Grant
                  203 N. Ewing
                  Helena, MT 59601
                  Telephone: 406.442.1300
                  Facsimile: 406.443.7033
                  E-mail: jgrant@jmgm.com

                  *Attorneys for the Ad Hoc Committee*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 12, 2008, a copy of the foregoing Limited Objection Of The Ad Hoc Committee Of Yellowstone Club Members To Debtors' Motion To Approve Debtor In Possession Financing was served via email or fax upon the following:

James A. Patten
Patten, Peterman, Bekkedahl & Green
2817 Second Avenue North, Suite 300
Billings, MT 59101
APatten@ppbglaw.com

Office of the United States Trustee
Liberty Center Suite 204
301 Central Avenue
Great Falls, MT 59401
Fax: 406-761-8895

Charles W. Hingle
Suite 1500
401 North 31st Street
Billings, MT 59101
chingle@hollandhart.com

_____
John Grant