UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>YELLOWSTONE MOUNTAIN CLUB, LLC,<br><br>Debtor. | Case No. 08-61570-11<br><br>Jointly Administered with: |
| In re<br><br>YELLOWSTONE DEVELOPMENT, LLC,<br><br>Debtor. | Case No. 08-61571-11 |
| In re<br><br>BIG SKY RIDGE, LLC,<br><br>Debtor. | Case No. 08-61572-11 |
| In re<br><br>YELLOWSTONE CLUB CONSTRUCTION COMPANY, LLC,<br><br>Debtor. | Case No. 08-61573-11 |

## *MEMORANDUM of DECISION*

At Butte in said District this 26th day of November, 2008.

In the above-referenced Chapter 11 bankruptcies, which are being jointly administered pursuant to an Order dated November 13, 2008, a hearing was held November 12, 2008, in

1

Missoula on interim approval and November 25, 2008, in Butte on final approval of Debtor's "Motion Pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364 and Bankruptcy Rules 2002, 4001, and 9014 for Interim and Final Orders (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Authorizing Debtors to Utilize Cash Collateral, (III) Granting Adequate Protection to Pre-Petition Secured Lenders and (IV) Scheduling Interim and Final Hearings" filed November 10, 2008, and on Debtor's oral Motion made at the hearing for approval of debtor-in-possession ("DIP") financing with CrossHarbor Capital Partners (CrossHarbor"). At the hearing held November 25, 2008, appearances were as follows: James A. Patten of Billings, Montana, for the Debtors; Daniel P. McKay of Great Falls, Montana, Office of the U.S. Trustee; Charles W. Hingle of Billings, Montana, Mark S. Chehi of Wilmington, Delaware, and Evan R. Levy of New York, New York for Credit Suisse; John Grant of Helena, Montana, and Jonathan B. Alter of Hartford, Connecticut for the Ad Hoc Committee of Yellowstone Club Members; Ronald A. Bender of Missoula, Montana, for Michael Snow; Dean A. Stensland of Missoula, Montana for Prim Vintage Development, L.P.; Benjamin P. Hursh of Missoula, Montana, for CrossHarbor; Stephen R. Brown of Missoula, Montana for Garlington Lohn & Robinson PLLP; Quentin M. Rhoades of Missoula, Montana for Normandy Hill Capital, LP; Mark E. Cadwallader of Helena, Montana for the Montana Department of Labor & Industry; and Keith Jones, Teresa G. Whitney and Joel E. Silverman of Helena, Montana for the Montana Department of Revenue. Edra Blixseth ("Blixseth") testified at the November 12, 2008, hearing while Debtors' Exhibit 1 was admitted into evidence without objection. Sam Byrne of CrossHarbor and CIP Yellowstone Lending, LLC, and Ronald Greenspan ("Greenspan"), a restructuring real estate consultant with FTI Consulting, testified at the November 25, 2008, hearing and the Debtors' Exhibits 1 and 2

were admitted into evidence without objection.

This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law. This Court has jurisdiction of the matters raised in the Debtors' DIP Financing Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the DIP Financing Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

## BACKGROUND

Blixseth, through an entity known as Blixseth Group or BGI, owns the Debtors. The Debtors collectively own approximately 10,000 acres of land, on which the Debtors have developed a millionaires-only club that offers a private ski resort, championship golf course, lodge with retail and food service, and various other amenities which are generally referred to as the "Yellowstone Club". Blixseth testified that the Yellowstone Club provides families, who buy property within the "Yellowstone Club" boundaries, and who buy memberships to said Club and pay annual membership dues, with the "Montana experience", including skiing, fishing, golfing, etc. The Yellowstone Club has become a vital component of the local economy of Big Sky, Montana. For example, the Debtors employ anywhere from 400 to 600 employees, with the period between Christmas and April 15th being the Debtors' busiest season. The Debtors' monthly payroll is roughly $600,000.

Blixseth testified that the Debtors' real estate properties have an approximate value of $780 million. Indeed, per the Debtors' schedules filed on or about November 11, 2008, Yellowstone Mountain Club, LLC, has real property valued at $46,680,000 and personal property valued at $553,265,015.94; Yellowstone Development, LLC, has real property valued at $529,040,000 and personal property valued at $157,964,223.44; Big Sky Ridge, LLC, has real

3

property valued at $202,280,000.00 and personal property valued at $4,446,466.00; and Yellowstone Construction Club, LLC, has no real property, but has personal property valued at $19,028.48. The total debts of the Debtor entities are disclosed at approximately $399 million, with Credit Suisse owed $307 million of the total debt. The Debtors' personal property includes in the neighborhood of 500 actual and future unsold memberships with a value of $360 million to $380 million. As shown above, Debtors also own various items of personal property including ski lifts.

