James A. Patten (1191)
**PATTEN, PETERMAN, BEKKEDAHL & GREEN, PLLC**
2817 2nd Avenue North, Suite 300
Billings, MT 59101
Phone: (406) 252-8500
Fax: (406) 294-9500
E-Mail: japatten@ppbglaw.com

Attorney for Debtors

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| IN RE: ) | Case No. 08-61570-11-RBK |
| ) | |
| YELLOWSTONE MOUNTAIN ) | |
| CLUB, LLC, et al. ) | JOINTLY ADMINISTERED |
| ) | |
| Debtors. ) | |

**MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, AND 364 AND BANKRUPTCY RULES 2002, 4001, AND 9014 FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING (II) AUTHORIZING DEBTORS TO UTILIZE CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION AND (IV) SCHEDULING FINAL HEARINGS**

COMES NOW the YELLOWSTONE MOUNTAIN CLUB, LLC, YELLOWSTONE DEVELOPMENT, LLC, BIG SKY RIDGE, LLC and YELLOWSTONE CLUB CONSTRUCTION CO., LLC., Debtors and Debtors in Possession (collectively "Debtors") by and through their attorney James A. Patten, who hereby move for entry of an interim order and a final order (the "Final Order"), under §§105, 361, 363 and 364 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rues of Bankruptcy Procedure (the "Bankruptcy Rules"), and

1

the Local Rules for the United States Bankruptcy Court for the District of Montana (the "Local Rules"): (i) authorizing the Debtors to obtain postpetition financing with a priming lien and other liens as more particularly described below and superpriority administrative expense treatment; (ii) authorizing the Debtors to utilize cash collateral; (iii) scheduling a final hearing on this Motion (the "Motion").

In support of the motion, the Debtors respectfully represent:

## I. BACKGROUND

1. On November 10, 2008 (the "Petition Date"), Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Yellowstone Club Construction Company LLC, and Big Sky Ridge, LLC (the "Company" or the "Debtors") each commenced a case by filing a petition for relief under Chapter 11 of the Title 11 of the United States Code, 11 U.S.C. §§101 et seq., as amended (the "Bankruptcy Code"). The Debtors continue to operate their business and manage their properties as debtors and debtors-in-possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code. This Court has ordered these Chapter 11 cases (the "Chapter 11 Cases") be jointly administered.

2. No creditors' committee has been appointed in these Chapter 11 cases by the United States Trustee. No trustee or examiner has been appointed in any of the Debtors' Chapter 11 cases.

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. Venue is proper pursuant to 28 U.S.C. §§1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

4. On September 30, 2005, the Debtors entered into that certain Credit Agreement dated September 20, 2005 (the "Prepetition Loan") with Credit Suisse, as Administrative Agent and Collateral Agent (the "Prepetition Agent") and Lenders (including any successors, the "Prepetition

5. As of the Petition Date, the Debtors were indebted and liable to the Prepetition Lenders, in the aggregate principal amount of approximately $307,000,000.00 in respect of loans made by the Prepetition Lenders pursuant to, and in accordance with the terms of, the Prepetition Credit Agreement and related documents (the "Prepetition Credit Documents"), plus accrued and unpaid interest thereon and fees, expenses and other obligations incurred in connection therewith as provided in the Prepetition Credit Documents (the "Prepetition Secured Obligations") and the liens and security interests granted to the Prepetition Agent and the Prepetition Lenders pursuant to and in connection with the Prepetition Credit Documents (including, without limitation, all security agreements, pledge agreements, mortgages, leasehold mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Prepetition Lenders) are first liens on and security interests in what was then substantially all of the Debtors' property ("Prepetition Collateral").

6. In order to secure the Prepetition Secured Obligations, the Borrowers granted the Prepetition Lender a security interest and mortgage interest in, and lien on, the Prepetition Collateral.

7. The Debtors owe, as of October 31, 2008 approximately $323,000,000 to the Prepetition Lenders and approximately: (a) $857,512 for other secured obligations which is secured by the value of the underlying property to which such loan or lease relates; (b) $11,838,000 to other lenders secured by real estate; (c) $6,310,000 for ordinary course trade debt; and (d) $1,245,000 for contractual unsecured obligations, including, without limitation, payments owed under a settlement agreement, liability under an unsecured note and sales and brokerage commissions owed. These estimates do not include claims which the Debtors believe are contingent, unmatured and/or disputed.

8. As set forth above, the Prepetition Obligations are secured by the Prepetition Liens on the Prepetition Collateral which includes the Debtors' "cash collateral" as such term is defined in §363 of the Bankruptcy Code (the "Cash Collateral"). The Debtors do not have any unencumbered cash with which to operate their business during these Chapter 11 cases.

9. At this time, the Debtors have an immediate need to use Cash Collateral, without which they would be unable to operate their business at this critical time in their business cycle. Moreover, although the use of Cash Collateral is necessary to this process, Cash Collateral alone is insufficient to afford the Debtors the ability to manage their businesses, and generate revenues, during these Chapter 11 cases. Therefore, the Debtors also have an immediate need for additional liquidity that can only be obtained from CIP Yellowstone Lending LLC ("Lender") through a secured debtor in possession financing facility ("DIP Facility"). The Debtors' use of Cash Collateral and the funds provided under the DIP Facility shall be limited to expenditures described in the terms and conditions of the DIP Loan Term Sheet attached hereto as Exhibit 1 ("DIP Loan Term Sheet") through and including the date of the Final Hearing (the "Interim Financing Period"), in such amounts as may be made available to the Debtors by Lender in accordance with the budget and the terms and conditions set forth in the DIP Loan Term Sheet.

## II. RELIEF REQUESTED

10. The Debtors intend to finance the operations of their business during the initial 24 weeks of these Chapter 11 cases through the continued use of cash collateral and by entering into the DIP Facility with the Lender pursuant to the DIP Loan Term Sheet. The Debtors intend to use the proceeds of the DIP Facility: (i) to fund the costs and expenses of the Debtors in respect of the Project, (ii) to fund their general corporate needs, including working capital needs; and (iii) to pay

4

fees and expenses related to the financing and these Chapter 11 cases, in accordance with the terms set forth in the DIP Term Sheet and in accordance with the DIP budget.

11. The Debtors have negotiated the specific terms of the proposed DIP Facility and use of cash collateral with the Lender. Accordingly, by this Motion, the Debtors request entry of a final order authorizing the Debtors to enter into the DIP Facility on the terms set forth on the DIP Loan Term Sheet.

12. The Debtors request approval of the DIP Facility, authorizing:

(a) for the Debtors to obtain a postpetition loan facility up to an aggregate of $19,750,000 on a senior secured basis (the "DIP Loan"), which shall be issued in minimum increments of $3 million on the terms set forth in the term sheet attached to this Court's November 26, 2008 Memorandum and Order ("Memorandum") as Exhibit 1 (the "DIP Term Sheet"), and for each existing and subsequently acquired or organized subsidiary of any Debtor (the "Subsidiary Guarantors") to guaranty the Debtors' obligations in connection with the DIP Loan, from the "DIP Lenders" (as defined in the DIP Term Sheet);

(i) having priority, pursuant to §364(c)(1) of the Bankruptcy Code, over any and all administrative expenses of the kind specified in §§503 (b) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out (as defined below);

(ii) being secured pursuant to §364(c)(2) of the Bankruptcy Code, by duly perfected first priority security interests in and liens, not subject to subordination, upon all property of the Debtors and the Subsidiary Guarantors (as defined below), whether owned on the property of the Debtors and the Subsidiary Guarantors (as defined below), whether owned on the Closing Date (as defined in the DIP Term Sheet) or thereafter acquired, including but not limited to, Cash Collateral (defined below), inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, property, plants, equipment, general intangibles, instruments, interests in leaseholds, real property, patents, copyrights, trademarks, trade names, other intellectual property and the proceeds of all the foregoing (the "Collateral"), that is not subject to any valid and duly perfected lien or security interest as of the Petition Date but (i) subject to the Carve-Out; and (ii) excluding claims and causes of action under §§502(d), 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code (collectively, the "Avoidance Actions");

(iii) being secured pursuant to §364(d)(1) of the Bankruptcy Code, by duly perfected senior priming security interests and liens, not subject to subordination, on all Collateral. Such perfected priority senior priming and security interests and liens (x) shall be subject to the Carve-Out, and (y) shall have priority over and shall prime any liens (the "Prepetition Liens")

5

allegedly securing obligations (the "Prepetition Secured Obligations") created by, relating to or arising from the Prepetition Credit Agreement, and (z) to extent sent forth below, shall be subject to "Prepetition Third Party Liens" (as defined below);

(b) for the Debtors to use the Cash Collateral (as defined in the Prepetition Credit Agreement) pursuant to §§361, 362 and 363 of the Bankruptcy Code, and all over collateral on which the Prepetition Agent and the Prepetition Lenders assert a lien or security interest (together with the Cash Collateral, the "Prepetition Collateral");

(c) to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing"), which this Court held on December 11, 2008, at which Final Hearing the Court would consider entry of this final order ("Final Order") authorizing such additional postpetition financing under the DIP Loan and approve all interim and final postpetition financing on a final basis and on such terms as shall be set forth in definitive debtor-in-possession loan documents consistent with the DIP Term Sheet (the "DIP Financing Documents") and as set forth in the Motion.

13. For purposes hereof, the "Carve Out" means (i) all fees, incurred during the period prior to an Event of Default, required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United states Trustee under §1930(a) of title 28 of the United States Code and (ii) to the extent subject to and only up to the amounts set forth in the agreed Budget, in the event of the occurrence and during the continuance of an Event of Default, the payment of allowed and unpaid post-petition professional fees and disbursement of the Debtors' counsel and other professionals retained by the Debtor, and for allowed and unpaid post-petition fees and expenses of counsel and professionals retained by an official creditors committee, if any ("Committee") (excluding any incurred and unpaid professional fees and expenses of the DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders) in an aggregate amount as set forth in, and payable solely in accordance with, the terms and conditions of the DIP Term Sheet. Nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (A) and (B) above.

14. The Debtors have exhausted their options for addressing their liquidity issues. Thus,

6

without the DIP Facility and use of cash collateral, the Debtors do not have sufficient available sources of working capital and financing to operate their business during the first 24 weeks of these Chapter 11 cases. The Debtors need approval of the DIP Facility to, among other things, satisfy its costs and expenses in connection with the Project, and other routine operating expenses such as payroll, contractor costs, or other obligations. Without the proposed source of postpetition financing, the Debtors will be forced to discontinue their operations. The DIP Facility and use of cash collateral will avoid such a result and provide a basis upon which the Debtors can continue ordinary course operations while affording them the opportunity to secure confirmation of a plan or to conclude a sale of property.

15. Moreover, access to such additional financing will provide the Debtors' contractors, homeowners, customers and vendors with the needed assurance that the Debtors will be able to continue conducting their business in the ordinary course without interruption. In the absence of the approval of the DIP Facility and use of cash collateral, the Debtors will have no choice but to immediately discontinue operations, resulting in immediate and irreparable harm to the Debtors and their estates. For these reasons, the Debtors have an immediate need for adequate postpetition financing.

16. Prior to the Petition Date, the Debtors sought postpetition financing proposals from several sources. Indeed, the Debtors, with the help of their advisors, contacted multiple parties, and received preliminary interest from two parties. Ultimately, however, the Debtors were unable to obtain post-petition financing in the form of unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, unsecured credit allowable under sections 364(a) and 364(b) of the Bankruptcy Code, or secured credit pursuant to section 364(c) of the Bankruptcy

Code on terms and conditions more favorable to the Debtors' estates than those offered by the Lender. In light of the Debtors' search, and given the current credit markets, the Debtors do not believe that any lender would be willing to loan new money to the Debtors on terms more favorable to the Debtors than the terms of the DIP Facility.

17. After reviewing the proposals submitted by the Lender and engaging in vigorous, arm's-length, and good-faith negotiations, the Debtors determined, in the exercise of their business judgment, that the financings offered by the Lender are in the best interests of the Debtors' estates. The Debtors believe that the terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

18. The Debtors believe that the value of the Debtors' property will be enhanced by a greater amount than the cost of the DIP Facility which enhancement constitutes adequate protection sufficient to protect the Prepetition Lenders from any diminution in value of their interest in the Prepetition Collateral.

### III. TERMS OF THE DIP FACILITY

19. The terms of the proposed DIP Facility and Cash Collateral uses are more specifically set forth in the DIP Loan Term Sheet.

20. The Debtors request that this Court authorize the Debtors to execute the DIP Facility to the extent and pursuant to the terms set forth herein and in the DIP Loan Term Sheet.

21. These Chapter 11 cases were precipitated by the Debtors' severe liquidity problems. Without the proposed financing and cash collateral usage, the Debtors will run out of cash and be forced to immediately cease operations, in a non-orderly manner. The value of the Prepetition

8

Lenders' interest in the Prepetition Collateral is greatly increased by the DIP Facility because it ensures the continued operation of the Debtors' facilities during the period of these Chapter 11 cases.

22. The Debtors submit that the forms of protection preserving the value of its collateral and enhancing the value of the collateral more than adequately protect the interests of the Prepetition Lenders and, therefore, the relief sought herein should be granted. Moreover, the Debtors have demonstrated herein and have demonstrated through testimony, that absent such relief, the Debtors will suffer immediate and irreparable harm.

23. In addition to the need for the postpetition financing, the Debtors have a critical need for the immediate use of the Cash Collateral. The Debtors require use of the Cash Collateral to pay present operating expenses including payroll and to pay vendors to ensure a continued supply of services and materials essential to the Debtors' continued viability. If unable to use the Cash Collateral pending the Final Hearing, the Debtors will be unable to operate their business.

24. Under §363(c)(2) of the Bankruptcy Code, the Debtors may not use Cash Collateral without the consent of the Prepetition Lenders or authority granted by the Court. Section 363(e) of the Bankruptcy Code provides that on request of an entity that has an interest in property to be used by a debtor, the Court shall prohibit or condition such use as necessary to provide adequate protection of such interest. The Debtors submit that the adequate protection, as detailed above, preserving the value of the collateral and enhancing the value of the collateral is sufficient to approve the emergency use of the Cash Collateral under §363 of the Bankruptcy Code.

WHEREFORE, the Debtors respectfully request that the Court enter the proposed Final Order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

DATED this 2nd day of December, 2008.

/s/ James A. Patten
James A. Patten
Patten, Peterman, Bekkedahl & Green, PLLC
2817 2nd Avenue North Suite 300
Billings, MT 59101
Attorneys for Debtors