CHARLES W. HINGLE (#1947)
SHANE P. COLEMAN (#3417)
HOLLAND AND HART LLP
401 NORTH 31st STREET, SUITE 1500
BILLINGS, MONTANA 59101
(406) 252-2166 (PHONE)
chingle@hollandhart.com (EMAIL)
spcoleman@hollandhart.com (EMAIL)

EVAN R. LEVY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FOUR TIMES SQUARE
NEW YORK, NEW YORK 10036
(212) 735-3000 (PHONE)
elevy@skadden.com (EMAIL)
*Admitted Pro Hac Vice*
   - and –

MARK S. CHEHI
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
ONE RODNEY SQUARE
P.O. BOX 636
WILMINGTON, DELAWARE 19899
(302) 651-3000 (PHONE)
mchehi@skadden.com (EMAIL)
*Admitted Pro Hac Vice*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re: | Chapter 11 |
| Yellowstone Mountain Club, et al., | Case No. 08-61570-11<br>Jointly Administered |
| Debtors. | |

**OBJECTION OF PREPETITION LENDERS TO DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363 AND 364 AND BANKRUPTCY RULES 2002, 4001, AND 9014 FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO ENTER INTO POST-PETITION FINANCING FACILITY WITH CPC YELLOWSTONE LENDING LLC; (II) AUTHORIZING DEBTORS TO UTILIZE CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDERS AND <u>(IV) SCHEDULING INTERIM AND FINAL HEARINGS</u>**

Credit Suisse, as administrative agent and collateral agent (the "Agent") for the prepetition lenders (the "Lenders") under that certain Credit Agreement, dated as of September 30, 2005 (the "Prepetition Credit Agreement") hereby objects (the "Objection") to entry of an order approving the Debtors' motion for interim and final orders authorizing, among other things, a postpetition financing facility (the "CH Financing") with CrossHarbor Capital Partners LLC and its affiliate CPC Yellowstone Lending LLC (individually and collectively, "CrossHarbor"), as follows:

## PRELIMINARY STATEMENT

1.   The Motion, seeking authority to grant non-consensual priming liens senior to the Lenders' prepetition liens and non-consensual use of the Lenders' cash collateral, must be denied as a matter of law under sections 364(d)(1) and 363(c)(2) of the Code, because:

   a.   The Debtors cannot prove they are unable to obtain credit other than the CH Financing, see 11 U.S.C. § 364(d)(1)(A), because Credit Suisse has offered debtor-in-possession financing terms that provide the Debtors with the liquidity they need and do not require non-consensual priming liens;

   b.   The Debtors cannot carry their burden of proof to show "adequate protection" of the Lenders' interests in property of the estate subject to their prepetition liens, see 11 U.S.C. § 364(d)(1)(B), because (i) the Debtors do not contend that the Lenders are protected by an "equity cushion," (ii) the Debtors have admitted that the CH Financing does not protect the Lenders against a decline in the value of their collateral; and (iii) the Debtors' speculation that "the value of the Debtors' property will be enhanced by a greater amount than the cost of the DIP Facility" is both wrong and legally insufficient;

   c.   The Debtors likewise cannot carry their burden of proof to show "adequate protection" in connection with the Debtors' proposed non-consensual use of the Lenders' cash collateral, see 11 U.S.C. § 363(c)(2), (e) and (p);

   d.   Final approval of the CH Financing and its terms will give CrossHarbor inappropriate and inequitable control and influence over these chapter 11 cases, including any sale or reorganization plan-based transaction;

   e.   The CH Financing is inequitable because (i) CrossHarbor is an "insider" in control of the Debtors and Edra Blixseth, see 11 U.S.C. § 101(31), (ii) CrossHarbor owns

interests in Yellowstone Club that are outside the Debtors' estates, (iii) Discovery Land Company ("DLC") is an "insider" in control of the Debtors, id., (iv) both CrossHarbor and DLC have contractual rights to restructure the Debtors' affairs and acquire ownership interests in the Debtors that are adverse to the Debtors' estates, (v) the CH Financing is expressly conditioned upon DLC's continued management and control of the Debtors, and (vi) the Debtors, CrossHarbor, DLC and Edra Blixseth have refused to disclose admitted written agreements and arrangements between and among themselves that they seek to advance with the chapter 11 cases; and

       f.    The refusal of the Debtors, CrossHarbor and DLC to disclose their agreements and arrangements - - and the record that such written agreements exist - - evidence lack of "good faith" under 11 U.S.C. §364(e) in connection with the proposed CH Financing.

2.    For the reasons stated above and as set forth more fully below, (x) the Motion should be denied or, alternatively, (y) the final hearing on the Motion should be continued and a renewed Credit Suisse motion for discovery should be granted, to permit needed exploration of facts related to CrossHarbor, DLC, Blixseth and the Debtors that are relevant to consideration of the Motion.

3.    Credit Suisse contests the Motion and CH Financing because (i) they provide absolutely no adequate protection for the Lenders against a diminution in value of their collateral, (ii) the Lenders' claims approximate $307 million plus interest, fees and expenses, while the Lenders' collateral appears to have a current appraised value of only $310 million - - meaning that Credit Suisse and the Lenders are not oversecured given the proposed CH Financing's $19.75 million priming liens, and (iii) CrossHarbor is an insider of the Debtors with significant property interests inside Yellowstone Club that are outside of the Debtors' estates - - and the CH Financing will permit CrossHarbor to control the chapter 11 cases for the benefit of CrossHarbor's, DLC's and Blixseth's insider interests.

## ARGUMENT

A.   **The Debtors Cannot Carry Their Burden Under Section 364(d)(1) of the Bankruptcy Code**

4. Bankruptcy Code section 364(d)(1) only authorizes non-consensual debtor-in-possession priming liens when (a) the debtor is "unable to obtain such credit otherwise," and (b) "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior . . . lien is proposed to be granted." 11 U.S.C. § 364(d)(1)(A)&(B).  The Debtors bear the burden of establishing that both prongs have been met.  See 11 U.S.C. § 364(d)(2); See Owens-Corning Fiberglas Corp. v. Center Wholesale, Inc., (In re Center Wholesale, Inc.), 759 F.2d 1440, 1442, 1450 (9th Cir. 1985); The Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994).

   1.   **Debtors Cannot Show They Are Unable To Obtain Credit Otherwise**

5. The Motion must be denied because the Debtors have not satisfied section 364(d)(1)(A) of the Code.  The Debtors admittedly have not asked anyone other than Credit Suisse and CrossHarbor for alternative debtor-in-possession financing terms.  Greenspan Tr. 54:16-56:10.

6. Moreover, Credit Suisse has issued a fully-funded and binding commitment to the Debtors for a postpetition financing facility that satisfies the liquidity needs of the Debtors (the "Pending CS Proposal", annexed as Exhibit A hereto).  The Pending CS Proposal is an available source of committed financing and is an alternative to the non-consensual priming posed by the CH Financing.

## 2. Debtors Have Failed To Carry Their Burden On Adequate Protection

7. The Motion must be denied because the Debtors cannot satisfy their burden of proof under section 364(d)(1)(B) of the Code – which requires them to show " adequate protection" of the Lenders' interests as holders of liens on the Debtors' properties.

8. The purpose of providing adequate protection is to insure that the creditor receives the value for which it bargained prebankruptcy. In re WRB West Associates Joint Venture, 106 B.R. 215, 219 (Bankr. D. Mont. 1989) (citing In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987)). Adequate protection is required to compensate a secured creditor for any diminution in collateral value due to the "use, depreciation, destruction or other caused reduction in value." WRB West, 106 B.R. at 219. Moreover, adequate protection is warranted due to the imposition of the automatic stay and the resulting restraint on the secured creditor's lien enforcement rights. Pistole v. Mellor (In re Mellor), 734 F.2d 1396, 1400 (9th Cir. 1984).

### (a) Debtors Admit That the CH Financing Does Not Provide The Lenders With Adequate Protection Against A Decline In The Value Of Their Collateral

9. The Debtors' Chief Restructuring Officer, Ronald E. Greenspan ("Greenspan") has admitted that the terms of the CH Financing do not provide the Lenders with adequate protection against a decline in the value of their collateral. Greenspan Tr. 81:3-7 ("there's nothing specifically in the DIP that would prevent lenders from suffering a decline in value if something happens to cause a decline in value"); id. 81:12-15 ("If there is something above and beyond whatever is anticipated that happens that causes a decline in value, there's nothing in the DIP that protects the lenders from that external event.").

10. The terms sheet accompanying the CH Financing excludes any adequate protection terms for the benefit of the Lenders, and the Debtors do not disagree. Greenspan Tr. 77:4-78:12.

### (b) Debtors Do Not Contend And Cannot Show Any Equity Cushion

11. The Motion does not even contend - - and the Debtors cannot prove - - that any "equity cushion" adequately protects the Lenders against declines in the value of their collateral that may occur during the chapter 11 cases. Greenspan has testified repeatedly that if he had to choose whether the Lenders are oversecured or undersecured, "I would certainly say undersecured." Greenspan Tr. 32:5-34:8.

12. Although Blixseth testified as a lay witness at the "first day" hearing that the "value on the . . . books of the Yellowstone Club" of its real estate assets is about $780 million (11/12 Tr. 24:2-6), Blixseth did <u>not</u> testify as to market value. She admits that no one has given her a view of market value or "an actual analysis of that at this time." Blixseth Tr. 16:22-17:5. She relied on certain Cushman & Wakefield reports calculating "Total Net Proceeds" in the amount of $780 million - - but such reports <u>expressly</u> <u>disclaim</u> that "Total Net Proceeds is not a value estimate nor should be construed as such."

13. The best available evidence of the market value of the Lenders' collateral on a going concern basis is the $310,000,000 Appraisal of Real Property as of November 10, 2008, prepared by Cushman & Wakefield of Colorado, Inc. Given that the Lenders' secured claims total $307,000,000 plus interest, fees and expenses, there is no "equity cushion" providing adequate protection to the Lenders.[1]

---

[1] The Debtors may assert that the Prepetition Lenders are oversecured due to third-party promissory notes payable to the Debtors that were pledged as collateral by certain non-debtor entities controlled by the Blixseths. See Yankauer Tr. at 36:5-37:7; 95:7-20. Upon information and belief, the Agent understands such notes may be valueless, because the obligor(s) on the notes have no value other than their equity interests in the Debtors. Any attribution of collateral value to such promissory notes would be highly speculative.

  **(c)**  **There Is No Merit To The Debtors' Contention That The Value Of The Debtors' Property Will Be Enhanced In Excess Of The Amount Of The CH Financing Priming Liens**

  14.  The Motion's contention that "the value of the Debtors' property will be enhanced by a greater amount than the cost of the [CH Financing]" does not justify finding that the Lenders are adequately protected. At bottom, the Debtors' only "adequate protection" argument is Greenspan's speculation that the Debtors will be more valuable with the CrossHarbor DIP than if the Debtors' operations are "mothballed." The relevant alternative to the CH Financing, however, is the Pending CS Proposal -- not "mothballing." Greenspan has conceded that he does not know whether the difference between the value of the Debtors under the CH Financing and the value of the Debtors under a Credit Suisse financing would be greater than the costs of the CH Financing. Greenspan Tr. 115-16. The Debtors cannot carry their burden of proving adequate protection because they concede they have no idea whether the CH Financing will protect the value of the Lenders' interests as compared to the relevant alternative.[2]

  15.  The Yellowstone Club operates at significant deficits. Its operating expenses approximate $25,000,000 for the 325 club members. Williamson Tr. at 22:21-23:19; 27:6-8. Yellowstone Club is providing elaborate annual services costing almost $77,000 per member, yet collects only $18,000 in annual membership dues per member. Id. at 27:12-13. The Debtors' business model is simply unsustainable and has driven the Debtors into bankruptcy. No business can survive providing a 77% subsidy to its customers. With such generous subsidies, the Prepetition Lenders are effectively subsidizing a lavish playground for Yellowstone Club members while the Lenders' collateral continues to erode.

---

[2]  If a debtor could avoid the absolute statutory requirement of "adequate protection" merely by asserting that debtor-in-possession financing is necessary to preserve value, the statutory requirement would be meaningless.

16. "Congress did not contemplate that a creditor could find its priority position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects." Swedeland, at 567; see also, In re Windsor Hotel, LLC, 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003) ("When the effect of the new borrowing with a senior lien is merely to pass the risk of loss to the holder of the existing lien, the request for authorization should be denied.") (citation omitted).

B. **The CH Financing Should Not Be Approved Because That Will Give CrossHarbor Undue Opportunity To Control And Influence The Chapter 11 Cases**

17. The Motion should be denied on equitable grounds because CrossHarbor is an insider working in concert with Blixseth and DLC to use these chapter 11 cases to advance self-interested restructuring transactions and agreements between the Debtors, CrossHarbor, DLC and Blixseth, including the Agreement to Form, the MOU (each as defined below) and other unknown agreements between the parties - - none of which have been produced by the Debtors.

18. <u>The Insiders of the Debtors</u>. The Debtors and their properties are controlled by their ultimate equity owner and insider, Edra Blixseth ("Blixseth"). She, in turn, is indebted to CrossHarbor in an amount of not less than $35 million. Blixseth Tr. 39:22-41:8. Blixseth's personal indebtedness to CrossHarbor - - which is secured by Blixseth's personal residence - - has been in default since October 15, 2008. Id. 41:18-44:11. CrossHarbor has given Blixseth notices of default and is asking her for a repayment plan. Id. 43:4-43:25. As such, CrossHarbor has exercised, and is in a position to exercise, substantial influence and control over Blixseth and her management of the Debtors.

19. Even before November 10, 2008 (the "Petition Date"), CrossHarbor and DLC were deeply involved in the management and affairs of the Debtors. During 2007 and 2008, CrossHarbor and its agents were part of the Yellowstone Club management "team," working

there on CrossHarbor's plan "to own the club."  Blixseth Tr. 23:10-22; 25:10-14; 26:25-27:18. Indeed, prior to the Petition Date, Blixseth appointed an operative of CrossHarbor who was "on the payroll of Cross Harbor" (not the Debtors) to serve as Chief Operating Officer of Yellowstone Club.  Blixseth Tr. 26:21-28:22; 61:14-62:17.

20. The MOU.  On or prior to September 1, 2008, DLC began to manage the Debtors pursuant to a memorandum of understanding between the Debtors and DLC (the "MOU"). Blixseth Tr. 29:8-21.  DLC has continued to manage all of the Debtors' operations and sales and marketing functions, but has been paid little if any compensation under the MOU.  Id. 20:22-21:24.  The MOU entitles DLC to receive an equity participation in the restructured Debtors. Blixseth Tr. 21:25-22:14.

21. "Agreement To Form".  Prior to the Petition Date, Blixseth, CrossHarbor and DLC formulated "an overall global plan" to restructure and recapitalize the Debtors.  Blixseth Tr. 31:25-36:14.  This plan was reduced to a written agreement (the "Agreement to Form") negotiated by Blixseth, representatives of CrossHarbor including Sam Byrne and Joe Harris, and others, and provides for joint ventures and substantial property transfers and other transactions involving the Debtors' properties, CrossHarbor and DLC.  Id. 31:25-33:10; 34:15-35:5; 45:4-45:12.  The Agreement to Form provides CrossHarbor and DLC with equity participations and preferred returns on their investments in a restructuring of the Debtors.  Id. 47:19-49:22. CrossHarbor has purchased a substantial amount of property and lots located at Yellowstone Club for development purposes, is engaged in the business of building-out lots at Yellowstone Club, and seeks to contribute some of its properties to the contemplated joint venture.  Id. 34:17-25; 56:6-57:8.

22. Despite repeated formal and informal requests for the MOU, Agreement to Form and other insider agreements between the parties, none of the Debtors, Blixseth, CrossHarbor or DLC have produced any copies of such agreements. Yankauer Tr. 22:7-20. It is unclear whether such documents have ever been provided to Debtors' counsel.

23. <u>Insider Bankruptcy Planning</u>. Prior to the Petition Date, Blixseth, CrossHarbor and Discovery repeatedly discussed using chapter 11 bankruptcy to accomplish the restructuring transactions contemplated by the MOU and Agreement to Form. Blixseth Tr. 49:23-51-18. Blixseth's understanding is that Discovery is participating in the chapter 11 process in anticipation of achieving the outcome for Discovery contemplated by the MOU and Agreement to Form, including acquisition of a "financial interest" in the Debtors. Id. 51:19-54:17.

24. At CrossHarbor's suggestion, its lawyers (from the Duane Morris LLP firm) drafted chapter 11 bankruptcy papers for the Debtors even before the Debtors retained their own independent counsel. Id. 64:20-65:24.

25. In the circumstances above, the terms and conditions of the CH Financing will enable CrossHarbor to increase its control over the Debtors and the chapter 11 cases, and will empower CrossHarbor to declare an event of default and terminate the CH Financing if certain conditions are not met, including without limitation, (i) continued DLC management of the Debtors on terms satisfactory to CrossHarbor, (ii) minimum collections of Yellowstone Club member dues, (iii) failure of the Debtors to file a plan of reorganization acceptable to CrossHarbor or commence a sale of substantially all of the Debtors' assets and (iv) giving CrossHarbor "sole and absolute discretion to fund a plan of reorganization" with proceeds of the Farcheville Property (as defined in the CH Financing Term Sheet).

## RESERVATION OF RIGHTS

26. Credit Suisse reserves its right to further evaluate the relief sought in the Motion and the terms of the proposed final order and to present any additional objections at or prior to the conclusion of the hearing.

WHEREFORE, Credit Suisse respectfully requests the entry of an order (i) denying approval of the Motion or, alternatively, continuing the Motion to permit Credit Suisse to take discovery of CrossHarbor and DLC related to the Motion, and (ii) granting such other and further relief as is just.

Dated: December 9, 2008

/s/ Shane P. Coleman
Charles W. Hingle
Shane P. Coleman
HOLLAND AND HART LLP
401 North 31st Street
Suite 1500
Billings, Montana 59101
(406) 252-2166 (Phone)
spcoleman@hollandhart.com (Email)

Of Counsel:
Evan R. Levy (NY No. 2720068)
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

  - and –
Mark S. Chehi (Del. Bar No. 2855)
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

Attorneys for Credit Suisse,
sole administrative agent and collateral agent