## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **YELLOWSTONE MOUNTAIN CLUB, LLC,** | Case No.  **08-61570-11** |
| Debtor. | Jointly Administered with: |
| In re | |
| **YELLOWSTONE DEVELOPMENT, LLC,** | Case No.  **08-61571-11** |
| Debtor. | |
| In re | |
| **BIG SKY RIDGE, LLC,** | Case No.  **08-61572-11** |
| Debtor. | |
| In re | |
| **YELLOWSTONE CLUB CONSTRUCTION COMPANY, LLC,** | Case No.  **08-61573-11** |
| Debtor. | |

## *MEMORANDUM of DECISION*

At Butte in said District this 17th day of December, 2008.

In the above-referenced Chapter 11 bankruptcies, which are being jointly administered

pursuant to an Order dated November 13, 2008, a hearing was held November 12, 2008, in

Missoula on interim approval and November 25, 2008, in Butte on final approval of Debtor's November 10, 2008, "Motion Pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364 and Bankruptcy Rules 2002, 4001, and 9014 for Interim and Final Orders (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Authorizing Debtors to Utilize Cash Collateral, (III) Granting Adequate Protection to Pre-Petition Secured Lenders and (IV) Scheduling Interim and Final Hearings." Also on November 25, 2008, the Court considered Debtor's emergency oral Motion for approval of debtor-in-possession ("DIP") financing with CrossHarbor Capital Partners (CrossHarbor").

Following the second hearing held November 25, 2008, the Court entered a Memorandum of Decision and Order on November 26, 2008, denying the Debtors' November 10, 2008, motion for DIP financing through Credit Suisse for the reason that as of 9:00 a.m. on November 25, 2008, Credit Suisse was not able to fund its previously proposed DIP financing. The Debtors, upon learning that the Credit Suisse DIP financing was no longer available, scrambled and were successful, over a six hour period, in arranging DIP financing through CrossHarbor. Thus, at the November 25, 2008, hearing, the Debtors made, and the Court granted, on an interim basis, the Debtors' oral motion for an order (1) authorizing the Debtors (a) to obtain postpetition financing pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (b) to utilize cash collateral pursuant to 11 U.S.C. § 363; (2) granting liens, security interests and superpriority claims; (3) granting adequate protection to prepetition secured parties pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and (4) scheduling a final hearing pursuant to bankruptcy rules 2002, 4001 and 9014. After due notice, a final hearing on the Debtors' oral Motion--which was memorialized in a written Motion filed on December 2,

2

2008, at docket entry no. 96--was held December 11 and 12, 2008, in Missoula.[1]

Appearances at the November 25, 2008, hearing are set forth in the Court's November 26, 2008, Memorandum of Decision.  Sam Byrne ("Byrne"), a principal and co-founder of CrossHarbor and of CIP Yellowstone Lending, LLC; and Ronald Greenspan ("Greenspan"), a restructuring real estate consultant with FTI Consulting and the Chief Restructuring Officer hired by the Debtors, testified at the November 25, 2008, hearing and the Debtors' Exhibits 1 and 2 were admitted into evidence without objection.

Appearances at both the December 11th and December 12th hearings were formally stated on the record as follows:  James A. Patten of Billings, Montana, for the Debtors; Daniel P. McKay of Great Falls, Montana, Office of the U.S. Trustee; Mark S. Chehi and Robert S. Saunders of Wilmington, Delaware, Evan R. Levy of New York, New York, and Shane P. Coleman of Billings, Montana, for Credit Suisse; John Grant of Helena, Montana, and Jonathan B. Alter of Hartford, Connecticut, for the Ad Hoc Committee of Yellowstone Club Members; Benjamin P. Hursh of Missoula, Montana, and Paul D. Moore of Boston, Massachusetts, for CrossHarbor; Quentin M. Rhoades of Missoula, Montana, for Normandy Hill Capital, LP; J. Thomas Beckett of Salt Lake City, Utah, for the Official Committee of Unsecured Creditors; Jon Doak of Billings, Montana, for James T. Murphy, the Murphy Family Limited Partnership and

---

[1]   Notice of the Motion, the relief requested therein, and notice of the Interim Hearing and the Final Hearing was served by the Debtors on their largest unsecured creditors, the Prepetition Agent, the United States Trustee for the District of Montana and certain other parties, including, without limitation, those to whom mailing of the Memorandum and Interim Order was required pursuant to the Memorandum and Interim Order.  Under the circumstances, such notice constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c).  The form and content of the Motion satisfies the requirements in all material respects of Fed.R.Bankr.P. 4001.

the Edwards Law Firm; and Keith Jones of Helena, Montana, for the Montana Department of

Revenue.[2]  At the two day hearing, Edra D. Blixseth ("Blixseth"); Greenspan; and Christopher

Donaldson ("Donaldson"), the Managing Director of Cushman & Wakefield of Colorado, Inc.,

testified, and Credit Suisse's Exhibits 4, 9, 11, 14, 15 and 16 were admitted into evidence without

objection.  This Memorandum of Decision sets forth the Court's findings of fact and conclusions

of law.

## JURISDICTION

Pursuant to 28 U.S.C. §§ 157(b) and 1334, this Court has jurisdiction of the matters

raised in the Debtors' DIP Financing Motion.  Consideration of the DIP Financing Motion

constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).  Venue is proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

Blixseth, through an entity known as Blixseth Group, Inc., or BGI, owns and is the

managing member of the Debtors.  Blixseth and her former husband Timothy L. Blixseth,

through the Debtors, undertook to develop an exclusive club, targeted to individuals with high

net worth, that consists of a private 13,000 acre plus master-planned residential and recreational

community/retreat commonly referred to as the "Yellowstone Club."  Donaldson's appraisal as of

November 10, 2008, Exhibit 9, lists the Debtors' existing improvements as: 417 developable

lots/units; an estimated 481 Yellowstone Club resident memberships; 150 National

memberships; 20 guest cabins (ranging in size from 416 sq. feet to 1,080 sq. feet) in a mid-

---

[2]  Several other attorneys on behalf of other parties were present for all or a portion of the
December 11th and 12th hearings, but did not make an official appearance on the record.

4

mountain ski-in/ski-out location; a 540 sq. foot entry gatehouse; a 3,366 sq. foot mountaintop lodge/restaurant; a 3,579 sq. foot kids center; a 5,626 sq. foot mid-mountain lodge/restaurant with outdoor infinity pool and spa; Lodge Lift consisting of a Doppelmayr Highspeed detachable quad with bubble with length of two miles; Lake Lift consisting for a Doppelmayr Highspeed detachable quad with length of 8,000 feet; Mountain Lift consisting of a Doppelmayr fixed-grip lift with length of 2,000 feet; none other chairlifts including the Platter Lift and American Spirit Lift; 27 existing ski runs on Pioneer Mountain (elevation of 9,861 feet); Camp Blixseth - a high quality log camp facility for children with adjacent lawn consisting of 4,680 sq. feet; a Mountain Lodge and parking garage facility in a base village to include 21 condominium units (all presold), dining rooms, lounge, outdoor terrace, meeting rooms and other amenities that is nearing completion; an 18-hole Championship golf course (designed by Tom Weiskopf) that was completed in 2005; several modular units for employee housing, temporary golf clubhouse, and sales/marketing functions; skiable chairlift access to adjoining Big Sky Resort (Yellowstone Club members are required to purchase separate lift tickets or season passes from Big Sky Resort); and the Warren Miller Grille and Lodge Lift Grille.  The Debtors' master plan also includes the future completion of a 27,000 square foot golf clubhouse, a total of 40 ski runs (19 miles) and ski lifts, including a gondola, a heliport, employee housing, fly-fishing lakes and streams, an equestrian club, outdoor basketball court, tennis courts and swimming pool, health spa and fitness center, a Nordic ski facility with 12 miles of Nordic trails, and development of a town.

Blixseth testified that the Yellowstone Club does and is being further developed to provide families, who buy property within the "Yellowstone Club" boundaries, and who buy memberships to said Club and pay annual membership dues, with a year-around "Montana

5

experience", including skiing, fishing, horseback riding, golfing, etc.  The Yellowstone Club has become a vital component of the local economy of Big Sky, Montana.  For example, the Debtors employ anywhere from 400 to 600 employees, with the period between Christmas and April 15th being the Debtors' busiest season.  The Debtors' monthly payroll is roughly $600,000.

Blixseth and Timothy L. Blixseth separated sometime ago and following the separation, Blixseth was "frozen out" of the Yellowstone Club for about two years, or until approximately mid-August of 2008, when Blixseth was awarded the Yellowstone Club entities in a Marital Settlement Agreement.  During the period of time that Blixseth was "frozen out" of the Yellowstone Club, Timothy Blixseth attempted to sell the Yellowstone Club properties to CrossHarbor.  CrossHarbor and Byrne did considerable due diligence with respect to CrossHarbor's possible purchase of the Yellowstone Club and they own substantial property within the Yellowstone Club.  For various reasons, the sale of the Yellowstone Club properties to CrossHarbor did not come to fruition.  However, CrossHarbor loaned Blixseth $35 million, secured by various non-Debtor assets, in order to permit Blixseth to buyout Timothy Blixseth's interest in the Yellowstone Club as part of their Marital Settlement Agreement.

Upon assuming the reigns of the Yellowstone Club in August of 2008, Blixseth, at the suggestion of CrossHarbor, hired Discovery Land Company to take over the management and marketing of the Yellowstone Club.  Discovery Land Company, and its principals, are personally known to both Blixseth and CrossHarbor.  The Debtors have not yet sought the approval of Discovery Land Company's employment in this bankruptcy, but Blixseth would like not only to employ Discovery Land Company, but would also like to see Discovery Land Company have an ownership interest in the Yellowstone Club.

6

Blixseth testified that the Debtors' real estate properties have an approximate value of $780 million.  The Debtors' various Schedules A and B list the following:  Yellowstone Mountain Club, LLC, has real property valued at $46,680,000 and personal property valued at $553,265,015.94; Yellowstone Development, LLC, has real property valued at $529,040,000 and personal property valued at $157,964,223.44; Big Sky Ridge, LLC, has real property valued at $202,280,000.00 and personal property valued at $4,446,466.00; and Yellowstone Construction Club, LLC, has no real property, but has personal property valued at $19,028.48.  The total debts of the Debtor entities are disclosed at approximately $399 million, with Credit Suisse owed $307 million of the total debt plus an additional $2 or $3 million in interest.  The Debtors' personal property includes in the neighborhood of 500 actual and future unsold memberships with a value of $360 million to $380 million.[3]  As shown above, Debtors also own various items of personal property including ski lifts.

Contrary to Blixseth's testimony and the Debtors' schedules, Donaldson prepared, as of November 10, 2008, and on behalf of Credit Suisse's counsel, an appraisal of the Debtors' properties.  Donaldson's valuation of the Debtors' properties is:

> [T]hat the Market Value of the Fee Simple Estate and going concern [of] the Project, subject to the assumptions and limiting conditions, certifications, extraordinary assumptions, hypothetical conditions, if any, and definitions, "As-is" on November 10, 2008, was:

---

[3]  An appraisal completed by Donaldson references 40 Pioneer/Frontier memberships, 830 Resident memberships and 150 National memberships.  The 40 Pioneer/Frontier memberships were sold to the founding members at a substantially reduced price.  The last Resident memberships sold for $300,000.  The Debtors have not yet marketed or sold the National memberships, but anticipate selling such memberships at a price of $1 million each. Based upon the above, Donaldson valued the "Total Net Proceeds" of the unsold non-realty Club memberships at $336 million.

7

THREE HUNDRED TEN MILLION DOLLARS
$310,000,000

The value conclusion reported above included the going concern related to the
Yellowstone Club revenues.  The allocation of value to the going concern would
be approximately $44,000,000 which would include all F, F, & E associated with
the going concern.

Donaldson was a credible expert witness, and was qualified by the Court, and the Court accepts

Donaldson's appraisal of $310 million as the low-end, going concern value of the Debtors' assets

for purposes of this Memorandum of Decision.

The Court would note that Donaldson also completed, at the direction of Timothy L.

Blixseth, a Total Net Proceeds[4] evaluation of the Debtors' properties and as of August 26, 2008,

concluded that:

[T]he Total Net Proceeds of the fee simple estate in real property and going
concern in the club operations in the referenced property, subject to the
assumptions, limiting conditions, certifications, and definitions, as of June 30,
2008 is:

**TOTAL NET PROCEEDS**
**ONE BILLION ONE HUNDRED FOURTEEN MILLION DOLLARS**
**$1,114,000,000**

Of this value, the total proceeds of the unsold non-realty memberships and club

---

[4]  For purposes of the August 2008 report, "Total Net Proceeds is defined as the aggregate
sum of master development net cash flows *excluding* any deduction for master developer's profit,
return or the time value of money.  Net cash flows are derived by estimating individual
component land/property sale revenue events as they occur and deducting associated master
development related costs.  Land/property sale revenues may include, but are not limited to, bulk
residential lots, existing home inventory, commercial land, golf courses, and other non-
residential land property types.  Master developer costs may include, but are not necessarily
limited to, applicable infrastructure construction, off-sites, grading, master marketing, and related
carrying costs.  Master developer's profit/entrepreneurial reward and present value calculations
have not been considered or applied in estimated Total Net Proceeds.  Total Net Proceeds *is not* a
value estimate nor should be construed as such.  The client has specifically requested the
appraiser(s) report Total Net Proceeds, as defined."

reversion is $336,000,000.  Therefore, the value breakdown is as follows:

| | |
|---|---|
| Real Estate: | $778,000,000 |
| Unsold Non-Realty Club Memberships: | $336,000,000 |
| Total | $1,114,000,000 |

Exhibit 4.

The Debtors also own interests in non-debtor entities.  For example, the debtor Yellowstone Development, LLC owns stock and interests in Cosborn Investments B.V., which in turn owns Danika Investments Limited, which in turn owns Jaroup Investments B.V., which in turn owns the Chateau de Farcheville in Bouville, France (the "Farcheville Property").  The Farcheville property is alleged to be the premier estate property in all of Europe and is currently for sale with two separate sales entities at a price of $60 million.  Another related entity also owns property in Scotland.  BGI has been seeking to sell the Farcheville Property, but given the current economic conditions, has been unsuccessful in selling such asset.  Blixseth testified that sale of the Farcheville Property would provide the Debtors with much needed operating cash.  Blixseth has contributed substantial amounts of her own money to the Debtors, but no longer has the financial wherewithal to continue funding the Debtors' operations.

Given the inability to successfully secure much needed operating cash, the Debtors filed for protection under the Bankruptcy Code on November 10, 2008.  Following commencement of these Chapter 11 cases, both Credit Suisse and CrossHarbor proposed to provide the Debtors with DIP financing.  At the time of the first hearing held November 12, 2008, Blixseth testified that Credit Suisse had preliminarily offered a more economically sound DIP financing package.  For example, Credit Suisse originally proposed a more favorable interest rate as compared to the interest rate proposed by CrossHarbor.  In addition, Blixseth was reluctant to pursue the proposal

offered by CrossHarbor because CrossHarbor's proposal required a priming lien over the secured interest of Credit Suisse.  Credit Suisse had advised Blixseth that it would not agree to a priming lien in favor of CrossHarbor under any circumstances.  Also, the CrossHarbor DIP financing would cover only 13 weeks and required confirmation to occur by February 13, 2009.  If the Debtors did not secure confirmation by February 13, 2009, the Debtors would have to agree to an immediate 11 U.S.C. § 363 sale of all their assets.  CrossHarbor's proposed financing was particularly problematic for the Debtors because it would not get them through the 2008-2009 ski season.

Credit Suisse, on the other hand, was offering DIP financing for a period of 21 days, or through November 30, 2008.  Such financing for a period of 21 days would allow the Debtors to ramp up for the coming ski season and would allow the Debtors time to negotiate additional financing that would take the Debtors through the 2008-2009 ski season.  Moreover, counsel for Credit Suisse was fairly confident that given time, the Debtors and Credit Suisse could reach agreeable terms for DIP financing that would take the Debtors through the 2008-2009 ski season.  After comparing the two proposals, Blixseth made the decision that as of November 12, 2008, Credit Suisse's proposed DIP financing was more favorable to the Debtors.

Entry of an interim order approving 21 days of DIP financing to the Debtors by Credit Suisse was opposed by CrossHarbor, the Ad Hoc Committee of Yellowstone Club Members, Michael Snow, the Montana Department of Revenue and the United States Trustee.[5]  After

_____

[5]  The Ad Hoc Committee of Yellowstone Club Members argued in their written objection to Credit Suisse's original DIP financing:

In consideration for no more than a mere 3 weeks of financing from a subset of the Pre-Petition Lenders ["Credit Suisse"] (a quarter of which is set aside for fees, costs

hearing Blixseth's testimony and the comments of counsel, and after reviewing Credit Suisse's Term Sheet, the Court was troubled by several aspects of Credit Suisse's DIP financing proposal, including the leverage that Credit Suisse was demanding. However, if the Court denied approval of some type of DIP financing, it was clear that the Debtors would have to close their doors. Blixseth testified that closure of the Yellowstone Club would have a devastating impact not only on the local economy, but also on the value of the Debtors' assets and correspondingly, on the value of the collateral of the secured creditors. Thus, given the absence of any viable alternative, the Court, in an Order entered November 13, 2008, reluctantly approved the Debtors' proposed interim Order, thereby allowing the Debtors to obtain an interim 21 day superpriority postpetition term loan financing facility pursuant to a DIP Term Loan Facility in the principle amount of $4,450,000.00 from the Debtors' largest and first-position secured creditor, Credit Suisse. The Court advised the parties at the November 12, 2008, hearing that it would consider final approval of the Debtors' interim DIP financing with Credit Suisse and would also consider any proposal for longer-term financing at a hearing scheduled for November 25, 2008.

All parties worked extremely hard between November 12, 2008, and November 25, 2008, to come to some sort of agreement regarding additional financing that would allow the Debtors to continue with operations at least through the 2008-2009 ski season, and indeed, as late as

----

and interest), the [Credit Suisse] demand[s] releases, surcharge waivers, indemnifications, adequate protection, and good faith findings in addition to interest of 15% pe annum plus loan fees and costs that, together, would correlate to an interest rate of 93% per annum. The proffered financing does not provide the Debtors, their employees or their creditors with any degree of assurance that there will be normal operations, or that the estates are on a path to resolve the financial challenges facing the Debtors, only that we will be back before this Court in a very short period of time at the mercy of the allegedly secured lenders who appear to want to run this case solely for their own short term benefit.

11

November 24, 2008, all parties, including the Debtors and CrossHarbor, thought that Credit

Suisse's proposed DIP financing, that would take the Debtors through the 2008-2009 ski season,

was the DIP financing that would be submitted to the Court, and approved without objection.

However, on the eve of the November 25, 2008, hearing, counsel for Credit Suisse learned that

Credit Suisse was not able to secure member approval and funding for additional DIP financing.

Thus, as of 9:00 a.m. on November 25, 2008--the date and time set for the final hearing

on approval of the Debtors' DIP financing with Credit Suisse--the Debtors had not a single DIP

financing arrangement in place from any source.  In a last ditch effort to salvage the Debtors'

going concern operations, Debtors' counsel requested a recess.  Just prior to or during the recess,

either Blixseth or the Debtors' counsel contacted CrossHarbor to see if their prior DIP financing

proposal was still on the table.

After several recesses, the Court reconvened the hearing at 3:00 p.m. on November 25,

2008, and was advised that between 9:00 a.m. and 3:00 p.m., CrossHarbor and Debtors had

negotiated a DIP financing arrangement, patterned extensively after the Debtors' 212-day DIP

financing arrangement with Credit Suisse, whereby CrossHarbor would lend the Debtors up to

$19,750,000 with which to fund its operations through the end of the 2008-2009 ski season.  Up

to $4,450,000.00, plus interest and approved professional fees, of the CrossHarbor DIP Financing

is earmarked to repay the existing approved 21-day interim Credit Suisse DIP Financing.

Byrne testified that a requirement of CrossHarbor, through CIP Yellowstone Lending,

LLC, providing DIP financing is that it be granted a priming loan on all collateral that exists

under the interim DIP financing loan between the Debtors and Credit Suisse.  CrossHarbor's

proposed interest rate is 15%.  The DIP Financing Term Sheet entered into evidence as Exhibit 1

12

at the November 25, 2008, hearing also contains several restructuring benchmarks.  For example, Debtors must collect the first-half membership dues from at least 80% of the Yellowstone Club members by December 26, 2008, and must collect the second-half dues from at least 80% of the Yellowstone Club members no later that February 28, 2009.  Based on testimony from Greenspan, the members of the Yellowstone Club are agreeable to this accelerated dues schedule if the Court approves CrossHarbor's proposed DIP financing.  Under the restructuring benchmarks, the Debtors must also file a proposed Chapter 11 plan on or before February 13, 2009, and must have a confirmed Chapter 11 plan not later than March 31, 2009, or the Debtors shall immediately commence sale of substantially all of the Debtors' assets pursuant to 11 U.S.C. § 363.  CrossHarbor's DIP financing also provides for legal fees of approximately $800,000 to protect an easement that is absolutely necessary to the Debtors' future development plans.

During negotiations of the CrossHarbor DIP financing proposal on November 25, 2008, and just prior to the 3:00 p.m. hearing, Credit Suisse reversed course and once again agreed to provide the Debtors with additional DIP financing in the amount of $8,250,000.[6]  However, as part of Credit Suisse's proposal, the Debtors would be obligated to obtain additional funding of $5 million to $7 million from other outside sources by January 31, 2009.  In furtherance of the Debtors obtaining additional funding, Credit Suisse agreed to release its lien on 11 lots located on the Debtors' championship golf course.  However, Credit Suisse tied the Debtors' hands, so to speak, by requiring that any sale of the lots must be for a reasonable value, as opposed to a fire sale value.  Debtor has sold only one or two comparable lots in the last year.  Thus, if the Debtors

---

[6]  It was also not clear from the record whether all members of Credit Suisse agreed to the newly proposed DIP financing proposal.

were not able to sell the lots, Debtors would have to find a creditor that would lend the Debtors money and take the lots as security.  Greenspan testified at the prior hearing that given the current economic conditions, it was highly unlikely that the Debtors could secure the additional funding required by the Credit Suisse proposal.  The Court agreed and concluded that such condition imposed by Credit Suisse was unworkable and made it unrealistic for the Debtors, or this Court, to give any meaningful consideration to Credit Suisse's proposal because such proposal guaranteed the Debtors' failure.  Moreover, the members of the Yellowstone Club indicated that they would not agree to pay their dues on an accelerated basis and indeed, Greenspan testified that the Yellowstone Club members might not pay their dues at all under the Credit Suisse proposal because of the uncertainty and risk created by the $5 million to $7 million hole in Credit Suisse's proposed DIP financing.  Finally, while the CrossHarbor DIP financing provides for points up front, the Credit Suisse DIP financing proposal contemplated interest of 20%, which rate was 5% higher than the interest rate proposed by CrossHarbor.

The DIP financing agreement between the Debtors and CrossHarbor was amended between November 25, 2008, and December 11, 2008, to accommodate several of the objections raised by the Montana Department of Labor and the Official Committee of the Unsecured Creditors.  The Debtors also agreed just prior to the December 11, 2008, hearing to provide, as a condition precedent to the closing of the DIP Loan, that the Debtors shall list for sale the Farcheville Property at a price reasonably acceptable to CIP Yellowstone Lending LLC.  A portion of the proceeds of the sale, if the Farcheville Property sale generates proceeds in excess of the DIP Loan,  less the reasonable costs of sale, of the Farcheville Property shall contemporaneously with the sale thereof be paid to CIP Yellowstone Lending, LLC to satisfy the

14

DIP Loan to the extent of such proceeds and the Debtors' counsel further agreed at the December 11, 2008, hearing that any sales proceeds above and beyond any amount owed to CIP Yellowstone Lending, LLC for the DIP financing would be segregated and sequestered to be used by the Debtors in their reorganization efforts.

It was clear at the end of the December 12, 2008, hearing that the only remaining objections to CrossHarbor's DIP financing were those of Credit Suisse and Normandy Hill Capital, LP.  Normandy Hill Capital, LP is a member of the Credit Suisse consortium.

DISCUSSION

The Debtors are authorized to operate their business under 11 U.S.C. § 1108 and, as such, are able to request Court approval of postpetition credit under § 364, which reads in relevant part:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt-
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.
>
> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--
>
> > (A) the trustee is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien

15

is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

As set forth above, in order to obtain Court approval of the Debtors' motion for approval of DIP financing with CrossHarbor, which seeks postpetition financing on a superpriority, secured, and priming basis under § 364(d), the Debtors must establish: (1) that they are unable to obtain credit otherwise; (2) that the transaction is within the Debtors' business judgment; and (3) that the interests of primed lienholders are adequately protected.

As previously noted, as of 9:00 a.m. on November 25, 2008, the Debtors had no financing options. It was also clear to this Court that the DIP financing proposed by Credit Suisse late in the day on November 25th was not a viable option. In fact, it is very apparent that Credit Suisse proposed its 60-day finance proposal at the last minute in an effort to frustrate the Debtors' efforts to secure legitimate DIP financing from CrossHarbor. As such, the Court concluded that as of November 25, 2008, the Debtors were unable, despite tremendous effort, to obtain any feasible operating credit, other than that proposed by CrossHarbor, that would prevent the Debtors from closing their doors, either now or in the near future. The fact that Credit Suisse has attempted to propose new and improved DIP financing following the November 25, 2008, hearing does not change the Court's conclusions that the Debtors only viable chance for a successful reorganization is with the CrossHarbor DIP financing.

Next, all parties acknowledge that the Debtors need funds to maintain business operations. The CrossHarbor financing provides the Debtors with sufficient capital to operate their business through the 2008-2009 ski season; it allows the Debtors time to propose a plan of

reorganization; and, unlike the financing proposed by Credit Suisse, it does not unduly impose a stranglehold on the Debtors.  The weight of the evidence demonstrates that the Debtors have exercised sound business judgment in seeking Court approval of the CrossHarbor DIP financing.

The only factor arguably at play in this case is the third factor under § 364(d).  Credit Suisse opposes the DIP financing proposed by CrossHarbor because Credit Suisse asserts that its position is not adequately protected.  Section § 364(d)(1)(B) requires the Debtors to show that the interests of the primed lien holders are adequately protected.  The Debtors have the burden of proof on the issue of adequate protection.  The Tenth Circuit Court of Appeals explains that: "The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy.  In determining these values, the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis."  *Dallas Bank, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987).

This Court discussed quite extensively the concept of adequate protection in *In re WRB West Associates Joint Venture*, 106 B.R. 215, 219-20 (Bankr. D. Mont. 1989):

> In a classic sense, adequate protection payments should be applied to compensate a secured creditor for any diminution in the value of collateral as a result of use, depreciation, destruction or other caused reduction in value. 11 U.S.C. § 361; 11 U.S.C. § 363(e); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., (In re Timbers of Inwood Forest Assocs., Ltd.)*, 793 F.2d 1380, 1412 n. 57 (5th Cir.1986) (collecting supporting cases), *aff'd, United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, [484] U.S. [365], 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *General Elec. Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.)*, 25 B.R. 987, 994 (Bkrtcy.D.Utah 1982) ('adequate protection was protection ... against depreciation of the collateral when it erodes the allowed secured claim.').

17

[*Matter of Kain*,86 B.R. 506, 511, 513 (Bankr. W.D. Mich. 1988)]

On the issue of adequate protection required by § 363(d) and (e), *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir.1987) holds:

> In recognition of the powers created in bankruptcy law to adjust debts and creditors' interest, Congress realized the need to protect creditors from unfair treatment. Hence, it codified the concept of adequate protection into the several aggressive remedies available to debtors and bankruptcy trustees. *See 2 Collier on Bankruptcy* ¶ 361.01[1] (15th ed. 1979). The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy. House Rep. No. 95-595, 95 Cong., 2d Sess. 53, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6295. In determining these values, the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis. *In re Martin*, 761 F.2d 472 (8th Cir.1985); *In re Monroe Park*, 17 B.R. 934 (D.C.Del.1982). Since 'value' is the linchpin of adequate protection, and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact. *In re Martin*, 761 F.2d at 472; *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017 (11th Cir.1984); *In re Bank Hapoalim B.M., Chicago Branch v. E.L.I.*, Ltd., 42 B.R. 376 (D.C.N.D.Ill.1984); *Brookfield Production Credit Association v. Borron*, 36 B.R. 445 (D.C.E.D.Mo.1983), *aff'd*, 738 F.2d 951 (8th Cir.1984).

Greenspan testified extensively that the best way to maximize the value of Debtors' assets is to maintain the Debtors' going-concern value.  Greenspan testified that if the Debtors' properties were "moth balled," as proposed by Credit Suisse on November 25th, the Debtors' properties would become nothing more than acreage in the woods.  Greenspan noted that under CrossHarbor's proposal, the Yellowstone Club members will bear $4 million of the operating costs.  In addition, the difference in cost between allowing the Debtors to maximize their value under CrossHarbor's proposal, and shutting their doors under Credit Suisse's November 25th proposal, is $3.3 million through the end of January 2009.  Maximization and preservation of the Debtors' going-concern value at a net cost of $3.3 million must be juxtaposed with the

18

diminution in value of the Debtors' assets if the Debtors closed their doors and ceased operations. According to Greenspan, having the Yellowstone Club "go dark" would be financially adverse to all stakeholders, including Credit Suisse.

Greenspan went on to explain that while CrossHarbor's and Credit Suisse's DIP financing proposals may appear economically similar on their face, the proposals are not economically similar in two important respects. First, Greenspan contends that Credit Suisse's proposal does not provide any protections to any of the stakeholders. Because of the absence of any type of meaningful protections, the Yellowstone Club members are not willing to support such a proposal. Second, even if Greenspan could get the Yellowstone Club members on board with Credit Suisse's proposal, which Greenspan contends is highly unlikely, Greenspan would still be faced with securing additional financing of $5 million to $7 million in a tough economic market. Greenspan concluded that simply put, Credit Suisse's proposal does not afford any of the parties the same economic benefits or protections as CrossHarbor's proposal.

On a particular matter, Greenspan testified that CrossHarbor's proposed DIP financing includes funding of up to $800,000 for the Debtor to pursue an easement that is currently in escrow. Loss of that easement could result in the Debtors' inability to plat a substantial portion of their real property. The Debtors' loss of the easement would adversely affect all parties involved.

On cross-examination, counsel for Credit Suisse asked Greenspan if CrossHarbor's proposed financing provided Credit Suisse with any type of adequate protection. Greenspan noted that the concept of adequate protection was a legal conclusion that Greenspan was not qualified to give. However, Greenspan did note that while Credit Suisse would be repaid

$4,450,000, plus interest and approved professional fees, under CrossHarbor's proposed financing, Greenspan did not see where Credit Suisse would receive any additional liens. Greenspan also reiterated, however, that while he believes that a consensual deal is the best for everyone, he cannot maximize the value of Debtors' assets under Credit Suisse's proposal. The value of CrossHarbor's proposal, on the other hand, would be above and beyond the amount of CrossHarbor's priming lien because CrossHarbor's proposal provides for better value enhancement, less risk and better protection of Credit Suisse's liens.

Greenspan testified at one point that a § 363 sale of the Debtors' operating enterprise with support of the Yellowstone Club members would fetch substantially more in sales proceeds than would be obtained from a 60-day "moth ball" sale of the Debtors' assets as previously proposed by Credit Suisse. In response to such statement, counsel for Credit Suisse asked Greenspan whether Credit Suisse was oversecured or undersecured. Greenspan replied that he did not feel comfortable with specific values and noted that he just came on board in this case two weeks prior to the November 25, 2008, hearing, but if he had to choose between oversecured or undersecured, he would "probably" think that Credit Suisse was undersecured. Greenspan was quick to note though, that Credit Suisse would walk away from this case with a lot more money if the Court approved CrossHarbor's proposed financing. While Greenspan indicated that Credit Suisse is "probably" undersecured, such opinion was given reluctantly and without the benefit of any appraisals.

Blixseth testified at the November 12, 2008, hearing that the Debtors' assets have a value of $780 million. Credit Suisse did not challenge Blixseth's testimony at the November 12, 2008, hearing, and in fact appeared to embrace such valuation. Credit Suisse did, however, challenge

20

that valuation at the December 2008 hearings, presenting Donaldson's appraisal reflecting a value of $310 million.  Donaldson's appraisal is very clear that $310 million is the Debtors' going concern value.  Donaldson's appraisal report states that $44 million is allocated to going concern. A review of Donaldson's report of August 26, 2008, Exhibit 4, appears to attribute $5 million to furniture, fixture and equipment, leaving $39 million to the Debtors' true going concern value. The Debtors' going concern value of $39 million will clearly be protected by CrossHarbor's priming lien.

In addition, the Debtors' willingness to pledge the sales proceeds from the Farcheville Property for repayment of CrossHarbor's DIP financing further protects Credit Suisse's secured position as Credit Suisse concedes that it has no security interest in the Farcheville Property. Credit Suisse is not in a position to complain if the replacement funding provided by the sale of the Farcheville Property is sufficient to repay CrossHarbor's DIP financing.  Indeed, under such scenario, the Debtors' going concern value will be preserved at absolutely no cost or risk of loss to Credit Suisse.

Morever, its does not appear from a review of Exhibit 9 that Donaldson's appraisal includes the Promissory Notes owed to the Debtors by BGI, Blixseth and/or Timothy Blixseth in the approximate stated amount of $275 million.  At the hearing, the Court inquired as to why Credit Suisse could not proceed on the Debtors' behalf with collection of the Promissory Notes. Counsel for Credit Suisse simply stated that he had no idea whether such Promissory Notes had any value.  The Court, however, would think that it would be in the Debtors' and Credit Suisse's best interest to demand payment on the Promissory Notes, if permitted, and pursue collection of the funds due thereunder.  Collection of a mere $20 million on the Promissory Notes would more

than offset CrossHarbor's DIP financing, which DIP financing is maintaining the value of the Debtors' assets listed in Donaldson's appraisal.

Debtors' willingness to sell the Farcheville Property, and apply the proceeds of sale to repayment of the CrossHarbor DIP financing and Greenspan's steadfast belief, and to a certain extent, Donaldson's belief, that preservation of the Debtors' going concern value outweighs the cost of CrossHarbor's DIP financing, combined with the fact that Credit Suisse's position is also protected to some extent by Promissory Notes with a stated value of approximately $275 million, convinces this Court that not only is Credit Suisse adequately protected at this time, but also, that CrossHarbor's DIP financing proposal will provide prepetition secured creditors, such as Credit Suisse, with at least the same level of protection they would have absent CrossHarbor's superpriority financing that primes Credit Suisse's position.

As noted by Greenspan, the difference between a consensual § 363 sale in April or sometime thereafter, as opposed to Credit Suisse's 60-day proposal for sale of the Debtors' assets, is not just temporal because the parties would literally be selling different assets. Credit Suisse's proposed 60-day sale would create enormous ill-will with the members of the Yellowstone Club, and while the Yellowstone Club's reputation has been somewhat tarnished by this bankruptcy and the events leading up to this bankruptcy, the magnitude of the stigma would go up exponentially if the Yellowstone Club turned out the lights. Finally, in discussing the first priority method of sale between CrossHarbor's DIP financing proposal and Credit Suisse's DIP financing proposal, it was Greenspan's opinion that "a 363 sale of the operating enterprise with the member goodwill is, again, going to fetch you substantially greater proceeds than going to the 363 sale of a shut down project with 240 really powerful [and angry] people."

22

In closing arguments, attorney Mark Chehi, on behalf of Credit Suisse, argued that the Debtors have not proven that adequate protection exists to protect the value of Credit Suisse's collateral and argued that the relationship between CrossHarbor and Blixseth somehow taints CrossHarbor's offer to provide DIP financing. Credit Suisse has continually challenged that CrossHarbor is somehow manipulating Blixseth, and in turn the Debtors, yet Credit Suisse has offered not one iota of proof to support its baseless allegations.

As to the argument that some improper close nexus exists between CrossHarbor and Blixseth that proves that CrossHarbor's DIP financing is not provided in good faith, the Court finds no evidence in the record to support Credit Suisse's contention. The evidence shows that CrossHarbor has loaned Blixseth $35 million to pay a settlement required through Blixseth's divorce from her ex-husband that is secured by property in California and by the family compound at the Yellowstone Club. The record is devoid of any evidence that CrossHarbor is providing the Debtors with DIP financing for any purpose other than to preserve and maximize the value of the Debtors' assets at the Yellowstone Club and to preserve Byrne's membership and property interests located at Yellowstone Club, which in turn benefits all creditors and Yellowstone Club members. Similarly, no evidence exists in the record that suggests any improper or ulterior motive for CrossHarbor to provide the DIP financing. The only evidence that exists involves Byrne's statement that he wants to see the Debtors succeed at reorganization and not go dark or be "moth balled," which he stated would diminish the value of everyone's assets and collateral.

At the December hearing, the Official Committee of Unsecured Creditors, like this Court, rejected Credit Suisse's argument that CrossHarbor's DIP financing will have a chilling effect on

these proceedings, stating that all parties will insist on transparency and that CrossHarbor is a obvious party to bid against Credit Suisse's expected credit bid at any auction.  The Unsecured Creditors Committee embraces a little competition, akin to a horse race, where the leader perhaps is hobbled and the straggler gets encouraged.

Counsel for Credit Suisse countered that he preferred auctions as opposed to horse races. The Court does not doubt that Credit Suisse would like an auction of the Debtors' properties, where Credit Suisse is the sole bidder.  A horse race, on the other hand, implies that competition exists and Credit Suisse obviously would like to see the competition eliminated.

After consideration of Greenspan's, Byrne's and Donaldson's testimony, the Court finds that failure to finally approve the Debtors' request for DIP financing with CrossHarbor would cause immediate and irreparable harm to the bankruptcy estates.  The Court further finds that CrossHarbor, based on the record, and the findings contained herein, has extended the DIP Loan in good faith.  Accordingly, consistent with this Memorandum of Decision, the Court will enter a final order providing as follows:

IT IS ORDERED:

1.   *Motion Allowed and Objections Overruled.*  The Debtors' Motion to obtain DIP financing through CrossHarbor is ALLOWED on the terms and conditions set forth in this Order. The objections of Credit Suisse and Normandy Hill Capital, LP to approval of the Debtors' DIP financing with CrossHarbor are OVERRULED.

2.   *Findings Regarding the DIP Loan.*

(a)   Good cause has been shown for the entry of this Order.

(b)   The Debtors have an immediate and continuing need to obtain the balance

24

of the DIP Loan and use the Prepetition Collateral, including the Cash Collateral, and the

proceeds of the DIP Loan subject to and in accordance with the DIP Term Sheet, for the purposes

and on the terms and conditions set forth in the DIP Term Sheet, in order to permit, among other

things, the orderly continuation of the operation of their businesses, to pay the Debtors' post-

petition operating expenses and certain other costs and expenses of administration of the Cases,

to maintain business relationships with vendors, suppliers and customers, to make payroll, to

make capital expenditures, and to satisfy other working capital and operational needs.  As a

condition to any postpetition lending, the Debtors' use of the Prepetition Collateral and access to

the Cash Collateral are necessary in order to ensure that the Debtors have sufficient working

capital and liquidity and can preserve and maintain the going concern value of the Debtors'

estates while they formulate their plan of reorganization.

      (c)     The Debtors are unable to obtain financing on more favorable terms from sources

other than the DIP Lenders under the DIP Financing Documents and are unable to obtain

adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an

administrative expense or unsecured credit without the enhanced priority afforded by section

364(c)(1) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable

under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors

granting to the DIP Lenders the DIP Liens and the Superpriority Claims (defined below), subject

to the Carve-Out, under the terms and conditions set forth in this Order and in the DIP Term

Sheet.

      (d)     The terms of the DIP Term Sheet and the use of Cash Collateral are fair and

reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their

fiduciary duties and constitute reasonably equivalent value and fair consideration.

      (e)    The DIP Term Sheet and the use of Cash Collateral have been negotiated in good faith between the Debtors and the DIP Agent, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Loan, including without limitation, the DIP Loan Term Sheet and DIP Financing Documents (together with any other obligation arising under this Order or the DIP Term Sheet, collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Lenders in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

      (f)    The Court previously issued and entered its Memorandum of Decision dated November 26, 2008 ("Memorandum") and its interim order dated November 26, 2008 ("Interim Order"), and all findings of fact and conclusions of law in the Memorandum and Interim Order are incorporated here by reference.  Pursuant to the Memorandum and Interim Order, the Court, inter alia, allowed the Motion on an interim basis after conducting a preliminary hearing pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2) and 4001(d)(4).  To avoid immediate and irreparable harm, the Court awarded interim relief and authorized the Debtors to incur the postpetition indebtedness described in the Motion to a maximum principal amount of $10,000,000 (the "Interim Authority").  By this Order, the Court allows the Motion in full on a final basis.  Consummation of the DIP Loan and the use of Cash Collateral in accordance with this Order and the DIP Term Sheet also are in the best interests of the Debtors' estates.

Authorization of the DIP Term Sheet and DIP Financing Documents

3.      The DIP Term Sheet is incorporated by reference, approved in its entirety, except as noted herein, and in all respects and is **SO ORDERED AS AN ORDER OF THIS COURT** as if its terms are set forth here at length.  The Debtors are hereby authorized, empowered and directed to execute and deliver, without any further order or notice, any and all documents necessary or desirable (including, without limitation, the DIP Financing Documents), as they determine or as requested by the DIP Agent to permit them to borrow money pursuant to the DIP Term Sheet and this Order, in the amounts, and on the terms and conditions set forth in the DIP Term Sheet.

(a)      The DIP Term Sheet and (when executed by the Debtors) the DIP Financing Documents shall constitute the valid and binding obligation of the Debtors, enforceable against the Debtors in accordance with their terms.  No obligation, payment, transfer or grant of security under the DIP Term Sheet, the DIP Financing Documents or this Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under section 502(d) of the Bankruptcy Code, under section 548 of the Bankruptcy Code or under any applicable State Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

4.      *Superpriority Claims*.

(a)      Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses, and all other claims against the Debtors, now existing or hereafter

27

arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed Superpriority Claims shall be payable from and have recourse to all pre and post-petition property of the Debtors and all proceeds thereof, subject only to the payment of the Carve Out.

(b)     For purposes hereof, the "Carve Out" means (I) all fees, incurred during the period prior to an Event of Default, required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and (ii) to the extent, subject to and only up to the amounts set forth in the agreed Budget, in the event of the occurrence and during the continuance of an Event of Default, the payment of allowed and unpaid post-petition professional fees and disbursements of the Debtors' counsel and other professionals retained by the Debtor, and for allowed and unpaid post-petition fees and expenses of counsel and professionals retained by an official creditors committee, if any ("Committee")  (excluding any incurred and unpaid professional fees and expenses of the DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders) in an aggregate amount as set forth in, and payable solely in accordance with, the terms and conditions of the DIP Term Sheet. Nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (A) and (B) above.  All professional fees must be approved by the Court upon proper application irregardless of what

may be otherwise contained herein or in the Term Sheet.

5.      *DIP Liens.*

As security for the DIP Obligations, effective and perfected upon the date of this Order and without the necessity of the execution and recordation of filings by the Debtors of security agreements, control agreements, pledge agreements, financing statements or other similar documents, the following security interests and liens are hereby granted to the DIP Agent on behalf of the DIP Lenders and as provided in the DIP Financing Documents, subject, only in the event of the occurrence and during the continuance of an Event of Default, to the Carve Out and, as set forth below, the Prepetition Third Party Liens (all such liens and security interests granted to the DIP Agreement and DIP Lenders, pursuant to this Order, the "DIP Liens"):

(a)      *First Lien on Unencumbered Property.*  Pursuant to section 364(c)(2) of the Bankruptcy Code, subject only to the Carve-Out, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all pre- and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (collectively, "Unencumbered Property"), including, without limitation, any unencumbered cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock or other equity interests of subsidiaries, and the proceeds of all the foregoing.  Unencumbered Property shall exclude the Avoidance Actions.

(b)      *Priming DIP Liens, Senior to and Priming Prepetition Secured Parties'*

29

*Liens.*  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all Collateral that is subject to the existing liens allegedly securing the Prepetition Secured Obligations (the "Prepetition Secured Collateral").  Such security interests and liens shall be senior in all respects to the Prepetition Liens.  As to any Collateral that is encumbered by a Prepetition Third Party Lien, then with respect to such Collateral, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected senior priming security interest in and lien upon all such Collateral junior only to such Prepetition Third Party Liens.

      (c)    *DIP Liens Senior to Other Liens*.  Except as otherwise set forth in this Final Order with respect to Prepetition Third Party Liens, the DIP Liens shall not be (I) subject or subordinate to any lien or interest, including, without limitation (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors, or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 105, 363, 364 or 510 of the Bankruptcy Code or otherwise.

      (d)    *Definition of Prepetition Third Party Liens*.  For purposes of this Final Order, the term "Prepetition Third Party Liens" shall mean prepetition liens of third parties on the Collateral (excluding the Prepetition Secured Collateral) as to which such third parties have a valid, perfected and unavoidable existing lien.

6.      *Protection of DIP Lenders' Rights.*

The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, upon the occurrence of an Event of Default (including, without limitation, failure to meet any Benchmark) and the giving of notice, if any, as provided for in the DIP Term Sheet and DIP Financing Documents, all rights and remedies against the Collateral provided for in the DIP Term Sheet and DIP Financing Documents (including, without limitation, the right to set off monies of the Debtors in accounts maintained with or under the control of the DIP Agent or any DIP Lender or their affiliates, requiring the Debtors' best efforts to sell the Collateral at the request of the DIP Agent, foreclosing on the Collateral or otherwise selling the Collateral, and directing that the DIP Agent and its representatives be granted access to all locations during the continuance of an Event of Default in support of the enforcement and exercise of such remedies). In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and each of the Debtors hereby waive its rights to seek any relief other than a determination whether an Event of Default has occurred and is continuing, including, without limitation, under section 105 of the Bankruptcy Code.  In no event shall the DIP Agent or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral. The DIP Agent's or the DIP Lenders' failure to seek relief or otherwise exercise its rights and remedies under the DIP Loan or this Order shall not constitute a waiver of the DIP Agent's or the DIP Lenders' rights hereunder, thereunder or otherwise.

7.      *Limitation on Charging Expenses Against Collateral.*

31

Except to the extent of the Carve Out, no expenses of administration of any of the Cases or any future proceeding that may result therefrom (including liquidation in bankruptcy, the commencement of any action adverse to the DIP Agent or any DIP Lender or their respective rights hereunder, under the DIP Term Sheet, the DIP Financing Documents or under any other order, or other proceedings under the Bankruptcy Code) shall be charged against or recovered from the Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent.

8.     *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders pursuant to the provisions of this Order or any subsequent order of the Court shall be received free and clear of any claim, charge, assessment or other liability including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtor) or 552(b) of the Bankruptcy Code.

9.     *Use of Cash Collateral.*  The Debtors' cash, including without limitation, all cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable (including, without limitation, membership dues), sale of inventory or other disposition of the Prepetition Collateral, may constitute proceeds of the Prepetition Collateral and, therefore, may be cash collateral of the Prepetition Agent and Prepetition Lenders within the meaning of Section 363(a) of the Bankruptcy Code (the "Cash Collateral").  The Debtors are hereby authorized to use the Cash Collateral in which the Prepetition Agent and the Prepetition Lenders assert an interest, and the

proceeds of the Prepetition Collateral, without further order of this Court or notice to any parties, but solely under the terms and conditions governing the Debtors use of the proceeds of the DIP Loan pursuant to the DIP Term Sheet.

10.     *Adequate Protection.*  The Court finds that the interests of the Prepetition Agent and the Prepetition Lenders in all property of the estate, including, without limitation, the Prepetition Collateral, are adequately protected pursuant to 11 U.S.C. §§361 – 364.  As set forth in detail in the Memorandum, the Court finds that there will be a net economic benefit to all parties stemming from the DIP Loan.  Moreover, the DIP Loan will provide the Prepetition Agent and Prepetition Lenders, and their interests in property of the estate, with at least the same level of protection they would have absent the DIP Agent's superpriority financing that primes the Prepetition Agent's position.  In any event, based upon the testimony of the Debtors' Chief Restructuring Officer, whether or not the Prepetition Agent and the Prepetition Lenders ultimately prove to be oversecured or undersecured, the DIP Loan will serve to preserve the value of their collateral and in fact enhance it in an amount that exceeds the amount of the DIP Loan by multiples.

11.     *Sufficiency of Adequate Protection.*

The Court finds that the adequate protection of the Prepetition Agent and the Prepetition Lenders and their interests in property of the estate, arising from the use of the DIP Loan proceeds and the maintenance of the going concern value of the Debtors' businesses and their assets, is reasonable and sufficient to protect the interests of the Prepetition Agent and the Prepetition Lenders.

12.     *Perfection of DIP Liens.*

33

(a)      The DIP Agent and the DIP Lenders, are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent on behalf of the DIP Lenders shall, in its sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, duly perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Order.

(b)      A copy of this Order authenticated by the certificate of the Clerk of the Bankruptcy Court pursuant to Mont. Code Ann. Section 70-21-205, in the discretion of the DIP Agent, may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording without the imposition of any stamp, intangibles recording or similar tax in accordance with the provisions of section 1146 of the Bankruptcy Code.

(c)      The Debtors shall execute and deliver to the DIP Agent all such agreements, financing statements, instruments and other documents as the DIP Agent may reasonably request to evidence, confirm, validate or perfect the DIP Liens granted pursuant hereto.

(d)      Any provision of any lease or other license, contract or other agreement

34

that requires (I) the consent or approval of one or more landlords or other parties or (ii) the

payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge,

grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or

other post-petition collateral related thereto, is hereby deemed to be inconsistent with the

applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect

with respect to the transactions granting post-petition liens, in such leasehold interest or the

proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lenders in

accordance with the terms of the DIP Term Sheet, DIP Financing Documents or this Order.

(e)     Cooperation and Non-Interference by Credit Suisse.  Pursuant to an

Interim Order of this Court dated November 13, 2008 ("CS Interim Order"), Credit Suisse,

Cayman Islands Branch, acting through one or more of its branches or affiliates (collectively

"CS"), acted as sole administrative agent and collateral agent ("CS DIP Loan Agent") for a

syndicate of banks, financial institutions and other institutional lenders (the "CS DIP Lenders")

who made available to the Debtors a certain postpetition loan up to the aggregate principal

amount of $4,450,000 ("CS DIP Loan"), plus applicable interest, and professional fees and

expenses allowed by this Court.  The Debtors contemplate that a portion of the DIP Loan

approved by this Order will be used to satisfy the CS DIP Loan.  CS shall cooperate with and

shall not interfere with the transactions contemplated by this Order fully and completely.

Without limiting the generality of the immediately preceding sentence, upon payment to CS or

upon delivery to counsel for the DIP Agent as escrow agent such sums as are necessary to satisfy

the then outstanding amounts due under the CS DIP Loan, CS, in all of its capacities, including

as CS DIP Loan Agent and Prepetition Agent, and whether in connection with the CS DIP Loan,

the Prepetition Loan, the Prepetition Liens, or any of them, (I) shall execute and deliver to the

Debtors or to the DIP Agent, as appropriate, any and all documents requested by either of them to

effectuate and implement the DIP Loan transactions, and the granting and perfection of the DIP

Liens, described in this Final Order, (ii) shall comply with all requests made by either the

Debtors or the DIP Agent to turnover to the DIP Agent all Collateral in CS's possession, custody

or control, and shall terminate its existing control agreements with respect to the Prepetition

Loan and the CS DIP Loan to enable the DIP Agent to perfect its priority DIP Liens and

unfettered control of all deposit accounts that are the subject of any such control agreements.  CS

shall retain as escrow agent any portion of such amount that the Debtors dispute are owing to CS,

subject to further order of this Court or agreement between the Debtors and CS with respect to

any amounts so disputed by the Debtors.  CS shall comply with its obligations under this

paragraph, and CS's obligations hereunder shall not be conditioned, suspended, delayed or

limited, notwithstanding that any disputed amounts remain in escrow in accordance with this

paragraph.

      13.     *Preservation of Rights Granted Under the Interim Order and Final Order.*

      (a)     Unless and until all DIP Obligations are paid in full, the Debtors shall not

seek, and it shall constitute an Event of Default if without the consent of the DIP Agent (and no

such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent),

any of the Debtors seek or if there is entered, (I) any modifications or extensions of this Order,

(ii) any order authorizing additional or different debtor-in-possession financing in these Cases, or

(iii) an order dismissing any of the Cases.  If an order dismissing any of the Cases under section

1112 of the Bankruptcy Code or otherwise is at any time entered, then such order shall provide

(in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the DIP Liens and Superpriority Claims granted to the DIP Agent or the DIP Lenders shall continue in full force and effect and shall maintain their priorities as provided in this Order until all DIP Obligations shall have been paid and satisfied in full (and that such Superpriority Claims and DIP Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) of this paragraph.  Without the express written consent of the DIP Lenders, if at any time prior to the repayment in full of all obligations arising under the DIP Loan, including subsequent to the confirmation of any plan in these cases, any of the Borrowers, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to section 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the terms of the Interim Order or the Final Order or if any of them, the Prepetition Agent or the Prepetition Lenders shall receive proceeds from a sale of Collateral pursuant to section 363(b) of the Bankruptcy Code, then all of the cash proceeds derived from such credit, debt, or sale shall immediately be turned over to the DIP Agent for the application to the DIP Loan in accordance with the DIP Financing Documents, except for any recovery that may be made on any promissory notes owed to Debtor for which Credit Suisse has a pledge.

       (b)      If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (I) the validity of any DIP Obligations incurred prior to the actual  receipt of written notice by the DIP Agent, as applicable, of the effective date of such reversal, modification, vacation or stay or (ii)

37

the validity or enforceability of any lien (including the DIP Lien) or priority (including the DIP

Agent's Superiority Claims) authorized or created hereby or pursuant to the DIP Term Sheet, DIP

Financing Documents or this Order. Notwithstanding any such reversal, modification, vacation or

stay, any use of Cash Collateral or DIP Obligations incurred by the Debtors to the DIP Agent and

the DIP Lenders, prior to the actual receipt by the DIP Agent or of written notice of such reversal,

modification, vacation or stay, shall be governed in all respects by the original provisions of this

Order, and the DIP Agent and the DIP Lenders shall be entitled to all the rights, remedies,

privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Order and pursuant

to the DIP Term Sheet and DIP Financing Documents.

        (c)     The DIP Term Sheet, the DIP Financing Documents, the DIP Liens, the

Superpriority Claims, and all other rights and remedies of the DIP Agent and the DIP Lenders

granted or approved by the provisions of this Order, the DIP Term Sheet and the DIP Financing

Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an

order converting any of the Cases to a case under chapter 7, dismissing any of the Cases or by

any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any

of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have

waived any discharge as to any remaining DIP Obligations.  The terms and provisions of this

Order, the DIP Term Sheet and the DIP Financing Documents shall continue in these Cases, in

any successor cases if these Cases cease to be jointly administered, or in any superseding chapter

7 cases under the Bankruptcy Code, and the DIP Obligations and all other rights and remedies of

the DIP Agent and the DIP Lenders granted or approved by the provisions of this Order, the DIP

Financing Documents and the DIP Term Sheet shall continue in full force and effect until the

DIP Obligations are paid in full.

14.     *Effect of Stipulations on Third Parties.*  The findings, stipulations and admissions contained in this Order shall be binding upon the Debtors in all circumstances.  The findings, stipulations and admissions contained in this Order regarding the extent, priority and validity of the DIP Obligations, the Superpriority Claim and the DIP Liens shall be binding upon all other parties in interest, including, without limitation, any Committee or trustee.  Nothing in this Order vests or confers on any Person or Entity (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtors or their estate, except as authorized by this Court.

15.     *Waiver of Claims and Causes of Action Against the DIP Lenders.*  The Debtors on behalf of their bankruptcy estate hereby are deemed to waive any and all claims and causes of action against the DIP Agent and the DIP Lenders, and their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, directly related to the DIP Loan, this Order or the negotiation of the terms thereof.

16.     *Limitation on Use of DIP Loan Proceeds and Collateral.*  The Debtors shall use the proceeds of the DIP Loan and the Cash Collateral solely as provided in this Order and in the DIP Term Sheet and DIP Financing Documents.  Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, letters of credit, Cash Collateral, Prepetition Collateral, Collateral or the Carve Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any DIP Obligations and DIP Liens, the terms and conditions of the DIP Term Sheet and the DIP Financing Documents, (b) assert any causes of action against the DIP Agent, the DIP Lenders, or their respective agents, affiliates,

subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Agent's assertion, enforcement or realization on the Cash Collateral or the Collateral in accordance with the DIP Loan, the DIP Term Sheet, the DIP Financing Documents or this Order, or (d) seek to modify any of the rights granted to the DIP Agent or the DIP Lenders, in each foregoing case without the DIP Agent's prior written consent. Notwithstanding anything herein or the DIP Term Sheet, the Debtors shall be authorized to withdraw funds from any collateral account established or maintained for purposes of funding DIP Loan advances to the Debtors only to fund expenses consistent with the DIP Term Sheet or DIP Financing Documents or to the extent of, and with, the DIP Agent's express consent; and all funds in such account shall be deemed Collateral and under the control of the DIP Agent whether or not subject to any account control agreement in favor of the DIP Agent.

17.     *Insurance.*  Pursuant to this Order, the DIP Agent and the DIP Lenders shall be and shall be deemed to be. without any further action or notice, named as an additional insured and, as applicable, loss payee/mortgagee on each insurance policy maintained by any of the Debtors which in any way relates to the Collateral.

18.     *Termination of Exclusivity Periods.*  In the event the Debtors fail to file the "Plan Documents" (as that term is defined and used in the DIP Term Sheet), the Debtors' exclusive periods to file a plan of reorganization under 11 U.S.C. §1121 shall terminate at midnight on February 13, 2009.

19.     *Binding Effect; Successors and Assigns.*  The DIP Term Sheet and the provisions of this Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Prepetition Agent, the

Prepetition Lenders, any Committee, and any of the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary hereafter appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of the DIP Agent, DIP Lenders, the Prepetition Agent, the Prepetition Lenders and the Debtors and each of their respective successors and assigns; *provided, however,* that the DIP Lenders shall have no obligation to extend any financing to any chapter 7 or chapter 11 trustee or similar responsible person appointed for the estate of any of the Debtors.  In the event any conflict exists between the Term Sheet and this Order, this Order governs.

20.     *Limitation of Liability.*  In determining to make any loan under the DIP Term Sheet or in exercising any rights or remedies as and when permitted pursuant to this Order, the DIP Financing Documents or the DIP Term Sheet, the DIP Agent and the DIP Lenders shall not be deemed to be in control of the operations of any of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of any of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute).  Furthermore, nothing shall in any way be construed or interpreted to impose or allow the imposition, upon the DIP Agent or the DIP Lenders, of any liability for any claims arising from the prepetition or post-petition activities by any of the Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code) in the operation of their businesses, or in connection with their restructuring efforts.

41

21.     *Right of Access and Information*.  The Debtors shall permit representatives, agents and/or employees of the DIP Agent to have reasonable access to the Debtors' premises, management and non-privileged records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses), and the Debtors' and their officers, directors, members and professional persons shall cooperate and consult with, and provide to such persons all such non-privileged information as they may reasonably request.

22.     *Memorandum of Decision, Effectiveness, No Stay*.  This Order and the Memorandum incorporated by reference shall constitute findings of fact and conclusions of law and, notwithstanding the possible application of any applicable Federal Rule of Bankruptcy Procedure, including, without limitation, Bankruptcy Rules 4001(a)(3) and 6004(g), shall take effect immediately upon execution hereof.  The stay of this Order provided by Rules 4001(a)(3) and 6004(g), F.R.B.P., or similar rule shall NOT apply, and this Final Order shall NOT be stayed but instead shall be effective immediately.

23.     *Montana Department of Revenue Provision*.  Notwithstanding anything herein to the contrary, the relief granted herein is without prejudice to any rights of the Montana Department of Revenue to funds which do not constitute property of the estate but which may qualify as tax trust funds.  The Montana Department of Revenue is not precluded from pursuing such funds, if any, by this Order, nor is any party in interest precluded from contesting any action of the Montana Department of Revenue to recover alleged trust funds.

24.     *Mailing of Final Order to certain Parties in Interest*.  The Debtors shall promptly mail copies of this Order to all parties in interest, with a certificate of service filed with the Court showing that service of this Order has been completed.

IT IS FURTHER ORDERED that Credit Suisse's oral motion for a continuance of the instant hearing to Monday, December 22, 2008, is DENIED; and Credit Suisse's oral motion for stay pending appeal lodged December 12, 2008, is DENIED.

IT IS FURTHER ORDERED that the Debtors, Credit Suisse and any other parties in interest, shall appear before the Court on **Tuesday, January 13, 2009, at 10:00 a.m.**, or as soon thereafter as the parties can be heard, in the 2ND FLOOR COURTROOM, FEDERAL BUILDING, 400 N. MAIN, BUTTE, MONTANA, and show cause why the Court should not lift the automatic stay to allow Credit Suisse to proceed with enforcement of the three Promissory Notes in the approximate stated amount of $275,000,000.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana