UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re **YELLOWSTONE MOUNTAIN CLUB, LLC**,<br><br>        Debtor. | Case No. **08-61570-11**<br><br>Jointly Administered with: |
| In re **YELLOWSTONE DEVELOPMENT, LLC**,<br><br>        Debtor. | Case No. **08-61571-11** |
| In re **BIG SKY RIDGE, LLC**,<br><br>        Debtor. | Case No. **08-61572-11** |
| In re **YELLOWSTONE CLUB CONSTRUCTION COMPANY, LLC**,<br><br>        Debtor. | Case No. **08-61573-11** |

*MEMORANDUM of DECISION*

At Butte in said District this 16th day of January, 2009.

1

In the above-referenced Chapter 11 bankruptcies, which are being jointly administered pursuant to an Order dated November 13, 2008, a hearing was held January 13, 2009, in Butte on: (1) the Court's Order to Show Cause entered December 17, 2008, which ordered Debtors, Credit Suisse and other parties in interest to appear before the Court and show cause why the Court should not lift the automatic stay to allow Credit Suisse or another party to proceed with enforcement of three Promissory Notes in the approximate stated amount of $275,000,000; (2) on the objections of Credit Suisse, the Official Committee of Unsecured Creditors (the "Committee"), the Ad Hoc Committee of Yellowstone Club Members, the Ad Hoc Group of Class B Unit Holders ("Class B Group") and Michael Snow to this Court's approval of Debtors' Application to Approve Employment of attorney Doug James as special legal counsel to pursue collection of three Promissory Notes; and (3) approval of the Stipulation of Credit Suisse, as Agent, and Official Committee of Unsecured Creditors Regarding Enforcement of and Collection on Promissory Notes filed January 9, 2009.  The following appearances were made at the January 13, 2009, hearing:  James A. Patten of Billings, Montana, for the Debtors; Daniel P. McKay of Great Falls, Montana, for the Office of the U.S. Trustee; Mark S. Chehi and Robert S. Saunders of Wilmington, Delaware, Evan R. Levy of New York, New York, and Shane Coleman of Billings, Montana, for Credit Suisse, Cayman Island Branch ("Credit Suisse"); John Grant of Helena, Montana, and Jonathan B. Alter of Hartford, Connecticut, for the Ad Hoc Committee of Yellowstone Club Members; Matthew J. Cuffe of Missoula, Montana, and Clark T. Whitmore of Minneapolis, Minnesota, for the Class B Group; Paul D. Moore of Boston, Massachusetts, for CrossHarbor Capital Partners ("CrossHarbor"); J. Thomas Beckett of Salt Lake City, Utah, and James H. Cossitt of Kalispell, Montana, for the Committee; Jon Doak of Billings, Montana , for

James T. Murphy, Murphy Family Limited Partnership and the Edwards Law Firm; and Joel E. Guthals of Billings, Montana, for Timothy Blixseth. The Debtors' Exhibits 1 through 4, Credit Suisse's Exhibits 1 through 4 and the Committee's Exhibits 1, 1A, 5 and 6 were admitted into evidence. Doug James, Edra Blixseth and Louis Pistecchia testified.

## BACKGROUND

Per Credit Suisse's Exhibit 2 – a Credit Agreement dated September 30, 2005 -- Timothy L. Blixseth, as President of Yellowstone Mountain Club, LLC, as President of Yellowstone Development, LLC, and as the Manager of Big Sky Ridge, LLC, agreed to borrow and Credit Suisse agreed to loan, the sum of $375,000,000 to Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, and Big Sky Ridge, LLC.[1] The Credit Agreement was accompanied by a Security Agreement dated September 30, 2005, which Security Agreement was signed by Timothy L. Blixseth on behalf of Yellowstone Mountain Club, LLC, Yellowstone Development, LLC and Big Sky Ridge, LLC.

Also on September 30, 2005, Timothy L. Blixseth, as President of Blixseth Group, Inc., individually and collectively, for value received, executed and promised to pay: (1) a Promissory Note payable to Yellowstone Development, LLC in the amount of $55,798,796.68 ("Promissory Note 1"); (2) a Promissory Note payable to Yellowstone Mountain Club, LLC in the amount of $208,831,158.45 ("Promissory Note 2"); and (3) a Promissory Note payable to Yellowstone Mountain Club, LLC in the amount of $7,800,000 ("Promissory Note 3"). The Promissory Notes

---

[1] The Court notes that Exhibit 2 filed at docket entry no. 230 is missing numerous pages and pages 20, 21 and 22 of the Credit Agreement are missing from the hard copy of Exhibit 2 that Credit Suisse brought to the hearing. However, pages 20, 21 and 22 appear to be included in the Debtors' Exhibit 5 filed at docket entry no. 233.

are demand notes.[2]  Credit Suisse's Exhibit 1.  On February 16, 2006, Timothy L. Blixseth, as the Manager of Yellowstone Club World, LLC, promised to pay Yellowstone Development, LLC the sum of $908,005.89 for value received.  *Id.*

Edra D. Blixseth ("Blixseth") and Timothy L. Blixseth separated sometime ago and following the separation, Blixseth claims she was "frozen out" of the Yellowstone Club for about two years, or until approximately mid-August of 2008, when Blixseth was awarded BGI – which owns the Debtors -- under the terms of a Marital Settlement Agreement.  As part of the Marital Settlement Agreement, Blixseth was required to buyout Timothy L. Blixseth's interest in BGI for $35 million.  Blixseth borrowed the $35 million from CrossHarbor, which amount is secured by various non-Debtor assets.  At some point, Blixseth changed the name of BGI to BLX Group, Inc. ("BLX").  Blixseth is the President and 100% equity owner of BLX.  BLX owns substantially all the interests in the Debtors.

The "Yellowstone Club" was in financial disarray when Blixseth assumed control of the Debtors in mid-August 2008.  Given the inability to successfully secure much needed operating cash, the Debtors filed for protection under the Bankruptcy Code on November 10, 2008.  At hearings held November 25, 2008, and December 11 and 12, 2008, on the Debtors' request for approval of debtor-in-possession ("DIP") financing with CrossHarbor, the various parties argued about the value of the Debtors' assets, particularly the value of the Debtors' real property interests in Big Sky, Montana.  During the aforementioned hearings and in discussing the Debtors' various assets, the parties acknowledged Promissory Notes 1, 2 and 3, but indicated that the Promissory

---

[2] The Promissory Notes provide that "[t]he payment of principal and all accrued interest shall be made upon written demand of Payee."

4

Notes, with a stated face value of $272,429,955.13, had little value to the Debtors at this particular time. According to Blixseth's testimony on January 13, 2009, BLX cannot generally pay its debts as they come due, has liquidity problems and is unable to make its payroll obligations for the employees at Blixseth's residence known as Porcupine Creek located in Rancho Mirage, California.[3] In sum, Blixseth argues that BLX can't repay the Promissory Notes at this time because it has no equity or liquidity with which to repay the Promissory Notes. Such testimony is consistent with Ronald Greenspan's testimony at the December 12, 2008, hearing:

> Q. So you think BGI doesn't have the ability to make interest payments?
>
> A. That's my understanding.
>
> Q. Okay. Would that . . . possibly play into the value of the notes at all?
>
> A. Yes.
>
> Q. Okay. Have you asked the Blixseth Group, Inc., to pay interest on the notes?
>
> A. I haven't made formal demand.
>
> Q. Why not?
>
> A. Because when I've asked about it, I've been told there's no capacity. And what we're looking for right now is immediate funding, and I don't believe there's any way to get income on that right now other than commence an action, which is not going to get money into the estate in the time we need it.
>
> Q. And who did you ask?
>
> A. Ms. Blixseth.
>
> Q. Did you ask Ms. Blixseth whether the Blixseth Group, Inc., would repay any of the principal that they owe on these notes?

---

[3] Blixseth's residence at Porcupine Creek is supposedly pledged as security for Blixseth's $35 million loan from CrossHarbor. However, Blixseth states that BLX is not indebted to CrossHarbor and BLX is the entity that supposedly owns Porcupine Creek.

5

> A. Again, when I've inquired whether there were resources to make cash payments, which is what we need now, I was told there's not cash to make payments.

While Blixseth maintains that BLX is essentially insolvent, that fact has not been established and thus the value of the three Promissory Notes with a face value of $272,429,955.13 is not known at this time.[4] However, the Court can appreciate why Blixseth would want to stall any demand on the Notes by the Debtors because a demand by the Debtors' would force Blixseth to face head on not only the Debtors' financial issues, but also the financial issues of BLX, which owns Blixseth's 240 acre personal residence in Rancho Mirage that includes a 30,000 square-foot compound and an 18-hole Weiskopf golf course. Therefore, while a demand for payment of the Notes may be beneficial to the Debtors, said demand would certainly be detrimental to Blixseth and the Debtors' parent corporation, BLX.

Interestingly, after the Court inquired on December 11th and 12th about the Promissory Notes and after the Court indicated that it would consider lifting the automatic stay to allow a party or parties in interest to investigate and pursue collection of the Promissory Notes, the Debtors filed on December 23, 2008, an application to employ attorney Doug James of Billings, Montana to pursue collection of the Promissory Notes. This Court routinely grants applications to employ professionals if the Court sees no conflict of interest in the application itself. Given the absence of any appearance of conflict of interest in the Debtors' application to employ Doug James, the Court, in an Order entered December 24, 2008, approved the Debtors' employment of

---

[4] When Ronald Greenspan, the Debtors' Chief Restructuring Officer, was examined by counsel for Credit Suisse at a hearing held December 11, 2009, Mr. Greenspan testified regarding BLX that he had been "told that Blixseth Group, Inc. has the estate and all the property in Palm Springs. I've been told it has another house; and I'm told that it owns the stock in Yellowstone World entities, which I don't believe there are assets at that level, but I do believe it has very, very substantial real-estate holdings."

6

Doug James. Doug James testified that on January 6, 2009, he sent BLX a demand on behalf of Yellowstone Mountain Club, LLC for repayment of the Promissory Notes.[5] Debtors' Exhibit 4.

Credit Suisse opposes the Debtors' employment of Doug James arguing that such employment may be unnecessary depending on the Court's ruling on the motion to modify stay. The Committee, Michael Snow and the Class B Group also oppose the Debtors' employment of Doug James arguing that said employment is premature and further argue that neither the Debtors nor Credit Suisse should be allowed to seek collection of the Promissory Notes.

Conversely, the Debtors oppose the Court's Order to Show Cause and lifting the automatic stay to allow a party or parties in interest to pursue collection of the Promissory Notes on the grounds that the Debtors are "taking appropriate steps to collect the notes." The Debtors also maintain that there has been an inadequate showing of cause under 11 U.S.C. § 362(d). Finally, the Debtors contend that the "terms of the Credit Suisse loan agreement allow for 'distribution or loans' up to $209,000,000 to members of the borrower for purposes unrelated to Yellowstone Development" making it improper for Credit Suisse to undertake the collection of the BLX Promissory Notes.

The Class B Group similarly objects to lifting the automatic stay in favor of Credit Suisse with respect to the Promissory Notes. Members of the Class B Group collectively own in the aggregate an approximate six percent equity stake in the Debtors. While the Class B Group supports the monetization of some of the Debtors' assets, it objects to allowing Credit Suisse to

---

[5] While the demand letter of January 6, 2009, references all three Promissory Notes, one could argue that the demand letter is not effective as to Promissory Note 1 payable to Yellowstone Development, LLC in the amount of $55,798,796.68 because Doug James asserts in the demand letter that he and the law firm of Moulton Bellingham represent Yellowstone Mountain Club, LLC, but make no reference to Yellowstone Development, LLC.

pursue collection of the Promissory Notes, arguing that,

> an order granting relief from the automatic stay to Credit Suisse to collect or sell the BGI Notes could result in harm to the estates in two important ways.
>
> a)  First, a disposition of the BGI Notes by Credit Suisse in foreclosure or through secured creditor collections would likely produce far less value for the estates than the careful and integrated prosecution of all relevant claims by an appropriate fiduciary for these estates.  The Court noted in its Memorandum that Credit Suisse had not affirmatively sought relief from the stay to collect the BGI Notes and indicated little interest in doing so.  Its counsel indicated to the Court that he had "no idea whether such Promissory Notes had any value." Memorandum at p. 21.  The Class B Group has little confidence that the value of the BGI Notes and related claims would be maximized by Credit Suisse who may be oversecured with other primary collateral.  While a poor recovery on the BGI Notes might generate some needed cash it would do so at the expense of the Class B Group whose equity interests have value after the payment of all unsecured claims.
>
> b)  Second, either a sale or isolated collection efforts by Credit Suisse based on the BGI Notes alone could frustrate or complicate the subsequent prosecution of related claims retained by the estates for related wrongful transfers of funds and breaches of duty.  Claims of this complexity and size demand a thorough investigation and pursuit by a fiduciary who is committed to maximizing recovery for all constituents.  Credit Suisse would only be required to dispose of collateral in a commercial[ly] reasonable manner under the UCC.

The Committee also opposes allowing Credit Suisse to investigate and collect on the Promissory Notes, alleging that "Credit Suisse's loan to the Debtors in 2005 was a fraudulent conveyance under Montana State law.  So it contests the extent, validity and priority of Credit Suisse's liens, including its security interest in the Notes."  The Committee's objection to Credit Suisse's investigation and collection of the Promissory Notes resulted in the Committee and Credit Suisse entering into a Stipulation Regarding Enforcement of and Collection on Promissory Notes filed January 9, 2009.  Counsel for the Committee summarizes the Stipulation as follows:

> Pursuant to the Stipulation, the Committee will take the nominal lead in investigating and collecting the Notes. Pursuant to the Stipulation, the Committee

>will take the advice and seek the consent of Credit Suisse. This will assure that the fiduciary representative of the unsecured creditors, and the agent for the secured creditors, will work collaboratively to collect a maximum recovery. All collection proceeds will be held, separate and apart, pending further Court order (presumably an order confirming the Debtors' reorganization plan). All rights, claims and causes of action will be preserved. Finally, all settlements will be brought before the Court pursuant to Bankruptcy Rule 2019, so all the parties in these cases can express their views. The Stipulation is consistent with the Committee's statutory duties to conduct investigations leading to the enhancement of creditor recoveries. *See, e.g. In re W. Pac. Airlines Inc.*, 219 B.R. 575, 577-78 (Bankr.D.Colo. 1998) (noting the committee of unsecured creditors is a "watchdog."); 11 U.S.C. § 1103(c)(2) (committee may conduct investigations). The process will be open to all unsecured creditors comprising the Committee's constituency. 11 U.S.C. § 1102(b)(3) (committees required to solicit views and share information).

It is against the foregoing background that the Court issues its decision on the three matters pending before the Court. This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law.

## DISCUSSION

With respect to the Debtors' employment of Doug James to investigate and pursue collection of the Promissory Notes, the Court agrees with all the parties, other than the Debtors, that the Debtors are simply not the appropriate party to be investigating and seeking collection of the Notes. While the Court is confident that Doug James has no conflict of interest and that he would pursue his investigation and collection of the Notes with the utmost professionalism, the appearance of impropriety created by the fact that Blixseth singlehandedly controls the Debtors and BLX simply cannot be overlooked. Given BLX's and Blixseth's current financial situations, it is clearly in the best interests of BLX and Blixseth to stall the Debtors' collection of the Promissory Notes and this Court cannot in good conscience put any professional in a compromising position because of Blixseth's dual role as obligor and obligee. Thus, the Court

must vacate its Order of December 24, 2008, at docket entry no. 201 and deny the Debtors' employment of Doug James.  Doug James, on behalf of his firm, may file an administrative claim for fees and costs arising from the date of employment through the date of this Order, subject to objection, for this Court's consideration.

The issue regarding the automatic stay is more problematic because to grant Credit Suisse relief from the automatic stay would theoretically permit Credit Suisse to dispose of the Promissory Notes in any commercially reasonable manner, even if that meant disposition of the Notes for perhaps $10.00.  What needs to happen is maximization and monetization of the Promissory Notes.  Given the Stipulation between Credit Suisse and the Committee, the matter litigated before the Court was really whether the Committee should be granted standing to investigate and then pursue collection of the Notes.

As previously recognized by this Court, "in appropriate situations the bankruptcy court may allow a party other than the trustee or debtor-in-possession to pursue the estate's litigation. *In re Valley Park*, 217 B.R. 864, 866 (Bankr. D.Mont. 1998), quoting *Liberty Mutual Ins. Co. v. Official Unsecured Creditors Comm. of Spaulding Composites Co. (In re Spaulding Composites Co.)*, 207 B.R. 899, 903 (9th Cir. BAP 1997).  *See also Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 247-48 (5th Cir.1988); *Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904 (2nd Cir.1985); *Official Unsecured Creditors' Comm. v. Michaels (Matter of Marin Motor Oil, Inc.)*, 689 F.2d 445, 453 (3d Cir.1982);  *In re First Capital Holdings Corp.*, 146 B.R. 7, 11 (Bankr.C.D.Cal.1992).  In determining whether to confer derivative standing on a creditors' committee, this Court has previously acknowledged four factors often considered by courts:

    1.       A demand has been made upon the statutorily authorized party to take action;

    2.       The demand is declined;

    3.       A colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court; and

    4.       The inaction is an abuse of discretion ('unjustified') in light of the debtor-in-possession's duties in a Chapter 11 case.

*Valley Park*, 217 B.R. at 866. However, in *Valley Park*, this Court also concluded that where, as here, the president of the debtor-in-possession was reluctant to initiate proceedings "against himself and trust entities of which he and his family are beneficiaries, such reluctance obviates the need for strict application of the first, second, and fourth considerations from [*Canadian Pacific Forest Products Limited v. J.D. Irving, Limited (In re the Gibson Group, Inc.)*, 66 F.3d 1436 (6th Cir. 1995)].

    In the instant case, the Debtors admit that they took no steps to demand payment on the Promissory Notes until the matter was raised by the Court, and only after the Court's inquiry did the Debtors take steps to make demand on the Notes. Furthermore, collection of any amounts under the Promissory Notes could only benefit the estate. An efficient investigation of and collection on the Promissory Notes -- while perhaps not in Blixseth's best interest – may well be the Committee's only hope of realizing any benefit from this bankruptcy proceeding. At the direction of Blixseth, the Debtors declined to seek collection on the Promissory Notes for almost four months. The failure of the Debtors to promptly pursue collection of the Notes was unjustifiable.

    Like the Debtors, and as counsel for the Class B Group correctly stated, Credit Suisse also took a lackadaisical attitude toward the Notes until it realized that other parties-in-interest

may have an interest in the Notes. However, Credit Suisse, unlike the Committee, cannot have derivative standing to pursue collection of the Notes. Moreover, if this Court were to grant Credit Suisse relief from the automatic stay, Credit Suisse would be free to liquidate the Promissory Notes in a commercially reasonable matter. While such course of action may confer a benefit upon Credit Suisse, it would, in all likelihood, provide no benefit to the Committee. The best course of action is to allow the Committee to pursue collection of the Promissory Notes. However, the Promissory Notes are in Credit Suisse's possession and Credit Suisse may have valuable information concerning the Promissory Notes. Therefore, following the spirit of the Stipulation between Credit Suisse and the Committee, the Committee is granted, on behalf of the bankruptcy estate and not in its own right, the authority to pursue investigation and collection of the Promissory Notes. In addition, the Court deems it appropriate and necessary to lift the automatic stay as it relates to Credit Suisse for the sole and limited purpose of allowing Credit Suisse to assist the Committee, to the best of Credit Suisse's ability, in investigating, pursuing collection and ultimately maximizing the value of the Promissory Notes.

For the reasons discussed above and to memorialize the Court's oral ruling made at the January 13, 2009, hearing, the Court will enter a separate order providing as follows:

IT IS ORDERED that the Court's Order entered December 24, 2008, at docket entry no. 201, authorizing the Debtors to employ Doug James is vacated; and the Debtors' Application to Approve Employment of Professionals filed December 23, 2008, at docket entry no. 200, is DENIED.

IT IS FURTHER ORDERED that the Stipulation of Credit Suisse, as Agent, and Official Committee of Unsecured Creditors Regarding Enforcement of and Collection on Promissory

Notes filed January 9, 2009, at docket entry no. 242 is APPROVED subject to the clarification provided by the Committee's counsel and subject to the following conditions:

1. The Committee, as fiduciary of the bankruptcy estate, shall conduct a full review of the causes of action belonging to the Debtors that are related to the Promissory Notes to determine how the Debtors' bankruptcy estates should best proceed to recover the divested proceeds of the Credit Suisse loan; and

2. The Committee shall undertake every effort to maximize the value of the Promissory Notes for the benefit of the bankruptcy estates, and this Court will retain ultimate control over the course of any litigation, sale and liquidation stemming from or associated with the Promissory Notes.

IT IS FURTHER ORDERED that the stay afforded by 11 U.S.C. § 362 is modified for the sole and limited purpose of allowing Credit Suisse to assist the Committee, to the best of Credit Suisse's ability, in investigating, pursuing collection and ultimately maximizing the value of the Promissory Notes.

BY THE COURT

*Ralph B. Kirscher*
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana