CHARLES W. HINGLE (#1947)
SHANE P. COLEMAN (#3417)
HOLLAND & HART LLP
401 NORTH 31st STREET, SUITE 1500
BILLINGS, MONTANA 59101
(406) 252-2166 (PHONE)
chingle@hollandhart.com (EMAIL)
spcoleman@hollandhart.com (EMAIL)

EVAN R. LEVY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FOUR TIMES SQUARE
NEW YORK, NEW YORK 10036
(212) 735-3000 (PHONE)
elevy@skadden.com (EMAIL)
*Admitted Pro Hac Vice*
   - and –

MARK S. CHEHI
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
ONE RODNEY SQUARE
P.O. BOX 636
WILMINGTON, DELAWARE 19899
(302) 651-3000 (PHONE)
mchehi@skadden.com (EMAIL)
*Admitted Pro Hac Vice*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re: | Chapter 11 |
| Yellowstone Mountain Club, et al., | Case No. 08-61570-11<br>Jointly Administered |
| Debtors. | |

**EMERGENCY MOTION OF PREPETITION LENDERS
FOR ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363 AND 364
COMPELLING IMMEDIATE COMMENCEMENT OF MARKETING PROCESS;**

**AND NOTICE**

Credit Suisse, as administrative agent and collateral agent (the "<u>Agent</u>") for the prepetition lenders (the "<u>Prepetition Lenders</u>") under that certain Credit Agreement, dated as of September 30, 2005 (the "<u>Prepetition Credit Agreement</u>"), hereby moves on an emergency basis (the "<u>Motion</u>") for an order under 11 U.S.C. §§ 105(a), 361, 362, 363 and 364 directing and compelling the above-captioned Debtors to commence immediately a full, fair and open marketing process to identify prospective purchasers or investors for purposes of a sale or plan of reorganization of the Debtors' Yellowstone Club businesses and properties, as follows:

**Preliminary Statement**

1. The Court should enter an order directing and compelling the Debtors to commence immediately a full, fair and open marketing process to identify prospective purchasers or investors for purposes of a sale or plan of reorganization of the Debtors' Yellowstone Club businesses and properties (the "<u>Marketing Process</u>") because:

    a.    <u>Need for Robust Marketing Process</u>.  A robust Marketing Process is needed to identify and explore with prospective purchasers and investors their possible transaction interests and capabilities before the Debtors or any other parties in interest - - or this Court - - can properly consider proceeding with any particular sale or reorganization plan-based transaction structure that might be proposed.  The Debtors previously testified under oath that a robust Marketing Process was needed to maximize value - - and that the Debtors would actually undertake a robust Marketing Process (and not just negotiate a plan) prior to February 13, 2009.

    b.    <u>Delay of Marketing Process By Debtors</u>.  The Debtors intentionally have delayed commencing a robust Marketing Process due to pressures and directions exerted by CrossHarbor Capital Partners LLC and its affiliates (collectively, "<u>CrossHarbor</u>") to advance the insider interests of CrossHarbor and Edra Blixseth ("<u>Blixseth</u>"), the person ultimately in control of the Debtors.

    Cross Harbor has forced the Debtors to delay the Marketing Process by threatening that if the Debtors proceed to engage a broker or sales advisor and commence the Marketing Process before a reorganization plan being proposed by CrossHarbor is filed, such actions will allegedly trigger an Event of Default under the CrossHarbor debtor-in-possession financing in these cases.

    c.    <u>Immediate Commencement of Marketing Process Is Essential</u>.  The Court should grant this Motion without delay because it takes time for an experienced broker/sales advisor to prepare and execute a robust Marketing Process that will maximize value for creditors - - and

1

those preparations should not be delayed any longer simply because the Debtors have decided improvidently to cast their lot with CrossHarbor without first testing the market and seeking higher valued reorganization alternatives with a robust Marketing Process.

  d. <u>Adequate Protection of Prepetition Lenders' Interests Requires Marketing Process</u>. The Court should condition the Debtors' further use of the Prepetition Lenders' collateral on commencement and completion of a minimum 90-day Marketing Process, to protect the Prepetition Lenders' interests in their collateral.

## Jurisdiction and Venue

  2. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

  3. The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363 and 364.

## Background

  4. <u>Approval of DIP Facility</u>. By order of the Court dated December 17, 2008 [Dkt. No. 182] (the "<u>Final Order</u>") this Court approved the debtor-in-possession financing facility (the "<u>DIP Facility</u>") provided by CrossHarbor and its affiliate, CPC Yellowstone Lending LLC.

  5. Restructuring Deadlines. The DIP Financing Term Sheet incorporates several "Restructuring Benchmarks," including a February 13, 2009 deadline for the Debtors to file a reorganization plan and disclosure statement <u>acceptable to CrossHarbor</u>. Other Restructuring Benchmarks include a March 31, 2009 confirmation deadline, and in lieu of plan confirmation by that date, an April 30, 2009 deadline for consummating a sale of the Debtors' assets <u>on terms and with procedures agreeable to CrossHarbor</u>. A failure to meet such restructuring deadlines will result in Events of Default under the DIP Facility. (<u>See</u> DIP Financing Term Sheet).

  6. When approving the CrossHarbor DIP Facility, the Court concluded that the interests of the Prepetition Lenders in their collateral are adequately protected in part because the

2

DIP Facility will preserve and enhance the value of the Prepetition Lenders' collateral.  See Final Order at ¶ 10.

7.       **Prior Debtor Commitments To Robust Marketing Process**.  On November 25, 2008, under oath in response to direct questioning by the Court about the Restructuring Benchmarks, the Debtors testified (and assured the Court and other parties) that over the next "60 days over the holiday season, over Christmas; over New Years; over weather problems," the Debtors were "going to run as robust a process as possible to ensure that . . . the value is maximized for all the stakeholders", and that such 60 day period would be used by the Debtors "not just [to] negotiate a plan, but [to] find people with money."  Transcript of November 25, 2008 (Greenspan testimony), at 99:8-21.

8.       Moreover, the Debtors stated under oath on December 12, 2008 that they understood they needed to "get to a deal" by mid-February 2009; that they "will continue" to market the Debtors' businesses and properties "in a way that maximizes value"; and that dealing with "anybody" on an "exclusive" basis will not maximize value; and, therefore, the Debtors would not stake their reorganization negotiations on a single purchaser/investor:  "[w]e don't think that throwing our fate into the hands of a single company is the optimal way to do it. . . . "  Transcript of Deposition of Ronald F. Greenspan (December 6, 2008) at 108:23 – 109:8.

9.       Based on the Debtors' foregoing statements under oath,  the Court, the Prepetition Lenders and other parties were led to believe that beginning in December 2008 the Debtors would commence and run a robust Marketing Process through the Debtors' ski season, and that process would run through at least January 2009.

10.      Contrary to the Debtors' representations to the Court and Prepetition Lenders, no Marketing Process has occurred.

3

11. <u>Material Insider Relationships</u>. A plethora of insider relationships, including agreements, understandings, obligations and commitments between and among the Debtors, Blixseth, CrossHarbor and Discovery Land Company (the manager of the Debtors' businesses) ("<u>DLC</u>"), pose significant conflicts and insider self-interests and have thwarted a fair and open Marketing Process.

12. Blixseth's personal financial affairs are inextricably intertwined with CrossHarbor. She personally and/or her affiliates including BLX Group Inc. ("<u>BGI</u>") are indebted to CrossHarbor in an amount exceeding $35 million. Blixseth has testified that such indebtedness is secured by her personal residence - - owned by BGI - - and CrossHarbor is enforcing such indebtedness. Transcript of January 13, 2009 Hearing, 42:6-23.

13. Just prior to these chapter 11 cases, Blixseth entered into agreements with CrossHarbor and DLC to restructure the Debtors' businesses and advance their respective interests in obtaining ownership and control of the Debtors' properties. Transcript of December 11, 2008 Hearing, 87:7-23.

14. BGI - - Blixseth's wholly-owned subsidiary that controls the Debtors - - is obligated to the Debtors on notes aggregating in excess of $200 million. It follows that the Debtors and their estates are competing against CrossHarbor in respect of its claims against Blixseth and BGI's assets. Transcript of December 13, 2008 Hearing, 19:14-22, 27:19-22, 37:8-16.

15. Additionally, the Debtors have purported to transfer to property personally owned by Blixseth important development rights of the Debtors in respect of their Yellowstone Club properties. Public records show that CrossHarbor is in the process of platting such benefited

4

Yellowstone Club properties owned by Blixseth in a manner that will effectively reduce the maximum available development rights of the Debtors.

16. On top of this, CrossHarbor admitted to the Agent that it reached agreement with Blixseth on reorganization plan terms prior to the January 13, 2009 hearing in these cases. Such terms and agreements have not been disclosed to this Court or the Debtors' creditors. Upon information and belief, the Debtors' bankruptcy counsel and CRO were not involved in Blixseth's insider negotiation of reorganization plan terms with CrossHarbor.

17. <u>Intentional Delay of Marketing Process</u>. In recent weeks, at CrossHarbor's direction and insistence, the Debtors intentionally delayed the Marketing Process that is needed to maximize the value of the Debtors' businesses and properties for the benefit of all parties in interest.

18. Weeks ago, the Debtors told the Agent that the Debtors' choice was to engage CB Richard Ellis ("<u>CBRE</u>"), an experienced real estate advisor, to undertake the Marketing Process. The Debtors proposed the terms of such engagement to the Agent, and the Debtors began preparing preliminary marketing materials for a Marketing Process.

19. Upon learning that the Debtors were about to employ CBRE, CrossHarbor intervened to pressure the Debtors to delay the Marketing Process. Following CrossHarbor's intervention, the Debtors determined <u>not</u> to seek to retain CBRE until after a plan proposed by and acceptable to CrossHarbor is filed. Among other things, CrossHarbor threatened to declare an Event of Default under the DIP Facility if the Debtors were to engage CBRE and commence robust Marketing Process before the filing of a plan acceptable to CrossHarbor.

20. <u>Exclusive Dealings With CrossHarbor Instead of Robust Marketing Process</u>. The Debtors failed to commence a robust Marketing Process during the 60-day period following the

5

November 25, 2008 hearing in these cases. Indeed, the Debtors have made little progress with prospective purchasers/investors, instead negotiating reorganization plan terms exclusively with CrossHarbor.

21. Without exploring possible transaction alternatives with third-party purchasers/investors, the Debtors only have negotiated plan terms with CrossHarbor. The Debtors have said that they believe they are compelled to file a plan acceptable to CrossHarbor, and it is their intention to grant to CrossHarbor breakup fees and other inappropriate stalking horse bidder rights to advance the plan being proposed by CrossHarbor.

22. <u>Failure to Establish Useful Data Room</u>. Although the Debtors have taken steps to establish an electronic 'data room' (the"<u>Data Room</u>") for information about the Debtors' businesses and properties to inform prospective purchasers/investors, the quality of the information in the Data Room is insufficient and suspect: (i) the Data Room is <u>not</u> populated with all the material information needed by prospective purchasers/investors, (ii) DLC has not provided - - and the Debtors are not requesting DLC to provide - - all of its non-privileged information concerning the Debtors and (iii) the Debtors have sought to block use of certain information in the Data Room on grounds that it is CrossHarbor's information (not the Debtors').

23. <u>"Chilling" of Third Party Expressions of Interest</u>. The Debtors have told the Agent that prospective investors/purchasers have said they are concerned about CrossHarbor's "head start" in the due diligence process and that CrossHarbor may have undue influence over the Debtors' properties and any competitive bidding process.

24. The Debtors' delay of the Marketing Process, their exclusive plan negotiations with CrossHarbor, the lack of complete information in the Data Room, and the Debtors' admitted

6

intention to provide stalking horse bidder protections and a break up fee to CrossHarbor all contribute to a "chilling" effect on possible third party expressions of interests.

### Immediate Need for Marketing Process

25.     As the Debtors previously testified under oath (<u>see</u> paragraphs 7-10 above), a robust and open Marketing Process is needed to maximize the value of the Debtors' businesses for the benefit of all creditors and other parties in interest.

26.     It is imperative that the Court promptly grant the relief requested by this Motion, because it will take time for an experienced broker/financial advisor to prepare and execute a robust Marketing Process that will provide opportunities to explore higher valued reorganization alternatives to the CrossHarbor plan.

27.     A robust Marketing Process should not be delayed by CrossHarbor threats that such a process will be an Event of Default under the DIP Facility - - or by the Debtors' improvident decision to negotiate plan terms exclusively with CrossHarbor, instead of other parties.

28.     Moreover, the Court should require completion of a minimum 90-day Marketing Process <u>before</u> permitting any CrossHarbor (or other) plan of reorganization to proceed towards confirmation. The Debtors have put the proverbial "cart before the horse" by agreeing to file a CrossHarbor plan without exploring fully other reorganization plan structures and alternatives that should flow from a robust Marketing Process.

29.     CrossHarbor's own efforts to block the employment of CBRE and other robust marketing efforts belies the infirmity of the Debtors' flawed process.

30.     In addition to a minimum 90-day Marketing Process, the Court should order the Debtors to make available in the Data Room <u>full information</u> about the Debtors' businesses and

properties, including <u>all</u> Yellowstone Club-related information, models and projections shared by CrossHarbor with the Debtors, Blixseth and/or DLC. Blixseth has testified that CrossHarbor has "turned a lot of information over:" to her. Blixseth Deposition Transcript (December 6, 2008) at 27:10-13.

### The Debtors Have Failed Their Fiduciary Duty To Proceed With A Marketing Process That Maximizes Value

31. The Court should order the Debtors to commence the Marketing Process described above because the Debtors have failed their fiduciary duty to take appropriate steps to maximize the value of the Debtors' businesses and properties for the benefit of their creditors - - not just insiders like CrossHarbor, Blixseth and DLC. <u>See</u>, <u>e.g.</u>, <u>In re Chief Executive Officers Clubs, Inc.</u>, 359 B.R. 527, 540 n.6 (Bankr. S.D.N.Y. 2007) ("'As fiduciaries, the debtor in possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate, and protect and conserve the debtor's property'") (quoting <u>In re Centennial Textiles, Inc.</u>, 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998)); <u>In re Nat'l R.V. Holdings, Inc.</u>, 390 BR. 690, 699 (Bankr. C.D.Cal. 2008) ("Ninth Circuit holds the debtor in possession's corporate officers to the standards of 'officers of the court because of their responsibility to act in the best interests of the estate as a whole and the accompanying fiduciary duties.'") (quoting <u>Gumport v. China Int'l Trust & Inv. Corp. (In re Intermagnetics Am., Inc.)</u> 926 F.2d 912, 917 (9th Cir. 1991)).

32. The need for a robust Marketing Process and the Debtors' fiduciary failure is evidenced by the Debtors' own testimony under oath. <u>See</u> paragraphs 7-10 above.

### The Motion Should Be Granted On Adequate Protection Grounds

33. The Debtors' failure to commence a robust Marketing Process has risked the value of the Prepetition Lenders' collateral and their prospects for maximizing the value of it. This

circumstance raises the issue of adequate protection of the Prepetition Lenders' interests in their collateral.

34. Section 363(e) of the Bankruptcy Code provides, in relevant part, that "at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

35. The Agent submits this Motion as an "adequate protection" request under section 363(e) of the Bankruptcy Code. The Agent respectfully asks the Court to condition the Debtors' further use of the Prepetition Lenders' collateral on (i) the Debtors' immediate employment of an experienced broker/financial advisor, (ii) commencement and completion of a minimum 90-day Marketing Process, (iii) population of the Data Room with all non-privileged information, models, projections and business plans related to the Yellowstone Club that have been shared by CrossHarbor with any of the Debtors, Blixseth or DLC, and (iv) the suspension of any plan of reorganization filed by the Debtors or CrossHarbor or any other party pending completion of such minimum 90-day Marketing Process.

36. Imposing such conditions on further use of the Prepetition Lenders' collateral is consistent with the Prepetition Lenders' adequate protection rights, and the terms of this Court's Final Order approving the CrossHarbor DIP Facility. Immediate commencement of a minimum 90-day Marketing Process as described above is necessary to preserve and enhance the value of the Prepetition Lenders' collateral.

37. The Agent and Prepetition Lenders submit that if the Court does not require commencement and completion of a robust Marketing Process as a prerequisite to any

9

reorganization plan process, the value to be realized on the Prepetition Lenders' collateral will fall far short of the minimum $310 million valuation found by this Court in its Memorandum of Decision, dated December 17, 2008.

WHEREFORE, the Agent respectfully requests entry of an order (i) compelling the Debtors immediately and without further delay to *(x)* employ CBRE or another experienced broker or financial advisor of their choice, *(y)* commence a minimum 90-day Marketing Process as described above and *(z)* populate the Data Room with all material, non-privileged information possessed by the Debtors, Blixseth and DLC, including information exchanged with or received from CrossHarbor, (ii) conditioning the Debtors' further use of the Prepetition Lenders' collateral on compliance with this Order, and (iii) granting the Agent and the Prepetition Lenders such other and further relief as is just and proper.

Dated: Billings, Montana
January 27, 2009

/s/ Shane P. Coleman
Charles W. Hingle
Shane P. Coleman
HOLLAND & HART LLP
401 North 31st Street
Suite 1500
Billings, Montana 59101
(406) 252-2166 (Phone)
spcoleman@hollandhart.com (Email)

Of Counsel:
Evan R. Levy (NY No. 2720068)
SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

- and –

Mark S. Chehi (Del. Bar No. 2855)
SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

Attorneys for Credit Suisse,
sole administrative agent and collateral agent

---

**NOTICE TO DEBTORS AND INTERESTED PARTIES**

---

**If you object to the motion, you must file a written responsive pleading and request a hearing within ten (10) days of the date of the motion. The objecting party shall schedule the hearing and shall include in the caption of the responsive pleading the date, time, and location of the hearing by inserting in the caption the following:**

**NOTICE OF HEARING**
**Date:** _____
**Time:** _____
**Location:** _____

**If no objections are timely filed, the Court may grant the relief requested as a failure to respond by any entity shall be deemed an admission that the relief requested should be granted.**

4435496_1.DOC

11