James A. Patten (1191)
**PATTEN, PETERMAN, BEKKEDAHL & GREEN, PLLC**
2817 2nd Avenue North, Suite 300
Billings, MT 59101
Phone: (406) 252-8500
Fax: (406) 294-9500
E-Mail: japatten@ppbglaw.com

Lawrence R. Ream, WSBA #18159
Richard G. Birinyi, WSBA #9212
**Bullivant Houser Bailey PC**
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Phone: (206) 292-8930
Fax: (206) 386-5130
Email: larry.ream@bullivant.com
Email: rick.birinyi@bullivant.com

Attorney for Debtors

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| IN RE: | Case No. 08-61570 |
| YELLOWSTONE MOUNTAIN CLUB, LLC, et al. | JOINTLY ADMINISTERED |
| Debtors. | |

### MOTION FOR APPROVAL OF BIDDING AND SOLICITATION PROCEDURES REGARDING PROPOSED SALE OF 100% OF THE EQUITY INTERESTS IN THE DEBTORS PURSUANT TO A PLAN OF REORGANIZATION

The Yellowstone Club, debtor-in-possession, and all the other debtors in these administratively consolidated cases ("Debtors"), move this Court for the entry of an order approving certain bidding, notice and solicitation procedures with regard to a proposed sale

1

of 100% of the equity interests in the Debtors pursuant to the terms of a proposed Plan of Reorganization (the "Bidding and Solicitation Procedures Motion").

## FACTS

The Debtors filed their petitions for relief under Chapter 11 on November 10, 2008 (the "Petition Date"). The Court entered its order of joint administration on ,November 13 2008. The Debtors have retained control over their assets and continue to operate their business pursuant to §§ 1107 and 1108 of the Bankruptcy Code. The Debtors collectively own and manage the Yellowstone Club (the "Club" or the "Yellowstone Club"), which consists of remaining lots and/or residential units and memberships in the Club. In addition the Debtors and their wholly owned subsidiaries own properties in France and Scotland and possess potential avoidance and other civil claims. The Company hired and the Court has approved the retention of FTI and Ronald Greenspan as Chief Restructuring Officer to provide assistance to the Debtors in connection with these chapter 11 proceedings.

The Court has approved a DIP Loan to provide funding of the Debtors' operations through the winter season. Under the terms that govern the DIP Loan, among the benchmarks governing the Debtors performance under the DIP Loan is a requirement to file a proposed Plan of Reorganization on or before February 13, 2009. The Debtors and their consultants have engaged in discussions with interested parties to attempt to arrive at a completely consensual plan of reorganization, but despite sustained efforts have been unable to achieve that result for a number of reasons, including a view of the value of the Yellowstone Club assets that differs between the secured creditor and market participants and the litigious history of this case. The Debtors, however, are in the process of finalizing negotiations with CrossHarbor Capital Partners LLC ("CrossHarbor") with respect to a plan

of reorganization that can be drafted and filed in accordance with the benchmarks. In the negotiations, the Debtors have required that a key element of a plan proposal be a meaningful marketing period to test the market for alternative sources of capital and CrossHarbor has agreed to the requested marketing period.

In pursuit of this process, the Debtors set up an electronic data room and invited all interested parties (including prospective purchasers, Credit Suisse Cayman Island Branch as administrative agent for the existing secured lenders ("Credit Suisse") and the Official Committee of Unsecured Creditors) to review all relevant material associated with the Debtors' assets, inspect the property and have questions answered by management. Additionally Debtor solicited marketing proposals from four qualified brokerage and investment banking firms. Credit Suisse, in particular, has also requested that the Debtors employ the services of a professional broker so that the Court and the Parties can be assured that the fair market value of the Yellowstone Club assets have been tested in the market. The Debtors have agreed in principle with Credit Suisse and have solicited proposals from qualified brokers. Of the four firms solicited by the Debtors, two were suggested by Credit Suisse. As a result of that solicitation the Debtors have selected CB Richard Ellis and will promptly be filing an application to employ that firm as the Debtors' broker to market the equity in the Reorganized Debtors as contemplated by the Plan. In order to maximize the market exposure time and make the marketing process more organized, and thus more transparent and effective, CB Richard Ellis, in anticipation of being retained, has already begun analyzing data and preparing its marketing campaign, which will go "live" only after Court approval of its retention and approval of Bidding and Solicitation Procedures. Pursuant to the contemplated plan of reorganization, the assets other than those associated

with the Yellowstone Club will be contributed to a liquidating trust and will not be part of the property being marketed by CB Richard Ellis.

## Plan of Reorganization

Since the approval of the DIP Loan the Debtors have aggressively sought to achieve consensus among the various creditor groups and the members of the Club with respect to the reorganization cases. That effort has been frustrated at every turn by the litigious stance to the case adopted by Credit Suisse and its counsel. Nevertheless, the Debtors and their professionals prepared a virtual Data Room that contains detailed documented information about the project and the Debtors' assets, including the Debtors' historical performance, their current operations and market position, its core assets and liabilities, and other information typically required by organizations that might have an interest in acquiring the Yellowstone Club. Debtors provided access to the virtual Data Room to Credit Suisse (and all of the participants in that credit) and the UCC and in response to their comments have augmented the contents of the data room as appropriate. The Yellowstone Club bankruptcy has been covered extensively in real estate and bankruptcy professional publications and the national and local popular press. This coverage has led numerous interested parties to contact the Debtors, FTI and Credit Suisse regarding potentially purchasing or investing in Yellowstone Club. On information and belief, Credit Suisse has referred all contacts it has received to the Debtors. Additionally, FTI has contacted entities it believes are qualified and might be interested in acquiring the Yellowstone Club. Through these points of contact, approximately 12 parties displayed some level of interest, with 3 parties executing confidentiality agreements, and 5 parties accessing the Data Room (this number includes some of the investors in the senior secured credit facility, which parties are primarily hedge

4

funds and investors in distressed assets, which are a key potential source of buyers or investors in Yellowstone Club). Follow-up has been made with each of these parties who have so requested, including telephone conferences, personal meetings, tours of the Yellowstone Club, and meetings with its senior employees.. These efforts have not yet produced any party, other than CrossHarbor, that is willing to commit to the substantial due diligence required to properly evaluate the assets and enter into meaningful acquisition negotiations.[1]

The Yellowstone Club assets are very complex and determining their development potential and value requires significant expenditures of time and money. In today's distressed environment, there are a myriad of available real estate and resort projects competing for the attention of the limited pool of qualified purchasers. Three consistent difficulties have been identified by acquisition prospects to pursuing fulsome due diligence, and hence being in a position to make a meaningful offer for the Yellowstone Club properties: (1) the risk of Credit Suisse exercising an overriding credit bid with respect to any sale of the real property and the rights afforded Credit Suisse under the *Clear Channel* decision *In re PW, LLC*, 391 B.R. 25 (9th Cir.BAP,2008), (2) the head start in analysis of the project enjoyed by CrossHarbor as a result of its substantial investment in the project prior to the filing of the petition, (which investment includes the purchase of lots and acquisition due diligence conducted over an extended period of time), and (3) the very visible hostility and litigious approach by Credit Suisse. While not completely solving all three of these issues,

---

[1] Because the Debtors' efforts have been and continue to be on a multi-track process, as of January 31, 2009, there is now one party that appears to be expending meaningful effort, including a scheduled due diligence and inspection trip to the Yellowstone Club during the first week of February. As has been the situation since the beginning of this case, during the pendency of the instant motion, and during the anticipated on-going marketing period, the Debtor will continue to cooperate with and facilitate the due diligence by all qualified and interested parties.

5

Debtors believe that all three of these concerns, together with the time frame set forth in the approved DIP arrangement (which is the same time frame as was contained in the aborted Credit Suisse DIP loan), are ameliorated in the best manner possible by the Plan and the proposed sale and solicitation order. The Debtors are confident that the negotiations with CrossHarbor, and the transparency, uniformity, and "base line" terms of the proposed Plan and Disclosure Statement, together with an Order Granting this Motion, will maximize the value of the Yellowstone Club for all stakeholders given the difficult economic conditions currently being experienced world-wide and the particular financial and practical situations of the Debtors.

The Debtors have negotiated an equity sale (the "Equity Sale") to an affiliate of CrossHarbor ("Purchaser") pursuant to which the Purchaser has agreed to purchase 100% of the equity interests in the Reorganized Debtors for a total purchase price of $100 Million Dollars plus a substantial equity investment to ensure the success and future viability of the Club and enhanced security for all post-confirmation creditors. The purchase price shall be payable $30,000,000 cash and the balance, $70,000,000, in the form of a note on such terms as shall be more specifically set forth in the Plan. Purchaser may apply its outstanding DIP loan toward the cash component of the purchase price. In satisfaction of its secured claim, Credit Suisse will receive its share of (1) the cash remaining with the Debtor after satisfaction of the DIP loan and administrative expenses and claims payments at confirmation, (2) the $60 Million promissory note, and (3) the proceeds of the liquidating trust, until it has been paid the amount of its secured claim. The promissory note will be secured by all assets which currently secure the Credit Suisse secured note plus all of the Debtors' other assets associated with Yellowstone Club which it currently does not encumber

(such as the base lodge) as well as such additional real property to be contributed to the Reorganized Debtor by CrossHarbor and/or its affiliates. Purchaser is also agreeing to contribute an additional $75,000,000 to the Reorganized Debtors, which funds shall be used by the Reorganized Debtors in the furtherance of its activities post-confirmation, of which $25,000,000 will be available on the Plan's effective date and the balance of $50,000,000 shall be in the form of binding capital commitments. The assets to be retained by the Reorganized Debtors consist of the operating assets of the Yellowstone Club and will be detailed in the proposed Disclosure Statement and Plan of Reorganization. Although all negotiations with affected member constituents have not been finalized, the Debtors anticipate that membership agreements will be assumed by the Reorganized Debtors, provided, however, that the contracts of certain special classes of members will likely be rejected and those members will be permitted to enter into new membership agreements with the Reorganized Debtors. Debtors shall tentatively designate other executory contracts and/or unexpired leases for assumption, but shall have the right at any time prior to confirmation to modify that designation and would expect to do so in consultation with Purchaser or other successful investor. Unless a contract is designated for assumption, it shall be rejected on confirmation. It is intended that the Plan will provide that the Reorganized Debtors shall use the cash received from Purchaser (if other than CrossHarbor) to pay the DIP financing in full, pay administrative expenses, and then pay to Credit Suisse its share of the balance. All assets not designated by Debtors as part of the Yellowstone Club operations, plus all non-operating assets (such as avoidance actions), will be transferred to a Liquidating Trust first for the benefit of any § 507(b) claim of Credit Suisse, subject to any offset for the estate's § 506(c) claim against Credit Suisse's collateral, then for the benefit of

the unsecured creditors (including Credit Suisse's deficiency claim, if any), and then to former equity.

The Debtors recognize that reasonable efforts should be extended to maximize the prospects that they are receiving the highest possible value for the Yellowstone Club and that the Court and all interested parties are entitled to the same assurance. Accordingly, the Debtors have proposed and the DIP Lender has agreed to the extension of certain dates in the DIP Loan agreement, so that the business provisions of the plan be further exposed to the marketplace for higher and better offers. By extending the plan confirmation date to the end of April and establishing a transparent and Court-approved bid and plan solicitation process, Debtors believe the prospect for maximum recovery is best maximized in the current environment.

## Approval of Bid Procedures

The Debtors designed the plan and these bidding and solicitation procedures to foster submission of competitive bids from other parties ("Alternative Bids") in connection with the motion for confirmation of the proposed Plan under § 1129(a) & (b) of the Bankruptcy Code (the "Confirmation") and the hearing thereon (the "Confirmation Hearing"). The Debtors therefore request approval of the following bidding procedures (the "Bidding Procedures") to be employed with respect to the plan's sale of 100% of the Reorganized Debtors' equity to the Purchaser or the successful bidder resulting from these Bidding Procedures. The Bidding Procedures are designed to compensate the Purchaser for its efforts and agreements to date and the concomitant benefits conferred upon the Debtors' estate, and to facilitate a full and fair process designed to maximize the value of the Reorganized Debtors for the benefit of the Debtors' estate. The Bidding Procedures as such may be approved by the Court will be set

forth in full in the proposed disclosure statement and will be provided to CB Richard Ellis, and any acquisition prospects immediately following the hearing on this Motion:

1. **Confidentiality Agreement.** Upon execution of an acceptable confidentiality agreement, any party that wishes to conduct due diligence may be granted access to all material information that has been or will be provided to any potential bidder

2. **Alternative Bid Deadline.** All Alternative Bids must be submitted not later than 12:00 p.m. (MST) on the tenth day prior to the Confirmation Hearing (the "Alternative Bid Deadline") to:

    > Yellowstone Club
    > 71713 Highway 111
    > Rancho Mirage, CA 92270
    >
    > with copies to:
    >
    > Ron Greenspan
    > c/o FTI Consulting, Inc.
    > 633 West Fifth Street, 16th Floor
    > Los Angeles, CA 90071
    >
    > James A. Patten
    > Patten Peterman Bekkedahl & Green
    > 2817 Second Avenue North, Suite 300
    > Billings Mt 59101
    >
    > Lawrence R. Ream
    > Bullivant Houser Bailey PC
    > 1601 Fifth Avenue, Suite 2300
    > Seattle, Washington 98101-1618

3. **Distribution of Alternative Bid.** Upon receipt of an Alternative Bid, the Debtors shall immediately distribute a copy of such Alternative Bid to counsel of record for (i) the Purchaser, (ii) Credit Suisse, (iii) the Unsecured Creditors Committee (the "Committee"), and (iv) the Ad-Hoc Members' Committee (the "Ad-Hoc Committee").

4. **Qualified Alternative Bid.** An Alternative Bid will qualify for consideration only if the Alternative Bid is a "Qualified Alternative Bid." To be a Qualified Alternative Bid, the Alternative Bid shall either be submitted by Purchaser or must:

    a. Identify the proponent of the Alternative Bid and an officer who is authorized to appear and act on behalf of and bind the bidder in connection with all proceedings related to such bid;

9

b.  Propose in writing a transaction with the cash component of the purchase price greater than or equal to the sum of (x) the cash component of the purchase price set forth in the Plan, plus (y) $3,500,000.00 (the "Initial Overbid Amount"), plus (z) in the case of any subsequent Qualified Alternative Bids, $1,000,000.00 over the immediately preceding Qualified Alternative Bid (the "Subsequent Overbid Amount"), and in all cases the debt component of the purchase price shall not exceed the amount of the debt component set forth in the Plan;

c.  Propose in writing what additional collateral will be provided to replace the additional property being contributed by CrossHarbor and/or its affiliates to the Reorganized Debtors, with such additional collateral to be substantially equal in value to the additional collateral set forth in the Plan, failing which the Alternative Bid shall propose modifications to the purchase price (e.g. an increased interest rate) that provide reasonably equivalent value to the relevant parties affected by the lack of additional collateral;

d.  Consist of an agreement in the form of the Agreement to be entered into with Purchaser to effectuate the purchase contemplated by the Plan (the "CH Definitive Agreement"), marked to show changes thereto that is on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the CH Definitive Agreement and provides for working capital no less than that to be provided by Purchaser;

e.  Not be subject to any contingencies related to due diligence, financing or further approval, such as by senior management or board of directors;

f.  Not be subject to termination by such bidder except on the same terms as the CH Definitive Agreement and state such Alternative Bid is irrevocable until the effective date of the Plan;

g.  Be accompanied by (i) a cash deposit or letter of credit in the amount of $10,000,000, refundable only in the event that the prospective bidder is not the successful bidder at the Auction (as defined below), and (ii) financial information regarding the prospective bidder in quantity and quality to enable parties in interest to determine such bidder's creditworthiness and ability to close the transaction;

h.  Not be subject to any conditions precedent other than the approval of such Alternative Bid by the Bankruptcy Court in connection with the confirmation of a plan incorporating such alternative Agreement.

i.  Contain such financial and other information that will allow the Debtors to make a reasonable determination as to the Alternative Bidder's financial and other capabilities to consummate the transactions contemplated by the Alternative Bid, including adequate

        assurance of such bidder's ability to perform under any assumed executory contract;

j. Identify with particularity each and every executory contract and unexpired lease, the assumption and assignment of which is a condition to closing;

k. Not request or entitle the bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment;

l. Fully discloses the identity of each entity that will be bidding for the equity interests or otherwise participating in connection with such bid, and the complete terms of any such participation;

m. If the Alternative Bid is submitted by Credit Suisse as administrative agent for the existing secured lenders there shall be no requirement of a cash deposit or letter of credit (although it shall be subject to a comparable $10,000,000 forfeiture if it should be the prevailing bidder and not close);

n. If the Alternative Bid is submitted by Credit Suisse and if, prior to the auction, the Bankruptcy Court has determined that Credit Suisse has the right to credit bid, then it shall have the right to pay its bid in the form of cash equal to the cash component of the Alternative Bid less an offset for the portion of the cash component that would be payable to Credit Suisse under the Plan, plus a note identical to the promissory note in the amount equal to the Liquidating Trust's share, if any of the Promissory Note.[2] Any right of Credit Suisse to credit bid will not affect its obligation to provide working capital no less than that to be provided by Purchaser.

o. Contain evidence that the bidder has received equity funding commitments or has financial resources readily available sufficient in the aggregate to finance the purchase of the equity interests and establish the working capital, which evidence is reasonably satisfactory to the Debtors.

5. **Auction, Bidding Increments and Bids Remaining Open.** If the Debtors do not receive any Qualified Alternative Bids, the Debtors will report the same to the Bankruptcy Court and will proceed with the Motion for approval of the plan based on the CH Definitive Agreement. If the Debtors receives a Qualified Alternative Bid:

a. The Debtors shall conduct an open auction (the "Auction") at the offices of [the Debtors will finalize an auction location prior to the entry of the Order on this Motion], on the business day five days immediately prior to the Confirmation Hearing, beginning at 10:00 a.m. local time or such later time or other place as the Debtors shall notify

---

[2] By including this provision, the Debtors are not conceding that Credit Suisse has the right to credit bid with respect to the Plan, which will provide that the Reorganized Debtor will retain portions of the Credit Suisse collateral.

11

the Purchaser and all bidders who have submitted Qualified Alternative Bids (Purchaser and such bidders collectively, "Qualified Bidders"). Only the Debtors, representatives of Credit Suisse, the Committee, the Ad-hoc Committee, the U.S. Trustee, and any Qualified Bidders, together with their respective legal counsel and financial advisors, shall be entitled to attend the Auction, and only the Qualified Bidders shall be entitled to make any additional bids ("Subsequent Bids") in increments of the Subsequent Overbid Amount at the Auction. All Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Bid will be fully disclosed to all other bidders throughout the entire Auction. The Debtors may announce at the Auction additional procedural rules that they determine to be reasonable under the circumstances (e.g., the amount of time allotted to make subsequent alternative bids) for conducting the Auction so long as such rules are not inconsistent with these Bidding Procedures.

b. As a condition of participating in the Auction, each Qualified Bidder shall certify prior to the commencement of the Auction that (i) it has the full ability, and expressly agrees, to close a purchase in accordance with the time period set forth in the CH Definitive Agreement; (ii) its representatives attending the auction have the full power and authority to act on behalf of and legally bind the bidder to any bids made at the auction; and (iii) any bid made shall constitute a binding and legally enforceable contract of the bidder to timely close a purchase of 100% of the Debtors' equity at the price bid in the event an order is entered approving a plan based upon such bid.

c. At least two business days prior to the Auction, the Debtors shall provide to all Qualified Bidders a copy of the highest and best Qualified Alternative Bid received and copies of all other Qualified Alternative Bids. In addition, the Debtors will inform the Purchaser and each other Qualified Bidder who has expressed its intent to participate in the Auction of the identity of all Qualified Bidders that may participate in the Auction.

d. At the Auction, bidding shall begin with the highest Qualified Alternative Bid and continue in increments of the Subsequent Overbid Amount in one or more rounds of bidding and shall conclude after each Qualified Bidder has had the opportunity to but has declined to submit an additional Subsequent Bid. For the purpose of evaluating the value of the consideration provided by each Subsequent Bid (excluding any Subsequent Bid by the Purchaser), the value shall be the net consideration payable to the Debtors, after giving effect to any Termination Fee that may be payable to Purchaser under the Bidding Procedures Order. At the conclusion of the bidding, the Debtors shall announce their determination as to the bidder submitting the successful bid, which shall be submitted to the Bankruptcy Court for approval at the Confirmation Hearing. The Purchaser shall be deemed a party-in-interest with standing to appear and be heard in connection with any

      motions, hearings, or other proceedings relating to the CH Definitive Agreement and any Alternative Bid or Subsequent Bid.

  e. The Purchaser shall be entitled to a termination fee (the "Termination Fee") in the amount of (a) $2,000,000 (being 2% of Purchaser's acquisition price of $100 Million) plus (b) all out of pocket expenses and fees incurred by CrossHarbor or Purchaser subsequent to November 10, 2008 in pursuing the acquisition of the Debtors' equity interests but not to exceed the sum of $1,000,000 in the aggregate, in the event (i) the Bankruptcy Court approves a sale of 100% of the Debtors' equity to an entity other than the Purchaser, and (ii) the Purchaser remained at all times through and including seven (7) business days immediately following such Bankruptcy Court approval, ready, willing and able to consummate the CH Definitive Agreement.

  f. The bidding at the Auction will be transcribed.

  The Debtors, in consultation with its legal and financial professionals, shall determine in their sole discretion whether an Alternative Bid meets the qualifications described herein and in the Bidding Procedures Order and whether a Qualified Alternative Bid or Subsequent Bid constitutes the highest and/or best offer for 100% of the Debtors' equity. The highest and/or best offer as determined by the Debtors shall be submitted to the Bankruptcy Court for approval at the Confirmation Hearing.

  The Debtors believe that the proposed Bidding Procedures are in the best interests of the Debtors, their creditors, and the estates. The Bidding Procedures are designed to strike a balance between inviting competing bids while enabling the Debtors to attract and close a transaction with the Purchaser within a reasonable time frame in the absence of competitive bidding. The Bidding Procedures are fair, reasonable and necessary to promote the highest and best sale price, without imposing undue obstacles to the competitive bid process.

  Transactions of this sort commonly feature break-up fees and other bidding protections in favor of the initial bidder in order to encourage the making of an original offer subject to higher and/or better offers and ultimately to increase value for Debtors' estate. In

this case, the Termination Fee was an integral part of the Purchaser's offer. In fact, the Purchaser's offer was – and remains – predicated and conditioned upon, inter alia, this Court's approval of the Termination Fee. As such, the assurance of the Termination Fee has "promoted more competitive bidding" because it induced a bid from the Purchaser that might otherwise not have been made and created the opportunity and environment for potential competing bids and an enhanced return to the estate. In the event that higher and better bids are submitted, it is plain that the catalyst of those bids would be the Purchaser's offer (including the Termination Fee). The Termination Fee is nominal in relation to the aggregate consideration offered under the Purchase Agreement—a mere two percent of the Purchase Price together with diligence expenses. The Debtors therefore believe that it is appropriate to compensate the Purchaser for its willingness to assume the role of the "stalking horse" as it is the only party ready and willing to serve in such role. Accordingly, the Debtors respectfully submit that this Court should authorize and approve the Bidding Procedures, including the Termination Fee.

## Motion to Extend Exclusivity Periods

The Debtors also seek an extension of the exclusivity periods under § 1121(b) and (c)(3). Under the DIP Loan, the exclusivity period under § 1121(b) in this case was to expire on February 13, 2009 in the event the Debtors were unable to propose a Plan by that date, or alternatively on March 31, 2009 in the event no plan was confirmed. The DIP Lender and the Debtors have now agreed to an extension of the date by which confirmation must be obtained through the end of April. The Debtors therefore, request that exclusivity be extended through April 30, 2009, and that the provisions of the DIP order with respect to a

confirmation deadline of March 31, 2009 be deemed amended in accordance with the agreement between the Debtors and the DIP Lender.

## SCHEDULING

As the initial portion of this Motion states, the Debtors will be filing a plan which calls for the Purchaser to acquire 100% of the equity in the Reorganized Debtors and a disclosure statement describing that plan (or the sale to a higher successful bidder) before the February 13, 2009 benchmark in the DIP Loan Agreement. Subject to the Court's calendar, the Debtors respectfully request that a hearing on the adequacy of the to be filed disclosure statement be tentatively set for the Court's March 10th calendar in Butte. The Debtors also request that the Court direct that any party objecting to the adequacy of the proposed disclosure statement meet with the Debtors counsel five days prior to the disclosure statement hearing to resolve all objections prior to the hearing. The Debtors will file a report with the Court of the results of that meeting three days prior to the disclosure statement hearing, which statement will set forth any remaining issues required to be addressed at the hearing. The Debtors believe that such a procedure will be beneficial to the parties and the Court in reducing the amount of time required for the disclosure statement hearing.

DATED this 3rd day of February, 2009.

/s/ James A. Patten
James A. Patten
Patten, Peterman, Bekkedahl & Green, PLLC
2817 2nd Avenue North Suite 300
Billings, MT 59101
Attorneys for Debtors