CHARLES W. HINGLE (#1947)
SHANE P. COLEMAN (#3417)
HOLLAND & HART LLP
401 NORTH 31st STREET, SUITE 1500
BILLINGS, MONTANA 59101
(406) 252-2166 (PHONE)
chingle@hollandhart.com (EMAIL)
spcoleman@hollandhart.com (EMAIL)

EVAN R. LEVY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FOUR TIMES SQUARE
NEW YORK, NEW YORK 10036
(212) 735-3000 (PHONE)
elevy@skadden.com (EMAIL)
***Admitted Pro Hac Vice***
- and –

MARK S. CHEHI
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
ONE RODNEY SQUARE
P.O. BOX 636
WILMINGTON, DELAWARE 19899
(302) 651-3000 (PHONE)
mchehi@skadden.com (EMAIL)
***Admitted Pro Hac Vice***

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MONTANA**

| In re: Yellowstone Mountain Club, et al., Debtors. | Chapter 11<br>Case No. 08-61570-11<br>Jointly Administered<br>Notice of Hearing:<br>Date: February 10, 2009<br>Time: 9:00 a.m.<br>Place: 400 Main Street, Butte MT |
|---|---|

**PREPETITION LENDERS' OBJECTION**
**TO DEBTORS' MOTION FOR APPROVAL OF**
**BIDDING AND SOLICITATION PROCEDURES, AND**
**EXTENSION OF EXCLUSIVITY PERIODS**

Credit Suisse, as administrative agent and collateral agent ("Credit Suisse" or, the "Agent") for the prepetition lenders (the "Prepetition Lenders") under that certain Credit Agreement, dated as of September 30, 2005 (the "Prepetition Credit Agreement"), hereby objects (this "Objection") to the Debtors' "Motion For Approval of Bidding and Solicitation Procedures Regarding Proposed Sale Of 100% Of The Equity Interests In The Debtors Pursuant To A Plan Of Reorganization," dated February 3, 2009 (the "Motion") [Dkt. No. 322], as follows:

**Preliminary Statement**

1. Let there be no doubt about it, the Motion represents an important development in these chapter 11 cases, and the Court should pause to consider it carefully: the Motion is the first overt disclosure by the Debtors that (i) they intend to advance a plan that benefits insider interests at the expense of legitimate third-party creditors; (ii) the Debtors' position now is that the Prepetition Lenders are substantially undersecured, notwithstanding this Court's finding (and the Debtors' prior positions) that the Prepetition Lenders are adequately protected by the value of their collateral - - which this Court found was not less than $310 million[1]; and (iii) they intend to sell the Yellowstone Club to CrossHarbor Capital Partners LLC and its affiliates (collectively, "CrossHarbor") for $100 million, less than one-third of the $310 million low-end value determined by this court less than two months ago and $370 million less than the $470 million purchase price CrossHarbor previously contracted to pay for the Yellowstone Club.

---

[1] The Courts express finding of “$310 million as the low-end, going concern value” excluded the value of the expansive and opulently appointed 110,000 square foot Warren Miller Lodge. See Memorandum of Decision, dated December 17, 2008 [Dkt. No. 182].

2. It should now be abundantly clear to the Court that the interests and claims of the Prepetition Lenders, and the claims of unsecured creditors generally, will not be protected by the self-conflicted Debtors and their "contemplated" insider plan. All creditors will be prejudiced if the "contemplated" plan described in the Motion and inappropriate Bidding Procedures are authorized to go forward.[2]

3. The piecemeal Motion is an unorthodox and ill-conceived effort to advance insider interests at the expense of legitimate creditors. It seeks to:

a. Mislead this Court into believing that the Debtors have attempted in good faith to negotiate a consensual plan with their creditors - - when the Debtors have not;

b. Accelerate a process for confirming a reorganization plan - - not yet even filed - - that admittedly will advance insider interests at the expense of legitimate creditors;

c. Obtain authorization of Bidding Procedures and a Termination Fee and expense reimbursement that are inappropriate, flawed and will diminish rather than maximize recoveries for creditors; and

d. Extend the Debtors' exclusive periods and schedule an expedited disclosure statement hearing to prevent a full and fair marketing process and formulation of alternative reorganization plans.

**The Motion Should Be Denied Because It Misrepresents**
**<u>The Debtors' Failure To Negotiate With Their Creditors</u>**

4. The Motion attempts to mislead this Court into believing that the Debtors have attempted to negotiate plan terms with their primary creditor representatives (the Agent and Official Committee of Unsecured Creditors) - - when the Debtors have utterly failed to do that.

5. The Debtors allege misleadingly that they have exercised "<u>sustained efforts</u>" in an "attempt to arrive at a <u>completely consensual</u> plan of reorganization," and

[2] Capitalized terms not otherwise described herein have the meanings ascribed to them in the Motion.

"have aggressively sought to achieve consensus among the various creditor groups . . . with respect to the reorganization cases." See Motion at 2, 4 (emphases added).

6. The record shows the statements in the Motion are false. At the January 13, 2009 hearing in these cases, Edra Blixseth ("Blixseth") testified under oath for the Debtors that they had not yet proposed reorganization plan terms to their creditor representatives. [Transcript of January 13, 2008 Hearing (Blixseth testimony), at 47:17-48:2 ("We have not proposed any term sheets yet.")]

7. Nothing has changed since January 13. Despite repeated requests for plan terms by the Agent and its counsel after January 13, the Debtors have declined to provide to the Prepetition Lenders - - much less discuss or negotiate with them - - any reorganization plan terms. Likewise, the Agent is informed that the Debtors never proposed or presented to, or negotiated plan terms with, the Official Committee of Unsecured Creditors (the "Official Committee") or its counsel prior to the filing of the Motion. Instead, the Debtors have continued to negotiate plan of reorganization terms exclusively with CrossHarbor, an insider that dominates the Debtors' ultimate control person, Blixseth.

**The Motion Confirms The Debtors' Strategy To Advance Insider Interests Over Creditor Recoveries**

8. The Motion's description of the Debtors' "contemplated" (but unfiled) plan of reorganization shows that the Debtors intend to advance insider interests over creditor recoveries. Allegedly, "[t]he Debtors have negotiated an equity sale . . . to an affiliate of CrossHarbor," pursuant to which CrossHarbor "has agreed to purchase 100% of the equity interests in the Reorganized Debtors." See Motion at 6. However, while the Motion alleges that CrossHarbor has "agreed" to purchase the equity interests of the

"Reorganized Debtors" (Motion at 6), such agreement is, apparently, not reduced to writing, and is just an "offer . . . [that] remains . . . predicated and conditioned upon, inter alia, this Court's approval of the Termination Fee." (Motion at 14).

9. It is clear why the Debtors' "efforts have not yet produced any party, other than Cross Harbor," to pursue a purchase of the Debtors' assets (Motion at 5): the Debtors gave only 9 days to prospective investors to make a proposal that would be considered by the Debtors as a basis for a plan. The Debtors opened their "data room" on January 14, 2009 - - and the Debtors' "Investment Opportunity" memorandum in the "dataroom" instructed prospective investors/purchases that the "deadline to submit a binding proposal is January 22, 2008 [sic]." And the Debtors admittedly acquiesced to CrossHarbor's demand not to undertake any marketing process. See Debtor objection [Dkt. No. 336] (at paragraph 7) to Prepetition Lenders' Motion to Compel Marketing Process (as defined below).[3]

10. As for the Prepetition Lenders' treatment under the "contemplated" plan, they apparently will receive "in satisfaction of . . . [their] secured claim" their "share of (1) the cash remaining with the Debtor after satisfaction of the [CrossHarbor] DIP Loan and administrative expenses and claims payments at confirmation", (2) a "$60 Million promissory note", and (3) "the proceeds of the liquidating trust, until [they have] . . . been paid the amount of . . . [their] secured claim." See Motion at 6.

11. The Debtors' "remaining" cash to be distributed to the Prepetition Lenders would necessarily be a modest sum, because the initial $30,000,000 "purchase price"

[3] These paltry efforts fall well short of the United States Trustee's admonition that it is an "absolute necessity that that sale process be thoughtful and adequate to expose this property to whatever market is out there to assure that the greatest recovery for those assets is made . . ." (Transcript of January 13, 2009 Hearing 103:11-15).

payment by CrossHarbor is to be applied in the first instance to pay administrative expenses, repay the outstanding amount of the CrossHarbor DIP Loan (over $23 million), and pay unspecified "claims payments at confirmation." Even assuming arguendo there might be $5 million in "remaining" cash for payment to the Prepetition Lenders, the "contemplated" plan would give them no additional cash, only a "$60 Million promissory note" and unspecified "proceeds of the liquidation trust."

12. Thus, the "contemplated" plan would give CrossHarbor ownership of the Debtors' real property assets, leaving the Prepetition Lenders with a minimal cash payment (if any), a $60 million promissory note, and speculative recoveries from unspecified assets in a "liquidating trust."[4] This is far less than the low-end of $310 million of Prepetition Lender collateral value fixed by the Court just weeks ago - - and $370 million less than the $470 million purchase price CrossHarbor previously contracted to pay for the Yellowstone Club. The result is no better for general unsecured creditors. See Motion at 7.

13. The Court should expect that the "contemplated" plan will incorporate broad releases for insider CrossHarbor and its affiliates (and Blixseth) in respect of any fraudulent transfer or other possible insider litigation claims - - thereby further reducing possible recoveries for the Prepetition Lenders and general unsecured creditors.

**The Bidding Procedures And Termination Fee Are Inappropriate, Flawed And Will Diminish Creditor Recoveries**

14. As set forth in the Prepetition Lenders' emergency motion to compel immediate commencement of a marketing process, dated January 27, 2009 (the "Motion

[4] Such recoveries apparently would be subject to further reduction by "offset" under section 506(c) under the Debtors' “contemplated” plan of reorganization.

to Compel Marketing") [Dkt. No. 311], the Debtors' intentionally have delayed their engagement of CB Richard Ellis ("CBRE") or another qualified broker or sales advisor and delayed commencing a full, fair and open marketing process to identify all prospective purchasers or investors for purposes of a sale or plan of reorganization of the Debtors' Yellowstone Club Businesses and properties (a "Fair Marketing Process"). The Agent is informed and believes such delay was at CrossHarbor's direction and insistence.

15. The present piecemeal Motion is the Debtors' attempt to make it appear that they are now ready to commence a Fair Marketing Process. However, the Bidding Procedures are not that. They are expressly designed to limit a qualified broker's marketing efforts to outcomes constrained by the "contemplated" insider plan.

16. The Bidding Procedures put a plan "cart" ahead of the marketing "horse." If approved, the Bidding Procedures will preclude a Fair Marketing Process, and will chill and diminish prospects for a higher valued plan of reorganization because, as stated expressly in the Motion:

- CBRE will be employed only to "market the equity in the Reorganized Debtors as contemplated by the [CrossHarbor] Plan" (Motion at 3).
- CBRE's "marketing campaign . . . will go 'live' only after . . . approval of Bidding and Solicitation Procedures," i.e., procedures for solicitation of acceptances of the "contemplated" CrossHarbor plan (Id.).
- "[A]ssets other than those associated with the Yellowstone Club will be contributed to a liquidating trust and will not be part of the property being marketed by CB Richard Ellis" (Id. at 4) (emphasis added).
- The Bidding Procedures will be employed only with respect to "the plan's sale of 100% of the Reorganized Debtors' equity" (Id. at 8).
- The Bidding Procedures "are designed to compensate the Purchaser [i.e., CrossHarbor] for its efforts and agreements to date" (Id.).

- The Bidding Procedures constrain the structure of competing bids to the form and structure of the insider self-dealing CrossHarbor purchase transaction structure (see, e.g., id. at 10 ("b", "c" and "d")).

17. Express limitations on the scope of CBRE's marketing efforts and the Debtors' expressed intention to restrict prospective bidder proposals to the form and structure of an insider transaction dictated by (and benefiting) CrossHarbor - - whose "head start" as an insider admittedly already has chilled interest among prospective investors (see Motion at 5) - - simply do not add up to the "robust" and Fair Marketing Process that is needed. The Debtors previously promised to the Court and creditors (but never delivered) a full, fair and robust marketing process. See Motion to Compel Marketing, ¶¶ 7-10.

18. Further, it is clear that the "contemplated" plan and Bidding Procedures were expressly designed and intended to frustrate the ability of the Agent and the secured creditors to credit bid for the assets financed by the Prepetition Credit Agreement (i.e., the real estate assets constituting the Yellowstone Club) by requiring flawed Bidding Procedures for only the "equity interests" in the restructured Debtors.

19. The infirmities, flaws and chilling effect (on prospective purchasers) of the Bidding Procedures are compounded by the proposed $2,000,000 "Termination Fee" and $1,000,000 expense reimbursement payable to CrossHarbor. The Termination Fee and Expense Reimbursement are inappropriate and inequitable mechanisms that will dampen third-party investor interest in the Debtors' businesses and properties, and all the more because CrossHarbor's insider status already has had a chilling effect. Id.

20. The Bidding Procedures should not be approved on two additional grounds: (i) neither the "contemplated" plan nor the CrossHarbor purchase agreement

have been reduced to writing, much less filed with the Court,[5] and (ii) absent completion of a Fair Marketing Process (not the mere market test proposed by the Motion), there is no evidence that the "contemplated" insider plan is the best available and highest valued transaction deserving of stalking horse bidder protections and breakup fees like those proposed for CrossHarbor.

21. The Motion should also be denied because the Bidding Procedures and "contemplated" plan structure are little more than a scheme by insiders to advance long-standing objectives of CrossHarbor, Blixseth and others to transition Yellowstone Club ownership to CrossHarbor, without permitting the Agent and Prepetition Lenders to exercise rights of senior secured lenders and maximize the proceeds of their collateral.

Bidding Procedures And "Contemplated" Plan
Deserve Heightened Scrutiny - - Not Deference

22. There is no merit to the Debtors' position that "deference" should be given to their "exercise of business judgment" that purportedly led to their decision to delay a Fair Marketing Process and to propose the insider-biased Bidding Procedures. See Debtor objection [Dkt. No. 336] to Motion to Compel Marketing Process, at paragraphs 4 and 10-11. The Bidding Procedures and "contemplated" plan process involve insiders and inherent conflicts of interest - - and therefore the Debtors' judgment and the proposed process is subject to "heightened scrutiny". See In re Summit Global Logistics, Inc., 2008 WL 819934 at *9 (Bankr. D.N.J. March 26, 2008) (insider transactions subject to "heightened scrutiny" standard); Westship, Inc. v. Trident Shipworks, Inc., 247 B.R. 856,

[5] Indeed, the Motion should be denied for lack of proper notice for numerous reasons: the Debtors have not filed and distributed (i) the "contemplated" plan thereto, (ii) the putative CrossHarbor purchase agreement (if any), (iii) the identity of any particular property and its value to be contributed by CrossHarbor and Blixseth under the "contemplated" plan, (iv) an application to retain another experienced broker and (v) any related disclosures.

866 (M.D. Fla. 2000) (same); In re Copndere Corp., 228 B.R. 615, 632 (Bankr. S.D. Miss. 1998) (same); In re Medical Software Solutions, 286 B.R. 431, 445-46 (Bankr. D. Utah 2002) (same).

23. Where, as here, the "contemplated" plan and proposed Bidding Procedures propose a sale to an insider (CrossHarbor) that dominates the Debtors' ultimate control person (Blixseth) before the Debtors have engaged an experienced broker and intensively explored non-insider proposals, and where the Bidding Procedures provide an insider Termination Fee, expense reimbursement and other terms aimed at cutting off other competing or alternative plan transaction structures, the business judgment rule simply does not apply - - and this Court should appoint an independent examiner to scrutinize the Debtors' actions and efforts to facilitate an insider sale to CrossHarbor, and the fairness of any plan proposed by the Debtors.[6]

**The Debtors' Requests To Extend Exclusivity**
**And Set A Disclosure Statement Hearing Should Be Denied**

24. The Court should let the Debtors' exclusive periods lapse (or terminate them) and suspend further consideration of the "contemplated" CrossHarbor plan (if and when it is filed) for a minimum of 90 days, so that (i) the Debtors can file a proper application to retain an experienced broker, (ii) an experienced broker can commence immediately, with oversight and input from the Agent and Official Committee, a Fair Marketing Process that is not tied to any particular plan or transaction structure, (iii) the

[6] See In re Bidermann Industries U.S.A., 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (ordering the parties to show cause why an examiner with expanded powers should not be appointed "to assess the desirability of proceeding along the mapped route and to assess the fairness of any offers which may be made to the debtors" and disapproving proposed sale to insider due to conflicts of interest and self-dealing, debtors' failure to hire investment banker, and fact that sale process failed to "follow[] an intensive effort to drum up the best price obtainable for creditors" but, rather, was "aim[d] to cut off other possible sales") (copy of decision attached at Exhibit A hereto).

Agent and Official Committee can take discovery of the pervasive insider issues presented in these cases, (iv) an examiner can begin to investigate possible causes of actions against and fraudulent transfers involving CrossHarbor and its affiliates, who presumably will be seeking releases under the "contemplated" plan, and (v) non-insider creditors including the Prepetition Lenders can explore, formulate, negotiate and file higher valued reorganization plan alternatives. The foregoing should occur before the Court decides what plan(s) and plan sponsor(s) are deserving of solicitation rights.

25. No "cause" exists to support the extension of exclusivity that the Motion seeks because no proper solicitation procedures have been proposed, a plan has not been filed, the Bidding Procedures are inappropriate and flawed, the "contemplated" plan is and will be the product of insider self-dealing, and the Debtors have intentionally chosen to not negotiate plan terms in good faith with the Prepetition Lenders and Official Committee, but rather have elected to negotiate plan terms exclusively with CrossHarbor, an insider. See Official Committee of Unsecured Creditors v. Henry Mayo Newhall Memorial Hospital (In re Henry Mayo Newhall Memorial Hospital), 282 B.R. 444, 452 (9th Cir. BAP 2002); see also In re Situation Management Systems, 252 B.R. 859, 865-66 (Bankr. D. Mass. 2000).

WHEREFORE, the Agent respectfully requests entry of an order (i) denying the Motion, and (ii) granting the Agent and Prepetition Lenders such other and further relief as is just and proper.

Dated: Billings, Montana

February 6, 2009

/s/ Charles W. Hingle-----
Charles W. Hingle
Shane P. Coleman
HOLLAND & HART LLP
401 North 31st Street
Suite 1500
Billings, Montana 59101
(406) 252-2166 (Phone)
chingle@hollandhart.com (Email)
spcoleman@hollandhart.com (Email)

Of Counsel:
Evan R. Levy (NY No. 2720068)
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

- and –

Mark S. Chehi (Del. Bar No. 2855)
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

Attorneys for Credit Suisse,
sole administrative agent and collateral agent

4444960_1.DOC