# Exhibit "A"

J. THOMAS BECKETT (UTAH #5587)
DAVID P. BILLINGS (UTAH #11510)
**PARSONS BEHLE & LATIMER**
*Admitted Pro Hac Vice (Docket # 156)*
One Utah Center
201 South Main Street, Suite 1800
Salt Lake City, UT  84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
Email: tbeckett@parsonsbehle.com
         dbillings@parsonsbehle.com

*Counsel to the Official Committee*

JAMES H. COSSITT (MONT. # 4773)
**JAMES H. COSSITT, PC**
40 – 2nd East Suite 202
Kalispell, MT 59901-6112
Telephone: (406) 752-5616
Email: jhc@cossittlaw.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re: | Case No. 08-61570-11-RBK |
| **YELLOWSTONE MOUNTAIN CLUB, LLC, et al.,** | Jointly Administered with 08-61571, 08-61572, and 08-61573 |
| Debtors. | Chapter 11 |
| **OFFICIAL COMMITTEE OF UNSECURED CREDITORS,** | **COMPLAINT** |
| Plaintiff**,** | **(AIDING AND ABETTING BREACH OF FIDUCIARY DUTY, AVOIDANCE OF FRAUDULENT TRANSFER, DISALLOWANCE OF CLAIMS, SUBORDINATION OF CLAIMS, TURNOVER, AND DECLARATORY JUDGMENTS)** |
| vs. | |
| **CREDIT SUISSE, CAYMAN ISLANDS BRANCH, and JOHN DOES 1-15,** | Adv. Pro. No. |
| Defendants. | Judge:  Ralph B. Kirscher |

The Official Committee of Unsecured Creditors (the "Committee") of Yellowstone Mountain Club, LLC ("YMC") and its debtor affiliates, Yellowstone Development, LLC ("YD"), Big Sky Ridge, LLC ("BSR") and Yellowstone Club Construction Company, LLC (collectively, the "Debtors"), by and through its undersigned counsel, herein states its causes of action and claims for relief against Credit Suisse, Cayman Islands Branch and John Does 1-15, as follows:

## INTRODUCTION

1.     In 2005, Credit Suisse was offering a new financial product for sale.

2.     It was offering the owners of luxury second-home developments the opportunity to take their profits out early by mortgaging their development projects to the hilt. Credit Suisse would loan the money on a non-recourse basis, earn a substantial fee, and sell off most of the credit to loan participants. The development owners would take most of the money out as a profit dividend, leaving their developments saddled with enormous debt.

3.     Credit Suisse and the development owners would benefit, while their developments bore all the risk.

4.     This new financial product enriched Credit Suisse and more than one luxury development owner, but it left those developments too thinly capitalized to survive.

5.     In August, 2005, Credit Suisse made one of these deeply-flawed loans to YMC, YD and BSR. Those entities, which were controlled by the Blixseths, owned one of Montana's most spectacular ski and golf resort communities, the Yellowstone Club.

6.     The loan enriched the Blixseths (who took most of the proceeds) and Credit Suisse (which earned a seven-figure fee, plus interest). But it saddled the Yellowstone Club with an enormous burden – a debt for which it received almost no benefit.

7.     The architects and proponents of this loan were Credit Suisse and Blixseth. But the very structure of the loan created a deep conflict for the Blixseths: On the one hand, they wanted to withdraw a profit dividend; on the other hand, they had fiduciary duties to the Yellowstone Club and its members, minority owners and unsecured creditors.

8.     Enticed by the riches available from Credit Suisse, the Blixseths chose to breach their fiduciary duties, abandon the Yellowstone Club, and participate in a loan transaction that gave windfalls to them and Credit Suisse, at the expense of the Yellowstone Club.

9.     The Blixseths represented themselves and their own personal interests in the loan negotiations. The Yellowstone Club was unrepresented in those negotiations; it truly did not participate in any meaningful way.

10.    Credit Suisse knew the Blixseths were breaching their fiduciary duties. It approved of and supported the Blixseth's decision. And it assisted the Blixseths in concealing their breaches from the beneficiaries of their duties.

\* \* \* \* \*

11.    In its very first sentence, Credit Suisse's loan agreement baldly acknowledges that the loan was a secured, non-recourse loan being made primarily "***for purposes unrelated***" to the Yellowstone Club. That is, for mortgaging nearly everything it owned, the Yellowstone Club would receive very little benefit. All it received, in fact, was the risk.

18119.001/4837-5329-0243.1

12.     The inevitable failure of this loan drove the Yellowstone Club into bankruptcy. That failure inflicted substantial harm on the Club's unwitting members and unsecured creditors.

13.     This lawsuit invokes the statutory and common laws of the United States and the States of Montana and New York and seeks:

> a.    A judgment of this Court that Credit Suisse knowingly aided and abetted a breach of fiduciary duties by the Blixseths. To remedy that injustice, Credit Suisse must be held to account for the damages suffered by the Blixseth's breach, or the loan documents must be reformed to reflect the original and actual intent of the parties: that Credit Suisse made a substantial loan to the Blixseths and a much smaller loan to the Yellowstone Club.
>
> b.    In the alternative, a judgment by this Court that the loan was a fraudulent transfer that must be avoided to return those involved or effected to their original positions, with all the legal consequences that that entails.

14.     This lawsuit seeks redress for the substantial damages suffered by the unwitting unsecured creditors of the Yellowstone Club who were harmed by this loan transaction, including hundreds of trade vendors who have not been paid for goods and services they provided to the Yellowstone Club, and including the Club's other owners and members whose interests, membership deposits and real estate investments are now unnecessarily at grave risk.

## PARTIES

15.     The Committee is the plaintiff.

16.     Pursuant to section 1102 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), the Committee is the statutory representative of the unsecured creditors of the Debtors.

18119.001/4837-5329-0243.1

17.     The Committee is authorized to bring this action virtue of an order of this Court dated February __, 2009.  The Committee prosecutes the claims herein, not for itself, but on behalf of and for the benefit of the Debtors, their estates, and the creditors thereof.

18.     Defendant Credit Suisse is a financial services company that purports to be a secured creditor of YMC, YD and BSR.  Credit Suisse is headquartered in Zurich, Switzerland.

19.     Defendants John Doe 1-15 are parties who breached duties as complained of herein, aided and abetted in the breaches of those duties, or who hold property of the Debtors' estates pursuant to avoidable transfers.

20.     BGI is an Oregon corporation.  It is the majority owner of YMC and YD.

21.     Timothy L. Blixseth ("Blixseth") is a resident of the State of Washington.  He was the controlling shareholder of BGI and Yellowstone Club World, LLC ("YCW") through August of 2008.  As such, he controlled BGI, YMC, YD and YCW.

22.     Edra E. Blixseth ("Ms. Blixseth"; together Blixseth, the "Blixseths") was Chief Operating Officer of YMC until she resigned in late 2005 or early 2006.  She resigned, in large part, because of her concerns about the Credit Suisse loan.

23.     Upon her divorce from Blixseth in August, 2008, Ms. Blixseth became the majority owner of BGI and YCW.  As such, she now controls BGI, YMC, YD and YCW.  She is a resident of the State of California.

24.     Until January 2007, she was paid a six-figure salary as Chief Operating Officer of YMC.  She was reinstated to that position in August, 2008, after the divorce was finalized.

25.     BGI and the Blixseths are insiders of the Debtors.

5

26.     YCW is a Washington State limited liability company.  It was majority owned by Blixseth.  Since the divorce, YCW has been majority owned by Ms. Blixseth, although Washington State records still reflect that it is majority owned by her ex-husband.  YCW was conceived by Blixseth as a world-wide corollary of the Yellowstone Club.  But it never got off the ground

27.     An involuntary petition for relief under section 303 of the Bankruptcy Code is pending against YCW.  YCW presently enjoys the protections of the automatic stay of section 362 of the Bankruptcy Code.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334, and as this is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

29.     Venue is proper in this court pursuant to 28 U.S.C. § 1409.

30.     This action is brought as an adversary proceeding in *in re Yellowstone Mountain Club, LLC, et al.*, chapter 11 cases, procedurally consolidated under case number 08-61570, currently pending in the United States Bankruptcy Court for the District of Montana.

## GENERAL ALLEGATIONS

A.     **The Yellowstone Club.**

31.     The Blixseths conceived of and developed the Yellowstone Club.

32.     The Club is a 13,500 acre exclusive membership resort comprising, among other things, a 2,200 acre private ski resort, a championship golf course, second homes, sold lots awaiting development, unsold platted and unplatted inventory and open space land, and the 125,000 square foot Warren Miller Lodge.

18119.001/4837-5329-0243.1

**B.**      <u>The Credit Suisse Loan Transaction.</u>

33.      As of September 29, 2005, the Yellowstone Club's properties carried less than $25 million of secured debt.

34.      On September 30, 2005, Credit Suisse purported to loan $375 million to YMC, YD and BSR in a loan transaction (the "Loan Transaction") pursuant to which Credit Suisse purported to obtain mortgages, liens and security interests in nearly all these entities' properties.

35.      But the Loan Transaction was not made for the benefit of the Yellowstone Club; it was made for unrelated purposes. The credit agreement evidencing the Loan Transaction (the "Credit Agreement") provided that nearly all the proceeds of the loan were intended to be used "***for purposes unrelated***" to the Yellowstone Club. Indeed, the first recital of the Credit Agreement expressly provides:

> **WHEREAS**, the Borrower desires that the Lenders extend certain senior term loans to the Borrower hereunder, the proceeds of which will be used:
>
> (i) for distribution or loans up to $209,000,000 to [BGI] ***for purposes unrelated to the Yellowstone [Club]***,
>
> (ii) for investments up to $142,000,000 into Unrestricted Subsidiaries ***for purposes unrelated to the Yellowstone [Club]***,
>
> (iii) to pay the Transaction Costs,
>
> (iv) to refinance the Existing Indebtedness, and
>
> (v) to finance a portion of the development and construction costs associated with the Yellowstone [Club] in accordance with the Financial Plan.

36.      Remarkably, on the face of the Credit Agreement – in the very first recital – the parties admitted that up to $351 million of the $375 million loan (94%) was intended "***for purposes unrelated to***" the Yellowstone Club.

18119.001/4837-5329-0243.1

37.     Section 2.6 of the Credit Agreement, which is substantially identical to the very first recital of the Credit Agreement, in fact ***required*** that up to 94% of the face amount of the loan would be used "***for purposes unrelated***" to the Yellowstone Club.

38.     All the Credit Agreement required of the Yellowstone Club, and its unsecured creditors and members, was that they shoulder all the risk.

39.     The Loan Transaction was not intended to benefit the Yellowstone Club. The Club was supposedly represented in the Loan Transaction negotiations by the Blixseths. But the Blixseths were representing only their own interests in those negotiations. The Club did not really participate in the Loan Transaction negotiations at all.

40.     Consequently, as set forth in more detail below, the Loan Transaction was intended to benefit, and it did in fact benefit, only Credit Suisse and the Blixseths.

**C.     Nearly all the Proceeds of the Loan Transaction were used "*for Purposes Unrelated*" to the Yellowstone Club.**

41.     As explained in some detail below, a vast majority of the Loan Transaction proceeds were used, as required by paragraphs 2.6(i) – (v) of the Credit Agreement, "***for purposes unrelated***" to the Yellowstone Club.

42.     As agent bank, Credit Suisse knew or should have known that a vast majority of the Loan Transaction proceeds were used "***for purposes unrelated***" to the Yellowstone Club.

**Loan Transaction Proceeds Distributed
Pursuant to Paragraph 2.6(i) of the
Credit Agreement**

43.     Paragraph 2.6(i) of the Credit Agreement provided that up to $209 million of the Loan Transaction proceeds were required to be "distributed or loaned to [BGI] ***for purposes unrelated***" to the Yellowstone Club.

8

44. Pursuant to that provision, YMC immediately distributed $208,831,158.45 of the Loan Transaction proceeds for "***purposes unrelated to***" the Yellowstone Club, as follows:

 a. $25,000,000 certificate of deposit at First Bank in BGI's name.

 b. $11,939,495 payoff to First Bank for the Blixseth's primary residence at Porcupine Creek in Rancho Mirage, California.

 c. $17,000,000 certificate of deposit at Palm National Bank in the Blixseths' name.

 d. $14,016,227.87 deposit into a money-market account at Palm Desert National Bank in Blixseth's name.

 e. $4,133,623.50 payoff to Palm Desert National Bank for the following debts:

  (1) $3,169,118.75 for charges related to "Desert Ranch," Blixseth's personal housing development near Palm Springs, California.

  (2) $79,629.54 payoff of "Edra's Condo," a condo owned by Ms. Blixseth in Palm Desert, California.

  (3) $402,546.02 payoff of the Blixseths' personal line of credit.

  (4) $482,329.19 payoff of Ms. Blixseth's personal line of credit.

 f. $15,000,000 certificate of deposit at Jackson State Bank in Blixseth's name.

 g. $3,068,749.99 payoff to American Bank for unknown purposes.

 h. $975,908.57 payoff to American Bank for unknown purposes.

 i. $1,515,250 payoff to American Bank for unknown purposes.

 j. $896,423.28 payoff to American Bank for unknown purposes.

 k. $977,894.92 payoff to American Bank for unknown purposes.

 l. $100,000,000 certificate of deposit at U.S. Bank in the Blixseths' name, from which $28,000,000 was used to purchase a private island in Turks and Caicos.

18119.001/4837-5329-0243.1

| m. | $5,000,000 certificate of deposit at Pacific Western Bank in the Blixseths' name. |
| n. | $2,971,443.02 payoff of a personal note to Pacific Western Bank. |
| o. | $160,765.83 payoff to Union Bank for a rental home owned by Blixseth. |
| p. | $175,376.23 payoff to Union Bank for a rental home owned by Blixseth. |
| q. | $2,007,930.55 payoff to Commercial Bank for unrelated purposes. |
| r. | $1,403,547 payoff to GECC for an airplane owned by a Blixseth owned company in which neither Yellowstone Mountain Club nor Yellowstone Development have an interest. |
| s. | $2,484,774 payoff to GECC for an airplane owned by a Blixseth owned company in which neither Yellowstone Mountain Club nor Yellowstone Development have an interest. |
| t. | $272,590 payoff to World Savings for a rental home owned by the Blixseths. |

45. In respect of the funds disbursed pursuant to paragraph 2.6(i) of the Credit Agreement, and although it received little benefit therefrom, BGI executed an unsecured demand note (dated as of September 30, 2005, but prepared months thereafter) (the "First BGI Note") in favor of YMC in the amount of $208,831,158.45.

46. It has been alleged that BGI has made $40 million of interest and principal reduction payments to YMC in respect of the First BGI Note. The Committee has not been able to verify this.

47. The First BGI Note was hardly consideration to YMC for the benefits conferred on the Blixseths for the funds they received from the Loan Transaction proceeds.

48. BGI ultimately received little if any benefit from the $208,831,158.45 of funds disbursed by YMC.

49.     In addition, the First BGI Note was made payable on demand by YMC (controlled at that time by Blixseth) from BGI (also controlled at that time by Blixseth). Obviously, it was unlikely that Blixseth's YMC would ever make a demand on Blixseth's BGI.

50.     The First BGI Note was never intended by any of the parties to be collectable or collected.

51.     The First BGI Note's real value may be inconsequential in comparison to its face value because BGI is insolvent.

52.     The Blixseths breached their fiduciary duties to the Yellowstone Club when they allowed Credit Suisse to place $208,831,158.45 of liens on Club properties, for expenditures made pursuant to paragraph 2.6(i) of the Credit Agreement.

53.     The Debtors received less than reasonably equivalent value – in fact no value whatsoever – for the $208,831,158.45 of liens placed upon their properties pursuant to paragraph 2.6(i) of the Credit Agreement.

### Loan Transaction Proceeds Distributed Pursuant to Paragraph 2.6(ii) of the Credit Agreement

54.     Paragraph 2.6(ii) of the Credit Agreement provided that up to $142 million of the Loan Transaction proceeds would be invested by others, "*for purposes unrelated*" to the Yellowstone Club.

55.     Pursuant to paragraph 2.6(ii) of the Credit Agreement, $133,110,262.53 of Loan Agreement proceeds were disbursed to YD as follows:

     a.     $100 million was placed in a six-month certificate of deposit at U.S. Bank in YD's name;

b. $30 million was placed in a six-month certificate of deposit at American Bank in YD's name; and

c. $3,110,262.53 remained in YD's checking account, although at least $225,000 of those funds were used for marketing YCW.

56. $80 million of the $130 million that was placed in the two certificates of deposit referred to above was further disbursed as follows:

a. $28 million was used to purchase Chateau de Farcheville located in France;

b. $40 million was used to purchase a resort known as Tamarindo located in Mexico;

c. $12 million was used to purchase and improve a golf property located in St. Andrews, Scotland.

57. Pursuant to the Credit Suisse loan agreement, these properties were purchased "*for purposes unrelated*" to the Yellowstone Club. And only the Farcheville and St. Andrews properties are currently owned indirectly by YD. YD sold Tamarindo to Ms. Blixseth in August, 2008, for a $40 million unsecured note, $31.2 million of which remains outstanding. She thereafter transferred it to Blixseth for unknown consideration.

58. The Committee has not yet traced the $50 million balance from the certificates of deposit referred to above, but, on information and belief, it alleges that the Yellowstone Club received less than reasonably equivalent value for the $50 million of liens placed on Club properties, in respect of such expenditures, pursuant to paragraph 2.6(ii) of the Credit Agreement.

59. The Blixseths breached their fiduciary duties to the Yellowstone Club when they allowed Credit Suisse to place $133,110,262.53 of liens on Club properties pursuant to paragraph 2.6(ii) of the Credit Agreement.

18119.001/4837-5329-0243.1

60.     The Debtors received less than reasonably equivalent value for the $133,110,262.53 of liens placed upon its properties pursuant to paragraph 2.6(ii) of the Credit Agreement.

## Loan Transaction Proceeds Distributed
## Pursuant to Paragraph 2.6(iii) of the
## Credit Agreement

61.     Paragraph 2.6(iii) of Credit Agreement provided that Loan Transaction proceeds would be spent for "transaction costs."

62.     Approximately $7.4 million of the Loan Transaction proceeds were paid in fees to Credit Suisse.  An additional $1.2 million were paid to other parties in fees.

63.     The Blixseths breached their fiduciary duties to the Yellowstone Club when they allowed Credit Suisse to place $8.6 million of liens on Club properties for expenditures made pursuant to paragraph 2.6(iii) of the Credit Agreement.

64.     The Debtors received less than reasonably equivalent value for the $8.6 million of liens placed upon their properties pursuant to paragraph 2.6(iii) of the Credit Agreement.

## Loan Transaction Proceeds Distributed
## Pursuant to Paragraph 2.6(iv) of the
## Credit Agreement

65.     Paragraph 2.6(iv) of the Credit Agreement provided that Loan Transaction proceeds would be spent "to refinance the Existing Indebtedness."

66.     At most, $24.2 million of Loan Transaction proceeds were used to refinance existing secured indebtedness owed by YMC, YD and/or BSR.

67.     The Debtors received no incremental benefit from the refinancing of the Existing Indebtedness.  In fact, the refinancing inured principally to the benefit of Credit Suisse inasmuch

18119.001/4837-5329-0243.1

as it provided Credit Suisse with a first mortgage, remedy-controlling, position on the Debtors' assets.

<strong><u>Loan Transaction Proceeds Distributed<br>Pursuant to Paragraph 2.6(v) of the<br>Credit Agreement</u></strong>

68.     Paragraph 2.6(v) of the Credit Agreement provided that Loan Transaction proceeds would be spent "to finance a portion of the development and construction costs associated with the Yellowstone [Club] in accordance with the Financial Plan."

69.     Only $258,579.10 of Loan Transaction proceeds remained, after the expenditures referenced above, but not including those unaccounted for, to finance development and construction costs associated with the Yellowstone Club.

**D.      The Debtors did Not Receive Reasonably Equivalent Value in Consideration for the $375 million of Liens Placed on their Properties.**

70.     With respect to paragraph 2.6(i) of the Credit Agreement, the Debtors received no value for the $208,831,158.45 of liens placed on Club properties in connection with the Loan Transaction.

71.     With respect to paragraph 2.6(ii) of the Credit Agreement, the Debtors received less than reasonably equivalent value for the $133,110,262.53 of liens placed on Club properties in connection with the Loan Transaction.

72.     With respect to paragraph 2.6(iii) of the Credit Agreement, the Debtors received less than reasonably equivalent value for the $8,600,000 of liens placed on Club properties in connection with the Loan Transaction.

73.     Even assuming that the Debtors did receive reasonably equivalent value with respect to the $24.2 million and $258,579.10 disbursed pursuant to paragraphs 2.6(iv) and 2.6(v)

14

of the Credit Agreement, it presently appears the Debtors only received between $67,343,841.53 (the value of the refinance, plus the purchase prices of St. Andrews and Farcheville, plus the amount remaining for operations, plus the amount remaining in YD's bank account) (17.9%) and $166,168,841.55 (all disbursements excepting the $208,831,158.45 disbursed to the Blixseths) (44.3%) of value in consideration for the $375 million of liens placed on the Club's properties in connection with the Loan Transaction.

74. In either event, the Debtors received far less than reasonably equivalent value – between 17.9% and 44.3% – in consideration for the $375 million of liens placed on the Club's properties by Credit Suisse in connection with the Loan Transaction.

**E.  Payments Made by the Debtors to Credit Suisse Pursuant to the Loan Transaction.**

75. Pursuant to the Credit Agreement, the Debtors have paid Credit Suisse approximately $139 million since August, 2005. Approximately $68 million of that has reduced the principal amount outstanding under the Credit Agreement. Approximately $71 million of that has been paid as interest on the entire outstanding loan balance.

**F.  The Yellowstone Club's Inevitable Bankruptcy.**

76. By November, 2008, the Debtors were unable to make the interest payments required by the Credit Agreement.

77. But for numerous "bail-out" land purchases made by interested parties prior to that time, the Debtors may have been unable to meet their interest expense obligations long before.

78. As a consequence of the Loan Transaction, the Debtors were rendered insolvent and required to seek Bankruptcy protection.

**G.**     **Additional Promissory Notes Constituting Indebtedness of BGI to the Debtors.**

79.     BGI executed another unsecured demand note (dated as of September 30, 2005, but prepared months thereafter) in favor of YD in the amount of $55,798,796.68 (the "Second BGI Note").

80.     BGI executed a third unsecured demand note (dated as of September 30, 2005, but prepared months thereafter) in favor of YMC in the amount of $7,800,000 (the "Third BGI Note").

81.     Demand has properly been made in respect of the Second and Third BGI Notes.

82.     Neither the Second nor the Third BGI Notes pertain to any obligation to repay funds disbursed pursuant to the Loan Transaction.

**H.**     **Damages Suffered by the Debtors' Creditors.**

83.     Presently, the Debtors' unsecured creditors hold an estimated $25 to $50 million of extant claims against the Debtors and the defendants herein for unpaid-for goods and services and other legal obligations. Those claims are directly attributable to the failure of the Loan Transaction.

84.     If their Club membership agreements are not assumed pursuant to section 365 of the Bankruptcy Code, the Yellowstone Club's members will hold an additional $80 million of claims against the Debtors and the defendants herein on account of their Club membership deposits. Those contingent claims, if they matured, would also be directly attributable to the failure of the Loan Transaction.

85.     If the Yellowstone Club amenities cease to be provided, the Yellowstone Club's members' individual claims against the Debtors and the defendants will be titanic.

16

86.     Ultimately, the quantum of the claims of the unsecured creditors of the Yellow-stone Club – claims that are attributable to the failure of the Loan Transaction – will not be known until the Debtors either successfully reorganize under chapter 11 of the Bankruptcy Code or fail.

87.     Those claims will be minimized when the Yellowstone Club's members' membership agreements are assumed, and when Club amenities are guaranteed, in a successful reorganization.

88.     But those claims will metastasize if the reorganization effort fails.

## FIRST CAUSE OF ACTION

### (Against Credit Suisse)

*Aiding and Abetting the Blixseths'*
*Breaches of Fiduciary Duty*

89.     The Committee incorporates by reference all the prior allegations of this Complaint.

90.     As the owners of YMC, YD and BSR, the Blixseths owed fiduciary duties to YMC, YD BSR, the minority owners of those entities, and the Club and its members, to protect their interests in connection with the Loan Transaction.

91.     The Blixseths breached those duties in connection with the Loan Transaction by abandoning the Yellowstone Club and allowing it to be entirely unrepresented in the negotiations leading up to the Loan Transaction and to participate in that transaction which benefited only the Blixseths and Credit Suisse.

92.     Credit Suisse induced the Blixseths to breach their fiduciary duties.

18119.001/4837-5329-0243.1

93.     Credit Suisse knowingly participated in the Blixseth's breach of fiduciary duty by encouraging and affirmatively assisting the Blixseth's breach of that duty.

94.     Credit Suisse helped the Blixseths conceal their breach of fiduciary duty from YMC, YD, BSR, the minority owners of those entities and the Club's members and other unsecured creditors.

95.     The Credit Agreement should and must be reformed to reflect the actual intent of the parties and actual consequences of the Loan Transaction.  To wit,

    a.  Credit Suisse made a loan of between $67,343,841.53 and $166,168,841.55 to YMC, YD and BSR; and

    b.  Credit Suisse made a loan of between $208,831,158.55 and $307,656,158.53 to the Blixseths, and that loan is secured by the First BGI Note, which Credit Suisse and/or its loan participants may seek recovery on.

96.     The Debtors have made $68 million of principal payments pursuant to the Loan Transaction.

97.     Upon such reformation, therefore, the Court should and must find that Credit Suisse's loan to YMC, YD and BSR has been substantially repaid or repaid in its entirety.

98.     If the Loan Transaction is not reformed as described above, then Credit Suisse must be held to account for the full measure of damages, including interest, suffered by those who should have been the beneficiaries of the Blixseth's fiduciary duties.

## SECOND CAUSE OF ACTION

### (Against Credit Suisse)

### *Turnover of Excess Interest Payments Made*

99.     The Committee incorporates by reference all the prior allegations of this Complaint.

18119.001/4837-5329-0243.1

100.    If the Loan Transaction is reformed as described above, then YMC, YD and BSR have substantially overpaid Credit Suisse's interest charges pursuant to the Loan Transaction.

101.    In that case, the Committee is entitled to a judgment compelling Credit Suisse, under section 541 of the Bankruptcy Code, to turn over to the Debtors' estates the amount of the Debtors' overpayment of interest, approximately $39 and $59 million.

### THIRD CAUSE OF ACTION

#### (Against all Defendants)

*Avoidance of Loan Transaction Pursuant to*
*Montana Uniform Fraudulent Transfer Act*

102.    The Committee incorporates by reference all the prior allegations of this Complaint.

103.    YC, YD and BSR did not receive reasonable equivalent value in exchange for the mortgages, liens and security interests given to Credit Suisse in connection with the Loan Transaction.

104.    Those Debtors were engaged in a real estate venture for which their remaining assets, after the Loan Transaction, were unreasonably small.

105.    In connection with the Loan Transaction, those Debtors knew or should have known they were incurring a debt they would not be able to repay.

106.    In connection with the Loan Transaction, each of the defendants knew or should have known that those Debtors were incurring a debt they would not be able to repay.

107.    Pursuant to section 544(b) of the Bankruptcy Code, the Loan Transaction was a fraudulent transfer under Mont. Code. Ann. 31-2-333.  As such, it can be avoided pursuant to section 550 of the Bankruptcy Code and Mont. Code. Ann. 31-2-339(a).

18119.001/4837-5329-0243.1

108.    Upon such avoidance, Credit Suisse must release the mortgages, liens and security interests it obtained from the Debtors in connection with the Loan Transaction.

109.    Upon such avoidance, Credit Suisse must turn over to the Debtors the $139 million paid to it by the Debtors for interest expenses and principal reductions, as well as the $7.4 million paid by the Debtors for Credit Suisse's fee.

## FOURTH CAUSE OF ACTION

### (Against all Defendants)

### *Declaratory Judgment that the Yellowstone Club Received Less Than Reasonably Equivalent Value in Connection with the Loan Transaction*

110.    The Committee incorporates by reference all the prior allegations of this Complaint.

111.    The Committee is entitled to a declaratory judgment that the Debtors did not receive reasonably equivalent value in connection with the Loan Transaction.

## FIFTH CAUSE OF ACTION

### (Against Credit Suisse)

### *Declaratory Judgment that Credit Suisse's Bankruptcy Claim Should be Disallowed Pending its Release of all Mortgages and its Return of all Cash Received in Connection with the Loan Transaction*

112.    The Committee incorporates by reference all the prior allegations of this Complaint.

113.    The Committee is entitled to a declaratory judgment that, pursuant to section 502(d) of the Bankruptcy Code, any and all claims that are made in these Bankruptcy cases by Credit Suisse in connection with the Loan Transaction must be disallowed until Credit Suisse releases the mortgages, liens and security interests it obtained on the Debtors' property and

20

returns the approximately $146.4 million it has been paid in connection with the Loan Transaction.

114.    The Committee is entitled to a declaratory judgment that Credit Suisse's bankruptcy claim should be disallowed pending its release of all mortages, liens and security interests, and its return of all cash it received in connection with the Loan Transaction.

## SIXTH CAUSE OF ACTION

### (Against Credit Suisse)

*Declaratory Judgment that Credit Suisse's Claims*
*are to be Equitably Subordinated to the Claims of*
*Debtors' General Unsecured Creditors*

115.    The Committee incorporates by reference all the prior allegations of this Complaint.

116.    Credit Suisse was a knowing and willing participant in (i) the Blixseths' breaches of fiduciary duty, and/or (ii) the Loan Transaction that was a fraudulent transfer.

117.    In either event, Credit Suisse cannot equitably participate in the recoveries sought herein for the damages caused by their participation until the Debtors' unsecured creditors, who suffered from that participation, are recompensed in full.

118.    Consequently, the Committee is entitled to a declaratory judgment that Credit Suisse's bankruptcy claim, if and when allowed under subsections 502(a) and 502(d) of the Bankruptcy Code, must be equitably subordinated to the claims of general unsecured creditors pursuant to subsection 510(c) of the Bankruptcy Code.

18119.001/4837-5329-0243.1

## SEVENTH CAUSE OF ACTION

### (Against Credit Suisse)

*Declaratory Judgment that the Credit Suisse Liens*
*are in Bona Fide Dispute*

119.     The Committee incorporates by reference all the prior allegations of this Complaint.

120.     The Committee is entitled to a declaratory judgment that, by virtue of this lawsuit, the purported interest of Credit Suisse in the Debtors' properties is in *bona fide* dispute.

121.     Consequently, until the Committee's contentions herein are resolved, such properties may be sold free and clear of Credit Suisse's purported mortgages, liens and security interests pursuant to section 363(f)(4) of the Bankruptcy Code, and Credit Suisse may not be allowed to credit bid at any such sale.

122.     Furthermore, Credit Suisse, and the loan participants for whom it acts as agent, may be disallowed from making any election under section 1111(b) of the Bankruptcy Code or credit bidding at any sale conducted pursuant to sections 363 or 1123 of the Bankruptcy Code.

## EIGHTH CAUSE OF ACTION

### (Against all Defendants)

*Attorneys Fees*

123.     The Committee incorporates by reference all the prior allegations of this Complaint.

124.     To the extent allowed by any of the applicable contracts, or otherwise by law, the Committee is entitled to recover its attorneys fees from the defendants.

18119.001/4837-5329-0243.1

## PRAYER FOR RELIEF

**WHEREFORE**, the Committee prays for the following judgments against Credit Suisse and John Does 1-15:

1.      That Credit Suisse aided and abetted the Blixseths in a breach of their fiduciary duties and must account for the damages suffered thereby;

2.      That the Loan Transaction be reformed to reflect the parties' actual original intent: that Credit Suisse made (i) a relatively small loan to the Debtors that has been paid down substantially or paid off in full, and (ii) a substantially larger loan to BGI and/or the Blixseths, secured by the First BGI Note, or else Credit Suisse must be held to account for the damages suffered;

3.      That, if the Loan Transaction is so reformed, Credit Suisse must turn over to the Debtors' estates the amount that the Debtors have overpaid in interest charges, plus interest;

4.      That the Court declare that the Debtors did not receive reasonably equivalent value in connection with the Loan Transaction;

5.      That the Loan Transaction be annulled, terminated, avoided and unwound, as having been a fraudulent transfer;

6.      That Credit Suisse be required to release all its mortgages, liens and security interests in the Debtors' properties to the extent obtained in connection with the Loan Transaction;

7.      That Credit Suisse be required to turn over to the Debtors the $146.4 million it received from the Debtors in connection with the Loan Transaction;

8.      That the Court declare that Credit Suisse's bankruptcy claims shall be disallowed pending its release of such mortgages and security interests, and its return of approximately $146.4 million in cash to the Debtors;

9.      That the Court declare that Credit Suisse's bankruptcy claims, if and when allowed, shall be equitably subordinated to the claims of the Debtors' general unsecured creditors;

10.     That the Court declare that, by virtue of this lawsuit, Credit Suisse's purported claims against and interests in the Debtors' properties are in *bona fide* dispute;

11.     For interest, costs, and attorneys' fees; and

18119.001/4837-5329-0243.1

12.     For such other and further relief as the Court deems just.

DATED this __ day of _____, 2009.

                              **PARSONS BEHLE & LATIMER**

                              _____
                                 J. Thomas Beckett
                                 David P. Billings
                              201 S. Main Street, Suite 1800
                              Salt Lake City, Utah   84111


                              **JAMES H. COSSITT, PC**

                              _____
                                 James H. Cossitt
                              40 – 2nd East Suite 202
                               Kalispell, MT 59901-6112

                              *Attorneys for the Official Committee*

Plaintiff's Address:

*Official Committee of Unsecured Creditors*
*c/o  J. Thomas Beckett*
*Parsons Behle & Latimer*
*201 South Main St.  Suite 1800*
*Salt Lake City Utah    84111*

18119.001/4837-5329-0243.1