# DISCLOSURE STATEMENT

**INFORMATION CONCERNING THE DEBTORS AND THE
DEBTORS' PROPOSED PLAN OF REORGANIZATION**

## Yellowstone Mountain Club, LLC
## Yellowstone Development, LLC
## Big Sky Ridge, LLC
and
## Yellowstone Club Construction Company, LLC

Debtors in Chapter 11 Cases
No. 08-61570
No. 08-61571
No. 08-61572
No. 08-61573
in the United States Bankruptcy Court for the
District of Montana
_____, 2009

| PATTEN, PETERMAN, BEKKEDAHL & GREEN, PLLC<br>2817 2nd Avenue North, Suite 300<br>Billings, MT 59101<br>(406) 252-8500<br>James A. Patten | BULLIVANT HOUSER BAILEY PC.<br>2300 Westlake Office Tower<br>1601 Fifth Avenue<br>Seattle, Washington 98101-1618<br>(206) 292-8930<br>Lawrence R. Ream<br>Richard G. Birinyi |
|---|---|

Reorganization Counsel for Debtors and Debtors in Possession

# Table of Contents

                                                            **Page**

**I.** INTRODUCTION ....................................................................................... 1
**II.** SUMMARY OF THE PLAN ................................................................... 1
   **A.** General Discussion ..................................................................... 1
   **B.** Classification and Treatment of Claims and Interests ................. 5
   **C.** Effective Date ........................................................................... 10
   **D.** Acceptance of the Plan ............................................................. 10
   **E.** Credit Suisse Requested Disclosures ....................................... 11
**III.** DESCRIPTION OF THE DEBTORS, THEIR BUSINESS AND FINANCIAL
   CONDITION. ........................................................................................ 11
   **A.** The Yellowstone Club .............................................................. 11
      1. Ownership and Senior Management ..................................... 11
      2. Location ............................................................................... 12
      3. Yellowstone Club Facts ...................................................... 12
   **B.** Organization And Ownership. ................................................... 15
      1. Yellowstone Mountain Club, LLC ...................................... 15
      2. Yellowstone Development, LLC .......................................... 15
      3. Big Sky Ridge, LLC ............................................................ 15
      4. Ownership of Yellowstone Mountain Club and Yellowstone Development .......... 15
   **C.** Debtors' Business And Operations. ........................................... 16
   **D.** Employees. ............................................................................... 16
   **E.** Real Property And Personal Property. ....................................... 16
   **F.** Valuations .................................................................................. 17
   **G.** Causes Of Action. ..................................................................... 17
      1. Non-Bankruptcy Causes of Action. ..................................... 17
      2. General Bankruptcy Avoiding Power Causes of Action. ...... 18
      3. Causes of Action Related to the 2005 Financing ................. 19
   **H.** Debtors' Principal Liabilities. ................................................... 21
      1. Liabilities Generally. ........................................................... 21
      2. Secured Creditors. ............................................................... 22
      3. Administrative and Other Priority Creditors. ...................... 24
      4. Unsecured Creditors ............................................................ 24
   **I.** SIGNIFICANT PRE-PETITION EVENTS ................................ 25
      1. EPA Consent Decree ........................................................... 25
      2. CrossHarbor/Club Transactions .......................................... 25
      3. CrossHarbor and Credit Suisse/Skadden Arps Relationships and Dealings. .......... 27
      4. Events Leading to the Filing. ............................................... 30
**IV.** SUMMARY OF BANKRUPTCY PROCEEDINGS ...................... 30
   **A.** DIP Financing ........................................................................... 30
   **B.** Retention of Debtors' Professionals ......................................... 32
   **C.** Appointment of the Creditors' Committee ................................ 32
      1. Members of the Creditors' Committee ................................. 32

i

| | | |
|---|---|---|
| 2. | Counsel to the Creditors' Committee | 33 |
| D. | Marketing Efforts | 33 |
| E. | Post-Petition Operations | 35 |
| F. | Claims Process and Bar Date | 35 |
| 1. | Schedules of Assets and Liabilities and Statements of Financial Affairs | 35 |
| 2. | Bar Date | 35 |
| G. | The Plan of Reorganization | 35 |
| 1. | Negotiations Concerning the Plan of Reorganization | 35 |
| 2. | The Exclusivity Period | 36 |
| 3. | Description of Definitive Agreement | 36 |
| H. | Investigation of Avoidance Actions | 38 |
| V. THE PLAN | | 39 |
| A. | Unclassified Claims - Administrative Expenses and Priority Tax Claims | 39 |
| 1. | Administrative Expenses | 39 |
| B. | Classification and Treatment of Claims and Interests | 41 |
| 1. | Class 1 - Allowed Priority  Non-Tax Claims | 41 |
| 2. | Class 2 - Allowed Other Secured Debt | 41 |
| 3. | Class 3 - Allowed First Lien Lender Secured Claim | 42 |
| 4. | Class 4 – General Unsecured Claims | 43 |
| 5. | Class 5 – Convenience Class Claims | 43 |
| 6. | Class 6 – Intercompany Claims | 43 |
| 7. | Class 7 – Equity Interests | 44 |
| 8. | Class 8 - Allowed First Lien Lender Deficiency Claim | 44 |
| 9. | Class 9—Pioneer/Frontier Members Rejection Claims | 45 |
| 10. | Class 10-- American Bank Claims. | 45 |
| 11. | Class 11-- Prim Claims. | 45 |
| 12. | Class 12 – Honorary Member Rejection Claims. | 45 |
| 13. | Class 13 – Founder's Circle Member Rejection Claims. | 45 |
| 14. | Class 14 – Company Member Rejection. | 45 |
| C. | Contested Claims and Interests | 45 |
| 1. | Procedures for Treating and Resolving Disputed and Contingent Claims. | 45 |
| 2. | Disputed Claim Estimation Procedure. | 45 |
| D. | Means for Implementation of the Plan | 46 |
| 1. | Continued Entity Existence. | 46 |
| 2. | Amended LLC Agreements. | 46 |
| 3. | New Membership Interests. | 46 |
| 4. | Cancellation of Equity Interests and Other Instruments. | 46 |
| 5. | Corporate Action. | 47 |
| 6. | Dissolution of the Committee. | 47 |
| 7. | Pre-Effective Date Injunctions or Stays. | 47 |
| 8. | Preservation of Retained Actions. | 47 |
| 9. | Exemption From Certain Transfer Taxes. | 47 |
| 10. | Section 1123(a)(5)(J) Issuance of New Membership Interests. | 48 |
| 11. | Vesting of Assets | 48 |
| 12. | Effective Date Payments | 48 |

13.   Creation and Funding of Yellowstone Club Liquidation Trusts. ...........................49
14.   Discharge of Claims and Termination of Equity Interests. .....................................50
15.   Exculpation and Limitation of Liability. ..................................................................51
16.   Effect of Confirmation................................................................................................51
17.   Order of Steps on the Effective Date and Knowledge of Restructure of
Indebtedness. .........................................................................................................................51
18.   Substantive Consolidation .........................................................................................52
E.   Ownership and Management of Reorganized Debtors................................................52
F.   Executory Contracts and Unexpired Leases ..............................................................53
1.   Assumption or Rejection of Executory Contracts and Unexpired Leases. ..............53
2.   Payment of Cure Amounts. ........................................................................................58
3.   Objections to Assumption and Proposed Cure Amounts. ........................................58
4.   Rejection Claims Bar Date. ........................................................................................59
5.   Post-Petition Contracts and Leases. ..........................................................................59
G.   Retention of Jurisdiction .............................................................................................59
1.   Claims and Actions.....................................................................................................59
2.   Retention of Additional Jurisdiction .........................................................................59
3.   Modifications of the Plan ...........................................................................................60
4.   Revocation and Withdrawal of the Plan ....................................................................60
VI. CONFIRMATION AND CONSUMMATION PROCEDURE ........................................60
A.   Disclosure and Solicitation .........................................................................................60
B.   Acceptance of the Plan ................................................................................................60
C.   Classification ...............................................................................................................61
D.   Confirmation................................................................................................................61
1.   Acceptance..................................................................................................................61
2.   Feasibility ...................................................................................................................61
3.   Best Interests Test.......................................................................................................62
4.   Confirmation Without Acceptance By All Impaired Classes....................................62
VII. MATTERS RELATING TO FEDERAL AND STATE SECURITIES LAWS .............63
A.   No Registration of New Membership Interests ..........................................................63
VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES........................................63
A.   Liquidating Trusts........................................................................................................64
B.   Tax Consequences To Creditors. ................................................................................65
1.   Introduction.................................................................................................................65
2.   Class 1 - Allowed Prepetition Non-Tax Priority Debt ..............................................65
3.   Class 2 - Allowed Prepetition Other Secured Claims ...............................................65
4.   Class 3 - Allowed First Lien Lender Claims ..............................................................66
5.   Class 4, 5 and 8 - Allowed General Unsecured Claims, Convenience Class Claims,
and Lender Deficiency Claims ..............................................................................................67
6.   Class 7 - Allowed Interests ........................................................................................67
7.   Class 9, 12, 13, and 14 – Rejected Membership Claims ...........................................67
8.   Federal Income Tax Consequences to Debtors...........................................................67
9.   Tax Consequences to Equity Interest Holders............................................................69
C.   Withholding and Reporting .........................................................................................69
IX. CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS.................................70

**A.** Business Risks ................................................................................................. 70
  1. Economic Downturn ........................................................................................ 70
  2. Capital Expenditures ........................................................................................ 70
  3. World Events ................................................................................................... 71
  4. Unfavorable Weather Conditions .................................................................... 71
  5. Seasonality of Operations ............................................................................... 71
**B.** Risks Specific to Real Estate Development and this project in particular ............... 71
**C.** Competition ...................................................................................................... 72
**D.** Forward-looking Statements in This Disclosure Statement May Prove to Be
Inaccurate ................................................................................................................ 74
**E.** Credit Suisse Possible Administrative Claim ...................................................... 74
**F.** Credit Suisse Confirmation Objections .............................................................. 74
  1. Plan Violates Terms Of Prior Order. ............................................................... 75
  2. The Plan Fails to Contain Adequate Means for Implementation. ..................... 75
  3. Prohibited Non-Debtor Releases. .................................................................... 75
  4. Not "Fair and Equitable" ................................................................................ 75
  5. Impermissible Classification Scheme/Gerrymandering. .................................. 76
  6. Unfair Discrimination. ..................................................................................... 76
  7. Improper Classification And Treatment of Convenience Class Claims. ............ 76
  8. Violates "Best Interests of Creditors" Test. ..................................................... 76
**X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .. 76**
**A.** Liquidation Under Chapter 7 ............................................................................. 76
**B.** Alternative Plan(s) of Reorganization ................................................................ 77
**XI. VOTING INSTRUCTIONS** ................................................................................. 77
**A.** Classes Entitled to Vote .................................................................................... 77
**B.** Classes Not Entitled to Vote .............................................................................. 78
**C.** Ballots ............................................................................................................... 78
**D.** Voting Multiple Claims and Interests ................................................................. 78
**E.** Incomplete Ballots ............................................................................................ 78
**F.** Expiration Date ................................................................................................. 78
**XII. CONCLUSION** .................................................................................................. 79

# I. INTRODUCTION

Yellowstone Mountain Club, LLC ("YC"), Yellowstone Development, LLC ("YD"), Big Sky Ridge, LLC ("Big Sky"), and Yellowstone Club Construction Company, LLC ("YCC")(collectively the "Yellowstone Club" or "Debtors") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on November 10, 2008 ("Petition Date").

The Debtors continue to operate their business as Debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. The Debtors' cases are pending in the United States Bankruptcy Court for the District of Montana (the "Bankruptcy Court" or "Court") under Cases No. 08-61570, No. 08-61571, No. 08-61572, and No. 08-61573 (the "Bankruptcy Cases" or the "Cases"). The Bankruptcy Court entered an order providing for the joint administration of the Cases on November 13, 2008. An Official Committee of Unsecured Creditors (the "Committee" or the "Creditors' Committee") was appointed on December 4, 2008. An examiner with no duties has been appointed in the Bankruptcy Cases.

The Debtors' proposal for reorganization of its businesses is set forth in the Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code (the "Plan"), proposed by the Debtors.

A copy of the Plan is attached hereto as Exhibit I. This Disclosure Statement is intended to describe the Plan and provide you with adequate information to allow you to make an informed judgment regarding the Plan.

Capitalized terms used in this Disclosure Statement have the meaning ascribed to them in the Plan unless otherwise defined in this Disclosure Statement.

The Plan is summarized in Section II below and described in more detail in Section V below. Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims or Interests that are Impaired and that receive or retain property pursuant to the Plan are entitled to vote to accept or reject the Plan. A description of the requirements for acceptance of the Plan is set forth in Section VI below.

## II. SUMMARY OF THE PLAN

### A.   General Discussion

For a more detailed description of asserted Claims and available assets, see Section III below. These Sections also describe certain other features of the Plan and implementing provisions thereof.

Among other things, the Plan provides that most of the Debtors' contractual obligations under Club membership agreements will be assumed and honored in accordance with the terms of those agreements and as provided for in the schedule of assumed obligations. Some members will have their existing contracts rejected, but are offered the

1

election to enter into new uniform contracts in full satisfaction of any rejection claims. Development of the Project will continue. The Plan will fund payments to Convenience Class Unsecured Creditors, and if the present bidder for the Debtors' Membership Interests is the successful bidder, there will be provided a Trade Creditor Fund of up to $7,500,000 for payment of certain Allowed Claims of local trade and other unsecured creditors.

The Plan is supported by the Creditors' Committee appointed in Development's Chapter 11 Case by the Office of the United States Trustee, the Ad Hoc Committee of Members, and the Current Equity Owners. The Committee, the Ad Hoc Committee and the Current Equity Owners urge all secured creditors, unsecured creditors, and Club members to support the Plan.

The factual representations contained in this Disclosure Statement are made by the Debtors, except as otherwise indicated. Court approval of this Disclosure Statement does not constitute the Bankruptcy Court's verification of the accuracy of those factual representations.

The Plan provides for the reorganization of the Debtors and the continued development and operation of the Project through the issuance of 100% of the membership interest in the Reorganized YC, YD and Big Sky in exchange for the payment of at least $100 million by the successful bidder at a Bankruptcy Court approved auction of the new membership interests. The successful bidder at the auction ("Acquirer") will then operate the Reorganized Debtors and provide adequate assurance of future performance of the Assumed Obligations

To facilitate the reorganization, the Debtors, in consultation with the Committee, Ad Hoc Committee of Members, and the Ad Hoc Group of Class B Unit Holders will market the New Membership Interests through the Debtors' broker, CB Richard Ellis. The Debtors have filed a motion with the Bankruptcy Court seeking approval of the terms and conditions of the Sale, which will include requirements that:

  (i) the entity acquiring the New Membership Interests (the "Acquirer") shall assume (or have the Reorganized Debtors assume) those Club membership agreements, and other "Assumed Obligations" as provided under the Plan (subject to certain exceptions as discussed further below);

  (ii) the Acquirer shall agree to provide the same treatment for the Debtors' existing employees as is provided for in the Plan and the Definitive Agreement;

  (iii) except in the case of a credit bid, if allowed by the Bankruptcy Court, the proposed alternative Acquirer shall make a deposit of immediately available funds to the Debtors in an amount equal to $5,000,000; and

  (iv) the Acquirer shall provide written evidence reasonably satisfactory to the Debtors that it has the financial wherewithal to close and become the new owner of the Reorganized Debtors, to fund ongoing operations and construction of the

Project and the Club, and to satisfy the Assumed Obligations when such obligations become due for the purpose of demonstrating the feasibility of the Plan and adequate assurance of future performance of the Assumed Obligations.

(v)     the closing and issuance of the New Membership Interests  shall occur on the Effective Date.

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES EQUAL OR GREATER VALUE TO CREDITORS AND MORE RAPID DISTRIBUTIONS THAN AVAILABLE ALTERNATIVES.  A LIQUIDATION ANALYSIS CONTAINING A COMPARISON OF RECOVERIES UNDER THE PLAN VERSUS A CHAPTER 7 LIQUIDATION IS ATTACHED HERETO AS EXHIBIT II.  THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE ON THE PLAN AND RECOMMEND THAT EACH CREDITOR AND INTEREST HOLDER VOTE TO ACCEPT THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS GOOD FAITH ESTIMATES AND ASSUMPTIONS, WHICH ARE BASED ON FACTS CURRENTLY KNOWN TO THE DEBTORS AND WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.

EACH CREDITOR AND INTEREST HOLDER SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND CONSULT WITH ITS LEGAL AND/OR BUSINESS ADVISORS AS IT DEEMS APPROPRIATE BEFORE VOTING ON THE PLAN.  THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE THEREON, BUT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW.  THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY, AND HOLDERS OF CLAIMS OR INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN THEMSELVES FOR A FULL UNDERSTANDING OF THE PLAN.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY FEDERAL OR STATE SECURITIES AGENCIES.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF SEVERAL OTHER DOCUMENTS, INCLUDING, BUT NOT LIMITED TO, THE DIP FINANCING FACILITY AND VARIOUS EXHIBITS. THE DESCRIPTIONS CONTAINED HEREIN OF SUCH DOCUMENTS ARE ONLY SUMMARIES AND ARE QUALIFIED ENTIRELY BY REFERENCE TO SUCH DOCUMENTS. COPIES OF THOSE DOCUMENTS ARE ON FILE WITH THE BANKRUPTCY COURT AND HOLDERS OF CLAIMS OR INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW SUCH DOCUMENTS.  IF ANY INCONSISTENCY EXISTS BETWEEN

THIS DISCLOSURE STATEMENT AND ANY SUCH DOCUMENT, THE TERMS OF SUCH DOCUMENT WILL CONTROL OVER THIS DISCLOSURE STATEMENT.

General information regarding the Debtors and the business and material events leading to and during the Cases is set forth in Sections III and IV below. Except where otherwise noted, this information is provided by the Debtors and their management. **THE STATEMENTS AS TO THE DEBTORS' FINANCIAL CONDITION CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF FEBRUARY 13, 2009 (UNLESS ANOTHER TIME IS SPECIFIED), AND THERE IS NO REPRESENTATION OR IMPLICATION THAT THE INFORMATION CONTAINED HEREIN WILL NOT HAVE CHANGED AS OF ANY TIME SUBSEQUENT TO THAT DATE NOR WILL YOU RECEIVE ANY NOTICE OF SUCH CHANGES.**

Alternatives to confirmation and consummation of the Plan are described in Section X below. Certain matters relating to federal and state securities laws are described in Section VII below. Certain federal income tax consequences associated with the Plan are described in Section VIII below. Certain risk factors and other considerations are described in Section IX below. Historical financial statements of the Debtors are attached as Exhibit III hereto. Projections for the years 2009 through 2014 are attached as Exhibit IV hereto. The Debtors' liquidation valuation is attached as Exhibit II hereto.

BALLOTS WITH RESPECT TO THE PLAN MUST BE RECEIVED AT THE ADDRESS SET FORTH ON THE ENCLOSED BALLOT ON OR BEFORE _____, 2009. FOR YOUR CONVENIENCE, A BALLOT AND PREADDRESSED ENVELOPE ARE ENCLOSED. ANY BALLOTS RECEIVED AFTER THE EXPIRATION DATE SHALL NOT CONSTITUTE VALID BALLOTS AND SHALL NOT BE COUNTED IN DETERMINING THE VOTE OF ANY CLASS. FURTHER VOTING INSTRUCTIONS ARE SET FORTH IN SECTION XI BELOW.

If you have questions concerning the procedure for voting, if you did not receive the appropriate Ballot or Ballots, if you received a damaged Ballot or have lost your Ballot, or if you have any questions concerning the Disclosure Statement and/or the Plan, please call Andy Patten at (406) 252-8500 or Larry Ream at (206) 521-6470.

THIS DISCLOSURE STATEMENT INCLUDES CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS PROVIDED BY THE ACQUIRER OR THE DEBTORS AS TO CERTAIN FUTURE MATTERS, WHICH REFLECT VARIOUS ASSUMPTIONS, WHICH ASSUMPTIONS MAY OR MAY NOT PROVE TO BE CORRECT. NEITHER THE DEBTORS NOR THE ACQUIRER UNDERTAKE ANY OBLIGATION TO PROVIDE ADDITIONAL INFORMATION OR TO CORRECT OR UPDATE ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT OR THE EXHIBITS HERETO.

*[AWAITING APPROVAL:* THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE HONORABLE RALPH B. KIRSCHER, BANKRUPTCY JUDGE OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF MONTANA. APPROVAL BY JUDGE KIRSCHER DOES NOT CONSTITUTE A RECOMMENDATION BY THE COURT AS TO THE MERITS OF THE PLAN, BUT INCLUDES A FINDING THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO ENABLE YOU TO DECIDE WHETHER TO VOTE FOR OR AGAINST THE PLAN. YOU SHOULD CONSULT WITH COUNSEL AND/OR OTHER ADVISORS REGARDING THE PLAN AS YOU DETERMINE APPROPRIATE.] [A LETTER STATING THE POSITION OF THE COMMITTEE WITH RESPECT TO THE PLAN IS ENCLOSED SEPARATELY WITH THE SOLICITATION PACKAGE.]

**B.     Classification and Treatment of Claims and Interests**

The following table summarizes the classification and treatment of Claims and Interests under the Plan. This summary is qualified in its entirety by reference to the provisions of the Plan. For a more detailed description of the terms and provisions of the Plan, see Section V below.

| Class Description | Treatment under the Plan |
|---|---|
| **Allowed Administrative Expenses.** Allowed costs of the Cases, including, without limitation, professional fees and other expenses of operation during the Cases, including any cure costs under Assumed Contracts and Leases as determined by the Court pursuant to the procedures approved by the Court to fix such cure costs. | Allowed Administrative Expense Claims (including the DIP Financing Facility and cure costs on Assumed Contracts and Leases) shall be paid in full in Cash on or promptly after the Effective Date or, where applicable, when otherwise Allowed or due after the Effective Date; provided, however, that such Claim may be satisfied on such other terms as may be agreed to by the holder of such Claim and the Disbursing Agent. |
| **Ordinary Course Allowed Administrative Expenses.** Ordinary course of business expenses incurred after the filing of the Cases. | Allowed Administrative Expense Claims incurred by the Debtors (other than YCC) in the ordinary course of business to the extent relating to the Project (including pro rated Administrative Expense Claims of governmental units for real estate taxes) and for which the initial invoice on account thereof has not been received in the ordinary course on or before the Effective Date will be assumed by the applicable Reorganized Debtor on the Effective Date and paid, performed or otherwise settled by the Reorganized Debtors when due in |

| Class Description | Treatment under the Plan |
|---|---|
| | accordance with the terms and conditions of the particular agreement or non-bankruptcy law governing such obligation. Allowed Administrative Expense Claims incurred in the ordinary course of business by the Debtors since the Petition Date and for which the initial invoice on account thereof was received in the ordinary course by the Reorganized Debtors on or before the Effective Date shall be paid by the Disbursing Agent in accordance with the agreed terms between the parties. |
| **Allowed Priority Tax Claims.** Allowed Claims entitled to priority under Code § 507(a)(8). | Any holder of an Allowed Priority Tax Claim shall receive at the Debtors' option (i) the amount of the Allowed Priority Tax Claim in one Cash payment on or immediately after the Effective Date or (ii) such other payments as will satisfy the requirements of 11 U.S.C. § 1129(a)(9) with respect to such claims. That section requires that all such claims receive payments over time together with interest such that the present value of the payments is equal to the amount of the Allowed Priority Tax Claim.<br><br>The Debtors estimate that there will be approximately $_____$ of priority tax claims. |
| **Class 1 – Allowed Prepetition Priority Claims.** Allowed Claims entitled to priority under Code § 507(a)(3) & (4). | Allowed Prepetition Priority Claims shall be Paid in full in Cash on or promptly after the Effective Date or, where applicable, when otherwise Allowed or due after the Effective Date; provided, however, that such Claim may be satisfied on such other terms as may be agreed to by the holder of such Claim and the Disbursing Agent.<br><br>The Debtors estimate that there will be approximately $_____$ of prepetition priority claims. |

| | |
|---|---|
| **Class 2- Allowed Prepetition Other Secured Debt.** Class 2 consists of Allowed Secured Claims of Other Secured Lenders. This Class is further subdivided into sub-classes with respect to each person or entity which holds such a Claim. | **Class 2 is Unimpaired**  Each and every Holder of a Claim that is a Subclass of Class 2 will be dealt with according to one of the following alternatives: (i) the rights of the holder will not be modified by the Plan, (ii) the collateral will be surrendered, or (iii) any default prior to the Plan's Effective Date will be cured and the original obligation reinstated. <br><br> The Debtors estimate that there will be approximately $_____ of Class 2 Claims. |
| **Class 3 – Allowed Prepetition First Lien Claims.**  Class 3 consists of all Allowed Secured Claims of the First Lien Lenders, whose agent in these proceedings is Credit Suisse. | **Class 3 is Impaired.**  Class 3 will be paid its Allowed Secured Claim related to the Project based on the allocated portion of the Equity Purchase Payment attributable to the Collateral.  The Holders of the Class 3 Claims will retain their liens on any other Collateral.  Based on the allocation of value between unencumbered Project Assets and the Project Assets that serve as Collateral for the Class 3 Claim, the portion of the Claim secured by Project Assets will receive some or all of the promissory note paid to the Estates for the issuance of new equity in the Reorganized Debtors.  The note will be secured by all the Collateral currently securing the Claim plus all the Debtors' presently unencumbered property.  No payments shall be made to the First Lien Lenders until the final resolution of Avoidance Claims against them on account of actions prior to the filing of the Bankruptcy Cases. The Plan includes provisions that addresses the impact of an election by the Holders of Class 3 Claims to have their Allowed Claims treated in accordance with Section 1111(b) of the Bankruptcy Code. |

7

| | |
|---|---|
| **Class 4 – General Unsecured Claims.** Class 4 consists of Allowed General Unsecured Claims. | **Class 4 is Impaired.** Following the Effective Date, the Holders of Allowed General Unsecured Claims shall receive periodic distributions from the Liquidation Trusts which will pursue the liquidation of all the Estates' non-operating assets and all Avoidance Actions. In the event CrossHarbor, or an affiliate, becomes the Acquirer, some Holders of General Unsecured Claims may be able to participate in a pool of funds which will be used for payments to preserve the reputation and standing of the Club in the community. The persons or entities participating in the Trade Creditor Fund will be chosen by the Reorganized Debtors in consultation with the Unsecured Creditors' Committee and the Ad Hoc Members' Committee. |
| **Class 5 – Convenience Class Claims.** Class 5 consists of Convenience Class Claims. These are defined as Allowed General Unsecured Claims that total less than $5,000 or as to which the Holder elects to voluntarily reduce the claim to $5,000. | **Class 5 is Unimpaired.** Following the Effective Date, the Holders of Convenience Class Claims shall receive cash equal to 100% of such claim in full and complete satisfaction of such claim. |
| **Class 6 – Intercompany Claims.** Class 6 consists of Intercompany Claims. | **Class 6 is Impaired.** These claims shall receive periodic distributions from the Liquidation Trusts which will pursue the liquidation of all the Estates' non-operating assets and all Avoidance Actions. |
| **Class 7 – Equity Interests.** Class 7 consists of the Allowed Equity Interests of the owners of the Debtors. | **Class 7 is Impaired.** The existing equity interests shall be cancelled on the Effective Date. The Holders of such interests shall be residual beneficiaries of the Liquidation Trusts and shall be entitled to receive distributions from the Liquidation Trusts after the full payment of all prior Allowed Claims. |

| | |
|---|---|
| **Class 8 – Lender Deficiency Claims.** Class 8 consists of the Allowed Unsecured Claims, if any, of the First Lien Lenders. | **Class 8 is Impaired.** Class 8 will receive Pro Rata Payments from the Liquidation Trusts on a par with other Allowed General Unsecured Claim Holders. No payments shall be made to the Holders of the Lender Deficiency Claims until the final resolution of Avoidance Claims against them on account of actions prior to the filing of the Bankruptcy Cases. |
| **Class 9 – Pioneer/Frontier Member Rejection Claims.** Class 9 consists of the Allowed Unsecured Claims, if any, of Pioneer/Frontier Members whose contracts are being rejected under the Plan. | **Class 9 is Impaired.** Class 9 will receive Pro Rata Payments from the Liquidation Trusts on a par with other General Unsecured Claim Holders. The Holders will also have the option to waive all their Claims against the Debtors and the Estates in exchange for a new membership agreement with the Reorganized Debtor. |
| **Class 10 – American Bank Claims.** Class 10 consists of the Allowed Secured Claims of the American Bank. | **Class 10 is Impaired.** Class 10 will receive interest only payments at the existing non default rate under its loan documents for 23 months and will receive the entire balance of the Claim on the 24th month after the Effective Date. The lien will remain in place. In the event sales take place prior to the 24th month, the existing contract terms for deed releases will apply. |
| **Class 11 – Prim Claims.** Class 11 consists of the Allowed Secured Claims of Prim Vintage Development, L.P. | **Class 11 is Unimpaired.** The Collateral securing the Prim Claim will not revest in the Debtors on Confirmation and the Holder of the Claim will retain its lien and be free to exercise all its rights with respect to the Collateral in accordance with Montana law. |
| **Class 12 – Honorary Member Rejection Claims.** Class 12 consists of the Allowed Unsecured Claims, if any, of Honorary Members whose contracts are being rejected under the Plan. | **Class 12 is Impaired.** Class 12 will receive Pro Rata Payments from the Liquidation Trusts on a par with other General Unsecured Claim Holders. The Holders will also have the option to waive all their claims against the Debtors and/or the Estate in exchange for a new membership agreement with the Reorganized Debtor. |

| | |
|---|---|
| **Class 13 – Founders Circle Member Rejection.** Class 13 consists of the Allowed Unsecured Claims, if any, of Founders Circle Members whose contracts are being rejected under the Plan. | **Class 13 is Impaired.** Class 13 will receive Pro Rata Payments from the Liquidation Trusts on a par with other General Unsecured Claim Holders.  Each Holder will also have the option to request a new membership agreement, which request may be denied by the Reorganized Debtor.  If the Reorganized Debtor accepts a Holder's request for a new membership agreement, said Holder will waive all its claims against the Debtors and/or the Estate in exchange for a new membership agreement with the Reorganized Debtor. |
| **Class 14 – Company Member Rejection Claims.** Class 14 consists of the Allowed Unsecured Claims, if any, of Company Members whose contracts are being rejected under the Plan. | **Class 14 is Impaired.** Class 14 will receive Pro Rata Payments from the Liquidation Trusts on a par with other General Unsecured Claim Holders.  Each Holder will also have the option to request a new membership agreement, which request may be denied by the Reorganized Debtor.  If the Reorganized Debtor accepts a Holder's request for a new membership agreement, said Holder will waive all its claims against the Debtors and/or the Estate in exchange for a new membership agreement with the Reorganized Debtor. |

### C.      Effective Date

The Effective Date shall be the date not more than five days after the later of the Confirmation Date or the date on which all conditions to the effectiveness of the Plan have been satisfied or waived.  A notice of the Effective Date shall be filed with the Bankruptcy Court.

### D.      Acceptance of the Plan

A Class of Claims or Interests shall have accepted the Plan if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of the Claims or Interests that are Allowed or deemed Allowed for voting purposes and that have actually voted on the Plan. Classes of Claims or Interests that are entitled to vote on the Plan are identified in Section XI of this Disclosure Statement.  The votes of insiders are not counted in determining whether at least one class of impaired creditors has accepted the Plan for

purposes of Section 1129(a)(10) of the Bankruptcy Code. The requirements for Confirmation of the Plan are discussed in Section VI of this Disclosure Statement.

**E.      Credit Suisse Requested Disclosures**

In keeping with its litigious stance, Credit Suisse has requested additional disclosures with respect to a myriad of matters. Where relevant to other creditors' understanding of the Plan, the Debtors have included the information. For the absence of doubt, the Debtors address each item in Credit Suisse's requested additional disclosure in Exhibit VI.

## III. DESCRIPTION OF THE DEBTORS, THEIR BUSINESS AND FINANCIAL CONDITION.

**A.      The Yellowstone Club**

**1.      Ownership and Senior Management**

On the Petition Date, Edra Blixseth was the indirect owner of a majority of the equity interests in the Debtors. The notion of forming Yellowstone Club began in the mid 1990's. Edra wanted a place where she could relax and enjoy her family. As more friends came to visit, it became apparent that there was an opportunity to share the wonderful experience with others of like mind, with a strong family orientation. Since its inception in the mid 1990's, Edra has worked closely with each operation responsible for the formation and growth of Yellowstone Club. She was intimately involved in the planning and implementation of the day-to-day experience at the Club. Since its inception and until August 2008, Tim Blixseth was in control of the day-to-day operations of the Yellowstone Club.

The Vice President of Club Operations and General Manager is Hans Williamson. He joined the Yellowstone Club team in 2007 as Vice President of Procurement and Technology. In 2008, Hans was named Vice President of Club Operations and General Manager. Hans came to YC with an extensive background in hotel and restaurant procurement, where he most recently served as Senior Vice President, Operational Excellence with Levy Restaurants' Global Group. Prior to joining Levy Restaurants, Hans started his career in 1983 in hospitality management with Hilton Hotels Corporation. Throughout his 11-year career with Hilton, Hans served in various management positions, most notably, as the Director of Purchasing for the central region of the United States for a period of seven years. Hans graduated with a B.S. in Hotel Administration from Cornell University and earned a certificate in Purchasing Management from DePaul University.

The Vice President of Sales and Marketing is Charlie Callander. He joined the Yellowstone Club management team in 2001 after completing a 20-year commitment to the development, marketing, and selling of The Vintage Club in Indian Wells, California. The Vintage Club is a multiple golf course, high-end, private community which has become a landmark project, and has since been emulated by a number of similar developments around the country. His interest in being involved with what was clearly going to be another ground-

11

breaking community – in the mountains instead of the desert – brought him to the Yellowstone Club. Aside from his role as Vice President of Sales & Marketing, Charlie has been actively involved with many additional leadership roles including President of DreamCatcher Endowment, Inc. – Yellowstone Club's charitable giving affiliate which is dedicated to raising funds and improving education and awareness to support local organizations that contribute to the overall well-being of the Big Sky Community and Southwest Montana. Charlie currently serves as President of YC's Property Owners Association and the Architectural Review Committee, as well as the Club's exclusive Broker. Under his direction, the Sales office and Marketing team recently exceeded one billion dollars in sales of YC property.

### 2.    **Location**

Yellowstone Club is located in the heart of the Rocky Mountains, adjacent to Big Sky, Montana, and Yellowstone National Park. These landmarks give orientation:

TO THE NORTH: Big Sky Ski Area and the Spanish Peaks, most notably, Lone Peak

TO THE EAST: Yellowstone National Park and the Gallatin Mountains

TO THE SOUTH: National Forest Lands, Cinnamon Ridge, The Sphinx and The Helmet

TO THE WEST: Lee Metcalf Wilderness Area, Muddy Creek Drainage, Cedar and Fan Mountains

### 3.    **Yellowstone Club Facts**

The heart and soul of the Yellowstone Club is the community of families with like interests and a desire to share them with each other in the great Montana outdoors. One cannot put a finger on the whole that comprises Yellowstone Club membership. Naturally, it varies for each individual, but a common word often heard at the Club is 'Freedom!' Freedom from daily routines that are left behind at home and at the office. It is the freedom to connect with "Mother Nature" at her finest, whether the ground is covered with a blanket of white snow or the fairways are lush and green. It is the sound of running water in the rivers and streams and the sound of children's laughter. It is the enjoyment of a fine meal and a great bottle of wine with friends. There are approximately 13,500 acres of land within the Club boundaries under the master plan.

#### a.    **General**

• Yellowstone Club, "The World's Only Private Ski and Golf Community", is located in Big Sky, Montana, on 13,500 acres of private land near the northwest corner of Yellowstone National Park;

• The Club was established by Tim and Edra Blixseth in late 2000.

• Yellowstone Club is limited to 864 residential properties, and membership is by invitation only. Club amenities are available exclusively to Yellowstone Club members and their guests.

### b.    Community

• There are a wide variety of options for member residences at Yellowstone Club. They include generous home-sites with spectacular views, on-mountain chalets, lodges, private ranches, single-family custom residences, and condominiums in Sunrise Ridge and The Enclave. Many of these options offer ski access or golf course frontage.

• Families are what make Yellowstone Club so special, and children of all ages enjoy a wide variety of guided activities. Individual attention coupled with group fun offer children a comfortable, enjoyable environment and a terrific opportunity to immerse themselves in everything 'Montana.'

• Dining opportunities include three classic lodges: Rainbow Lodge, Warren Miller Lodge, and Timberline Café. All feature a wonderful mountain-elegant atmosphere, with a broad range of menu items from ultra-gourmet to "Montana casual," any of which can be paired with selections from a world-class wine list.

• At the base of Pioneer Mountain is the substantially complete 110,000-square-foot Warren Miller Lodge. This grand structure includes 21 condominium units, a dining room, lounge, retail and office space, a spa, an exercise room, casual café, lobby bar, ski shop, business center, three level parking structure and teen center.

• SnoCat Dinners at the mountain-top restaurant, Timberline Café, offers an adventurous and very special opportunity to enjoy an exceptional YC dining experience. A person can ride in comfort in one of YC's deluxe snow coaches, each fully-equipped with XM Radio, bucket seats, carpeting, a small wet bar, drink holders and heated windows.

• The rustic-yet-refined Guest Cabins provide a memorable lodging experience for members and guests. These twenty, custom-designed and attractively-furnished log cabins are located mid-mountain, they feature ski access, and are an easy walk from the breakfast, lunch, and dinner service, pool, and the inviting hot tub found at the Rainbow Lodge.

• Yellowstone Club employs a professional public safety and security staff to ensure privacy for all members.

• Yellowstone Club maintains its own on-property, 24/7 Fire Department and EMT for immediate response to medical and structural emergencies.

• Annual Club events include, among many others: golf tournaments, winemaker weekends, a spectacular New Year's Eve celebration with fireworks, a member ski race series, wine tastings, and Camp YC (our family-oriented summer camp).

### c.   Skiing

• Skiing at the Yellowstone Club matches many of the world's top ski resorts, thanks to 60+ powder-drenched trails dropping 2,700 vertical feet over more than 2,200 acres—all receiving an average annual snowfall of well over 300 inches.

• Multiple Doppelmayr high-speed bubble-equipped detachable quad lifts and fixed grip double and triple chairs service both Pioneer (9860') and Andesite (8850') mountains.

• The front side of Pioneer Mountain features an array of cruising corduroy groomed trails, knee-deep powder on moderate pitches and steep above-timberline chutes. The backside of the mountain boasts unparalleled gladded skiing and more powder.

• Yellowstone Club features its own children's instruction area complete with a Magic Carpet surface lift. A terrain park also offers a variety of jumps, rollers, rails, and boxes to challenge those who want to add excitement to their run while skiing or snowboarding.

• Four lifts swiftly deliver members to 1,350 vertical feet of groomed skiing on adjacent Andesite Mountain, while providing convenient ski access to many of the homes.

• Big Sky Ski Resort's 3,812 acres and Moonlight Basin Ski Area's 1,900 acres are interconnected with the Yellowstone Club's two peaks, for a combined total of over 7,500 total acres of skiing terrain available for members and their guests.

• Yellowstone Club features its own Ski Patrol and Snow Safety Department. Additionally, the Snowsports Department's guides and certified ski instructors are available upon request, for all ages and abilities. Other guided or unguided winter activities include cross-country skiing, snowshoeing and sleigh rides.

### d.   Golf

• Yellowstone Club offers an 18 hole championship golf course (with separate practice facilities) designed by former British Open and Senior Open champion Tom Weiskopf. The views are breathtaking, and the variety of terrain and multiple tee placements make the course challenging for players of all abilities.

• The spectacular mountain layout features unbelievable vistas, with stunning yet extremely playable elevation changes, creating what is one of the most celebrated mountain golf courses in the world.

• Temporary facilities are being utilized until a clubhouse is completed.

## B.   Organization And Ownership.

The Debtors are all limited liability companies incorporated and existing under the laws of the state of Montana.

### 1.   Yellowstone Mountain Club, LLC

Yellowstone Hotel Management LLC, which owns the hotel and restaurant operation known as Bucks T-4, is a wholly owned subsidiary of YC. Under the Plan, the membership interests in this entity will be transferred to the YC Liquidation Trust.

### 2.   Yellowstone Development, LLC

Yellowstone Utilities, LLC is a wholly owned subsidiary of YD and acts as the billing entity for utility service within the Yellowstone Club property. Under the Plan, the membership interests in this entity will be retained by the Reorganized Debtors.

Yellowstone Club Construction Company LLC is a wholly owned subsidiary of YD that performed construction services at the Club. It is one of the Debtors. Under the Plan, all its assets will be transferred to the YCC Liquidation Trust.

St. Andrews International Golf Club Limited  is a wholly owned subsidiary of YD. It is a UK company which owns 265 acres in St. Andrews, Fife, Scotland with existing entitlement for the development of a private golf club and condos. Under the Plan, the membership interests in this entity will be transferred to the YD Liquidation Trust.

Cosburn Investments B.V. is a wholly owned subsidiary of YD. It is a Netherlands company which owns 100% of the equity interest of Jaroup Investments B.V., another Netherlands company which owns 100% of the equity interest of Danika Investments Limited – an Irish company that owns the Châteaux de Farcheville, a majestic 14th-century chateau half an hour outside Paris and situated on over 1000 acres of land. Under the Plan, the ownership interest in this entity will be transferred to the YD Liquidation Trust.

### 3.   Big Sky Ridge, LLC

This entity is 50% owned by YD and 50% owned by Edra Blixseth. It is a Debtor and under the Plan, all of the existing membership interests are being cancelled and new membership interests are being issued to the Acquirer.

### 4.   Ownership of Yellowstone Mountain Club and Yellowstone Development

BLX Group, Inc. (an Oregon company) is the majority shareholder possessing 95% of the class A shares in both YC and YD with the remaining 5% of the Class A shares held by Blixseth Family Investments, LLC (60% of which is controlled by Edra Blixseth). The class B shares are held by JVB Properties with 2%; along with Blixseth Family Investments, LLC, Bankers Financial Corporation, MTN Vistas Properties, A.C. and Linda K. Markkula

15

Trustees of the Arlin Trust, Michael Snow, Spano Yellowstone Holdings, Robert Watson, Gregory C. Branch Family Limited Partnership each owning a 1% interest in the Class B shares.

## C.    Debtors' Business And Operations.

The Debtors are the owners, developers, and operators of a master planned unit development located in Madison County, Montana known as the Yellowstone Club.

The Project is an approximately 13,500 acre vacation home community that includes one championship golf course, clubhouses, an equestrian center, ski lodges, and other recreational amenities. The Project's master plan provides for a density of 864 residential units, of which 439 residential units have been sold to date. The Project is marketed toward sophisticated, high end consumers who desire first class operations and amenities.

During the case, the Debtors believe that the members have had a positive reaction to the operations. Discovery Land Company was hired by the Debtors on September 1, 2008, and has managed the day to day operations since that date. Post-petition, the amount of delinquent dues payments has decreased from levels experienced during 2007 and the first half of 2008. After the filing and approval of the DIP Loan, the Debtor was able to collect over 90% of the dues payments for the first half of 2008, a collection level far higher than historical collection.

## D.    Employees.

As of December 31, 2008, the Debtors employed a total of approximately 566 employees. Of these employees, approximately 280 work year-round and serve in many different important capacities, including, without limitation, development, marketing, accounting, and Club operations. Approximately 42 of the year-round employees are salaried and approximately 238 are paid hourly. In addition, the Debtors typically hire approximately 300 employees to work on a seasonal basis (generally December through April) for the Debtors and in connection with the skiing operations.

## E.    Real Property And Personal Property.

The Project occupies approximately 13,500 acres, with over 85% of the land preserved as open space for year-round outdoor recreational activities and natural habitat. The allowable density under the Project's master plan is 864 residential units (both single family lots and condominium units) and 439 units have been sold or transferred to date. The balance of the Project's real property is either owned by the Debtors or dedicated for public infrastructure and common area use. The Project includes the real property improvements that comprise the multi-generational resort-like amenities described in detail in Section III.A.3 above, including the ski facilities and the championship golf course designed by Tom Weiskopf, an Equestrian Center, the Warren Miller Lodge, and 20 Guest Cabins.

16

In addition to the real property, the Debtors own personal property used in connection with the development and operation of the Project. This personal property includes furniture, fixtures, and equipment for the Club and Project development and sales operations, vehicles, and other machinery and equipment (including lawn mowers, grooming and trimming equipment, blowers, snowmobiles, Clubcar carryalls, Trucksters, radios, rollers, and other similar equipment).

Approximately 320 individuals and their families are members in the Club. Prior to the Petition Date, there were seven different available memberships: (1) National, (2) Pioneer, (3) Frontier, (4) Company, (5) Founders' Circle, (6) Honorary and (7) Ordinary/Residential. All dues are paid in advance, and thus are for the future use of the Club. The current Club membership structure requires all Resident Members to own a lot at Yellowstone Club and to pay an initial membership deposit that is refundable (with certain conditions) upon the earlier of (i) resignation and reissuance of the membership or (ii) thirty (30) years. Memberships are acquired in conjunction with purchases of a residential unit.

**F.      Valuations**

The Debtors' Plan contemplates that 100% of the Equity Interests in YC, YD, and Big Sky will be issued to an entity. The Plan and the Court's Plan Solicitation Order provides for detailed procedures that will govern the Debtors' efforts to obtain higher and better offers for the issuance of the equity interests. Despite repeated requests from Credit Suisse and other parties to require the Debtors to include valuation opinions in this Disclosure Statement, the Bankruptcy Court agreed that including such information would act only to chill effective and robust bidding in accordance with the Plan Solicitation Order. Accordingly, this Disclosure Statement does not include any opinions of value by the Debtors, who prefer to rely on the marketplace to set the value for the Project.

**G.      Causes Of Action.**

      **1.      <u>Non-Bankruptcy Causes of Action.</u>**

The Debtors may have rights and causes of action against third parties, including those that arise in the ordinary course of the Debtors' business. Such rights and causes of action include, among others: (i) actions against contractors, subcontractors, suppliers, manufacturers, and other third parties on account of defective, substandard, or non-conforming goods and services, or for failure to provide goods and services as required by contract; (ii) actions for indemnity, contribution, and subrogation against third parties in connection with Claims made against the Debtors; and (iii) other types of rights and causes of action that may arise from time to time in the course of the Debtors' operations. At the present time, the Debtors are unaware of any such actions that would be material to the future operations or recoveries for the Liquidating Trusts. The Plan expressly preserves the Debtors', Reorganized Debtors', and Estates' rights with respect to all such causes of action, whether or not asserted prior to the Plan's Effective Date, and whether or not described in the Plan, this Disclosure Statement, or the Debtors' Schedules, except to the extent such causes

of action are expressly waived and/or released in the Plan. If such causes of action relate to the operation of the Club, or its retained property, the Reorganized Debtors reserve the right to bring such actions and enforce such rights, regardless whether a potential defendant in such an action has filed a proof of claim in the Cases, voted (or not voted) to accept or reject the Plan, or retained or received any consideration under the Plan. If such causes of action are unrelated to the operation of the Club, then they are transferred to the Liquidation Trusts and the Trustees reserve the right to bring such actions and enforce such rights, regardless whether a potential defendant in such an action has filed a proof of claim in the Cases, voted (or not voted) to accept or reject the Plan, or retained or received any consideration under the Plan

The following is a list of causes of action that the Debtors contend they may have against third parties, which list is not intended to be exhaustive:

• Collection Actions. The Debtors have causes of action for the nonpayment of amounts owed by the following categories of people/entities: (i) Members on account of past due amounts owing with respect to their memberships and under their respective membership agreements; and (ii) Vendors on account of outstanding credits that have not been applied or refunded to the Debtors.

• Warranty and other Contractual Rights. The Debtors have ongoing rights under contracts and other agreements with third parties, including, but not limited to, potential warranty and other claims or rights against contractors, subcontractors, suppliers, manufacturers, and other third parties. Nothing in the Plan is intended in any way to constitute a waiver or release of such claims or rights.

• Note Collections. The Debtors have causes of action for the collection of promissory notes against BGI, the owner of a majority of the Membership Interests in YC and YD. Among these notes are notes having a face amount of approximately $275,000,000.00. The Bankruptcy Court has authorized the Committee to pursue collection of these notes and the Committee has commenced an Adversary Proceeding. This cause of action will be transferred to the Liquidation Trusts.

• Another potential action would be related to the collection of a note payable by Edra Blixseth in the face amount of Thirty Nine Million Nine Hundred Ninety Five Thousand and no/100 U.S. Dollars $39,995,000.00 related to the August, 2008 transfer of the YD's interest in Tamarindo to Tim Blixseth. Tamarindo is a resort outside Manzanillo, Mexico that was transferred from YD to Ms. Blixseth in exchange for a note from Ms. Blixseth and then immediately transferred to Mr. Blixseth for no consideration as a part of the Blixseths' marital property settlement agreement executed in connection with the dissolution of their marriage.

### 2.   **General Bankruptcy Avoiding Power Causes of Action.**

The Debtors' Schedules reflect that various payments were made to creditors during the ninety day period prior to the Petition Date. The Debtors currently are investigating the

18

extent to which such payments might be avoidable under Bankruptcy Code sections 547 or 548. According to the Bankruptcy Schedules, the total of all payments to creditors during the 90 days prior to filing was $*. The Debtors currently believe, however, that many potentially preferential payments may be subject to valid defenses, including ordinary course, subsequent new value, and contemporaneous exchange for new value.

The Plan provides that, from and after the Effective Date, the Trustees of the Liquidation Trusts will be responsible for the enforcement of any preference or other Avoidance Actions under the Bankruptcy Code. Specifically included in such Avoidance Actions are actions seeking affirmative and defensive relief against the First Lien Lenders with respect to all of the remaining First Lien Lender Obligations.

Credit Suisse has also alleged in pleadings that there may be some Avoidance Actions capable of being asserted against Cross Harbor or its affiliates in connection with the Debtors' transfers to those entities as detailed in Section H.2. below.

As noted in the preceding section, the Debtors also transferred certain assets to Tim Blixseth in transactions that were part of the Blixseths' marital property settlement agreement executed in connection with the dissolution of their marriage.

Any recoveries or other proceeds received by the Trustees in connection with the prosecution of Transferred Actions shall be distributed in accordance with the provisions of the Plan.

The Debtors have not included any opinions of the value of any Avoidance Actions in this Disclosure Statement because they have no ability to predict with any type of accuracy the approach to such actions that the Trustee will take or the possible defenses that will be asserted to such claims.

### 3.   Causes of Action Related to the 2005 Financing

Credit Suisse made the First Lien Loan to the Debtors in September, 2005. That loan, for $375 million, was made for purposes of, among other things, refinancing the Club's outstanding secured debt and distributing a return of capital and/or dividend to Tim Blixseth, the former equity owner of the Debtors. Credit Suisse, acting for itself and as the administrative and syndication agent, structured the First Lien Loan and arranged for a group of participating lenders to provide those funds, secured by a first priority lien in some, but not all, of the Debtors' assets.

Some of the proceeds of the First Lien Loan were distributed to the equity Holders of the Debtors or transferred to the Debtors' subsidiaries. Section 2.6 A. of the Credit Agreement states:

> The proceeds of the Loans made to the Borrower shall be applied, (i) pursuant to Section 6.5(iii), for distributions or loans up to $209,000,000 to members of the Borrower for purposes unrelated to the

Yellowstone Development, (ii) pursuant to Section 6.3(ii), for investments or loans of up to $142,000,000 into any Unrestricted Subsidiaries, (iii) to pay the Transaction Costs, (iv) to refinance the Existing Indebtedness, (v) to finance a portion of the development and construction costs associated with the Yellowstone Development in accordance with the Financial Plan.

The Committee contends that Credit Suisse and Tim Blixseth structured the 2005 financing to leverage the Club and its properties in a manner that harmed the Club's legitimate creditors and members.  Moreover, the Committee contends that the First Lien Lenders were knowing and active participants in the true underlying purposes of the 2005 First Lien Loan.

Montana's Fraudulent Transfer Act and section 544 of the Code provide for avoidance of certain transfers and obligations, including liens and loans.  If the 2005 First Lien Loan was a fraudulent conveyance or otherwise avoidable transfer, the Committee contends it would be just as avoidable against the First Lien Lenders as it would be against the former Equity Owners.  In this case, avoidance of the obligation is especially compelling because the Debtors may have repaid 100% of the loans that actually benefited the Club, together with interest.  Indeed, based on preliminary calculations, the Committee believes that the First Lien Lenders should be obligated to make substantial repayments to the Trust, which, pursuant to the Plan, would be distributed to Allowed Unsecured Claims.

The avoidance causes of action against Credit Suisse and Tim Blixseth will require establishing that (a) the transfers were made with the actual intent to hinder, delay or defraud present or future creditors; or that (b) the Debtors received less than reasonably equivalent value for the liens placed on their properties, and that (i) the Debtors were engaged in a real estate venture for which their remaining assets, after the Credit Suisse loan, were unreasonably small, or (ii) knew or should have known they were incurring a debt they would not be able to repay.

The Committee contends that the Debtors did not receive reasonably equivalent value for the liens and mortgages placed on their properties because they never had the ability to use or control all of the proceeds of the First Lien Loan because the First Lien Loan Documents required portions of the loan proceeds to be distributed to the equity owners or subsidiaries.

On February 11, 2009, the Committee asserted claims on the Estates' behalf against the Debtors' existing equity owners, objected to Credit Suisse's claims in these bankruptcy cases, and sought leave of the Bankruptcy Court to file an action against Credit Suisse on account of these avoidance claims.  On February 27, 2009, the Bankruptcy Court granted the Committee's motion and authorized the Committee to file the Avoidance action.  Under the Plan, these Avoidance Causes of Action such as these will be transferred to the Liquidation Trusts and the Trustees will take over the control of the suits.

20

Mr. Blixseth contends that there was nothing inappropriate or avoidable about the September 2005 loan from Credit Suisse to Yellowstone Club or any other of his actions in connection with the Debtors. He further asserts that KPMG annual audits and IRS reviews contemporaneous with and following the 2005 loan support the Debtors' financial stability. Mr. Blixseth's defense to the avoidance action claims will purportedly include evidence that the Debtors operated while paying debts as they came due for years after the 2005 Loan. Mr. Blixseth states that he will vigorously defend any claims brought against him suggesting that the loans were improper and believes that any such claims are without merit.

Likewise, Credit Suisse has contended that the claims against it are without merit. On Feb. 24, 2009, Credit Suisse filed an adversary proceeding against the Committee and Debtors for a declaratory judgment that the loan transaction was lawful and legitimate and was not a fraudulent transfer or breach of fiduciary duty as asserted by the Committee and Debtors. Among the defenses Credit Suisse includes in its adversary proceeding is a defense based on the legal doctrine of *in pari delicti* by which Credit Suisse asserts that if Mr. Blixseth breached his fiduciary duties to the Debtor, the Debtor is barred from pursuing those claims against third parties and is limited to making the claims directly against Mr. Blixseth.

On February 27, 2009, the Bankruptcy Court ordered that the Credit Suisse adversary proceeding be consolidated with the Committee's suit.

## H.    Debtors' Principal Liabilities.

### 1.    Liabilities Generally.

The Debtors' principal liabilities consist of (i) alleged obligations to the First Lien Lenders, (ii) obligations to other secured creditors, including on account of Construction Lien Claims, the American Bank Claims, the Prim Claims, and vehicle financers, (iii) Priority Tax Claims, (iv) Unsecured Claims owed to, or asserted by, vendors, contractors, material suppliers, Club members, and lot and home owners, and (v) claims of parties to executory contracts, including, but not limited to, Club member claims.

According to the Debtors records, there are more than 1000 scheduled claims and a significant number of proofs of claim have been filed as of February 13, 2009 in these cases, totaling more than $433 million. Many more claims are anticipated to be filed prior to the bar date fixed by the Bankruptcy Court's bar date order. The Debtors believe, however, that the actual amount of allowable Claims in their Cases will be significantly less. The Debtors are presently in the process of reconciling the proofs of claim with the Debtors' respective books and records. Attached as Exhibit V is a spreadsheet which shows the amount of scheduled and filed claims against each of the Debtors, as of *, the date specified in the Exhibit. ALL ESTIMATES OF CLAIMS HEREIN AND AS SHOWN ON Exhibit V ARE PRELIMINARY AND PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ACTUAL AMOUNT OF ALLOWED CLAIMS AGAINST EACH OF THE DEBTORS CANNOT BE DETERMINED UNTIL THE DEBTORS HAVE COMPLETED THEIR CLAIMS ANALYSES AND THE BANKRUPTCY COURT HAS RESOLVED ALL

OBJECTIONS TO CLAIMS. THERE CAN BE NO GUARANTY THAT THE TOTAL AMOUNT OF THE ALLOWED CLAIMS WILL NOT DIFFER MATERIALLY FROM THE AMOUNTS ESTIMATED HEREIN.

### 2.    Secured Creditors.

#### a.    Secured Credit Facilities.

In connection with the development of the Project, on or around September 30, 2005, the Debtors entered into First Lien Credit Documents with the First Lien Lenders. Under the First Lien Credit Documents, the Debtors obtained a loan (the "First Lien Loan") in the amount of $375,000,000. Credit Suisse is the administrative agent and collateral agent for the First Lien Lenders. The First Lien Loan is allegedly secured by a first lien on portions of the Debtors' property, but specifically excludes significant parcels, including, but not limited to, the Warren Miller Lodge. Moreover, the Debtors contend that by operation of the provisions of the Bankruptcy Code, post-Petition Date club memberships deposits, dues and revenues are also not collateral for the First Lien Loan. The First Lien Lenders dispute this legal position and assert that their liens do attach to post-Petition Date club membership deposits, dues and revenue. Debtors YC and YD are the primary obligors under the First Lien Loan. As of the Petition Date, the First Lien Agent alleged that the Debtors owed principal of approximately $307 million under the First Lien Credit Documents. As set forth in the foregoing discussion regarding valuations, the Debtors' Plan contemplates that 100% of the Equity Interests in YC, YD, and Big Sky will be issued to an entity. The Plan and the Court's Plan Solicitation Order provides for detailed procedures that will govern the Debtors' efforts to obtain higher and better offers for the issuance of the equity interests. Despite repeated requests from Credit Suisse and other parties to require the Debtors to include valuation opinions in this Disclosure Statement, the Bankruptcy Court agreed that including such information would act only to chill effective and robust bidding in accordance with the Plan Solicitation Order. Accordingly, this Disclosure Statement does not include any opinions of value by the Debtors, who prefer to rely on the marketplace to set the value for the Project. Because some of the Project includes property that does not serve as collateral for the First Lien Lenders' Claim, the Plan contemplates that there will be an allocation of the purchase price for the New Membership Interests between the covered collateral and the unencumbered property.

#### b.    Other Secured Creditors.

The Debtors estimate that as of the Petition Date, they owed approximately $16 million to other creditors asserting Secured Claims  This amount is made up of the following significant obligations:

#### (i)    American Bank Claims.

As of the Petition Date, the Debtors owed American Bank on account of a construction loan to build part of the Warren Miller Lodge. The loan is secured by certain

remaining unsold units. According to the proof of claim, the outstanding balance on the American Bank note is approximately $4,237,875.35.

### (ii)    Prim Claims.

As of the Petition Date, the Debtors owed funds for the purchase of a 160-acre parcel of property. According to the proof of claim dated January 22, 2009, filed by Prim Vintage Development, L.P. against YD, the Claims are secured by a 160-acre tract of land located within the Yellowstone Club. The outstanding amount of the Claim as set forth in the proof of claim is $10,095,123.29.

### (iii)    Construction Lien Claims.

In connection with the development of the Project, the Debtors entered into agreements with numerous contractors and/or subcontractors for the performance of various services on and around the Project. Under applicable state law, such contractors and/or subcontractors may assert liens against the Debtors' property until they receive payment in full for their work. If such contractors and/or subcontractors were entitled to such a lien claim and properly followed applicable non bankruptcy law, such claims will be Allowed Construction Lien Claims. Under the Plan, if there is a dispute over such a Claim it will be resolved by the Bankruptcy Court.

The Debtors estimate that there are approximately $1.25 million in Construction Lien Claims asserted against various parts of the Project property, which liens arise from goods or services provided prior to the Petition Date. The work performed giving rise to such claims includes work done on improvements constructed by the Debtors as well as related warranty claim work, and work done on the infrastructure of the Project and the Club amenities. To the extent the work performed by Holders of such Construction Lien Claims relates to property allegedly encumbered by the First Lien Loans an additional step is required to determine if such Holder has a Construction Lien Claim. That analysis relates to the priority between such Holder and the First Lien Loan. If the work was underway or relates back as a matter of law to work underway before the First Lien Loans were funded and secured with deeds of trust on the Project, and the liens of such Holders were properly perfected, such liens are senior in priority to the First Lien Lenders' Claims and are considered Construction Lien Claims under the Plan. To the extent that this is not the case, the liens of such Holders would be junior in priority to the First Lien Loans and, if the First Lien Loans are not paid in full, such Claims would be unsecured.

### (iv)    Other Secured Claims.

The Debtors are unaware of any other significant secured claims that existed as of the Petition Date. There are, however, several Holders of claims secured by personal property assets used in the operation of the Project.

3.    **Administrative and Other Priority Creditors.**

The Debtors' employees also have priority claims on account of unpaid wage and benefit accruals that existed on the Petition Date. The Debtors estimate that there are $300,000 in such Claims.

The Debtors also have been incurring Administrative Expense Claims during the Cases on account of their ongoing Club operations and Project development. The Debtors believe that they are current on all such expenses, and that such expenses have been incurred in accordance with the cash flow budgets for their DIP Loan. Under the Plan, the Debtors' will pay all such expenses which have been billed prior to the Closing Date and the Reorganized Debtors will pay such expenses for bills where the initial invoice therefor is received after the Closing Date.

The Debtors have been incurring Administrative Expense Claims for the professionals retained by the Debtors and the Committee. As of January 1, 2009, approximately $51,000 has been paid to professionals employed by the Debtors and the Committee in accordance with the Bankruptcy Court's fee awards and the cash flow budgets for the DIP Loan. $150,000 is in Debtors' counsel's trust account for the benefit of FTI, Inc. pending submission of an application for compensation. There are significant amounts of accrued Professional Fees that have been incurred, but for which no fee application has been filed and all such fees must be paid in full in connection with the Confirmation. Credit Suisse is also holding $742,000 of Debtors' funds for the payment of fees to its counsel. Those fees, however, like the other accrued fees must be approved by the Bankruptcy Court prior to any payment.

Finally, the Debtors estimate that they owe approximately $1.268 million in Secured Tax Claims to Madison County, Montana on account of real property taxes.

4.    **Unsecured Creditors**

The Debtors and their financial advisors currently are analyzing the more than 1,000 proofs of claim filed in their Chapter 11 Cases as of February 13, 2009, the vast majority of which would be General Unsecured Claims, if they were to be allowed. The Unsecured Claims generally are asserted within the following categories: (i) vendors relating to the Debtors' Club and real estate operations; (ii) contractors and material suppliers for the Debtors' real property improvements that do not appear to have valid; first priority Construction Lien Claims; (iii) lease rejection Claims; (iv) employee related Claims; (v) member claims; and (vi) Intercompany Claims.

As noted, the Debtors' claims analysis is still ongoing and the bar date has not yet expired, and thus the total amount of Allowed General Unsecured Claims in these Cases may differ than those estimated in this Disclosure Statement. However, as of the date of approval of this Disclosure Statement, the Debtors estimate that the total amount of Allowed General Unsecured Claims will be approximately $_____ million, excluding Intercompany Claims, membership rejection claims and the First Lien Lender Deficiency Claims, if any. Exhibit V

is a listing of the Claims, by Class and Debtor. The listing shows the amount of a Claim listed on the Debtors' Schedules and the amount included in any proof of claim.

## I.   SIGNIFICANT PRE-PETITION EVENTS

### 1.   EPA Consent Decree

Under the terms of the Plan, the Reorganized Debtors will assume that certain Consent Decree (the "Consent Decree"), by and between United States of America, as Plaintiff, and Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Blixseth Group, Inc., and The Ranches at Yellowstone Club, LLC, as Defendants, filed January 14, 2005, in Book 524, Page 1, under Document No. 103674, records of Madison County, Montana. The Consent Decree resolves a 2003 federal Clean Water Act action filed by the United States Environmental Protection Agency against the Defendants and alleging inter alia that the Defendants filled federal jurisdictional wetlands without United States Army Corps of Engineers authorization. The Consent Decree requires, among other things, that the Defendants perform approximately five acres of wetlands restoration projects within the Club and approximately 1.5 acres of wetlands mitigation projects within the Club, some of which restoration and mitigation is ongoing. The Consent Decree likewise provides for ongoing monitoring, reporting and approval regarding the ultimate success of the required restoration and mitigation.

### 2.   CrossHarbor/Club Transactions

Beginning in 2005, CrossHarbor made its first investments in the Club when it purchased four individual Club lots. Residential units have been constructed on those lots, and these units are currently listed for sale. Then, in June 2006, CrossHarbor purchased the right to construct and sell 43 condominium units within the Club's 58-unit Sunrise Ridge condominium development. From and after that acquisition, CrossHarbor has completed its development plan at Sunrise Ridge, and 17 of the 43 units have been sold.

Consistent with typical practice within the Club, CrossHarbor has retained Big Springs Realty, LLC, as the sales agent to sell any of the properties that CrossHarbor has for sale within the Yellowstone Club. The agency agreements are on the form typically used by Big Springs and were the result of arms' length negotiations between the parties.

In the Spring of 2007, Timothy L. Blixseth ("Mr. Blixseth"), who then controlled the Debtors, proposed that CrossHarbor purchase substantially all of the Debtors' assets within the Club, in part because the Club was then short on operating cash and needed a well-capitalized buyer to preserve and complete the Club. On June 28, 2007, CrossHarbor and the Debtors executed a Letter of Intent (the "Letter of Intent") under which the Debtors offered to sell the Club to CrossHarbor for a purchase price based on the number of Density Units that were remaining in the Club, and that could be developed, as well as the number of unsold memberships in the Yellowstone Club. Because of the requirement that Credit Suisse be paid a release price of $800,000 for each Density Unit sold by the Club, consummation of this transaction would have resulted in the payoff of the entire Credit Suisse loan to the Club.

On or about June 28, 2007, CrossHarbor and Mr. Blixseth entered into an option agreement under which CrossHarbor had the right to purchase the "Settlement" (which is a 160-acre parcel of land within the Club boundaries then owned by Mr. Blixseth personally) for $56,000,000, subject to CrossHarbor's obtaining the right to develop approximately 40 residential units on the Settlement (the "Settlement Option Agreement"). The Settlement Option Agreement required that Mr. Blixseth, or his successors and assigns, obtain a Density Unit assignment from the Club for each residential unit for which CrossHarbor obtained development rights and that Mr. Blixseth pay to the Club $1,375,000 for each such Density Unit. Because the terms of Credit Suisse's September 30, 2005 Credit Agreement with the Debtors (the "Credit Agreement") require that Credit Suisse be paid a release price of $800,000 for each Density Unit sold by the Club, the Settlement Option Agreement specifically required that Credit Suisse's financial interests would be fully satisfied in connection with CrossHarbor's development of the Settlement (and, in fact, an approximately $32,000,000 pay down of the Credit Suisse debt would result). CrossHarbor ceased its subdivision efforts with respect to the Settlement upon filing of the Debtors' cases.

To alleviate the Club's worsening cash flow situation, CrossHarbor purchased 31 subdivided lots in the Club's 42-lot Golf Course subdivision for approximately $55,000,000, via the "Golf Course Lot Purchase Agreement" on or about August 27, 2007. $24,800,000 of the proceeds were directed to pay down the Credit Suisse debt ($800,000 per lot), and the Golf Course Lot Purchase Agreement required that "an amount of not less than $20,000,000 be used only for the payment of the infrastructure costs and operating costs within the Yellowstone Club." Contemporaneously with the closing of the acquisition of the 31 golf course lots, the Debtors granted CrossHarbor a right of first refusal to purchase the remaining 11 golf course lots. In consideration of CrossHarbor entering into the Golf Course Lot Purchase Agreement, the Debtors and CrossHarbor also entered into a Right of First Refusal Agreement granting CrossHarbor a right of first refusal and other rights specified therein with respect to an approximately 160 acre parcel adjacent to the Warren Miller Lodge.

As contemplated by the Letter of Intent, CrossHarbor entered on January 15, 2008, into an agreement (the "Club Deal Agreement") with the Debtors to purchase substantially all of Debtors' interest in the Club for a purchase price based on the number of unsold Density Units and unsold memberships remaining in the Club (i.e. as memberships or density units were sold (including under the Settlement Option Agreement) the purchase price was reduced). The Club Deal Agreement initially contemplated a customary due diligence review period and a March 3, 2008 closing. The due diligence period and closing date eventually both were extended until March 26, 2008. Discussions between the parties relating to the Club Deal Agreement continued until March 26, 2008. On March 26, 2008, however, CrossHarbor formally terminated the Club Deal Agreement in order to ensure the return of its $5,000,000 deposit and preserve its rights and remedies under that agreement due to the unwillingness of the Debtors to extend the diligence period to allow CrossHarbor to complete its examination of the Club.

On or about April 24, 2008, CrossHarbor purchased a $1 Million interest in the Credit Suisse loan to the Club. This interest was purchased directly from Credit Suisse.

In the Summer of 2008, CrossHarbor agreed to lend $35,000,000 to Blixseth Group, Inc. ("BGI") and Edra D. Blixseth ("Ms. Blixseth") on an interim basis to, among other things: (i) facilitate Ms. Blixseth's obtaining control of the Club and BGI; (ii) satisfy taxes, liens and other obligations binding on Ms. Blixseth and BGI, and (iii) provide the Debtors with urgently needed operating capital. It was contemplated that this $35,000,000 loan would be paid out of long-term financing that Ms. Blixseth had previously arranged with Archer Capital Management (which accounts for the loan's September 30, 2008 maturity date). It was likewise contemplated that proceeds from the sale of the Chateau de Farcheville property would provide the Debtors with additional operating capital. In exchange, CrossHarbor received mortgages on assets owned directly by BGI and Ms. Blixseth, and CrossHarbor, BGI and Ms. Blixseth contemporaneously entered into an "Agreement to Form."

The Agreement to Form, in an effort to alleviate permanently the Club's cash flow problems, contemplated that CrossHarbor would raise approximately $100,000,000 to be invested in the Club, while Ms. Blixseth was also required to inject additional capital into the Debtors. The parties to that agreement expressly agreed "to cooperate and seek" all required Credit Suisse consents in connection with such investment and conversations with Credit Suisse in this regard were subsequently held. The Agreement to Form similarly contemplated a comprehensive real estate development joint venture between the parties, which collectively owned the vast majority of subdivided (and therefore available for sale to end users) lots within the Club. Again, such joint venture expressly required "consent of the lenders" under the Credit Agreement, i.e., Credit Suisse, and conversations with Credit Suisse in this regard were held.

Finally, to ensure that the Club had the necessary management expertise in place and while the Club sought a professional management company, the Agreement to Form: (i) provided that Joseph Harris would temporarily function as the Club's "chief operating officer," and would report directly to Ms. Blixseth (which arrangement was rendered moot upon Discovery Land Company becoming the Club manager less than one month later); (ii) granted CrossHarbor a right to approve Club expenditures; and (iii) prohibited the Club from engaging in related entity transactions.

CrossHarbor has not pursued any of its rights or taken any action in furtherance of the Agreement to Form since the bankruptcy filings of the Debtors.

### 3.    CrossHarbor and Credit Suisse/Skadden Arps Relationships and Dealings.

Credit Suisse, acting through its counsel Skadden, Arps, Slate, Meagher & Flom ("Skadden"), has repeatedly questioned CrossHarbor's role in these cases and demanded disclosure of all of its dealings with the Debtors and their principals, pre- and post-petition, as well as with other parties in interest, including the more than 175 members of Yellowstone Club Ad Hoc Member Committee. Neither Credit Suisse nor Skadden has made any effort to disclose their own relationships with other parties, specifically including CrossHarbor and its

affiliates. Indeed, such relationships include matters directly relating to the Yellowstone Club.

### a.   Skadden.

Since 1998, Skadden has served as fund counsel to the MassMutual/Boston Capital Mezzanine Partners Funds, known as MMBC (1998 to 2004) and MMBCII (2002 to present). Skadden continues to serve as fund counsel to the General Partner of those funds, which is a 50/50 joint venture of CrossHarbor (formerly known as Boston Capital Institutional Advisors) and MassMutual/Babson Capital Management. In fact, Evan Levy, who serves as one of Skadden's lead counsel in the Bankruptcy Cases, personally serves as fund counsel to the MMBC funds and served as the lead Skadden fund formation counsel on behalf of MMBCII. Indeed, his on-line biography (www.skadden.com) states the following:

> Mr. Levy is actively involved in representing issuers and underwriters of real estate securities, including private equity funds, initial public offerings, commercial mortgage-backed securities and multinational debt offerings. His recent transactions include:
>
> •     The creation of private equity funds sponsored by Colony Capital, Fortress Investment Group, **Babson Capital**, Brascan Corporation and Northstar Capital Investment Corp.; (emphasis supplied).

Skadden's client MMBCII has made four investments in Yellowstone Club since 2005 (all of which continue to be owned by the fund), consisting of four home development projects in which MMBC II has invested approximately $35 million. Meanwhile, acting on behalf of Credit Suisse in these cases, Skadden has demanded extensive discovery with respect to MMBCII's purchases at the Yellowstone Club and has suggested that they somehow might be "fraudulent conveyances" in which MMBCII participated.

The General Partner of the MMBC funds is, as stated above, a joint venture of CrossHarbor and MassMutual/Babson Capital Management. Both of these general partners have extensive investments in the Yellowstone Club. MassMutual/Babson Capital Management is one of the largest noteholders in the Credit Suisse loan made to the Yellowstone Club. As detailed above, CrossHarbor has extensive investments within Yellowstone Club, including the four (4) house lots discussed above, the Sunrise Ridge condominium development and 31 golf course lots.

### b.   Credit Suisse.

Similarly, Credit Suisse served as "Placement Agent" to CrossHarbor Institutional Partners LP ("CIP I"), a CrossHarbor fund which has made significant investments in both Sunrise Ridge and The Yellowstone Golf Lots. Credit Suisse is also presently acting as fund

placement agent for CrossHarbor Institutional Partners II, LP.  For its services in connection with these placements, Credit Suisse has or will likely earn well in excess of $10 million.

As Placement Agent, Credit Suisse makes introductions to institutional investors and recommendations to invest in the CrossHarbor funds.  That is, Credit Suisse is the party that searches for appropriate investors, holds extensive meetings with potential investors to discuss the bona fides, experience and expertise of CrossHarbor and negotiates the terms pursuant to which investors invest in the CrossHarbor funds.  Since the fund assets are not identified at the time an investor elects to invest in these funds, the sophistication, trustworthiness and track record of fund management, namely CrossHarbor, is an important part of each investor's decision-making process and, as a result, an important element of the marketing conducted by Credit Suisse.

Acting as placement agent on behalf of CrossHarbor, Credit Suisse presumably complied with industry practice and conducted extensive due diligence with respect to CrossHarbor before agreeing to solicit on CrossHarbor's behalf in excess of $1 billion of investment capital from a range of institutional investors including state pension plans, insurance companies and endowments.  Moreover, Credit Suisse itself is a direct investor in CIP I, while, at the same time, Credit Suisse (and Skadden, simultaneously representing Credit Suisse as agent's counsel and MMBC's) is alleging that CrossHarbor has acted inappropriately in the transaction and that acquisition of the above-described properties by CrossHarbor's funds may somehow constitute fraudulent conveyances.

At present, Credit Suisse is also serving as the placement agent for CrossHarbor's current institutional fund (CIP II).  Marketing of CIP II commenced in late 2008 and is still being conducted with multiple meetings with potential investors having occurred just within the past 3 weeks.  Once again, Credit Suisse presumably also undertook appropriate steps to update the extensive due diligence that was performed on CrossHarbor for CIP I before undertaking to solicit up to an additional $1 billion from institutional investors for CIP II.  Like CIP I, the new fund has not yet identified its investments; accordingly, the ability and trustworthiness of CIP II management (namely, CrossHarbor) will be a key factor that Credit Suisse will need to address as it attempts to convince investors to place significant sums of money into CIP II.  Despite its and Skadden's repeated, scurrilous attacks against CrossHarbor and multiple accusations of improper and perhaps illegal activities relating to the Yellowstone Club, Credit Suisse continues to serve as placement agent for CrossHarbor's current institutional fund.

Finally, in connection with the above-described "Agreement to Form," Debtors and CrossHarbor approached Credit Suisse, in September, 2008, to attempt to negotiate an amendment to the Debtors' Credit Agreement (the "Amendment").  As a condition to any such arrangement, Credit Suisse imposed as a requirement that Debtors retain its affiliate, Credit Suisse Securities (USA) LLC, "to act as the sole and exclusive arranger for the Amendment."  Credit Suisse initially requested a fee in excess of $2 million from the Debtors for those services, but ultimately reduced the fee to $1.65 million and tendered one

or more draft retention letters to be signed by Ms. Blixseth on behalf of the Debtors in October, 2008. The engagement, however, was never concluded.

### 4.    Events Leading to the Filing

Upon assuming control of the Club, Ms. Blixseth discovered that the financial circumstances were at best precarious. There were overdrawn bank accounts, past due taxes, and significantly past due vendor payables in excess of $7 Million, and the cash flow from ongoing lot sales was significantly depressed. Those difficulties were to be addressed on a temporary basis through several of the negotiated transactions with Cross Harbor noted in the previous section. Ms. Blixseth long term plan included financing from Archer Capital Management and the receipt of proceeds from the sale of the Chateau de Farcheville. The transaction with Archer Capital Management would have given the Debtors significant operating cash through the new financing. After Archer representatives investigated the Debtors' actual financial situation, it determined that no financing would be provided. Moreover, the well documented difficulties faced by the world's capital markets made access to new financing almost impossible after Archer declined to go forward. The sale of the Chateau de Farcheville also failed to close when the buyer exercised its rights to terminate the transaction.

## IV. SUMMARY OF BANKRUPTCY PROCEEDINGS

On November 10, 2008, the Debtors commenced the Bankruptcy Cases in the United States Bankruptcy Court for the District of Montana (the "Court"). The Debtors continue to operate their businesses as Debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code.

The following is a brief description of some of the significant events that have occurred during the Bankruptcy Case.

### A.    DIP Financing

On November 13, 2008, November 26, 2008 and December 17, 2008, the Bankruptcy Court entered Orders and Memorandum Decisions [Docket # 40, 86, 181 & 182] with respect to the Debtors' request for approval of DIP Financing to allow for the preservation of the Project and the operation of the Club during the winter months. All of these were entered in connection with the Court's approval of the DIP Loan. In the final order approving the DIP lending, the Court made no finding of the value of the Debtors' assets encumbered by the First Lien Lenders' Claim. Rather, the Court stated, in ¶ 10 of its final findings, that

> The Court finds that the interests of the Prepetition Agent and
> the Prepetition Lenders in all property of the estate, including,
> without limitation, the Prepetition Collateral, are adequately
> protected pursuant to 11 U.S.C. §§ 361-364. As set forth in
> detail in the memorandum, the Court finds that there will be a
> net economic benefit to all parties stemming from the DIP Loan.

> Moreover, the DIP Loan will provide the Prepetition Agent and
> Prepetition Lenders, and their interests in property of the estate,
> with at least the same level of protection they would have absent
> the DIP Agent's super priority financing that primes the
> Prepetition Agent's position.  In any event, based upon the
> testimony of the Debtors' Chief Restructuring Officer, whether
> or not the Prepetition Agent and the Prepetition Lenders
> ultimately prove to be over-secured or under-secured, the DIP
> Loan will serve to preserve the value of their collateral and in
> fact enhance it in an amount that exceeds the amount of the DIP
> Loan by multiples."

In connection with the DIP Loan hearings, the First Lien Agent presented to the Court an appraisal of the Project.  That appraisal estimates that the net present value of the proceeds from the ordinary course of business sale of the Debtors' Assets as of November 10, 2008, was approximately $310,000,000 (the "Appraisal").  The Appraisal also shows a value of the Debtors' real property and membership interests that are alleged to be the collateral securing the First Lien Obligations.  The Debtors believe that the marketplace will ultimately establish the value of the collateral securing the First Lien Obligations.  In addition, as set forth in Section III(F)(3), discussing the Committee's Avoidance Action against the First Lien Lenders, the Debtors are unable to say with assurance what the final Allowed amount, if any, of the First Lien Lenders' Secured Claim will be.

Promptly after the Bankruptcy Court issued a final order authorizing the Debtors to obtain post-petition financing from CIP Yellowstone Lending LLC, as agent for itself and certain other lenders ("CIP"), in an amount of up to $19,750,000, in addition to Duane Morris LLP and Goulston & Storrs, P.C., CIP engaged Linklaters LLP (Paris) and Maples and Calder (Ireland) to serve as local counsel in CIP's efforts to obtain a mortgage (the "Mortgage") on certain property located in Bouville (Essonne) and Valpuiseaux (Essone), France, commonly known as the "Chateau de Farcheville" (the "Farcheville Property") in furtherance of such final order, which Farcheville Property is owned by Danika Investments Limited, an Irish company and a wholly-owned indirect subsidiary of Yellowstone Development, LLC ("Danika").  In accordance with French law and custom, a French notary firm was engaged to draft the Mortgage, which notary will execute, accept and record the Mortgage on behalf of CIP and Danika.  CIP, directly and/or through counsel, conducted customary due diligence with respect to the Farcheville Property (including title review and review of the organizational documents and structure of Danika).  In addition to a guaranty from Danika, the French notary firm requires certain opinions, certificates and instruments be delivered in connection with the execution, delivery and recording of the Mortgage (the "Supporting Documents").   The Supporting Documents were drafted and negotiated by the French notary firm and CIP's counsel.

On January 22, 2009, the Bankruptcy Court issued an order authorizing the increase of the post-petition financing to $23,306,701, of which up to $1,500,000 could be funded to Debtors in order to satisfy deferred maintenance and operating costs of the Farcheville

Property. Due to French legal requirements (and without prejudice to CIP's and all other lenders' rights under the orders of the Bankruptcy Court or otherwise), the guaranty, Mortgage and Supporting Documents reflect the fact that security from Danika and the Farcheville Property for the loan is limited to the amount of the post-petition financing advanced directly for the benefit of the Farcheville Property (plus interest and charges thereon pursuant to the loan documents and all costs (including legal fees and costs) associated with the preparation, negotiation, execution, delivery, recording (if applicable) and/or enforcement of the guaranty, the Mortgage and such other documents or instruments executed and/or delivered in connection therewith). Upon receipt of the necessary property insurance information from Danika's representative and the insurer on February 16, 2009, the French notary firm was able to complete the Mortgage and the Mortgage, guaranty and Supporting Documents (to which Danika is a party) were immediately provided to Danika's representative. As of the date hereof, CIP has not received the necessary signatures to the Supporting Documents and/or the guaranty from Danika in order to permit the French notary firm to execute the Mortgage on behalf of CIP and Danika and record the same. Debtor's counsel and CIP's counsel are discussing what matters, if any, need to be reviewed and/or addressed in order to complete the documents and record the Mortgage.

**B.      Retention of Debtors' Professionals**

Prior to the commencement of the Bankruptcy Cases, the Debtors retained James A. Patten and his firm Patten, Peterman, Bekkedahl & Green, PLLC as their bankruptcy counsel to provide advice regarding various bankruptcy-related matters, including bankruptcy and restructuring issues. In early January, 2009, the Debtors retained Bullivant Houser Bailey, PC to assist Mr. Patten in completing and concluding the restructuring. The Debtors hired FTI Consulting, Inc. and Ronald Greenspan as Chief Restructuring Officer to provide assistance to the Debtors in connection with these Chapter 11 cases. The Bankruptcy Court has approved the retention of all these professionals.

**C.      Appointment of the Creditors' Committee**

On December 4, 2008, the Office of the United States Trustee appointed the Creditors' Committee to represent the interests of the unsecured creditors of the Debtors. Since its formation, the Debtors have consulted with the Committee concerning various aspects of the Bankruptcy Cases. The Debtors have kept the Committee informed about their operations and sought the concurrence of the Committee for actions and transactions of the Debtors' business.

The members of, and the attorneys and advisors retained by, the Creditors' Committee are as follows:

**1.      Members of the Creditors' Committee**

| | |
|---|---|
| Stephen R. Brown, Chairman | Jorge Jasson |
| Garlington, Lohn & Robinson, PLLP | c/o Robins, Kaplan, Miller & Ciresi, LLP |
| 199 West Pine | 2800 LaSalle Plaza |

P.O. Box 7909
Missoula, MT 59807-7909

800 LaSalle Avenue
Minneapolis, MN 55402

William G. Griffon, II
1901 Bearberry Lane
Asheville, NC 28803

Yoav Rubinstein
500 Queens Quay West, Suite 1101 E
Toronto, ON M 5V 3K

Michael E. Lewis
NorthWestern Corporation
40 East Broadway
Butte, MT 59701

Doug Alexander
Story Distributing Company
P.O. Box 1201
Bozeman, MT 59771

Bob Gaulke
Wilbur-Ellis Company
1325 8th Avenue N
Great Falls, MT 59401

Roland Schumacher
Cowboy Equipment, LLC
80 Shire Trail
Bozeman, MT 59718

Chris Sabian
P.O. Box 6167
Malibu, CA 90264

Jim Davidson
401 Andesite Ridge Road
Big Sky, MT 59716

Dave Dollinger
555 Twin Dolphin Dr., #600
Redwood City, CA 94065

## 2. Counsel to the Creditors' Committee

J. Thomas Beckett and David P. Billings and the firm of Parsons, Behle and Latimer, P.O. Box 45898, Salt Lake City, Utah 84145-0898 are counsel to the Committee . Their telephone number is (801) 532-1234. Local counsel for the Creditors' Committee is James H. Cossitt, 40 2nd Street East, Kalispel, Montana 59901. Telephone number 406-752-5616.

## D. Marketing Efforts

The DIP Financing Facility contemplated that the Debtors would file a plan of reorganization by February 13, 2009. Since the approval of the DIP Loan, the Debtors have aggressively sought to achieve consensus among the various creditor groups and the members of the Club with respect to the Cases. The Debtors believe they have reached a consensus with the Unsecured Creditors' Committee, with a substantial number of the members, and have negotiated a stalking horse transaction with CrossHarbor. A consensus has not been reached with Credit Suisse. The Debtors and their professionals prepared a virtual Data Room that contains detailed documented information about the Project and the Debtors' assets, including the Debtors' historical performance, their current operations and market position, their core assets and liabilities, and other information typically required by organizations that might have an interest in acquiring the Yellowstone Club. Debtors

provided access to the virtual Data Room to Credit Suisse (and all of the participants in that credit) and the Committee and in response to their comments have augmented the contents of the data room as appropriate. The Bankruptcy Cases have been covered extensively in real estate and bankruptcy professional publications and the national and local popular press. This coverage has led numerous interested parties to contact the Debtors, FTI and Credit Suisse regarding potentially purchasing or investing in Yellowstone Club. On information and belief, Credit Suisse has referred all contacts it has received to the Debtors. Additionally, FTI has contacted entities it believes are qualified and might be interested in acquiring the Yellowstone Club. As of the date of filing of this Disclosure Statement, through these points of contact, approximately 12 parties displayed some level of interest, with 3 parties executing confidentiality agreements, and 5 parties accessing the Data Room (this number includes some of the investors in the senior secured credit facility, which parties are primarily hedge funds and investors in distressed assets, which are a key potential source of buyers or investors in Yellowstone Club). Follow-up has been made with each of these parties who have so requested information, including telephone conferences, personal meetings, tours of the Yellowstone Club, and meetings with its senior employees. These efforts have produced one party that is undertaking substantial due diligence. However, only CrossHarbor is willing to be a stalking horse bidder. Additionally, in order to conduct a robust marketing process, and pursuant to Bankruptcy Court's Order entered on February 10, 2009, the Debtors have retained C.B. Richard Ellis.

The Yellowstone Club assets are very complex and determining their development potential and value requires significant expenditures of time and money. In today's distressed environment, there are myriad available real estate and resort projects competing for the attention of the limited pool of qualified purchasers. Three consistent difficulties have been identified by acquisition prospects to pursuing comprehensive due diligence, and hence being in a position to make a meaningful offer for the Yellowstone Club properties: (1) the risk of Credit Suisse exercising an overriding credit bid with respect to any sale of the real property and the rights afforded Credit Suisse under recent appellate court authority in the Ninth Circuit, (2) the head start in analysis of the Project enjoyed by CrossHarbor as a result of its substantial investment in the Project prior to the Petition Date, (which investment includes the purchase of lots and acquisition due diligence conducted over an extended period of time), and (3) the very visible hostility and litigious approach by Credit Suisse.

Recognizing these problems, the Debtors proposed and the Bankruptcy Court entered on _____, 2009 a Plan Solicitation Order which governed the exposure of the Project to the market after the initial filing of this Disclosure Statement. The Debtors are confident that the negotiations with CrossHarbor, and the transparency, uniformity, and "base line" terms of the proposed Plan and Disclosure Statement, together with the structure provided by the Solicitation Order will serve to maximize the value of the Yellowstone Club for all stakeholders given the difficult economic conditions currently being experienced world-wide and the particular financial and practical situations of the Debtors.

Because the Plan contemplates a marketing plan and possible alternative bid for the equity interests in the Reorganized Debtors, the Debtors believe that the final purchase price

to be paid for the New Membership Interests under the Plan indicates the actual value of the Reorganized Debtors' interest in the Project on the Effective Date of the Plan.

**E.      Post-Petition Operations**

The Debtors file monthly reports with the Court detailing their operations. Under the present management, the Debtors have operated well within the budget agreed to in connection with the DIP financing. The Debtors also recently filed a report that Ms.Blixseth made a postpetition transfer of Debtor funds to her personal account and that upon discovering that the funds actually belonged to the estate she immediately returned the funds to the Debtor's account.

**F.      Claims Process and Bar Date**

**1.      Schedules of Assets and Liabilities and Statements of Financial Affairs**

The Debtors filed their schedules of assets and liabilities and statements of financial affairs with the Court, as amended and supplemented.

**2.      Bar Date**

The Court has entered an order which established March 18, 2009 as the date by which all creditors must file proofs of claim or be barred from asserting any Claim against the Debtors other than governmental units (the "Bar Date Order"). No bar date has yet been established for governmental units; however, Bankruptcy Rule 3002(c)(1) provides, with certain limited exceptions, a bar date for governmental units of 180 days after the Petition Date. In addition, under the applicable provisions of the Bankruptcy Rules, to the extent the Debtors reject an unexpired lease or executory contract, proofs of claim for any claims arising out of such rejection must be filed on or before the later of (i) the bar date or (ii) 30 days after entry of an order authorizing the rejection of such executory contract or unexpired lease, unless a different date for filing such a claim is specified in the applicable order and to the extent the Trustees under the Liquidation Trusts were to recover an avoidable transfer and such transfer is repaid, then the party repaying the avoided transfer might have the right to file a claim on account of that transaction for a period of 30 days after the entry of any judgment by the Court.

Individual notices of the bar dates were mailed to all scheduled creditors and interest Holders.

**G.      The Plan of Reorganization**

**1.      Negotiations Concerning the Plan of Reorganization**

On February 13, 2009, the Debtors filed their proposed plan of reorganization (the "Plan"). The Plan is the product of vigorous negotiations and discussions among the Debtors, the Committee, the DIP Lender and other creditor constituencies. These

negotiations pertain to, among other matters, the classification and treatment of claims; the compromise and settlement of disputes regarding the nature and amount of certain claims; the form and amount of the distributions to be disbursed on account of allowed claims; and various other issues. Although at several hearings, Ms. Blixseth testified that negotiations regarding the Plan prior to its filing included contributions of property by her and/or her affiliates, in return for some sort of interest in the Reorganized Debtors, the Plan, as finally negotiated and filed does not include any contributions by her and there is no agreement for her for the acquisition of any interests in the Reorganized Debtors. In particular, there is no agreement with respect to the contribution of the Settlement/Family Compound and any executory contract between Ms. Blixseth and any Debtor with respect to that parcel will be rejected under the Plan.

### 2.     The Exclusivity Period

Pursuant to section 1121 of the Bankruptcy Code, (a) only the Debtors may file a plan of reorganization during the 120-day period following the commencement of a Chapter 11 case (the "Exclusivity Period") and (b) if the Debtors file a plan of reorganization during the Exclusivity Period, only the Debtors may solicit acceptances of such plan of reorganization, and no other party may file a competing plan of reorganization, during the 180-day period following the commencement of a Chapter 11 case (the "Exclusive Solicitation Period"). On request of a party in interest, the Court, for cause shown, may extend, shorten or terminate the Exclusivity Period or the Exclusive Solicitation Period. The Debtors have filed the Plan prior to the expiration of the 120 day Exclusivity Period and reserve the right to seek additional extensions thereof. The Debtors did request an extension of the Exclusivity Period in connection with their motion seeking approval of the Bidding Procedures. The Bankruptcy Court denied that request. The Debtors' exclusive period to solicit acceptances or rejections of the Plan currently expires on May 9, 2009 and the Debtors reserve the right to seek extensions thereof.

### 3.     Description of Definitive Agreement

If the Plan is confirmed by the Bankruptcy Court and CrossHarbor is the successful bidder, all of the equity interests in YC, YD and Big Sky (the "Debtors") will be fully and finally cancelled and each of YC, YD and Big Sky as they will be reorganized as of the Effective Date in accordance with the Plan (as so reorganized, the "Reorganized Debtors") shall issue new limited liability company membership interests to New CH YMC Acquisition LLC (or its assignee(s), designee(s) or nominee(s), collectively, "Acquirer").

The Definitive Agreement provides that the purchase price for the acquisition of the new membership interests shall be $100,000,000, of which (a) $375,000.00 shall be paid by Acquirer to the Liquidation Trusts for Debtors' estates, and (b) $29,625,000.00 shall be paid to the Disbursing Agent on behalf of the Debtors on the closing date (collectively, the "Cash Payment"). The balance of the purchase price (i.e., $70,000,000.00) shall be satisfied by the execution by Reorganized Debtors of new loan documents (in the forms to be attached to the Definitive Agreement) on the closing date.

In addition, the Definitive Agreement provides:

(a) each of the Reorganized Debtors shall offer to retain (directly or indirectly through an operator or manager) on comparable terms and conditions their respective employees that are not under contract and are employed at the time of the closing;

(b) at the request of Acquirer, Debtors will file any additional or amended schedule or exhibit to the Plan in connection with the designation of executory contracts and unexpired leases to be assumed, provided that in the event an affiliate of the DIP Lender is the Acquirer, then the Debtors and the Acquirer shall jointly endeavor to reach an agreement with respect to the exercise of the foregoing rights;

(c) the Debtors shall not amend, modify, withdraw or revoke the Plan without the consent of Acquirer in any manner which materially affects the rights of the Acquirer under the Plan or the Definitive Agreement;

(d) to the extent that any exhibit or schedule to the Plan has not been filed as of the date of the Definitive Agreement, Debtors shall not file the same without the prior consent of the Acquirer;

(e) from and after the Effective Date, none of the entities transferred to the Liquidation Trusts nor their affiliates shall, directly or indirectly, use in any manner any of the Debtors' intellectual property (including the use of "Yellowstone", "Yellowstone Club", "YC", "Yellowstone Mountain Club", "Private Powder" and/or any similar variation thereof); except that the Liquidating Trusts will be able to use the initials of the respective Debtor in the name of the Trust;

(f) at or before closing, Acquirer shall provide evidence reasonably satisfactory to Debtors that as of closing Acquirer shall have working capital (in addition to the funds necessary for the Cash Payment) of at least $25,000,000 plus commitments (issued by individuals or entities whose creditworthiness is reasonably acceptable to the Debtors) for at least an additional $50,000,000 in working capital and Acquirer shall contribute the foregoing $25,000,000 to the Reorganized Debtors upon the Effective Date of the Plan;

(g) on or before the Effective Date, Debtors shall have caused the resignation of all designees of any Debtor (or any affiliate of any Debtor) as members, officers, directors or other title holders of any governing board, review board, committee or sub-committee of each of any property owners' or condominium unit owners' association controlled by any Debtor, the Yellowstone Mountain Club, and Yellowstone Mountain Club Public Safety and Privacy, Inc. and shall reasonably cooperate with Acquirer to effectuate the appointment of Acquirer's designee(s) to such vacated positions;

(h) during the term of the Definitive Agreement, the Debtors shall operate their business in a businesslike and prudent manner in the ordinary and usual course

of business; provided, however, Debtors shall not take (nor shall they permit or cause to be taken) certain enumerated actions that might individually or in the aggregate result in an adverse event, change or effect with respect to the condition (financial or otherwise), properties, assets, liabilities, business, operations, or prospects of the Debtors that is likely to be in the amount of $1,000,000 or more;

(i) Debtors will, in accordance with the Plan Solicitation Order, solicit higher or better offers for the new membership interests in the Reorganized Debtors; and

(i) subject to the terms of the Plan Solicitation Order, the Definitive Agreement is subject to the receipt by Debtors of any higher or better offer that is approved by the Bankruptcy Court provided that Debtors comply with the Plan Solicitation Order including payment to Acquirer of the termination fee and diligence expenses provided in the Plan Solicitation Order.

If the Definitive Agreement is terminated on account of a material breach of Acquirer thereunder, Debtors shall be entitled to liquidated damages from Acquirer in the amount of $5,000,000 as their sole and exclusive remedy. In the event the Definitive Agreement is terminated on account of a material breach of Debtors thereunder, Acquirer shall be entitled to either (a) seek specific performance of the Definitive Agreement or (b) terminate the Definitive Agreement. If the Definitive Agreement is terminated for any other reason in accordance with its terms, all obligations of the parties thereunder shall terminate and the Definitive Agreement shall be of no further force or effect.

To the extent Acquirer (or any of its affiliates) is not the successful bidder in connection with the confirmation of the Plan, the Definitive Agreement will require certain modifications to reflect the purchaser of the new limited liability company membership interests in the Reorganized Debtors all on terms consistent with the Plan Solicitation Order.

## H.    Investigation of Avoidance Actions

The Debtors have not investigated various causes of action they may have under applicable state and federal law with respect to Avoidance Actions (including, without limitation, the Bankruptcy Code). All such claims are being transferred to the Liquidation Trusts established by the Plan to be pursued for the benefit of the beneficiaries of the Trusts. and any net proceeds will be distributed to the beneficiaries. The Creditors' Committee has filed a motion requesting authority to commence an action against the First Lien Lenders to avoid their security interests and the portion of the obligation that represents a fraudulent conveyance. On February 27, 2009, the Bankruptcy Court granted the Committee's motion. Additionally, Credit Suisse filed an adversary proceeding seeking a declaration that the Committee's action was without merit. The Bankruptcy Court entered an order consolidating the Credit Suisse action with the action to be filed by the Committee. The Committee's action will be transferred to the Trusts if the Plan is confirmed.

## V. <u>THE PLAN</u>

THE FOLLOWING SUMMARY IS A GENERAL OVERVIEW ONLY, WHICH IS QUALIFIED IN ITS ENTIRETY BY, AND SHOULD BE READ IN CONJUNCTION WITH, THE MORE DETAILED DISCUSSIONS APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT AND THE PLAN AND THE DEFINITIVE AGREEMENT.

### A.    Unclassified Claims - Administrative Expenses and Priority Tax Claims

#### 1.    <u>Administrative Expenses</u>

Administrative Expenses are Claims against the Debtors constituting a cost or expense of administration of the Cases allowed under Bankruptcy Code § 503(b), including any actual and necessary costs and expenses of preserving any of the assets of the Debtors, any actual and necessary costs and expenses of operating the Debtors' businesses, any allowance of compensation and reimbursement of expenses of Professionals to the extent allowed by the Court and certain other amounts as set forth in the Plan. The Bankruptcy Code does not require Administrative Expense Claims to be classified under a plan. It does, however, require that Allowed Administrative Expense Claims be paid in full in Cash in order for a plan to be confirmed, unless the Holder of such Claim consents to different treatment.

Pursuant to the Plan, each Allowed Administrative Expense Claim (including the DIP Financing Facility and cure costs on Assumed Contracts and Leases) will be paid in respect of such Claim in Cash, in full, on or promptly after the Effective Date, or, if such Claim has not been Allowed on or before the Effective Date, promptly after the Claim is Allowed by a Final Order, or as otherwise due by agreement of the parties; provided, however, that an Allowed Administrative Expense Claim may be satisfied on such other terms as may be agreed to by the holder of such Claim and the Debtors, as the case may be. Certain Administrative Claims have been paid during the course of these Cases.

Notwithstanding anything to the contrary, Administrative Expenses related to the Debtors' ordinary course of business (including amounts owed to vendors and suppliers that have sold goods or furnished services to the Debtors after the commencement of the Cases) will continue to be paid by the Reorganized Debtors during the Case in accordance with the terms and conditions of the particular transactions and any agreement or Court order relating thereto.

Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid in accordance with the agreed terms between the parties. On the Effective Date, all of the obligations of the Debtors to the DIP Lender under or in respect of the DIP Financing Facility and the DIP Financing Order shall be satisfied through the issuance of New Membership Interests to the Acquirer and the commitments under the DIP Financing Facility shall be terminated.

The Plan provides for an administrative bar date for claims against the Debtors that falls thirty (30) days after the Effective Date of the Plan. All unpaid Administrative Expense Claims arising on or before the Effective Date shall be filed with the Court and served on Debtors' counsel in accordance with the Plan or any other applicable order of the Court or be forever barred.

The First Lien Lenders' Agent has stated that it may assert a claim under § 507(b) of the Bankruptcy Code on behalf of the First Lien Lenders. That section governs potential administrative claims by creditors as the result of adequate protection proving to be inadequate. The Debtors have examined the Bankruptcy Judge's Memorandum Decision and the basis for his finding of adequate protection under the unique circumstances of this case, and do not believe that Credit Suisse will be entitled to any claim under § 507(b). As noted below, however, there is a risk that the First Lien Lenders could have an Allowed Administrative Claim. In such event, entry of a Confirmation Order would require that there be sufficient funds to pay such claim in full in cash.

### a.    Priority Tax Claims

Priority Tax Claims are Claims asserted by governmental units entitled to priority under Bankruptcy Code § 507(a)(8). The Bankruptcy Code does not require Priority Tax Claims to be classified under a plan, but requires that such claims receive the treatment described below unless the holder of such Claim consents to different treatment.

Unless otherwise agreed by the Debtors (or, as applicable, the Reorganized Debtors) and the Holder of an Allowed Priority Tax Claim (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim against any of the Debtors that is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of such Claim, cash equal to the amount of such Allowed Priority Tax Claim on the later of the (i) Effective Date or (ii) and the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as practicable. All payments shall be paid from the cash portion of the Equity Purchase Payment or, in the event of a successful credit bid, as Required Plan Payments from cash paid by the credit bidding First Lien Lenders.

### b.    Professional Compensation Claims

All Persons seeking an award by the Bankruptcy Court of a Professional Compensation Claim incurred through and including the Effective Date are required (unless otherwise ordered by the Bankruptcy Court) to file final applications for the allowance of compensation for services rendered and reimbursement of expenses incurred within thirty (30) days after the Effective Date. Holders of Professional Compensation Claims that file final applications in accordance with the Plan will be paid in full in cash in the amounts approved by the Bankruptcy Court: (a) on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which the order relating to the allowance of any such Professional Compensation Claim is entered; or (b) on such other

terms mutually agreed upon by the Debtors or, as applicable, the Reorganized Debtors, and the Holder of an Allowed Professional Compensation Claim. All payments shall be paid from the cash portion of the Equity Purchase Payment or, in the event of a successful credit bid, as Required Plan Payments from cash paid by the credit bidding First Lien Lenders.

**B.      Classification and Treatment of Claims and Interests**

The Plan treats Allowed Claims and Interests of the Debtors' Creditors and Interest Holders as stated below.

For purposes of the Plan, an Allowed Claim is a Claim against the Debtors to the extent that such Claim is allowed under Code § 502. Claims listed by the Debtors in its schedules and not designated as "contingent," "unliquidated," "disputed" or the subject of a pending unadjudicated proof of claim seeking an amount greater than the scheduled amount are Allowed Claims (although the Debtors reserve the right to amend their schedules). All other Claims are not Allowed Claims for purposes of distribution under the Plan until the Court enters a Final Order allowing such Claims and only to the extent allowed by such Final Order. Unless otherwise specified, the term "Allowed Claim" does not include (i) interest on the amount of such Claim accruing from and after the Petition Date, (ii) fees and costs incurred from and after the Petition Date, (iii) punitive or exemplary damages, or (iv) any fine, penalty or forfeiture. The Reorganized Debtors and the Trustee are reserved the right to pursue and collect setoffs or counterclaims that the Debtors may have had against otherwise valid Claims.

The Plan designates thirteen Classes of Claims and one Class of Interests. Each of these Classes is further divided into sub-classes related to each individual Debtor.

**1.      Class 1 - Allowed Priority Non-Tax Claims**

Class 1 consists of Allowed Claims of the Holders of prepetition priority debt. These Claims generally include claims for wage and benefit accruals for periods prior to the filing of the case. The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims shall remain unaltered by this Plan. On the Effective Date, except to the extent a Holder of an Allowed Priority Non-Tax Claim and the Reorganized Debtors agree to a different treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Priority Non-Tax Claim shall receive full payment in cash on account of and in full and complete settlement, release and discharge of such Claim. Certain employee accrued benefits are being assumed by the Reorganized Debtors and those Claims will be paid when such Claims become due and payable in accordance with the terms thereof.

**2.      Class 2 - Allowed Other Secured Debt**

Class 2 consists of Allowed Other Secured Claims of the Holders of prepetition secured debt. These Claims are further divided into sub-classes both with respect to each Debtor and with respect to the priorities existing among the Holders of the prepetition

secured debt. All Holders of secured debt in these sub-classes are unimpaired. Each Allowed Other Secured Claim shall, at the sole option of the Reorganized Debtors, be treated as follows: (i) the Plan will leave unaltered the legal, equitable and contractual rights to which such Claim entitles the Holder thereof, (ii) the Reorganized Debtors shall surrender all Collateral securing such Allowed Other Secured Claim to the Holder thereof as soon as practicable after the Effective Date, without representation or warranty by or recourse against the Debtors or the Reorganized Debtors and in full and complete settlement, release and discharge of such Claim, or (iii) notwithstanding any contractual provision or applicable law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to the stated maturity of such Claim from and after the occurrence of a default, such Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

### 3.    Class 3 - Allowed First Lien Lender Secured Claim

Class 3 consists of Allowed Secured Claims of the First Lien Lenders, which arise under the First Lien Credit Agreement and the other First Lien Credit Documents as of the Effective Date to the extent allowable under section 506(b) of the Bankruptcy Code. The First Lien Lender Claims shall include any Section 507(b) Claims that may be asserted by the First Lien Lenders.

The Committee has asserted that the claims and the security for such claims are avoidable obligations under applicable provisions of Montana law because the Debtors actually received little, if any, of the consideration under the First Lien Credit Documents. According to the Committee that consideration actually was immediately distributed to other entities. Accordingly, the Plan reserves all Avoidance Actions against the First Lien Lenders and transfers them to the Trustees and the Trustees shall be granted standing and authority to pursue Avoidance Actions and Retained Actions on behalf of the Debtors, Reorganized Debtors, and the Estates against the First Lien Lenders and Credit Suisse. Unless the Bankruptcy Court otherwise so orders, the First Lien Lender Claims of such First Lien Lender shall be treated as Disputed Claims until such time as any such Avoidance Actions and Retained Actions against the First Lien Lenders and Credit Suisse are resolved.

In the event that the First Lien Lender Claims are Allowed, each Holder of an Allowed First Lien Lender Claim shall receive, on account of and in full and complete settlement, release and discharge of such Claim, and only upon the resolution of any Avoidance Actions or Retained Actions against the First Lien Lenders, such Holders share of the Equity Purchase Payments.

Under the Plan the First Lien Lenders also had the right to elect the application of Section 1111(b) of the Bankruptcy Code. Under the applicable Bankruptcy Rules that election is required to be made prior to the conclusion of the hearing on the Disclosure Statement, unless the Court extends the time for the election. In its Motion to Expedite Proceedings filed in connection with its Declaratory Judgment Complaint Credit Suisse made reference to its alleged rights under Section 1111(b). The Bankruptcy Court set March 4th as

42

the date and time to consider whether to grant Credit Suisse an extension. The Debtors
oppose any extension of time. Section 1111(b) is the method that Congress provided for
secured creditors like the First Lien Lenders to avoid entirely the valuation process entrusted
to Bankruptcy Judges when property is not being sold under a plan of reorganization. It
allows such creditors to have the Court treat their entire claim as secured. In this case, the
Plan provides that if the First Lien Lenders elect the application of 1111(b) then the Debtor
has the option of surrendering the First Lien Lenders' collateral to them in full satisfaction of
the First Lien Lenders Obligations. In that event, the Debtors would retain their interests in
the Warren Miller Lodge and other unencumbered assets. The First Lien Lenders would not
have any deficiency claims. The Debtors estimate that in those circumstances all other
Holders of Claims and Interests would have a significantly enhanced recovery.

## 4.    Class 4 – General Unsecured Claims

Class 4 consists of all unsecured, non-priority Allowed Claims against the Debtors
that are not Convenience Class Claims or who do not elect to voluntarily reduce their claims
to $5,000 and become a Convenience Class Claim. Each Holder of an Allowed General
Unsecured Claim shall receive, on account of and in full and complete settlement, release
and discharge of such Claim, on the later of (i) the Initial Distribution Date or (ii) the first
Distribution Date after the date on which such General Unsecured Claim becomes an
Allowed Claim, such Holder's Pro Rata Share of the General Unsecured Claim Distribution
from the Liquidation Trust. If a Holder of a Claim in Class 4 asserts otherwise identical
General Unsecured Claims against more than one Debtor, no more than one such General
Unsecured Claim shall be treated as Allowed for purposes of receiving distributions from the
Liquidation Trust.

## 5.    Class 5 – Convenience Class Claims

Class 5 consists of (a) any Allowed Unsecured Claim in an amount equal to or less
than $5,000 or (b) any Allowed Unsecured Claim in an amount greater than $5,000 whose
Holder has agreed to voluntarily reduce such Unsecured Claim to $5,000 in accordance with
the Convenience Claim Election. Each Holder of an Allowed Convenience Claim shall
receive, on account of and in full and complete settlement, release and discharge of such
Claim, on the later of (i) the Effective Date or (ii) the first business day after the date on
which such Convenience Claim becomes an Allowed Claim, payment of cash in the amount
equal to 100% of such Allowed Convenience Claim from the Liquidation Trusts. If a Holder
of a Claim in Class 5 asserts otherwise identical Convenience Claims against more than one
Debtor, no more than one such Convenience Claim shall be treated as Allowed for purposes
of receiving distributions under from the Liquidation Trust.

## 6.    Class 6 – Intercompany Claims

Class 6 consists of Allowed Claims by one Debtor against another Debtor.
Intercompany Claims shall be taken into account by the Trustees of the Liquidation Trusts in
determining distributions. The effect of this provision will preclude any actual distribution

43

from one Debtor to another, but the Trustees can settle the Intercompany claims and then make distributions between the trusts which will allow the Trustee to adjust the size of the total distributions from each Trust to creditors of each Debtor. Under the terms of the Liquidating Trust document, these claims will be treated as Disputed Claims until the Trustee has an opportunity to review the matter and arrive at an appropriate method of resolving any issues concerning the proper amount of the Allowed Claims.

### 7.   Class 7 – Equity Interests

Class 7 consists of the membership interests of the owners of the Debtors. The Holders of such Interests shall receive no distribution from the Reorganized Debtors. Equity Interests in the Debtors shall be cancelled and duly extinguished on the Effective Date, and the Holders of Equity Interests in the Debtors shall only be entitled to receive such Holder's Pro Rata Share of any Equity Distribution from the Liquidation Trust.

### 8.   Class 8 - Allowed First Lien Lender Deficiency Claim

Class 8 consists of all Allowed Lender Deficiency Claims, if any, which are all the First Lien Lender Obligations that are not Secured Claims.

The Committee has asserted that the claims and the security for such claims are avoidable obligations under applicable provisions of Montana law because the Debtors actually received little, if any, of the consideration under the First Lien Credit Documents. According to the Committee that consideration actually was immediately distributed to other entities. Accordingly, the Plan reserves all Avoidance Actions against the First Lien Lenders and transfers them to the Trustee and the Trustee shall be granted standing and authority to pursue Avoidance Actions and Retained Actions on behalf of the Debtors, Reorganized Debtors, and the Estates against the First Lien Lenders and Credit Suisse. Unless the Bankruptcy Court otherwise so orders, the Lender Deficiency Claims of such First Lien Lender shall be treated as Disputed Claims until such time as any such Avoidance Actions and Retained Actions against the First Lien Lenders and Credit Suisse are resolved.

Each Holder of an Allowed Lender Deficiency Claim shall receive on account of and in full and complete settlement, release and discharge of such Claim such Holder's Pro Rata Share of the General Unsecured Claim Distribution from the Liquidation Trusts. If a Holder of a Lender Deficiency Claim in Class 8 asserts otherwise identical Lender Deficiency Claims against more than one Debtor, no more than one such Lender Deficiency Claim shall be treated as Allowed for purposes of receiving distributions from the Liquidation Trusts; provided, however, that any judgment in any Avoidance Action may contain provisions which subordinate any distributions from the Liquidation Trusts to the Holder of a Lender Deficiency Claim, and in such event such Holder's Pro Rata share of any General Unsecured Claim Distribution, shall only be payable after the payment in full, with interest at the federal judgment rate from and after the Petition Date, of (i) all Allowed Unsecured Claims in Classes 4 and 5, and (ii) all attorney's fees, expenses, and other litigation expenses of the Liquidation Trusts.

9. **Class 9—Pioneer/Frontier Members Rejection Claims**

Class 9 consists of the Allowed Unsecured Claims, if any, of Pioneer/Frontier Members whose contracts are being rejected under the Plan.

10. **Class 10-- American Bank Claims.**

Class 10 consists of the Allowed Secured Claims of the American Bank.

11. **Class 11-- Prim Claims.**

Class 11 consists of the Allowed Secured Claims of Prim Vintage Development, L.P.

12. **Class 12 – Honorary Member Rejection Claims.**

Class 12 consists of the Allowed Unsecured Claims, if any, of Honorary Members whose contracts are being rejected under the Plan.

13. **Class 13 – Founder's Circle Member Rejection Claims.**

Class 13 consists of the Allowed Unsecured Claims, if any, of Founder's Circle Members whose contracts are being rejected under the Plan.

14. **Class 14 – Company Member Rejection.**

Class 14 consists of the Allowed Unsecured Claims, if any, of Company Members whose contracts are being rejected under the Plan.

C. **Contested Claims and Interests**

1. **Procedures for Treating and Resolving Disputed and Contingent Claims.**

No Distributions shall be made with respect to any portion of a Disputed Claim unless and until such Disputed Claim has become an Allowed Claim. All objections to Claims shall be filed on or before the Claims Objection Deadline, and all Claims with respect to which objections have been filed on or before the Claims Objection Deadline shall be treated as Disputed Claims for purposes of this Plan. Once a Disputed Claim becomes an Allowed Claim it shall be entitled to receive the distributions that would have been payable to the Holder of that Allowed Claim. The Reorganized Debtors and the Trustees are to establish a Disputed Claim Reserve Account which will hold funds from Distributions that take place during the pendency of any Claim Objection.

2. **Disputed Claim Estimation Procedure.**

In addition to the Claim Objection Procedure, the Plan gives the Reorganized Debtors and the Trustee the authority to estimate the maximum allowable amount of any Disputed Claim (the "Estimation Claim") pursuant to a Claim Estimation Procedure. The Claim

Estimation Procedure is designed to provide an inexpensive alternative to full blown litigation over the allowance of claims. The Bankruptcy Court's ruling on the Estimation Claim amount shall be used for purposes of determining the amount of the Disputed Claim Reserve Account attributable to such Claim.

**D.      Means for Implementation of the Plan**

      **1.      Continued Entity Existence.**

All of the Debtors will continue to exist after the Effective Date as separate limited liability companies in accordance with the applicable Montana law and pursuant to their respective articles of organization, operating agreements, and other organizational documents in effect prior to the Effective Date, except to the extent such articles of organization, operating agreements, and other organizational documents are amended pursuant to the Plan. The Acquirer is not acquiring any interest in YCC, and, therefore all of its assets are being transferred to the Liquidation Trusts for liquidation and distribution to its creditors.

      **2.      Amended LLC Agreements.**

On the Effective Date, or as soon thereafter as is practicable, the operating agreements of all of the Debtors (collectively, the "Amended LLC Agreements") shall be amended as necessary to satisfy the provisions of this Plan and the Bankruptcy Code, including, without limitation, the prohibition against the issuance of non-voting equity securities set forth in section 1123(a)(6) of the Bankruptcy Code. The forms of Amended LLC Agreements shall be included in the Plan Supplement. After the Effective Date, the Amended LLC Agreements shall be subject to such further amendments or modifications as may be made by law or pursuant to such Amended LLC Agreements.

      **3.      New Membership Interests.**

On the Effective Date, each Reorganized Debtor (YC, YD, and Big Sky) shall issue the New Membership Interests for Distribution to the Acquirer.

      **4.      Cancellation of Equity Interests and Other Instruments.**

On the Effective Date, except as otherwise specifically provided for herein, all Equity Interests in the Debtors and the First Lien Credit Documents shall (a) be deemed fully and finally cancelled; and (b) have no effect other than the right of the Holders of First Lien Lenders Claims to participate in the Distributions provided under this Plan from the Reorganized Debtors and from the Liquidation Trusts in respect of such Claims and the right of the Holders of Equity Interests to participate in Distributions from the Liquidation Trusts. As of the Effective Date, all Liens, charges, encumbrances and rights related to any Claim or Equity Interest, except to the extent specifically permitted under ARTICLE III of the Plan, shall be terminated, null and void and of no effect.

5.    **Corporate Action.**

Each of the matters provided for under this Plan involving the corporate structure of any Reorganized Debtor or corporate action to be taken by or required by any Reorganized Debtor shall be deemed to have occurred, and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by the stockholders, members, creditors or directors of any Reorganized Debtor.

6.    **Dissolution of the Committee.**

The Committee shall cease to exist after the Effective Date.  On the Effective Date the members of the Committee shall be released and discharged of and from all duties, responsibilities and obligations related to and arising from and in connection with the Cases.

7.    **Pre-Effective Date Injunctions or Stays.**

All injunctions or stays, whether by operation of law or by order of the Bankruptcy Court, provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise that are in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

8.    **Preservation of Retained Actions.**

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain all of the Retained Actions, and the Reorganized Debtors and shall transfer all such Retained Actions, except Reserved Actions to the Liquidation Trusts.

a.    **Reserved Actions.**

The Reorganized Debtors, in their sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce the Reserved Actions (or decline to do any of the foregoing) without further approval of the Bankruptcy Court.  The Reorganized Debtors or their successors in interest may pursue such Reserved Actions in accordance with the best interests of the Reorganized Debtors.

b.    **Transferred Actions.**

The Trustees of the Liquidating Trusts, in their sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce the Transferred Actions (or decline to do any of the foregoing) without further approval of the Bankruptcy Court, subject to the terms of the Liquidating Trusts.

9.    **Exemption From Certain Transfer Taxes.**

Pursuant to Section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage,

deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with this Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated in this Plan and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 10.    Section 1123(a)(5)(J) Issuance of New Membership Interests.

Pursuant to the provisions of section 1123(a)(5)(J) of the Bankruptcy Code, the Plan Solicitation Order, and subject to Bankruptcy Court approval in connection with Confirmation of this Plan, the Reorganized Debtors shall issue the New Membership Interests to Acquirer. in accordance with the Definitive Agreement for the purpose of acquiring the funds and other consideration necessary for the consummation of the Plan.

### 11.    Vesting of Assets

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property of the Estates, to the fullest extent of section 541 of the Bankruptcy Code, and any and all other rights and Assets of the Debtors of every kind and nature (including the Retained Actions and Avoidance Actions) shall revest in each of the Reorganized Debtors that owned such property or interest in property as of the Petition Date, free and clear of all Liens, Claims and Equity Interests, except as specifically provided for in this Plan. As of the Effective Date, the Reorganized Debtors shall be authorized to operate their businesses and to use, acquire, and dispose of property, or Reserved Actions without supervision of the Bankruptcy Court and without notice to any party, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, except those restrictions explicitly imposed by this Plan and the Confirmation Order.

### 12.    Effective Date Payments

Attached as Exhibit VIII is a spreadsheet showing the projected Effective Date payments, assuming there is a $30,000,000.00 cash portion of the Equity Purchase Price.

**13.** **Creation and Funding of Yellowstone Club Liquidation Trusts.**

    **a.** **Effective Date Transfers to the Trusts.**

On the Effective Date, and prior to the closing under the Definitive Agreement, each Debtor and the Committee shall convey to the Liquidation Trusts for such Debtor's Estate all of its assets and property except the Project (including, without limitation, the Reserved Actions). In addition to the Adversary Actions, two of the primary assets that will be transferred include the ownership interests in all of the Debtors' subsidiaries that own assets unrelated to the Project. Primary among these is St. Andrews International Limited and Cosburn Investments B.V. two wholly owned subsidiaries of YD. St. Andrew International owns 265 acres in St. Andrews, Fife, Scotland with an existing entitlement for the development of a private golf club and condos. Cosburn Investments, through additional wholly owned subsidiaries owns the Château de Farcheville, a chateau situated on 1,000 acres of land located 30 minutes outside Paris, France. This property is presently listed for sale and the Debtors are actively pursuing efforts to conclude a sale transaction. The purchase and sale agreement for the property that failed to close in late 2008 had a purchase price of Fifty Million Euros. The Debtors have obtained funding through the DIP Loans to permit them to advance funds for the purpose of allowing the Châteaux to pay its bills. A third primary asset is the Debtors' interest in promissory notes from BGI in the approximate amount of $275,000,000.00. The Bankruptcy Court authorized the Committee to commence suit on these notes, and there is a pending adversary proceeding. Immediately thereafter, the closing under the Definitive Agreement shall occur and the Reorganized Debtors shall transfer the Initial Liquidation Trust Deposits with respect to the relevant Debtor (other than YCC) to the Liquidation Trust for such Debtor's Estate.

    **b.** **Effective Date Transfers to the Disbursing Agent.**

After the payment of all Required Plan Payments and the Distributions to the Holders of Convenience Class Claims, Priority Tax Claims, and Priority Non Tax Claims, the Disbursing Agent shall transfer any funds or property remaining from the cash portion of the Equity Purchase Price to the Liquidation Trusts for each Debtor. The Disbursing Agent shall then assign, if not assigned earlier, interests in the note portion of the Equity Purchase Payment first to the First Lien Lenders up to the amount of the First Lien Lender Project Claim, and the balance of the note shall be assigned to the Liquidation Trusts in proportion to each Estate's interest in the Project as determined under the Plan; provided, however, that in the event the First Lien Lender Project Claim exceeds the face amount of the note, then the Disbursing Agent shall pay cash equal to the deficiency prior to making any distribution of cash to the Liquidation Trusts; and provided, further, that in the event the Disbursing Agent does not have sufficient cash to make such payment, then the Trustee shall pay 100% of all distributions from the Liquidation Trusts to the First Lien Lenders until the remaining deficiency is paid in full in accordance with § 1129(b).

### c.     Final Transfer.

After the payment of all the Claims to be paid on or shortly after the Effective Date, the Disbursing Agent shall transfer any funds or property remaining from the Purchase Price to the Liquidation Trusts and the Note Disbursing Agent. The Bankruptcy Court, at the Confirmation Hearing shall determine the appropriate allocation of value between the Project Collateral securing the First Lien Lenders Claim and the unencumbered assets. That allocation will be used by the Disbursing Agent to determine the percentage interest in the note portion of the purchase price for the purpose of assigning the note to the Liquidation Trusts and the First Lien Lenders.

### 14.     Discharge of Claims and Termination of Equity Interests.

### a.     Discharge.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as provided in the Confirmation Order, the Distributions and rights provided in this Plan and the treatment of Claims and Equity Interests under this Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and satisfaction or termination of all Equity Interests, including any interest accrued on Claims from and after the Petition Date. Except as otherwise provided in this Plan or the Confirmation Order, Confirmation shall, as of the Effective Date: (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (x) a proof of claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (y) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (z) the Holder of a Claim based on such debt has accepted this Plan; and (ii) terminate and cancel all Equity Interests in the Debtors.

### b.     Prohibition on Assertion of Discharged Claims and Equity Interests.

As of the Effective Date, except as otherwise provided in this Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or property, any other or further Claims, demands, debts, rights, Causes of Action, liabilities or Equity Interests based upon any act, omission, cause, transaction, state of facts, or other activity of any kind or nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in this Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of discharge of all such Claims and other debts and liabilities against the Debtors and satisfaction, termination or cancellation of all Equity Interests pursuant to sections 524 and 1141 of the Code, and such discharge will void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

15.    **Exculpation and Limitation of Liability.**

None of (a) the Debtors or the Reorganized Debtors, (b) the Committee, (c) the individual members of the Committee in their capacities as such, (d) the DIP Lenders, any other lenders of (or participants in) the DIP Loan and any agent thereof, (e) the Current Equity Owners, (f) CrossHarbor Capital Partners LLC and all affiliates thereof, (g) the Acquirer and (h) with respect to each of the foregoing Persons, each of their respective directors, officers, employees, agents (including Edra Blixseth, as managing member of the Current Equity Owners), representatives, shareholders, partners, members, attorneys, investment bankers, restructuring consultants and financial advisors in their capacities as such (collectively, the "Exculpated Parties"), shall have or incur any liability to any Person for any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the formulation, negotiation, implementation, confirmation or consummation of this Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document entered into during the Chapter 11 Cases or otherwise created in connection with this Plan; provided, however, that nothing in this Section V(D)(14) shall be construed to release or exculpate any Exculpated Party from willful misconduct or gross negligence as determined by a Final Order or any breach of the Definitive Agreement or any documents entered into in connection therewith.

16.    **Effect of Confirmation.**

On the Confirmation Date, the provisions of the Plan shall become binding on the Debtors, the Estates, the Acquirer, the Reorganized Debtors, all Holders of Claims against or Equity Interests in the Debtors, and all other parties in interest in the Chapter 11 Cases whether or not such Holders of Claims or Equity Interests are impaired and whether or not such Holders of Claims or Equity Interests have accepted this Plan.

17.    **Order of Steps on the Effective Date and Knowledge of Restructure of Indebtedness.**

Notwithstanding anything to the contrary contained herein, all steps taken in implementation of the Plan and effective on the Effective Date shall be deemed to occur sequentially such that, for all purposes of the Plan and the Confirmation Order, the following actions occur in the following order: (1) discharge of any Claims or other indebtedness; (2) cancellation of Equity Interests, and (3) issuance of New Membership Interests in the Reorganized Debtors to Acquirer. Further, the Debtors are deemed to have acknowledged and agreed that for federal income tax purposes, (i) Acquirer is purchasing the assets of the Debtors and that (ii) the Debtors are aware that the indebtedness to which they are subject with respect to their assets is being restructured in connection with the Acquirer's acquisition and for federal tax purposes the modifications and cancellation of any Claims are treated as taking place prior to Acquirer's purchase, consistent with Treas. Reg. §1.1274-5(b)(1).

18.    **Substantive Consolidation**

Except as expressly provided in the Plan, the Reorganized Debtors shall continue to maintain their separate existences for all purposes other than the treatment of Claims under the Plan.  The Debtors are proposing that YD and YC be substantively consolidated under the Plan on the Effective Date pursuant to Section 1123(a)(5)(C) of the Bankruptcy Code and the Confirmation Order.  The effect of such substantive consolidation would be that: (i) all assets (and all proceeds thereof) and liabilities of the YC shall be deemed merged or treated as though they were merged into and with the assets and liabilities of YC, (ii) no distributions shall be made under the Plan on account of intercompany Claims among the YC and YD and all such Claims shall be eliminated, (iii) all guarantees of either YD or YC of the obligations of the other shall be deemed eliminated and extinguished so that any claim against YC and YD and any guarantee thereof executed by the other and any joint or several liability of YC and YD shall be deemed to be one obligation of the consolidated YC and YD, (iv) each and every Claim filed or to be filed in the Chapter 11 Case of YC or YD shall be deemed filed against the consolidated YC and YD, and shall be deemed one Claim against and obligation of the consolidated YC and YD and (v) for purposes of determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, YC and YD shall be treated as one entity so that, subject to the other provisions of Section 553 of the Bankruptcy Code, debts due to either YC or YD may be set off against the debts of either YC or YD.  Such substantive consolidation shall not (other than for purposes related to the Plan) affect the legal and entity structures of the Reorganized YC or YD.  If the proposed order is entered, there shall be only three Trusts for the purpose of administering the Liquidating Trusts.  Notwithstanding anything set forth in the Plan, any and all Claims against or Interests in the Non Consolidated Debtors (YCC and Big Sky) shall remain unaffected by the Plan and such Non Consolidated Debtors shall not be consolidated with the Debtors pursuant to the Plan for any reason.

E.    **Ownership and Management of Reorganized Debtors**

On *, 2009, the Bankruptcy Court entered an order granting the Debtors' Motion seeking to establish procedures in connection with the solicitation of higher and better offers for the Equity Interests being issued in connection with the Plan.  Under those approved procedures and if a qualified alternative bidder emerges, the Debtors shall conduct an auction with respect to the Equity Interests and some other person or entity may be the successful Acquirer under the Plan.  In such event, that Acquirer will have the right to select the management of the Reorganized Debtors and the Debtors have no current information regarding any post-confirmation management for any such competing bidder.

The following information, however, is being provided based on the Debtors understanding of the plans for post confirmation management by the proposed purchaser under the Definitive Agreement.  CrossHarbor will control the day to day management and operation of the Reorganized Debtors and intend to continue the infrastructure buildout and development of remaining density units at the Yellowstone Club.  Of paramount importance to CrossHarbor is providing a unique membership experience catered to the desires and

expectations of the members of the Yellowstone Club. In this regard, CrossHarbor has
delivered a Statement of Principles to the Ad Hoc Committee of Members detailing the
principles to which CrossHarbor intends to adhere if it is the successful bidder (see Exhibit
VII attached hereto).

Likewise, professional management of the Yellowstone Club is essential to its
success. Accordingly, the Debtors are informed that Discovery Land Company will in all
likelihood continue to operate the Club on a day to day basis and in all likelihood will take
over the real estate sales role currently being performed by Big Springs Realty, LLC.
Although a form of management agreement has not yet been agreed to and the ownership
interests of the new sales arm of the Yellowstone Club has not yet been finalized, it is
currently contemplated that Discovery Land will be paid largely, if not entirely, for its
management services through sales commissions on properties sold within the Yellowstone
Club. It is also contemplated the Discovery Land will make an equity investment in the
Acquirer and will receive a promoted interest in the Acquirer.

**F.    Executory Contracts and Unexpired Leases**

    **1.    Assumption or Rejection of Executory Contracts and Unexpired Leases.**

        **a.    Rejected Contracts and Leases.**

On the Effective Date, all executory contracts and unexpired leases to which any of
the Debtors is a party shall be deemed rejected in accordance with the provisions and
requirements of sections 365 and 1123 of the Bankruptcy Code, except those executory
contracts, unexpired leases, and other obligations that (i) have previously been assumed by
the Debtors pursuant to an order of the Bankruptcy Court, (ii) are the subject of a motion to
assume filed by the Debtors at any time prior to the Effective Date, or (iii) that are Assumed
Obligations listed in the Contract Assumption Schedule. The Debtors may identify
additional executory contracts, unexpired leases, and other obligations for the Debtors to
assume and reserve the right to seek such assumption at any time prior to the Effective Date.

        **b.    Assumed Obligations.**

Entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of
the Reorganized Debtors' or Acquirer's assumption of the Assumed Obligations listed in the
Contract Assumption Schedule, as of the Effective Date pursuant to section 365(a) of the
Bankruptcy Code. This is Schedule 1.34 to the Plan and a copy is attached. Included among
the contracts being assumed is the Consent Decree between the Debtors and the
Environmental Protection Agency. Under the Plan, the Reorganized Debtors will continue to
perform all obligations under the consent decree.

        **c.    Club Member Agreements.**

The are several different classes of club members. Most members are regular
Resident or National (non-Founder's Circle) Members, whose contracts are being assumed.

Pioneer/Frontier Members, Honorary Members, Company Members, and Founder's Circle Members contracts are being rejected, but Pioneer/Frontier Members and Honorary Members may elect to enter into new membership contracts. Company Members and Founder's Circle member may request a new membership contract which request may be accepted or denied by the Reorganized Debtors. The schedules to the Plan identify which memberships are included within each category. The following sections discuss the treatment of each type of membership.

### (i)     Resident and National (non-Founder's Circle) Members

The Debtors will assume all valid Resident and National (non-Founder's Circle) membership agreements in good standing, along with the corresponding membership deposit refund obligations, as well as all valid membership deposit postponement agreements that were executed in connection with the purchase of residential units and have not expired by their terms. The Debtors' current list of such members is set out at Schedule 1.86 of the Plan. The Debtors acknowledge that their membership files are imperfect. Accordingly, (i) certain individuals not listed on Schedule 1.86 may, in fact, possess valid memberships; (ii) certain of the individuals listed on Schedule 1.86 may not, in fact, possess valid memberships; and (iii) no membership deposit postponement agreements are currently listed on Schedule 1.86. To the extent an owner of a residential unit within the Club has neither a valid membership agreement nor a valid postponement agreement, such owner will be required to purchase a membership, failing which such owner will have no rights to use Club facilities.

The Debtors will endeavor to file a completed list of Resident and National members with the Plan Supplement (which is currently due ten days prior to the Confirmation Hearing). Given the state of the Debtors' membership files, the Debtors have requested that all members send their executed membership agreements and postponement agreements to the below-listed address. The Debtors will review any agreements promptly received and update Schedule 1.86 as appropriate.

Brad Foster
Re: Membership Files
FTI Consulting
804 Douglas Road, 4th Floor
Coral Gables, FL 33134
Email: Brad.Foster@FTIConsulting.com
Fax: (404) 460-6230

### (ii)    Founder's Circle Members

Although the Debtors will reject all Founder's Circle membership agreements, the Debtors intend to offer new Founder's Circle membership agreements to those Founder's Circle members determined by the Debtors to be valid and in good standing. The Debtors' current list of Founder's Circle members is set out at Schedule 1.71 of the Plan. The Debtors

acknowledge that their Founder's Circle membership files are imperfect. Accordingly, certain of the individuals listed on Schedule 1.71 may not, in fact, possess valid Founder's Circle memberships, whereas certain individuals not listed on Schedule 1.71 may, in fact, possess valid Founder's Circle memberships.

Schedule 1.71 also includes a form of Founder's Circle Replacement Member Contract, which (as amended prior to the Confirmation Date) will be offered to certain Founder's Circle members determined by the Debtors to be valid and in good standing. Importantly, those Founder's Circle members that acquired residential units within the Club, and should have converted to Residential memberships under the terms of their Founder's Circle membership agreements, will not be offered Founder's Circle Replacement Member Contracts, but will instead be required to enter into Residential membership agreements (which agreements will incorporate any valid and unpaid Founder's Circle membership deposit refund and credit obligations). Any Founder's Circle member who executes a Founder's Circle Replacement Member Contract will be deemed to have voluntarily waived any claim on account of the initial rejection of such member's Founder's Circle membership agreement.

The Debtors will endeavor to file a completed list of Founder's Circle members with the Plan Supplement (which is currently due ten days prior to the Confirmation Hearing). Given the state of the Debtors' Founder's Circle membership files, the Debtors have requested that all Founder's Circle members send their executed membership agreements to the below-listed address. The Debtors will review any agreements promptly received and update Schedule 1.71 as appropriate.

Brad Foster
Re: Membership Files
FTI Consulting
804 Douglas Road, 4th Floor
Coral Gables, FL 33134
Email: Brad.Foster@FTIConsulting.com
Fax: (404) 460-6230

(iii)   **Pioneer Members**

Although the Debtors will reject all Pioneer membership agreements, the Debtors will offer new Pioneer membership agreements to all Pioneers members determined by the Debtors to be valid and in good standing. The Debtors' current list of Pioneer members is set out at Schedule 1.88 of the Plan. The Debtors acknowledge that their Pioneer membership files are imperfect. Accordingly, certain of the individuals listed on Schedule 1.88 may not, in fact, possess valid Pioneer memberships, whereas certain individuals not listed on Schedule 1.88 may, in fact, possess valid Pioneer memberships.

Schedule 1.88 also includes a form of Pioneer Replacement Member Contract, which (as amended prior to the Confirmation Date) will be offered to all Pioneer members

determined by the Debtors to be valid and in good standing.  That form agreement provides (x) that a Pioneer member (and the Pioneer member's spouse, adult child and adult grandchild who is a permitted transferee of the Pioneer membership) will pay no dues prior to the date the Club is converted to an equity club owned by the members; (y) that a Pioneer member is entitled to a $250,000 membership deposit refund and an additional $250,000 purchase price refund at the point in time when a total of 650 Residential memberships and National memberships are issued and outstanding.  The form agreement also eliminates the 50% discount on lodging rates and provides that the Pioneer member's Option to Purchase Real Property and Membership is terminated and of no further force or effect.  Any Pioneer member who executes a Pioneer Replacement Member Contract will be deemed to have voluntarily waived any claim on account of the initial rejection of such member's Pioneer membership agreement.

The Debtors will endeavor to file a completed list of Pioneer members with the Plan Supplement (which is currently due ten days prior to the Confirmation Hearing).  Given the state of the Debtors' Pioneer membership files, the Debtors have requested that all Pioneer members send their executed membership agreements to the below-listed address.  The Debtors will review any agreements promptly received and update Schedule 1.88 as appropriate.

Brad Foster
Re: Membership Files
FTI Consulting
804 Douglas Road, 4th Floor
Coral Gables, FL 33134
Email:  Brad.Foster@FTIConsulting.com
Fax:  (404) 460-6230

### (iv)    Frontier Members

Although the Debtors will reject all Frontier membership agreements, the Debtors will offer new Frontier membership agreements to ALL Frontier members determined by the Debtors to be valid and in good standing.  The Debtors' current list of Frontier members is set out at Schedule 1.88 of the Plan.  The Debtors acknowledge that their Frontier membership files are imperfect.  Accordingly, certain of the individuals listed on Schedule 1.88 may not, in fact, possess valid Frontier memberships, whereas certain individuals not listed on Schedule 1.88 may, in fact, possess valid Frontier memberships.

Schedule 1.88 also includes a form of Frontier Replacement Member Contract, which (as amended prior to the Confirmation Date) will be offered to all Frontier members determined by the Debtors to be valid and in good standing.  That form agreement provides that a Frontier member is entitled to a $250,000 membership deposit refund at the point in time when a total of 650 Residential memberships and National memberships are issued and outstanding.  The form agreement also eliminates the 50% discount on lodging rates and provides that the Frontier member's Option to Purchase Real Property and Membership is

terminated and of no further force or effect.  Any Frontier member who executes a Frontier Replacement Member Contract will be deemed to have voluntarily waived any claim on account of the initial rejection of such member's Frontier membership agreement.

The Debtors will endeavor to file a completed list of Frontier members with the Plan Supplement (which is currently due ten days prior to the Confirmation Hearing).  Given the state of the Debtors' Frontier membership files, the Debtors have requested that all Frontier members send their executed membership agreements to the below-listed address.  The Debtors will review any agreements promptly received by and update Schedule 1.88 as appropriate.

> Brad Foster
> Re: Membership Files
> FTI Consulting
> 804 Douglas Road, 4th Floor
> Coral Gables, FL 33134
> Email:  Brad.Foster@FTIConsulting.com
> Fax:  (404) 460-6230

### (v)   Honorary Members

Although the Debtors will reject all Honorary membership agreements, the Debtors will offer new Honorary membership agreements to ALL Honorary members.  The Debtors' current list of Honorary members, along with a form of Honorary Replacement Member Contract, are set out at Schedule 1.77 of the Plan.

### (vi)   Company Members

The Debtors will reject all Company membership agreements, but may elect to offer new Company membership agreements to those individuals determined by the Debtors to be eligible for Company memberships.  The Debtors' current list of Company members, along with a form of Company Replacement Member Contract, are set out at Schedule 1.27 of the Plan.

### d.   Right to Reject Assumed Obligations.

Under certain circumstances, the Debtors (or Reorganized Debtors, as applicable) shall have the right to abandon the assumption of any Assumed Obligation, and to treat such Assumed Obligation as rejected under the Plan, at any time during the thirty (30) day period following the Bankruptcy Court's resolution of any objection by the non-Debtor party to the assumption of such Assumed Obligation (including, but not limited to, any objection by the non-Debtor to the Cure Amount, if any, proposed with respect to such Assumed Obligation).

2.    **Payment of Cure Amounts.**

The Contract Assumption Schedule and the Modified Member Schedule attached to the Plan list the proposed Cure Amount, if any, with respect to each Assumed Obligation included therein. Cure Amounts with respect to any Assumed Obligations will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, (i) by payment of the Cure Amount in cash on the Effective Date or, (ii) in the event a timely objection to assumption of the Assumed Obligation or to the proposed Cure Amount is raised in accordance with Section 5.3 of the Plan, as soon as practicable after the Cure Amount is determined by the Bankruptcy Court in a Final Order and the expiration of the time for the Reorganized Debtor to elect to treat such agreement as rejected pursuant to Section 5.1.8, or agreed to by the Debtors (or Reorganized Debtors or Acquirer, as applicable) and the non-Debtor party to the Assumed Obligation.

3.    **Objections to Assumption and Proposed Cure Amounts.**

a.    **Requirement of Timely Objection.**

If any non-Debtor party to an Assumed Obligation opposes the Reorganized Debtors' or Acquirer's assumption of such Assumed Obligation for any reason (including, but not limited to, (i) the assertion of the existence of a default under such Assumed Obligation, (ii) any dispute as to the Cure Amount set forth in the Contract Assumption Schedule, (iii) any dispute as to the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or (iv) any dispute concerning the Plan's ability to modify such contractual provisions, then such non-Debtor party to the Assumed Obligation must file an objection no later than the deadline for filing objections to Confirmation of this Plan.  Such objection shall be served on the Debtors and the Committee and shall state (i) the Cure Amount to which such non-Debtor party claims it is entitled; (ii) the amount of the Rejection Claim which such non-Debtor would be able to assert if the Assumed Obligation were rejected by the Debtors; (iii) the nature of any defaults with respect to such Assumed Obligation; and (iv) any other basis upon which the non-Debtor party opposes the assumption of the Assumed Obligation.  Pending the Bankruptcy Court's ruling on such an objection, the Assumed Obligation at issue shall be treated as assumed by the Reorganized Debtors or Acquirer unless otherwise ordered by the Bankruptcy Court.

b.    **Consequences of Failure To Object.**

Failure to timely file and serve an objection in accordance with Section 5.3 of the Plan shall constitute the non-Debtor party's consent to the Reorganized Debtors' or Acquirer's assumption of the Assumed Obligation, a determination by the Bankruptcy Court that, upon the Reorganized Debtors' payment of the Cure Amount (if any), no defaults shall exist under such Assumed Obligation, and with respect to member agreements listed on the Modified Member Schedule, a determination that each identified member and the Reorganized Debtor have voluntarily agreed to a modification of the affected member agreement in accordance with applicable non-bankruptcy law.  Any non-Debtor party that

fails to object timely to the proposed Cure Amount or to the Debtors' assumption of any contract, unexpired lease, or other obligation to which it is a party shall be forever barred and estopped from asserting any Claims against the Debtors, the Reorganized Debtors, or any Person acting on behalf of the Debtors that arose prior to the Effective Date with respect to such contract or unexpired lease or with respect to any additional agreements, either oral or written, that may be related thereto, including, without limitation, any Claims for fraud or misrepresentation that may be asserted by such non-Debtor party against the Debtors or any Person acting on behalf of the Debtors in connection with, or related to, its contractual relationship with the Debtors, and any such Claims shall be deemed Disallowed.

### 4.     Rejection Claims Bar Date.

All proofs of claim with respect to Rejection Claims arising from the Debtors' rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise must be filed with the Bankruptcy Court within thirty (30) days after the entry of an order by the Bankruptcy Court, which may be the Confirmation Order, authorizing the rejection of such executory contract or unexpired lease. All Rejection Claims that become Allowed Claims shall be treated as General Unsecured Claims (or Convenience Claims, if applicable). Any Rejection Claims that are not timely filed in accordance with the foregoing provision shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or the Liquidation Trusts, or any property of the Debtors or the Reorganized Debtors unless otherwise ordered by the Bankruptcy Court.

### 5.     Post-Petition Contracts and Leases.

There shall be a schedule of all contracts, agreements and leases that were entered into by the Debtors (other than YCC) and relating to the Project after the Petition Date. The Reorganized Debtors shall be assuming all such contracts to the extent they appear on Schedule **Error! Reference source not found.** to Plan which schedule shall be filed with the Bankruptcy Court no later than five (5) Business Days after entry of an order approving this Disclosure Statement.

### G.     Retention of Jurisdiction

#### 1.     Claims and Actions

The Court shall retain jurisdiction over the Case, including, without limitation, such jurisdiction as is necessary to ensure that the purposes and intent of the Plan are implemented. The Court shall also expressly retain jurisdiction to hear and determine all Claims against the Debtors.

#### 2.     Retention of Additional Jurisdiction

The Court shall also retain jurisdiction for the purpose of classification of the Claims of any Creditor and the determination of such objections as may be filed with respect to the

Claims and Interests, including Code § 502(c) proceedings for the estimation of Claims. The Court shall further retain jurisdiction over matters as indicated in Article 10 of the Plan.

### 3. Modifications of the Plan

The Debtors may modify the Plan in the manner provided for under Code § 1127. The Debtors shall give notice of any proposed modification to the Office of the United States Trustee for the District of Montana and any other parties designated by the Court. The Debtors also reserve the right to make such modifications at or prior to any hearings on Confirmation as are necessary to permit the Plan to be confirmed under Code § 1129 and as permitted by applicable law. The Definitive Agreement imposes limits on the Debtors' ability to modify the Plan.

### 4. Revocation and Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan at any time before entry of a Confirmation Order. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, or if the Confirmation or the Effective Date does not occur, then the Plan shall be deemed to be null and void. In such event, nothing in the Plan or this or any other Disclosure Statement relating to the Plan shall be deemed to constitute an admission of validity, waiver or release of any Claims by or against the Debtors or any Person or to prejudice in any manner the rights of the Debtors or any Person in any proceeding involving the Debtors. The Definitive Agreement imposes limits on the Debtors' ability to revoke or withdraw the Plan.

## VI. CONFIRMATION AND CONSUMMATION PROCEDURE

### A. Disclosure and Solicitation

This Disclosure Statement is presented to the Holders of Claims and Interests in Impaired Classes that receive or retain property pursuant to the Plan to satisfy the requirements of Bankruptcy Code §§ 1125 and 1126. Bankruptcy Code § 1125 requires that full disclosure be made to all Holders of Claims and Interests in Impaired Classes that receive or retain property pursuant to a plan at the time, or before, solicitation of acceptances of such plan is commenced.

### B. Acceptance of the Plan

The Bankruptcy Code defines acceptance of a plan by a Class of Creditors or Interest Holders as acceptance by Holders of more than two-thirds in dollar amount and more than one-half in number of the Claims of that Class that have timely voted on a plan. A vote may be disregarded if the Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

A vote to accept or reject the Plan can only occur by proper submission of a duly executed ballot. Failure of a holder to vote does not constitute a vote to reject the Plan by that holder. **EACH HOLDER OF A CLAIM SHOULD SEEK SUCH INDEPENDENT LEGAL AND/OR BUSINESS ADVICE AS IT DEEMS APPROPRIATE REGARDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.**

## C.    Classification

The Debtors are required under Code § 1122 to classify the Claims and Interests of its respective Creditors and Interest Holders into Classes that contain Claims and Interests that are substantially similar to the other Claims or Interests in such Class. The Plan can be confirmed so long as there is one consenting Class of Impaired Claims (not including the votes of insiders), and so long as the other requirements for Confirmation that do not involve voting are met.

## D.    Confirmation

The Bankruptcy Code requires the Court, after notice, to hold a Confirmation Hearing. At the Confirmation Hearing, the Court will confirm the Plan only if all the requirements of § 1129 of the Bankruptcy Code are met. Among the requirements for Confirmation of a plan are that the plan is (i) accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class; (ii) feasible; and (iii) in the "best interests" of rejecting Creditors and Interest Holders impaired under the Plan.

### 1.    Acceptance

Classes 3, 4, 6, 7, 8, 9, 10, 12, 13, and 14 and applicable sub-classes therein are Impaired under the Plan and, therefore, must accept the Plan in order for it to be Confirmed without application of the "fair and equitable" test. For Confirmation despite rejection by a Class, the Court must determine that the Plan is "fair and equitable" with respect to the rejecting Class.

The "fair and equitable" test is described below under the heading "Confirmation without Acceptance by All Impaired Classes."

### 2.    Feasibility

The Debtor must establish that confirmation of the Plan is not likely to be followed by the Reorganized Debtors' liquidation or the need for further financial reorganization unless the plan provides for such liquidation. The Debtors believe that the funds subscribed by the Acquirer as additional working capital in accordance with the Definitive Agreement, together with results of operations, and collection of membership dues constitute sufficient working capital to permit the Reorganized Debtors to fulfill their obligations under the Plan. Financial projections through 2014 are attached as Exhibit IV hereto. With respect to all remaining assets, the Liquidation Trusts provide for the liquidation of all the Estates' assets

that are unrelated to the ongoing operations. Based on the foregoing, the Debtors believe that the Plan is feasible and that the Bankruptcy Court will so find.

### 3. Best Interests Test

With respect to each Impaired Class, Confirmation of the Plan requires that each holder of an Allowed Claim or Allowed Interest in such Class either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if Debtors were liquidated under Chapter 7 of the Bankruptcy Code. Under the Debtors' liquidation analysis attached as Exhibit II hereto, the Debtors believe that the Bankruptcy Court will make that determination with respect to each Impaired Class.

### 4. Confirmation Without Acceptance By All Impaired Classes

The Bankruptcy Code provides that, so long as at least one Impaired Class of the applicable bankruptcy estate (other than insiders) accepts the Plan, that estate can seek Confirmation of the Plan despite the rejection by any other impaired class. To obtain such Confirmation, the Debtors must demonstrate to the Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these and any other dissenting Classes. The "unfair discrimination" test requires, among other things, that the Plan recognize the relative priorities among Creditors and Interest Holders.

The Bankruptcy Code establishes different "fair and equitable" tests for secured Creditors, unsecured Creditors and Interest Holders. The respective tests include the following requirements:

### a. Secured Creditors

Either (i) each Impaired Secured Creditor of the rejecting Class (a) retains its liens in the collateral securing such Creditor's Claim or in the proceeds thereof to the extent of the allowed amount of the Secured Claim and (b) receives deferred cash payments in at least the allowed amount of such Secured Claim with a present value at the Effective Date at least equal to such Creditor's interest in its collateral or in the proceeds thereof or (ii) the Plan provides each Impaired Secured Creditor with the "indubitable equivalent" of its Secured Claim.

### b. Unsecured Creditors

Either (i) each Impaired unsecured Creditor of the rejecting Class receives or retains under the Plan property of a value equal to the amount of its Allowed Claim or (ii) the Holders of Claims and Interests that are junior to the Claims of the dissenting Class do not receive or retain any property under the Plan.

### c. Interest Holders

Either (i) each Interest holder of the rejecting Class receives or retains under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption prices, if any, of the Interest it holds or (b) the value of such Interest or (ii) the Holders of Interests that are junior to such Interest do not receive or retain any property under the Plan.

The Debtors believe that the Plan can meet the applicable tests described above, even in the event that it is rejected by the Holders of one or more Classes of Claims and Interests.

The Bankruptcy Code provides for confirmation of a plan even if the plan is not accepted by all Impaired Classes as long as at least one Impaired Class of Claims has accepted it and the other non-voting requirements of a Confirmation are met. These "cramdown" provisions for confirmation of a plan, despite the nonacceptance of one or more Impaired Classes of Claims or Interests, are set forth in Bankruptcy Code § 1129(b).

## VII. MATTERS RELATING TO FEDERAL AND STATE SECURITIES LAWS

### A. No Registration of New Membership Interests

No registration statement will be filed under the Securities Act, nor will there be any registration or qualification under, any state securities laws with respect to the offer, issuance, sale or subsequent transfer of the New Membership Interests under the Plan. Recipients of securities issued under the Plan are advised to consult with their own counsel as to the availability of any exemption from registration under the Securities Act and from registration or qualification under state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

## VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain significant U.S. federal income tax consequences of the transactions that are described herein and in the Plan that affect Holders of Claims or Interests and the Debtors. This summary is based upon the Internal Revenue Code of 1986, as amended ("Tax Code"), the Treasury Department regulations promulgated there under ("Treasury Regulations"), judicial authority and current administrative rulings and practice now in effect. These authorities are all subject to change at any time by legislative, judicial or administrative action, and such change may be applied retroactively in a manner that could adversely affect Holders of Claims or Interests and the Debtors. The federal income tax consequences to any particular holder of a Claim or Interests may be affected by matters not discussed below. For example, neither the impact of the Plan on foreign Holders of Claims or Interests nor the impact under any state or local law is discussed herein. Further, this summary generally does not address the tax consequences to Claim Holders who may have acquired their Claims from the initial Holders nor does it address the tax considerations applicable to Claim Holders or Interest Holders that may be subject to special tax rules such as financial institutions, insurance companies, dealers in

securities or currencies, tax-exempt organizations or taxpayers subject to the alternative minimum tax.

The discussion below summarizes only certain of the federal income tax consequences associated with the Plan's implementation. This discussion does not attempt to comment on all aspects of the federal income tax consequences associated with the Plan, nor does it attempt to consider various facts or limitations applicable to any particular Holder of Claims or Equity Interests that may modify or alter the consequences described herein. A Holder of a Claim or Equity Interest may find that the tax consequences of the Plan to such Holder differ materially from the tax consequences discussed below because of such Holder's unique facts and circumstances. This discussion does not address state, local, or foreign tax consequences, or the consequences of any federal tax other than the federal income tax.

NO RULING WILL BE SOUGHT FROM THE INTERNAL REVENUE SERVICE ("IRS"), AND NO OPINION OF COUNSEL HAS BEEN OR WILL BE SOUGHT, WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN. THE DISCUSSION SET FORTH BELOW IS FOR GENERAL INFORMATION ONLY. THIS DESCRIPTION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. EACH CLAIM AND INTEREST HOLDER IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

\*       \*       \*

Any discussion of U.S. federal tax issues set forth in this Disclosure Statement is written in connection with the promotion and marketing by the Plan Proponents of the transactions described in this Disclosure Statement. Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties that may be imposed on such person. Each holder of a Claim or Equity Interest should seek advice based on its particular circumstances from an independent tax advisor.

## A.     Liquidating Trusts

The Trusts are intended to be liquidating trusts described under the Treasury Regulations. Consequently, the transfer of assets to the Trusts will be deemed for tax purposes to be a transfer to the creditors in satisfaction of their claims not otherwise provided for and to the Equity Interest Holders in liquidation of their remaining interests in the Debtors and a subsequent transfer by the Creditors and the Equity Interest Holders to the Trusts. Thereafter, the Trusts will be taxed as Grantor Trusts and any income and loss of the Trusts will be taxed to the Creditors and Equity Interest Holders.

\*       \*       \*

**B.      Tax Consequences To Creditors.**

**1.      Introduction**

As used herein, a "U.S. holder" means a beneficial owner of a Claim that is for U.S. federal income tax purposes any of the following: (i) an individual citizen or resident of the United States; (ii) a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust if it (a) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (b) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.  The term "non-U.S. holder" means a beneficial owner of a Claim (other than a partnership or any other entity treated as a partnership for U.S. federal income tax purposes) that is not a U.S. holder.

This summary does not represent a detailed description of the U.S. federal income tax consequences applicable to a creditor if such creditor is a person subject to special tax treatment under the U.S. federal income tax laws, including, without limitation: (i) a dealer in securities; (ii) a financial institution; (iii) a regulated investment company; (iv) a real estate investment trust; (v) a tax-exempt organization; (vi) an insurance company; (vii) a person holding the Reorganization Property (as hereinafter defined) as part of a hedging, integrated, conversion or constructive sale transaction or a straddle; (viii) a trader in securities that has elected the mark-to-market method of accounting for securities; (ix) a person liable for alternative minimum tax; (x) a partnership or other pass-through entity for U.S. federal income tax purposes; (xi) a U.S. holder whose "functional currency" is not the U.S. dollar; (xii) a controlled foreign corporation; (xiii) a passive foreign investment company; or (xiv) a U.S. expatriate.  If a partnership (including any entity classified as a partnership for U.S. federal income tax purposes) holds Reorganization Property, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If a creditor is a partnership or a partner in a partnership holding Reorganization Property, such creditor should consult its own tax advisors.

**2.      Class 1 - Allowed Prepetition Non-Tax Priority Debt**

Class 1 Claims consist of any prepetition priority debt.  The Class 1 ClaimHolders should realize income upon consummation of the Plan in an amount equal to the cash payments they receive. The character of any such income should be ordinary.

**3.      Class 2 - Allowed Prepetition Other Secured Claims**

Holders of Class 2 Claims will generally receive deferred payments of principal and interest on their existing obligations.  A holder of an Allowed Secured Claim receiving deferred cash payments should not recognize income, gain or loss on the repayment except as described below.  A Class 2 Claimholder who is a cash basis taxpayer should be treated as

recognizing ordinary income in an amount equal to cash received in excess of its basis in the claim. An accrual basis taxpayer should not recognize any income except to the extent that a bad debt loss had previously been claimed with respect to the Debtor's indebtedness and except to the extent of interest payments received in excess of accrued interest, which will constitute ordinary income. The recognized income with respect to the Claim should be ordinary to the extent that it arose in the ordinary course of trade or business for services rendered or from the sale of inventory to the Debtors. To the extent the payments represent a return of capital, neither gain nor loss would be recognized except to the extent the holder of the Claim had previously claimed a bad debt loss with respect to the indebtedness. Holders of Class 2 Claims to whom collateral is surrendered in satisfaction of the Claim generally will have taxable income or loss to the extent that their basis in the Claim differs from the fair market value of the collateral; however, if the Claim is for debt received in exchange for the sale of real estate collateral by the Holder to the Debtor, a Holder who reacquires the property in full or partial satisfaction of the debt will have no loss and will have income only to the extent that the amount of money and other property previously received exceeds the amount of taxable income previously reported in connection with the sale.

### 4.    Class 3 - Allowed First Lien Lender Claims

#### a.    Receipt of Cash Payments.

A holder of an Allowed First Lien Lender Claim receiving cash payments should not recognize income, gain or loss on the repayment except as described below. A Class 3 Claimholder who is a cash basis taxpayer should be treated as recognizing ordinary income in an amount equal to cash received in excess of its basis in the claim. An accrual basis taxpayer should not recognize any income except to the extent that a bad debt loss had previously been claimed with respect to the Debtors' indebtedness and except to the extent of interest payments received in excess of accrued interest, which will constitute ordinary income. To the extent the payments represent a return of capital, neither gain nor loss would be recognized except to the extent the holder of the Claim had previously claimed a bad debt loss with respect to the indebtedness.

#### b.    Receipt of new note from Reorganized Debtors

A holder of an Allowed First Lender Lien Claim receiving an interest in the new note should be treated as receiving a payment on the underlying Claim to the extent of the issue price of the new note. As a result, the holder of an Allowed First Lien Lender Claim should not recognize income, gain or loss in connection with the receipt of a share of the new note, except to the extent that the new note received is allocable to unpaid interest or to the extent that its issue price plus any other payment received exceeds the holder's basis in the Allowed First Lien Lender Claim. A holder of an Allowed Secured Claim should take a tax basis in the new note in an amount equal to the tax basis that such Holders' had in the portion of their secured debt exchanged therefore, less the cash and other property received plus any gain and additional interest income recognized on the exchange.

5.      **Class 4, 5 and 8 - Allowed General Unsecured Claims, Convenience Class Claims, and Lender Deficiency Claims**

Holders of Class 4, 5 and 8 Claims will receive cash payments either in a lump sum or over time from either the Reorganized Debtors or the Trustees. The fair market value of the portion of the property transferred to the Trustees that are deemed to have been transferred to the holder (the "Allocable Portion") will likely be treated as a payment received by the holder. A Class 4, 5 or 8 Claimholder who is a cash basis taxpayer should be treated as recognizing ordinary income in an amount equal to cash received and Allocable Portion in excess of its basis in the claim. An accrual basis taxpayer should not recognize any income except to the extent that a bad debt loss had previously been claimed with respect to the Debtors' indebtedness and except to the extent of interest payments received in excess of accrued interest, which will constitute ordinary income. To the extent the payments and deemed payments represent a return of capital, neither gain nor loss would be recognized except to the extent the holder of the Claim had previously claimed a bad debt loss with respect to the indebtedness. The recognized income with respect to the Claim should be ordinary to the extent that it arose in the ordinary course of trade or business for services rendered or from the sale of inventory to the Debtors.

6.      **Class 7 - Allowed Interests**

To the extent that payments are made to the owners of the Debtors, they should be taxed as additional payments for their ownership interests in the Debtors.

7.      **Class 9, 12, 13, and 14 – Rejected Membership Claims**

Unless the Holders of rejected membership claims elect to waive their claims arising on account of their existing memberships and agree to the terms of a new membership contract as provided in the Plan, they will receive cash payments over time from the Trustees. The fair market value of the portion of the property transferred to the Trustees that are deemed to have been transferred to the holder (the "Allocable Portion") will likely be treated as a payment received by the holder. A Class 9, 12, 13, or 14 Claimholder who does not receive a new contract should be treated as recognizing income in an amount equal to cash received and Allocable Portion in excess of its basis in the claim. Payments in excess of basis in the claim and allocable to interest that has not been accrued for tax purposes should be taxed as ordinary income. The character of any recognized income with respect to the Claim that is not characterized as interest will depend on the purpose and nature of their acquisition of the membership. The extent to which any such loss is deductible will depend on the purpose of their acquisition of the membership. If they elect to convert to and enter into a new membership contract, they would add any amounts paid to obtain that status to their tax basis in their membership.

8.      **Federal Income Tax Consequences to Debtors.**

The Debtors have taken the position that YC, YD, Big Sky and YCC, although organized as limited liability companies under state law, are taxed as partnerships for federal

income tax purposes, in which case they would not themselves be income-taxpaying entities, but instead would pass through to their members all items of income, gain, loss, deduction, and credit for federal income tax purposes.

Under federal income tax law, a limited liability company owned by a single member generally is disregarded as an entity. All assets and liabilities of the limited liability company are treated as if they were directly held by, and obligations of, the single member of the limited liability company. The Plan generally requires the Reorganized Debtors to issue all their New Membership Interests to Acquirer (and to cancel all pre-existing Equity Interests) (the "Restructuring"). Following the Restructuring, YC, YD, and Big Sky will all be single member LLCs. Under the rule described above and as stated by the Debtors, their existence will be disregarded for federal income tax purposes, and Acquirer will be treated as directly owning the assets of YC, YD, and Big Sky.

The Plan transactions which for tax purposes may be viewed as the transfer of certain of the Debtors' assets to Acquirer with the balance being transferred to the Liquidation Trusts would be treated as a sale or exchange of such assets, and thus may require Debtors YC, YD, and Big Sky to recognize gain or loss measured by the difference between the amount realized with respect to such assets on the date of the transfer and the adjusted tax basis of such assets on the date of transfer in the hands of YC, YD, and Big Sky. Any such recognized income, gain, or loss will pass through to the Current Equity Owners. The indebtedness to which the Debtors are subject with respect to their assets is being restructured in connection Acquirer's acquisition and for federal tax purposes the modifications and cancellation of any Claims are treated as taking place prior to Acquirer's purchase, consistent with Treas. Reg. §1.1274-5(b)(1).

The amount realized by YC, YD, and Big Sky on the deemed sales of assets transferred to Acquirer and to the Liquidation Trusts may depend upon whether the creditors' Claims are recourse or nonrecourse to the Debtors for purposes of IRC section 1001. If the Claims are recourse, the amount realized will be deemed to be the fair market value of transferred assets. If the Claims are nonrecourse, the amount realized will be deemed to be the amount of indebtedness represented by the Claims, determined according to federal income tax rules. The Debtors have taken no position at this time with respect to whether the Claims are recourse or nonrecourse for purposes of IRC section 1001.

If the Claims are recourse, and if the fair market value so determined, less liabilities assumed or taken subject to, is less than the amount of creditors' Allowed Claims treated as indebtedness for federal income tax purposes, the Debtors may experience cancellation of indebtedness income to the extent of the shortfall. Any such cancellation of indebtedness income will pass through to the Current Equity Owners. The Debtors may also recognize cancellation of indebtedness income to the extent that general unsecured claims are not paid in full under the Plan. In the event that any action taken pursuant to the Plan results in the discharge of indebtedness of any of the Debtors, such discharge will be treated as having occurred prior to the acquisition by the Acquirer of the equity of the Debtors and any resulting COD income to the Debtors from such discharge will be allocable solely to the

members of the Debtors (the Current Equity Owners) immediately prior to the cancellation of such members' equity interest pursuant to the Plan.

Generally, a taxpayer recognizes cancellation of indebtedness ("COD") income upon satisfaction of its outstanding indebtedness for less than its adjusted issue price. The amount of COD income is, in general, the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the issue price of any new indebtedness issued by the taxpayer, the amount of cash and the fair market value of any other consideration (including stock of the taxpayer) given in exchange for the indebtedness satisfied.

However, COD income is not included in gross income to a debtor if the discharge occurs in a Title 11 case or the discharge occurs when the debtor is insolvent. Although the IRC provides in section 108 for exclusion of cancellation or discharge of indebtedness in bankruptcy from gross income, such rules apply at the partner, rather than the partnership level. Consequently, Debtors YC, YD and Big Sky will not be entitled to exclude debt cancellation or discharge from income, but instead are required to pass such cancellation or discharge of indebtedness income through to their members and the extent to which that income might be excluded will be determined by the particular tax attributes of each member.

The Debtors will not owe any federal income tax by reason of Plan transactions. However, Debtors YC, YD and Big Sky will be required to prepare and file federal partnership income tax returns reporting such transactions.

### 9.     Tax Consequences to Equity Interest Holders.

#### a.     General

Equity Interest Holders will receive their distributive share of items of income (including any cancellation of debt income), gain, loss, deduction, and credit from YC, YD, Big Sky, and YCC for the 2009 tax year. Such items will affect the basis of Equity Interest Holders in their membership interests in YC, YD, Big Sky, and YCC. Although Equity Interest Holders may receive no cash distributions under the Plan (and in fact may be required under the Plan to contribute money to the Debtors), they may be deemed for federal partnership income tax purposes to have received a constructive distribution from Debtors pursuant to IRC section 752, relating to a net decrease in a share of liabilities of the Debtors. Such constructive distributions may reduce the amount of any loss and substantially increase the amount of any gain recognized by Equity Interest Holders upon the cancellation of their Equity Interests under the Plan.

### C.     Withholding and Reporting

The Reorganized Debtors and the Trustees will withhold all amounts required by law to be withheld and will comply with all applicable reporting requirements of the Tax Code. Under the Tax Code, interest, dividends and other "reportable payments" may under certain circumstances be subject to "backup withholding" at a rate equal to the fourth lowest rate of

tax under Section 1(c) of the Tax Code. Backup withholding generally applies if the Holder (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and the Holder is not subject to backup withholding. Your ballot contains a place to indicate your TIN.

**AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT PERSON.**

## IX. CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS

### A.   Business Risks

We are exposed to various risks and uncertainties in the normal course of our business that can cause significant variation in our results of operations and affect our financial condition. Some of these risks and uncertainties are discussed below. Additional risks and uncertainties not described below or not currently known to us could affect our businesses. It is impossible to predict whether any risk will occur, or, if it does, what its ultimate consequences might be; hence the results achieved by our business could be materially different than we currently project.

#### 1.   Economic Downturn

Skiing, and golf and vacation home purchases are discretionary recreational activities with relatively high participation costs. A severe economic downturn, as we are currently experiencing, could meaningfully reduce spending on recreational activities and second home purchases, which will result in declines in sales to new members and a reduction in the number of member visits and resort revenue. In addition, a deterioration of economic conditions could weaken the likely sales values of the resort real estate. Both slower sales and lower prices reduce the value of our real estate assets. The depth and length of the current economic contraction are unknown and whether there will be one or more additional contractions during the extended period of anticipated operations by the Reorganized Debtors is unknown.

#### 2.   Capital Expenditures

The ability to sell more than the existing platted and improved 37 lots (and two lodge units) depends upon making extensive capital improvements, including substantial grading,

construction of road, water, electricity, natural gas and sewer systems, additional ski runs and lifts, the golf course club house, and many other improvements. In addition, our competitive position depends, in part, on our ability to maintain and improve the quality of our resort operations and facilities, which requires significant capital expenditures. In addition, we require significant capital expenditures to carry out our development activities. Adequate funds may not be available to make all planned or required capital expenditures and, if they are available, there is no assurance that they will lead to improved results. Also the actual costs of such improvements are currently unknown and unexpected developments and cost overruns even after such projects have been bid and commenced are possible.

### 3.   World Events

World events, such as international conflicts, terrorism or contagious illness outbreaks, may disrupt domestic or international travel patterns, which could reduce revenue in our resort operations and negatively impact our sales efforts.

### 4.   Unfavorable Weather Conditions

Our ability to attract members and prospects to our mountain resort is influenced by weather conditions and the amount of snowfall during the ski season. Prolonged periods of adverse weather conditions, or the occurrence of such conditions during peak visitation periods, could have a material adverse effect on our operating results.

### 5.   Seasonality of Operations

Resort operations are highly seasonal. Approximately 90% of our resort operations revenue and costs are generated during the period from December to April, the prime ski season. Furthermore, during this period a significant portion of revenue is generated on certain holidays, particularly Christmas/New Year, Presidents' Day and school spring breaks, and on weekends. Our real estate operations tend to be somewhat seasonal as well, with construction primarily taking place during the summer and the majority of sales closing in the December to June period. Also, due to severe weather and cold temperatures, there is a very limited building window each year (potentially as short as five months), which increases costs and risks that markets will have changed by the time construction of a particular project or product has finished.

### B.   Risks Specific to Real Estate Development and this project in particular

As a real estate developer we are exposed to several industry-specific risks, including: an inability to obtain zoning approvals or building permits; construction and other development costs could exceed our budgets; project completion could be delayed; and purchasers could rescind their purchase contracts. In addition there is no assurance that market conditions will support our planned real estate development activities.

Yellowstone Club has some specific additional risks, which include but are not limited to the following:

71

- Of the competitive skiing and/or golf resort development properties in the United States, this is among, or is, the most expensive in terms of average lot price. This means there is less empirical comparative data on which to evaluate this project and means it can sell to a shallower market than other less expensive properties

- The land constituting the Yellowstone Club is very severe terrain. This results in very reduced developable areas and substantially increases the costs of such development.

- Geotechnical, percolation, environmental and many other necessary engineering studies have not been performed throughout the property. Consequently, the actual development capacity and the cost to effect such development is not know with certainty.

- There are only 37 platted, unsold lots. The development agreement with Madison County permits a total of 388 additional "housing units" for this planning area. There is no assurance that the remaining lots permitted by the development agreement can physically be sited on the property given all physical and planning constraints, that the placement required by such constraints would permit the economic siting and development of that number of lots, or whether the currently contemplated mix of single family and multifamily suitable lots can be physically effected. Furthermore, the platting of additional lots will require further engineering studies which might reveal presently unknown conditions and the County can and will establish conditions to the recordation of such plats, many of which will affect development costs and feasibility.

- The development area for which the County has agreed to allow 388 additional platted lots contains at least one 160 acre parcel of land owned by persons other than the Debtors. It is uncertain what the effect on the development capacity of the land owned by the Debtors would be if such other persons apply for and record a subdivision plat on their land.

## C.    Competition

Yellowstone Club competes on a national if not international basis for prospective purchasers of luxury resort residences. We believe it is the only, or one of just a few, truly private access first-class developed ski mountains in the United States. As a result, it competes to a certain extent against luxury second home resort communities throughout the United States and, in some respects, has very few direct competitors. The following describes the ski mountains in the immediate vicinity of Yellowstone Club (note, all of these mountains are open to the public, unlike Yellowstone Club):

The Spanish Peaks Resort Area Master Planned Unit Development is located at a secondary base off the Big Sky Ski Resort and adjacent to the 13,775-acre Yellowstone Club. It includes ski terrain and chair lifts utilized by Big Sky Ski Resort. The Spanish Peaks master planned unit development is located midway between Meadow Village on Highway 64 and Pioneer Mountain, which is located within the Yellowstone Club.

The Big Sky Resort, developed by newscaster Chet Huntley and other major corporate investors, opened in 1973 on the site of the old Crail Ranch, and was sold in 1976. The size of the entire resort was approximately 8,700 acres at that time. The Resort is presently operated by Boyne U.S.A. who purchased it in 1976. It is now considered the premier, public ski resort in Montana. The Big Sky Resort is adjacent to Yellowstone Club on the northern boundary and there is a ski run which provides access from Yellowstone Club to the Big Sky ski area and a return run (on which Yellowstone Club maintains a guard station) back to the Yellowstone Club AndesiteAnthracite Mountain ski area.

Moonlight Basin Ranch, on the north side of Lone Mountain and Big Sky, consists of 25,000 acres of privately owned land adjoining the Big Sky ski area. It comprises a destination ski resort, townhomes, condominiums, homesites, cabins and large ranch parcels. Skiing at Moonlight Basin offers 80 mapped trails, chutes, and glades on over 1,900 skiable acres with a vertical drop of 4,150 feet. The ski area is served by six lifts, including Montana's only high-speed, six-passenger chair. Moonlight recently received approvals for 695 developable units on 4,600 acres of master-planned, ski accessible land surrounding its Jack Nicklaus golf course now under construction. This is in addition to approximately 250 remaining development units in itstheir existing development. Moonlight also is in the midst of selling about 20 160- acre ranchettes at the base of the Spanish Peaks.

- Selected Other Luxury Single Family Second Home Resort Developments in the Northern Inter-Mountain Region with a Significant Number of Available Lots or Homes

Gozzer Ranch Golf and Lake Club is- located 25 miles (by car) from Coeur d'Alene, Idaho. This is a private golf course community with lakefront amenities. Amenities include club house, fitness center, pool, tennis courts, and ice rink.

Club at Black Rock  is-  located 14 miles south of Coeur d'Alene, Idaho. This is a private golf course community with a Jim Engh-designed golf course.  Amenities include a 30,000 SF clubhouse, lake and mountain views, marina, pool, spa, tennis, fitness and equestrian facilities.

Promontory Club is located in– Park City Utah has sold approximately 900 lots and has an approximately 900 more lots to sell.  It includes a Pete Dye and a Jack Nicklaus golf course and contemplates the future construction of  initially up to three additional golf courses.  It also contains or has planned along with 40 miles of scenic trails, an equestrian center, tennis courts, pools, cabins, lodges, club houses and fitness centers and other activities and amenities. Skiing is available at nearby Deer Valley ski area. 5,000 acres of open space. Project is currently in bankruptcy.

Tamarack Resort is  - located 90 miles north of Boise near Lake Donnelly, Idaho.  It is a semi-private development situated on (3,608 acres) (semi-private). This development includes a ski resort, Robert Trent Jones II golf course, water activities on the lake, cross-country skiing, clubhouse/lodge, tennis courts, pool, and spa. Sports membership included

with real estate. On information and belief, this Pproject is currently in loan default and a
receiver is operating it.

**D.      Forward-looking Statements in This Disclosure Statement May Prove to Be
Inaccurate**

Many of the statements included in this Disclosure Statement contain forward-looking
statements and information relating to the Debtors and Reorganized Debtors. These forward-
looking statements are generally identified by the use of terminology such as "may," "will,"
"could," "should," "potential," "continue," "expect," "intend," "plan," "estimate," "project,"
"forecast," "anticipate," "believe," or similar phrases or the negatives of such terms. These
statements are based on the beliefs of management as well as assumptions made using
information currently available to management. Such statements are subject to risks,
uncertainties and assumptions, including those identified in the foregoing "Risk Factors," as
well as other matters not yet known or not currently considered material by management.
Should one or more of these risks or uncertainties materialize, or should underlying
assumptions prove incorrect, actual results may vary materially from those anticipated,
estimated or projected. Given these risks and uncertainties, you are cautioned not to place
undue reliance on such forward-looking statements. Forward-looking statements do not
guarantee future performance. You should recognize these statements for what they are
and not rely on them as facts. Neither the Debtors nor the Reorganized Debtors nor the
Acquirer undertake any obligation to update or revise any of these forward-looking
statements to reflect new events or circumstances after the date of this Disclosure
Statement.

**E.      Credit Suisse Possible Administrative Claim**

As set forth above, Credit Suisse has asserted that it might have an Administrative
Expense Claim under the provision of § 507(b) of the Bankruptcy Code. If that Claim is
ultimately Allowed in an amount that exceeds the available cash being received by the
Debtors under the Definitive Agreement or an alternative Definitive Agreement, the
Confirmation may not occur.

**F.      Credit Suisse Confirmation Objections**

In connection with the approval of this Disclosure Statement Credit Suisse raised
several objections to the confirmation of the Plan. Their counsel has advised the Debtors that
Credit Suisse presently intends to vigorously oppose the Confirmation. The Court did not
rule on these objections at the time of the hearing on the Disclosure Statement. The Debtors
do not believe that any of the objections represent an accurate view of the application of
applicable law to the facts of this case and that none of the objections will be sustained by the
Court at the Confirmation hearing. According to the pleadings they filed these objections
include the following.

1.     **Plan Violates Terms Of Prior Order.**

Credit Suisse alleges that the proposed Plan provides for subordination of the Prepetition Lenders' Deficiency Claim and treats the Claims as disputed claims and liens for purposes of their Plan, and to extinguish them with the Plan.  Credit Suisse alleges that the Plan therefore violates fundamental terms of the Interim Order Authorizing Debtors To Obtain Postpetition Financing [Dkt. No. 40] (the "Order") whereby the Debtors explicitly waived their rights to propose a plan with those terms and that the Debtors' should be estopped from taking positions and advancing a Plan and Disclosure Statement where that violates the Order.

2.     **The Plan Fails to Contain Adequate Means for Implementation.**

Credit Suisse alleges that the Plan fails to satisfy Code section 1123(a)(5), because: (i) the Plan seeks to satisfy and extinguish the Prepetition Lenders' liens on Project Assets purportedly in accordance with Code section 1123(a)(5)(E) without a proper legal determination of lien validity pursuant to an adversary proceeding; (ii) the feasibility of the Plan depends upon the success of inchoate litigation against the Prepetition Lenders and their claims and liens; and (iii) the confirmability of the Plan depends upon whether the Prepetition Lenders' exercise their Code section 1111(b) election.

3.     **Prohibited Non-Debtor Releases.**

Credit Suisse asserts that the Plan provides for unlawful releases of "insiders" (including without limitation, Edra Blixseth, her affiliates, BLX Group, Inc., and CrossHarbor Capital Partners and its affiliates) through purported "exculpation and limitation of liability" terms (Plan § 8.4) and also through purported "no recourse" terms (Plan § 7.75). It also asserts that under Code section 524(e) prevents court from using equitable powers to permanently release third-party claims.

4.     **Not "Fair and Equitable"**

Credit Suisse asserts that the Plan fails to provide "fair and equitable" treatment of the Prepetition Lenders' claims within the meaning of Code sections 1129(b)(2), because the Plan (i) proposes to extinguish the Prepetition Lenders' liens (rather than providing that the Prepetition Lenders will "retain the liens securing" their claims), and fails to provide that the Prepetition Lenders' deferred cash payments with a present value at least equal to the value of the Prepetition Lenders' liens in their prepetition collateral totaling at least the allowed amount of their claim; (ii) fails to provide the Prepetition Lenders the "indubitable equivalent" of their secured claims; and (iii) violates the absolute priority rule by making a distribution to Equity Interests without making payment in full on account of the Prepetition Lenders' deficiency claim.    It also asserts that the bankruptcy court will be prohibited from confirming a plan that fails to provide "fair and equitable" treatment by allowing Holders of the debtor's equity to receive or retain property under the plan without paying all senior objecting creditors in full.

### 5.    Impermissible Classification Scheme/Gerrymandering.

Credit Suisse asserts that the Plan unlawfully proposes to classify Prepetition Lender deficiency claims as a class separate from general unsecured claims in an effort to obtain an impaired consenting class.  (Plan §§ 3.4, 3.8).  It asserts that the Plan also classifies the General Unsecured Claims separately from four separate classes of claims of Holders of member rejection damages claims, creating artificial legal distinctions between and among such claims in order to obtain an impaired consenting class in violation of Ninth Circuit law

### 6.    Unfair Discrimination.

Credit Suisse asserts that the Plan discriminates unfairly in violation of Code section 1129(b)(1), because it effectively pays many unsecured creditors in full (Plan §§ 3.5, 3.8, 6.17) while providing disparate treatment to unsecured Prepetition Lender deficiency claims through potentially giving the Prepetition Lenders only a fractional recovery on their deficiency claims.

### 7.    Improper Classification And Treatment of Convenience Class Claims.

Credit Suisse asserts that although Code section 1122(b) permits a convenience class of claims in an amount that is reasonable and necessary for administrative convenience, the Plan proposes a convenience class of claims allowed in the amount of $5,000 or less (or voluntarily reduced to such an amount).  According to Credit Suisse, such amount goes beyond what is reasonable and necessary for administrative convenience.

### 8.    Violates "Best Interests of Creditors" Test.

Credit Suisse asserts that the Plan violates Code section 1129(a)(7)(A)(ii) because it will not provide the Prepetition Lenders with at least as much as they would receive in a chapter 7 liquidation.

## X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not Confirmed or consummated, the alternatives include, in addition to dismissal of the Case, (i) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code or (ii) an alternative Chapter 11 plan.

### A.    Liquidation Under Chapter 7

If no plan can be Confirmed or the Court determines other cause exists for conversion, the Chapter 11 Cases may be converted to Cases under Chapter 7 of the Bankruptcy Code. In Chapter 7, a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to Creditors in accordance with priorities established by the Bankruptcy Code.  Under the Debtors' liquidation analysis attached as Exhibit II hereto, the projected payout for Debtors' unsecured Creditors in a Chapter 7 case and for the

deficiency claim of the First Lien Lenders is far less than 7 percent, which is substantially less than the recoveries under the Plan. The Debtors believe that the primary factors driving that result are: (a) the fact that Debtors' assets would be valued at liquidation as opposed to going-concern values; (b) depressed asset values associated with a Chapter 7 disposition of assets; (c) additional administrative expenses involved in the appointment of a trustee, attorneys and other Professionals to assist such trustee and their need to extensively study this Case in order to fulfill their fiduciary duties; (d) delays while a Chapter 7 trustee employs professionals to analyze issues and research the background of Debtors, their assets and liabilities and the recovery analysis, (e) the substantial increase in the amount of claims against the Debtors if YMC does not continue to operate and assume the ongoing obligations to existing members, and (f) the lack of any source to fund the annual negative cash flow for the operation of the Club during the pendency of the chapter 7 proceedings. Indeed, Debtors' liquidation analysis concludes that little or no distributions would be made to Creditors with Unsecured Claims under a Chapter 7 liquidation except those associated with the Avoidance Claims, which under the Plan are being pursued by the Trustees.

## B.   Alternative Plan(s) of Reorganization

If the Debtors' exclusive period to file a plan of reorganization and solicit acceptances of a plan of reorganization has expired pursuant to § 1121 of the Bankruptcy Code, other parties could propose their own plans of reorganization for the Debtors. The Debtors' current exclusive right to file a plan of reorganization continues through March 10, 2009 and their current exclusive right to solicit Ballots continues through May 9, 2009, without prejudice to its right to seek a further extension of its rights to solicit acceptance of the Plan and without prejudice to any party's rights to seek to shorten the exclusivity periods. The Debtors DIP Financing agreement, however, requires that if a Plan is not confirmed by April 30, 2009, that it will move for approval of a sale of its assets under § 363 of the Bankruptcy Code. In light of the existing economic climate and other factors, the Debtors believe that such a sale would not result in any significant increase in the amount of funds available for creditors, and, because of the litigious stance of Credit Suisse that the process may not result in any sale at all. If such a sale is not approved, then the DIP Lenders have the right to relief from the automatic stay, for the purpose of commencing a foreclosure which would further depress the value of the property.

The Debtors believe that Confirmation and implementation of the Plan is preferable to either of the above-described alternatives and recommends that all Creditors vote in favor of the Plan.

## XI.   <u>VOTING INSTRUCTIONS</u>

## A.   Classes Entitled to Vote

Classes 3, 4, 6, 7, 8, 9, 10, 12, 13 and 14 are Impaired and may receive or retain property pursuant to the Plan; therefore, all Persons holding Claims or Interests in those

Classes are entitled to vote to accept or reject the Plan provided that either: (i) the Claim has been scheduled by the Debtors and such Claim is not scheduled as disputed, contingent or unliquidated, as set forth in the Debtors' most current schedules; or (ii) the claimant has timely filed a proof of Claim and the Debtors have not filed an objection to such Claim. **IF THE DEBTORS HAVE FILED AN OBJECTION TO A CLAIM, THEN THE HOLDER OF SUCH CLAIM MAY NOT VOTE ON THE PLAN UNLESS THE CLAIMANT HAS OBTAINED AN ORDER FROM THE COURT UPON NOTICE AND HEARING ALLOWING SUCH CLAIM FOR VOTING PURPOSES.**

**B.     Classes Not Entitled to Vote**

Classes 1, 2, 5 and 11 and all sub-classes thereto are Unimpaired under the Plan and, therefore, are conclusively presumed to accept the Plan under Code § 1126.

**C.     Ballots**

Separate Ballots are used for each Class of Claims or Interests. Creditors or InterestHolders may need to file more than one ballot and should take care to use the proper address on any envelope to ensure that Ballots are returned to the proper address.

**D.     Voting Multiple Claims and Interests**

ANY PERSON WHO HOLDS CLAIMS OR INTERESTS IN MORE THAN ONE CLASS AND/OR SUBCLASS (WHICH INCLUDES A CLAIM AGAINST MORE THAN ONE DEBTOR) IS REQUIRED TO VOTE SEPARATELY WITH RESPECT TO EACH CLASS AND/OR SUBCLASS IN WHICH SUCH PERSON HOLDS CLAIMS OR INTERESTS. PLEASE USE A SEPARATE BALLOT OR THE APPROPRIATE FORM TO VOTE EACH SUCH CLASS OF CLAIM OR INTEREST. IF, HOWEVER, A CREDITOR CASTS MORE THAN ONE BALLOT VOTING THE SAME CLAIM OR INTEREST PRIOR TO THE VOTING DEADLINE, ONLY THE LAST BALLOT RECEIVED SHALL BE COUNTED.

**E.     Incomplete Ballots**

ANY BALLOT RECEIVED WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN.

**F.     Expiration Date**

THE SOLICITATION PURSUANT TO THIS DISCLOSURE STATEMENT WILL EXPIRE ON _____, 2009. TO BE COUNTED, YOUR BALLOTS MUST BE ACTUALLY PHYSICALLY RECEIVED BY 4:00 P.M. MOUNTAIN TIME ON _____ _____, 2009. THE DEBTORS RESERVE THE RIGHT TO EXTEND THIS SOLICITATION FOR SUCH PERIOD OR PERIODS AS THEY MAY DETERMINE UPON APPROVAL BY THE COURT. THE DEBTORS WILL PROVIDE SUCH NOTICE

AS REQUIRED BY APPLICABLE LAW AND/OR AN ORDER OF THE COURT IN THE
EVENT OF SUCH EXTENSION.

## XII. CONCLUSION

The Debtors believe that acceptance of the Plan is in the best interest of each and
every Class of Creditors and InterestHolders and recommends that you vote to accept the
Plan.

[Signatures appear on the following pages]

**YELLOWSTONE MOUNTAIN CLUB, L.L.C.,** a
Montana liability company

By:     Blixseth Investment Group, LLC, as Managing
Member

By: _____
        Name:  Edra Blixseth  *Edra Blixseth*
        Title:  Managing Member

**YELLOWSTONE DEVELOPMENT, L.L.C.,** a
Montana limited liability company

By:     Blixseth Investment Group, LLC, as Managing
Member

By: _____
        Name:  Edra Blixseth  *Edra Blixseth*
        Title:  Managing Member

**BIG SKY RIDGE, L.L.C.,** a Montana limited liability
company

By:     Blixseth Investment Group, LLC, as Managing
Member

By: _____
        Name:  Edra Blixseth  *Edra Blixseth*
        Title:  Managing Member

**YELLOWSTONE CLUB CONSTRUCTION
COMPANY, L.L.C.,** a Montana limited liability
company

By:     Blixseth Investment Group, LLC, as Managing
Member

By: _____
        Name:  Edra Blixseth  *Edra Blixseth*

80

/s/JA Patten

James A. Patten (1191)
**PATTEN, PETERMAN, BEKKEDAHL &**
**GREEN, PLLC**
2817 2nd Avenue North, Suite 300
Billings, MT 59101
Phone: (406) 252-8500
Fax: (406) 294-9500
E-mail: japatten@ppbglaw.com


Lawrence R. Ream, WSBA #18159
Richard G. Birinyi, WSBA #9212
**Bullivant Houser Bailey PC**
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Phone: (206) 292-8930
Fax: (206) 386-5130
Email: larry.ream@bullivant.com
Email rick.birinyi@bullivant.com

Reorganization Counsel for Debtors and Debtors in
Possession