IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

_____

|                                    | )                          |
| In Re:                             | ) Case No. 08-61570-RBK    |
|                                    | )                          |
| Yellowstone Mountain Club, LLC,    | )                          |
|                                    | )                          |
|            Debtor.                 | )                          |
| _____ | )                          |

(Full caption on next page)

THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

November 12, 2008

Transcript Services:

Proceedings recorded by electronic recording;
transcript produced by reporting service.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

_____

|   |   |   |
|---|---|---|
| In Re: | ) | |
| | ) | |
| Yellowstone Mountain Club, LLC, | ) | Case No. 08-61570-11 |
| | ) | |
| Debtor, | ) | |
| | ) | |
| Yellowstone Development, LLC, | ) | Case No. 08-61571-11 |
| | ) | |
| Debtor, | ) | |
| | ) | |
| Big Sky Ridge, LLC, | ) | Case No. 08-61572-11 |
| | ) | |
| Debtor, | ) | |
| | ) | |
| Yellowstone Club Construction Company, LLC, | ) | Case No. 08-61573-11 |
| | ) | |
| | ) | |
| Debtor. | ) | |

_____ )

```
 1                          APPEARANCES
 2
 3      FOR THE DEBTOR:
 4           JAMES A. PATTEN
 5           Attorney at Law
 6           Suite 300, The Fratt Building
 7           2817 Second Avenue North
 8           Billings, MT  59101
 9
10      FOR THE OFFICE OF THE U.S. TRUSTEE:
11           DANIEL P. McKAY
12           Trustee
13           U.S. Trustee's Office
14           Liberty Center, Suite 204
15           301 Central Avenue
16           Great Falls, MT  59401
17
18      FOR CREDIT SUISSE:
19           MARK S. CHEHI
20           Attorney at Law
21           Skadden, Arps, Slate,
22             Meagher & Flom
23           One Rodney Square, Seventh Floor
24           Wilmington, DE  19801
25
```

```
 1                    APPEARANCES (continued)

 2


 3        FOR CREDIT SUISSE:

 4              EVAN R. LEVY

 5              Attorney at Law

 6              Skadden, Arps, Slate,

 7                 Meagher & Flom

 8              Four Times Square

 9              New York, NY  10036-6652

10

11              CHARLES W. HINGLE

12              Attorney at Law

13              Holland & Hart

14              401 North 31st Street, Suite 1500

15              Billings, MT  59101

16

17        FOR THE AD HOC COMMITTEE OF YELLOWSTONE

18        CLUB MEMBERS:

19              JOHN H. GRANT

20              Attorney at Law

21              Jackson, Murdo & Grant, PC

22              203 North Ewing

23              Helena, MT  59601

24

25
```

```
 1                   APPEARANCES (continued)

 2


 3      FOR THE AD HOC COMMITTEE OF YELLOWSTONE

 4      CLUB MEMBERS:

 5           JONATHAN B. ALTER

 6           JASKA P. MIETTINEN

 7           Attorneys at Law

 8           Bingham McCutchen, LLP

 9           One State Street

10           Hartford, CT  06103

11


12      FOR MICHAL SNOW:

13           MATTHEW J. CUFFE

14           Attorney at Law

15           Worden Thane, PC

16           P.O. Box 4747

17           Missoula, MT  59806

18


19           CLARK T. WHITMORE

20           Attorney at Law

21           Maslon Edelman Borman & Brand, LLP

22           3300 Wells Fargo Center

23           90 South Seventh Street

24           Minneapolis, MN  55402-4140

25
```

```
 1                   APPEARANCES (continued)

 2


 3        FOR THE MONTANA DEPARTMENT OF REVENUE:

 4             TERESA GRACE WHITNEY

 5             JOEL E. SILVERMAN

 6             Attorneys at Law

 7             Montana Department of Revenue

 8             P.O. Box 7701

 9             Helena, MT  59604-7701

10


11        FOR THE MONTANA DEPARTMENT OF REVENUE:

12             LYNN HAMILTON BUTLER

13             Attorney at Law

14             Brown McCarroll, LLP

15             111 Congress Avenue, Suite 1400

16             Austin, TX 78701

17


18        FOR NORMANDY HILL CAPITAL, LP:

19             QUENTIN M. RHOADES

20             Attorney at Law

21             Sullivan, Tabaracci & Rhoades

22             1821 South Avenue West, Third Floor

23             Missoula, MT  59801

24

25
```

```
 1                    APPEARANCES (continued)

 2

 3      FOR PRIM VINTAGE DEVELOPMENT, LP:

 4           DEAN A. STENSLAND

 5           Attorney at Law

 6           Boone Karlberg, PC

 7           P.O. Box 9199

 8           Missoula, MT  59807

 9

10      FOR GARLINGTON, LOHN & ROBINSON, PLLP:

11           STEPHEN R. BROWN

12           Attorney at Law

13           Garlington, Lohn & Robinson, PLLP

14           P.O. Box 7909

15           Missoula, MT  59807-7909

16

17      FOR CIP SUNRISE RIDGE OWNER, LLC:

18           BENJAMIN P. HURSH

19           Attorney at Law

20           Crowley, Haughey, Hanson,

21             Toole & Dietrich, PLLP

22           P.O. Box 7099

23           Missoula, MT  59807

24

25
```

```
1                    APPEARANCES (continued)

2


3       FOR THE MONTANA DEPARTMENT OF LABOR AND INDUSTRY:

4            MARK CADWALLADER

5            Staff Attorney

6            Montana Department of Labor and Industry

7            P.O. Box 1728

8            Helena, MT  59624-1728

9


10      FOR EDRA BLIXSETH:

11           JOSEPH A. EISENBERG

12           Attorney at Law

13           Jeffer, Mangels, Butler & Marmaro, LLP

14           1900 Avenue of the Stars, Seventh Floor

15           Los Angeles, CA  90067

16


17      FOR TIMOTHY BLIXSETH:

18           JOEL E. GUTHALS

19           Attorney at Law

20           Guthals, Hunnes & Ruess, PC

21           P.O. Box 1977

22           Billings, MT  59103

23


24


25
```

1                      I N D E X

2    WITNESS:                                    PAGE:

3    EDRA BLIXSETH:

4         Direct Examination by Mr. Patten   .   .   .   .   .   19

5         Cross-Examination by Mr. Chehi      .   .   .   .   .   44

6         Cross-Examination by Mr. Alter      .   .   .   .   .   51

7         Cross-Examination by Unidentified Speaker   .   .   63

8         Cross-Examination by Mr. Butler     .   .   .   .   .   66

9         Cross-Examination by Mr. Cuffe      .   .   .   .   .   69

10        Redirect Examination by Mr. Patten  .   .   .   .   .   70

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              YELLOWSTONE MOUNTAIN CLUB BANKRUPTCY

2                      MISSOULA, MONTANA

3                          - - -

4        BE IT REMEMBERED THAT this matter came on for hearing

5     on November 12, 2008, in the United States Bankruptcy

6     Court, District of Montana, The Hon. Ralph B. Kirscher,

7     presiding:

8

9     The following proceedings were had:

10

11             THE COURT:  Good afternoon.  Please be seated.

12    Let's go ahead.

13             Mr. Patten, I'm not sure, regarding the four

14    entities, if we want to just refer to all -- well, let me

15    just refer to all four of them at this point before we

16    consider, either today or later, your motion to

17    consolidate.

18             MR. PATTEN:  Okay.

19             THE COURT:  Scheduled for today at this time, In

20    Re:  Yellowstone Club, LLC, 08-61570; Yellowstone

21    Development, LLC, 08-61571; Blue Sky Ridge, LLC, 08-61572;

22    Yellowstone Club Construction Company, LLC, 08-61573.

23             Two matters have been scheduled in each case:

24    Motion for joint administration as well as motion

25    authorizing Debtors to obtain postpetition financing,

```
 1    authorizing Debtors to utilize cash collateral -
 2    (inaudible) - adequate protection to prepetition secured
 3    lenders, scheduling interim and final hearings filed by
 4    Debtor.
 5           There are objections that have been filed as to
 6    the motion authorizing Debtors to obtain postpetition
 7    financing.  I did not see, but may have missed it, any
 8    objections to the motions for joint administration.
 9           Mr. Patten.
10           MR. PATTEN:  Your Honor, first as a point of
11    clarification, there is some typos in some of the filings.
12    It's Big Sky Ridge and not Blue Sky Ridge.
13           THE COURT:  Okay, okay.
14           MR. PATTEN:  Your Honor, I'm not aware of any
15    objections to the joint administration.
16           THE COURT:  Okay.  There is time for response,
17    still, on that --
18           MR. PATTEN:  Okay.
19           THE COURT:  -- under the 10-day negative notice.
20           I will have all counsel that have been admitted
21    state their appearances.
22           MR. HINGLE:  Charles Hingle for Credit Suisse.
23           THE COURT:  Now, I want to make sure that they
24    can pick you up on the recording.  You may need to be by a
25    microphone.  Let's just do an entourage to the mike, and --
```

1           MR. HINGLE:  Your Honor, Chuck Hingle for Credit

2    Suisse.  I'm with, today with two gentlemen from the

3    Skadden firm in Wilmington, Mark Chehi and Evan Levy.

4           THE COURT:  Okay.  And both have you have been

5    admitted, as I recall, pro hac.

6           MR. HINGLE:  Pro hac motions have been filed for

7    both, Your Honor.

8           THE COURT:  Yes, thank you.  Welcome.

9           MR. EISENBERG:  Good afternoon, Your Honor.

10   Joseph A. Eisenberg - Jeffer, Mangels, Butler & Marmaro -

11   appearing on behalf of Ms. Blixseth.  There's a pro hac

12   application which is somewhere in process.

13          THE COURT:  Okay, thank you.  Mr. Grant.

14          MR. GRANT:  Your Honor, John Grant for the Ad Hoc

15   Committee of Yellowstone Club Members.

16          And we have also filed a motion for pro hac vice

17   admission of Jonathan Alter.

18          THE COURT:  Okay.

19          MR. GRANT:  And he is here, and I'd like your

20   permission for him to argue.

21          THE COURT:  Okay.  I'm assuming you've paid the

22   pro hac fee and -- with your motion.

23          MR. GRANT:  I was in the, I was in the car coming

24   here as it was being filed.

25          THE COURT:  Okay, okay.

```
1              MR. GRANT:  So I'm certain that it -- if it

2   hasn't been, it will be by the end of the day.

3              THE COURT:  Okay, thank you.

4              MR. GRANT:  Thank you, Your Honor.

5              MS. WHITNEY:  Your Honor, Teresa Whitney for

6   Montana Department of Revenue.

7              With me, I have Joel Silverman, also representing

8   Department of Revenue.  And we have filed an application

9   for pro hac for Lynn Butler, and it is my understanding the

10  fees are in the mail.

11             THE COURT:  Okay.  We've all heard that before.

12             Mr. Rhoades.

13             MR. RHOADES:  Your Honor, Quentin Rhoades, on

14  behalf of Normandy Hill Capital.

15             MR. CUFFE:  Your Honor, Matt Cuffe - Worden Thane

16  - here on behalf of Michael Snow, a Class B member and a

17  creditor.

18             TRUSTEE McKAY:  Good afternoon, Your Honor.  Dan

19  McKay for the Office of the U.S. Trustee.

20             MR. STENSLAND:  Dean Stensland with the law firm

21  of Boone Karlberg representing Prim Vintage Development,

22  LP.

23             MR. CADWALLADER:  Mark Cadwallader, Montana

24  Department of Labor and Industry.

25             MR. HURSH:  Benjamin Hursh with the Crowley Law
```

1    Firm here on behalf of CrossHarbor.

2            THE COURT:  Okay.

3            MR. BROWN:  Steve Brown with the Garlington Law

4    Firm, and I'm here on behalf of the Garlington Law Firm.

5            THE COURT:  Okay.  Any others that wish to state

6    their appearances?

7            MR. GUTHALS:  Yes, Your Honor.  This is Joel

8    Guthals in Billings.  And, Your Honor, I'm appearing on

9    behalf of Timothy Blixseth, creditor.

10           THE COURT:  Okay.

11          MR. WHITMORE:  Your Honor, this is Clark

12    Whitmore.  I'm appearing for Mike Snow in addition to Matt

13    Cuffe.

14          And I believe that a pro hac vice application has

15    been filed.

16          THE COURT:  Okay.

17          MR. WHITMORE:  And Mr. Cuffe --

18          MR. MIETTINEN:  Your Honor --

19          THE COURT:  Go ahead.

20          MR. MIETTINEN:  Your Honor, Jaska Miettinen with

21    Bingham McCutchen for the Ad Hoc Committee of Yellowstone

22    Club Members on the phone.

23          THE COURT:  Okay.  We're having -- from the

24    standpoint of everyone here in the Missoula courtroom, I'm

25    finding it very hard to hear the people on the telephone.

1    I'm not sure if it's a volume thing, or whatever, but I

2    would venture to say there's probably no one that heard the

3    two people that just spoke except maybe me, in part.

4            Is Mr. Manson appearing in Butte?

5            THE CLERK:  Judge, Mr. Manson is not here.

6            THE COURT:  Okay.  No one's appearing in Butte?

7            THE CLERK:  No, there isn't.

8            THE COURT:  Okay.  And only Mr. Guthals in

9    Billings, okay.

10           Initially, obviously -- Mr. Patten.

11           MR. PATTEN:  Your Honor, I want to ask the

12   Court's permission that Mr. Eisenberg, who's not been

13   admitted pro hac vice yet, be permitted to represent

14   Ms. Blixseth in these proceedings today.

15           THE COURT:  Okay.  It's in process, as I

16   understand.

17           MR. EISENBERG:  Yes, Your Honor.

18           THE COURT:  Okay, very well.  Just, I guess, a

19   little bit of discussion about ground rules and background.

20   Obviously, this has been filed on fairly short notice,

21   hearings have been set with fairly short notice.

22   Obviously, everyone's had notice of the hearing or we

23   wouldn't have a courtroom full of people.  So I am going to

24   take that as a comment that, in fact, everybody does have

25   notice and notice as a position on the motions that have

 1    been filed.

 2           As it relates to just proceeding and appearing

 3    before this Court, we may meet, depending on where we need

 4    to meet, in different locations.  It just happened today

 5    that I was here, and it may have been easier to get people

 6    in and out of Missoula than maybe some other sites.  I

 7    don't know that.  But we may also -- this is actually a

 8    case that would be normally heard in Butte.  That's

 9    probably where the 341 meeting, in fact, will be scheduled

10    as it's scheduled.  But we may hear, may hear parts of this

11    in Billings, Great Falls.  Whatever the need is and the

12    urgency of the matter, we will schedule things wherever and

13    whenever.

14           As it relates to video conferencing and the use

15    of video conferencing, if you don't know, you will soon

16    know that I am an advocate of video conferencing and expect

17    people to use it rather than traveling over the country to

18    attend.  Typically, we like to keep the sites to four just

19    because we can have all -- we have three, three sites up

20    now, but we can have four sites up.  We can also cascade to

21    other sites depending upon the need.  But if you're

22    appearing from out of state, you might want to look into

23    facilities nearby for purposes of accessibility, and

24    whether matters come up on short notice, if you could

25    appear by use of video conferencing.  I use it for

1    everything, for uncontested, contested trials, whatever.

2    So I'm going to push it.  And if it's not being used by

3    people that have to travel a lot, which incurs a lot of

4    expense, I'm going to look at those very carefully, why you

5    weren't appearing by video, as it relates to travel

6    expense, airline expense, all of that.  So keep that in

7    mind.  There are some things you just can't appear by video

8    - that's fine, I understand - but at least be aware it's

9    there, and I expect it to be used.

10           I would imagine there may be press that has some

11   interest in this case.  If so, they're certainly welcome at

12   any of the hearings.  They're public hearings.  And,

13   certainly, we'll make accommodation for them.  I don't know

14   if there's any press here today or not, but if there is,

15   you're certainly welcome.  If you need background

16   information or if you need other information from public

17   documents that might be filed with the Court, then you

18   should contact the clerk's office in Butte.  That's where

19   all matters are filed.

20           As it relates to recording, we digitally record.

21   That's being recorded in Butte as we speak, which goes over

22   the video conferencing lines.  But the Court staff there is

23   very accommodating, very helpful, so if you need something,

24   please contact them.

25           I expect the parties to be civil; get through the

1    matters that we need to; put on the evidence as need be;

2    present exhibits in advance, file them online unless

3    they're extensive, voluminous.  Then I'll certainly

4    consider that they be either sent to me or, or -- by mail

5    or Federal Express, or whatever.

6          But I use CM/ECF exclusively on the bench.  I try

7    to get away from the paper.  So if you have things you want

8    to get filed or you want to get to the Court, you don't

9    need to send extra copies to chambers - it's a waste of

10   your paper and your postage - because I'll pick it up off

11   of online unless it's, like I say, voluminous.  So if you

12   have a question about anything like that that you're

13   wanting to submit and whether it's too big or not, check

14   with Lynn Myers, who's the chief deputy clerk.  And on any

15   matters, feel free to either contact her or the chief

16   clerk, Bernie McCarthy, and they will get back to me if

17   there's an issue that needs to be resolved.

18          In a case like this, I expect to move through it

19   quickly.  I will devote as much time as necessary to it to

20   make sure it gets done.  I expect counsel to do the same

21   and the parties to do the same; meet the deadlines, filing

22   schedules, all of those things I expect to be done.

23          What am I overlooking or missing -- it's probably

24   standard for all of you in the courts that you appear in.

25          So with that, Mr. Patten, I'll let you proceed.

1          MR. PATTEN:  Your Honor, I would call Edra

2   Blixseth.

3          THE COURT:  If you could come to the podium to be

4   sworn by the clerk, who will appear on the video.  You can

5   just stand right there by the microphone for now.

6              EDRA BLIXSETH, WITNESS, SWORN

7                  DIRECT EXAMINATION

8   BY MR. PATTEN:

9   Q.  Would you please state your name?

10  A.  Edra Blixseth.  Am I too close?

11  Q.  And, Ms. Blixseth, what's your relationship with what

12  is known as the Yellowstone Club?

13  A.  I'm the owner of BGI, who owns the Yellowstone Clubs.

14  Q.  Okay.  And it's correct, isn't it, that there are

15  several entities that make up the Yellowstone Club?

16  A.  That's correct.

17  Q.  Could you advise the Court of what the names of those

18  entities are?

19  A.  Yellowstone -- what we call "YDI", Yellowstone

20  Development, Inc.; Yellowstone Mountain Club; Big Sky

21  Ridge.

22  Q.  And do these entities also own other companies,

23  corporations, or limited liability companies?

24  A.  There are some other companies, yes --

25  Q.  Okay.

1   A.   -- involved in that, yeah.

2   Q.   There's a company named "Yellowstone Hotel Management"?

3   A.   Correct.

4   Q.   Who owns that?

5   A.   I have to tell you, Yellowstone Hotel was, was created

6   during the time -- the last couple of years, I've been

7   frozen out of Yellowstone Club.  That was created during

8   that time.  So when I answer those questions, I want to

9   give that caveat that I might not be up to speed quite yet

10  on that, but I think that that is owned by YDI.

11  Q.   Okay.  And before we go any further, how long has it

12  been since you were not frozen out of the --

13  A.   Just August of this year.

14  Q.   Okay.  So you're still getting up to speed on the

15  details?

16  A.   Trying very hard.

17  Q.   Okay.  There's a company called Sunrise Ridge?

18  A.   Correct.

19  Q.   Well, let me go back.  What does Yellowstone Hotel

20  Management do?

21  A.   It owns Buck's T-4.

22  Q.   Okay.  And is that used for housing for employees?

23  A.   Correct.

24  Q.   Sunrise Ridge does what?

25  A.   Sunrise Ridge was actually sold to CrossHarbor.

1   There's a small portion of Sunrise Ridge that we still have

2   an agreement with CrossHarbor that there are some other

3   partners involved with.

4   Q.  What is Sunrise Ridge?

5   A.  It's a, it's -- I hate using "condo", but it's a chalet

6   development within Yellowstone Club.

7   Q.  Okay.  There's an entity called "Yellowstone

8   Utilities"?

9   A.  Yes.

10  Q.  What is that?

11  A.  That's the, the corporation in which we have the

12  utilities that provide utilities for Yellowstone Club.

13  Q.  Okay.  There's something called "St. Andrews Golf Club

14  International"?

15  A.  That was a purchase that was for the now defunct

16  Yellowstone Club World that was going to be developed into

17  a golf course.

18  Q.  And there's an entity called "Cosborn Investments"?

19  A.  That's an entity that holds the Chateau Farcheville

20  that's just outside of Paris that was also a Yellowstone

21  Club World location.

22  Q.  Okay.  And is that the French castle?

23  A.  Yes, otherwise known as.

24  Q.  And is Cosborn Investments owned by Yellowstone

25  Development?

1   A.   Yes, it is.

2   Q.   Other than the St. Andrews and the Cosborn and the

3   other -- the debtors in this case, Yellowstone Mountain

4   Club, Yellowstone Development, Big Sky Ridge, Yellowstone

5   Club Construction Company, Yellowstone Hotel Management,

6   Sunrise Ridge, and Yellowstone Utilities are all involved,

7   in one aspect or the other, of the Yellowstone Club?

8   A.   That's correct.

9   Q.   Okay.  Can you describe to Judge Kirscher, please, what

10   the Yellowstone Club is?  What kind of business is it

11   engaged in?  What does it own, generally?

12   A.   Well, Yellowstone Club, in my definition, is in the, in

13   the business of providing an experience and a Montana

14   experience to certain people that want to be able to be

15   here and own property.  Sometimes it's been described as a

16   real-estate development, but that's not how I've ever

17   viewed it.  And that's always been our philosophy within

18   our sales program.

19   Q.   Is it a resort or an experience kind of a business?

20   A.   It's a resort that allows families to enjoy the Montana

21   experience from skiing to fishing to golfing in the summer

22   and everything else that Montana has to offer.

23   Q.   And the families are members of the club?

24   A.   Correct.

25   Q.   And in order to utilize the club's facilities, you have

1    to be a member?

2    A.   Correct.

3    Q.   Okay.  How many employees does the Yellowstone Club

4    have?

5    A.   It varies from season, when we're off season and when

6    we're at full season, but anywhere from 400 to 600.

7    Q.   What time of the year is the busiest season

8    employment-wise for the Yellowstone Club?

9    A.   Gearing up right now to get ready for the holiday

10   season going all the way through April 15th.

11   Q.   The ski season?

12   A.   The ski season.

13   Q.   Okay.  And does the Yellowstone Club create -- let me

14   back up.

15   A.   Okay.

16   Q.   Generally, what's the monthly payroll of the

17   Yellowstone Club?

18   A.   It's about 600,000.

19   Q.   Okay.  And does the Yellowstone Club spend money

20   locally on goods, services, contracts, and such?

21   A.   We try to, we try to use as many local vendors and

22   Montana -- both -- vendors, purveyors, contractors, that

23   kind of thing, yes.

24   Q.   Is the Yellowstone Club significant to the local

25   economy?

1    A.   I believe it is, yes.

2    Q.   What's the value of the Yellowstone Club real-estate

3    assets?

4    A.   The value, the value on the, the books of the

5    Yellowstone Club for the real estate is about 780,

6    780 million.

7    Q.   Okay.  And are there unsold memberships to the

8    Yellowstone Club?

9    A.   Yes, there are.

10   Q.   How many?

11   A.   We're at 360-something now, I think, and we're going to

12   864.

13   Q.   Okay.  What's the value of the unsold memberships?

14   A.   That would be $360 million - $380 million.

15   Q.   Okay.  And then there will be a number of items of

16   personal property of ski lifts, and irrigation systems,

17   furniture, and so forth?

18   A.   Correct.

19   Q.   And those are all set out in the various bankruptcy

20   schedules that we've filed in this case?

21   A.   Yes, they are.

22   Q.   And the values of all of that property, to the best of

23   your ability, is as set out in the bankruptcy schedules?

24   A.   Yes, they are.

25   Q.   Generally, what are the liabilities of the Yellowstone

1    Club, just in total dollars?

2    A.  Including Credit Suisse?

3    Q.  Yes.

4    A.  Oh, 355 - 360.

5    Q.  Million?

6    A.  Million.  Sorry.

7    Q.  Thank you.  You're familiar with the Credit Suisse

8    loan?

9    A.  Yes, I am.

10   Q.  And that's a loan that Credit Suisse is an agent for a

11   bunch of other lenders; is that right?

12   A.  Yes, it is.

13   Q.  Okay.  When did the Yellowstone Club start business?

14   When did it start selling memberships?

15   A.  When it started business and when it started selling

16   memberships are kind of two different things.  And I'll go

17   back to 1999, I wish Charlie was over here, 1998 - 1999.

18   Q.  That's when it started business?

19   A.  That's when it started selling memberships.

20   Q.  Okay.  And you've involved in the Yellowstone Club

21   since 1998 - 1999?

22   A.  From the beginning.

23   Q.  Okay.  Did you have an official role in the operations

24   for the Yellowstone Club?

25   A.  Yes.  Until just a couple years ago, I was the COO.

1    Q.   "Chief operating officer"?

2    A.   Correct.

3    Q.   Okay.  And then something happened a couple years ago?

4    A.   Yes.

5    Q.   What was it that happened a couple years ago?

6    A.   I filed for divorce.

7    Q.   Okay.  And did you cease being the chief operating

8    officer upon filing your divorce?

9    A.   It actually happened just a little bit prior to that.

10   You don't normally file for divorce -- something leads up

11   to it.  So I believe about six months prior to that - could

12   be a little longer - I resigned by position as COO, Tim

13   resigned his position as COO, and Dieter Huckestein was

14   hired to become president and CEO.

15   Q.   And during the period of your divorce, did you have any

16   involvement in the operation of the Yellowstone Club?

17   A.   I was completely frozen out.

18   Q.   Were you frozen out of the information regarding

19   Yellowstone Club?

20   A.   I was frozen out of everything.

21   Q.   Everything.  So during the period of the freeze-out,

22   I'll call it, you obtained no inside information regarding

23   the operations of the Yellowstone Club?

24   A.   During that time?

25   Q.   Yes.

1   A.   Yeah; no, I did not.

2   Q.   Okay.  When, when was your divorce completed?

3   A.   It just was finalized about a month ago.

4   Q.   Okay.  Prior to a month ago, did you become active

5   again in the operations of the Yellowstone Club?

6   A.   Yes.  We signed an MSA in which I bought BGI, and that

7   closed in August of this year.  And BGI owns Yellowstone

8   Clubs.

9   Q.   Okay.  Tell me, if you would, what an MSA is?

10  A.   Oh, a marital settlement agreement.  Sorry.

11  Q.   Okay.  So as part of your divorce settlement, you ended

12  up with BGI, which is Blixseth Group, Inc.?

13  A.   It was Blixseth Group, Inc., and we changed the name to

14  Blix Group, Inc., yes.

15  Q.   Okay.  And I'll call it "Blix".

16  A.   We just call it "BGI".

17  Q.   BGI is a member of the debtor limited liability

18  companies?

19  A.   I'm sorry, I don't understand your question.

20  Q.   BGI owns a membership interest in the debtor limited

21  liability companies?

22  A.   Correct.

23  Q.   And by virtue of your ownership of BGI, you control the

24  debtor limited liability companies?

25  A.   Correct.

1  Q.  And you've been -- you've had that control since last

2  August?

3  A.  Correct.

4  Q.  And until August, you didn't have information about the

5  operations of the Yellowstone Club?

6  A.  No, I did not.

7  Q.  And you had no information about the, the debts of the

8  Yellowstone Club?

9  A.  Well, I had information prior to the two years I was

10  frozen out, but not during that time.

11  Q.  Okay.  And you have information as to the liquidity of

12  the Yellowstone Club as of last August?

13  A.  I started getting some information from members and

14  concerned employees and vendors in early spring of last

15  year, tried to find a way to step back in to see what those

16  were.  But other than that, I still didn't get anything

17  officially.

18  Q.  Okay.  And so it wasn't until you regained power, I'll

19  say, under your marital settlement agreement that you

20  understood the full scope and extent of BGI -- or, excuse

21  me, of the Yellowstone Club's financial condition?

22  A.  Correct.

23  Q.  And that was three months ago in August?

24  A.  Hm-hmm.

25  Q.  Can you generally describe what BGI's -- or, I'm sorry,

```
 1   can you generally describe what the Yellowstone Club's
 2   financial condition was as of August when you stepped back
 3   into control?
 4   A.   Well, there was purveyors not being paid, construction
 5   people not being paid, employees actually putting things
 6   that Yellowstone Club needed on their own personal credit
 7   cards.  It was more of a mess than I realized.  I knew it
 8   was kind of a mess going in, but it was -- actually,
 9   CrossHarbor helped me quite a bit because they had been
10   doing due diligence for a purchase.  And so I -- they were
11   able to help me get up to speed faster than I would have
12   been able to.
13   Q.   Okay.  Tell the Court, if you would, what CrossHarbor
14   is.
15   A.   CrossHarbor is an entity that was going to purchase
16   Yellowstone Club, and the sale fell through in the spring
17   of this last year.  And they have been working for about a
18   year and a half on due diligence and had done a really
19   in-depth job of going through the Yellowstone Club and the
20   expenses and the operating of it.  And then when I -- then
21   they came to me, and then I came to them, and we kind of
22   shared information for the betterment of Yellowstone Club
23   to quickly get up to speed.
24   Q.   Once you got back into control, what, what steps or
25   actions did you take in order to stabilize the financial
```

1    condition?

2    A.  The first thing I did was try to market the Yellowstone

3    Club World locations so that we could monetize those and

4    get those back into cash flow for Yellowstone Club which

5    would have resolved the liquidity situation, actually.  I

6    met with Sam Byrne and CrossHarbor, and we resolved any

7    issues that might have been left over and the collapse of

8    the sale.  We actually worked together closely with them,

9    actually put one of their people in as, as interim COO so

10   that we could evaluate and more quickly get up to speed to

11   see what we -- direction we needed to go.

12   Q.  Did you invest any of your own funds into the

13   Yellowstone Club?

14   A.  Yes, I did.

15   Q.  Approximately how much?

16   A.  A little over $16 million.

17   Q.  Okay.  And did your investment of your own funds

18   stabilize the finances?

19   A.  No, it did not.

20   Q.  And did that bring us to where we are today?

21   A.  Partially.

22   Q.  Okay.  Are you able to invest more of your personal

23   funds into the Yellowstone Club?

24   A.  I am not.

25   Q.  Does the Yellowstone Club have the funds today, I'll

1    say, in order to pay for its day-to-day operations?

2    A.  No, it does not.

3    Q.  Absent the Court granting the motion that's before it

4    right now, do you foresee the Yellowstone Club having the

5    funds necessary to pay for its operations going forward?

6    A.  No, I do not.

7    Q.  Is there any substantial source of income or

8    contributions, or whatever, to bring money into the

9    Yellowstone Club to pay for its operations, any absence of

10   the Court approving an arrangement such as is before the

11   Court today?

12   A.  Not at this time.  And I'm still diligently working on

13   trying to settle the Yellowstone Club World locations and

14   those things, but the market turned on us so I'm still

15   working on those things.  But that's an option out there.

16   Q.  Okay.  Have you had negotiations with anyone in the

17   last month to provide a loan in order to finance the

18   operations of the Yellowstone Club?

19   A.  Yes, I have.

20   Q.  Who have you talked to?

21   A.  Credit Suisse and CrossHarbor.

22   Q.  And have you been talking to them continually about

23   financing for operations?

24   A.  It feels like nonstop.

25   Q.  Up through yesterday?

```
 1    A.   Yes.
 2    Q.   Okay.  Did you advise at any time in the last two weeks
 3    CrossHarbor that you were contemplating Yellowstone Club
 4    filing for bankruptcy?
 5    A.   Oh, yes.
 6    Q.   Okay.  And the same with Credit Suisse?
 7    A.   Correct.
 8    Q.   Okay.  So for the past several weeks, both have known
 9    of the pending -- impending bankruptcy filings?
10    A.   Correct.
11    Q.   Okay.  And you have been discussing and negotiating
12    with both arrangements for debtor-in-possession financing
13    for the past couple of weeks?
14    A.   Yes, I have.
15    Q.   Are you familiar with the terms and conditions of the
16    proposed CrossHarbor debtor-in-possession financing?
17    A.   Yes, I am.
18    Q.   And you're familiar with the terms and conditions of
19    the Credit Suisse debtor-in-possession financing?
20    A.   Yes, I am.
21    Q.   Did they differ?  Did the --
22    A.   Yes, they did.
23    Q.   -- terms differ?
24         Was there a difference in the interest rate?
25    A.   Yes, there was.
```

1    Q.   Which of the two provided the better interest rate?

2    A.   Credit Suisse.

3    Q.   Did the CrossHarbor debtor-in-possession financing

4    require getting a priming lien from the Court over the

5    security interest and mortgages of Credit Suisse?

6    A.   Yes, it did.

7    Q.   Did you have conversations with Credit Suisse as to

8    whether it would oppose or accept a priming lien granted to

9    CrossHarbor?

10   A.   Yes, I did.

11   Q.   What was Credit Suisse's position with regard to a

12   CrossHarbor priming lien?

13   A.   "Absolutely not."

14   Q.   Okay.  They would not agree to it?

15   A.   They would not consider it.

16   Q.   Okay.  And did Credit Suisse advise you of the extent

17   to which they would resist?

18   A.   They were very clear.

19   Q.   Very clear what?

20   A.   Of their -- that, that they would resist that --

21   Q.   Okay.

22   A.   -- and fight that.

23   Q.   What was the length of time that the CrossHarbor

24   debtor-in-possession financing was to cover?

25   A.   Thirteen weeks.

1    Q.  And was there any condition about having a Chapter 11

2    plan confirmed by a particular date?

3    A.  Yes, there was.

4    Q.  Do you remember what the date was?

5    A.  February 13th, I believe.

6    Q.  And do you remember what the consequence -- was there a

7    consequence if the plan was not confirmed by that date?

8    A.  Well, it would immediately go into -- I don't have

9    bankruptcy terms down; I've just had a two-week crash

10   course here, so -- but it would immediately go into -- I

11   think it's a 355 -- 3-something sale.

12   Q.  A 363 sale?

13   A.  It's a 363, there we go.

14   Q.  Okay.  So if a plan wasn't confirmed by February 13,

15   2009, then you would have to commit to a sale of the

16   Yellowstone --

17   A.  Immediately.

18   Q.  Did the CrossHarbor debtor-in-possession financing get

19   you through the ski season?

20   A.  No, it got through 13 weeks.

21   Q.  Okay.  Was there a discussion about continuing it

22   beyond 13 weeks with CrossHarbor?

23   A.  With CrossHarbor funding it?

24   Q.  Yes.

25   A.  No.  There was discussion, but --

1  Q.   Would CrossHarbor agree to fund it for --

2  A.   No.

3  Q.   Okay.  Now, the Credit Suisse debtor-in-possession

4  financing is for what time period?

5  A.   This initial one is only for the -- to get us through

6  the end of this month.

7  Q.   Okay.  Does the Credit Suisse financing allow you to

8  ramp up for the ski season?

9  A.   Yes, it does.

10  Q.   What's the projected or predicted date of opening the

11  ski area?

12  A.   December 12th or 16th.

13  Q.   Okay.  What's going to happen at the end of the three

14  weeks with Credit Suisse?

15  A.   You're asking for my prediction?

16  Q.   Well, do you have -- what do you contemplate will get

17  the Yellowstone Club through the entire ski season?

18  A.   Well, I contemplate that I'm taking Credit Suisse's

19  word that the -- part of what they said was that if they

20  would get us through this immediate -- so that we would be

21  prepared for ski season.  And then they would sit down at

22  the table and have everybody involved that wanted to be

23  involved - CrossHarbor, the members, anybody that had

24  anything to offer - to come up with a long-term plan for an

25  additional DIP loan.

```
 1    Q.   Okay, to carry it beyond the initial three-week period?

 2    A.   Oh, yes.

 3    Q.   Okay.  And with regard to sitting at the table, are

 4    there any current plans for meetings with Credit Suisse to

 5    start that process for arranging a debtor-in-possession

 6    financing after the end of the three-week period?

 7    A.   About 15 minutes after we leave this courtroom.

 8    Q.   There will be a meeting with Credit Suisse?

 9    A.   Yes.

10    Q.   And anybody else?

11    A.   I think CrossHarbor, I think members.  I'm not sure who

12    else besides CrossHarbor and members and Discovery that

13    will be there; but then we also have additional meetings

14    that we are going to try to have tomorrow since people

15    traveled all this way here, as many as we can; and then

16    scheduled meetings next week in New York where more members

17    can be present, and Credit Suisse and CrossHarbor and

18    everybody is more locally involved there.

19    Q.   Taking the two proposals and comparing them, the Credit

20    Suisse proposal and the CrossHarbor proposal, did you make

21    some determination as to which you felt was preferable?

22    A.   I made a determination of what I felt was preferable

23    for today.

24    Q.   Okay.  And what, what was that?

25    A.   Credit Suisse.
```

1    Q.   Okay.  And did you come to that conclusion in

2    considering the various aspects and elements of both of the

3    competing debtor-in-possession financing proposals?

4    A.   It was going through the math of a logical business

5    decision based on what we thought would be the easiest

6    transition into the Chapter 11 to then have the time to sit

7    down and, and figure out which is the best for a long-term

8    DIP and not, maybe, have Credit Suisse object to anything

9    else we were trying to do so we had the time to actually

10   evaluate CrossHarbor's and the other things, including

11   Credit Suisse, to go forward in more of a business, logical

12   standpoint rather than rushing in 24 or 48 hours.

13   Q.   And so did you exercise your business judgment and

14   decide to pursue the Credit Suisse proposal?

15   A.   I felt that it was in the best interest of Yellowstone

16   Club and the safest route to protect everything, yes.

17   Q.   Thank you.  Has Credit Suisse made any threats to you

18   in order to get you to agree to go along with their

19   proposal?

20   A.   No.

21   Q.   Have they made any promises to you other than those

22   that are set out in the term sheet that has been submitted

23   to the Court?

24   A.   Yes, they have.

25   Q.   What was that?

1   A.   The promise to sit down at the table in good faith,

2   with everybody involved, including the members and

3   CrossHarbor and anyone else that I felt was -- would be

4   somebody that would be an option for the best interest of

5   Yellowstone Club for the long term.

6   Q.   And do you think that they are meeting that commitment

7   to sit down in good faith?

8   A.   Absolutely.  We've got it scheduled for right after.

9   And I also don't think that they would have put up the

10  short-term DIP if they weren't planning on doing that.

11  Q.   Okay.  Did you negotiate with Credit Suisse at arm's

12  length to derive the term sheet that is before the Court?

13  A.   When you say "at arm's length" --

14  Q.   Were you allowed an opportunity to comment on the

15  terms?

16  A.   Oh, yes, absolutely.

17  Q.   And to negotiate some of the terms?

18  A.   Yes, absolutely.

19  Q.   Has Credit Suisse treated you fairly in the course of

20  the negotiations?

21  A.   Yes, they have.

22  Q.   Has Credit Suisse been heavy-handed in any way in the

23  course of the negotiations?

24  A.   No.

25  Q.   Generally, you are aware of the terms of the Credit

```
 1    Suisse DIP financing?

 2    A.  Yes, I am.

 3    Q.  Are you familiar with the budget that it's based upon?

 4    A.  Yes, I am.

 5    Q.  (Inaudible, talking over each other)?

 6    A.  Discovery and Yellowstone Club put the budget together,

 7    so I'm very familiar.

 8    Q.  You've mentioned Discovery a couple of times.  Can you

 9    tell Judge Kirscher what Discovery is?

10    A.  Oh, I'm sorry.  Discovery is -- it's Discovery Land,

11    and they're a management -- they're actually owners of

12    other -- or other -- similar to Yellowstone Club, second to

13    none of managing private membership clubs.  And I had

14    promised the members to put in a third-party professional

15    management, and that was one of the first acts I did when

16    taking over.

17    Q.  And so the budget that is before the Court and that

18    will be funded under the DIP financing is based on the

19    budget that the Yellowstone Club, in conjunction with

20    Discovery, put together?

21    A.  Yes.  And I have to say that CrossHarbor actually

22    helped with it as well because of their extensive knowledge

23    of the last year and a half and Discovery just coming in.

24    So with the senior management of Yellowstone Club, it was a

25    collaboration.
```

1   Q.   Does that budget meet the immediate needs of the

2   Yellowstone Club?

3   A.   The immediate needs.

4   Q.   The necessary expenses for the next three weeks --

5   A.   Yes, it does.

6   Q.   -- in order to get the Yellowstone Club ramped up for

7   the ski season?

8   A.   Correct.

9   Q.   Do you understand that the DIP financing will provide

10  Credit Suisse's agent with a first lien on the assets of

11  the Yellowstone Club that are already collateralized to

12  support the Credit Suisse lien?

13  A.   I understand that the people putting up the money were

14  going to be primed before that.

15  Q.   Okay.  So it's priming itself, in effect, right?

16  A.   Basically.

17  Q.   Okay.  And for those properties that are subject to

18  third-party liens, do you understand that Credit Suisse

19  will get a junior lien to the existing liens on those

20  properties?

21  A.   Yes, I do.

22  Q.   And do you understand that the Credit Suisse DIP

23  financing will require the employment of a chief

24  restructuring officer?

25  A.   Yes.

1    Q.   And have you met the proposed chief restructuring

2    officer?

3    A.   I have.

4    Q.   Is that Mr. Greenspan --

5    A.   Yes, it is.

6    Q.   -- and his company?

7    A.   Yes.

8    Q.   If the Court disallows the proposed Credit Suisse DIP

9    financing, what will happen to the Yellowstone Club in the

10   immediate future?

11   A.   We would not be able to continue operation.

12   Q.   Does the Yellowstone Club have sufficient money to make

13   its next payroll?

14   A.   No, it does not.

15   Q.   Does it have the funds necessary to pay utilities?

16   A.   No, it does not.

17   Q.   Does it --

18            THE COURT:  When is the next payroll?

19            MR. PATTEN:  Your Honor, the payroll was paid --

20            THE WITNESS:  Friday.

21            MR. PATTEN:  -- Friday.  And so the payroll lags

22   14 days, 10 days - 14 days.  So right now, there's about a

23   seven-day -- or at the time of filing on Monday, there was

24   about a seven-day back-payroll, if you will.  And those

25   employees have been set out on Schedule E of the schedules.

1    Q.   (By Mr. Patten)  And let me ask you this, Ms. Blixseth:

2    Is it your intention to pay the employees for their

3    prebankruptcy wages as part of this DIP financing?

4    A.   I'm -- I understand under Montana law that we're not

5    allowed to do that.

6    Q.   Okay.  And is the same true for any other critical

7    vendor that existed as of the date of filing?

8    A.   That's what I've been -- understand Montana law is.

9    Q.   Okay.

10            UNIDENTIFIED SPEAKER:  It's bankruptcy law, it's

11   bankruptcy law.

12            THE WITNESS:  Oh, is it?

13   Q.   (By Mr. Patten)  Will the Yellowstone Club shut down

14   and cease operations?

15   A.   If we don't have the DIP?

16   Q.   Yes.

17   A.   Yes.

18   Q.   And if that happens, how will that affect the value of

19   the Yellowstone Club's assets?

20   A.   Well, we won't have an operating enterprise to be able

21   to sell the experience of what Yellowstone Club is, so

22   we -- it shuts us down.  I mean we have nothing to -- that

23   we could sell.  We wouldn't have employees to take care of

24   services, or vendors, or -- so --

25   Q.   Would it have a devastating impact on the value of the

```
 1   real estate?
 2   A.  Of course, yes.
 3   Q.  And the membership -- unsold memberships would have no
 4   value?
 5   A.  Not if we're not operating.
 6   Q.  Would it jeopardize the ability, at least through a
 7   plan, to pay the existing unsecured creditors?
 8   A.  Oh, absolutely.
 9           MR. PATTEN:  Thank you, that's all I have.
10           THE WITNESS:  Thank you.
11           THE COURT:  Who would like to cross-examine
12   first?
13           THE WITNESS:  "First"?
14           THE COURT:  Well, I hate to say that, but there
15   were a number of attorneys that -- (inaudible, talking over
16   each other.)
17           THE WITNESS:  Okay.
18           MR. ALTER:  Your Honor, I don't know if anybody
19   else intended to cross-examine the witness, so I don't mean
20   to commandeer the podium first if there's others that
21   wanted to cross-examine.
22           MR. CHEHI:  I can, I can go first if you would
23   like, Your Honor.  I just have a few short questions.
24           Or you can, either way.
25           MR. ALTER:  I think, I think the attorney is
```

```
 1   going to be cross-examining towards the end of favoring the
 2   DIP proposal, so I would assume that maybe -- that I should
 3   wait until after you're concluded.
 4            Does that make sense, Your Honor?
 5            THE COURT:  Absolutely.  You may proceed.
 6            MR. CHEHI:  Good afternoon, Your Honor.  Mark
 7   Chehi from Skadden-Arps for Credit Suisse.
 8                      CROSS-EXAMINATION
 9   BY MR. CHEHI:
10   Q.  And good afternoon, Ms. Blixseth.  I'd like to ask you
11   a few questions.
12       Do you personally owe any money to CrossHarbor?
13   A.  Yes, I do.
14   Q.  And how much is that?
15   A.  Thirty-five million.
16   Q.  And what is the basis of their claims against you?
17   A.  In order to -- the financing that I had put together to
18   take out the MSA.  Do I need to say "marital settlement
19   agreement?
20       Because of the early markets kind of turning, the bank
21   that I had that was providing me with that funding wasn't
22   able to provide it in time.  We felt that - CrossHarbor
23   felt, as well - that it was -- we needed to get this
24   resolved.  So they were kind enough to put together the
25   financing for me to be able to pay what I needed to pay to
```

1    get Tim's interest out of the Yellowstone Club and BGI, and

2    some additional things that needed to be paid in order for

3    Tim to be completely out of it.  And so that's what they

4    did.

5    Q.  Did they, did CrossHarbor advance funds to you that

6    you, in turn, used to finance the operations of the debtor?

7    A.  No -- oh, you know, actually, that's not right.  Part

8    of, part of the funds that they provided was --

9    $4.4 million of that went into the Yellowstone Club,

10   directly into the operations of which I owe now

11   CrossHarbor.  And part of those funds did pay a payment to

12   Credit Suisse.

13   Q.  And is their claim against you secured in any manner?

14   A.  It's secured, it's secured by some separate personal

15   property not including anything to do with the Yellowstone

16   Club.

17   Q.  Prior to the petition date, did CrossHarbor propose any

18   transactions to you whereby CrossHarbor would become an

19   owner of the company of the debtors?

20   A.  CrossHarbor and Yellowstone Club entered -- took a look

21   at the picture, big picture of Yellowstone Club in the --

22   for the future.  They put a great business plan together

23   and, again, have more information than I did in the last

24   two years.  We ended up - I don't know how to word this

25   correctly - making nice because there was some contentions

1    because they didn't get the sale -- or the purchase of it.

2    And there were some, some areas that could have caused

3    concern for Yellowstone Club.  Sam Byrne and I sat down

4    with his team, my team, and we actually came up with a very

5    good plan to have some joint ventures between Yellowstone

6    Club and CrossHarbor and make everything okay.

7    Q.  Now, you've mentioned that CrossHarbor helped develop a

8    business plan for the club?

9    A.  No.  They shared with me the business plan that they

10   were going to use if they were the purchaser of the club.

11   And that was very helpful to me coming in, to give me

12   information that would have taken me months to come, to

13   come up with, so -- (pause.)

14   Q.  Did the proposed -- the transactions or transaction

15   proposed by CrossHarbor involve Discovery Land Company?

16   A.  No.  I had been speaking with Discovery Land Company

17   for well over a year when, when I wasn't sure who was going

18   to be trying to sell Yellowstone Club.  I have been talk --

19   I know the Mike Meldman, the president of Discovery.  We

20   had been talking with him quite awhile.  And I brought them

21   up when Sam and I were looking at doing some joint ventures

22   with the Yellowstone Club.

23        Sam had about three different people, management-type

24   on his list, if he were going to by Yellowstone Club.

25   Discovery was one of those.  I told him that Discovery was

1  my preference, and he asked me to talk to the other two

2  people that were his preference.  We ended up not doing

3  that; we ended up negotiating with Discovery, and they came

4  on board as management.

5  Q.  So in connection with your selection of Discovery as

6  the management of the, of the company, that was, in part, a

7  decision reached with the involvement of CrossHarbor?

8  A.  Well, I thought CrossHarbor should be involved because

9  of the joint ventures we were going to be doing, because

10 Discovery wouldn't just be managing the operations and the

11 F and B and the ski, and all of that; Discovery was going

12 to be managing the sales and marketing.  So CrossHarbor,

13 with our joint venture, is doing to the vertical and doing

14 the extensive development that would be joined together.

15 It would only be prudent that they would be involved in

16 that, that decision.

17 Q.  Did CrossHarbor's proposals of a transaction of some

18 sort include a role for Discovery?

19 A.  Not originally.

20 Q.  What about most currently prior to the filing of these

21 cases?

22 A.  Well, well before filing these cases.  I mean it --

23 when I say "not originally", when they brought their idea

24 for some joint ventures that would be beneficial to both

25 Yellowstone Club and Discovery -- I mean, excuse me,

1    Yellowstone Club and CrossHarbor, Discovery wasn't part of

2    that.  I'm the one that suggested Discovery and asked them

3    to consider that as the one and only rather than the other

4    two.

5    Q.  But most recently in the past month or two, have your

6    discussions about a possible transaction with CrossHarbor

7    included a Discovery participation in that transaction or

8    the -- on the other side of the transaction?

9    A.  Well, Discovery is already part of it.  So I'm not

10   clear on your question, because Discovery is already

11   involved and is the manager of Yellowstone Club.

12   Q.  Okay, very good.  And for how long has Discovery been

13   managing the company?

14   A.  Just shortly after we started working on the MOU,

15   within a couple of weeks of me taking over.  And so just I

16   think they started, actually, September 1.

17   Q.  Of this, of this year?

18   A.  Correct.

19   Q.  So just in the last few months?

20   A.  Right after I took, right after I took over, yes.

21   Q.  And the MOU you referred to is what?

22   A.  Oh, sorry, I keep using initials.  That's the agreement

23   we put together prior to putting a full contract together

24   because we want -- we didn't want any lag time.  And to try

25   to put a full contract together we thought was going to

1    take too long, so we started operating under an MOU.

2    Q.  Has Discovery been paid any money to manage the

3    companies during this period since they became involved in

4    managing the companies?

5    A.  Unfortunately, they have been on the list of not being

6    able to be paid, as well.

7    Q.  Was there a promise reached to pay them anything in

8    connection -- prior to the commencement of the cases?  In

9    other words, do they have an outstanding claim at this

10   time?

11   A.  Yes, they would.

12   Q.  And what amount of claim is that?

13   A.  I really don't know.

14   Q.  Why is that?

15   A.  Because there's certain things that are based on

16   percentages of sales and certain things that are based on

17   the people they had on the ground, and those kind of

18   things.  So there's -- now, now we're, we're just doing a

19   fee base so we're going to be able to do that going

20   forward.  Because with the situation between the last two

21   years of the divorce and the litigation and then this, we

22   can't really predict them to be able to be paid --

23   (inaudible.)

24   Q.  So Discovery has been, been working for the last two

25   months without any payment?

1    A.   To the best of my knowledge.

2    Q.   Now, you mentioned that CrossHarbor proposed a DIP

3    financing to, to you?

4    A.   Yes, they did.

5    Q.   And I think you also mentioned that that financing

6    proposal included terms requiring a prompt sale of the

7    company.

8    A.   At the end of 13 weeks.

9    Q.   And what, what exact date would it be that they -- the

10   terms of the CrossHarbor DIP financing would require the

11   closing of such a sale?

12   A.   I believe it was February 13th, somewhere in that --

13   (pause.)

14   Q.   And you also testified that they required confirmation

15   of a plan of reorganization by February 13th of 2009?

16   A.   Correct.

17   Q.   So what you're saying is that a condition of their

18   debtor-in-possession financing was that the company either

19   confirm a plan by February 13th or consummate a sale of

20   substantially all of its assets?

21   A.   Consummate -- or I can't say "consummate", but

22   immediately start a proceeding for sale of -- yes.

23           MR. CHEHI:  Those are the only questions I have,

24   Your Honor.

25           THE COURT:  Thank you.

| | |
|---|---|
| 1 | CROSS-EXAMINATION |
| 2 | BY MR. ALTER: |
| 3 | Q.  Good afternoon, Ms. Blixseth. |
| 4 | A.  Good afternoon. |
| 5 | Q.  My name is Jonathan Alter, and I represent the ad hoc |
| 6 | group of members.  I believe you are familiar with me.  We |
| 7 | have spoken before. |
| 8 | A.  Yes. |
| 9 | Q.  Is that correct? |
| 10 | A.  That's correct. |
| 11 | Q.  Ms. Blixseth, you had testified briefly with respect to |
| 12 | when payroll was due.  Can you clarify for me, so the |
| 13 | record is clear, when is the next payroll check due to the |
| 14 | employees? |
| 15 | A.  I'm going to have to answer that in a, in a couple of |
| 16 | ways.  We paid -- we scraped up enough money to pay them on |
| 17 | Friday because of knowing that we couldn't pay once we |
| 18 | filed.  Normally, they're paid every two weeks.  Under |
| 19 | this, we're proposing in our budget that we pay them every |
| 20 | Friday so that, that there's no lag time, to try to help |
| 21 | the employees not have any lag time in that.  So if you |
| 22 | answer post or pre, it's different. |
| 23 | Q.  So postpetition, the next payroll check is due this |
| 24 | Friday or the following Friday? |
| 25 | A.  This Friday. |

1    Q.  This Friday.  What other material amounts are coming

2    due for the club in the next three business days?

3    A.  The specifics are listed in the budget.  We've got

4    some - (inaudible, static in microphone) - some important

5    things for being in Montana with our weather turning to

6    what we'd like it to be so that we have some, some very

7    immediate needs that do have to do with utilities and that

8    kind of thing.

9    Q.  How many members are there in the club?

10   A.  Around 360-ish.

11   Q.  Are members required to place a membership deposit with

12   the club?

13   A.  Yes, they are.

14   Q.  What is the amount of the membership deposit?

15   A.  Currently, it's 300.  It was 250.

16   Q.  And is it fair to say that over the course of the life

17   of the club, the club has collected approximately

18   $88 million in member deposits?

19   A.  That would be pretty close.

20   Q.  What about with respect to annual dues?  Are annual

21   dues required of the members?

22   A.  Yes, they are.

23   Q.  What is the amount of the annual dues required of the

24   members?

25   A.  You know, this is -- I think I'm going to say 16,000,

1    but I think it's 18,000 now.  Somebody nodded out there.

2    Because it went up while, while I was not involved the last

3    two years, so --

4    Q.   Understood.  And the collective amount of dues on

5    behalf of all the members on an annual basis is

6    approximately $5 million a year?

7    A.   Approximately.

8    Q.   Thank you.  What is the outstanding amount of the debt

9    owed to CSFB, as agent, for the prepetition lenders?

10   A.   It's around 305 - 306 million.

11   Q.   And you testified before that the value of the assets

12   of the Yellowstone Club and its debtors were a certain

13   amount, but what is the amount of the value of the

14   collateral that is held to secure the loan of the

15   prepetition lenders?  Is it the same amount?

16   A.   It's the same amount, yes.

17   Q.   And that amount was what, just to refresh your

18   recollection with the Court?

19   A.   Seven hundred seventy-eight million.

20   Q.   So the -- if I understand correctly, the club has

21   received about $5 million a year from membership dues,

22   approximately $88 million in capital from membership

23   deposits, and has received approximately $375 million of

24   funds through CSFB, as agent, over the course of the last

25   several years, correct?

```
 1              THE COURT:  Yes?

 2              UNIDENTIFIED SPEAKER:  May I interpose one point,

 3    Your Honor?  It's not CSFB; it's just Credit Suisse.

 4              MR. ALTER:  Oh, I'm sorry, my apologies; Credit

 5    Suisse.

 6              THE WITNESS:  Yes.

 7    Q.  (By Mr. Alter)  And based upon the fact that you were,

 8    as in your own words, frozen out, do you have any idea

 9    where all that money went to?

10    A.  To answer your specific question:  All?  No.

11    Q.  Thank you.  And during that period of time, CS was

12    monitoring the outstanding loan that it provided to the, to

13    the debtors?

14    A.  I assumed it was because prior to the two years, there

15    were certain regulations and things they had, audits and

16    those kind of things.  So I assume that went on.

17    Q.  Let's talk a little bit about the financing that CS has

18    offered.  What is the amount of the financing?  I'm not

19    certain I heard that number testified to.

20    A.  4.6.

21    Q.  Out of that $4.6 million of financing, do you know how

22    much of the money is going to the debtors and how much is

23    going to CS to provide the financing?

24    A.  I believe, from my calculations, it's about 25 percent

25    of that for Credit Suisse to get the CRO on board.  And
```

1    there are legal fees and a lot of other expenses and fees

2    in there.

3    Q.  Well, let's talk about that number, because it's a

4    rather large number.  Do you recall the budget that you

5    testified to before in direct examination?

6    A.  Yes.

7    Q.  And you, you obviously reviewed the budget and

8    considered the budget in selecting the appropriate

9    financing.

10   A.  Yes.

11   Q.  Do you understand that the amount of legal professional

12   fees of the lender that is being asked to be paid pursuant

13   to this $4 million, or so, DIP financing is $742,600?

14   A.  Yes.

15   Q.  That's professional fees for whom?

16   A.  Credit Suisse.

17   Q.  With respect to the agent fee, what is the agent fee

18   that is required by virtue of this DIP financing?

19           MR. PATTEN:  Your Honor, let me object.  If she's

20   going to be questioned about the line items on the budget,

21   she ought to be provided a copy of it.

22           MR. ALTER:  Oh, absolutely.  I apologize.  I

23   thought she simply knew them.  But I would be happy to

24   provide her with a copy.

25           THE WITNESS:  I know the, I know the totals.  But

1   in the weeds of separating, I probably -- I don't want to

2   give the wrong answer.

3          THE COURT:  If you have a copy, you may approach

4   and present that to her.

5          THE WITNESS:  What size font is this going to be?

6          THE COURT:  Would you like that marked as an

7   exhibit?

8          MR. ALTER:  Sure.  It's actually an exhibit to

9   the pending motion before the Court, so it's already got --

10  it's a matter of public record.  But if Your Honor thinks

11  it's easier to mark it as an exhibit, I'm happy to do so.

12         THE COURT:  Let's mark it.  That raises an issue.

13  When we're talking about exhibits to motions, I expect all

14  the exhibits to be presented at the time of hearing or

15  trial.

16         THE WITNESS:  What size font is that that you're

17  going to hand me?  I might need my glasses.

18         THE COURT:  I'm going to mark this as Exhibit 1.

19  It is the management cash weekly DIP budget, dated - with

20  fax number - November 9, 2008.

21         THE WITNESS:  Let me look and see; I'll tell you.

22  Oh, no, I can see it okay.

23  Q.  (By Mr. Alter)  Okay.

24  A.  Sorry.  I thought at my age, I might need my glasses

25  because I wasn't sure what size font it was.

1   Q.  I didn't know whether I needed to fetch your glasses.

2   A.  I can see this okay.

3   Q.  All right.  And I think we were talking about the

4   $50,000 figure.  Do you know what that $50,000 figure is

5   that is contained on the budget?

6   A.  I need to -- where, where I'm looking here.

7   Q.  What I'm --

8   A.  Sorry, I'm --

9   Q.  You're fine.  What I'm drawing your attention to is the

10  varies fees that are associated -- (inaudible, talking over

11  each other) --

12  A.  I got you.  Got it, hm-hmm.

13  Q.  -- proposed DIP loan.

14      What is your understanding of the $50,000 figure that's

15  contained within the budget?

16  A.  To be honest with you, we - Yellowstone Club and

17  Discovery - put the budget together, presented it to Credit

18  Suisse, and Credit Suisse came back and told us the numbers

19  that they would require in order to be able to do the DIP

20  loan and what their fees and costs would be.  And we simply

21  plugged them in.

22  Q.  With respect to the DIP loan interest and fees, what is

23  your understanding of the amount of DIP loan interest and

24  fees during the supposed three life -- three-week life of

25  the DIP facility?

1    A.   Two hundred and -- it's either thirty-eight or

2    seventy-eight.

3    Q.   It wasn't meant to be an eye test.

4         With respect to the trustee fees, obviously we

5    understand what those are for the U.S. Trustee's Office;

6    and court fees.

7         The following line is estimated CRO fees.  What is your

8    understanding of the estimated CRO fees, chief

9    restructuring fees, through the life of this DIP facility?

10   A.   One hundred fifty thousand a month.

11   Q.   And so we are clear, the DIP facility terminates in no

12   more than three weeks, correct?

13   A.   If this one doesn't go forward, yes.

14   Q.   No.  If, if --

15   A.   This one, yes.

16   Q.   This DIP facility, if approved, terminates in no more

17   than three weeks?

18   A.   Correct.

19   Q.   In fact, there are conditions in the DIP that may, may

20   result in the DIP being terminated earlier than three

21   weeks, based upon defaults and the like.

22   A.   I think that would be in any DIP loan.  So there could

23   be defaults, yes, but -- (pause.)

24   Q.   What is your understanding of the interest rate for the

25   DIP?

```
 1    A.   I believe it was 15 percent.

 2    Q.   And what was your understanding of the -- and what is

 3    your understanding of the interest rate that was called for

 4    by the DIP proposed by CrossHarbor?

 5    A.   Seventeen percent.

 6    Q.   So it was simply 2 percent more?

 7    A.   Correct.

 8    Q.   Now, you testified a bit about the fact that the

 9    CrossHarbor DIP was a priming lien, it required a priming

10    lien.  Do you remember that discussion?

11    A.   Yes, I do.

12    Q.   Okay.  Is it your understanding that the CS DIP also

13    requires a priming lien over lenders that did not agree to

14    participate in this DIP?

15    A.   I was not aware of that.  It's been mentioned to me

16    today, but I was not aware of that.

17    Q.   Okay.  Do you have any basis for your, for your

18    understanding - and I believe it's your understanding -

19    that there has been consent from all lenders to the

20    prepetition -- all prepetition lenders to this DIP, to the

21    priming?

22    A.   I have, I have information that Credit Suisse has done

23    it.  I don't -- I have not had conversations with all the

24    bondholders.

25    Q.   You testified that it was important to you that CS had
```

1    agreed to negotiate.  Do you recall that testimony?

2    A.  Yes, I do.

3    Q.  Did CS indicate to you that they refused to negotiate

4    in the event that you did not agree to do their DIP?

5    A.  They indicated to me that they would, would prefer they

6    did -- I did their DIP in order to have time to do a more

7    in-depth evaluation of what, what we needed going forward.

8    If they -- I hope that answered.

9    Q.  So is it, is it fair to say that the purpose of this

10   DIP, perhaps, from CS's standpoint, as far as you

11   understood it, was to allow a three-week due diligence

12   period to understand whether they would provide further

13   funding?

14   A.  Not only, not only that -- yes, that is part of my

15   understanding.  But not only that, but to -- they knew that

16   I was strongly in favor of the Credit -- CrossHarbor DIP.

17   And so it was, it was their offer to let the CrossHarbor

18   people come to the table and explain what their DIP was,

19   let the members come to the table and explain a little more

20   in depth of actually what Yellowstone Club is, and that

21   kind of thing.

22   Q.  And at some point -- you just testified that at some

23   point, you were strongly in favor of the CrossHarbor DIP.

24   Was it material to you CS told you that they would fight

25   vigorously to oppose any priming lien against their, their

1    claim?

2    A.   That definitely was on my mind.

3    Q.   Yet the existing loan actually results in a priming

4    lien over nonparticipating lenders in their own facility?

5    A.   Yeah.  And I was not aware of that.

6    Q.   The existing DIP order provides a release by the

7    debtors of CS.  Are you aware of that?

8    A.   Yes.

9    Q.   What analysis was performed by the debtors in

10   connection with determining that it was appropriate to

11   release CS at this point in time?

12   A.   It felt like the best option for expediting what we

13   needed to do in an emergency situation.

14   Q.   Was there any claims that you are aware of that was

15   released in connection with the release language in the

16   documents?

17   A.   No.

18   Q.   Was any analysis performed to reach that conclusion?

19   A.   We read the, we read the DIP terms, and we went back

20   and forth on a few things and basically did an analysis,

21   yes.

22   Q.   So is it fair to say that that was a condition to the

23   DIP financing that they needed to be released from any

24   claims against them, both prepetition and postpetition?

25   A.   It was definitely one of their terms.

1   Q.   What other potential lenders were solicited for

2   financing of the bankrupt debtors?

3   A.   Besides Credit Suisse -- I mean besides CrossHarbor?

4   Q.   Besides the two entities that are before the Court at

5   this point in time, the ones that have been discussed by

6   the Court -- with the Court, CrossHarbor and CS.

7   A.   We didn't -- none others.  The market was not in a

8   position where we felt that we had a -- unless somebody had

9   real insight or kind of a skin in the game already, we

10  didn't think we had any options for that.

11  Q.   There's been some discussion of the fact that, that it

12  was a negative on the CrossHarbor DIP that come mid

13  February, that there would be a requirement of the sale.

14  Do you recall that testimony?

15  A.   Yes, I do.

16  Q.   What is your understanding of what could potentially

17  happen to this debtor in three weeks if CS does not agree

18  to further -- a further DIP and there is no further

19  financing?  What would happen to the debtor at that time

20  without financing?

21  A.   Well, I -- I hate to answer it the way I'm going to

22  answer it, but I wouldn't let that happen because I would,

23  I would -- CrossHarbor has a DIP that they're offering to

24  do, and I would bring that to the Court.

25  Q.   But CrossHarbor has a DIP that it suggested doing at

1    this point in time.  There was no assurance in three weeks

2    that either Credit Suisse or CrossHarbor will be available

3    to provide further long-term financing for this debtor.  So

4    isn't it the case that in three weeks, there could be a

5    sale?

6    A.  That could always be an option.  But to finish the,

7    the -- my answer is that a lot can be done in three weeks

8    with people that care about Yellowstone Club the way they

9    do and are committed to it.  Credit Suisse is obviously

10   putting up money that they wouldn't put up.  CrossHarbor is

11   not walking away saying that they wouldn't still come back

12   with their DIP.  So I feel very confident in the next few

13   weeks we'll have that additional DIP financing.

14   Q.  And with respect to the impending discussions with

15   Credit Suisse, do you have any agreement whatsoever that

16   they will agree to provide any further funding other than

17   the funding that's set forth in this interim order?

18   A.  No, I do not.

19              MR. ALTER:  I have nothing further, Your Honor.

20                     CROSS-EXAMINATION

21   UNIDENTIFIED SPEAKER:

22   Q.  Ms. Blixseth, since Counsel delved into a few of the

23   details of the CrossHarbor DIP, at least, let me ask you:

24   Was it your understanding that the CrossHarbor DIP proposal

25   was accompanied by any budget?

1    A.   Oh, yes, it was accompanied by a budget.

2    Q.   Was there one attached to the term sheet that

3    CrossHarbor proposed?

4    A.   Oh, yes.

5    Q.   And which budget was that?

6    A.   It was a 13-week budget that, that Discovery and

7    Yellowstone Club put together.

8    Q.   And what was the initial amount of funding under the

9    CrossHarbor DIP financing proposal that would be made

10   available to the company?

11   A.   Eighteen million dollars.

12   Q.   Is it your understanding or not that the initial

13   funding was a $5 million increment?

14   A.   It could have been.  It could come in that.  There was

15   some, there was some structure in there for submitting the

16   budget, showing variances if we had any variances from the

17   budget.  But it would fall under the same things we'd have

18   to do under bankruptcy anyway, so it wasn't, it wasn't an

19   issue in my mind.

20   Q.   Are you saying that you don't recall whether or not the

21   CrossHarbor DIP included an initial advance of $5 million

22   for -- a $5 million funding of the budget rather than the

23   entire full $18 million amount?

24   A.   I do recall, and I do recall that it was in increments

25   based on the budget.  And we would, we would -- they had an

1    instrument put that they would have -- as, as we went along

2    for the weeks, we would request the funds.  We would show

3    that that's the -- where all the money was being used in

4    the budget, much the same we're going to have to for the

5    bankruptcy; and they would grant those funds in increments.

6    But the overall DIP was 18 million.

7    Q.  And do you recall that there was an original issued

8    discount feature of the DIP proposal?

9    A.  Can you be more specific?

10   Q.  Do you recall that there was an amount approximating

11   $538,000 that was attributable or equivalent to a 3 percent

12   fee payable to CrossHarbor on account of its DIP financing

13   proposal?

14   A.  I have to be honest with you:  There's been so many

15   proposals and so many drafts, I don't -- I can't honestly

16   answer that one.

17   Q.  Okay.  Is it your understanding that the release of

18   Credit Suisse that's provided by the debtors would not be

19   binding upon a creditors committee or other creditors but

20   would apply only to the debtors themselves as borrowers?

21   A.  Yes.

22            UNIDENTIFIED SPEAKER:  Thank you.

23            THE COURT:  Mr. Patten.

24            MR. PATTEN:  (Inaudible, out of range of

25   microphone) -- Your Honor.  I don't know if there's anybody

1    else that wants to go.

2            MR. BUTLER:  Actually, Your Honor -- (inaudible,

3    our of range of microphone.)

4            THE COURT:  Oh, Mr. Butler -- oh, before we

5    proceed, Mr. Alter, did you wish to offer Exhibit 1?

6            MR. ALTER:  Your Honor, yes, I will offer

7    Exhibit 1.  But, again, I note for the record that it is,

8    it is part of the motion that is -- that has been submitted

9    to the Court.  And it's also an exhibit to the interim

10   order upon which the, the proposed financing is based.

11   But, yes, I will ask that that be introduced as Exhibit 1.

12           THE COURT:  Any objection?

13           MR. PATTEN:  No objection.

14           THE COURT:  Exhibit 1 is admitted.

15           MR. ALTER:  Thank you, Your Honor.

16            EXHIBIT NO. 1 ADMITTED INTO EVIDENCE

17           THE COURT:  Mr. Butler.

18           MR. BUTLER:  Yes, Your Honor.  And, again, my

19   application for pro hac is pending before the Court.

20                     CROSS-EXAMINATION

21   BY MR. BUTLER:

22   Q.  Yes, ma'am, my name is Lynn Butler.  I represent the

23   Montana Department of Revenue.  I have three quick areas

24   I'd like to ask you about.

25       In your understanding of the facility that's before the

1    Court, are you aware that there's a carve-out provision for

2    certain payments?  Are you aware of that at all?

3    A.  A carve-out for certain payments, or --

4    Q.  Payments to your, your attorneys, the debtor attorneys,

5    and payments to the U.S. Trustee's Office.  Are you aware

6    of --

7    A.  Yes, I am.

8    Q.  Is it your understanding that the case will not go

9    forward if that carve-out is not in place?

10   A.  The case will not go forward --

11   Q.  Yes.

12   A.  -- or the DIP loan would not --

13   Q.  The DIP loan, let's start there.

14   A.  The DIP loan, yes.

15   Q.  So it's the lender's requirement that there's a

16   carve-out for the debtor attorney in the U.S. Trustee's

17   Office?

18   A.  That's correct.

19   Q.  Okay.  And as Counsel asked earlier, there is a large

20   amount of releases and stipulations that the debtor is

21   making as regard to Credit Suisse within the motion.

22   You're familiar with those?

23   A.  Yes, I am.

24   Q.  Do you know of any investigation that has been made as

25   to the past activity of Credit Suisse as it relates to the

1    debtor?

2    A.   No.

3    Q.   Thank you.  And, lastly, you said the payroll -- the

4    monthly payroll budget's about $600,000?

5    A.   Hm-hmm.

6    Q.   Which one's the employer entity out of the four, do you

7    know?

8    A.   YMC.

9    Q.   YMC.  And on the budget, it wasn't clear.  It showed

10   payroll and it showed payroll expenses.  Are the

11   postpetition payroll withholding taxes part of the, part of

12   the items to be paid?

13   A.   Yes, they are.

14   Q.   And who's responsible for making payments of the wages

15   and taxes?

16   A.   Yellowstone Club will be, under the direction of

17   whoever has the DIP in the court right now.

18   Q.   Okay, thank you very much.

19   A.   Hm-hmm.

20            MR. BUTLER:  That's all, Your Honor.

21            THE COURT:  Thank you.  Mr. Patten -- oh,

22   Mr. Cuffe.

23            MR. CUFFE:  Your Honor, I have three quick

24   questions.

25            THE COURT:  Okay.

```
 1              MR. CUFFE:  Well, at least I hope they're quick.
 2                         CROSS-EXAMINATION
 3    BY MR. CUFFE:
 4    Q.  Ma'am, my name is Matt Cuffe.  I think I've seen you in
 5    Virginia City a couple of times.
 6    A.  Yeah.
 7    Q.  I represent Mike Snow.  Three quick questions for you.
 8         You mentioned earlier that there was ongoing litigation
 9    during the divorce and all of those things.  Do you
10    remember that?
11    A.  I do.
12    Q.  And you were personally sued in that litigation,
13    weren't you?
14    A.  I was.
15    Q.  And some of the allegations in that complaint related
16    to the use of proceeds from the prepetition loan from CS,
17    didn't they?
18    A.  Correct.
19    Q.  And those allegations included that you personally
20    benefitted from those loan proceeds improperly, correct?
21    A.  They, they had -- it was put in there as Tim Blixseth
22    and Edra Blixseth, so, yes, I was part of that.
23    Q.  Right.  And there's been allegations that a CD in your
24    name for in excess of $1 million was funded with those
25    proceeds, correct?
```

```
1   A.  I'm, I'm not familiar with that.

2   Q.  You don't recall that?

3   A.  No.

4           MR. CUFFE:  Okay, that's all I have.

5           THE WITNESS:  In my name?

6   Q.  (By Mr. Cuffe)  Yes, ma'am.

7           THE COURT:  You only have to answer --

8           THE WITNESS:  Okay.

9           THE COURT:  -- questions that have been asked.

10          THE WITNESS:  I can't ask back?

11          THE COURT:  You can't ask back.  This is not a --

12          THE WITNESS:  Sorry.

13          THE COURT:  You can do that during the

14  negotiations.

15          THE WITNESS:  Okay.

16                     REDIRECT EXAMINATION

17  BY MR. PATTEN:

18  Q.  Ms. Blixseth, was CrossHarbor willing to commit to any

19  DIP financing beyond this 13-week period?

20  A.  Not at the time we were negotiating.

21  Q.  Did you request them to commit beyond the 13-week

22  period?

23  A.  Yes, I did.

24  Q.  And they refused?

25  A.  They would not commit to anything past the 13 weeks.
```

1   Q.   Are you familiar, in general, with the condition of the

2   financial markets?

3   A.   I am too familiar.

4   Q.   Okay.  And based on your familiarity, is that -- you

5   focused your attention on CrossHarbor and Credit Suisse DIP

6   financing --

7   A.   Correct.

8   Q.   -- and not some other potential source of financing?

9   A.   I didn't feel in this market that unless somebody else

10  was abundantly familiar with the Yellowstone Club or had

11  some already, like I said, skin in the game, that we could

12  get any other financing.

13  Q.   Do you believe that you have -- strike that.

14       Mr. Alter asked you about the payment of membership

15  dues?

16  A.   Correct.

17  Q.   Are those dues paid at a certain time during the year?

18  A.   Yes.  In fact, the -- part of the dues will be coming

19  up to be paid in December.

20  Q.   What, what percentage of the dues will be due in

21  December?

22  A.   Half.

23  Q.   Okay.  And the other half is due when?

24  A.   Sometime in the summer.

25  Q.   Okay.  So the approximate $5 million in dues aren't

1    available to the Yellowstone Club today?

2    A.  No, they're not.

3    Q.  They won't be available next week or the week after?

4    A.  No, they will not.

5    Q.  And, at best, half of them will be received sometime in

6    December?

7    A.  Well, they will be if the members think that the club

8    is going to be open and available to them.

9    Q.  But that's not money that Yellowstone Club has

10   available to fund its operations for the next three weeks?

11   A.  No, it's not.

12   Q.  Now, do you understand, with respect to the CrossHarbor

13   proposal, whether the 363 sale was to be held in

14   February or was to -- the process was to start in February?

15   A.  It was my understanding that, that it started

16   immediately on that date.  So, so one could not logically

17   think that you wouldn't have to start marketing prior to

18   that in order to, to effect a sale right after that date.

19   Q.  Okay.  And CrossHarbor --

20   A.  (Inaudible, talking over each other) -- concern.

21   Q.  -- CrossHarbor was not committing to provide any

22   financing for any time after the February 13th, correct?

23   A.  No, they were not.

24   Q.  So everything would have to shut down in the middle of

25   the ski season before the sale.  Is that the timing on the

1   CrossHarbor proposal?

2   A.  Yes.

3   Q.  Thank you.  You're familiar with the release language

4   Mr. Alter asked you about in the Credit Suisse --

5   A.  Yes, I am.

6   Q.  That Credit Suisse has released?

7   A.  Yes.

8   Q.  And does that -- to your understanding, does that

9   affect anybody other than the debtors in this case?

10  A.  No.

11  Q.  Okay.  So trustees, anyone else can continue?

12  Creditors can assert whatever claims there may exist?

13  A.  It's my understanding it only affects me.

14          MR. PATTEN:  Okay, that's all.  Thanks.

15          THE COURT:  You know, Mr. Patten, could I have

16  you just -- or maybe you can just answer it, or maybe some

17  questioning.  I just want to clarify:  When we speak of

18  "Yellowstone Club", are we just collectively talking about

19  all four entities?

20          MR. PATTEN:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MR. PATTEN:  And I should ask Ms. Blixseth.

23  Q.  (By Mr. Patten)  When, when you've been testifying

24  about "Yellowstone", you're talking about the four entities

25  that are in bankruptcy right now?

74

1    A.   And that's why I've been using the word the

2    "Yellowstones", because I was doing everything; so, yeah.

3              MR. PATTEN:  Okay, thank you.

4              THE COURT:  You may step down.

5              THE WITNESS:  Thank you.

6              THE COURT:  Next witness?

7              MR. PATTEN:  And I have no further witnesses,

8    Your Honor.

9              THE COURT:  I guess I have a few questions, and

10   maybe they go to the attorneys as well as to anyone.  I see

11   in here in the proposed -- now, and I don't know that I've

12   got the latest version of the interim order because there

13   were a flood of interim orders that were floating through

14   the, the cyberspace.  And so I have one that I was

15   reviewing that had been filed either yesterday or the day

16   before which probably has, has some changes.  But to be

17   quite honest, I was uncertain when I started opening up the

18   versions which was, which was the most current and which

19   one were you going to be proposing and submitting to me.

20   So my questions are going to be based upon an earlier

21   version.

22             MR. PATTEN:  Okay.

23             THE COURT:  But in here on page 6 of the version

24   I'm looking at, there's a reference that's -- and these are

25   findings of fact that I'm making, that the terms of the DIP

1    term sheet and use of cash collateral were for fair and

2    reasonable.  I don't know if I've had any testimony that

3    allows me to make that finding.  I mean because here's my

4    point going to the budget:  How is this -- and let me

5    preface it with another question.

6              Does the lender anticipate filing an application

7    for these fees, professional fees of 742.6 -- (inaudible,

8    talking over each other)?

9              MR. PATTEN:  Your Honor, it's my, my position

10   that any professional fees, whether they're occurred by

11   the, by the lender or any other creditor as well as the

12   debtor, have to submit their fees to this Court for

13   approval.

14             THE COURT:  Well, that certainly would be my

15   understanding, but I wanted to know what their attorneys

16   are contemplating here.  Because then I -- that paragraph

17   really troubles me because you're suggesting to me that by

18   approving this interim agreement, that I'm concluding that

19   the terms of the term sheet and use of cash collateral were

20   for fair and reasonable.  I don't know that yet because I

21   don't know that these fees are reasonable.

22             MR. CHEHI:  Your Honor, the -- let me explain as

23   best I can.  And we can also -- there's a financial advisor

24   that we have retained who also could be qualified today as

25   an expert to speak to Your Honor about the status of terms

1    of debtor-in-possession financing that are available in the

2    market today to the extent it's available.  And he would be

3    prepared to testify as to the interest rate and the other

4    terms and give Your Honor a view of those issues.

5         But I need to correct the record, and I can do

6    that based upon the papers as opposed to the, you know, the

7    questioning of the witness who is, you know, a lay witness.

8    The alleged, you know, $700,000-some of fees that allegedly

9    are coming to Credit Suisse is a, is a gross overestimate.

10   What we have, Your Honor, in the first instance is a

11   requirement that the debtors engage a CRO, a chief

12   restructuring officer; in other words, someone who has

13   competence in financially restructured companies, managing

14   these situations, and who is an independent third party.

15   That was a requirement that we discussed with the borrowers

16   from Day 1, and it was a -- put that inside the term sheet.

17   But it's not a CRO that's being retained by or selected by

18   Credit Suisse.  And so the $150,000 cost of that is a cost

19   of providing independent management to the debtor's estate.

20        THE COURT:  But we haven't seen any employment

21   application at this point for such a person, right?

22        MR. CHEHI:  No.  But we understand that the

23   debtors have selected a Mr. Ron Greenspan from a firm

24   called "FTI", which is an advisory firm.  And he is

25   well-qualified in real estate and troubled-company workouts

1    and restructurings and bankruptcy reorganizations.  He is

2    the person, as we have been told - and we haven't, you

3    know, talked to him directly about this - is going to be

4    engaged or is already engaged to assist the debtors'

5    management in working through the difficult bankruptcy

6    issues that they're confronting at this time.

7            And, you know, that's very important to us, Your

8    Honor, because the circumstances in this case are -- call

9    out for some great concern about the debtor's current

10   management.  Its management since at least September 1st,

11   as the witness testified --

12           THE COURT:  This is Discovery?

13           MR. CHEHI:  Well, Discovery Land Company and

14   CrossHarbor, Your Honor, are both, on information and

15   belief, given our conversations with CrossHarbor's

16   bankruptcy counsel a couple weeks ago -- and, you know,

17   various documents that were provided to us outlying

18   proposed transactions between the debtors prepetition and

19   CrossHarbor included, again, a change in control of the

20   company to CrossHarbor, and it involved a participation in

21   some manner or another as a principal and not simply as a

22   management company of Discovery.

23           And upon information and belief, Your Honor, we

24   believe that these companies have effectively been managed

25   by and run by CrossHarbor directly and indirectly through

1    Discovery for CrossHarbor's self-interested benefit in

2    connection with a transaction that has admittedly been

3    under discussion for some months and which was admittedly

4    discussed with all the other parties, including us, Your

5    Honor, prior to the filing of the petition.

6           Further, upon information and belief, and I don't

7    think it's inconsistent with the witness's testimony --

8           THE COURT:  Just a moment.  Mr. Alter.

9           MR. ALTER:  Your Honor, my point was simply going

10   to be that this has crossed so far over the line of what is

11   appropriate argument in connection with an evidentiary

12   component of a hearing.  If there's a witness that can

13   testify to -- (inaudible, talking over each other.)

14          THE COURT:  Well, anything that, anything that's

15   argument is not evidence.

16          MR. ALTER:  And I think that's the point.  We're

17   getting a lot of "upon information and belief" that I

18   haven't -- I hear no witnesses testifying to, and I have no

19   basis to know that this is true at all.

20          UNIDENTIFIED SPEAKER:  And are you representing

21   CrossHarbor?

22          MR. ALTER:  I am not, Your Honor.  I am not, Your

23   Honor.

24          THE COURT:  He's not the "Honor"; I am.

25          MR. ALTER:  I know, but I -- Counsel.  But I

1   think the judge asked me a question, so I was responding.

2          THE COURT:  I mean I view this strictly at this

3   point as argument, which I'm not going to take as evidence.

4          UNIDENTIFIED SPEAKER:  And that's understood,

5   Your Honor.  And I'm not, I'm not testifying.  All I can do

6   is tell you what we've heard here today and what is of

7   record and what would very clearly become of record in any

8   further scrutiny of the relationships, the prepetition

9   relationships between the party.  And this goes back to the

10  need for an independent third-party expert manager to come

11  in and to ensure the proper oversight internally of these

12  companies, to act as an independent fiduciary in connection

13  with the existing equity owner of the company and its

14  existing management structure.

15         THE COURT:  Well, but let's get back to the fees

16  and what I'm, I'm finding is fair and reasonable here when

17  I don't know if they are.

18         UNIDENTIFIED SPEAKER:  Well, the $150,000 should

19  come out of that equation, Your Honor.  The balance of the

20  fees, a component of those consists of $200,000 in the

21  aggregate of an agent fee and an arrangement fee.

22         THE COURT:  That's the lender fee?  This is the

23  -- (inaudible, talking over each other.)

24         UNIDENTIFIED SPEAKER:  These are, these are,

25  these are -- no.  Those are fees that have been grouped in

1   the budget under the term "lender fees", but they include

2   the estimated costs, legal and financial advisory fees of

3   the lenders for the -- this three-week period, including

4   the costs and expenses of our firm; the costs and expenses

5   of our financial advisor, Laughlin Mangies (phonetic) who's

6   representing the lenders in this, so that we can spend an

7   intensive period of time over the next three weeks engaging

8   in workout discussions with this -- these borrowers and

9   with all the other parties in interest, including -- as the

10  witness said, and I agree with her, that we are going to be

11  talking to the homeowners, we're going to be talking to

12  CrossHarbor, we're going to be talking to all the

13  stakeholders over the coming weeks and hopefully preparing

14  additional documentation to allow this matter to proceed in

15  an orderly manner.

16          THE COURT:  For which applications are all going

17  to be made -- (inaudible, talking over each other.)

18          UNIDENTIFIED SPEAKER:  Applications will be made.

19  We understand and I understand from your local rules, Your

20  Honor - and I don't quibble with those - that any fees and

21  expenses of a secured creditor are --

22          THE COURT:  Oversecured creditor.

23          UNIDENTIFIED SPEAKER:  -- oversecured creditor

24  have to be approved as being reasonable.  And we're happy

25  to subject our fees to a reasonableness test.  And we'll

1    submit, you know -- and I'm not sure whether we'll be

2    submitting the equivalent of bankruptcy fee applications to

3    Your Honor, but we will be giving you, you know, clear

4    visibility of the amounts spent, what the functions were,

5    how much time was spent both by, by my firm, the other

6    attorneys, the local counsel representing Credit Suisse's

7    agent, as well as the financial advisor that's been engaged

8    on behalf of the agent to advise the agent and the lenders

9    to make this possible.

10           So that -- the reasonableness component of that,

11   of those fees, are going to be subject to Your Honor's, you

12   know, oversight within reason.  And, again, I think the

13   standard will be something probably less than a bankruptcy

14   fee application for a debtor's counsel or committee

15   counsel, but we're --

16           THE COURT:  They use the same form.

17           UNIDENTIFIED SPEAKER:  We'll use the same form.

18           THE COURT:  You know, anyway, that's why I'm

19   troubled with the language that I'm finding -- making a

20   finding of fair and reasonable when I've had -- at least as

21   it relates to some items on this budget and in the term

22   sheet may not be deemed fair and reasonable.

23           UNIDENTIFIED SPEAKER:  Well, we can add language

24   to that order, Your Honor, you know, subject to a review, a

25   reasonableness review of the, you know, the legal fees and

1    advisory costs for which the lenders seek reimbursement

2    from, from the, from the company.  We expect to be spending

3    a lot of time at this over the next three weeks, Your

4    Honor, and we've spent a lot of time at it to date.

5            THE COURT:  See, I'm concerned because -- I'm

6    really concerned with like this three-month -- or

7    "three-month".  We wish it was three-month interim

8    financing; but three-week interim financing, because when

9    we get to the end of November, I'm real concerned as to

10   where we're going to be.

11           UNIDENTIFIED SPEAKER:  We may be nowhere, Your

12   Honor, unless there's an ability to repay or a prospect for

13   repayment of the various debt on this company and all of

14   the other, you know, obligations that are being incurred.

15           What we're offering, Your Honor, is a short-term

16   financing to allow the parties to sort out those issues and

17   perhaps larger possibilities for a transactional solution

18   here, which clearly went in the air with CrossHarbor.  And

19   they've been mining that and pushing that on a prepetition

20   basis.  But now we're in a new world here, and we're going

21   to have to take into account all of the interests.  We have

22   to make sure there's, you know, some visibility to this and

23   there's proper disclosures.

24           And we're giving everybody an opportunity to have

25   those accelerated, detailed discussions over three weeks

1    without any prospect that at the end of three weeks this

2    $4.4 million or $4.5 million that we're committed to fund

3    in is going to be repaid at the end of that three weeks.

4    That is a risk.  And that goes to the issue of:  Is this a

5    fair and reasonable, you know, interest rate?  Are the

6    agent fees that are being charged fair and reasonable under

7    the circumstances?

8            You know, we'll be able to put on testimony from

9    a financial advisor.  I have documents that the Court can

10   take judicial notice of from other recent bankruptcy cases

11   showing that these types of terms are -- I won't call them

12   "customary" now because there's nothing customary in this

13   market.  These are the minimum terms that people are

14   willing to provide financing on.  And, frankly, Your Honor,

15   the lenders were hoping to be getting actually higher

16   interest rates, and the like, because you can't get money

17   in the market right now for a DIP financing in any

18   scenario.  And you can read that in the Wall Street Journal

19   or you can listen CNBC every night, and you'll know what

20   the problem is.

21           THE COURT:  All things have changed over the last

22   couple of years.

23           UNIDENTIFIED SPEAKER:  And they've changed

24   dramatically over the last month, and it's gotten worse.

25   And we're prepared to give you a record on that if you need

1    it so that these types of arrangements that we're talking

2    about are not obscene, they're not unfair, especially

3    since, at the end of three weeks or four weeks, or whenever

4    it might be, if the music does come to a stop, there's

5    nobody going to be writing a check to these lenders to pay

6    them off immediately.  There's no way to monetize this

7    credit, either the prepetition credit or the DIP facility

8    credit, in lieu of some sort of sale of collateral,

9    perhaps.

10           And Your Honor must know that there's no

11   real-estate sales activity on any level, much less for, you

12   know, high-valued, you know, real estate such as this.  So

13   these lenders are taking an incredible risk.  But they have

14   to weigh that against the prospects of an utter train

15   wreck, Your Honor, where we were notified approximately two

16   weeks ago that, all of a sudden, the equity owner can no

17   longer infuse any more money into this company, they're

18   unable to make payroll, they're unable to pay trust fund

19   taxes, they're going to file bankruptcy in two days.

20           And we had conversations with CrossHarbor.  And

21   I'm not going to get into all the conversations, but their

22   attorneys were involved.  They were -- their attorneys were

23   preparing bankruptcy papers for these companies before

24   Mr. Patten was even retained.  And so we had people who

25   were very self-interested in a process towards a

1    transaction that they had in mind.  They were, in effect,

2    managing this company.  And that's on information and

3    belief, and we can make a record on that, but let's not

4    quibble over all the details.  And at the end of the day,

5    they stopped funding these companies by refusing to fund

6    any more money to Ms. Blixseth so that she could, in turn,

7    fund the operating expenses.  She admitted they were doing

8    that.

9          And they held -- they hold a $35 million secured

10   claim over her head; and with that, they were proposing

11   debtor-in-possession financing with some very harsh

12   triggers for a plan of reorganization to be confirmed.

13   Very unrealistic things, Your Honor.

14         THE COURT:  Well, what about -- there's

15   references in this order about findings of adequate

16   protection provided here, and is reasonable and sufficient

17   for -- protect the interests of the prepetition agent and

18   prepetition lenders.

19         UNIDENTIFIED SPEAKER:  Those are the junior liens

20   that people have not objected to.  You know, a majority of

21   the, of the prepetition lender group has, has -- on our

22   steering committee, you know, has authorized this sort of,

23   you know, consensual priming.  It's been discussed with the

24   balance of the lender group; they are not objecting to it.

25   Everybody realizes the practicalities of this.  If you

1    don't provide the funding, the company goes into Chapter 7.

2         You know, a week ago, they had $40,000 in their

3    bank account and they were telling us that they needed, you

4    know, large sums of money to pay employees and to play --

5    pay everything else.  And, you know, we understand that.

6    We did not want to see a train wreck.  We are, I think,

7    wearing the white hats here to try to make sure that

8    there's a smooth landing into Chapter 11 so that these

9    companies and all of their stakeholders can, in good faith,

10   discuss a longer-term financial accommodation for these

11   companies and a possible restructuring.  Because there are

12   no lot sales and no other sources of revenue for this

13   company other than, you know, some ad hoc member fees, and

14   the like, to fund a ski season coming up.  Which is very

15   important to them, Your Honor; but, again, funding

16   $15 million or $18 million into this company to get into

17   half of a ski season without the prospects for any larger

18   solution that would afford any opportunity to repay that

19   and to pay off my client's claims is -- you know, really

20   begs the question of:  Where are we going from here?

21        And we think that a three-week period of time

22   allowing the company its own management budget to be funded

23   to carry up this ramp up to the ski season -- and then have

24   everybody sit down and decide whether there is going to be

25   appropriate funding available, how it's going to work, and

1    what are the prospects of a transactional solution.

2    Because funding this company for the next six months or two

3    years or whatever period of time it takes for there to be

4    any meaningful improvement in the real-estate market and

5    the sale of lots by this company is, you know, a pretty

6    harsh scenario.

7              THE COURT:  Well, at this point --

8              MR. ALTER:  Your Honor, just briefly, Your Honor.

9    I know this is simply argument, but forgive me if I'm not

10   taken by the argument that CS is a party wearing a white

11   hat here.  Your Honor, what you're looking at is, is

12   someone who -- a lender that's providing, at an annualized

13   correlated interest rate of 425 percent, $4 million over

14   three weeks, 1.2 million of it which is set aside for their

15   own fees and costs.

16             THE COURT:  Well, Mr. --

17             MR. ALTER:  If this lender wants to wear a white

18   hat, they -- (inaudible, talking over each other.)

19             THE COURT:  Well, Mr. Alter, the concern and the

20   problem I have, though, with -- I understand your position,

21   but I also understand -- where else are they going to get

22   some interim DIP financing so that they can try to get this

23   thing reorganized?  I mean I don't see you coming forward

24   with $4.5 million.

25             MR. ALTER:  Your Honor, I'm glad you asked me.

1    The answer is CrossHarbor.  What you heard is that

2    CrossHarbor was --

3            THE COURT:  Well, what I just heard from

4    CrossHarbor, from the testimony, is the terms are not as

5    reasonable as these.

6            MR. ALTER:  What you heard, I believe, from the

7    witness was that she favored the CrossHarbor term sheet up

8    until the time that she spoke with CS and CS said that they

9    refused to have anyone prime their liens although they were

10   willing to prime their own unaffiliated -- (inaudible,

11   talking over each other.)

12           THE COURT:  Well, at this point in time, I don't

13   have any other evidence than what was testified to.

14           UNIDENTIFIED SPEAKER:  Your Honor, I think, I

15   mean for the reasons set forth in our papers, this is a

16   truly onerous, onerous DIP only serving this lender.

17           THE COURT:  Well, then you've got to come forward

18   and prove it to me.

19           UNIDENTIFIED SPEAKER:  Your Honor, again, we are

20   ourselves, as members, under a motion that was filed 36

21   hours ago, and I suspect that we will revisit this argument

22   hopefully in three weeks.  But I want the Court to please

23   be clear in the way the members look at this, because this

24   DIP was an entire disappointment to the membership that was

25   looking for some assurance that this club would continue,

```
1    that this club would be viable, that -- (inaudible, talking
2    over each other.)
3            THE COURT:  (Inaudible) -- my question.  I mean
4    I'm looking here at a debtor, four entities, that obviously
5    have no ability to finance anything or to pay anything at
6    this point without this DIP financing.  Now, the terms, the
7    15 percent, some of the terms may not be as favorable as
8    one would like to see or which may have been seen just a
9    short period of time ago prior to the economic crisis, but
10   it is what's on the table at this point, and I don't see
11   anything else that I can look at to, to compare.
12           UNIDENTIFIED SPEAKER:  I understand, I understand
13   the Court's predicament.  It's, frankly, the same
14   predicament that we have struggled with as a membership in
15   talking to our clients.  At the end of the day, we want
16   financing, we want this club to continue.  But, you know,
17   let it be clear that this financing is not a white hat.  It
18   is far, far from it.
19           THE COURT:  Well, whether it is or it isn't, it's
20   what I have before me to deal with.  I mean if the ad hoc
21   committee of members want to come forward with some lending
22   package that resolves the issue, I would welcome that at
23   any subsequent hearing.
24           UNIDENTIFIED SPEAKER:  We appreciate that, that
25   invitation, Your Honor, and very much intend over the
```

1    course of the next two or three weeks, should Your Honor

2    approve this interim financing or even - I mean, obviously,

3    the Court could delay the hearing on this - but to the

4    extent that the Court approves this interim financing,

5    spend the next three weeks trying to find the right

6    solution for this club to give it some, some sense and some

7    assurance that these jobs that are there -- there's

8    700-some-odd jobs, I believe, that are going to be saved,

9    that the season is going to be maintained, and the value of

10   this club is going to be maintained.

11           UNIDENTIFIED SPEAKER:  We're all, we're all in

12   favor of that, Your Honor, in maintaining the value of the

13   club.  It's our collateral.  And, indeed, prior to today

14   upon, you know, an invitation to talk, you know, very

15   initially with the ad hoc committee, they were asked, "Are

16   you willing to contribute financially to, you know, a

17   solution, a DIP financing, an operation of the facilities?"

18   And the initial response was in the negative.

19           However, Your Honor, we were hopeful that under

20   the circumstances and the reality of bankruptcy, we will

21   have more productive discussions with them and other

22   stakeholders who have a vested interest in making sure that

23   the wheels don't completely fall off in the coming weeks

24   and this doesn't end up in Chapter 7.  And, hopefully,

25   these other parties will contribute to a solution because

1    it will be very difficult, I imagine, for the lenders

2    themselves to again unilaterally continue to fund and

3    provide financial accommodations for the long haul for a

4    business model that at this time, given market conditions

5    and the real hard reality of the world we're in, is not

6    going to be generating much in the way of revenue.

7              THE COURT:  Mr. Chehi, what impact does this have

8    on the Department of Revenue tax?  Does priming have any

9    impact?

10             MR. CHEHI:  Your Honor, to the extent that there

11   are valid, preexisting, unavoidable liens on these, these

12   assets, we are taking junior, junior liens, not priming

13   liens.  We are recognizing the existence of a category of

14   other claims.

15             THE COURT:  Priority taxes.

16             MR. CHEHI:  I'm not saying "priority taxes".  If

17   they're not secured, they're not priority.  There's a lot

18   of unsecured claims, I'm sure, in this case, that -- we're

19   trying to, you know, again, for --

20             THE COURT:  We just don't want too many of them.

21             MR. CHEHI:  Yeah, we don't want too many of them.

22   But what we're trying to do is to cover the administrative

23   costs that are incurred.  You know, someone came up here

24   and, you know, questioned, it appears, the carve-out.  You

25   know, Your Honor, if you don't want a carve-out in the case

1    for the U.S. Trustee and for debtors' counsel fees, you

2    know, we're agreeable to eliminating that.  But in all

3    fairness, you know, we would like to make sure that there's

4    some independent -- (inaudible.)

5           THE COURT:  I'm not going to eliminate the

6    carve-out because, otherwise, it becomes very difficult for

7    the debtor to find professionals to assist through the

8    process.

9           MR. CHEHI:  And they did not have to ask us for a

10   carve-out, Your Honor; this was proposed Day 1.  And, in

11   fact, I think if the U.S. Trustee is here, they've seen the

12   proposal, and we've talked to them.  We've given a very --

13   what they felt was a fair proposal.  You know, we're not

14   asking for all kinds of what would be viewed in other

15   circumstances, you know, very, you know, outrageous types

16   of requests.

17          As far as the release, Your Honor, a lot of

18   discussion about that today.  And we'll have to get away

19   from the witness, but let's talk a bit about the fact that

20   the release that's being requested is typical of any

21   release that any borrower in these circumstances, a

22   Chapter 11 borrower or a prepetition borrower, makes when

23   they ask for an over-advance or whatever it might be as a

24   release.

25          That release, though, does not release any estate

1    claims against Credit Suisse.  It is not binding on anybody

2    except these debtors and their capacities as borrowers.

3    The creditors committee, a trustee, any other party in

4    interest that has rights to, you know, vindicate the

5    estates, the claims and causes of action, if any -- and I

6    don't think there are any.  All we would have is the tort

7    of loaning money here, perhaps.

8            THE COURT:  So without the release, you would not

9    lend the $4.5 million?

10           MR. CHEHI:  Well, without the release from the

11   debtors, yes, that's a requirement.  But that is without

12   prejudice to a creditors committee, you know, doing an

13   examination of whatever the arrangements are between Credit

14   Suisse - which is a true third-party lender here, Your

15   Honor - and these companies.  And if there's any, you know,

16   qualification to the liens -- we provided our lien reports

17   and, you know, the UCC filings and that type of analysis to

18   the debtors before the filing.  They requested that, they

19   got it.  These liens are good liens, Your Honor.  But this

20   is all without prejudice to somebody coming in and

21   commencing an avoidance action on the liens.  That's not

22   what this case is about because that's not in the cards.

23   If there are any other causes of action people want to, you

24   know, dream up and assert against Credit Suisse, they're

25   free to do it.  We've built in a 90-day period for people

1    to do that.  And, you know, we encourage the U.S. Trustee

2    to appoint a creditors committee, and everybody can look at

3    it.

4            THE COURT:  All the, all the liens have been

5    perfected?

6            MR. CHEHI:  I believe so, Your Honor.  I think

7    there were --

8            THE COURT:  -- (inaudible, talking over each

9    other) -- UCC?

10           MR. CHEHI:  Absolutely.  There may have been, you

11   know, what I would call a number of trivial, maybe, you

12   know, trade-name or, you know, copyright type of issues, or

13   something like that, but those are immaterial in the big

14   scheme of things.  We're talking about real estate and

15   sticks and bricks and the real stuff here, Your Honor, all

16   the equipment.  Those are all good liens.

17           And, again, we'll make it available to whomever.

18   We'll make it available to counsel here.  All of these

19   records, they can go at it and take a look.  But it's --

20   that's not going to be -- you're not going to hear about

21   that again, Your Honor, because it's going to be time sort

22   of wasted.  But I encourage people to do it.  We have

23   nothing to hide on that front.

24           THE COURT:  Okay.  Mr. McKay.

25           TRUSTEE McKAY:  Your Honor, since we were

1    mentioned, I'd just point out to the Court we did negotiate

2    a little bit longer time for the committee on bringing any

3    claims.  With regard to the carve-out, we have not really

4    had discussions on the carve-out.  And recognizing that

5    this is interim financing, we may have an issue that we

6    will bring before the Court in any long-term finance

7    package about the reasonableness of the carve-out as it

8    should, in our view, extend to the fees of a -- I think a

9    Chapter 11 trustee is probably remote, but certainly a

10   Chapter 7 trustee.  And we were -- are anxious to discuss

11   that in the coming weeks, you know, with counsel for Credit

12   Suisse.  But that may be an issue that will arise some

13   other day, so --

14              THE COURT:  Yeah, okay.  Thank you, Mr. McKay.

15              Mr. Patten.

16              MR. PATTEN:  Your Honor, I want to make one point

17   and then ask the Court if it would like more testimony.

18              But the debtor here has had two competing

19   financing proposals, and the debtor had to weigh the merits

20   and the positives and negatives of both, and she made a

21   business decision.  And I think that's entitled to a lot of

22   weight by the Court.  There are a lot of problems with the

23   CrossHarbor proposal.  It might get everybody through the

24   Christmas season, but it really doesn't do much beyond

25   that.  And so I think that Ms. Blixseth's decision, unless

1    it is plainly wrong, ought to be given respect by the Court

2    and, frankly, by the members.

3         Your Honor, if -- was the Court's only concern

4    about the fair and reasonableness relating to the

5    professional fees that are set out in the budget, or were

6    there other concerns?

7         THE COURT:  Well, it was the concern about the

8    finding, that I'm finding that there -- it was a paragraph

9    on page 6.  It was troubling to me when I'm making a fair

10   and reasonable decision when those may still need to be

11   made.

12        MR. PATTEN:  But that only relates to the

13   professional fees, Your Honor, as opposed to the other

14   aspects?

15        THE COURT:  Well, related to the term sheet and

16   use of cash collateral, fair and reasonable.

17        Now, as it relates to the payment of the other

18   items on here such as payroll, utilities, fuel, I mean

19   obviously those are actual expenses.  I mean I don't think

20   there's any question about, about those set forth; sales

21   office operations.  You know, I mean you can go down

22   through them.  I suspect that I don't have a problem with

23   actual expenses and the fact that they're necessary for the

24   operation of this business in the next three weeks.

25        There's just a concern that I had when -- I mean

1    it looked as if there was going to be some limitation on a

2    subsequent hearing that I get this thrown in my face that,

3    "Well, you've already made a finding that it was all fair

4    and reasonable."

5              MR. PATTEN:  Okay.

6              THE COURT:  That's my concern on that.

7              MR. PATTEN:  Well, we can, we can put on some

8    more evidence, if the Court would like to hear it, about

9    the fairness and reasonableness of the overall proposal and

10   it how it relates to what --

11             THE COURT:  Well, I think, I think that the

12   interim order can be adjusted merely by some phraseology

13   subject to Court, Court review and approval as it relates

14   to the professional fees and expenses.

15             MR. PATTEN:  Okay.

16             UNIDENTIFIED SPEAKER:  Your Honor, the only thing

17   I would ask is that if, if it is subject to Court approval,

18   that it be on notice and with an opportunity for other

19   parties and creditors to object, as well.

20             THE COURT:  That's, that's how we do it.

21             UNIDENTIFIED SPEAKER:  Thank you, I appreciate

22   it.

23             THE COURT:  Because, well, the rule allows fees

24   to be approved under $1,000 without notice and a hearing,

25   but I don't think that's going to happen in this case.

1          UNIDENTIFIED SPEAKER:  Thank you, Judge.

2          MR. BUTLER:  Your Honor?

3          THE COURT:  Mr. Butler.

4          MR. BUTLER:  I'm sorry.  I don't even know what

5     version you're working on because mine was a 30-day

6     facility and you keep saying "21 days".  But that's one of

7     our concerns, both for the State of Montana and the

8     citizens of Montana, is that this order is packed full of

9     statements and restrictions and the giving up of rights.

10    And it is an interim order.  Now, if the interim order can

11    say "everything is subject to a final", I think we're fine,

12    but when they --

13         THE COURT:  It has to.  It's going to be subject

14    to a final.

15         MR. BUTLER:  It needs to, Your Honor, because

16    the -- if you start looking at Paragraph 18 --

17         THE COURT:  Well, that's how we deal with interim

18    orders.

19         MR. BUTLER:  Okay.  I appreciate it.

20         THE COURT:  I mean they're always subject to a

21    final.

22         MR. BUTLER:  Because starting on page --

23    Paragraph 18 and Paragraph 20, we aren't the committee, we

24    won't ever be a committee, but anytime you're hamstringing

25    third parties' right to investigate, including subsequent

1    trustees -- if you've heard anything, you've heard it's a

2    bad economy, we're under water, and the only lender that

3    will lend money is the lender that has skin in the game.

4    Trying to hamstring a subsequent trustee, at least from my

5    experience - and we can argument this at the final - is

6    wholly inappropriate.  You don't know where the case is

7    going to go.  If the debtor wants to give up rights, fine,

8    but don't impact third parties because we don't know what's

9    out there.

10            THE COURT:  And that's, in essence, what was just

11   said, that they won't.

12            MR. BUTLER:  Yeah, but --

13            UNIDENTIFIED SPEAKER:  We're not impacting

14   third-party rights except to the extent that if people want

15   to assert claims against us - and, again, I don't think any

16   such claims exist - they have 90 days to do it.  This is

17   not going to be a languishing, you know, it will take two -

18   three years to figure out whether there's any claims

19   against Credit Suisse.

20            You know, the alternative to this, Your Honor, is

21   simply that the money will not be available and this, this

22   company can -- it can have a Chapter 7 trustee tomorrow.

23   And that's, that's the stark reality.

24            UNIDENTIFIED SPEAKER:  Your Honor, can I be

25   heard?

1          UNIDENTIFIED SPEAKER:  These terms are very

2     standard provisions that DIP lenders request and

3     prepetition lenders request, and we want to, you know, have

4     those are protections.  We're agreeable to adjusting the

5     reasonableness issue on the professional fees and expenses

6     incurred by the lenders; but, otherwise, the order is the

7     order.  It's an interim DIP financing order which is, you

8     know, subject to entry of a final order; it is nevertheless

9     enforceable as to the amounts that are going to be advanced

10    before the final order.

11         MR. BUTLER:  And maybe I misunderstood it.  Mine

12    has 60 days, not 90.  Thirty days isn't much more, but it's

13    something.

14         THE COURT:  Well, I think regarding -- it's about

15    five o'clock.  Obviously, because of staff and court

16    security, we try to conclude these matters by five.  Now,

17    you all indicated that you're going to be around, many of

18    the principal players are going to be around with

19    discussions tomorrow, as I understand it.  I did hear that,

20    at least.  I have Missoula hearings tomorrow, so I'm going

21    to be here.  And I guess I would like to see what the

22    proposed order is, an interim order at this point in time

23    is, so that I've got the latest version.

24         MR. PATTEN:  Your Honor, we've lodged the latest

25    version this morning.

1          THE COURT:  That's the latest one?

2          MR. PATTEN:  Oh, well, I don't know if we lodged

3   it.  I know that we provided chambers with a copy of the

4   latest.

5          THE COURT:  Well, see, but when I open that up

6   and look at it, I've got -- there are two versions of the

7   term sheet, two versions of the interim order.  I don't

8   know which -- one's Version 5 and 7, and one's Version, I

9   don't know, 6 and 8.

10          UNIDENTIFIED SPEAKER:  Your Honor, it's the most

11   -- you know, it's the highest-number versions.  I believe

12   the term sheet is --

13          THE COURT:  Well, I'm not going to speculate as

14   to which one it is.  You need to get me the latest interim

15   proposed order.

16          MR. PATTEN:  We will do that.

17          UNIDENTIFIED SPEAKER:  Your Honor, can I just

18   make one quick point?  Because I want to make certain that

19   the record was clear with a comment that was made.  I

20   believe that a concern that was assuaged of this gentleman

21   was that everything is pending a final hearing; however,

22   what I believe that CS's counsel said was, "Subject to the

23   fact that it is binding as to any amounts that are financed

24   pursuant to the interim order."

25          Now, to the extent that the amounts are financed,

```
 1    you know, in the next three weeks until the -- up to the

 2    final hearing, that doesn't provide much protection for

 3    this gentleman's concerns.

 4              THE COURT:  Well, do you have a comment --

 5              UNIDENTIFIED SPEAKER:  Yeah.

 6              MR. WHITMORE:  Your Honor, can I be heard?

 7              UNIDENTIFIED SPEAKER:  And the comment is the

 8    order will govern the advances that are being made up until

 9    the final order.

10              THE CLERK:  Excuse me.

11              THE COURT:  Up to the extent of $4 million?

12              UNIDENTIFIED SPEAKER:  Or some lesser amount if

13    the Court wants to allocate a lesser amount.  You know, but

14    to tell you the truth, on this short period of time, it's

15    going to be almost the whole thing.

16              THE COURT:  Lynn?

17              THE CLERK:  I apologize for interrupting, but

18    Patti wasn't picking up that gentleman's statement.

19              THE COURT:  I was also hearing somebody over the

20    telephone, I believe, that was trying to interject

21    something, maybe.  Was I?

22              MR. WHITMORE:  Yes, Your Honor.  This is Clark

23    Whitmore.  I apologize.  I don't if I -- how my reception

24    is coming through there.

25              THE COURT:  You're kind of faint.
```

1           MR. WHITMORE:  Can you hear me?

2           THE COURT:  You're faint.  Mr. Patten, can you

3    hear it okay?

4           MR. PATTEN:  I can hear him, yes, Your Honor.

5           THE COURT:  Okay.  Please proceed.

6           MR. WHITMORE:  I'll try to speak up.  Obviously,

7    I'm counsel along with Mr. Cuffe to Mr. Snow.

8           And we certainly understand that the Court needs

9    to approve some sort of financing that will enable the

10   debtor to continue its operations, but we believe that

11   since the prepetition lenders here are owed more than $300

12   million, they should not be able to use their position as

13   DIP lenders for a real small amount of money in order to

14   benefit their status as prepetition lenders

15   inappropriately.  I think that the order should be

16   scrutinized very carefully with respect to 506(c) waivers,

17   cross-collateralization, releases, indemnifications.

18   Prohibitions on the use of money to investigate claims

19   against the prepetition lenders and various other

20   provisions really have no business in a case like this

21   where the prepetition lenders really are making a

22   protective advance to protect their own collateral.  And

23   they should be getting, with respect to their position as

24   prepetition lenders, should be getting a replacement lien,

25   and that's about what they should be getting.

1          And this law-and-order arguably is an effort by

2     the prepetition lenders by making a very small DIP loan at

3     a high cost to benefit themselves with respect to their

4     prepetition position.

5          And we would like to have an opportunity at the

6     continued hearing to, you know, go through in a very

7     detailed basis the provisions of the proposed order that

8     need to be challenged in that respect.

9          UNIDENTIFIED SPEAKER:  Your Honor, for the

10    record, I would very much echo those comments, and I

11    thought they were very well-said.  I know that we're coming

12    through the close of our day.  I do note for the record

13    that we did file, on behalf of our client group, a full

14    objection.  And, obviously, the Court the entertain that at

15    its discretion.

16          THE COURT:  Yes, Mr. Chehi.

17          MR. CHEHI:  I'll go to the podium so the comments

18    aren't dropped.  The 506(c) waiver is subject to the final

19    hearing, Your Honor.  There's no attempt to get a 506(c)

20    waiver today.  That's built into the order.  We have tried

21    to keep all of these provisions what I would call

22    standard-practice provisions, at least in the jurisdictions

23    that I've been practicing in in Delaware.  We are not

24    including any offensive, you know, elements to this.  The,

25    the prepetition lenders will receive as adequate protection

1    junior liens on, on the debtor's property subject to

2    preexisting liens of third parties that are valid and

3    enforceable and unavoidable, and the like.

4          I'm not sure what the cross-collateralization

5    issue is.  We're not trying to cross-collateralize.  We're

6    giving adequate protection liens to, to interests that are

7    being primed subject to third-party interests.

8          And, again, I think you can, you can read through

9    the order, and it's very fair.  We're not looking to ask

10   for more than we should get; and, frankly, any more than I

11   would agree to as debtor's counsel in representation of the

12   debtor.  I've been on both sides of this.  This order's a

13   very straight order for financing in these circumstances,

14   which are very risky; no prospective repayment at the end

15   of three weeks if things don't go swimmingly and probably

16   not any prospective repayment soon on any of these amounts

17   even if things do go very well in terms of a reorganization

18   process.

19         And so for all the complaining about how

20   everything should be subject to be revisited, you know,

21   there is provision in the order for an amount that is being

22   authorized on an interim basis until you can get to the

23   final hearing.  And I assume we could have the final

24   hearing in about, you know, two weeks out from now.  And

25   that -- you know, maybe we should look at the budget and

1    pick a date and allow the debtors to use an amount of money

2    that takes them to the final hearing, and then that will be

3    protected under the terms of this order.  At the hearing,

4    people can talk about 506(c) waivers and, you know, they

5    can argue about that at that point; and then we can decide

6    whether we're going to lend the additional amounts that are

7    allowed to give the company another week or whatever it is

8    that's remaining on the facility.  You know --

9              MR. WHITMORE:  You know, Clark Whitmore.  It

10   seems to me a great suggestion if the suggestion is that

11   the prepetition lenders receive only a replacement lien at

12   this point since they are, after all, principally

13   real-estate lenders; and that the DIP lenders receive all

14   the protections they're talking about; and that there be a

15   final hearing set where these other provisions can be

16   talked about.  There's really no need to grant the

17   prepetition lenders any relief other than a replacement

18   lien at this point.

19             UNIDENTIFIED SPEAKER:  Your Honor, all I can say

20   is that we have a form of order here that is what we're

21   going to have to proceed upon with the adjustment that Your

22   Honor suggested and we're agreeable to, and that is

23   subjecting the fees of the lender's professionals to, you

24   know, a judicial reasonableness determination and a fee

25   application subject to, you know, notice to the third

1    parties, and the like.  We're happy to do that.  The other

2    terms of the order are really, you know, what they are.

3            To the extent that Your Honor were inclined to

4    authorize less than the full $4.4 million or $4.5 million

5    today on an interim basis so that there's some portion of

6    that for the third week, or whatever the time period is

7    that would follow a final hearing, you know, hold that in

8    reserve, we could, you know, adjust in some way the -- you

9    know, that's where the parties get to adjust their rights.

10   We could adjust the fees.  You know, I'm trying to be

11   reasonable here to make this -- I think it's actually going

12   to be, from an administrative point of view, somewhat

13   burdensome for the debtors, but if you're going to approve

14   some sort of, you know, three-quarters, or whatever it is,

15   advance off this 4.4 or 4.5, we could, you know, we can

16   live with that.  And the debtors are going to have to come

17   back within a short period of time to allow the parties to,

18   I guess, dispute about whether there's another week of

19   financing that they need.  Actually, the costs of doing

20   that, and the like, could be relatively high, but we made

21   provision for that in the order.

22           THE COURT:  Well, but your budget lines out, in

23   essence, that if it's approved, there's so much allocating

24   each week --

25           UNIDENTIFIED SPEAKER:  That's right.

1          THE COURT:  -- during the three-week period.

2          UNIDENTIFIED SPEAKER:  That's right.  But we can
3    -- you know, of course, as lenders, if the borrowers come
4    in and say, "Listen, we need to have an additional $50,000
5    or $100,000 that's outside of the budget," the term sheet
6    provides that the budget can be adjusted because people may
7    not have clear visibility on what their issues are going to
8    be, financial needs two weeks from now.  That's not unusual
9    in a Chapter 11 case.

10         You know, we're willing to work within Your
11   Honor's authority.  And if you want to scale back the
12   number to get - (inaudible) - final hearing, that's fine.

13         THE COURT:  From the standpoint -- so, basically,
14   you have financing that goes through the 30th; is that
15   right?

16         UNIDENTIFIED SPEAKER:  The 21 days.  It's a
17   21-day financing.

18         UNIDENTIFIED SPEAKER:  The 30th.

19         UNIDENTIFIED SPEAKER:  Thirty days?

20         UNIDENTIFIED SPEAKER:  It's the 30th of November.

21         UNIDENTIFIED SPEAKER:  The 30th of November.

22         THE COURT:  It goes to the 30th, to the end of
23   the month.  So, in essence, and then you have another week,
24   December 5th, which is just kind of on the -- I guess in
25   the future and not part of the 4.5.

1       UNIDENTIFIED SPEAKER:  And that's the fourth week

2  that we felt it was important for all the parties in

3  interest and the Court to know what the additional

4  immediate needs of the company appear to be, given their

5  best forecasts now and budget, so that as the parties are

6  having these accelerated discussions, they can focus on the

7  need to step it up.  There's another approximately

8  $2 million needed at that fourth week.

9       THE COURT:  Well, at this point in time, then --

10  I mean, obviously, to have financing discussed and final,

11  we would really need to have some type of hearing during

12  the early part of the week of the 24th such as like Tuesday

13  the 25th, it would appear to me.  Because, otherwise,

14  you're running into Wednesday, Thanksgiving is on Thursday

15  day --

16       UNIDENTIFIED SPEAKER:  Right.

17       THE COURT:  -- and the financing ends on the

18  30th.

19       UNIDENTIFIED SPEAKER:  Correct.

20       UNIDENTIFIED SPEAKER:  And, Your Honor, I think

21  that's, you know, a practical issue.  I'm suggesting here

22  to the Court that conserving judicial resources and

23  everybody else's resources here, it may be just as well to

24  approve the entire amount to allow the company to get

25  through to the 30th of November instead of having people

```
 1    spending a lot of time about this.  But, again, we're --

 2              THE COURT:  Well, no, but what I'm saying -- I

 3    think you're misunderstanding what I'm getting to.  So we

 4    have something lined up on --

 5              UNIDENTIFIED SPEAKER:  Sure.

 6              THE COURT:  -- December 1, there needs to be a

 7    hearing prior to that time so we know what's going to

 8    happen financing-wise as of the 1st.

 9              UNIDENTIFIED SPEAKER:  I think you need to --

10    everybody has to --

11              THE COURT:  And, and that first week in December

12    may raise problems for people, people's availability.  So

13    I'm just -- I'm looking to have some hearing prior to that

14    time, because by that time, you will have had not quite two

15    weeks to discuss where things are going financing-wise.

16              UNIDENTIFIED SPEAKER:  And the other parties have

17    two weeks.

18              THE COURT:  That's right.

19              UNIDENTIFIED SPEAKER:  It's a big "you", a Y-O-U,

20    capital "Y", because we are not the only solution here.

21              THE COURT:  I understand, I understand.  In fact,

22    I would hope that the sphere becomes very large in what the

23    offers might be.  And they may get very small.  Who knows?

24    I'm just looking at this point -- so just keep that in mind

25    that it may be Tuesday the 25th we would have another
```

1    hearing to discuss what happens after the 30th.

2         UNIDENTIFIED SPEAKER:  I wanted to confirm that I

3    -- I wasn't certain that Counsel, that Counsel understood

4    the point of Your Honor, that Your Honor is not just

5    talking about a final hearing for this interim financing

6    but an additional hearing for further financing that would

7    extend beyond December 1st.

8         THE COURT:  Well, yeah.  I mean we have to.

9    Where are we going to be on December 1?  There won't be any

10   financing.

11        UNIDENTIFIED SPEAKER:  That's right, Your Honor.

12        THE COURT:  I mean there's no need waiting until

13   the 2nd or 3rd because you've got employees, you've got

14   operations up there that are going to not be running.

15        UNIDENTIFIED SPEAKER:  There will be a solution

16   reached within the next two weeks or not.  You know, and

17   then it may need to be documented and proposed to the

18   Court, but that's the point.

19        THE COURT:  So that's my thought.  You look at

20   that.  Now, you had indicated you were having meetings

21   tomorrow, probably this evening and tomorrow.  I'm not sure

22   what people's schedules are.  I realize not all of you may

23   be available -- maybe you will all be available, maybe

24   there will be more people available.  But I want to be able

25   to review the final proposed order.  And if I have

1    questions, I want to be able to address them to somebody

2    before that's entered.  And I guess I'd like to, you know,

3    basically tentatively set something right now for tomorrow.

4            MR. PATTEN:  Your Honor, we -- and maybe we

5    confused the Court by doing this, but we first lodged with

6    chambers the final proposed order and the final proposed

7    term sheet, and then we lodged a red-line version or a

8    black-line version that shows the changes from what had

9    previously been submitted to the Court.  And that's -- I

10   think maybe that's what Your Honor's looking at in terms of

11   the version numbers.

12           THE COURT:  Well, we've got two separate e-mails

13   with four separate documents.

14           MR. PATTEN:  The second of those e-mails is the,

15   I believe, the red-line version.

16           THE COURT:  Okay.  Well, here's what I want, it's

17   not hard:  I want the final proposed order and term sheet.

18           MR. PATTEN:  Okay.

19           THE COURT:  And I don't think that's what's been

20   filed at this point; maybe it is.

21           MR. PATTEN:  No, I think it is.

22           THE COURT:  Okay.

23           UNIDENTIFIED SPEAKER:  There's one that I believe

24   may be filed under -- (inaudible, out of range of

25   microphone.)

```
 1          MR. PATTEN:  Right.  But I filed the one --
 2   (inaudible, talking over each other.)
 3          THE COURT:  That was filed yesterday.
 4          MR. PATTEN:  Yeah, I know.  But Mr. Chehi sent me
 5   one this morning that we then passed on to the Court this
 6   morning.
 7          THE COURT:  Okay, there's another one that was
 8   lodged this morning.  So that's your most recent one?
 9          MR. PATTEN:  Yes.
10          THE COURT:  Okay.  Let me just pull it up here
11   and see what the version is.
12          UNIDENTIFIED SPEAKER:  The correct version
13   numbers, Your Honor, is Version 13 for the term sheet and
14   Version 7 for the interim order.
15          THE COURT:  Well, actually, the filed one doesn't
16   have the versions on it.
17          UNIDENTIFIED SPEAKER:  The very last page of
18   the -- (inaudible, out of range of microphone.)
19          THE COURT:  Does it?  Well, I have 27 pages here
20   with the last one for my signature, but it doesn't have
21   a --
22          MR. PATTEN:  Well, we'll bring, we'll bring one
23   over to chambers.  We'll provide one.
24          THE COURT:  Okay.
25          MR. PATTEN:  I don't have one.  I thought I had
```

```
 1    one.  You have one?
 2              MR. CHEHI:  I do.
 3              MR. PATTEN:  So maybe this is simple.  Mr. Chehi
 4    has a copy.
 5              UNIDENTIFIED SPEAKER:  If I may approach the
 6    bench, Your Honor.
 7              THE COURT:  You may approach.  So I've got an -
 8    (inaudible) - term sheet and a budget?
 9              UNIDENTIFIED SPEAKER:  Yes, Your Honor.
10              THE CORT:  Okay, thank you.  I appreciate that.
11              UNIDENTIFIED SPEAKER:  (Inaudible, out of range
12    of microphone) -- budget will be attached to that
13    document -- (inaudible.)
14              THE COURT:  So this hasn't changed from the 9th?
15              UNIDENTIFIED SPEAKER:  No.
16              THE COURT:  Okay.
17              UNIDENTIFIED SPEAKER:  Your Honor, the comment
18    that I just heard from a couple of lawyers, including
19    myself, I was about to make, is:  Obviously, we have not
20    seen that revised version yet that was submitted to the
21    Court.  And so, hopefully, we get a copy at some point in
22    time.
23              THE COURT:  I think that's reasonable.  If this
24    is the final one that's been lodged, it's Docket No. 17.
25    Okay?
```

1          One other thing procedurally -- and I don't want

2  to keep, keep you much longer, but there's some things I

3  just saw in looking through the docket that I think need to

4  be addressed because it may be different here than in some

5  districts:  As you know, we have 10-day negative noticing.

6  A motion's filed, there's a 10-day notice that goes with it

7  for most motions.  The opposing party has 10 days to

8  respond and request a hearing.  You do that right with the

9  docketing.

10          When you go to docket your document, you should

11  have a date that comes up, and you can fill in as to when

12  the hearing will be and all of that.  If you have any

13  questions about that, check with either a fellow Montana

14  practitioner or with the clerk's office so that when you

15  set your response, you're setting it for hearing.  And it

16  will be set for hearing probably at the next hearing.

17  (Inaudible) -- particular case scheduled for that site.  So

18  for this case, since it's a Butte case, it would be set for

19  December 9th, is the Butte hearing date that's been

20  scheduled.  It's right on our website.  You can find out

21  all the hearing dates for all the sites.

22          So it's your responsibility to get that location

23  in there.  It's also your responsibility when you file the

24  motion to get the due date in there on the 10 days.  So if

25  you file something on the 12th, the due date's the 22nd,

1    plus then we add in a mailing before we issue the order.

2    But if there's not a response, it's granted on that -- on

3    the appropriate day.  I just wanted to note -- because some

4    districts are different, and they do scheduling in chambers

5    or in the clerk's office; here, you, the attorney opposing,

6    schedules it.  So just so you're aware of that.

7              Tomorrow, I can't honestly tell you how long

8    hearings may go.  I know Mr. Patten may have -- I think you

9    have some other hearings tomorrow, as well, or maybe

10   some --

11             MR. PATTEN:  No, they're taken care of, Judge.

12             THE COURT:  Okay.  So there may be resolution of

13   some things that would have taken longer.  So I guess I'm

14   thinking that maybe we could -- depending on schedules, we

15   could meet about one o'clock to see if there are any final

16   issues that I might have based upon my review of the

17   interim order.  And if you want to be here and discuss

18   them, you certainly are welcome to.  And at that point,

19   subject to minor change or some change, you know, an order

20   will be entered.

21             MR. PATTEN:  Your Honor, I might advise everybody

22   I have copies -- I think I have six or seven copies of the

23   red-line versions from what was filed before that I'm happy

24   to give to the first six people that want them.

25             THE COURT:  Okay, very good.  So one o'clock

```
 1    tomorrow.  And we'll meet again and see if there are any

 2    final concluding issues that we need to go over before we

 3    proceed over the next three weeks, so forth.  Okay?

 4              UNIDENTIFIED SPEAKER:  Is it fair to say, Your

 5    Honor, before you leave the bench for one second, that you

 6    have not yet addressed some of the more substantive

 7    objections, that you'll enter an order but you have not yet

 8    ruled on the issues of the 506(c) waiver or the releases or

 9    the prepetition adequate protection?  That has not yet been

10    determined by the Court?

11              THE COURT:  Well, I'll look at, I'll look at

12    this -- (inaudible, talking over each other) --

13              UNIDENTIFIED SPEAKER:  Thank you.

14              THE COURT:  -- objections, see if there's

15    anything final that we need to go over.

16              UNIDENTIFIED SPEAKER:  Thank you.

17              THE COURT:  We'll be in recess.

18

19                        *  *  *  *  *

20

21

22

23

24

25
```

```
1                    C E R T I F I C A T E

2

3        I certify that the foregoing is a correct transcript

4    from the electronic recording of the proceedings in the

5    above-entitled matter, all done to the best of my skill and

6    ability.

7

8        _____    _____

9        Jonny B. Nordhagen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```