IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

_____

|                              | )  |                           |
|------------------------------|----|---------------------------|
| In Re:                       | )  | Case No. 08-61570-RBK     |
|                              | )  |                           |
| Yellowstone Mountain Club, LLC, | ) |                        |
|                              | )  |                           |
|           Debtor.            | )  |                           |
| _____ | ) |                          |

(Full caption on next page)

THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

November 13, 2008

Transcript Services:

Proceedings recorded by electronic recording;
transcript produced by reporting service.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

_____
                                       )
In Re:                                 )
                                       )
Yellowstone Mountain Club, LLC,        ) Case No. 08-61570-11
                                       )
          Debtor,                      )
                                       )
Yellowstone Development, LLC,          ) Case No. 08-61571-11
                                       )
          Debtor,                      )
                                       )
Big Sky Ridge, LLC,                    ) Case No. 08-61572-11
                                       )
          Debtor,                      )
                                       )
Yellowstone Club Construction          ) Case No. 08-61573-11
Company, LLC,                          )
                                       )
          Debtor.                      )
_____)

```
 1              YELLOWSTONE MOUNTAIN CLUB BANKRUPTCY

 2                    MISSOULA, MONTANA

 3                         - - -

 4       BE IT REMEMBERED THAT this matter came on for hearing

 5   on November 13, 2008, in the United States Bankruptcy

 6   Court, District of Montana, The Hon. Ralph B. Kirscher,

 7   presiding:

 8

 9    The following proceedings were had:

10

11              THE COURT:  Good afternoon.  Please be seated.

12              Mr. Patten.

13              MR. PATTEN:  May I approach the bench, Your

14   Honor?

15              THE COURT:  You may.

16              MR. PATTEN:  Your Honor, I don't know how the

17   easiest way to do this is, but we have met with some of the

18   objectors this morning and have gone through the order that

19   was submitted to you yesterday as the proposed order and

20   have, by handwriting, made some interlineations.  They're

21   very minor.  And we can either print -- redo the order and

22   submit it to the Court, or the Court's got the additional

23   language that is agreeable to us.

24              Now, I was handed, on the way into the courtroom,

25   some much more substantial proposed changes from Mr. Snow.
```

1    And I understand that Mr. Alter may have some comments or

2    some continuing concerns, but the document that I've just

3    handed you reflects our review of the order this morning

4    with Mr. Alter.

5            THE COURT:  Okay.  Well, let me get the caption

6    into the record.  This is the continuation of the hearing

7    on interim cash collateral and other matters in In Re:

8    Yellowstone Mountain Club, LLC; Yellowstone Development,

9    LLC; Big Sky Ridge, LLC; Yellowstone Club Construction

10   Company, LLC.  I'll collectively refer to them under

11   08-61570.

12           Just as a housekeeping matter, as I recall - and

13   I didn't look at the docket earlier - but there's been no

14   objection to the joint administration, correct, or has

15   there?

16           MR. PATTEN:  Not that I've seen, Your Honor.

17           THE COURT:  I realize there's time to respond,

18   but I'm just wondering if no one has an objection, we can

19   just deal with that.

20           UNIDENTIFIED SPEAKER:  We certainly do not have

21   any objection, Your Honor.

22           THE COURT:  Okay.  Is there anyone else that

23   would like to lodge any objection to that?  Mr. Bender.

24           MR. BENDER:  Your Honor, Ronald Bender for Snow.

25           I think in terms of our objections, we objected

1    to the joint administration to the extent that they

2    comingle all the funds and don't keep separate accounting

3    for it by each entity.

4              THE COURT:  Well, I don't think that -- well,

5    Mr. Patten, how do you address that?

6              MR. PATTEN:  Well, I think we're not going to

7    comingle the funds and we do have to provide an accounting

8    for where the money goes.  So I understand the concern,

9    but --

10             THE COURT:  And, essentially, for purposes of

11   administration so that anyone having a motion or a response

12   will file it under one case number rather than having

13   multiple case, case filings.  They'd just add the -- add to

14   the docket.  And we'll do it under one debtor's name.

15   Okay?  So I see no objection.

16             Is Yellowstone Mountain Club, LLC, the one we

17   want to put everything under?

18             MR. PATTEN:  Yes, Your Honor.

19             THE COURT:  Okay.  So the motion for joint

20   administration is granted.  The primary case will be

21   Yellowstone Mountain Club, LLC, 08-61570.  And there's no

22   need to file anything in the others at this point in time,

23   subject to subsequent order of the Court.  That would be

24   true with claims, as well.

25             So that gets us back to the interim order.

1    Mr. Bender.

2         MR. BENDER:  Your Honor, just for the record, on

3    behalf of the -- Michael Snow, we filed - and it's on your

4    system, I think - the notice of lodging proposed deletions

5    and additions to the revised proposed interim order, and

6    get copies to some counsel here today.  And I just -- I

7    have a copy for the Court if the Court wants a hard copy --

8    (inaudible, talking over each other.)

9         THE COURT:  It's been filed?

10        MR. BENDER:  Yes.

11        THE COURT:  If you would approach, please.  Given

12   the other hearings I have had today, I have not seen this.

13   So thank you.

14        MR. BENDER:  And, basically, by interlineation,

15   on the second page I list the pages that our proposed

16   changes and deletions are.

17        THE COURT:  Mr. Patten, have you seen this?

18        MR. PATTEN:  I have, Your Honor.

19        THE COURT:  Okay.  Have you discussed any of this

20   with Mr. Bender?

21        MR. PATTEN:  No, I have not.

22        THE COURT:  Okay.

23        MR. PATTEN:  But I can advise the Court that

24   we're -- we object to what he has proposed, which I think

25   is essentially an attempt to renegotiate our terms and

```
 1    conditions with Credit Suisse.

 2              THE COURT:  Okay, thank you.

 3              MR. ALTER:  By the way, Your Honor, I'm happy to

 4    walk through the interlineations that were made at my

 5    request and then also to identify for the Court those

 6    changes that were not made, and allow the Court to either,

 7    either disregard them or insist upon them.

 8              THE CLERK:  Excuse me.  Counsel, would you

 9    identify yourself, please?

10              MR. ALTER:  My apologies.  My name is Jonathan

11    Alter.  I'm with Bingham McCutchen.  And I represent the ad

12    hoc committee of members of Yellowstone Club.

13              THE CLERK:  Thank you.

14              MR. ALTER:  My apologies.

15              UNIDENTIFIED SPEAKER:  Your Honor --

16              THE COURT:  You know, you may be seated.  I'll

17    call on you in a moment.

18              MR. BENDER:  Okay.  At least for the record, we

19    have -- I've not seen that document that they presented to

20    you.

21              THE COURT:  Okay.  I'm sure you will.  You know,

22    in looking through this, obviously I found interest in much

23    of it.  Certainly, it appears that pretty much the debtors

24    have given up just about anything and everything as a claim

25    against CS, whereas CS has maintained every right and claim
```

1     that they could ever have against the debtors.  Which I

2     guess I'm not surprised; they're also the one providing the

3     $4.5 million.

4          But I guess the concern I have is:  They've

5     already given $307 million; the 4.5 is a fairly small

6     amount; and in the documentation for the $307 million, did

7     they take all the issues -- take all the rights and claims

8     as they've done in this document?

9          As I was reading this late last night, I'll be

10    honest with you, I had some real questions whether I would

11    further consider it and approve this interim order.  The

12    things that trouble me with interim orders - and you may

13    get this from other judges, as well - is when you start

14    looking through some of this, they're contract terms, some

15    of this stuff, between the parties.  And here you've got

16    me, as the judge, imposing contract terms that should be in

17    a separate document, maybe in the terms document.  That's

18    not an order.  And I guess that's, that's what troubles me

19    with these things.

20          Why don't we just grant it, grant the motion as

21    it's submitted, and the parties work out -- according to

22    the terms and conditions of the motion and the agreement

23    that's attached to the motion?  Why am I going through 27

24    pages determining rights and liabilities or releases and

25    waivers if that's what you've agreed to in a separate

1    document?  I think it's overkill.  And when I got done

2    reading all of this last night, I was kind of like, "Why am

3    I doing this?"

4            Now, I also, then, thought more practically:  If,

5    in fact, I don't sign this, what's the consequence?  What

6    happens to the debtor?  And if I don't sign it, there's no

7    financing at this point in time, and how does the debtor

8    meet obligations it has coming up tomorrow, next week, and

9    I guess the week after under this agreement?  And if

10   nothing can happen in those three weeks, we're going to be

11   back here probably without financing anyway if there's not

12   a renegotiation that people are agreeable with.

13           So from a practical standpoint, I hate to see

14   this early in the stage a debtor the ability to at least

15   try to survive and reorganize through a period of time.  I

16   think three weeks is a really short period of time, but

17   that's what has been kind of negotiated here.  And it

18   certainly doesn't delay the inevitable if financing can't

19   be obtained.

20           The thing that's a little more troubling is --

21   and maybe there's been some interlineations that kind of,

22   that deal with it, but the distinctions between 4 and --

23   Paragraphs 4 and 18 where there's some reservation to third

24   parties or protections of third parties; and then I think

25   as I read 18, it's like you kind of take it away a little

1    bit.  And are those, are they taken away?

2           And, of course, I'm then staring at the, the

3    provision in this interim order that says:  Well, Judge,

4    you can do whatever you want, but if you sign an order that

5    doesn't contain everything that's in this interim order, CS

6    is going to walk anyway because we have to approve the

7    order.

8           So I'll be honest, I find it a little bit

9    overreaching.  And I know I'll hear the comment, "Hey, we

10   do this in every other court.  In Delaware, we do this all

11   the time."  And yet when we have meetings, Delaware judges,

12   "We don't do all that stuff necessarily.  You may hear

13   that, but we don't necessarily do it."  Now, I'm not saying

14   everything in this order isn't in Delaware's orders; I'm

15   just saying we hear that when we're visiting with our

16   colleagues.

17          Debtor did negotiate this.  The testimony

18   yesterday was that these are the best terms they could come

19   up with.  The other, the other prospective lender wanted

20   not as good of terms.  So it leaves me in a real quandary

21   because if I don't sign this, where does that leave

22   everybody?  Still at the negotiating table, or do we have a

23   much more severe situation and CS says, "We're not going to

24   play anymore.  We're just going to start -- we're going to

25   move to modify stay, we're going to move to convert, we're

1    going to do whatever we need to do to get this thing

2    going"?

3              And then I'm looking at:  Where are the members

4    in all of this?  Certainly, given 360-some members, there's

5    probably adequate wealth to probably finance the

6    $4.5 million for the three weeks without having to give CS

7    all the super-priority.  And where are they?  What interest

8    do they have, and why haven't they stepped up to help?

9              So these are all questions that are running

10   through my mind as I'm reading this thing last night.  And

11   I'll tell you, I've gone back and forth.  If you would have

12   asked me at one o'clock last night, I would have said,

13   "This isn't going to get signed.  I'll let things fall

14   where they fall."  This morning, and maybe because of other

15   hearings I've already heard today, maybe I've tempered my

16   thoughts.

17             So, Mr. Patten, certainly you can add what you

18   would like.

19             MR. PATTEN:  Your Honor, I think based on the

20   testimony from yesterday, that if, if we don't have an

21   order today, we have a wreck, we're going to lose

22   employees.

23             THE COURT:  But are we going to have a wreck in

24   three weeks anyway?

25             MR. PATTEN:  Maybe, but we know --

1          THE COURT:  But in the interim, we've given --

2     we've taken away any defenses that the debtor may have in

3     any of this lending and given them maybe additional rights

4     that they wouldn't have had under their existing

5     documentation.

6          MR. PATTEN:  Well, Your Honor, I think that

7     there's something that I think is fairly certain, and that

8     is that if we don't have a DIP order today, financing order

9     today, the Yellowstone Club is done; it's going to shut

10    down; and all of the value that exists by reason of the

11    ongoing business, if you will, is going to evaporate; and

12    everybody is going to suffer.  If the order is approved,

13    then we, then we breathe three weeks of life into this

14    while we put together a longer-term arrangement.  But, Your

15    Honor --

16         THE COURT:  Mr. Patten, when you say everyone's

17    going to suffer, who's going to suffer?

18         MR. PATTEN:  I think the members are going to

19    suffer, I think the creditors are going to suffer, and I

20    think the debtors are going to suffer.

21         THE COURT:  But here from an ad hoc group, I'm

22    hearing the members aren't very happy with this financing.

23         MR. PATTEN:  Well, to be honest, I don't think

24    anybody is happy with it here, Your Honor.  This isn't,

25    this isn't, certainly isn't our wish list; I don't think

1  it's Credit Suisse's wish list.

2        THE COURT:  But they'd like their money.  I'm

3  sure that's their bottom line.

4        MR. PATTEN:  Well, this is a result of what seems

5  like about two weeks of conference calls.  And this is the

6  best arrangement that we can come up with.  We have

7  considered other proposals.  And for various reasons - and

8  they weren't necessarily easy to compare, you know, next to

9  each other - but this is the one that appeared to provide

10  the best going-forward arrangement.

11        It certainly isn't perfect from the debtors'

12  point of view, but it's what we have.  And this is the

13  terms that we were able to negotiate, and it reflects

14  decisions that the debtors have made with respect to

15  waiving rights against Credit Suisse and others.  We

16  haven't tried to track any other third party into any kind

17  of waivers.  But this is, this is what we have.  And if it

18  isn't approved, then there probably won't be any reason to

19  have any further discussions about financing because it

20  will be too late.

21        So, Your Honor, this keeps us going.  It, again,

22  isn't perfect, it isn't acceptable to everybody, but this

23  is the decision made by the debtor to move forward on this.

24  And they're willing to make the commitments in the waivers,

25  etc., both in the term sheet and in the proposed order, and

1    that's the -- that's what they're prepared to live with.

2          THE COURT:  Andy -- Mr. Patten, at this time - my

3    note says "Andy" here, I'm sorry - Mr. Patten, what

4    analysis have you done or have the debtors done regarding

5    the stipulations here that all prepetition obligations are

6    legal, valid, and binding?  Has there been review of

7    documents and financing statements and security documents?

8          MR. PATTEN:  I've reviewed the security

9    documents, the mortgage, the financing statements, and I've

10   reviewed counsel opinion at the time the loans were made.

11         THE COURT:  (Inaudible, audio cuts out) -- full

12   release by Debtors?

13         MR. PATTEN:  Yes.  Your Honor, you mean --

14         THE COURT:  Well - (inaudible, audio cuts out) -

15   Debtors fully release any claims, counterclaims -

16   (inaudible) - action, defenses, setoffs, whether arising

17   under the code, I'm sure, before and after filing as it

18   relates against prepetition agent, prepetition lenders,

19   affiliates, officers, directors?

20         MR. PATTEN:  That's been a considered decision to

21   do that, yes.

22         THE COURT:  And CS wouldn't expect anything less.

23         MR. PATTEN:  No.  And I think that is pretty

24   standard, Your Honor.

25         THE COURT:  You did make a reference or a

1    revision which -- on the Paragraph D, page 6, related to

2    fair and reasonable, I see, subject to Rule 2016.  Under

3    Paragraph 6(b), page 7 where we're talking about DIP

4    (quoted as read):

5          "The term sheet shall constitute a valid and

6    binding obligation of debtors to" - (inaudible) - "debtors

7    in accordance with its terms.  No obligation payment

8    transfer" - (inaudible) - "security under DIP term sheet,

9    or this order shall be stayed, restrained, voidable,

10   avoidable for a" - (inaudible) - "under the bankruptcy

11   code."

12         I guess as I read that, that impacts trustees,

13   creditor committees, any other interested parties; or does

14   it only apply to Debtor?

15         MR. PATTEN:  Your Honor, I think it applies only

16   to the debtor.

17         THE COURT:  I guess I'm not sure if it says that.

18         MR. PATTEN:  Well, to the extent -- if I

19   understand this right, to the extent that money is advanced

20   under this arrangement, those advances are not going to be

21   challengeable by anybody.

22         THE COURT:  Anybody.

23         MR. PATTEN:  By anybody, to the extent that

24   they're advanced.

25         MR. ALTER:  Your Honor, to the extent of

1   Paragraph 21, I believe, there's a provision that's called

2   "preservation of rights granted under the order".

3           Under Subparagraph B, what that says is to the

4   extent, essentially, of any monies advanced, regardless of

5   what happens in context of the final order, the order will

6   be binding in full upon all parties.

7           THE COURT:  Did you say "Paragraph 21"?

8           MR. ALTER:  I believe it's 21(b), but my memory

9   might be wrong.  It's called "preservation of rights

10  granted under the order".

11          Oh, I'm sorry, it's 17.  I'm looking at the -

12  (inaudible) - and it changes the number.

13          THE COURT:  Oh, yeah, it's Paragraph 17, page 17.

14  You didn't change the -- I'm not looking at your most

15  recent version, but the 90-day provision is still in

16  regarding -- in Paragraph 18 on page 20 as it relates to

17  filing any adversaries -- (inaudible)?

18          MR. PATTEN:  That was unchanged, Your Honor.

19          THE COURT:  Okay.

20          MR. ALTER:  Your Honor, they might be able to

21  clarify that provision and have one less comment later.  My

22  understanding, and hopefully Counsel would agree with me,

23  is that to the extent that there's any binding aspect on

24  that provision of other third parties, that the third

25  parties are only bound to the extent of derivative claims

1    by and through the debtor.  If there were independent

2    third-party causes of action, those are preserved under

3    this letter.

4            MR. CHEHI:  If I may clarify it, Your Honor.  And

5    I understand that, you know, you could be troubled by what

6    appears to be a release of all of the debtors' claims and

7    causes of action.  Actually, the order is only, in effect,

8    binding upon the debtors - (inaudible) - debtors, and not

9    their estate or any representatives of their estate or any

10   creditors who would seek to assert challenges or claims -

11   (inaudible) - category that are being stipulated and

12   released in the prior Paragraph 4 of the, of the findings,

13   and the like.

14           And this Paragraph 18 is very important because

15   it, it is essentially giving any creditor or a creditors

16   committee, for a period of 90 days following the

17   appointment of the creditors committee, the right to go

18   back and challenge those stipulations, releases,

19   stipulations as to the amount and the validity of our

20   claims, the validity and forceability of our liens, and the

21   like.  And Paragraph 18, in a sense, sets up a time frame

22   and a process for that to occur.

23           And so, as is customary in financings, when

24   lenders are lending money in these circumstances and other

25   circumstances, as well, typically they're going to request

1    that the borrower in a commercial arrangement like this be,

2    in effect, at the time of executing the agreement, the

3    lending agreement, acknowledging that it doesn't have any

4    claims against the debtors and that whatever the

5    existing -- I mean the lenders, rather; and that any

6    existing arrangements, credit arrangements between the

7    parties are, you know, valid, etc.  Otherwise, the lender

8    would be funding into a borrower that is going to turn

9    around and attack it.

10            But we're not precluding the attack of any

11   creditors, the homeowners, the ad hoc committee, or anybody

12   else within the time frames permitted.  And that's the

13   protection for the estate.

14            MR. ALTER:  And just to take it one step farther,

15   there is no prohibition in this order regarding

16   non-derivative claims.

17            MR. CHEHI:  Oh, that's right.  The issue of

18   derivative claims or not, this doesn't preclude people from

19   asserting claims.  It just says that for -- there's a --

20   there are two 90-day periods in here measured differently,

21   depending -- the committee gets 90 days from the time it's

22   formed.  It's not prejudiced by the delay in that.  They

23   have a right to go back and look at whatever -- the

24   stipulations and admissions contained in the order.  And if

25   they bring on a cause of action or a challenge to any of

```
 1     those -- the substance of any of those stipulations and

 2     admissions and they ultimately are successful with those

 3     challenges, then those stipulations and admissions are not

 4     enforceable against the estate.  And whether it's a

 5     derivative claim or not, that's what it's doing.  It's not

 6     purporting to release the lenders from any claims at all;

 7     it just sets a time frame for challenging these relatively

 8     basic stipulations --

 9               THE COURT:  Which I understand.  You obviously

10     want a timeline in there.

11               MR. CHEHI:  Right, 90 days.  And we were -- you

12     know, it was originally 60, which is, you know, sort of a

13     standard in some areas.

14               THE COURT:  (Inaudible, talking over each other.)

15               MR. CHEHI:  The U.S. Trustee asked for 90 days,

16     three months.  So it's going to be three months, which is a

17     fairly ample period of time for somebody to do whatever the

18     debtor has already done in looking at the credit agreement

19     and the closing opinion; and do more, for that matter.

20               UNIDENTIFIED SPEAKER:  And, again, so that the

21     record is clear.

22               THE CLERK:  Excuse me.

23               MS. TANABE:  Your Honor, may we be heard on this

24     issue?

25               THE CLERK:  Would you please identify yourself,
```

08-61570-RBK  Doc#: 548  Filed: 03/10/09  Entered: 03/10/09 08:40:56  Page 20 of 50

1    the gentleman that just spoke?

2             MS. TANABE:  Sure.  My name is Kesha Tanabe, I'm

3    appearing for Michael Snow.

4             MR. CHEHI:  That was Mark Chehi of Skadden-Arps

5    for Credit Suisse.

6             THE CLERK:  Thank you.

7             MR. ALTER:  And Jonathan Alter again.  My

8    understanding is that the 90-day period does not apply to

9    non-derivative claims.  That was the point I was trying to

10   make.

11            MR. CHEHI:  You know, this is not purporting to

12   preclude anybody from bringing any direct claim.  If people

13   have claims against, you know, the lenders, whatever they

14   are, they're going to assert them.  This goes to the timing

15   of the challenge of the stipulations and admissions.  Thank

16   you.

17            THE COURT:  Regarding the term sheet, before

18   that's finalized, I assume the preparatory paragraph would

19   probably be removed that talks about:  This is for

20   discussion purposes only.

21            And maybe yours is already off.

22            MR. PATTEN:  It will be removed if it hasn't

23   already, Judge.

24            THE COURT:  Maybe you've already taken it off of

25   yours.  I don't know.

1                MR. CHEHI:  We, we don't have the version that

2    Your Honor is looking at.

3                THE COURT:  That you gave me yesterday?

4                MR. CHEHI:  The one that was given to you

5    yesterday, you know, the term sheet, I think there was a

6    final version that should have been submitted without that.

7    But if there's something on it, you could "X" that out,

8    "for discussion purposes only".

9                THE COURT:  Okay.  Because this is, in essence,

10   incorporated into the order.

11               MR. CHEHI:  Absolutely, Your Honor.  And there

12   were a guarantee, a set of guarantor signatures, and a

13   paragraph related to that, which goes to the rear of the

14   term sheet.

15               THE COURT:  Exactly.  Now, there's some blanks.

16   Have those been filled in?  I'm thinking of availability as

17   to dollars.  On the bottom of -- there's no pagination of

18   this.  It's the second page.  At the bottom, it says

19   (quoted as read):

20               "Lenders will fund the DIP loans" - (inaudible) -

21   "closing date" - (inaudible) - "collateral" - (inaudible) -

22   "maintained by the agent."  (Inaudible) -- "DIP loans will

23   be made available to borrow upon entry of the interim

24   order."

25               You've discussed what that amount is, or is that

22

1    still up in the air?

2           MR. CHEHI:  Your Honor, it could be the full

3    amount of the 4.4 or 4.5.  Or if the Court wanted to limit

4    it to some lesser amount pending the final hearing, given

5    the fact that I believe Your Honor scheduled us to be back

6    here on November 25th, the amount, if not the full

7    4.4 million or 4.5 million should be at least an amount

8    sufficient to cover the debtors' operations through that

9    final -- that next hearing date of --

10           THE COURT:  So it would either be the full amount

11   or equal, equal percentages for the three weeks --

12   (inaudible.)

13           MR. CHEHI:  Tracks the budget to cover, to cover

14   the debtors at least through the final hearing day or a day

15   thereafter.

16           THE COURT:  Okay.  Well, I'm just wondering if

17   you guys had the -- what number you guys wanted to put in

18   here.

19           MR. CHEHI:  We're not opposed to having the full

20   amount in there.  We did not want to be presumptuous to say

21   that it should be all authorized on Day 1.  But given the

22   short period of time here, Your Honor, it's --

23           THE COURT:  Well, I think it's being all

24   authorized by the interim order.  But it could be, it could

25   be disbursed, I guess, by an agreement with the parties in

1    equal installments, or something.

2             MR. PATTEN:  Well, I think it would be disbursed

3    from that account into the debtor-in-possession account.

4             THE COURT:  Yeah, okay.  I'm just looking for

5    blanks, just to make sure there's something that --

6             THE CLERK:  Excuse me, Judge.  I believe there

7    might be someone on the telephone that wanted to make a

8    comment.

9             THE COURT:  Okay.  Well, I'll take those up in a

10   minute.

11            Voluntary prepayments.  I guess I wondered why

12   you would only take minimums of 100,000.  Why wouldn't you

13   take anything?

14            MR. CHEHI:  Your Honor, in some senses there's an

15   administrative cost to processing the payments, and the

16   like.  In this case, unfortunately, I don't think we're

17   going to have to worry about any voluntary - (inaudible) -

18   payments before the term -- (inaudible.)

19            THE COURT:  Well, you're probably right.  I just

20   saw the number and thought it's interesting.

21            And I'll tell you, I don't know which page it is

22   because they're not paginated, but it deals with expenses

23   and indemnifications (quoted as recorded):

24            "Borrowers" - (inaudible) - "indemnified,

25   provided that no indemnified person would be indemnified

1    for any costs, etc., as a result" - (inaudible) -

2    "negligence or willful misconduct."

3              It's a fairly high standard.  Is there a reason?

4              MR. CHEHI:  Again, that's, that's the standard

5    term that the, that the lenders are assisting upon.  And in

6    some other jurisdictions, Your Honor, it's fairly standard

7    and an expectation of the parties.

8              THE COURT:  Okay.  Under Exhibit A, "additional

9    conditions precedent", Paragraph 3, about the fifth line, I

10   think we're missing the word "days".  We have (quoted as

11   recorded:  "Three business after the petition date."

12             I assume it's "days".

13             MR. CHEHI:  Yes, Your Honor.

14             THE COURT:  And then Exhibit A, Exhibit B,

15   Exhibit -- or Annex.  I guess these are Annex A, Annex B,

16   the approved budget, that's, that's what was a separate

17   document?

18             MR. CHEHI:  Yes, Your Honor.  That was the

19   exhibit entered into the record yesterday.

20             THE COURT:  This is the management case weekly

21   DIP budget?

22             MR. CHEHI:  Correct.

23             THE COURT:  Okay.  And then the form of note,

24   that's probably your standard note.

25             MR. CHEHI:  There are in excess of a dozen

1   participating lenders, I believe, in this at this point,

2   and so there's going to be a form of note that will be

3   roughly identical for all them.  And as a condition of

4   closing, there's actually going to have to be a note signed

5   for each of them.

6           THE COURT:  Okay.  So is that part of this order?

7   I mean this is an attachment, attachment to the order,

8   right?

9           MR. CHEHI:  Yeah.  That can be to-be-provided,

10  Your Honor.  I think everyone's in agreement on the form of

11  the note.

12          THE COURT:  I mean I don't think terms of the --

13  forms of the note need to be in the court order.

14          MR. CHEHI:  Not today, Your Honor.

15          THE COURT:  What about the organizational

16  structure?  Is that something --

17          MR. CHEHI:  That's something that's required by

18  the terms of the facility.  Since the original Credit

19  Suisse loan was put in place, there have been subsequent

20  changes to the organizational structure of the, of the

21  borrowers and their subsidiaries.  And that information has

22  not yet been shared entirely with Credit Suisse.  And so as

23  part of the conditions to closing or conditions to continue

24  funding, there's going to have to be an organizational

25  chart provided by the company.  We understand that that's

1    being prepared and they have to clean it up and provide it

2    to us so we know who the subsidiary guarantors are, for

3    instance, Your Honor.

4              THE COURT:  Okay.  I guess really what I --

5    probably the more important question is:  Why can't the

6    form of the note, Annex B, be pulled out of this term?  And

7    if there's a reference to an incorporation of Annex B in

8    this term sheet, why isn't it just as attached to -- or as

9    subsequent -- as separately identified in the note as well

10   as this organizational structure?  I guess I just don't see

11   why you need to hold -- I mean if I sign this today, it's

12   going to get docketed today.

13             MR. CHEHI:  Yes, Your Honor.  I think they're for

14   working purposes.  Given the fact that time is of the

15   essence with this, this financing, we could -- Your Honor

16   could note on each of those pages "to be provided".

17             THE COURT:  I guess my point is:  Why do they

18   even need to be in this, though?  I mean you want them for

19   your loan documents.  Why can't they just be in your loan

20   documents?

21             MR. CHEHI:  Well, Your Honor, what you're holding

22   there, the term sheet, is actually our loan document

23   because we do not have a fully -- we don't have an

24   additional credit agreement.  The term sheet and the form

25   of the notes, and the like, and all the terms, and that, is

1    the governing loan documentation at this point.

2         THE COURT:  But you're, you're incorporating, by

3    reference, this into my order, right, or my law?

4         MR. CHEHI:  Yes.

5         THE COURT:  I mean the term sheet is Exhibit 1.

6         MR. CHEHI:  Correct.

7         THE COURT:  I just think it's kind of unwieldy to

8    be having the note and the organizational structure in my

9    interim order.  It should just be in your loan documents.

10        MR. CHEHI:  Typically, what we would do, Your

11   Honor, had we had the time and the opportunity and had the

12   debtors had the resources, etc., to draft a complete formal

13   credit agreement, in addition to the term sheet, the credit

14   agreement itself would be attached to the form of order

15   because the Court is, in effect, authorizing the financing

16   pursuant to the credit documentation between the parties,

17   and we attached that to the form of order.  (Inaudible) --

18   authorizing this particular credit agreement, these

19   particular terms.

20        In this case, the term sheet is a relatively

21   detailed term sheet.  And for purposes of the interim

22   order, at least - and maybe for the purposes of the final

23   order, as well - we'll be operating off of the term sheet

24   with those various exhibits.  And by the time we get to

25   the, you know, the final hearing, we would expect that

1    we'll have, you know, have all those forms together.  And,

2    in fact, before there's going to be any significant funding

3    except to the extent that Credit Suisse, you know,

4    otherwise consents, the debtors will have to obviously

5    provide the notes and the, and the other documents -

6    (inaudible) - organizational structure that are required.

7         THE COURT:  Then do you expect that the signed

8    document from the subsidiary guarantors are also included

9    as an attachment to the interim order as part of the term

10   sheet?

11        MR. CHEHI:  Yes, to the rear of the term sheet.

12        THE COURT:  So, what, this gets filed without

13   signatures?

14        MR. CHEHI:  Yes, Your Honor, you're authorizing

15   those -- that form of documentation.  And then once we've

16   received the signatures, we'll feel comfortable.  And that

17   will be part of the closing conditions that we actually

18   have signatures from the guarantors.

19        THE COURT:  Mr. Chehi, you basically are telling

20   the Court that, but for this interim order being signed as

21   it's presented to me at this point in time with the term

22   sheet and the budget attached, you won't provide interim

23   financing?

24        MR. CHEHI:  Your Honor, that's correct.  And

25   that's the directive we received from our clients, of

1    course.  I'm just a lawyer here.  But these were the terms

2    that everyone agreed to.  And, in fact, the commitments to

3    fund, and the like, that have been received from the

4    various lenders who are willing to provide this facility is

5    predicated upon these forms of documents which they and

6    their attorneys have reviewed and clearly instructed us

7    that there's not to be any changes to the terms.  These are

8    the, these are the terms upon which they're willing to

9    lend.

10          THE COURT:  Mr. Patten, if, in fact, I don't sign

11   this order, what other options do you have on behalf of the

12   debtor for interim financing?

13          And this was testified to yesterday --

14          MR. PATTEN:  Yeah.

15          THE COURT:  -- but I guess just want you to

16   restate it.

17          MR. PATTEN:  Well, there's been discussions and

18   negotiations with Cross Harbor who have offered to provide

19   debtor-in-possession financing.

20          THE COURT:  At the terms that was testified to

21   yesterday?

22          MR. PATTEN:  Yeah.  They would require a priming

23   lien, they would require a confirmed plan by February 13th,

24   they would -- as I understand the proposal, they would

25   require a 363 sale immediately after February 13th, and

1    they would provide funding up to February 13th without a

2    commitment to fund any further.  There would be a --

3              THE COURT:  To which Credit Suisse is, is --

4    objects to?

5              MR. PATTEN:  I think what Credit Suisse objects

6    to is the priming lien.

7              THE COURT:  Mr. Chehi, I think I'll have you

8    confirm that.  I think that's what I heard yesterday.

9              MR. CHEHI:  Yes, Your Honor.  To the extent that

10   any party in interest would, you know, propose

11   debtor-in-possession financing and there were to be a

12   motion filed, which there hasn't been, of course, that

13   would purport to or request approval of priming of our

14   preexisting liens, we would certainly oppose that.  And in

15   the case of, you know, Cross Harbor, and the like, given,

16   you know, relationships with the company, we would also

17   have additional reasons to object to that type of priming

18   in there providing the facility in the first place.

19              But we are looking forward to working

20   cooperatively with all the parties.  I think, pursuant to

21   the hearing yesterday, there have been actually a number of

22   meetings between all of the parties.  And since the hearing

23   concluded yesterday, everyone is working in good faith

24   towards trying to come up with a global resolution of all

25   of the issues, if possible.  And so we look forward to

1     doing that.

2           And our clients certainly feel that this is the

3     right thing to be done now for this three-week period to

4     permit the parties to work, but we would oppose any

5     alternative DIP financing that would prime us or contain

6     any other terms and conditions which we think would be

7     unacceptable for these debtors at this particular time.

8           MR. ALTER:  Your Honor, Jonathan Alter, if I

9     might.

10          THE COURT:  You may.

11          MR. ALTER:  Thank you.  The issue of priming

12    isn't going away, so we shouldn't fool ourselves.  To the

13    extent that we're back in front of this Court in three

14    weeks, there's a very strong likelihood that this is going

15    to be death by 1,000 cuts if CS is insisting on doing

16    another very small interim financing and prohibiting and

17    arguing vehemently that no nobody else can finance this

18    debtor and prime their interests.

19          What the members clearly want is some long-term

20    financing package that runs for a reasonable period of time

21    to provide some degree of certainty for this business to

22    allow them a reasonable restructuring process.  And rest

23    assured, no matter what the Court does today, we will

24    endeavor to give every single effort that we possibly can

25    to try to find ultimate financing that runs through a

1    season, that provides assurances to the employees, you

2    know, provides for assurances to the businesses that rely

3    upon the Yellowstone for their success through a winter

4    season.  But I'm going to speculate that many, if not all

5    of them, are going to require some degree of priming.  So

6    the priming issue is probably coming back; we're just

7    delaying the day of reckoning a couple of weeks.

8            THE COURT:  Yeah.  I mean that's, that's the

9    trouble I see with this three-week lending.  And I'm sure

10   the debtors concur, they'd like to have a longer, longer

11   term of interim financing which would give them additional

12   time to negotiate a plan of reorganization, which is their

13   goal.  So we are really under a crunch.  And when I say

14   "we", I mean everyone is.

15           Mr. Patten.

16          MR. PATTEN:  Your Honor, there's a, there's a

17   meeting scheduled next week for everyone to get together

18   and work on a longer-term financing.  I think one of the

19   problems that, that all of us face is that this bankruptcy

20   has come to a head literally in the last couple of weeks,

21   and so there is a lot of information that people don't have

22   and that people have to get in order to evaluate any kind

23   of a longer-term arrangement.  And that's the basis for

24   the, the three-week proposal, is that enables Credit Suisse

25   to try and fill in a lot of blanks that it has about the

1    business and where the business can go and what the

2    business plans are going to be.  And that without that,

3    they're flying in the dark and are unwilling to make any

4    longer-term commitment until they have that information and

5    can analyze it and digest it and understand it.

6         THE COURT:  And I would think, from the

7    standpoint of CS, they have enough money into this project

8    that in order to get their money out of it, they need to

9    see some things occur to recover the $307 million.

10        MR. PATTEN:  Or -- but I'm not sure, and I don't

11   want to speak for them, but I think they have to be

12   satisfied they're not throwing good money after bad.

13        THE COURT:  Exactly.  I cut off some people

14   earlier.  If you would like to make additional comments,

15   I'll certainly allow that for the record.  Mr. Alter?

16        MR. ALTER:  Yes.  Thank you, Your Honor.  And I

17   recognize fully the position taken by CS.  And I guess in

18   some ways, some of my comments are simply notifying the

19   Court the provisions in this order so that Your Honor is

20   aware.  I note that one change was made that was simply

21   factual, which is to add that this hearing occurred on --

22   over a two-day period.

23        With respect to Paragraph 3 of the order, we have

24   placed in there certain language that reserves the rights

25   of parties to object in the context of the final order.

1    And I believe that language was acceptable.

2            In addition, in Paragraph 5(d), we spoke with the

3    debtors' counsel and with CS and placed some language in

4    there that preserves the right to actually -- for Your

5    Honor to rule on issues of professional fees associated

6    with the DIP lenders.

7            With respect to Paragraph 7(b), I simply note for

8    the Court that there is no carve-out for any creditors

9    committee.  I also note for the Court that it's probably

10   academic since we're talking about a two-and-a-half-week -

11   three-week period of time.  But I assume that in the

12   context of a final order, that issue will come back.

13           THE COURT:  That may need to be dealt with.  I

14   guess we'll see.  Because, obviously, the 341 meeting,

15   maybe it's been set at this point.  I'm not sure.

16   Mr. McKay can probably elaborate on that.  But I suspect

17   it's in December sometime.

18           TRUSTEE McKAY:  I believe it's either December

19   17th or 18th.

20           UNIDENTIFIED SPEAKER:  It's the 18th, Your Honor.

21           THE COURT:  Okay.  The 341 meeting, just to

22   paraphrase what was said probably off the record, is

23   December 18th --

24           TRUSTEE McKAY:  And that will be held in Butte.

25           THE COURT:  -- which will be held in Butte for

1    anyone that wishes to attend.  At what time?

2           TRUSTEE McKAY:  Ten o'clock.

3           THE COURT:  Ten o'clock.  So, obviously, there

4    won't be a creditors committee up and running probably

5    before that time.

6           TRUSTEE McKAY:  We're going to make every effort,

7    Your Honor, to get our arms around that in the next several

8    days.  And it may be that we will be able to appoint one.

9    And I've also been talking with Mr. Alter and other parties

10   about the possibility that it may be that they will want to

11   make the motion asking the Court to order us to appoint a

12   separate equity -- or members committee.  My concern is

13   that the general unsecured creditors may sort of get

14   swallowed up in the whole - (inaudible, out of range of

15   microphone) - and so we're thinking about that possibility,

16   also.

17          THE COURT:  Yeah.  Just to paraphrase again - I'm

18   sure Mr. McKay is probably off the sound system - but

19   they're looking at trying to do something regarding the

20   official creditors committee very shortly - in the next few

21   days, if possible - and see where they're at with that, as

22   well as to determine the appropriateness of having some

23   type of ad hoc official members committee, as well.  So --

24          MR. ALTER:  That is correct.  And we are engaged

25   in conversations at this point in time.

1          Your Honor, my next comment and notation for the

2     record is in Paragraph 9, which is entitled "protection of

3     DIP lender rights".

4          And, again, I understand the position that's been

5     espoused by CS and its counsel.  I note for the record that

6     in the event of a default, in five business days, the

7     automatic stay is automatically vacated.  That obviously

8     puts the onus upon other parties to rush in, find Your

9     Honor, get a hearing, and get an order within five business

10    days.

11         I also note that the CS counsel has not agreed

12    that there can be an emergency hearing, and they have also

13    indicated in this provision that Your Honor is restricted

14    in only looking at the issue of whether there was a

15    default, obviously depriving Your Honor of any other rights

16    to consider the equities of the case under Section 105 or

17    otherwise.  Obviously, that's troubling, but again, I note

18    the position that's been espoused by CS.

19         With respect to Paragraph 10 and the succeeding

20    paragraph which deals with the 506(c) surcharge waiver, my

21    recollection is that counsel and Court properly stated that

22    the language of this document provides that the 506(c)

23    waiver is not affected until the final order is entered.

24    However, I do note for the record that the succeeding

25    paragraph, which is entitled "payments free and clear",

1    provide that any payments that are made are made without

2    any right of anyone to allow for a Section 506(c)

3    surcharge.  So with one hand, they giveth; and with one

4    hand, they taketh away.

5          With respect to Paragraph 18, which is entitled

6    "the effect of the stipulation on third parties", there is

7    a provision -- and hopefully you can locate it, Your Honor.

8    I believe it's "III".  And they have made a change in the

9    last version of the document.  In the past, there would be

10   an extension allowed of the period of time by which third

11   parties can investigate derivative claims if there is

12   consent or if the judge has ordered.  They have taken that

13   out.  And now the extension of the period of time is only

14   if they consent and the judge orders.  So in other words,

15   they have deprived Your Honor of the opportunity to ruling

16   that an extension for cause is warranted unless they think

17   that you should.

18         By the way, I also note for the record my

19   understanding that I've confirmed with counsel for CS that

20   the requirement in the bottom of Paragraph 13 that there be

21   a final order entered in favor of - (inaudible) - challenge

22   or claim is not tied to the 90-day period as provided

23   earlier in the provision.  In other words, a claim has to

24   be filed against the lender within a 90-day period, but

25   there is not a 90-day period of time to actually get an

1    entry of an order finding that the claim is disallowed or

2    there's otherwise a claim against the lenders.

3          In addition, Your Honor, I note for the record

4    that in Paragraph 20, which is entitled "limitation on use

5    of DIP facility proceeds and collateral", by negative

6    inference, it would seem that the parties are allowed to

7    investigate claims against the, the DIP lenders or the

8    prepetition lenders.  I have confirmed with CS's counsel

9    that there is no limitation in this provision on the right

10   of parties to use the funds to investigate claims.

11         And lastly, Your Honor, just as a matter of

12   clarity for the record, I had asked, with respect to

13   Paragraph 22 at the bottom of Subparagraph A, why the

14   attorneys at CS were insisting that they not have to comply

15   with Rule 2019 of the Federal Rules of Bankruptcy

16   Procedure.  And I have been told that that is because they

17   only represent one party, they represent CS as the agent.

18   In that case, I would have no objection to that language.

19   Thank you.

20         THE COURT:  Thank you.  Mr. Bender, I believe you

21   had some comments that I cut you off earlier on.

22         MR. BENDER:  I do, Your Honor.  Ronald A. Bender

23   for Michael Snow.

24         I just wanted to point out that in terms of the

25   proposed order, we filed a notice of the deletions and

1    additions.  And I'd be glad to go through the Court with

2    all of them in terms of what they are, but basically, they

3    basically follow our objections in terms of basically

4    giving Credit Suisse, in terms of its -- and the

5    prepetition lenders more rights than they had before.  We

6    don't have any problem with the DIP, and all that, but

7    basically giving them more rights that they had before in

8    terms of the waiver, and indemnification, the use of the

9    cash collateral, that's what we object to.  And I've gone

10   through and listed all our languages that's basically to

11   accomplish that, and that's the - (inaudible) - of what

12   that does.  And if the Court wants to go -- wants me to go

13   through that item by item, I'm glad to do it, but it's --

14   they're all marked out clear.

15          And that's our biggest concern, is basically that

16   any prepetition lenders basically are insulating themselves

17   from any claims and rights, and they're getting more rights

18   than they have now.  And that's our objection.

19          THE COURT:  Okay.  Yeah, your objection is noted.

20   You've filed this, as well, haven't you?

21          MR. BENDER:  Yes, Your Honor.

22          THE COURT:  Yeah.  Certainly, the Court has noted

23   your comments and concur with what, what has happened and

24   what is happening with the documentation and the order as

25   it relates to -- (inaudible, audio cuts out.)

1            Anyone else?  There was someone maybe by phone

2    that had a comment.  No?

3            MS. TANABE:  Your Honor, am I audible?

4            THE COURT:  Yes.

5            MS. TANABE:  This is Kesha Tanabe for Michael

6    Snow.  I'd just like to call your attention, if I may, to

7    Paragraph 18 in the proposed order.  You know, our concern

8    -- and we heard it said that, that this order wouldn't

9    impact any third parties, especially with respect to the

10   derivative claims against the, the lenders.  You know, our

11   concern is that, as a practical matter, the time frame here

12   is actually rather tight.  There may be instances in which

13   it's necessary for a party to move to establish standing,

14   for instance, in which it may not be possible for them to

15   commence a proceeding within 90 days, you know, after entry

16   of this order.  So, you know, it seems, in a sense, to say

17   in several parts of the order - in Paragraph 4, for

18   instance, and in Paragraph 19 - that, that there's no

19   prejudice to the rights of third parties, but it's always

20   subject to this time frame in Paragraph 18 which may, in

21   fact, make it, as a practical matter, not possible for

22   those parties to exercise their rights, and parties who may

23   or may not be here today.

24            So just concern that, that the release that's

25   being sought here will impact parties that are not present

1    and will not give them a full opportunity to assert

2    derivative claims, you know, in exchange for a, a -- in the

3    context of this DIP order which they may or may not have

4    notice of.  So I'd just like to note, if I may, that the 90

5    days is actually rather short and they prejudice those

6    parties, the 90 days referred to.

7              THE COURT:  Okay.  Any other comment?

8              MR. BUTLER:  I'll be brief, Your Honor.

9              THE COURT:  Mr. Butler.

10             MR. BUTLER:  Yes, sir, Your Honor.  Thank you.

11   We've raised that, the issue about the preclusion against

12   third-party investigations yesterday.

13             A thought occurred to me, though:  Nothing -- no

14   time frame set forth by this Court in any order you ever

15   enter is excluding Rule 9006 that would give any party

16   within the 90-day time frame the ability to come in and

17   request under Rule 9006 an extension of a time frame that

18   you put in place by order.  That may be a middle ground

19   that will cure these concerns if it's too short of a time

20   frame.

21             THE COURT:  Well, as I read the order, I can't

22   modify this order without the consent of CS, or they walk.

23             MR. BUTLER:  That provision I would strike if I

24   were, but, you know, that's --

25             THE COURT:  I told you they threw everything in.

1          MR. BUTLER:  Yeah.  I tried.

2          THE COURT:  I understand.  Any other comments?

3          You know, Mr. Butler, it's kind of like the

4   BAPCPA provisions:  You know, they try to take away our

5   discretion, you know, through congressional action; now the

6   creditors try to do it through the lending documents.  So

7   we're just here to do our job.

8          Any other comments?  Billings?  I'm not sure

9   who's appearing in Billings.

10          UNIDENTIFIED SPEAKER:  I'm just a reporter.

11          THE COURT:  Okay.  You know, I recognize and I

12   understand everyone's concern and objections - I have them

13   myself - and yet I also see if, in fact, we string this out

14   and I basically send everybody out in the hall and say,

15   "I'm not going to accept that provision and that

16   provision," by the time we're done with it, CS is going to

17   say, "I've got a plane to catch.  We're out of here.  You

18   know, send us our full amount, and we're not doing interim

19   financing."

20          Now, maybe I'm speaking on their behalf rather

21   than them saying, "Well, no, we want to stay in here and

22   try to work something out."

23          I think at some point, it becomes a diminishing

24   return and they're going to walk, which in the next three

25   weeks does not help this debtor.  It's $4.5 million, a

1   small percentage of the amount that's owed on this project

2   at 307 million-plus.  And even though it's primed and there

3   are things in here that probably impact -- well, that do

4   impact some rights, I don't know that there's any other

5   alternative, based upon the testimony that's presented to

6   me.  It's either we let this thing go forward for three

7   weeks to see if something can be worked out, or we

8   basically -- I say "no", and it probably ends up converted

9   before the middle of next week unless other financing is

10  arranged, maybe which would occur, I don't know.

11          But in the interim, we've lost -- we've had

12  employees' wages that are due and probably other bills that

13  are due in the interim.  And, suddenly, I think the

14  entities are going to start losing their employees because

15  they're going to have to find other employment.

16          And where does that leave -- and maybe we're just

17  deferring the inevitable.  Maybe we'll be here on the 25th,

18  and we still are having some difficulties in getting better

19  financing or longer-term financing.  But at least at that

20  point, we can say, "The effort was made and the opportunity

21  was given," and we'll see where, where they're at.

22          I don't know what else to do with this, to be

23  quite honest.  And maybe we've spent a lot of time going

24  over this stuff that typically in some districts would just

25  be signed without even a hearing, I don't know, but I guess

1   we don't do things quite that way here.  I like to have a

2   better, fuller discussion of some of this and have people

3   have the opportunity to voice their objections and --

4   which I'm going to overrule those objections at this point

5   in time.  You certainly may file additional objections

6   toward the final financing.

7           Given the record before me, I am going to sign

8   this order.  And I'm going to set final hearing for

9   November 20 -- what was it -- the 25th, I believe, wasn't

10  it?  We might as well do that at nine o'clock.  We'll do

11  that in Butte.

12          Mr. Patten.

13          MR. PATTEN:  I was going to ask where it was

14  going to be.

15          THE COURT:  Yeah.  You know, let me just ask

16  those -- I don't know who all would be at that hearing.

17  And maybe this is a minor thing and I shouldn't be worrying

18  about people's transportation and convenience, but I will.

19  How many people are flying by commercial airlines, and by

20  which commercial airlines, to get here?

21          The reason I ask that is because Butte's going to

22  limit you to Delta at this point in time.  And if you're

23  not flying Delta, that's, that's a concern; or if they

24  don't have seats available, that's a concern.  You're going

25  to have to go to another site and drive.  Which I really

1   shouldn't care about, but I do, because it's just more time

2   and expenses.

3          So Mr. Alter.

4          MR. ALTER:  I'll figure it out.  I appreciate

5   Your Honor's worry, but I'm sure we'll find a way to get

6   here.

7          THE COURT:  Okay.  Is that everybody's feeling:

8   Don't worry about it?

9          Everybody will fly in in their private jets, and

10   I won't have to worry about it anyway, so --

11          MR. BENDER:  You Honor, that's fine.  No private

12   jets here, but we'll make our way there.

13          THE COURT:  Well, I assume it's coach, as well.

14          MR. BENDER:  We're flying whatever's available

15   Your Honor.

16          UNIDENTIFIED SPEAKER:  Your Honor, that's fine,

17   but some of us will still be driving.

18          THE COURT:  Yeah, I know, they certainly will.

19   Anyway, it will be in Butte on Tuesday, nine o'clock.

20          UNIDENTIFIED SPEAKER:  Thank you.

21          THE COURT:  As it relates to the final

22   documentation, Mr. Patten, I need to, I guess, work out

23   with you if you're going to try to get these typed, have

24   your staff type them, e-mail them to me, or what your plan

25   is.

1          MR. PATTEN:  Judge, can you sign that order?  I

2   appreciate it doesn't look very professional, but we need

3   to get the money moving as soon as we can.

4          MR. HINGLE:  Your Honor, there's some -

5   (inaudible, out of range of microphone) - transferring that

6   much money --

7          THE CLERK:  Excuse me, Mr. Hingle, we're not

8   picking you up.

9          THE COURT:  And you've already missed wire

10  transfer times, probably, for today.

11         MR. HINGLE:  We want to wire first thing in the

12  morning.  We've asked the Court to initial it -

13  (inaudible) - if you would, sir.

14         THE COURT:  Okay.  Let me just get the one that

15  I -- see if I wrote all over it.

16         You know, this is a really poor copy, this one

17  here.

18         MR. HINGLE:  Do we have the original?

19         UNIDENTIFIED SPEAKER:  Andy?

20         MR. PATTEN:  Judge, all of the copies that we

21  have are bad, fuzzy like that.

22         THE COURT:  Well, who has this on system?

23  Mr. Hingle?

24         MR. PATTEN:  No.  It starts in --

25         MR. CHEHI:  Skadden does.

1          MR. PATTEN:  Skadden.

2          MR. CHEHI:  We can give it to you.

3          THE COURT:  Okay.  Well, rather than -- let's --

4   I'm going to recess this.  And, Mr. Patten, Mr. Hingle, or

5   whoever that can assist in facilitating this documents,

6   stay, so I can visit with you as to how I'm going to get

7   them.

8          MR. PATTEN:  Okay.

9          UNIDENTIFIED SPEAKER:  Your Honor, I believe

10  they've already been uploaded to the Court, and the Court

11  should have the final iteration of this order.

12         MR. PATTEN:  Not with that, no, not --

13         UNIDENTIFIED SPEAKER:  Not with the --

14         UNIDENTIFIED SPEAKER:  Not with the

15  interlineations.  You would have to add the --

16         THE COURT:  The interlineation.

17         UNIDENTIFIED SPEAKER:  Yes, sir.

18         THE COURT:  I mean this is just such a poor

19  copy --

20         UNIDENTIFIED SPEAKER:  I understand.

21         THE COURT:  -- that by the time it gets scanned

22  in and printed again, it's going to be worthless.

23         MR. PATTEN:  So, Judge, there is a Word copy

24  that's been -- propose to order that's been -- (inaudible.)

25         THE COURT:  This version?

1          MR. PATTEN:  Yeah.  So all we'd have to do is go

2     into the Word version and put in the changes that are

3     handwritten on the copy.

4          May I approach the bench, Your Honor?

5          THE COURT:  You may.

6          UNIDENTIFIED SPEAKER:  Judge?

7          THE COURT:  Yes.

8          UNIDENTIFIED SPEAKER:  Are there a bunch of

9     changes on that, on the version --

10          THE COURT:  Oh, there are about four -- they're

11     about four or five handwritten ones.  They're short

12     phrases.

13          UNIDENTIFIED SPEAKER:  I can do them from this

14     end because I have the latest version.

15          THE COURT:  You do?

16          UNIDENTIFIED SPEAKER:  Yes.

17          THE COURT:  Do you have the latest version of the

18     term sheet?

19          UNIDENTIFIED SPEAKER:  Not that's marked up.  But

20     if somebody gives me the changes that have, have been made

21     today, I can make them to the version that I had yesterday.

22          THE COURT:  Okay.

23          MR. PATTEN:  And I think we have to write in the

24     dollar amount on the term sheet.

25          THE COURT:  Right.  Let's go ahead -- this is

1  pretty much administrative.  This isn't, you know,

2  prejudiced to anybody's right at this point.

3          I am going to enter the order.  I've overruled

4  your objections, they're noted for the record.  So I'm

5  going to be in recess.

6

7                        * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I certify that the foregoing is a correct transcript

4    from the electronic recording of the proceedings in the

5    above-entitled matter, all done to the best of my skill and

6    ability.

7

8        _____   _____

9    Jonny B. Nordhagen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25