UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**YELLOWSTONE MOUNTAIN CLUB, LLC**,<br><br>        Debtor. | Case No. **08-61570-11**<br><br>Jointly Administered with: |
| In re<br><br>**YELLOWSTONE DEVELOPMENT, LLC**,<br><br>        Debtor. | Case No. **08-61571-11** |
| In re<br><br>**BIG SKY RIDGE, LLC**,<br><br>        Debtor. | Case No. **08-61572-11** |
| In re<br><br>**YELLOWSTONE CLUB CONSTRUCTION COMPANY, LLC**,<br><br>        Debtor. | Case No. **08-61573-11** |

**MEMORANDUM of DECISION**
**Regarding Contested Matter**
**Heard March 24, 2009**

At Butte in said District this 26th day of March, 2009.

1

In the above-referenced Chapter 11 bankruptcies, a hearing was held March 24, 2009, in Billings on the Debtor's "Motion to Vacate March 5, 2009, Order Directing that Hearing on Credit Suisse's Emergency Motion for Valuation of Secured Claims be Held on April 1, 2009" filed March 16, 2009, at Docket Entry No. 579.  Debtors' Motion was opposed in writing on March 20, 2009, by Highland Capital Management, LP and on March 23, 2009, by Credit Suisse. Steven Lehr of CB Richard Ellis, Brad Foster of FTI Consulting, Inc. and James P. Winchell of Galusha, Higgins and Galusha testified.  Credit Suisse's Exhibits 2, 3 and 4 were admitted into evidence.

The following appearances were made at the March 24, 2009, hearing:  James A. Patten of Billings, Montana for the Debtors; Mark S. Chehi and Robert S. Saunders of Wilmington, Delaware, Evan R. Levy of New York, New York and Shane Coleman of Billings, Montana for Credit Suisse; Jonathan B. Alter of Hartford, Connecticut and John Grant of Helena, Montana for the Ad Hoc Committee of Yellowstone Club Members ("Ad Hoc Committee"); Paul D. Moore of Boston, Massachusetts and Benjamin P. Hursh of Missoula, Montana for CrossHarbor Capital Partners and CIP Yellowstone Lending, LLC ("CrossHarbor"); J. Thomas Beckett of Salt Lake City, Utah for the Official Committee of Unsecured Creditors (the "Committee"); Joel E. Guthals of Billings, Montana for Timothy Blixseth; and Michael D. Warner of Fort Worth, Texas for Highland Management, L.P.  The following attorneys monitored the proceeding telephonically: Dean Stensland and Ronald Bender, both of Missoula, Montana.

The Debtors' motion heard March 24, 2009, was filed in response to an Emergency Motion for Valuation of Secured Claim filed by Credit Suisse on March 2, 2009, wherein Credit Suisse seeks an order from this Court setting the amount of Credit Suisse's allowed secured claim

2

at not less than $310 million. The valuation of allowed secured claims in Chapter 11 bankruptcies is governed by 11 U.S.C. § 506, FED. R. BANKR. P. 3012 and Mont. LBR 3012-1. After reviewing the record, the Court notes that Credit Suisse had not filed a proof of claim at the time it filed its motion for valuation of secured claim. Without a proof of claim, it would be premature for this Court to make a valuation determination. *In re Gehnert*, 15 Mont. B.R. 409 (Bankr. D. Mont. 1996). Credit Suisse, however, cured the foregoing defect when it filed Proof of Claim No. 633 on March 16, 2009, asserting a secured claim of not less than $307,000,000.

On their petition dates, the Debtors owed Credit Suisse not less than $307 million, which amount is secured by a substantial portion of the Debtors' assets. Credit Suisse's debt, consisting of three loans, is not secured by the Debtors' "Warren Miller Lodge." The Debtors assert that the Warren Miller Lodge is an integral component of the Debtors' master development, commonly referred to as the Yellowstone Club. The Warren Miller Lodge is a lodge facility and parking garage in the base village of the Yellowstone Club that is slated to include 21 condominium units, dining rooms, lounge, outdoor terrace, meeting rooms and other amenities. The Debtors were nearing completion of the Warren Miller Lodge prior to their bankruptcy filings.

Furthermore, in connection with the development of the Yellowstone Club, the Debtors established 40 Pioneer/Frontier memberships, 830 Resident memberships and 150 National memberships. Of the foregoing memberships, Debtors have not sold an estimated 481 Yellowstone Club resident memberships or the 150 National memberships. The last Resident membership sold by the Debtors sold for $300,000. The Debtors have not yet marketed or sold the National memberships, but previously anticipated selling such memberships at a price of $1 million each. A dispute may exist as to whether Credit Suisse has a security interest in the

unsold memberships.  Additionally, Credit Suisse may or may not have a security interest in some of the infrastructure at the Debtors' property.

In an effort to maximize the value of the Debtors' assets, the Debtors' propose to sell substantially all of their assets, with the exception of some lawsuits and similar intangible assets, in a single sale of equity interests in a new corporation.  Under Schedule 1.34, attached to Debtors' First Amended Joint Plan of Reorganization filed March 3, 2009, the Debtors propose that the purchaser of Debtors' assets will assume 17 Utility/Infrastructure Contracts, 10 Operational/Construction Contracts, 42 Lease Agreements, 212 Governmental Contracts and 20 Other Contracts.  In addition, pursuant to Schedule 1.87, the Debtors propose that the purchaser of Debtors' assets will assume roughly 241 Membership Agreements that are valid and in good standing and, pursuant to Schedule 1.94, the Debtors are rejecting various of the Pioneer and Frontier Membership Agreements, which agreements will be replaced by the purchaser with replacement memberships.

The Debtors contend that an equity sale, as opposed to an asset sale, will preserve the overall integrity of the Yellowstone Club and will preserve the Membership Contracts of those members who are in good standing at the Yellowstone Club.  The Debtors maintain that a sale of only assets, such as those that serve as collateral for the obligation owing to Credit Suisse, would result in not only substantial termination or rejection damages to the Debtors but also, would result in less sales proceeds because the Debtors' assets are worth more as a going concern.

In the present Motion, the Debtors' oppose Credit Suisse's request for valuation arguing that a valuation of Credit Suisse's assets is not necessary because: (1) Debtors' proposed auction of its equity "is the best evidence of its value to the exclusion of prior appraisals," (2) a valuation

4

hearing will chill the current bidding process, (3) this Court can allocate value among the Debtors' various assets at the confirmation hearing, and (4) that 11 U.S.C. § 1111(b) does not require a valuation determination. The Court finds no merit in the Debtors' arguments.

The Debtors rely on the case of *Romley v. Sun National Bank (In re The Two "S" Corporation)*, 875 F.2d 240 (9th Cir. 1989), for their argument that Debtors' proposed auction is the best evidence regarding the value of Debtors' assets. *Romley* is factually distinguishable from the instant case. In *Romley*, the bankruptcy trustee sold the debtor's equipment at auction for a price of $230,000. The bankruptcy trustee then filed an adversary complaint to determine the validity and priority of the various liens on the equipment and to determine the real value of the auctioned equipment. Two secured creditors moved for summary judgment arguing that the price obtained at the trustee's auction dispositively determined the equipments' value. The bankruptcy trustee opposed the creditors' summary judgment motion arguing that the court should consider appraisals of the property prior to its sale (estimating a liquidation value of $80,000 to a retail value of $171,708) and should consider the trustee's efforts to keep the debtor's business operating over a period of approximately one month. The bankruptcy court partially granted the creditors' motion for summary judgment, concluding that the $230,000 in sales proceeds represented the value of the equipment.

On appeal the Ninth Circuit upheld the bankruptcy court's partial summary judgment ruling, stating it had,

> found no cases holding that after a single asset is sold at a commercially reasonable sale the court is still required to consider other possible methods of valuation. Rather, the cases state that the price paid at a commercially reasonable sale is the best evidence of value. *In re Walkup*, 28 B.R. 225, 227 (Bankr.N.D.Ind.1983) ("Actual sales are the best evidence [of value]."); *In re The*

>*Kids Stop of America, Inc*., 64 B.R. 397, 401 (Bankr.M.D.Fla.1986) (If there is a disposition of the property, "then the valuation of the collateral should be based on the funds received from the disposition as long as the disposition was commercially reasonable.").

*Romley*, 875 F.2d at 243. The Ninth Circuit also concluded that the purchaser was buying nothing more than equipment because the Bill of Sale specifically stated that the only item being sold was "equipment, '*not*... the leasehold interests, goodwill, and trade name(s).' (emphasis in the original)." *Id*. at 244.

In the case *sub judice*, the Debtors are seeking to sell not just Credit Suisse's collateral, but their equity interests, which includes such items as leasehold interests, unexpired contracts, goodwill, trade names and the Warren Miller Lodge. In order to establish the amount of Credit Suisse's allowed secured claim under 11 U.S.C. § 506(a), this Court must know the value of Credit Suisse's underlying collateral, which simply cannot be determined from a sale of the Debtors' equity.

Moreover, in order to allocate any equity sales proceeds between Credit Suisse and other creditors, this Court must know the value of not only Credit Suisse's collateral, but also the value of all other tangible and intangible assets that will be included in Debtors' proposed equity sale. This Court will not allow the Debtors to proceed to confirmation without such necessary facts, particularly when Mont. LBR 3012-1 specifically provides that the "amount of an allowed secured claim may not be litigated at a confirmation hearing in a case under Chapter 11[.]" The Debtors' statement that this Court can allocate value among the Debtors' various assets at the confirmation hearing is, in reality, an in artful attempt by the Debtors to proceed with their sale, which will then force the parties to litigate the amount of Credit Suisse's allowed secured claim at

confirmation.  Such proposal by Debtors is backwards.

The Court is similarly not persuaded by the Debtors' argument that a valuation of Credit Suisse's collateral will chill bidding procedures.  Only a year ago, CrossHarbor was negotiating to purchase the Debtors' assets for an amount in excess of $400 million.  An appraisal done for Timothy L. Blixseth reflects that the "Total Net Proceeds" value of the Debtors as of August 26, 2008, was $1,114,000,000.[1]  Edra Blixseth testified in November of 2008 that Debtors' real estate properties had an approximate value of $780 million.  In contrast to Edra Blixseth's opinion, an appraisal done on behalf of Credit Suisse shows that as of November of 2008, Debtors' properties had a value of $310 million.  And now, CrossHarbor seeks to snatch Debtors' assets out of bankruptcy for a price they argue equates to $100 million.  The Court cannot fathom how assigning a value to Credit Suisse's assets could have any more of a chilling effect on the bidding process than the prior valuation estimates that are already circulating through this case.

This case cannot be propelled through the confirmation process when it is plagued with speculation and uncertainty, such as it is now.  The parties agree, at least in open court, that this case must proceed with transparency.  Assigning a value to Credit Suisse's collateral is a

---

[1] For purposes of the August 2008 report, "Total Net Proceeds is defined as the aggregate sum of master development net cash flows excluding any deduction for master developer's profit, return or the time value of money. Net cash flows are derived by estimating individual component land/property sale revenue events as they occur and deducting associated master development related costs. Land/property sale revenues may include, but are not limited to, bulk residential lots, existing home inventory, commercial land, golf courses, and other nonresidential land property types. Master developer costs may include, but are not necessarily limited to, applicable infrastructure construction, off-sites, grading, master marketing, and related carrying costs. Master developer's profit/entrepreneurial reward and present value calculations have not been considered or applied in estimated Total Net Proceeds. Total Net Proceeds is not a value estimate nor should be construed as such. The client has specifically requested the appraiser(s) report Total Net Proceeds, as defined."

necessary component of transparency and is also a necessary component in order to protect Credit Suisse's rights under the Bankruptcy Code. Therefore, the Court must deny Debtors' baseless attempt to sidestep Credit Suisse's motion for valuation of collateral.

Notwithstanding such decision, the Court is also aware that the Official Committee of Unsecured Creditors has filed an Adversary Complaint against Credit Suisse seeking to unravel the loans made by Credit Suisse to the Debtors. Whether a valuation of Credit Suisse's collateral is necessary depends first on the outcome of the pending adversary proceeding. Trial in the adversary proceeding is scheduled to commence on April 22, 2009, and conclude on or before April 29, 2009. Accordingly, any valuation of Credit Suisse's collateral before April 29, 2009, would be a waste of the parties and this Court's resources.

The Court also agrees with the Unsecured Creditors' Committee, that this case could benefit from a Court ordered mediation conference. Some of the attorneys in this case seem all too happy to litigate every little nuance. Such attitude may benefit the attorneys, but it certainly does not benefit the Debtors, creditors or other parties in interest. Perhaps with a little dose of reality from a mediator who is knowledgeable about the bankruptcy process and with a little open-mindedness on the part of the parties, the parties might be able to resolve most, if not all, of their pending disputes. Rather than face the realities of this case, particularly in the current economic climate, the parties instead come to Court ready for a fight, throwing reason out the window. At least one party in open court on March 24, 2009, suggested that a closed- room settlement conference may achieve a resolution of the contentious issues in this case. The Court, in viewing the excessive litigating tactics in this case concludes a mediation between the contesting parties may promote resolution of the issues that the parties have been unable to

accomplish through constructive negotiation. These Chapter 11 cases and the associated adversary proceedings should not be a lawyers' relief program. Consequently, this Court is directing and mandating by this Memorandum and separate order that the parties in this case set aside an entire day to mediate the pending valuation issue and their confirmation disputes with the Honorable John L. Peterson, who retired in 1999 but is currently on recall status. Judge Peterson has served as a bankruptcy referee or judge since 1963 and is familiar with the Bankruptcy Code and Rules. Perhaps with his expertise, the parties may reach some realistic and consensual middle ground in this case and the associated adversary proceedings.

The Court is requiring that mediation occur prior to the trial in the related adversary proceeding. In an attempt to avoid any issues concerning Passover and Easter and given the requirements of this case, the only possible date for the mediation is Friday, April 17, 2009. Also, looking forward, the Court is tentatively continuing the hearing on Credit Suisse's Motion for Valuation from April 6, 2009, to May 8, 2009. The Court will continue with the hearing on Debtors' Disclosure Statement on April 6, 2009, but will *sua sponte*, and for good cause, extend the time for Credit Suisse to make its 11 U.S.C. § 1111(b) election to May 11, 2009, at 12:00 Noon, MDT. The Court is also tentatively scheduling the hearing on confirmation of the Debtors' Chapter 11 Plan for Monday, May 18, 2009. In accordance with the above findings of fact and conclusions of law, the Court will enter a separate order providing as follows:

IT IS ORDERED that Debtor's "Motion to Vacate March 5, 2009, Order Directing that Hearing on Credit Suisse's Emergency Motion for Valuation of Secured Claims be Held on April 1, 2009" filed March 16, 2009, at Docket Entry No. 579, is DENIED; and the hearing on Credit Suisse's Emergency Motion for Valuation of Secured Claim filed by Credit Suisse filed March 2,

2009, at Docket Entry No. 489 is continued from April 6, 2009, to **Friday, May 8, 2009, at 09:00 a.m.** in the BANKRUPTCY COURTROOM, RUSSELL SMITH COURTHOUSE, 201 EAST BROADWAY, MISSOULA, MONTANA.

IT IS FURTHER ORDERED that for good cause shown, the deadline for Credit Suisse to make any election under 11 U.S.C. § 1111(b) is extended beyond the hearing on approval of Debtors' Disclosure Statement to May 11, 2009, at 12:00 Noon, MDT.

IT IS FURTHER ORDERED that Credit Suisse's Emergency Motion for Valuation of Secured Claims and the issues surrounding the Debtors' proposed Chapter 11 Plan are hereby referred to the Honorable John L. Peterson for mediation on Friday, April 17, 2009. Judge Peterson will enter a separate order governing the mediation process.

        BY THE COURT

        */s/ Ralph B. Kirscher*
        HON. RALPH B. KIRSCHER
        U.S. Bankruptcy Judge
        United States Bankruptcy Court
        District of Montana