IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

_____
                                        )
In Re:                                  ) Case No. 08-61570
                                        )
Yellowstone Mountain Club, LLC,         )
                                        )
            Debtor.                     )
_____        )

THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

December 5, 2008

Transcript Services:

Proceedings recorded by electronic recording;
transcript produced by reporting service.

```
1                              APPEARANCES

2

3           FOR THE DEBTOR:

4               JAMES A. PATTEN

5               Attorney at Law

6               Suite 300, The Fratt Building

7               2817 Second Avenue North

8               Billings, MT  59101

9

10          FOR THE OFFICE OF THE U.S. TRUSTEE:

11              DANIEL P. McKAY

12              Trustee

13              U.S. Trustee's Office

14              Liberty Center, Suite 204

15              301 Central Avenue

16              Great Falls, MT  59401

17

18          FOR CREDIT SUISSE:

19              MARK S. CHEHI

20              Attorney at Law

21              Skadden, Arps, Slate,

22                Meagher & Flom

23              One Rodney Square, Seventh Floor

24              Wilmington, DE  19801

25
```

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

```
 1                APPEARANCES (continued)

 2

 3      FOR CREDIT SUISSE:

 4          SUSAN BROWN

 5          MEGAN E. CLEGHORN

 6          Attorneys at Law

 7          Skadden, Arps, Slate,

 8            Meagher & Flom

 9          Four Times Square

10          New York, NY  10036-6652

11

12          SHANE P. COLEMAN

13          Attorney at Law

14          Holland & Hart

15          401 North 31st Street, Suite 1500

16          Billings, MT  59101

17

18      FOR THE AD HOC COMMITTEE OF YELLOWSTONE

19      CLUB MEMBERS:

20          JOHN H. GRANT

21          Attorney at Law

22          Jackson, Murdo & Grant, PC

23          203 North Ewing

24          Helena, MT  59601

25
```

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

```
 1                    APPEARANCES (continued)

 2

 3          FOR THE AD HOC COMMITTEE OF YELLOWSTONE

 4          CLUB MEMBERS:

 5              JONATHAN B. ALTER

 6              Attorney at Law

 7              Bingham McCutchen, LLP

 8              One State Street

 9              Hartford, CT  06103

10

11          FOR MICHAL SNOW:

12              RONALD A. BENDER

13              MATTHEW J. CUFFE

14              Attorneys at Law

15              Worden Thane, PC

16              P.O. Box 4747

17              Missoula, MT  59806

18

19

20

21

22

23

24

25
```

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

```
1                   APPEARANCES (continued)

2

3        FOR THE MONTANA DEPARTMENT OF REVENUE:

4            KEITH JONES

5            TERESA GRACE WHITNEY

6            JOEL E. SILVERMAN

7            Attorneys at Law

8            Montana Department of Revenue

9            P.O. Box 7701

10           Helena, MT  59604-7701

11

12       FOR NORMANDY HILL CAPITAL, LP:

13           QUENTIN M. RHOADES

14           Attorney at Law

15           Sullivan, Tabaracci & Rhoades

16           1821 South Avenue West, Third Floor

17           Missoula, MT  59801

18

19       FOR PRIM VINTAGE DEVELOPMENT, LP:

20           DEAN A. STENSLAND

21           Attorney at Law

22           Boone Karlberg, PC

23           P.O. Box 9199

24           Missoula, MT  59807

25
```

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

```
 1                    APPEARANCES (continued)

 2

 3         FOR GARLINGTON, LOHN & ROBINSON, PLLP:

 4              STEPHEN R. BROWN

 5              Attorney at Law

 6              Garlington, Lohn & Robinson, PLLP

 7              P.O. Box 7909

 8              Missoula, MT  59807-7909

 9

10         FOR CROSSHARBER CAPITAL PARTNERS, LLC:

11              BENJAMIN P. HURSH

12              Attorney at Law

13              Crowley, Haughey, Hanson,

14                Toole & Dietrich, PLLP

15              P.O. Box 7099

16              Missoula, MT  59807

17

18         FOR CROSSHARBER CAPITAL PARTNERS, LLC:

19              WILLIAM D. LAMDIN, III

20              Attorney at Law

21              Crowley, Haughey, Hanson,

22                Toole & Dietrich, PLLP

23              P.O. Box 2529

24              Billings, MT  59103-2529

25
```

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

```
 1                    APPEARANCES (continued)

 2

 3        FOR CROSSHARBER CAPITAL PARTNERS, LLC:

 4            PAUL D. MOORE

 5            Attorney at Law

 6            Duane Morris, LLP

 7            470 Atlantic Avenue, Suite 500

 8            Boston, MA  02210-2600

 9

10        FOR DISCOVERY LAND COMPANY:

11            STEVEN G. SKLAVER

12            Attorney at Law

13            Susman Godfrey

14            1901 Avenue of the Stars, Suite 950

15            Los Angeles, CA 90067-6029

16

17

18

19

20

21

22

23

24

25
```

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

```
 1              YELLOWSTONE MOUNTAIN CLUB BANKRUPTCY

 2                          - - -

 3         BE IT REMEMBERED THAT this matter came on for

 4    hearing on December 5, 2008, in the United States

 5    Bankruptcy Court, District of Montana, The Hon. Ralph B.

 6    Kirscher, presiding:

 7

 8     The following proceedings were had:

 9

10              THE COURT:  We'll start with the people that

11    are either present in the courtroom or on video.  I'll

12    have the attorneys all state their appearances on the

13    record, and then I'll have the people on the telephone

14    also identify themselves again and who they represent.

15              MR. PATTEN:  Good morning, Your Honor.  James

16    Patten in Billings.

17              THE COURT:  Okay.

18              MR. LAMDIN:  Bill Lamdin, representing

19    CrossHarbor, in Billings.

20              THE COURT:  Okay.

21              MR. HURSH:  Benjamin Hursh in Missoula,

22    representing CrossHarbor.

23              THE COURT:  Okay.

24              MR. COLEMAN:  Shane Coleman in Billings,

25    representing Credit Suisse.
```

Page 8

```
 1            MR. RHOADES:  Quentin Rhoades in Missoula for
 2   Normandy Hill Capital.
 3            MR. BENDER:  Ronald A. Bender in Missoula for
 4   Michael Snow.
 5            MR. STENSLAND:  Dean Stensland in Missoula for
 6   Prim Vintage Development, LP.
 7            MR. CUFFE:  Matt Cuffe in Missoula, also for Mike
 8   Snow.
 9            MR. BROWN:  Steve Brown in Missoula for
10   Garlington, Lohn & Robinson.  And I'm also here in capacity
11   as the chair of the unsecured creditors committee.
12            THE COURT:  Okay.
13            MR. GRANT:  This is John Grant in Helena for the
14   ad hoc committee.
15            MR. JONES:  And Keith Jones, Joel Silverman, and
16   Teresa Whitney on behalf of the Department of Revenue, Your
17   Honor.
18            THE COURT:  Okay.  Then I'll go to the telephonic
19   appearances.
20            MR. CHEHI:  Mark Chehi of Skadden-Arps for Credit
21   Suisse.
22            THE COURT:  I'm sorry, please speak louder.
23            MR. CHEHI:  Mark Chehi of Skadden-Arps for Credit
24   Suisse.
25            MR. MOORE:  Paul Moore --
```

1              MR. McKAY:  Dan McKay for the -- go ahead.

2              MR. MOORE:  Paul Moore for CrossHarbor.

3              MR. McKAY:  Dan McKay for the Office of the U.S.

4    Trustee.

5              MR. GREENSPAN:  And Ron Greenspan, the chief

6    restructuring officer.

7              MS. BROWN:  Susan Brown of Skadden-Arps for

8    Credit Suisse.

9              And Megan Cleghorn is also on the line with me

10   from Skadden-Arps for Credit Suisse.

11             MR. ALTER:  Jonathan Alter for the ad hoc

12   committee of Yellowstone members.

13             THE COURT:  Okay.  Anyone else that's on

14   telephonically?

15             THE CLERK:  Judge, I just received an e-mail from

16   a Benjamin Theines (phonetic) who apparently represents

17   Discovery Land Company and wants to join in the call.  So I

18   was going to send him a dial-in number.

19             THE COURT:  Absolutely.

20             THE CLERK:  I will do that right now.

21             THE COURT:  Okay.  This is the time set for

22   emergency hearing on the request and motion for expedited

23   hearing concerning Local Rules 5074 -1 and 9014-1, and

24   discovery requests, and a deposition scheduling that has

25   occurred in this case over the past week.

1          I think it may be best to wait for the gentleman

2   with CrossHarbor to join so we've got everyone - we're not

3   happy to repeat - before I move to have -- well, until I

4   have Mr. Hursh or appropriate party present information on

5   their motion.

6          And there has also been a response filed locally

7   by Mr. Coleman on behalf of Credit Suisse.  Obviously, we

8   have other counsel also representing Credit Suisse.  It

9   will be just a moment, hopefully.

10          I will note just for the record and for people

11   that are present and can hear, you know, when we try to set

12   these emergency hearings, obviously it would be nice if we

13   had a broadband telephonic connection that we could

14   utilize.  We're utilizing the District Court's bridge here

15   that's located in Missoula that accommodates up to eight

16   people.  Apparently, we had more than that.  We thought we

17   only had six to seven people that were calling in, and then

18   the eighth would have been the call to the Court to be able

19   to add it to recording.  Obviously, other people added on

20   someplace because we didn't have the eighth spot, then, to

21   call into the court recording system.

22          So when, when we're trying to set these up, I

23   guess just as a point of practice for future instances

24   where this might occur - hopefully rarely - you know, if

25   you're going appear, fine, let us know; but if we think we

1    only have six or seven people, it changes how we have to

2    approach this.  If we would have known, we would have had

3    the Sprint operator do a conference call back an hour ago,

4    and we wouldn't have had the delay that we've had with

5    people sitting around for an hour.  So keep that in mind as

6    a process and procedure.

7              Also, since we're appearing in various sites and

8    by telephone, I want each of you, before you speak, to

9    identify yourself so that we know who's speaking.

10   Obviously, with some voices, we are very familiar with them

11   because we hear them year after year, and they're local

12   practitioners; but for, for this case, we have new, new

13   faces, new people, and we may not recognize your voice

14   immediately.  And, also, for recording purposes, the

15   electronic court reporter is then able to identify who the

16   speaker is much more easily and readily; also, if there's a

17   transcript that has to be done, the transcribing court

18   reporter would have a much better way of knowing who is

19   speaking.  So, again, always identify yourself first.

20             If we were in an evidentiary situation, which I

21   don't foresee this being today, but if we were, then I

22   would want you to even yourself before you raise your

23   objection so that we, again, know who is speaking and

24   raising the objection.  We have to have that.  And if you

25   don't, I'm going to remind you before we proceed.  So keep

1    that in mind.  Things will flow much, much easier, I think.

2              Do we know if we have the CrossHarbor counsel

3    yet, or individual?

4              UNIDENTIFIED SPEAKER:  Discovery counsel.

5              THE COURT:  Discovery counsel, I mean.

6              THE CLERK:  Mr. Theines, are you on the

7    telephonic conference call?

8              I did provide him the dial-in number.

9              Oh, here we are.

10             THE COURT:  Very good.

11             THE CLERK:  Hello, Mr. Theines?  Is anyone

12   holding on the telephonic end?

13             Did we lose the telephone parties?

14             MR. MOORE:  This is Paul Moore.  We're still on.

15             THE CLERK:  Oh, great.  Thank you.

16             THE COURT:  That's the other thing.  And I don't

17   mean to -- I mean I probably don't even need to say this,

18   but just being here in Missoula, I will waive the attire

19   rule for today.  I see a couple of attorneys that are

20   dressed in business casual rather than business attire,

21   which basically means coat and tie.  It doesn't appear that

22   you're necessarily speaking, but maybe are observing more

23   than participating.  Obviously, it's an emergency hearing

24   and I would probably waive that today, but I have sent

25   people home before to get the proper attire before they can

1    appear.

2         Well, maybe Mr. Theines is going to just have to

3    catch up.  I hate to keep people just holding here,

4    especially at the rates that I know are being charged.

5         So, Mr. Hursh, if you're the one that wants to

6    advocate on the motion.

7         MR. HURSH:  I'll begin, Your Honor.

8         THE COURT:  Okay.

9         MR. HURSH:  Today's hearing --

10        THE COURT:  And I would ask that you speak

11   loudly, because I want to make sure --

12        MR. HURSH:  Okay.

13        THE COURT:  And if you can't hear him on the

14   telephone connection, let us know, please.

15        MR. HURSH:  Judge, the hearing here today - let

16   me give you a little background - had its genesis on the

17   courthouse steps in Butte after our hearing on the 25th

18   when counsel was advised by Suisse that in the event of an

19   adverse ruling, parties could prepare to spend significant

20   time in depositions in a contentious and protracted

21   discovery battle.  Consistent with that threat, beginning

22   Friday immediately after Thanksgiving, a volley of e-mails

23   began coming through wherein Suisse began demanding various

24   items for production and unilaterally setting dates and

25   demanding people appear for depositions.

1           Ultimately, Suisse was advised that we had some

2    objections.  We felt the manner in which they were

3    proceeding was unreasonable.  And this culminated in a

4    telephone call on Wednesday, at which time the parties did

5    try to work out some sort of reasonable accommodations that

6    would meet everybody's needs.  CrossHarbor's efforts to do

7    that failed.  During the call, Suisse steadfastly demanded

8    that folks produce people and documents as demanded in

9    their requests, and barring that, they weren't willing to

10   agree to any sort of accommodation or even acknowledge

11   that, perhaps, what they were asking for exceeded the

12   allowable scope.

13          As the papers show, we then served on them our

14   objection.  It's still clear that we weren't going to get

15   anything resolved so, on behalf of CrossHarbor, I requested

16   this hearing.

17          Now, it seems that one can't lose track of the

18   fact that the proposal put forth by CrossHarbor for DIP

19   financing was developed over the course of six to eight

20   hours on the 25th .  You know, everyone was prepared on the

21   25th for there to be a very short hearing wherein

22   Suisse's -- Suisse, essentially, would live up to what it

23   had proposed to the Court at the very first hearing in this

24   matter.  There were significant concerns raised at the very

25   first hearing in this matter about Credit Suisse's

1    proposal.  Those concerns were assuaged by Suisse in a

2    variety of ways, indicating there would be these meetings

3    and everybody would get to the table and a long-term

4    solution would be crafted.

5            Instead, what we received on the 25th was, "We're

6    sorry.  Despite our best efforts, we can't fund the very

7    proposal we made and was accepted by Debtors in this case,

8    so maybe the best thing we should do is just mothball the

9    project and move on."

10           CrossHarbor stepped in, filled the vacuum that

11   was lift by Suisse's failure to follow through.  And for

12   reasons that aren't clear to CrossHarbor, Suisse now seems

13   to be pursuing a course that really doesn't seem to be

14   directed at determining whether or not the DIP financing

15   should go through for CrossHarbor.

16           That's our position, Your Honor.

17           THE COURT:  Okay.  One thing I guess I will ask

18   in that regard -- and I recall this, and I'll say that I've

19   reviewed your motion very quickly, but it seemed as if

20   there was a statement made, and just to clarify:  Was, in

21   fact, the discovery that was propounded already prepared

22   and out on the 25th, or is it just that you had this

23   hearing on the steps that there would be forthcoming

24   discovery?

25           MR. HURSH:  No, let me be clear.  The discovery,

1    to my knowledge, I don't know when the discovery was

2    actually prepared at Skadden's offices.  There was,

3    however, a statement made there on the 25th on the

4    courthouse steps as we were all leaving that, in light of

5    an adverse ruling, that's what we could expect.  And then

6    so that was, I believe, the Tuesday prior to Thanksgiving.

7    And then immediately on -- it was approximately, I think,

8    about 11 o'clock Friday morning after Thanksgiving that I

9    received the first e-mail essentially putting on paper what

10   was said on the courthouse steps Tuesday evening.

11            THE COURT:  And the discovery that they were --

12            MR. HURSH:  Yeah, it was a -- it wasn't, it

13   wasn't finalized discovery Friday morning; it was just a

14   Word document that essentially laid out what the requests

15   would be for documents.  But it wasn't on pleading paper or

16   in the form of a subpoena at that point.

17            THE COURT:  Okay.  Also, Mr. Hursh, is this

18   requested discovery of the depositions -- you've commented

19   that it may be broader than just for DIP financing.  Is it

20   clear that that's the case, that it is broader than just

21   for finalization of DIP financing which would be set for

22   hearing a week -- well, next Thursday?

23            And I mean is it attempting to raise claims that,

24   in fact, would not be necessarily germane to the DIP

25   financing but may be to other claims that Credit Suisse may

1   or may not have against participants in this bankruptcy

2   that it might require even an adversary proceeding?

3          MR. HURSH:  Judge, that would be our position,

4   that, in fact, Suisse is using the issues surrounding the

5   DIP financing to conduct a very broad fishing expedition

6   into matters that aren't, in fact, at all related to the

7   DIP financing.  I mean their requests go well beyond those

8   issues that would be appropriate for such discovery in the

9   hearing scheduled for next Thursday.

10          THE COURT:  Okay.  I'm not sure who would like to

11   respond next.  Mr. Lamdin, I realize Mr. Hursh has

12   presented a motion there.  Can you think of anything else

13   you wish to add, or can we move on, then, to other counsel?

14          MR. LAMDIN:  We can move on, Your Honor.  Thank

15   you.

16          THE COURT:  Okay.  I guess at that point, then,

17   since it's directed towards Credit Suisse and Mr. Coleman

18   raised the response, I don't know if Mr. Coleman is the one

19   participating or if Mr. Chehi is or how you wish to handle

20   this as a response.

21          MR. COLEMAN:  Your Honor, Shane Coleman.  I

22   understand that Mark Chehi will be addressing this.

23          THE COURT:  Okay.  Mr. Chehi.

24          MR. CHEHI:  Good afternoon, Your Honor.  Mark

25   Chehi of Skadden-Arps for Credit Suisse.

1           THE COURT:  If I could have you speak as loudly

2     as you can within the confines that you are.  I'm having a

3     hard time hearing you.

4           MR. CHEHI:  Okay.  And I may to --

5           THE COURT:  That's better.

6           MR. CHEHI:  -- shout a little bit into this

7     phone.  Is that better?

8           THE COURT:  That's better.

9           MR. CHEHI:  Very good.  Let me focus on the

10    timing of discovery requests that have been made in this

11    case just to make it clear that the discovery requests

12    directed to CrossHarbor and the ad hoc committee, in

13    particular - which are essentially equivalent to the

14    discovery requests directed to the other parties, including

15    Discovery Land Company - are all -- were first generated

16    and delivered as informal discovery requests in New York

17    City on November 19, which was the date of the meetings

18    among the various parties to discuss additional possible

19    financing and, you know, global resolution of the issues.

20           I hand-delivered to counsel for CrossHarbor and

21    to counsel for the ad hoc committee, you know, a two-page

22    summary of the document requests that we believe would be

23    pertinent in the event that the parties were not going to

24    be able to reach agreement on financing and if there were

25    to be any priming financing proposed adverse and

1    non-consensually against our client.  And we, we did

2    deliver those documents on the 19th of November, which is

3    some weeks ago now.  And the immediate reaction from

4    CrossHarbor, on the one hand, was that they would never

5    produce any of these types of documents; and the committee

6    response was not positive, either.  And so as far as when

7    the discovery requests were first made, that was when they

8    were made on an informal basis.

9         The fact that they were rejected led us to

10   ultimately, you know, propound the formal discovery we did

11   on the day after Thanksgiving, which was our first

12   opportunity after receiving Your Honor's memorandum of

13   opinion, which was, I believe, delivered late in the day on

14   the day before Thanksgiving.  And so as early in the day

15   after Thanksgiving as possible, I sent out by e-mail to all

16   of the counsel for the various parties copies of the

17   informal discovery requests that we had developed and had

18   already provided to CrossHarbor and the ad hoc committee,

19   at least, indicating that these would be the documents

20   that, as was indicated earlier, would be requested, and

21   that we were in the process of that same day preparing

22   formal discovery papers.  And that's what we did.

23        And I believe it was later that evening or early

24   evening of the day after Thanksgiving when we issued the

25   discovery requests, the formal discovery requests and the

1   accompanying subpoenas, understanding that we were not

2   going to be confronting consensual discovery; that, No. 2,

3   that we ultimately, notwithstanding the locations and dates

4   and times of requests of production and depositions, we

5   would be working with the various parties to agree upon

6   mutually convenient locations and times for not only

7   production of documents, but depositions.  And I made that

8   clear in my e-mail to the party on the -- parties on the

9   morning after Thanksgiving and then, I believe,

10  subsequently in the e-mail that we sent out that Friday of

11  the formal discovery papers.

12          And then the following Monday, we invited all of

13  the parties to set a time to meet and confer about our

14  discovery requests.  And we were able to do that with the

15  debtors.  The other parties were unwilling to meet and

16  confer until Wednesday.  And we had late afternoon on

17  Wednesday a teleconference to discuss the scope of our

18  discovery requests, the reason for that, and the

19  willingness and availability of all the parties to provide

20  the discovery and the witnesses.

21          The debtors served on us, Your Honor, a request

22  for a production of documents and a request to depose

23  Steven Yankauer, the Credit Suisse representative.  And we

24  were agreeable to that and, in fact, reached relatively

25  easily a consensus with the debtors on a schedule for a

1    deposition - (inaudible) - deadline this coming Tuesday.

2    And we worked it out with the debtors so they would provide

3    their witnesses, three of them, including Mr. Greenspan,

4    Edra Blixseth, and another manager of the property, in our

5    Los Angeles offices.  And we would make those depositions

6    available by video to any party that, you know, could --

7    wanted to appear by video or in person.  We also agreed to

8    make our offices in New York City available for any

9    conference room and video capabilities for purposes of East

10   Coast attorneys.  Those were agreements reached with the

11   debtor.

12          Discovery Land Company agreed on Wednesday to

13   provide a witness for a deposition in our Los Angeles

14   office on Monday, I believe it was at 10 o'clock in the

15   morning or thereabouts.  And those are our scheduled

16   depositions.

17          I think the - (inaudible, papers shuffling in

18   microphone) - Your Honor, is that there's clearly a

19   disagreement among the parties - meaning our client on the

20   one hand and then CrossHarbor, Discovery Land Company, and

21   the ad hoc committee on the other - as to what the proper

22   scope of our discovery requests can be.  And as is set

23   forth in our response that was filed today, we think that

24   really everything that we have asked for is appropriate and

25   reasonable under the circumstances of the case.  We are

1   seeking discovery of various relationships, arrangements,

2   agreements, communications that are non-privileged between

3   and among CrossHarbor, Discovery Land Company, members of

4   the ad hoc committee, and Edra Blixseth as the owner of the

5   company in respect of the parties' prepetition and

6   postpetition agreements and arrangements, and the like,

7   that go to both debtor-in-possession financing for the

8   company and restructuring arrangements.

9           And as we included in our response today, we're

10  not just speculating that there are arrangements that are

11  undisclosed, and the like, and objectives that are

12  undisclosed to the Court and other parties, but there are,

13  you know, documents that we received from

14  CrossHarbor prepetition, you know, proposing various

15  restructuring and refinancing arrangements which would

16  include - (inaudible) - equity participation by

17  CrossHarbor, Discovery Land Company, Edra Blixseth, and

18  unnamed others to accomplish really a change in control of

19  the company and the property to CrossHarbor.

20          And we -- you know, our position, Your Honor, is

21  that those facts which CrossHarbor, in particular, and the

22  other parties are energetically opposing disclosure of are

23  germane to the final approval of the CrossHarbor financing.

24          On the one hand, the financing itself provides

25  expressly that it's conditioned upon the continued

1    management of the debtors by Discovery Land Company.  And
2    it's set forth in our papers.  That existing arrangement
3    which, you know, existed before the petition was filed and
4    since then is highly irregular.  They had no management
5    contract, they had not been receiving any payment over the
6    last month, and it's very clear that their involvement is
7    in the nature of a participation to become a principal in
8    an acquisition of these companies.  And for a company in
9    Chapter 11, that seems to be an extraordinary management
10   arrangement to have if it's undisclosed.  And even if it is
11   disclosed, it's unorthodox.
12           But in any event, the record is pretty clear.
13   From what we've gleaned from the prepetition correspondence
14   sent to us, we think it will be more than abundantly clear
15   that, you know, Discovery has numerous undisclosed, you
16   know, arrangements and participations with CrossHarbor and
17   CrossHarbor's ultimate objective in terms of these debtors
18   and their properties.  And to the extent that the
19   CrossHarbor DIP financing is predicated on or conditioned
20   on Discovery's continued management of the company, it
21   gives both Discovery and CrossHarbor and anybody else
22   working with them ample opportunity to manipulate the
23   course of events in a manner that could bring an abrupt or
24   premature termination of financing in the cases.  And that
25   would result in a sale or a "for sale" of the company to

1    CrossHarbor in a manner that might preclude competitive

2    bidding for the company if the assets fall to the detriment

3    of the third-party creditors, including our client and

4    others.

5         THE COURT:  Mr. Chehi.

6         MR. CHEHI:  Yeah.

7         THE COURT:  Isn't that an issue that you just

8    raised that would come up in the event that there is a sale

9    that maybe didn't meet the requirements of either a

10   confirmed plan or a 363 sale?

11        MR. CHEHI:  Your Honor, you know, if, if we get

12   to the point where the case is forced into an emergency

13   liquidation sale where there has not been an ample

14   opportunity for Ron Greenspan and for any other truly

15   independent fiduciary in control of the company to

16   meaningfully market the assets, negotiate competing bids,

17   and the like, we'll be in a situation where, you know, the

18   value will have been lost.  And then we can argue about why

19   that happened, who shot John, and whether, you know,

20   CrossHarbor is a good-faith purchaser or whether any of

21   what happened was good or bad.  But that's the scenario we

22   all want to avoid.

23        We want to avoid putting these companies in a

24   situation where there are current obvious -- a

25   stalking-horse bidder, if you want to call CrossHarbor

1    that.  It's not just, you know, dealing with the companies

2    as a potential acquirer on a hand -- an arm's-length basis,

3    but is actually, you know, controlling the purse strings

4    and the financing that's essential to a continued Chapter

5    11 process.  And if they and Discovery and others

6    affiliated with them or working with them are able to

7    manufacture, under the terms of the CrossHarbor DIP

8    financing under - (inaudible) - default, CrossHarbor then

9    effectively has the ability to frustrate a competitive

10   auction process if that's what this case ends up in.  It

11   could very well end up in a plan of reorganization.

12           THE COURT:  Well, Mr. Chehi, Mr. Chehi, I guess a

13   couple of questions I have for you.  One -- well, maybe

14   three matters.  But one is, and I'll relay it back so I

15   don't forget about it:  The Discovery and the employment of

16   Discovery, I think I raised at the last hearing as to

17   whether they had sought an application of employment, which

18   I don't think has yet been filed.  I mean I think if

19   they're, they're being employed by Debtor to do things up

20   there, they probably need the authority of this Court.  I

21   raise that as one issue.

22           Secondly, the issue that you raised regarding

23   frustration of sale, and that, I mean Credit Suisse,

24   subject to the priming lien, is a first secured creditor on

25   all the assets, correct?

1          MR. CHEHI:  Should be, yes.

2          THE COURT:  And so as a result of that, in the

3     event of any sale, the seller, the debtor, and any

4     prospective buyer are going to have to deal with Credit

5     Suisse because of your liens on all the property up there,

6     correct?

7          MR. CHEHI:  Your Honor, having to deal with us

8     is -- you know, everyone always has to deal with everybody

9     else in the process.  The issue is:  Is there going to be

10    an opportunity in this case for third-party independent

11    potential investors, plan funders, or acquirers to have an

12    opportunity to have any due diligence and involvement in a

13    sale or restructuring process?

14         THE COURT:  But Mr. Chehi, Mr. Chehi --

15         MR. CHEHI:  Yes.

16         THE COURT:  -- as long as Credit Suisse is

17    protected on their first lien, what else are you entitled

18    to, to be paid on your first lien?

19         MR. CHEHI:  Your Honor, having first liens is a

20    good legal position to be in, but the real issue is:  What

21    is the value that you -- do you monetize on your secured

22    claims?

23         And the only way to monetize those is to have a

24    third party acquire your assets that are subject to liens.

25    And it's good that CrossHarbor is interested in doing that.

1    We like that idea, that someone might be interested, having

2    expressed an interest in buying the assets, but in this

3    world of restructuring and bankruptcy, it's always better

4    to have two parties who are interested in buying the assets

5    because then you have an auction and --

6              THE COURT:  But I guess you're missing my point.

7    As long as you get paid, what do you care?

8              MR. CHEHI:  Well, I'm not sure whether we're

9    going to get paid anytime soon or --

10             THE COURT:  But, Mr. Chehi, you also may have the

11   protections under Clear Channel in the 9th.

12             MR. CHEHI:  Your Honor, you know, there's a

13   process issue here, and then there's a legal entitlement

14   issue.  We understand our legal entitlement.  But our right

15   to receive the proceeds of our collateral through a sale or

16   plan of reorganization or in some other restructuring

17   transaction in Chapter 11 depends a lot upon the legal

18   principles, but the practical outcome is dependent upon

19   whether there are more than one buyer at the table to bid

20   for those assets.

21             You know, if CrossHarbor is there for the $100

22   million and someone else is there for $150 million, then

23   suddenly CrossHarbor will have to meet that bid.  If

24   someone else comes in and they lever up in an auction

25   process the amount that people are willing to pay for

1    the assets, that's a different outcome for us than if you

2    only have one bidder, and that's the best outcome out

3    there.

4            THE COURT:  Well, I guess my concern is that,

5    depending upon the value of these properties, there won't

6    be a sale that's approved unless it satisfies the first

7    lienholder.  I mean if you're secured, you're secured; if

8    you're not secured, you're not.  But to the extent you're

9    secured, you're going to be protected as the first

10   lienholder.

11           MR. CHEHI:  Your Honor, but that's -- the fact

12   that we have a lien doesn't guarantee that there's any

13   particular price that's paid for the assets.  And there are

14   numerous ways to maximize the value of the assets,

15   including through a Chapter 11 plan, including through

16   a sale under a plan.  There's a range of alternatives than

17   are better what I would call an emergency liquidating fire

18   sale, Chapter 11 sale, or Chapter 7 sale.

19           And our concern, and it's a very significant

20   concern, is that the approval of the CrossHarbor DIP

21   financing puts the only, you know, obvious purchaser for

22   the asset in a position of being able to regulate the

23   timing of the sale and forcing it into what I call a fire

24   sale, liquidation sale, as opposed to an orderly Chapter 11

25   sale process that might include a 363 sale, it might

1    include a plan of reorganization that will increase values.

2         THE COURT:  But, Mr. Chehi, that runs counter to

3    what happened last week when, on the day of the hearing on

4    DIP financing, Credit Suisse had said, "No, we're not

5    providing anything."  Which you would expect at that point

6    that this case would tank.

7         MR. CHEHI:  Actually, Your Honor, I want to just

8    make clear on the record, you know, what happened, because,

9    you know, we don't want to be too broad-brush-stroke about

10   this.  Credit Suisse had endeavored in the week before that

11   hearing to put together a 24-month financing package for

12   the company.  And we explained to Your Honor in chambers

13   that was unsuccessful, given the events of the preceding

14   weekend, including the Citigroup financial disaster.  And

15   people were unable to get the last incremental amount of

16   commitments from their existing lender groups to fund at

17   that time a longer-term DIP financing.

18        And we were, you know, ourselves, and everyone

19   was disappointed to have to report that to Ron Greenspan on

20   the eve of the hearing.  And we said, "You know, as an

21   alternative to that, because we just don't have the money

22   today to do that, notwithstanding everyone's best efforts

23   to pull that together, we are available to, you know,

24   provide funding for at least a 60-day process to provide

25   for a sale," which is about what everybody wanted to do,

1     but that was the best thing available at that moment.

2           During the course of the day of the hearing, Your

3     Honor, we, Credit Suisse, continued to, you know, man the

4     phone and was able to raise commitments for a 24-month

5     funding.  And that was made available --

6           THE COURT:  But, Mr. Chehi, I think you beg my

7     question because at the time I started the hearing at nine

8     o'clock or thereafter, there was no financing on the table,

9     as I was informed.  And without the scurrying around with

10    CrossHarbor -- or with the DIP of the debtor with

11    CrossHarbor, there wouldn't have been anything by three

12    o'clock that afternoon.

13          You know, so I guess I don't know that the

14    argument really holds up, especially when you're a first

15    lienholder.  If you were an unsecured creditor or a second

16    or third creditor who is undersecured or maybe wholly

17    undersecured, I can understand your arguments that you

18    would want to make sure that there was protection for you

19    and that there was no collusive active by the DIP financing

20    or any third-party buyer or anything else.

21          And this Court, if I get any inkling of that,

22    there are going to be problems with that because I'm not

23    going to stand for it.  One, I'm not so certain it doesn't

24    raise criminal issues that I have an obligation to refer to

25    the U.S. Attorney.  But that's not how we run our court in

1    Montana and how we handle the bankruptcy process.  Things

2    are to be above board.  And if anything that you're even

3    alleging now between CrossHarbor, Discovery, if there's

4    merit to any of that that may be obtained through

5    discovery, this Court will take a great displeasure on

6    those parties and how they're dealt with through this

7    process.  I just don't go for any of that stuff.

8                 MR. CHEHI:  Your Honor, that's exactly --

9                 THE COURT:  Either the debtor makes this or he

10   doesn't make it, but I guess I'm just -- when you're

11   sitting in a first-lien position on property that is

12   allegedly worth, by testimony, 700 million-plus, I find

13   that maybe the first secured creditor is arguing too much

14   about what's happening and should be sitting there going,

15   "How can we help to make sure that we get paid?  Because

16   all we want is our money."

17                 MR. CHEHI:  Your Honor, these properties are not

18   worth $780 million.  That's testimony from Edra Blixseth,

19   and she's not a real-estate expert, was never qualified.

20   It was based upon some unusual formulations of value that

21   the debtors apparently requested their appraisers to

22   provide which were simply undiscounted sums of proceeds of

23   sales, and the like, over a period of time.  That is what

24   those numbers refer to, that is not a market value.

25                 Mr. Greenspan -- you know, I attempted to address

1    those issues at the last hearing, and I understand Your

2    Honor, you know, thought that his testimony on that was

3    that pertinent, so were inclined to go with the Edra

4    Blixseth testimony.

5          THE COURT:  But, Mr. Chehi, you had the

6    opportunity to refute that or to -- I mean you're the one,

7    I think, who had raised the question - well, or Mr. Patten

8    did - in the hearing in Missoula.  So it was never refuted.

9          But, anyway, I guess I'm --

10         MR. CHEHI:  May I add one other point, Your

11   Honor, that I think is very, you know, important?

12         THE COURT:  You may.

13         MR. CHEHI:  And that is that we, you know, Credit

14   Suisse, you know, in working to try to make sure that this

15   Chapter 11 process is run appropriately and is funded

16   appropriately, has been successful in raising commitments

17   from lenders to fund the, you know, 24-week plan, the

18   longer-term plan and delivered it to Mr. Greenspan, I

19   believe it was yesterday.  And we will be filing with the

20   Court today, you know, a fully committed, fully funded

21   debtor-in-possession financing arrangement that does not

22   require Discovery Land Company to be managing the debtors.

23   That's not to say that they're not going to be involved,

24   and we're not judging that issue, but we're not

25   conditioning our financing on that sort of insider

1    involvement which is, you know, highly suspicious and

2    irregular; No. 2, is actually provided on, we believe,

3    better terms.  It provides more money and is a better

4    outcome for the debtors.

5          And so the issue of whether or not the

6    CrossHarbor financing is worthy of final approval is not an

7    issue of, "This is the only financing on the table."  We

8    have financing in place that is improved terms over the

9    CrossHarbor proposal and does not --

10         THE COURT:  It would have been nice to have had

11   it last week.

12         MR. CHEHI:  Your Honor, I agree, it would have

13   been nice to have it.  I think everybody wished it would

14   have been there then.  But you know what?  You know,

15   difficult financial times.

16         But that doesn't -- just because it wasn't

17   available last week doesn't mean that the Court and the

18   other parties should ignore, you know, the downside and the

19   problems associated with the CrossHarbor financing its

20   self-interest in acquiring the assets -- (inaudible.)

21         THE COURT:  So, Mr. Chehi, is the debtor going to

22   also, in addition to preparing and advocating for final DIP

23   financing with CrossHarbor next Thursday, the alternative

24   of financing with Credit Suisse?

25         MR. CHEHI:  That's the debtor's decision, Your

1    Honor.  And, you know, Mr. Greenspan can address those

2    issues.  But we think from a fiduciary point of view, that

3    it's the better financing proposal.  It doesn't suffer from

4    the defects of the involvement of CrossHarbor and

5    Discovery, who are potential acquirers of the asset in, you

6    know, essentially having the fox in the chicken house with

7    respect to the entire case.  It doesn't allow them to

8    manipulate the timing of the sale, it doesn't allow them to

9    shut off the lights prematurely.

10          Because they're not interested, I'm sure, in

11   competitive bidding.  Having represented a lot of acquirers

12   over time, Your Honor, most of them are interested in being

13   able to win an asset with their original offer.  But if

14   there's competitive biders and there's a competitive

15   bidding situation, typically people have to pay more.

16   CrossHarbor's interest as an acquirer is not in paying more

17   but in paying as little as possible for the asset at the

18   end of the day, and they can use their control over the

19   debtor's debtor-in-possession financing to truncate the

20   process of the sale.  And we don't think that's appropriate

21   under the circumstances.

22          THE COURT:  Well, I don't know how they're going

23   to get to that position without dealing with Credit

24   Suisse's first lien position.

25          MR. CHEHI:  Your Honor, it's an issue of timing.

1    And it's not an issue of our legal entitlement; it's an

2    issue of whether or not Mr. Greenspan, as an independent

3    fiduciary, has an opportunity to bring third parties to the

4    table, which is, as we understand it, his intention.  He

5    can do that as long as he has a Chapter 11 process in which

6    to do it.  If the Chapter 11 process is cut short because

7    of an event of default under the CrossHarbor financing,

8    there's going to be very little for the Court or anybody

9    else to do when CrossHarbor wants to enforce its rights

10   under the debtor-in-possession order that it would get on

11   the final basis to, you know, cut short the case.

12           THE COURT:  Well, and CrossHarbor may --

13           MR. CHEHI:  And, Your Honor --

14           THE COURT:  -- CrossHarbor may have a problem

15   there.  If I get information or testimony that that's

16   what's occurring, that may not occur.

17           MR. CHEHI:  Your Honor, but that's the purpose of

18   our discovery, you know, is to be able to begin to, you

19   know, get to the Court -- unless the Court is undertaking

20   its own independent factfinding, you know --

21           THE COURT:  Well, the Court doesn't do that.

22           MR. CHEHI:  Right.  And so, you know, the parties

23   have to do it.  We're the party, we have a vested interest

24   in it.  We want to make sure that there are not untoward

25   circumstances here which are not in the best interest of

1    the estate.  That's our position on information and belief.

2    And given some of the documents that we have and our

3    understanding of the arrangement, that's what we think is

4    a, we think it's a real problem.  We should have a right to

5    explore those.

6              And, listen, if there's nothing to hide here and

7    there's no inappropriate arrangements and circumstances,

8    and the like, discovery will show that.  If there are

9    inappropriate arrangements and circumstances, we believe

10   that those are material to approval, final approval of the

11   CrossHarbor financing or -- and the merits of it.  And we

12   want to be able to put that -- have a fair opportunity to

13   put that before the Court on next Thursday.

14             THE COURT:  Well, Mr. Chehi, what if, in fact, it

15   doesn't occur by next Thursday but you still have those

16   claims that you can seek through the normal, routine

17   discovery process?  If I allow it.  I mean right now, the

18   discovery requests aren't even, aren't even appropriate,

19   given our rules, so that's one problem.

20             MR. CHEHI:  Your Honor, we haven't mentioned

21   once -- I think Your Honor raised the issue of whether we,

22   the lenders, have any claims against anybody here.  We

23   haven't once said we have claims against anybody.  We do

24   not have, as far as I know, any claims.  Any claims that

25   would exist, you know, would most likely be, if claims at

1    all, claims of the debtor in possession and the estate

2    against various, you know, parties.

3            And, of course, you know, the CrossHarbor DIP

4    financing, by its own terms, provides for -- I believe the

5    word is, quote and unquote, broad releases for the benefit

6    of all those parties.  You know, we haven't even -- you

7    know, we're not thinking about claims against people; we're

8    thinking about the integrity of the Chapter 11 process and

9    what's happening now.

10           We're not looking to take litigation discovery

11   against these parties; we're looking for discovery of

12   relationships and circumstances that would tend to show

13   that CrossHarbor is not the most appropriate party to be

14   providing DIP financing under the circumstances when it's

15   interested in being the acquirer of the assets - and that's

16   what this case is all about, selling the company - and,

17   No. 2, has very intimate relationships, apparently, with

18   Discovery Land Company, which is actually managing the

19   debtor.

20           THE COURT:  Anything else, Mr. Chehi?

21           MR. CHEHI:  Your Honor, again, we have, you know

22   -- you know, we've made our facility available in New York

23   so that Mr. Byrne can appear.  And if he wants to appear in

24   Boston, we can do that.  But, you know, we're trying to

25   arrange a mutually convenient venue for both debtor's

1   counsel and other counsel in the case, whether they be on

2   the West Coast or the East Coast, to be able to participate

3   simultaneously in video depositions.  And we would hope

4   that Your Honor would require, you know, some deposition

5   testimony by CrossHarbor and also by Discovery Land

6   Company.

7          You know, we can talk about all these issues, but

8   unless there's a fact record made and an opportunity to do

9   it, I don't think we're getting our due process in terms of

10  addressing the merits of the CrossHarbor financing, not to

11  mention, you know, the adequate protection issue.

12         THE COURT:  You know, you've mentioned,

13  Mr. Chehi, that you had, you had discussed with debtor's

14  counsel, and that debtor's counsel didn't have -- that they

15  had concurred with you on selected dates and times for some

16  depositions?

17         MR. CHEHI:  Yes, Your Honor.  We have those

18  scheduled for Saturday in Los Angeles.  And we have a

19  deposition slot for Mr. Yankauer from Credit Suisse on, on

20  Sunday.  He would actually be in New York, because that's

21  where he lives, and would be available for a deposition by

22  the debtors.  And we believe that Mr. Patten would likely

23  still be in Los Angeles, and so he would in our Los Angeles

24  office where the other depositions are occurring, and

25  question Mr. Yankauer.  And we think it would be

1   appropriate.

2          There's going to be a production of witnesses by

3   CrossHarbor on one hand and Discovery Land Company and the

4   ad hoc committee on the other, that they also be

5   depositions that are taken on, I assume, Sunday so that

6   there's enough time on Saturday and Sunday to do that and

7   give everybody an opportunity, then, on Monday and Tuesday

8   to file -- (inaudible.)

9          THE COURT:  Okay.

10         MR. CHEHI:  Your Honor, the one last point I want

11  to make is, and it is just, you know, basic:  If the

12  parties that we're seeking discovery of have nothing to

13  hide, they wouldn't be resisting so energetically and

14  strenuously and coming to the Court to block, you know,

15  this type of discovery.  If they had nothing to hide,

16  they'd put up their witness, they'd give us the documents,

17  instead of putting in their discovery papers, which they

18  do, that they just are not going to comply with requests

19  for documents that touch upon Discovery Land Company's

20  arrangement with anybody or their compensation arrangement

21  with the debtors.  You know, all of the, all of the topics

22  that are germane to what I've been talking about are, in

23  their view, off limits.  And they should be happy to

24  vindicate the record, vindicate themselves, and be able to

25  demonstrate there's nothing untoward going on, but,

1    instead, we're getting quite the opposite.

2            MR. MOORE:  Your Honor, if I may.  Paul Moore for

3    CrossHarbor.  Can I just respond briefly?

4            Your Honor, we have --

5            THE COURT:  Yes, Mr. Moore.

6            MR. MOORE:  -- nothing to hide.  The point --

7    sorry, Your Honor.

8            I mean the point is that we have been-- from Day

9    1 in this case, we have been accused of things that if they

10   weren't stated in a courtroom would probably be slanderous

11   and actionable.  And the whole premise of this is that

12   there's this grand scheme by CrossHarbor to steal the

13   asset, to engineer an abrupt termination of financing which

14   would result in a forced liquidation sale.  But that's not

15   where Mr. Byrne is going.  Don't forget, he testified to

16   all these matters already.  Mr. Chehi may not have liked

17   the answers, but he testified under oath, and we stand by

18   that testimony.  But if that was his scheme, then it was

19   handed to us on November 25th.  And shame on my client if

20   he snatched defeat from the jaws of victory by standing up

21   and offering $20 million.

22           And, apparently, Mr. Chehi thinks that even

23   though that's been approved on an interim basis, that

24   somehow he could renegotiate it all over again.  And that's

25   where -- that's the whole purpose of this:  To berate and

1   beat everyone into letting them do what they want when they

2   want to do it.

3           And I'm just appalled that -- these accusations

4   make no sense whatsoever.  If you read his opposition, at

5   one point, he accuses - talk about paranoia - he accuses

6   CrossHarbor, Discovery Land, Ms. Blixseth, and one or more

7   members of the ad hoc member committee - which apparently

8   are key to his value for his assets - of, quote:  Acting in

9   conflict for manipulating control of Debtors' affairs in

10  these Chapter 11 cases in order to achieve a sale or

11  transaction of - (inaudible) - ownership, and control of

12  the debtors and their assets in CrossHarbor, Discovery

13  Land, Edra Blixseth, and other unnamed persons.

14          Your Honor, I've been doing this for 32 years

15  and, believe me, I would not come into your court with any

16  kind of scam.  And if my client's goal was to buy this at a

17  fire sale, I certainly wouldn't suggest to him that that

18  Tuesday morning we move mountains to come in and give

19  $20 million worth of financing or that we finance the

20  entire season.  None of this makes any sense.  It's

21  contrary to the facts as you know them, it's contrary to

22  all the testimony you have.

23          And you talk about Mr. Byrne, you know, not being

24  forthcoming, not willing to answer questions.  Well, the

25  window of opportunity we're being given to testify is -- I

1    think it's either Sunday morning or Sunday night or

2    sometime on Monday.  And particularly for those of us on

3    the East Coast, the deposition schedule as it now stands

4    is:  Ron Greenspan at noontime East Coast time; Edra

5    Blixseth approximately at 4, which I think it means once

6    they're done with Mr. Greenspan; Mr. Williamson,

7    approximately at four, which is 6 o'clock East Coast time;

8    on Sunday, we switch to East Coast time, and we've got

9    Mr. Yankauer at 12 p.m.

10           So, certainly, you know, the notion that somehow

11   Mr. Byrne's trying to hide something -- he flew --  he

12   appeared by video last time to testify, and he's flying to

13   the court again this week with me.  It's just silly.  I

14   mean this is just an effort to intimidate, to control the

15   case.

16           Somehow - (inaudible) - thinks that if their

17   selected funding people -- and, Your Honor, let me point

18   out that the primed the existing bondholders at the first

19   hearing.  There's like 40 bondholders, as I understand

20   them.  A select group came in, represented by the same

21   agent -- and you note that Mr. Chehi appears only on behalf

22   of the agent, not the bondholders.  That's because on

23   behalf of the agent, the agent for both groups, he came in

24   and primed the other ones.  He sat there and didn't

25   complain about the valuation Ms. Blixseth testified to, but

1    now he doesn't like it.

2            He now has a whole new group.  And, Your Honor, I

3    haven't heard who the members of that group are.  The last

4    time he came in, he wouldn't tell us who they were.  So if

5    you want to talk about an abuse of process, I'll tell you,

6    this is the most abusive I've seen in 32 years.  Thank you.

7            THE COURT:  Thank you.  Mr. Hursh.

8            MR. HURSH:  Well, Judge, I was just - (inaudible)

9    - make a couple comments, some of which my echo

10   Mr. Moore's.

11           But what Credit Suisse has told this Court and

12   anyone sitting in the gallery watching these proceedings

13   from Day 1 is, "We're going to run the table.  And if we

14   can't run the table, nobody will."

15           And this is consistent with the approach they've

16   had since Day 1.  The idea that, "If there was nothing to

17   hide, why do it?" well, the reality is, in fact,

18   CrossHarbor's saying, "This isn't your table to run, there

19   are other options, and we've offered one.  Let's see what

20   happens."  Okay?

21           Secondly - and, again, I know it echoes what

22   Mr. Moore just said - but I would just ask that the Court

23   think for a moment about the testimony that Sam Byrne gave

24   at the last hearing.  It addressed the very issues that

25   Mr. Chehi now seeks to revisit.  He's seeking to plow

1    ground that's already been plowed.  I mean I know I'm

2    echoing here and I don't want to go on, but I just think

3    that that's important to remember here.

4              MR. ALTER:  Your Honor, Jonathan Alter.  May I

5    speak very briefly?

6              THE COURT:  You may, Mr. Alter.

7              MR. ALTER:  Thank you, Your Honor.  Just a couple

8    of points.  With regard to the issue of when discovery was

9    first propounded, I just wanted to note for the record that

10   Bingham was, in fact, handed an informal discovery request

11   in the context of the settlement meeting in Skadden-Arps in

12   New York.  Frankly, we've found that to be quite

13   distressing, thinking, Why would someone hand you a

14   settlement -- during a settlement discussion, a broad set

15   of, you know, discovery requests when you're trying to sit

16   down to reach some sort of a constructive resolution?

17             It was clear to us, was that it was an attempt to

18   further posture and threaten litigation if we refuse to go

19   along.  Why would we spend the time and the money, Your

20   Honor, responding to such broad discovery requests before

21   we even had a contest with Credit Suisse?

22             Moreover, Your Honor, we were ultimately ready to

23   go along with the Credit Suisse proposal, but, again, as

24   the record properly reflects, they backed out the day of

25   the hearing so we were left with no choice.

1        Your Honor, with respect to the planned sale

2   benchmarks that Mr. Chehi complains about, I'd just simply

3   note for the record that those benchmarks are identical

4   from the CrossHarbor proposal as they are the Credit Suisse

5   proposal.

6        With regard to the discovery plan itself, Your

7   Honor, it's extraordinarily broad, as people have said.

8   It's looking for eight depositions, roughly, over the

9   period of two or three days.  We object, of course, as the

10  other parties have, to the breadth of these requests which

11  go way beyond anything of relevance.

12        I think the record should reflect again the

13  importance of the fact that our group is a group of

14  voluntary homeowners who have banded together because

15  they're concerned about their property, the employees, and

16  the local community.  We have approximately 150 members

17  representing a number higher than that - (inaudible) - land

18  actually owned.  We are only looking for the club to

19  proceed and to thrive and to grow and to get through this

20  process.  If there is any relevance whatsoever to serving

21  us with discovery and subpoenas, both - (inaudible) - just

22  like any creditors, it is entirely unclear to my committee.

23        Concerns with the sale process or the monitoring

24  of the DIP can all be addressed by the Court as we go

25  along, and I'm certain that the Court will admonish and

1   properly reprimand anyone that runs afoul of this Court's

2   orders.  This discovery is extraordinarily expensive, it's

3   extraordinarily contentious, and it's purely, purely driven

4   by litigation.

5           As to the relevance, Your Honor, maybe we could -

6   (inaudible) - some relevance in some questions that are

7   directed to the right people regarding adequate protection

8   or valuation information, but certainly not to some

9   conspiracy theory with no facts to support it.  There will

10  be time after the financing hearing, Your Honor, for

11  discovery within a reasonable time frame by Credit Suisse,

12  but also of Credit Suisse.

13          And, Your Honor, I suggested that any reasonable

14  discovery that's directed at my ad hoc committee be limited

15  in some scope because, again, there are 150-plus members

16  and the number keeps growing as this case progresses.  We

17  have gotten, I think, at least 20 new members since the

18  case actually filed, Your Honor.

19          So, again, on behalf of the ad hoc group of

20  members, we respectfully request that the discovery be

21  curtailed or simply waived in this context.

22          THE COURT:  Thank you, Mr. Alter.

23          MR. ALTER:  Thank you.

24          THE COURT:  Mr. Patten, I have a question for you

25  as it relates to the comments made by Mr. Chehi:  At this

1    point in time, Debtor hasn't really raised any objection to

2    the depositions scheduled.  It appears the schedules have

3    been scheduled and are going forward.  Is that your

4    understanding?

5           MR. PATTEN:  Yes, Your Honor.  We have endeavored

6    to comply with the discovery to the best of your ability

7    within a time.  We produced numerous documents yesterday.

8    And it's our intention to comply to the greatest extent

9    that we can.

10           THE COURT:  What's the status, then, on the

11    depositions?  Who's scheduled and when as it relates to you

12    and to the debtor?

13           MR. PATTEN:  Tomorrow, we have Mr. Greenspan;

14    Ms. Blixseth; and Hans Williamson, who is the -- I'm not

15    sure of his official title, but he's the business manager

16    on site at the Yellowstone Club to be deposed tomorrow.

17    And then pursuant to my request, Credit Suisse has offered

18    Mr. Yankauer to be deposed on Sunday.

19           MR. CHEHI:  We're really just talking about two

20    depositions that we're requesting, Your Honor.  That's

21    Mr. Byrne and then the Discovery Land Company

22    representative, who had agreed -- they had agreed to make

23    their person available on Monday at, I believe,

24    10 o'clock a.m. --

25           THE COURT:  Mr. Chehi?

1        MR. CHEHI:  -- (inaudible) - Los Angeles office.

2   Yes, sir.

3        THE COURT:  That was Mr. Chehi speaking?

4        MR. CHEHI:  Yes.

5        THE COURT:  Okay.

6        MR. SKLAVER:  Your Honor, this is Steven Sklaver

7   of Susman Godfrey.  I am counsel for Discovery Land

8   Company.

9        May I say a quick, quick few words?

10       THE COURT:  Yes.

11       MR. SKLAVER:  As an administrative matter, Your

12  Honor, I need to -- we were just retained to assist

13  Discovery Land Company because Morgan Lewis, their ordinary

14  counsel, was conflicted out by Credit Suisse, who would not

15  waive the conflict - (inaudible) - counsel.  So I need to,

16  as an administrative matter, make a quick oral motion for

17  admission pro hac vice.

18       THE COURT:  For the limited purposes of this

19  hearing, that is granted, to be followed up within the next

20  two or three days by motion.

21       MR. SKLAVER:  Thank you, Your Honor.  Discovery

22  Land Company had agreed to provide a witness to answer

23  questions about the DIP financing that was proposed on

24  November 25th.  We have objections that were served by

25  in-house counsel before we were retained.  And a preview of

1    that deposition testimony is going to be, "We don't know
2    anything," which is the events happened at 9 in the morning
3    and finished at 3 p.m., and Discovery Land Company, the
4    developer, wasn't even there for the hearing.
5             As far as questions about the grand conspiracy of
6    collusion and collecting documents on a huge discovery
7    request about any communication that Discovery Land has had
8    with CrossHarbor or with Edra Blixseth or anyone else -
9    (inaudible) - objections to that.  And we and join the ad
10   hoc committee and CrossHarbor's comments today, which is:
11   The collusion arguments are inappropriate - (inaudible,
12   coughing in microphone) - appears to be many days late and
13   many dollars short.  These issues appear from the opinion
14   to have been addressed on the November 25th hearing.  And
15   we will make ourselves available if counsel for Credit
16   Suisse wants to ask questions about the November 25th
17   financing, but the collusion stuff we do believe is
18   inappropriate, burdensome, excessive, and inappropriate.
19   Thank you, Your Honor.
20            THE COURT:  You may admit that they have -- if
21   there were any merit to such allegations, that might be
22   something that would come up in the event of any, any sale?
23            MR. SKLAVER:  Yes, Your Honor, in the event of a
24   sale.  We just think this is not the appropriate time under
25   a four- or five-day notice period.  Discovery Land did not

```
 1    even get this informal discovery on November 19th.  The
 2    first time Discovery Land received it was on the Friday
 3    after Thanksgiving.  So we have had it for less than a
 4    week.  And then Credit Suisse wouldn't waive the conflict,
 5    so they had to hunt down and find new counsel here in Los
 6    Angeles to try and assist them.  I am here in the office
 7    trying to go through tons of e-mails.  I'll have to try to
 8    create a privilege log -- (inaudible.)
 9            There will be a time when the alleged collusion
10    accusations may be relevant, if the event that -- for which
11    the collusion may be relevant - (inaudible) - a sale come
12    about, but now is not that time.
13            MR. CHEHI:  Your Honor, Mark Chehi here.
14            The Discovery Land Company involvement with
15    various parties, both prepetition and postpetition, is
16    something that needs to be addressed by the Court rather
17    immediately.  Because as Your Honor has said, they have to
18    make application to be retained and paid by the estate.
19    And, indeed, the CrossHarbor financing makes their
20    retention and involvement and control over the management
21    of the company a condition of a CrossHarbor financing.
22            So it seems to me that while one can talk about
23    holding off on all of these issues until a sale, it begs
24    the question of:  Aren't we going to be addressing these
25    issues about Discovery and its relationship, and the like,
```

1   in the very near future?  Or there's not going to be

2   satisfaction of the condition of the CrossHarbor financing,

3   which is truly the reason why all of these issues need to

4   be explored in connection with final approval of the

5   CrossHarbor financing.

6           THE COURT:  Mr. Patten, what is your intent on

7   behalf of the debtor in filing an employment application

8   for Discovery?

9           MR. PATTEN:  Your Honor, I received a proposed

10  contract by e-mail about six o'clock last night.  I have

11  not had a chance to review it yet.  It was my goal to have

12  that completed today and to discuss it with my client and

13  submitted to the Court for approval today.

14          THE COURT:  Okay.  I mean I think what Mr. Chehi

15  just raised is an issue that goes to their application of

16  employment, whether they should or shouldn't be employed.

17  So, obviously, we need to get at that issue, if there's

18  oppositions to that, to that application.

19          At this point in time, with the debtors'

20  depositions -- well, the debtors agreeing to the four

21  depositions, those are going forward.  Is that pretty much

22  everyone's understanding, Mr. Patten and Mr. Chehi?

23          MR. PATTEN:  Yes.

24          THE COURT:  Okay.  So it really leaves what?

25  What are we looking at, then?  We're looking at one of --

1  Mr. Byrne and one of Discovery's.  So we're talking about

2  two depositions here?

3          UNIDENTIFIED SPEAKER:  And the ad hoc committee,

4  Your Honor.

5          THE COURT:  Oh, and the ad hoc committee, yeah.

6          MR. ALTER:  Your Honor, again, I can't believe

7  we're discussing the potential deposition of an ad hoc

8  committee of homeowners.  I would respectfully request that

9  the Court consider whether that's necessary or appropriate

10  under the circumstances.

11          THE COURT:  The Court will.

12          MR. ALTER:  And this is Jonathan Alter.

13          THE COURT:  The Court will, Mr. Alter.

14          MR. ALTER:  Thank you, Judge.

15          MR. BROWN:  Your Honor?

16          THE COURT:  Mr. Brown.

17          MR. BROWN:  Thank you, Your Honor.  I'm here

18  speaking in my role as chair of the unsecured creditors

19  committee.  That committee was just organized on Wednesday

20  of this week.  And we -- since that time, we've been pretty

21  much working nonstop trying to retain counsel.  So I'm here

22  sort of on an interim basis, not as official counsel for

23  the committee, but as chair of that committee.  We do

24  anticipate having counsel in place by Monday and actually

25  asking for an application out of the DIP financing that

1    counsel be paid out of that.  So we do anticipate that that

2    will be done.

3           We have not been consulted in any of this

4    process, partly because I think the committee was formed so

5    recently, but partly because, you know, a lot of this has

6    been happening for quite some time.

7           Our position on this is -- and we have discussed

8    it in a meeting, but our position is:  We understood this

9    was going to be very, very narrow, and any discovery that

10   was going to occur was only in relation to the DIP

11   financing, and it doesn't preclude further discovery that

12   may be necessary down the road.  And obviously, we want to

13   preserve our ability to take discovery we're up to speed on

14   the case and our counsel is up to speed on the case.  So

15   that's really our position.

16          And, you know, we're speaking on behalf of

17   everybody who's an unsecured creditor, which, as you know,

18   is an extremely broad group of people, including some of

19   the people Mr. Alter represents all the way down to just

20   small businesses here in Montana.  So we don't really have

21   a position on this motion other than, as I sit here, I get

22   more and more nervous at the breadth of the discovery that

23   seems to be possible here because a lot of this stuff may

24   have to happen again once we have a -- have counsel and

25   have another creditor and once DIP financing is in place.

1   And I hate to see all this have to happen more than once

2   when, really, the issue is:  Should the DIP financing be

3   approved next Thursday or not?  So thank you.

4              THE COURT:  Thank you, Mr. Brown.  Anyone else

5   like to make any comment?

6              MR. SKLAVER:  Yes, Your Honor.  Steven Sklaver

7   for the Discovery Land Company.

8              I do want to make the statement that we do agree

9   that in the time where an application to be paid is made,

10  there may be an appropriate venue for discovery, perhaps,

11  related to this alleged collusion conspiracy.  But Monday

12  is not that time when all we're discussing is the DIP

13  financing.  Thank you, Your Honor.

14             THE COURT:  Thank you.  Mr. Stensland.

15             MR. CHEHI:  Mark Chehi again, Your Honor.

16             It can't be that the involvement of Discovery as

17  a requirement of this CrossHarbor financing put -- allows

18  Discovery to be outside the ambit of the merit of the

19  CrossHarbor financing.  If they can't be -- if they can't

20  properly be involved in managing the debtor, it's because

21  they're not disinterested, because they have various

22  involvement and objectives in their own capacity as an

23  acquirer and as a participant.  And that's reflected

24  clearly in the document that we attached to our response

25  today.  It just seems to me that those issues have to be

1    explored before the Court can get the final approval of the

2    CrossHarbor financing.  And that's irrespective of an

3    application to employ them and pay them.

4            THE COURT:  Well, it seems, it seems that the

5    issue over their employment, any issue that might be raised

6    about their employment certainly is an issue that this

7    Court takes very seriously, as well as I understand the

8    issue that, well, in the event, then that discovery should

9    for some reason not be approved by this Court, what that

10   does to the DIP financing.  And that's something obviously

11   that this Court is concerned about and obviously should be

12   of great concern to the debtor, as well, and to, I would

13   hope, a lot of the other participants in this bankruptcy.

14   Because if, in fact, the DIP financing ends or is ended on

15   short notice because of some event of default such as

16   Discovery not being employed, then we're back to where we

17   were last Tuesday with no financing.

18           MR. CHEHI:  Your Honor, Credit Suisse - Mark

19   Chehi again - has put on the table and will be filing

20   today, just so that everybody in the world had notice of

21   it, you know, this committed financing, which is, you know,

22   more than equivalent to what CrossHarbor has on the table

23   but doesn't have any of the infirmities in respect of

24   conditioning it on Discovery Land Company or any other, you

25   know, insider relationships continuing.

1          We believe that the merits of the CrossHarbor

2     financing final approval has to take into account the

3     alternatives, which is the Credit Suisse financing, and

4     these issues of infirmity with Discovery, and the like.

5     And then that - (inaudible) - discovery of.  We'll make a

6     record on it.  Maybe there's nothing there, and it's all

7     neutral, and people are avoiding this because they're

8     concerned about spending the time.  But, you know, in my

9     view, Your Honor, that's not what's going on.

10          THE COURT:  Mr. Chehi, how is it that --

11          MR. MOORE:  Your Honor, if I may; Your Honor, if

12     I may.  Paul Moore.

13          THE COURT:  Mr. Moore.

14          MR. MOORE:  Your Honor, it's Paul Moore.  Could I

15     just address that last issue regarding Discovery Land?

16          THE COURT:  Okay.

17          MR. MOORE:  Regardless of what people think, it's

18     certainly not our intent to create a default or veto power

19     over the loan.  I feel confident in saying that we -- to

20     the extent necessary, we will modify our conditions such

21     that if the Court finds that Discovery's employment is

22     inappropriate under applicable law, then certainly that

23     won't be a breach.  And we will work around that condition

24     to either find someone else who's reasonably acceptable,

25     that is approvable by the Court, or to monitor in a

1    different way.  But I'm certain we are not creating a loan

2    for the purpose of creating default.  And I'm not trying

3    to - (inaudible) - Discovery, Your Honor; I just think it's

4    such a red herring and taking on a life of its own.

5            Again, I would point out, I would point out that

6    Mr. Byrne testified at length regarding all of these

7    relationships.  No one tried to hide anything.  If it turns

8    out that he testified falsely, then God forbid what will

9    happen to him.

10           THE COURT:  I guess the question that I have for

11   Credit Suisse is:  What gives them the opportunity to file

12   a motion for additional financing unless it comes through

13   the debtor?

14           MR. CHEHI:  We're not filing a motion, Your

15   Honor; we're just filing the term sheet and the commitment

16   letter so that everyone knows what the terms are.

17           THE COURT:  I see, I see.  Mr. Stensland.

18           MR. STENSLAND:  Dean Stensland on behalf of Prim

19   Vintage Development.  And we have no position on this

20   motion before the Court today, but just one thing to clear

21   up the record, because it was raised at the November 25th

22   hearing and again by the Court today.  The issue is as

23   follows:  Credit Suisse is not the only holder of a

24   first-position lien on Yellowstone Club assets.  Prim

25   Vintage is a -- was an owner of 160 acres and sold the real

1    property to the Yellowstone Club.  They have an $8 million

2    promissory note; they have a first-lien possession -- or

3    position on that 160 acres; they're listed in the

4    bankruptcy schedules as an undisputed, fully secured

5    creditor.

6            And I just wanted to raise that just because the

7    focus of these hearings has been on the fact that Credit

8    Suisse is a prepetition lender and has a $307 million loan,

9    and they have liens on -- that they have.  We also have a

10   first-position lien, although much smaller.  But I just

11   wanted to clear up the record that there is another

12   first-position lien on an asset that doesn't belong to

13   Credit Suisse.

14           THE COURT:  Okay.  Mr. Stensland, I do have a

15   follow-up to that, and it's more for clarity:  Is this

16   property, your client's property, involved with the

17   easement that Mr. Greenspan testified to at the last

18   hearing which an easement has to be acquired?

19           MR. STENSLAND:  I'm not privy to knowledge of

20   that, Your Honor.

21           THE COURT:  Okay, very good.  Thank you.

22           MR. BROWN:  I can speak to that, Your Honor.

23           THE COURT:  Mr. Brown.

24           MR. BROWN:  The easement that Mr. Greenspan was

25   speaking about was an access easement to the Yellowstone

1    Club.  And it is a condition of future subdivision decision

2    approvals.  It's not within the Yellowstone Club itself;

3    it's outside the Yellowstone Club, but it provides access

4    to basically the boundary of the club.  So it is not really

5    internal to the Yellowstone Club; it's just an access

6    easement to it.

7              THE COURT:  To get to the club?

8              MR. BROWN:  Correct.

9              THE COURT:  From the public road?

10             MR. BROWN:  Yes.  There's already one main public

11   access, there's two emergency accesses.  This would provide

12   a second regular access that the County, Madison County,

13   has said is a better long-term public access.  It requires

14   that as a condition of future plat approvals.  And that's

15   what Mr. Greenspan was testifying, Your Honor.

16             THE COURT:  The Prim property, is that contiguous

17   to the club property?

18             MR. BROWN:  It is contained within the club

19   property.  There's 13,000 acres that make up the club.

20   Prim has 160 acres --

21             THE COURT:  Internal.

22             MR. BROWN:  Internal, within that 13,000.

23             THE COURT:  I understand.  Okay, thank you.

24   That's really not relevant for the hearings -- or the

25   matters we're hearing today; that was just for

1    clarification.

2            Anyone else have comment?

3            Oh, Mr. Bender.

4            MR. BENDER:  Ronald Bender for Michael Snow.

5            I have no knowledge in terms of what's been going

6    on here other than just this seeing -- (inaudible.)  The

7    only thing I would request is that other parties be allowed

8    to participate by phone in terms of any of these

9    depositions.

10           THE COURT:  Why?

11           MR. BENDER:  Rather than find some video hookup

12   or travel to LA or Boston.

13           THE COURT:  Do you have any interest in it?

14           MR. BENDER:  We might.

15           THE COURT:  Is it something you can view later or

16   read later or schedule it on our own?

17           MR. BENDER:  I'm just looking at the expense and

18   the flexibility in terms of all the parties that are out

19   here, in terms of schedules.

20           THE COURT:  I do understand that part of it,

21   Mr. Bender.

22           Anyone else?  No one else?

23           Well, as it relates to the motion of discovery,

24   the depositions - with an exception - the discovery that's

25   been provided, the request of depositions - and I guess I'm

1   not certain if subpoenas are out, and maybe there are - are

2   in violation of our rule.  It's very clear under our local

3   rule that this Court will set and determine what rules of

4   discovery or adversary rules will apply in a contested

5   matter under 9014.  I don't think the rule can be any

6   clearer.  There's been no such motion made, I've ruled on

7   no such motion.  And I certainly in the past in other cases

8   have ruled on that and have required the parties to go

9   through the process and file the motion, we take it up if

10  there's an objection and see if there needs to be a

11  limitation imposed or if what's being proposed is fine, so

12  -- except to the extent that, as already been addressed by

13  Debtor, that they have agreed to schedule depositions,

14  which include not only the property manager -- or the

15  business manager, Ms. Blixseth, and Mr. Greenspan, and then

16  the representative from Credit Suisse, which parties have

17  mutually agreed to those, I see no reason that those

18  depositions cannot go forward.  You've agreed to them, and

19  I don't see that those have an impact.

20          As far as it relates to any propounded discovery

21  that's been submitted, that discovery is quashed because it

22  doesn't comply with the local rule.  And if a motion -- you

23  wish to make a motion that needs to be filed, it will be

24  taken up at an appropriate time in relation to any response

25  that's filed.  If there's no response, it will be granted

1    after 10 days unless this Court sets it for hearing to

2    determine why.

3              As it relates to the scheduled depositions with

4    CrossHarbor and Discovery Land, I'm quashing those, again,

5    for violation of the rule.  And I realize maybe what I'm

6    doing here is prolonging or just putting into a shorter

7    time frame issues that will need to be dealt with, but I'm

8    not going to waive the rule in this particular case when

9    I've imposed it in other cases.  And there's a reason that

10   rule was imposed, so that this Court could control just

11   this type of discovery and not have it go on a process

12   that, that maybe isn't as germane is it needs to be for the

13   particular issue that's being dealt with at that particular

14   time but is basically a fishing expedition that slows this

15   process down.

16             So that's basically my ruling.  I think it has

17   taken care of probably everything before me.

18             MR. ALTER:  Your Honor, Jonathan Alter.

19             May I correct the record or ask for a correction

20   to the record?  You said that you were quashing the

21   discovery with respect to CrossHarbor and Discovery Land.

22   I assume you also meant against the ad hoc committee.

23             THE COURT:  I did.

24             MR. ALTER:  Thank you.

25             MR. CHEHI:  Your Honor, Mark Chehi.

1          I would just like to mention for the record that

2     on the day of the last hearing, in-court hearing on

3     approval of the interim financing, I did, indeed, Your

4     Honor, make an oral motion for the discovery.

5          THE COURT:  Well, I guess without going back and

6     looking at the record, I don't know that I recall that.

7     But I mean at this point, I'm going to, I'm going to quash

8     the motion because I don't see a written motion at this

9     point in time, and I think the rule is specific.

10         And, you know, I want to see -- if there's

11    dispute on discovery, I'll tell you, everyone that's

12    involved and participating here:  I take dim view of

13    discovery disputes.  I've told every practitioner that's

14    ever appeared before me I don't appreciate it at all.  I

15    expect the parties to be able to work out discovery issues.

16    And if it's a matter that can't be resolved, and certainly

17    if it's a privilege matter, we'll go down through each item

18    at a hearing on the record, and I'll determine what is and

19    isn't germane, and it will be provided.  But I'll tell you,

20    I don't appreciate the fight.  You need to work these

21    things out mutually.  You'll have a lot better result.

22         As it relates to the hearing that's coming up, I

23    mean I would expect that there's going to be -- as

24    Mr. Patten referenced, an application for employment of, of

25    Discovery, which, obviously, I think there's probably going

1    to be an objection to based upon what I've heard today.

2    And it obviously - (inaudible, audio cuts out) -

3    specifically references now, there may or may not be a

4    condition that Discovery has to be the property manager --

5    or that's probably not the proper term, but has to be

6    involved; although, Mr. Moore did address that briefly.

7    Obviously, that's an issue that will have to be dealt with

8    if -- unless we hear the contested application for

9    employment on the same day as we do the DIP financing that

10   I can then take under advisement and deal with

11   simultaneously.  Because I think it is an issue that has --

12   that this Court will deal with one way or the other.  I'm

13   just giving fair warning to the parties that you need to

14   consider and think about that.

15         And as it relates to other things that Mr. Chehi

16   has referenced, if there's a merit to any of the

17   statements, I will give him the opportunity to certainly

18   flush any of that out.  And if there is any of that kind of

19   activity going on, this Court, even as I commented about

20   discovery, I take an even greater dim view of that sort of

21   activity between participants in this process and will rule

22   appropriately or accordingly.  So I -- if there is merit to

23   anything that Mr. Chehi is alleging and arguing, it will be

24   dealt with, you know, by this Court; and if there isn't,

25   then let's move on and get this to conclusion and finality

1    so that the parties can deal with the situation.

2           The other thing that I will comment about, and

3    it's only because of prior rulings of this Court, as well,

4    that I just want the participants to be aware of - and it

5    may or may not be true, depending upon the final, final

6    outcome in this case - but:  I have, in the past, looked

7    very carefully and scrutinized fees on an oversecured

8    creditor in fighting tooth and nail all the way through the

9    process and have disallowed fees where it appeared it was

10   just to fight when there was no jeopardy or prejudice to

11   the secured position.  And I just raise that because if, in

12   fact, as I've talked about earlier in this hearing, there

13   have been -- the lienholders are protected through the plan

14   or a sale, then I'm going to review that carefully in any

15   fee app.

16          And, you know, as it stands now, I'm still

17   waiting for fee apps for the initial interim financing that

18   was provided by Credit Suisse, because, obviously, that's

19   part of what needs to be dealt with if, in fact, I go

20   forward with final approval of the CrossHarbor financing,

21   because part of that is that they pay off the priming lien

22   of the Credit Suisse interest and the approved attorney's

23   fees.

24          So we've got a lot of things on the table, and I

25   think we need to spend time to detail and to the things

1    that are important and germane at the time we're going

2    through it so that we get this thing concluded and the

3    secured creditors can get paid; and I would hope the

4    unsecured, too, but they have a little different position

5    than the secured creditors.

6              We will issue an order, but this will serve as a

7    bench ruling to be followed with a formal order that will

8    be entered, written, that you will receive.

9              Is there anything else that I can take up at this

10   time?  Is there anything else that I can assist with?

11             If not, we'll be in recess.

12

13                        *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 C E R T I F I C A T E

 2

 3      I certify that the foregoing is a correct transcript

 4   from the electronic recording of the proceedings in the

 5   above-entitled matter, all done to the best of my skill and

 6   ability.

 7

 8   _____    _____

 9   Jonny B. Nordhagen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```