IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

```
                    _____
                                      )
In Re:                                ) Case No. 08-61570
                                      )
Yellowstone Mountain Club, LLC,       )
                                      )
            Debtor.                   )
_____       )
```

THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

Butte, Montana
January 13, 2009

Transcript Services:

Proceedings recorded by electronic recording;
transcript produced by reporting service.

```
 1                        APPEARANCES

 2

 3        FOR THE DEBTORS:

 4             JAMES A. PATTEN

 5             Attorney at Law

 6             Suite 300, The Fratt Building

 7             2817 Second Avenue North

 8             Billings, MT  59101

 9

10        FOR EDWARDS LAW FIRM:

11             JON E. DOAK

12             Attorney at Law

13             Doak & Associates

14             P.O. Box 1875

15             Billings, MT  59103-1875

16

17   FOR THE OFFICE OF THE U.S. TRUSTEE:

18             DANIEL P. McKAY

19             U.S. Trustee's Office

20             Liberty Center, Suite 204

21             301 Central Avenue

22             Great Falls, MT  59401

23

24

25
```

```
 1                    APPEARANCES (continued)

 2

 3      FOR CREDIT SUISSE:

 4           MARK S. CHEHI

 5           ROBERT S. SAUNDERS

 6           Attorneys at Law

 7           Skadden, Arps, Slate,

 8              Meagher & Flom

 9           One Rodney Square, Seventh Floor

10           Wilmington, DE  19801

11

12           EVAN R. LEVY

13           Attorney at Law

14           Skadden, Arps, Slate,

15              Meagher & Flom

16           Four Times Square

17           New York, NY  10036-6652

18

19           SHANE P. COLEMAN

20           Attorney at Law

21           Holland & Hart

22           401 North 31st Street, Suite 1500

23           Billings, MT  59101

24

25
```

```
 1                    APPEARANCES (continued)

 2


 3        FOR THE CREDITORS COMMITTEE:

 4              J. THOMAS BECKETT

 5              Attorney at Law

 6              Parsons, Behle & Latimer

 7              201 South Main Street

 8              Salt Lake City, UT  84111

 9

10       FOR THE AD HOC COMMITTEE OF YELLOWSTONE

11       CLUB MEMBERS:

12              JOHN H. GRANT

13              Attorney at Law

14              Jackson, Murdo & Grant, PC

15              203 North Ewing

16              Helena, MT  59601

17

18              JONATHAN B. ALTER

19              Attorney at Law

20              Bingham McCutchen, LLP

21              One State Street

22              Hartford, CT  06103

23

24

25
```

```
 1                   APPEARANCES (continued)

 2

 3       FOR THE CLASS B AD HOC MEMBERS COMMITTEE:

 4            MATTHEW J. CUFFE

 5            Attorneys at Law

 6            Worden Thane, PC

 7            P.O. Box 4747

 8            Missoula, MT  59806

 9

10            CLARK T. WHITMORE

11            Attorney at Law

12            Maslon Edelman Borman & Brand, LLP

13            3300 Wells Fargo Center

14            90 South Seventh Street

15            Minneapolis, MN  55402-4140

16

17       FOR THE UNSECURED CREDITORS COMMITTEE:

18            JAMES H. COSSITT

19            Attorney at Law

20            James H. Cossitt, PC

21            202 KM Building, 40 Second Street East

22            Kalispell, MT  59901-4563

23

24

25
```

```
 1                    APPEARANCES (continued)

 2


 3        FOR CROSSHARBER CAPITAL PARTNERS, LLC:

 4             PAUL D. MOORE

 5             Attorney at Law

 6             Duane Morris, LLP

 7             470 Atlantic Avenue, Suite 500

 8             Boston, MA  02210-2600

 9

10        FOR TIMOTHY J. BLIXSETH:

11             JOEL E. GUTHALS

12             Attorney at Law

13             Guthals, Hunnes & Ruess, PC

14             P.O. Box 1977

15             Billings, MT  59103

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2    WITNESS:                                        PAGE:

3    DOUG JAMES

4         Direct Examination by Mr. Patten   .   .   .   .   .   18

5         Cross-Examination by Mr. Beckett   .   .   .   .   .   23

6         Cross-Examination by Mr. Saunders   .   .   .   .   .   24

7         Cross-Examination by Mr. Whitmore   .   .   .   .   .   25

8         Cross-Examination by Mr. Guthals   .   .   .   .   .   29

9    LOUIS PISTECCHIA

10        Direct Examination by Mr. Saunders .   .   .   .   .   32

11   EDRA BLIXSETH

12        Direct Examination by Mr. Saunders .   .   .   .   .   36

13

14

15

16

17

18

19

20

21

22

23

24

25

1          YELLOWSTONE MOUNTAIN CLUB BANKRUPTCY

2                    BUTTE, MONTANA

3                      - - -

4      BE IT REMEMBERED THAT this matter came on for hearing

5   on January 13, 2009, in the United States Bankruptcy Court,

6   District of Montana, The Hon. Ralph B. Kirscher, presiding:

7

8    The following proceedings were had:

9

10          THE COURT:  There are several matters in

11   Yellowstone Club, 08-61570, including motion of Wells Fargo

12   Equipment Finance to modify stay; order to show cause why

13   the Court should not lift stay to allow Credit Suisse to

14   proceed with enforcement of promissory notes; objection of

15   Credit Suisse to order granting debtors' application to

16   employ Mr. James and the law firm of Moulton Bellingham;

17   also, objection by the unsecured creditors committee to the

18   order appointing Mr. James and Moulton Bellingham; also,

19   objection of ad hoc group of Class B unitholders to that

20   order.

21          Also, there's hearing on approval of stipulation

22   by Credit Suisse and the official committee of unsecured

23   creditors regarding enforcement of collection of promissory

24   notes; and objection by the ad hoc group of Class B

25   unitholders; also, the debtors have filed an objection to

1    that stipulation.

2            I believe those are the matters that have been

3    set.  I may have missed something.  If I have, we'll take

4    it up as you properly notify me and tell me that I've

5    missed something.

6            And I guess, Mr. Patten, you are ready to do so.

7            MR. PATTEN:  Good morning, Your Honor.  Andy

8    Patten for the debtors.

9            We've entered into a stipulation with Wells Fargo

10   that resolves their motion for relief from the stay.

11           THE COURT:  Okay.

12           MR. PATTEN:  I signed it yesterday and returned

13   it to Mr. Dye, and I thought it would be filed by now.  But

14   it essentially provides for payment of adequate protection.

15   And Wells Fargo will be withdrawing its motion.

16           THE COURT:  Okay, withdrawing their motion.

17           MR. PATTEN:  Yes.

18           THE COURT:  Okay.  If it hasn't been filed, I

19   grant you five days to get it filed.

20           MR. PATTEN:  Thank you.

21           THE COURT:  And it may have already been filed,

22   as you've --

23           MR. PATTEN:  Thank you.

24           THE COURT:  -- as you've stated.  We'll issue an

25   appropriate order upon receipt.

1          Let's state our appearances for the record.

2          We have Credit Suisse kind of squeezed into the

3     corner here, but, anyway --

4          MR. CHEHI:  Mark Chehi of Skadden-Arps for Credit

5     Suisse as agent to the prepetition lenders, along with my

6     partners Rob Saunders and Evan Levy.

7          THE COURT:  Okay.

8          MR. COLEMAN:  Shane Coleman of Holland & Hart,

9     also for Credit Suisse.

10         MR. CUFFE:  Matt Cuffe, Your Honor, Warden Thane,

11    for the Class B ad hoc members committee.

12         MR. WHITMORE:  And, Your Honor, Clark Whitmore

13    from the law firm of Maslon, Edelman, Borman & Brand as

14    counsel for the Class B ad hoc committee.

15         THE COURT:  Okay.

16         MR. MOORE:  Paul Moore, counsel for CrossHarbor

17    Capital.

18         MR. COSSITT:  Jim Cossitt, Kalispell, local

19    counsel for the unsecured creditors committee.

20         MR. BECKETT:  Good morning, Your Honor.  Tom

21    Beckett - Parsons, Behle & Latimer in Salt Lake City - for

22    the unsecured creditors committee.

23         THE COURT:  Okay.  Mr. Patten, you've already

24    made your appearance.

25         MR. GRANT:  John Grant for the ad hoc committee.

1          THE COURT:  Okay.  Any other --

2          MR. ALTER:  And, Your Honor --

3          THE COURT:  Yes.

4          MR. ALTER:  -- Jonathan Alter from Bingham

5    McCutchen, also on behalf of the members committee.

6          THE COURT:  I almost missed you there, yes.

7          Who else?

8          MR. GUTHALS:  Your Honor, in Billings, this is

9    Joel Guthals on behalf of Timothy J. Blixseth.

10          THE COURT:  Okay.

11          MR. DOAK:  And in Billings, this is Jon Doak on

12    behalf of the Edwards Law Firm and James Murphy.

13          TRUSTEE McKAY:  Your Honor, Dan McKay from Great

14    Falls, appearing on behalf of the U.S. Trustee's Office.

15          THE COURT:  Any others that wish to make

16    appearances for the record?  Seeing none, we'll proceed.

17          They're really all kind of interrelated here.  I

18    think the best way to do it is I'm just going to deal with

19    these kind of in the aggregate.  Let's deal with -- because

20    they're all kind of related at this point.  Initially, I

21    got this started with the order to show cause, so let's

22    start with that, show cause why the Court shouldn't lift

23    the automatic stay to proceed with enforcement of the

24    notes.  Obviously tied with that now is the stipulation

25    between Credit Suisse and the official unsecured creditors

1    committee as to how they would like to proceed.

2         We also have the application filed by the debtor,

3    which this Court automatically grants, to which there are

4    objections regarding the retention of Mr. James and the

5    Moulton Bellingham firm to proceed and pursue collection on

6    those notes.

7         I think with that, Mr. Patten, why don't I have

8    you proceed as to Debtors' position on these matters?

9         MR. PATTEN:  Your Honor, the debtors' position is

10   that there is no cause to lift the automatic stay; and,

11   further, that there is no cause to take from the debtors in

12   possession the power and duty to collect these promissory

13   notes and to give that power to either the official

14   committee or the Credit Suisse.

15        We have commenced action to start collection on

16   the notes.  There's no basis to deny the debtors in

17   possession the right, I think, as debtors in possession to

18   collect the notes.  The debtors in possession represent all

19   of the myriad interests involved in this bankruptcy case,

20   which includes the Credit Suisse, it includes the unsecured

21   creditors, it includes the Class B members, it includes the

22   Yellowstone Club members.  And so the debtors in possession

23   are properly the entity to collect the notes.  The fact

24   that there are insider transactions involved are nothing

25   different and nothing new, and we deal with that all the

1    time.

2          I provided a -- filed an objection late yesterday

3    afternoon, Your Honor, and cited some cases from other

4    courts to the effect that before the debtor should be --

5    debtors in possession should be stripped of the power to

6    collect -- or to commence avoidance actions, which are

7    similar, I think, in this case to collecting the BGI notes,

8    there would have be four conditions met.

9          One, there has to be a showing of a colorable

10   claim, which I think is plainly met here.

11          Number 2, the debtor in possession has to have

12   been requested to commence an action on that claim.  That

13   hasn't been met here, hasn't been shown here.

14          Three, the debtor must have unreasonably refused

15   to commence an action, and that clearly is not met here.

16          And fourth, the party trying to wrestle that

17   power away from the debtor needs to apply to the Court for

18   that authority and to take that authority away from the

19   debtor in possession.  And there's been no application made

20   to the Court to do that.

21          So for all of those reasons, we oppose, the

22   debtors in possession oppose anyone else collecting these

23   notes.  We believe that there's no showing that the debtors

24   in possession cannot effectively collect the notes.

25   There's no showing that the automatic stay ought to be,

1    ought to be lifted, which I think would cause other

2    problems in terms of Credit Suisse actually foreclosing its

3    interest in the notes.

4           And, finally, if the Court is concerned that

5    because of the relationship between the debtors in

6    possession and BGI - the payor under the notes - and

7    Ms. Blixseth, the simple solution is to include the debtors

8    with the same role and responsibilities and powers that

9    Credit Suisse has under its stipulation with the official

10   committee.

11          We're happy to be involved and have other people

12   look over our shoulders and to engage in the collection in

13   a transparent fashion.

14          THE COURT:  Do you think you won't have?

15          MR. PATTEN:  No, I don't, which is why I think

16   the debtor in possession can effectively and properly

17   collect these notes to begin with.  But if other parties

18   are concerned, then we can do it collectively like Credit

19   Suisse and the unsecured committee is doing.

20          Your Honor, the collection of these notes is an

21   asset of the bankruptcy estate, and it accrues to the

22   benefit of the entire bankruptcy estate which is above and

23   beyond the creditors alone.  The collection of these notes

24   may be an essential element of the debtors' bankruptcy

25   plan.  And I think by carving out an asset of the estate -

1    (inaudible) - over to entities that may not have the full

2    interest of the estate in mind but have their own parochial

3    interest in mind is damaging for the entire estate.  And I

4    think that it's inappropriate to do that.

5            I think that if the debtors are seated at the

6    table with Credit Suisse and with the official committee

7    and we proceeded to collect the notes together, that's fine

8    with me.  That allows the debtors to have knowledge of what

9    is transpiring, what the discovery has uncovered, where

10   collection of the notes may lead to subsequent transfers.

11   And I think that that would, at a minimum, be appropriate

12   in this case.

13           THE COURT:  Do you wish to put on testimony?

14           MR. PATTEN:  Your Honor, I'm happy to put on

15   testimony from Mr. James as to his qualifications to

16   collect on the notes, if the Court would like to hear that.

17           THE COURT:  Well, what about any testimony about

18   the debtors' ability to pursue these claims other than what

19   you've just stated in attorney argument?

20           MR. PATTEN:  I don't think there would be

21   testimony for that, Your Honor, other than Mr. James'

22   testimony that he can -- is qualified and capable

23   of collecting these.

24           THE COURT:  Okay.  Why don't you call Mr. James?

25   And then we'll deal with that portion, as well.

1          MR. PATTEN:  Very well.  I call Doug James.

2              DOUG JAMES, WITNESS, SWORN

3          THE COURT:  You know, Mr. Patten, before you

4     proceed, even though we've called the witness, I just was

5     looking through my material.  There was one thing that I

6     think all of you have received.  And it's unrelated to this

7     particular matter, but I just wanted to know if, in fact,

8     anything needs to be done with this.  As you may know, I

9     received a copy of this letter to all parties in interest

10    from FW Investments, LLC, in Bozeman with copies going to,

11    I think, pretty much everybody that's in this room.

12         MR. CHEHI:  Credit Suisse has not received a copy

13    of it, to the best of my knowledge.

14         THE COURT:  You have not received it.  I see

15    you're not on the list.  But it's talking about warehouses

16    and locations and contents of the storage units.  And I

17    guess I was copied just to bring me in so I would be at

18    least aware of it.

19         But I guess I'm wondering:  Have the parties

20    dealt with this?  Because it involves State Court

21    litigation, as well, Mr. Lamdin on behalf of American Bank,

22    and what's happening because of default of utility

23    payments.  Is that part of this case or another case, or

24    where are we at?

25         MR. PATTEN:  Well, Your Honor, it's only part of

1    this case in that prior to the letter that the Court's

2    received, there was some indication that the FW was going

3    to exercise its rights under the agisters lien law as a

4    storage unit.  And the information that I received from the

5    -- I think the Yellowstone Mountain Club is that in

6    addition to property of Monarch furniture stored in these

7    various warehouses or storage units, there was property of

8    the Yellowstone Mountain Club in storage there, as well.

9    And I notified FW's attorney that the Yellowstone Mountain

10   Club property could not be sold or liquidated under the

11   agisters lien statute unless the automatic stay was first

12   lifted.

13         Subsequent to that, there was discussion and I

14   think a lawsuit filed against Monarch and maybe

15   Ms. Blixseth that I understand has been resolved.  And the

16   only remaining issue, as far as I'm aware, is that we have

17   to identify with particularity what property the

18   Yellowstone Mountain Club has in these storage units so

19   they can be segregated from an arrangement for a sale that

20   I think has been negotiated between FW and American Bank

21   which has a lien on the furniture, and whatnot, and

22   Ms. Blixseth.

23         THE COURT:  Okay.  So as it relates to this

24   bankruptcy, though, I mean obviously if they're wanting

25   rent and things like that, that's an administrative expense

1    they're going to have to -- if, in fact, it even governs.

2         How many of you have not received this?

3         Okay.  Before you all leave, I will see that you

4    all receive copies of this so you have it.  I'm not going

5    to do anything with it unless it comes to my attention on

6    some contested matter.

7         MR. PATTEN:  I think the estate's interest in

8    that, Your Honor, is close to being fully resolved.  And

9    I've been communicating with Mr. Lamdin about that.

10        THE COURT:  Okay.  You may proceed.

11        MR. PATTEN:  Thank you, Your Honor.

12                   DIRECT EXAMINATION

13   BY MR. PATTEN:

14   Q.  Please state your name.

15   A.  Doug James.

16   Q.  What's your address, Mr. James?

17   A.  1570 Westridge Circle; Billings, Montana.

18   Q.  Your occupation?

19   A.  I am an attorney with the law firm of Moulton

20   Bellingham, PC.

21   Q.  Where are you licensed to practice?

22   A.  Montana.

23   Q.  How long have you been licensed in Montana?

24   A.  Since 1982.

25   Q.  In the course of -- and have you practiced law since

1   1982?

2   A.  Yes.

3   Q.  What's the nature of your law practice?

4   A.  My practice is twofold:  A large portion of my practice

5   involves commercial law, representing predominantly lenders

6   in connection with loans and loan collections,

7   foreclosures, collection lawsuits, other collection

8   activities.  The balance of my practice involves

9   real-estate development, predominantly shopping centers.

10  Q.  Have you ever practiced before this Bankruptcy Court?

11  A.  Yes, that is a substantial part of my practice.

12  Q.  Have you had an opportunity to examine the promissory

13  notes at issue here?

14          MR. PATTEN:  And, Your Honor, may I approach the

15  witness?

16          THE COURT:  You may.

17          THE WITNESS:  You've handed me Exhibit 1, which

18  is a promissory note for 5 million -- $55,798,796.68, dated

19  September 30, 2005; Exhibit 2, which is a promissory note

20  for $208,831,158.45, also dated September 30, 2005; and

21  Exhibit 3, which is a promissory note in the amount of

22  7,800,000, dated September 30, 2005.

23          And in answer to your question, yes, I have

24  examined these notes.

25  Q.  (By Mr. Patten)  Okay.  Do any of the notes present any

1    unique issues or problems, as far as you're aware, in your

2    collection above and beyond what you deal with ordinarily

3    in your commercial law practice?

4    A.  No.

5              MR. PATTEN:  May I approach again, Your Honor?

6              THE COURT:  You may approach.

7    Q.  (By Mr. Patten)  I've handed you what's been marked as

8    Exhibit 4.  Can you identify that?

9    A.  Exhibit 4 is a letter dated January 6, 2009, on my

10   stationery and letterhead addressed to Blixseth Group,

11   Inc., sent certified mail to a Salem, Oregon address.  It

12   was carbon-copied to the corporation's registered agent and

13   was also sent by certified mail to another address.

14   Essentially, this letter is a demand for payment on

15   Exhibits 1, 2, and 3.  And I have received a certified

16   return receipt back from one of the three copies that was

17   sent out.

18   Q.  And is a demand, in your opinion, necessary in order to

19   commence a collection action on the three notes?

20   A.  Yes.  These are demand notes.  We've made demand for

21   payment.  If payment is not made promptly, my plan of

22   action would then be to bring an adversary action to

23   collect on the notes as well as all interest and attorney's

24   fees that are incurred as a result of the collection

25   activities.

1          MR. PATTEN:  And, Your Honor, I would move the

2    admission of Exhibits 1, 2, 3, and 4.

3          THE COURT:  Any objection?

4          MR. BECKETT:  Your Honor, the committee objects.

5    I don't think that the witness has firsthand knowledge of

6    where the notes came from.  He testified that he inspected

7    them and -- but he didn't testify that he had any knowledge

8    about their making.

9          THE COURT:  Well, I concur with your thoughts in

10   that regard.  I'm going to admit them for the purposes that

11   these are the items that he has reviewed.

12         MR. BECKETT:  Thank you.

13     DEBTORS' EXHIBIT NOS. 1 - 4 ADMITTED INTO EVIDENCE

14   BY MR. PATTEN:

15   Q.  Exhibits 1, 2, and 3 are signed; is that correct?

16   A.  That is correct.

17   Q.  Mr. James, does your firm or do you have experience in

18   collecting notes such as Exhibits 1, 2, and 3?

19   A.  Yes, as to myself and as to my firm.

20   Q.  Mr. James, have you been pressured or persuaded in any

21   manner by BGI or by the debtors in possession in this case

22   to do anything other than your ordinary course of

23   collection activity in connection with Exhibits 1, 2,

24   and 3?

25   A.  No.  And exactly the opposite is true.  And it if were

1   anything other than the opposite, I would not have

2   undertaken this assignment.

3       My practice is to be as aggressive as common sense will

4   dictate in collection activities.  That's how I practice,

5   that's how I've been successful.  In this case, the debtor

6   in possession has obligations under the bankruptcy code, to

7   the Court, to its creditors, to its equity holders.  And,

8   you know, my position is that I need to move aggressively

9   and to utilize all of the resources that are available in

10  order to enable the debtor to fulfill its obligations.  And

11  I would go so far as to say that those resources would

12  include my utilizing the assistance of counsel for

13  creditors, for secured creditors, for the committee, for

14  equity holders.

15      I'm willing to take assistance and utilize any

16  resources that I can to recover on these notes to put money

17  into the debtor-in-possession account.  That is my ultimate

18  objective.  How we get from here to there, I will utilize

19  every resource and pursue every avenue, or I will not be

20  doing this.

21          MR. PATTEN:  Thank you, Mr. James.  That's all I

22  have.

23          THE COURT:  Are there parties who wish to

24  cross-examine?

25          Mr. Beckett.

```
1              MR. BECKETT:  Thank you, Your Honor.
2                      CROSS-EXAMINATION
3    BY MR. BECKETT:
4    Q.  How do you do, Mr. James?  I think I have one question
5    and maybe a follow-up.
6        Have you had any conversations with Ms. Edra Blixseth
7    about this engagement?
8    A.  Yes.
9    Q.  And the next question is a yes-or-no question that
10   calls for a yes-or-no answer.  Can you tell me everything
11   that she said and that you said in those conversations?
12   A.  The conversation that we had was briefly over coffee.
13   And to the extent of what we discussed, yes.  There was
14   nothing that I would feel at this point that would be
15   privileged or that I would be precluded from discussing
16   with you or revealing here in court.
17   Q.  But in other conversations with her on this topic, you
18   would reserve to invoke the attorney-client privilege and
19   not disclose the content of your communication with her; is
20   that correct?
21   A.  I have no relationship with Edra Blixseth.  My
22   employment would be by the debtor in possession.  And the
23   attorney-client privilege, to the extent that it would
24   exist, would run to the debtor in possession.  I can tell
25   you that my practice in similar circumstances to this and
```

1   my recommendation to the debtor and to all parties here

2   would be that we should pursue the collection of these

3   notes as aggressively as possible and that the debtors

4   should to it with the highest degree of transparency

5   possible, meaning that my recommendation would be, is that:

6   We should not hide behind the attorney-client privilege to

7   the extent that it serves the common goal of collecting

8   these funds.

9   Q.   So you would not invoke the attorney-client privilege

10  in any conversation with her?

11  A.   That is for my client to invoke.

12          MR. BECKETT:   Thank you.

13          MR. SAUNDERS:   Your Honor, may I?

14          THE COURT:   You may.

15                     CROSS-EXAMINATION

16  BY MR. SAUNDERS:

17  Q.   Good morning, Mr. James.   My name is Rob Saunders, and

18  I'm with Skadden-Arps representing Credit Suisse.

19  A.   Good morning.

20  Q.   In your experience representing creditors in debt

21  collection matters, from time to time does the circumstance

22  arise where there is a tactical or a strategic decision to

23  be made about how to pursue the debt collection matter?

24  A.   Yes.

25  Q.   Okay.   And when those situations arise, would you

1    discuss with your client the pros and cons of the different

2    options that might be available at that point?

3    A.   Yes.

4    Q.   Okay.  And you would let your client -- subject to your

5    advice, you would let your client make the decision about

6    which of those options to pursue, right?

7    A.   Yes.

8              MR. SAUNDERS:  Okay, no further questions.

9                        CROSS-EXAMINATION

10   BY MR. WHITMORE:

11   Q.   Mr. James, I'm Clark Whitmore, representing the ad hoc

12   group of Class B holders.

13       You've testified that you see this, I think, as a

14   fairly straightforward set of actions to collect some

15   promissory notes; is that correct?

16   A.   No.

17   Q.   You don't, okay.  Could you explain that?

18   A.   It is a collection of three promissory notes.

19   "Straightforward" or "standard" or "ordinary", I would not

20   use those terms, no.

21   Q.   Have you had an opportunity to review the exhibits that

22   have been provided by the unsecured creditors committee?

23   A.   Some of the exhibits.  I have not reviewed the entire

24   docket, but in terms of some of the documentation that's

25   been filed most recently, yes.

1   Q.   Have you had an opportunity to review a copy of the

2   second amended complaint that was filed in the Greg LeMond

3   vs. Blixseth Group, Inc., and various other parties in

4   State Court?

5   A.   Briefly, yes.

6   Q.   You have reviewed that?

7   A.   Correct.

8   Q.   And so you're aware of the claims that have been

9   alleged in that, in that lawsuit; is that right?

10  A.   I did briefly review it, saw that there were a number

11  of claims that were asserted, that is correct.  I could

12  neither summarize them for you nor tell you what they are,

13  but yes.

14  Q.   Do you remember that Claim 26 involved a conversion

15  claim against Edra Blixseth for $200 million?

16  A.   I do not recall that, no.

17  Q.   You don't recall reading that.  Do you recall reading

18  Count 28 involving allegations of a breach of fiduciary

19  duty against BGI as the manager of the Yellowstone Mountain

20  Club and the Yellowstone Development Company?

21  A.   Specifically, no, but I am generally aware that there

22  were claims of that nature that were asserted.  It was, as

23  I recall, a very lengthy and unusually long complaint.

24  Q.   So did you recall a Count 29, which was a count for the

25  conspiracy to breach fiduciary duty that was directed

1   against Tim and Edra Blixseth?

2   A.   I don't recall that, no.

3   Q.   In your review, do you recall reading Count 27 calling

4   for the piercing of the BGI corporate bail against -- to

5   assert claims against Edra and Tim Blixseth?

6   A.   I don't recall that, no.

7   Q.   How about Count 21 involving aiding and abetting breach

8   of fiduciary duty by the Yellowstone Club World, LLC?

9   A.   I would have the same answer to all of the complaints.

10  My review of the complaint was cursory.

11  Q.   Okay.  So that would be true of the tortious

12  interference with the debtors by the Yellowstone Club

13  World, as well?

14  A.   Yes.

15  Q.   And the various other claims and counts for alleged

16  wrongful distributions of money, including the proceeds of

17  the Credit Suisse loan by Tim and Edra Blixseth and BGI?

18  A.   Correct.

19  Q.   And you're generally aware, are you not, that the BGI

20  notes represent money that's owed by BGI to the Yellowstone

21  debtors; isn't that right?

22  A.   I believe that the notes speak for themselves, yes.

23  Q.   Okay.  But it's your general understanding that those

24  notes represent perhaps the first stop?

25       When the, when the Credit Suisse proceeds for the loan

1   in 2005 came into the corporation, the Yellowstone debtors,

2   and left to go to BGI and they left thereafter for parts

3   unknown, that these notes simply represent the very first

4   -- potentially, the very first stop in a long series of

5   complicated and interwoven transactions; isn't that right?

6   A.   Well, let me go back to your first question and finish

7   my answer to that which I think will also answer this

8   question.   And that is that, as I've stated, these are not

9   ordinary notes, this is not an ordinary collection, this is

10  not simply looking at Blixseth Group for collection.   If we

11  could get all of the money out of Blixseth Group, that

12  would be excellent, but the bankruptcy code as well as

13  state law provides other mechanisms for collection

14  including fraudulent transfer claims, preferential transfer

15  claims.   And from my conversations with Mr. Patten and with

16  others, it certainly appears that there are a number of

17  claims here that need to be investigated and prosecuted.

18  And so --

19  Q.   Wouldn't it, wouldn't it -- would you agree that these

20  claims may well be interrelated?

21  A.   They may be.

22  Q.   Would you agree that it would make more sense to have a

23  comprehensive review of all of these interrelated claims

24  before embarking on a collection strategy?

25  A.   I don't know that I could agree with that because

1    without beginning the collection strategy, without

2    initiating collection and making demand and pursuing some

3    of these avenues to get other information, I don't know

4    that we're going to have answers to those questions or the

5    documents and information that we need in order to make

6    those determinations.

7        You know, the first thing is to make demand on Blixseth

8    Group, which I've done.  The second thing is to look at

9    where the money went, to follow the money.  And at this

10   point, I don't have the documents or the information to

11   make that determination or those judgments.  And, you know,

12   without all of that information, I think it's going to be

13   very difficult to answer.

14   Q.  But it's your judgment at this point that it would make

15   more sense to proceed against BGI Group than to proceed

16   against Edra Blixseth?

17   A.  I can't concede that, no.

18             MR. WHITMORE:  No further questions.

19             THE COURT:  Anyone else have questions?

20             MR. GUTHALS:  Your Honor, this is Joel Guthals

21   from Billings.  May I ask a couple questions?

22             THE COURT:  Mr. Guthals.

23                      CROSS-EXAMINATION

24   BY MR. GUTHALS:

25   Q.  Good morning, Mr. James.

```
 1    A.   Good morning, Mr. Guthals.

 2              MR. GUTHALS:   The three promissory notes in

 3    question, first of all, Your Honor, have they been admitted

 4    into evidence?

 5              THE COURT:   Exhibits 1, 2, and 3 have been

 6    admitted.

 7              MR. GUTHALS:   Thank you.

 8    Q.   (By Mr. Guthals)   The three promissory notes,

 9    Mr. James, are the note obligations of Blixseth Group,

10    Incorporated; is that right?

11    A.   That is correct.

12    Q.   These are corporate obligations; is that correct?

13    A.   That is correct.

14    Q.   Okay.  And these are not personal obligations of

15    Timothy L. Blixseth; is that correct?

16    A.   Based upon the language in the note, that appears to be

17    the case.  I don't know if there's a basis to make a claim

18    against Mr. Blixseth; otherwise, there may be.

19    Q.   Do you have today any basis for any claim against

20    Mr. Timothy Blixseth?

21    A.   I would say that I have a strong gut feeling and

22    suspicion that there is.  I don't have the documents and

23    the evidence before me to substantiate that to proceed on

24    it at this point, but that would be an avenue of my

25    investigation and is something that I certainly would want
```

1    to investigate and pursue.

2              MR. GUTHALS:  Thank you.

3              THE COURT:  Anyone else with questions?

4              Mr. Patten, do you have any redirect?

5              MR. PATTEN:  No, Your Honor.

6              THE COURT:  You may step down, Mr. James.

7              Any other witnesses as it relates to this

8    specific application and the objections?

9              MR. PATTEN:  No, Your Honor.

10             THE COURT:  Anyone else have anything?

11             Okay.  Let's continue on -- oh, Mr. Chehi.

12             MR. CHEHI:  Your Honor, if we may, we would like

13   to put on some witnesses and then, you know, make an

14   argument on the order to show cause and in support of the

15   stipulation, if we could.

16             THE COURT:  Okay.  I was just going to call for

17   the stipulation now.  Let's just take that on right now,

18   the stipulation as well as it relates to the order to show

19   cause.

20             MR. CHEHI:  Very good, Your Honor.

21             THE COURT:  So if you wish to call yours or

22   Mr. Beckett.

23             Okay.  Mr. Chehi or Mr. Saunders, I'm not sure

24   which is handling this.

25             MR. SAUNDERS:  I'll be handling the examinations,

```
 1   Your Honor.  We'll call Louis Pistecchia as our first

 2   witness.

 3                THE COURT:  Okay.  If the witness could come

 4   forward, please, to be sworn.

 5                LOUIS PISTECCHIA, WITNESS, SWORN

 6                     DIRECT EXAMINATION

 7   BY MR. SAUNDERS:

 8   Q.  Good morning.  Could you state your full name again for

 9   the record, please?

10   A.  Louis Pistecchia.

11   Q.  Okay.  And do you have a job, sir?

12   A.  Yes, sir.

13   Q.  What's your job?

14   A.  I'm a director at Credit Suisse.

15   Q.  Okay.  Are you a director with any particular

16   responsibilities?

17   A.  Yes.  I'm in charge, I'm the manager in charge of the

18   loans control group.

19   Q.  Okay.  And what do you do in that capacity of the loan

20   control group?

21   A.  Among other responsibilities, I'm in charge for keeping

22   track of documentation for the bank.

23   Q.  Okay.

24                MR. SAUNDERS:  Your Honor, could I grab some

25   exhibits and approach?
```

```
 1              THE COURT:  You certainly may.
 2    Q.  (By Mr. Saunders)  Mr. Pistecchia, could you take a
 3    look at what's behind the tab for Exhibit 1, Credit Suisse
 4    Exhibit 1?  Have you seen that document before?
 5    A.  Yes, I have.
 6    Q.  When did you first see it?
 7    A.  I saw this in August of 2006.
 8    Q.  Okay.
 9    A.  Oh, I'm sorry, I saw this document on -- the document
10    was dated -- I'm sorry, I saw this document for the first
11    time on Friday that just passed --
12    Q.  Okay.
13    A.  -- on January 10th.
14    Q.  Okay.  How did you come to see it on Friday?
15    A.  At the request of our outside counsel, Skadden-Arps.
16    Q.  Okay.
17    A.  They requested me to review the documentation, and they
18    sent it.  They sent me a PDF of the documentation.
19    Q.  Okay.  Does Credit Suisse have possession of the
20    originals of these notes?
21    A.  Yes, we do.
22    Q.  Okay.  And where does Credit Suisse keep the originals?
23    A.  These are kept in a vault in New York City.
24    Q.  Okay.  Is the maintenance of original loan documents
25    like these notes at that vault something that Credit Suisse
```

 1   does in the ordinary course of its business?

 2   A.  Yes, it does.

 3   Q.  Okay.  Have you ever personally seen the originals?

 4   A.  Yes, I have.

 5   Q.  Okay.  How did you come to see the originals?

 6   A.  I was requested to obtain the original documentation

 7   from the file and make a comparison to what is contained in

 8   the exhibits to make sure they were a match.

 9   Q.  Okay.  And the way that you obtained the originals from

10   the vault, is that the same process that you would use in

11   the ordinary course of your business if you had to be able

12   to look at the originals of something that was in the

13   vault?

14   A.  Yes, it is.

15   Q.  And did you have an opportunity to compare the

16   originals that you retrieved from the vault against the

17   copies that Skadden-Arps had provided you that are

18   Exhibit 1?

19   A.  Yes, I did.  I made a line-by-line comparison.

20   Q.  A line-by-line comparison?

21   A.  Yes.

22   Q.  And what did that comparison show?

23   A.  That the exhibits are the exact copy to the originals.

24          MR. SAUNDERS:  Your Honor, at this point, I would

25   move Credit Suisse Exhibit 1 into evidence.

1          THE COURT:  Any objection?

2          Exhibit 1 is admitted.

3     CREDIT SUISSE EXHIBIT NO. 1 ADMITTED INTO EVIDENCE

4          MR. PATTEN:  Your Honor?

5          THE COURT:  Mr. Patten.

6          MR. PATTEN:  Is Exhibit 1 the promissory note?

7          THE COURT:  No, Exhibit 1 -- well, Exhibit 1 is a

8     letter.  It includes a letter dated July 26, 2006, to Dana

9     Klein from Doyle, Garland, Nelson, which includes copies of

10    four promissory notes.

11         MR. PATTEN:  Okay.

12         THE COURT:  Do you have that?  Does everyone have

13    those?  Okay.

14    Q.  (By Mr. Saunders)  How long have those original notes

15    been in possession of Credit Suisse?

16    A.  They have been in our possession since August of 2006.

17    Q.  Okay.  And then has that possession been continuous?

18    A.  Yes, it has been.

19         MR. SAUNDERS:  Okay, no further questions.

20         THE COURT:  Mr. Saunders, you did offer

21    Exhibit 1, didn't you?

22         MR. SAUNDERS:  Yes, Your Honor.

23         THE COURT:  And Mr. Patten raised the question.

24         MR. SAUNDERS:  Right.

25         THE COURT:  Exhibit 1 is admitted.

```
 1              MR. SAUNDERS:  Thank you, Your Honor.

 2              THE COURT:  Any cross-examination anyone wishes

 3      to make?

 4              If not, you may step down.  Thank you.

 5              THE WITNESS:  Thank you very much.

 6              THE COURT:  Next witness?

 7              MR. SAUNDERS:  Your Honor, we'd call Edra

 8      Blixseth.

 9              THE COURT:  Okay.  If you could come forward to

10      be sworn, please.

11                   EDRA BLIXSETH, WITNESS, SWORN

12              MR. SAUNDERS:  Your Honor, would it be acceptable

13      for Mr. Pistecchia to leave the courtroom at this point?

14              THE COURT:  Without objection, he certainly may.

15      He's excused.

16              MR. SAUNDERS:  Thank you very much.  Your Honor,

17      could I also approach Ms. Blixseth with an exhibit?

18              THE COURT:  You may.

19              THE WITNESS:  Thanks.

20                        DIRECT EXAMINATION

21      BY MR. SAUNDERS:

22      Q.  Good morning again, Ms. Blixseth.

23              THE WITNESS:  Your Honor, I forgot to bring my

24      glasses again.  Can I run and get them?

25              THE COURT:  Just a moment.
```

1              MR. SAUNDERS:  Sure.

2              THE WITNESS:  I forgot to bring my glasses up

3    again.

4              THE COURT:  Okay.  You may step down and retrieve

5    your glasses.

6    Q.  (By Mr. Saunders)  Good morning.

7    A.  Good morning.

8    Q.  Ms. Blixseth, you are the president of an entity called

9    the "BLX Group, Inc."; is that right?

10   A.  Yes.

11   Q.  Okay.  And you're also the owner of the BLX Group,

12   Inc., right?

13   A.  Yes, I am.

14   Q.  You're the 100 percent equity owner of BLX Group, Inc.,

15   right?

16   A.  Yes, I am.

17   Q.  Okay.  And your ownership of BLX Group represents a

18   significant portion of your personal wealth, right?

19   A.  That's a difficult question to answer.  It represents

20   the old BGI.  It just changed from Blixseth Group, Inc., to

21   BLX Group, Inc., which is the -- houses the Yellowstone

22   Club.

23   Q.  Okay.  Would you agree with me that it's a significant

24   portion of your assets, the assets that you control?

25   A.  Not right now.  I hope it to be in the future, but not

1    right now.

2    Q.   Okay.  Would you agree with me that it's a material

3    portion of your assets?

4    A.   It's got material potential upside for assets for me,

5    yes.

6    Q.   Fair enough.  And I think you mentioned this in your

7    answer:  The BLX Group, Inc., was formally known as

8    "Blixseth Group, Inc."; is that right?

9    A.   Correct.

10   Q.   Okay.  Can I call Blixseth Group, Inc., now known as

11   BLX Group, Inc., just "BGI"?

12   A.   That's what we all do.

13   Q.   Okay, great.  And BGI is the manager and controlling

14   member of the Yellowstone Mountain Club, LLC, and the

15   Yellowstone Development, LLC, right?

16   A.   That's correct.

17   Q.   Okay.  And those two entities are debtors in possession

18   in these Chapter 11 cases, right?

19   A.   That's correct.

20   Q.   Okay.  And in addition to controlling the manager of

21   the debtors, you are the chief executive officer of the

22   debtors, right?

23   A.   That's correct.

24   Q.   Okay.  And so subject only to the approval of the

25   Court, you are the person who ultimately directs the

1   actions of the debtors and their professionals in these

2   cases, right?

3   A.   That's correct.

4   Q.   Okay.  Are you generally knowledgeable about the

5   debtors' financial situation?

6   A.   I am generally knowledgeable about the debtors'

7   situation from taking over in mid August to now and trying

8   to get up to speed of things before.

9   Q.   But part of getting -- part of that getting up to

10   speed, you've had an opportunity to take a look at and

11   understand some of the financial circumstances that the

12   debtors find themselves in, right?

13   A.   That's correct.

14   Q.   Okay.  Could you take a look at Exhibit 2 in the

15   binder?  This is a copy of a credit agreement between the

16   debtors and various lenders with Credit Suisse as

17   administrative agent dated September 30, 2005, correct?

18   A.   Correct.

19   Q.   Okay.  I have put a little red flag on one of the pages

20   for you.

21         MR. SAUNDERS:  And I did the same for Your Honor

22   because the page doesn't have a number on it.  For the

23   record, it occurs right after page 92.

24   Q.   (By Mr. Saunders)  That's your ex-husband's signature

25   on three places on that page, right?

1    A.  That's correct.

2           MR. SAUNDERS:  Okay.  Your Honor, I would move

3    Credit Suisse Exhibit 2 into evidence.

4           THE COURT:  Any objection?

5           Exhibit 2 is admitted.

6      CREDIT SUISSE EXHIBIT NO. 2 ADMITTED INTO EVIDENCE

7    BY MR. SAUNDERS:

8    Q.  Ms. Blixseth, could you turn to Exhibit 3?  Exhibit 3

9    is a copy of a security agreement between the debtors and

10   Credit Suisse dated September 30, 2005, correct?

11   A.  Yes, it is.

12   Q.  Okay.  And could you take a look towards the end?  And,

13   I apologize, I don't think I put a flag on this, but it

14   would be page No. 27.  It's the signature line.

15   A.  Yes, I have that.

16   Q.  Okay.  And that's your ex-husband's signature, Timothy

17   L. Blixseth, in three places on that page, correct?

18   A.  That's correct.

19          MR. SAUNDERS:  Your Honor, I would move Credit

20   Suisse Exhibit 3 into evidence.

21          THE COURT:  Any objection?

22          Exhibit 3 is admitted.

23     CREDIT SUISSE EXHIBIT NO. 3 ADMITTED INTO EVIDENCE

24   BY MR. SAUNDERS:

25   Q.  Could you take a look at Exhibit 4?  Do you have that,

1    ma'am?

2    A.   I do.

3    Q.   Okay.   These are the audited financial statements of

4    the debtors as of December 31, 2007, right?

5    A.   That's correct.

6              MR. SAUNDERS:   Okay.   Your Honor, I would move

7    Credit Suisse Exhibit 4 into evidence.

8              THE COURT:   Any objection?

9              Exhibit 4 is admitted.

10             MR. PATTEN:   Your Honor, I would object for lack

11   of foundation.

12             THE COURT:   Overruled.   It's admitted.

13      CREDIT SUISSE EXHIBIT NO. 4 ADMITTED INTO EVIDENCE

14   BY MR. SAUNDERS:

15   Q.   Okay.   Could you turn back to Exhibit 1?   That is the

16   notes.

17   A.   Hm-hmm.

18   Q.   And these are the notes that are the reason for the

19   hearing today, right?

20   A.   Correct.

21   Q.   Okay.   BGI is the obligor on each of the first three

22   notes, right?

23   A.   Correct.

24   Q.   What assets does BGI have?

25   A.   Currently, BGI has the Yellowstone Club entities:   YMC,

1    normally known as "YC"; YDI; Big Sky Ridge; Porcupine

2    Creek; and -- (inaudible.)

3    Q.   Okay.  And Porcupine Creek is your personal primary

4    residence, right?

5    A.   Correct.

6    Q.   Okay.  Is BGI also the owner of a piece of land within

7    the geographic confines of the Yellowstone Club that is

8    known as the "family compound"?

9    A.   No, it is not.

10   Q.   Okay.  You own that separately from BGI?

11   A.   Correct.

12   Q.   Okay.  BGI is indebted to CrossHarbor, correct?

13   A.   BGI, no, I believe that's me personally.

14   Q.   Okay.  And then what's the approximate amount of your

15   personal obligation to CrossHarbor?  About $35 million?

16   A.   Thirty-five million dollars.

17   Q.   Okay.  And I know I asked you questions about this back

18   in December, but you're in default on that debt, correct?

19   A.   I am.

20   Q.   Okay.  Nothing's changed with respect to that since I

21   asked you those questions in December; is that right?

22   A.   Actually, yes.  They have, they have proceeded to

23   foreclose on their default and started an action.

24   Q.   CrossHarbor has started an action against you

25   personally?

```
 1    A.   Correct.
 2    Q.   Okay.  Where has that action been filed?
 3    A.   I'm sorry?
 4    Q.   Where has that action been filed?  Has it been filed in
 5    a court somewhere?
 6    A.   I believe so.  I was just served with it last weekend,
 7    and I actually wasn't there when I got it.  My attorney got
 8    it, so I haven't actually had time to read it yet.
 9    Q.   Okay.  Now, going back to BGI for a second, BGI is
10    generally unable to pay its debts as they come due, right?
11    A.   That is correct.
12    Q.   Okay.  It's got significant liquidity problems?
13    A.   That is correct.
14    Q.   Okay.  And it's been unable to make payroll at
15    Porcupine Creek; is that right?
16    A.   That is correct.
17    Q.   Okay.  Is BGI considering bankruptcy?
18    A.   BGI hasn't pursued considering bankruptcy.  We're
19    trying to resolve the liquidity issue.
20    Q.   I'm sorry, it hasn't filed a bankruptcy petition, but
21    it's considering it?  Is that --
22    A.   No.  What we're working on now is trying to resolve the
23    liquidity issue.
24    Q.   Is Porcupine Creek pledged to CrossHarbor as
25    collateral?
```

1   A.  Yes, it is.

2   Q.  Okay.  Are you personally considering bankruptcy?

3   A.  Right now, I'm personally considering for BGI, for

4   myself, for everything else involved trying to find a way

5   to take care of the liquidity issue.

6   Q.  And is bankruptcy an option that you're considering?

7   A.  Not at this time.

8   Q.  Okay.  The three notes from BGI to the debtors, they're

9   all demand notes, right?

10  A.  That's correct.

11  Q.  But prior to January 6, 2007, the debtors made no

12  demand for repayment of the notes, right?

13  A.  Not to the best of my knowledge.  But at that time, I

14  was not in control of BGI.

15  Q.  I'm sorry, I misspoke.  Prior to January 6th of 2009 --

16  A.  Okay.

17  Q.  -- the debtors made no demand for repayment of those

18  notes, right?

19  A.  That's correct.

20  Q.  Okay.  And then Mr. James testified about a letter that

21  he had sent demanding repayment on January 6th?

22  A.  That's correct.

23  Q.  And have you received that letter?

24  A.  I have.

25  Q.  Okay.  Did you repay the notes?

1    A.   No.

2    Q.   Okay.  Do you intend to repay the notes?

3    A.   We intend to work with Tim to try to figure out if

4    there's a way to find a way to repay the notes or find out

5    where -- we intend to cooperate.  We can't repay the notes

6    now.  There's, there's, there's not equity or liquidity to

7    repay the notes.

8    Q.   And prior to Mr. James making that demand on January

9    6th of this year, you've never directed anyone else of the

10   debtors to make a demand on the notes, right?

11   A.   No.  We've discussed with -- I discussed with Andy

12   Patten, our lawyer --

13             MR. PATTEN:  Objection.

14             THE WITNESS:  Okay, sorry, I forgot.  Thanks,

15   Andy.

16             THE COURT:  What's your objection?

17             MR. PATTEN:  Attorney-client communication.

18             THE COURT:  Okay, I'll sustain that.

19   Q.   (By Mr. Saunders)  Okay.  My question, though, was:

20   Putting aside conversations you may or may not have had

21   with Mr. Patten, you never directed anybody to make the

22   demand?

23   A.   No, I did not.

24   Q.   Okay.  Would you agree with me that enforcement of the

25   notes by the debtors against BGI would have a negative

1   effect on BGI's financial condition?

2   A.  Could you repeat your question?

3   Q.  Sure.  Would you agree with me that enforcement by the

4   debtors of these notes against BGI will have a negative

5   effect on BGI's financial condition?

6   A.  Well, I think the fact that BGI has the notes payable

7   probably already has a negative effect on BGI, so having

8   them enforced would just be the normal process of, of when

9   you have a note.

10  Q.  Okay.  Well, BGI has liquidity problems at the moment,

11  right?

12  A.  It definitely has liquidity problems.

13  Q.  Okay.  And if the debtors were to enforce the notes, it

14  might cause you to have to sell real property, for

15  instance, like Porcupine Creek on an expedited basis,

16  right?

17  A.  That would create, that would create a real problem of,

18  of maximizing the value of an asset.

19  Q.  Okay.  So it's possible that the enforcement --

20  depending on how the enforcement proceeds, it's possible

21  that the enforcement of these notes by the debtors against

22  BGI will make BGI's situation even worse, right?

23  A.  That would be correct.

24  Q.  Okay.  And because you own BGI, if that happens, that

25  makes your situation worse, right?

1    A.   That would be correct.

2    Q.   Okay.  You were the person who -- I'll withdraw that

3    question.

4         You're generally familiar, are you not, with the terms

5    of CrossHarbor DIP financing term sheet as approved by the

6    Court?

7    A.   Yes.

8    Q.   Okay.  And you're aware that there's a February 13,

9    2009, deadline for the debtors to file a reorganization

10   plan acceptable to CrossHarbor, right?

11   A.   Yes, I am.

12   Q.   Okay.  Have the debtors proposed reorganization plan

13   terms to Credit Suisse as agent for the prepetition

14   lenders?

15   A.   Have we proposed a plan?  I'm sorry, could you repeat

16   the last part?

17   Q.   Have you proposed any reorganization, any plan of

18   reorganization terms or term sheet to Credit Suisse yet?

19   A.   We have not proposed it to them yet.

20   Q.   Okay.  Have you proposed any plan of reorganization

21   terms or term sheet to the official committee of unsecured

22   creditors?

23   A.   We have not proposed any term sheets yet.

24   Q.   Okay.  Have the debtors proposed any plan of

25   reorganization terms or term sheet to any of their

1    creditors?

2    A.  We have not proposed any term sheets yet.

3    Q.  Okay.

4         MR. SAUNDERS:  Your Honor, could I just have a

5    minute?

6         THE COURT:  Yes.

7         MR. SAUNDERS:  May I proceed again, Your Honor?

8         THE COURT:  You may proceed.

9    Q.  (By Mr. Saunders)  I'm sorry, Ms. Blixseth, I just want

10   to make sure that I understand the status of Porcupine

11   Creek as it relates to BGI and CrossHarbor.  I think you

12   told me that Porcupine Creek is owned by BGI; is that

13   right?

14   A.  That's correct.

15   Q.  And yet Porcupine Creek is -- and you also told me that

16   the loan from CrossHarbor, the $35 million loan, is to you

17   personally and not to BGI; is that right?

18   A.  That's correct; to the best of my recall, that's

19   correct.

20   Q.  Okay.  And yet that loan is secured by a lien on

21   Porcupine Creek?

22   A.  Correct.

23   Q.  Okay.  Is it secured by a lien on BGI as a whole?

24   A.  No, it's not.

25   Q.  Okay.  But as the managing member of BGI, you gave

1    CrossHarbor a lien on one of BGI's assets, Porcupine Creek,

2    to secure a loan that went to you personally; is that

3    right?

4    A.   Yeah.  I may be misstating that.  I'm trying to recall.

5    If I had it in front of me, I could probably answer more

6    accurately, too.  But that's my recall of it.

7              MR. SAUNDERS:  Okay.  Nothing further, Your

8    Honor.

9              THE COURT:  Mr. Beckett, do you have questions?

10             MR. BECKETT:  No, thank you, Your Honor.

11             THE COURT:  Mr. Patten?

12             MR. PATTEN:  No, Your Honor.

13             UNIDENTIFIED SPEAKER:  Nothing, Your Honor.

14             THE COURT:  No one else?

15             I guess if you could clarify --

16             THE WITNESS:  Okay.

17             THE COURT:  So you also have property at Palm

18   Desert?

19             THE WITNESS:  Correct.  It's Rancho Mirage, but

20   that's Porcupine Creek.

21             THE COURT:  Okay, Rancho Mirage.  And that's

22   owned by BGI or by someone else?

23             THE WITNESS:  By BGI.

24             THE COURT:  Okay.  And that's also collateral to

25   the $35 million loan with CrossHarbor?

1          THE WITNESS:  That is the collateral, yes.

2          THE COURT:  Okay.  So Porcupine Creek as well as

3    Rancho Mirage?

4          THE WITNESS:  It's the same thing.

5          THE COURT:  Oh, it's the same thing.

6          THE WITNESS:  Yeah.

7          THE COURT:  Okay, very good.  I appreciate that

8    clarification.  I thought Porcupine Creek was at Big Sky.

9          THE WITNESS:  No, Porcupine Creek is in Rancho

10   Mirage.  It sounds like it because there's Porcupine Creek

11   and Big Sky.

12         THE COURT:  Thank you.

13         THE WITNESS:  Okay.

14         THE COURT:  I appreciate the clarification.  You

15   may step down.

16         THE WITNESS:  Thank you.

17         MR. SAUNDERS:  Your Honor, we had put

18   Mr. Greenspan on our list of witnesses, but I understand

19   from - oh, thank you very much - I understand from

20   Mr. Patten that he's not available.  So with the Court's

21   indulgence, I'm not sure what the local practice is, but I

22   would like to read into the record two very brief excerpts

23   from Mr. Greenspan's testimony in December just to make

24   sure that they're in the record for this hearing.

25         Now, if anything that's been previously testified

1    to at a prior hearing is already on the record for this

2    hearing, then I don't need to do that, but if Your Honor

3    would like it to be on the record --

4            THE COURT:  Well, without objection, I would ask

5    that the excerpts be noted and stated so that we know

6    what's in the transcript that you're referring to rather

7    than the entire transcript.  Okay?

8            MR. SAUNDERS:  Okay.  The two excerpts, then, are

9    from Volume I, which was December 11, 2008; page 100 -

10   line 16 through page 101 - line 1.

11           THE COURT:  Okay.

12           MR. PATTEN:  Excuse me, could you state that

13   again, Mr. Saunders?

14           MR. SAUNDERS:  Sure.  Page 100 - line 16 through

15   the next page, page 101 - line 1.

16           THE COURT:  Okay.  Let's just read that into the

17   record, whatever they are.

18           MR. SAUNDERS:  They're quite short, Your Honor.

19   So page 100 - line 16.

20           "QUESTION:  You're the debtors' chief

21   restructuring officer; is that right?

22           "ANSWER:  I am.

23           "QUESTION:  And in that capacity, you report to

24   Ms. Edra Blixseth, correct?

25           "ANSWER:  Either to Ms. Blixseth or to the board.

1              "QUESTION:  And subject to the Court's approval,

2    it's Ms. Blixseth as the chief executive officer who

3    ultimately decides what strategies the debtors pursue and

4    who positions they take, right?

5              "ANSWER:  I think that's correct."

6              Your Honor, the other excerpt is in Volume II,

7    which is the testimony from December 12th -- or the

8    proceedings from December 12, 2008.  And my excerpt is the

9    entirety of page 165, so that's lines 1 through 25.  Would

10   you like me to read them, as well, Your Honor?

11             THE COURT:  I would.

12             MR. SAUNDERS:  Okay.

13             "QUESTION:  So you think BGI doesn't have the

14   ability to make interest payments?

15             "ANSWER:  That's my understanding.

16             "QUESTION:  Okay.  Would that, you know, possibly

17   play into the value of the notes at all?

18             "ANSWER:  Yes.

19             "QUESTION:  Okay.  Have you asked the Blixseth

20   Group, Inc., to pay interest on the notes?

21             "ANSWER:  I haven't made a formal demand.

22             "QUESTION:  Why not?

23             "ANSWER:  Because when I've asked about it, I've

24   been told there's no capacity.  And what we're looking for

25   right now is immediate funding, and I don't believe there's

1   any way to get income on that right now other than commence

2   an action, which is not going to get money into the estate

3   in the time we need it.

4        "QUESTION:  And who did you ask?

5        "ANSWER:  Ms. Blixseth.

6        "QUESTION:  Did you ask Ms. Blixseth whether the

7   Blixseth Group, Inc., would repay any of the principal that

8   they owe on these notes?

9        "ANSWER:  Again, when I've inquired whether there

10  were resources to make cash payments, which is what we need

11  now, I was told there's not cash to make payments.  I

12  didn't specify between interest and principal."

13       Thank you, Your Honor, no further witnesses.

14       THE COURT:  Mr. Chehi?

15       MR. CHEHI:  Good afternoon, Your Honor.  I'm

16  going to make some points based upon the record today that

17  will show that and establish on the record that Credit

18  Suisse has a perfected security interest in the notes; and,

19  secondly, that there is factual circumstances to justify

20  and, in fact, require stay relief under Section 362(d)(1)

21  of the code and also under 362(d)(2) of the code.

22       As far as the perfection issue goes, as the

23  evidence and testimony today shows, Credit Suisse's agent

24  and collateral agent for the prepetition lenders under the

25  credit agreement dated September 30, 2005, has a valid

1   perfected security interest in the three notes that are the

2   subject of the order to show cause.  As set forth on the

3   debtors' schedules and statements and in prior testimony in

4   these cases, the debtors are indebted to Credit Suisse and

5   the lenders that it acts as agent for in an amount of not

6   less than $307 million.

7           The related security agreement also dated as of

8   September 30, 2005, which was admitted today as an exhibit,

9   grants Credit Suisse a security interest in the notes.

10  Section 27 of the security agreement provides that it is

11  governed by New York law.  Accordingly, New York's Uniform

12  Commercial Code, the "UCC", as I'll refer to it, applies to

13  the security agreement and the issues of perfection of

14  Credit Suisse's liens and the various pieces of collateral

15  that are subject to the security agreement and the credit

16  agreement.

17          Section 1 of the security agreement grants Credit

18  Suisse's security interest in all personal properties of

19  Yellowstone Mountain Club and Yellowstone Development,

20  including instruments and all proceeds thereof, which are

21  all defined as collateral in the security agreement.

22          Section 2 of the security agreement provides that

23  it secures and the collateral is collateral security for

24  payment of all obligations of the debtors under the credit

25  agreement.  And, again, this is the contractual language of

1   the security agreement.

2          Now, under Section 9-102(a) of New York's Uniform

3   Commercial Code, instruments are defined.  And they mean a

4   negotiable instrument or any other writing that evidences a

5   right to payment of a monetary obligation.  Accordingly,

6   each of the notes that are in evidence and are the subject

7   of the hearing today are an instrument within the meaning

8   of the New York UCC and Section 1 of the security

9   agreement.  And, further, any proceeds of the notes are

10  therefore collateral under the security agreement and

11  subject to Credit Suisse's security interests granted under

12  Section 1 of the security agreement.

13         In sum, the terms of the credit agreement, the

14  security agreement, and applicable New York Uniform

15  Commercial Code law create a security interest in the BGI

16  notes in favor of Credit Suisse as collateral agent for the

17  prepetition lenders to secure all amounts owed to them

18  under the credit agreement.

19         Now, as for perfection of those security

20  interests, Credit Suisse, as collateral agent, has a

21  perfected security interest in the notes because, one, on

22  September 30, 2005, Credit Suisse filed with the Montana

23  Secretary of State various UCC financing statements

24  covering all assets of the debtors, including the notes;

25  and, additionally - and that's the subject of the testimony

1    today - Credit Suisse perfected its security interest by

2    taking possession of the notes and continuously retaining

3    possession of them in the state of New York and New York

4    City.

5            Credit Suisse's witness today testified to the

6    facts that Credit Suisse is taking possession of the notes

7    not later than August 2006; and pursuant to delivery by a

8    letter dated July 26, 2006, Credit Suisse has had

9    continuing possession of the notes since that time.

10           Section 9-313(a) of the New York Uniform

11   Commercial Code states, quote (quoted as read):  "A secured

12   party my perfect security interest in instruments by taking

13   possession of the collateral," end quote.

14           That provision of the New York UCC governs Credit

15   Suisse's perfection by possession because the notes have

16   been located in New York, and Section 9-301(b) of the New

17   York Uniform Commercial Code provides that local -- the

18   local law of the jurisdiction in which the collateral is

19   located governs perfection.  And that's why the New York

20   UCC governs the perfection by possession of Credit Suisse's

21   interest in those notes, because that's where the notes

22   have been located since Credit Suisse took possession of

23   them.

24           Given the applicable New York UCC law and the

25   testimony today of Mr. Pistecchia of Credit Suisse

1    concerning Credit Suisse's possession of the notes in New

2    York, Credit Suisse has shown that it has perfected

3    security interests in the notes.  And we would ask the

4    Court to, you know, so find in consideration of this

5    hearing.

6            Now, as set forth in our submission in respect to

7    the order to show cause, Your Honor, we indicated that

8    Credit Suisse is entitled to - and the statutes are

9    mandatory - to receive modifications of the stay for a

10   number of reasons, and the first being:  Under

11   Section 362(d)(1) of the bankruptcy code, the Court shall

12   and must grant stay relief for cause shown, including the

13   lack of adequate protection of the prepetition lender's

14   interests in the notes.

15           The lender's interests in the notes are not

16   adequately protected for two reasons.  First, the final

17   order authorizing CrossHarbor DIP financing does not

18   adequately protect the lenders against an event of default

19   under the DIP financing.  Such an event of default, which

20   may occur within just a few weeks if the debtors do not

21   file a plan of reorganization acceptable to CrossHarbor by

22   February 13th, as Ms. Blixseth testified, will permit

23   CrossHarbor to declare an event of default, discontinue

24   funding of these cases, seize the debtors' cash collateral

25   and other property, including the notes.  And this will

1    cause the loss of going-concern value which the Court has

2    considered an important element of lender adequate

3    protection in these cases.  And the provisions of the final

4    order that apply to CrossHarbor's rights to seize the notes

5    and all of the other properties of the debtors in

6    satisfaction of their debtor-in-possession financing claims

7    in the event of default are Paragraphs 5(b), 6, 9, and

8    12(e).

9            And in those circumstances, Your Honor, we

10   believe that, given the short period of time between now

11   and February 13th and Ms. Blixseth's admitted -- the

12   debtors' admitted failure to provide term sheets or plans

13   of reorganization to the official committee or to the

14   Credit Suisse's agent - and those are their major creditor

15   constituents in these cases, Your Honor - that there is at

16   least a significant likelihood, if not a great probability,

17   that over the course of the next three to four weeks before

18   February 13, the debtors are going to be unable to satisfy

19   the February 13 requirement of the CrossHarbor financing.

20   And that in and of itself creates cause in these

21   circumstances to lift the automatic stay with respect to

22   the notes because they're going to be subject to seizure by

23   CrossHarbor in the event of -- an event of default.

24           Second, there is cause to lift the stay because,

25   as shown by Ms. Blixseth's testimony today and

1   Mr. Greenspan's testimony on December 11th or 12th that

2   Mr. Saunders read into the record, BGI's financial

3   difficulties and inability to pay on the notes have a

4   negative impact on the notes and their speculative value.

5   The notes are losing value as BGI's financial condition

6   deteriorates.

7          Among other things, Ms. Blixseth has admitted

8   that BGI owes CrossHarbor personally $35 million that BGI

9   cannot pay, that she cannot pay, and that's secured by

10  BGI's property, Porcupine Creek, which is a significant

11  asset of BGI.  And she admitted, as well, that CrossHarbor

12  is seeking repayment of such amounts as, indeed, I guess,

13  commence some sort of action against her, which means that

14  they're going to be able to take an action on their liens

15  against the BGI property known as Porcupine Creek.

16         In these circumstances, the value of the notes to

17  the lenders is declining, is at risk, and is not adequately

18  protected by the final order.  Such declining value and

19  risk of loss of the notes - (inaudible) - CrossHarbor

20  constitutes a lack of adequate protection, and that

21  constitutes ample cause under Section 362(d)(1) of the

22  statute to justify and, in fact, require modifying the stay

23  to allow Credit Suisse, as collateral agent, to pursue

24  enforcement of the notes.  And we think it equally

25  justifies perhaps even the lesser remedy, if you want to

1    call it that, of the stipulated joint enforcement of the

2    notes by the committee and Credit Suisse as set forth in

3    the stipulation.

4              Moving on to Section 362(d)(2) of the code, which

5    also requires mandatory stay relief in certain

6    circumstances, it's required here because the debtors have

7    no equity in the notes and they are not necessary to an

8    effective reorganization of these debtors.  The debtors

9    lack equity in the notes because the aggregate senior

10   lender claim in the amount of at least $307 million exceeds

11   the outstanding aggregate $225 million amount of the notes

12   that's recorded on the debtors' financial statements as of

13   December 31, 2007, by at least $80 million.  So the debtors

14   are under water on those notes in respect of the

15   prepetition lender's claims by $80 million.  And even if

16   the notes were worth - which I can't believe they are - but

17   even if they were assumed to be worth their full face

18   principal amounts as written, that would be an aggregate of

19   $272 million.  And, again, that amount falls short of the

20   amount that's owed to the prepetition lenders.  They have

21   secured perfected liens in those notes; and, therefore, the

22   debtors lack equity in them.

23             And as a third basis for finding that the debtors

24   lack equity in the notes, that's because their value is

25   declining due to the financial decline in BGI and

1    Ms. Blixseth and the risk that CrossHarbor may seize those

2    notes upon an event of default in the near future.  And

3    that decline in value of the notes caused by those

4    circumstances is a further factual circumstance, and a

5    strong one, that the notes are declining in value.  And to

6    that extent, the debtors have much less negative equity

7    than they otherwise would have.

8            The second prong of Section 362, which is

9    362(d)(2)(b), requires a showing that the notes are not

10   necessary to the reorganization.  That prong is satisfied

11   because the debtors' own actions show the notes are not

12   essential to their reorganization.  There's no plan that is

13   in prospect and there has been no meaningful debtor

14   progress towards a plan.  Indeed, the likelihood of a plan

15   is remote, given that the February 13th deadline is fast

16   approaching, and the debtors have not yet drafted or

17   proposed or discussed with any of their major constituents,

18   our clients, and the official committee anything about a

19   plan.  They have not proposed a term sheet.  And at this

20   late date in the game, one cannot expect reasonably that in

21   cases of this complexity and with the significant issues at

22   stake that the debtors are going to be able to cobble

23   together and file a plan that is -- a fair plan that is

24   acceptable to CrossHarbor and also acceptable to the

25   unsecured creditors and Credit Suisse.  Because they

1   haven't even asked -- no particular plan terms have been

2   proposed.  And in my experience, it takes many weeks, if

3   not months, to come to a conclusion on an appropriate plan,

4   if one is going to file one.

5           Additionally, if the notes were essential to the

6   debtors' reorganization, the debtors would have made a

7   demand on them at the beginning of the cases.  They would

8   have proceeded with litigation long before January 6th.

9   It's a little too late and a little too little.  The fact

10   that the debtors have made a demand through their new

11   counsel against BGI for payment of the notes came just two

12   days before they filed their brief in response to your

13   order to show cause, Your Honor, and I don't think that

14   that is a coincidence.  They have very few facts to support

15   their position on the order to show cause, they have very

16   few facts that could possibly support why the stay should

17   not be lifted, so they had to go out and actually make the

18   demand so they could say, "We're in charge.  We're doing

19   it, we're doing our job."

20           I want to now talk about why Credit Suisse and

21   the committee should be authorized to jointly enforce and

22   seek payment on the notes pursuant to the stipulation.  We

23   have many reasons for that.

24           First, the debtor has inherent and inescapable

25   conflicts.  The evidence today, prior testimony in the case

1   by Mr. Greenspan, and the entire record of these chapter 11

2   cases shows that the debtors cannot be suitable plaintiffs

3   against BGI because Ms. Blixseth is the person in control

4   of the debtors.  There's no independent board, there's no

5   independent directors; it's just Ms. Blixseth running the

6   debtors.  And, similarly, she's the only person in charge

7   of BGI.  And BGI, as a matter of contract and the debtors'

8   own organizational documents, is the manager of the

9   debtors.  It's hard to believe under those circumstances,

10  notwithstanding the statements of the debtors' new special

11  counsel to pursue the notes, that there could be any real

12  meaningful third-party litigation dealings between the

13  debtors and BGI on those notes because Ms. Blixseth is on

14  both sides of the equation.  It's almost incomprehensible.

15          She admitted that she's going to work with the

16  debtors and work with BGI to come up with some sort of

17  satisfactory solution which isn't going to involve a

18  payment on the notes because she's trying to maximize the

19  value of BGI and Porcupine Creek for her personal benefit.

20  That's, that's the bottom line here.  There's just an

21  unbelievable conflict of interest because she controls and

22  ultimately directs the debtors' attorneys and the other

23  professionals.  There's no one else in this case that does

24  that.

25          For instance, what if BGI proposed a settlement

1    to the debtors?  Who at the debtors would be making the

2    decision about whether that proposed settlement term was

3    appropriate or not?  It would be Ms. Blixseth, unless the

4    attorneys independently are going to be calling the shots,

5    but I don't think attorneys can do that, not in Chapter 11.

6           These conflicts are exacerbated by Ms. Blixseth's

7    admitted financial difficulties, her illiquidity, and the

8    illiquidity of BGI.  She cannot be expected - and you

9    wouldn't want to put her in that position, frankly - to be

10   making decisions for the debtors that maximize the value on

11   the notes because she has a personal conflict and a very

12   clear economic one which Mr. Saunders elicited from her is

13   at least material.

14          Second, the debtors' professionals should focus

15   on the reorganization plan or the sale process, all of

16   which has to come to a head by February 13th, instead of

17   focusing on collecting the notes.  These debtors have

18   limited time, they have limited financial resources, and

19   they have limited professional resources.  They've made

20   little, if any, progress towards a plan of reorganization.

21   The February 13th deadline is rapidly approaching, and the

22   debtors should be focusing strictly and primarily on

23   facilitating a fair reorganization process, not a phony

24   reorganization process that's going to have them spring a

25   plan of reorganization on their major creditor

1    constituencies by February 13th so that they can please

2    CrossHarbor and keep their financing in place.

3            We have inquired of debtors' counsel on numerous

4    occasions over the past weeks and the business people have

5    inquired of Mr. Greenspan, "So where's the data room that

6    was promised by the debtors, a room collecting information

7    about the debtors' businesses so that third-party

8    prospective purchasers or investors in this business,

9    pursuant to a reorganization plan or a sale, could start to

10   do due diligence to see what's available for sale?"  That

11   data room has not been open to anyone.  It has not been

12   open to Credit Suisse.

13           The debtors have not yet hired a broker.  They've

14   talked about it, but apparently there's some resistance

15   from certain parties in interest to hiring a broker, a real

16   professional who's going to go out and identify prospective

17   plan investors or prospective purchasers.  No progress has

18   been made, no application to employ such a broker or a

19   financial advisor has been put before the Court, and we're

20   probably today just about a month or less than a month away

21   from the February 13th deadline.

22           Third, Credit Suisse has every right and

23   incentive to maximize the value of the notes

24   notwithstanding some concerns expressed and some of the

25   objections that were filed.  You know, there were

1    statements made that, you know, Credit Suisse shouldn't

2    have anything to do with the collection on these notes if

3    not incentivize, to maximize value; they might take

4    something too little for the notes, etc.  I can assure Your

5    Honor that the lenders that are represented by Credit

6    Suisse as their agent have the greatest incentive in the

7    world to maximize their recovery, the recovery on these

8    notes because they're owed over $300 million.

9            The debtors can't come up with financing to fund

10   the cases over the next few weeks and months.  That was the

11   testimony in December, "Why are we not paying attention to

12   the notes?  We have to get DIP financing in place."  Well,

13   if they can't do that without getting DIP financing from a

14   third source, they're not going to be able to pay the

15   lenders or pay any of their unsecured creditors, either.

16   They're very illiquid.

17           Fourth, the proposed stipulation is the right

18   solution, and the Court should authorize the official

19   committee and Credit Suisse to jointly enforce and seek

20   payment on the notes.  The stipulation should be approved

21   because it properly addresses the debtors' inherent

22   conflict issues.

23           Second, it does not dictate the ultimate

24   disposition of any proceeds of the notes but rather leaves

25   that to first order of the Court or a plan of

1    reorganization.  So this stipulation, in resolution of this

2    order to show cause and resolution of Credit Suisse's

3    rights to adequate protection and to stay relief, doesn't

4    give Credit Suisse the notes and say they can do with them

5    what they want and keep the proceeds.  The stipulation

6    provides that there will be a joint enforcement of the

7    notes with the committee taking the lead as the named

8    plaintiff on behalf of the estate, subject to Credit

9    Suisse's consent and involvement in all of the particulars,

10   so that we can feel assured that we -- our collateral is

11   being handled and disposed of properly and liquidated

12   properly.  But that doesn't mean that we get to collect or

13   keep any of the money.  The stipulation provides that

14   the -- that any of the proceeds are going to be segregated

15   subject to our liens and not used by the debtors.

16          Now, the interests of other parties and the

17   estate are protected under the stipulation because the

18   official committee with its fiduciary duties will be able

19   to proceed on the notes without delay.  If we were to have

20   the stay absolutely lifted with respect to the notes,

21   Credit Suisse and the lenders would have to pursue a

22   foreclosure on the notes, go through the UCC process.  If

23   you get tied up with that, there would be an inordinate

24   delay before action can really be taken to pursue a

25   recovery on the notes or whatever that leads to by taking

1    action, making the demand against BGI.  The official

2    committee can do that with Your Honor's order today without

3    any delay.

4            Second, the official committee has a duty to

5    maximize value for unsecured creditors.  And that addresses

6    the concerns of any of the objecting parties that somehow

7    this joint-enforcement arrangement is going to prejudice

8    creditors of the estate or residual equity owners on the

9    grounds that Credit Suisse doesn't have the incentive to

10   maximize a recovery for anyone but itself.  Here you have

11   the unsecured creditors, the official committee,

12   participating actively, taking the lead.  And they know

13   that they have to shoot to make their constituents whole.

14   If the unsecureds are going to get paid in whole, we're

15   going to be taken care of.  And that should also address

16   the concerns of the equity because there's going to be a

17   real fiduciary with duties to their -- the class of

18   creditors they represent, but nevertheless it's the

19   unsecured creditors pushing for a recovery that satisfies

20   someone other than just the secured creditors.

21           Also, the stipulation provides specifically that

22   any settlement of the notes requires Court approval under

23   Rule 9019.  So there's not going to be any shortsighted,

24   inappropriate, unfair, or unreasonable resolution of these

25   notes and the collections -- and collection or settlement

1   of them.   It's going to come back before Your Honor, and at

2   that time everybody in the courtroom, every party in

3   interest in the case is going to have the opportunity to

4   object to such a 9019 settlement.

5            And, also, importantly enough - agreeable, never

6   disputed by Credit Suisse - the stipulation is expressly

7   without prejudice to the committee's rights to challenge

8   the lender's liens and claims.   The fact that we are --

9   we've put on the record here today, Your Honor, about our

10  situation - we have liens and they're perfected and, etc. -

11  that's without prejudice to the committee's rights to

12  somehow try to avoid those liens later or challenge our

13  claims under whatever theories they have.   And they've

14  mentioned some of them in their papers.   We clearly

15  disagree that our claims and liens are avoidable or subject

16  to attack on some other ground, but that's tomorrow's

17  problem.   And that's actually a garden variety issue in

18  cases like this when unsecured creditors are under water

19  and there's a real question about whether the secured

20  creditors are going to get paid.   The only way the

21  unsecured creditors get a recovery is if they put pressure

22  on the secured creditors to make some sort of concessions

23  through a plan.   And we would all look forward to having a

24  consensual plan at the end of the day, but it's not going

25  to happen by February 13th, especially with the debtors not

1       having proposed any plan terms to any of us.

2                   And, finally, as for Credit Suisse's consent

3       rights under the stipulation, Paragraph 9 of the

4       stipulation makes it clear that if the arrangement is not

5       successful, if Credit Suisse and the committee cannot agree

6       on a joint -- taking joint action at any point down the

7       road, then either party may seek modification or

8       termination or vacation of the stipulation by Court order.

9       In other words, Credit Suisse's consent rights under the

10      stipulation are not an unworkable veto power over what the

11      committee can do.  If we become unreasonable and we're not

12      giving consent to things that the committee thinks should

13      be done, the committee's going to come back to court and

14      make a motion to say, "Credit Suisse's consent is no longer

15      required."

16                  And, likewise, if the committee is persuing

17      actions without our consent and we feel that that's

18      inappropriate, given all the circumstances and why this

19      order is being entered in these circumstances, we'll come

20      back to court and we'll complain bitterly.  But that will

21      be subject to everybody in the courtroom weighing in on it

22      just as they have here.

23                  I think that's enough for now, Your Honor.  I'm

24      going to reserve my rights to respond to any other

25      statements that might be made by other parties in interest,

1    but Credit Suisse respectfully request that the Court enter

2    an order approving and authorizing the stipulation as being

3    in the best interest of all the parties in the case, in the

4    best interest of the estate, and in the best interest of

5    Credit Suisse and the prepetition lenders who have a

6    perfected security interest and vested property rights in

7    the notes.

8         THE COURT:  Thank you.  Mr. Patten -- you know, I

9    guess one question that I have before we go to

10   Mr. Patten -- Mr. Chehi, you can be seated.

11        Mr. Beckett, you wanted to probably speak in

12   favor of the stipulation, I'm assuming.

13        MR. BECKETT:  Your Honor, I apologize.  I lost

14   track a little bit of whether we were doing openings in

15   evidence and then closings.

16        THE COURT:  Typically, we don't need to.  I think

17   Mr. Chehi was going through and identifying facts in

18   support of the stipulation and for lifting the -- or

19   modifying the stay that have already been presented.

20        But I guess before we get to that, are there any

21   parties here who still have evidentiary issues or have

22   witnesses that they wish to put on the record at this point

23   in time?  Or is all of the testimony in and all of the

24   exhibits in?

25        MR. BECKETT:  Your Honor, there are a couple of

1    issues -- excuse me, a couple of documents that do not

2    require witnesses.  I can get those before the Court at

3    your convenience.

4            THE COURT:  Well, let's do it right now.

5            MR. BECKETT:  Thank you.  And, also -- thank you,

6    Your Honor.  May it please the Court, Tom Beckett for the

7    unsecured creditors committee.

8            A little bit of evidence, and then, Your Honor, I

9    do have a comment to make.  And I will take that at the

10   Court's convenience.

11           The first piece of evidence I would like to hand

12   up, Your Honor, is a little bit cumulative, but I think not

13   fatally so.  Ms. Blixseth has testified that she is the

14   control person of BGI.  And to comfort the Court with that,

15   though it may not be necessary, but I have prepared

16   certified copies of documents from the state of Oregon that

17   stand for the same proposition.  By the time I packed them

18   up to bring them up yesterday, I had not yet received the

19   final page, and so with the Court's permission, if I may

20   hand forward Committee's Exhibits 1 and 1(a), which are

21   documents from the state of Oregon certifying that

22   Ms. Blixseth is president of BGI.

23           THE COURT:  Okay.  Is there any objection to the

24   exhibits?

25           MR. PATTEN:  I haven't seen them, Your Honor.

1          Your Honor, I have no objection to Exhibits 1 and

2     1(a).  They stand for what they stand for.

3          THE COURT:  Okay.  Exhibits 1 and 1(a) of the

4     official unsecured creditors committee are admitted.

5          UNSECURED CREDITORS COMMITTEE EXHIBITS 1 and 1(a)

6                    ADMITTED INTO EVIDENCE

7          MR. BECKETT:  May I approach?

8          THE COURT:  You may approach.  Thank you.

9          MR. BECKETT:  And, secondly, Your Honor, there

10    was testimony regarding the witness's familiarity with a

11    lawsuit captioned Greg LeMond, et al., vs. Blixseth Group,

12    et al., filed in Montana State Court.  I do have certified

13    copies of the complaint and answer.

14         THE COURT:  For what purpose would these be

15    offered?

16         MR. BECKETT:  Your Honor, there are allegations

17    in the complaint and answers which substantiate the

18    allegation specifically at pages 43 -- excuse me, 33

19    through 46, which include allegations as to where the money

20    went after it got to BGI and admissions as to that by BGI,

21    by Mr. Blixseth, and by the debtors.

22         THE COURT:  Okay.  And in summary, what is that?

23    What do they say?

24         MR. BECKETT:  $200 million, Your Honor - and it's

25    much more detailed than this - $200 million that went as

1   follows, in rough numbers:  BGI, $37 million; Mr. Blixseth,

2   $49 million; the married couple of Timothy and Edra

3   Blixseth, $122 million; and $560,000 to Edra Blixseth.

4           The purpose is not to substantiate for today's

5   hearing where the money went, but rather so Your Honor

6   understands the dimensions, the depth of the issue of the

7   question:  Where did the money go after it left BGI?

8           THE COURT:  Is there any admissions as to

9   acquisition of assets for which this money was used that

10  may or may not be recoverable in some way?

11          MR. BECKETT:  There are certainly admissions

12  there that the committee has used and will continue to use

13  as a basis of its investigation of these issues going

14  forward.  There's nothing in those complaints otherwise

15  that I would intend to use as evidence today.

16          THE COURT:  Okay.  Any objection to the admission

17  of these?

18          MR. PATTEN:  No objection.

19          THE COURT:  Are they marked?

20          MR. BECKETT:  Yes, Your Honor.

21          THE COURT:  Okay.  As what?

22          MR. COSSITT:  They're in Docket No. 237, Your

23  Honor.  It's Document No. 5 and 6 on Docket No. 237.

24          THE COURT:  So it's Exhibits 5 and 6?

25          MR. COSSITT:  Yes, sir.

1          MR. BECKETT:  UCC 5 is the complaint, UCC 6 is

2   the answer.

3          THE COURT:  Okay.  They are admitted.

4          MR. BECKETT:  Thank you, sir.

5      UNSECURED CREDITORS COMMITTEE EXHIBITS 5 and 6

6                ADMITTED INTO EVIDENCE

7          MR. BECKETT:  I can make a comment about the

8   committee's position with respect to these proceedings or

9   do so at Your Honor's convenience.

10          THE COURT:  You may do it right now.

11          MR. BECKETT:  Thank you.  Your Honor, I think

12   that part of the dispute between the debtor and the secured

13   lender comes from the fact that they're talking about two

14   different things.  I'd like to go back to Mr. Patten's

15   comment at the beginning of his presentation where he

16   identified the law with the four elements of when a

17   committee may sue derivatively on behalf of the debtor.

18   And I think his description of the law is generally

19   correct.

20          And I submit, Your Honor, that that's not the

21   situation here.  The situation here is different because

22   the notes, and it might be as if the causes of action in a

23   Chapter 5 avoidance action -- the notes in this

24   circumstance are subject to, for now, without prejudice, a

25   perfected first security interest held by Credit Suisse.

1    And so the question is not:  When does the committee act

2    derivatively when the debtor fails to do so?

3           That's a different situation.  This situation is:

4    What are a creditor's rights when it has a perfected

5    interest in a piece of collateral that it wants to

6    monetize?

7           Credit Suisse has said that cause exists to lift

8    the stay so it can go forward with monetizing, collecting

9    the notes.  The committee, as a general principle, agrees

10   with this.  The issues raised by the notes are at the heart

11   of the issues that a lot of people want answers to in

12   connection with this case.  Very simply:  Where did the

13   proceeds of the Credit Suisse loan go?

14          The notes do not answer that question in its

15   entirety.  In the first place, as I suggested, the notes

16   look like $200 million worth of money of Credit Suisse

17   proceeds.  In addition, Your Honor, the committee believes

18   that there's another $68 million of notes that were

19   representative of amounts previously taken out of the

20   debtors before the Credit Suisse loan.  And so it's about

21   207 in that could come from the Credit Suisse loan, but

22   another 68, or so, represented by the notes that had been

23   taken out previously.  That's the disconnect on that point.

24          But my point is:  $200 million on the note side,

25   that leaves another $100 million unaccounted for.  So the

1    notes are not the entirety of the question.  And then,

2    again, we don't know what happened -- well, we do know a

3    lot more than we're going to talk about today, but where

4    did the money go after it got to BGI?  There's a lot of

5    information about where it went.  The notes are not the end

6    of the inquiry; the notes are at the heart of the inquiry.

7    And my point is:  There is cause to get going on the notes

8    that would constitute cause to lift the stay - (inaudible,

9    coughing in microphone) - Credit Suisse start to unwind us.

10          And second is the question of monetizing the

11   notes.  Better start that sooner rather than later.  Every

12   party in this interest is looking for cash.  And so with

13   Credit Suisse's argument and, in addition, that on the

14   grounds of adequate protection, the committee feels

15   similarly that there is cause to lift the stay so someone

16   can continue, can proceed against the notes.

17          What I'm doing is saying, "That's very different

18   from a derivative action with the four elements where the

19   committee acts derivatively on behalf of the debtor."  This

20   is a question of:  Does the creditor have a perfected

21   interest in collateral and does cause exist to lift the

22   stay to monetize that?

23          Then the question is:  Who should do it?

24          And the committee feels very strongly that the

25   debtor cannot do it and should not do it.  Your Honor has

1     received the evidence sufficient to show that Ms. Blixseth

2     controls the debtors and BGI controls the debtors and she

3     controls BGI.  And you saw part of the problem this

4     afternoon in her testimony when she was asked about what

5     did she, as BGI, intend to do about the notes?

6             And she said, "BGI intends to cooperate.  There's

7     not liquidity now to pay the notes, but we're looking into

8     it," something like that.

9             And then the question was:  Well, what did she,

10    as Debtor, intend to do?

11            And she didn't get to answer because there was a

12    proper instruction, "Do not answer that question.  That's

13    attorney-client privilege."

14            And so Ms. Blixseth controls the obligor on the

15    note and can say, "We're doing the best we can," and is the

16    obligee on the note and says, "I can't talk about that

17    right now."

18            Whether or not it poses a conflict, and I agree

19    it poses an insurmountable conflict, the fact is it just

20    looks terrible.  We don't need in this case to have the

21    lawyers for the debtors pursuing the entity that is -- that

22    owns the debtors.  There's enough insider allegations, and

23    this whole Mr. and Mrs. Blixseth drama, and -- you know,

24    and it's unfortunate and I know it touches people's lives

25    and, I'm sorry, I don't mean to make fun of it, but that

1    needs to be removed from what is a really, really beautiful

2    property out there.  The property needs to be rehabilitated

3    and needs to be put back on its feet.

4            And, personally, I don't understand why the

5    debtors want anything to do with the insider stuff.  I

6    would like to see that removed, and I would like to see

7    somebody else deal with that.  And the debtors need to get

8    going on a bankruptcy plan.  It's a month; it's three

9    months until the DIP runs out.  That's where the debtors'

10   focus should be and not on these difficult problems

11   involving insider relationships.

12           And the next question, then, is:  Well, if the

13   debtors can't do it and shouldn't do it, what about Credit

14   Suisse?

15           I think I speak for almost all of the

16   constituencies of the case where -- I mean everyone would

17   say, "We're a little uneasy with Credit Suisse doing that

18   for itself.  It has the property that it's secured by.

19   Perhaps it would credit bid on the notes and purchase them

20   for $10, and that would be the end of that."

21           And in addition, the committee, and maybe others,

22   do feel that there are issues with the Credit Suisse lien,

23   and so the committee would have objected to lifting the

24   stay for Credit Suisse to proceed on the notes; however,

25   Credit Suisse proposed a solution.  And the solution

1   addresses both the committee's concern with Credit Suisse

2   pursuing the notes and Credit Suisse and the committee's

3   concern with the debtors persuing the notes.

4           And the solution is that, in name, the committee

5   will pursue the notes.  And it acts more derivatively from

6   Credit Suisse as a secured lender, Your Honor, than it does

7   derivatively of the debtor under the circumstances

8   Mr. Patten alluded to earlier.  And there will be advice

9   and consent from Credit Suisse, but make no question about

10  it, let there be no question that the committee will be

11  running the show, the committee will be deciding what needs

12  to be done and what direction to go.  Credit Suisse has an

13  enormous amount of information and expertise to add to that

14  as does the ad hoc committee, as does the ad hoc committee

15  of the Class B holders, as does the debtor.  Everybody in

16  this case has something to add to that.

17          And Mr. Chehi explained it very well:  The

18  proceeds aren't going to disappear anywhere.  The proceeds

19  will be held separate and apart.  They will be subject to

20  the committee's rights, claims, and causes of action

21  against the Credit Suisse and all of Credit Suisse's

22  rights, claims, causes of action and everybody else's.

23  This is:  Set the money the aside, hold it safe, and we'll

24  answer those questions in due course, which will probably

25  be failure soon, but in due course.

1              I submit that the committee is in a pretty good

2      position to do this, Your Honor.  I have told you before

3      the committee has 11 members:  Five are fairly typical

4      trade creditor members; five are more like members of the

5      Yellowstone Club; and one is a members who had settled, who

6      was a Class B certificate holder, but who had settled

7      before the case had -- before the bankruptcy cases were

8      filed.

9              That collection of people has an enormous amount

10     of information, historical information about what happened

11     with the money and what has happened with the, what has

12     happened with the debtor.  And so I think that the

13     committee is in probably already a very good position now

14     and has collected an enormous amount of information on

15     these questions and is in a great position to prosecute it,

16     but again, not in a vacuum, but with the advice and consent

17     of Credit Suisse and with the input from every other

18     constituency.  The committee has an obligation under 1102

19     to solicit and take input -- give information and solicit

20     input and take input from the other creditor

21     constituencies.

22             And at the end of the day, I think there's cause

23     to lift the stay.  That creates the problem of who

24     prosecutes the notes.  The debtors can't; if the debtors

25     can, they really should not.  That leaves Credit Suisse.

1    The committee has an objection to that.  The solution is:

2    The committee prosecutes the notes with the advice and

3    consent of Credit Suisse and input from every other party.

4            And, lastly, I want to reiterate something

5    Mr. Chehi said:  If there's any difficulty here, Your

6    Honor, I'll be right back here, and I know Mr. Chehi will,

7    as well.  If we can't get along, we'll need a modification

8    of the stipulation or we'll need to call it a day or

9    somebody needs to enforce it.  But I think we are going to

10   make this work, and I think it's a good experience for a

11   couple of parties who at loggerheads in this case to have

12   found a way to work together.  And I really do hope that

13   that spreads, and there are five, six, seven of us who can

14   do that within the next 30 days.

15           If you have any questions, I'm more than happy to

16   enter obtain them.  Thank you.

17           THE COURT:  Thank you, Mr. Beckett.

18           Anyone else before I go to Mr. Patten?

19           MR. WHITMORE:  You're asking for people who would

20   be in favor of the stipulation?

21           THE COURT:  Yes.

22           MR. WHITMORE:  I guess --

23           THE COURT:  Mr. Whitmore, you may address the

24   Court, if you would like, on that issue.

25           MR. WHITMORE:  All right.  Your Honor, I think we

1   fall somewhere in the middle here, so I'll try to do my

2   best to make some order out of my presentation.  And I hope

3   that the timing of my comments is appropriate.

4          We represent an ad hoc group of six Class B

5   unitholders and the Yellowstone Mountain Club and

6   Yellowstone Development Company.  Together, they are --

7   each of them own a little bit more than 1 percent of the

8   equity value in each of these two debtor entities.  They

9   don't have any rights to vote, really.  There's a few

10  things that requires their consent.  But, in essence, they

11  were frozen out of the management of these companies and

12  feel very aggrieved with respect to what has happened to

13  their equity stake.  They also hold some claims in

14  connection with their investments.  And they're members of

15  the club and very much want the club to succeed and are

16  supportive of some kind of solution coming out of these

17  proceedings.

18         The Class B holders, the ad hoc committee has

19  objected to the lift-stay in favor of Credit Suisse and has

20  also objected to the debtors' retention of counsel to

21  collect the BGI notes.  We've also objected to the approval

22  of the stipulation in its current form.

23         And I guess I would summarize our position with

24  respect to that by saying -- referring to the end of our

25  most recent objection saying that the Class B holders do

84

1    not categorically object to establishing a solution

2    involving the committee as representative of the estates,

3    but there needs to be appropriate protection of the

4    interests of the estates.

5         This would require at least the following:  A

6    full review of the causes of action belonging to the

7    Yellowstone debtors - this is Yellowstone Mountain Club and

8    Yellowstone Development company - that are related to the

9    BGI notes by an estate fiduciary, possibly the committee,

10   to determine how the estate should best proceed to recover

11   the divested proceeds -- or the diverted proceeds of the

12   Credit Suisse loan and other funds, valuable funds that

13   have been taken out of these estates.  And I'd like to --

14        THE COURT:  But you concede that that is one of

15   the functions and part of what the official unsecured

16   creditors committee should be looking into and

17   investigating?

18        MR. WHITMORE:  Well, I think that we have a

19   procedural problem here of the first order and that, at the

20   suggestion of the Court, the Court is entertaining

21   essentially a lift-stay motion.  And I think, through

22   the --

23        THE COURT:  Well, and I'll be honest:  You

24   weren't at the prior hearings we've had on this.  The

25   reason the Court did that was nobody was doing anything

1    with them, and we needed to move --

2               MR. WHITMORE:   I think --

3               THE COURT:   And now, of course, everybody wants

4    it done, you know, like it should have been done a month

5    ago.

6               MR. WHITMORE:   Absolutely.  I think it's very

7    evident in reading the very well-thought-out order of the

8    Court that the Court, in considering whether or not

9    adequate protection existed in connection with approval of

10   the DIP loan, looked around at these castles and hundreds

11   of millions of dollars of promissory notes and

12   appropriately said, "Well, what's going on with this

13   stuff?"

14               And I think that is the occasion -- and the

15   Court's very appropriate question, I think, is it really

16   prompted two questions in response, you know:  "What

17   claims?" and "Who is going to be pursuing them?"

18               And the Class B unitholders who have been

19   involved in -- at least Mr. Snow has been involved in some

20   of the litigation relating to the LeMond case, but the

21   Class B unitholders are very familiar with a lot of these

22   issues that have gone on and were very delighted that the

23   Court has had -- has an opportunity to review the pleadings

24   that have been filed in the LeMond case because I think the

25   Court will get a sense for the complexity of these issues

1    in connection with those pleadings.

2            THE COURT:  Okay.  So is Mr. Snow a part of that,

3    or is there a separate litigation going on in Virginia

4    City?

5            MR. WHITMORE:  The answer, Your Honor, is that we

6    generally represent the non-settling Class B unitholders

7    who are not parties to that litigation.  The one exception

8    is that Mr. Snow intervened in the LeMond case, but the

9    other Class B unitholders in connection with that reached a

10   settlement and I believe either partially or completely

11   received money in exchange for their -- or the promise of

12   money in exchange for their Class B units.

13           THE COURT:  Okay, thank you.

14           MR. WHITMORE:  So that's where we sit with there.

15   So the two questions that the Court has really caused to be

16   asked, the "what" and the "who" -- we're seeing a lot of

17   people seizing on the BGI notes, and that's what the Court

18   referred to in addition to the castle that caught your

19   attention in the order.  But the BGI notes are just buried

20   in the middle of a morass of complicated claims.  There are

21   30 causes of action alleged in the LeMond case, and you can

22   see the claims and you can see the responses of the debtors

23   that include Yellowstone Club World, and so forth.

24           So the claims -- to reach the conclusion that the

25   correct thing to do is to run out right now and start a

1   lawsuit or make demand and start a lawsuit on an entity

2   that doesn't have any money - just, you know, may have some

3   indirect interests in some things - as the solution to this

4   whole problem is not a very thoughtful response by the

5   professionals in this case, I think, to the question the

6   Court's asking, the "what" question.

7           I think that some serious homework needs to be

8   done here on behalf of the professionals who want to step

9   up and say, "I'll be the fiduciary for the estate, and I'll

10  look after everybody's interest," to look at the claims.

11  Well, what are the derivative claims that this -- that

12  these companies have relating to the hundreds of millions

13  of dollars of assets that have been diverted?

14          You had a company -- or two companies that

15  together owned this business, and they owned a mountain,

16  essentially, free and clear of liens.  They went and

17  leveraged it up and apparently took all the money.  And

18  there's a very complicated series of transactions made more

19  complicated by a divorce and a split-up of property and a

20  liquidity crisis and probably some transfers relating to

21  that.

22          THE COURT:  You know, Mr. Whitmore, I mean this

23  is the stuff -- these are the items, the "what", that

24  professionals need to be dealing with in this because -- in

25  order to make this thing succeed at all.

1          I mean there's got to be somebody looking at the

2     whole picture here.  And that's what's been troubling me,

3     is that, "Is there?" and, "What claims are out there?"

4     which you've raised.  And you've got 30 claims that have

5     been alleged, some which may have merit, some which may

6     not.  But we don't know -- I don't know at this point.

7     Nothing's before me.

8          Obviously, I know Mr. Beckett, on behalf of the

9     unsecured creditors committee, I'm sure, is looking and

10    investigating and finding out what is and what isn't valid

11    under the authority of the committee, as have you for the

12    ad hoc.  So I think that that's stuff that needs to be done

13    to find out what is out there.

14         I mean are we just looking at a shell, and we're

15    just wasting a lot of time and money that's ultimately

16    going to go down the tube some way, or is there real

17    success that can be achieved here?  And that's, I guess,

18    where I think the professionals at this point need to be

19    focusing in order to get any recovery at all, whether it be

20    through a plan or through other collections.

21         So, anyway, I appreciate your thoughtful comments

22    about that and Mr. Beckett's comments, as well.  I know

23    Mr. Chehi has touched on this and I don't want to take

24    anything away from Credit Suisse, but I know Credit Suisse

25    has a primary objective as well as trying to recover monies

1    that they are owed as well as, maybe to the exclusion of

2    everybody else that might be owed money, they'd like to get

3    theirs first.

4           I'm not taking away from Credit Suisse and what

5    you have presented because I think all of you have done an

6    admirable job of trying to bring matters before this Court.

7    I know CrossHarbor and Mr. Moore, everybody has been

8    prepared, astute, thoughtful about what's going on, and I

9    think that's very important for this case.  Whether it

10   succeeds or doesn't succeed, that has to occur.

11          MR. WHITMORE:  So at any rate, Your Honor, the

12   derivative claims that may belong to these two debtors may

13   be incredibly valuable.  They could -- if assets are

14   properly pursued, if the people who, you know, breach their

15   fiduciary duties or aided and abetted in that or involved

16   in conspiracies, if these things can be run to ground, this

17   case, you could be dealing with hundreds of millions of

18   dollars, potentially, of value coming back into these

19   estates.  And that could be the difference between this

20   case being a disaster and this case being a very, very

21   successful case.

22          So we're responding and have responded in our

23   objections a little bit to what we consider to be kind of a

24   shoot, ready, aim approach on the BGI notes, and are very

25   much asking the Court to -- when it looks at the

1    stipulation -- and we'll get to this in a second because

2    the stipulation is really neither fish nor fowl.  I mean I

3    hear the committee saying on the one hand, "Yes, I'm a

4    fiduciary enough for the Court to be comfortable that

5    everything is going to be okay," but the stipulation is, at

6    bottom, a terrible muddle between about what the rights and

7    duties are.  I mean it's quite clear the rights and duties

8    of a secured creditor, if it gets the stay lifted or stay

9    modified, is to liquidate the collateral in a commercially

10   reasonable manner.  That's what its duties are going to be.

11   The rights and duties of the creditors committee, I

12   believe, may depend -- I mean if the Court decides to grant

13   standing to the creditors committee, I think that that,

14   that grant under the circumstances of this case where a

15   possible equity, favorable equity outcome may occur should

16   be conditioned upon the committee accepting responsibility

17   to pursue a designated set of claims - (inaudible, coughing

18   in microphone) - come to the Court and said, "I want to go

19   get the money this way on behalf of the estates, period;

20   not just on behalf of the unsecured creditors."

21           So we have some concerns about the secured

22   creditor perhaps for, you know, obviously tactical reasons,

23   but beyond that, you know, certainly, if the mountain is

24   worth enough so that they're covered, they may not have the

25   greatest incentive to maximize recovery as this drags on.

1          The unsecured creditors -- this case doesn't have

2     an infinite amount of unsecured claims.  And there is a

3     hope and expectation on the part of these unitholders that

4     there may be -- in addition to a great club to be a member

5     of going forward, there may be some value to, to their

6     equity investment.  So we very much would ask the Court to

7     open the "what" question up for reexamination and perhaps

8     have a hearing about that at the appropriate time after

9     people have done some homework.  And Mr. James, I think,

10    correctly pointed out that he hadn't really thought about

11    whether there was anything else to do other than, you know,

12    go after the notes, and there might be.

13         The ad hoc committee absolutely concurs with the

14    judgment that the debtors in possessions here are totally

15    impaired and cannot be appropriately put in the position of

16    acting as a fiduciary to maximize the recoveries.  I mean

17    the situation here is that, essentially, these same

18    insiders and the various entities that they have created

19    have taken hundreds of millions of dollars out of this

20    company and in inappropriate ways.  And however earnest and

21    appropriate the professionals may be that they hire,

22    they'll be caught in a terrible ethical morass almost

23    immediately and nothing can be expected to happen.  So I

24    certainly concur with Credit Suisse that that is a problem.

25         And we're kind of turning to the next question of

1   "who".  We're open, the ad hoc committee is open to a

2   solution here.  If people don't want to go down the road of

3   getting a trustee appointed and they think that would be

4   destructive to the dynamics of the case for some other

5   reason and want to find a way to have an estate fiduciary

6   start pursuing these claims with the idea, perhaps, when a

7   plan gets confirmed, the claims will be transferred to some

8   sort of liquidating trust that can be pursued by -- on

9   behalf of creditors and/or equity holders following

10  confirmation.  But the question of "who", we're open on it

11  provided that it is somebody who has a fiduciary duty to

12  act on behalf of all the constituencies in the case.  Other

13  things wrong with the current stipulation include the need

14  to place adequate controls on the powers and prerogatives

15  of Credit Suisse.

16          Credit Suisse, I don't think the stipulation is

17  very clear about who was running the show.  I think it

18  sounds sort of like a couple of captains on a ship and

19  their suggestion is that they're going to reach consensus

20  and be cooperative.  But there is a possibility of -- I

21  mean there's a fundamental question of really:  Who's in

22  charge here?

23          Is this going to be run by the committee on

24  behalf of the estate, on behalf of all constituencies in

25  the estate with some potential limitations imposed by

1  Credit Suisse, or is Credit Suisse really getting the stay

2  modified and the committees there to just sort of make sure

3  that nothing too bad happens?  That lack of clarity is not

4  appropriate.

5          These claims are worth hundreds of millions of

6  dollars, they're very complicated, and they need to be

7  owned and controlled by somebody who is accountable to this

8  estate for doing a good job or doing a bad job in trying to

9  get a recovery.  And you don't want to have a diffusion of

10  responsibility where Credit Suisse is sort of a secured

11  creditor with limited duties and the committee hasn't been

12  clearly put in the hot seat of having to run these things

13  and be responsible for the decisions concerning these

14  things.

15          I certainly didn't find anywhere - perhaps I

16  missed it in the stipulation - the sentence that if they

17  didn't get along and Credit Suisse began to use its veto

18  power in a way that was troubling to the committee, that

19  they would just come to the Court and it would get

20  resolved.

21          THE COURT:  Well, I think that was kind of the

22  purposes of what Paragraph 9 --

23          MR. WHITMORE:  When you read Paragraph 9,

24  perhaps -- I didn't see that in there.  To me, Paragraph 9

25  doesn't say that.

94

1            THE COURT:  Well, basically, the last sentence

2     just indicates that it shall not be modified, altered,

3     amended, or vacated without the prior written consent of

4     the parties or by order of the Court.  So if somebody's in

5     disagreement, they can bring it before the Court for

6     clarification and modification.

7            MR. WHITMORE:  Okay.

8            THE COURT:  And that follows from what Mr. Chehi

9     said as well as what Mr. Beckett said.

10           MR. WHITMORE:  Well, that's good news, then.  I

11    stand corrected.  At least with respect to that, that's a

12    little comfort on that particular point.

13           And then, finally, to the extent that a solution

14    can be worked out so that the committee, when Credit Suisse

15    has some opportunity to, to influence and control, I think

16    that there just needs to be some sort of balance where

17    there's some sort of equity representation.  And I think it

18    needs to obviously be disinterested equity representation

19    other than the Blixseths, making sure that when we get into

20    that value equation about, "Are we trying hard enough to

21    get the most possible money?  Are we trying too hard, and

22    should we be trying to hit a double here instead of a home

23    run every time but not just bunt the ball every time" --

24    so I think that if a process gets created and as the Court

25    considers the "who" question, not only does it have to be a

1    fiduciary with real responsibilities, but there needs to be

2    transparency and participation not just by the secured

3    creditors and the unsecured creditors but also, we believe,

4    by the equity holders.

5            I have some other comments with respect to why we

6    don't believe the stay should be lifted.  I don't know if

7    that's really before the Court.

8            THE COURT:  Well, in a way, it is.  You should

9    put that in the record if you wish to do so, based on the

10   order to show cause.

11           MR. WHITMORE:  Yes, based on the order to show

12   cause.  I would just make the following notes on that:  I

13   think that a lot of arguments were made under 362(d)(1)

14   that there was no adequate protection; and, therefore,

15   cause exists for getting relief from the automatic stay.  I

16   think those arguments were problematic in the sense that

17   they looked at the notes in isolation and they really

18   didn't take into account the fact that Credit Suisse's

19   position will, I think, be best protected by having the

20   estates do a good job of looking at all the claims that

21   exist and prosecuting them in some appropriate way rather

22   than necessarily just running off and trying to collect the

23   BGI notes.  So when you look at adequate protection in the

24   context of the real situation that they're facing, it's not

25   at all clear that they're better off going and suing on the

1   BGI notes.

2        And this really brings up a point that's of grave

3   concern to us, is, is that we may be messing up the

4   lawsuits that the estates could bring, the derivative

5   claims, by allowing actions to go forward on the BGI notes.

6   Those lawsuits, to some extent, will be for the same money

7   that was wrongfully moved around and ultimately ended up in

8   castles or islands or people's pockets.  So allowing a

9   lawsuit to go forward in which BGI is named as a defendant

10  and that claim is pursued in isolation, I have a concern on

11  behalf of the estates, but I think even Credit Suisse

12  should have a concern about whether that might negatively

13  affect the overall appropriate collection of these notes.

14  So we think that looking at the adequate protection issue

15  in isolation with respect to these notes is not really the

16  best way to look at it.

17        We would ask the Court to consider sort of a

18  balance of harms test under (d)(1) in which you look at the

19  harm to Credit Suisse of continuing to have the automatic

20  stay in effect with respect to these notes as opposed to

21  the harms to the estate.  And we think that as long as

22  there is an effort underway to appropriately recover and

23  bring back into the estate for everybody's benefit -

24  probably first for Credit Suisse's benefit, if they can

25  establish that they don't have problems - would be, would

1   be better for everybody, including them.  So on a balance

2   of harms test under 362(d)(1), we think that there really

3   is a basis for saying that adequate protection is best seen

4   in the light -- in light of some appropriate process being

5   in place as opposed to the stay just being lifted at this

6   point.

7            The arguments that there was no equity in the

8   notes because the notes -- these notes, which are sort of

9   extra collateral, add up to $270 million, and they're owed

10  $307 million, I think -- I'm not sure that that analysis is

11  correct.  I mean they have other collateral.  If you take

12  that sort of argument to the logical extreme, you could

13  look at every single piece of collateral in isolation and

14  say, "Well, there's no equity in this particular piece of

15  collateral because I'm owed $307 million, and it's only

16  worth $2."

17           They have a lot of other collateral.  And as the

18  Court noted in its order, they hadn't been -- certainly

19  hadn't done a lot, taken a lot of steps with respect to

20  this collateral previously.  So I think it's fair to

21  characterize it as secondary collateral to the real estate

22  that they hold as the primary basis for their loans.  So I

23  don't know that under (d)(2) they really win on the no

24  equity test.  And, certainly, the collection of these

25  claims could be vital to the reorganization effort.

1           THE COURT:  Regarding these claims, these claims

2   that are alleged through the litigation - and I haven't

3   read the complaint other than what you've referenced in

4   your questioning or in your argument - are not against any

5   of the debtors, correct?

6           So there really isn't the need, necessarily, for

7   any modifications of the stay as it relates to those

8   claims.  Is that a fair statement?

9           MR. WHITMORE:  Well, those claims are -- I would

10  call them a cousin or a relative of the claims I'm talking

11  about.  The claims that are referenced in the complaint are

12  claims by some equity holders, some "B" unitholders who are

13  mad because money was taken out of the, out of the company

14  and they didn't get their share and various things.

15          THE COURT:  Yeah.  But when you're talking about

16  claims in general, just generically you're saying there are

17  other claims, they're not necessarily claims against any of

18  the debtor entities but of other people or entities.

19          MR. WHITMORE:  Yes.  There may, there may well be

20  claims against nondebtor entities for which the stay

21  wouldn't be applicable.

22          THE COURT:  Right.  I guess that's my question.

23          MR. WHITMORE:  Yeah, that's a fair point.  I

24  think I've really -- I've covered the points on the

25  stipulation.

1          The ad hoc committee wants the project to be

2     successful, they want people to do a great job of

3     reorganizing and persuing these claims appropriately.  I

4     think -- I heard a lot today about -- if I had to choose

5     between whether I heard more about control versus

6     collection, I think I heard more about control than I heard

7     about collection.  And that always makes me a little

8     nervous representing clients who are on the bottom of the,

9     of the food chain, so --

10          THE COURT:  Okay, thank you.

11          MR. WHITMORE:  Thank you, Your Honor.

12          THE COURT:  Anyone else before I get to

13     Mr. Patten?

14          MR. ALTER:  Your Honor, Jonathan Alter, if I may.

15          THE COURT:  Yes.

16          MR. ALTER:  I only wanted to speak to the Court

17     for just a moment.

18          THE COURT:  Mr. Alter.

19          MR. ALTER:  Thank you.  Jonathan Alter on behalf

20     of the members committee, Your Honor.

21          I note for the record that we recently filed a

22     Rule 2019 statement indicating a further increase in the

23     amount of members in our group.  Your Honor, I will be very

24     brief because I thought that the comments and argument made

25     by Mr. Whitmore were exactly correct.

1           We also agree that those claims should be

2     pursued, but they should be pursued in a proper manner.  We

3     also agree that the debtor has clearly irreconcilable

4     conflicts of interest associated with the prosecution of

5     those claims.  We agree that the claims, if pursued - and

6     we do believe that there should be a pursuit of claims in

7     this case - should be pursued by a fiduciary on behalf of

8     the estate.  And, certainly, the creditors committee seems

9     to be the appropriate body to pursue those claims.

10          With respect to the issue of standing, Your

11    Honor, not only do we believe that standing should be

12    obtained by the creditors committee in connection with the

13    pursuit of these BGI notes, but frankly, we believe that

14    the creditors committee should be aggressively looking to

15    recover standing to pursue all potential recoveries as part

16    of a broader plan as articulated by Mr. Whitmore.  In fact,

17    I simply note for the record that the creditors committee

18    has also -- has already come to the conclusion -- in its

19    papers, it notes that the December 2000 -- that the 2005

20    transaction was a fraudulent conveyance under Montana law.

21    That would seem to suggest that they intend litigation, at

22    the very minimum, against Credit Suisse.

23          Which, by the way, segues nicely into my next

24    point, which is:  We can see no reason why Credit Suisse

25    needs to be a party to this stipulation.  If the assets and

```
 1    the claims are going to be recovered by an independent

 2    fiduciary, all parties in interest have an interest in that

 3    proceeding fairly and equitably.  And we do not believe

 4    that any further adequate protection would be required to

 5    be given to Credit Suisse since the recoveries that would

 6    be obtained would be subject to any lien that they have

 7    which would be a legitimate lien claim.

 8              We also, by the way, share the same concern that

 9    Mr. Whitmore had that the stipulation was not at all clear

10    as to the rights of both parties.  It did seem like a

11    copartnership as opposed to simply Credit Suisse having

12    some, some notice rights of some kind.  So we would very

13    much like to see that stipulation, which would be so

14    important, much more carefully drawn; and, frankly, the

15    references to Credit Suisse deleted from the stipulation so

16    that a proper fiduciary pursues the claims on behalf of all

17    parties in interest.

18              THE COURT:  So there's really no need for a

19    stipulation.

20              MR. ALTER:  Your Honor, the answer may simply be

21    as Mr. Whitmore states, that the issue could be resolved by

22    the creditors committee recovering appropriate standing to

23    pursue these claims as fiduciaries on behalf of the entire

24    estate.

25              And, finally, Your Honor, I think the points that
```

1    were made about cause I think were exactly correct that

2    Mr. Whitmore made, but I would also had that the comments

3    that were made by Mr. Chehi that there's a probability of a

4    default for failing to file a plan by February 13th is just

5    pure speculation.  I don't think that this Court or any of

6    the parties have any evidence to suggest that this debtor

7    will be in default on February 13th.  And, frankly, we

8    remain very optimistic and hopeful that the debtors and all

9    the parties in interest work collaboratively to try to come

10   up with a solution and a consensual plan by February 13th.

11   Thank you, Your Honor.

12            THE COURT:  Thank you, Mr. Alter.

13            Anyone else before I go to Mr. Patten?  He'll be

14   concluding.

15            TRUSTEE McKAY:  Your Honor?

16            THE COURT:  Yes, Mr. McKay.

17            TRUSTEE McKAY:  Dan McKay for the U.S. Trustee's

18   Office.  Just a couple of comments.

19            It seems the case is proceeding on two tracks,

20   and I think that's the way it should be.  I think everybody

21   assumes that the plan is going to provide for a sale of the

22   Yellowstone Club as a going concern, and there's no reason

23   that I can see that that proposal cannot be put together in

24   time for a plan to be filed by the February 13th deadline.

25   And I would assume that given the, the professionals that

1   have been hired, Mr. Greenspan, and so forth, and I think

2   we should all assume - and if this isn't true, somebody's

3   going to be held to account for it - that that's being

4   pursued vigorously and the data room is being repaired and

5   whatever marketing that's going to be done -- as I

6   understand it, the plan has to be filed by February 13th,

7   confirmed by March 31st, but that sale process, I would

8   assume under the plan, may take longer than that and

9   probably should in order to appropriately market the

10  properties.

11         But I think this whole discussion today just

12  points out the absolute necessity that that sale process be

13  thoughtful and adequate to expose this property to whatever

14  market is out there to assure that the greatest recovery

15  for those assets is made so that we're probably going to

16  know what the excess claims in this estate -- if that

17  property sells for less than is sufficient to pay all the

18  secured creditors in full, if that's the outcome.  And I

19  think people probably assume that it will be the outcome.

20  But we're going to know what needs to be pursued outside of

21  that sale process when that sale process concludes because

22  I can't imagine that settling all of these issues with

23  regard to these notes and all of the claims that may

24  surround them is going to be a much longer process than

25  that.

1          I do agree, I think, with the consensus here that

2    to step in now and appoint the Chapter 11 trustee is

3    probably not a workable proposition given the timeline.

4    Sometimes trustees with limited powers are appointed, but I

5    think that's a very iffy proposition under the code.  And

6    there is case authority that says that the bankruptcy judge

7    simply doesn't have the authority to limit the trustee's

8    powers in that way.  It's not provided for in the code.

9          I think that the unsecured creditors committee is

10   probably the appropriate avenue, and I think anyone's

11   concerns with regard to its parochial interests I think

12   should be allayed by the fact that these are estate claims.

13   And to the extent that the committee takes on the

14   responsibility to prosecute those claims, it has to do so

15   from the perspective of these being estate claims and all

16   of the constituencies that are represented because of that.

17         So I'm hoping -- I guess my message, if I'm

18   allowed to send one today, is:  I'm hoping the debtors are

19   working diligently with regard to the plan at least as far

20   as it will deal with the main assets, and that's the

21   mountain club as a going concern.  And I don't see any

22   reason why that -- an acceptable plan that deals with that

23   and leaves the issue of collection of all these other

24   claims to happen in the due course being pursued by whoever

25   the appropriate entity is to pursue those.  And at this

1    point, I see that as being the unsecured creditors

2    committee.

3            Thank you, Your Honor.

4            THE COURT:  Thank you, Mr. McKay.  Now to

5    Mr. Patten, who has concluding remarks.

6            MR. PATTEN:  Thank you, Your Honor.  I'm trying

7    to figure out who in the room is my friend and who isn't,

8    and it's kind of hard.

9            THE COURT:  Everybody's looking for, you know,

10   the global resolution of this that makes it all successful

11   for everybody.

12           MR. PATTEN:  I think Mr. Chehi identified why the

13   stay ought not be lifted - and Mr. Whitmore alluded to

14   this, too - and that is:  If the stay is lifted, then

15   Credit Suisse has to foreclose its lien on the collateral.

16   It doesn't mean that it --

17           THE COURT:  Well, and pursue whatever

18   nonbankruptcy remedies are available, which is -

19   (inaudible) - nothing.

20           MR. PATTEN:  Well, yes.  But I don't think that

21   it's necessarily that it can go out to collect the notes

22   itself.  It's got to sell the notes or dispose of them in a

23   commercially reasonable fashion.  That isn't necessarily

24   the same as suing on the notes.  So for that reason alone,

25   Your Honor, I would think that lifting the stay is not the

1    remedy that we want to follow.  There's reasons -- if

2    lifting the stay is a consideration, there's reasons not to

3    do it.  And I don't want to repeat largely what

4    Mr. Whitmore said, but it's speculation as to whether the

5    debtor is not going to file a plan on time.  There is other

6    collateral that Credit Suisse is ignoring when it's looking

7    at these notes and determining whether there's any equity

8    in these notes.

9            And at this stage, there's all sorts of -- now

10   this hearing has kind of morphed.  Now we're talking about

11   some derivative claims and avoidance actions that are

12   property of the estate, and they're properly prosecuted by

13   the debtors in possession.  All of these things may be an

14   essential part of the bankruptcy plan.  And to remove this

15   property from the estate prior to the development and

16   submission of a bankruptcy plan is going to start tying our

17   hands, and I think that that's not appropriate.

18           There's a lot of speculation as to the ability of

19   the debtor in possession to collect these notes.  The same

20   inherent conflicts exist in many cases, Your Honor.

21   Preferential transfers and fraudulent transfers often

22   involve insiders.  Prosecution of those claims does not

23   automatically create conflicts of interest.  We're

24   particularly aware the debtor in possession is taking steps

25   to recover the avoidable transfer and, in that sense, these

 1    promissory notes are much the same as a preferential

 2    transfer or fraudulent conveyance.

 3            So until there's something more than speculation

 4    about conflicts of interest, until there's some action or

 5    something done by the debtors in possession that

 6    demonstrate that they're not adhering to their fiduciary

 7    duty to all of the various entities involved here, all of

 8    the parties in interest, and all of the different

 9    constituencies, then that ought to remain an asset that the

10    debtors in possession manage in the ordinary course and

11    prosecute to collect.

12            There's clearly disagreement among virtually

13    everybody here about what should be done.  All of the

14    powers to collect all of the avoidance actions that are

15    somehow getting sucked into this hearing should be, at

16    least in the first instance, prosecuted by the debtor in

17    possession until it is shown to the Court that the debtor

18    in possession cannot do that.  That hasn't been shown.  All

19    that's been shown is guesswork and supposition.  And so

20    until there's something that demonstrates to the Court that

21    that can't be done, the Court should not remove those

22    powers from the debtor.

23            The debtor is to look out for all of the

24    constituencies:  The unsecured creditors, the Class B

25    members, the secured creditors.  That's what we're supposed

1    to do, that's what we understand our obligations are, and I

2    think that that's something that we can do and will do and

3    intend to do.  And toward that end, we've started the

4    collection process.  And Mr. -- the Class B members may not

5    like the avenues that we're taking, but we're -- we've

6    started taking the action.  And so it seems, Your Honor,

7    that it is premature to take that power from the debtors in

8    possession.  It will hamstring them in fashioning a

9    bankruptcy plan.  The plan has to be filed in about a

10   month's time.  And, certainly, until the plan is filed and

11   we know how these claims, and so forth, are treated, those

12   things should remain in the control of the debtors in

13   possession.

14           THE COURT:  Thank you, Mr. Patten.  Well, for the

15   record, I haven't missed any other remaining issues that

16   were scheduled for today that haven't been heard, right?

17   We've heard everything, okay.

18           Given the testimony presented today and the

19   exhibits and the record before me, I find that the pursuit

20   of some of these claims and the promissory notes, given the

21   interrelationship between the entities, creates a profound

22   problem or an appearance of impropriety or conflict between

23   the owner/controller of the debtors as well as BGI.  And I

24   think it puts Ms. Blixseth in a really difficult situation

25   because she's kind of on both sides of this.  Whether

1    there's anything, anything that she is doing or not doing

2    that would impact the success of this case, I can't say

3    that, but I think it just puts her in an extremely

4    difficult position in being able to pursue claims that may

5    be against herself or related entities.  I think that's an

6    extremely difficult position to be in.

7              And as a result of that, I think that the next

8    person, the "who", is really the official unsecured

9    creditors committee to assist the debtor in some of

10   these -- and to take the lead on some of these claims,

11   notes, investigation, formulation of a plan to assist the

12   debtor in proceeding and collecting assets for the estate

13   as the creditors committee does in any event.  That's the

14   duties that are set forth under 110 -- what, 1103.  So I

15   think that's what the committee should do.  They're the

16   official creditors committee, and they should pursue that.

17             As it relates to my order to show cause and the

18   modification, I have a lot of discretion with

19   modifications.  And this is a very limited modification

20   because I want Credit Suisse to be involved in looking at

21   those notes and pursuing, in conjunction with the official

22   unsecured creditors committee, collection on those notes

23   and their collateral but not to the prejudice or the

24   jeopardy of other claims that may be out there that could

25   also be of benefit in the bigger picture rather than just

1    focusing on, "Well, what's our collateral?  Let's go and

2    get it regardless of what happens to everything else."

3           Because I think what I see in this, based upon

4    the facts before me, it's going to take a big-picture

5    solution for this to remain viable.  So from that

6    standpoint, I want the official creditors committee and

7    Credit Suisse to work in conjunction on the notes, not

8    losing sight of other claims that may impact the

9    collections of those notes, as well.

10           As it relates to the stipulation, I guess I want

11   to make it very clear in the stipulation that if any issue

12   comes up for which there is dispute that's not reconciled

13   and that would have prejudice to any other interest party

14   in this proceeding, I want to know about it immediately by

15   motion, by notice, or whatever.  Because I just -- I think

16   we've got to maintain a process here in order to make this

17   all work.  So to that extent -- and I'll issue an order on

18   this rather than just having a bench order.  But to that

19   extent, I want -- there will be some modification of the

20   stay for that purpose.

21           Now, as it relates to the application and the

22   appointment of Mr. James and his law firm for pursuing the

23   notes on behalf of the estate, I'm going to vacate that

24   order of appointment and employment because I think, based

25   on the testimony before me, with the interrelated controls

1   of the entities, it places Mr. James in an extremely

2   difficult position if any conflict at all comes up or even

3   the appearance of conflict comes up in how he proceeds in

4   trying to do any collection.  And so I'm going to vacate

5   that order, but I am going to allow him to this date,

6   through to this date an administrative claim that he may

7   file for professional fees based upon his prior

8   appointment.  I think that's only fair to him, given the

9   appointment by this Court.  So that will be effective as of

10  this date.

11          MR. PATTEN:  Your Honor?

12          THE COURT:  Yes, Mr. Patten.

13          MR. PATTEN:  Could I ask for a clarification?

14          THE COURT:  Yes.

15          MR. PATTEN:  I think it's critical that the

16  debtors in possession are aware of and have the knowledge

17  that's uncovered during the course of any collection

18  activity --

19          THE COURT:  Yes, let me clarify on that.  I

20  expect the -- Mr. Beckett, his staff, and the official

21  unsecured creditors committee to maintain constant

22  interaction with you, as they have to, in order to

23  investigate, to help formulate, to notify you of what

24  claims there are and where they're at.

25          MR. PATTEN:  Well, and toward that end, Your

1    Honor, if there's depositions taken or discovery, written

2    discovery undertaken, will the debtors in possession be

3    allowed to sit in at the depositions and hear the evidence

4    that's brought out in the depositions and get copies of the

5    discovery that's produced?

6            THE COURT:  You know, I guess offhand I don't

7    have an objection to that, but there may be instances that

8    I'm not aware of or there may be facts or claims that I'm

9    not aware of that could be impeded because of that.  I

10   don't know.  And I guess what I'm going to ask is in that

11   regard, if there are depositions scheduled and there is the

12   exclusion of the debtor in possession, that, certainly, you

13   have a right to notify the Court.  And before that

14   deposition's held, determination will be made as to whether

15   you should or shouldn't, based upon what the purpose of

16   that deposition is.

17           MR. PATTEN:  Very well.

18           THE COURT:  I do want to keep you informed, and I

19   think that's important in the whole process.

20           As it relates to the stipulation, in most part, I

21   don't have a problem with it, but I do have -- I just want

22   to make clear that if there's any dispute over the

23   stipulation, that this Court retains control to resolve any

24   issue or dispute or activity under that stipulation.  And I

25   think that was clear from what was said.

```
 1              MR. CHEHI:  And that goes without saying.  We'll

 2   say it on the record right now - and I'm sure Mr. Beckett

 3   will agree - that that was our intention.  We had clear

 4   discussion about this before anybody signed that

 5   stipulation that, to the extent that there are

 6   disagreements that, you know, need to be resolved because,

 7   for instance, they go in a direction that we think they

 8   shouldn't be going in and they're going to say, "Well,

 9   you're not consenting to it," they're going to come back to

10   court or we'll jointly come back to the Court and ask for a

11   resolution of it.

12              THE COURT:  And I guess I just want to make

13   sure -- we're under a really short timeline in this case,

14   as you know.  And I'm going to, you know, expedite things

15   to the extent I can, but I'm also not going to expect

16   matters before me that don't have merit, either, just to

17   slow this process up.  And I'm not suggesting that would

18   ever occur, but --

19              MR. CHEHI:  We don't expect to be bringing in,

20   you know, things in the sort of garden variety discovery

21   disputes that the Court doesn't want to hear about.  That's

22   not what we're talking about.

23              THE COURT:  Okay.

24              MR. CHEHI:  I think Mr. Beckett and I have an

25   understanding.  We would not be proceeding as we have
```

1    without a clear understanding of the significance of this,

2    the significance in what this is all about in terms of how

3    it affects larger recoveries and implications of other

4    claims.  We're all sensitive to that.  And we don't want to

5    do anything to jeopardize recoveries because we're the

6    beneficiaries of those recoveries as much as anybody.

7            THE COURT:  And, certainly, Mr. Beckett and

8    Mr. Whitmore, I expect, would be cooperating with each

9    other, as well, because you're all unsecured in any event.

10           MR. WHITMORE:  Yes, Your Honor.  If the Court as

11   it fashions its order could be thoughtful of including some

12   duty on the part of the committee to be open with respect

13   to the ad hoc group of Class B holders and advise and

14   consult with respect to the prosecution of the claims, I

15   think that it would be beneficial to the process.

16           THE COURT:  Well, certainly, I want to -- you

17   know, through the investigative powers of the official

18   committee, obviously I would expect all parties to work

19   with them and cooperatively in providing information,

20   claims, background, whatever is necessary so that they

21   can -- so that the committee can thoughtfully proceed on a

22   basis after consulting with the players.

23           We'll issue a formal order on these matters, but

24   I wanted to let you know before you left where you all will

25   be on these matters.  Because, you know, we're a month

1   away.  We have hearings on the 10th of February, again,

2   scheduled here; hearings in Missoula on the, on the 12th;

3   Great Falls on the 13th; and then Billings, I guess, is the

4   17th.  So it kind of gives you a timeline of where we're

5   at.  Most of those hearings will be held in that week

6   period.

7           And then I have a -- just so you know, I'll be,

8   I'll be at the Idaho CLE toward the end of the week of the

9   16th.  So, you know, I'm always available, but some times

10  are more convenient than others.  But this case is very

11  important, and I don't want things to get bogged down.  If

12  there are any issues at all, I want them brought to my

13  attention immediately, and we'll get them set as quickly as

14  possible for the issues that are before us.

15          So with that, we'll be in recess.

16

17                    *  *  *  *  *

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3      I certify that the foregoing is a correct transcript

4    from the electronic recording of the proceedings in the

5    above-entitled matter, all done to the best of my skill and

6    ability.

7

8    _____   _____

9    Jonny B. Nordhagen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25