IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

_____
                                    )
In Re:                              ) Case No. 08-61570-11
                                    )
Yellowstone Mountain Club, LLC,     )
                                    )
          Debtor.                   )
_____     )


THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

Butte, Montana
February 10, 2009


Transcript Services:


Proceedings recorded by electronic recording;
transcript produced by reporting service.

```
 1                         APPEARANCES

 2

 3      FOR THE DEBTORS:

 4           JAMES A. PATTEN

 5           Attorney at Law

 6           Suite 300, The Fratt Building

 7           2817 Second Avenue North

 8           Billings, MT  59101

 9

10           LAWRENCE REAM

11           Attorney at Law

12           Bullivant Houser Bailey, PC

13           1601 Fifth Avenue, Suite 2300

14           Seattle, WA  98101-1618

15

16      FOR JAMES MURPHY and EDWARDS LAW FIRM:

17           JON E. DOAK

18           Attorney at Law

19           Doak & Associates

20           P.O. Box 1875

21           Billings, MT  59103-1875

22

23

24

25
```

```
 1                    APPEARANCES (continued)

 2

 3      FOR THE OFFICE OF THE U.S. TRUSTEE:

 4           DANIEL P. McKAY

 5           U.S. Trustee's Office

 6           Liberty Center, Suite 204

 7           301 Central Avenue

 8           Great Falls, MT  59401

 9

10      FOR CREDIT SUISSE:

11           MARK S. CHEHI

12           ROBERT S. SAUNDERS

13           Attorneys at Law

14           Skadden, Arps, Slate,

15              Meagher & Flom

16           One Rodney Square, Seventh Floor

17           Wilmington, DE  19801

18

19           EVAN R. LEVY

20           JOSEPH LARKIN

21           Attorneys at Law

22           Skadden, Arps, Slate,

23              Meagher & Flom

24           Four Times Square

25           New York, NY  10036-6652
```

```
 1                     APPEARANCES (continued)

 2


 3        FOR THE CREDITORS COMMITTEE:

 4             J. THOMAS BECKETT

 5             Attorney at Law

 6             Parsons, Behle & Latimer

 7             201 South Main Street

 8             Salt Lake City, UT  84111

 9


10     FOR THE AD HOC COMMITTEE OF YELLOWSTONE

11     CLUB MEMBERS:

12             JOHN H. GRANT

13             Attorney at Law

14             Jackson, Murdo & Grant, PC

15             203 North Ewing

16             Helena, MT  59601

17


18             JONATHAN B. ALTER

19             Attorney at Law

20             Bingham McCutchen, LLP

21             One State Street

22             Hartford, CT  06103

23


24


25
```

```
 1                  APPEARANCES (continued)

 2

 3        FOR THE CLASS B AD HOC MEMBERS COMMITTEE:

 4             CLARK T. WHITMORE

 5             Attorney at Law

 6             Maslon Edelman Borman & Brand, LLP

 7             3300 Wells Fargo Center

 8             90 South Seventh Street

 9             Minneapolis, MN  55402-414

10

11             RONALD A. BENDER

12             Attorney at Law

13             Worden Thane, PC

14             P.O. Box 4747

15             Missoula, MT  59806

16

17        FOR THE UNSECURED CREDITORS COMMITTEE:

18             JAMES H. COSSITT

19             Attorney at Law

20             James H. Cossitt, PC

21             202 KM Building, 40 Second Street East

22             Kalispell, MT  59901-4563

23

24

25
```

```
1                    APPEARANCES (continued)

2


3       FOR CROSSHARBER CAPITAL PARTNERS, LLC:

4            PAUL D. MOORE

5            BARRY GREEN

6            Attorneys at Law

7            Duane Morris, LLP

8            470 Atlantic Avenue, Suite 500

9            Boston, MA  02210-2600

10


11      FOR TIMOTHY J. BLIXSETH:

12           JOEL E. GUTHALS

13           Attorney at Law

14           Guthals, Hunnes & Ruess, PC

15           P.O. Box 1977

16           Billings, MT  59103

17


18      FOR CIP SUNRISE RIDGE OWNER, LLC:

19           BENJAMIN P. HURSH

20           Attorney at Law

21           Crowley, Haughey, Hanson,

22              Toole & Dietrich, PLLP

23           P.O. Box 7099

24           Missoula, MT  59807

25
```

```
1                    APPEARANCES (continued)

2


3        FOR HIGHLAND CAPITAL MANAGEMENT, LLP:

4             EDWARD MURPHY

5             Attorney at Law

6             Edward Law Offices

7             P.O. Box 2639

8             Missoula, MT  59806-2639

9


10            MICHAEL D. WARNER

11            Attorney at Law

12            Warner Stevens, LLP

13            301 Commerce Street, Suite 1700

14            Fort Worth, TX  76102

15


16       FOR NORMANDY HILL CAPITAL, LP:

17            QUENTIN M. RHOADES

18            Attorney at Law

19            Sullivan, Tabaracci & Rhoades

20            1821 South Avenue West, Third Floor

21            Missoula, MT  59801

22


23


24


25
```

```
 1                    I N D E X

 2   WITNESS:                                    PAGE:

 3   EDRA BLIXSETH

 4        Direct Examination by Mr. Saunders .  .  .  .  .  31

 5        Cross-Examination by Mr. Patten   .  .  .  .  .  52

 6        Redirect Examination by Mr. Saunders   .  .  .  55

 7        Cross-Examination by Mr. Moore    .  .  .  .  .  60

 8        Redirect Examination by Mr. Saunders   .  .  .  62

 9        Recross-Examination by Mr. Moore  .  .  .  .  .  63

10

11        Direct Examination by Mr. Saunders .  .  .  .  . 312

12        Cross-Examination by Mr. Warner   .  .  .  .  . 321

13   SAMUEL BYRNE

14        Direct Examination by Mr. Saunders .  .  .  .  . 64

15        Cross-Examination by Mr. Moore    .  .  .  .  . 71

16   RONALD GREENSPAN

17        Direct Examination by Mr. Patten  .  .  .  .  . 72

18        Cross-Examination by Mr. Saunders .  .  .  .  . 80

19        Cross-Examination by Mr. Moore    .  .  .  .  . 92

20        Redirect Examination by Mr. Patten .  .  .  .  . 96

21        Cross-Examination by Mr. Beckett  .  .  .  .  . 101

22        Cross-Examination by Mr. Warner   .  .  .  .  . 103

23        Redirect Examination by Mr. Patten .  .  .  .  . 109

24

25
```

```
 1                    I N D E X (continued)

 2     WITNESS:                                          PAGE:

 3     RONALD GREENSPAN
```

```
 4          Direct Examination by Mr. Ream      .    .    .    .    . 147

 5          Cross-Examination by Mr. Saunders   .    .    .    .    . 191

 6          Cross-Examination by Mr. Whitmore   .    .    .    .    . 245

 7          Cross-Examination by Mr. Warner     .    .    .    .    . 257

 8          Cross-Examination by Mr. Beckett    .    .    .    .    . 271

 9          Cross-Examination by Mr. Moore      .    .    .    .    . 272

10          Cross-Examination by Mr. McKay      .    .    .    .    . 279

11          Redirect Examination by Mr. Ream    .    .    .    .    . 282

12          Cross-Examination by Mr. Saunders   .    .    .    .    . 286
```

```
13     SCOTT MILLER

14          Direct Examination by Mr. Saunders  .    .    .    .    . 290

15          Cross-Examination by Mr. Patten     .    .    .    .    . 304

16          Cross-Examination by Mr. Moore      .    .    .    .    . 309

17          Redirect Examination by Mr. Saunders     .    .    .    . 310

18          Recross-Examionation by Mr. Patten  .    .    .    .    . 311
```

```
19

20

21

22

23

24

25
```

1              YELLOWSTONE MOUNTAIN CLUB BANKRUPTCY

2                      BUTTE, MONTANA

3                         - - -

4        BE IT REMEMBERED THAT this matter came on for hearing

5    on February 10, 2009, in the United States Bankruptcy

6    Court, District of Montana, The Hon. Ralph B. Kirscher,

7    presiding:

8

9     The following proceedings were had:

10

11             THE COURT:  This is the time set for various

12    matters in the Yellowstone Club case, 08-61570.  We do have

13    a number of matters.  I'm not sure if any have been

14    resolved, but let me name them, and we'll proceed.

15             Objection to Debtors' motion to obtain increased

16    postpetition financing and objection thereto; Credit

17    Suisse's amended motion for Rule 2004 exam to be

18    reconsidered and objection thereto; Credit Suisse's

19    emergency motion for order compelling immediate

20    commencement of a marketing process and objection thereto.

21             Oh, just a moment.  I guess we'd better wait for

22    our recorder.

23             THE CLERK:  It's being recorded.

24             THE COURT:  Is it being recorded?

25             THE CLERK:  Yes.

1           THE COURT:  Okay.  Credit Suisse's emergency

2    motion of prepetition lenders for order authorizing

3    prepetition lenders to seek expedited discovery and

4    objection thereto; Credit Suisse's emergency motion of

5    prepetition lenders for appointment of examiner and

6    objection thereto; motion of Debtors for approval of

7    bidding and solicitation proceedings regarding proposed

8    sale of 100 percent of the equity interest in the debtor

9    and objections thereto by ad hoc group of Class B

10   unitholders, Highland Capital Management, Credit Suisse,

11   the United States Trustee, Normandy Hill Capital, LLP, and

12   Mr. Blixseth; and motion of prepetition lenders pursuant to

13   Bankruptcy Rules 7026, 9014, and Local Rule 9014-1 for

14   order authorizing prepetition lenders to seek expedited

15   discovery and objection thereto; and then creditors

16   committee response to the various pending issues pending

17   before the Court for today.

18           There is also an Adversary 09-00010, creditors

19   committee vs. Edra Blixseth and BLX Group; motion for

20   temporary restraining order and preliminary injunction.

21           I hope I've covered all the pending matters.

22   Mr. Patten, do you recall anything that I haven't covered?

23           MR. PATTEN:  No, Your Honor, but we actually have

24   resolved one of them.

25           THE COURT:  Just one?

1          MR. PATTEN:  And that was the debtors' motion to

2    increase DIP funding.

3          THE COURT:  Okay.

4          MR. PATTEN:  And there was a stipulation filed

5    some time ago, and I believe the -- almost positive the

6    order approving it has been issued.

7          THE COURT:  You know, and I recall that that had

8    taken place, but I -- because the emergency in Paris.

9          MR. PATTEN:  Yes.

10         THE COURT:  We did that like on a Friday, or

11   something.

12         MR. PATTEN:  Yes.

13         THE COURT:  Okay, so that's off.

14         MR. PATTEN:  And, Your Honor, I believe the issue

15   with regard to the temporary restraining order regarding

16   Edra Blixseth has been resolved, as well.

17         THE COURT:  And BLX Group?

18         THE WITNESS:  And BLX Group.

19         THE COURT:  Has been resolved?

20         UNIDENTIFIED SPEAKER:  Yes, sir.

21         THE COURT:  Okay.

22         UNIDENTIFIED SPEAKER:  (Inaudible, out of range

23   of microphone.)

24         THE COURT:  And the stipulation has been filed?

25         MR. COSSITT:  Your Honor, I've got it here on the

1   laptop in PDF and Word format, and I can submit it --

2                THE COURT:  Okay.

3                MR. COSSITT:  -- later today or whenever I can

4   get a connection.

5                THE COURT:  Okay, very good.  Thank you.

6                MR. COSSITT:  Thank you.

7                THE COURT:  I'll take that off, then.  Anything

8   else?

9                MR. CHEHI:  Your Honor --

10               THE COURT:  (Inaudible, talking over each

11  other) -- resolved.

12               MR. CHEHI:  Your Honor.

13               THE COURT:  Mr. Chehi.

14               MR. CHEHI:  On the last matter, if we could just

15  make sure that we get a copy of that stipulation, or

16  whatever, resolving the Blixseth TRO before it's submitted

17  to the Court so we can comment on it or at least review it.

18               THE COURT:  Are you a party?

19               MR. CHEHI:  Well, we are a part of the

20  enforcement action, I believe, on the, on the notes, Your

21  Honor.  We have been given some authority to participate

22  with the committee in the enforcement of the notes, and the

23  like.  And I believe --

24               THE COURT:  But this is by the creditors

25  committee to restrain any transfers, as I recall.  Correct?

1          MR. CHEHI:  Or leading up on the BLX or Blixseth

2    Group property, yes.

3          THE COURT:  Well, I'm not sure if you're a party

4    to it, is what I'm trying to say, if it's creditors

5    committee.

6          Do you have comment?

7          MR. BECKETT:  Your Honor, the only party to have

8    made an appearance in that case is the committee.  There's

9    one other creditor that made an appearance, and I don't

10   recall who it was right now.  A secured creditor made an

11   appearance in the adversary proceeding; Credit Suisse did

12   not.  I think that if we can get a -- I don't know if we

13   can have a printout.  We're happy to have them -- to share

14   it with them or anyone else who wants to look at it, but --

15         THE COURT:  I have absolutely no problem - in

16   fact, I would encourage them reviewing it and sharing it -

17   but I don't see where they have a "yea" or "nay" or on it.

18         MR. CHEHI:  I'm not saying we do, Your Honor.

19         THE COURT:  Okay.

20         MR. CHEHI:  But we're a party in interest, and

21   the matter was active, and we understood that it was going

22   forward today.  And, you know, we are interested in it.  I

23   believe we received copies of it from committee counsel,

24   and we discussed it with them even before they filed it --

25         MR. BECKETT:  Even before we filed it.

1          MR. CHEHI:  -- as part of the collection action.

2     And so we are hoping to continue to play a meaningful role,

3     even as just an observer from time to time and as a party

4     in interest in it.

5          THE COURT:  Well, I know you'll be observing all

6     of the proceedings.  Just as soon as I see the stipulation,

7     though, I may approve it --

8          MR. BECKETT:  Thank you.

9          THE COURT:  -- if it's been agreed to by the

10    parties.

11         MR. BECKETT:  We'll make every effort to make

12    sure that parties who want to look at it --

13         THE COURT:  Make sure anybody who wants it has a

14    copy.

15         MR. BECKETT:  They may only -- it may, it may be

16    on a screen because I think it's going to go from

17    Mr. Cossitt's screen into the system.

18         THE COURT:  I would think so.

19         MR. BECKETT:  But we will do that, and we will

20    file it.  Thank you.

21         THE COURT:  Thank you, Mr. Beckett.

22         Mr. Patten.

23         MR. PATTEN:  Just so the record's clear, Your

24    Honor, Ms. Blixseth agreed to an order.  And so there's no

25    stipulation, per se, but there is an agreed-upon order that

1    will be submitted to the Court.

2           THE COURT:  Okay, okay.  Do you have any

3    preference as to the order in which we take up some of

4    these matters?

5           What's this about the amended motion for a Rule

6    2004 exam be reconsidered?  What's the issue there?  I

7    think this is Credit Suisse's motion --

8           MR. HURSH:  Yes, Your Honor.

9           THE COURT:  -- a Rule 2004 exam.

10          Mr. Hursh.

11          MR. HURSH:  We had actually objected and

12   requested the reconsideration.

13          THE COURT:  Oh, for CrossHarbor.  I'm sorry.

14          MR. HURSH:  Yes.

15          THE COURT:  I'm sorry, yes.

16          MR. HURSH:  Yes, Your Honor --

17          THE COURT:  Okay.

18          MR. HURSH:  -- for a couple of reasons that are

19   in the papers.  And if you would like to proceed with that,

20   I certainly can do so at this time.  I did, though -- post

21   filing of those papers, there was a subsequent motion for

22   an examiner.  And depending on how that issue was resolved,

23   it seems that that may, in fact, resolve the underlying of

24   the 2004 exam.

25          THE COURT:  Okay.  Is there concurrence there to

```
 1    get the examiner first, Mr. Chehi?

 2              MR. CHEHI:  I don't think we can, you know, talk

 3    to that.  Perhaps we should, you know, focus on the

 4    examiner motion.  If Your Honor would like to do that, I

 5    think that the examiner motion implicates discovery issues

 6    and, in fact, the examiner motion has been brought on

 7    because the lack of cooperation in discovery.  And, you

 8    know, we have some views on both of those matters.  And

 9    however Your Honor would like to proceed, we're happy to

10    proceed.

11              THE COURT:  Let's proceed with the examiner

12    motion, then.  I take dim views of these kinds of hassles

13    and failure to provide information.  I guess we'll see what

14    the substance of it is.  And I'm meaning that from the

15    standpoint of those opposing -- I mean, you know, if we

16    need an examiner, do we need a Chapter 11 trustee?  I mean

17    where are we headed with this and where is the debtor in

18    two days with a disclosure statement and plan?

19              MR. CHEHI:  Your Honor, we have -- Mark Chehi of

20    Skadden-Arps for Credit Suisse's agent to the prepetition

21    lenders.

22              Indeed, Your Honor, we do have, you know,

23    significant concerns about how the case has been conducted

24    by the debtors and how other parties in interest who happen

25    to be, you know, classic insiders of the debtors -
```

1   including CrossHarbor and Edra Blixseth and Discovery Land

2   Company - have -- or have not, actually, cooperated with

3   various pending discovery requests, both formal and

4   informal, since beginning in November shortly after the

5   cases were commenced.

6           Your Honor, the prepetition lenders filed the

7   motion for appointment of an examiner under

8   Sections 1104(c)(1) and (c)(2) of the bankruptcy code

9   because of prepetition and postpetition irregularities in

10  the management of the debtors' affairs; self-dealing

11  transactions, agreements, and other conduct by insiders of

12  the debtors; numerous admitted transactions involving

13  CrossHarbor and the debtors, CrossHarbor and the debtors

14  and the debtors' businesses and properties; and financial

15  involvements, agreements, and understandings between Edra

16  Blixseth and her affiliates, CrossHarbor, Discovery Land

17  Company, and others.

18          Such circumstances were identified in our motion

19  with record references to various transcripts in these

20  cases, hearings in these cases, references to transcripts

21  of depositions of sworn testimony, including various

22  parties.  And CrossHarbor itself has admitted the existence

23  of many of these circumstances in connection with the

24  response it filed a few days ago to our examiner motion.

25  They responded to some of the circumstances, made some

1   statements about them, characterizing them, and attached

2   some documentation apparently reflecting these various

3   transactions and agreements, prepetition agreements and

4   transactions with the debtors.  But they did not attach

5   full copies of these documents and agreements, and the

6   like.

7          The motion requests that an examiner be appointed

8   to investigate and report on whether such circumstances

9   give rise to estate causes of action, causes of action for

10  the debtors' estates; and to report, otherwise, whether or

11  not these circumstances, activities, involvements,

12  agreements, and the like, involving the debtors' properties

13  and businesses and the debtors' on the one hand and the

14  various insiders on the other have compromised the

15  integrity of these Chapter 11 cases and the contemplated

16  plan process.

17         The motion was filed because CrossHarbor; Edra

18  Blixseth, her affiliates; the debtors; and Discovery Land

19  Company have not yet provided any meaningful discovery to

20  the prepetition lenders despite months of discovery

21  requests and delays.  For instance, Edra Blixseth's

22  affiliate, BLX Group, Inc. - also known in these cases as

23  "BGI" - is subject to a discovery subpoena that required

24  production of documents yesterday.  And to the best of my

25  knowledge, at least, such documents have not been produced.

1          Indeed, neither Ms. Blixseth nor Debtors'

2     counsel, Mr. Patten, have responded to our requests to them

3     for the name of the attorney representing BGI.  And perhaps

4     if today there was some sort of order agreed to resolving

5     this injunctive complaint by the committee, one of the

6     things we were interested in knowing is who actually is

7     representing BGI and Ms. Blixseth.  I still don't know if

8     there's someone here in the courtroom today doing that or

9     whether these negotiations occurred between Ms. Blixseth

10    herself and the others who brought that action, but it's,

11    again, highly irregular that we do not even have the name

12    of an attorney representing these counterparties to the

13    notes that are owing to the debtors' estates which are our

14    collateral and the like.

15         THE COURT:  Mr. Chehi, you'll know that before

16    this hearing is concluded.

17         MR. CHEHI:  As for Ms. Blixseth personally, she

18    has said she is gathering documents in response to our

19    original subpoena to her in November but has not produced

20    them.

21         CrossHarbor's refusal to provide discovery to

22    date is no secret.  The only documents that CrossHarbor has

23    ever produced are those attached to its response to the

24    examiner motion.  And, again, I want to make it clear those

25    are not even complete documents.  Those are what I would

call self-serving excerpts of documents.  And they did

provide -- I believe it was sometime in December, Your

Honor, when we brought in another one of these discovery

motions against them -- or objected to the fact that they

were not providing discovery.  There had been so many minor

skirmishes on the discovery to date that I can't even

recall the procedural context at this time, but I know that

Your Honor entered an order and directed them expressly to

provide a copy of the agreement to form and the so-called

MOU involving Blixseth, the debtors, CrossHarbor, and

Discovery Land Company with respect to their prepetition,

eve-of-bankruptcy agreements to restructure their

companies.  They provided those two documents to us, Your

Honor.  Those are the only documents we have received from

CrossHarbor in these cases.

Discovery Land Company has also not produced any

documents notwithstanding repeated statements by their

counsel that they would begin on a rolling production two

weeks ago and notwithstanding our agreement to a stipulated

order governing their employment that remains subject to

results of such discovery.  And, again, the issues there,

we believe, are the fact that there are these arrangements

between -- agreements.  They're not even arrangements;

they're agreements that they've admitted to between

CrossHarbor and Discovery Land Company with respect to a

1    restructuring of these companies.  And those parties are

2    hesitant to deliver to us representing the prepetition

3    lenders the agreements and the information that's been

4    exchanged between these parties for whatever reason.

5    Someone has something to hide, but we're not getting any

6    documents.  I've been at this now for three months.  It's

7    very irregular.

8            And, finally, the debtors themselves seem to

9    ignore the prepetition lender's information requests with

10   impunity.  For instance, there was just a reference to the

11   settled incremental DIP financing matter by which the DIP

12   financing by CrossHarbor was increased by several million

13   dollars to fund Farcheville.  Well, if Your Honor looks at

14   that order that was entered that we agreed to and

15   negotiated with them to consensually resolve that matter,

16   there's a clear term in there that requires them to

17   promptly provide to the prepetition lenders - meaning to my

18   firm - copies of all information, documents, and the like

19   that they have relating to the Farcheville asset and its

20   value.  We have not seen that yet.

21           They asked for -- they reach agreement on a DIP

22   financing, we reach agreement on the terms, and somehow we

23   never get documents.  And that's not the only incident of

24   it in this case, Your Honor.  I've made repeated requests

25   to counsel for the debtors during this case to receive

1    copies simultaneously of any information they're sharing

2    with the CrossHarbor, as the DIP lender; with other parties

3    in interest.  It's non-privileged information.  We don't

4    get any of that, Your Honor.

5           THE COURT:  Okay.  Mr. Chehi, let's put on some

6    evidence.  I mean at this point, all I have is attorney

7    argument.

8           MR. CHEHI:  Well, Your Honor, I'll ask Mr. Patten

9    if he wants to -- have you provided the information to us

10   on Farcheville, for instance?

11          MR. PATTEN:  If we haven't provided information

12   on Farcheville, it's been an oversight.  And I don't think

13   you've asked for it since -- you haven't brought that to my

14   attention --

15          MR. CHEHI:  I asked --

16          MR. PATTEN:  -- Mr. Chehi.

17          MR. CHEHI:  Okay.

18          MR. PATTEN:  And you have asked for -- we have

19   fully complied with the discovery that you have given to

20   the debtors.

21          MR. CHEHI:  Your Honor, I'm not sure what I can

22   do.  We can put Ms. Blixseth up here.  I think we were

23   intending to call her as a witness.  And we can fold in --

24   in connection with some of the other matters pending here

25   today, we can ask her under oath who's representing BGI,

1    who's representing her interests in her capacity as a

2    representative of BGI.  Again, she's in the courtroom.

3    We're looking for the answers; not so much, you know,

4    putting people under oath.  We're happy to do that, but we

5    just don't have the information.  I'm just relating to you

6    what we don't get.

7                THE COURT:  Well, if you're wanting an examiner

8    appointed, I'm going to have to have some factual basis for

9    it.

10               MR. CHEHI:  Well, Your Honor, let me finish my

11   presentation on the examiner motion, and then we'll go to

12   evidence.

13               THE COURT:  I mean let's just go right to the

14   testimony.  Let's get to the evidence.  I mean I need to

15   have evidence before I can make rulings.

16               MR. CHEHI:  Well, actually, the allegations in

17   our pleading, Your Honor, about the various connections and

18   affiliations between the parties, there's references to

19   transcripts in the case.

20               THE COURT:  Are they verified?

21               MR. CHEHI:  Excuse me?

22               THE COURT:  Are they verified?

23               MR. CHEHI:  They're hearing transcripts from

24   testimony in this courtroom, Your Honor.

25               THE COURT:  Well, I want some -- I want on this

1    particular motion -- this is a significant motion.  If I'm

2    going to award your motion and place an examiner in this

3    case, I want some evidence, I want some testimony, I want

4    some facts.

5        MR. CHEHI:  All right.  Your Honor, let me have

6    Mr. Saunders come up and, and call some witnesses.  I would

7    like to, with Your Honor's permission, just take another

8    moment to just address the legal issues to put in context

9    the evidence.

10        THE COURT:  Okay.

11        MR. CHEHI:  And that is that the appointment of

12   an examiner here, Your Honor, under 1104(c)(2), is a

13   mandatory appointment because the amount of claims

14   unsecured, fixed, liquidated claims in the case against

15   these debtors exceed $5 million, and there's a requirement

16   that an examiner be appointed under the code.  It's set

17   forth in our motion, Your Honor.  Those legal standards

18   have been, have been satisfied.

19        There are proofs of the claim that are of record

20   with the Court that are specifically referenced in our, in

21   our motion identified by claim number.  They're not

22   duplicate claims, and they satisfy the threshold monetary

23   amount.  And with that showing, Your Honor, in a case of

24   this sort, the appointment of the examiner is mandatory.

25   And, again, you know, we've laid that all out in our

1    motion.

2         Indeed, the debtors concede in their response to

3    our examiner motion that the appointment of examiner is

4    required.  No one has objected to the appointment of the

5    examiner.  The only responses that were filed were by the

6    debtor and by CrossHarbor, and the only issues appear to be

7    the scope of the examiner's investigation which the debtors

8    and CrossHarbor and other insiders predictably want to or

9    will want to restrict.  And the second issue is how the

10   examiner will be paid.

11        And as for the scope of the investigation, you

12   know, we submit it should be as set forth in our motion, no

13   more; no less.  The preamble to our motion, the "whereas"

14   clause, sets forth that.  Unless the Court wants an

15   examiner to also valuate and report on the fairness of any

16   plan that might be filed or sponsored by any of the

17   insiders in the case - for instance, the contemplated plan

18   that was referenced in the debtors' bidding procedures

19   motion, Your Honor - we suggest that if that were to go

20   forward at some point in the future or if there were any

21   other proposals for reorganization plans made by any

22   insiders or sponsored by them, that an examiner could look

23   at the fairness of those.

24        And I'd refer you to the Bitterman (phonetic)

25   case which is cited in our papers for a precedent which is

1    very close to that where a Court felt highly concerned

2    about the insider nature of a proposed sale transaction,

3    plan process, and the like, and said she was going to

4    appoint -- the Court was going to appoint an examiner with

5    expanded powers to do, among other things, report to the

6    Court on the fairness of the insider-based proposals.

7         THE COURT:  Well, if I'm going to do an examiner,

8    why not just do a Chapter 11 trustee?

9         MR. CHEHI:  Well, Your Honor, you once said to us

10   that we should not come to this Court to request a trustee

11   without facts.

12        THE COURT:  Well, I'm not going to do an examiner

13   without facts, either.

14        MR. CHEHI:  Right.  And our problem, Your Honor,

15   on the trustee issue is that no one has given us any

16   meaningful discovery of the sorts of facts that go to the

17   integrity of the Chapter 11 process:  The communications,

18   the negotiations, and the like, between Ms. Blixseth and

19   the other insiders or the debtors in connection with the

20   case.  And so we have a circularity here, Your Honor.

21        THE COURT:  We do.  I mean under "C", we're

22   talking about (quoted as read):

23        "After notice and hearing, the Court shall order

24   the appointment to conduct such an investigation of the

25   debtor as is appropriate, including investigation of any

1   allegations of fraud, dishonesty, incompetence, misconduct,

2   mismanagement, or irregularity in the management of the

3   affairs of the debtor of or by current or former management

4   of the debtor if such appointment is in the interests of

5   creditors, equity security holders, and other interests of

6   the estate; or the debtor's fixed, liquidated, unsecured

7   debts, other than the debts for goods, services, or taxes,

8   or owing to an insider exceed $5 million."

9            MR. CHEHI:  Yes, Your Honor.  And (c)(2) is the

10   latter one there.  It's a test in the alternative, and that

11   test is clearly satisfied here.

12            Frankly, the test under (c)(1) is satisfied, as

13   well, but (c)(2) is satisfied, given the amount of the

14   claims in the case and the -- and there's not much more

15   that needs to be said about it.

16            THE COURT:  Okay.

17            MR. CHEHI:  And, you know, again, we're going to

18   put on evidence today, Your Honor, that will, you know,

19   elicit some of the issues largely in connection with the

20   debtors' bidding procedures motion, and the like.  And we

21   can, you know, walk through all of that beginning now, if

22   you would like to, Your Honor, because it's all sort of

23   tied up together.

24            These are irregular transactions, and they

25   deserve scrutiny and they deserve investigation.  And to

```
 1    date, we have not been able to obtain any of that
 2    investigation in discovery of these matters, and that's why
 3    bring on an examiner motion.  There's a lot of value at
 4    stake to our clients, there's a lot of value at stake to
 5    other creditors in the case.
 6            These cases are being run by an insider who has
 7    numerous relationships with the DIP lender.  The debtor has
 8    now filed a motion seeking bidding procedures for an
 9    undisclosed plan for the benefit of the insider,
10    CrossHarbor.  And there's been no discovery of any of these
11    issues.  And it deserves the light of day before any of
12    this can go forward because it has a material implication
13    for creditor recoveries for my clients and its
14    constituent's recoveries, in particular.
15            And it's no joke.  We're not doing this for, as
16    some have alleged, some sort of scorched-earth tactic in
17    the cases.  This is the sort of -- these are the sorts of
18    relationships that in any Chapter 11 case deserve a lot of
19    attention before a Court approves significant
20    case-determinative outcomes such as a 60-day expedited sale
21    process which is what the debtors are asking you to do.
22            I can only remind Your Honor back to sometime in
23    December, I believe it was, when we came here and were
24    unable to locate the funds required to fund the debtors
25    beyond the initial several weeks of the case.  And in those
```

1    circumstances, because there seemed to then be no other

2    funding opportunities, we had to tell the debtors that all

3    we can see lying in store is a 60-day, you know,

4    liquidating sale, a prompt resolution, an emergency sort of

5    fire sale of the debtors' assets because there simply

6    wasn't any money at that point to do anything more,

7    notwithstanding the best hopes and, actually, attempts by

8    the debtors to come up with the funding at that point.

9         And that was decried as, you know, horrible, "A

10   60-day, you know, expedited sale process doesn't make any

11   sense."  But, Your Honor, that's exactly what the debtors

12   are asking you to do and to approve with their bidding

13   procedures, is to consummate a plan with a marketing

14   process by the end of April, which is approximately 60 days

15   from now.  And we are right back to where we were except

16   now we have CrossHarbor in the seat of being the planned

17   sponsor and the acquiror of the assets entirely consistent

18   with the prepetition agreements between the parties -

19   Blixseth, CrossHarbor, Discovery Land Company - and the

20   debtors are attempting to put a short fuse on that process.

21        So these are all the types of issues that we

22   think need visibility through an examiner and also through

23   the discovery of -- taken by us and by the committee and

24   others.  To get an examiner involved in this case will take

25   some weeks.  It will take some time for an examiner to get

1    up to speed with the issues.  And this case is moving.  And

2    we believe that our discovery should go forward in the

3    meantime - document discovery only - so that we and the

4    committee, if they choose to participate in the discovery,

5    and I don't know why they wouldn't want to, can begin to

6    understand the documents that reflect the underlying

7    realities of the various transactions, agreements,

8    arrangements between the parties so that when an examiner

9    is actually appointed, they can be pointed in the right

10   direction of what are the issues, what is it that they need

11   to look at carefully and make an independent report to the

12   Court on.  That's what we're looking for.  And this comes

13   full circle --

14            THE COURT:  Well, let's get the testimony on.

15            MR. CHEHI:  Okay, Your Honor.

16            MR. SAUNDERS:  Your Honor, Rob Saunders for

17   Credit Suisse.

18            We'll call Edra Blixseth.

19            THE COURT:  Okay.  If you could come forward,

20   please, to be sworn.

21                 EDRA BLIXSETH, WITNESS, SWORN

22                     DIRECT EXAMINATION

23   BY MR. SAUNDERS:

24   Q.  Good afternoon, Ms. Blixseth.  How are you?

25   A.  I'm good, thanks.

1   Q.   Okay.   Just to set the stage again, you're the chief

2   executive officer of the debtors; is that right?

3   A.   That's correct.

4   Q.   Okay.   And you're also the owner the debtors, correct?

5   A.   That's correct.

6   Q.   Okay.   And you're also personally indebted to

7   CrossHarbor for more than $35 million, right?

8   A.   That's correct.

9   Q.   Okay.   And that loan is secured by your personal

10  residence, correct?

11  A.   That's correct.

12  Q.   Okay.   And you're still in default on that loan, right?

13  A.   I am.

14  Q.   Okay.   And you don't have any cash to repay it, right?

15  A.   I do not.

16  Q.   Okay.

17           MR. SAUNDERS:   Your Honor, may I approach?

18           THE COURT:   You may approach.

19  Q.   (By Mr. Saunders)   Could you please turn to Exhibit 12?

20  A.   And I remembered my glasses.

21           THE COURT:   Do you have your glasses?

22           THE WITNESS:   I remembered them this time.

23           THE COURT:   Okay.

24           THE WITNESS:   I'm there.

25  Q.   (By Mr. Saunders)   Exhibit 12, this is a sworn

1   affidavit that you submitted in April of 2008 in a Montana

2   State Court lawsuit involving the Yellowstone Club,

3   correct?

4   A.   I submitted it an behalf of BFI, Blixseth Family

5   Investments, yes.

6   Q.   But it's your personal sworn testimony, right?  You

7   signed the -- this affidavit, correct?

8   A.   It is my sworn testimony as manager of BFI.

9   Q.   Okay.  Could you take a look at page 7?  It's the

10  signature page.

11  A.   Hm-hmm.

12  Q.   Okay.  That's your signature there right above the name

13  "Edra Blixseth"?

14  A.   That is my signature.

15  Q.   Okay.

16         MR. SAUNDERS:  Your Honor, I'd move Exhibit 12

17  into evidence.

18         THE COURT:  Any objection?

19         MR. PATTEN:  No objection.

20         THE COURT:  Exhibit 12 is admitted.

21         EXHIBIT NO. 12 ADMITTED INTO EVIDENCE

22  BY MR. SAUNDERS:

23  Q.   As of March of 2008 just before you submitted this

24  affidavit, CrossHarbor was under a contract to buy the

25  Yellowstone Club from your ex-husband, correct?

1    A.  They were under contract to buy the Yellowstone Club

2    from the owners of Yellowstone Club.

3    Q.  Okay.  BGI?

4    A.  BGI.

5    Q.  Okay.  Which your ex-husband used to control and which

6    you now control?

7    A.  He used to control.  At the time they were doing it, it

8    was community property.

9    Q.  Fair enough.  And you now control BGI?

10   A.  Correct.

11   Q.  Okay.  Your affidavit attaches some e-mails between

12   Mr. Blixseth and Mr. Sam Byrne of CrossHarbor that

13   discussed the possible use of a prepackaged bankruptcy to

14   effectuate that sale, right?

15   A.  Yes, it does.

16   Q.  Okay.  And those were e-mails that were provided to you

17   contemporaneously, right?

18   A.  I'm trying to, I'm trying to recall how they were

19   provided to me, but they were provided to me.

20   Q.  In March of 2008?

21   A.  I don't remember if it was in March or prior to that.

22   Q.  Okay.  Let's, let's take a look at --

23   A.  If it says in my affidavit that --

24   Q.  Certainly, you knew about them by April of 2008 because

25   that's --

1    A.   Of course.

2    Q.   -- when you put in your affidavit.

3    A.   That's when I, that's when I provided them to the

4    Court.

5    Q.   Thank you very much, okay.  You got those affidavits

6    from your ex-husband, right?

7    A.   Either from him or someone related to him.

8    Q.   Those "e-mails", if I misspoke.

9    A.   I knew what you meant.

10   Q.   Do you know whether you got all of the communications

11   between Mr. Byrne and your ex-husband?

12   A.   I would assume I did not.

13   Q.   That you didn't?

14   A.   It's an assumption.

15   Q.   Right.  You would assume that there are other e-mails

16   out there involving communications between Mr. Byrne and

17   your ex-husband on behalf of BGI that you don't have,

18   right?

19   A.   I would assume that during a course of a year and a

20   half due diligence to purchase this property, that there

21   was e-mails other than these.

22   Q.   Okay.

23   A.   But I have no way of knowing that.

24   Q.   And the purchase price for the contract that was in, in

25   force back then was around $470 million, right?

1   A.   The original purchase price was more than that, but

2   CrossHarbor had closed on some of the lots, and as an early

3   closing.  And so at the time that the sale fell through,

4   that was approximately the price.

5   Q.   Okay.  And the, the stalking-horse proposal that is

6   maybe another topic of discussion today, that's -- that

7   would involve CrossHarbor buying the debtors for 100

8   million, right?

9   A.   That's not exactly correct.

10   Q.   Okay.  How is it not correct?

11   A.   Well, we haven't actually -- we haven't submitted the

12   entire proposal yet of what the plan's going to be and so

13   we're still working on it, but some, some of that that we

14   supplied last week to the Court is accurate to, to what

15   we're looking at with CrossHarbor and a plan.

16   Q.   Okay.  But some of what you supplied to the Court last

17   week is no longer accurate?

18   A.   No, I'm not saying it's no longer accurate; I'm saying

19   it's not a complete package, it's not a complete detail of

20   what the plan will be.  We'll do that when we submit the

21   plan.

22   Q.   Okay.  Has the purchase price in the proposed

23   stalking-horse agreement with CrossHarbor changed from

24   100 million?

25   A.   It's not a complete -- it's hard -- it's difficult to

```
 1   answer your question --

 2   Q.  Okay.

 3   A.  -- because it's an incomplete -- what we filed last

 4   week is not a complete plan.  So I think in fairness,

 5   that's easier to answer once the plan is filed.

 6   Q.  Okay.  Now, you came back into control of the debtors

 7   in August of 2008; is that right?

 8   A.  That's correct.

 9   Q.  Okay.  And when you came into control, you entered into

10   an agreement, a contract with CrossHarbor that was called

11   an "agreement to form"; is that right?

12   A.  That's correct.

13   Q.  Okay.  And did you have any communications with

14   CrossHarbor in which you negotiated the terms of the

15   agreement to form?

16   A.  Of course.

17   Q.  Okay.  Are any of those communications in writing or in

18   e-mails?

19   A.  Most of them were done within meeting with our -- my

20   law firm at the time was Liner in Los Angeles.  And we

21   negotiated those over a few days of meeting together there,

22   so I don't think that there were many e-mails for the --

23   Q.  Okay.  Were there drafts exchanged, for instance,

24   between counsel for the two parties?

25   A.  We went back and forth on a lot of things, so I'm sure
```

1  that there are drafts that were "wants" and "not wants" of

2  each of us as any contract is.

3  Q.  Right.  And since you mentioned counsel, who is your

4  counsel now, ma'am, personally?

5  A.  Joe Eisenberg.

6  Q.  Okay.  And does he also represent BGI?

7  A.  We're unclear if that can be -- we'd like him to be the

8  one, but he's trying to verify that he can also represent

9  BGI.

10  Q.  Okay.

11         THE COURT:  I would just his last name again.

12         THE WITNESS:  Eisenberg.

13         THE COURT:  Eisenberg.

14         THE WITNESS:  Hm-hmm.

15         THE COURT:  Okay.  Mr. Saunders, I just wanted to

16  double-check, too:  On your exhibits, you mentioned

17  Exhibit 12, which is the affidavit.

18         MR. SAUNDERS:  Yes, Your Honor.

19         THE COURT:  I may have a wrong docket entry here,

20  but when I look at the list of exhibits for upcoming

21  2/10/09 hearing, which is Exhibit 341, my Exhibit 12,

22  unless I'm looking at it wrong, isn't -- oh, there it is.

23  I follow.  It's actually No. 13, but it's for Exhibit 12,

24  got you.  Very good, thank you.

25  Q.  (By Mr. Saunders)  Have you, have you made any effort

1   to gather up and produce to Credit Suisse all the drafts

2   and documents that might reflect negotiations of the

3   agreement to form?

4   A.   We've been trying to gather things that have been asked

5   for.  We actually had to phone Joe Eisenberg, and Mark

6   Chehi had a -- we had a phone conversation a few weeks ago

7   because the things that were being asked were so broad.  We

8   got that narrowed down to things that seemed agreeable to

9   both sides on a telephone conversation, but then when we

10   were re-served with the discovery, it was -- all of those

11   things were added back in plus some more, so now we're just

12   a little confused on what we need to provide.

13       The other, the other difficulty I'm having is that

14   until August of 2008, I had no information, completely

15   frozen out of BGI and the operations of BGI.  When the

16   records were turned over to me, they were basically turned

17   over in a lot of boxes.  So I just -- just by difficulty of

18   trying to get all the information that they're requesting

19   has been, has been difficult for us.

20   Q.   Okay.  And as a result of those difficulties, you

21   haven't produced any of those things yet, right?

22   A.   We have some of them.  We haven't produced all of them.

23   We're trying to produce them together, and we're having

24   difficulty getting all of them.

25   Q.   Okay.  But as a result of that, you haven't produced

1    any of them yet, right?

2    A.  That's correct.

3    Q.  Okay.  Could you take a look at Tab 6, please?  Tab 6

4    is the final version of the agreement to form, right?

5    A.  That's correct.

6            MR. SAUNDERS:  Your Honor, I would move Tab 6

7    into evidence.

8            THE COURT:  "Tab 6"?

9            MR. SAUNDERS:  Exhibit 6.

10           MR. PATTEN:  No objection, Your Honor.  It's

11   already been admitted to this Court as Exhibit 15 back on

12   December 11th.

13           THE COURT:  Let me just look at it here,

14   agreement to form -- well, if it's already been admitted,

15   it will be admitted again.

16           MR. SAUNDERS:  Well, I just want to make sure

17   that we get everything that we want into the record, Your

18   Honor.

19           THE COURT:  Absolutely.  I want you to be sure of

20   that, as well.

21           MR. SAUNDERS:  Okay.

22           THE COURT:  Exhibit 6 is admitted.

23            EXHIBIT NO. 6 ADMITTED INTO EVIDENCE

24   BY MR. SAUNDERS:

25   Q.  Ms. Blixseth, could you take a look at page 7,

1    Subparagraph D on page 7?

2    A.   Page 7, Subparagraph B?

3    Q.   "D" as in "dog".

4    A.   Oh, "D", okay.

5    Q.   Yeah.

6    A.   Yes.

7    Q.   Do you see that that paragraph begins:

8              "Other than negotiations and agreements with CH

9    Acquisition and its affiliates, the EB parties agree that

10   they shall not, and shall not permit the YC Parties to,

11   (directly or indirectly) solicit, respond to or otherwise

12   engage in negotiations or discussions with any parties

13   (other than CH Acquisition and its affiliates) regarding a

14   sale, encumbrance or other transfer (directly, indirectly,

15   by operation of law or otherwise) of any of the Yellowstone

16   Mountain Club (other than lot sales of platted lots as of

17   the date hereof in the ordinary course of the business of

18   the YC Parties but specifically including sales,

19   encumbrances or other transfers of direct and indirect

20   interests in the YC Parties or BGI), or a merger (or

21   similar transaction) of any of BGI or the YC Parties."

22        Did I read that right?

23   A.   You did.

24   Q.   Okay.  And is there any, is there any writing that you

25   can point me to in which that obligation that I just read

1    or the agreement to form is terminated or modified in any

2    way?

3    A.   Well, the agreement to form is not just one page in one

4    category; it's the entire agreement.   So when the agreement

5    wasn't able to come together in the way that we had hoped

6    it would be able to come together, then none of the

7    agreement to form would, then, still have validity.

8    Q.   Right.  So my question is just a narrow one:  Is there

9    a writing somewhere?  Is there an agreement in which you,

10   on behalf of the EB parties and CrossHarbor, agree that the

11   agreement to form is modified or terminated in any way?

12   A.   The agreement to form, by essence of it not being gone

13   forward in the manner that it was supposed to go forward in

14   and of itself, was null and void at that time.

15   Q.   Okay.  And so the question to my question is:  No,

16   there's no writing?

17   A.   I don't think there is a writing.

18   Q.   Okay.

19   A.   I could be wrong, but I assume there's not.

20   Q.   Okay.  And could you take a look at page 15, the very

21   last line of page 15?

22   A.   Yes, I see that.

23   Q.   Do you see it says:  "This Agreement may not be changed

24   orally but only by an agreement in writing, duly executed

25   by or on behalf of the party or parties against whom

 1   enforcement of any waiver, change, modification, consent or

 2   discharge is sought"?

 3       Do you see that?

 4   A.  I do.

 5   Q.  Okay.  Did you have any communications with CrossHarbor

 6   after the agreement to form was signed up in which you were

 7   discussing the accomplishment of the transactions that were

 8   provided for by the agreement to form?

 9   A.  Yes.

10   Q.  Okay.  And those have -- those documents or those

11   communications haven't been produced to us, right?

12   A.  I think that they were verbal communications with

13   meetings that we had on -- each of us had responsibilities

14   within the agreement to form to try to accomplish those, to

15   put together what we were trying to accomplish with

16   Yellowstone Club so that we wouldn't be in a court like

17   this today.  And as those went along and certain times

18   that -- certain things that we had and certain dates that

19   we had to accomplish things didn't come to fruition, we

20   would have discussions.  But I don't -- I'm not aware of

21   anything being in writing on those.

22   Q.  Okay.  Have you looked for any written communications

23   in that time period?

24   A.  I actually didn't.

25   Q.  You did not?

```
 1   A.  No, I have not.
 2   Q.  Okay.  When you came back into control of the debtors
 3   in August of 2008, CrossHarbor was very helpful to you in
 4   providing you information that they had about the business
 5   of the Yellowstone Club so that you could get up to speed
 6   quickly, right?
 7   A.  CrossHarbor had been working directly with Tim and not
 8   with me.  So we had a time where we got together and
 9   decided what might be in the best interest of the
10   Yellowstone Club for us to work together based on all of
11   the work they had been while I had been frozen out of
12   Yellowstone Club.  So I think that I provided some
13   historical things to them and they provided some more
14   current things to me so that we could establish the best
15   program to go forward.
16   Q.  Okay.  And those things that CrossHarbor gave to you to
17   help you get up to speed, you haven't produced those to
18   Credit Suisse, right?
19   A.  It was more, again, in discussions and in meetings.
20   Until we got to the agreement to form and how we actually
21   executed the final agreements, I actually didn't have a
22   lot.  It was in verbal conversations within meetings.
23   Q.  Okay.  Have you looked for any documents that
24   CrossHarbor provided you in that time frame, in August of
25   2008?
```

1    A.  No, I have not.

2    Q.  Okay.

3    A.  I thought the final agreements spoke for themselves.

4    Q.  Okay.  Would you take a look at Exhibit 7, please?

5    Exhibit 7 is what's been referred to as an option

6    agreement, I think, under which CrossHarbor has the right

7    to purchase a 160-acre parcel of land within the geographic

8    confines of the Yellowstone Club; is that right?

9    A.  Yes.  This, again, was a part of the time that I was

10    not actively involved, so -- but I have seen this

11    agreement.

12          MR. SAUNDERS:  Okay.  Your Honor, I would move

13    Exhibit 7 into evidence.

14          THE COURT:  Any objection?

15          MR. PATTEN:  No objection.

16          THE COURT:  Exhibit 7 is admitted.

17           EXHIBIT NO.7 ADMITTED INTO EVIDENCE

18    BY MR. SAUNDERS:

19    Q.  Okay.  And this agreement hasn't been terminated,

20    right?  CrossHarbor still has this option, right?

21    A.  That would be a legal conclusion.  I'm not sure.

22    Q.  Have you had any discussions with anybody at

23    CrossHarbor about this option?

24    A.  We've had discussions about the fact that the, the

25    ideas and the plans for moving Yellowstone Club forward in

1  a positive and productive manner would work well with

2  looking at some of these options as going forward.  As far

3  as having anyone legally tell me if this is still in force

4  or not, I have not done that.

5  Q.  So you've had conversations with CrossHarbor about them

6  maybe buying this 160-acre parcel of land from you?

7  A.  We've had conversations with them as that being good

8  for Yellowstone Club as the overall global plan that we

9  might put forward.

10  Q.  So a transaction in which CrossHarbor bought this

11  160-acre parcel of land that you currently own, that might

12  be part of a plan for reorganization; is that right?

13  A.  Yes, that might be.

14  Q.  Okay.  And the discussions or the communications that

15  you've had with CrossHarbor about the possibility of them

16  buying this 160-acre parcel of land, have any of those been

17  by e-mail or in writing?

18  A.  Other than to set -- "do you have time to talk now?"

19  that kind of thing, and go over those kinds of things, I

20  don't believe so.  If there are, we'll find them and try to

21  have them.

22      To be clear on this, this purchase agreement with --

23  was made with Tim Blixseth at that time owning 160 acres.

24  It was not made with me.  It was made with CrossHarbor.

25  When I did the MSA with Tim, part of that was getting all

1    the lands within Yellowstone Club back to me so that it was

2    under one umbrella.  And this was part of the contract that

3    went with, with that parcel.

4    Q.   Okay.  But more broadly, you've been discussing with

5    CrossHarbor as part of -- or you've been discussing with

6    CrossHarbor during the course of the debtors' bankruptcy

7    the possibility that you might sell to them, as part of a

8    reorganization, some land within the geographic boundaries

9    of the Yellowstone Club that you personally own, right?

10   A.   Correct.

11   Q.   Okay.  And any -- we've never been able to get

12   deposition testimony about any of that, right?

13   A.   I made myself available for depositions.  And if you

14   had asked me that question, I would have answered it, but I

15   can't remember if you asked me that question.

16   Q.   Okay.  I deposed you back in December, right, in

17   California?

18   A.   I can't remember when it was, but, yes --

19   Q.   Okay.

20   A.   -- you deposed me.

21   Q.   Has there been some time since then when you've made

22   yourself available for a deposition?

23   A.   I haven't been deposed by you since then, I don't

24   believe.

25   Q.   Okay.  Could you turn to Tab 13?  Do you have Tab 13,

1  ma'am?

2  A.  I do.

3  Q.  Okay.  And this is the MOU that you entered into

4  prepetition with Discovery Land Company, right?

5  A.  That's correct.

6  Q.  Okay.

7        MR. SAUNDERS:  Your Honor, I'd move Exhibit 13

8  into evidence.

9        THE COURT:  Any objection?

10       MR. PATTEN:  No objection.  It's already been

11  admitted, Your Honor.

12       THE COURT:  Exhibit 13 is --

13       THE WITNESS:  It's already --

14  Q.  (By Mr. Saunders)  Mr. Joseph Harris of CrossHarbor

15  served as an interim chief operating officer of the debtors

16  for a period of time shortly before the filing of these

17  cases, right?

18  A.  Shortly before the filing of the case, yes.  It was

19  actually just the interim.  When I stepped in when the MSA

20  was, was finalized and we were negotiating, we needed, we

21  needed somebody on the ground.  Joe Harris had been

22  spending the last year and a half doing due diligence for

23  CrossHarbor, and we felt that -- it was my suggestion that

24  he might come in and fill in until we got Discovery, if we

25  were able to, to come on board.

1           MR. SAUNDERS:  Okay.  Can I have just a minute,

2    Your Honor?

3           THE COURT:  You may.

4           THE WITNESS:  Your Honor, could I just ask:  Who

5    are the other people - did we say that - that I see on the

6    screen?

7           THE COURT:  Mr. Guthals is in Billings, and

8    Mr. Doak is in Billings.

9           THE WITNESS:  Okay.  And who do they represent?

10          THE COURT:  Mr. Guthals, would you, for the

11   record, reference who you represent?

12          MR. GUTHALS:  Thank you, Your Honor.  I represent

13   Timothy Blixseth.

14          THE COURT:  Mr. Doak?

15          MR. DOAK:  Yes, Your Honor.  I represent James

16   Murphy, the Murphy Family Trust, and the Edwards Law Firm.

17          THE COURT:  Okay.  While we're taking a moment,

18   Mr. Patten, let's just go on around and identify everyone

19   who's representing parties here today.

20          MR. PATTEN:  Andy Patten, representing the

21   debtors.

22          MR. REAM:  Larry Ream, representing the debtors.

23          MR. MOORE:  Paul Moore, counsel for CrossHarbor.

24          MR. GREEN:  Barry Green, counsel for CrossHarbor.

25          MR. ALTER:  Jonathan Alter, counsel for the

 1   member group.

 2          MR. BECKETT:  Tom Beckett, counsel for the

 3   committee.

 4          MR. BENDER:  Ronald A. Bender, counsel for the ad

 5   hoc group of Class B unit members.

 6          MR. WHITMORE:  Clark Whitmore, also counsel to

 7   the Class B ad hoc group.

 8          MR. HURSH:  Benjamin Hursh for CrossHarbor.

 9          MR. CHEHI:  Mark Chehi, Evan Levy, Rob Saunders,

10   and Joe Larkin for Credit Suisse's agent to the prepetition

11   lenders.

12          THE COURT:  Thank you.  Anyone else appearing?

13          MR. MURPHY:  Your Honor, Edward Murphy along with

14   Mike Warner, representing Highland Capital Management.

15          MR. WARNER:  Good afternoon, Your Honor.  I'm

16   Mike Warner, Warner Stevens, on behalf of Highland Capital.

17          MR. McKAY:  Your Honor, Dan McKay for the Office

18   of the U.S. Trustee.

19          MR. RHOADES:  Judge, Quentin Rhoades for Normandy

20   Hill Capital.

21          MR. GRANT:  John Grant for the ad hoc committee.

22          MR. COSSITT:  Mr. Cossitt, local counsel for the

23   committee.

24          THE COURT:  Anyone else wishing to make an

25   appearance on behalf of any client?

1              Okay.  Mr. Saunders, you may proceed.

2              THE WITNESS:  Thank you, Your Honor.

3              MR. SAUNDERS:  Thank you, Your Honor.

4    Q.  (By Mr. Saunders)  Ma'am, could you turn back to the

5    agreement to form?  It's Tab 6.

6    A.  Okay.

7    Q.  Section 14 on page 11.  Do you see the first sentence

8    of Section 14 says:

9              "To secure the obligations of the EB Parties

10   hereunder, EB is contemporaneously granting a mortgage to

11   CH Acquisition encumbering the Settlement Property and

12   granting a negative pledge encumbering the Settlement

13   Property"?

14       Do you see that?

15   A.  I do.

16   Q.  And you did, in fact, grant that mortgage, right?

17   A.  Yes, I did.

18   Q.  Okay.  And that was filed, right?

19   A.  I'm sorry?

20   Q.  That was filed, publicly filed?

21   A.  Yes.

22   Q.  And it's never been released, right, that mortgage?

23   A.  No, it has not.

24             MR. SAUNDERS:  Okay.  Your Honor, I have no

25   further questions for Ms. Blixseth.

1          THE COURT:  Okay.  Mr. Patten -- you know,

2   Mr. Patten, before we go to you, is there anyone else that

3   wishes to inquire of Ms. Blixseth that would be supporting

4   the motion?

5          Okay, Mr. Patten.

6                    CROSS-EXAMINATION

7   BY MR. PATTEN:

8   Q.  Ms. Blixseth, have you ever testified about this

9   transaction with CrossHarbor before?

10  A.  Yes, I have.

11  Q.  Where?

12  A.  I believe it was in the first hearing.

13  Q.  Do you remember a hearing in Missoula, the final

14  hearing on the CrossHarbor DIP loan?

15  A.  Yes, I do.

16  Q.  Were you examined on the very same issues that

17  Mr. Saunders just questioned you about?

18  A.  Pretty much exactly.

19  Q.  Have you been deposed in this case?

20  A.  I have been.

21  Q.  When were you deposed?

22  A.  He said it was December, so I'm going to go with his

23  recollection.  I don't remember.  But it was late December

24  or early January.

25  Q.  Were you represented at the deposition by counsel?

1    A.  Yes, I was.

2    Q.  Who was your counsel?

3    A.  Joe Eisenberg.

4    Q.  Was Mr. Eisenberg your counsel when these cases were

5    filed?

6    A.  Yes, he was.

7    Q.  Have you and Mr. Eisenberg had conversation with any

8    Credit Suisse lawyer, phone conversations or face-to-face

9    meetings?

10   A.  Yes, we have.

11   Q.  Who did you meet with?

12   A.  We had a phone conversation with Mr. Chehi.

13   Q.  Do you remember how many such conversations you've had?

14   A.  I'm not sure.  That one, I was present for.  I'm not

15   sure how many Mr. Eisenberg has had.

16   Q.  Have you attempted to comply with the Credit Suisse

17   discovery?

18   A.  I have.

19   Q.  Would you look at Exhibit 6; and, in particular,

20   Schedule B to Exhibit 6?

21   A.  Is that on page 1?

22   Q.  It's an --

23   A.  There's several B's, so I don't know.

24   Q.  It's after -- it's an attachment to the exhibit.  It's

25   at the end of the agreement to form.

```
 1   A.   Is it a schedule or an exhibit?

 2              MR. PATTEN:  May I approach the witness, Your

 3   Honor?

 4              THE COURT:  You may approach.

 5              THE WITNESS:  Sorry.  Is it this?

 6   Q.   (By Mr. Saunders)  Yes.

 7   A.   Okay.

 8   Q.   In your agreement to form, was there going to be a

 9   contribution of what is called a "settlement" to some joint

10   venture with CrossHarbor?

11   A.   Yes, there was.

12   Q.   And is that described, in some part, in this

13   Schedule B?

14   A.   Yes, it is.

15   Q.   And did you meet -- prior to bankruptcy being filed,

16   did you meet with Credit Suisse or representatives of

17   Credit Suisse?

18   A.   We had many conversations.

19   Q.   And did you disclose in any of those conversations the

20   terms or the context of the agreement to form?

21   A.   I believe we did.  I know we talked about the idea of

22   the phases that we felt were going to be good going forward

23   if the Farcheville sale happened.  And so we discussed what

24   -- our overall global business term.  I don't know if we

25   actually gave them the documents or not, but we had a
```

1    discussion with all of them.

2    Q.   Okay.  And do you remember the agreement to form being

3    admitted as an exhibit at the hearing on December the 11th

4    and 12th?

5    A.   Yes, I do.

6    Q.   And do you remember being examined about the agreement

7    to form?

8    A.   Yes, I do.

9    Q.   Do you remember the Discovery Land Company memorandum

10   of understanding, which is Exhibit 13?

11   A.   Hm-hmm.

12   Q.   Do you remember that being admitted at the hearing in

13   December 11th and 12th?

14   A.   Yes, I do.

15   Q.   And do you remember being examined about this exhibit

16   on December 11th and 12th?

17   A.   Yes, I do.

18             MR. PATTEN:  Thank you, that's all I have.

19             THE COURT:  Mr. Saunders.

20             MR. SAUNDERS:  Thank you, Your Honor.

21                     REDIRECT EXAMINATION

22   BY MR. SAUNDERS:

23   Q.   Ms. Blixseth, could you turn to Tab 14, please?  Tab 14

24   is the transcript of your deposition in Los Angeles on

25   December 6th.  Do you see that?

1    A.   I do.

2    Q.   Okay.  So does that refresh your recollection that

3    that's when I took your deposition in California?

4    A.   Yes, that helps on the date.

5    Q.   And that's the only time I've taken -- I've been able

6    to take your deposition in this case, right?

7    A.   That's the only time you've asked to have my

8    deposition.

9    Q.   Okay.  Do you recall that we didn't have the agreement

10   to form or the MOU when I took your deposition in

11   California?

12   A.   I don't recall when, when you had it, so I can't answer

13   that with dates of when I had this and when, when it was

14   turned over.  I just know we tried to do it when it was

15   asked for.

16            MR. SAUNDERS:  Your Honor, may I approach?

17            THE COURT:  You may approach.

18            MR. SAUNDERS:  Your Honor, I've handed the

19   witness a copy of Your Honor's order dated December 10th.

20   And it's captioned:  Order granting motion of prepetition

21   lenders pursuant to Bankruptcy Rules 7026 and 9014 and

22   Local Rule 9014-1 authorizing prepetition lenders to

23   conduct expedited discovery.

24            I apologize, Your Honor.  I have an extra copy if

25   I can hand it up to Your Honor.

1          THE COURT:  That's fine, you may approach.

2     Q.  (By Mr. Saunders)  Do you see, Ms. Blixseth, on page 2,

3     second paragraph under the bold letters (quoted as read):

4     "It is hereby ordered and adjudged," Paragraph 2 of the

5     order says (quoted as read):

6               "The agent is hereby authorized to seek on an

7     emergency basis a formal discovery from, one, CrossHarbor

8     Capital Partners and any of its affiliates; and, two,

9     Discovery Land Company and any of its affiliates for the

10    purpose of ascertaining the nature and scope of the alleged

11    prepetition insider relationships which may affect whether

12    or not CrossHarbor Capital Partners or its affiliates is a

13    proper postpetition lender."

14        Did I get that right so far?

15    A.  You did a great job.

16    Q.  Okay, thank you.  My mother will be proud (quoted as

17    read):

18              "Said discovery will include production by either

19    CrossHarbor Capital Partners or Discovery Land Company,

20    one, the memorandum of understanding between the debtors

21    and Discovery Land Company referenced at page 4 of the

22    agent's motion; and, two, the written agreement formulated

23    by Edra Blixseth, CrossHarbor Capital Partners, and

24    Discovery Land Company concerning an overall global plan to

25    restructure and recapitalize the debtors as referenced in

1    Paragraph 15 of the agent's motion."

2        Did I get that, right?

3    A.  Yes, you did.

4    Q.  Okay.  So it wasn't until December 10th, four days

5    after your deposition, that the Court ordered CrossHarbor

6    and Discovery Land to provide us with the MOU and the

7    agreement to form, right?

8    A.  If that's what it says, I'm sure that that's accurate.

9    Q.  Okay.

10   A.  It's hard to keep the dates straight.

11   Q.  And in fairness, I take Mr. Patten's point.  I have had

12   an opportunity to ask you questions about the agreement to

13   form and the MOU, right?  I asked you about those in the

14   December hearing, right?

15   A.  Yes.

16   Q.  Okay.  But I don't have any of the communications that

17   led to those agreements or that followed those agreements,

18   right?

19       You haven't produced a single document to me that

20   would, you know, that would describe or record any draft

21   agreement to form, draft MOU, any piece of negotiations

22   that led to those agreements, or anything involved in

23   trying to implement those agreements, right?  I don't have

24   any of that, right?

25   A.  Provided for me -- as I've stated, I think that most of

1   our negotiations and -- for going back and forth were

2   handled in person.  We've met for days and hours going back

3   and forth with verbal agreements and verbal suggestions.

4   And so I'm not -- not through any type of not wanting to

5   give you something.  I don't -- we didn't conduct this by

6   you know, across Sam in Boston and me in California; we met

7   together and pounded through it.

8   Q.  Right.  And I didn't know until you told me today that

9   you've had discussions with CrossHarbor in the course of

10  the bankruptcy about, about having them purchase land that

11  you personally own within the geographic confines of the

12  Yellowstone Club as part of a plan of reorganization,

13  right?

14  A.  That wasn't even -- that's actually not accurate, to

15  have them purchase the land.  It was that I would be

16  donating the land to Yellowstone Club.  So if I

17  misunderstood your question, then I apologize.  It's

18  actually that I would be contributing that land as they

19  would be contributing lands that they have already paid for

20  to the overall plan to make the most productive and

21  successful course of what we're trying to do with the

22  Yellowstone Club.

23  Q.  Okay.  But today is the first time that we've heard

24  anything - "we", Credit Suisse - have heard anything about

25  the possibility of you contributing lands to the debtors as

1   part of a plan of reorganization, right?

2   A.   Well, I think that if you had read the agreement to

3   form, that has that as part of it, as well.   And so going

4   along those lines -- and we've indicated that part of our

5   plan would be going along with what -- the plan that we

6   thought would be a successful plan prior to the bankruptcy.

7   You might have assumed that, but I know you can't just

8   assume.   But you were aware that that was in the agreement

9   to form.

10  Q.   Okay.   But you are trying to implement now through the

11  bankruptcy process the restructuring that you had in mind

12  in the agreement to form?

13  A.   We think that it was a very positive way to go about

14  going forward with the Yellowstone Club, yes.

15  Q.   Okay, all right.

16          MR. SAUNDERS:   Nothing further, Your Honor.

17          MR. MOORE:   Your Honor, may I?

18          THE COURT:   Yes, you may proceed.

19                      CROSS-EXAMINATION

20  BY MR. MOORE:

21  Q.   Ms. Blixseth, you testified that it's your

22  understanding that the agreement to form is of no force and

23  effect?

24  A.   Yes, I have.

25  Q.   And has that been your understanding throughout this

1    bankruptcy?

2    A.   As soon as we filed the bankruptcy.

3    Q.   So you've never been guided by it during the

4    bankruptcy?

5    A.   Absolutely not.

6    Q.   Okay.  And to the extent it had nonsolicitation

7    provisions, that hasn't prevented you from doing whatever

8    you wanted with respect to soliciting; is that correct?

9    A.   That was null and void.  And our CRO has been very

10   active in, in trying to do everything that we should be

11   doing.

12   Q.   Okay.  And has Mr. Harris participated on behalf of the

13   debtor in any respect following the bankruptcy case?

14   A.   No, he has not.  Quite a bit -- actually, to be clear,

15   quite a bit before this.  He was interim COO only until we

16   got Discovery to sign on the MOU.  They took over that part

17   September 1st, and Mr. Harris was no longer the interim

18   COO.  So it was a relatively short time.

19   Q.   And that's consistent with your testimony Mr. Saunders

20   took that Sunday in December; is that correct?

21   A.   It absolutely is.

22   Q.   With respect to plan negotiations and the marketing

23   process on behalf of the debtors, who have been the

24   principal representatives of the debtors in developing that

25   strategy?

1    A.   Our CRO.

2    Q.   Mr. Greenspan?

3    A.   Mr. Greenspan, yes.

4    Q.   And your counsel?

5    A.   I'm sorry?

6    Q.   And your counsel?

7    A.   All of us working together, yes.

8    Q.   Yeah.  And have you taken guidance from them?

9    A.   Absolutely.

10   Q.   Have you overruled them in any respect?

11   A.   Not at all.

12          MR. MOORE:  Okay, thank you.

13          THE COURT:  Thank you, Mr. Moore.

14          MR. WARNER:  Your Honor --

15          THE COURT:  You may --

16          MR. WARNER:  -- Mike Warner.  I just want to make

17   sure we're still just focusing on the examiner motion and

18   not on the other matters, because the questions went a

19   little bit far afield.  And I want to preserve my right

20   with this witness at a later --

21          THE COURT:  Certainly, certainly.

22          MR. WARNER:  Thank you.

23          THE COURT:  Mr. Saunders.

24                   REDIRECT EXAMINATION

25   BY MR. SAUNDERS:

1   Q.  Ma'am, who recommended Mr. Greenspan to you?

2   A.  I believe Joe Eisenberg did.

3           MR. SAUNDERS:  Okay.  Nothing further, Your

4   Honor.

5           THE COURT:  You may step --

6           MR. MOORE:  Your Honor, one more?

7           THE COURT:  Mr. Moore.

8           MR. MOORE:  Two more, maybe.

9                    RECROSS-EXAMINATION

10  BY MR. MOORE:

11  Q.  Was your retention of a CRO a requirement placed upon

12  you by Credit Suisse in its DIP financing?

13  A.  It absolutely was.

14  Q.  And did it have to be somebody approved by them?

15  A.  It absolutely did.

16  Q.  And they approved Mr. Greenspan?

17  A.  Yes, they did.

18          MR. MOORE:  Thank you.

19          THE COURT:  You may step down.

20          THE WITNESS:  Thank you.

21          THE COURT:  Next witness?

22          MR. SAUNDERS:  Your Honor, we'll call Sam Byrne.

23          THE COURT:  Okay.  Come forward to the clerk's

24  bench to be sworn, please.

25                  SAMUEL BYRNE, WITNESS, SWORN

                         DIRECT EXAMINATION

BY MR. SAUNDERS:

Q.  Good afternoon, Mr. Byrne.  How are you?

A.  Good, thank you.

          MR. SAUNDERS:  In case it's not there anymore,
Your Honor, may I approach and hand up the order we spoke
about earlier?

          THE COURT:  You may.

Q.  (By Mr. Saunders)  I won't impress everybody with my
ability to read again, but, Mr. Byrne, could you take a
look at Paragraph 2 of this order that appears on page 2
and confirm for me that CrossHarbor has never produced any
document to Credit Suisse in this case other than the
memorandum of understanding and the agreement to form?

          THE COURT:  And, Mr. Saunders, for clarification,
this is the order of December 10, 2008?

          MR. SAUNDERS:  That's right, Your Honor.  Thank
you.

          THE WITNESS:  Pursuant to this agreement?

Q.  (By Mr. Saunders)  Well, I'll just ask you broadly:
Are there any documents that CrossHarbor has ever produced
to Credit Suisse in this case other than the MOU and the
agreement to form?

A.  I'm sure in -- prior to the filing of the cases, many,
many documents --

1    Q.   Okay.

2    A.   -- including the MOU and agreement to form, which were

3    provided back in September, I believe.

4    Q.   Okay.  And in the course of the bankruptcy cases in

5    response to discovery requests that Credit Suisse has

6    propounded in the bankruptcy cases, has CrossHarbor

7    produced anything other than the MOU and the agreement to

8    form?

9    A.   I don't believe so, no.

10   Q.   Okay.  CrossHarbor filed last week some exhibits in

11   support of their objection to and their motion to

12   reconsider the Court's order permitting 2004 discovery.

13   Are you familiar with that, generally?

14   A.   I am, yes.

15   Q.   Okay.  Included in, in that package of exhibits were

16   some excerpts from various agreements.  Do you recall that?

17   A.   If I could have them, it would be helpful.

18   Q.   Sure.

19            THE COURT:  Are they available?

20            MR. SAUNDERS:  Let me just correct the record,

21   Your Honor.  It's actually in response to CrossHarbor's --

22   excuse me, the exhibits were filed in connection with

23   CrossHarbor's response to the motion for an examiner.

24            THE COURT:  Okay.  And these are the exhibits

25   that were filed at Docket 343, Exhibits 1 through -- or,

1    actually, it's A through I?

2            MR. SAUNDERS:  Your Honor, may I approach?

3            THE COURT:  You may approach.

4            THE WITNESS:  Thank you.

5            MR. HURSH:  Judge?

6            THE COURT:  Mr. Hursh.

7            MR. HURSH:  I may have misunderstood what you

8    said.  I believe you referenced Docket No. 343.

9            THE COURT:  Yes.

10           MR. HURSH:  I believe the correct docket number

11   is Docket 354.  It was CrossHarbor's reply or response to

12   the actual examiner motion.  There was a series of exhibits

13   attached to it.

14           THE COURT:  What did you say, Mr. Hursh?  Three

15   fifty-three?

16           MR. HURSH:  Three fifty-four, Your Honor.

17           THE COURT:  Oh, 354.

18           MR. HURSH:  If I understood correctly.

19           THE COURT:  Very good, okay.  Thank you for the

20   clarification.

21           MR. SAUNDERS:  Can I approach again, Your Honor?

22           THE COURT:  You may approach.

23           MR. SAUNDERS:  (Inaudible, out of range of

24   microphone.)

25           THE COURT:  These would be Exhibits A through K,

1    it appears.

2            MR. SAUNDERS:  Yes, Your Honor.  I apologize,

3    Your Honor.

4            We're referring to the CrossHarbor's response to

5    emergency motion of the prepetition lenders for appointment

6    of examiner and the exhibits that were attached to that

7    document.  So not the hearing exhibits for this agreement,

8    but the exhibits that were attached to the CrossHarbor's

9    response to emergency motion of prepetition lenders for

10   appointment of examiner.

11           THE COURT:  Are they different than the exhibits

12   that were filed by CrossHarbor in opposition to the motion?

13           MR. SAUNDERS:  Yeah.  Well, I think that there is

14   a binder of hearing exhibits that are, you know, proposed

15   to be talked about through testimony today, and those are

16   different than the exhibits that were actually attached to

17   the response when it was filed with the Court.

18           THE COURT:  Mr. Hursh, would you clarify?

19           MR. HURSH:  Your Honor, I believe -- I can go

20   through my docket here, and I believe my witness list was

21   filed.  Subsequent to that, we filed the reply response.  I

22   believe it was the last pleading that we filed in this case

23   prior to the hearing here today.  And so, yes, there are

24   exhibits attached to the pleading response filed late

25   Friday at 354 which I don't believe were identified on the

1    witness and exhibit list.

2              THE COURT:  But I guess real question was:  How

3    do they vary from the exhibits that you filed here -- okay,

4    I see what's going on.

5              MR. HURSH:  Okay.

6              THE COURT:  Okay.

7              MR. HURSH:  I can go through them, if you'd like,

8    Your Honor.

9              THE COURT:  No.  The exhibits are -- I'm looking

10   at exhibits to the response that's at 354.

11             MR. SAUNDERS:  That is A through K?

12             THE COURT:  Yes.

13             MR. SAUNDERS:  Okay.

14             THE COURT:  I just want to make sure for the

15   record we know which exhibits we're referring to subsequent

16   to today.

17             MR. SAUNDERS:  All right.

18   Q.  (By Mr. Saunders)  And, Mr. Byrne, do you recall

19   submitting those exhibits with the response that

20   CrossHarbor filed on Friday?

21   A.  I didn't submit anything.  Are you talking about the

22   2000 -- we filed a response to your 2004 motion -- no, your

23   examiner motion --

24   Q.  Yes.

25   A.  -- which we said we were perfectly fine with an

1    examiner.

2    Q.   Right.   But you put in some evidence to show that you

3    hadn't done anything wrong?

4    A.   No, we put in some evidence to show that everything --

5    most of the things that you guys referred to in there were

6    -- you know, were not factually accurate.

7    Q.   Okay.   And do you recall submitting as some of the

8    exhibits to that response excerpts from contracts?

9    A.   Sure.

10   Q.   Okay.   Are there full contracts from which those

11   excerpts were taken?

12   A.   I'm sure there are, yes.

13   Q.   Okay.   But you haven't produced those, right?

14   A.   I'm sure in the case of most of them, if you gave them

15   to me, I could tell you when we gave them to Credit

16   Suisse --

17   Q.   Okay.

18   A.   -- at some point over the course of the last two years.

19   Q.   Okay, but before the bankruptcy.   You haven't produced

20   those documents to us in this bankruptcy case, right?

21   A.   That's correct.

22   Q.   Okay.

23   A.   We've been trying.

24   Q.   Okay.   You've been trying to produce them?

25   A.   We have been trying to come up with a reasonable

1    discovery agreement with you guys.  And every time we seem

2    to agree with something, the next day we get something that

3    expands the scope of it or adds another party to it or asks

4    us for more stuff.

5    Q.  Your position is that you're not going to produce

6    anything until you have an agreement on the scope of the

7    request; is that right?

8    A.  Yeah.  I mean there was an understanding that we would

9    agree to a scope.

10   Q.  Okay.  Included in the, in the exhibits is an e-mail

11   that you sent to Ms. Blixseth earlier in 2008.  Do you

12   recall that?  You characterized it as a "plea".

13   A.  If I could have it, I would appreciate it.

14   Q.  You don't --

15   A.  I don't have -- I mean we were rushing to get that out

16   over the weekend, so if I could see it, it would be

17   helpful.

18   Q.  Okay.  Do you recall sending an e-mail to Ms. Blixseth

19   earlier in 2008?

20   A.  I recall reading one that was incorporated in our

21   response, yes.

22   Q.  Okay.  And did you ever have any other communications

23   with Ms. Blixseth in the course of 2008?

24   A.  Sure.

25   Q.  Right.  And did you ever have any other e-mail

1    communications with her in the course of 2008?

2    A.  Sure.

3    Q.  Yeah.  But they haven't been produced, right?

4    A.  That's right.

5    Q.  Okay.

6           MR. SAUNDERS:  Nothing further, Your Honor.

7           THE COURT:  Mr. Moore.

8                     CROSS-EXAMINATION

9    BY MR. MOORE:

10   Q.  Mr. Byrne, did any of your communications with

11   Ms. Blixseth in early 2008 have anything to do with the

12   bankruptcy?

13   A.  No.

14   Q.  Anything to do with the plan?

15   A.  We didn't have discussions about the plan until the

16   10th of January in Palm Springs.

17   Q.  Okay.  Anything that you could imagine would be

18   remotely relevant to this bankruptcy?

19   A.  No.

20           MR. MOORE:  Thank you.

21           THE COURT:  You may step down.

22           THE WITNESS:  Thank you.

23           THE COURT:  Any further --

24           MR. SAUNDERS:  No other witnesses, Your Honor.

25           THE COURT:  Okay.  Mr. Patten?

| | |
|---|---|
| 1 | MR. PATTEN:  I'll call Ron Greenspan. |
| 2 | THE COURT:  Mr. Greenspan, if you would come |
| 3 | forward to be sworn, please. |
| 4 | RONALD GREENSPAN, WITNESS, SWORN |
| 5 | DIRECT EXAMINATION |
| 6 | BY MR. PATTEN: |
| 7 | Q.  Please state your name and address. |
| 8 | A.  Ronald Greenspan, 633 West Fifth Street; Los Angeles, |
| 9 | California. |
| 10 | Q.  Mr. Greenspan, you're the chief restructuring officer |
| 11 | for the debtors in this case? |
| 12 | A.  Yes. |
| 13 | Q.  And you've been the chief restructuring officer since |
| 14 | early November; is that correct? |
| 15 | A.  I was approached after the case had been filed, so |
| 16 | after the case had been filed just immediately before that |
| 17 | first hearing on the DIP, so whatever that date was.  And |
| 18 | then I guess I was approved by the Court several weeks |
| 19 | later. |
| 20 | Q.  Mr. Greenspan, have you been deposed in this case? |
| 21 | A.  On that infamous -- well, actually, I think I was |
| 22 | deposed on Saturday in December, and Ms. Blixseth on |
| 23 | Sunday. |
| 24 | Q.  Okay.  And outside of your deposition, have you |
| 25 | provided any information to Credit Suisse or any |

1    representative of Credit Suisse?

2    A.   Very, very voluminous information.

3    Q.   Have you had any meetings with Credit Suisse or

4    representatives of Credit Suisse?

5    A.   Yes.

6    Q.   How many meetings?

7    A.   All total, probably six or seven full days.  There was

8    a meeting in -- an all-day meeting in New York that

9    started, I don't know, I think it was 9 or 10 o'clock in

10   the morning and probably ended 6 or 7 in the evening.

11       There was a subsequent meeting in New York that I

12   attended telephonically, but counsel for the debtor and

13   Brad Foster - managing director who worked for me - was

14   there in person.  I couldn't make it in person, so I

15   attended telephonically.  And that was probably a five-hour

16   face-to-face -- four-hour face-to-face meeting.

17       In addition, they have had an entire series of

18   individual companies that have asked us for information,

19   that have come to the property.  Loughlin Meghji together

20   with another company called "The Monticello Group" was on

21   the property for two full days the first time and were

22   given whatever documents that the debtor had that they

23   asked for as well as tours of the property and opportunity

24   to interview all of the debtor management that they wanted

25   to.

1        Another group that was retained for ski operation

2   review, which is called "Replay", similarly was given

3   access to the property; was allowed to ski the mountain;

4   again, interviews with everybody they wanted, all documents

5   they wanted.

6        Then, subsequently, after the New York meeting,

7   Loughlin Meghji wanted some additional information.  And so

8   what we suggested was the way to make it most efficient is

9   for them to actually attend the meeting in New York, which

10  was an informational exchange meeting.  They attended the

11  meeting in New York.  We then suggested that they go up to

12  CrossHarbor's office and sit down and meet with

13  CrossHarbor, ask whatever questions they wanted, get

14  whatever information -- because I told them that

15  CrossHarbor has spent more time on this property and more

16  time analyzing it than anybody else, and that other than

17  debtors' onsite personnel, CrossHarbor would be a great

18  source of information.  They went and did that.

19       And then we agreed that the following week, they could

20  once again come out on the property and spend another

21  couple days on the property; again, get whatever documents

22  they want and speak to whoever they wanted.  And they, in

23  fact, did that.

24       Then on top of that, we have set up an electronic data

25  room, and we have populated that data room.  We've given

1   the index of that data room to both the unsecured creditors

2   committee and to Credit Suisse, and we've asked them what

3   else they would like to see in that data room.  They have

4   told us, and all of the relevant documents they've asked to

5   be added to that document room we put into the document

6   room.  We have given access to that document room not only

7   to Credit Suisse but to every single member - and I think

8   there's 40 members - to every single member of their loan

9   syndicate so that all the individual owners can get access

10   to all the documents in the data room.

11       In addition, they've given us additional requests for

12   documents as recently as two weeks ago, and we told them we

13   would fulfill all those requests.  We told them we had to

14   prioritize them.  I mean these are sweeping additional

15   requests.  Quite frankly, half, at least, have nothing to

16   do with anything relevant to the sale process or to the

17   operations but, again, we said we will get to them.  But

18   what we put as the top priorities is everything involved

19   there that would help them understand the property,

20   understand the potential transaction, understand the

21   parameters of the plan.

22       To the best of my knowledge, other than asking us for a

23   document that was not ours, we've provided them with every

24   single thing they've ever asked for.

25   Q.  And that's been Loughlin Meghji?

1   A.   Yeah, it's been Loughlin Meghji and The Monticello

2   Group and Replay.

3       What is now interesting is -- and then you have -

4   (inaudible) - event, is that after we did all that with

5   Loughlin Meghji and Monticello, it now appears - and I

6   think it's probably because they may not have been giving

7   Credit Suisse the answer they wanted - they have now

8   terminated Loughlin Meghji and The Monticello Group after

9   we spent all this time with them.  They've now apparently

10  stopped them from pursuing this and have now brought in

11  Replay, a Canadian company.  And Replay is now giving us

12  the exact same information request list that we provided to

13  both Credit Suisse and Loughlin Meghji, and they've asked

14  us to start the process all over again.  Replay wants to

15  come back out with two new people, ski the mountain again,

16  and now get into all the land development process.  So once

17  again, I mean we'll spend days and days.  They asked to do

18  it this week.  They just called us up last week and said

19  they wanted to do it this week.  We said we can't, we have

20  this hearing and other important things like a plan

21  disclosure statement to get done.  But we're going to do

22  this once again with a brand-new group of people; terribly

23  distracting, terribly interfering, taking up a tremendous

24  amount of time of management and of ours.

25      But we've bent over backwards to give them everything

1    they've asked for and to make everybody as available as

2    possible.

3    Q.   You're familiar with Mr. Yankauer with Credit Suisse?

4    A.   I am.

5    Q.   Has Mr. Yankauer requested information from you

6    directly?

7    A.   Yes.

8    Q.   Have you provided the information that Mr. Yankauer

9    requested?

10   A.   Again, to the best of my knowledge, I believe we've

11   provided everything he's asked for.  I mean in some cases

12   he, for example -- and then to go on, we've provided them

13   with all the draw requests.  We provide them with weekly --

14   I'm sorry, not weekly; with actual-to-budgeted variances.

15   And so, for example, they originally asked that we provide

16   that to them on a weekly basis.

17        And we said, "Look, we only draw money every two weeks.

18   The checks we cut, that's all -- the draws show everything

19   we're spending.  We then do a reconciliation and give you

20   the reconciliation.  Let us do it every two weeks."

21        We reached an agreement so we give them a

22   budget-to-actual every two weeks rather than every week.

23   So we've agreed to everything like that.

24        The only thing -- Mr. Yankauer asked for something, and

25   we said we had been giving it regular to Mr. Meghji.  And

1   upon checking, they found that, yes, in fact, we had, in

2   fact, been providing all that information on a periodic

3   basis to Mr. Meghji.  And so everything that Mr. Yankauer's

4   asked for I believe we've given them.

5       I'm not aware of anything, any outstanding requests

6   other than, as I say, the latest request we got about two

7   weeks ago which was repetitive to a lot of the stuff we had

8   given them before.  But, again, we said we will give them

9   everything, prioritizing it with everything that's relevant

10  to the plan, the property, and so forth.

11      They asked for some things that are best characterized

12  as "historic forensic information".  They want to know

13  about transactions a year ago - two years ago that really

14  have nothing to do with getting the property disposed of or

15  the plan, what are really the burning bridges in this case.

16      And we said, "Notwithstanding the fact that I'm not

17  sure it's relevant, we will, in fact, provide it to you.

18  But because this is a limited number of bodies and a

19  limited number of hours in the day, we're going to put the

20  important stuff that's necessary for right now at the top

21  of the list.  But we will, in fact, get everything to you."

22  Q.  And have you been personally involved in, in receiving

23  the requests for information and making sure that the

24  requests for information is, in fact, provided to Credit

25  Suisse?

1    A.   Yes.  Most of -- I have, but most of the requests and

2    my direction -- I'm not necessarily the most accessible

3    individual and, I mean, I'm doing a bunch of things,

4    including this.  Brad Foster, managing director, spends the

5    great majority of his time -- I mean he's there for the

6    last nine consecutive days on the property.  So he is on

7    site virtually 24/7 or in the Bozeman office.  And so much

8    of my requests are that Loughlin Meghji and he and

9    Mr. Yankauer and he deal directly because he is immediately

10    accessible, he's very responsive.

11       They have a standing instruction that if there's

12    anything they ask him to do that they don't get an

13    immediate response from or a satisfactory response, to get

14    ahold of me.  And it's been very rare that they have had to

15    do that.  And the only time has been, for example,

16    Mr. Yankauer did call and say, "We're not getting the

17    monthly operating reports.  We're not getting the biweekly

18    reconciliations."

19       And I sent them the e-mail showing them, in fact, we

20    had been providing them to Mr. Meghji, who is his eyes and

21    ears, and we weren't expecting to provide those directly to

22    Steve.  We're more than happy to provide it to Mr. Yankauer

23    directly.  And we started do that, we started copying him

24    on it.  But, in fact, his agent and his financial advisor

25    had been getting those all the way along.

1    Q.   Have you given it your best effort to make sure that

2    Credit Suisse has whatever information they've requested?

3    A.   We have.   I mean I don't know anything more we could

4    have done to get them any more information.

5    Q.   And has this all been on an informal basis?   In other

6    words, has Credit Suisse had to propound formal discovery

7    to you or to the debtor to obtain this information or has

8    it been voluntarily provided at Credit Suisse's request?

9    A.   It's been 100 percent voluntary.   And I mean I've heard

10   today about the Farcheville information for the first time

11   -- I believe it's the first time.   I didn't read the order.

12   I don't believe anybody's ever asked us for that.   And

13   we'll, of course, provide that information.

14            MR. PATTEN:   Thank you.   That's all I have.

15            THE COURT:   Mr. Saunders?

16                         CROSS-EXAMINATION

17   BY MR. SAUNDERS:

18   Q.   Mr. Greenspan, I think you said you weren't engaged

19   until late November of last year; is that right?

20   A.   You know, I said I don't remember the dates.   I was

21   engaged after the filing and within a day or two of that --

22   the initial $4.5 million DIP, I was engaged just a day or

23   two before that.   As a matter of fact, I don't even know if

24   I had an engagement letter then, but that's when I was

25   contacted.   I did show up for that initial DIP hearing, and

1    then I was subsequently approved by the Court.

2    Q.   Okay.  So you have no idea what, what communications or

3    negotiations took place between Ms. Blixseth or

4    Mr. Blixseth and CrossHarbor in the years that preceded

5    your involvement, right?

6    A.   I don't.  And I can unequivocally tell you they have no

7    influence upon anything I'm doing or, as far as I can see,

8    anything the debtor is doing now.

9    Q.   Okay.  And you've never tried to go out and get

10   documents that might reflect those communications or

11   negotiations prepetition, pre your involvement, so that you

12   could produce them to Credit Suisse, right?

13   A.   I've never -- nobody -- no, I have not tried to do

14   that.

15   Q.   Right.  So all of that stuff that -- all of the

16   prepetition communications and negotiations, all right,

17   that's not within the stuff that you've testified about

18   trying to be responsive to Credit Suisse and getting them,

19   right?

20   A.   That's correct.

21   Q.   Okay.  And have you ever --

22   A.   Oh, with one exception.  To the extent, as I say, about

23   two weeks ago - and I don't have the list with me - about

24   two weeks ago, I was given a list that had some property,

25   some prospectives, some current information requests, and

1    also had a number of things on it that I characterize as

2    "forensic", as deep historical issues that would go to such

3    things as avoidance transactions, and so forth.

4        I told Steve that I would, in fact, produce everything

5    on that list that I could get but that I was going to

6    prioritize it because I know we have a plan and a

7    disclosure statement and a property transaction that has to

8    get done; and that we'd prioritize it and get these stuff

9    to him, that we could, that dealt with that; and then we

10    would, in fact, satisfy the balance of that list.

11    Q.  Let me just ask you a question about a plan:  Have you

12    ever proposed plan terms to Credit Suisse?

13    A.  I have certainly told them what we're contemplating and

14    asked for input.

15    Q.  Okay.  When did you do that?

16    A.  We did it in a phone -- I talked to them right after

17    the DIP hearing, and that's when there was discussions

18    about retaining a broker.  And, frankly, it was their

19    suggestion initially, and it was an idea that I said, "I

20    don't think that is necessary," I said, "given the time and

21    given our capabilities."

22        They felt it was important.  I talked to the unsecured

23    creditors committee about it, and then we then proceeded

24    with that.  And then going into January, going into

25    January, we had a full-day -- not a full-day; a half-day

1   meeting at Skadden-Arps's office in New York at which we

2   arranged for Credit Suisse to be there, CrossHarbor to be

3   there, and for the debtor to be there.  At which point

4   there was significant discussions had about what's

5   important, which is the asset, the value, the development

6   opportunity, what type of capital is necessary in order to

7   go forward.

8       And then subsequent to that, there's been ongoing

9   negotiations between CrossHarbor and Credit Suisse because

10  the key issue is the new capital coming in.  And then I've

11  had subsequent discussions with Mr. Yankauer.

12  Q.  Okay.  I'm sorry, have you ever proposed plan terms to

13  Credit Suisse, plan of reorganization terms?

14  A.  A specific term sheet, no.

15  Q.  Okay.  Have you ever proposed a plan of reorganization

16  term sheet to the creditors committee?

17  A.  A specific term sheet, no; but - (inaudible) - we've

18  had numerous discussions about what would -- what should be

19  a plan, how it should be contemplated, what our views were,

20  and what their views are in an effort to try to narrow

21  differences and craft something that is going to work.

22  Q.  Okay.  Mr. Byrne, I think, made mention of a meeting

23  with Ms. Blixseth in Palm Springs on January 10th.  Were

24  you there for that?

25  A.  I was invited but was unable to come.

1    Q.   Okay.  So whatever communications or negotiations or

2    discussions they had at that meeting you don't have any

3    direct knowledge of, right?

4    A.   Well, I do in that immediately afterwords, they called

5    me.  And that was a conversation that not just I but also

6    counsel was involved in.  And we discussed what they had

7    discussed.

8    Q.   Okay.  And what did they tell you?

9    A.   They told me that they had a discussion regarding a

10   plan with CrossHarbor contributing money that would be paid

11   to satisfy secured and unsecured creditors.  The

12   contemplation was -- and I really commend the Court to go

13   out and actually look at the property.  I think you'll get

14   a very different -- a much fuller understanding of what's

15   the actual physical premises.

16        There was a concept -- in order to get maximum value

17   and maximum use out of what's known as the Yellowstone

18   Club, there's a shortage of level land.  You basically

19   have -- it's a property made of three peaks, three

20   mountains, and much of it is vertical face.  I mean there's

21   skiing on everything that constitutes Yellowstone Club, and

22   that's where the houses and the condos are basically

23   perched except for a very small area down at the bottom

24   that's owned by Yellowstone Club.  There is the other 160

25   acres - which is also referred to as the settlement or the

1    compound - which the Blixseths have owned prior to the

2    Credit Suisse loan.  I mean that's never been encumbered.

3    It wasn't owned by Yellowstone Club at the time that that

4    loan was recorded.

5        As you saw under the memorandum to form, in order to

6    maximize that development, for there to be a financially

7    viable development there and, frankly, to get the most

8    value to the unsecured creditors and to Credit Suisse, you

9    need flat land to build more structures on, to be able to

10   economically build structures.  And so they had discussed

11   the concept of Ms. Blixseth contributing into a reorganized

12   debtor some of that land; and, as she testified to, not

13   being paid for it, but contributing it into a reorganized

14   debtor a portion of that land in order to give Yellowstone

15   Club more level ground in order to be able to continue to

16   build structures.

17       They also told me about proposed treatment for

18   unsecured creditors that they had discussed.  Go

19   fast-forward to the end of that conversation, and I told

20   them I did not think that was a confirmable plan.  There

21   were a lot of issues in there that I thought were not

22   confirmable.  And so we basically went back to Square 1 and

23   started negotiations for a plan that I think has a

24   possibility of being confirmed.

25   Q.  Okay.  Did they tell you, coming out of that meeting in

1   Palm Springs, that they had reached agreement on the

2   $100 million stalking-horse bid?

3   A.   I believe so.

4   Q.   Okay.

5   A.   Well, actually, no, I take that back.

6   Q.   And, again, you weren't at this meeting, right?

7   A.   Actually, no, I don't believe it was -- it certainly

8   was not in any way or shape the format it is today.   My

9   recollection is it was either -- I don't think it's

10  actually a stalking-horse -- well, yeah, it probably was a

11  stalking-horse bid, but it was under a very different

12  structure.   The structure today is one that is truly going

13  to be, I think, a vibrant marketing process.

14  Q.   What was the stalking-horse bid that they told you they

15  had agreed on, then, coming out of Palm Springs?

16  A.   I don't remember the exact details, but it was trying

17  to live within the confines of the DIP agreement.

18       And I've got to correct a comment Mr. Chehi made when

19  he was talking, and that is the structure in the DIP

20  agreement was not 60 days put in in the -- what was called

21  the "mothball budget".   The time frame that we're using in

22  the existing DIP agreement was the time frame mandated by

23  Credit Suisse when they were going to fund the full

24  $20 million.   That was not a liquidation, it was not a

25  60-day mothball, or anything.   He's just plain old wrong.

1    We took -- if you remember, we took exactly their term

2    sheet, the $20 million term sheet, and essentially changed

3    Credit Suisse out when they couldn't fund and put

4    CrossHarbor in.  So this was the marketing plan and program

5    they insisted upon in the original DIP with the debtor.

6        What I said was -- let me finish.  You asked me about

7    their stalking-horse bid.  Their stalking-horse concept was

8    to stay within that time frame that's in there.  And I said

9    I felt there needs to be a longer, more robust time frame.

10       And I said, "If I'm going to back a stalking-horse bid,

11   what we need to do is you need to give us the concession of

12   expanding out."

13       Remember, under the existing DIP loan, I have to have a

14   plan filed, we need a disclosure statement, and we need a

15   plan confirmation by March 31st.  What that meant was, is

16   we were only going to have maybe three weeks in order to

17   actually shop that bid because, realistically, if you're

18   going to actually get somebody into a plan that you're

19   going to -- and a disclosure statement you're going to file

20   by February 13, you need to have an offer in there, a

21   serious offer by the third or fourth week of January, be

22   negotiating it the first week of February, and then spend a

23   week trying to memorialize it and get a plan disclosure

24   statement drafted.  So you really basically had a

25   three-week marketing period there.

1      And I said, "I'm not comfortable with that, I don't

2  think the Court's going to be comfortable with it, I

3  certainly know that Credit Suisse isn't going to be

4  comfortable with it."

5      And so what I said was, "If we're going to go forward

6  with a stalking-horse" -- which I think is a good idea, and

7  I'm sure we'll get into that later, "If we're going to go

8  forward with the stalking horse, you've got to make

9  concessions on the time period."

10     And, ultimately, they agreed to extend the time period

11  out, extend the time period out so that we would have a bid

12  process that would run all the way up to 10 days before

13  plan confirmation.  The longest possible period of time --

14  it's either 5 or 10 days.  I think it's 10 days before plan

15  confirmation, so it's the absolute longest possible time,

16  and push plan confirmation out by 30 days.  So move the

17  plan confirmation out to the end of April, which, if you

18  remember, it was supposed to be March 31st for the 363

19  sale.  If that failed, I got those deadlines extended out

20  so that if we could get the procedures approved today, we

21  have essentially a full 2-1/2 month period, far longer than

22  was ever contemplated under the Credit Suisse DIP or under

23  the CrossHarbor DIP.

24  Q.  Okay.  That's all that Ms. Blixseth and Mr. Byrne told

25  you coming out of their Palm Springs meeting?

1    A.   Treatment of unsecureds, member contracts, price, a

2    concept to get more flat land in -- oh, additional items,

3    and that is:  In order to enhance the -- well, no, two

4    other things.

5        In order to enhance the note that would be carried

6    back, that you would have Credit -- the debtor would

7    receive -- that that note would be encumbered by what I'll

8    describe as good collateral.  Right now, right now the

9    Credit Suisse loan does not encumber the base lodge.  You

10    know, it's -- the $110 million - (inaudible) - lodge, the

11    base lodge, the eating facilities, the ski rental shop, the

12    retail store, the three-deck parking structure.

13        They basically don't have the heart of the resort and

14    the project within their collateral.  The concept would be,

15    is that they, in fact -- the note that would be securing

16    the deferred payments would, in fact, correct all those

17    imperfections in the Credit Suisse collateral.

18        In addition, as you've heard, Mr. Byrne over the years

19    or CrossHarbor over the last several years has bought some

20    golf course lots.  Those would be contributed back into the

21    debtor and that the lien would attach to those lots, as

22    well, as well as the land that Ms. -- that I guess it's --

23    yeah, that Ms. Blixseth would contribute back in the 140

24    acres, or so, of flat land.  That, too, would be encumbered

25    by the lien so that the deferred payments out under a

1    plan -- I'm sorry, the deferred dollars coming in and,

2    hence, the deferred payments being paid out would actually

3    be -- would encumber the totality, not just of what's there

4    today - much better than Credit Suisse has claim on today -

5    but also it would include this additional land being

6    contributed back in to really make it a viable -- the

7    ongoing development be viable as well as it would be a

8    viable loan.

9         And then, finally -- oh, yeah, and then, also, they

10   knew and everybody who's looked at this knows that this

11   project needs 10s of millions of dollars of additional

12   capital just to operate and then to prosecute the

13   development.  And, again, I commend anybody who's going to

14   make a decision in this case to go out and actually look at

15   the property, and you will get an understanding of the

16   magnitude of the capital improvements necessary and what it

17   costs just to maintain this piece of property.

18        CrossHarbor at that point had agreed that, as a

19   proponent of a plan, that they would commit to contribute

20   substantial additional dollars into reorganized debtor.  I

21   believe as of that time they had not quantified that

22   amount.  That was -- that had -- they did not have a number

23   and no number had been agreed upon, is my recollection, but

24   that very additional -- I mean 10s of millions of dollars

25   of additional capital above and beyond the initial capital

1   contribution would be, would be assured.

2   Q.   Okay.  And all of that came out of the meeting in Palm

3   Springs between Ms. Blixseth and Mr. Byrne that you weren't

4   at, right?

5   A.   That's my understanding.

6   Q.   Okay.  Have Ms. Blixseth and Mr. Byrne had other

7   communications in the course of the bankruptcies that you

8   haven't been a party to?

9   A.   I would imagine so, but I don't know.

10   Q.   Right.  And you -- to the extent they've had e-mail

11   communications or negotiations or draft documents going

12   back and forth, none of that has, you know, has come to

13   your attention and been produced to Credit Suisse, right?

14   A.   I wouldn't say none of it's come to my attention.  If

15   I've been cc'd on it, I've seen it.  And, frankly, nobody's

16   ever asked me for it, but to the best of my knowledge, it

17   hasn't been produced.

18   Q.   Okay.  You spent a lot of time talking in response to

19   Mr. Patten's questions about information requests that

20   you've had from Credit Suisse.  Do you have an

21   understanding as to how long CrossHarbor spent doing due

22   diligence on the Yellowstone Club?

23   A.   Well, I know they were involved for probably two years.

24   Q.   Okay.

25   A.   I don't know how long they did formal due diligence,

 1   but they -- a considerable period of time, very

 2   considerable.

 3              MR. SAUNDERS:  Okay.  Nothing further, Your

 4   Honor.

 5              THE COURT:  Mr. Moore.

 6              MR. MOORE:  Thank you, Your Honor.  Just a few

 7   questions.

 8                        CROSS-EXAMINATION

 9   BY MR. MOORE:

10   Q.  Mr. Greenspan, I think in response to CS counsel's

11   questions about gathering correspondence and documents

12   prior to your tenure, you basically said, I think, they

13   were historical issues and avoidance issues, correct?

14   A.  That's correct.

15   Q.  That's how you viewed the requests?

16   A.  What I said was, again, I -- and I could be wrong by a

17   week, but my recollection is about two weeks ago, we got

18   yet another request, which is fine.  I mean we get these

19   requests regularly.  So we got yet another request which

20   asked for a lot of material we had previously produced.

21   But for the -- I think it's for the very first time, it

22   asked for material that dealt with historic -- I mean, you

23   know, a list of all transactions between Blixseth -- the

24   Blixseth entity and the debtor.

25   Q.  But not to put words in your mouth, but you essentially

1  said those should be sort of secondary requests because

2  they're historical, they're avoidance issues, they're past

3  transactions.  So we're not going to look -- try and gather

4  them immediately.

5  A.  Well, no, what I said was is we have -- that's not the

6  reason why we're not going to gather them immediately.  The

7  reason we're not going to gather them immediately is we

8  have some immediate -- what I call the burning-bridge

9  issues.  I mean you're always prioritizing.  Unless you

10  have unlimited money and unlimited time, you've got to

11  prioritize.

12      And so when they want to know -- when they want, for

13  example, an engineering report, that's going to help

14  determine what the costs are to build a road or a structure

15  because that's imperative to determine -- the value of the

16  property is the sale value less the cost of getting there.

17  So on this list was additional information about the costs

18  of getting somewhere or something about the environmental

19  mitigation costs which get --

20  Q.  What about did it also include transactions that

21  were -- that occurred prior to your tenure?

22  A.  Oh, certainly.

23  Q.  Okay.  And did you ever think that those transactions

24  might be important to an analysis of insider relationships?

25  A.  Ultimately, yes, they'll be -- I mean I assume they're

1  all going to be relevant.  And one of the things we've

2  talked about and we've put in the papers and I've talked to

3  Mr. Yankauer about is that the avoidance actions, and so

4  forth, my concept -- and I've talked to Mr. Yankauer about

5  it, I've talked to the unsecured creditors committee about

6  it, and it seems to have universal agreement, is when you

7  take those, put them into a liquidating trust, and let --

8  Q.  I'm going to stop --

9  A.  Let me, let me --

10  Q.  -- you because you're not answering my question.

11  A.  Okay.

12  Q.  Really what I want to focus on is:  You haven't

13  produced those documents because, in your mind, they relate

14  to avoidance issues, historical issues that are not burning

15  in your mind today, correct?

16  A.  We have not spent the time to put those together in the

17  last two weeks because on that list and what we're -- and

18  other things we're doing in connection with what has to be

19  done to safeguard this asset, those other items --

20  gathering the information they've requested and doing these

21  other items for the plan have to take priority if we are

22  going to maximize the benefit of Credit Suisse and maximize

23  the benefit of all the other unsecured creditors.  We will

24  absolutely get to them, but we can't get to them any faster

25  and still take care of this property.

1    Q.   So to the extent that they may deal with issues of

2    prior-to-the-petition good faith, prior-to-the-petition

3    insider relationships, prior-to-the-petition fair dealings

4    between the parties, it's not something Credit Suisse can

5    get to today because it's not being produced today.  Am I

6    correct?

7    A.   I can -- I mean I know of no, I know of no transactions

8    that haven't been openly discussed with Credit Suisse, any

9    relationship that hasn't been discussed with them - let me

10   finish - or any operative -- a document that that was

11   operative then.  I know of no documents they have asked

12   for, legal documents, other than the ones that have been

13   introduced.  We will go back and look for anything in the

14   debtors' archives and historic files, and we will endeavor

15   to do that, but I know of no documents -- you know, and I'm

16   sure -- as I say, I'm sure there are e-mails, I'm sure

17   there are old ledgers.  We will produce those.

18   Q.   Okay.  But, again, you know of none, but you can't say

19   to this Court today you've looked at everything and you've

20   turned it over so someone else like Credit Suisse can

21   decide whether they deem it relevant.  In your mind, you

22   know of none, correct?

23   A.   No, I haven't used the word "relevant" yet.  I mean

24   I've never said it's not relevant.  What I said was, "In

25   the priority, we will give it to them."

1     I have never told them anything isn't relevant.

2          MR. MOORE:  All right.  Thank you, Your Honor.

3          THE COURT:  Anything else, Mr. Patten?

4                    REDIRECT EXAMINATION

5  BY MR. PATTEN:

6  Q.  Mr. Greenspan, does the CrossHarbor DIP loan require

7  the debtor to file a plan that is acceptable to

8  CrossHarbor?

9  A.  Yes, it does.  That was the approved terms.  I have to

10 have a disclosure statement and plan on file this Friday

11 that's acceptable to CrossHarbor.

12 Q.  And did the Credit Suisse DIP loan that they couldn't

13 fund, did the term sheet for that DIP loan contain language

14 that required that the debtors file a plan acceptable to

15 Credit Suisse?

16 A.  Correct.  The DIP we agreed to with them required a

17 disclosure statement and plan filed by this Friday on the

18 terms acceptable to them.

19 Q.  And so the requirement that the plan be acceptable to

20 the DIP lender and the deadlines to file the plan and the

21 deadlines to have the plan confirmed all originally came

22 from Credit Suisse?

23 A.  They were Credit Suisse's demands that we had issues

24 with before.  And they said, "Those the terms you're going

25 to have to live with."

1    Q.  Do you have enough time to immediately respond to the

2    Credit Suisse information requests and meet the deadlines

3    that are contained in the DIP loan term sheets?

4    A.  As I said, to the best of my knowledge, we've responded

5    to every request in full up until the one we received

6    approximately two weeks ago.  We've responded to a bunch of

7    that, but I can't respond to that in full and do everything

8    else, including getting a disclosure statement and plan on

9    file by Friday.

10   Q.  Complying with the -- at least over the last two weeks,

11   complying with the information requests would interfere

12   with your ability to timely file the plan and disclosure

13   statement?

14   A.  Both timely file the plan and disclosure statement as

15   well as operate the property.  In other words, we've cut

16   back staff, and the only way to go through years of records

17   is to have those pulled and have people who are

18   knowledgeable go do that.  These people all have day jobs.

19        That is the height of the season.  This coming week

20   when, for example, Replay wanted to be there, besides this

21   hearing, this and next week because of the presidents

22   holiday is the busiest two weeks outside of the Christmas

23   to New Years Day.  So, again, they wanted to be on site at

24   the time when the staff was maximally occupied otherwise.

25   So we cannot both run the debtor, comply with the DIP, and

1   get a plan and disclosure statement as well as, within two

2   weeks, satisfy what is an unbelievably voluminous document

3   request list.

4   Q.   And so you have to prioritize your time?

5   A.   Yes.

6   Q.   And deal with what's the, the biggest fire on a burning

7   bridge first?

8   A.   Deal with putting that fire out and saving the bridge,

9   yes, sir.

10              MR. PATTEN:   Thank you.

11              THE COURT:   So, Mr. Greenspan, is an examiner

12  going to just compound that problem?

13              THE WITNESS:   Having yet another party there --

14  and, again, we would try to comply fully with everything

15  the examiner asked for.   Having another party there, going

16  through, both producing for them as well as -- it's an

17  education process.   I mean it is days and days and days of

18  both my staff's time as well as management's time.   And

19  needing somebody to give you access to systems, to

20  accounting systems, at a time when everybody's complaining

21  there's not enough time to get an effective sale process

22  going I think is going to very much compound the situation.

23  We can run a better, more effective sales process in the

24  next 60 days --

25              THE COURT:   The reason I ask that is, I mean, you

1    know, there may be the mandatory nature of one being

2    appointed anyway, which is alluded to by Debtors.  The

3    creditors committee has no problem with it; you know,

4    transparency, it opens up the system to any issues.

5    Obviously, Credit Suisse would like to see that.

6          The issue I have is:  Do we just compound

7    problems in getting toward a plan, a disclosure statement

8    and plan and getting the properties marketed?

9          THE WITNESS:  Your Honor, I mean I think the

10   debtor said that the debtor didn't have an objection to an

11   examiner, either.

12         THE COURT:  That's right.

13         THE WITNESS:  I mean if you're going to appoint

14   an examiner, what I would ask for is -- I think you have

15   discretion as to when that examiner starts.  Okay?

16         The next 30 days are incredibly difficult, and

17   then we're going to be into actual confirmation.  So you've

18   got discretion over when it starts and you clearly have

19   discretion over scope.  And I would ask you, as the person

20   involved in that, in trying to maximize that asset, to be

21   judicious as far as start date and scope.

22         THE COURT:  Well, the problem with that, however,

23   is if we delay the commencement, do we, do we not have

24   adequate examination prior to going to confirmation?

25   Although, from that standpoint, the claims remain anyway.

```
1              THE WITNESS:  Right.  I mean we're -- and my

2    assumption -- and I'm not going to be involved in it.  I

3    mean the Credit Suisse, if there's a deficiency; and the

4    creditors committee, assuming they're not paid in full, are

5    the ones that are going to handle -- I have no desire to

6    get anywhere near that liquidating trust.  That will be

7    where all the claims are, it's where the investigations are

8    going.  They're doing that now, and they're not going

9    anywhere.  I mean what we're talking about is past acts.

10             So I mean it's -- again, you're ultimately going

11   to make that decision as to how it's implemented.  As I

12   said, the old deals, from my perspective -- I mean there's

13   a reason why -- I mean if you go back to that memorandum to

14   form, there's a clear reason why land from that settlement

15   was going to be paying part of Yellowstone Club.  I mean it

16   is, it is a huge benefit for the ongoing development, and

17   it's land Yellowstone Club hasn't had a right to for years.

18   I mean when the Credit Suisse loan was recorded,

19   Yellowstone Club didn't own that land.

20             So there's -- while there's some elements in the

21   old memorandum to form, the looks - (inaudible) - what's

22   been conceived of now, it's only that way because those

23   were logical then and they're logical now for a maximal

24   development.  There is nothing about that old memorandum to

25   form or anything else that is influencing or guiding the
```

```
 1    discussions now or the formulation of a plan now.

 2            And that doesn't say -- I mean an examiner can

 3    come on in and replicate what's been done.  Again, I'm back

 4    in the situation of I can't see what an examiner is going

 5    to report one way or another that is going to influence --

 6    particularly when we go out to market.  I mean in the

 7    market -- and we'll get to the whole marketing issue, what

 8    we've found when we've been in the market to date, but I

 9    think that the market's going to speak.

10            THE COURT:  Okay.  Thank you, Mr. Greenspan.

11            THE WITNESS:  You're welcome.

12            THE COURT:  Did my question prompt any questions?

13            Mr. Beckett.

14            MR. BECKETT:  Sorry, Your Honor.  Thank you very

15    much.

16                    CROSS-EXAMINATION

17    BY MR. BECKETT:

18    Q.  Mr. Greenspan, this is a quick, silly inquiry -- it may

19    be silly.  There has been a fair amount of testimony that

20    there have been relationships in the past between

21    Ms. Blixseth and CrossHarbor.  And you've heard of that,

22    and you're aware of that.

23        Are you aware of any other relationships between those

24    two that haven't been testified to today?

25    A.  I don't think -- I mean what -- I don't know if it's
```

1   been made clear that Ms. Blixseth sued to stop the

2   transaction between Tim Blixseth and CrossHarbor in March

3   of '08.   I mean kind of the irony of this is that "this

4   acquisition is a long-term conspiracy".   She was trying to

5   block a transaction there that she thought -- I mean there

6   was no love lost between, from everything I can see,

7   CrossHarbor and Edra Blixseth at that time.

8      I'm not aware of any other transaction, any other

9   document.   All I know about is the loan that encumbers the

10   settlement and the BGI asset and the documents that have

11   been produced here that were produced back in December and,

12   I'm told, were given to Credit Suisse.

13      I mean Credit Suisse -- sorry, CrossHarbor and Edra

14   Blixseth went in and made a proposal to Credit Suisse back

15   in September together.   And I am told - and from everything

16   I can tell - told that the MOU was disclosed to them and

17   the memorandum to form, the MOF, was disclosed to them.

18   And that was the, that was the operative agreement they

19   wanted to move forward on and were making that proposal to

20   Credit Suisse at that time.

21   Q.   And you're not aware of any --

22   A.   I'm not aware of any other documents or agreements.

23   Q.   And how about you?

24   A.   I'm sorry?

25   Q.   And how about you?   Do you have any other connections

1    with CrossHarbor?

2    A.  I've never met CrossHarbor until this.  And I think

3    with respect to Joe Eisenberg, I think my only experience

4    with him other than knowing him in the bankruptcy community

5    in Los Angeles for 20 years, I think I've been opposed to

6    him before.  I think I had one small transaction with him

7    10 years ago, but, for the most part, we've been

8    adversaries.

9                MR. BECKETT:  Very good, thank you.

10               MR. WARNER:  Your Honor, I do have some

11   follow-up --

12               THE COURT:  Mr. Warner.

13               MR. WARNER:  -- as a result of the Court's

14   comments.

15                         CROSS-EXAMINATION

16   BY MR. WARNER:

17   Q.  In the proposed transaction, which we haven't seen

18   because we haven't seen the plan, but CrossHarbor, in your

19   mind, would be seeking a finding of this Court approving a

20   sale transaction, correct?

21   A.  No.

22   Q.  It's not a sale transaction?

23   A.  No.  And I'm sorry if we weren't clear enough in what

24   we thought.  What we tried to do was give enough

25   information -- because the details -- this is a work in

1    process.  If we had details, we would file a plan -- full

2    details, five days ago.  What we're trying to do is get

3    everything teed up so that when we do have a plan, we do

4    have a marketing program that we can go live with - let me

5    just finish - to give them enough time.

6        What it's been conceived of -- and I don't think it's

7    going to change between now and Friday.  What it's been

8    conceived of is that this is a solicitation for the equity

9    for a reorganized debtor.  The old equity will be wiped out

10   and that new equity will go to either the stalking horse or

11   a higher bid or potentially to Credit Suisse.

12   Q.  And that will be a sale of the new equity through the

13   plan, correct?

14   A.  Oh, I'm sorry, sale of the new equity, yes.

15   Q.  Okay.

16   A.  I'm sorry, I thought --

17   Q.  That's all I asked.

18   A.  I'm sorry, I thought you said asset.

19   Q.  It's a sale, correct?

20   A.  Correct.

21   Q.  And CrossHarbor is going to be looking for a finding of

22   this Court that they've acted in good faith; isn't that

23   correct?  In order to close the deal --

24   A.  Yeah -- well, I --

25   Q.  -- wouldn't they want that?

1   A.   Well, I don't believe that's been expressly discussed,

2   but you see that in every plan so I assume they're going to

3   ask for that.

4   Q.   Fair enough.   How can you, as the chief restructuring

5   officer; how can this Court; how can any party assess the

6   good faith if it can't look to prepetition transactions

7   because the documents have not been turned over?

8   A.   I think twofold, is -- as I told you, whatever

9   prepetition relationship, discussions, or anything else

10  that went on between Ms. Blixseth and CrossHarbor is not

11  guiding, has no import, does not affect anything I've

12  negotiated with them and anything that I've seen

13  Ms. Blixseth has negotiated with them.   Let me just finish.

14  That's one reason.

15      Secondly, what we are going to do is -- secondly, you

16  have -- whatever their deal was that was reduced to

17  writing, the memorandum to form, and so forth, has, in

18  fact, been produced and has been testified about forever.

19      And then, thirdly, we have the situation where we are

20  going to take the debtor, the Yellowstone Club assets, and

21  we are going to expose it to the market and seek to see if

22  the market or Credit Suisse or somebody will pay more for

23  those assets.

24      So when you're talking about a good-faith purchase, we

25  are going to test the price.   And to the extent that there

1    is a higher and better bid, that is going to be taken; to

2    the extent there's not, I think that's going to be a good

3    indication of what good-faith price is.

4    Q.  So in your mind, if there's no higher and better bid,

5    the bid that's been made is presumptively good faith

6    because there's no other bid, correct?

7    A.  I would say "yes", it's presumptively.  Then you've got

8    to get to con exclusively.  And where I would go there is:

9    You have analyses of value that will be undoubtedly

10   presented, there will be appraisals that will undoubtedly

11   be presented, and there will be a course of looking at what

12   has been done in the negotiations and for the last 3 months

13   since I've been there and what's going to happen over the

14   next 60 days.

15        This is going to be under an incredible microscope.

16   And I think there will be plenty of evidence to find good

17   faith and bad faith as to how this is conducted.

18   Q.  And in your mind, good faith is only tested from the

19   petition date forward; nothing prior to the petition date?

20   A.  With respect to this transaction, yes, because this

21   transaction doesn't involve prepetition agreements.

22   Q.  So the bankruptcy cleanses whatever occurred?  The

23   filing of the petition cleanses whatever may have occurred

24   between parties prior to the petition date when you're

25   looking at this new transaction?

1  A.  You know, because what -- the beauty of real estate --

2  no, it doesn't cleanse anything.  There is still going to

3  be, I am sure, avoidance actions.  Unless everybody's paid

4  in full, there's still going to be avoidance actions.  The

5  beauty of real estate is every transaction was recorded.

6  There's no secret as to the conveyance of every lot from

7  Yellowstone Club to CrossHarbor.  There's recorded deeds.

8  There are recorded deeds on every one of -- there's no

9  question about the security for any loan between

10  CrossHarbor and Ms. Blixseth.  It's all public record.

11  This is all recorded.  So it's not an issue of cleansing.

12      When you asked me about a finding of good faith -- and

13  I think this Court is going to have six months in this

14  bankruptcy that's going -- that has been and is going to be

15  examined under a microscope.  They're going to have a plan

16  that's going to be a vetted, a disclosure statement that's

17  going to be vetted, a marketing process that's going to be

18  vetted.

19      I mean Judge Kirscher has made it clear that he is

20  going to take charge and review.  Nothing is going to

21  happen that's not exposed to the light of day during this

22  process.

23  Q.  But you've told us we're not exposing what occurred

24  prebankruptcy.  That's my concern.

25  A.  No.  What I told you was, is in the last two weeks --

1    or if it's three weeks, I don't know.  Somebody give me the

2    document, and I can tell you when it was produced.

3        In that period of time, given everything that's going

4    on and given what's happening, we did, in fact, say, "Those

5    things that don't affect getting a value and getting Credit

6    Suisse in the capacity to fully evaluate this property,

7    those are going to be second fiddle," but they're second

8    fiddle just to providing them documents.  I mean we'll get

9    it to them.

10             MR. MOORE:  Thank you, Your Honor.

11             THE COURT:  Thank you.

12             You may come forward.

13             MR. WHITMORE:  Clark Whitmore for the ad hoc

14    Class B holders.  I just want to clarify again:  This is

15    just for the examiner?

16             THE COURT:  It's broadened, it's broadened.

17             MR. WHITMORE:  Because I --

18             THE COURT:  Mr. Warner brought that up, as well.

19    It's broadened.  I mean we're almost talking, to some

20    degree, about the solicitation.  And I mean the whole --

21             MR. WHITMORE:  I have a few questions on the

22    solicitations motion that relate to facts, and I don't want

23    to bring them up out of turn.  But I get the feeling, as

24    sometimes happens in bankruptcy, you go from being too

25    early to too late.

1          THE COURT:  Well, you're never too late.  But,

2    you know, we're going to get to that, and we probably

3    should break it at this point.  You will have an

4    opportunity to raise your questions.

5          MR. WHITMORE:  Okay.

6          THE COURT:  Mr. Patten.

7                    REDIRECT EXAMINATION

8    BY MR. PATTEN:

9    Q.  Mr. Greenspan, have you been in discussion with

10   CrossHarbor over the terms of the plan when we filed on

11   Friday?

12   A.  Yes.

13   Q.  And has the prebankruptcy relationship between

14   CrossHarbor and Ms. Blixseth been brought forward in the

15   context of your discussions with CrossHarbor?

16   A.  No.  I mean when I say haven't been brought forward,

17   there has never been any claim that they're -- that there's

18   an enforceable agreement there, that they're acting under

19   that agreement, or it's ever been said, "You've got to do

20   X, Y or Z because there's an agreement."

21       Everybody's obviously aware of -- we've discussed the

22   historic relationship.  I mean that's an unavoidable --

23   it's not even "unavoidable"; that is a fact that's out

24   there for everybody to see.  I mean that relationship is

25   known.  They're our, they're our lender.  We talk to them

```
 1   virtually every day.  We've gone in for an increase in

 2   their loan.  I mean there's -- the relationship isn't

 3   hidden, but it's also a daily business relationship, and

 4   the history is known.

 5   Q.  In the context of proposing the plan, have you been

 6   influenced by the prebankruptcy relationships between

 7   Ms. Blixseth and CrossHarbor?

 8   A.  No.  And as I testified before, I don't think anything

 9   prebankruptcy with respect to a deal, document, or

10   otherwise has been brought up in connection with the

11   negotiation of a plan.

12   Q.  So any question of good faith in connection with the

13   prebankruptcy relationship doesn't have anything to do with

14   the good faith in proposing the plan on your end?

15   A.  That's correct.  You just said it far more artfully

16   than I rambled about.

17               MR. PATTEN:  Thank you.

18               THE COURT:  Mr. Greenspan, you may step down.

19               THE WITNESS:  Thank you, Your Honor.

20               THE COURT:  Mr. Chehi -- oh, you may step down.

21               THE WITNESS:  Okay, thank you.

22               MR. CHEHI:  Let me pick up where I left off, Your

23   Honor.  First I'll summarize the testimony and then go to

24   the legal -- some of the legal points.

25               THE COURT:  Let me ask you a couple of questions.
```

1              MR. CHEHI:  Sure.

2              THE COURT:  Maybe we can move it along.

3              MR. CHEHI:  Yes, Your Honor.

4              THE COURT:  Given the responses, given the

5    testimony, it seems what really is at odds is, one, what

6    the scope of this may be, the examiner's responsibility; as

7    well as who pays it; and when it commences.

8              I mean those are three things that it seems like

9    maybe there's not consensus.  There's consensus that there

10   should be an examiner, let's have transparency, let's have

11   light on everything.  And the question, as Mr. Greenspan

12   just kind of discussed, was, "Well, if there is an examiner

13   those claims are going to be -- whatever is discovered is

14   going to be there.  Just give us a little time so we can

15   get some other things put together."

16             Now, you may strongly disagree with that type of

17   thing and you may also disagree as to Debtors' request

18   that, in fact, Credit Suisse pay for the costs of the --

19   potentially pay for the costs of examiner.

20             I guess the question I have for you is:  What is

21   your position on timing?  Immediate, or is it something

22   that can actually be delayed as far as the commencement of

23   his or her responsibility for 30 days?

24             MR. CHEHI:  Let me give you the practical

25   solution here that, you know, we have mind, is:  We assume

1    that were Your Honor to enter an order today directing the

2    appointment of an examiner, the U.S. Trustee would have to

3    then undertake a process to appoint an examiner, an

4    appropriate examiner for the circumstances of these cases.

5    And that process in and of itself would take a number of

6    weeks by the time the U.S. Trustee interviews; determines,

7    you know, who's right for the mission; and then actually

8    gets that examiner employed by application of this Court.

9    And that examiner, then, in turn, would have to engage

10   counsel to assist the examiner in undertaking its

11   investigation.

12          So as a practical matter, Your Honor, the timing

13   issue is not -- no one is suggesting or expecting, at least

14   on our side, that the examiner would be miraculously

15   appointed and off investigating next week, the following

16   week, or even by the middle of next month.  I think it's

17   going to take that examiner some time to get moving.

18          And so from a timing point of view, we actually

19   think that it's important to get the examiner process

20   started so that it can actually bear some fruit and shed

21   some light on relationships which are just not prepetition

22   relationships and are not just potential prepetition causes

23   of action, but, as counsel for Highland suggested, our --

24   the focus has to also be on the relationships, the

25   associations, the agreements, the understanding, the whole

1    ball of yarn that overlaps the prepetition and the

2    postpetition period.  Because Ms. Blixseth testified,

3    Mr. Greenspan testified that there have been, you know,

4    ongoing negotiations between Blixseth and CrossHarbor

5    outside of the ambit of Greenspan.

6              THE COURT:  Mr. Chehi, if there's an examiner

7    appointed, it's going to be pre and post.

8              MR. CHEHI:  Very good.  And we think that the

9    Court deserves and the other parties in interest deserve,

10   you know, a report from the examiner expressing independent

11   views - not our allegedly biased views or that other

12   person's allegedly biased views - of what their view is of

13   the facts and whether those are tantamount to something

14   that, No. 1, could give rise to causes of action; No. 2,

15   could have tainted or is tainting the plan process, the

16   process that began supposedly at the commencement of the

17   cases but, as Ms. Blixseth testified - notwithstanding

18   other statements subsequently made - began at the time the

19   agreement to form and the MOU were negotiated, because

20   those documents, in her view, are -- contemplated a

21   restructuring, which she said today very specifically are

22   being effectuated as they can be through the Chapter 11

23   process.  She admitted that to Mr. Saunders.

24             THE COURT:  Well, so then, you know, I guess

25   trying to cut through so we can get to some of the other

1    matters, as well - not to cut you off - so if we have an

2    examiner that investigates pre- and post-transactions,

3    conduct, etc. --

4         MR. CHEHI:  Etc.

5         THE COURT:  -- and there's a process by which

6    that will take some time to get that person in place,

7    whoever that person may be - I'm not sure if there's been

8    discussion by any of the parties at all - but so there will

9    be a process there which probably provides Mr. Greenspan

10   the breathing room he may need to be able to go forward

11   with the things that are of immediate attention.

12        MR. CHEHI:  Absolutely, Your Honor.  And he

13   testified to an important fact, and that is:  There have

14   been no formal discovery requests propounded upon the

15   debtors since November.  And we have not pressed the

16   debtors to comply with those discovery requests above and

17   beyond the compliance that we received, which is, you know,

18   a relatively small assortment of documents at the time the

19   depositions were taken in early December.  We haven't been

20   pressing them to provide us with additional information

21   which would have fallen within the ambit of the documents

22   Mr. Greenspan talked about.

23        "I'm sure there are" - he said - "e-mails, things

24   in our files, information that's somewhat historical in

25   nature."

 1              That was never produced to us when we originally

 2      requested it.  And we can understand that because

 3      Mr. Patten was, you know, single-handed at that time and

 4      things were moving along quickly and everyone was tied up

 5      with the DIP financing.  But, in fact, there, you know,

 6      were outstanding discovery requests to the debtors just

 7      like there were to these other parties.

 8              THE COURT:  But isn't that part of the reason for

 9      my December 10th order, so that there could be that formal

10      discovery?

11              MR. CHEHI:  Well, it actually just authorized

12      discovery of CrossHarbor and Discovery Land Company, Your

13      Honor.

14              THE COURT:  That's right, it did.

15              MR. CHEHI:  It did not -- and we didn't want to

16      interfere with the debtors because --

17              THE COURT:  Okay.

18              MR. CHEHI:  -- as we'll get to when we talk about

19      the bidding procedures motion and the time frame for

20      confirming a plan and the necessity of filing a plan that's

21      acceptable by the --

22              THE COURT:  Well, at this point, then, I guess as

23      I see it, really the only remaining issue is who pays for

24      it.

25              MR. CHEHI:  Yeah.  We, we --

1           THE COURT:  And, obviously, it's a 330 expense

2    unless, I guess, there's, well, an alleged surcharge,

3    potentially.

4           MR. ALTER:  Your Honor, if I may interrupt.

5           THE COURT:  Mr. Alter.

6           MR. ALTER:  Jonathan Alter for the record.

7           I just had a question because I'm not certain I

8    understand:  Would the appointment of the examiner obviate

9    the need for the pending discovery that Credit Suisse has,

10   or would that be duplicative and run in tandem with the

11   examiner's work?  Because, frankly, if the examiner is the

12   only one that he's beholden to answer those questions, it

13   may be better for the estate than having to deal with this

14   constant dispute regarding discovery.  Thank you.

15          THE COURT:  Well, and I thought that that was

16   about the first or second sentence that was stated on the

17   record when we first started this hearing several hours

18   ago, was that the decision on the examiner may resolve some

19   of the discovery disputes.

20          MR. CHEHI:  Here's what our view is on that, Your

21   Honor, if I can give it to you -- and, again, as a

22   practical matter, an examiner I don't think will be able to

23   get up and running with his, you know, lawyers to really

24   commence an investigation until about a month from now.  As

25   a practical matter, it will take them that long to figure

1    out what's going on, figure out what the issues are, figure

2    out what they should be looking at.

3           We do not agree that the discovery that the

4    creditor constituents, including our client, the rights we

5    have to discovery should somehow be suspended because the

6    examiner is coming.  Actually, we think that the efficient

7    and cost-effective way to proceed is to allow the document

8    discovery only, which everyone has delayed for whatever

9    reasons, to go forward; have those documents produced to my

10   client; have them produced to the committee; and allow

11   those documents to become part of the mix of information

12   that the examiner is going to be looking at.

13          And then when the examiner does get up to speed,

14   he's going to do what every other examiner does, and that

15   is have some frank discussions with all the parties in

16   interest about what the potential issues are, what people's

17   views are about possible matters for investigation,

18   possible improprieties, possible conflicts, all of the

19   things that are the subject matter of our motion.  And with

20   the benefit of documents already having been produced in an

21   orderly fashion, we're talking about non-privileged

22   documents; and the ability of the various parties in

23   interest - the committee, Credit Suisse, if there's others

24   who want to participate in that, that's up to them - those

25   parties who understand these cases pretty well can sift

1  through the documents, identify the important issues, the

2  important documents.  And then when the examiner arrives on

3  the scene and is ready to go, he's going to have a real

4  head start in that process.  He's going to have access to

5  the same documents.  And if he wants more documents, he can

6  ask for them.  So it's not duplicative; it's a start.

7         THE COURT:  Well, I guess my concern is:  How

8  isn't it duplicative?

9         MR. CHEHI:  Well, Your Honor, the same documents

10  that are being produced for us are going to be made

11  available to the examiner.

12         THE COURT:  Why don't we wait and let the

13  examiner request those documents?

14         MR. CHEHI:  Because it is not giving my client

15  and its constituents and other parties in interest who have

16  standing to examine the good faith of various arrangements,

17  insider arrangements and agreements that pertain to the

18  plan of reorganization process to explore those for

19  purposes of bringing those issues forward at the time of a

20  confirmation of a plan.  That's what this is all about.  We

21  can't -- what the examiner can provide to the Court is an

22  independent view.  That doesn't mean that other parties

23  shouldn't be heard, that there shouldn't be discovery.

24         THE COURT:  Well, the problem I have, then, is:

25  What are we accomplishing with the examiner but just

1    burdening the system more?

2         Because I know Credit Suisse and the other

3    parties that are going to object are going to be all over

4    the debtor.  And so why do we throw another party in there?

5         MR. CHEHI:  I'm not even asking for documents

6    from the debtor, Your Honor; I'm asking for documents from

7    Blixseth and the Blixseth affiliates, CrossHarbor, and

8    Discovery Land Company.  These are the insiders who are not

9    the debtors who have a stake in prepetition agreements and

10   postpetition plan process.

11        THE COURT:  Well, see, here's where I run into

12   the problem, is I just feel like we're just strangling the

13   system with trying to just push more and more stuff onto

14   the debtor in trying to get toward confirmation by having

15   another third party, independent party, doing things.  And

16   then that examiner looks at the situation and goes, "Well,

17   I don't know if I really trust these documents.  I think

18   there's more behind all of this," and so then we have just

19   discovery on top of discovery.

20        Certainly, Credit Suisse is very competent in

21   going forward with discovery, and maybe that's where we

22   should leave it -- and the creditors committee, as well;

23   and the ad hoc committee.  I mean we've got numerous groups

24   here that are all wanting to make sure the debtor is

25   complying with everything they need to do.

1              MR. CHEHI:  Your Honor, we can talk to our client

2    about it.  You know, I don't think we'd be here filing an

3    examiner motion if we were getting discovery and

4    information.

5              But, again, we haven't seen anything but two

6    documents that the Court ordered produced some time on

7    December 10th.  That's the sum and substance of all of the

8    issues.  It's sort of remarkable, isn't it?

9              And then, lo and behold, the issues that we had

10   concerns about at the onset of the case and about the

11   commencement of the case, the involvement of CrossHarbor in

12   the restructuring of the debtors and in their management,

13   and in the outcome, lo and behold, the testimony here for

14   the first time today is that's exactly what's being

15   proposed.  And we haven't had an opportunity to look at any

16   of that.

17             You know, I'll talk to my client, but we'd be

18   happy -- if Your Honor ordered discovery and we got full

19   discovery of this non-privileged information that we've

20   been seeking, we could probably be satisfied for the time

21   being with going forward with that.  And then it's up to

22   Your Honor if you want to decide to -- you need an

23   independent view of it.  But what you do need is --

24   somebody needs a view of it, meaning the undisclosed

25   communications, the stuff behind the selective disclosures

1    and statements that have been made in court and in excerpts

2    and pleadings and two documents that were given up.

3         THE COURT:  Well, you know, maybe what I should

4    do is just direct that all discovery be done.  And if it's

5    not complied with by order, we look at sanctions under 37

6    and just bring all this stuff to a halt.

7         I mean I think with the examiner, I'm still

8    concerned that all we're doing is adding another party in

9    this; true, independent.  And I realize that the debtors

10   agree to it, the official creditors committee has agreed to

11   it, Credit Suisse wants it, CrossHarbor has agreed to an

12   examiner, and yet it seems like we're augmenting the system

13   for transparency that's going to come out through all the

14   discovery in any event.

15        MR. CHEHI:  If we can take a recess, perhaps,

16   for, you know, five minutes.  And we can talk to our client

17   and talk to my partners here, and we can talk about whether

18   or not we'll withdraw the motion for the examiner if we're

19   going to get full discovery.

20        THE COURT:  Well, at this point, I'm wondering if

21   the motion isn't -- if the appointment isn't mandatory, as

22   the debtor asserts, anyway.

23        MR. CHEHI:  If there's a request and the request

24   is ours.  And we can withdraw the request.

25        THE COURT:  Well, before we do that, let me tell

1     you a couple of things that are going on.  The Billings

2     courtroom, there are two trials going on.  There's, I

3     believe, an arraignment coming -- or a detention hearing

4     coming up at three which takes out the third courtroom

5     where Mr. Guthals and Mr. Doak are sitting right now.

6     They've been informed previously of this risk that they may

7     be -- they may have to leave.  And then we'll terminate and

8     then bring them back after the detention hearing.

9           Given that prior knowledge to them, I really

10    can't sit here until three-thirty to reactivate this

11    hearing.  I will give you a recess.

12          MR. CHEHI:  We're just talking five minutes for

13    ourselves, Your Honor.

14          THE COURT:  Yes.  But all I'm saying is I think

15    just so Mr. Guthals and Mr. Doak know, you may not be on

16    system for awhile during that detention hearing.  And then

17    we'll just go forward here, and then you can come back on

18    at the time that detention hearing is over.  Because we

19    need the time here.

20          So before we do anything, I do want Mr. Hursh to

21    comment because he has a comment to just what we've been

22    talking about, Mr. Chehi.

23          MR. CHEHI:  Sure.

24          MR. HURSH:  Judge, I was just going to add two

25    comments.  One, to the extent that the Court is considering

1   what it mentioned just a moment ago - (inaudible) - all the

2   discovery to go forward, I would like just clarify that

3   it's never been an issue of us not producing or appearing.

4   It was truly related to scope, and we think there was a

5   basis for that.

6          Having said that, I think that what is behind, in

7   large part, many of the parties' willingness to entertain

8   an examiner is the thought that that independent party will

9   exercise judgment and evaluate that which is produced to it

10  at its request through an independent lens.  To date, all

11  the requests for production that have been served that are

12  at issue here have been done through the lens of Credit

13  Suisse.

14         There is, in fact, the possibility that an

15  examiner, if appointed, could come in and preliminarily

16  decide that, in fact, there are other issues to look at and

17  that, in fact, it may take a very different view from this,

18  independent of the view Credit Suisse has put forth.  And

19  if, in fact, that were the case, then all that document

20  production that had previously been ordered would have been

21  for not.

22         So I guess with that, we'll go to recess unless

23  Mr. Moore has anything he'd like to add, but I think that

24  that's important to keep in mind, that the parties see this

25  as a solution to a problem in this case which has been, you

1    know, I think a use of discovery that hasn't been

2    result-oriented.

3              THE COURT:  Okay.  Mr. Patten.

4              MR. PATTEN:  Your Honor, I think that the counsel

5    for Credit Suisse has acknowledged that the debtor has

6    complied with the discovery that's been put to it.  I think

7    Mr. Greenspan described in detail all the information that

8    he's provided.

9              And I think what this gets down to -- and the

10   request for an examiner is really to resolve a discovery

11   dispute between Credit Suisse and CrossHarbor.  And I don't

12   think that we should be burdened by their discovery

13   dispute, either financially or timewise.  And I think that

14   to the extent that there is going to be an examiner - which

15   I think is mandatory, Your Honor - it seems to me that it

16   would be appropriate to stay the Credit Suisse discovery

17   while an examiner investigates; otherwise, we're bombarded

18   with information requests and discovery.  And there's

19   another motion set for hearing today on expedited discovery

20   at a time when we're doing the best we can do comply with

21   some pretty short deadlines to get the plan in, get the

22   property marketed, and get the plan confirmed.  And instead

23   of being diverted from multiple different angles, if we're

24   going to get diverted, let's just be diverted from one side

25   and not from all sides.

```
 1            THE COURT:  Okay, thank you.  Mr. Guthals, I'll

 2   let you go next because you may get bumped.

 3            MR. GUTHALS:  Yes.  And this is, this is just a

 4   question in case we get bumped.  There is a Rule 2004

 5   examination scheduled for Edra Blixseth in Los Angeles this

 6   coming Monday.  And I'm trying to determine if that is

 7   actually going forward or not in light of what we've talked

 8   about today.

 9            THE COURT:  Mr. Chehi.

10            MR. CHEHI:  Your Honor, Mr. Guthals, that is

11   actually a Rule 2004 examination scheduled for BLX Group,

12   Inc.; not Edra Blixseth because Your Honor did not

13   authorize 2004 discovery of her in person.  And so whoever

14   they put forward, which we assume is her, is supposed to

15   appear for that.  But as we've explained to other parties,

16   we don't intend to go forward with that deposition absent

17   receiving documents and a meaningful opportunity to review

18   them because depositions without prior document review are

19   not very helpful and are wasteful.

20            THE COURT:  Okay.  Does that answer your

21   question?

22            MR. GUTHALS:  Does that mean "no"?

23            MR. CHEHI:  I assume I have done --

24            MR. GUTHALS:  I just need to know "yes" or "no"

25   so I can find out - (inaudible, audio cuts out) - flight to
```

1    LA.

2           MR. CHEHI:  Let's say "no", and we'll reschedule

3    it at everyone's convenience.

4           THE COURT:  Okay.

5           MR. GUTHALS:  Thank you.

6           MR. McKAY:  Your Honor, just two points:  I

7    wanted to echo Mr. Patten's comment that - this is the U.S.

8    Trustee's position - that an examiner is mandatory, given

9    the predicates in the statute.

10          Secondly, just to inform the Court that when the

11   motion was filed, I did begin discussions with people more

12   knowledgeable about this in the program as far as how we

13   would go about identifying a candidate and trying to do the

14   consultation with the parties that we need to do, and so

15   forth.  And I can't represent to the Court how long that

16   would take, but we would certainly gear up and do that

17   after we got the order with regard to scope, and so forth,

18   so we could mesh those things as far as identifying a

19   candidate.  So I just wanted the Court to be aware that we

20   really -- I anticipate it would take several weeks to

21   identify the candidates, contact them, do the interviews,

22   and so forth.

23          So if that goes into anybody's thinking -- and, I

24   don't know, if Credit Suisse caucuses and decides they

25   would withdraw that, I guess it's up to the other parties

1    who may be in favor of it.  If they are going to make oral

2    motions, or whatever, on their own to appoint one, then

3    we'll address that.  But we are ready to move if that's the

4    Court's order.  Thank you.

5              THE COURT:  Okay.  Mr. Beckett.

6              MR. BECKETT:  Thank you, Your Honor.  I'm a

7    little disappointed to hear that last comment because I

8    should think that if the Court wanted an examiner

9    appointed, that you get one appointed within a day or two.

10   And, Your Honor, it struck me that the three highlights of

11   the testimony were that:  Ms. Blixseth has had, has had a

12   past experience with CrossHarbor and has a current

13   experience with CrossHarbor.  And the current experience is

14   troublesome.

15             I have asked people to imagine if you can have an

16   arm's-length transaction with -- negotiation with somebody

17   who's foreclosing on your house.  And I don't know if

18   that's possible.  But what I heard, Your Honor, is

19   Mr. Greenspan is really much more in control of the

20   business elements of the plan negotiations right now.

21             And I'm going to suggest that the parties think

22   about an examiner for a small purpose at first.  And the

23   small purpose is to come in and to come back and to take

24   the stand and to advise the Court:  Is it possible for

25   Yellowstone with Ms. Blixseth there to negotiate with

1    CrossHarbor and have a plan which is in the best interest

2    of creditors?

3              And there are a number of considerations, but I'm

4    not certain it goes into boxes and boxes and boxes of

5    documents.  It needs to be somebody seasoned with some

6    judgment who can ask some questions and spend some time and

7    take a look at the - (inaudible) - Credit Suisse discovery

8    requests and advise the Court on how much of that is

9    necessary right now.

10             I mean if there are claims and causes of action

11   that honestly do not go to the ability for there to be

12   arm's-length negotiations toward a good plan, then that's

13   stuff that belongs later on in a liquidating trust.  I mean

14   those are claims and causes of action to be pursued later.

15             In the meantime, the most important question is:

16   Is the Court satisfied that there can be arm's-length

17   negotiations given these connections resulting in a plan

18   that's in the best interest of creditors?

19             It doesn't seem to me that that should take very

20   long.  And if the answer is "no", we go from there; if the

21   answer is "yes", then I hope that gives this Court some

22   confidence in this process.

23             THE COURT:  Okay.  Thank you, Mr. Beckett.

24             Let's break.  We'll be in recess here until about

25   three.  We will come back at three o'clock.  And at that

1    time, just for the Billings people, we understand that they

2    should be done by three-thirty, so we'll reconnect at

3    three-thirty.  We're in recess.

4              (A brief recess was taken.)

5              THE COURT:  We'll continue with the Yellowstone

6    Club hearings.

7              Mr. Chehi.

8              MR. CHEHI:  Your Honor, we are not withdrawing

9    our motion for an appointment of an examiner.  We request

10   the Court appoint an examiner and, however, hold the

11   examiner's scope of investigatory duties and obligations to

12   the Court in abeyance until the examiner is actually

13   appointed and some determination is made as to how to get

14   them paid, because that will influence what his scope of

15   his duties and willingness to perform are going to be.  We

16   think that will take some time.

17             THE COURT:  How are you going to find an examiner

18   before you tell him how he's going to get paid?

19             MR. CHEHI:  No.  On the payment issue, Your

20   Honor, that, we think, rests squarely with the debtors.

21   They should be requesting CrossHarbor to provide additional

22   funding for this, if they're willing to; they should ask

23   other potential sources of funding for the same amounts

24   that would be required to, you know, carry an examiner in

25   the performance of his duties; and they should come to the

1    prepetition lenders, and they can ask for the same thing.

2            And, of course, if it's not CrossHarbor providing

3    it, somebody's going to have to provide it on a junior DIP

4    basis, and come up with a budget and an amount that's

5    meaningful.  And, again, that will go back to what the

6    examiner's duties are.  And if his scope is broad, he'll

7    need more money to get it done; if his scope is very

8    narrow, it will probably take him less time.

9            But until the budgetary issues and the actual

10   issues that will require examination are formulated, we

11   think initially, the Court should enter the order directing

12   the U.S. Trustee to appoint an examiner who's willing to

13   undertake it in those types of circumstances.

14           In the meantime, Your Honor, we're not waiving or

15   giving up on our rights to take discovery, because the

16   discovery that we're seeking of CrossHarbor and Discovery

17   Land Company and BGI is entirely appropriate, it is

18   meaningful, it is directed to the issues that are at stake

19   in this expedited plan process in the merits of -- in the

20   good faith of any CrossHarbor-sponsored plan that benefits

21   CrossHarbor and Edra Blixseth and whoever else is involved

22   in transactions and contributing property, and the like,

23   for whatever consideration under the plan.

24           THE COURT:  It sounds like you want to prove the

25   good faith of CrossHarbor.

 1          MR. CHEHI:  No, I'm not asking to approve the

 2    good faith of --

 3          THE COURT:  No, that you're going to prove it

 4    through all of your discovery.

 5          MR. CHEHI:  Your Honor, to tell you the truth,

 6    this discovery will either disclose warts, disclose

 7    malignancies, or disclose not much.  And in either event,

 8    that will be informative for the process, because the

 9    process of resolving the cases consensually at the end will

10    be driven a bit by the transparency of what is there.

11    Right now, it's very difficult for our client constituency

12    to be able to agree to the contemplated plan, as it's been

13    described in court today and some pleadings.

14          THE COURT:  Well, I guess, you know, the issue --

15    you know, I look back on this thing to November, the last

16    week in November, the hearings we had right here.  But for

17    you not -- your group not having financing, CrossHarbor

18    would not have even been involved in this process except as

19    an owner up at the club because you would have had the DIP

20    financing.  And we all know where that process went.  And

21    so I mean here we are.

22          And, unfortunately, it just seems you're trying

23    to fight tooth and nail on something that -- you were in

24    the driver's seat at one point and decided stop at a

25    stoplight rather than going forward.  Now, that's just a

1      comment.

2            I realize you have -- certainly, your clients

3      have an interest in making sure that there isn't a problem,

4      and I understand that.  It's just, from a credibility

5      standpoint, it affects me a little bit because I think that

6      you could have had that position.

7            MR. CHEHI:  It's unfortunate, Your Honor.  And

8      we, you know, feel badly on a number of fronts and maybe

9      apologetic to a certain extent, but also chastened, but

10     also a bit surprised that inability of our group to provide

11     funding in the circumstances in which there was a

12     good-faith attempt made to provide the funding failed

13     because of developments in the financial markets in that

14     particular weekend.

15           THE COURT:  Yeah.

16           MR. CHEHI:  And that did, indeed, allow

17     CrossHarbor to become the DIP lender in the case, but that

18     does not mean that CrossHarbor should then have unbridled

19     freedom to sponsor a plan without an appropriate

20     examination and investigation and discovery of the

21     underlying merits and good faith of the plan and the

22     relationships between the various insiders which are

23     pervasive in the case and in the plan process.

24           THE COURT:  But, Mr. Chehi, we've got, what, how

25     many people that are going to be looking at the disclosure

1    statement and the plan?  Probably six, seven, eight people

2    that are going to be objecting and that we're going to have

3    hearings on.  So I mean I think that to some point, we're

4    going to flush out those issues through -- and the

5    feasibility of the plan through all the subsequent hearings

6    that are forthcoming.

7            But at this point, based on what you first said

8    and you're not withdrawing the motion, I am going to issue

9    an order appointing in limited scope an examiner,

10   initially.  And if that examiner comes back and feels that

11   there's more that needs to be examined, I'll entertain a

12   motion to broaden his scope, much like you've mentioned and

13   much like Mr. Beckett mentioned, to see what the issues

14   are.

15           And as far as the compensation of that, certainly

16   it's a 330 expense, and I guess we'll have to kind of sort

17   that out once the trustee gets to the point of appointing

18   an examiner and making sure that there's some process by

19   which that examiner is paid.

20           MR. CHEHI:  And the debtors should explore those

21   financing options with the people who are in the room here

22   and with anybody else who might be available to provide

23   funding for an examiner.

24           THE COURT:  I think that I will encourage -- I

25   will ask the U.S. Trustee's Office to work with the

1　examiner on that basis to get consensus as to employment

2　and the expense of that.  And if not, I'll decide it.

3　　　　　Mr. Moore.

4　　　　　MR. MOORE:  Your Honor, if I could help, my

5　client is prepared to fund that if the Court authorizes an

6　increase in the DIP loan and the parties think that's

7　appropriate.  And you can sort out relative responsibility

8　later.

9　　　　　THE COURT:  Any objection to that?

10　　　　　MR. CHEHI:  To the extent that we receive

11　adequate protection of our interests.

12　　　　　THE COURT:  Well, I'm not sure what that is.

13　　　　　MR. CHEHI:  Well, Your Honor, just to --

14　　　　　THE COURT:  No, I mean let's just cap it.  I mean

15　I don't know what an examiner needs, but are we talking

16　10,000, 20,000, 30,000 to do that initial -- I mean I'm not

17　talking millions here.  I mean, in fact, I haven't seen any

18　fee apps yet in this thing -- the one fee app that I did

19　see was withdrawn.

20　　　　　MR. CHEHI:  This gentleman here has served as an

21　examiner.  He may be able to give you a better view of what

22　sort of values might --

23　　　　　THE COURT:  Mr. Warner.

24　　　　　MR. WARNER:  I really wasn't anticipating saying

25　this, Your Honor.  I've been listening to the process.  I

1    am currently the examiner in the Asarco case pending in

2    Corpus Christi, Texas.

3              THE COURT:  Okay, sure.

4              MR. WARNER:  What the judge did there - and I

5    thought it was awful creative - was because the code

6    mandatorily -- or requires the appointment of an examiner,

7    the judge really had no choice, and he entered an order and

8    said, "Examiner is appointed.  U.S. Trustee, find someone."

9              The U.S. Trustee said, "What's the scope?"

10             And he said, "Come back, and I'll let you know."

11             The process took six, seven, eight weeks.  The

12   interviewing process goes on at the U.S. Trustee level

13   locally.  Once they've narrowed it down - or at least this

14   is how it went on in Corpus - once they narrowed it down,

15   the three or four candidates were sent to D.C.  They were

16   interviewed there.  D.C. ultimately made the decision and

17   sent it back to the local office where they actually

18   appointed the examiner.  Then an order is entered where the

19   examiner files an affidavit that says:  Here's my lack of

20   interestedness.  That process was almost eight - nine

21   weeks.

22             Then the Court said, "Now we will hold a hearing

23   on what the scope is."

24             In this case, it's a little different.  We would

25   also need to hold a hearing vis-a-vis, unless we had

1    funding in place, where the funding comes from.  In that

2    case, there was plenty of funding to pay the examiner,

3    thank God.

4         The scope issue was brought before the Court when

5    the parties had narrow issues to address.  And that's what

6    the Court really wanted.

7         He said, "Fine, the examiner is now sent out to

8    do this issue and focus on this issue."

9         The parties were going at that issue themselves,

10   and it was necessary.  The Court did not limit what the

11   parties would do even if it was to some extent duplicative

12   of what the examiner was because the examiner was there to

13   be the eyes and ears of the Court and report to the Court;

14   the parties would spend it any way they saw.  And that was

15   appropriate to do so.

16        As far as the cost, in this case, you know, if

17   the Court limits the scope of the examiner to very narrow,

18   you're probably looking at a $150,000 item.  I don't know

19   if that's offensive to anybody.  I'm just saying that as a

20   gut reaction.  I know what the professionals in this room

21   charge.  I can't tell you that an examiner is going to be a

22   lot less than that.  But it's something we need to at least

23   focus on, and it's a function of the scope.

24        THE COURT:  Thank you.

25        MR. CHEHI:  And, Your Honor, in the meantime

1    while the examiner is engaged and arrangements are made to

2    employ him, you know, our proposal and request to the Court

3    is that the 2004 discovery that we have - not against the

4    debtors; we haven't sought discovery against the debtors,

5    but against CrossHarbor and Discovery Land Company which

6    this Court previously authorized, I believe it was on

7    December 10th - that that should be permitted to go

8    forward.

9              It will not be duplicative of the discovery that

10   the examiner will be doing because the document production

11   is going to be done once, and they're going to produce

12   documents.  And to the extent the examiner wants to see

13   those documents, he's going to have access to them.

14   Documents are produced on a disk electronically, and the

15   examiner can have his disk of documents as and when he gets

16   involved.  And to the extent that he wants to parse through

17   it while the parties, meaning our client, the committee and

18   if there are other parties in interest that want to

19   participate in that process - because they all have their

20   rights, too, to explore the good faith of the plan process,

21   and the like - have the ability, then, as adversaries in

22   the case to explore those issues.

23              And, again, Your Honor, when the parties have had

24   the opportunity to do that, they will then be convinced one

25   way or the other that either there are issues or there are

1   not meaningful issues or there are huge issues that should

2   be brought to the Court and which will go to the

3   confirmability of the plan.  Absent having that process,

4   you're not going to have the opportunity for the parties in

5   interest who are most affected by the plan to actually

6   weigh in on the merits of the plan.

7           The plan that's proposed, as Your Honor might

8   recall from reading the bidding procedures motion, is an

9   approximate $100 million purchase price plan.  And as we

10  wrote in our motion, the most important thing about that

11  motion as a threshold matter is that it's indicating a

12  value for our collateral that is in the range of

13  $100 million as opposed to $310 million.  And that is not a

14  comforting sign to us from a couple of different points of

15  view:

16          Number 1:  Is that the right value?  Has the

17  property been properly marketed?  Is this the right type of

18  plan to be going forward with as a stalking-horse plan; or

19  alternatively, are there higher and better plan

20  alternatives out there?

21          And, No. 2, if those are the values that the

22  debtors are now advocating and CrossHarbor is now

23  advocating, those values are very different than the values

24  that they embraced just two months ago during adequate

25  protection hearings.

1          And it really puts into question whether our --

2    whether the prepetition lenders' interests in their

3    collateral are adequately protected against the priming

4    liens.  They certainly aren't if the ultimate value is

5    $100 million.  And so we have very serious concerns about

6    that.  The treatment of unsecured creditors is no better.

7    And so those issues loom very large.

8          And, again, that justifies -- because these are

9    very large numbers, Your Honor.  They may not be out here

10   too often but these numbers are here now, and they're big

11   for the people who have advanced money to these companies

12   and not been repaid.  Three hundred million dollars is a

13   lot of money.  And the difference between $100 million

14   recovery and a $200 million recovery and a $300 million

15   recovery on a claim of that size is very, very material

16   today.  And that justifies the expenditure of the lender's

17   resources in taking the discovery and understanding fully

18   the plan.

19         Which again, Your Honor, maybe the discovery

20   shows there are no warts, there are some warts, or there's

21   a big problem.  That will drive the outcome of these cases

22   either to a consensual conclusion or to a litigation.

23         THE COURT:  Well, let's move on to the next

24   matters.  As it relates to the examiner, I'll issue an

25   order on that.  And it will have some limited scope, as

1    Mr. Beckett referenced during his comment as well as

2    Mr. Chehi's.  And it may be even that we broaden that -

3    (inaudible, coughing in microphone) - proper motion once we

4    know who we might be having as an examiner.  So that's,

5    that's resolved.

6            Now, we still have the discovery, the motion to

7    reconsider the 2004 exam, which I believe is Mr. Hursh's

8    motion to reconsider.

9            MR. HURSH:  Yes, Your Honor.  And I'll start

10   where I left off just before the break.  And I will, in

11   recognition of the other issues on the calendar, try to

12   curtail my comments to some extent.

13           We have not - and let's be clear - said at any

14   time, "We're not going to participate in the examination or

15   produce documents."  That's simply not been our position.

16   I don't know if --

17           THE COURT:  What is your position?

18           MR. HURSH:  The position is that the requests

19   that have been received exceed the permissible scope of a

20   2004 exam of a third party.  And they're simply -- at least

21   we've not received to date any reason to justify them.

22   They create a burden on CrossHarbor that is extensive.

23   Particularly, they require production of all internal

24   communications, e-mails going back to, I believe it's 2007,

25   well before either the petition date or even some of the

1   matters prepetition that have been talked about today.

2           We proposed as an alternative, and this is an

3   exhibit that -- there is in the docket --

4           THE COURT:  Well, but I guess let's not get the

5   cart before the horse.  Really, the only motion before me

6   is the motion to reconsider whether, in fact, the order

7   previously granting the 2004 should go forward.

8           MR. HURSH:  Certainly; yes, Your Honor.

9           THE COURT:  And I really hear concurrence on that

10  point.

11          MR. HURSH:  Well --

12          THE COURT:  And so if there is a concern over the

13  scope of that examination or the documentation, or

14  whatever, it would seem to me that that would come at the

15  point that you're either producing the documents and that

16  you feel there's an objection that's appropriate or you

17  come to me for a protective order.

18          MR. HURSH:  Okay.

19          THE COURT:  And we just go down through

20  whatever's been requested, and I rule if you have to

21  produce it or you don't produce it.  Then we know what

22  we're dealing with.  At this point in time, we don't

23  know what --

24          MR. HURSH:  I understand.

25          THE COURT:  I realize they've asked for all

1    internal communication.  Maybe there are those

2    communications, maybe they don't even exist.  But I mean

3    what are we dealing with?

4            So, in essence, just based upon what's just

5    occurred, I don't believe that there's cause to reconsider

6    my earlier order.  But, certainly, I leave with you leave

7    to file motion as to protective order --

8            MR. HURSH:  Okay.

9            THE COURT:  -- as to the matters.  Or if they

10   don't exist -- and we'll just go down through it.  We may

11   do that.  Certainly, it wouldn't require, necessarily, all

12   the parties to travel back to Montana.  We can probably set

13   something like that up either by video conference or by

14   phone, and we'll just go down through the issues.

15           MR. HURSH:  With that in mind, Your Honor, I

16   believe Credit Suisse wanted to set up for next week,

17   February 16th, an examination.  Mr. Chehi previously

18   indicated, absent production, he wasn't going to go forward

19   with Ms. Blixseth's.  Based on what you're telling me and

20   what Mr. Chehi said earlier, should I understand, then,

21   that that is off next week?  We'll revisit it?

22           THE COURT:  I think he already indicated to

23   another attorney that that was off for the 16th.  Is that

24   Monday?  I'm sure that's what he said.

25           MR. CHEHI:  The answer is the same, Your Honor.

1    We are not interested in taking a deposition of anybody

2    until we've had documents.  And that means resolving the

3    document issues.  There are really only three issues here.

4    One is the specified period covered by discovery.

5              THE COURT:  Sure.

6              MR. CHEHI:  The original 2004 order said the

7    discovery -- the information should be produced to the

8    extent it exists and arises during the period from

9    January 1, 2007, through the present.

10             In discussions with CrossHarbor's counsel, I was

11   agreeable to taking an entire year off of that and just

12   starting at January 1, 2008, which is a period in time

13   after they had reached their arrangements with Tim Blixseth

14   but prior to the end of March time when CrossHarbor

15   admittedly terminated the arrangements.  And then there

16   were various marital disputes that were resolved and the

17   entire thing transitioned.

18             THE COURT:  Well, I think, given what you've said

19   and what Mr. Hursh said and given the motion for

20   reconsideration, the motion to reconsider is denied with

21   leave to pursue whatever other remedies you feel

22   appropriate regarding either protection or for you to seek

23   sanction under 37 for not producing.

24             MR. CHEHI:  Okay.  And, Your Honor, what we're

25   most interested in is just getting them to start to

1    produce.  If they want to do it -- you know, produce and

2    then fight about other -- you know, the scope of discovery,

3    that sort of forces them to go back and, you know, maybe go

4    through their files again because they've got to, you know,

5    look again a second time to get things that Your Honor may

6    be directing them to produce.

7            I think in the interest of efficiency for all the

8    parties, and judicial efficiency, we should, in the next

9    couple of days or whenever it's at the earliest convenience

10   of the Court, address the particular issues.  Because they

11   are not difficult.  We're just looking for non-privileged,

12   internal communications at CrossHarbor, no doubt, and

13   during that time frame that are responsive to the requests

14   in our documents which really just go to their involvements

15   with the debtors on a prepetition and postpetition basis.

16   That's what we're looking for.

17           THE COURT:  Okay.  I leave that between you,

18   Mr. Hursh, and Mr. Moore to work out, and other counsel.

19           MR. CHEHI:  Very good, Your Honor.

20           THE COURT:  I don't mean to exclude you.

21           UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

22           THE COURT:  And Mr. Byrne, as well.  Obviously,

23   I'm sure he'll be involved with that process.

24           So that takes care of -- Mr. Chehi, that deals,

25   then, with your emergency motion of prepetition lenders for

1    order authorizing prepetition lenders to seek expedited

2    discovery, doesn't it?  Isn't that all tied together?

3            MR. CHEHI:  Actually, Your Honor, that motion was

4    directed at our motion to compel immediate commencement of

5    a marketing process.  And that - (inaudible) - upon the

6    debtors' more recent motion to -- for bid -- approval of

7    bidding procedures.

8            We had hoped that we would have had some

9    discovery prior to coming here today, Your Honor, but, you

10   know, as has happened in the past, to the extent we're

11   examining witnesses, we're going to be doing it without the

12   benefit of a deposition or any documents.

13           THE COURT:  You know, sometimes that's the best

14   way to do it.

15           MR. CHEHI:  And we're prepared to do that, Your

16   Honor.  If we could, if we could, we would move forward on

17   those matters, which I think from an evidentiary point of

18   view are closely related, so both their motion to approve

19   their bidding procedures and our motion to compel immediate

20   commencement of a fair marketing process.

21           THE COURT:  Okay, let me just make a note here.

22   Okay, so that goes with the other -- let's see, maybe it's

23   not the same motion, but it goes with the motion:  Rule

24   7026, 9014 for order authorizing prepetition lenders to

25   seek expedited discovery.  That's all tied together with

```
 1    that, as well?

 2              MR. CHEHI:  I believe so, Your Honor.

 3              THE COURT:  Okay.  The next matters will be

 4    dealing with the debtors' motion for approval of bidding

 5    solicitation procedures that are also tied with immediate

 6    commencement of marketing process and the discovery

 7    motions.  I'll take those up together.  It seems like

 8    they're all interrelated.

 9              So Mr. Patten or Mr. Chehi.

10              MR. CHEHI:  Either or, whoever you want to go

11    first.  I think we'd just call our witnesses for those

12    purposes.  We'll let --

13              THE COURT:  I'll let Mr. Patten proceed or

14    appropriate counsel proceed on the motion for approval of

15    bidding and solicitation procedures.

16              MR. REAM:  Good afternoon, Your Honor.  Larry

17    Ream from Bullivant Houser Bailey.

18              I'm going to call Ron Greenspan.  I just wanted

19    to say thank you for allowing me and my firm to

20    participate --

21              THE COURT:  Certainly.

22              MR. REAM:  -- in this matter and these

23    proceedings.

24              And I would call Mr. Greenspan.

25              THE COURT:  Okay.  Mr. Greenspan, I will recall
```

1    you to the witness stand.  I'll remind you that you're

2    still under oath.

3                          DIRECT EXAMINATION

4    BY MR. REAM:

5    Q.  Mr. Greenspan, there has been a great deal of comments

6    regarding what the debtor has and hasn't been doing, and so

7    I think there are a couple of items I'd like you to cover

8    generally for the judge before we get started, and

9    specifically about the bidding procedures motion.

10       Since 12/15/08 when the DIP loan was approved, what

11   have you and the debtors been doing to move this case

12   forward?

13   A.  Well, I don't think we can separate operations and the

14   progress that's been made there from the general

15   reorganization and moving the disclosure statement of plan

16   forward.  So we've been handling everything necessary in

17   order to successfully and, as best we can, economically

18   operate the debtor.

19       We've been supervising the expenditures and the draws.

20   And I can tell you that through last week, our budget was

21   13 million.  We've only spent about 8.3.  Some of that's

22   tiny difference, but there have been very real and

23   substantial economies.  So we're running meaningfully ahead

24   of the DIP budget.  We, in addition to hiring everybody

25   that was happening at that week - hiring them, deploying

1   them, getting open for the season - we had major other

2   issues like Farcheville.

3       And, Your Honor, I don't know how accurate your

4   description of strangling the debtor is.  Things that

5   should have been simple like Farcheville -- I mean we had a

6   situation where a relatively small amount of money was

7   needed, but we were under the very real threat of imminent

8   seizure by the tax authorities in France.  And you -

9   (inaudible) - sheriff's auction of it, and there would have

10  been 10s of millions of dollars of value lost to this

11  estate and to the unsecured creditors.  We couldn't

12  consensually get a deal there to get the necessary money

13  into the estate.  And you saw the motions.  It was two

14  weeks of my time around the clock with all the parties just

15  to get the money, the $3 million or $2 million for

16  Farcheville that should have been a no-brainer.

17      We then went on and, during the next period, we've had

18  the liability -- the - (inaudible) - insurance, we suddenly

19  found out 48 hours before that was to expire that that was

20  expiring.  And we have a tail on it, but we had to -- we

21  contacted all the parties to get all claims that they knew

22  of, and we scrambled - again, an around-the-clock type

23  thing - in order to get the appropriate claims filed.

24      We now have our CGL, comprehensive general liability

25  policy, that's up for renewal with challenges to that

1    renewal because they are owed money prepetition as well as

2    it's always tough, both a ski resort and a debtor.

3         So you have those nonstop issues in the operations

4    which -- some of which you would expect, but others should

5    never take this type of time and effort to get done.  But

6    immediately after -- simultaneously, immediately after, we

7    moved -- as I said before, we had discussions with Credit

8    Suisse and with the unsecured creditors committee.

9    Q.  Mr. Greenspan, before you go on, would you explain to

10   the judge, though, how the actual operations of the club

11   have been going?  How is it -- how are the members

12   reacting?  How have operations actually occurred coming up

13   through the -- what, the busiest weekend of the ski season?

14   A.  Well, this is the busiest other than -- Christmas to

15   New Years is the busiest, and then the week before and the

16   week after president's holiday is the second busiest up

17   until the Easter break week.  So this is a peak period, the

18   week we're just finishing now and next week.

19        I mean I think the best indication is we set the bar of

20   getting 80 percent of the members to pay their dues.  And

21   we're at just about --

22             THE COURT:  You said "80"?

23             THE WITNESS:  Eighty percent.  That's what -- if

24   you remember, that was required in the Credit Suisse, it

25   was carried on over into the CrossHarbor.  We are right now

1    just about 95 percent paid.  And we launched an intensive

2    -- both what I'll call an internal marketing as well as a

3    collection effort in order to ensure that they're paid.

4    And we've also -- we early sent out the second-half

5    payments, and we're well on our way towards collecting the

6    second half of the dues payments.  I think that's probably

7    the best indication of whether you have the members buying

8    in.

9            We, for the most part, have been able to keep

10   goods coming to the estate.  There's been a few issues, but

11   we've just had to change vendors.  But this, as you

12   probably know, Your Honor, was not a planned bankruptcy.

13   There were employees who were left with a week of unpaid

14   wages, there was no plan on paying, you know, important

15   vendors before filing, or anything of that nature.  So the

16   fact that operations are running, I think, as smoothly as

17   they are is a tribute to the staff who's here who have just

18   been -- you know, even though they weren't paid and

19   there's, you know, all - (inaudible) - issues about their

20   future, the staff's done tremendous job.  And I think the

21   community, the members have gotten behind what's happening

22   at the property.

23           So concurrently with doing the operations and

24   handling the inevitable emergencies and then spending just

25   an inordinate amount of time doing things that should have

1   been much easier than they were, talked to Credit Suisse

2   and unsecured creditors committee, and they wanted a broker

3   retained.  As I testified earlier - and I'll try not to

4   repeat what I talked about earlier - I didn't necessarily

5   agree with that decision but agreed to it and went out on a

6   solicitation process for a broker, both -- I identified a

7   real-estate broker and an investment banker, Credit Suisse

8   provided a name of a real-estate broker and an investment

9   banker, and I went to all four of those parties soliciting

10  proposals.  And we were doing this literally over

11  Christmas.  I mean if you look at the timing of what's

12  happening here, this is -- we started in the week between

13  the 16th and the 20th.  We're doing this literally over

14  Christmas and New Years.

15          And it's a complex brokerage solicitation

16  process.  Ultimately, we ended up negotiating arrangements,

17  had to negotiate with all four of those parties; ultimately

18  selected and negotiated what I think is a very, very

19  advantageous brokerage agreement that we can talk about.

20  Q.  (By Mr. Ream)  Mr. Greenspan, let me interrupt you a

21  second and back you up minute.  Specifically, though,

22  before you move to the brokerage issue, will you explain to

23  the judge what efforts you've made to negotiate with

24  specific parties a consensual plan?  What efforts have you

25  undertaken to actually bring parties together to try and

1    resolve this case?

2    A.   To a certain extent, what I am -- I mean, well, I am

3    both a protagonist, but I'm, to a certain extent, what I'd

4    describe as a mediator.  The debtor itself does not have

5    the capacity with -- I mean you can take everybody that's

6    sitting from there over on that row, the debtor with those

7    people together don't have the capacity to a plan.  I mean

8    we have no more funding after May 1st.  We're going to go

9    through $25 million.  A bunch of it's bankruptcy-related

10   costs.  We're going to go through $25 million, and we are

11   going to have an inability to continue operations as of May

12   1st.  There's got to be somebody to step up and fund those

13   operations as well as fund the ongoing development.  That

14   requires a capital provider to come into the situation.

15   And so the debtor by itself and the debtor with the

16   committee and the debtor with Credit Suisse doesn't have

17   the capacity to solve that absolutely vital issue.

18        Therefore, my concept of what's necessary in order to

19   effectively get a plan here is that we need a capital

20   partner in the process.  And beginning right after the

21   15th, we began to put together everything that's necessary

22   for the prospective capital partners to evaluate making an

23   investment.

24             THE COURT:  After the 15th of --

25             THE WITNESS:  Of December.

1          THE COURT:  Okay.

2          THE WITNESS:  I mean up until that point, we had

3   no assurance of anything.  I mean we -- and we were very,

4   very busy doing something else.  So beginning with the

5   15th, we began to put together all the information

6   necessary.  I mean we had been work on it before, but I

7   mean doing it seriously and in earnest, putting together

8   the documents, the electronic data room; putting together

9   what we call a "teaser", but in this case it's a really

10  much more comprehensive, describing the history of the

11  project, what the assets are, what somebody who would be

12  getting in involved in would be getting involved in,

13  describing the club, and so forth.

14          Simultaneously with -- we put together the data

15  room and simultaneously began contacting parties out in the

16  market to see what the market perception was of Yellowstone

17  Club, what type of interest there would be.  As has been

18  talked about, we were in a fairly tumultuous economic time

19  at that point; we still are.  Things have, frankly, calmed

20  down considerably since that date, I mean even looking back

21  the six or eight weeks.  We began contacting potential

22  capital providers and simultaneously assembling the data

23  room and simultaneously soliciting proposals from brokers

24  and investment bankers.

25  Q.  When you were thinking, Mr. Greenspan, about the way

1    the plan was going to have to be structured in this case,

2    based on some of the comments you just made, what were your

3    conclusions about whether or not this had to be a plan

4    versus a sale, and why?

5    A.   Well, part of is, is we always talked from the

6    beginning -- I said when I was testifying before and we

7    talked about it in chambers that I believe a plan makes

8    more sense than a 363 sale for an asset that is this

9    complex with this many moving parts, and it requires this

10   much due diligence and prearrangement with various factors,

11   parties, and factions.

12       Once I started talking to the market in late December,

13   to me, that became overwhelmingly clear that the interest

14   by people in the market was for the ability to essentially

15   what I'll describe as ring-fence this and reduce the number

16   of simultaneously moving parts that they could evaluate and

17   that they could actually put a proposal or offer on.  And I

18   believe the best way to do that or the only realistic way

19   to do that is through a plan and a disclosure statement

20   where everything is both described as well as identified

21   and that you've already prescribed treatment for some of

22   the biggest, what I would describe as question marks and

23   moving pieces such as what's going to happen with the

24   $88 million of member deposit and the member agreements.

25   Are they going to be rejected?  Are they going to be

1    accepted?

2    Q.  Mr. Greenspan, is --

3    A.  (Inaudible, talking over each other.)

4    Q.  I'm sorry to interrupt.  Is the fact that

5    CrossHarbor -- I'm sorry, Credit Suisse does not have

6    security in all of the Yellowstone Club assets a factor?

7    A.  That's the second issue.  And that is:  This is an

8    atypical situation, where you would have a 363 sale of the

9    debtors' assets, of the encumbered assets would clearly be

10   value-destructive.  I won't repeat what constitutes the

11   base lodge, but it is the heart of the resort.  It's where

12   the main lift goes to.  It's the parking for the resort.

13   This project and that mountain and these homes don't really

14   operate without that.  Credit Suisse doesn't have a lien on

15   it.

16       I talked, again, in discussion with Credit Suisse and

17   with the committee as to whether it made sense to try to

18   package the encumbered and the unencumbered assets together

19   and go to market with that.  And I believe everybody was in

20   unanimous -- at that time, they were.  I don't know what

21   they've decided since.  At that time, everybody was in

22   unanimous agreement that it made sense that you would want

23   to put those together as a whole and that the allocation

24   issues are going to be tough.  You know, you're going to

25   wrestle with those on how that's allocated.  But the

1  conclusion was:  We could get a much bigger pie, and we'll

2  wrestle about the allocation issues later, but let's not

3  let a fight over prospectively allocation issues now cause

4  this to go south and have a much smaller pie for everybody

5  to divide up.

6  Q.  Is this any certainty to assumption or rejection of the

7  membership contracts if you have a 363 sale versus a plan?

8  A.  Well, I don't believe there's any certainty there.

9  You're going to go to a 363 sale - especially in the time

10  frame we're leaking at - and then you're going to go to a

11  plan.  And there's no assurance as to what, "A", the

12  debtors' going to do under that plan; or, "B", that the

13  plan can even be approved.

14      And, therefore, once again -- I mean I'm a strong

15  believer, and I haven't heard any meaningful argument to

16  the contrary that this project has a higher value with

17  member antipathy than with member support.  And if there is

18  going to be as full a recovery as possible for the

19  unsecureds and secureds, it should be done with member

20  agreements in place, possibly modified but with the support

21  of the members.  And that can't be done, as far as I can

22  see, in a 363 process.

23  Q.  How does assumption or rejection affect value, in your

24  opinion -- I mean in your experience and what you've

25  learned so far, and in claims?

```
 1    A.   I'm not sure anybody has real experience in having gone

 2    through anything like this in full circle previously other

 3    than, I mean, you can point to some of the others that

 4    started earlier than us, things like Promontory.

 5    Promontory filed March of last year, also a Credit Suisse

 6    credit.   You know, another very significant loan made a

 7    couple years ago with a very quick bankruptcy after that.

 8    They now -- I think they just had a hearing yesterday, but

 9    they still, 11 months later, do not have a buyer, do not

10    have new equity coming in.   I think they finally have

11    resolved most of their issues.   And I think they may, after

12    11 months, be getting to a consensual deal, but once again,

13    a priming loan.

14        It wasn't to me -- it's not a -- that is not the --

15    that isn't a way to either maximize value and it's not a

16    possible way to run this and certainly not something I'm

17    interested in doing of just languishing and, in the

18    process, spending the money.

19    Q.   Well, if you just sell the dirt without the membership

20    and the club in place, do you think that affects value?

21    A.   I personally believe -- and as I say, I don't think you

22    can point to any real examples because we haven't had any

23    yet that I'm aware of.   I think that would be very, very

24    detrimental to value that --

25    Q.   In your negotiations, have you been given any
```

1    indication from the unsecured creditors committee what the

2    rejection damages might be if the member contracts are

3    rejected?

4    A.  Well, I've heard $1 billion.  And I think I could --

5              THE COURT:  Did you may "1 million" or

6    "1 billion"?

7              THE WITNESS:  One billion.  Your Honor,

8    unfortunately, I don't think there are any millions in this

9    deal.  And I echo what Mr. Chehi said.  I mean these are,

10   these are big numbers, and I think everybody's taking this

11   very, very seriously.  I mean the liability to the members

12   just on the rejection and the straight contracts is

13   somewhere between $80 million and $88 million of cash that

14   was collected from them.  I think their argument for, you

15   know, 10 or 12 times that number is those memberships were

16   part and parcel an inducement for them to buy lots that

17   they paid $1 million to $6 million or $10 million for and

18   to go and build very expensive homes on.  And what the

19   consequential damages, and so forth, would be, I think,

20   leave up to anybody's guess.

21             So I think you've got both the denominator

22   effect, the fact that they would begin to start swamping

23   all the other unsecured and push down recoveries, but even

24   more than that is anybody's willingness to tackle this

25   asset and make the type of hundreds of millions of dollars

```
 1    of investment that everybody agrees needs to be made to put

 2    that type of investment in here, without -- with either the

 3    antagonism or the hostility or litigation with the members,

 4    you're not going to find a buyer out there in the market

 5    today to do that.

 6              THE COURT:  Not to be facetious, but have you

 7    considered a bank holding company or anything like that for

 8    generation of any new capital?

 9              THE WITNESS:  Well, we'll see what Mr. -

10    (inaudible) - says today.

11              But seriously, Your Honor, the right answer may

12    be that Credit Suisse might step up and put the capital up.

13    I mine that's -- that is a -- we wanted to get into the

14    details, the specifics of the sale procedure, that we sat

15    there; seriously looked at; and when we walked through the

16    terms, tried to make it in a fashion that would be most

17    conducive for that.  And if not conducive, certainly get

18    rid of all impediments for that.

19              But so what my -- going back to what I think your

20    first question was - what I did as far as literally

21    mediating and trying to bring it together - I can't

22    unilaterally, and I can't with Credit Suisse, and I can't

23    with the unsecured creditors, and the three of us together

24    can't solve this.  We need a capital partner.

25              And so I was both out in the market talking to
```

1   capital providers; and then secondly, working to get

2   CrossHarbor - which it's clear, they've never, they've

3   never hidden the concept that they would like to own this.

4   That's no secret agenda.  That's out there and open - get

5   them talking to Credit Suisse because unless they could

6   come together on terms, I can't get a consensual deal done.

7          Towards that, they hadn't arranged a meeting

8   which all parties wanted to do.  Due to the holidays, it

9   was delayed, but it happened in the second week of January.

10   I spent several days before that meeting talking with both

11   parties, talking with the lawyers from CrossHarbor, talking

12   with Mr. Byrne, I believe, talking with Mr. Yankauer,

13   talking with my counsel; trying to, trying to shape the

14   purpose of that meeting and what was going to happen at

15   that meeting.  As you've probably figured out, there's a

16   little bit of antagonism going on.  And my goal was, was to

17   have a productive meeting that would advance the

18   opportunity for a consensual resolution.

19          As part of that, as I said, we also invited the

20   Credit Suisse financial advisors because there's clearly, I

21   think, a difference of opinion about the project and

22   difference of value view between Credit Suisse and

23   CrossHarbor; at least ostensibly, there is.  And what I was

24   hoping was, was that the meeting would be an informational

25   exchange, because unless they can get somewhere close on a

1     view of this - and the only way to get close on a view is

2     through an informational exchange - then we weren't going

3     to be able to make a lot of progress.

4            So we had the meeting.  Brad Foster of my office

5     was there in person, I was on the phone, Debtors' counsel

6     was there, Loughlin Meghji was there, CrossHarbor was

7     there, Credit Suisse was there, and Credit Suisse's

8     financial advisors.

9            Credit Suisse's financial advisors had wanted to

10    be out on the property at that time, and I suggested, "Go

11    to the meeting, listen, then go to CrossHarbor, get as much

12    information as you can from them, then come out to the

13    property and spend whatever time you want on the property

14    with us and with documents."  And this is, in fact, what

15    happened.

16           And so they went up and they spent time at

17    CrossHarbor's office, I think a day, and then they came out

18    to the property.  And I tried to encourage those parties to

19    come to a resolution.  Needless to say, Credit Suisse came

20    back and said, "Pay us 310 million.  That's what we want."

21    I mean the negotiations -- (inaudible.)  I mean, "We're not

22    going to take less than 310.  That's what we think it's

23    worth.  Pay us."

24           That didn't leave a lot of space.  We were up

25    against a deadline to get a plan filed.  We're up against a

1   deadline even more so to get a broker working on marketing.

2   And, therefore, we launched full scale into trying to put

3   together a backstop, essentially the stalking-horse bid by

4   CrossHarbor that could be put into a disclosure statement

5   and a plan.

6   Q.  (By Mr. Ream)  Let me ask you a couple of questions.

7   Is it still the debtors' goal to obtain a consensual plan,

8   if possible?

9   A.  Absolutely.

10  Q.  I'd like to start talking about marketing and --

11  because, obviously, you've read in the oppositions that

12  there's been a great deal of criticism about the debtors

13  not marketing.  Do you think that criticism is appropriate?

14  A.  I think the characterization of -- I mean the

15  characterization about marketing is just wrong.  We've put

16  together the data room --

17  Q.  Explain to the judge in detail, would you please, what

18  the data room is?  What's in there?  Who's accessed it?

19  A.  The data room is an attempt to put together all the

20  documents - and we do it in electronic form - all the

21  documents that a prospective investor or buyer would want

22  to see so that they can quickly, efficiently make a

23  decision.

24      And what you really want to do is lower the barriers to

25  entry.  You want to be able to get as many serious and

1    capable interested parties to the table as possible.  So

2    you do it electronically so they can access it.  They don't

3    have to deal with the weather and deal with the travel,

4    they can access it essentially for free.  And what it --

5    and we put it together in two stages.

6        And I think, again, to preserve the value of this

7    asset, you need to maintain some exclusivity.  And there's

8    also going to be confidential information about, you know,

9    potentially about members, about sales leads, about sales

10   prices.  This is a nondisclosure state, as you probably

11   know.  The sales prices of transactions are not made

12   public.  The data room has all that by transactions, and so

13   forth.  So we want to be very careful about what is

14   actually disclosed.  We also have -- I mean the members

15   are -- they may be relatively - (inaudible) - but they're

16   still individuals and people, and they deserve a certain

17   amount of privacy.  And we've got potential records dealing

18   with them there, as well.

19       So we've set up the data room in two fashions.  The

20   first is one that all people that appear to be, I'll call

21   it, remotely qualified can actually get into.  And that has

22   the deal memo or the teaser, which is much more extensive

23   in this case than is often done; and it also has a

24   nondisclosure agreement.

25       People, to get in, once they go through that

1    information and - (inaudible) - nondisclosure agreement can

2    then execute the nondisclosure agreement and, assuming

3    they're qualified, they are -- they appear to be a bona

4    fide and potential purchaser, they can then move into

5    Phase 2 of the data room where you have a very

6    comprehensive listing of documents dealing with the

7    property.  It's the financials, it's engineering studies

8    it's environmental studies, it's the budgets, and so forth.

9        In addition, I took the index to the date room and

10   circulated it amongst the interested parties and said,

11   "Tell me what you think isn't here.  I mean you want a

12   robust process.  Tell me what else you think ought to be in

13   the data room."

14       As you would not be surprised in this deal, I spent a

15   week negotiating the nondisclosure agreement with lawyers

16   as to what the nondisclosure agreement was.  And the

17   nondisclosure agreement was, was fairly standard to start

18   with, with a couple terms that I think just reflected the

19   particularities of this particular deal; and then, as I

20   said, turned access to the data room over to everybody

21   that's involved here:  All of the creditors, the unsecured

22   creditors committee.

23       In addition to the electronic data room, we also have

24   available to us -- the engineer for the project has a

25   hardcopy room.  And anybody who wants to actually get in

1    and see all the engineering drawings, the engineering

2    studies, and so forth -- those tend to be odd sizes.  I

3    mean very often, they're blueprints.  They don't reproduce

4    well, they've got funny backgrounds.  So those are really

5    not feasible to put up into the electronic data room, but

6    anybody that wants that type of detail, they're welcome to

7    access the physical data room, as well.

8    Q.  What's been the response?  How many -- you know, what

9    kind of interest has there been, then, in the data room?

10   A.  Far and away, the biggest response has been from the

11   parties in this room.  Credit Suisse has accessed quite a

12   bit, the creditors have accessed.  What we have found --

13   and that's why this is informative, and then informs how we

14   fashioned -- the other reason why I said when we talked to

15   the market, why we fashioned the plan the way we did - and

16   so that makes a lot more sense than trying to do a 363 here

17   - is that the market reaction has been very muted, that

18   everybody that -- we've approached Credit Suisse, we've

19   talked to -- we've given access to the data room, we've

20   offered to give tours, too, up at the property.

21        Everybody who's contacted us - because this has gotten

22   a lot of publicity - so everybody's who's contacted us,

23   we've done the same type of introduction; gave the same

24   opportunity both with the data room, the property; as well

25   as made an outreach to a number of what I and what the head

1   of my investment banking group feel were some of the most

2   likely interested parties in pursuing this.

3        And to date, a number of them have accessed the data

4   room, but what I'll seriously describe as a disappointingly

5   few number, that the market -- this is a very challenging

6   asset.  It requires a very big bite.  I mean we're talking

7   about at this stage 100 million-plus commitment upfront

8   plus at least another 75 million of cash commitment, and

9   with some tremendous uncertainties.  We've talked about

10  before there's only 33 platted lots.  Everything else is on

11  the come.  The engineering studies are not complete.  There

12  are EPA violations that's under a remediation agreement

13  that causes people to have concerns.  It is a high-,

14  high-risk project on a go-forward basis requiring a lot of

15  money up-front, a lot of money over the years, and

16  continuing operating losses for many years.

17       Consequently, there were a limited number of people

18  that have accessed it, but what it also -- we learned a lot

19  from talking to the market and what prospective buyers were

20  telling us, to be interested in the process, what they

21  wanted to see.  And that's what we tried to fashion into

22  this bidding procedures -- (inaudible.)  So we -

23  (inaudible) - it based on the market.

24       There's been a total of about 40 people, I believe,

25  that have accessed the data room.  I think we're talking

1    about approximately five of them are prospective, outside

2    buyers.  CrossHarbor, of course, has been in the data room,

3    and the lenders make up the balance and some of the staff

4    at Yellowstone Club make up the balance.

5    Q.  Before you move on to what you learned from the

6    potential investors, and that, that you contacted directly,

7    were there other marketing efforts that you personally,

8    staff, professionals in this case have done to market this

9    property?

10   A.  Yes.  But for completeness, let me just --

11   Q.  Sure, all right.

12   A.  The last -- I'm sorry, I -- I guess I took a breath.

13   One party has -- and I think you saw that in a footnote

14   because all this is happening in real time and we're still

15   doing it.  One party has actually been aggressively going

16   forward, has -- the only party that has actually come on

17   out to the site, that has made some meaningful

18   investigation of the data room.  After you've done this

19   long enough and gone through enough deals, you can see how

20   long people are in the data room, how many documents they

21   access.  All that's recorded.  And we give that record to

22   Credit Suisse.  We give that record to Credit Suisse and

23   anybody else who's involved who wants to see it so they can

24   at the same time monitor this.

25       You're getting relatively little action except for from

1   this one party.  We're providing them -- we have an NDA in

2   place with them.  They came out to the property and spent

3   two full days on the property.  We provided them with all

4   the documents that they could want, we responded to the

5   questions.  And so we do have one party that is exhibiting

6   some action.  The last week has been somewhat disappointing

7   with them, but I just don't want it to go -- leave you with

8   the impression that nobody was -- had been taking those

9   extra steps.

10  Q.  Let me go back even just one second to what you said.

11  So what reports do you provide to Credit Suisse?

12  A.  Well, apart from the financial reporting, we do have a

13  detailed report that lists every person who's accessed the

14  data room, how many times they've accessed it, how many

15  documents they've opened, the cumulative time they've been

16  in the data room.  You know, and so we've got some people

17  who have been there 20 hours, 30 hours, 40 hours; and

18  others who, you know -- if somebody professes to be a

19  buyer, an interested buyer, and they've looked at two

20  documents and they've spent a cumulative two and a half

21  minutes in there, you know they're not for real.  So we

22  provide those reports.  And, frankly, if there's any other

23  report that anybody wants, I'm more than willing to provide

24  it.

25  Q.  Be careful what you offer.

```
 1    A.   I will provide it.

 2    Q.   So my question when I interrupted you when you were

 3    breathing was:  What have you and other staff at the

 4    Yellowstone Club and professionals been doing in advance of

 5    today to market this club, these assets?  What have you

 6    been doing?

 7    A.   I mean the data; room, the deal memo or teaser; the

 8    NDA, the nondisclosure agreement, getting that into form;

 9    and then, as I said before, the outreach to every person

10    who's contacted Credit Suisse or who has contacted us; and

11    then an affirmative outreach to a number of parties that

12    were viewed as some of the most likely to be interested and

13    to give us feedback as well as the outreach to the

14    brokerage and the investment banking community in order to

15    find someone to retain to do this as requested by, by

16    Credit Suisse and the committee.  And it's been trying to

17    follow through and fulfill the -- fulfill each of those as

18    well as respond to all of the requirements of those

19    parties.

20    Q.   And you mention that you had solicited from brokers and

21    investment firms an opportunity to bid on marketing this

22    property.  Could you explain to the judge what you did

23    there and what resulted from it?

24    A.   What I did was identified -- this is something of a

25    hybrid between real estate slash kind of a business
```

1    opportunity; and, therefore, I didn't want to restrict the

2    search to just the traditional investment banker, just the

3    traditional realtor.  Although, I think the larger realtors

4    look a lot more investment banking firms and the investment

5    banking firms in the real-estate section look a lot more

6    like realtors, so I'm not sure there's that big of a

7    distinction.  But I identified an investment banking firm

8    and a real-estate firm with world-class world reputation

9    and solicited proposals from them.  I talked to Credit

10   Suisse.  They provided the name of an investment bank --

11   actually, I think they probably provided more than one name

12   of each.  They provided me a list.  And from that, I went

13   to what I think was one of the better realtors that were on

14   that list as well as an investment banker from that list

15   and solicited proposals.  And over -- it took about a week

16   to get all of them, but I did get good proposals from all

17   four.  I evaluated those proposals, and then a number --

18   like in any case when you're dealing with these type of

19   assets, there are a number of holes in them.  I had to go

20   back to them.

21        And then I identified a couple issues that could be

22   very profound.  For example, typically, an investment

23   banking or a brokerage agreement reads you pay a commission

24   on cash contributed plus assumed liabilities.  And all of a

25   sudden, we realized that there's potentially $88 million of

1    assumed liabilities here for which the reorganized debtor

2    is not going to get a penny of cash benefit from.  And the

3    question is:  Does that get included in?

4        And a lot of buyers are going to be looking at this as

5    potentially 200 million; if you take 100 plus 88 as a

6    baseline, you know, a $200 million transaction.  And the

7    question is:  Do we really have to pay brokerage commission

8    on that?  We also recognize that the commission structure

9    was all across the board.

10       So I went back and started negotiating both the

11   commissions and the structure of the commissions, which

12   were important, as well as the issue of:  Are you going to

13   include assumed liabilities?

14       And, typically, the answer is "yes", but they're

15   typically small liabilities.  Here, we're talking about

16   something that could rival the purchase price.

17       So I engaged in negotiation with all four of them in

18   order to negotiate both the fees, the structure of the

19   fees, and how we'd be covered.

20   Q.  And did you come to a conclusion as to which one you

21   thought would be -- would best serve the estate and the

22   creditors?

23   A.  Yes.

24   Q.  And how long ago was that that you came to that

25   conclusion, roughly?

1   A.   From today, four or five weeks ago.

2   Q.   And why is it that you didn't hire -- or didn't at

3   least bring a motion on to have them employed at that time?

4   Was there a reason right at that time why you didn't just

5   hire that broker and move forward?

6   A.   Well, there's two predominant reasons.  One, I believe

7   we needed -- based on what I was hearing from the market,

8   we needed more structure.  You could not at that stage -- I

9   mean that was two weeks after getting the DIP approved.  We

10  were still understanding -- we were still assembling the

11  data room, frankly.  To bring a broker on right now, the

12  market was saying:  We need more definition of what's being

13  sold, where things stand.

14      And often with buyers, you're only going to really --

15  probably some deals get stale.  You're not going to go out

16  with a half-baked deal to the sophisticated buyers, have

17  them say, "No, it's half-baked," and then get the same type

18  of response when you come back three weeks later and say,

19  "Well, look at it again.  Spend more analyst time.  We've

20  actually got our act together this time."  That was one

21  reason.

22      And the second reason was, is that -- went back to

23  CrossHarbor, advised them of what we were doing, and

24  CrossHarbor said they thought it was a violation of the DIP

25  agreement for us to be marketing the property or listing it

1    with a broker.  And we spent a period of time negotiating

2    that.  And I ultimately told them it was nonnegotiable,

3    that I was going to continue to market the property.  I

4    felt that I didn't read the DIP agreement the same way they

5    did.  I was going to continue to market the property

6    because we were getting good market feedback.  And as long

7    as there were people that were interested, that were

8    talking to Credit Suisse or were talking to us, we were

9    going to continue to pursue that, but that I would refrain

10   I did not want them calling the DIP, that I would refrain

11   -- and go through yet another legal battle, I would refrain

12   from signing the listing agreement or going live with the

13   listing agreement until we've filed the plan.  And they

14   believed that's what -- actually what was required by the

15   DIP agreement, as well as not marketing.  But, as I said,

16   we continued to market, but we agreed to refrain from

17   actually executing the going live with a marketing program

18   until we filed the plan.

19       We did use that time, though, to do the several weeks

20   of premarketing and market campaign design, that if we

21   waited until the 13th of this month, we would have been two

22   -- farther before we could actually go live with the

23   marketing program.  So after selecting them, I spent the

24   time negotiating their contract, the details of it,

25   negotiating the application to employ, and working with

1    them to get the teaser right, to design the marketing

2    campaign, to identify who's going to be approached, do

3    everything that would otherwise be a waste of time after

4    getting them approved, trying to get that done beforehand

5    so we could hit the ground running once we get the green

6    light.

7    Q.  Were you also negotiating with CrossHarbor to reach

8    plan terms that were acceptable to CrossHarbor?

9    A.  During the -- basically, the last three weeks, yes.

10   Q.  And that was necessary -- is that necessary before you

11   can have any broker or any marketing go live?

12   A.  Yes, because I -- as I said before, if I -- based on

13   all the feedback from the market - and it doesn't surprise

14   me at all - we need to stop some of the moving pieces in

15   order to get serious money interested and to be able to

16   start comparing -- get bids in place.  As I say, I mean a

17   lot of those issues deal with -- such as assumption of

18   member contracts, other vendor issues, and just plan

19   treatment issues.  We need to have that ironed out before

20   you can start talking to people about investing

21   $100 million plus into a venture, and get their serious

22   attention in this market, and get it on short notice.

23   Q.  To your knowledge, have the debtors now filed an

24   application to employ a broker?

25   A.  It took longer than we had hoped.  We got it filed this

1    morning.

2    Q.  And which broker are the debtors seeking to employ?

3    A.  CB Richard Ellis.

4    Q.  And would you explain to the judge what a standard fee

5    would be in the marketplace and what the fee that CBRE has

6    agreed to?

7    A.  I would normally say a typical fee in the marketplace

8    would be 1.5 to 3 percent, and maybe a little more in a

9    bankruptcy context because the uncertainty and the

10   difficulties.

11      I can tell you that one of the parties that we went to

12   wanted 5 percent.  It was not negotiable on that.  And I

13   talked to Credit Suisse about that and I talked to the

14   committee, and everybody was in unanimous agreement that

15   that was a disabling fee demand.  They did agree not to

16   charge it on the assumed liabilities, just on the purchase

17   price, but 5 percent was too high.  So I would say 1.5 to

18   3 percent is where I would typically expect would be a

19   typical fee in this situation.

20   Q.  In your discussions with potential

21   investors/purchasers, did you learn any -- or what issues

22   and impediments did you learn from them that you felt had

23   to be addressed in any plan moving forward?

24   A.  Not just in a plan, but in order to have an effective

25   sales process -- and "sales process" is probably wrong.  In

1    order to have an effective investment process - and we're

2    really looking at somebody who's going to sign on and

3    operate this enterprise - there were really three continual

4    themes that were the reason why a lot of the people we went

5    to just had no interest of even accessing the data room,

6    getting at all involved with the project; and those that

7    did initially access it deciding that after a quick look

8    around, they had no interest in continuing to pursue a

9    significant investment here:

10       One is the prospect and the issues of a credit bid.  To

11    do the due diligence that's going to be required here is

12    going to take six figures.  I mean I don't know if it's

13    going to be 100,000, 200,000, 300,000, or more.  It's going

14    to be an expensive proposition, and it's going to take

15    somebody at least a couple weeks.  No matter how much

16    material we've put together, it's going to be at least a

17    couple of weeks.  It's going to be a lot of meetings.  It's

18    going to be court hearings, and so forth.  So it's going to

19    be an expensive proposition.  And there's - as often is the

20    case, but particularly so here - a very big concern about a

21    $308 million credit bid hanging out there.  And so even if

22    somebody was offering value if it was less than that, they

23    might be trumped by somebody who didn't have to do any of

24    that, that work.

25       The second issue that we ran up against frequently,

1   again, as a reason people were not interested in spending a

2   lot of money and time upfront is that CrossHarbor is viewed

3   by the marketplace as having a big head start.  And

4   there's, there's no denying -- nobody, nobody's suggested

5   otherwise that CrossHarbor doesn't know a huge amount about

6   this asset and that CrossHarbor has been involved with this

7   asset for a couple of years and that CrossHarbor is also

8   interested in acquiring it.  It's so out there that every

9   buyer knows that, every potential buyer and bidder knows

10   that.  And they are concerned that CrossHarbor has

11   knowledge they'll never gain just because of the work that

12   CrossHarbor has done.  I mean CrossHarbor has already spent

13   all this money in spades.  And so that was a reason people

14   were giving that they weren't interested in persuing the

15   process.  And that was a very frequent comment.

16       And I think the third issue is just the

17   contentiousness, the litigiousness of this case, that this

18   case is talked about a lot out there.  It's picked up in

19   the press.  If you saw the AP, AP picks up a feed.  And so

20   it makes not just the business press and the bankruptcy

21   press, but it makes the popular press throughout the

22   country.  And that isn't lost on people.  And so when the

23   potential -- again, we're talking about only people that

24   have -- if you're going to devote a couple - $300 million

25   to this project, that means you're talking about people in

```
 1    funds that have billions to invest.

 2        Those type of institutions, given all the opportunities

 3    out in the world today - (inaudible) - interest in spending

 4    a lot of time on this in that structure.  And so those were

 5    the three major issues that we saw that we real needed to

 6    attempt to ring-fence if we were to get a robust marketing

 7    process going.

 8    Q.  Was clarity in the structure or a process a factor,

 9    too?

10    A.  It was.  And I would have put that down in the third

11    one.  And that is:  People that are doing that want some

12    certainty.  And without any type of bid or plan

13    solicitation procedures act - (inaudible) - they're worried

14    about certainty, they're worried by arbitrariness by me or

15    by anybody else.  And, you know, you add on to that the

16    credit bid, you add on to that the head-start issues.  And

17    people were just concerned about, I'll call it

18    transparency.

19    Q.  So how does the bidding procedures and solicitation

20    motion address those particular concerns?

21    A.  I think we hit those three plus a lot of others as well

22    as we could.  And so what we've proposed is, is that we

23    will file a disclosure statement and a plan and that that

24    will describe the treatment of the major issues that are

25    giving the -- what we perceive to be giving the market
```

1    concern if they're to be out there trying to buy the assets

2    that they can't leave as an uncertainty at the time of

3    purchasing the assets.  And anticipating that their

4    purchase -- not "their purchase"; their investment, their

5    sponsorship of the plan is going to be subject to getting

6    the plan approved, which will solve the treatment of those.

7        The first one with respect to the credit bid, what

8    we've proposed is -- because this is a plan solicitation,

9    that I'm not sure there are credit bid rights; and that if

10   there are credit bid rights, that we've asked -- proposed

11   that Credit Suisse come in and ask for those and prove to

12   the Court that they have a credit bid right.  And that's

13   both the issue of it's a plan, but also we're selling

14   together for a unitary price noncollateral assets.  And

15   everybody agrees - and I haven't heard anybody even voice a

16   disagreement - that the assets combined aren't worth a lot

17   more than the assets sold separately.  So we're combining

18   them.

19       What we did provide, though, is that if Credit Suisse

20   can credit bid, we've got rid of all the stuff that might

21   stand in the way.  We've got rid of the fact that they've

22   got to qualify to do it.  We've got rid of the fact

23   everybody else has to put up a $10 million forfeitable

24   deposit.  That is not a requirement for Credit Suisse in

25   our procedures.  What we've tried to do is make it so that

1    they can step up and, as best I can describe it is, is

2    replicate a credit bid in a noncredit bid environment, if

3    the Court so allows.  So I guess as far as that first issue

4    of the market being concerned that you have a 500-pound

5    gorilla out there that could trump them no matter what they

6    did and no matter how fair value they were paying, I think

7    we've circumscribed that.

8        The second issue deals with CrossHarbor's head start.

9    And there's nothing I or anybody else can do about that.  I

10    mean that's a fact.  They've been working for two years on

11    this, and they've spent more money than any prospective

12    buyer is going to spend, I mean hundreds and hundreds and

13    hundreds of thousands of dollars and in stacks and stacks

14    of studies and engineering studies, and so forth.  The best

15    I can do is both organize the data room, organize the hard

16    data room, and get more time and get the bidders more time.

17    And by doing -- what I did was, is I said, "We'd only be

18    willing to go forward if CrossHarbor extends the term on

19    the DIP so that we have the maximum time period possible.

20    I want to be marketing this from the moment we file the

21    disclosure statement and the plan up until the very last

22    time."  I think we say bids have to be in 10 days before

23    plan confirmation; and that if there are overbids, we go to

24    the bid process 5 days before plan confirmation.  So I've

25    attempted to give it as long as possible, the marketing

1    period.  That's the best thing I can do to ameliorate their

2    head start in the buying public.

3        And then, thirdly, the issue of, you know,

4    transparency, the animosity which hopefully can be put

5    behind everybody, the concept there was, is actually lay it

6    out in a plan format, have procedures, have it be

7    transparent.  We've provided, for example, in the brokerage

8    agreement -- provided that every one of the constituents,

9    the unsecured creditors committee, and Credit Suisse get

10   the weekly updates from the broker.  We've required the

11   broker to give updates of who's doing what, and so forth.

12       And, honestly, there's still issues we have to work

13   through because the participants in the CrossHarbor loan,

14   some of those are some of the most likely buyers for this

15   type of asset.  I mean their loan participants are largely

16   hedge funds and venture funds and distressed asset buyers.

17   And so a lot of those may be the ideal buyers.  We've got

18   issues -- we clearly have issues, if they're in the buying

19   process, how much information you disclose.  But what we've

20   provided is, is that they essentially will be able to get

21   all the information we get and that there is a defined

22   court-ordered process.  We've provided that if there is an

23   overbid and we go to the bid process, that every party here

24   with their lawyers and their advisors can attend.  We've

25   provided that the bid will be transcribed, the bidding

1   process will be transcribed.  So what we've tried to do is

2   make this as transparent and as organized as possible, and

3   yet still leave enough flexibility that you don't

4   bootstrap -- or not "bootstrap"; that you don't constrain

5   the process unduly.  And that's the balance we tried to

6   strike.

7   Q.  Does the plan that you've negotiated with CrossHarbor

8   provide any advantages regarding the fact that there are

9   encumbered and unencumbered assets?

10  A.  Oh, I think it's -- when you say "advantages", I think

11  from the estate's point of view, that the estate is

12  substantially better off on twofold:  One is being able to

13  have somebody come in and gather all of the assets with a

14  single offer, a fully functioning optimal situation; and,

15  secondly, we're also providing -- the proposed plan will

16  involve the contribution of land back into Yellowstone Club

17  that will optimize development opportunity, as we talked

18  about, the -- prospectively.  And, again, this is not

19  done -- this is all being done the last three weeks and is

20  still underway, is prospectively the -- some of the land

21  from the settlement and the CrossHarbor golf course lots

22  would come back in.  Because, again, those are lowland flat

23  lots that the development could produce relatively similar

24  -- when we talk about "relatively similar", we're still

25  talking about two to three years away.  So that's, you

1    know, the type of overhang that's on this project versus

2    three, four, five years on hillside.

3    Q.  Do the procedures that you've negotiated and have been

4    outlined in the motion enhance bidding or chill bidding?

5    A.  I think the procedures enhance bidding.  I mean I don't

6    know -- I, frankly, don't know anything in them that chill

7    the bidding.  There's a number of things that we went out

8    of our way to be sure weren't in there that we rejected

9    when they were requested, we negotiated away.  And I'm

10   not -- if you want me to, I can walk through them, but I

11   don't know of anything in that that chills bidding.  I

12   believe the stalking horse provides some certainty.  We

13   know that there's a minimum of 100 million of value plus

14   another 75 million that's going to come in here plus some

15   additional land.  There's a lot of value coming into this

16   estate, a lot of value that will be available for the

17   secured and unsecured creditors at a minimum and then bids

18   above that.

19       I think that also by establishing a floor, you also get

20   rid of the true looky-Lou's, I mean the people that are

21   coming and saying, "This is a distress situation.  They're

22   fighting.  Can I get it for 10 million, 20 million, 50

23   million?"  Those people are gone by this, and I think

24   that's going to be a great economy to the Court and to the

25   estate.

1      We kept overbids to what I really think is a minimum

2  amount in an asset of this size on a transaction like this.

3  The way we structured the breakup fee, there's a number of

4  features in there that are not typical that I think are

5  more favorable to us.  For example, it only is paid if

6  CrossHarbor loses.  Often, the -- if there's overbids, the

7  stalking horse gets to credit the breakup fee and the

8  reimbursement.  That is not in this case.  But if they're

9  the prevailing party, they get no breakup fee whatsoever

10  and they pay the full costs of everything they've incurred

11  to date.  So that was a very advantageous feature.

12      As I said, we sat and took particular efforts with

13  respect if Credit Suisse wants to participate, to reduce

14  their barriers to entry.  We structured it such that if

15  somebody else is the prevailing bidder, CrossHarbor has to

16  keep their offer open for seven days after the confirmation

17  in case the prevailing bidder doesn't follow through.

18      You do have breaches.  As we've seen both here and

19  elsewhere, you do have breaches.  They are obligated to

20  leave their most highest bid open and stand ready to

21  perform or else they still lose $10 million if they were to

22  default, as well.

23      We've taken as many steps as we can to have this be a

24  process that will get people in and get robust bidding and

25  have done everything we can to avoid the chilling -- any

1  chilling effect.

2  Q.  Let me ask you a question:  Are the effects -- I mean

3  the fact that these assets are complex and difficult lean

4  towards your conclusion about having a stalking horse?

5  A.  Yes.  There's great uncertainty about the value of

6  these assets, and I think there's also probably great

7  disagreement about the value of these assets.  And given

8  the state of the capital markets, I believe that if you, if

9  you set a floor, you are going to tell buyers you are both

10  serious and give them a prospective they've got to shoot

11  above.  And, also, we've structured it -- which goes with

12  that, the brokerage fee we structured also encourages

13  bidders and, frankly, encourages Credit Suisse that -- I

14  negotiated the fee down to 95 basis points, less than

15  1 percent.  I also negotiated a lower fee if CrossHarbor is

16  the prevailing, again, to encourage the brokerage company

17  to go out and get somebody else.  The brokerage company

18  makes 20 percent more if they get a bidder that essentially

19  comes in and just bests CrossHarbor by $1 million.  So it's

20  a real incentive for them to get anybody in there over

21  that.

22      And then if Credit Suisse comes in as the bidder, so as

23  not to tax, for lack of a better word, the asset that

24  they've got the security in for them to sell it -- for them

25  to be the purchaser, I negotiated a brokerage fee down to

1   just 50 basis points, one-half of 1 percent if Credit

2   Suisse is ultimately the buyer.

3       And I also negotiated that if this breaks down -- is

4   the disappointment fee $100,000?  I think it's just

5   $100,000 if they've gone through all this effort, all the

6   marketing, and we've got the right to cancel it.  We put it

7   in the document we have the right to cancel it.  If we

8   cancel it, I believe all they're entitled to is $100,000.

9       So I think it is a very strong deal and is a strong

10  deal that is designed in all structures and all effects in

11  order to try to promote competition and be unchilling,

12  promote them to bring in qualified parties to the table.

13  Q.  Does CrossHarbor have the right to match any bid that's

14  made?

15  A.  No.  And, again, that's the type of thing that stalking

16  horses often ask for, often get.  They have no such right

17  here.  (Inaudible) -- turn that down.  This is a full and

18  fair, open auction.  And if somebody's higher, somebody

19  else walks away with the reorganized debtor.

20  Q.  CrossHarbor didn't ask for that, did they?

21  A.  I can't tell you whether they did or didn't.  I mean

22  they -- what you're seeing is, is a roundly negotiated

23  deal.  There were a lot of things they asked for.  Whether

24  that was precisely -- I mean they asked for a lot of -- a

25  lot more bid productions, they asked for higher overbids.

1    I mean they asked for the type of thing that somebody who's

2    committing to, on a standby basis, guarantee that there's

3    going to be $100 million available plus additional

4    investment and is agreeing to commit that and stand by for

5    the next two and a half months and also to have their offer

6    out and shopped around the world.  They asked for a lot of

7    things, and a lot of things are things that are not

8    unreasonable; it's just we were able to negotiate them down

9    from that.

10   Q.  Well, they ask for a termination fee, and that's

11   included in there.  Why do you believe a termination fee is

12   appropriate?

13   A.  Two things:  One, it's a significantly reduced

14   termination fee from what they wanted; and, secondly, I

15   think what I've described -- and that is we were asking

16   them to do a lot more than be a buyer.  We've asked them

17   to, for the next two and a half months, stand ready,

18   willing, and able.  Every other person who comes to this

19   gets to wait until 10 days before confirmation before

20   committing.  They can continue to look around, they can

21   continue to do whatever they want to do, and they don't

22   have to tie their money up.

23       We're telling CrossHarbor, "We are going in on February

24   13th, and you are going to be committed with a $10 million

25   forfeiture if you don't stand there completely willing and

1   able."

2       Secondly, it's very infrequent to get that because you

3   are -- they've done a lot of work, we've negotiated a lot

4   of things, and they don't have a done deal.  This deal is

5   now going to go be shopped.  It is going to be shopped by

6   one of the best brokerage companies in the world.

7       And then, thirdly, as I said, we've also asked for

8   additional concessions.  For example, they have to stand

9   behind their bid if they, in fact -- they have to stand

10  behind their bid for seven days after the confirmation in

11  case we have a default by the winning bidder, which again,

12  is an extraordinary obligation, and somebody deserves to be

13  compensated for doing that.

14      And then, finally, for providing the assurance that

15  this estate, in fact, will be able to financially

16  reorganize.

17  Q.  Can CBRE start the marketing process beyond getting

18  ready to go live if the debtors' motion to approve the

19  bidding and solicitation procedures isn't approved?

20  A.  Well, I don't believe so.

21  Q.  And what would be -- if it isn't approved now, what

22  would be the resulting delay that would occur?

23  A.  Well, two things:

24      One, I've been pretty successful in prevailing upon

25  them to work for several weeks now without anything

1    tangible.  I would hope to be able to prevail upon them to

2    continue to work in the face of a turndown of that.  I

3    can't assure that.

4        And then, secondly, it's just going to delay -- every

5    day past the 13th that we can't be marketing is just going

6    to foreshorten the marketing period.

7        And most of the papers that are filed in opposition

8    complain that the two and a half months is too short, and

9    every day we go beyond the 13th -- I mean I just find it --

10   you know, again, it's the height of irony, you know, the

11   whole strangle issue.  What we're trying to do is start

12   this as quickly as possible on the 13th.  And the papers

13   are saying:  No, don't approve it now because the period's

14   too short.

15       Well, all that's going to do is make it shorter.  But

16   that's kind of par for the course in this case.

17              MR. REAM:  If I could have a moment, Your Honor.

18              THE COURT:  You may.

19   Q.  (By Mr. Ream)  I just have one additional question,

20   Mr. Greenspan.

21       You've read all the oppositions.  Do you think the

22   debtors' proposal is the best approach that the debtors can

23   use to sell these assets based on the circumstances that

24   exist?

25   A.  I believe we've got the best of both worlds.  I mean we

1    have an assured source of funds to reorganize, keep

2    operating, continue development, and get a distribution out

3    to secured and unsecured creditors; and, simultaneously,

4    particularly with the extended period we negotiated, we've

5    got the opportunity to have a robust marketing process.

6        The time obviously isn't ideal, but we don't have money

7    to operate this come May 1st.  And so I really do believe

8    this is the best of both worlds.  We've got an assurance

9    and yet we've got an opportunity in what I believe is an

10   unchilled, full, and fair process to solicit considerably

11   higher offers if possible.

12               MR. REAM:  No further questions, Your Honor.

13               THE COURT:  Thank you.  Mr. Saunders.

14               While he's coming to the podium, what are you

15   proposing as a site for the bidding?  I assume you have an

16   alternative.  It's kind of in brackets at this point.

17               THE WITNESS:  Your Honor, we -- again, we believe

18   it probably should be a place that -- we need two things:

19               We want it to be easily accessible by air.  And,

20   again, we are trying to do everything to minimize -- it's

21   not going to be the property.

22               And we need -- I don't know if you've ever

23   attended -- if this comes out the way we like it to -- I

24   don't know if you've ever attended these.  There tends to

25   be a very large room, and then we need a large number of

1    breakout rooms.  Because this is not -- you don't operate

2    these as you sit everybody here, and you have an

3    auctioneer, and you just go through, and everybody puts a

4    paddle up.  You have a round of bidding.  That's why you

5    have overbid limits or minimums, because you then break up,

6    and you go and you literally lobby them, and you try to get

7    them to raise their bid, and you come back in, and you have

8    another round, and then you break off.  And I've done these

9    for two - three days like this.

10           We need a facility that's quite large that

11   accommodates this.  And part -- we've been comparing where

12   we have offices and capacities.  It's almost certainly

13   going to be either New York, Denver, Los Angeles where

14   people can get to, and offices -- my expectation, given

15   where a capital source is likely going to come from today,

16   it's probably going to be New York.  It's the place where

17   we -- you know, it's where you have firms like Skadden with

18   the types of facilities that are designed just for this.

19           MR. SAUNDERS:  Was that a compliment?

20           THE WITNESS:  Yeah, you guys know what you're

21   doing.

22           MR. SAUNDERS:  May I begin, Your Honor?

23           THE COURT:  You may proceed.

24                   CROSS-EXAMINATION

25   BY MR. SAUNDERS:

1   Q.  Mr. Greenspan, let me just sort of start with a point

2   at the end.  I think, if I understand the docket correctly,

3   that the debtors filed an application to approve the

4   employment of CBRE this morning and that the Court has

5   approved that order.

6   A.  Has approved it?

7   Q.  Yeah.

8   A.  Oh.

9            THE COURT:  We issued an order.

10            THE WITNESS:  Okay.  Thank you, Your Honor.

11  That's news to me.

12  Q.  (By Mr. Saunders)  But there's no reason why -- you

13  expressed some concern that if CB Richard Ellis was not

14  immediately unleashed, that there be even less time for

15  them to market, right?

16      And so I guess my question to you:  Is there any reason

17  why we can't blue-pencil that agreement that you've reached

18  with CB Richard Ellis to simply unleash them from the

19  restrictions of the bidding and solicitation procedures so

20  that the Court can approve or not approve the bidding and

21  solicitation procedures as it sees fit, based on what it

22  hears today, and still we can have CBRE get going?

23  A.  And, I'm sorry, you used the term "blue-pencil".  I

24  don't --

25  Q.  Right.  Just amend, edit, amend, change.

1   A.  Well, I think -- and look, I'm all in favor of getting

2   them out there as soon as we can.  They have to know what's

3   going to the market, and the market's got to be able to

4   look and see what is being offered.

5       I don't see any reason why they can't start making --

6   well, there's two things.  I don't see why they couldn't

7   start making contacts.  They've got nothing to offer.  I do

8   have an issue that I think -- I mean you would have to ask

9   CrossHarbor whether they think it's a default under the

10  DIP.  I know it's not a default as of the 13th.  If it's

11  not a default as of now, I don't see any reason why they

12  couldn't be out to the market, but only in the sense of

13  you've got nothing to hand the market right now.  You know,

14  we've been working on the flyer, we've got the data room in

15  shape.  I think -- I don't see any reason why you can't do

16  a pre-education, but you've got nothing to offer the market

17  at this moment.

18  Q.  Okay, fair enough.  Let me just try to step back for a

19  second and make sure that I understand the sequence that

20  you're proposing.  You're asking the Court today -- the

21  debtors are asking the Court today to approve a proposed

22  set of bidding and solicitation procedures for a subset of

23  the debtors' assets, right?

24  A.  That is correct.

25  Q.  Okay.  What's in a subset?

```
1    A.   The subset is everything that is involved in

2    Yellowstone Club that the debtor owns.  And that's the, you

3    know, the balance of the 13,500 acres that haven't been

4    sold, so -- which isn't that which - (inaudible) -

5    encumbered by CS; it also includes the lodge, which is not

6    encumbered by CS; it includes the personalty that is there;

7    it includes the intangibles, the trade names, trademarks;

8    it will presumably include -- because they will be bidding

9    for the equity in the reorganized debtor, it also will

10   presumably include the treatment of the members that will

11   be laid out in the plan and the disclosure statement.

12   Q.   I'm sorry, when you say "presumably" -- so we don't

13   know yet?

14   A.   If I had a finished plan today, we would submit it, and

15   they could be out marketing that.  We are running all these

16   tracks parallel trying to get it done in time and trying to

17   get the marketing going as quickly as possible to give it

18   maximum time.  So it will be done, it will be done by

19   Friday.

20   Q.   Okay.  But as it stands, you're asking the Court today

21   to approve bidding and solicitation procedures on a set of

22   assets, a subset of assets.  And there's no piece of paper

23   that we can look to to know exactly what's in and what's

24   out; is that right?

25   A.   No.  I mean it -- I'm sorry.  As far as the major
```

1   assets, I think it's well-known.  And I mean I can

2   represent, if it hasn't been filed anywhere, it's what

3   everybody believes Yellowstone Club is.  It's everything

4   your client, it's everything your client has encumbered

5   plus everything used there that is not encumbered by your

6   client.  It doesn't include causes of action; it doesn't

7   include, it doesn't include Farcheville; it doesn't include

8   the Scottish property.  I believe it will include Buck's

9   T-4 because of the employee housing component.  And, again,

10  I don't think your client has a lien on that, but it's

11  integral to the, the permanent process at Yellowstone Club.

12  But those are the assets.

13      We'd certainly -- by Friday, there will be a full list,

14  but it's not, it's not mysterious, it's not convoluted.

15  And if somebody thinks there's something that should be in

16  there, we'll certainly -- that isn't, we'll certainly look

17  at it.  But I -- it's pretty well delineated.

18  Q.  Not mysterious, not convoluted, but as of today, at

19  least, it doesn't exist, right?

20      It's not -- there's no piece of paper anywhere that

21  you've given people notice of or that you could hand me and

22  say, "Here's the list of assets that are going to be in the

23  subset that CB Richard Ellis is going to be marketing,"

24  right?

25  A.  I think that's right.

1   Q.   Okay, thanks.  Now, the procedures are also predicated

2   on a stalking-horse agreement with CrossHarbor, right?

3   A.   Yes.

4   Q.   Okay.  Has that stalking-horse agreement been approved

5   by the Court?

6   A.   No.

7   Q.   Has it been presented to the Court?

8   A.   It will be presented, presumably, Friday.

9   Q.   Okay.  So "no"?

10  A.   Correct.

11  Q.   As of today, "no", okay.  Has it been finalized?

12  A.   No.

13  Q.   Okay.  So there's not even an agreement or a final set

14  of terms that you have agreed will be proposed on Friday?

15  A.   We are -- that is correct.  I mean I've told you and we

16  tried to put in the papers where it was developed as of

17  when we filed the papers, and we continue to work on it

18  every single day.  We've used the breaks here to work on

19  it.  We will be working on it from sunrise to sunset plus

20  some tomorrow.  Contrary to what you think, it is a real

21  negotiation.  This is not them dictating and handing a

22  piece of paper; this is a back-and-forth real negotiation.

23  Q.   Okay.  That hasn't concluded yet?

24  A.   That is correct.

25  Q.   Okay.  So CrossHarbor hasn't bound itself to anything

```
 1   yet; is that right?
 2   A.  Presumably by Friday, they will be bound.
 3   Q.  Okay.  But as of now --
 4   A.  And that's why we have these sales procedures going
 5   effective then, and that's why I say I don't think
 6   CB Richard Ellis could go out and tell somebody exactly at
 7   this moment.  There's a good concept, they could
 8   pre-educate, but as of this moment, they haven't bound
 9   themselves to anything.
10   Q.  Right.  So if the Court enters the bidding and
11   solicitation procedures as you've requested and then
12   something changes in the world and CrossHarbor says, you
13   know, "Because of" -- in complete good faith, "Because of"
14   these changes in the world, we just can't go forward with
15   this deal anymore," then, you know, they're not bound,
16   right?
17   A.  I would have to read the actual terms, but I think we
18   would have to do something different on Friday.
19   Q.  You would have to file something different than a
20   stalking-horse agreement that they had backed out of,
21   right?
22   A.  Correct.
23   Q.  Yeah, okay.  And the bidding and solicitation
24   procedures are also predicated on the plan, right?
25   A.  Yeah, the plan being filed, yes.
```

1    Q.   Right.   And the plan has not been filed, right?

2    A.   Correct.

3    Q.   Okay.   And it hasn't been shared with any party in

4    interest other than CrossHarbor, presumably?

5    A.   No.   We've discussed it with parties in interest, we

6    put a description in our papers of the plan.   I mean it's

7    not wildly complex.   It's the -- it's bringing an investor

8    in for the reorganized YC and the rest of the assets into a

9    liquidating trust which the existing debtor would have no

10   interest in.   And we've briefly described treatment, and

11   we're working on defining the treatment and defining the

12   other -- you know, getting down the details of the rest of

13   the terms of the plan.

14   Q.   Okay.   And in addition to still negotiating the

15   stalking-horse agreement, you're still negotiating the plan

16   with CrossHarbor, right?

17   A.   Correct.

18   Q.   Okay.

19   A.   Well, and internally.   I mean we've -- we're trying

20   to -- this is a complex legal situation.   We're trying to

21   present a plan that will be confirmable.

22   Q.   Okay.   And you expect to file it on Friday; is that

23   right?

24   A.   I'm hoping to.

25   Q.   You're hoping to, right.   Do you intend to share the

1    plan documents with anybody before you file it on Friday?

2    A.   Probably.

3    Q.   Okay.   When do you expect to do that?

4    A.   When we have something in a form that's strong enough

5    to share.

6    Q.   Okay.   But you're not there yet?

7    A.   We are not there.

8    Q.   Okay.   And under the DIP financing term sheet, the

9    debtors are obligated to file a plan on Friday; is that

10   right?

11   A.   Correct.

12   Q.   Okay.   That's what's driving this, right?

13   A.   Well, a lot of things are driving this.   That certainly

14   is one; and then, secondly, trying to do this at the speed

15   of light so that we can get out and expose it to the

16   market.

17   Q.   And under the DIP financing term sheet, that plan has

18   to be in a form and substance acceptable to CrossHarbor,

19   right?

20   A.   Correct.

21   Q.   Okay.   And if the debtors don't file a plan of

22   reorganization that's acceptable to CrossHarbor by Friday,

23   they'll be in default under the DIP financing term sheet.

24   Is that your understanding?

25   A.   That is correct.

1    Q.   Okay.  Did you ask CrossHarbor to extend that deadline?

2    A.   Yes.

3    Q.   And what did they say?

4    A.   I got them to extend the back-end date.  So in order to

5    extend the marketing period, they wouldn't extend the front

6    end, but any extension on the front end is just going to

7    reduce the marketing period.

8    Q.   Okay.  And as a result of the fact that you have to

9    file a plan that is acceptable to them, you've had to

10   negotiate with them, right?

11   A.   Yes.

12   Q.   Okay.  And if you didn't have that obligation to file a

13   plan that was acceptable to them, then you wouldn't have to

14   negotiate with them about the plan, right?

15   A.   Well, I absolutely would negotiate with them.  I mean

16   they, like everybody else that's expressed an interest in

17   being an interested bidder and they are to the table with

18   cash, I would absolutely be negotiating with them.

19   Q.   Fair enough.  I understand you would like to -- you

20   know, maybe you'd like to negotiate with everybody.  But

21   they have leverage with you that arises from the fact that

22   you are obligated to file a plan on Friday that is

23   acceptable to them, right?

24   A.   To a certain extent, yes.

25   Q.   Okay.  In your negotiations with them, you have agreed

1    to things in the -- to their benefit that you wouldn't have

2    if it weren't for the fact that you have to file a plan on

3    Friday that's acceptable to them, right?

4    A.  I am candidly hard-pressed to think of one that fits in

5    that category because they've asked for a lot, but the

6    guiding principle that I've stood by is - besides fair and

7    open - is that it's got to be a confirmable plan.  And

8    there's a lot of things that particular creditors want, as

9    you know, there's a lot of things that a potential buyer or

10    a plan proponent would want that potentially engenders

11    confirmability.  I've got to get a plan confirmed two and a

12    half months from now, and I won't put in that plan anything

13    that endangers, in my mind, that confirmability.  And with

14    that -- as I say, this is going to be a relatively simple

15    plan.  With that, I think you're going to see a plan that

16    is quite plain vanilla, that does not have all the things

17    that Skadden would have demanded their client get.

18        I have said "no" far more than "yes".  I don't, I don't

19    see -- I think there's -- and if you've listened to what

20    I've described, there's very little in there.  I can't

21    think of anything they've demanded that I haven't gotten

22    out of there that doesn't belong in that plan or anything

23    that they've used leverage to get.

24    Q.  Okay.  But you said "yes" to them on -- with respect to

25    at least some of the provisions, right?

1   A.  Correct.

2   Q.  They asked for provisions that would not have been in

3   the debtor-perfect version of this plan, right, and that

4   you agreed to put in, right?

5   A.  For example, in a debtor-perfect, if you could get a

6   stalking-horse bidder to make all the commitments that they

7   made without giving them a breakup fee, that would be a

8   debtor-perfect plan.  Is that realistic in any case?  I

9   don't think so.  Is it realistic here?  Certainly not.

10      So, yes, they asked for it.  We negotiated it very

11  heavily.  I think it is as unchilling and as benign -- for

12  example, provisions - (inaudible) - and we got a lot of

13  benefit out of it in certainty, in dollars, and a

14  benchmark.  So I think we've -- the estate more than its

15  benefit for that bargain.  In a debtor-perfect world, I'd

16  love them to do that and me not have to pay them any

17  breakup fee at all.

18  Q.  You asked -- you said this, right?  I mean you asked

19  CrossHarbor to permit an extension of the February 13th

20  deadline, right?

21  A.  Correct.

22  Q.  And they said "no"?

23  A.  Correct.

24  Q.  What if they had said "yes"?  You might have taken

25  advantage on it, right?

1   A.  Well, I don't know if I would have because I'm under

2   unceasing - (inaudible) - attack for not having a long

3   enough marketing period.  And I know what's going to

4   happen:  If we put it off and took another two weeks to

5   have an absolutely polished plan, you would be in here

6   saying, "Your marketing period's too short by another two

7   weeks."

8   Q.  Right.

9   A.  So we might even still have tried to get it done -- I

10  mean we're doing this just as fast as we can.  So we might

11  still have tried for this Friday, but I've got to tell you,

12  some of us or tired of being up 24 hours a day trying to

13  get this done.  So that's the real reason I would like it

14  to be on the 13th.  But for a purpose of marketing, I'd

15  like to stick with the 13th and get this thing exposed as

16  much as possible.

17  Q.  Okay.  If it weren't for the fact that you have to file

18  a plan on Friday acceptable in form and substance to

19  CrossHarbor, you would be filing a different plan than

20  you're anticipating filing, right?

21  A.  As I told you, I'm not -- I mean there's got to be

22  something in there, but I'm sitting here today, and I can't

23  think of what I would do differently.  I would want to have

24  a stalking horse that assures continuity, I'd want this

25  type of clarity.  I don't know what -- I mean we've taken

1  all protections out for CrossHarbor, we've reduced the

2  brokerage commission if it's a CrossHarbor or CS deal.  I

3  mean I don't know what I would do differently if I didn't

4  have to file it on the 13th.  I think, you're right, I

5  would sit and have more conversations with more people

6  before filing; yes, I would.  I would have more

7  conversations with more people.  But I know in this case,

8  that's a long, torturous process.

9  Q.  But there at least some things you would do

10  differently?

11          THE COURT:  You know, I think he's --

12          THE WITNESS:  But not in, but not in the plan.

13          THE COURT:  -- really answered the question.

14          THE WITNESS:  I'm sorry, Your Honor.

15          THE COURT:  I think he's really answered the

16  question.

17          MR. SAUNDERS:  Fair enough, Your Honor.

18          Can I approach, Your Honor?

19          THE COURT:  You may.

20  Q.  (By Mr. Saunders)  Would you take a look at Exhibit 1,

21  please?

22  A.  Yes.

23  Q.  Okay.  And could you take a look at the restructuring

24  benchmarks on page 5?

25  A.  Yes.

1  Q.  All right.  Do you see Benchmark B, Subparagraph B?

2  It's sort of in the middle of the page.

3  A.  Yes.

4  Q.  And then it's got a last sentence that says (quoted as

5  read):

6          "Debtors shall be in default under the DIP loan

7  unless debtors have filed the plan documents and

8  solicitation motion on or before February 13, 2009; or,

9  alternatively, the Bankruptcy Court has previously entered

10  an order that terminates the debtors' exclusive period as

11  of February 13, 2009," right?

12  A.  Yes.

13  Q.  Okay.  So if the Court would enter an order that

14  terminated the debtors' exclusivity period effective

15  February 13, 2009, then you would no longer be obligated to

16  file a plan in form and substance acceptable to CrossHarbor

17  on Friday, right?

18  A.  Well, no.  I mean I, I made this point in -- I'm not

19  obligated -- just like you say there, I'm not obligated to

20  file a plan now.  It's a breach of the DIP.  But there's

21  nothing in here that says -- there is no covenant on my

22  part.  This is a condition to the continued funding of the

23  DIP loan.  So that's why -- so whether the Court enters

24  that or not, I'm not obligated to file that plan.  I'm

25  choosing to file the plan because, "A", it's the right

1    thing to do; and, "B", I don't want my DIP called because I

2    can't make payroll next week.

3    Q.  Okay.  But if the Court were to enter an order

4    terminating the debtors' exclusivity as of Friday, then -

5    (inaudible) - obligation, right, it would no longer be a

6    default under the DIP, right, if you chose to file a plan

7    that wasn't, in form and substance, acceptable to

8    CrossHarbor, right?

9    A.  I think it would be -- well, I always read this to

10   believe that that would be a breach of the DIP that would

11   suspend their funding obligations.  But maybe I'm wrong.  I

12   would have to read the entirety.  Unless there is a -

13   (inaudible, out of range of microphone) - or,

14   alternatively, the Bankruptcy Court -- (inaudible.)

15      Oh, I see how you're reading that.  And that may be --

16   I mean I'll leave it up to the lawyers, but that may be.  I

17   see how you're reading that sentence.  I would have to

18   review the rest of the document.

19   Q.  Okay.  And had you focused on that in that way before

20   my question to you?

21   A.  No.

22   Q.  Okay.  In your direct testimony, I think you stated

23   that you, you contacted some people in the market to talk

24   to them about and try to engage their interest in the

25   Yellowstone Club; is that right?

```
 1    A.   Correct.

 2    Q.   Okay.  Did you keep logs of FTI contacts with potential

 3    purchasers or potential capital providers?

 4    A.   Kept some logs of those as well as -- you know, in my

 5    everyday business, I mean this is not the only matter I'm

 6    doing in my everyday business.  You know, we're doing

 7    LandSource, which is another multi-billion-dollar land

 8    development project, and we're in constant contact with the

 9    people in the marketplace.  And so I never lost an

10    opportunity to, to get market feedback.

11    Q.   Okay.  And was there anybody at FTI doing that other

12    than you, making those calls?

13    A.   Brad Foster was doing some.  Brad, as I said before, is

14    on the property most of the time and has devoted full-time

15    to this, as well as Kevin Schulz who runs my investment

16    banking group.

17    Q.   Okay.  And did Brad and Kevin keep logs of their calls

18    to people?

19    A.   I don't know about logs of calls by Brad.  I believe he

20    kept records of contact.  And Kevin is subject to the NASD

21    - or whatever it's now called - requirements.  So usually

22    that requires logs, but I don't know what Kevin actually

23    did since he doesn't have the mandate to market it.

24    Q.   And how many people did you contact?

25    A.   I personally -- well, I mean in an actual, an actual
```

1    list of people, besides the ones that contacted us, I went

2    out to four that I felt would give me very good feedback on

3    the market and potentially would have an interest.

4    Q.  I'm sorry, four?

5    A.  Hm-hmm.

6    Q.  Okay.  How many did Brad and Kevin contact?

7    A.  I don't know the exact numbers.

8    Q.  I'm sorry, you don't know the --

9    A.  The exact numbers.

10   Q.  Okay.  Did they -- okay.  When did you contact the four

11   that you contacted?

12   A.  Between the week after, between the week after our DIP

13   was approved, so essentially the week before Christmas

14   through mid January.

15   Q.  Okay.  And did you have more than one conversation with

16   any of them, or one conversation each?

17   A.  This were none that -- I did not.  There were none

18   that, after going through what this was about, that

19   expressed an interest in pursuing any farther.  I shouldn't

20   say "none".  Some of them listened, needed to go consult

21   with their partners, needed to talk to their deal committee

22   to see if there was any possibility of an interest.  So a

23   couple of them got back to me and said, "No, we're not,"

24   but I had never had two substantive conversations.

25       There was nobody that we got through a full

1    conversation that didn't say, "We don't have an appetite

2    for that as it stands today," or else didn't go away, come

3    back, and say, "We do not have an appetite."

4    Q.   Are you permitted to tell me who the four are?  Please

5    do.

6    A.   Yeah, I think so.  One is LNR, Lennar, one of the

7    larger property investors in the country in doing --

8    looking at a considerable number of distress deals; Canyon

9    Partners; Regent; and another individual.  I don't know

10   what company he's with now but, you know, a gentleman by

11   the name Lehrner.

12   Q.   I'm sorry?

13   A.   A gentleman by the name of Lehrner.  I don't want what

14   his company affiliation is right now.

15   Q.   Warner?

16   A.   Lehrner.

17   Q.   Lehrner?

18   A.   L-E-H-R-N-E-R, I believe.

19   Q.   Okay.  Did you give any of those four any written

20   information about the debtors?

21   A.   I don't believe -- well, LNR have gotten our teaser; I

22   don't think the others did.  Again, this is -- on many of

23   these, given the status it was in at that time, it's pretty

24   easy to rule out whether you have an appetite or not.

25   Q.   Okay.  And all of the four ruled out that they had no

```
 1   appetite?
 2   A.  Well, right.
 3   Q.  Okay.
 4   A.  And, further, all four were -- all four knew of the
 5   property, all four knew of the project.  They had either
 6   looked at it before or were aware of the press, had done
 7   some work to investigate previously.
 8   Q.  Okay.  And how many parties other than -- as a result
 9   of everything that you did, done to date with the
10   marketing, how many parties other than people who are
11   already represented in the room signed confidentiality
12   agreements to look at the data room?
13   A.  I think there was only five or six confidentiality
14   agreements that were actually executed.
15   Q.  Okay.  How many times have you been to the Yellowstone
16   Club?
17   A.  I personally have been there once.
18   Q.  No, I -- once --
19   A.  Hm-hmm.
20   Q.  -- since you were -- okay.
21   A.  Correct.  I've got somebody there.  As you can tell
22   from what I'm doing, it's not very efficient for me to be
23   out dealing with these issues at a place that doesn't have
24   cell phone reception and doesn't have internet connection.
25   Q.  Okay.  So the entire time from your appointment in
```

 1  November to today, you've been there once, right?

 2  A.  Correct.  I can't do business there.

 3  Q.  Okay.

 4  A.  I've got some, I've got somebody who's there full-time,

 5  but I can't, I can't even make a cell phone call, I can't

 6  get internet, I can't get e-mails.

 7  Q.  Okay.  If I remember correctly from your November

 8  testimony, you personally run the real-estate restructuring

 9  practice at FTI; is that right?

10  A.  That is correct.

11  Q.  And that's the largest real-estate practice in the

12  country; is that right?

13  A.  I think it's the largest real-estate restructuring

14  practice, I believe.

15  Q.  Okay.  And so aside from being the chief restructuring

16  officer for the Yellowstone Club, how many other active

17  engagements are you currently handling?

18  A.  Quite a few.

19  Q.  More than five?

20  A.  I would say if you're actually talking about open

21  matters, definitely more than five; if you're talking about

22  time, this is monopolizing my time.

23  Q.  Okay.  More than 10 other active engagements that

24  you're responsible for?

25  A.  Well, again, when you're talking about for what I'm

1  responsible for, in my position, I have another senior

2  managing director or managing director working -- for

3  example, Brad Foster, a managing director in the practice

4  with 20-something years experience, is on this full-time,

5  nonstop.  So I have a Brad Foster or equivalent or multiple

6  Brad Fosters or equivalent on every one of my engagements.

7  So when you say "responsible", I am ultimately responsible

8  for the engagement.  I am spending the bulk of my time on

9  this engagement.

10  Q.  More than 20 active engagements that you're responsible

11  for right now?

12  A.  I don't think more than 20.

13  Q.  Okay.  You're not an expert in the marketing of real

14  estate like this, right?

15  A.  Actually, I'm a California licensed broker.  I've let

16  it go inactive, but I've been a broker since the mid '80s.

17  I've probably bought and sold literally in each case

18  hundreds of properties, all of which have been marketed.  I

19  mean I think I am.

20  Q.  Well, let me ask you this:  If you were not the chief

21  restructuring officer or were not otherwise affiliated with

22  the Yellowstone Club, right, would you have considered

23  yourself within the group of realtors and investment banks

24  who, you know, were considered for retention that

25  ultimately led to CB Richard Ellis here?  Do you operate in

1    that world?

2    A.  Yeah, FTI does.  I mean my -- what I was -- thought

3    would be an effective, efficient process is -- FTI does

4    have a licensed special-situations investment banker with

5    full-time bankers that do that.  And what we do on

6    real-estate assets is we team up the licensed investment

7    banker with the real-estate professionals and go to market

8    that way.

9        So I would not -- I don't think I personally --

10   although I do believe I'm an expert in marketing, I don't

11   believe I personally have the time or the sufficient

12   contacts to do this single-handedly or even a team under my

13   guidance.  But coupled with our investment bank, I'd put

14   them up against anybody, but that was not what the

15   creditors wanted here.  And so I, within a day or two,

16   deferred to their wishes.

17   Q.  Okay.  With all of the, you know, the burning bridges

18   or the fires on bridges or all of the things that you've

19   needed to deal with since you got involved with the

20   debtors, wouldn't it have made sense as quickly as possible

21   to delegate or download that marketing job to somebody, get

22   that off your plate and get that to somebody like

23   CB Richard Ellis?

24   A.  Well, we did.  I mean we went to them and three others

25   within a week.  I mean I, I spent the 23rd and 24th of

1    December chasing the CB Richard Ellis guy down at Disney

2    Land in Anaheim.  I mean he lives in Minneapolis.  I chased

3    him down at Disney Land with his kids on the ride

4    negotiating the terms of the agreement.

5        I chased the guys from Florida on their ski vacation

6    because I was trying to get this done.  And, you know,

7    silly me, I was actually trying have to have a vacation

8    with my family, which didn't work.

9        I mean I chased these people down throughout that time

10   trying to delegate this and trying to get them involved.  I

11   mean we negotiated four brokerage deals.  We solicited

12   them, we evaluated them.  I then negotiated the fees, I

13   negotiated the fee structure, I negotiated the member

14   assumptions.  I mean that was -- if you think this happens

15   overnight -- I mean that's what we were doing, trying to do

16   as quickly as possible.

17   Q.  Okay.

18   A.  So, yes, that's what was -- our goal was.  I couldn't

19   just turn around and hand it to them the next day and say,

20   "Okay, 5 percent in members dues?  Yeah, go.  And, oh, by

21   the way go out and sell it to a market that has no clue

22   what it's buying."

23   Q.  Okay.  By this Court's hearing in January, okay, by

24   around January 8th or 9th, actually, you had an agreement

25   from CB Richard Ellis that you had circulated to Credit

```
1    Suisse and the creditors committee, right?

2    A.   Correct.

3    Q.   Okay.  And you wanted to sign that agreement up, right?

4    A.   I did initially.

5    Q.   Right, okay.  Because you think that more marketing

6    efforts are necessary, right?

7    A.   I would always like to have more than less, yes.

8    Q.   Okay.  You don't think that your, your calls to the

9    four people, for instance, that that counts as fully

10   canvassing the market, right?  You think that somebody

11   ought to be retained to do that, right?

12   A.   I mean you're also ignoring every person who called us

13   and who called the lenders.  But I do, believe, yes, that

14   there should be a canvas beyond that.

15   Q.   Okay.  And the reason why you stopped that was because

16   CrossHarbor told you to, right?

17   A.   I stopped it for two reasons, and it's what I've

18   testified to:

19        One was that CrossHarbor said that would be a default

20   and I would be in yet another fight in this case, which I

21   don't need, over just the essence of my funding to keep

22   operating.

23        And, No. 2, the feedback -- because I've been talking

24   to people in the marketplace for a couple weeks at that

25   point.  The feedback coming from the marketplace was, as
```

1    presently structured, to walk out there and start selling a

2    situation with the overbid, with the head start, with the

3    hostility in this case, with the lack of rules of the game

4    was not going to be productive.

5        So for those two reasons, what we did is we then

6    switched into the gear of saying, "Okay, let's satisfy what

7    the market's asking for.  Let's get CB on board and

8    preloaded to hit the ground running."  And that's the tack

9    that then followed.

10            THE COURT:  Before you do your next question; in

11   Billings, we are going to shut down the Billings site so

12   the CSOs can go home.

13            So Mr. Guthals and Mr. Doak, we will see you on

14   another occasion.

15            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.  As

16   I leave, may I ask the Court to please consider the

17   objections that I have filed?

18            THE COURT:  Okay.

19            UNIDENTIFIED SPEAKER:  Thank you.

20            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

21   Q.  (By Mr. Saunders)  On January 8th or 9th you had an

22   agreement with CB Richard Ellis at least in a position to

23   circulate to Credit Suisse and the committee, correct?

24   A.  When you say "an agreement", that had not yet been

25   approved by the CB Richard Ellis hierarchy.  What we had

1  was we had their document.  We did our markup and, as soon

2  as possible, I circulated it to you guys to get your

3  feedback on it.

4  Q.  Okay.  And it's now February 10th, right?

5  A.  Correct.

6  Q.  Okay.  So that's a month, right, that CB Richard Ellis

7  could have been marketing, right, but for the fact that

8  CrossHarbor told you to stop, right?

9  A.  No, it's really not a month.  I mean what we -- the

10  reason why -- and I apologize to the Court.  I mean the

11  reason why you only had that filed today is they're a large

12  organization, too.  So once we then -- we spent a bunch of

13  time on your comments.  So when we circulated that to you,

14  I don't know, what was it, a week before we finally

15  resolved your comment and the committee's comments, we then

16  had to turn that back to CB Richard Ellis.  They are a

17  large international company.  We had to get their feedback;

18  we then had to negotiate that; and then even after that was

19  put to bed, I think it's taken us another week to get the

20  employment application through their lawyers and their

21  hierarchy.

22      So, no, if we got it to you on the 9th of January -

23  which meant we worked over the holidays to get that done,

24  which we did - we got it to you on the 9th of January, they

25  might have been able to go live and get approval by the

1   Court maybe by January 20th or 25th.

2       And we filed this, what, a week ago?  I think we filed

3   our procedures a week ago.  So, yeah, we probably lost a

4   week.

5   Q.  Your motion -- the debtors' motion says that

6   CrossHarbor is the only party ready and willing to serve as

7   a stalking horse.  Is that a correct assertion, in your

8   view?

9   A.  I believe so.

10  Q.  Okay.  Did you ever ask Credit Suisse to make a

11  stalking-horse bid?

12  A.  I have talked to Mr. Yankauer, and Mr. Yankauer has

13  said they would consider putting up a replacement DIP in

14  order to give more time.

15      And I said, "Fine, give me a proposal," and I haven't

16  received that proposal.

17      So in my conversations with him, he's never mentioned

18  that they would want to be a stalking-horse bidder.

19  Q.  But my question was:  Did you ever ask him?  Did you

20  ever say, "Would you be willing to be a stalking horse"?

21  A.  I don't think I ever used those words, but I could tell

22  you with absolute certainty that if they had any interest

23  in it, I would have heard about it.

24  Q.  Okay.  Did you ever ask anyone other than CrossHarbor

25  to make a stalking-horse bid?

1   A.  Other than East West, which -- East West Resorts -- and

2   we can talk about them in a moment.  Other than East West

3   Resorts, I, to date - and this includes everybody who's

4   come to us and everybody who's come to Credit Suisse, so

5   they have an interest in the asset - I've been unable to

6   get any of them to commit to due diligence.

7      Nobody will give a stalking-horse bid without having

8   done due diligence because they're committing themselves to

9   a price and a $10 million forfeiture.  So I mean I'm a

10   month away from getting somebody else that's a

11   stalking-horse bidder.  I mean I can't get people to

12   Square 1.  To be a stalking-horse bidder, you've got to be

13   at Square 5 or 6.

14   Q.  You said, I think, in your direct testimony that it

15   would take at least, at last two weeks for somebody to get

16   to a position of being comfortable with making a proposal;

17   is that right?

18   A.  I believe so.

19   Q.  Okay.  When did the data room open?

20   A.  I think we finally got everything - (inaudible) - live

21   on the 16th of January, or so.

22   Q.  Okay.  And when was the deadline that was stated for

23   proposal?

24   A.  We extended that out to -- well, when you say -

25   (inaudible) - by that time, it was very clear in my mind

1     that, given the circumstances, we were not going to have

2     anybody that was going to advance through the process.  So

3     I technically extended the deadline out to January 30th

4     with everybody I was dealing with, knowing that that was

5     the absolute latest date for them to put an a proposal,

6     that we could still get a plan written and filed by the

7     13th.

8     Q.   Okay.  But the deadline that was stated when the data

9     room opened was the 22nd of January, right?

10    A.   My personal -- I mean, again, dates are mushy as to

11    what was in that data room at what particular date.  I

12    think by the time we got to the 16th, we had extended it to

13    the 30th.  If we hadn't, as soon as we realized it -

14    (inaudible) - the 22nd, we extended it.  But people had

15    been getting the teaser before then.  The fact that the

16    data room itself -- the people had been getting every piece

17    of document that I had asked for.  We just didn't have the

18    data room up and ready at that point.

19    Q.   Just a minute.  I just want to ask you some questions

20    about the bid procedures.

21              MR. SAUNDERS:  May I approach, Your Honor?

22              THE COURT:  You may.

23    Q.   (By Mr. Saunders)  Mr. Greenspan, do you recognize that

24    to be the document I think you've described as the teaser

25    and the data -- (inaudible)?

```
 1   A.  Yeah, it is a version of it.  I would have to go

 2   through to see what -- I mean this -- again, we are

 3   constantly, to the extent we can, updating or refreshing

 4   the information.  People point out errors.  And one of the

 5   things we asked your clients to do is to go in, look, and

 6   tell us -- and we asked CrossHarbor to do the same, "Go in

 7   and tell us every area you see there; not just omissions,

 8   but commissions and anything else that should be there."

 9       But so this document is constantly being updated.  So

10   this, it does look like - I'm sure it is - a copy, because

11   it has -- when somebody downloads, for example, Your Honor,

12   out of the room, it automatically stamps the name of the

13   party that downloaded it so that if anybody photocopies

14   this and disburses it around despite the NDA, we can always

15   trace it back to see who did -- and it has the date and the

16   time stamp on it that's automatic coming out of the data

17   room.  So, yes, this came out of our data room, and it is,

18   as of February 5th, a teaser.

19   Q.  Right.  And you see at the bottom of the second page,

20   it states that the deadline for submitting bids is January

21   22nd?

22   A.  That is what it says.

23   Q.  Okay.

24           MR. SAUNDERS:  May I approach again, Your Honor?

25           THE COURT:  You may.
```

1          MR. SAUNDERS:  Your Honor, I've handed the

2    witness a copy of -- it's Docket No. 322.  It's the motion

3    for approval of bidding and solicitation procedures

4    regarding proposed sale of 100 percent of the equity

5    interest in the debtors' pursuant to a plan reorganization.

6    I have another copy for Your Honor if --

7          THE COURT:  I have it up.

8          MR. SAUNDERS:  Okay.

9    Q.  (By Mr. Saunders)  Mr. Greenspan, I want to ask you

10   some questions about the qualified alternative bid rules

11   that start on page 9 and go on to page 10.

12   A.  Yes.

13   Q.  Okay.  Actually, let's start on Subparagraph B.  It's

14   the top of page 10.  The last phrase of this Subparagraph B

15   requires that in all cases, the debt component of the

16   purchase price shall not exceed the amount of the debt

17   component set forth in the plan.  Do you see that?

18   A.  Yes.

19   Q.  Okay.  Of course, there is no plan yet, but what do you

20   anticipate is going to be the debt component set forth in

21   the plan?

22   A.  I believe it will be $70 million.

23   Q.  Okay.  And that's the debt component that is provided

24   in the -- at least proposed CrossHarbor stalking-horse

25   agreement?

1    A.   Correct.

2    Q.   Okay.  What's the point of that provision?

3    A.   It's twofold.  Again, everything is an attempt to

4    strike a balance.  And I've had this discussion with Credit

5    Suisse, whether we can get higher offers if there is an

6    opportunity to have some of the purchase price financed.

7    And it's usually a belief that you can; and in this market,

8    I think it's clear you can get better offers if there is a

9    finance component.

10        And in my discussions with Mr. Yankauer, he's

11   repeatedly said that if we have a buyer who is interested

12   and is interested in talking about financing, that I

13   certainly can send them to Mr. Yankauer to talk about that.

14        So we've had, you know, ongoing discussions regarding

15   the potential of financing.  If someone wants to pay out

16   cash, they can bid all cash.  The reason we capped it is

17   that there is a limit to how much leverage any viable

18   reorganized debtor can sustain.  As we know, this property

19   is operating at a negative cash flow.  It's going to

20   operate at a substantial negative cash flow probably for

21   several years.  And to load up an excessive debt burden on

22   top of that as well as to sell it, potentially, to

23   somebody, to -- or not sell it because they're making an

24   investment - (inaudible) - reorganized debtor; to have

25   somebody come in with an insignificant amount of equity

1    will not be a feasible plan.

2         We've got to pass feasibility both in front of this

3    Court as well as in practicality.  And looking at that, it

4    was my considered opinion that the maximum debt that seems

5    reasonable on this property would be 70 percent of this

6    initial bid amount.

7         It also will make it easier -- again, we talked about

8    that third element that the market is saying when the

9    market is saying:  Give us a clear set of guidelines.  We

10   want to know how we can put an offer out, how our offer is

11   going to be judged, and we want to know that this isn't

12   going to be an arbitrary situation.

13        So instead of starting to have people mix potentially

14   debt and cash, and so forth, we came to the conclusion that

15   we can have a much more transparent, and much fairer, a

16   much more objective process if we establish a 70 percent

17   leverage initially, and people can bid cash up from that

18   but not increase the debt amount.  And I spent a lot of

19   time thinking about that issue.

20   Q.   Okay.  But that 70 million is a hard cap.  It doesn't

21   flow as a percentage of the total bid, right?

22   A.   That is correct.

23   Q.   So if somebody came in and they said, "I want to offer

24   40 million in cash and 80 million in debt," that would not

25   qualify as a superior bid, right?

1   A.   That's correct.  That would impose yet a further

2   negative cash flow on the asset.  And, again, there's,

3   there's no absolute automatic number, that I think anybody

4   that's starting off at -- that 70 percent leverage ratio is

5   a pretty high leverage ratio in this world; and, therefore,

6   requiring cash above that is certainly reasonable and will

7   add to the safety and stability of the reorganized debtor.

8   Q.   Okay.  But, again, you know, pick a leverage ratio that

9   you think is safe.  Let's say it's 50 percent, right?

10  Somebody came in and offered 80 million in cash and

11  80 million in debt.  That would not count as a superior

12  bid.  It would be $160 million, and it would not count as a

13  superior bid on these procedures, right?

14  A.   That is correct.  But if they offered that as cash with

15  a 70 million, it would.

16  Q.   Did you ask for this provision or did CrossHarbor?

17  A.   It was negotiated.

18  Q.   And who asked for it in that negotiation?

19  A.   I don't know who asked -- I mean this -- as I said

20  before, this went through a lot of thought, a lot of

21  iteration, a lot of back-and-forth.  And the number had

22  changed.  At one point, I know the number was 60 million.

23  At one point, it was -- could be increased pro rata, as you

24  just described.

25       All those permutations were negotiated and ultimately

```
 1    came to a resolution that I think -- that both -- that,

 2    "A", I could get them to agree to -- again, I have to get

 3    them to agree to put up the cash and to incur the liability

 4    on the note.  I mean they didn't want to pay this much.  I

 5    got the offer up to this level through using the leverage

 6    and yet not so overburden the property on a go-forward

 7    basis that it can't be a sustained, viable, reorganized

 8    debtor.

 9    Q.  Is there any written analysis that you can point us to

10    that you've done or that you've seen that shows that

11    $70 million is a realistic cap on the amount of debt that

12    should be on the post-reorganized debtors?

13    A.  No, there's no magic to that.

14    Q.  Okay.

15    A.  Because this is a property that has negative cash flow,

16    so even at 70 million it runs negative.  You have to at

17    some point make a judgment call and do what is practical

18    and what can be accomplished and do it in a way that is

19    reasonable for all concerned.  I believe that is -- is it

20    demonstratively better or worse than 60 or 80?  Only

21    marginally.  I mean there's no magic to 70, but less than

22    70 -- I'm sorry, more than 70, you're up above 70 percent

23    leverage, which I think everybody is going to agree is not

24    a good place to go; and anything more than as the bid goes

25    up just further taxes the negative cash flow on the
```

```
 1   project.  So at some point, you've got to draw and line,
 2   and I was able to draw that line at 70 and to get them to
 3   go along with that.
 4        Again, they wanted no debt and lower cash because
 5   that's their preference.  I think this is a higher-valued
 6   deal than their all-cash deal.  But at some point, you've
 7   got to draw the line and say, "No more debt on this
 8   property."  That's what got us in this mess to begin with.
 9   Q.  Is it possible that a buyer for this property or
10   someone interested in infusing capital could have a
11   different business plan in mind for the club than the one
12   under which it's operated so far?
13   A.  Certainly.  I mean I would expect any buyer to have
14   tweaks.  And there may be a buyer with a radically
15   different business plan.  I think to get a deal done in the
16   next two and a half months and an approved plan of
17   disclosure statement, I don't think you can have a
18   radically different -- I mean I don't think anybody could
19   survive their due diligence on a radically different
20   concept.  You would, of course, never get concurrence on --
21   I assume you're talking about on a radically different
22   concept; for example, a public ski area.  And I haven't
23   heard anybody that's suggested the value is maximized for
24   the secured or unsecured creditors by doing something
25   radically different.
```

1    Q.  Well, but put aside radical.  Is it possible that

2    somebody could look at these assets and say, "Well, geeze,

3    if you tweaked the membership dues a little bit - which the

4    debtors have the right to do - to eliminate the subsidy to

5    the current members and thereby stop the negative cash

6    flow, maybe I could put a lot more debt on this"?  Isn't

7    that possible?

8    A.  Well, as presently contemplated, there is going to

9    be -- as I said, you're not limiting this.  You will be

10   presently surprised, I hope, that the day after this is

11   confirmed, as I conceive the plan right now, there's no

12   limitations on somebody changing the dues.  As a matter of

13   fact, our projections assume the dues has to increase.

14   Q.  Okay.

15   A.  I mean I don't think anybody is so unrealistic to

16   believe that a developer can, in perpetuity, pay for

17   services beyond what they're being compensated for, so the

18   anticipation is everybody will.  Whether a buyer wants to

19   raise the dues to 20,000 or 24,000 or raise it over 4 years

20   or raise it over 10 years, that's the reorganized debtor's

21   business to deal with.  We have a set of projections and

22   we're going to attach those projections, but those are not

23   binding on the business plan of the new equity investor.

24   Q.  But the limitation you are asking the Court to impose

25   is that any of those -- any potential buyer can't propose

```
 1    more than $70 million in debt, right?

 2    A.  Correct, that --

 3    Q.  Isn't that going --

 4    A.  I'm sorry.

 5    Q.  -- to deter bids?  Because somebody who has a different

 6    business plan and therefore thinks they can put more debt

 7    on isn't going to be able to make that bid.

 8    A.  I guarantee you I could get somebody out there to bid

 9    200 million if they don't have to put $1 down; yes, you

10    will.  Everybody in this room would pay $1 and take on

11    200 million worth of debt.

12    Q.  Okay.

13    A.  That's not the point.  The point is:  Are you deterring

14    the type of entities that have to put up $200 million worth

15    of cash by -- and, again, this is debtor financing.  If

16    they have access to third-party financing, by all means,

17    get it; if they want to do all cash, by all means, do cash.

18        But you're absolutely right.  I made a determination

19    that in order to spur bidding for the majority of people,

20    that we would -- and to, again, give them comfort.  I've

21    got to get realistic people in here who aren't going to

22    want to over-leverage this.  And their fear is that if I

23    allow a yahoo to come in and put a dollar down with

24    everything else being debt, you're not going to get the

25    serious people looking at this.
```

1     You need -- and mean that was -- the market's loud and

2  clear.  In this market, you need a set of parameters so the

3  serious people will pay attention to this.  And anybody who

4  wants to put more than 70 percent of debt on, I question

5  whether, "A", they're serious; and, "B", they've got the

6  further capital to go ahead and do the development.

7  Q.  I'll ask you one more question, then I'll move on to

8  the next one.  I mean we're really not talking about the

9  guy who wants to have more than 70 percent, right?

10     Somebody comes in and says, "I'm willing to pay 50

11  million in cash, and I want to have 75 million in debt," a

12  more conservative leverage ratio than what is contemplated

13  by the CrossHarbor proposal.  That bid is excluded, right?

14  A.  That wouldn't be a qualifying bid.

15  Q.  Okay.  Let's go to Paragraph C.  Paragraph C requires a

16  qualified bidder or a bidder in order to be qualified to

17  propose in writing what additional collateral will be

18  provided to replace the additional property being

19  contributed by CrossHarbor and/or its affiliates, right?

20  A.  Correct.

21  Q.  Okay.  What is the additional property that's being

22  contributed by CrossHarbor?

23  A.  Okay.  And that will be fully spelled out.  The

24  anticipation is that the CrossHarbor will contribute back -

25  and, again, this will be in writing and detailed out - will

1    contribute back the golf course lots that it purchased, and

2    that those will go back in, and that those will serve --

3    both the proceeds from the development of that will go to

4    the reorganized debtor as well as the lien that's being

5    created here will also encumber those, so that the lien

6    will have more value than -- certainly far more value than

7    the existing CS lien because it will have both the

8    clubhouse as well as -- I'm sorry, the lodge as well as

9    these new lots.

10   Q.   Okay.  And just to make it perfectly clear, right, we

11   don't know what that collateral is because it's in the plan

12   and we won't see that until Friday, right?

13   A.   Well, you might be able to see it earlier.  I wouldn't

14   count on it, but that's correct.

15   Q.   Okay.

16   A.   But I'm telling you what is.

17   Q.   Okay.

18   A.   It's --

19   Q.   Do we know how much it's worth?

20   A.   As I sit here today, no.

21   Q.   Any idea?  I mean because if the Court approves these

22   bidding procedures, right, then anybody else who wants to

23   put in a bid is going to have to match what that value is,

24   right?

25   A.   They're going to have to match that value in some form

1    of collateral or cash.

2    Q.  Right.  And you can't tell us how much that is, that

3    mystery requirement that any bidder is going to have has to

4    comply with in order to be qualified.  You can't tell us

5    what that amount is, right?

6    A.  Correct.

7    Q.  Okay.

8    A.  I would anticipate that we will establish some form of

9    benchmark so that it is not an uncertainty, something that

10   a -- for example, an LC or something else of a defined

11   amount will certainly qualify.  But, again, in an effort

12   not to chill, it would be easy to say, "You've got to put

13   up an LC or cash."

14       We've left it flexible since other potential bidders

15   may want to use other noncash collateral, leaving that

16   open.  Again, I recognize, again, all this is a trade-off.

17   We recognize that that engenders a certain amount of

18   uncertainty, but at some point you've got to draw the line

19   in order to try to encourage people in that respect so

20   we're not binding them.  An easy thing to say would have

21   been a letter of credit, and then you would have have upset

22   at cash or a letter of credit.  So we try to leave it open

23   enough that another real-estate entity could potentially

24   use real-estate collateral to make that up, which is, in

25   fact, what's happening here.

1    Q.   Okay.   This Paragraph C is something that CrossHarbor

2    asked for, right?  You didn't propose that, right?

3    A.   No, I actually, I actually, I actually did propose it

4    in this fashion.  And then, again, back to the issue of --

5    I sat down, and one of the things I sat down and tried to

6    do is walk through the mechanics.  And we are going to have

7    to -- and you've been through many of these before or at

8    least your bankruptcy partners have been through this

9    before.  You're going to try to analyze, and we'll sit here

10   with -- I know CS's financial visor will be involved, as

11   well.  You're going to get bids, and you're going to try to

12   compare and try to figure out what the value of the bid is.

13       And we wanted to provide here that we had a mechanism

14   for calling out and identifying that the -- that we're

15   going to try to evaluate collateral versus collateral.  I

16   mean the -- let me just give you an example:  Let's assume

17   somebody gave a bid and didn't put up additional

18   collateral.  If we didn't have that provision in here, I

19   then have to value a note, say a $70 million note that

20   secured by Yellowstone Club plus these 11 lots versus

21   somebody who's offering the same note not secured by those

22   11 lots because they don't have those 11 lots to give.

23       And at that point, we're going to be in a terrible

24   fight trying to say, "How much is the note worth more

25   because it has a little more collateral?"

1     And so I did not want to be in that process.  I wanted

2  more definitiveness to this.  So what I said was, "Is

3  anybody else who wanted to put up a note" -- and they don't

4  have to put up a note; somebody can pay cash.  But if they

5  want the note, they do have to put up a like amount of

6  collateral as the stalking-horse bid.  But I left it open

7  so that they could be flexible in what they put up as

8  collateral.  I didn't restrict that at all.

9  Q.  Well, you've also -- I mean that potential complexity

10  is still here, right, because somebody would be entitled to

11  propose an increased interest rate on the note in lieu of

12  collateral, right?

13  A.  That's correct.

14  Q.  Okay.  So you're still going to have to try to figure

15  out what's a $60 million face note at 8 percent worth

16  versus -- you're still going to have to do that, right?

17  A.  I believe -- I mean my concept, and I -- first of all,

18  it's a lot easier to compare -- when you apply present

19  value structure to that, it's a lot easier to compare the

20  value of that than compare a note that has a little

21  different collateral pool.

22     But more importantly, no, we -- that's one of the

23  reasons why we are not allowing the note to be varied, just

24  for the reason you just described.  The note is the note

25  with the terms on the note, and that's why what we limited

1    the initial bids to was cash so we actually avoid exactly

2    that thing you just said.

3        We don't want to be here -- first of all, we want the

4    bidders to show up because they believe in certainty; and,

5    secondly, we don't want to be here arguing with you as to

6    whether a particular note has more or less value by $100

7    than another particular note.  The note will be set, and

8    people can then bid above that in cash.  And I'm confident

9    that we'll all agree the difference in the value of cash.

10   Q.  Okay.  And just so we're clear, I mean the only way

11   that this contribution of collateral to the reorganized

12   debtors could possibly benefit any of the creditors in this

13   case, right, is by securing that $70 million note, right,

14   making it more secure?  Is that right?

15   A.  That is correct.

16   Q.  All right.  There's no suggestion that that collateral

17   goes directly to -- gets spit out to the creditors in this

18   case, right?

19   A.  No, specifically, it does not.

20   Q.  Right.

21   A.  But it's not insignificant.  I mean you've got a

22   problem with the collateral behind your note now.  What I'm

23   trying to do is remedy that so that that imperfection and

24   that problem doesn't continue in the future.

25   Q.  Well, I mean there's a problem right now which is that

1   there's a disequilibrium between the claim and the value of

2   the collateral, maybe, right?  And you're going to remedy

3   that in both directions, right?  I mean you're going to

4   reduce the value of the claim down to 70 million, right?

5   A.  No, I'm not --

6   Q.  Okay, all right.

7   A.  -- reducing the value of the claim down to 70 million.

8   More important -- I mean there's no suggestion of that.

9   But more importantly, I don't know if there's an issue

10  between value of collateral; what there clearly is an issue

11  with your collateral is you don't have the base lodge, you

12  don't have any flat land encumbered with your lien.  You

13  have a very, you have a very difficult -- your collateral

14  loan is very difficult development situation.

15  Q.  Let me just try to clear up one tangential issue.  You

16  were talking on your direct about the $88 million in -- is

17  it member deposits that are potential rejection damages, is

18  that correct, that somebody would need to assume -- or it's

19  not "rejection damages"; it's the -- they would need -- a

20  buyer would need to assume the obligation to pay that back;

21  is that right?

22  A.  That is correct.

23  Q.  Okay.  I apologize, it took me awhile to get there.

24      But that $88 million doesn't need to be paid back for

25  30 years and then without interest, right?

1  A.  Well, I'm not sure.  I mean that's -- if the club

2  continues to perform, that's correct.  But if the club is

3  in default on performing its obligations - for example, not

4  rendering services, not rendering services at the

5  represented level - if we lose our funding on May 1st, I

6  think that deposit -- the club is then in breach and then

7  owes that liability back.

8  Q.  Okay.  But a potential bidder coming in here is not

9  expecting to propose a business plan that's going to end up

10  back in Chapter 11, right?

11    They're going to propose to operate these assets in

12  some way, presumably keep the members around, right?

13    When they look at that $88 million obligation, it's not

14  $88 million; it's, "I may in 30 years have to pay back

15  $88 million," right?

16  A.  And that's precisely the logic I used to negotiate with

17  the brokers.

18  Q.  Okay.  And $88 million - (inaudible) - discounted back

19  to present value is a tiny fraction of $88 million, right?

20  A.  That's my argument to both the buyers and the brokers,

21  exactly.

22  Q.  Okay, great.  Let's look to Paragraph D.

23  A.  But that -- but you asked me about the claim.  In the

24  event of breach, if we go to -- if the DIP is pulled or we

25  go to liquidation, you then have the $88 million due then.

1  So you've got to be clear whether you're talking about how

2  it affects the value or what claim amount, legitimate claim

3  amount would be asserted.

4  Q.  Well, I guess I thought that you were suggesting that

5  it was an impediment to a bidder and suggested a bidder was

6  really going to have to come to the table with an awful lot

7  of resources because, in addition to having to top the 100

8  million, in addition to having to top the collateral, and

9  in addition to having to provide working capital, they were

10  going to have to be prepared to repay $88 million; isn't

11  that right?

12  A.  I'm sorry if my testimony was misunderstood.  No, what

13  I was saying is a bidder needs to know whether the

14  memberships are going to be assumed or rejected not because

15  of the financial issue of rejection but because of the

16  effect upon the value of the club, the ongoing capacity -

17  (inaudible) - the lack of litigation and everything else

18  that would be incurred with a rejection of those

19  agreements.  And so a bidder, I believe, needs certainty in

20  knowing whether those agreements are going to be rejected

21  or assumed.

22  Q.  Okay.  Let's look at Paragraph D.  In Paragraph D

23  (quoted as read):  "Any bidder -- any rival bidder in order

24  to be qualified is going to have to commit to working

25  capital no less than that to be provided by Purchaser,"

```
 1   right?

 2   A.   Correct.

 3   Q.   And "Purchaser" is CrossHarbor, at least --

 4   A.   It's -- well, it's --

 5   Q.   -- contemplated to be CrossHarbor?

 6   A.   I'm sorry, I interrupted you.

 7   Q.   "Purchaser" is at least contemplated to be CrossHarbor?

 8   A.   Yeah, "Purchaser" is a defined term in here as

 9   CrossHarbor.

10   Q.   Okay.  And the working capital that is contemplated to

11   be committed by CrossHarbor is 75 million; is that right?

12   A.   Above and beyond the initial purchase price, correct.

13   Q.   Right.  And the 77 -- 75 million, again, is not going

14   to be a payout to the creditors in this case.  That's just

15   a promise to put $75 million in working capital or commit

16   $75 million in working capital to the reorganized debtors,

17   right?

18   A.   It's more than a promise.  It's 25 million in cash

19   initially plus another $50 million firmly committed over

20   time.

21   Q.   Okay.  But none of that 75 million gets paid out to the

22   creditors in this case, right?

23   A.   Not directly.

24   Q.   Okay.

25   A.   It's necessary for the debtor to continue to operate
```

1    and be able to repay the note.

2    Q.   Okay.  So maybe it provides comfort for the note, but

3    the $75 million is not directly paid out to any creditors,

4    right?

5    A.   That's correct.

6    Q.   Okay.  And did you propose this requirement, or did

7    CrossHarbor?

8    A.   Well, as I said, it's been clear in every discussion

9    that I've had with anybody, including CrossHarbor, is the

10   absolute requirement that very meaningful additional cash

11   be contributed to a reorganized debtor.  I mean once we've

12   been continuing to run projections and spreadsheets and

13   hone the budget, they're -- I don't believe this can be

14   done for less than $75 million of additional capital.  And

15   consequently, CrossHarbor was willing to put the money in.

16   CrossHarbor wants to put the money in knowing that you can

17   only be successful -- the only reason they put money

18   upfront and undertake this is if they are going to put

19   additional money in.  And I can't propose a plan or endorse

20   anybody else stepping in to reorganize this debtor that

21   isn't also making a commitment to contribute what is the

22   bare-minimum capital necessary to go ahead and prosecute

23   this and make payroll.

24   Q.   Is there an analysis or a spreadsheet or model, or

25   something, that you've prepared that supports that

1   $75 million bare-minimum number?

2   A.  Well, several - (inaudible) - yes.  I mean we -- and we

3   will file projections with the disclosure statement.  But

4   one of the other things -- I didn't talk about it today,

5   but one of the other things we put up in the data room for

6   everybody to get and for your clients, who reviewed it

7   extensively, is we did put a model up which shows the cash

8   negative.  We talked about this at great length at our

9   hearing here six - eight weeks ago.  And CrossHarbor has a

10  different model.  They've shared their model with your

11  client.

12      There isn't any model I've seen by anybody -- your

13  appraisal, your appraisal, your appraisal, I think, shows

14  $200 million of capital needed.  I mean we're talking about

15  a very capital-intensive project.  There's nobody

16  suggesting you can do this -- there's nobody suggesting you

17  can get through May without new capital.

18  Q.  Would you agree with me that the amount of working

19  capital necessary for the reorganized debtors would depend

20  on their business plan?

21  A.  Yes.

22  Q.  Okay.  And couldn't somebody have a business plan that

23  varied from the existing one; and, therefore, called for

24  less working capital?

25  A.  I think the existing business plan requires more

```
 1    capital than this.  And, again, that's one of those
 2    compromises that anybody who's going to be a serious
 3    proponent of reorganizing is going to have to put capital
 4    in.  I think I could have very reasonably said 100 million,
 5    125 million, even 150 million, and I think some of the
 6    projections show that as needed.
 7        Again, the effort is not to be 99 percent sure; the
 8    objective is, is to be sure enough that we can go forward
 9    and not dissuade anybody who would be an honest-to-goodness
10    prospective investor and proponent.  We would all be safer
11    with that number being higher, but I think it's going to
12    reduce the number of people that have an interest.  If you
13    get down below 75 million, it is very, very difficult for
14    me to see how any plan like that could maximize value; and,
15    frankly, just be able -- for me to be able to present a
16    feasible plan of just carrying the operating loss and the
17    minimum physical improvements that need to be done on the
18    property over the next several years.
19    Q.  Okay.
20    A.  We're running about a 25-million-a-year deficit now
21    without doing any capex.
22    Q.  Right.  And this working capital requirement is really
23    driven by the deficit, right?
24    A.  It's both the deficit as well as improvements to
25    prosecute the completion of the club.
```

1    Q.   Okay.  But if a buyer came in and said, "You know, I'm

2    going to change the business model, increase the membership

3    dues to reduce the operating loses, I'm going to tweak the

4    expenses and the income, I'm going to start charging for X

5    Y and Z, and I'm going to, you know, reduce the number of

6    lifts operating.  And I recognize that that may have a

7    long-term impact on selling lots, but I think it's

8    worthwhile for me to stop the bleeding.  Therefore, I only

9    need 50 million in working capital, and I'm willing to

10   offer 25 -- that $25 million savings, I'm willing to offer

11   to the creditors in this case."

12       You can't do it under these procedures.  That bid is

13   excluded.  It's not qualified, right?

14   A.   Well, I think there's two things.  You said "stop the

15   bleeding".  You can run whatever numbers you want; you

16   cannot stop the bleeding.  You could change certain things

17   and reduce the bleeding, but between that, even at a

18   reduced level with the necessary capex, I don't see a

19   viable business plan that could be put forward for less

20   than a $75 million commitment.  As I said, I know

21   CrossHarbor has budgeted considerably more than 75.  I

22   don't see that 75 -- I don't see you can get meaningfully

23   below 75.

24       And the other thing is:  I think people are going to

25   bid the value.  And 75 going into the debtor isn't going to

1    reduce the purchase price they pay because if that 75 -- if

2    they really believe only 50 is needed, they put 75 in and

3    then they can pull 25 out if it's not needed.  This is a

4    commitment to provide the working capital, if needed,

5    irrevocably.  And if it's not needed, there's no commitment

6    to put it in.  I don't see how that chills the price that

7    would be paid for the, for the debtor.

8              MR. SAUNDERS:  Just a minute, Your Honor.

9    Q.  (By Mr. Saunders)  What was the date of your visit to

10   the Yellowstone Club?

11   A.  I actually just got there last Sunday.

12   Q.  Okay.  So as of the time you talked to the four

13   prospects, you called about their potential interest, you

14   had never been there; is that right?

15   A.  That's correct.

16   Q.  Okay.

17   A.  I had assembled the data room, went through every topo,

18   had a person there, but I -- as I told you before, I

19   couldn't even call those prospects being there.  I mean

20   that is not a place you can do business.

21             MR. SAUNDERS:  No further questions.

22             THE COURT:  Does anyone have any questions?  I

23   guess a couple.

24             You may proceed.

25             MR. WHITMORE:  Clark Whitmore for the Class B ad

1    hoc group.

2                        CROSS-EXAMINATION

3    BY MR. WHITMORE:

4    Q.  Mr. Greenspan, it would be prudent, wouldn't it, if

5    possible, to know what the plan says before we went ahead

6    and locked into approval, court approval of bidding

7    procedures based on sale of an equity interest that's

8    generated by that plan?  Isn't that right?

9    A.  You know, I've read that in the papers, and I don't --

10   no, I don't believe so at all.  These procedures -- you

11   know, we will debate the disclosure statement and the plan,

12   I'm sure, ad nauseam, but these procedures aren't

13   contingent upon -- I wouldn't change these procedures based

14   on modifications to the plan.

15       These are procedures designed to foster an open,

16   transparent, competitive process, and I would want these

17   procedures in place irrespective of what the plan says.

18   And that's why I feel comfortable getting this on as

19   quickly as possible so that it could come together with the

20   plan.  We tried to lay out the outlines of the plan --

21   Q.  Sure.

22   A.  -- as we knew it then so this wouldn't be done in a

23   total vacuum, but I don't see that you -- changes to the

24   disclosure statement or the plan would affect these

25   procedures.

1    Q.  So I think you testified earlier that there could be

2    material changes to the plan between now how you conceive

3    of it and what it turns out to be on Friday; isn't that

4    right?

5    A.  Well, and then beyond that, I mean I -- in the

6    perfect --

7    Q.  If you could just answer.

8    A.  I'm sorry, yes.

9    Q.  Okay.  And it's certainly, it's certainly possible that

10   the contracts with CrossHarbor and Edra Blixseth haven't

11   been finalized, right?  You testified that that's the case,

12   right?

13   A.  I mean to the best of my knowledge, there's not going

14   to be contracts with CrossHarbor and Edra Blixseth.

15   Everything would be done with the reorganized debtor, would

16   be disclosed in the disclosure statement, and laid out for

17   everybody to review.  The best I know, there's not going to

18   be a contract between Edra and CrossHarbor.  Everything is

19   going to - (inaudible) - to the benefit of the debtor.

20   Q.  Okay, so this is helpful to -- so there's not going to

21   be a contract on Friday signed by CrossHarbor that will

22   bind it do anything; is that right?

23   A.  I'm sorry, I may have misunderstood you.  I thought you

24   were saying a contract where the two parties were

25   Ms. Blixseth and CrossHarbor and, I'm sorry, that's what I

1    responded to.

2       I would anticipate that there is an agreement between

3    CrossHarbor and the debtor, subject to confirmation of a

4    plan, and a contract between Ms. Blixseth and the debtor

5    that would be effective upon confirmation of a plan.

6    Q.  And you would agree that the contents of those

7    agreements could affect what somebody would be willing to

8    pay for the equity interest in these debtors, right?

9    A.  No, because that -- they, they are not -- they would

10   not be binding themselves.  Ms. Blixseth and CrossHarbor

11   wouldn't be binding themselves to convey property to the

12   debtor if they aren't going to be the successful bidder.

13   The CrossHarbor contribution, giving land, giving 11 lots

14   that they paid, what, $20 million or $30 million or

15   $35 million for, they're not going to give those lots to

16   the reorganized debtor for gratis if they're not the

17   prevailing bidder.  And nobody, nobody in the world has the

18   right to buy those from the reorganized debtor.  The debtor

19   doesn't own those.

20   Q.  And that's true for Edra Blixseth's property, as well,

21   that unless CrossHarbor's the successful bidder, that will

22   not become part of the package, or is that different?

23   A.  No, that I would not expect Ms. Blixseth to contribute

24   that without something in it for her.  I mean that's --

25   Q.  Okay.  Now, I'm just finding this out for the first

1   time.  And that's something that would be clear in the

2   plan, though, right?

3   A.  It should be, yeah.

4   Q.  Okay.

5   A.  I mean if it's not, you will clearly challenge the

6   disclosure statement.  But that is additional assets coming

7   into the estate to benefit the estate.

8   Q.  All right.  So you're asking the Court today to approve

9   the bidding procedures, and it's really going to be a bid

10  between CrossHarbor having the right to buy a

11  fully integrated club with a clubhouse as opposed to third

12  parties only bidding on the assets without the benefit of

13  that; is that right?

14  A.  (Inaudible) -- there's two different sets of assets --

15  well, two different set of assets; one with a subset.

16  There's a set of assets the debtor owns.

17  Q.  Yeah.

18  A.  Okay.  The debtor owns the clubhouse, and the debtor

19  owns the mountain, and the debtor owns a lot of vertical

20  space, a lot of vertical area.  All of that is proposed to

21  be bid upon.  That is being bundled.  And some of that is

22  Credit Suisse's collateral and some is not.  So all of that

23  will stay in the reorganized debtor, and a prospective

24  investor/buyer will bid on all of that.

25  Q.  And that includes --

1   A.   Let me -- I'm sorry.

2   Q.   -- some of the property that Edra Blixseth owns?

3   A.   No.   Okay.

4   Q.   Okay.  Tell me about the property she owns, please.

5   A.   CrossHarbor and Ms. Blixseth are proposing to

6   additionally contribute property that they own to the

7   reorganized debtor.  And in consideration -- and that

8   reorganized debtor, with that, CrossHarbor will pay right

9   now $100 million as laid out here.  Okay?

10       A competing bidder will bid, but a competing bidder

11  isn't getting the assets that CrossHarbor is putting in and

12  isn't getting the assets that Ms. Blixseth is putting in

13  unless they negotiate for that --

14  Q.   Okay.

15  A.   -- I mean if they want to negotiate for that.  But

16  those aren't assets the debtor owns today.

17  Q.   And you testified earlier that the assets that Edra

18  Blixseth owns are important to the value of the project; is

19  that right?

20  A.   I think it substantially enhances it.

21  Q.   And you made the point that Credit Suisse's not having

22  a lien on that was a -- made their secured position very

23  problematic; isn't that right?

24  A.   I think a whole combination of things does.  But the

25  debtor -- at the time they made the loan, the debtor didn't

1    own those.

2    Q.  If we waited until after the plan were proposed and we

3    had CB Richard Ellis here to testify before the Court, they

4    could have an opportunity to explain to the Court whether

5    or not the bidding procedures might discourage third-party

6    bidders; isn't that right?

7    A.  Sure, you could ask them.  I mean I've discussed with

8    them concepts, taken advice back from them.  They obviously

9    are going to put a ton of work into this.  And they get

10   paid a bunch more if they bring in an outside bidder.  They

11   get paid almost twice as much as if CS credit bids.

12   Q.  Right.

13   A.  They get paid 20 percent more than if CrossHarbor is

14   the prevailing bidder.  I don't think they'd be spending

15   that type of time -- I've got a national team from them

16   that are going to work on this from across the country.  I

17   don't think they'd be spending the time if they thought

18   these bidding procedures were a fool's errand.

19   Q.  But nevertheless, we don't have the benefit of hearing

20   their testimony, right, because of the timing of all of

21   this?

22   A.  Correct.

23   Q.  What is Edra Blixseth to receive in the plan of

24   reorganization that's going to be filed?  I mean has it

25   been settled?

1   A.  No, it hasn't.

2   Q.  Can you describe the bid and the - (inaudible) - or --

3   A.  I mean what is being discussed is some form of deep,

4   residual, back-end interest, but that, you know, it's

5   still -- this is still a work in process.  And that's why

6   the -- it's the other reason why what we're trying to do is

7   get the pieces in place.  And that will not be a

8   complicating factor for a prospective bidder unless the

9   prospective bidder wants to also buy that.

10  Q.  And is there a discussion of a release of claims in

11  connection with her donation of this property?

12  A.  My personal -- I don't think the Court's going to

13  approve a release of claims to third parties.  But I mean,

14  as I said, I want to have a confirmable plan up.  I don't

15  to be asking --

16  Q.  Is that being discussed?

17  A.  What?

18  Q.  Is that being discussed?

19  A.  There's always an ask, of course, but I think we're all

20  pushing -- at least I certainly am pushing for a plan that

21  is going to be confirmable.

22  Q.  I noticed in the plan bidding procedures that there are

23  a number of places where the debtors have discretion to do

24  various things; isn't that right?

25      Well, let me give you an example:  For example, the

1   debtor gets to decide whether or not a bid is a qualifying

2   bid; isn't that right?

3   A.   Correct.

4   Q.   And the debtor gets to decide, if there are two

5   qualifying bids in an auction, which is the better or best

6   bid; isn't that right?

7   A.   Typically, yes.

8   Q.   Okay.  And in connection with that process, it's

9   certainly possible that the debtors' judgment may be

10  affected by debtor-in-possession financing arrangements it

11  has with CrossHarbor; isn't that right?

12  A.   Again, I do not believe that anything this debtor has

13  done is affected by that.  And I mean, you know, as you

14  said, anything's possible, but this is going to be done

15  with every party here present, every party's input, with

16  the transcription.  We've provided in the listing agreement

17  that every party here gets the same weekly reports I get.

18  They will have full access to the broker, they have access

19  to the community, and they'll have access to the

20  transaction process.

21      Will we potentially have a legitimate difference of

22  opinion?  Of course.  And I can guarantee you, if we

23  actually have one that we can't work out, we're going to be

24  back in front of this Court again to resolve it.

25  Q.   Now, I imagine there are some issues where you're sort

1    of the professional kind of representing the deal, almost.

2    Is that how you feel in connection with these negotiations?

3    A.   This is, this is a tough position.  No, I don't

4    represent the deal; I represent a boatload of workers who

5    didn't get paid, a boatload of trade, a boatload of

6    members, a secured lender who's owed a huge amount of

7    money.  There's, there's equity at the residual; there's

8    "B" equity, which is your clients.  There's just a

9    massive -- the employees that are working there, the reorg

10   debtor.  I mean this is, this is a balancing act.

11   Q.   Now, while I appreciate you're doing the best that you

12   possibly can - I have the highest regard for what you've

13   done and for your organization - for that matter, at the

14   end of the day, you may need to do what your client tells

15   you to do, though, right?

16   A.   If my client tells me to do something that I'm not

17   comfortable with or, quite frankly, if I'm at the point

18   where I think I'm not being effective or productive, I

19   resign.  I mean I have plenty of -- as was just pointed

20   out, I have got more things to do than this, and I would be

21   very happy to go back and do them.  So the answer is "no",

22   I am not compromising myself one iota whether she says it

23   or Credit Suisse says it or Tom Beckett says it.

24   Q.   If we could get one week, if CrossHarbor would extend

25   the back-end deadline by a week and we could have this

1  hearing a week after the plan were filed and all of the

2  other time frames remain essentially the same, that would

3  mean a much better position for us to be in as constituents

4  wanting to make sure that we're comfortable with the

5  appropriateness of the bidding process and for the Court,

6  wouldn't it?

7  A.  You know, I've got cynical doing this one.  I'm not

8  sure anyone would be comfortable.  I mean I'm not sure I

9  would ever get an agreement.  But I am still back to --

10  and I've scratched my head hard and long.  I don't see what

11  the details of the plan - I mean we've got the parameters -

12  but what the exact details of the plan have to do with the

13  bidding procedures.  You know, you may think the disclosure

14  statement and the plan are terrible, but I don't see how

15  that's going to change the bidding procedures.

16      What would you change in these bidding procedures?  Are

17  you going change the entity that goes out?  Are you going

18  to change the overbid amount?  Are you -- I don't see

19  anything that's going to change here based on what we've

20  put in a disclosure statement and plan.  We tried to give

21  you the outline of it so that it wouldn't be a total

22  vacuum, but filling out those details I don't think

23  advances it.  And as I said before I would always like to

24  have more time.

25  Q.  We all miss things, though.

1    A.   If you can get them to give you more time and if you

2    can fund the estate for another week, I'm willing to do

3    whatever.   That's not the reality.

4    Q.   Okay.   But we all miss things, right?   We all make

5    mistakes, right?

6    A.   Plenty.

7    Q.   And I think today we were looking at a basic provision

8    of the DIP order and potentially people are reading it a

9    different way.   So that's certainly possible, isn't it?

10   A.   Yes.

11   Q.   And it's true that CrossHarbor's goal in its

12   negotiations with you presumptively will be to try to get

13   this property for as cheap as possible and not to encourage

14   competing bids, right?

15   A.   They are not doing this out of charity, I agree.   I

16   mean they're a buyer.

17   Q.   Okay.   I mean that's their presumptive objective.   And

18   if the fact that the plan, the plan that they have control

19   over and influence over hasn't been filed yet, it's

20   certainly possible that the fact that the plan hasn't been

21   filed yet, that we might end up making a mistake here and

22   approving a bidding process that is problematic.   It's at

23   least a possibility, isn't it?

24   A.   I don't -- see, I don't think that's the case with the

25   proceeding procedure.   As I said, I don't see what we'd

1    change in the bidding procedures.  And they're pretty

2    simple, and they're out there.  I guarantee you, w are

3    going to file cleanups on the disclosure statement and

4    plan.  I mean there will be errors in that.  I've never

5    seen a case where you don't have cleanups, but especially

6    in this.  And as we go on, there's going to be

7    modifications.

8        But, once again, I bifurcate the bidding procedures

9    where we've all had a chance to look lat them and where

10   they're relatively straightforward from the disclosure

11   statement and the plan.  You and we and all the other

12   parties are going to spend a month beating up the

13   disclosure statement and the plan, I know that.  What I'd

14   like to be doing is marketing during that time with bidding

15   procedures that are applicable almost irrespective of what

16   that plan and disclosure statement are.  And I think that's

17   what we have here.

18   Q.  But nobody can market until the plan's filed anyway,

19   right?

20   A.  That's Friday.

21   Q.  Okay.

22   A.  That's, what, three days.

23           MR. WHITMORE:  Okay, thank you.  Nothing further.

24           THE COURT:  Thank you.  Mr. Warner.

25           MR. WARNER:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WARNER:

Q.  I want to go back to the motion and the actual outline
of bidding procedures, because as I read this, this is just
an outline; these aren't the procedures.

    There's additional property being contributed by
CrossHarbor, correct?

A.  The disclosure statement and plan will provide for
additional property.

Q.  And that will be additional collateral for the note,
and the note can't exceed 70 million?

A.  That's correct.

Q.  Is that additional property being provided -- becomes
an asset of NewCo?

A.  Yes, it will be, it will be an asset of the reorganized
debtor.

Q.  Okay.  And it's -- and if I were to have to match that
bid, I have to provide property of the same value or
greater than that additional property, correct?

A.  Deliberately left it flexible, but either -- you know,
when you say "property", yes, property, but the property
can be realty, could be an LC, could be cash.  But, yes,
something so that you have an apples-to-apples note.

Q.  Okay.  So let's start with the first apple:  The
property being contributed by CrossHarbor.  If I were go to

1  compete, how do I know in making my bid what the debtor

2  says is the value of that property?

3  A.  I would expect us to be able to put forth what I'll

4  describe as a cash equivalence so somebody will have

5  certainty that if they put an LC or cash, that that, in

6  fact, would give them assurance that it's of equal value.

7  If they want the additional flexibility of posting other

8  types of collateral, we then have to have a valuation of

9  it.

10  Q.  Okay.  I'm a buyer.

11  A.  Yes.

12  Q.  I show up on Monday of next week because your plan got

13  filed on Friday.

14  A.  Hm-hmm.

15  Q.  How do I know the value of the additional property

16  being contributed on Monday when I sit around in my data

17  room and I figure out I'm going to make a bid?  I have to

18  ask you, the debtor?

19  A.  Well, I anticipate we would actually publish what I'll

20  describe as a safe-harbor number, a number that they know

21  that if they put that up in cash or LC equivalent, they can

22  be assured - I don't want to exclude anybody - so they can

23  be assured that they've got an equal value of collateral.

24  Q.  And when are you going to put that out?

25  A.  I would hope to get that out by Friday, as well.

1  Q.  Okay.  And what is that number right now, in your mind?

2  A.  I don't know what that number is, exactly.

3  Q.  And that number is additional property contributed as

4  collateral for the note, correct?

5  A.  That is correct.

6  Q.  Okay.  If I, as a buyer, propose a lower note, do I

7  still have to contribute property equal to that value or am

8  I no longer a qualified bidder?

9  A.  That's a good clarification.  I think it would make

10  sense that you would -- that if you put in -- well, your --

11  if your additional cash -- I think your additional cash

12  would reduce the amount of the note, and you could apply

13  that first against the additional collateral.  I think

14  that's a good clarification.

15  Q.  We heard today that the Court has entered an order

16  authorizing the employment of CB Richard Ellis, correct?

17  A.  Yes.

18  Q.  Are they here today to testify?

19  A.  I don't believe so.

20  Q.  But you've retained them as your agent to market,

21  correct?

22  A.  Well, I've indicated a desire to retain them subject to

23  Court approval.

24  Q.  The Court's approved it.

25  A.  Well, yeah, but I haven't signed a contract.  We

1    weren't planning on having that hearing today.  So I mean I

2    just --

3    Q.  Do you not intend to sign the contract?

4    A.  I don't believe I've signed it.

5    Q.  Okay.  But you might sign it later today?

6    A.  If I have an approved order, yes.

7    Q.  Okay.  We'll take the Court's word that the order has

8    been entered, correct?

9    A.  Correct.

10   Q.  You intend to sign the employment agreement now?  It's

11   not a trick question.

12   A.  No, no, no, no.

13   Q.  I just want to make sure you're going forward.

14   A.  No, but I'm -- in my mind, I had assumed that we were

15   going to have bid procedures approved, we were then going

16   to get a retention of them.  You're now -- so what I'm now

17   saying is, clearly, if we get bid procedures or plan

18   solicitation procedures approved, I would clearly sign

19   their order -- I mean their agreement today.  If we do not

20   have an approved plan solicitation, I then question whether

21   I should sign their agreement.  Because if I sign their

22   agreement, I'm obligating the estate to at least the

23   disappointment fee.  I have to write them a check if we

24   never get to a position where I can actually have them

25   market.  So I probably -- if I don't have plan solicitation

1   procedures approved, I think it would be imprudent for me

2   to sign a contract with them obligating them -- for me to

3   pay them money if we never get to this step.

4   Q.  Fair enough.  But if you sign it, you're doing it

5   because you believe they are the best agent for this estate

6   to market what you want to sell, correct?

7   A.  Correct.

8   Q.  Okay.  But they're not here today to testify that the

9   procedures you're proposing are the best.  You're

10  testifying; not the agent you're hiring to implement,

11  correct?

12  A.  That is correct.

13  Q.  Okay.  And so we don't know what they might say is the

14  best?

15  A.  Correct.

16  Q.  Okay.  You agree that more time is better than less

17  time in trying to market something of this nature?

18  A.  Within reason, yes.

19  Q.  You also agree that as the time gets compressed, the

20  bidders either disappear or the price at which they pay is

21  less?

22  A.  Potentially.

23  Q.  You spoke to four people - yourself, our chief

24  restructuring officer - four entities about an interest,

25  correct?

1    A.  No.  The question was:  Who above and beyond everybody

2    who had expressed an interest did we actually affirmatively

3    go out and outreach to.

4    Q.  Correct.

5    A.  No, I spoke to many more -- I mean we spoke to many

6    more.  All the ones that East West -- every person that

7    Credit Suisse sent to me, every person that had contacted

8    me on their own from any source was above and beyond that.

9    His question was:  How many people did I affirmatively go

10   out and test above and beyond all those.

11   Q.  Fair, fair, you're right.  That was your testimony.  In

12   the four you talked to that you went out and called, you

13   said they didn't have an aptitude -- apt -- I apologize.

14            UNIDENTIFIED SPEAKER:  Appetite.

15            MR. WARNER:  Appetite.  It is late.  And I'm an

16   hour later than y'all.

17   Q.  (By Mr. Warner)  They didn't have an appetite at this

18   time, right?

19   A.  Under these -- under the circumstances I had then,

20   correct.

21   Q.  Okay.  But now that we're here and about to consider

22   approving procedures, which is 20 - 30 days later than

23   those phone calls, do we know what their appetite is today?

24   A.  I would expect -- those are the type of people that I

25   would expect CBRE to be going back to.  You know, so I

```
 1   don't know firsthand what their appetite is.  We've
 2   resolved a number of the objections and problems they had
 3   by doing this.
 4   Q.  And what about the time that they think would be
 5   reasonable for them to do what they have to do in
 6   diligence?  Do you have that question answered?
 7   A.  I can't tell you with any certitude on any one of them.
 8   On an asset of this size - I've said it before and I think
 9   every knowledgeable person will tell you - the more time
10   they could get, within reason, the more they'd like to
11   have.  I mean it, it --
12   Q.  I want to put aside the parameters that you're working
13   under vis-à-vis the DIP order, because as we heard today,
14   maybe there's a way around it by terminating exclusivity.
15   So let's just put that aside for the moment.  Now, you may
16   not agree with that interpretation, but put it aside for
17   the moment.
18       I haven't heard one bit of testimony on what a buyer
19   would want in order to consider purchasing these assets.
20   What you've said, correct, is that the debtor is ready to
21   go out and market; is that correct?  The debtor is ready to
22   go out and market.
23   A.  The debtor is ready to go out and market, that is
24   correct.
25   Q.  The debtor has its data room ready.
```

1  A.  Correct.

2  Q.  The debtor has gathered the diligence that it believes

3  is necessary for the data room.

4  A.  Correct.  And the debtor is going to afford every

5  prospective buyer the absolute maximum period of time to do

6  due diligence possible.  We don't have the money to pay the

7  lights or the workers on May 1st.  The auction is going to

8  be five days before then.  They have the entire time up

9  until the five days before then.

10 Q.  We've heard the speech.  Let's stick with my questions.

11     My concern is that the limitation is imposed by some

12 other reason.  I'm trying to figure out what's the best for

13 this estate.  And if the estate needs more time to market,

14 that's what we should be focusing on.  We should focusing

15 on a buyer trying to buy a project of this size in this

16 economy, in this debt-structure financial situation.  Okay?

17 A.  (Inaudible.)

18 Q.  The debtor is ready, and you've told us that, but you

19 haven't told us a potential buyer can get it done.  And,

20 boy, that sure seems more important than what you're ready

21 to do.  Let's talk about --

22 A.  Well, wait, wait.  Where's the question?

23          UNIDENTIFIED SPEAKER:  Your Honor --

24          THE COURT:  Just a moment, just a moment.  We

25 don't need commentary.

```
 1              MR. WARNER:  I apologize.
 2              THE COURT:  Let's ask the questions and sit down.
 3              MR. WARNER:  I agree.
 4    Q.  (By Mr. Warner)  You heard the testimony of the
 5    debtors' principal, that's correct, earlier today --
 6    A.  Yes.
 7    Q.  -- the debtors' CEO?
 8         And she said that CrossHarbor has had - and I think she
 9    said it twice - a year and a half of effort towards putting
10    together a transaction with the debtor; is that right?
11    A.  I mean I'll defer to her exact words, but CrossHarbor
12    made their first acquisition up there a year and a half -
13    two years ago - it's well-documented, and the documents
14    have been turned over - that they negotiated a deal back in
15    March of 2008, so --
16    Q.  But they've had a lot of time for diligence, correct --
17    A.  Yeah.
18    Q.  -- more than --
19    A.  Oh, I'm sorry.
20    Q.  -- any somebody coming in today might have?
21    A.  Absolutely.
22    Q.  Okay.  And you said -- you talked about populating the
23    data room, and you even said you've gone to CrossHarbor as
24    well as Credit Suisse and asked what else should be in
25    there, correct?
```

1   A.  And the committee, I believe.

2   Q.  Okay.  And I'm just not sure how it's realistic to ask

3   CrossHarbor what else should be in there unless you know

4   that everything they have is in there.  Wouldn't that be

5   better?

6   A.  Well, no.  I mean isn't -- they have proprietary stuff.

7   I don't have a right.  Just like -- I mean Credit Suisse

8   has asked me, "Put in CrossHarbor's proprietary stuff."

9       And I've told Mr. Yankauer, "I have no more right to

10  put their proprietary stuff in the data room than I have to

11  get a confidential file from Credit Suisse and post it or I

12  have to put the minutes of the unsecured creditors

13  committee that's confidential in the data room.  I don't

14  have any right to put anything in that data room that's not

15  the debtors' or that's not publicly available."

16      And so that's what I've attempted to do, is everything

17  that is properly there -- and I've included putting stuff

18  there that is highly sensitive and highly confidential.

19  And I'm trying to do that out of -- again, everything is a

20  balance.  I try to do that with appropriate safeguards.

21  But the conservative -- the easiest thing to do is not put

22  half that stuff in there.

23  Q.  But are you comfortable that everything that

24  CrossHarbor has from the debtor is in there and available

25  to other potential buyers?

1    A.   Absolutely.  I mean and I've sat -- you've got the

2    director of development here, you've got the general

3    manager here.  We spent two months with them, and they're

4    the ones that -- I mean it's -- they're the ones that have

5    processed this.  We've got everything from the debtors, I

6    believe, that is relevant.  And if there's anything else in

7    there, somebody let us know and we'll put it in there.

8    Q.   Has Richard Ellis, CB Richard Ellis been involved in

9    the negotiations of the CrossHarbor offer, if you will, as

10   opposed to the bid procedures?

11   A.   No.

12   Q.   So why do we propose to give them any - (inaudible) -

13   in connection with that transaction?

14   A.   There's two reasons, is you cannot -- or, actually, I

15   think it really comes down to one.  You can't get a

16   topflight investment banker or broker to work on something

17   when a very likely purchaser is excluded from them getting

18   the commission.  They will work on a contingency of getting

19   a deal closed, but if I elect or if they give the highest

20   and best offer and they've marketed the property -- let's

21   assume they brought in a buyer.  Don't get -- these

22   companies -- CB Richard Ellis, their rule is to only work

23   on exclusives.

24       So whether I -- the standard contract that I rejected

25   that we spent weeks negotiating was that if I take the

1    property off the market, I still owe them a full

2    commission.  Okay?  We negotiated that away, we negotiated

3    it down.  So no reputable broker will work on a provision

4    that a likely buyer, where I have the choice or the Court

5    has the choice as to who's going to be the buyer, that that

6    likely buyer is excluded from their commission schedule.

7    Q.  Even though the buyer is already there?  And that's

8    what I'm concerned about.  The buyer is already there.

9    A.  That was one of my arguments for 80 basis points rather

10   than 95.  I mean I -- look, I would love to pay them zero

11   for everything and get them to work their heart out, but

12   that's the reality.

13   Q.  Okay.  Let me ask a few final questions.  If you would

14   look at the pleading, which is Docket 322, it's the

15   pleading that -- the motion that we're hearing today on,

16   your motion for approval of bidding procedures --

17   A.  I'm sorry, what are you referring me to?

18   Q.  It's the actual motion for approval of bidding and

19   solicitation procedures.  I think it's the pleading right

20   there in front of you.

21   A.  Thank you, yes.

22   Q.  Okay.  In the first -- in the second line, it reads

23   you're moving this Court for an entry of order approving

24   certain bid procedures, correct?  And so what we're doing

25   today is asking the Court to approve the bid procedures?

1  A.  Yes.

2  Q.  Okay.  And then if you go to page 14, the line before

3  the section starting "motion to extend exclusivity period",

4  the last sentence reads (quoted as read):

5         "Accordingly, the debtors respectfully submit

6  that this Court should authorize and approve the bidding

7  procedures, including the termination fee."

8     So you're asking today to approve the procedures,

9  correct?

10  A.  Correct.

11  Q.  Okay.  Now, if you would, then, turn to the bottom of

12  page 8.  It says the bidding -- the last sentence starting

13  on the bottom reads (quoted as read):

14         "The bidding procedures, as such, may be approved

15  by the Court -- as such, may be approved by the Court will

16  be set forth in full in the proposed disclosure statement."

17     So I'm reading this as sort of an outline, but not all

18  the procedures.  Am I reading that wrong?

19  A.  Well, no, I don't -- I mean I think you're reading into

20  it more than is there.  It says (quoted as read):

21         "The bidding procedures as may be approved by the

22  Court will be set forth in full in the proposed disclosure

23  statement and will be provided to CB Richard Ellis and any

24  acquisition prospects immediately following the hearing on

25  this motion."

1      I believe what's intended by that -- and I'll leave it

2    up to the lawyers who drafted it.  I mean I certainly

3    reviewed this, and we all commented on this.  I think

4    what's intended there is that, again, trying to go to the

5    transparency, that what the Court approves is going to be

6    set forth in full.  It's not going to be edited; it will be

7    set forth in full, and it's going to be given to the broker

8    and all prospects, and it will be put in the disclosure

9    statement.

10      I mean what we're trying to say is -- again, I mean you

11   can -- we can try to read innuendo and insinuation into

12   everything.  We're trying to say:  Whatever gets approved

13   we're going to disclose to everybody.

14   Q.  Oh, I appreciate that.  What I'm trying to find out is,

15   is what I read in this motion the full extent of the

16   procedures, or will I read more detail when I read the plan

17   and disclosure?

18   A.  Sitting here, I'm not aware of anything that's not in

19   here.

20   Q.  Okay.

21   A.  I mean but, again, just like you -- I mean, well, let

22   me just -- you provided a good comment - I think it was

23   you; whoever did - a good question.  And I think it's going

24   to be a good clarification to change.

25          THE COURT:  Mr. Beckett, any questions?

```
 1              Mr. Moore?

 2              Mr. Patten?

 3              MR. BECKETT:  Yeah, I have just maybe one.

 4                      CROSS-EXAMINATION

 5   BY MR. BECKETT:

 6   Q.  Mr. Greenspan, you were asked by counsel to the "B"

 7   interest holders at the end of his questioning of you:

 8   Could these bid procedures change depending upon the kind

 9   of plan that you filed on Friday?

10       I believe your answer was "no".

11       Was your answer:  No, any different kind of plan that

12   you would propose on Friday would all have the same kinds

13   of bid procedures, that these are standard bid procedures?

14   A.  Correct.  I mean that's what I'm saying.  I can't

15   conceive of a plan that we'd file that would not be

16   suitable and that these wouldn't be the appropriate bid

17   procedures.  I think if we --

18   Q.  Would you say, then --

19   A.  Go ahead.

20   Q.  -- that they're standard in the market, that the market

21   would expect something just like this?

22   A.  Yes.  I hesitate to say anything's standard in these

23   because you can, you can point to a dozen different ones.

24   I think everything in these bid procedures, I think

25   everything, I think everything in them is very typical.
```

1    You will find them frequently in bid procedures, and I

2    don't think anything in these -- I mean I've tried my

3    darndest to be sure that nothing in these is considered

4    unreasonable or out of line or would chill bidding.

5            MR. BECKETT:  All right, I just wanted to

6    clarify.  Thanks.

7            THE COURT:  Mr. Moore.

8            MR. MOORE:  I'll try to be quick.

9                    CROSS-EXAMINATION

10   BY MR. MOORE:

11   Q.  Mr. Greenspan, we heard about the additional

12   collateral.  You stated that was your requirement?

13   A.  Yes, so that we could have apples-to-apples bidding.

14   Q.  Okay.  And it's the estate representatives who make the

15   determination as to the value of that; is that correct?

16   A.  Correct.

17   Q.  It's not CrossHarbor?

18   A.  Correct.

19   Q.  Okay.  Now, one thing I'm confused about is - I wasn't

20   aware of it - you testified that there was a request to

21   extend the Friday deadline.  Do you know who made such a

22   request to CrossHarbor?

23      Because I'll tell you, frankly, I'm not aware of it.

24   A.  I think during the discussions -- I mean, yeah, during

25   the discussions, I think I probably had asked, "Let's just

1    push everything off."  And the answer was "no".

2    Q.  Frankly, I would have been delighted, but I figured

3    that would generate another round.

4    A.  It would.

5    Q.  In any event, again, the benchmarks we have are those

6    that were proposed originally by Credit Suisse?

7    A.  Correct.

8    Q.  And, if anything, the only thing we're doing is adding

9    another 30 days at the end, correct?

10   A.  Well, I think that's, I think that's -- I consider that

11   a major accomplishment.  I think that's significant.

12   Q.  Okay.  Well, that's the only difference that you're

13   aware of, okay.

14       Now, with respect to an acceptable plan, you and I have

15   had a lot of discussions about that.  And your position

16   throughout this has been that, "It's not an acceptable plan

17   with us; it's an acceptable plan," correct?

18   A.  Correct.

19   Q.  And it's your position that as long as you've proposed

20   a plan that addressed the issues of CrossHarbor, that you

21   could propose a plan with anyone, correct?

22   A.  That's correct.

23   Q.  Okay.  You said it was your goal to have a confirmable

24   plan.  Is it your understanding we have the same goal?

25   A.  I believe so.  But as you well know, you and I don't

```
 1    necessarily always agree on what's a confirmable plan.

 2    Q.  Correct.  But, ultimately, the judge will determine

 3    that.  And my next question was going to be:  If we don't

 4    have a confirmable plan, what is it that CrossHarbor gets

 5    under these procedures other than anxiety?

 6    A.  I don't think you get anything.  I don't think -- the

 7    only time you get any reimbursement or an overbid is if

 8    there actually is a successful overbid.  If there is not a

 9    confirmable plan, you get zero.

10    Q.  And we eat all of our costs in the meantime, correct?

11    A.  That is historic and prospective, yes.

12    Q.  Okay.  You were asked about Credit Suisse being a

13    stalking-horse bidder.  Would you have rejected that notion

14    if they offered it to you?

15    A.  Not at all.

16    Q.  Okay.  In my years of experience, I've never seen it.

17    Have you ever seen a secured lender be the stalking-horse

18    bidder in a Chapter 11 case?

19    A.  No.  It's usually the antithesis of what they -- they

20    sit there with -- they can bid.

21    Q.  Okay.  When you were testifying concerning marketing,

22    you were testifying concerning marketing to date; is that

23    correct?

24    A.  Correct.

25    Q.  And these procedures contemplate that there will be a
```

1    continuing period of marketing for what?  About two and a

2    half months; is that correct?

3    A.  Yeah, two-plus months.

4    Q.  Okay.  And you testified concerning a disagreement you

5    and I had with regard to CB Richard Ellis and the marketing

6    procedures in January; is that correct?

7    A.  Yes.

8    Q.  And is it fair to say that my disagreement was of the

9    notion with respect to the late January deadlines?

10   A.  It's late.  What are the late January deadlines?

11   Q.  You talked earlier about the fact that -- and you were

12   pointed to a tickler, or whatever, a teaser that had a

13   deadline for people to submit bids to support the plan at

14   the end of January, and the like.

15   A.  Oh.

16   Q.  Wasn't our discussion with respect to whether it made

17   any sense to have CB Richard Ellis go out and try to market

18   this asset for a period of three weeks?

19   A.  Well, we've, of course, had that discussion, but

20   also -- no you, you believed it -- yeah, beyond that.  I

21   mean you did believe that it was a default under the DIP,

22   and I think you probably still believe there's a default

23   under the DIP to do that.

24   Q.  But I'm talking about the substance of our disagreement

25   with respect to the marketing process.  Do you recall me

1  making the statement that I couldn't sell my house in three

2  weeks?

3  A.  Oh, correct.  I mean we all recognize that this is a

4  much better -- when I see "we", I think you believe and

5  your client believes, I certainly believe, that we will get

6  a much more robust marketing process doing this than had we

7  tried to get a broker involved in early or middle January

8  for a plan that has to be filed this Friday.

9  Q.  So the context wasn't we were trying to, we were to

10  prevent marketing; it was a disagreement as to what would

11  be acceptable to everyone here and the Court.  Is that

12  correct?

13  A.  Well, that was one element.  But you also did believe

14  it was a violation of the DIP.

15  Q.  Okay.  Now, with respect to the retention of CB Richard

16  Ellis, we didn't preclude you from getting CB Richard Ellis

17  retained prior to today, did we?

18  A.  No, not at all.

19  Q.  Our suggestion was:  We go ahead and get them retained,

20  they prepare their marketing materials, and we be ready to

21  go on Friday or Monday.  As soon as the plan was filed, we

22  go forward.

23  A.  That is correct.

24  Q.  And that would maximize the marketing period?

25  A.  That is correct.

1   Q.   Now, the four brokers that you solicited to or you

2   spoke to with respect to selling this, they understood the

3   marketing period; is that correct?

4   A.   Well, no.   I mean when you say "understood the

5   marketing period" -- I mean I initially went to them with

6   the proposal, and I did get proposals from them to sign

7   them up in late December or January and try to go to market

8   then.

9        And as I said, that was, that was prior to -- I started

10   that just virtually immediately after the DIP hearing and

11   negotiated that through December, that that was when -- was

12   still considering doing that.   And so that was my original

13   negotiations with them.   Once it became clear that that was

14   not going to be a way to get the best value in here and was

15   not going to be a way to run this to a maximum benefit, I

16   then advised them - (inaudible) - what I -- in my mind, the

17   finalists that we would be going to a plan with --

18   attempting to go to a plan with plan solicitation

19   procedures.

20   Q.   My point was only going to be that the brokers

21   understood there was a limited marketing period; is that

22   correct?

23   A.   Yes, they did.

24   Q.   And they were all prepared to undertake this, given

25   that marketing period; is that correct?

1    A.  All four were willing to undertake this.  I told them

2    it was going to be a two- to three-week marketing period.

3    Q.  Okay.  Well, now it's two and a half months.

4    A.  That's correct.  I mean they, all four, were willing to

5    do it under what was substantially more extreme conditions.

6    All four were willing to, I think, bust their tail to get

7    it done.

8    Q.  And none of them were going to get compensated other

9    than, perhaps, a disappointment fee unless they succeeded;

10   is that correct?

11   A.  That's correct if anybody thinks this disappointment --

12   this disappointment fee is not going to motivate them to do

13   anything.  They were only doing it if they thought they

14   could actually get a deal done.

15   Q.  Did anyone refuse to propose on it because of the

16   marketing period?

17   A.  No, all four, all four agreed to propose.  I got some

18   resistance from one and convinced them that we would do

19   everything we could to support them.  And the fact that we

20   had a good head start would -- in the data room and the

21   tickler would -- persuaded them to accept a three-month --

22   a three-week process, if necessary.

23   Q.  And you were asked with respect to the sharing of a

24   plan with other parties -- has the debtor not shared the

25   plan with the creditors committee?

1  A.  We have talked to the creditors committee about a

2  prospective plan, but there's nothing tangible there to

3  share with them.  But we have had discussions with them.

4            MR. MOORE:  Okay.  No further questions, Your

5  Honor.

6            THE COURT:  Thank you.  Mr. Alter, any questions?

7            MR. ALTER:  No, Judge.

8            THE COURT:  Mr. Patten, any questions?

9            Mr. Ream?

10           MR. McKAY:  Your Honor.

11           THE COURT:  Oh, Mr. McKay.

12                      CROSS-EXAMINATION

13 BY MR. McKAY:

14 Q.  Mr. Greenspan, I think I know the answers to my

15 questions - I hope I do - but in putting together these

16 marketing procedures, did you consider the potential effect

17 of an 1111(b) election being made by a class of secured

18 creditors?

19 A.  The answer is "yes", I've dealt long and hard with that

20 issue.  As I've told you, until -- I hadn't -- in

21 connection with the plan development, and so forth, I

22 hadn't, frankly, closed the loop with respect to these

23 procedures or to -- how -- that that would be a condition,

24 frankly, until you filed your, your papers.

25 Q.  Okay.  So you acknowledge that it is a possibility?

1    A.   Correct.   There's -- you know, let me make clear, there

2    is nothing intended in these procedures to in any way

3    preempt, forestall, take away any rights under the plan or

4    the code.

5    Q.   And I guess that's my next question:   You haven't had

6    discussions - I know you can't disclose everything you've

7    discussed with the attorneys, I guess - but that this would

8    be a sale of Credit Suisse's collateral or any other

9    secured creditor's collateral that would cut off their

10   1111(b) election rights?

11   A.   Again, it's specifically designed -- this is not a

12   363-style sale.   And I think every right they have under

13   the code is fully preserved.

14   Q.   So you're concerned about the credit bid potential in a

15   363 sale.   I assume that there was some weighing of

16   whatever chill might be put on bidding by an 1111(b)

17   election possibility as opposed to credit bid rights and

18   maybe concluded that it -- that you thought the eventuality

19   of an 1111(b) election was remote, perhaps, and --

20   A.   Well, yeah, I mean I do think it's remote.   And, again,

21   we can't let the perfect be the enemy of the good in

22   progress.   But I don't have any right to take away their

23   1111(b) election.   I wouldn't ask them to give that up.   I

24   talked to -- I mean, frankly, I've talked to Credit Suisse

25   and I've discussed with them the issue of credit bid

1    chilling out in the market.

2        And I've been upfront with them.  I said, "I don't

3    expect you to give up your -- but is there anything you can

4    do, is there anything the lenders, secured creditors, would

5    be comfortable with that would allow me to allay the

6    concerns of the marketplace?"

7        And in that context, there is nothing that they offered

8    and there's nothing that I could really think of that they

9    would be willing to do that would do it.  I think the

10    prospect of an 1111(b) election is there.  It's always

11    going to be there.  I think it's unlikely, but that's --

12    it's what Congress designed.  That's their ultimate

13    protection under the code and under the plan.

14    Q.  Okay.  But you can understand somebody reading

15    Paragraph N in the proposal with regard to if the Court

16    concluded that Credit Suisse had the right to credit bid, I

17    mean that's a term we generally associated with a 363 sale,

18    correct?

19    A.  Well, that's correct.

20    Q.  Okay.  And I guess I say that to point out why I wanted

21    to clarify that with regard to the proceedings today.

22    A.  Correct.

23    Q.  Now --

24    A.  We're -- I'm sorry.

25    Q.  -- with regard to the first part of the U.S. Trustee's

1    objection, you don't view the approval of these procedures

2    as going down a road toward a de facto consolidation of

3    these cases that somehow can't be undone?

4        I mean you've considered that these are separate

5    estates and that that's something that will have to be

6    dealt with in due course?

7    A.   That's absolutely correct.  The whole concept of this

8    is to, to create a valuable estate.  The allocation --

9    whether it's one estate or three estates.  And the

10   allocation between the secured and the unsecured is going

11   to be left to a later day.

12       And I mean, quite frankly, I think we're going to do a

13   proposal.  We're going to propose how to deal with that in

14   the disclosure statement and plan.  But there's nothing in

15   these bidding procedures that is intended in any way,

16   shape, or form to affect that or reflect on that.

17   Q.   Thank you, Mr. Greenspan.

18             MR. McKAY:  I have no further questions.

19             THE COURT:  Mr. Ream?

20             MR. REAM:  Thank you, Your Honor.  I'm happy to

21   say I only have one issue.

22                    REDIRECT EXAMINATION

23   BY MR. REAM:

24   Q.   It's an issue of fact I want to make sure that we're on

25   the same page about, Mr. Greenspan.

 1       You testified in response to one of the questions, I

 2  believe, of Credit Suisse that the, the CrossHarbor

 3  definitive agreement will be filed at the same time as the

 4  plan.  Are you certain that that's an appropriate

 5  recollection of what the plan currently states?

 6  A.  I guess I can't be sure of that, can I?

 7  Q.  Is it possible that the definitive agreement with

 8  CrossHarbor will be filed just 5 to 10 days before the

 9  disclosure statement hearing?  Does that refresh your

10  recollection?

11  A.  Actually, that does.  I mean that's what's presently

12  being contemplated.

13           MR. REAM:  I have no further questions, Your

14  Honor.

15           THE COURT:  Okay.  You know, Mr. Greenspan, this

16  is just for clarification because there was a little

17  confusion earlier - and I know you can explain it very

18  quickly just so there's no lingering confusion - but:  On

19  the subset of property of what the debtor owns, does the

20  debtor own the lodge?

21           THE WITNESS:  Yes, Your Honor.

22           THE COURT:  Okay.  And the ski lift?

23           THE WITNESS:  Yes.

24           THE COURT:  Okay.  And then there's some acreage,

25  as well, that goes along with the lodge, etc.?  Why don't

1    you tell me what the subset is that Debtor owns.

2              THE WITNESS:  Well, I mean, essentially, the

3    debtor, the debtor owns everything that hasn't been sold or

4    conveyed to someone else.  I mean the debtor owned

5    everything, and the debtor has sold 300-some-odd lots to

6    individuals or builders and has sold, I believe, the 160

7    acres that are called the "the compound" or "the

8    settlement".  And so other than the lots that have been

9    sold -- and that was just a big lot.  I mean it's a

10   160-acre lot.  Other than those lots, the debtor owns

11   everything:  Personalty, realty, and intangibles.

12             THE COURT:  Okay, okay.  And we've got the golf

13   course lots that, that may be contributed by CrossHarbor?

14             THE WITNESS:  Correct.  Among the 300-some-odd

15   lots that have been sold were those golf course lots.

16             THE COURT:  Yes.  And also, then, we have the

17   property, the compound that Ms. Blixseth has, that she's --

18             THE WITNESS:  That's correct.  And then also,

19   just so -- Your Honor, just so you understand, from what

20   I -- when those lots were sold to CrossHarbor, that

21   transaction had to be presented to Credit Suisse because

22   that land was encumbered by their loan.

23             THE COURT:  And they had released.

24             THE WITNESS:  And they agreed -- they looked at

25   the transaction, they agreed to the release, and Credit

1   Suisse, I believe, actually got a significant paydown on

2   the loan.

3          THE COURT:  Okay.

4          THE WITNESS:  So I mean that was -- that's a

5   long-time-ago transaction that occurred -- I think it

6   occurred in '07 after the loan was -- in '06 or '07 after

7   the loan was recorded with their release of the

8   collateral --

9          THE COURT:  Okay.

10         THE WITNESS:  -- and long before this.

11         THE COURT:  Okay.  And the lodge is unsecured?

12         THE WITNESS:  Well, the lodge is actually -- the

13   lodge is not secured by the -- there's --

14         THE COURT:  By Credit Suisse.

15         THE WITNESS:  Correct.  There's about a

16   $4 million loan on the lodge to a different -- to America

17   Bank, a different secured creditor.

18         THE COURT:  Owed to American Bank?

19         THE WITNESS:  Yeah.

20         THE COURT:  Okay, thank you.

21         THE WITNESS:  You're welcome.

22         THE COURT:  Mr. Patten.

23         MR. PATTEN:  Your Honor, I think there's been

24   prior testimony in this case that Ms. Blixseth's 160 acres

25   was never owned by the Yellowstone Club and has never been

 1   part of the Yellowstone Club.  It's within it, but it's

 2   not -- it wasn't sold by the Yellowstone Club or any of the

 3   entities to Ms. Blixseth.

 4            THE COURT:  This is the property that's

 5   internally enclosed by the club property to which also the

 6   easement goes to?

 7            THE WITNESS:  Correct.  I mean multiple easements

 8   across this property, but, yes, an access easement.

 9            THE COURT:  Okay, thank you.

10            MR. SAUNDERS:  (Inaudible, out of range of

11   microphone) -- Your Honor.

12            THE COURT:  Mr. Saunders.

13            MR. SAUNDERS:  Two more questions, and they were

14   caused by the refreshed recollection of Mr. Greenspan.

15            THE COURT:  I'll give you a chance for a few

16   questions.

17            MR. SAUNDERS:  Thank you, Your Honor.

18                      RECROSS-EXAMINATION

19   BY MR. SAUNDERS:

20   Q.  If you could turn to Subparagraph D of the bidding

21   procedures as to which your -- well, excuse me (quoted as

22   read):

23            "Bidders are going to be required to submit an

24   agreement in the form of the agreement to be entered into

25   with the purchaser marked to show changes thereto."

1   A.  Yes.

2   Q.  Do you see that?

3   A.  Yes.

4   Q.  Okay.  And they're not going to know what they need to

5   do, then, for quite some time yet; is that right?

6   A.  That, that -- well, for some time, that is correct.  I

7   mean that's the tension of trying to get this to market as

8   quickly as possible, as definitive as possible within the

9   human capabilities of finite time and energy and

10  distractions.

11          MR. SAUNDERS:  No further questions.

12          THE COURT:  Okay, thank you.  Mr. Greenspan, you

13  may step down.

14          THE WITNESS:  Okay.  Thank you, Your Honor.

15          THE COURT:  Mr. Ream, did you have any further

16  witnesses on your motion?

17          MR. REAM:  No, Your Honor.

18          THE COURT:  Okay.  That pretty much concludes all

19  the testimony?

20          MR. SAUNDERS:  No, Your Honor.  We have two

21  witnesses in opposition to Debtors' motion or in support of

22  our motion to compel a market process.

23          THE COURT:  Well, it seems like the marketing

24  process is about ready to start.  What's accomplished by

25  the motion?

1          MR. SAUNDERS:  Well, I think the -- I agree.  The

2   testimony goes to both motions, but the testimony goes

3   to the -- (inaudible, out of range of microphone.)

4          THE COURT:  Okay.  Call your witness.

5          MR. SAUNDERS:  Okay.  Your Honor, we'd call Scott

6   Miller.

7          THE COURT:  Mr. Miller, please come to the

8   clerk's bench to be sworn.

9               SCOTT MILLER, WITNESS, SWORN

10         THE COURT:  You know what?  Mr. Saunders, I'm

11  going to ask you:  How long do you think your witnesses

12  will take?

13         MR. SAUNDERS:  Mr. Miller, his direct examination

14  might take 20 minutes.

15         THE COURT:  And your other witness?

16         MR. SAUNDERS:  I wanted to call Ms. Blixseth for

17  five.

18         THE COURT:  And are all of you going to

19  cross-examine?

20         UNIDENTIFIED SPEAKER:  Probably.

21         THE COURT:  Probably?  Well, let me just lay it

22  out to you real bluntly:  I'm real tempted, if it's going

23  to take up that kind of time, to continue this until --

24  when do I finish with preliminaries tomorrow?

25         THE CLERK:  Twelve-thirty.

1          THE COURT:  Twelve-thirty until one o'clock.

2   You've probably all missed your plains out of Butte anyway.

3   That's my thought.  Because if we're going to -- given

4   what's happened today so far, I would suspect we're going

5   to be here until close to eight with cross-examination and

6   redirect.  And it's just my, my feeling.  Correct me if I'm

7   wrong.

8          UNIDENTIFIED SPEAKER:  Your Honor, I doubt that

9   cross will take much time, so -- I would just as soon

10  finish now.

11         UNIDENTIFIED SPEAKER:  And, Your Honor, you may

12  not be as familiar with this sort of cutback flight

13  schedule, but if we start at 12 tomorrow, even if it just

14  goes for an hour or two, people will not be able to fly out

15  tomorrow, either.

16         THE COURT:  Oh.  Well, we enjoy having you here.

17  Have you ever thought about residence?

18         UNIDENTIFIED SPEAKER:  More importantly, Your

19  Honor, actually, we are scheduled to be working on the plan

20  all day tomorrow.

21         THE COURT:  I fully understand, but we have to

22  get through the testimony, as well.  Without objection, I

23  will go later.

24         MR. SAUNDERS:  I appreciate that, Your Honor.

25         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

1          MR. SAUNDERS:  May I approach?

2          THE COURT:  You may.

3                    DIRECT EXAMINATION

4   BY MR. SAUNDERS:

5   Q.  Mr. Miller, could you state your full name for the

6   record, please?

7   A.  Scott Miller.

8   Q.  Okay.  Do you have a job, sir?

9   A.  Yes.

10  Q.  What's your job?

11  A.  I'm a managing director at Jones Lang LaSalle.

12  Q.  And what are your, what are your responsibilities in

13  the position of managing director at Jones Lang LaSalle?

14  A.  I lead a team of 15 people out of Chicago that sell

15  development rights throughout the nation.

16  Q.  Okay.  What do you mean by "development rights"?

17  A.  Land in search of an alternative use, land that's been

18  entitled for vertical development.

19  Q.  Okay.  Could you summarize for the Court briefly your

20  educational and professional experience relating to real

21  estate?

22  A.  Sure.  I have a graduate degree, a master's in

23  real-estate appraisal and investment theory.  I've spent

24  over 20 years in real estate, the first 6 years with a

25  national syndicator and then with a real-estate investment

1  bank learning their property management, an asset

2  management group, and then 7 years with a real-estate

3  investment bank capitalizing development deals across the

4  country, and the last 4 with Jones Lang LaSalle monetizing

5  development rights.

6  Q.  Okay.  And has Skadden-Arps engaged you to testify here

7  today?

8  A.  They have.

9  Q.  Are we paying you?

10  A.  Yes.

11  Q.  How much have we agreed to pay you?

12  A.  Thirty-eight hundred dollars a day plus expenses.

13  Q.  Okay.  Could you take a look at your deck here starting

14  at page 5 --

15  A.  Sure.

16  Q.  -- and just briefly summarize what it appear -- what it

17  is that appears on page 5 through 17 of your deck?

18  A.  Sure.  I mean, basically, within this deck are case

19  studies of prior transactions that we have taken to the

20  market, and many of them successfully completed.  The first

21  three, you know, are probably most applicable to, you know,

22  the subject matter today.  The first one was the Four

23  Seasons - Hualalai.  It was, you know, a 243-room Four

24  Seasons hotel that was on leased land.  It had a golf

25  course and a very substantive club component to it.  The

1    deal traded at, you know, roughly $540 million.

2       The next one is the Maui Prince resort in Makena,

3    Hawaii.  That was an 1800-acre development.  It had a

4    310-key hotel on it.  The preponderance of value in that

5    deal was in the development rights in the 1300 acres

6    surrounding the core resort.  That traded, again, for

7    roughly 575 million.

8             THE COURT:  These are all public resorts?

9             THE WITNESS:  Yes.

10             THE COURT:  Not private?

11             THE WITNESS:  Correct.

12             THE COURT:  Okay.

13             THE WITNESS:  And then the last one that's

14    probably very applicable is a project down in Rocky Point

15    or Puerto Penasco, Mexico.  It's a three-hour direct drive

16    south of Phoenix.  We sold that on behalf of Alliant

17    Energy.  It was a development that had all of the

18    horizontal infrastructure in place but none of the

19    vertical.  There was no vertical development actually

20    completed other than nine holes of a Jack Nicklaus course,

21    but it was one in which it was a partially-completed

22    development.

23             MR. SAUNDERS:  Your Honor, at this time, I ask

24    that Mr. Miller be qualified as an expert in the marketing

25    and sale of high-end resort properties.

1          THE COURT:  Any objection?

2          UNIDENTIFIED SPEAKER:  So stipulated.

3    Q.  (By Mr. Saunders)  Mr. Miller, could you begin --

4          THE COURT:  Just a moment.  I guess I'm

5    wondering:  Are we dealing with a high-end resort here?

6    This is a private club.  I mean he may be an expert on

7    resorts, which I don't have a problem with qualifying him,

8    but does he, in fact, have the credentials on a private

9    resort -- private club, I mean.

10          MR. SAUNDERS:  I can ask him.

11          THE COURT:  I mean --

12   Q.  (By Mr. Saunders)  Mr. Miller, do you see --

13   A.  Well --

14   Q.  Or what differences do you see --

15   A.  -- essentially all of these have a private component.

16   The hotels are public, but the residents and the club

17   memberships are private.  So both on the Four Seasons, the

18   Maui Prince --

19          THE COURT:  But this is an exclusive private

20   club.

21          THE WITNESS:  Hm-hmm.

22          THE COURT:  I mean I don't know what the purpose

23   of your testimony will be.  Maybe it's alternatives to

24   whatever.  But I guess I'm going to reserve until I hear a

25   little bit more in your questioning.

1              MR. SAUNDERS:  Okay.

2    Q.  (By Mr. Saunders)  Mr. Miller, starting at page 19 of

3    your deck, could you describe what, in your opinion, is the

4    right way to market a property like the Yellowstone Club in

5    order to maximize the sale proceeds?

6    A.  Well, I think it's really to get in and understand the

7    asset; create the picture; paint the picture as to how to

8    best maximize sale proceeds through this and through a, you

9    know, a very well-orchestrated, timely marketing; paint

10   that picture of what that property is, how it sits within

11   marketplace; and maximize the value of the brand.

12        You know, I think there's some key components in doing

13   that.  You have to create aggressive yet defensible

14   assumptions when you're marketing this.  You're really

15   leveraging one's own market knowledge of the individual

16   profit centers within the overall development to obtain the

17   highest purchase price.  You want to expose this as broadly

18   as possible, internationally if possible.  And then you're

19   really trying to demonstrate through your marketing

20   materials and your level of knowledge of this on a

21   successful execution that will drive the most value back

22   into the land, that which you're selling.

23        You know, I think when we really get down to it, you're

24   trying to remove as much a perceived risk as possible.

25   You're wanting to get people comfortable that the

1    environmental matters that are associated with this are --

2    can be aggressively managed or minimized, the entitlements

3    and permitting are such that one can get in and get an

4    execution done aggressively.

5        Understanding what those infrastructure costs are in

6    order to take the project from its current position through

7    final execution is imperative; and then understand and

8    convey, you know, what is this property's competitive -

9    (inaudible) - within its competitive set.  I mean I think,

10    really, the long and short of it is:  Really, you're

11    wanting to create marketing materials such that you're

12    really putting this in its best light.

13        It's a process that -- you are going through a very

14    structured process so that everybody's comfortable with

15    those individual steps.  You're having that premarketing

16    underwriting that I've talked about.  You've got an

17    outreach, an aggressive outreach around the world to

18    potential investors in this type of property.

19        To give you an instance on the Maui Prince transaction,

20    we contacted well over 300 possible investors and actually

21    had signed confidentiality agreements of over 100

22    participants that were then offered into or allowed access

23    into the war room.

24        What you're really trying to do is create a fervor

25    around the property that's encouraging a lot of people to

1   submit bids, and then you're narrowing the field and

2   ultimately picking that winner that best meets all of your

3   criteria.

4   Q.  Mr. Miller, have you had an opportunity to review the

5   contents of the debtors' data room in this case?

6   A.  Yes.

7   Q.  And what conclusion, if any, did you reach about the

8   contents of the data room?

9   A.  Well, there's an awful lot of data in there, but it is

10  difficult to get through and really -- it's not

11  well-organize.  They could be possibly better organized,

12  and there's really not the road map in order to exercise or

13  maximize sale proceeds.  I mean, typically, we put in pro

14  formas, and so forth, that are aggressive yet believable

15  that we can really drive purchase price.  I couldn't find

16  that road map.

17  Q.  What do you mean in terms of presentation issues in the

18  data room?

19  A.  There is a lot of data.  Individual files are numbered

20  but they're not well-labeled.  I mean it's difficult to

21  quickly go through that and get to the core pieces of the

22  data that you really want in order to underwrite your

23  transaction.

24  Q.  And why would that matter to potential buyers?

25  A.  Well, we've got -- you know, it's my understanding we

1    have a compressed timeline.  And time is money for all

2    investors, and they're wanting to get through this due

3    diligence as rapidly as possible.

4    Q.   Okay.  In your opinion, was a time span of seven or

5    eight or nine days between the opening of the data room in

6    mid January and the deadline for bids of January 22nd, was

7    that an adequate amount of time to solicit proposals?

8    A.   No, no.  I mean I think ideally, you would want, you

9    know, 45 to 60 days minimum.

10   Q.   Okay.  Have you had an opportunity to review the

11   marketing summary that was in the data room?

12   A.   Yes, I have.

13   Q.   Okay.  And what conclusion, if any, did you reach about

14   that marketing summary?

15   A.   It's a lot of statement of fact, is my understanding,

16   but there's no real sale spin to it, there's no real

17   promotion.  It's just a lot of statement of pure fact.

18   Q.   Okay.  And how does that compare to what you would

19   expect to see by way of a teaser or a marketing summary in

20   your experience?

21   A.   Well, you would want a much more sales-perspective spin

22   to it and a lot more, you know, photographs, and so forth,

23   that individual purchasers may then use as collateral

24   materials to secure additional investors or lenders or

25   partners in the deal.

1  Q.  Okay.  You've been in the court today, right?

2  A.  Yes.

3  Q.  What reaction, if any, did you have to Mr. Greenspan's

4  testimony about the debtors' efforts to date to identify

5  interested parties?

6  A.  You know, the debtors' efforts to secure interested

7  parties?

8  Q.  Sure.  The number of -- for instance, the number of

9  people that Mr. Greenspan called.

10  A.  Yeah.  I mean four is -- I believe that was the number,

11  four, that he actually reached out for as opposed to

12  actually called him.  You know, that's a very slim number

13  of people.  I mean, normally, you would see, you know, a

14  team of people, you know, contacting 200, 300, 400 people.

15  Q.  Okay.  And is there any difference in your mind between

16  affirmative outreach and, you know, waiting for potentially

17  interested buyers to call you?

18  A.  Well, you know, the thing that's concerning is, is

19  that, yeah, there's public exposure of this, but, you know,

20  when is the appropriate time for an investor to approach

21  and inquire about getting into this deal.  I mean,

22  typically, you have a more formal acknowledgment, "Now's

23  the time to come," and so forth.  And I haven't seen that

24  today in this.

25      So, normally, you know, to get people to spend the time

1    to underwrite a transaction of this complexity, you've got

2    to call them, you've got to push them, and you've got to

3    ride them through the process.

4    Q.   In your experience, are there potential investors,

5    purchasers of a property of this type who simply wouldn't

6    be responsive to media, to general public media?

7    A.   Absolutely.

8    Q.   Okay.  What kinds of investors?

9    A.   I mean they're private individuals who want to be

10   touched personally and to understand and have described to

11   them, you know, what is the competitive alignment, how can

12   they access this unique opportunity.

13   Q.   Is there an international market for a property like

14   this, in your view?

15   A.   Absolutely.  I mean what's been created is world-class,

16   and there are wealthy individuals and groups around the

17   world that would be very interested in accessing this --

18   Q.   Okay.

19   A.   -- not necessarily just U.S.

20   Q.   What reaction, if any, do you have to Mr. Greenspan's

21   testimony about the potential deterrent effect of the due

22   diligence head start that CrossHarbor has?

23   A.   I mean I think that that has a chilling effect on the

24   response that one would get because you've got a party

25   that's in, you know, a significant advantage to everybody

1     else.  And so I think, you know, it really -- you know, is

2     it ideal to have anybody this early in the exposure of the

3     asset, the investment opportunity, to have a stalking horse

4     in place so early?

5     Q.  And do you have an opinion on that?

6     A.  Yeah.  I think it, I think it would deter the response

7     because there is going to be a perception that somebody's

8     got a favored position already at the table.

9     Q.  And how, if at all, in a marketing program would you go

10    about trying to alleviate concerns that potential bidders

11    had about some other party having an advantage or a leg up?

12    A.  Well, I think that you could expose this.  You could,

13    you know, put your call dates out for people to, you know,

14    submit their letters of intent, their offer, and you can go

15    through one or two rounds of narrowing the field before you

16    actually select your stalking-horse candidate so that

17    everybody feels like they have an equal footing coming to

18    the table.

19       Now, you know, there still may be this issue that

20    CrossHarbor has had a lot of lead time, but as long as

21    somebody feels comfortable that they're going to get a fair

22    shot at it and they're going to have enough time to fully

23    get through the due diligence war room, then I think it's

24    something that we can overcome, anybody can overcome.

25    Q.  Is that an area where affirmative outreach is

1  important?

2  A.  Absolutely.  I mean it's tracking those calls, it is

3  following up and understanding, you know, what's causing

4  people any pause or concern.

5  Q.  In your experience, do the potential purchasers of a

6  high-end property like the Yellowstone Club all have the

7  same business plan in mind for the property?

8  A.  Absolutely not.

9  Q.  Can you give the Court some examples of different kinds

10  of business plans or tweaks on the business plan that

11  potential purchasers of the Yellowstone Club might have in

12  mind?

13  A.  Well, I think the first one that comes to mind is, is,

14  you know, limiting this debt component to $70 million.  I

15  mean somebody may decide that, you know, it should be, you

16  know, a much higher number.  But maybe 70 is fixed and

17  there's a participation with the lender on the future sales

18  of pads, of dwelling units that the lender can participate

19  in.  All of that is, you know, prohibited, is my

20  understanding.

21  Q.  Okay.  In your experience, do potential purchasers of a

22  property like this all have the same financing structure in

23  mind?

24  A.  Absolutely not.  I mean it's -- there is many, many

25  combinations and permutations available, and favored

1    structures that people have.

2    Q.  Okay.

3    A.  They don't all fit within this box.

4    Q.  Okay.  And do you have an opinion about whether or not

5    it is likely to maximize value for the debtors to require

6    all potential bidders to fit within that box at this point?

7    A.  No, I would not.

8    Q.  Okay.  Based on your experience, would it tend to help

9    or hinder a competitive bidding process in this case to

10   prohibit bidders from proposing a financing structure that

11   involved more than $70 million in debt?

12   A.  I think it would substantially hinder the process.

13   Q.  Okay.  And based on your experience, would it tend to

14   help or hinder a competitive bidding process in this case

15   to prohibit bidders from making proposals that committed

16   less than $75 million in working capital for the

17   reorganized debtors?

18   A.  I think it would substantially hinder the process.

19   Q.  Okay.  And why is that?

20   A.  Well, what if you get somebody that is an outlier who

21   is wanting to bid substantially more than all of this?

22   And, essentially, they're sitting there, "Well, you know,

23   maybe the first go-around, or so, I don't have to go, I

24   don't have to stretch this far."

25       I mean by kind of putting in these initial parameters,

1    you may be limiting your upside in this transaction.

2              MR. SAUNDERS:  Okay.  Your Honor, I've completed

3    the substantive testimony, and I just want to know if Your

4    Honor would like more voir dire in order to accept those

5    opinions or --

6              THE COURT:  And I'm still reserved on it.

7              MR. SAUNDERS:  Okay.

8    Q.  (By Mr. Saunders)  Then, Mr. Miller, do you see any

9    difference, in your experience, in the way that you would

10   go about marketing the Yellowstone Club as a private club

11   from the entities that were outlined in Slides 5 through 17

12   of your deck?

13   A.  No, because the first two products that I talked about

14   have private components to it.  The club is private

15   at Hualalai, and that is very similar -- it's an exact

16   parallelism to this.

17             THE COURT:  But they also have public, as well.

18             THE WITNESS:  They have a public -- but there's

19   also a benefit for the residents, the private residents to

20   access --

21             THE COURT:  Would you use different criteria when

22   you've got a public component and a private component?

23             THE WITNESS:  Criteria around?

24             THE COURT:  How you would view the property, how

25   you would market the property.  Here you've got a dual

1    component.  You've got public and private in the examples

2    you have here.  In this instance, you have only a private,

3    exclusive private component.  So your market is different.

4              THE WITNESS:  The players are -- I don't believe

5    that the investors are all that different.  And they're

6    going to be down to, you know, what is the return on

7    equity.

8              THE COURT:  Okay.  But you're not going to be

9    seeing Four Seasons or Hilton or some of those that may be

10   interested in a public and a private component?

11             THE WITNESS:  Well, those are flags and

12   management companies, and sometimes they participate in

13   those hotels; not always.  And so most of the time, these

14   are private individuals.

15             THE COURT:  But that could broaden your base.

16             THE WITNESS:  It could, it could.  I mean --

17             THE COURT:  I'm still going to reserve.  I'm

18   going to allow cross-examination to occur.

19             MR. SAUNDERS:  Thank you, Your Honor.

20             THE COURT:  Mr. Patten.

21                       CROSS-EXAMINATION

22   BY MR. PATTEN:

23   Q.  Mr. Miller, my name is Andy Patten, and I represent the

24   debtors.

25   A.  Hm-hmm.

```
 1   Q.   Have you had any sales close in the last year?

 2   A.   Yes.   I mean we have, we have.

 3   Q.   How many?

 4   A.   You know, it's probably north of six in the United

 5   States.

 6   Q.   And would these be hotels?

 7   A.   Yes.   One's the Whitetail Lodge, you know, and Salish

 8   Lodge.

 9   Q.   Have any of the sales in the last year been involved in

10   a bankruptcy?

11   A.   No.

12   Q.   And how many sales have you closed that were bankruptcy

13   property?

14   A.   We're only in the process on one right now.

15   Q.   So to date, you've never sold property that was --

16   A.   I have not personally.

17   Q.   -- in a bankruptcy?

18   A.   I have not personally, no.

19   Q.   And the properties that you've sold have been at least

20   partially public, and some of them have been partially

21   private?

22   A.   That's correct.

23   Q.   None have been entirely private?

24   A.   It's -- you know, it's unclear on Laguna Del Mar, the

25   property in Mexico, as to whether that's going to be public
```

1    or private.

2    Q.   Okay.  Were there existing members in the club in

3    Mexico?

4    A.   Yes, there were; not many.

5    Q.   Did the membership in the club at Mexico provide enough

6    dues to pay the operating costs for the club?

7    A.   Not even close.

8    Q.   Have any of the properties that you've sold been ski

9    areas?

10   A.   Yes.

11   Q.   "Yes"?

12   A.   Yes.

13   Q.   What ski areas?

14   A.   I mean right now, we're in the market with the

15   St. Regis in Aspen.

16   Q.   That's a hotel, correct?

17   A.   Yes, that's correct.

18   Q.   At a ski area, correct?

19   A.   That's correct.

20   Q.   Have you sold any ski areas themselves?

21   A.   No.

22   Q.   Did you sign a nondisclosure agreement to enter into

23   the data room in this case?

24   A.   I don't recall.

25   Q.   Other than the information in the data room not having

 1    a spin for sales, was the information in the data room

 2    adequate for someone to do their due diligence?

 3    A.   Probably not.

 4    Q.   How much time did you spend in the data room?

 5    A.   Probably an hour and a half to two hours.

 6    Q.   When was that?

 7    A.   I would say a week ago.

 8    Q.   What information do you think should be in the data

 9    room that was not in the data room?

10    A.   I think it would be great to have readily accessible

11    the ability for somebody to come in and understand exactly:

12    How far completed, you know, is the infrastructure within

13    the development?  You know, how many more dollars need to

14    be spent?  How much is -- what is one buying when they're

15    stepping into this?  What percentage of completion is the

16    sewer system, is the water, the utilities, and so forth?

17        I didn't quite find that.

18    Q.   Have you been to the Yellowstone Club?

19    A.   I have not.

20    Q.   And other than the hour or two that you spent in the

21    data room last week, have you had any prior information

22    about the Yellowstone Club?

23    A.   Yes.

24    Q.   What information?

25    A.   I had talked to Mr. Greenspan about possibly being

```
 1    involved in the sale of the asset.

 2    Q.  You were one of the brokers that Mr. Greenspan

 3    interviewed?

 4    A.  Yes.

 5    Q.  And what was your commission rate that you were asking

 6    in your negotiations with Mr. Greenspan?

 7    A.  Ninety basis points, and eighty basis points if

 8    CrossHarbor was the winning bidder.

 9    Q.  Is your firm a better position to market this property

10    than CB Richard Ellis?

11    A.  No.  I think CB Richard Ellis would do a great job.

12    Q.  Okay.  Did I understand your testimony that there would

13    be a -- 45 to 60 days would be the minimum time to market

14    this property?

15    A.  I think to immerse it in the marketplace appropriately,

16    yes, I think it needs to be that minimum.

17    Q.  Have you had a chance to see the motion that's in front

18    of the Court right now, motion for bidding and solicitation

19    procedures?

20    A.  I have not focused on it carefully.

21    Q.  Do you have any knowledge as to how much time there

22    would be available for marketing should this Court approve

23    the motion?

24    A.  I haven't seen it, no.

25              MR. PATTEN:  Just a minute, Your Honor.
```

1          No further questions.  Thank you.

2          THE COURT:  Anyone else?

3          Mr. Warner?

4          Mr. Moore?

5          Mr. Beckett?

6          UNIDENTIFIED SPEAKER:  Nothing, Your Honor.

7          THE COURT:  Mr. Moore, do you have a question?

8          MR. MOORE:  (Inaudible, out of range of

9  microphone.)

10                    CROSS-EXAMINATION

11  BY MR. MOORE:

12  Q.  Were you aware when you entered the data room that it

13  required a signature to an NDA?

14  A.  No.

15  Q.  Who provided you the information that enabled you to

16  access the data room?

17  A.  I was working with counsel.

18  Q.  Pardon me?

19          MR. CHEHI:  Your Honor, if I could just clarify

20  for the record, as was stated, he was employed by

21  Skadden-Arps.  And through Credit Suisse and Skadden-Arps,

22  we have access to the data room, and they were working with

23  us.  And so he's covered by our confidentiality.

24          UNIDENTIFIED SPEAKER:  Your Honor, our

25  confidentiality agreement is - (inaudible, out of range of

```
 1    microphone) - by our - (inaudible) - which is in the

 2    record, which provides access to anybody in any enforcement

 3    proceeding or -- (inaudible.)

 4              THE COURT:  Okay.

 5              MR. MOORE:  No further questions, Your Honor.

 6              THE COURT:  Mr. Warner, did you have anything?

 7    No, okay.

 8              Mr. Saunders.

 9                     REDIRECT EXAMINATION

10    BY MR. SAUNDERS:

11    Q.  Your testimony about 45 to 60 days as a sort of minimum

12    appropriate period --

13    A.  Yes.

14    Q.  -- is that before the selection of a stalking horse?

15    A.  Yes, absolutely.

16              MR. SAUNDERS:  Okay.  Nothing further, Your

17    Honor.

18              THE COURT:  Okay, thank you.  You may step down,

19    thank you.

20              THE WITNESS:  Thank you.

21              THE COURT:  Mr. Patten.

22              MR. PATTEN:  Can I ask one follow-up question of

23    Mr. Saunders?

24              THE COURT:  Are you sure you want to?

25              MR. PATTEN:  I will be quick, Your Honor.
```

```
 1                      RECROSS-EXAMINATION
 2    BY MR. PATTEN:
 3    Q.  You've never sold property out of a bankruptcy before.
 4    Did I understand your earlier testimony correctly on that?
 5    A.  I've never completed a transaction, that's correct --
 6    Q.  Okay.
 7    A.  -- through bankruptcy.
 8    Q.  Okay.
 9    A.  That's correct.
10    Q.  And how many stalking-horse sales have you been
11    involved in?
12    A.  Two.
13    Q.  And neither one of them closed?  Is that --
14    A.  We're right in the process of finishing one right now
15    for Delphi.
16              MR. PATTEN:  Okay, thank you.
17              THE COURT:  Were you involved with Tamarack at
18    all -- (inaudible, talking over each other)?
19              THE WITNESS:  No.
20              THE COURT:  Okay.  You may step down.
21              THE WITNESS:  Thanks.
22              THE COURT:  Thank you.  Next witness?
23              MR. SAUNDERS:  Your Honor, we call Edra Blixseth.
24              THE COURT:  If you could come forward,
25    Ms. Blixseth, I'll remind you you're still under oath.
```

1    I'll have you take the witness stand.

2                    DIRECT EXAMINATION

3    BY MR. SAUNDERS:

4    Q.  I'm sorry, ma'am, I'll try to make this quick.

5        How is it that you expect personally to be treated in

6    the plan that you expect to file on Friday?

7    A.  I'm not clear on your question.

8    Q.  Okay.  Do you expect that the plan that you file on

9    Friday will involve you personally or BGI in any way?

10   A.  To your first question, me personally, if I contribute

11   the land that I personally own into the plan, then in the

12   back end, hopefully in years down the road that will be

13   developed and I might be able to recap something.  As far

14   as BGI goes, I knew all along going into this that BGI was

15   not looking at probably being able to recap anything.

16   Q.  Okay.  But you're expecting that the plan you file on

17   Friday will provide for at least some kind of potential

18   equity interest for -- or upside recovery for you

19   personally; is that right?

20   A.  If I can contribute 160 acres in the heart of

21   Yellowstone Club, yes.

22   Q.  Okay.  Is there any transaction proposed or that you've

23   ask discussed with CrossHarbor that would enable you to

24   repay your $35 million loan from them?

25   A.  Again, I'm sorry, but I'm not -- maybe I'm just tired.

1    I'm not exactly clear on your question.

2    Q.  Me too.  You owe $35 million plus to CrossHarbor,

3    right?

4    A.  That's correct.

5    Q.  You owe that personally, right?

6    A.  That is correct.

7    Q.  Okay.  Have you had any discussions with CrossHarbor

8    about how you might pay that back?

9    A.  I've had discussions early on because of how -

10   (inaudible) - was going to repay.  It didn't work out.  To

11   be clear on the 35 - which you're not asking, but I'm going

12   to answer in this way - that was to close on the MSA, which

13   was how I got ownership and possession of BGI.

14       Of that, 20 million went to Tim Blixseth to buy him out

15   of BGI of which he got 7 cash.  And I assumed a $13 million

16   obligation that he had already to CrossHarbor.  Eight

17   million went to the LeMond payment.  Because of the

18   financial condition that I found myself in when I took over

19   BGI of overdrawn accounts, things not being paid,

20   4.7 million of that went into operating capital for

21   Yellowstone Club.  There was another 1 million, or so,

22   somewhere along there.  But then the totality of the

23   35 million of which I personally benefitted from was around

24   $1 million.  And that was to pay taxes that I found had not

25   been paid from community property.

1        So, yes, I'm planning on trying to figure out a way on

2    the 35 million to CrossHarbor, but I didn't personally

3    benefit other than getting possession of BGI.

4    Q.   Okay.  Is there any transaction that's connected to the

5    plan of reorganization that you're proposing to file on

6    Friday or ancillary to it or related to it in any way under

7    which you would be repaying that loan to CrossHarbor?

8    A.   There is not.  It's a separate and total different

9    agreement.

10   Q.   Okay.  When you -- you met with Mr. Byrne on January

11   10th in Palm Springs; is that right?

12   A.   We did.

13   Q.   Okay.  And was anybody else there?

14   A.   Quite a few CrossHarbor people, my legal counsel for me

15   personally.  I'm trying to think of the other legal counsel

16   that was there.  Ron Greenspan was not available; we talked

17   to him right after that, though.

18   Q.   Okay.  Was Mr. Patten or anybody else representing the

19   debtors, legal counsel for the debtors there?

20   A.   He was, he was intermittently on and off the phone, and

21   we talked to him.  In fact, we talked to Mr. Chehi that

22   day, as well.

23   Q.   Okay.  And did Mr. -- did you make a demand or did

24   Mr. Byrne make a proposal?  How did the negotiations start?

25   A.   You're talking about for the plan for Yellowstone

1    Club --

2    Q.   Yeah.

3    A.   -- not me personally?

4        Those are two separate issues, that's the reason I'm

5    asking the question.

6    Q.   I'm sorry.

7    A.   No, we just started the negotiations of what would be

8    in the best interest of Yellowstone Club since we had to go

9    into a Chapter 11 of how we'd put a plan forward, if we're

10   able to do that.  It was clear to them, it's been clear to

11   them all along through either Ron Greenspan or Andy or any

12   time I've had discussions with CrossHarbor, is that my

13   fiduciary responsibility is first and foremost to

14   Yellowstone Club.  If they had a plan that worked that

15   benefitted Yellowstone Club to come out of this and be what

16   I've always envisioned to be back for the members and the

17   community and the employees, then we were trying to put a

18   plan together like that.

19   Q.   Okay.  Did you say to Mr. Byrne or anybody at

20   CrossHarbor, "I want you to make a $100 million bid"?

21   A.   No, I did not.

22   Q.   Did he say, "We're willing to make a $100 million bid"?

23   A.   We eventually got down to numbers around that they

24   thought that they could either raise the money that we know

25   needs to go into the company for the company to be

1   capitalized properly and for the company not to be

2   over-encumbered like it has been since, since we did the

3   Credit Suisse years ago.  So there was talks about that,

4   based on just a simple market plan of how many lots are

5   going forward and what we think they could sell for and

6   what, what we think the plan should be in order for it to

7   be successful for Yellowstone Club.

8   Q.  Did they make a proposal?  Did CrossHarbor make a

9   proposal at all in the course of this meeting about what

10  they would be willing to invest in, in the debtors to

11  finance a plan?

12  A.  At that time, in the time you're talking about, Palm

13  Springs, it was kind of bullet notes.  It was kind of

14  sheets of paper that people wrote on and tore up, and it

15  was kind of back and forth like that.  So no plan in

16  writing, no term sheet in writing came out after that.

17  Just conceptually, we had a little -- it was more than just

18  arbitrary talk.  It was a little more solid conceptually

19  what we might try to do.

20  Q.  Did anybody say "100 million"?

21  A.  I don't remember if 100 million was mentioned at that

22  time.

23  Q.  Okay.  When was the first time anybody said

24  "100 million"?

25  A.  I don't recall.  I'm sorry.

1   Q.  Okay.

2   A.  We've talked -- I mean this is all I've done for 24/7.

3   Q.  Was there a back-and-forth where CrossHarbor started at

4   less than 1 million, and you said, "No, you've got to pay

5   more"?

6   A.  Oh, yes.

7   Q.  Okay.  Where did they start?

8   A.  I don't, I don't remember.  I think that maybe there

9   was something thrown around that Ron and I both reacted

10   quickly to of about 50.  And that was early on.  That was

11   when they were putting some numbers together, and they

12   approached us on that.  And, again, I don't even remember

13   when that was.  But they immediately said that that might

14   not be where it should start, and then they went back and

15   we went from there.  But it's hard for me to tell you, tell

16   you exact dates or times or things because we've talked

17   about so many different things kind of nonstop.

18   Q.  Okay.  When you say the 50 million was early on, early

19   on after the Palm Springs meeting on January 10th?

20   A.  Oh, no, before that.

21   Q.  Okay.  Did there come a time after January 10th when

22   somebody made a bid or somebody made an ask?

23   A.  It came down to in the last couple of weeks, in the

24   last, let's say, two or three weeks of trying to come down

25   to -- I asked CrossHarbor to speak directly, since they

```
 1    were the ones going to be raising the money, directly to

 2    some of the other people that needed to be -- hopefully we

 3    were going to get it consensual - including Credit Suisse,

 4    including the members group - to talk to them about the

 5    plan to see if they thought that that was something that,

 6    then, they could bring back to us, bring back to Ron and

 7    Andy and me and Brad, and be able to sift it and go

 8    through.  So there's been negotiations ongoing where

 9    they've come back with saying that they've got things that

10    they think are a little more solidified after, let's say,

11    talking to the members group.

12    Q.  Okay.  Sometime after the meeting on January 10th and

13    before today, did CrossHarbor say, "Here's a piece of paper

14    with a term sheet, an offer or a proposal for discussion"?

15    Did they give you some piece of paper like that?

16    A.  Yes, they did.

17    Q.  Okay.  And what was the number on that piece of paper?

18    A.  The last one?

19    Q.  No, the first one.

20    A.  I don't remember.

21    Q.  Okay.  But there were several rounds of back-and-forth?

22    A.  Oh, there was a lot of back-and-forth.

23    Q.  Did you give them marked-up versions of that piece of

24    paper.

25    A.  Absolutely.
```

1   Q.   Okay.   What valuation analysis did you do to decide

2   whether $100 million was fair?

3           MR. PATTEN:   Your Honor, may I?

4           THE COURT:   Mr. Patten.

5           MR. PATTEN:   I don't know if any of this is

6   relevant, if any of this has to do with the bidding and

7   solicitation motion.   It seems to me we're back into the

8   conspiracy between Ms. Blixseth and CrossHarbor and

9   Discovery Land Company and the debtors.

10          THE COURT:   Which they'll certainly be able to

11  look at through their discovery.

12          MR. SAUNDERS:   We never leave that conspiracy,

13  Your Honor.   But, no, it relates directly to the bidding

14  and solicitation procedures that they're asking Your Honor

15  to approve on based on this stalking-horse bid.   And what

16  I'm trying to propose is:   How much negotiation or work

17  really was there before they said, "Yeah, that is what we

18  want to go forward with, is the stalking horse"?

19          MR. PATTEN:   What relevance is there in how much

20  negotiation there was, Judge?   We have a motion in front of

21  you.   They're undoubtedly going to discover all of the

22  conversations that anybody had between the debtor and

23  Ms. Blixseth and CrossHarbor.   And it's really got -- it's

24  getting late, and we're way off track of what motion is

25  before the Court.

1          THE COURT:  Mr. Saunders.

2          MR. SAUNDERS:  Your Honor, I've already moved off

3   the negotiations and, I started to ask the next question

4   about the valuation.  And I'd like to just ask the CO of

5   the company what basis she has to think that $100 million

6   is fair for the sale of the equity of these debtors.

7          THE COURT:  I'll let you ask the question.

8          MR. SAUNDERS:  And as soon as we're done on that,

9   I'll be done.

10          THE COURT:  Okay.

11   Q.  (By Mr. Saunders)  Ms. Blixseth, what basis do you have

12   to believe that $100 million is a fair price for the sale

13   of the equity in the debtor?

14   A.  I think in this marketplace and with the troubles that

15   Yellowstone Club has had in the last couple of years from

16   the perception in the marketplace as well as what's

17   happened in the global market, that looking at what

18   Yellowstone Club can bear as a -- as credit as well as what

19   Yellowstone Club needs to raise in order to go forward and

20   make it viable for the infrastructure and the capex and the

21   other things that we need to do, that number seemed to be

22   the number that made sense with the overall business plan.

23   Q.  Did you have any investment banker or a valuation

24   expert or appraisal give you a view on the fairness of that

25   number?

1  A.   We used our, our CRO; and Brad; and the people that we

2  have; Discovery Land, who is, is credible in the management

3  and the overhead, and that kind of thing, of a lot of other

4  clubs.  And we put all that together.

5  Q.   Okay.  And did it --

6  A.   Did we hire someone separate?  "No" is the answer.

7  Q.   Okay.  And none of those people gave you a fairness

8  opinion, right?

9  A.   Gave me a fairness opinion?

10  Q.   Right.  None of those people gave you an opinion that

11  says:  In the opinion of FTI --

12  A.   I did not --

13  Q.   -- Discovery Land, or --

14  A.   I did not request one nor was I given one.

15  Q.   Okay, thank you.

16          MR. SAUNDERS:  Nothing further, Your Honor.

17          THE COURT:  Thank you.  Mr. Warner.

18          MR. WARNER:  Real quick, Your Honor.

19                  CROSS-EXAMINATION

20  BY MR. WARNER:

21  Q.   You talked about the $35 million that's the secured

22  obligation to CrossHarbor.  Is that secured by the 160

23  acres?

24  A.   There's some security of that, yes.

25  Q.   So the 160 acts as collateral for it or only a portion

1   of the 160?

2   A.  Only a portion.

3   Q.  Okay.  And you're going to contribute the 160 under the

4   plan to whomever the buyer is, correct?

5   A.  If another buyer came up and said, "Could we negotiate

6   that?" I would negotiate, I would talk to them about that.

7   But no other buyer has presented that to me, so --

8   Q.  Okay.  So I just wanted to make sure, because I'm

9   confused.  So if CrossHarbor is the proposed buyer under

10  this $100 million plan, you, in addition, will contribute

11  the 160 acres to NewCo?

12  A.  Yes, I would contribute that.  And they would be

13  contributing the golf course lots that they purchased.

14  Q.  As collateral for the notes?

15  A.  As additional collateral -- as additional land going

16  back to Yellowstone Club.

17  Q.  Will the 160 also be collateral for the $70 million

18  notes?

19  A.  Everything going back in is collateral.  Because it's a

20  NewCo, so everything going back in -- I was trying to be

21  clear on your question.  It's not that specifically, but

22  everything going in would be a new, a new company with that

23  land in it and so part of that collateral, yes.

24  Q.  So as I understand it, the buyer, NewCo, CrossHarbor,

25  whatever you want to call it, right, will be issuing a

1    $70 million note, and that will be held by the former

2    secured lenders?  That note will be secured by everything,

3    including what you contribute, the 160 acres?

4    A.  You know, I think I'm feeling a little uncomfortable

5    answering some of these things because I don't want to say

6    anything wrong.  We haven't submitted our plan yet.

7    Q.  That's fair.

8    A.  We are going to submit the plan on Friday.  And I'd

9    feel much more comfortable for you to get the plan, read

10   it, and then if you would like to ask me questions

11   specifically, I feel like I could answer them more

12   accurately for you.

13   Q.  Okay.  And so it's not a contribution by you to NewCo

14   for any buyer; it happens to be sort of a joint transaction

15   between you and CrossHarbor that, if this transaction goes,

16   you will be contributing that to NewCo?

17   A.  Correct.  But if another buyer came and wanted to have

18   a similar plan, I would certainly look at that.

19            MR. WARNER:  That's fair, okay.

20            THE COURT:  And when you refer to the 160, it's

21   the same 160 that I asked Mr. Greenspan about, right?

22            THE WITNESS:  Correct.

23            THE COURT:  Okay.  So the debtor doesn't own

24   the 160.

25            THE WITNESS:  No.

1           THE COURT:  You own the 160.

2           THE WITNESS:  Personally, yes.

3           THE COURT:  Okay.  Mr. Patten?

4           MR. PATTEN:  No questions, Your Honor.

5           THE COURT:  No questions.  Any follow-up?  Any

6      redirect?

7           MR. SAUNDERS:  No, none, Your Honor.

8           THE COURT:  Okay.

9           MR. SAUNDERS:  And no more witnesses from us.

10          THE COURT:  Very good.  You may step down.  Thank

11     you.

12          Okay, I think that concludes matters.  I'm going

13     to take them under advisement.  I'll issue my decision.

14          MR. ALTER:  Your Honor, may I?  Before you --

15          THE COURT:  Mr. Alter.

16          MR. ALTER:  Before you close the pleadings, I

17     just wanted to address an issue.

18          Your Honor, I wanted, for the sake of candor, to

19     disclose to the Court an issue that at least my member

20     group wanted to bring to the forefront of the Court.

21          We've been, I believe, dancing around a major

22     issue in this case, and I think we need to place it out

23     there a little bit especially as we're beginning to talk

24     about credit bidding and 1111(b) elections.  Your Honor,

25     Credit Suisse made a loan to these debtors where 94 percent

1     of the 375 million went out the door.  They took large

2     fees, collected interest, monitoring fees, and agency fees,

3     then they sold a lot of it off to various loan

4     participants.

5           The over-leveraging and the application of the

6     funds the for ultra vires purposes propelled this company

7     into bankruptcy.  Yet, Your Honor, we've been sitting here

8     for today and for the various hearings listening to various

9     parties be attacked; however, the direction of this

10    proceeding hasn't proceeded to look more carefully at that

11    transaction.

12          We know that the creditors committee has filed a

13    piece of paper, at least, alleging that the entire

14    transaction was a fraudulent transaction.  Your Honor, it

15    just strikes me as ironic that we're spending so much time

16    and energy -- and it's not Your Honor's fault, obviously -

17    the motions are brought before the Court and the Court

18    addresses them - but yet we're spending so much time a

19    energy assuaging the concerns of Credit Suisse as to the

20    integrity of the one party that provided financing when

21    Credit Suisse backed out that helped the debtors on a

22    prepetition basis and is the one party that is legitimately

23    interested in buying these assets and assuming the member

24    contracts.

25          Your Honor, I firmly believe that some action

1    needs to be taken soon on behalf of the estate to defend

2    these estate causes of action, Your Honor.  And I defer to

3    the creditors committee.  I know that the creditors

4    committee has done some investigation on this issue.  I

5    don't know where they stand on it.  But I suspect that if

6    no one takes some action, Your Honor, we will be forced and

7    propelled to file some pleading with the Court so that some

8    fiduciary of the estate looks at this transaction.

9            Your Honor, it's our understanding that this is

10   not the only loan transaction that Credit Suisse has had

11   where it's ended up in a defaulted situation in bankruptcy

12   related to similar types of luxury resort transactions.  To

13   the extent that we are talking about credit bids, 1111(b)

14   elections, and the further course of these proceedings, I

15   think that issue is paramount and needs to be addressed

16   soon by this Court.

17           THE COURT:  Thank you, Mr. Alter.

18           MR. WHITMORE:  One second.  I'm sorry.

19           THE COURT:  Mr. Whitmore.

20           MR. WHITMORE:  Your Honor, Clark Whitmore on

21   behalf of the Class B ad hoc group.  I appreciate the

22   Court's about to take this under advisement.  I don't want

23   to belabor the motion that's before the Court, but in light

24   of the timing of the plan being filed, I was just going to

25   suggest - and, perhaps, others might agree with this - that

1    if we were to wait until the plan were filed on Friday and

2    then if people were given, perhaps, an opportunity until no

3    later than Monday to file some additional pleading with the

4    Court, if they determine it to be appropriate, pointing out

5    how the actual provisions of the plan may have some bearing

6    on the motion, I think that would be more in accordance in

7    due process.

8              THE COURT:  I think you're going to have that

9    opportunity in any event.

10             MR. WHITMORE:  Oh, okay.  Thank you, Your Honor.

11             THE COURT:  Mr. Beckett.

12             MR. BECKETT:  Your Honor, forgive me, but one

13   moment to respond to a really very eloquent comment by

14   Mr. Alter.  I appreciated his comments.

15             And, Your Honor, three weeks ago, you asked the

16   committee to conduct a review of BGI notes.  And in three

17   weeks, Your Honor, the committee has accomplished quite a

18   bit in that regard.  The committee has looked -- with the

19   assistance, I will say, of many other constituencies in the

20   case.  I understood the Court wanted us to reach out and

21   talk to other people, and we have, and I express my

22   appreciation for their assistance in this.

23             When you look at the notes, you look downstream

24   to see where the money went and you do look upstream to see

25   where the money came from.  And so, Your Honor, indeed,

1  there was a lawsuit filed with regard to the downstream

2  part and there is a lawsuit prepared in regard to the

3  upstream part.

4          And, you know, there would -- and I had expected

5  this morning coming in that if it were a leisurely day and

6  wrapped up early, I might ask the Court for a chambers

7  conference to discuss this, to apprise the Court of the

8  status of it, and to talk about some events because this

9  is -- none of this, for any of us, has been a perfectly

10  smooth run.  But it's late, and you've had enough, and I've

11  had enough.

12          And I guess I just wanted to express my

13  appreciation to the other parties who have assisted in the

14  preparation of a lot of good work, and to advise the Court

15  that we're on it, and to also advise the Court that it is

16  very important for the committee to act, as I think you

17  instructed us to act, independently.  There are going to be

18  people who are mad and don't want us to do something, and

19  there are going to be people who are mad and who do want us

20  to do something.

21          Your Honor, the committee will evaluate all of

22  this with independence and with an eye toward the best

23  interest of the creditors estate -- (inaudible.)  Thanks.

24          THE COURT:  Okay, I appreciate your report.

25          MR. CHEHI:  And if I may add, Your Honor.

```
 1              THE COURT:  Mr. Chehi.
 2              MR. CHEHI:  Mr. Beckett and I have had many
 3    discussions about their duties, their fiduciary duties.
 4    And we're confident that the unsecured creditors committee
 5    in this case is investigating all of the issues that it
 6    should properly by investigating, including the claims that
 7    our clients are asserting in the case and all the other
 8    related issues.  And we have no fear that that
 9    investigation will be conducted and it will be concluded
10    appropriately.
11              And we're not in the east concerned about any
12    statements of concern expressed by Mr. Alter, for instance.
13    That will all be taken care of in due course through the
14    course of the cases.
15              THE COURT:  Okay.  Thank you, Mr. Chehi.  I
16    expect nothing less.  I expect all the parties to do their
17    respective responsibilities.
18              With that, we'll be in recess.
19
20                        *  *  *  *  *
21
22
23
24
25
```

1                  C E R T I F I C A T E

2

3        I certify that the foregoing is a correct transcript

4    from the electronic recording of the proceedings in the

5    above-entitled matter, all done to the best of my skill and

6    ability.

7

8    _____    _____

9    Jonny B. Nordhagen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25