Debtors are seeking to sell certain of their assets, referred to as Yellowstone World properties located in France and Scotland, but given the current economic conditions, the Debtors have been unable to sell such assets. Blixseth testified that sale of the properties in France and Scotland would provide the Debtors with much needed operating cash. In an effort to provide the Debtors with operating cash, both Credit Suisse and CrossHarbor had proposed, as of November 12, 2008, DIP financing. At that time, Credit Suisse provided a more favorable interest rate over the rate proposed by CrossHarbor. In addition, Blixseth was reluctant to pursue the proposal offered by CrossHarbor because CrossHarbor's proposal required a priming lien over the secured interest of Credit Suisse. Credit Suisse had advised Blixseth that it would absolutely not consider or agree to a priming lien in favor of CrossHarbor. Also, the CrossHarbor DIP financing would cover only 13 weeks and required confirmation to occur by February 13, 2009. If the Debtors did not secure confirmation by February 13, 2009, the Debtors would have to agree to an immediate 11 U.S.C. § 363 sale of all their assets. CrossHarbor's proposed financing was particularly problematic for the Debtors because it would not get them through the 2008-2009 ski season.

Credit Suisse, on the other hand, was offering DIP financing for a period of 21 days, or through November 30, 2008. Such financing for a period of 21 days would allow the Debtors to ramp up for the coming ski season and would allow the Debtors time to negotiate additional financing that would take the Debtors through the 2008-2009 ski season. After comparing the two proposals, Blixseth made the decision that as of November 12, 2008, Credit Suisse offered a more favorable financing proposal to the Debtors.

Entry of an interim order approving 21 days of DIP financing to the Debtors by Credit Suisse was opposed by CrossHarbor, the Ad Hoc Committee of Yellowstone Club Members, Michael Snow, the Montana Department of Revenue and the United States Trustee. After hearing Blixseth's testimony and the comments of counsel, and after reviewing Credit Suisse's Term Sheet, the Court was troubled by several aspects of Credit Suisse's DIP financing proposal, including the leverage that Credit Suisse was demanding. However, if the Court denied approval of some type of DIP financing, it was clear that the Debtors would have to close their doors. Blixseth testified that closure of the Yellowstone Club would have a devastating impact not only on the local economy, but also on the value of the Debtors' assets and correspondingly, on the value of the collateral of the secured creditors. Thus, given the absence of any viable alternative, the Court, in an Order entered November 13, 2008, reluctantly approved the Debtors' proposed interim Order, thereby allowing the Debtors to obtain an interim 21 day superpriority postpetition term loan financing facility pursuant to a DIP Term Loan Facility in the principle amount of $4,450,000.00 from the Debtors' largest and first-position secured creditor, Credit Suisse. The Court advised the parties at the November 12, 2008, hearing that it would consider final approval of the Debtors' interim DIP financing with Credit Suisse and would also consider any proposal

for longer-term financing on November 25, 2008.

It is quite apparent that all parties worked extremely hard between November 12, 2008, and November 25, 2008, to come to some sort of agreement regarding additional financing that would allow the Debtors to continue with operations at least through the 2008-2009 ski season. However, on the evening of November 24, 2008, Credit Suisse advised the Debtors that it was not able to secure its members' approval for any continued DIP financing. The Debtors and CrossHarbor had assumed that the members of Credit Suisse would approve continued DIP financing. Thus, as of 9:00 a.m. on November 25, 2008, the date and time set for the final hearing, Debtor did not have a DIP financing arrangement in place from any source. However, after several recesses, the Court reconvened the hearing at 3:00 p.m. on November 25, 2008, and was advised that between the Court's first recess at 9:30 a.m. and 3:00 p.m., CrossHarbor and Debtors had negotiated a DIP financing arrangement whereby CrossHarbor was willing to lend the Debtors up to $19,750,000 with which to fund its operations. Up to $4,450,000.00, plus interest and approved professional fees, of the CrossHarbor DIP Financing is earmarked to repay the existing approved interim Credit Suisse DIP Financing.

Sam Byrne, a principal and co-founder of CrossHarbor, testified that a requirement of CrossHarbor, through CIP Yellowstone Lending, LLC, providing DIP financing is that it be granted a priming loan on all collateral that exists under the interim DIP financing loan between the Debtors and Credit Suisse. CrossHarbor's proposed interest rate is 15%. The DIP Financing Term Sheet entered into evidence as Exhibit 1, and attached hereto, also contains several restructuring benchmarks. For example, Debtors must collect the first-half membership dues from at least 80% of the Yellowstone Club members by December 26, 2008, and must collect the

6

second-half dues from at least 80% of the Yellowstone Club members no later that February 28, 2009. Based on testimony from Greenspan, the members of the Yellowstone Club are agreeable to this accelerated dues schedule if the Court approves CrossHarbor's proposed DIP financing. Under the restructuring benchmarks, the Debtors must also file a proposed Chapter 11 plan on or before February 13, 2009, and must have a confirmed Chapter 11 plan not later than March 31, 2009, or the Debtors shall immediately commence sale of substantially all of the Debtors' assets pursuant to 11 U.S.C. § 363.

During negotiations of the CrossHarbor DIP financing proposal on November 25, 2008, and just prior to the 3:00 p.m. hearing, Credit Suisse reversed course and once again supposedly agreed to provide the Debtors with additional DIP financing in the amount of $8,250,000.[1] However, as part of Credit Suisse's proposal, the Debtors would be obligated to obtain additional funding of $5 million to $7 million from other outside sources by January 31, 2009. In furtherance of the Debtors obtaining additional funding, Credit Suisse agrees to release its lien on 11 lots located on the Debtors' championship golf course. However, Credit Suisse ties the Debtors' hands, so to speak, by requiring that any sale of the lots must be for a reasonable value, as opposed to a fire sale value. Debtor has sold only one or two comparable lots in the last year. Thus, if the Debtors are not able to sell the lots, Debtors will have to find a creditor that will lend the Debtors money and take the lots as security. Greenspan, the Chief Restructuring Officer hired by the Debtors, testified that given the current economic conditions, it is highly unlikely that the Debtors could secure the additional funding required by the Credit Suisse proposal. Such

---

[1] It is not clear from the record whether all members of Credit Suisse agreed to the continued DIP financing proposal.

condition imposed by Credit Suisse is unworkable and makes it unrealistic for the Debtors, or this Court, to give any meaningful consideration to Credit Suisse's proposal, which sets the Debtors up for imminent failure. Moreover, the members of the Yellowstone Club have indicated that they will not agree to pay their dues on an accelerated basis and indeed, Greenspan testified that the Yellowstone Club members may not pay their dues at all under the Credit Suisse proposal because of the uncertainty and risk created by the $5 million to $7 million hole in Credit Suisse's proposed DIP financing. Finally, while the CrossHarbor DIP financing provides for points up front, the Credit Suisse financing provides for interest of 20%, which is 5% higher than the interest rate proposed by CrossHarbor.

## DISCUSSION

The Debtors are authorized to operate their business under 11 U.S.C. § 1108 and, as such, are able to request Court approval of postpetition credit under § 364, which reads in relevant part:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt-
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.
>
> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--

>> (A) the trustee is unable to obtain such credit otherwise; and
>>
>> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

As set forth above, in order to obtain Court approval of the Debtors' emergency oral motion for approval of use of cash collateral, which requests postpetition financing on a superpriority, secured, and priming basis under § 364(d), the Debtors must establish: (1) that they are unable to obtain credit otherwise; (2) that the transaction is within the Debtors' business judgment; and (3) that the interests of primed lienholders are adequately protected.

It is clear to this Court that the DIP financing proposed by Credit Suisse at the November 25, 2008, hearing is not a viable option and appears to have been proposed at the last minute in an effort to frustrate the Debtors' efforts to secure DIP financing from CrossHarbor. As such, the Court concludes that the Debtors have been unable, despite tremendous effort, to obtain any feasible operating credit, other than that proposed by CrossHarbor, that would prevent the Debtors from closing their doors, either now or in the near future.

All parties acknowledge that the Debtors need funds to maintain business operations. The CrossHarbor financing provides the Debtors with sufficient capital to operate their business through the 2008-2009 ski season; it allows the Debtors time to propose a plan of reorganization; and, unlike the last minute financing proposed by Credit Suisse, it does not unduly impose a stranglehold on the Debtors. The weight of the evidence demonstrates that the Debtors have exercised sound business judgment in seeking Court approval of the CrossHarbor DIP financing.

9

With respect to factor 3, Credit Suisse opposes the DIP financing proposed by CrossHarbor because Credit Suisse asserts that its position is not adequately protected. Section § 364(d)(1)(B) requires the Debtors to show that the interests of the primed lien holders are adequately protected. The Debtors have the burden of proof on the issue of adequate protection. The Tenth Circuit Court of Appeals explains that: "The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy. In determining these values, the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis." *Dallas Bank, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987). The existence of an equity cushion is, as the Ninth Circuit Court of Appeals has stated, "the classic form of protection for a secured debt ... ." *Pistol v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 (9th Cir. 1984). *See also In re Interstate Distrib. Co., Inc.*, 13 Mont. B.R. 86, 89-90 (Bankr. D.Mont. 1992) (Recognizing that an equity cushion is the classic form of protection for a secured debt, and its existence, standing alone, can provide adequate protection under the Bankruptcy Code.) The *Mellor* Court defined the term "equity cushion" as "the value in the property, above the amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the property during time the automatic stay remains in effect." *Id.* at 1400 n.2.

This Court discussed quite extensively the concept of adequate protection in *In re WRB West Associates Joint Venture*, 106 B.R. 215, 219-20 (Bankr. Mont. 1989):

> In a classic sense, adequate protection payments should be applied to compensate a secured creditor for any diminution in the value of collateral as a result of use, depreciation, destruction or other caused

> reduction in value. 11 U.S.C. § 361; 11 U.S.C. § 363(e); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., (In re Timbers of Inwood Forest Assocs., Ltd.)*, 793 F.2d 1380, 1412 n. 57 (5th Cir.1986) (collecting supporting cases), *aff'd, United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, [484] U.S. [365], 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *General Elec. Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.)*, 25 B.R. 987, 994 (Bkrtcy.D.Utah 1982) ('adequate protection was protection ... against depreciation of the collateral when it erodes the allowed secured claim.')."

[*Matter of Kain*,86 B.R. 506, 511, 513 (Bankr. W.D. Mich. 1988)]

On the issue of adequate protection required by § 363(d) and (e), *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir.1987) holds:

> "In recognition of the powers created in bankruptcy law to adjust debts and creditors' interest, Congress realized the need to protect creditors from unfair treatment. Hence, it codified the concept of adequate protection into the several aggressive remedies available to debtors and bankruptcy trustees. *See 2 Collier on Bankruptcy* ¶ 361.01[1] (15th ed. 1979). The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy. House Rep. No. 95-595, 95 Cong., 2d Sess. 53, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6295. In determining these values, the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis. *In re Martin*, 761 F.2d 472 (8th Cir.1985); *In re Monroe Park*, 17 B.R. 934 (D.C.Del.1982). Since 'value' is the linchpin of adequate protection, and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact. *In re Martin*, 761 F.2d at 472; *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017 (11th Cir.1984); *In re Bank Hapoalim B.M., Chicago Branch v. E.L.I.*, Ltd., 42 B.R. 376 (D.C.N.D.Ill.1984); *Brookfield Production Credit Association v. Borron*, 36 B.R. 445 (D.C.E.D.Mo.1983), *aff'd*, 738 F.2d 951 (8th Cir.1984)."

Greenspan testified extensively that the best way to maximize the value of Debtors' assets is to maintain the Debtors' going-concern value. Greenspan testified that if the Debtors' properties were "moth balled," the Debtors' properties would become nothing more than acreage in the woods. Greenspan noted that under CrossHarbor's proposal, the Yellowstone Club

11

members will bear $4 million of the operating costs. In addition, the difference in cost between allowing the Debtors to maximize their value under CrossHarbor's proposal, and shutting their doors under Credit Suisse's proposal, is $3.3 million through the end of January 2009. Maximization and preservation of the Debtors' going-concern value at a net cost of $3.3 million must be juxtaposed with the diminution in value of the Debtors' assets if the Debtors closed their doors and ceased operations. According to Greenspan, having the Yellowstone Club "go dark" would be financially adverse to all stakeholders, including Credit Suisse.

Greenspan went on to explain that while CrossHarbor's and Credit Suisse's DIP financing proposals may appear economically similar on their face, the proposals are not economically similar in two important respects. First, Greenspan contends that Credit Suisse's proposal does not provide any protections to any of the stakeholders. Because of the absence of any type of meaningful protections, the Yellowstone Club members are not willing to support such a proposal and without the Yellowstone Club members' support, Greenspan is not willing to go forward with hiring additional people for the Holiday season and is not willing to bring in product, only to shut the Debtors' doors in three weeks. Second, even if Greenspan could get the Yellowstone Club members on board with Credit Suisse's proposal, which Greenspan contends is highly unlikely, Greenspan would still be faced with securing additional financing of $5 million to $7 million in a tough economic market. Greenspan concluded that simply put, Credit Suisse's proposal does not afford any of the parties the same economic benefits or protections as CrossHarbor's proposal.

On a particular matter, Greenspan testified that CrossHarbor's proposed DIP financing includes funding up to $800,000 for the Debtor to pursue an easement that is currently in escrow.

Loss of that easement could result in the Debtors' inability to plat a substantial portion of their real property. The Debtors' loss of the easement would adversely affect all parties involved.

On cross-examination, counsel for Credit Suisse asked Greenspan if CrossHarbor's proposed financing provided Credit Suisse with any type of adequate protection. Greenspan noted that the concept of adequate protection was a legal conclusion that Greenspan was not qualified to give. However, Greenspan did note that while Credit Suisse would be repaid $4,450,000, plus interest and approved professional fees, under CrossHarbor's proposed financing, Greenspan did not see where Credit Suisse would receive any additional liens. Greenspan also reiterated, however, that while he believes that a consensual deal is the best for everyone, he cannot maximize the value of Debtors' assets under Credit Suisse's proposal. The value of CrossHarbor's proposal, on the other hand, would be above and beyond the amount of CrossHarbor's priming lien because CrossHarbor's proposal provides for better value enhancement, less risk and better protection of Credit Suisse's liens.

Greenspan testified at one point that a § 363 sale of the Debtors' operating enterprise with support of the Yellowstone Club members would fetch substantially more in sales proceeds than would be obtained from a 60-day "moth ball" sale of the Debtors' assets as previously proposed by Credit Suisse. In response to such statement, counsel for Credit Suisse asked Greenspan whether Credit Suisse was oversecured or undersecured. Greenspan replied that he did not feel comfortable with specific values and noted that he just came on board in this case two weeks ago, but if he had to choose between oversecured or undersecured, he would "probably" think that Credit Suisse was undersecured. Greenspan concluded by once again noting that Credit Suisse would walk away from this case with a lot more money if the Court approved

CrossHarbor's proposed financing. While Greenspan indicated that Credit Suisse is "probably" undersecured, such opinion was given reluctantly and without the benefit of any appraisals, or consideration of previous testimony by Blixseth.

Blixseth testified at the November 12, 2008, hearing that the Debtors' assets have a value of $780 million. Credit Suisse did not challenge Blixseth's testimony, despite ample opportunity to do so, and even if the true value of the Debtors' assets is only half of what is in the Debtors' schedules, Credit Suisse is still oversecured. Blixseth's uncontradicted testimony combined with Greenspan's testimony regarding the net economic benefit to all parties stemming from CrossHarbor's DIP financing proposal convinces this Court that not only is Credit Suisse adequately protected at this time, but also, CrossHarbor's DIP financing proposal will provide prepetition secured creditors, such as Credit Suisse, with at least the same level of protection they would have absent CrossHarbor's superpriority financing that primes Credit Suisse's position.

As noted by Greenspan, the difference between a consensual § 363 sale in April or sometime thereafter, as opposed to Credit Suisse's 60-day proposal for sale of the Debtors' assets, is not just temporal because the parties would literally be selling different assets. Credit Suisse's proposed 60-day sale would create enormous ill-will with the members of the Yellowstone Club, and while the Yellowstone Club's reputation has been somewhat tarnished by this bankruptcy and the events leading up to this bankruptcy, the magnitude of the stigma would go up exponentially if the Yellowstone Club turned out the lights. Finally, in discussing the first priority method of sale between CrossHarbor's DIP financing proposal and Credit Suisse's DIP financing proposal, it was Greenspan's opinion that "a 363 sale of the operating enterprise with the member goodwill is, again, going to fetch you substantially greater proceeds than going to the 363 sale of a shut

14

down project with 240 really powerful [upset] people."

In closing arguments, attorney Mark Chehi, on behalf of Credit Suisse, argued that the Debtors have not proven that adequate protection exists to protect the value of Credit Suisse's collateral and argued that the relationship between CrossHarbor and Blixseth somehow taints CrossHarbor's offer to provide DIP financing. As previously discussed above, the Court finds that Credit Suisse is adequately protected for the reasons stated.

As to the argument that some improper close nexus exists between CrossHarbor and Blixseth that proves that CrossHarbor's DIP financing is not provided in good faith, the Court finds no evidence in the record to support Credit Suisse's contention. The evidence shows that CrossHarbor has loaned Blixseth $35 million to pay a settlement required through Blixseth's divorce from her ex-husband that is secured by property in California and by the family compound at the Yellowstone Club. The record is devoid of any evidence that CrossHarbor is providing the Debtors with DIP financing for any purpose other than to preserve and maximize the value of the Debtors' assets at the Yellowstone Club and to preserve Mr. Byrne's membership and property located at Yellowstone Club, which in turn benefits all creditors and Yellowstone Club members. Similarly, there is no evidence before the Court suggesting any improper or ulterior motive for CrossHarbor to provide the DIP financing. The only evidence that exists involves Mr. Byrne's statement that he wants to see the Debtors succeed at reorganization and not go dark or be "moth balled," which he stated would diminish the value of everyone's assets and collateral.

After consideration of Greenspan's and Mr. Byrne's testimony, the Court finds that failure to approve the Debtors' interim request for DIP financing with CrossHarbor would cause

immediate and irreparable harm to the bankruptcy estates. Accordingly, consistent with this Memorandum of Decision, the Court will enter a final order providing as follows:

IT IS ORDERED that final approval of the Debtors' Motion Pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364 and Bankruptcy Rules 2002, 4001, and 9014 for Interim and Final Orders (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Authorizing Debtors to Utilize Cash Collateral, (III) Granting Adequate Protection to Pre-Petition Secured Lenders and (IV) Scheduling Interim and Final Hearings" filed November 10, 2008, is DENIED;

Also in accordance with this Memorandum of Decision, and to avoid immediate and irreparable harm to the Debtors pending a final hearing, as allowed under F.R.B.P. 4001(c), the Court will enter an interim order providing as follows:

IT IS ORDERED that the Debtors' oral motion for an interim and final order (1) authorizing the Debtors (a) to obtain postpetition financing pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (b) to utilize cash collateral pursuant to 11 U.S.C. § 363; (2) granting liens, security interests and superpriority claims; (3) granting adequate protection to prepetition secured parties pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and (4) scheduling a final hearing pursuant to bankruptcy rules 2002, 4001 and 9014, lodged November 25, 2008, is GRANTED in accordance with the DIP Financing Term Sheet, attached hereto as Exhibit 1, and the proposed Budget, attached hereto as Exhibit 2.

IT IS FURTHER ORDERED that Debtor shall file on or before **Tuesday, December 2, 2008**, a written motion, consistent with Debtor's oral motion lodged November 25, 2008, and all other pleadings and notices required by F.R.B.P. 4001(c).

IT IS FURTHER ORDERED that the Final Hearing on the Debtors' November 25, 2008,

16

Motion shall be held **Thursday, December 11, 2008, at 2:00 p.m.** in the BANKRUPTCY COURTROOM, RUSSELL SMITH COURTHOUSE, 201 EAST BROADWAY, MISSOULA, MONTANA. The Debtors shall promptly mail copies of this Order to all parties in interest, with a certificate of service filed with the Court showing that service of this Memorandum and related final and interim orders has been completed. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served upon (a) counsel to the Debtors, Patten, Peterman, Bekkedahl & Green, P.L.L.C., the Fratt Building, 2817 Second Ave. North (Suite 300), Billings, Montana 59101 (Attn: James A. Patten); (b) counsel to any statutory committee appointed in the Chapter 11 cases; (c) counsel for CrossHarbor; and (d) the office of the United States Trustee for the District of Montana, and shall be filed with the Clerk of the United States Bankruptcy Court for the District of Montana, in each case to allow actual receipt by the foregoing no later than **December 9, 2008 at 4:00 p.m.**, Mountain Standard time.

BY THE COURT

*/s/ Ralph B. Kirscher*
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana