IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

_____
                                    )
In Re:                              ) Case No. 08-61570
                                    )
Yellowstone Mountain Club, LLC,     )
                                    )
          Debtor.                   )
_____ )

THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

Butte, Montana
March 4, 2009

Transcript Services:

Proceedings recorded by electronic recording;
transcript produced by reporting service.

```
 1                          APPEARANCES

 2

 3       FOR THE DEBTORS:

 4            JAMES A. PATTEN

 5            Attorney at Law

 6            Suite 300, The Fratt Building

 7            2817 Second Avenue North

 8            Billings, MT  59101

 9

10            LAWRENCE REAM

11            RICHARD BIRINYI

12            Attorney at Law

13            Bullivant Houser Bailey, PC

14            1601 Fifth Avenue, Suite 2300

15            Seattle, WA  98101-1618

16

17       FOR JAMES MURPHY and EDWARDS LAW FIRM:

18            JON E. DOAK

19            Attorney at Law

20            Doak & Associates

21            P.O. Box 1875

22            Billings, MT  59103-1875

23

24

25
```

```
 1                    APPEARANCES (continued)

 2


 3        FOR THE OFFICE OF THE U.S. TRUSTEE:

 4             DANIEL P. McKAY

 5             U.S. Trustee's Office

 6             Liberty Center, Suite 204

 7             301 Central Avenue

 8             Great Falls, MT  59401

 9


10        FOR CREDIT SUISSE:

11             MARK S. CHEHI

12             ROBERT S. SAUNDERS

13             Attorneys at Law

14             Skadden, Arps, Slate,

15                Meagher & Flom

16             One Rodney Square, Seventh Floor

17             Wilmington, DE  19801

18


19             SHANE P. COLEMAN

20             Attorney at Law

21             Holland & Hart

22             401 North 31st Street, Suite 1500

23             Billings, MT  59101

24


25
```

```
 1                    APPEARANCES (continued)

 2


 3       FOR CREDIT SUISSE:

 4            EVAN R. LEVY

 5            JOSEPH LARKIN

 6            GEORGE A. ZIMMERMAN

 7            Attorneys at Law

 8            Skadden, Arps, Slate,

 9               Meagher & Flom

10            Four Times Square

11            New York, NY  10036-6652

12


13       FOR THE CREDITORS COMMITTEE:

14            J. THOMAS BECKETT

15            Attorney at Law

16            Parsons, Behle & Latimer

17            201 South Main Street

18            Salt Lake City, UT  84111

19


20       FOR HIGHLAND CAPITAL MANAGEMENT, LLP:

21            MICHAEL D. WARNER

22            Attorney at Law

23            Warner Stevens, LLP

24            301 Commerce Street, Suite 1700

25            Fort Worth, TX  76102
```

```
 1                APPEARANCES (continued)

 2

 3      FOR THE AD HOC COMMITTEE OF YELLOWSTONE

 4      CLUB MEMBERS:

 5           JOHN H. GRANT

 6           Attorney at Law

 7           Jackson, Murdo & Grant, PC

 8           203 North Ewing

 9           Helena, MT  59601

10

11           JONATHAN B. ALTER

12           Attorney at Law

13           Bingham McCutchen, LLP

14           One State Street

15           Hartford, CT  06103

16

17      FOR THE CLASS B AD HOC MEMBERS COMMITTEE:

18           RONALD A. BENDER

19           Attorney at Law

20           Worden Thane, PC

21           P.O. Box 4747

22           Missoula, MT  59806

23

24

25
```

```
 1                    APPEARANCES (continued)

 2


 3        FOR THE UNSECURED CREDITORS COMMITTEE:

 4             JAMES H. COSSITT

 5             Attorney at Law

 6             James H. Cossitt, PC

 7             202 KM Building, 40 Second Street East

 8             Kalispell, MT  59901-4563

 9

10             DEREK LANGTON

11             Attorney at Law

12             Parsons Behle & Latimer

13             201 South Main Street, Suite 1800

14             Salt Lake City, UT 84111

15

16        FOR CROSSHARBER CAPITAL PARTNERS, LLC:

17             PAUL D. MOORE

18             BARRY GREEN

19             ROBERT ZAFFRANN

20             Attorneys at Law

21             Duane Morris, LLP

22             470 Atlantic Avenue, Suite 500

23             Boston, MA  02210-2600

24

25
```

```
 1                 APPEARANCES (continued)

 2

 3      FOR CROSSHARBER CAPITAL PARTNERS, LLC:

 4           BENJAMIN P. HURSH

 5           Attorney at Law

 6           Crowley, Haughey, Hanson,

 7              Toole & Dietrich, PLLP

 8           P.O. Box 7099

 9           Missoula, MT  59807

10

11      FOR TIMOTHY J. BLIXSETH:

12           JOEL E. GUTHALS

13           Attorney at Law

14           Guthals, Hunnes & Ruess, PC

15           P.O. Box 1977

16           Billings, MT  59103

17

18           MICHAEL J. GEARIN

19           Attorney at Law

20           K&L Gates

21           925 Fourth Avenue, Suite 2900

22           Seattle, WA 98104

23

24

25
```

```
 1                    APPEARANCES (continued)

 2


 3       FOR PRIM VINTAGE DEVELOPMENT, LP:

 4            DEAN A. STENSLAND

 5            Attorney at Law

 6            Boone Karlberg, PC

 7            P.O. Box 9199

 8            Missoula, MT  59807

 9


10      FOR THE MONTANA DEPARTMENT OF REVENUE:

11            TERESA GRACE WHITNEY

12            JOEL E. SILVERMAN

13            Attorneys at Law

14            Montana Department of Revenue

15            P.O. Box 7701

16            Helena, MT  59604-7701

17


18      FOR MARK GROSVENOR:

19            GERALD SIMS

20            Attorney at Law

21            (Contact information not provided)

22


23


24


25
```

1                          I N D E X

2     WITNESS:                                         PAGE:

3     ROBERT ZAFFRANN                                      27

4

5     STEVEN LEHR

6          Direct Examination by Mr. Patten    .   .   .   .   . 136

7          Cross-Examination by Mr. Saunders   .   .   .   .   . 153

8          Cross-Examination by Mr. Warner     .   .   .   .   . 164

9          Cross-Examination by Mr. Moore      .   .   .   .   . 169

10    RONALD GREENSPAN

11         Direct Examination by Mr. Ream      .   .   .   .   . 173

12         Cross-Examination by Mr. Saunders   .   .   .   .   . 223

13         Cross-Examination by Mr. Warner     .   .   .   .   . 242

14         Cross-Examination by Mr. Moore      .   .   .   .   . 260

15         Cross-Examination by Mr. Gearin     .   .   .   .   . 268

16         Redirect Examination by Mr. Ream    .   .   .   .   . 276

17         Rebuttal Direct Examination by Mr. Ream   .   .   . 306

18    EDRA BLIXSETH

19         Direct Examination by Mr. Saunders  .   .   .   .   . 278

20    SAMUEL T. BYRNE

21         Direct Examination by Mr. Saunders  .   .   .   .   . 279

22

23

24

25

|     |                                                              |
|-----|--------------------------------------------------------------|
| 1   | YELLOWSTONE MOUNTAIN CLUB BANKRUPTCY                          |
| 2   | BUTTE, MONTANA                                                |
| 3   | - - -                                                        |
| 4   | BE IT REMEMBERED THAT this matter came on for                |
| 5   | hearing on March 4, 2009, in the United States Bankruptcy    |
| 6   | Court, District of Montana, The Hon. Ralph B. Kirscher,      |
| 7   | presiding:                                                   |
| 8   |                                                              |
| 9   | The following proceedings were had:                          |
| 10  |                                                              |
| 11  | THE COURT:  Good morning.  Please be seated.                 |
| 12  | This is the date and time set for a number of                |
| 13  | matters involving the Yellowstone Club, 08-61570; and a      |
| 14  | couple of the adversaries.                                   |
| 15  | We have the trustee's report regarding the                   |
| 16  | examiner; we have approval of Debtors' disclosure            |
| 17  | statement; Credit Suisse's response to order granting        |
| 18  | application to employ CB Richard Ellis, Inc., and request    |
| 19  | for reconsideration; motion of Navistar Financial to assume  |
| 20  | or reject; motion of Debtors to vacate order denying         |
| 21  | Debtors' motion for bidding solicitation.                    |
| 22  | We have motion of CrossHarbor for protective                 |
| 23  | order; motion of Debtor to vacate order denying Debtors'     |
| 24  | motion for bidding; expedited motion for valuation; motion   |
| 25  | of GMAC to modify.                                           |

1              We have in the Adversary 09-10, motion for

2      expedited hearing on motion for temporary restraining

3      order; 09-14, we have a pretrial scheduling conference.

4              And as it relates to the motion of Navistar

5      Financial Corp. to assume or reject, I think that was

6      alternatively for adequate protection.  That matter has

7      been settled, as I read the docket, by a consent to -- for

8      Debtor to pay adequate protection of $1,286.96 a month.  So

9      that matter is settled.  It will be off the calendar.

10     We'll issue an order pursuant to the prayer that was set

11     forth in the consent filed by Navistar, which basically

12     asks for an order directing or requiring Debtor to

13     immediately commence monthly adequate protection payments

14     of $1,286.96 no later than March 15th by the 15th day of

15     each subsequent month to Navistar by delivering payments to

16     a designated person's address.  So we'll issue an order to

17     that effect.  So that's off.  The hearing is vacated on

18     that.

19             As it relates to the motion to modify, where are

20     we on that?

21             MR. PATTEN:  Your Honor, it's my understanding

22     that GMAC would like to continue this hearing until, I

23     think it's next week.  I had a brief discussion with

24     Mr. Binney, and I see that he's in the courtroom in

25     Missoula.

 1                 THE COURT:  He is, he is.

 2                 MR. BINNEY:  Yes, Your Honor, Jon Binney in

 3    Missoula.

 4                 And if the Court could would deem today a

 5    preliminary hearing and set it for a final hearing, I think

 6    Mr. Patten and I can try to resolve this.

 7                 THE COURT:  Okay.  And given the response,

 8    Mr. Patten, I guess I was a little confused.  The motions

 9    both reference three vehicles, I think; and your response

10    was only to two vehicles, one for each motion.  I didn't

11    know if the others were resolved or if they were still an

12    issue.

13                 MR. PATTEN:  No.  That must be an error in my

14    response, Your Honor.  It's our position that there is --

15    not only are they necessary for a reorganization but that

16    there's equity in all of the vehicles.

17                 THE COURT:  As to all of the vehicles?

18                 MR. PATTEN:  Yeah.

19                 THE COURT:  Okay, okay.

20                 MR. PATTEN:  We're prepared to pay adequate

21    protection, and I think that's what -- Mr. Binney and I

22    just need the opportunity to work out the terms of the

23    adequate protection.

24                 THE COURT:  Okay.  I will continue that matter

25    until March 10th.

1           MR. PATTEN:  Thank you.

2           THE COURT:  Nine o'clock.

3           MR. BINNEY:  Thank you, Your Honor.

4           THE COURT:  That concludes your matters,

5  Mr. Binney?

6           MR. BINNEY:  Yes, Your Honor.

7           THE COURT:  Okay.  Well, before we get into all

8  the other matters that are still left pending, are there

9  other matters that have resolved or are we at issue on all

10  of them?

11           Mr. Patten.

12           MR. PATTEN:  Your Honor, we met a week ago today

13  face-to-face and by telephone with various counsel relative

14  to the disclosure statement.  We have spent pretty much

15  24/7 since amending the disclosure statement.  And the

16  court docket will reflect that we filed an amended

17  disclosure statement on Monday, and we filed another one

18  last night at about one o'clock in the morning.

19           THE COURT:  About midnight, yes.

20           MR. PATTEN:  We believe that with the filing last

21  night, that we've met the objection of the creditors.

22           THE COURT:  Have the creditors seen them, seen

23  the second amended?  It was filed about midnight, maybe

24  quarter-to-one.

25           MR. PATTEN:  My suggestion, Your Honor, is that,

1    out of fairness to everybody, if the Court set another

2    short deadline on objections and then reset this hearing

3    for next week, whether it's in Butte or Missoula, then we

4    could allow the objectors the additional opportunity to

5    look at what we filed last night, they can make their

6    objections, give us another chance to either look at those

7    objections and decide whether we want to try and meet them

8    or whether we'll fight about them, and then appear back in

9    court next week.

10          If the Court would like, we're prepared to go

11   through the disclosure statement and the objections kind of

12   line by line and show where we've met them.

13          THE COURT:  I may give you an opportunity to do

14   that in just a moment.

15          MR. PATTEN:  Okay.

16          THE COURT:  Thanks.  Since there are no other

17   matters that are resolved, I will ask all counsel that are

18   appearing to state their appearances for the record.  And I

19   guess we'll just start with Mr. Patten.

20          MR. PATTEN:  Andy Patten for the debtors.

21          MR. REAM:  Good morning, Your Honor.  Larry Ream

22   on behalf of the debtors.

23          MR. BIRINYI:  I'm sorry, Your Honor.  Richard

24   Birinyi from Bullivant Houser Bailey on behalf of the

25   debtors.

1            MR. MOORE:   Paul Moore, counsel for CrossHarbor

2    Capital.

3            MR. McKAY:   Dan McKay for the U.S. Trustee's

4    Office.

5            MR. GREEN:   Barry Green for CrossHarbor Capital.

6            MR. ALTER:   Jonathan Alter for the members.

7            MR. BECKETT:   Tom Beckett for the Official

8    Committee of Unsecured Creditors.

9            MR. COSSITT:   Jim Cossitt, local counsel for the

10   committee.

11           And I would like to introduce Derek Langton from

12   Parsons Behle & Latimer for whom we'll be filing a pro hac

13   vice very shortly, Your Honor.

14           THE COURT:   Okay.

15           MR. CHEHI:   Mark Chehi of Skadden-Arps for Credit

16   Suisse along with my colleague, Joe Larkin; and my partners

17   Rob Saunders, Evan Levy, and George Zimmerman who your Your

18   Honor was introduced to telephonically.

19           THE COURT:   Okay.

20           MR. WARNER:   Good morning, Your Honor.   Michael

21   Warner on behalf of Highland Capital.

22           MR. BENDER:   Ronald A. Bender on behalf of the

23   Class B unit members.

24           MR. GUTHALS:   Good morning, Your Honor.   Joel

25   Guthals on behalf of the Timothy Blixseth.

1           And I would like to introduce to you Michael

2   Gearin from Seattle who has been admitted pro hac vice and

3   will be co-counsel with me representing Mr. Blixseth.

4           THE COURT:  Okay.  Welcome.

5           MR. GEARIN:  Thank you, Your Honor.

6           MR. GRANT:  John Grant, local counsel for the

7   members.

8           MR. STENSLAND:  Dean Stensland on behalf of Prim

9   Vintage Development.

10          MR. HURSH:  Benjamin Hursh, local counsel for

11  CrossHarbor.

12          And, Your Honor, I'd also like to introduce

13  Robert Zaffrann from Duane Morris.  His pro hac was filed,

14  approved, and the check was taken upstairs to the clerk

15  this morning.

16          THE COURT:  Very well.

17          MR. ZAFFRANN:  Good morning, Your Honor.

18          THE COURT:  Those are important things.  Anyone

19  else?  I guess I don't see Mr. Hingle or Mr. Coleman, I

20  guess.  Okay.

21          MR. DOAK:  Jon Doak by telephone for James Murphy

22  and the Murphy Family Limited Partnership.

23          THE COURT:  Oh, we do have a couple of people --

24  okay, Mr. Coleman I see.  We do have a couple of people on

25  the telephone.  If you can identify yourselves.

1          Maybe we don't.

2          MR. DOAK:  Jon Doak for the Murphy Family Limited

3    Partnership, the Edwards firm, and James Murphy.

4          THE CLERK:  Excuse me, you're going to have to

5    speak louder.

6          THE COURT:  Well, obviously they're only

7    listening today because we can't hear them.  So we've got

8    Mr. Doak, and I believe we had one other.

9          Mr. Sims?

10          MR. SILVERMAN:  Your Honor, Joel Silverman and

11    Teresa Whitney from the Montana Department of Revenue.

12          THE COURT:  Okay, very good.

13          MR. SIMS:  And, Your Honor, Gerald Sims on behalf

14    of Mark Grosvenor.

15          THE COURT:  Okay.  I couldn't hear that, but I

16    think the clerk got it.

17          Okay, now we've got the preliminary things done.

18    We were talking about the disclosure statement and where we

19    were at on that.  Have any of you looked at the second

20    amended that was filed at midnight?

21          MR. CHEHI:  Your Honor, other than noting it

22    at -- it would have been, you know, 1 a.m. in the morning

23    when the actual amended plan of reorganization was filed.

24    And then about 3 a.m. eastern time, we noted that there was

25    the subsequent pleading.  I have certainly not had any

1    opportunity to read those documents.  They were not

2    hand-delivered to us today.  We have no idea what the

3    changes are in them.  There have been no black-lines filed

4    or served.  And so our position on it is that today is not

5    the day for considering the disclosure statement hearing or

6    the adequacy of the disclosure statement because we've just

7    now received it and there were, actually, apparently

8    voluminous filings along with it of new documents that had

9    not been served before.

10             THE COURT:  There are.

11             MR. CHEHI:  And so we reserve all of our rights.

12   We would ask the Court to adjourn it until some later date

13   so we can all properly evaluate it and take it on in due

14   course.

15             THE COURT:  Which probably leads into another one

16   of your requests, as well, but we'll take that up in a

17   moment.

18             Mr. Guthals.

19             MR. GUTHALS:  Your Honor, on behalf Mr. Blixseth,

20   I have not had an opportunity to review these late filings

21   last night.  And I concur with Mr. Chehi's position

22   regarding the disclosure statement hearing.

23             THE COURT:  I'm sure all of you do, obviously.

24   And I guess with the filing, Mr. Patten, of the second -- I

25   think you've designated it the second amended.  With that,

1    I'm assuming that supercedes your prior filings, your

2    original disclosure statement and the amended disclosure

3    statement --

4              MR. PATTEN:  Yes, Your Honor.

5              THE COURT:  -- and plan.

6              MR. PATTEN:  Yes.

7              THE COURT:  Okay.  Based upon the filing,

8    obviously, the disclosure statements that are previously

9    before me - not the second amended, obviously, which is

10   filed - but the other ones are denied approval superceded

11   by the second amended which obviously will not be dealt

12   with today.  And I will set a date and time for that before

13   we conclude today.  So that will take care of the

14   disclosure statement matter.

15             Ms. Blixseth, I know you're appearing by video.

16   I have a couple of questions for you.  One is:  You can

17   hear us?

18             MS. BLIXSETH:  Yes, I can.

19             THE COURT:  Very good.  We can hear you, as well.

20   Is there anyone else in the room with you?

21             MS. BLIXSETH:  No, there's not.

22             THE COURT:  Okay.  If there should be anyone that

23   comes into the room during the proceedings, I would ask

24   that they please sit near you and identify themselves, who

25   they are.  If they're just technological people, that's one

1    thing; but if they're counsel or others, I would want to

2    know who they are and I would want to be able to see them.

3              MR. CHEHI:  Your Honor, for the record, when

4    Ms. Blixseth did come into the conference room, there is

5    another person with her.  There is a second glass of water,

6    and he's off screen.  And we're not sure whether that's an

7    attorney.  And if it is an attorney representing

8    Ms. Blixseth - because I think there was a representation

9    on the record when it was set up that she was a client of

10   some sort - we would like to have the identification of who

11   it is who's representing Ms. Blixseth at this time.

12             THE COURT:  Well, that was the point of my

13   question.  She just indicated there's no one else there.

14             Is there anyone else in the room?

15             MS. BLIXSETH:  No, there is not.

16             THE COURT:  Okay.  Mr. Patten?

17             MR. PATTEN:  Your Honor, this brings up an issue

18   and a problem that I have.  One of our witnesses, Steve

19   Lehr, who is the CBRE broker, is traveling today, and he

20   was traveling to Palm Springs.  And we've provided him with

21   the address for this video conference in Palm Springs.  But

22   he won't be landing until late this morning in Palm

23   Springs, which makes it noon Butte time.

24             And so if -- unless we are resolved with all of

25   the issues before noon, I would ask leave of Court to

1    present him maybe out of order on the issues that are

2    presented so that we can get his testimony before the

3    Court.

4              THE COURT:  Okay.  Also, I think Mr. Saunders had

5    informed us that there will not be anyone appearing from

6    London.  Is that correct?

7              MR. SAUNDERS:  That's right, Your Honor.

8              THE COURT:  Okay.  Do you have a preference as to

9    what we take up next, or should we just proceed with the

10   reconsideration of the professional application for CB

11   Richard Ellis?

12             Mr. Chehi?

13             MR. CHEHI:  We would be happy to move in that

14   order, Your Honor.

15             THE COURT:  Okay.

16             MR. CHEHI:  I'll address the Court on that

17   motion.

18             THE COURT:  Mr. Patten, did you have a comment?

19             MR. PATTEN:  Well, Your Honor, if we could put

20   that at the end of the calendar, then our witness from CB

21   Richard Ellis would be available.

22             THE COURT:  Okay, yes, that would fit, then,

23   wouldn't it?  I'm sorry.

24             That would make more sense, Mr. Chehi.

25             MR. CHEHI:  All right.

1            THE COURT:  Okay.  Well, in looking at this, do

2    you have a preference, Mr. Patten?

3            MR. PATTEN:  My preference, Your Honor, would be

4    to deal with the discovery disputes first.  I think the

5    Credit Suisse motion on reconsideration of CB Richard Ellis

6    and our motion for reconsideration of the order denying the

7    bid and solicitation procedures go hand in hand.

8            THE COURT:  Okay.

9            MR. PATTEN:  And I think if we dealt with maybe

10   some of the smaller issues first and then dealt with the

11   larger issues, which I think are the crux of the hearing

12   today - at least it is for the debtors - we can maybe clean

13   the calendar up a little bit before we get down to what is,

14   I think, critically important to the debtors.

15           THE COURT:  Okay.  Well, why don't we take up the

16   motion of CrossHarbor for protective order.

17           MR. ZAFFRANN:  Your Honor, Robert Zaffrann again

18   for CrossHarbor.

19           It's our motion for a protective order.  I don't

20   want to waste a lot of the Court's time if you've had an

21   opportunity to review the papers.  Most of what I would say

22   is in there.  But if the Court hasn't had time, I'll

23   briefly go through the background.

24           THE COURT:  For everybody's benefit, why don't

25   you just do a short background.

1          MR. ZAFFRANN:  The Court had ordered on February

2     20th that CrossHarbor respond to the requests in a Rule

3     2004 examination made by Credit Suisse.  As soon as that

4     order entered in the scope of the electronic documentation,

5     CrossHarbor had already started gathering paper

6     documentation that didn't depend on the scope of, of the

7     Court's order in terms of time period and what limitations

8     were going to be included.

9          As soon as that scope was clear, we immediately

10    began on that Friday engaging Evidox, an electronic

11    harvesting document services company, to start harvesting

12    e-mails from all of the relevant computers at CrossHarbor.

13    Ultimately, that pull, because of the broad scope of the

14    requests and the time period involved, was about 60,000

15    e-mails.  Sixty thousand is an enormous number.  I was

16    personally involved in the review and production of that.

17          Basically, we started working around the clock as

18    soon as Evidox was able to harvest all of those e-mails and

19    get them in the software for the Duane Morris attorneys to

20    start to review, which happened about Sunday afternoon.  We

21    immediately began review.  We literally were working in

22    teams of 8, 9, 10 attorneys at a time reviewing these

23    documents straight through until late Thursday night or

24    early Friday morning.  I personally worked around the clock

25    on one occasion and then past midnight the following night

1  trying to get this done.  The point being, it's not a

2  sustainable pace for reviewing documents.  But all that

3  being said, we were able to get through what we believe to

4  be substantially all of the relevant material documents in

5  our possession that are responsive to that request.

6          Now, there were some 35,000 e-mails that were

7  pulled out by a privileged search done for the lawyers.

8  And as I think -- we're not claiming that all of those

9  documents are necessarily privileged.  The problem was:  In

10 the five-day space of time, we just don't have enough time

11 to go through 35,000 e-mails.  We went through 10,000 at an

12 unsustainable pace.  It took us a week.

13         In order to go through those remaining 35,000,

14 it's fair to estimate it's going to cost $1 million.  You

15 know, it may be a couple hundred thousand less; it may be a

16 couple hundred thousand more, but it's going to be in that

17 ballpark.  And it's going to take about four weeks, three

18 and a half - four weeks to do it; and then it will take

19 another three, three and a half, four weeks to put all of

20 the documents into a privilege log:  Name, "to", "from",

21 date, description of the document.

22         It's just, it's a colossal task.  And it's

23 something that CrossHarbor has understood the size of this

24 task from the beginning.  And I want to impress on the

25 Court they have nothing to hide.  If this production could

1    have been done in the 5, 7, 10 days in which Credit Suisse

2    has sought it, it would have been done a long time ago.

3    There would have been no negotiations that, you know,

4    ultimately ended up protracted because we couldn't get a

5    limitation on the scope.  None of that would have happened.

6    But the problem was:  We understood from the beginning that

7    this could not be done in the time frame that was being set

8    forth, and it was going to be an extraordinarily expensive

9    and extraordinarily time-consuming process.

10            So we tried to negotiate with them.  At one

11   point, we suggested, you know, doing searches in the "to"

12   lines which would limit substantially the number of e-mails

13   that would have to be reviewed and potentially allow it to

14   be done in a two-week or a three-week time frame.  Credit

15   Suisse did not want to agree to that.  And so, ultimately,

16   when the Court entered the order, we did the best we could

17   with the time frame we had.

18            And now we're essentially seeking the Court's

19   guidance.  You know, if the Court wants us to go through

20   those 35,000 e-mails one by one and do a privilege log, you

21   know, of tens of thousands of e-mails, we're happy to do

22   that.  But the question at this point from CrossHarbor's

23   perspective is:  Does that really make sense in the

24   cost-benefit analysis that the federal rules require in a

25   discovery thing like this?

1          Credit Suisse has gotten duplicative discovery

2     from the other parties involved in this.  So while there

3     are pockets of e-mails that will be -- would be available

4     from CrossHarbor should such a review take place, there's

5     every possibility that most if not all of them may be

6     already produced to Credit Suisse.  And so from

7     CrossHarbor's perspective, it seems to make a lot of sense

8     for Credit Suisse to review the voluminous documentation

9     that's already been produced; identify, you know, what

10    additional documents are not contained in the productions

11    of any of the parties; and then address what we need to do

12    from there at that point.  But, you know, spending

13    $1 million to potentially pick up some e-mails at the

14    margins just doesn't seem to be a valuable use of

15    resources.

16          Thank you, Your Honor.

17          THE COURT:  Regarding the support of your motion,

18    do you intend to call someone to basically just establish

19    the cause that you've just kind of summarized?

20          MR. ZAFFRANN:  I myself swore out an affidavit in

21    response to the motion because I was involved in the

22    production.  So I can attest that the -- you know, while

23    the time values and the dollar values are estimates,

24    they're based on what we've done to this point and our

25    extrapolations out, given the, you know, three and a half

```
 1    times as many e-mails that we're now being asked to review
 2    in addition.
 3              THE COURT:  And you have the firsthand knowledge
 4    of all of this, given your involvement?
 5              MR. ZAFFRANN:  I have the firsthand of every bit
 6    of it, Your Honor.
 7              THE COURT:  Okay.  I'm just going to have you
 8    sworn for the record.  Although you're an officer of the
 9    court, I'm going to have you sworn, and then I'm going to
10    ask you a couple of questions.
11              MR. ZAFFRANN:  Sure.
12                  ROBERT ZAFFRANN, WITNESS, SWORN
13              THE COURT:  The factual statements that you've
14    just summarized to the Court regarding the discovery, the
15    documentation, the expense involved, the numbers of
16    documents, the privilege log, and the amount of time that
17    would be required is true and correct?
18              THE WITNESS:  It is, Your Honor.  While some are
19    estimates, they are our best estimates based on the
20    knowledge I have at this time.
21              THE COURT:  Although, there's probably an
22    objection.  That's a compound question that I just asked.
23    I didn't hear any objections, so I assume it's waived.
24              And the factual statements that you've made are
25    based upon your personal knowledge?
```

1              THE WITNESS:  Yes, Your Honor.

2              THE COURT:  Okay.  I appreciate the comments.

3              Are there questions for this witness any of you

4    would like to raise?

5              MR. SAUNDERS:  No questions, Your Honor.

6              THE COURT:  No questions, okay.

7              THE WITNESS:  Thank you, Your Honor.

8              THE COURT:  Thank you.  A statement in

9    opposition?

10             MR. SAUNDERS:  Please, Your Honor.

11             THE COURT:  Mr. Saunders.

12             MR. SAUNDERS:  Your Honor, from the Credit Suisse

13   perspective, as I think Your Honor knows from the

14   motion-to-compel discussion, our view is that, you know,

15   whatever difficulty CrossHarbor is faced with at this point

16   is a difficulty of their own making.

17             From the beginning of this process, I would call

18   out to Your Honor's attention, I think, two fundamental

19   tactical decisions by CrossHarbor in the discovery process

20   that are responsible for them being where they are.

21             The first is that they essentially took the

22   position at the outset of the 2004 examination that they

23   were going to hold hostage the documents that they agreed

24   we were entitled to get while they attempted to persuade us

25   to scale back the 2004 examination.  So completely contrary

1   to the way discovery would normally proceed in which a

2   party would produce the documents that it acknowledged it

3   was supposed to produce and fight about objections and

4   bring those objections, if they're not resolved, before a

5   Court, CrossHarbor took the position:  We're not going to

6   do any work, we're not going to be produce anything to you,

7   we're not even going to begin the searches until we have

8   reached an agreement with you on scope.

9          The one element of scope in which we agreed to

10  scale back our request had to do with the date.  We agreed

11  we would bring the beginning date forward from January 1,

12  2007, to January 1, 2008, but we weren't willing to agree

13  to the limitations -- other limitations on scope that were

14  requested.  But rather than, again, as would have been

15  appropriate, to bring a motion for a protective order at

16  that point and say, "Hey, we've got a 2004 order in place.

17  We need a protective order against the burden that that's

18  going to impose on us or particular requests are going to

19  impose on us," CrossHarbor did nothing.  Okay?

20         That led us up to the motion to compel.  And Your

21  Honor, I'm sure, will remember leading into the motion to

22  compel - this is the second point - CrossHarbor made the

23  tactical decision that they were no longer going to assert

24  any of those objections to scope, that their position going

25  into that motion to compel was going to be:  Okay, fine.

1    We will give you everything you're asking for.  No longer

2    any burden objections.  We will give you everything that

3    you're asking for; we just need more time.

4            And what Your Honor said, if you remember from

5    the call, was because we had been willing to give them the

6    entire week to make that production -- I think Your Honor

7    said you had been inclined to order them to do it by

8    Tuesday, but since we permitted it to be Friday, you gave

9    them the extra three days.

10           Now having lost on that tactical decision to make

11   the approach to Your Honor on the motion to compel of,

12   "Okay, we'll give them everything; we just need more time,"

13   having lost on that, now they want to reargue the other

14   position and reassert scope objections that they've

15   previously abandoned.  And they shouldn't be able to do

16   that.

17           The last point I'd make, Your Honor -- two more

18   points.  One is:  We have essentially an admission, sworn

19   admission now, Your Honor, that there are documents out

20   there that are not privileged that they haven't produced.

21   And regardless of what you do with anything else, Your

22   Honor, surely we're entitled to get them.

23           There was no objection, no objection raised to

24   scope at the time of the motion to compel.  We were

25   successful on the motion to compel.  They concede now

1    because of the way they did their overly broad search for

2    privileged documents that they have privileged, that they

3    have non-privileged documents that they've yet to produce.

4    Okay?  At a minimum, we've got to get those.

5         My last point, Your Honor, is their reply brief

6    invites us or suggests that the Court should be -- should

7    require us to make a particularized showing of what

8    particular documents we need.  Well, Your Honor, we're

9    happy in the course of the motions today to show Your Honor

10   some of the documents that we've received Friday night, and

11   particularly, documents that we think are very relevant to

12   some of the issues that are on for today.  We think we'll

13   amply make that showing.  I don't think Your Honor even

14   needs to get to that because of the prior arguments that

15   I've made, but if that's what Your Honor wants to hang your

16   hat on, I think we'll present ample evidence of that today.

17        So I don't think it's reasonable, given the past

18   history, for CrossHarbor to come here now, try to resurrect

19   objections that they've previously waived, and say, "We

20   shouldn't have to give you documents that we know we have

21   and we know are non-privileged and responsive but just

22   don't care to give you."

23        Thank you, Your Honor.

24        THE COURT:  Mr. Saunders, are these documents

25   that you already have from other sources?

1      MR. SAUNDERS:  I don't know, Your Honor.  We have

2  been through, in the course of Friday night to today, every

3  document that was produced to us Friday by CrossHarbor, by

4  Discovery Land Company, and by BGI.  Okay?

5      There is some overlap in that there is some

6  e-mails, for instance, that were produced both by

7  CrossHarbor and by Discovery Land Company, but there were

8  some, some e-mails where there's no overlap.  In

9  particular, there are some e-mails produced by Discovery

10 Land Company that were communications with CrossHarbor

11 people but where CrossHarbor didn't produce that e-mail,

12 which causes us to wonder how they did the e-mail search.

13 Okay?

14      But I don't know how I can possibly know.  We

15 have looked at every document that's been produced to us by

16 any party, and I don't know how I can possibly know what

17 else might be in there, whether there are, whether there

18 are more e-mails that would be relevant that CrossHarbor

19 has that they haven't produced yet because they fell within

20 this overbroad privilege search.

21      THE COURT:  Okay.  Have you asked Mr. Levy if he

22 has knowledge of documents that were involved at all?  I

23 understand in looking at the disclosure statement, he may

24 have some knowledge of transactions with CrossHarbor.

25      MR. SAUNDERS:  You know, I'm not aware that

1   Mr. Levy has any knowledge of transactions with

2   CrossHarbor, Your Honor.

3           THE COURT:  Okay.  I just raise that.  I mean it

4   sounded like he had some background and maybe had come

5   across some things just in his, his work.

6           MR. CHEHI:  I'll say this, Your Honor - because I

7   was involved, you know, on a detailed basis in some of the

8   preliminary discovery requests and negotiations; and then

9   that became a career in and of itself managing the

10  CrossHarbor difficulties of getting them to produce - that

11  there are numerous categories of documents that go to

12  correspondence between CrossHarbor and its affiliate and

13  other parties in interest in the case that have not been

14  produced and that surely exist.

15          Because the selection of documents that are of

16  interest that we can show the Court today in the course of

17  these proceedings, which are germane to the issues, clearly

18  indicate that there are communications and activity that is

19  pervasive that we do not have the record of.  And this goes

20  back through the entire period of time at least from

21  February 2008.  And it is a fair representation that

22  there -- the 6,000 pages, I believe, that were produced by

23  CrossHarbor is a relatively small-scale production given

24  the entire scope of documents, which I think they

25  represented was 60,000 that they had gathered.

1          MR. SAUNDERS:  If I could just add some numbers,

2     Your Honor, just so you know what we've done.  What the

3     other parties have produced and what we have reviewed, and

4     this is based on the last few days:  BGI produced 5,831

5     documents totaling almost 17,000 pages; Discovery Land

6     Company produced 4,300 documents totaling almost 24,000

7     pages; and both of those productions were very

8     substantially more than CrossHarbor's production, which was

9     about 7,000 - 8,000 pages all in, Your Honor, including

10    some hardcopy documents that are were produced.

11          THE COURT:  What is it you don't know?

12          MR. SAUNDERS:  Well, we don't know what we don't

13    know, Your Honor.  We know quite a lot now.

14          THE COURT:  I understand that.  It's rhetorical.

15    Obviously, you don't know if you haven't seen it.

16          But it's just real interesting from the

17    standpoint that -- let me ask it this way, and maybe

18    Mr. Chehi needs to respond, as well, Mr. Saunders:  What's

19    the goal here?  Credit Suisse in this whole process and

20    procedure, what is your goal?  What do you want to see

21    done, accomplished through this whole case and through the

22    adversaries?  I mean it's a fair question.

23          What are your goals?

24          MR. SAUNDERS:  I think the goal, Your Honor, is

25    to maximize the recovery for our clients, right?

1           But the goal that is specific to discovery,

2    right, is to try to find out what has happened, find out

3    what is there.  Even in the self-selected production that

4    we got that is, again, admittedly by CrossHarbor not

5    complete and admitted by CrossHarbor that they have

6    documents that are not privileged that they haven't

7    produced to us yet, even from that, as Your Honor will see

8    today, we have a lot of documents that give us very great

9    concerns about what has happened and what is happening

10   here.  And if there are more documents, right, that --

11           THE COURT:  So what do all these documents go to?

12           MR. SAUNDERS:  The documents that we'll take Your

13   Honor through today go to the, the very close relationships

14   throughout these cases - prepetition and postpetition -

15   between CrossHarbor, Discovery Land Company, and

16   Ms. Blixseth.

17           THE COURT:  Okay.  And so going through that

18   whole process, what does it accomplish in the end as it

19   relates to the goal of getting the maximization of assets?

20           MR. SAUNDERS:  Well, I think it creates, it

21   creates a record one way or the other.  It creates a record

22   one way or the other from which we can go forward to a

23   plan, right, that is going to be proposed by somebody who

24   Your Honor can either trust or decide needs to be replaced

25   and put somebody in who can be trusted, right, and a

1    process that can be trusted so that at the end of the day,

2    we'll have a plan that we can all rely on as having been

3    sponsored by people who were trustworthy and who were

4    complying with their fiduciary obligations to the estates

5    to the extent that they had them.

6            THE COURT:  But in the end, your goal is to get

7    $310 million or more, right?

8            MR. CHEHI:  Your Honor, our goal is to maximize

9    the recovery for our clients, make sure that the Chapter 11

10   process in which we're involved and which is the forum for

11   vindicating our clients' claims and interests has

12   integrity.  And the documents that we have discovered to

13   date and what are, I think, limited productions of what is

14   available during a relatively finite time period will

15   definitely be of interest to Your Honor and call into

16   question some of the representations that have been made,

17   some of the testimony that's been given in court; and will

18   put, I think, the issue of good faith of the plan that the

19   debtors are proposing, the good faith of CrossHarbor in

20   connection with anything it's done in this case so far into

21   question.  It will certainly put into question Discovery

22   Land Company's employment by the debtors and their

23   involvement with the -- with CrossHarbor during a period of

24   time that far exceeds anything that was disclosed by those

25   parties in connection with any testimony in this Court or

1    in the debtors' applications to employ.  There are very

2    serious issues here.

3          I think that -- I'd just ask the Court to take

4    note, as I'm sure you're aware of, the U.S. Trustee has

5    filed a motion for appointment of a Chapter 11 trustee.

6    That's not us filing it, Your Honor; that's somebody else

7    doing that unilaterally.  And that raises -- that should

8    raise significant concerns to this Court.

9          THE COURT:  Well, which goes to this comment:

10   We've got an examiner; we've got an unofficial creditors

11   committee; we have, what, Group B, I probably don't have

12   the name right, but we have some other members out there;

13   we have a motion for a trustee.  If, in fact, there are

14   issues that can be established along what you are alleging,

15   it seems like we've got about three or four avenues to

16   establish that.

17         And is it necessary at this time to continue with

18   all of this discovery?  Given the discovery that you

19   already have and the arguments you have, is it easier to go

20   forward and get it into a bidding situation?

21         MR. SAUNDERS:  Well, Your Honor, if that's Your

22   Honor's view, then the last suggestion that I would make is

23   that you withhold judgment on the motion for protective

24   order until you've heard the evidence on the other motions

25   today.

1          THE COURT:  I'm really torn here because I

2     understand the need to discover documents, but it seems

3     like we've got about three or four entities that are doing

4     that.  And is the ultimate goal of all of that to

5     reorganize this debtor or to throw this debtor into either

6     a conversion or a dismissal?

7          And where does that leave all of you?  It may

8     leave you, I guess, with state foreclosure laws all

9     fighting it over priorities and marshaling.  But I don't

10    know that that's of benefit to the entire case.

11         MR. CHEHI:  Your Honor, we're interested in

12    maximizing the value of our recovery which means maximizing

13    the value of these assets as going concerns.  There is no

14    one -- we are not sitting here today saying, "Oh, boy, we

15    hope that everything burns down."  That would be an

16    irrational position for the lenders to take.

17         But what the lenders are confronted with is a

18    plan of reorganization which is attempting to deny the

19    lenders their rights to vindicate their interests.  It's a

20    plan of reorganization that has been proposed -- as Your

21    Honor, I believe, concluded to some extent in the last

22    order of the bidding procedures, it's a program that is

23    serving insider interests.  And there are inherent

24    conflicts of interest.  We are very concerned about that.

25         Because everyone seems to think that we should

1    have a diminished recovery in the case and others in the

2    case should receive the benefits of the Chapter 11 case and

3    the benefits of our collateral and the benefits of the

4    value that's incorporated in these businesses.  We

5    disagree.

6              And CrossHarbor is not some innocent third party

7    standing on the sidelines watching; they're a prime mover

8    in this.  And, again, the documents will show that.  And

9    they are the ones that are sponsoring this plan, they are

10   the ones that are exercising control over Ms. Blixseth,

11   they are the ones that are exercising control over the

12   debtors through the debtor-in-possession financing terms,

13   they are the ones that have not committed to any definitive

14   agreement.  They are not bound by anything in this case,

15   Your Honor.  They're holding the cards of the DIP financing

16   order, and they can pull the plug at any time and take the

17   collateral, and they could be very disruptive.  We are the

18   only --

19             THE COURT:  Which was the position that Credit

20   Suisse was wanting to be in, right?

21             MR. CHEHI:  The position that we wanted to be in,

22   Your Honor, was to have an appropriate, an appropriate

23   Chapter 11 case in which our funding of the cases would be

24   based upon appropriate budgets for appropriate purposes

25   with an appropriate track towards confirming a meaningful

1    plan; not a plan that is a litigation plan against the

2    lenders.  Clearly, we wouldn't want that to happen.  But

3    that's where we are.

4              THE COURT:  Well --

5              MR. CHEHI:  No one else has taken discovery, Your

6    Honor.  When you say there are these other parties in

7    interest --

8              THE COURT:  Well, there are other parties that

9    have responsible or will have the responsibility for

10   investigation.  I mean we haven't defined the examiner's

11   role at this point, and that will be done subsequent once

12   we know where we're at with an examiner.  The U.S.

13   Trustee -- I mean if a trustee is appointed, certainly

14   there is some responsibility there to investigate and find

15   out what's going on.  The official creditors committee is

16   certainly doing some things.

17             And I guess, you know, the thing that kind of

18   bothers me in this whole process is we wouldn't even be

19   having some of these discussions if, in fact, November

20   would have turned out differently.  And I hate to keep

21   dwelling on that.  But for your failure to provide the

22   final DIP financing, we wouldn't even be here.

23             MR. PATTEN:  Your Honor, may I be heard?

24             THE COURT:  Mr. Patten.

25             MR. PATTEN:  Since November, since this Court

1    entered its interim DIP loan approval for the CrossHarbor

2    DIP loan, we've been engaged in -- Mr. Chehi characterized

3    it as a "litigation plan", and that's what we've been

4    doing.  We've been spending huge amounts of time fighting

5    on issues that really are extraneous at this point to

6    what's at issue.  And it seems to me that what's at issue

7    is whether the process that is proposed or is adopted by

8    this Court to expose this property to the market is fair,

9    is transparent, and will generate the maximum recovery.

10          If there's some past nefarious activities between

11   CrossHarbor and Discovery Land Company and the debtor

12   doesn't make any difference if, in fact, going forward we

13   have an appropriate process.  But, instead, we're

14   constantly diverted from the real issues.

15          THE COURT:  Well, but Mr. Patten, Credit Suisse

16   is exactly saying that, that they feel that going forward

17   to get to the end of this, there is some alleged activity

18   that may prevent that.

19          MR. PATTEN:  But this Court will set the -- we're

20   asking the Court to set a bidding and solicitation

21   procedure order.  And if that order is fair and appropriate

22   - and I'm sure that, with all due respect for Credit

23   Suisse, they're going to oppose it no matter what it is

24   unless they get to write it, like they've wanted to direct

25   this case from the very beginning - if that order is fair

1    and appropriate, then it's fair and appropriate without

2    regard to whether there has been some past bad acts between

3    the debtor and CrossHarbor and Discovery Land Company.

4         But in the meantime, we're spending huge amounts

5    of resources, we're being diverted, and it's trying to take

6    our eye off the ball which ought to be to get this property

7    on the market, expose it, and sell it, which is what we

8    want to do.  And what I think is the critical issue for

9    this Court to address today is to get that process going

10   and not be diverted by, by all of these other issues that

11   CrossHarbor -- or, excuse me, that Credit Suisse keeps

12   raising that, I think, simply misdirect our attention.

13        THE COURT:  Mr. Chehi, I know you've probably

14   considered -- you've talked about it.  And I don't want

15   your conclusions at all; I'm just, I guess, raising a

16   question:  Does 1111(b) assist in maximizing the value

17   of -- well, assist in you receiving the amount that's owed

18   to Credit Suisse?

19        MR. CHEHI:  We have no idea, Your Honor, what

20   1111(b) is going to do for us in this case.  Our claims

21   have not been allowed; they've been disputed by the plan

22   and by the committee.  Our liens have been challenged.  And

23   the debtors seem reluctant to have a hearing on valuation

24   of our collateral notwithstanding the fact that there's

25   already been a valuation proceeding in this case.

1          We will exercise or not 1111(b) rights at the

2    appropriate time once there's been essential findings made

3    as to what that will mean.  Because when you're exercising

4    1111(b) rights, it has -- values are implicated, amount of

5    claim is implicated in terms of the treatment that you're

6    entitled to receive.

7          We think that the plan that they filed, and I

8    haven't read their new plan - assume it's not much

9    different - it provides unconfirmable treatment for us.  It

10   also would be unconfirmable if we elected 1111(b).  But

11   that's not the issue.  We don't want to be jumping ahead

12   here to what the ultimate outcome is, which should be a

13   consensual plan process, but there's been no

14   consensus-building by the debtors notwithstanding these

15   comments.

16         We seem to be being blamed because we have

17   objected to and litigated the issues of priming in this

18   case because we didn't show up with the money at the last

19   minute.  And we've given the reasons for that.  And Your

20   Honor can feel badly about that and everyone can feel badly

21   that we didn't materialize with the DIP funding in November

22   when everybody expected that we would, and we expected we

23   would.  But given, again, larger economic circumstances in

24   the real world, that was not possible.  We should not be

25   penalized because of that for the balance of this case.  We

1    should be allowed to vindicate our rights and not be

2    railroaded through a plan process which is an

3    insider-driven plan.

4           When one looks at the record of what has been

5    testified to in this court and then one looks at the

6    documents, you start to see some differences of view in

7    what really happened and what the parties - who have been

8    proposing this plan and sponsoring it and who have been

9    managing these companies prepetition and postpetition -

10    have really been up to.

11           THE COURT:  Okay.  Mr. Chehi, what could be done

12    to develop some consensus-building?

13           MR. CHEHI:  Your Honor, we have indicated to all

14    of the other parties that we're prepared to talk about a

15    consensual plan.  But the plan that's on the table seems to

16    be moving forward on a rapid path towards, again, putting

17    us in a position where our claims are challenged and

18    litigated.  And we won't know the outcome of that until

19    after the plan is confirmed.  We can't let that stand.

20           THE COURT:  Well, I guess I'm just asking:  What

21    could be done to develop the consensus?  What treatment are

22    you looking for that's going to improve the

23    consensus-building?

24           MR. CHEHI:  We'd like to have our claims valued.

25    We'd like to be able to credit bid on our collateral, all

1   of which is precluded by the plan.  We would like to be

2   able to propose a plan that's different than the insider

3   plan that's on the table which has been consuming enormous

4   resources.

5          It's not our fault that the plan was filed after

6   midnight last night.  They don't send us drafts of their

7   plans, they don't send us drafts of their proposals.  We

8   read about them in the newspaper and in the court pleadings

9   about the same time you get them.  That's the nature of the

10  debtors' efforts to negotiate with their largest creditors.

11  And we don't feel confident that anyone else in the case is

12  looking out for our interests, certainly not the unsecured

13  creditors committee.  They're joined at the hip to

14  the plan.

15         THE COURT:  Well, maybe there shouldn't be any --

16  maybe exclusivity should end and interested parties can

17  file their competing plans.

18         MR. CHEHI:  Your Honor, we were going to bring

19  that up today in due course and say that now is the time -

20  given that a Chapter 11 trustee motion has been filed,

21  given that Your Honor indicated that an extension of

22  exclusivity was inappropriate - we think it is, indeed,

23  time immediately to terminate the debtors' exclusive rights

24  so that other competing alternative plan structures can be

25  proposed.  And we're happy to propose those if we have the

```
 1    opportunity to do it.  And that's the right outcome in the

 2    case.

 3            But it's also the right thing for this Court not

 4    to believe -- or continue to believe that the reluctance of

 5    CrossHarbor or other parties to produce documents is the

 6    result of our scorched-earth litigation tactic.  We're not

 7    engaged in that, Your Honor.

 8            THE COURT:  I don't think we've heard that term

 9    yet in this proceeding, at least on the record.

10            MR. CHEHI:  I have heard that, and I've seen that

11    in pleadings.

12            THE COURT:  Okay.  Well, I guess I'm just

13    wondering:  If, in fact, there's no exclusivity and

14    interested parties have the right to file a plan, that

15    resolves some of the issue over the need for your

16    production of documents, doesn't it?  Because then you can

17    propose something that would --

18            MR. CHEHI:  The good faith of the debtors' plan,

19    Your Honor, which proposes to transfer a control of

20    Yellowstone Club to CrossHarbor and to Discovery Land

21    Company is very germane to the merits of that plan and

22    whether it's confirmable.

23            THE COURT:  Well, but if you've got a competing

24    plan --

25            MR. CHEHI:  If we don't have a competing plan or
```

1    if we do have a competing plan, the merits of their plan

2    require satisfaction of those -- that confirmation

3    requirement and others.  And we have the right, and we

4    should have the right --

5         THE COURT:  Well, but at that point in time,

6    we're at a plan hearing which provides some additional time

7    for the production of remaining non-privileged documents

8    that could go to testimony at that point in time.

9         MR. CHEHI:  Your Honor, I would encourage you to

10   do two things today.

11        Number 1 is:  Let's have a valuation hearing on

12   our collateral.  We're prepared to go forward on that.

13        And then No. 2, and maybe immediately:

14   Mr. Saunders can put on witnesses and can walk through a

15   sampling of the documents that were received from the

16   parties on Friday.

17        And it only took the Skadden-Arps team of, I

18   don't know, four or five lawyers, associates, to go through

19   these documents, all of them.  And I don't know what the

20   aggregate number is, but it's --

21        UNIDENTIFIED SPEAKER:  About 13,000.

22        MR. CHEHI:  About 13,000 pages of documents.  It

23   took them, in essence, less than a day.  And so all the

24   talk about how burdensome all the production of documents

25   is, no matter what the numbers are that they're reciting,

1   it's not that big a task, Your Honor.  People are holding

2   back because even what they've given us doesn't look good;

3   and if they have to give us everything that they have, it's

4   going to look very bad.

5            And we'd like to put on those documents now and

6   then let Your Honor decide what's the right approach to the

7   discovery issues and to some of these other matters and

8   what the real equities are in the case.  We're not making

9   it up.  These documents are going to speak for themselves.

10            THE COURT:  Okay.  Thank you, Mr. Chehi.

11            Mr. Patten.

12            MR. PATTEN:  Your Honor, without getting into

13  particular details, arguing with Mr. Chehi, there's

14  certainly two sides to the story about how everyone is

15  getting along.  And on behalf of the debtors, we have tried

16  our level best to work out consensual arrangements with

17  Credit Suisse, and we have been unsuccessful.

18            With regard to credit bids and 1111(b), Credit

19  Suisse can make an 1111(b) election right now.  And if they

20  did, it would set very clearly the path that this case

21  would have to go down.  But they're looking for reasons not

22  to make an 1111(b) election in order to keep everything up

23  in the air for as long as they can, which again, simply

24  diverts us and misdirects us from getting the job done that

25  we're here to do which is to expose this property to the

1    market, see what the market says that it's worth, and sell

2    it at that.  And that's the procedures that we want the

3    Court to order and to allow to be done, is to accomplish

4    that very purpose.

5              THE COURT:  Mr. Warner.

6              MR. WARNER:  Thank you, Your Honor.  Your Honor,

7    I represent Highland Capital Management.  We're one of the

8    lenders in the group represented by Credit Suisse.  We have

9    some $40 million of debt in this project, so I'm a real

10   player in this.

11             And I agree with the debtors' counsel.  The

12   debtors' counsel said we want to expose the property to a,

13   quote, fair and transparent process.  I don't think there's

14   a soul in this room that disagrees with that as an

15   objective.  Credit Suisse, Highland, the debtor, we all

16   agree.  The problem is:  You're being asked today in a

17   motion that's pending to approve bid procedures that will

18   have as fundamental element placing CrossHarbor as a

19   stalking horse.

20             Now, there's one provision alone that should

21   stand out that should say why this discovery is important

22   as a prerequisite to even considering that motion, and that

23   is:  If CrossHarbor is somehow tainted either prepetition

24   or postpetition, you are anointing them as stalking horse

25   and you are granting them a break-up fee of $2 million plus

1   1 million in expenses, capped at 1 million in expenses.

2            Today, you're giving them that approval if you

3   approve this bid procedure.  And by doing so, you're

4   absolutely finding that at least for this stage of the

5   game, CrossHarbor is in good faith.  We don't know that.

6   We don't have the discovery.  And as the Court pointed out,

7   you don't know what you don't have -- or you don't know

8   what you don't know.  And as a result, unless we get this

9   information, this Court should not be considering approving

10  a bid procedure that anoints someone a stalking horse.

11           We're putting them in the spot of controlling

12  things, of setting rules, of getting money if someone

13  overbids them.  Now, whether that happens or not is

14  irrelevant.  We're giving them that blessing, and that's a

15  good-faith finding at this moment.  That shouldn't happen

16  until we have vetted.  And if you hear some of the basic

17  testimony from Credit Suisse, just a sampling of it, you'll

18  see why this is premature and that the discovery should go

19  forward.

20           THE COURT:  Thank you, Mr. Warner.

21           MR. WARNER:  Thank you, sir.

22           MR. ZAFFRANN:  Your Honor, I just wanted to

23  address a couple of the points that were made by

24  Mr. Saunders.

25           And I think, you know, from CrossHarbor's

1    perspective, Your Honor hit it right on the head.  When

2    there's a trustee that's going to be appointed, when

3    there's an examiner already appointed, they'll be charged,

4    one or both of them will be charged with investigatory

5    duties.  And CrossHarbor would feel perfectly comfortable

6    with them investigating, determining, you know, whether

7    there's any question of good faith here or not; but not

8    simply relying on the fact that Credit Suisse alleges that

9    there's not good faith.

10           It's an enormous process.  It's enormously

11   expensive.  And the description Mr. Saunders gave of the

12   scope of what they're leaking for is extraordinarily vague.

13   And, you know, we could spend $1 million doing this, and

14   then he would ask for $1 million more worth of discovery.

15   It can never end, given the scope and the vague allegations

16   that they've put forward.

17           CrossHarbor would be happy if this could be done

18   in a short period of time to let them investigate and

19   search these e-mails to their heart's content.  They're not

20   going to find what they're looking for.  But to suggest

21   that they should spend -- you know, I should spend the next

22   two months of my life working 10 hours a day searching

23   through these e-mails I think is an awfully big burden to

24   impose on somebody.

25           THE COURT:  Well, but for you just to have made

1    that statement would suggest to me you've reviewed all

2    those in order for you to say they won't find anything.

3              MR. ZAFFRANN:  I have not reviewed them all.  I'm

4    familiar with what my client tells me, I'm familiar with

5    the general situation.  We have no concerns about producing

6    the documents.

7              And when Mr. Saunders suggests that there was

8    some sort of tactical strategy not to start producing

9    electronic documents, it ignores the reality of an

10   electronic document production.  When they initially asked

11   for documents, they were asking for documents for a whole

12   other additional year.  We ultimately recently got them

13   down to January 1, 2008, through February 18, 2009.  But

14   they were asking for January 1, 2007, which, given the

15   scope of the production we've had, one assumes that's

16   another 60,000 e-mails.  If we had immediately just waived

17   all objections and started doing electronic searches on

18   that, we would have spent two months and $1 million looking

19   through those e-mails which they're not even looking for

20   anymore.

21             THE COURT:  Well, given what you're saying, I

22   mean there's a tremendous amount of e-mail traffic.

23             MR. ZAFFRANN:  There's a huge amount.  The period

24   that we're looking at is in the midst of an incredibly

25   active bankruptcy case.  There is people that live on their

1    BlackBerrys, probably everybody in this room.  It's

2    astounding how many e-mails in a given day are harvested.

3              THE COURT:  But all of that was occurring prior

4    to the bankruptcy and prior to CrossHarbor even knowing if

5    they would be or would not be a DIP lender.

6              MR. ZAFFRANN:  The e-mail traffic could --

7              THE COURT:  So we're going back, basically,

8    during the sale negotiations period, as well, with

9    Mr. Blixseth?

10             MR. ZAFFRANN:  The search right now has been

11   through January 1, 2008, so it goes back to that time

12   period.  And I mean the e-mail is not exclusive to the

13   bankruptcy case.  You know, in this day and age, people are

14   on their BlackBerrys pretty much 24/7.  So there's a huge

15   volume of e-mails to look through.

16             THE COURT:  Maybe it says something about the use

17   of BlackBerrys.

18             MR. ZAFFRANN:  I think it probably does, Your

19   Honor.

20             The final point I wanted to make was that the

21   discovery that they've requested is also -- there's been

22   permutations over time.  So if we had originally started to

23   respond to their original 13 requests for discovery, done

24   all that, searched through every document over the course

25   of three or four months, they then added 4 or 5 or 6 more

1  requests.

2  Now, that doesn't -- in an electronic production,

3  you can't just, "Oh, well, we've already searched through

4  these papers; now we just have this small stack to look for

5  this."  No, you have to go back through the entire

6  production one more time to look for these additional

7  categories that they're looking for.  I mean every

8  additional request requires that you look through 60,000

9  e-mails.

10  THE COURT:  You do have production of what you

11  consider non-privileged at this point that are available?

12  MR. ZAFFRANN:  We have produced to them, I

13  believe, in excess of 6,000 pages of electronic and another

14  close to 1,000 pages of paper that are both relevant and

15  non-privileged.

16  THE COURT:  Okay.  But there's still some other

17  non-privileged that you're aware of in your search that

18  have not been provided?

19  MR. ZAFFRANN:  I'm not specifically aware of, you

20  know, particular pockets of e-mails.  I don't doubt that

21  there are such pockets in the 35,000 that have -- were

22  caught by the search for privilege.  Because it was, by its

23  nature, a broad search to try to make sure that nothing

24  privileged got produced.

25  You know, and if there is a way to narrow that by

1    doing specific search terms - if they want all e-mails with

2    Ron Greenspan in there, for instance - we can do a search

3    and dramatically reduce the scope of e-mails we would have

4    to do.  But there has to be very specific parameters that

5    would allow us to do a search in the "to" field or the

6    "from" field to pull out those e-mails.  So if Your Honor

7    is considering continuing the discovery, that, I think,

8    would be a proposal that would make a whole not more sense

9    than having us go through 35,000 e-mails and then do a

10   privilege log, you know, for the tens of thousands that are

11   not -- or that are privileged.

12          MR. CHEHI:  Apparently, Your Honor, what they

13   have done is they've said that, "If there's any

14   e-mail/electronic data out there that has an attorney's

15   name on it, then we're just going to throw that in the

16   bucket of 'potentially privileged'."

17          But the issue is that they have had many

18   communications with parties who are not represented by

19   CrossHarbor's counsel which they may have copied

20   CrossHarbor's counsel on, but those are not privileged

21   communications.  And that's the universe of the balance

22   between 60,000 and what we've seen is their broad net so

23   nothing privileged could possibly be produced.  They get an

24   opportunity to look at every document before they produce

25   it.

1            We're talking about having them actually produce

2    documents that are non-privileged notwithstanding the fact

3    that they shared those non-privileged communications with

4    their own attorneys.  Just putting a lawyer's name on a

5    document doesn't make it privileged, but that, apparently,

6    is the search that they -- or the basket that they've

7    created.  And that's our fundamental problem.

8            But again, Your Honor, I recommend:  Let's take

9    some time here to start walking through some of the

10   documents that came out of their own selective production.

11   And that, I think, will let the Court know that there's

12   need to investigate further.

13           THE COURT:  Well, before I get to that,

14   Mr. Patten -- and I'm trying to get my arms around this

15   because I'm troubled about where it's at, seriously

16   troubled about where this whole process is at.  So I'm

17   trying to get a broader perspective.

18           Has there been any contemplation of using a

19   different stalking horse?

20           MR. PATTEN:  If Your Honor will recall, on

21   November 24th to 25th, whenever that was, we were operating

22   under a Credit Suisse term sheet, and it had certain terms

23   and conditions.  Credit Suisse was unable to fund the

24   continuing DIP loan.

25           THE COURT:  Right.

1          MR. PATTEN:  And CrossHarbor took - and

2    CrossHarbor people can speak to this - but CrossHarbor took

3    the Credit Suisse term sheet and plugged its name in in

4    place of Credit Suisse.

5          THE COURT:  Right.

6          MR. PATTEN:  One of the conditions that was a

7    Credit Suisse condition and it carried through to a

8    CrossHarbor condition was that the lender had to consent

9    and approve the proposed plan; if not, then we're in breach

10   of the DIP loan.  So right away, we were constrained.  We

11   would have been constrained with Mr. Chehi telling us what

12   the plan was or CrossHarbor's attorneys telling us what the

13   plans were.  So with that in mind, CrossHarbor had to

14   consent to the plan, and this is the plan that they

15   consented to.

16         We also had the same time periods that carried

17   over from the Credit Suisse term sheet to the CrossHarbor

18   term sheet.  Now, CrossHarbor has agreed to extend the

19   deadline to confirm the plan by 30 days.  So they've been

20   generous, if you will, in that regard and extended the time

21   period.  But, otherwise, we have been constrained by a

22   series of parameters that were originally dictated by

23   Credit Suisse and then adopted by CrossHarbor as part of

24   the DIP financing.

25         MR. CHEHI:  Your Honor, I'm going to just recall

1     for the Court Mr. Greenspan's testimony, I believe it was

2     at the last hearing, where he was confronted with the fact

3     that, actually, the DIP financing term sheet - and terms

4     Your Honor approved, the CrossHarbor financing - provided

5     that it would be a default under the debtor-in-possession

6     financing facility if a plan acceptable to CrossHarbor were

7     not filed before February 13th unless the Court entered an

8     order before February 13th terminating the debtors'

9     exclusive periods.  That was, I believe, at a February 10th

10    hearing or thereabouts.

11            What he just said to you is not true.  It may be

12    what their view is of it, but that document did not

13    require, the DIP financing did not require that the plan

14    that the debtors proposed would be acceptable to

15    CrossHarbor.  All it required was that either they do file

16    a plan acceptable to CrossHarbor or, alternatively, the

17    Court would enter an order terminating exclusivity.  They

18    chose -- notwithstanding the disclosure to Mr. Greenspan

19    where he, apparently, on the stand didn't quite understand

20    that term of the DIP financing, they moved ahead,

21    nevertheless, over the weekend of February the 13th to file

22    a plan and not seek an extension -- a termination of

23    exclusivity which would have allowed them to preserve their

24    DIP financing, allowed them to have more negotiating

25    leverage with CrossHarbor.  They took the position they

1    couldn't do it.  That's not what the documents say.  And

2    they turned it back on us as if it was our fault because

3    those were the terms in the initial term sheet that was

4    being proposed.

5          But what they've done is they've relied upon

6    their view of it.  And they've not only filed a plan that's

7    acceptable to CrossHarbor, it's a plan that gives

8    CrossHarbor the business, gives them control of it.  And

9    that is -- and as a stalking horse nonetheless.  That is

10   far above and beyond filing a plan acceptable to

11   CrossHarbor, and it certainly was not a plan that needed to

12   be filed by February 13th.

13          MR. PATTEN:  Your Honor, I'll be brief.

14          But if the exclusivity period ends, then there's

15   going to be chaos.  We can't sell the property with

16   multiple competing plans out there.  It's going to be utter

17   chaos.  And I think Mr. Chehi realizes that it will be

18   utter chaos.  This whole case is becoming utter chaos, and

19   it's time to take -- to focus and get to the end of the

20   game here.  And these various alternatives suggested don't

21   get the job done; they just create continuing fights,

22   disputes, and chaos among all of the parties.  And, again,

23   it's just nothing but misdirection and taking our eye off

24   the ball.

25          THE COURT:  Mr. Beckett.

1              MR. BECKETT:  Thank you, Your Honor.  And I

2      apologize to Mr. Chehi.

3              I have to fight to get out of the corner.  I

4      didn't mean to stand up while you were talking and stand

5      there.

6              MR. CHEHI:  No offense taken.

7              MR. BECKETT:  Thank you.  There's a lot up in the

8      air, Your Honor, and I wanted to give you my perspective

9      and the committee's perspective, if that would be helpful

10     to the Court.

11             THE COURT:  Certainly.

12             MR. BECKETT:  And I also wanted to be up here in

13     case you had any particular questions that I can address.

14             I would begin comment with an observation with

15     respect to selling assets in bankruptcy.  I'm not the

16     expert on the point, but it seems to me that if you have an

17     asset that's a fairly simple estate asset - a lot, a

18     vehicle - you can either put it up for auction or you can

19     find someone who wants to buy it and do a simple contract

20     and notice it out and see if somebody else wants to bid.

21     As the complexity of the asset being sold by the debtor

22     increases, that protocol will fall apart.

23             And it is because you -- as you get to a more

24     complicated asset, you do need a stalking horse, because

25     you do need somebody who has a break-up fee so that they

1    have some protection for doing the due diligence and

2    writing the agreement under which they'll purchase the

3    asset.  That agreement reflects an awful lot of work on the

4    part of the debtor and the acquiror so that it shows other

5    people how it can be done.  And the stalking horse is not

6    going to be willing to do that unless the stalking horse

7    has the benefit of a break-up fee and can do that.

8                 As the complexity of the asset increases further

9    -- and I think here, Your Honor, this is probably one of

10   the more complicated assets that has been sold recently in

11   a bankruptcy.  As the complexity of the asset increases

12   further, not only do you have to have a stalking horse, but

13   you most probably have to have a stalking horse who is an

14   insider.  And I don't know if CrossHarbor is an insider

15   under the code.  They certainly know more about this asset

16   than anyone else -- perhaps not more than the debtor.  I

17   think Credit Suisse knows an enormous amount and

18   Mr. Blixseth knows an enormous amount.  There are a lot of

19   people who know an enormous amount, and they would probably

20   all be insiders.  And so it's not inappropriate at all, in

21   my view, to have a stalking horse for an asset this

22   complicated who is an insider.

23                 The committee's concern with the bidding

24   procedures at the last hearing was not that it gave an

25   advantage to CrossHarbor as an insider.  The committee's

1    concern was that it was being considered in a vacuum

2    without the ability to consider what the debtor -- the

3    complexities of what the debtor proposed in terms of its

4    plan.  And since then, the debtor has proposed a plan and

5    an awful lot of people have worked really hard to

6    understand the plan and to integrate the bidding procedures

7    with the plan.

8            And then in, in my view, I believe, and the

9    committee's view, then, the question is:  Can the bidding

10   procedures be made transparent and made to work so that

11   there can be bidding and so that there can be confirmation?

12           If this were a disclosure statement hearing

13   today, Your Honor, I would expect a fair amount of

14   conversation about the adequacy of information and I would

15   expect an enormous amount of conversation about "this is

16   not a confirmable plan".  Your Honor, this is a confirmable

17   plan.  This plan can be confirmed.  And I will state it as

18   simply as I can.

19           If at the confirmation hearing Your Honor hears

20   that there is bidding - Mr. Blixseth wants to bid, Credit

21   Suisse should be by then in a position to bid, CrossHarbor

22   wants to bid, there are rumors of other people who want to

23   bid, there is a broker who's pitching it who can find other

24   people who want to bid - if there is bidding and three or

25   four people bid up until they all drop out but one, then

1    the market will have cleared and that will be a confirmable

2    plan.

3            It will also provide the opportunity -- because

4    consensus occurs when a case is on a trajectory.  Consensus

5    doesn't occur when the case is upended, and consensus

6    doesn't occur when the deadline is tomorrow.  But what's

7    proposed by this plan and this disclosure is:  Get to the

8    end of April - that's plenty of time for consensus to

9    appear - and have bidding.

10           I don't want to be quoted, but I think it's very

11    likely -- if at the confirmation hearing we all stand up

12    and say, "Well, CrossHarbor showed up and bid, and nobody

13    else did, and they're all complaining because they weren't

14    allowed to," then that will not be a confirmable plan.  But

15    this plan can be confirmed.  And the secret is the sale and

16    bidding procedures.  That's the core of it:  Does it allow

17    other people to come in?

18           And I'm sure you're going to hear, when the time

19    is right, Credit Suisse or Mr. Blixseth or whoever else

20    will say, "We're not going to bid under these protocols.

21    We want to control our own process."  Of course they do.

22    And they will bid under these protocols if they're the only

23    ones that are available.  And the debtor within the

24    exclusivity period did what it was supposed to do, which is

25    negotiate with everyone possible and file a plan which the

1    DIP requires be acceptable to CrossHarbor.  That's what we

2    have.

3            And I believe, and I believe the committee

4    believes, that we have got to give that a shot, and we've

5    got to put that out for creditors to decide, and we've got

6    to get to a confirmation hearing where I expect a whole

7    bunch of people will have bid and there will be a plan that

8    can be confirmed.

9            But if the sale and bidding procedures are the

10   core, then the examiner is probably the answer.  And the

11   examiner can participate, and Your Honor can decide how

12   much he participates or she participates.  At some point in

13   the negotiation of the sale and bidding procedures, Credit

14   Suisse proposed that the examiner supplant the debtor and

15   the committees in deciding who is a qualifying bidder and

16   deciding which was the superior bid.  And that's not

17   appropriate.  I mean this is not the time to bring in

18   somebody brand-new to make that decision.

19           I suggested last time, Your Honor, that I -- and

20   maybe I should be sworn.  Being in Los Angeles on Thursday,

21   working with these guys closely for the last two weeks, I

22   believe that Edra Blixseth is an enormous repository of

23   historical information and she understands how the club is

24   being operated today.  I believe, Your Honor, that the

25   business decisions with respect to the bidding procedures

1    and the effectuation of a Chapter 11 plan is Mr. Greenspan.

2    And Mr. Greenspan is doing that as a fiduciary, as he

3    should, and he has not under the control of CrossHarbor.

4    The examiner should not supplant the debtor, should not

5    supplant the committees, but the examiner can be there in

6    the capacity Your Honor chooses to participate in the sales

7    and marketing process and to participate in the choosing of

8    the best bid, the qualifying bidders and the best bid.

9          And I'm very hopeful that leads to bidding, that

10   clears the market, that resolves the objections.  It

11   doesn't matter if CrossHarbor has whatever relationships it

12   has had with the debtor.  Everyone knows it has.  The

13   question is:  Does that keep other people from bidding?

14   And if it doesn't, it works, and the plan can be confirmed.

15         THE COURT:  Mr. Beckett, there was comment made

16   by Mr. Chehi that, in fact, they would be - and I may be

17   misstating this; I hope I am - that they would be precluded

18   from credit bidding at the time of sale.  Is that your

19   understanding, as well?

20         MR. BECKETT:  Well, that puts me on the spot

21   because I don't think that's a condition of the plan.  I

22   think that's an allegation and relief sought by the

23   committee's complaint against Credit Suisse.  The

24   committee's complaint says this is a loan program.

25   Promontory; Tamarack is closing today, that's another one -

1   (inaudible) - Yellowstone.  There are many of these, and

2   they have, in the committee's allegation, caused great

3   damage to creditors.  And that puts the Credit Suisse lien

4   in dispute.  When your lien is in bona fide dispute, I

5   honestly don't know how a credit -- how a secured creditor

6   credit bids.

7        But I do know this -- and let's just keep this

8   between us; I don't want Credit Suisse to hear this --

9        THE COURT:  And they're all ears.

10       MR. BECKETT:  I think it's on the record.  I

11  think one of the first things I said in this case was that

12  you want a horse race.  And you need a couple of things:

13  You need a track, we have a track; you need a couple of

14  horses, and you need more than one.

15       We have CrossHarbor and we have Mr. Blixseth,

16  that's two horses.  The committee would very much like to

17  see a third horse.  Credit Suisse knows this asset as well

18  as anybody.  Credit Suisse would make a great horse, and it

19  would help the horse race.

20       THE COURT:  So what you're saying is we need to

21  resolve all of the adversaries before April?

22       MR. BECKETT:  We know that, and we've agreed to a

23  scheduling order that will accomplish that.

24       THE COURT:  Okay.

25       MR. BECKETT:  And when we get to that at the end

1    of these, I will ask the Court for help.  I think ADR has a

2    very important role because I want Credit Suisse to bid

3    because I like three horses better than two, I like four

4    horses better than three.  But we have to talk first,

5    because there are issues with the Credit Suisse lien.  And

6    we can get there.

7              THE COURT:  Arguably.

8              MR. BECKETT:  Oh, Your Honor, I have issues with

9    the Credit Suisse.  You do not yet, no.  I apologize.

10   That's right.

11             Now, the question has been raised with respect to

12   the termination of exclusivity.  And that's a tough call.

13   And I think the committees would naturally say, "You know,

14   we like the horse race, and competing plans are a good way

15   to have a horse race."

16             The problem is time.  And time is not on our

17   side.  Time is not our friend.  The DIP runs out at the end

18   of April.  I heard this morning that CrossHarbor will

19   extend it to May.  We have to have a conversation with

20   Credit Suisse about that.  Because this plan is on a

21   trajectory to be confirmed by the end of April.  If

22   exclusivity is opened up, we've got a bunch of different

23   plans and not one of them gets confirmed before the end of

24   April.  And that means another DIP fight, and that means

25   staking out positions and fighting each other, and the burn

1    rate in this case is ungodly.  The committee would prefer

2    to avoid that.  It's expensive.

3           In June, Your Honor, that's the time when the

4    budget goes up preparing for the golf season.  That's the

5    time when a lot of men and women go up there and bang nails

6    and work.  There's a lot of labor in the vicinity that

7    depends on some certainty by June that they can get their

8    jobs back and go back to work up there.  I'm afraid that

9    the competing-plan idea pushes this into the summer and

10   into the fall.  I believe that the current trajectory with

11   the debtors' plan can get us out early.  I believe it keeps

12   the pressure up, which improves the opportunity to find a

13   consensual plan that Mr. Chehi wants, that I want, that

14   Mr. Patten wants, that everybody wants.  And the

15   committee's view is, for those reasons:  Stay the course.

16          I'd be happy to address any other issues or

17   answer your questions.

18          THE COURT:  Thank you, Mr. Beckett.

19          MR. BECKETT:  Thank you, sir.

20          THE COURT:  Mr. Alter.  I realize this is a

21   little broader than just the motion on protection, but as I

22   said, I'm trying to get a global picture of this thing

23   because many of these things are impacted by my global

24   impression of where things are at.

25          MR. ALTER:  Thank you, Your Honor, and thank you

1    for this opportunity to address the Court.  I will try to

2    be brief.  And I second virtually, I think, everything if

3    not everything that was said by the creditors committee.

4         Your Honor, the member group supports the

5    immediate commencement of the sales process in accordance

6    with the sales procedures order.  And it's the member

7    group's position that it's critical to understand the

8    impact that any delay to an aggressive sales process has to

9    parties in interest and, as Credit Suisse likes to say, to

10   legitimate creditors.

11        Your Honor, it's our position that even a few

12   months of a slowdown of the sales effort would be

13   devastating for the local community which is so dependent

14   upon the Yellowstone Club for construction, for services,

15   for furnishing, for management, and a host of various

16   service jobs.  Missing or reducing the summer season would

17   undoubtedly destroy most of the construction work for this

18   season.  That was touched upon by Mr. Beckett, and we very

19   much second his sentiment.  This would impact, in our

20   opinion, hundreds, if not more, of construction workers and

21   material suppliers, plus the architects, designers, and

22   landscapers that work in the summer season for the

23   Yellowstone Club.  In this economy, Your Honor, the

24   businesses are already struggling.  That result would be,

25   frankly, catastrophic.

1            From what we hear, the employees are all anxious

2    at the club and concerned as to whether they will have jobs

3    this summer let alone this fall.  Without work from the

4    Yellowstone Club, these families are faced with a very

5    difficult situation as there is not an abundance of jobs

6    elsewhere in the community.  So they all watch these cases,

7    and they wait.

8            Your Honor, Tim Foote, a Yellowstone Club

9    employee who grew up in Bozeman is in the courtroom today.

10   He's in the back and the left.

11           Tim, if you could just wave to the Court.

12           Tim was a ski and fishing guide when the land

13   that the Yellowstone Club sits on was first being

14   considered for development.  He was first involved with a

15   local construction company involved with the, with the

16   club, as well.  For the last six years, Your Honor, Tim has

17   been a Yellowstone Club salesman.  He knows the community,

18   he's worked on the area, and he understands the impact on

19   the area.  And, of course, his biggest frustration has been

20   with any sales prospects for the club that will not even

21   consider purchasing a lot at the Yellowstone Club in the

22   midst of these proceedings which are generally viewed as

23   especially contentious.

24           New members provide Mr. Foote with a commission,

25   of course, but a land purchase also provides funds for the

1    Yellowstone Club, it also provides membership deposits for

2    the Yellowstone Club.  Eventual construction projects

3    employ dozens of local workers.  The cash flow that it

4    generates impacts the community in countless other ways.

5            The value of the Yellowstone Club Your Honor, is

6    declining.  There is no doubt that it is declining as this

7    bankruptcy continues to proceed.  We have negative press,

8    we have a lack of any degree of sales, we have the members

9    expressing concern and great frustration as to the

10   contentiousness and the length of these proceedings, we

11   have a loss of key employees, we have a deterioration of

12   community support, and we have large incurrence of

13   bankruptcy fees plus the lost time value of money.

14           Your Honor, we need to move these cases forward

15   consensually, if possible; but consensually is not

16   happening at this point in time.  The level of

17   contentiousness is virtually unprecedented, and for that,

18   the members, the employees, the local community in Big Sky

19   are all concerned.  Your Honor, it's time to proceed with a

20   sales procedure and for the sales bidding procedure order

21   to enter to preserve value and to protect the creditors and

22   to protect the local community.

23           And that's the position of the members.  Thank

24   you, Judge.

25           THE COURT:  Thank you, Mr. Alter.

1           MR. GEARIN:  Your Honor, if I could be heard.

2           THE COURT:  Certainly.

3           MR. GEARIN:  Michael Gearin, Your Honor, of K&L

4    Gates for Mr. Blixseth.

5           THE COURT:  Okay.

6           MR. GEARIN:  Mr. Blixseth, as you know, has

7    expressed an interest on a number of occasions in

8    participating in these proceedings both either as a plan

9    proponent or as a bidder for the assets.  Mr. Blixseth, as

10   the founder of the club, still has a very continued

11   interest in the affairs of the club, has concerns about the

12   way the trade creditors have been treated, and has

13   consistently expressed an interest in trying to protect

14   those people and get them paid.  So the comments I've heard

15   about construction people, I can tell you Mr. Blixseth is

16   very interested in finding ways to satisfy those creditors'

17   concerns and to get them paid.

18           We have reached out in the last couple of weeks

19   to all of the major constituents in the case.  We've spoken

20   with the debtors' representatives, we had conversations

21   with Credit Suisse bank.  We've tried to open up some

22   conversations with them and invited them to attend some

23   meetings so we can try to reach consensus with them at what

24   a potential plan might look like that Mr. Blixseth would

25   propose.  We've spoken with representatives of the

1    unsecured creditors committee, we've spoken with

2    representatives of the Class B shareholders.

3         We believe there is an option, a possibility of

4    reaching a consensual plan with all of those parties which

5    might be sponsored by Mr. Blixseth.  It will take some time

6    to get there - there's no question about that - but I will

7    tell you that the plan that's being proposed presently

8    creates some serious advantages for CrossHarbor.  There

9    are, buried in the plan and in the plan solicitation

10   materials, provisions that, for example, assume all of

11   CrossHarbor's membership agreements.  Those membership

12   agreements contain deferred deposit agreements.  They total

13   about $25 million.  If those agreements are assumed,

14   there's a $25 million advantage built into the plan for

15   CrossHarbor, based upon that assumption.

16        In addition, the plan solicitation procedures

17   propose that CrossHarbor will be allowed to contribute some

18   of its property to the debtors' enterprise, 31 golf course

19   lots; and any competing creditor has to come in and provide

20   either $15 million in cash or $25 million of additional

21   property in order to compete with CrossHarbor's bid.

22        There's a $3.5 million overbid protection.  The

23   initial overbid is $3.5 million, and there's

24   $2 million-plus -- let's call it at this point at least a

25   $3 million break-up fee.

1            So if you total all that up, it's around $55

2    million or $56 million of advantage that CrossHarbor

3    achieves by having the plan confirmed and then having the

4    auction take place later.  That may be a death blow to any

5    competing offer, to any other party's ability to

6    participate in the proceedings meaningfully.

7            So I do think that terminating exclusivity would

8    be important and the Court should consider that very

9    carefully in determining whether there could be any

10   competing bids that will be viable going forward other than

11   a fight with Credit Suisse about whether it gets the credit

12   bid during the procedures.

13           And if you do confirm this CrossHarbor plan, Your

14   Honor, I will point out that this is a future litigation

15   plan.  This is a plan that means fighting with Credit

16   Suisse, with the Blixseths, with Edra Blixseth's ownership

17   group for years.  If we're going to fight about it, it

18   seems to me we can resolve some of those things.  We will

19   have an opportunity to create meaningful consensus if

20   you terminate exclusivity, and I would encourage you to do

21   that.

22           THE COURT:  Thank you.  Mr. Patten.

23           MR. PATTEN:  Your Honor, the Paragraph 5(m) of

24   the proposed order deals with a credit bid for -- from

25   Credit Suisse.  And what it does is it leaves that issue up

1    in the air.  It provides that:  If Credit Suisse is allowed

2    a credit bid or if it is not allowed a credit bid.

3              So the proposed order doesn't preclude a credit

4    bid but simply defers for decision by this Court whether

5    one is allowed or not.

6              In response to Mr. Gearin's comments, the first

7    proposed order that this Court rejected had language that

8    involved the contribution of golf course lots or, for

9    another bidder, some comparable property which would be as

10   additional collateral for the notes that will be springing

11   from this.  And it was our view that having additional

12   collateral would be advantageous for Credit Suisse.  In

13   view of everyone's complaints about having additional

14   collateral, that's been removed from the proposed order

15   that's before the Court right now.  So there's no required

16   contribution of any kind of additional property as part of

17   this.

18              THE COURT:  Okay, thank you.

19              MR. ALTER:  Your Honor, if I might, I just wanted

20   to add one thing for the record.

21              THE COURT:  Mr. Alter.

22              MR. ALTER:  It's a statement that's not a

23   statement, so let me explain it, Your Honor.  I just don't

24   want to be perceived as not having spoken to the potential

25   of Mr. Blixseth coming in and what the members' position is

1    with respect to Mr. Blixseth.

2          We will wait until Mr. Blixseth actually makes a

3    firm proposal before the members respond, though I will

4    state that the members definitely have significant concerns

5    regarding any such proposal.  And no one has reached out to

6    me as counsel for the member group at all from

7    Mr. Blixseth's camp.  But to the extent that there is a

8    position that's staked out by Mr. Blixseth to play a

9    continuing role, believe me, you will hear from the

10   members, Your Honor.  Thank you.

11         THE COURT:  Mr. Chehi.

12         MR. CHEHI:  I'm not sure whether -- are we

13   arguing the bidding procedures now that were supposed to be

14   adjourned until --

15         THE COURT:  No, no.

16         MR. CHEHI:  Okay, good.  Well, then I'm just

17   going to make one legal point, that:  Don't let anybody kid

18   you, Your Honor.  There's no opportunity for Credit Suisse

19   to credit bid under the bidding procedures in the proposed

20   plan because it involves not a sale of assets, not a sale

21   of our collateral, but a sale of equity of the reorganized

22   company.  Section 363 of the code does not give a secured

23   lender the right to credit bid on the equity of the

24   reorganized company.

25         So however they want to gussy up their bidding

1    procedures to make it seem like this is not been decided

2    and there's going to be an opportunity to credit bid,

3    there's not going to be credit bidding, and it's not going

4    to be permitted as a matter of law under these

5    configuration of bidding procedures which only allows one

6    transaction outcome, the transaction outcome of sale of

7    equity in the reorganized company with CrossHarbor as the

8    stalking-horse bidder.  And we'll go back to the merits of

9    that procedure when the time comes today.

10              But, again, I would like to move the Court back

11   to the matter that is pending, the discovery motion, and

12   let's put on some of our documents to give the Court a

13   flavor of what's in the record, the slim record that has

14   been provided, and see whether that raises any questions.

15   Maybe the Court will think it's all okay, but we don't

16   think so.

17              THE COURT:  Thank you, Mr. Chehi.

18              MR. PATTEN:  One comment, Your Honor, and I

19   promise I'll sit down.

20              The flip side of the credit bid in a 363 sale is

21   Credit Suisse's 1111(b) rights.  In an equity sale, they

22   have 1111(b) rights.  All they've got to do is exercise

23   them; accomplish the same thing.

24              THE COURT:  When we get to the professional --

25   and, actually, you raise a good point regarding the

```
 1    application for, I'm going to just say "Ellis" without
 2    looking at the full title.  Obviously, the application said
 3    one thing and the agreement says another thing as it
 4    relates to land, property, buildings versus equity
 5    interests.  I have a problem with that divergence because I
 6    was kind of headed down the -- thinking from the last
 7    hearing that it was more hard assets rather than an equity
 8    interest.
 9              Now, I realize the documents were there and I'm
10    sure there was some discussion about it, but for some
11    reason, I had in my mind hard assets.
12              MR. PATTEN:  You're referring to the CBRE, Your
13    Honor?
14              THE COURT:  Yes.
15              MR. PATTEN:  I'm sorry.  Well, if there's
16    confusion in the application, then it's my fault, and I'll
17    take responsibility for it.  But the intent --
18              THE COURT:  I know you would.
19              MR. PATTEN:  The intent all along, Your Honor,
20    has been to sell the equity, because we think that's the
21    only way that we can keep the memberships, which are a
22    vital component to this thing, married to the assets.
23              THE COURT:  Yes, I understand.
24              MR. PATTEN:  And we think that enhances the
25    value.
```

1              THE COURT:  I understand, I understand.

2              MR. CHEHI:  And, Your Honor, the last point I'm

3    going to make on it is that that procedure, that "we think"

4    business is properly subjected and must necessarily be

5    subjected to heightened scrutiny.  Because you're dealing

6    with insiders, insider transactions right and left.  And

7    what their business judgment is about the right way to go

8    doesn't insulate their view of what the right process

9    should be, what the right plan should be because it's an

10   insider-driven, an insider-benefitting plan.

11              And the reason that it's set up as an equity sale

12   process is because they don't want to give us their rights

13   to credit bid because they know that would be -- give us

14   too much power over the sale process.  It would not

15   allow -- it would allow us to credit bid the amount of our

16   claim.  Now, they can dispute our claim, etc., etc., but if

17   our claims are allowed and we have valid liens, we can

18   credit bid up to $310 million for those assets, and there's

19   no one sitting in this section of the courtroom that is

20   talking about putting up anywhere near $300 million.  And

21   they're looking to deny us the right to do that.  And that

22   is why it's structured the way it is.

23              THE COURT:  Well, I guess I would, just on that

24   factor alone, comment.  Anything that I view as intentional

25   to prevent some type of credit bid or bidding by Credit

1    Suisse is going to be highly scrutinized.  And so we can

2    take that up a little bit later with the bidding process.

3    But I'm quite concerned about any effort, if there is that

4    -- an intended effort to affect that ability.

5         So having said that, regarding the productive

6    order, I think you all know my position on these types of

7    matters.  I think there's a better way to handle matters

8    like this than to go tooth and nail as I've been seeing in

9    this whole process, starting with the emergency calls for

10   the last two weeks.  And I think that both sides, if there

11   are two sides; both sides, if there are not more than two

12   sides, should, given the professional firepower that's in

13   this room, get this type of thing worked out.  I just don't

14   understand the contentious nature over this.  It should be

15   dealt with.  You're professionals, and it should be handled

16   without this Court having to dictate what is and isn't

17   produced.  I think that, that's why you're professionals.

18   But sometimes that breaks down for whatever reasons, and it

19   doesn't get done.

20        Obviously, there's been production of a lot of

21   documents, a lot of pages.  Some have taken a long time to

22   review through it; others, apparently, have done it in a

23   day or two, at least as to what's been produced.

24   Obviously, it's very difficult for a party requesting it to

25   know what's out there if they don't get it.  And it seem as

1    little unnecessary to be producing 35,000 documents or

2    whatever the document number is, but if we're going to get

3    to transparency and that there's nothing out there that is

4    tainting this process, then we're going to need the

5    documents.

6         And I'll be quite honest, the cost of this thing

7    is abhorrent to me.  And, obviously, for those that are

8    going to want to get paid by the estate, I'm going to see

9    fee applications.  If there's duplication at all -- I mean

10   when I see three and five attorneys every hearing when

11   everyone is skilled in their own right, it bothers me.  We

12   have so many attorneys.  And is it just duplication?  Do we

13   need, do we need so many people?

14        Now, when you're producing 35,000 documents and

15   reviewing that many, obviously there's a lot of people that

16   are involved in trying to sort through all of that.

17        But even given what I view as certainly a burden

18   and a cost, so that we resolve these issues and we get on

19   with the matters at hand, which is a bidding and

20   solicitation process and a confirmation of a plan that

21   works and that maximizes the assets - which I think should

22   be, if it isn't, everyone's goal - I'm going to direct by

23   order that all documents be produced that have been

24   requested.

25        Certainly, the non-privileged documents -- and I

1    guess looking at, from the standpoint of the documents, the

2    grouping of documents, if there's just an attorney's name

3    in it that was copied and that has thrown it into a

4    privileged pool, then I think it needs to be looked at -

5    because it may not be privileged - and pulled out.  I want

6    that log prepared, and I want these discovery disputes to

7    end.  I want to get on with the real substance of this

8    matter.

9            And I realize you're all saying, "Well, we need

10   it because it will show that there's some bad thing going

11   on."  It may or it may not.  And I know Mr. Chehi feels

12   strongly that it will show some things that would impact

13   confirmation of this process.

14           So I'm going to direct that they be produced

15   subject to any agreement between the parties as to how --

16   you know, how do I want to say this -- I'm going to order

17   they be produced unless the parties agree otherwise as to

18   selected documents and selected generation of documents.

19   And if there can't be resolution, produce them all.

20           Now, I'm not leaving that in there so that one

21   party can just say, "Oh, I'm not doing it," or, "I want

22   everything."  I expect realistic, reasonable agreement on

23   this stuff.  And if it becomes -- if there are continuing

24   problems, I'll deal with that in a subsequent motion,

25   either for production or for sanctions, if it appears we've

1    got a problem.

2            Now, I know Mr. Moore is going:  What are you

3    doing to us here?  We've got to put in $1 million for these

4    documents.

5            I'm very concerned about that, and I appreciate

6    your position.  Given the number of documents, certainly,

7    that was testified to earlier, I would ask that they be

8    provided as promptly and as quickly as possible, and let's

9    get this behind us.

10           Mr. Moore, you may have some comment.

11           MR. MOORE:  Your Honor, I think, as you noted at

12   the prior hearing, we wouldn't be here today if we hadn't

13   stepped into the lurch and provided a DIP loan.

14           THE COURT:  That's all part of the record,

15   certainly.

16           MR. MOORE:  I understand.

17           THE COURT:  And I understand that.

18           MR. MOORE:  And that started the process, Your

19   Honor.  And we have an ongoing appeal on the DIP loan.  If

20   these costs are going to be reimbursed, that's one thing;

21   if they're not going to be reimbursed, then I think there's

22   a solution.

23           And I don't mean to threaten anyone, but if there

24   are no bid procedures, no reimbursement of these expenses,

25   you know, it becomes moot if we are not involved in the

84

```
 1    process.
 2              THE COURT:  I understand.
 3              MR. MOORE:  Which is something I'll have to talk
 4    to my client about.
 5              THE COURT:  I understand.  We'll issue an order
 6    on that.
 7              MR. CHEHI:  Thank you, Your Honor.
 8              THE COURT:  And I expect if there are minor
 9    skirmishes, that they be worked out.  I will entertain,
10    though, however, any motions that come up on this matter
11    either by CrossHarbor or by Credit Suisse, and I'll deal
12    with them promptly.
13              I know you want to wait a bit for the fellow to
14    appear from the professional group.  Should we take up
15    the -- it seems like all that's kind of bidding-related.
16    Should we take up the TRO in the Adversary Case 09-010,
17    official creditors committee of unsecured creditors motion
18    for expedited hearing on motion for temporary restraining
19    order.
20              Mr. Cossitt.
21              MR. COSSITT:  Thank you, Your Honor.  Jim Cossitt
22    appearing on behalf of the creditors committee.
23              Formally, I guess I would like to begin with
24    moving for admission of the exhibits which are at
25    Docket No. 18.  That's Exhibits 1 through 7.
```

1          I'd secondarily note that --

2          THE COURT:  Any objection on that?  Without

3     objection, they're admitted.

4          MR. COSSITT:  Thank you.

5          EXHIBITS 1 - 7 ADMITTED INTO EVIDENCE.

6          MR. COSSITT:  Secondarily, I'd note that there

7     still has been no response by any of the defendants, no

8     formal response.

9          Informally, I have been in touch with a lawyer in

10    Los Angeles who is apparently advising Ms. Blixseth and the

11    other defendant, the BLX Group, informally.  And as I've

12    been sitting in the courtroom, actually, I hate to admit

13    it, I've been sitting in the courtroom logged in and

14    working this out, but I've been generating more e-mail in

15    the process.  But I'm not using a BlackBerry, Judge; I'm

16    actually using a laptop.

17         THE COURT:  Be prepared to produce them.

18         MR. COSSITT:  In any event, the lawyer in Los

19    Angeles actually indicated that Ms. Blixseth had consented

20    to a stipulation which I had circulated yesterday.  I

21    haven't had an opportunity to confirm that with

22    Ms. Blixseth yet, but I guess she's available by video.

23    And the good news is I think I've got one matter on your

24    docket resolved.

25         THE COURT:  Okay, very good.  Did you want to

1   confirm that with -- Ms. Blixseth, are you aware that there

2   has been a resolution regarding the temporary restraining

3   order in the preliminary injunction?

4            MS. BLIXSETH:  Absolutely.  And I totally agreed

5   with it.  And they needed confirmation since my lawyer is

6   more of an advisor than my official lawyer, so I sent an

7   e-mail confirming that I did accept the TRO -- (inaudible,

8   audio cuts out.)

9            MR. COSSITT:  If the Court would give me a couple

10  days, I'll just submit the written document.

11           THE COURT:  I'll give you a couple of days --

12           MR. COSSITT:  Okay.

13           THE COURT:  -- to obtain necessary document

14  finalization and a signature.

15           MR. COSSITT:  Okay.

16           THE COURT:  And we'll approve it.

17           MR. COSSITT:  Okay.  And, Judge, we're also going

18  to extend the answer date for about two weeks on this.  Do

19  you want me to file a little notice or some such thing to

20  that effect?

21           THE COURT:  There absolutely should be something

22  in the record.

23           MR. COSSITT:  Okay, will do.  Thank you.

24           THE COURT:  Okay.  09-014, Credit Suisse vs.

25  Official Committee of Unsecured Creditors, which has also

1     been consolidated with the Official Committee of Unsecured

2     Creditors vs. Credit Suisse, I believe; pretrial scheduling

3     conference.

4           And as I understand from previous comments, there

5     may be a resolution or at least -- not a resolution, but a

6     proposal.

7           MR. CHEHI:  Mr. Zimmerman will address it for

8     Credit Suisse.

9           THE COURT:  Okay, thank you.  Mr. Zimmerman.

10          MR. ZIMMERMAN:  Yes.  We have, in fact, come up

11    with an agreement with the committee on a pretrial

12    schedule --

13          THE COURT:  Okay.

14          MR. ZIMMERMAN:  -- that hopefully will permit

15    everything to be done in preparation for a trial that's

16    subject to Your Honor's availability.  We would anticipate

17    starting April 22nd in the morning.  And I think we would

18    have a pretrial stip ready to be filed by Monday or Tuesday

19    to that effect.

20          UNIDENTIFIED SPEAKER:  Agreed.

21          THE COURT:  How long do you think that will take?

22          MR. ZIMMERMAN:  Four to five days, that sounds

23    about right.

24          THE COURT:  What's everyone's pleasure, then, as

25    it relates to trying to get to confirmation?  I realize

1    it's unrelated, but are we still looking at a confirmation

2    date at the end of April?

3            Mr. Patten.

4            MR. PATTEN:  As far as I know right now, we are,

5    Your Honor.

6            THE COURT:  Okay.  So we've got a five-day trial

7    that will lead right into confirmation hearing?  Is that

8    kind of what I'm hearing?

9            MR. PATTEN:  Plus, Your Honor, we'll be having --

10   if you approve our procedures order, we'll be having an

11   auction in the middle of this, as well.

12           THE COURT:  Right, okay.  Does that impact --

13   does the trial and the adversary have direct impact on

14   confirmation and the sale?

15           MR. CHEHI:  Your Honor, the answer from the

16   bankruptcy law point of view is "abundantly, yes".  The

17   issue of our claims and our liens and the values associated

18   with them are huge.  They're the largest claims in the

19   cases.  They may say that they have a confirmable plan, but

20   as set forth in our papers, there are numerous reasons why

21   it's not confirmable.  I haven't had the benefit of reading

22   what was filed midnight last night and maybe they've

23   changed some things, but in general, whatever treatment

24   that they're proposing for us, assuming the world turns out

25   in their view the way they want it to be, it is still

1    non-confirmable under the bankruptcy code.

2            And I'll suggest that we -- you know, those

3    issues should be joined in connection with the disclosure

4    statement hearing because there's no reason for these

5    debtors to go marching down the road spending a lot of

6    money on a non-confirmable plan and soliciting acceptances

7    and running whatever type of auction is going to be run if

8    at the end of the day the plan can't be confirmed.  And

9    that's -- I think we'll leave that for the disclosure

10   statement hearing if Your Honor wants to take up

11   confirmation issues then, but the professionals and the

12   debtors, you know, move forward at a great risk, really, to

13   the estate if at the end of the day there are solid reasons

14   why the plan is not confirmable under -- because of the

15   treatment and outcome of the adversary litigation resolving

16   elements of our claims or for other bankruptcy

17   garden-variety confirmation issues.

18           THE COURT:  Mr. Patten.

19           MR. PATTEN:  Your Honor, the Ninth Circuit has

20   ruled that it's perfectly appropriate for the market to

21   determine the value as opposed to appraisers battling over

22   the value.  And if this Court adopts the proposed bidding

23   and solicitation procedures order, then we're going down a

24   path of the market being the determiner of the value and

25   not the appraisers.  It would make no sense, if that's the

1    route we're taking, to have a separate path where we're

2    having the appraisers battle out what the value is because

3    it's redundant and I think mutually exclusive of having the

4    market determine the value.

5        Now, the litigation can certainly determine the

6    merits of the official committee's claims against Credit

7    Suisse, and so forth, but if the Court is going to proceed

8    with the fundamental structure of the proposed plan, which

9    is to expose the property to the market and let the market

10   determine what that value is, then there is no reason to

11   separately conduct valuation proceedings in an adversary or

12   otherwise.

13       THE COURT:  Thank you, Mr. Patten.  So given your

14   proposal on, on scheduling, that's the soonest that you

15   would be able to deal with trial, the 22nd?

16       MR. BECKETT:  For the committee, I would say that

17   there may be some flexibility, but it's not much more than

18   a couple of weeks.  And there may also be dispositive

19   motions that can be filed.

20       And I can speak for my half of it:  We will do

21   everything we can to isolate issues and simplify issues so

22   at the end of the day, it is as streamlined as possible.

23   And when we get there, I also want to discuss the ADR

24   because, as I intimated a moment ago, I think that a lot of

25   this should be resolved.

1          THE COURT:  Okay.  Mr. Zimmerman.

2          MR. ZIMMERMAN:  Your Honor, Credit Suisse was the

3    one who moved to expedite this precisely because of this

4    problem.  We will move as quickly as you want us to move.

5          THE COURT:  Okay.  Well, I guess it's kind of

6    difficult for me to see what your other timing is in

7    relation to, well, submission of exhibits, witness lists,

8    pretrial order.  I'm assuming you've got that covered in

9    there --

10         MR. ZIMMERMAN:  Yes.

11         THE COURT:  -- leading up to the trial.  And I'm

12   just thinking it may be better if we can try to push that

13   up, but --

14         MR. ZIMMERMAN:  If it helps, Mr. Beckett has

15   outlined a little chart with the dates.

16         THE COURT:  Okay.  You may approach.  Thanks.

17         MR. PATTEN:  Your Honor?

18         THE COURT:  Yes.

19         MR. PATTEN:  I think, Your Honor, if the Court

20   addressed the procedures order first and made a ruling on

21   the procedures order, then either some issues could be

22   eliminated that would have to be tried or we may be able to

23   extend the deadline for confirmation which would then open

24   up more time to try this case.

25         THE COURT:  Say the first part of that again.

1          MR. PATTEN:  If Your Honor approves the bidding

2     and procedures order so that the value is going to be

3     determined via the marketplace, then it seems to me that

4     the issues of value and fixing the amount of claims don't

5     need to be tried in this adversary.  Because the claim's

6     going to be fixed by the marketplace -- at least the value

7     of the collateral is going to be fixed by the marketplace.

8          So to the extent that there are valuation issues

9     in the adversary, which I read when I read the complaint

10    and the prayer for relief, then those would not be

11    necessary if the Court adopts the procedural order.  I also

12    understand that if the Court adopts the procedure order,

13    then we may be able to move that April 30th date back to

14    the end of May which would then open up another month for

15    everybody to litigate some more.

16          THE COURT:  We've had just about enough

17    litigation, in my mind.

18          MR. PATTEN:  I agree, Your Honor.

19          MR. ZIMMERMAN:  May I just briefly -- having

20    drafted the complaint, we don't have a valuation -- you can

21    value it -- whatever properties have to be valued, you can

22    value it any way you want to, Judge, and it's not part of

23    the litigation.

24          The litigation is fundamentally seeking to

25    resolve two issues.  The plan on the table renders us,

1  Credit Suisse, an unsecured creditor for the vast majority

2  of its claim, and it subordinates its claims, and it strips

3  us of its liens.  That's what the litigation is about.  The

4  liens were valid, from our perspective; we have a fully

5  secured claim; and we have an allowed claim -- or an

6  allowable claim.  Forgive me, I'm a litigator, not a

7  bankruptcy person.

8          Valuation is a separate issue, and I don't see

9  how valuation of collateral -- that's a separate process

10  outside of this litigation, so that's not really part of

11  this.

12          MR. CHEHI:  If I can just clarify that, Your

13  Honor.

14          THE COURT:  Mr. Chehi.

15          MR. CHEHI:  The adversary complaint goes to

16  allowance of our claims, a dollar amount; it goes to the

17  priority, if you want to call it that, of those claims to

18  the extent that there has been an allegation that they

19  could be subject to equitable subordination.  So there's a

20  declaratory judgment saying:  Not subject to equitable

21  subordination.  So you get a dollar amount of a claim.  And

22  the liens, the validity and extent of the liens are being

23  determined in the adversary proceeding.

24          It doesn't have anything to do with the value of

25  the property that's subject to the lien.  That's, that's

1    the subject matter, actually, of our motion that we brought

2    on that's, you know, set for hearing today.

3            THE COURT:  That's set for today.

4            MR. CHEHI:  You know, a valuation there.  And in

5    responding to Mr. Patten just one step further, because to

6    the extent he misunderstands the purpose of the adversary,

7    he also is sort of confusing the valuation that will be

8    taking place if their procedures were to be approved by the

9    Court, which we don't think they should be -- that's going

10   to be valuing the equity of the reorganized company in a

11   configuration and a capital structure created by a plan of

12   reorganization; it's not a market test of the value of our

13   collateral.  Because they're not selling our assets,

14   they're not selling our collateral; they're selling equity

15   in a reorganized entity pursuant to a plan that they've put

16   together for the benefit of CrossHarbor.

17            They want to avoid a sale of the assets because

18   that, of course, would allow us to credit bid.  But what

19   we're going to do is have the litigators determine the

20   validity of the liens and the amount of the claim,

21   310 million, more or less; and then, separately - and

22   we think that should happen sooner rather than later

23   because it goes to fundamental issues of whether this plan

24   or any plan is going to be confirmable or feasible - is to

25   determine the value of the collateral securing our claims.

1      In other words, valuing the amount of our secured claims

2      assuming the liens are valid and assuming our claims are

3      allowed and full.

4            The valuation will be without prejudice to

5      whatever the judgment of the Court is on the adversary,

6      outcomes of the liens, and the allowability of the amount.

7      But we're going to get to the issue of value because that's

8      going to speak volumes about whether the plan of

9      reorganization that's being proposed makes any sense

10     whatsoever and whether it can accommodate -- the treatment

11     it proposes for our client can accommodate the outcome that

12     our liens are valid, our claims are allowed, and our

13     collateral is what it is.

14            THE COURT:  Okay, thank you.

15            MR. PATTEN:  Your Honor, when I read the first

16     paragraph, the prayer for relief in the complaint is that

17     the Court declared Credit Suisse has an allowed secured

18     claim of a particular amount.  I don't know how you can

19     determine that it has an allowed secured claim of a

20     particular amount without doing this valuation process.

21            So, again, it's the market -- if you adopt our

22     proposal, it's the market that determines the value, not

23     experts testifying to the Court.

24            THE COURT:  Okay, thanks.  As it relates to the

25     matter before me on the pretrial scheduling conference, you

1      know, certainly, I don't have a problem with this.

2              I guess just so you know, the 22nd is fine.

3              The afternoon of the 23rd is unavailable, as

4      noted on my order.

5              Let's see, the 24th, I have Great Falls hearings.

6      That was one of the dates that, I think, was excluded.

7              The 27th is -- oops; yes, the 27th is okay.

8              The 28th is okay.

9              The 29th is okay, if we have to go that far.

10             And it's not that we could -- it's possible that

11     we could carry on on the 24th.  I just don't know how long

12     the Great Falls hearings are.  So we would have to do it,

13     you know, starting probably a date -- a time certain would

14     be, you know, one o'clock.  We probably would be done.  I

15     haven't looked at that calendar so I don't know what's on

16     the 24th.  And because of commitment, I'm going to have to

17     do that in Missoula.  I'll have to, because I teach

18     Thursday afternoons.  So if you could submit a proposal

19     that way.

20             If I need to tweak it any more, I think what I

21     would do, so that you are aware, I would probably have a

22     quick conference call with Mr. Zimmerman and Mr. Beckett if

23     we need to tweak any of the times as it relates to the

24     trial that you would propose; otherwise, it's pretty much

25     your timing as it relates to the other stuff, so --

1          UNIDENTIFIED SPEAKER:  Thank you.

2          THE COURT:  Now, regarding a mediation, ADR,

3  settlement, certainly, if you think that that might assist

4  in any way, I will certainly allow you to do so.

5          One alternative is, certainly, depending on

6  availability - and I just don't know, having this issue

7  just come up this morning - but to have Judge Peterson

8  assist in that.  Certainly, that would be a possibility.

9  We can confer with him to see what his availability is.

10  And probably, if he's available today, we'll let you know

11  what that might be.  I honestly don't know what his

12  schedule might be, so --

13          MR. BECKETT:  Thank you, Your Honor.  May I

14  address the point for just a second?

15          THE COURT:  Yes.

16          MR. BECKETT:  I have two thoughts.  One is:

17  There are going to be a lot of documents involved, and

18  we're going to be doing it on a very compressed time

19  schedule, and there may be issues that arise.  And I felt

20  like I wanted to -- I felt like I wasn't sure what to do.

21  On the one hand, I wanted to protect the Court from any

22  more or too many more emergency gatherings of people; on

23  the other hand, Your Honor has expressed your interest that

24  you want to maintain control of this litigation.  So I'm

25  asking the Court for your pleasure and your direction in

1     that regard.

2             THE COURT:  As it relates to matters coming up

3     and needing some immediate attention?

4             MR. BECKETT:  Yes.

5             THE COURT:  Bring it to my attention.

6             MR. BECKETT:  Okay.

7             THE COURT:  We'll take it up as need be --

8             MR. BECKETT:  Okay.

9             THE COURT:  -- and as quickly as possible.

10            MR. BECKETT:  Thank you very much.  And the other

11    issue is:  Is it helpful to go to somebody and talk about

12    these issues and try and get them resolved?

13            And it may, it may work into a more global

14    resolution than these issues.  I think these issues are

15    fairly core to going forward.  If they can be resolved,

16    then maybe some other issues can be resolved, as well.  And

17    we can turn to Judge Peterson for that.

18            THE COURT:  Yes.  If there are no objections, I

19    don't believe he would have any conflicts, but we can

20    certainly confer with him and see.

21            MR. BECKETT:  Thank you.

22            THE COURT:  It may be that it may be something

23    that would assist in a global resolution.  I have seen that

24    occur before.

25            MR. BECKETT:  Thank you, I appreciate it.

1           THE COURT:  Mr. Patten.

2           MR. PATTEN:  Your Honor, just so that I'm clear,

3    are the parties going to submit a scheduling order --

4           THE COURT:  Yes.

5           MR. PATTEN:  -- or are you adopting the one

6    that's --

7           THE COURT:  No, they're going to submit to me a

8    stipulated scheduling order that I will then review.  If I

9    still have any problems with the dates they give me, I will

10   confer with the two of them directly and resolve that.

11          MR. PATTEN:  Okay.  And, Your Honor, we're

12   defendants in this case, too.

13          THE COURT:  Well, I would include you, as well.

14          MR. PATTEN:  Okay.  Thank you, Judge.

15          THE COURT:  We don't want anyone left out.

16          Okay.  So looking at what I have still -- oh,

17   this would be a good time for Mr. McKay.  What's the status

18   of the examiner?

19          MR. McKAY:  Your Honor, we have contacted and

20   interviewed a number of potential candidates for the

21   examiner.  We're in a position that we can act very

22   quickly.  To be candid with the Court, one of the concerns

23   that has been expressed by almost all of them is the

24   open-ended order.  And I think we've gotten the comment

25   that that both puts them -- conflicts them out of the case,

1    essentially, while they sit and wait; and, secondly, that

2    without knowing the duties, they would not know what

3    resources they need to muster, and so forth.

4            But in discussing the case with them and the

5    issues and, I guess, maybe anticipating where the Court may

6    be headed with the order, that we certainly have very

7    qualified and interested people that I think could act very

8    quickly.  Several of them have already done conflicts

9    checks and indicated that they don't feel there are any

10   conflicts.  So I would think, depending on the Court's

11   order, that we could have a proposed order for the Court by

12   the end of this week or the middle of next week.

13           THE COURT:  Okay.

14           MR. McKAY:  I guess my comments with regard to

15   the examiner is:  I believe that -- I guess I can't imagine

16   the Court simply assigning duties that were requested in

17   the original Credit Suisse examiner motion simply to look

18   at the CrossHarbor relationship and make some type of

19   report to the Court with the Credit Suisse discovery

20   ongoing in that regard and as central to their position in

21   the case as that is.

22           And, also, recognizing that we have moved to

23   appoint a trustee, the duties that the Court may determine

24   to assign to the examiner obviously would have, I would

25   assume, a large impact on whether the Court would be

1    inclined to grant the trustee motion or not if it felt that

2    the examiner had duties sufficient to essentially take that

3    issue off the table.

4              So with that having been said, Your Honor, we are

5    ready to act quickly with regard to the appointment.  I

6    would like to be able to have input with regard to,

7    perhaps, a supplemental order regarding the appointment or

8    the Court's order approving the appointment, because there

9    are several things that we like to see if an examiner order

10   with regard to the examiner's ability to hire professionals

11   since there's sort of a gap in Section 327 and 330 with

12   regard to employment by the examiner of professionals.  And

13   so there's some language we would at least suggest to the

14   Court with regard to several things like that, but I'm sure

15   we can work that out.

16             THE COURT:  Okay.

17             MR. McKAY:  Thank you, Your Honor.

18             THE COURT:  Yes, I would seek your review on any

19   proposed order.  I think that would be best.

20             Obviously, the feeling I had in going forward

21   with this is that the examiner would be somewhat limited in

22   focus so that we weren't just opening the whole thing up.

23             MR. McKAY:  Well, Your Honor, in listening to all

24   of the comments today, perhaps some examination or getting

25   together with all of the parties and assessing -- we hear a

```
 1   lot of talk about alternative plans and who may propose

 2   this and that.  An examiner may be able to at least talk to

 3   people, find out what they're thinking, and provide some

 4   input as to whether there are -- not only the examiner's

 5   view of the current proposal, but perhaps a view on

 6   whatever alternatives there may be out there and whether

 7   there are some potentially good alternatives.

 8            THE COURT:  Yes.

 9            MR. McKAY:  So just a suggestion.

10            THE COURT:  I appreciate the update, and I'll

11   give you some more direction on that.

12            MR. McKAY:  Thank you, Your Honor.

13            THE COURT:  Mr. Hursh.

14            MR. HURSH:  Judge, if I may, Mr. McKay's comments

15   sparked something.  If you would give me just a minute, I

16   wonder if it would be possible to somehow marry the issues

17   related to the discovery in the protective order to the

18   examiner order in such a fashion -- Mr. McKay said that the

19   examiner would be a -- he could move very quickly with

20   that.  If there would be some way to immediately, once the

21   examiner is appointed, get everything into his hands that

22   has been produced and let him evaluate where that stands.

23            And the reason I say that is that I am concerned

24   that, despite the parties' best efforts - and I make that

25   comment not just with regard to myself and my co-counsel
```

1    and my client, but with regard to, you know, the best

2    efforts of Credit Suisse's counsel and Credit Suisse - I am

3    concerned that without the examiner or some third party to

4    look at this issue, we will be back before you.  And I

5    don't think that's a great use of the time, of the Court's

6    resources.  And getting it in the eyes of an examiner

7    would, perhaps, solve that issue.

8              I previously mentioned, I believe at the last

9    hearing, that one of the concerns was that everything

10   that's being produced is being viewed through a lens.  The

11   examiner, Your Honor, would provide an independent lens.

12             And in light of the testimony regarding the cost,

13   the time, and those sorts of things, if, in fact, the

14   examiner says, "I've looked at this and, absolutely, you

15   know what?  There's problems.  We need to move ahead," that

16   would be one thing.

17             If the examiner looks at it and says, "You know,

18   I've looked at the 8,000 - 10,000 documents that have been

19   produced by all the parties," and, you know, reports to the

20   Court that, in fact, he's not concerned, that would save,

21   certainly, tremendous effort and expense in both the

22   production and the review by Credit Suisse.

23             THE COURT:  I appreciate your comments.  I

24   certainly will take it under advisement.  I am not so

25   certain I'm going to throw an examiner into the middle of a

1    discovery dispute between CrossHarbor and Credit Suisse.  I

2    think I'll deal with that.

3            MR. HURSH:  Thank you.

4            MR. CHEHI:  Your Honor, in connection with the

5    adversary and some of these other matters, you mentioned,

6    you know, Judge Peterson --

7            THE COURT:  Yes.

8            MR. CHEHI:  -- being available, perhaps, for

9    acting in some ADR role or mediation role.  You know, we

10   would welcome the Court's direction to all the parties to

11   consider mediation of the plan issues.  And, you know, that

12   could encompass some of these other larger issues to, you

13   know, create what we think has been lacking.  And everyone

14   will disagree with why that's been lacking and maybe blame

15   it on us.  But let's get beyond that because I think this

16   case could benefit from having what I'll call a regular

17   mediation process to the extent it could be helpful without

18   delaying litigations and without delaying whatever other

19   progress is going forward.  We're amenable to that.  We've

20   always invited other people to talk to us.  We haven't had

21   many conversations, but perhaps a mediator would facilitate

22   that.

23           THE COURT:  I appreciate the comment.  Other than

24   the bidding and solicitation and the issue over the

25   employment of CB Richard Ellis, Inc., it looks like the

1    only other matter I have - and correct me if I'm wrong; I

2    could have missed it in the docket - is the expedited

3    motion for valuation of secured claim.

4             And I think I know Mr. Patten's position on this

5    already, based on what he has said.

6             MR. PATTEN:  In addition to what I've already

7    said, Your Honor, I don't think we've had adequate or

8    reasonable notice to have a hearing on valuation.

9             THE COURT:  Well, we like to do these things on a

10   day notice, you know.  It moves things along.

11            MR. PATTEN:  I've had to explain that to

12   out-of-state counsel, Judge.

13            If we're going to have a valuation hearing, then

14   I think, certainly, due process requires a little bit more

15   notice than one day.  And we'll proceed to retain an

16   appraiser if this moves forward on this basis.  But I would

17   object to any valuation hearing today because we simply

18   haven't been given the opportunity to prepare for it.

19            THE COURT:  I appreciate your comments.

20            Mr. Chehi.

21            MR. CHEHI:  It's all right if I continue to stand

22   here, Your Honor?  It's tough to get in and out.

23            THE COURT:  You certainly may because I don't

24   know if you can get out from behind there anyway.

25            MR. CHEHI:  That's the practical problem.

1                Your Honor, what we want to do is have the

2       valuation hearing set at the earliest possible time and,

3       certainly, as we stated in our papers, before the

4       conclusion of any disclosure statement hearing on any plan.

5       And we think if there is --

6                THE COURT:  Unless otherwise ordered by this

7       Court as to extension of time for that.

8                MR. CHEHI:  Well, that's right.  And there's --

9       you know, the Riley case and, you know, local rules require

10      that there be, you know, motions brought on for addressing

11      these issues.  And this is not, as I think Mr. Patten or

12      someone said, this is not all about the value of a truck or

13      a piece of equipment.

14               THE COURT:  That was Mr. Beckett.

15               MR. CHEHI:  Mr. Beckett, that's right.  He's very

16      good.  What we'd like to do is, you know, bring on the real

17      issue, the 800-pound gorilla in the case.  And let's not,

18      you know, kid ourselves about the issue, and let's not

19      allow the debtors to say, "Well, we have this market test

20      here that's going to address all these issues," because it

21      really doesn't address the issue of our collateral.

22               THE COURT:  Well, isn't it, in fact, subsumed

23      within the adversaries?

24               MR. CHEHI:  It is not, Your Honor.  And, again, I

25      think there's three components to our claim.

1          THE COURT:  Okay.

2          MR. CHEHI:  The dollar amount of the claim; the

3   validity of the liens, what they cover; and, thirdly, the

4   value of the collateral that is subject to the liens.

5          And if we assume for argument purposes, without

6   prejudice to the outcome of the adversary proceeding, that

7   our claims will be allowed in the scheduled amount,

8   $309 million-plus, and our liens are valid and enforceable,

9   not invalid and avoidable - and that's the subject of the

10  adversary proceeding, to get it that - then that begs the

11  last question, and that's the question of value.

12         And Your Honor has addressed the issue of value

13  already at our adequate protection hearing.  That was the

14  value that was ascribed to our collateral.  They want to

15  substitute a whole different set of value to it by saying

16  that, "The value of that apple is really the value of this

17  orange we have in this plan, this equity that we're going

18  to be selling."  We disagree.

19         And we have a right under the code, and we think

20  we should move forward with that so that it creates some

21  clarity.  Maybe Your Honor will say, you know, collateral

22  has no value, little value, or maybe it will say it has

23  something that approximates what the Court found earlier.

24  That will do more towards eliminating uncertainty in the

25  case about some very fundamental issues.  That will be the

 1    thing that brings people to consensus on a plan, because

 2    everybody else is going to have to deal with those values

 3    and how our claim is going to be treated even before the

 4    adversary is done.  And that would bring on a settlement of

 5    the adversary, if need be, in the context of a global

 6    settlement under a plan.

 7            If these issues, these large issues are left

 8    outstanding, as they would prefer they would be, then we're

 9    going to have a train wreck if their plan goes forward

10    because it's not going to be confirmable.  If these issues

11    are joined, then everyone will know what they're bargaining

12    around.  They'll know what the size of the pie is and what

13    the secured creditor entitlement is.

14            THE COURT:  Mr. Patten, how much time do you need

15    on the --

16            MR. PATTEN:  Valuation?

17            THE COURT:  -- valuation?

18            MR. PATTEN:  Well, we'd have to hire an

19    appraiser.  And so I just requested Mr. Zimmerman and

20    Mr. Beckett to modify that pretrial order to set the expert

21    witness reports for April 1st, which I think is the soonest

22    I can have a report from an appraiser.

23            MR. CHEHI:  Your Honor, I beg to differ on that

24    approach because the valuation, again, is different than

25    the legal issues of the allowability of the claim and the

1    validity of the liens, whether they're avoidable on

2    whatever theory, whether the claims are subject to

3    subordination.  Those are legal issues that I think address

4    historical facts.  The issue of value is:  What's the value

5    of the collateral today?  Is it any different than it was

6    in November or December?  What is the value of the

7    collateral?

8            They can hire an appraiser, they can do whatever

9    they want to do.  We were told last week the debtors have

10   no independent view of value of any of this, and that's why

11   there was no value in the disclosure statement.  We pressed

12   them on that in our discussions with the objections to the

13   disclosure statement.  And so they don't have an

14   independent view of value.  Let them find somebody who has

15   a view of value, and let them bring it in.

16           THE COURT:  Isn't that what he just asked?

17           MR. PATTEN:  That's what I want.  I need until

18   April 1st.

19           MR. CHEHI:  Until April 1st?

20           MR. PATTEN:  Yes.

21           THE COURT:  I mean Mr. Chehi, this is March,

22   what, 4th?

23           MR. PATTEN:  The 4th.

24           THE COURT:  Getting an appraiser to value this

25   even by the 1st of April is going to be a push.  Maybe you

1    already have yours in place, I don't know.  Do you?

2         MR. CHEHI:  It's not our experience it takes that

3    long, Your Honor, but if they need that time.  But we would

4    also respectfully ask that the disclosure statement

5    hearings will be adjourned and -- or have that hearing at

6    the same time as the disclosure statement hearings on

7    whatever plans and disclosure statements might be -

8    (inaudible) - at that time, because we think that's all

9    very material to the adequacy of the disclosure statement.

10        MR. PATTEN:  Your Honor.

11        THE COURT:  Mr. Patten.

12        MR. PATTEN:  The value may be material to Credit

13   Suisse, but they already know what they think the value is.

14   Obviously, if we're going to have a disclosure statement

15   hearing sometime in early April, we're not going to have a

16   plan confirmation at the end of April.  And if the bidding

17   and solicitation procedures order is held up, which I would

18   kind of expect Credit Suisse to argue next, then we have

19   nothing in process for another month.

20        Again, Your Honor, I think this is a diversion,

21   and I would urge the Court that we need that bidding and

22   solicitation procedure order to get the ball rolling here.

23   That's what we want to do.  If Mr. Chehi -- I don't know

24   why we can't have the disclosure statement that describes

25   what the plan is.  It isn't Credit Suisse's plan, it isn't

1    what they want us to do, but it's what we're doing and it's

2    what we're proposing.  The valuation --

3         THE COURT:  Well, the only issue regarding the

4    disclosure statement is whether it provides adequate

5    information to the hypothetical investor.  I mean, you

6    know, I realize that you may argue, "Well, we need to know

7    everything going into plan confirmation," but if it

8    provides adequate information, I mean everybody can make

9    their own conclusions with what information is available.

10        I would venture to guess there's not one person

11   that's involved in this that really needs much more

12   information in the disclosure statement than is already

13   there, and that you can go to plan confirmation and object

14   over the terms of the plan, is where we really are.

15        I mean how much information is really not known

16   in the disclosure statement, seriously, by any of the

17   parties?  I mean CrossHarbor, certainly, has been

18   infinitely involved in this arrangement; the members have

19   been involved to some degree; Credit Suisse certainly knows

20   the dealings that have gone on in this whole arrangement

21   since the time the loan was given.

22        So I guess I think that there's probably more

23   than adequate information out there to assist the parties.

24   And I realize you're all going to object to that, but --

25        MR. CHEHI:  No, I'm not going to object to it.

1    I'll just mention this, Your Honor:  I haven't read the

2    documents that were filed overnight, but doing my best

3    reads of the disclosure statement and the plan to date, the

4    varieties of those documents that have come across the

5    wires, it's impossible to know what, if you're a creditor

6    voting on this as a general unsecured creditor - which we

7    may be if we have a deficiency claim - what is the economic

8    value of a general unsecured creditor's claim in the case.

9           There is no -- it doesn't tell the creditors what

10   a range of value might be, what's the potential recovery

11   for the general unsecured creditors.  It's just not there.

12   You can read that disclosure statement back and forth.  And

13   it also doesn't tell us what the values are in terms of the

14   collateral for purposes of making an 1111(b) election.  And

15   those are, those are fundamental issues.  And they will

16   have -- that election, if made, will have profound

17   consequences for other creditors in the case.  And so the

18   issue of value is actually important.

19          THE COURT:  Well, but still have your objections

20   to confirmation that will deal with those same issues.

21          Anyway, Mr. Patten.

22          MR. PATTEN:  I won't say any more.

23          THE COURT:  As it relates to the hearing for the

24   valuation, what time is your person supposed to be

25   available, Mr. Patten?

1          MR. PATTEN:  Your Honor, his plane, I understand,

2     lands in Palm Springs at 11, which is noon our time.  And

3     the video conference room, I'm told, is real close to the

4     airport.

5          We can put on other witnesses.  We would call

6     Mr. Greenspan.  And so we can certainly put him on and

7     proceed with him and wait for Mr. Lehr to deplane and

8     arrive.

9          THE COURT:  Okay.  Well, it's about a quarter-to.

10    I can see what's going to happen here.  Let's break, and

11    that will give him time to appear.  Rather than going

12    without lunch into the afternoon, we'll break right now and

13    we'll reconvene at quarter-to-one.

14         MR. McKAY:  Your Honor, can I make just one

15    comment before I forgot about this?

16         THE COURT:  Mr. McKay.

17         MR. McKAY:  I'm sure this afternoon will be fast

18    and furious.

19         One thing that the amended disclosure statement -

20    and I don't know if it's been incorporated with the plan -

21    does is provide for the consolidation of Yellowstone

22    Mountain Club and Yellowstone Development.  And I think

23    that we need to get that out on the table.  I believe it

24    should be done by motion, noticed, and that Debtors put on

25    evidence to support consolidation under the law.  And I

1    don't know how it can be done simply by fiat under the

2    plan.  So I just raise that.  I don't know what the Court's

3    view about that is, but I didn't want to forget about that

4    in everything else that's proceeding.  Thank you.

5              MR. BIRINYI:  Your Honor, if I might.

6              THE COURT:  You certainly may.

7              MR. BIRINYI:  Richard Birinyi.

8              THE COURT:  I'll let you get to the mike before

9    you start talking.

10             MR. BIRINYI:  I guess I get the honor --

11             THE COURT:  You might restate your name.

12             MR. BIRINYI:  Richard Birinyi from

13   Bullivant-Houser.

14             THE COURT:  Okay.

15             MR. BIRINYI:  And I get the honor, at least a

16   little bit, of working through the nuts and bolts of 1129

17   and 1123 and all of those strange sections.  But with

18   respect to this issue, 1123 expressly provides that the

19   plan can provide for consolidation.  So I think it is a

20   confirmation issue and would not be required to be brought

21   by a separate motion.

22             THE COURT:  Okay, thank you.  We'll be in recess.

23             (The lunch recess was taken.)

24             THE COURT:  This is the continuation of the

25   contested matters in Yellowstone Mountain Club, LLC,

1    08-61570.

2         I want to touch upon the examiner issue for a

3    moment.  At the time we granted the order, it was pretty

4    much all stipulated by everyone that an examiner needed to

5    be appointed because of the statutory mandate of this --

6    the mandate of the statute to basically investigate insider

7    transactions, etc., etc., which is set forth in Credit

8    Suisse's motion.  At the time we granted that order,

9    basically we indicated that upon request of parties, we

10   would then narrow the scope of the examiner's duties, I

11   think kind of on the basis of what Mr. Warner had talked

12   about happening in Texas.

13        And, you know, I look at it and all the things

14   that we've gone through this morning and in the past on

15   discovery, and it looks like Credit Suisse is doing all the

16   stuff that they were requesting an examiner to do for them

17   by examining the insider transactions.  So I guess I'm

18   wondering, do we really need an examiner?  Aren't you

19   pretty much doing everything you requested the examiner

20   would do?

21        MR. CHEHI:  Your Honor, we do not -- you know, as

22   long as we are getting our discovery and have latitude to

23   undertake an examination and an investigation of these

24   various insider relationships, you know, we're satisfied on

25   that point.  To the extent that the Court thinks that there

1    are, you know, other areas that would require an

2    examiner's, you know, assistance or investigation, you

3    know, that's up to the Court.  We are not insisting that

4    there be an examiner appointed today.  We can withdraw that

5    motion if that makes the Court feel --

6              THE COURT:  Well, it's been granted.  But I don't

7    need to fill it, either.

8              MR. CHEHI:  No, we're not asking you today to

9    fill that, Your Honor.  You know, the one thing that we did

10   mention in the context of bidding procedures - I think we

11   mentioned that in our last response to the renewed bidding

12   procedures motion that the debtors have brought on - is

13   that not only should there be fair marketing and bidding

14   procedures implemented, but the -- it might be very useful

15   to the Court and to other parties to have a report from or

16   a monitoring of -- or, in other words, an independent view

17   of what the decision-making is.

18             And Mr. Patten addressed that this morning,

19   saying, "We don't think that's a good idea.  You shouldn't

20   substitute an examiner for the debtors because the debtors

21   should be doing that, and Ms. Blixseth can be doing it

22   because she knows a lot about Yellowstone Club," or

23   something.  But that's, obviously, our great concern is

24   that we have an insider process and --

25             THE COURT:  Well, I guess I don't know at this

1    point in time what could be going on that isn't going to be

2    dealt with through the requests and the documents that have

3    been ordered.  I don't think we need a third party to be

4    going over the same stuff and adding another layer to this

5    at the expense of the estate.  That's my opinion.

6            So I just want to be clear, because it was your

7    motion.  We granted it pretty much because it was

8    statutorily required.  And I think, obviously, so that the

9    trustee knows, given the fact that he's spent time

10   conferring with people and has people that might want to

11   look at it, I'll be honest, I don't know that there's any

12   other aspect that the Court independently wants examined at

13   this point in time that all of these -- all of you active

14   attorneys aren't doing, to be quite honest with you.

15           MR. CHEHI:  Perhaps we could wait until the

16   conclusion of the hearing today and see how it goes on the

17   bidding procedures, and the like, but right at this moment,

18   we're in agreement with you, Your Honor, that interjecting

19   an examiner in some way is not necessarily going to add

20   value but might be an additional expense at this point.

21           THE COURT:  Yes.  And I'm not so certain that a

22   trustee adds value at this point, aside from the United

23   States Trustee.  I'm not sure that adding another --

24           MR. McKAY:  No offense taken, Your Honor.

25           THE COURT:  -- having another party in this is

 1    necessary, but we'll see where today goes.

 2            Mr. Beckett, you had a comment?

 3            MR. BECKETT:  If I may, I'm going to try Chehi's

 4    means of talking from here.

 5            THE COURT:  I understand.

 6            MR. BECKETT:  Very briefly.  Your last comment

 7    helped a lot, Your Honor.  From the committee's

 8    perspective, the appointment of a trustee at this time

 9    would be a disaster.  An examiner would -- to the extent

10    the Court had concerns, an examiner would be a much better

11    route, in the committee's view, than a trustee.  And so my

12    comments about the examiner this morning were motivated, in

13    large part, by the pendency of the motion for the

14    appointment of a trustee.

15            THE COURT:  I understand, I understand.  Well,

16    the trustee motion isn't even ripe.  You never know, the

17    U.S. Trustee may withdraw that before it becomes ripe.  I

18    don't know.  But they can do what they wish, and we'll take

19    it up as appropriate.

20            Mr. Warner.

21            MR. WARNER:  Your Honor, as the Court alluded, I

22    spoke last hearing on the issue of an examiner.  My first

23    duty as examiner in the Asarco matter was specifically to

24    monitor the sale process; and more specifically, to monitor

25    and report back to the Court that everybody had access to

1    information fairly, everybody was given access to the

2    debtor.  It was not a referee, it was not a mediator, which

3    the Court made very clear.

4         But what his order did say - and this is Judge

5    Schmidt in Corpus - was:  You will monitor the process and

6    report back to the Court that the process was implemented

7    fairly; and that during the process, there were no changes

8    in the process or there were no changes that became unfair;

9    or that any process approved by the Court didn't prove to

10   be unfair to the process and to all the parties.

11        And so the only thing I can think of - and I

12   agree with Mr. Chehi - I think that we may not need it at

13   this moment.  And I'd like to see what goes on with the bid

14   procedures, if anything.  But if there are procedures that

15   are ultimately implemented, maybe that's the duty of -- or

16   the first task assigned to an examiner.

17        THE COURT:  I appreciate the comment.  Duly

18   noted.

19        Well, at this point in time as it relates to the

20   examiner, I'm going to reserve on, I guess, making any

21   direction to the U.S. Trustee at this moment regarding

22   that.  Let's see how today develops and whether one needs

23   to be appointed.  Obviously, the longer we wait, the longer

24   it takes somebody to get in position to do the things that

25   they might be examining, which just slows the process down,

1   and I'm not in favor of that at all.  And with the

2   professional involvement here, I don't know how anything is

3   going to get by anybody that would be unfair, to be quite

4   honest.

5          You know, another thing we've talked about -- and

6   I don't want to belabor this, but I just want to clarify,

7   and maybe this is kind of an I'm-thinking-out-loud process:

8   You know, in looking at the materials provided - a

9   disclosure statement, and that sort of thing - and looking

10  at 1129(b)(2) and 363(k), I guess a question that kind of

11  troubles me is, you know, 1129(b)(2) with its inclusion of

12  363(k) is a situation for the sale of assets and the right

13  of the creditor to step in and basically credit bid.

14  They're protected.  And it kind of ties, even, with

15  1111(b).  We're talking about assets that they're secured

16  against.  And I've paraphrased.  I probably should read the

17  statute into the record, but I think you all know where I'm

18  at.

19          So, in fact, if we have a disclosure statement

20  and plan that is talking about equity interests and the

21  sale of equity interests and stalking horse and bidding,

22  given the structure - and certainly correct me if I'm wrong

23  in how I'm looking at this - the structure is such that for

24  anyone besides CrossHarbor to come in and bid, such as

25  Credit Suisse, would, in essence, have to come in with new

1    money in the bidding process to exceed the stalking-horse

2    bid and would not be able to utilize their debt in a

3    credit-bid situation because you're selling equity

4    interests, not sale of the property.

5            Now, if you go the other way and there's a

6    provision in the disclosure statement, I believe, that

7    references that if they do the 1111(b) election, that then

8    the bidder, successful bidder, would have the ability to

9    surrender the secured asset to Credit Suisse except for

10   those items that are not secured by Credit Suisse.  So you

11   would have a situation where Credit Suisse may end up with

12   their property, depending upon what scenarios happen, and

13   then that would leave the new corp. with the equity

14   interests, as I understand it.  That would be the

15   membership agreements, etc.  So you could have a situation

16   where some of the assets go to Credit Suisse; the new corp.

17   has the memberships; and I think there's a lodge, or

18   something, that's not secured.

19           To this point, have I kind of read correctly what

20   is contemplated by the disclosure statement and plan?  Let

21   me have debtors' counsel --

22           UNIDENTIFIED SPEAKER:  Yes, Your Honor, you have.

23   And I think it's because the 1111(b) rights -- unlike a

24   363(k) credit bid, the 1111(b) rights are all or nothing.

25           THE COURT:  Yeah.  But under a confirmed plan,

1    under 1129(b)(2), cramdown, they would still have the

2    protection of the 363(k) right to bid at a sale, right, if

3    you were selling their assets?

4         UNIDENTIFIED SPEAKER:  If you were selling their

5    assets under -- you are correct.  If you are selling their

6    assets, they would have a right to credit bid under 363.

7         THE COURT:  And as it stands right now, the only

8    way that Credit Suisse can really participate in this would

9    be to come in with new money in excess of whatever the bid

10   amounts would be at the time of the bidding?

11        UNIDENTIFIED SPEAKER:  Well, Your Honor, the

12   contemplation is -- and the reason why it's structured this

13   way is because there's a substantial amount of the assets

14   of the going concern that are not subject to the Credit

15   Suisse lien.  As you alluded to, the Warren Miller Lodge,

16   which is basically the heart of the whole project and where

17   everybody gets all of or most of the experience and the

18   parking and the -- it's right next to the lifts.  And with

19   that bifurcation, it is almost impossible to structure a

20   transaction where you could just sell Credit Suisse's

21   collateral and still have a going concern.  So that's part

22   and parcel of why we've negotiated this.

23        THE COURT:  What about access?  I mean does the

24   club own access?

25        UNIDENTIFIED SPEAKER:  The access, Your Honor, is

1   subject to all of the horizontal developments.  The roads

2   and everything are subject to CC&R's recorded interests

3   with respect to the real estate so that all of the members

4   and owners of individual properties have the right to use

5   the roads to get to their places.

6          THE COURT:  Okay.

7          UNIDENTIFIED SPEAKER:  Some of the, some of the

8   individual property owners have separate easement

9   agreements.  And I think you entered an order with respect

10  to approving the assumption of the secondary access right

11  that was part of an agreement with the Madison County.  I

12  want to say it's about two and a half weeks ago.

13         THE COURT:  I think some of the DIP financing was

14  to be provided for that, or something.

15         UNIDENTIFIED SPEAKER:  The DIP financing covered

16  that because that was part of the approval of the master

17  plan for the densities there, that there be an alternative

18  access route for the fire and safety and all that kind of

19  stuff.

20         THE COURT:  Okay.

21         UNIDENTIFIED SPEAKER:  And then, as well, one of

22  the subsidiaries that's not a debtor, in point of fact, for

23  the entirety of the owners of the property - and this is

24  part of the agreements with Madison County, as well - those

25  services, the fire and electricity and all that kind of

1    stuff, those are being billed and supplied by the debtor.

2    But all of that infrastructure, it's not entirely clear to

3    me looking in the credit documents -- like the roads and,

4    stuff like that, and the infrastructure, the lines of --

5    that's underneath the ground to pump the water, all of that

6    stuff is not necessarily Credit Suisse's collateral.  And

7    even if it is, it's subject to all of the reciprocal

8    easement rights in the CC&Rs.

9              THE COURT:  Okay, okay.

10             UNIDENTIFIED SPEAKER:  This is why we did it the

11   way we did it, because, as Mr. Beckett alluded to, this is

12   a complicated asset because there's so many moving parts.

13   It's almost impossible to treat it like a truck and say,

14   "Okay, Credit Suisse, we'll just take your truck down to

15   the used car lot and sell your truck."

16             THE COURT:  But in one instance, you're saying

17   whoever would acquire the bid would also have the ability

18   to surrender the property to Credit Suisse.

19             UNIDENTIFIED SPEAKER:  Well, but that's -- once

20   again, that's more an economic issue.  And it relates --

21   and I go back to the early days when I read Ken Klee's

22   article about "All You Ever Wanted to Know About Cram

23   Down".

24             But that is the only way -- if they make their

25   1111(b) election, that means they have said, "We will take

1    our collateral, we waive a right to deficiency.  Just give
2    us back our bundle of rights."
3          THE COURT:  Right, okay.  But, in fact, in order
4    for them to bid, though, then to buy the equity interest,
5    they're going to have to come up with an amount -- if they
6    wish to bid at the time of sale, they're going to have to
7    come up with an amount of money, new money, to exceed the
8    bid.
9          UNIDENTIFIED SPEAKER:  Well, basically, that's
10   because what they're buying is not only their collateral,
11   but the Warren Miller Lodge and all of the, you know, the
12   infrastructure, the --
13         THE COURT:  The member agreements.
14         UNIDENTIFIED SPEAKER:  All of -- like there's a
15   whole list in their collateral documents of excluded
16   collateral - the fire trucks, all of the things that are
17   required to keep this property as a property that all of
18   the members bought - that's what they have to pay for.
19          The bid procedures order -- and I think when you
20   get into the bid procedures order - and we made this this
21   morning, this explanation - it does have a provision in it
22   that gives them setoff rights.  If you rule that they would
23   have setoff rights and if they asked, it gives them setoff
24   rights with respect to the portion of the whole, the
25   portion of the going-concern business that represents their

1  collateral, and only requires them to pay cash for the

2  unencumbered portion.

3  And, of course, the unencumbered portion is what

4  gets the unsecured creditors paid, gets the members their

5  rights under all of their entitlements under their CC&Rs

6  for the ones that have bought the, bought the property.

7  And so that's, that's what we have contemplated, and that's

8  the only way we --

9  THE COURT:  So what's the mechanism to determine

10  the amount that they would have to pay for the interest

11  with the offset?

12  UNIDENTIFIED SPEAKER:  That gets done at the

13  confirmation hearing.  And this goes back to what

14  Mr. Patten was saying.  We perceive that the marketplace

15  should set the value of the entirety.  And Mr. Chehi has

16  given you the sort of odd proposition that, somehow or

17  another, the part of the going concern that Credit Suisse

18  has as its collateral is worth more than the marketplace is

19  going to determine is the entirety of the value of the

20  going concern.  Now, I have some fundamental problems with

21  that logic.

22  But at the time of the confirmation here, the

23  plan says that you are going to allocate the value of the

24  entirety of the going concern.  Whether it's $100 million

25  on the stalking-horse bid or 150 million because there's

1    other bidders, you're going to allocate the value between

2    all of the intangible, between the Warren Miller Lodge, and

3    between the unencumbered assets that are part of the

4    project and the encumbered assets, and you're going to say,

5    "Okay, this 100 million - 150 million; 60 percent Credit

6    Suisse, 40 percent unencumbered."

7            And that's going to determine, you know, where

8    the, where the dollars go at the end of the day.

9            THE COURT:  Do you think the way that's

10   structured -- well, that's an unfair question to you.  I

11   won't ask it at this point.

12           Mr. Chehi you have a question -- or you have a

13   statement, not a question.

14           MR. CHEHI:  Let me give you my spin on the

15   1111(b) in these circumstances of this case.

16           Number 1, if we were to elect the 1111(b), we

17   would have a right to have our liens run through on the

18   collateral through the end of the case, and the only way

19   they can satisfy our claim is through the cramdown

20   requirement and giving us the indubitable equivalent which,

21   as he mentioned, might be turning over all of the

22   collateral that we have to us; or, alternatively, giving us

23   a cramdown note in the full amount of our secured claim -

24   what's called "310" for purposes of today - with a present

25   value equal to the value of our collateral.

1          THE COURT:  Exactly.

2          MR. CHEHI:  Now, that latter approach I don't

3     think works in the economics of their plan.  They're not

4     proposing to give us the note.  What their plan says is, is

5     if we elect an 1111(b), they're going to give us our

6     collateral back.  And if we elect an 1111(b), we'll be

7     happy to take our collateral back, but that renders the

8     plan utterly unfeasible and non-confirmable.  Because if

9     you look at the projections, they provide for the sale of

10    lots over 10 - 15 years, or whatever it might be.  We have

11    a lien on memberships in the club and proceeds of

12    membership sales, not -- it's not as though they get the --

13    they take that away from us if we elect an 1111(b).  They

14    have, I think, a misconception about what else we get.  We

15    have liens on the ski lifts, on the ski trails; important

16    amenities.

17         And if they think their plan is going to be

18    feasible with us taking our collateral back, including all

19    the skiing infrastructure -- they may keep the Warren

20    Miller Lodge and they may think there's a big value

21    attached to that, but that is -- whatever it cost to build

22    that - and it's not our collateral - that is not a very

23    valuable asset.  And we're ready to put on a witness today

24    who will testify to that.

25         In short, Your Honor -- and not to forget the

1    other piece of our collateral, which is the BGI notes.  We

2    take it all.  And if we take all of that and exercise an

3    1111(b) election, I don't even have to read their

4    disclosure statement as it was filed last night.  I know

5    what they filed a couple days ago, and if it's anything

6    like that, their plan is unfeasible and non-confirmable,

7    and there's no -- whatever it is they think they have

8    there.

9            And so these are the sorts of issues that the

10   Court has to understand before you authorize a disclosure

11   statement and a plan process which is going to end up in a

12   train wreck for the debtors as well as everybody else.

13           THE COURT:  Okay.  So I was unclear that the

14   member agreements were a part of the collateral, as well.

15   Apparently --

16           UNIDENTIFIED SPEAKER:  Your Honor, that -- there

17   certainly is an issue on that.  And, obviously --

18           THE COURT:  Well, and which the adversary

19   probably deals with, as well, to some degree.  No?

20           UNIDENTIFIED SPEAKER:  Obviously, we haven't

21   filed --

22           THE COURT:  No, I mean Mr. Beckett's.  No?

23           MR. BECKETT:  I don't believe so.

24           THE COURT:  Okay, okay.  Well, I raise just that

25   general dialogue because I see some concerns there from the

1    bench's standpoint as to how that's dealt with.  So having

2    said that --

3              MR. CHEHI:  One last point, just one important

4    point.

5              MS. BLIXSETH:  Your Honor --

6              MR. CHEHI:  A fundamental predicate of the plan

7    is that it strip off the liens, our liens off of the

8    property that would be surviving with the acquiror here,

9    NewCo.  And that can't happen, No. 1, if we elect an

10   1111(b); and, therefore, the whole stalking-horse proposal

11   -- never been executed and no one's bound by it, but those

12   are -- the terms require that all those liens be stripped

13   off.  That can't be possible.

14             And, No. 2, they're giving us some sort of new

15   collateral package in trying allege that that's the

16   indubitable equivalent.  And taking our liens off of that,

17   that does not satisfy, again, the cramdown requirements.

18   Our liens survive.  And that's the point of 1111(b), the

19   cramdown of secured creditors.  They can't do -- what

20   they're, in effect, trying to do is sort of a hybrid asset

21   sale, you know, equity sale where they get the benefits of

22   an equity sale, we don't get the credit bid, and they get

23   the benefits of a 363 sale without our credit bidding where

24   they can strip the liens off.

25             THE COURT:  Okay.  Well, I appreciate the

1  dialogue, and I think it clarified some things.  With

2  that --

3            MS. BLIXSETH:  Your Honor, this is Edra.

4            THE COURT:  Yes.

5            MS. BLIXSETH:  You asked me to notify you when

6  the gentleman arrived, and he has arrived.

7            THE COURT:  Very good.  You know, could I have

8  him sit where I can see him?  I don't know if you can move.

9  You know, there's another chair that I see there on the

10  side.  That's visible.  I can see whoever sits there or

11  even one forward, just so you're more convenient so you're

12  not sitting on each other there.  There, that's fine, if

13  you're comfortable.

14            MR. CHEHI:  If we could have the person identify

15  themselves for the record and who they represent?

16            THE COURT:  We will, we will.

17            Also, is there anyone else in the room besides

18  you two?

19            MS. BLIXSETH:  No.

20            MR. LEHR:  No.

21            THE COURT:  Okay.  Now, I'll ask that the new

22  person identify himself.

23            MR. LEHR:  My name is Steve Lehr, Your Honor.

24            THE COURT:  Okay.  And who are you with?

25            MR. LEHR:  I'm with CB Richard Ellis.

1          THE COURT:  Okay, very good.  Thank you.

2          With that, then, let's proceed with those two

3    matters that are kind of tied and related together:  The CB

4    Richard Ellis application and the objection thereto and

5    reconsideration, as well as the bidding and solicitation

6    procedures.

7          MR. CHEHI:  Can I proceed with the motion for the

8    reconsideration first, Your Honor, on the CBRE?

9          THE COURT:  I'll let you proceed.

10          MR. CHEHI:  Thank you.  Let me come to the

11    podium.

12          Thank you, Your Honor.  We, the prepetition

13    lenders, through their agent, moved on February 20th for

14    reconsideration of the Court's February 10 order

15    authorizing the employment of CB Richard Ellis as a broker

16    because Paragraph 4 of the debtors' application to employ

17    CBRE misstated or misrepresented that CBRE's services will

18    include soliciting and procuring a prospective purchaser

19    for land, buildings, and improvements owned by the debtor.

20    In other words, it proposed a marketing of the debtors'

21    assets.  And on the basis of that application, we believe

22    Your Honor entered that order.

23          And I think Your Honor made it clear today that

24    in looking at our papers and then looking back at the

25    actual listing agreement with CBRE, the debtors have

1    modified what had otherwise been a standard listing

2    agreement which would have recited references to looking

3    for prospective purchasers of land, building, and

4    improvements and substituting in some defined term, equity,

5    for the equity of the debtors or the reorganized debtors.

6    I'm not sure if they were that specific.

7           The listing agreement also expressly incorporates

8    the flawed bidding procedures that this Court disapproved

9    on February 18th.  And that's in the listing agreement,

10   Section 1.3.  We believe that the order Your Honor entered

11   on the flawed bidding procedures, the original bidding

12   procedures, require a robust marketing process.  We agree

13   with that.  That was the purpose of our initial motion to

14   compel, which, you know, was denied as moot, I believe.

15          And, indeed, what has to happen here is there has

16   to be a very energetic encouragement of third-party bids

17   for either the equity of the reorganized company, but most

18   importantly, for any alternative transaction, any

19   transaction being an alternative to the CrossHarbor

20   transaction, because we think that that plan process is

21   flawed and non-confirmable.  Time is a wasting, and this

22   type of marketing should proceed expeditiously.

23          The debtors have objected to this in their

24   objection to our motion for reconsideration and are

25   actually asking that the Court not expand the broker's

1   marketing efforts beyond a sale of the equity under the

2   debtors' insider plan.  And, again, the plan is referenced

3   very clearly in the listing agreement through the

4   procedures.  And we believe this is just another example of

5   the debtors' inability to understand and meet their

6   fiduciary duties in this case under the guise that, "This

7   is our business judgment.  This is what we think is best

8   for everybody."  And they're, in effect, cutting off any

9   alternatives of somebody bidding against CrossHarbor, which

10  the debtors have already admitted have chilled the bidding

11  process.

12        We think the right thing to do today, Your Honor

13  - and this will actually overlap with the other remaining

14  matter - is that the Court should order that the employment

15  order be modified, the listing agreement be modified to be

16  very broad in what type of marketing CBRE is doing, that it

17  should include not just a sale -- or a marketing and an

18  identification of prospective purchasers of the equity

19  under the so-called plan, but also find purchasers for

20  assets; purchasers for plan-based transactions that have

21  different transaction structures than the CrossHarbor plan;

22  indeed, look for any expressions of interest from anybody

23  who's qualified to, in effect, sponsor a transaction,

24  whether it be a plan-based transaction or not, that will

25  deliver the highest maximum value to the estates and,

 1    therefore, to the creditors.

 2            We think that that process should have begun

 3    before Christmas when we were told that it was going to be

 4    initiated.  And that to the extent that it has been limited

 5    to date to just a sale of the equity, that should be

 6    changed very rapidly.  CBRE should go about marketing.  And

 7    there's no need today, frankly, to pass judgment on --

 8    unless you want to reject them out of hand, which I think

 9    is appropriate; but to approve the sort of bidding

10    procedures the debtors have proposed or any bidding

11    procedures.

12            All you need to do is get the broker marketing.

13    The parties can return to identify what are fair bidding

14    procedures at some later date.  The important thing is to

15    identify buyers and investors.

16            THE COURT:  Okay.  Do you wish to ask any

17    questions of the witness?

18            MR. CHEHI:  We're not going to, no.  We're not

19    going to ask any questions of that witness.  We may have

20    some of our own witnesses and testimony to put on.

21            THE COURT:  Okay.  Thank you, Mr. Chehi.

22            Mr. Patten.

23            MR. PATTEN:  I have questions for the witness,

24    Your Honor.

25            THE COURT:  I hope someone does.

```
 1            Do you wish to call your witness?
 2            MR. PATTEN:  Yes, I would call Mr. Lehr.  I'm
 3    sorry, Your Honor.
 4                STEVEN LEHR, WITNESS, SWORN
 5                   DIRECT EXAMINATION
 6    BY MR. PATTEN:
 7    Q.  Would you please state your name and address?
 8    A.  Steve Lehr; 67 Otis Avenue, St. Paul Minnesota.
 9    Q.  Mr. Lehr, what is your occupation?
10    A.  I'm the managing director of the Land Service Group of
11    CB Richard Ellis.
12    Q.  Can you tell me what your post high school education
13    is?
14    A.  I have a bachelor of science degree.  I majored in
15    international management from St. John's University, and I
16    have a juris doctorate from William Mitchell College of
17    Law.
18    Q.  How long have you been employed at CB Richard Ellis?
19    A.  I've been employed with CB Richard Ellis since 1998,
20    March of 1998.
21    Q.  When did you graduate from law school?
22    A.  1990.
23    Q.  Between graduating from law school and working for --
24    with CB Richard Ellis, what kind of work did you?
25    A.  I was in the private practice of law in the areas of
```

1    employment and real-estate law.

2    Q.   Do you have a focused type of business practice at CB

3    Richard Ellis?  Do you specialize in particular types of

4    property?

5    A.   Yes.  Our group, the Land Services Group, is focused on

6    raw land, entitled land, and improved residential land.

7    Q.   And at CB Richard Ellis, are you working with anyone

8    else --

9    A.   Yes, I'm working with --

10   Q.   -- in connection with this engagement?

11   A.   Yes.  I'm working with Jeff Woolson, who's the managing

12   director of our Golf & Resort Properties Group.

13   Q.   Is it customary in your firm for different people that

14   have different specialties, I'll say, to work together on a

15   particular project?

16   A.   Oh, yeah, yeah.  Jeff and I have worked together in the

17   past, actually.

18   Q.   Okay.  So if I understand it right, your background and

19   your focus is on developing raw land and Mr. Woolson's is

20   on membership types of property?

21   A.   Yes.

22   Q.   And are you familiar with what I want to call the

23   Yellowstone Club?

24   A.   Yes, I am.

25   Q.   And does the Yellowstone Club fall within the, I'll say

1    the scope of your, your practice and Mr. Woolson's

2    practice?

3    A.   Yeah.   We have a bit of an overlap when it comes to

4    master plan communities, and Jeff's assignments usually

5    involve a private golf course or some other amenity.

6    Q.   In connection with this case, have you reviewed a

7    proposed bankruptcy plan?

8    A.   Yes, I have.

9    Q.   Have you reviewed a disclosure statement?

10   A.   I have.

11   Q.   Now, this may not be fair, but do you know the date of

12   the plan that you reviewed?

13   A.   Yeah.   The plan that I reviewed is, is blank as to the

14   date.

15   Q.   Okay.   How about the disclosure statement?

16   A.   That's what I mean.   I'm looking at the disclosure

17   statement cover page, and it's blank.

18   Q.   Okay.

19   A.   (Inaudible, audio cuts out.)

20   Q.   How long have you had the plan and disclosure statement

21   to review?

22   A.   Over the last three days.

23   Q.   Okay.   Have you reviewed a proposed bidding and

24   solicitation procedures order?

25   A.   Yes.

Q.   Have you reviewed objections to the proposed bidding

and solicitation procedures order?

A.   Yes.

Q.   Have you reviewed the definitive agreement which is

attached to the plan?

A.   I have.

Q.   Have you had an opportunity to review the note or the

mortgage that are a part of the definitive agreement?

A.   Yes.

Q.   And, finally, have you reviewed the Credit Suisse

motion to reconsider the engagement of CB Richard Ellis in

this case?

A.   I have.

Q.   Have you reviewed documents in the data room that was

established by FTI?

A.   Yes, I have.

Q.   And have you been provided any other documents or

information in connection with your engagement in this

case?

A.   I suppose that I have.

Q.   Do you understand that Credit Suisse seeks to have CB

Richard Ellis market assets of the various entities that

are the Yellowstone Club?

A.   Yes, I do.

Q.   And do you understand that the debtors want you to

1   market the equity?

2   A.  I do.

3   Q.  And would you tell the Court what you understand the

4   distinction between the assets and the equity to be?

5   A.  I think that the equity includes the reorganized

6   debtors' interest in the entities, the new memberships, and

7   the assets of the debtors exclusive of the debt.  Selling

8   the assets would include both the debt and equity.

9   Q.  Have you previously marketed property on selling an

10  equity interest as opposed to the assets?

11  A.  I have not.

12  Q.  Has it ever come up in any negotiations or discussions

13  or transactions in which you've been involved?

14  A.  Yes.  We have had buyers specifically ask to buy equity

15  as opposed to the assets.  And as I understand it, the

16  buyers were considering tax considerations for buying an

17  entity's equity as opposed to assets.

18  Q.  If the equity is marketed, do you have an understanding

19  as to what happens to the existing membership obligations?

20  And by that, I mean the club membership obligations.

21  A.  Yes.

22  Q.  What is that understanding?

23  A.  It's my understanding that the debtors will cancel the

24  existing memberships and issue new memberships.  The buyer

25  will purchase the new memberships in connection with buying

1    the equity.

2    Q.  So will the memberships remain in the same entity as

3    the assets, the tangible assets:  The land, the

4    improvements, and so forth?

5    A.  I believe that is the case.

6    Q.  If the assets are marketed, do you have an

7    understanding as to what happens to the existing membership

8    agreements?

9    A.  Well, it's my understanding that the memberships might

10   not necessarily go with the assets.  I am not entirely

11   sure, though.

12   Q.  Do you have an opinion as to whether the value is

13   maximized if the memberships are included with what I'll

14   call the assets in a transaction?

15   A.  Yes.

16   Q.  Can you tell the Court what facts you have relied on in

17   coming to your opinion?

18   A.  I have been advised that the current memberships

19   account -- the current members account for 80 percent of

20   the real-estate sales referrals.  I understand that the

21   value of the real estate is really linked to the value

22   proposition of the memberships, the private skiing that's

23   associated with the memberships.

24            MR. SAUNDERS:  Excuse me, Your Honor.

25            THE WITNESS:  There's similar real estate down

1    the road at Spanish Peaks, but it does not have the same

2    kind of ski facilities or amenities that the memberships

3    would afford.

4              THE COURT:  Just a moment.  Mr. Saunders?

5              MR. SAUNDERS:  Yeah, Your Honor, could I object?

6    It seemed to me that the introductory question was asking

7    for some kind of expert opinion, and I didn't understand

8    Mr. Lehr to have been offered in that capacity.  I also --

9    it seems as though he's reading from something.  And if

10   he's reading from an expert report, or something, then we'd

11   like to have a copy of that.

12             THE COURT:  Okay.  Mr. Lehr, what are you reading

13   from?

14             THE WITNESS:  I have prepared some notes.

15             THE COURT:  It's not a report?

16             THE WITNESS:  No.  Do you want to see it?

17             THE COURT:  We may, we may.

18             THE WITNESS:  Some handwritten notes --

19   (inaudible, audio cuts out.)

20             THE COURT:  No.  Actually, I can't read it, but I

21   can see that there's writing on it.  I guess the next

22   thing:  Mr. Patten, are you offering him as an expert,

23   or --

24             MR. PATTEN:  Well, I'm trying to lay the

25   foundation for him to render an opinion, and so I guess I

1    am offering him as an expert.  I've got some more

2    foundation to lay unless it's --

3              THE COURT:  I'll allow you to do more foundation.

4              MR. PATTEN:  Thank you.

5              THE COURT:  The objection is overruled at this

6    point.

7    Q.  (By Mr. Patten)  Mr. Lehr, do you or any member of your

8    CBRE team have experience with membership clubs?

9    A.  Yes.  Jeff Woolson is very experienced with membership

10   clubs.

11   Q.  And sales transactions involving membership clubs?

12   A.  Yeah.  Jeff had transacted approximately 60 membership

13   clubs; in the last three years, probably 30.

14   Q.  And in reaching your opinion, are you incorporating

15   your experience in your sales as well as the experience of

16   other members of your CBRE team in sales of membership

17   clubs?

18   A.  I am.  And Jeff and I are working together on some

19   membership clubs.  We just divide up the work a little to

20   our specialties.

21   Q.  Okay.  And so you have experience in marketing

22   membership clubs?

23   A.  I do.

24   Q.  I initially asked if you had an opinion as to whether

25   the value was maximized by keeping the memberships in the

1    transaction, and then I asked you a series of questions.

2    But can you tell the Court what your opinion is about

3    whether the value is maximized by keeping the memberships

4    included?

5            MR. SAUNDERS:  Your Honor, at this point, I would

6    object.  I don't think that Mr. Lehr has been qualified to

7    be an expert.

8            And I want to say on the side, we're -- as I

9    think Mr. Chehi made clear, we're perfectly thrilled to

10   have CBRE get on with this process, but to the extent that

11   Mr. Lehr is being offered as an expert on something that

12   might go to one of these motions, then we do care about

13   that.  And I think he's conceded that he has no personal

14   experience in marketing club memberships; and, instead, I

15   think what's proposed is that he's going to tell the Court

16   about what his colleague's opinion might be.  I don't think

17   he's adequate to testify as an expert, Your Honor.

18           THE COURT:  As an expert?

19           MR. PATTEN:  I think the witness testified, Your

20   Honor, that he did have personal experience working with

21   Mr. Woolson in selling membership clubs.  And they've got

22   several of them at this time.

23           THE COURT:  Okay.  I guess I heard it the other

24   way, that he's dealt with development of raw land and

25   Mr. Woolson has dealt with membership clubs.

1          THE WITNESS:  But, Your Honor, we are working

2     together on projects that involve membership interests.  We

3     divide up the work differently amongst us.

4     Q.  (By Mr. Patten)  Can you tell me the Court what project

5     you're working on?

6          MS. BLIXSETH:  Your Honor, we're missing --

7     (inaudible, audio cuts out.)

8          THE COURT:  Just a moment.

9          MS. BLIXSETH:  We can't hear Mr. Saunders.

10          THE WITNESS:  (Inaudible, audio cuts out.)

11          THE COURT:  You couldn't hear Mr. Saunders.  I

12     could hardly, either.

13          THE WITNESS:  We're working on the Winchester

14     Country Club in Sacramento, and on this project, and in

15     pursuit of some additional similar projects.

16          THE COURT:  Mr. Lehr, I guess the notes that I

17     have down is that you had not had any personal involvement

18     in selling equity interests, but you have seen it sold in

19     other transactions.  Is that correct?

20          THE WITNESS:  Well, we're working together on the

21     Winchester Country Club, which involves equity memberships.

22     And Jeff, for his part, is handing more the membership

23     aspects of that sale.

24          THE COURT:  Okay.

25          MR. SAUNDERS:  Your Honor, could I voir dire?

1               THE COURT:  Well, I guess the thought process

2      that I have is I'm not so certain that I need to qualify

3      this person as an expert if he is testifying as to what

4      he's going to do if he is allowed to proceed in this

5      employment capacity.

6               MR. PATTEN:  Your Honor, that's not really the

7      scope of the examination that I intend.  I intend to ask

8      him about the bidding and solicitation procedures order

9      and, frankly, whether or not it will -- whether he can

10     effectively market the property within the confines, I'll

11     say, of that order.

12              THE COURT:  Right.  And I don't know that he has

13     to be an expert to do that.  I think he's testifying as to

14     what he's doing personally.  And you'll certainly have your

15     ability to cross-examine him on those questions if you feel

16     he's not qualified to testify on what he has to say.

17              MR. SAUNDERS:  Obviously, Your Honor, he's

18     entitled to testify as a fact witness about what he has

19     done or plans to do.  The word "opinion" has been used an

20     awful lot, and it certainly seemed to me that what

21     Mr. Patten was trying to elicit from him was an expert

22     opinion on what the effect of the bidding and solicitation

23     procedures is going to be.  And to that extent, we object.

24              THE COURT:  Okay.  Well, I'm going to allow him

25     to testify on a factual basis as a witness.  At this point,

1    I'm not going to qualify him as an expert.

2              MR. PATTEN:   Okay.

3    Q.   (By Mr. Patten)  Mr. Lehr, is the time frames contained

4    in the bid and solicitation procedures order -- you

5    understand what the deadlines are that are in that order?

6    A.   I do.

7    Q.   And do those -- with those time frames, are you able to

8    conduct an effective marketing program for this property

9    that we've asked you to market?

10   A.   Well, we have roughly 45 days on the market.  Would you

11   like me to go into what we've done to date and similar

12   projects with similar time frames, or --

13   Q.   Let's start with what you've done to date.

14   A.   Okay.  What we've done to date is we've reviewed all

15   the due diligence available to us, we have toured the

16   property, we've interviewed several key people, we have put

17   together our -- a draft of an offering memorandum, and we

18   have put together what we call a "teaser".  And yesterday

19   at about 11 p.m. Pacific time, that teaser went out, and we

20   had a phenomenal response to the teaser.

21        We received -- out of a group of 18,000 to whom the

22   teaser went to, we had an open rate of 30 percent, which is

23   one of the highest open rates we've had.  And from that

24   group of people, which would be roughly 6,000 that looked

25   at it, we had 47 downloaded confidentiality agreements as

1    of about five o'clock yesterday afternoon.

2    Q.   That was in one day's time?

3    A.   That was in about six hours' time.

4    Q.   Okay.

5    A.   And we have laid out a schedule to meet up with the

6    time frames that are available to us.  And, you know, I

7    think everybody here is in agreement that having more time

8    would be comfortable, and we have structured a process to

9    fit within the process as we understand it.

10   Q.   In your experience, is that time frame adequate in

11   order to realize the maximum value for the property?

12            MR. SAUNDERS:  Your Honor --

13            THE WITNESS:  Well, we --

14            THE COURT:  Mr. Saunders.

15            MR. SAUNDERS:  I'm sorry, Your Honor.  It sounds

16   to me like that's soliciting an expert opinion, based on

17   his experience whether something's adequate or not.

18            THE COURT:  Well, I'm going to overrule and allow

19   this witness to testify.

20            MR. SAUNDERS:  Thank you, Your Honor.

21            THE COURT:  You may proceed.

22   Q.   (By Mr. Patten)  Go ahead, Mr. Lehr.

23   A.   Well, I'd like to talk about three recent experiences

24   that I have had in marketing properties.

25        Last June, from about June to August, we went to market

```
 1    with a $187 million loan portfolio of land assets in and

 2    around the Phoenix area.  We called for bids and had them

 3    closed by September to October.  We had to get nine

 4    different bidders to close on that portfolio.

 5        And then we have another example here of where we've

 6    had a similar time frame where we represented a national

 7    home builder to dispose of nine separate communities within

 8    the Denver area.  It took us two weeks to do the due

 9    diligence, create our marketing materials.  And from the

10    same database that we used yesterday, we had a 23 percent

11    open rate, to give you an idea of the success of the

12    Yellowstone - (inaudible) - yesterday by comparison to

13    that.  And we had roughly 50 signed CA's from that; and

14    from that, we received 18 offers.  And I believe we did all

15    of that before December.  We went to market in about

16    October, mid October, and we were able to narrow it down to

17    three, three bidders.

18        And then another example of a transaction that I was

19    involved in, we received an offer on Thanksgiving, we

20    negotiated a purchase agreement in December, we had public

21    notice and hearings in January of the following year, like

22    the next month.  We had approvals of entitlements and

23    governmental incentives of up to $24 million, and we closed

24    in February, on February 9th of that same time frame.  The

25    grading equipment was brought on site February 12th, and
```

1   Cabela's was able to successfully open a

2   180,000-square-foot store in October of that same year.

3       So we have had similar marketing time periods, and

4   we've enjoyed some relative success in shorter time

5   periods.

6   Q.  And in those prior cases, was there a data room or some

7   depository of due diligence material for prospective buyers

8   to review?

9   A.  In the case of the Cabela's transaction, no; in the

10  case of the national home builder portfolio, yes; and with

11  respect to the loan portfolio last September, yes.

12  Q.  Is the information that's contained in the data room in

13  this case of comparable detail as the information in the

14  data room in the two other examples that you gave?

15  A.  Yeah, I would have to say that the data room was pretty

16  well populated.  We have talked about some things that, you

17  know, we would maybe put in there.  And some of the things

18  that we're missing, when I reflected back on them, are

19  maybe things that aren't even necessary.

20  Q.  Is the data room -- is the information in the data room

21  sufficient for a prospective buyer to do its due diligence

22  in connection with this project?

23  A.  You know, I think what we're doing over this next week

24  is we're going to be qualifying these bidders that

25  expressed interest through the confidentiality agreements

1   that they downloaded yesterday.  And I'm sure it's ongoing

2   today.  We want to add a little further organization to the

3   data room and complete our -- (inaudible.)  And we -- you

4   know, the information is what it is.  And I think that the

5   data room, for the most part, is in pretty decent shape.

6   Q.  Are you satisfied that CBRE will have enough time to

7   effectively market this property?

8   A.  I do think that we will.

9   Q.  Are you familiar with the terms of the definitive

10  agreement?

11  A.  I am.

12  Q.  And do those terms impair CBRE's ability to effectively

13  market the property?

14  A.  Not, not that I can think of right now.

15  Q.  Do the terms "impair" -- impair, excuse me, the ability

16  to obtain a market value for the property?

17  A.  You know, market value is a little different thing.  I

18  mean it is what a willing buyer is willing to pay a willing

19  seller.  And I'd be more comfortable telling you in 45

20  days.

21  Q.  Well, will the definitive agreement impair the ability

22  of a willing buyer to come forward and make an offer?

23  A.  I don't believe so.  And with respect to the time

24  frames of the people that I've directly talked to about the

25  process that we laid out in the teaser - and I think what

1   we put on the teaser is that bids would be due mid April -

2   no one has objected to me that that's not enough time for

3   them to act.  It's not discouraged them so far.

4   Q.  Are there any unusual or extraordinary terms in the

5   definitive agreement?

6   A.  Not that I can tell.

7   Q.  Do the terms of the plan or the disclosure statement

8   that you've read impair the ability to market the property?

9   A.  I don't believe so.

10  Q.  Are you familiar with the overbidding protections in

11  the bid and solicitations procedures order?

12  A.  I am.

13  Q.  And will those protections have a chilling effect on

14  the bidding?

15  A.  I don't believe so.  Are you referring to the

16  $1 million overbid requirement?

17  Q.  Well, the initial, I think it's $3.5 million overbid.

18  A.  No, I don't believe so.  That would represent something

19  less than 5 percent of the purchase price.

20  Q.  Will a fixed procedure for everyone to follow be

21  beneficial or detrimental to the solicitation process?

22  A.  You know, I think providing some structure to the

23  process is always pretty good.  We try to even out the

24  playing field for everybody.

25  Q.  And does the proposed bid and solicitation procedures

1    order provide the kind of structure that you're talking

2    about?

3    A.   It is a structure, and there are many different ways

4    that you can do it.  And, you know, we just intend to try

5    to live within the confines of the process that is laid

6    out.

7    Q.   And given, given everything - the proposed order, the

8    time periods that are involved, the data room, the type of

9    property being sold - are you satisfied that you can

10   effectively market the property between now and mid April

11   when the -- when bids are solicited?

12   A.   We are satisfied.  We are working very hard and, in

13   many respects - (inaudible) - our time.  And I don't think

14   we would be if we didn't think we could.

15                MR. PATTEN:  Thank you very much.  That's all I

16   have.

17                THE COURT:  Mr. Saunders?

18                MR. SAUNDERS:  Thank you, Your Honor.

19                          CROSS-EXAMINATION

20   BY MR. SAUNDERS:

21   Q.   Good afternoon, Mr. Lehr.  How are you?

22   A.   I'm well, thanks.

23   Q.   Can you see me now?

24   A.   Yes.

25   Q.   Okay.  I think you testified that you had never been

1  asked before to market equity.  Did I get that right?

2  A.  Yes, that is what I testified.

3  Q.  Okay.  So this would be the first time for you?

4  A.  Well, insofar as the Winchester Country Club, if we use

5  that, I have.

6  Q.  Well, I understood there to be a different issue that

7  involved whether or not you had ever been involved in the

8  marketing of clubs, and that's the area where Mr. Woolson

9  has his experience, right?

10  A.  Right.

11  Q.  Okay.  But I understood you to say that you had never

12  been asked before to market equity as distinct from assets;

13  is that right?

14  A.  Yes.

15  Q.  Okay.  You said that you had seen a note and a

16  mortgage; is that right?

17  A.  Yes.

18  Q.  Okay.  When did you first see those?

19  A.  Probably sometime in the last three days.

20  Q.  Do you remember any of the terms of the note?

21  A.  I do.

22  Q.  What terms do you remember?

23  A.  That the interest rate would be at 500 basis points

24  over LIBOR for a period of five years with the ability to

25  extend for an additional 50 basis points up to two times,

1    that the release price of any lots would be 500,000, and

2    that it could be in the 70 percent of loan to value.

3    Q.   I'm sorry, it could be 70 percent of loan to value?  Is

4    that what you remember?

5        I'm sorry, sir, can you hear me?

6    A.   Yes, yes.

7    Q.   Okay.  You remember the note saying something about 70

8    percent loan to value; is that right?

9    A.   Yes.

10   Q.   Okay.  And that was a requirement under the note?  It

11   was a covenant; is that right?

12   A.   I don't believe -- are we talking about the bidding

13   procedures?  Because that's what I was -- (inaudible, audio

14   cuts out.)

15   Q.   Okay.  I think you testified that you have seen a note

16   and you saw this note for the first time a few days ago; is

17   that right?

18   A.   Yes.  And if you want to direct me to the note, I can

19   try to locate it and get it in front of me.

20   Q.   Well, that's my concern.  The first time I saw any note

21   was this morning, so I'm trying to find out about the note

22   that you saw a few days ago.  Do you have it in the stack

23   of papers in front of you?

24   A.   I have a bound -- these are, I believe, your exhibits.

25   Would I find it in your exhibits?  If you just saw it this

1    morning, probably not.

2    Q.  All right.  Well, let's move on.  Have you ever been

3    asked to market assets out of bankruptcy?

4    A.  No.

5    Q.  Okay.  When you were first contacted about possibly

6    being engaged as a broker for the Yellowstone Club, when

7    was that?

8    A.  Late December.

9    Q.  Okay.  And who contacted you?

10   A.  I received an internal e-mail within the company.

11   Q.  And do you know who had made the contact to CBRE from

12   Yellowstone?

13   A.  I'm not sure, no.

14   Q.  Okay.  And what did that contact say?  What was the --

15   what was said to you the first time you heard anything

16   about possibly being engaged?

17   A.  That there was -- it was actually, I think, at the

18   suggestion of my superior in an e-mail chain.

19   Q.  Okay.  Who's your boss?

20   A.  Chris Ludeman.

21   Q.  Okay.  Did the e-mail chain reflect when Mr. Ludeman

22   had first been contacted about the possibility of CBRE

23   being engaged by the Yellowstone Club?

24   A.  No, I don't recall.

25   Q.  Okay.  Were you involved in submitting a proposed

1    engagement letter to Yellowstone Club?

2    A.   An engagement letter or a marketing proposal?

3    Q.   Either.

4    A.   I was involved in putting together the proposal for the

5    marketing.

6    Q.   Okay.  And when did you do that?

7    A.   Well, between late December and January 2nd.

8    Q.   Okay.  And was that provided to the Yellowstone Club on

9    January 2nd?

10   A.   I believe so.

11   Q.   Okay.  When was the next time you were contacted?

12   A.   Probably January 5th or thereabouts.

13   Q.   Okay.  Who contacted you on January 5th?

14   A.   Ron Greenspan from FTI.

15   Q.   Okay.  What did he say?

16   A.   Well, he just talked about trying to engage us to get

17   involved in a robust marketing plan of the club.

18   Q.   Okay.  And when was the next conversation you had with

19   Mr. Greenspan?

20   A.   I really don't recall.  I did not come prepared to talk

21   about when my communications were.

22   Q.   When were you asked to actually begin the marketing

23   process?

24   A.   Well, we understood in early January that we would

25   commence immediately, and then there was a period of time

1   where we did not.  And then we were contacted again, I

2   think, later in January.  And I understand that there was a

3   hearing sometime in mid February where we were being asked

4   to, to be reconsidered.  And I think at that point in time,

5   we started to go into the war room and started taking a

6   look at the information available to us.

7   Q.  Okay.  So you didn't do any work, then, from the

8   initial contacts in early January through mid February; is

9   that right?

10  A.  No, we did.  In anticipation or in hopes of getting the

11  assignment, we did start to review material.

12  Q.  Okay.  Now, the time frame that you have in mind for

13  your marketing process is 45 days; is that right?

14  A.  Well, 45 days is roughly from yesterday until April

15  15th, is what I was using as a benchmark.  And the entire

16  process, as I understand it, from engagement in mid

17  February to closing would be roughly 90 days.

18  Q.  Okay.  But there would be a -- you're anticipating a

19  period of 45 days between when you first went out to the

20  market with information and when you would conclude the

21  marketing process; is that right?

22  A.  What I was factoring was from yesterday until April

23  15th, which is when we understand the bids to be due.

24  Q.  Okay.  You've been told that that's the deadline for

25  bids, April 15th?

1    A.  Yes.

2    Q.  All right.  And you've been told to operate within

3    those - (inaudible) - right?

4    A.  (Inaudible, audio cuts out.)

5    Q.  "Yes"?

6    A.  Yes.

7    Q.  Okay.  Would you agree with me that one of the elements

8    of market value is that there have been an adequate time to

9    expose the asset to the market?

10   A.  I would agree with you.

11   Q.  Okay.  If you had been instructed by the Yellowstone

12   Club to liquidate the Yellowstone Club and liquidate the

13   assets of the Yellowstone Club, how much time would have

14   been adequate for that?

15   A.  You know, I think I'd need a few more facts.  I mean

16   "What are the goals of the Yellowstone Club?  What are the

17   time frames that they would want us to do that in?" I think

18   is where we would probably start the discussion.

19   Q.  Well, would you agree with me that a 45-day time frame

20   for a real-estate asset like this is generally more

21   consistent with a liquidation sale than a full marketing

22   process?

23   A.  I don't know.

24   Q.  In your experience, do all of the potential bidders for

25   an asset or a set of assets have the same business plan in

1   mind for the assets that are being marketed?

2   A.  I would highly doubt that.

3   Q.  Okay.  Is it sometimes the case that you have a

4   particular bidder who's interested in a particular subset

5   of the assets and maybe another bidder who's interested in

6   a different subset of the assets?  Does that happen

7   sometimes?

8   A.  Absolutely, particularly with portfolios that we offer.

9   Some people want just a couple of the assets, and some

10  people want the whole portfolio.

11  Q.  And that's not a chaotic process that you are unable to

12  manage as a marketer, right, the fact that some bidders

13  might be interested in different things than other bidders,

14  right?

15  A.  No.  I mean we have offered portfolios, and we have

16  entertained offers for subsets.

17  Q.  Okay.  And can you -- are you generally able to do a

18  better and more successful job selling assets, marketing

19  assets when you don't have to live within the confines of a

20  particular structure?

21  A.  Well, the whole genesis of our manage bid process is to

22  tighten up the time frames and get the market to focus on

23  an asset for a period of time.  What we have found is that

24  if we don't have end dates for people to respond to, they

25  will get distracted by another pursuit of a deal or they

1    will go on a vacation or do something else than to work on

2    the project that we're putting in front of them.  So we

3    like to have some time frames and some structure.  One, it

4    evens out everybody's understanding at a given point in

5    time, and it brings people to a point at the same point in

6    time.

7    Q.  Put aside, though, with -- put aside your point with

8    respect to time frame.  Doesn't it help you to run a more

9    robust marketing process to invite bidders to propose bids

10   on any kinds of subsets of the assets that they want to?

11   Isn't that beneficial?

12   A.  Well, I think one of the problems where you offer the

13   subsets is that we have what we call "cherry picking", that

14   the better assets tend to get bid on and get bid up, and

15   the lesser assets do not move, then.  And that, I think, is

16   one of the benefits of offering something as a whole, is

17   that it allows for the good with the bad, and you don't --

18   (inaudible, audio cuts out.)

19   Q.  Okay.  But you -- I'm sorry, sir.  Were you finished?

20   A.  (Inaudible, audio cuts out.)

21   Q.  You could always sort that out later.  If somebody gave

22   you a bid that was only on certain cherry-picked assets and

23   you didn't have a matching bid or a complimentary bid on

24   the other assets, you could always decide later that that

25   wasn't a winning bid, right?

```
 1    A.   I suppose you could.  And, you know, again, given the
 2    time to be able to do all that sorting out, I think you
 3    can.  But what I would add is that the more standardized
 4    that you can make the offering, the more standardized you
 5    will get the offers in.
 6    Q.   Okay.  But, certainly, if you had, if you had a longer
 7    period of time to market an asset like this, if you had
 8    three or four or five or six months, okay, then you would
 9    be more open to letting people make offers on different
10    business plans and with different sets of assets, right?
11    A.   I suppose.  But that's not my understanding of the
12    situation here.
13    Q.   Okay.  In your experience, is it possible to run a
14    sales process well or run it poorly?
15    A.   I suppose.
16    Q.   All right.  That's why somebody would hire you, to do
17    the process well, right?
18    A.   I would hope.
19    Q.   Okay.  So a particular asset could fetch a different
20    price if it was marketed well as opposed to being marketed
21    poorly, right?
22    A.   I suppose.
23    Q.   Okay.  And it's also true that the length of time
24    available to market the price can affect the value that's
25    obtained for it, right?
```

```
 1    A.   I suppose.

 2    Q.   Okay.  And would you agree with me generally that the

 3    more time you had available to market an asset, the higher

 4    price you would be able to get for it?

 5    A.   Well, not necessarily.  In an environment of falling

 6    prices, the more time you have, the lower the price will

 7    end up being.

 8    Q.   Well, as a general matter, would you prefer to have

 9    more time or less time to market an asset when you're

10    engaged to market it?

11    A.   It's more comfortable to know that you have more time.

12    Q.   Okay.

13    A.   And I think my previous testimony was, was pretty clear

14    that I think we're all in agreement that if given an

15    unlimited time, we would ask to have probably slightly more

16    than 45 days on the market time.

17    Q.   Okay.  Would you expect bidders for the Yellowstone

18    Club to have to incur expenses in order to educate

19    themselves to the point where they could make a bid?

20    A.   I would.

21    Q.   All right.  They're going to incur due diligence and

22    other kinds of expenses, right?

23    A.   Absolutely.

24    Q.   Okay.  The making of a bid isn't costless to the

25    bidder, right?
```

1    A.   Absolutely.

2    Q.   Okay.  And in circumstances where one bidder is

3    perceived to have a leg up or an inside track on purchasing

4    the asset, in your experience are sometimes other potential

5    bidders deterred from incurring those due diligence

6    expenses to make a bid?

7    A.   Not necessarily.  When you -- any property has always

8    got a neighbor.  And oftentimes the neighbor is the guy who

9    has been viewing the property for the longest time, is most

10   familiar with it, and he's always the potential bidder out

11   there.  And I don't think that discourages other people

12   from submitting bids on properties.

13   Q.   Well, certainly sometimes in your experience people are

14   deterred from making bids when they think that there's

15   somebody already out there with an inside track, right?

16   A.   I would categorize those bidders as not being very

17   motivated to begin with.

18           MR. SAUNDERS:  Could I have just a minute, Your

19   Honor?

20           THE COURT:  Thank you.  Mr. Warner, any

21   questions?  I saw you taking notes.

22           MR. WARNER:  I have a few, Your Honor.  Thank

23   you.

24                      CROSS-EXAMINATION

25   BY MR. WARNER:

1   Q.  Sir, I think you said that you sent out your teaser

2   yesterday, correct?

3   A.  Yes, we did.

4   Q.  Ask you received about 45 responses so far in a matter

5   of six, or so, hours, correct?

6   A.  Well, we are able to track the number of people that

7   actually view the document.  And out of 18,000, roughly

8   6,000 people viewed it.  Of the 6,000 people that viewed

9   it, 47 people went the extra step to fill out a

10  confidentiality agreement.

11  Q.  You also said that in that one-day period, nobody said,

12  "We can't do it by mid April," correct?

13  A.  Correct.

14  Q.  Okay.  But are you pleased by that, or is that really

15  somewhat irrelevant since the teaser's only been out there

16  a day?

17  A.  Well, I had conversations with probably at least a

18  half-dozen people yesterday in response to it.  And it did

19  not come up in the conversation with them, no.

20  Q.  But that's based upon the teaser, correct?

21  A.  That's based upon the teaser and it's based on the

22  conversations we had yesterday.

23  Q.  You said that you looked at a draft of the disclosure

24  statement, correct?

25  A.  Yes.

1  Q.  And I think you also said you looked at a draft of the

2  definitive agreement; is that correct?

3  A.  Yes.

4  Q.  Okay.  Is the definitive agreement attached to the

5  teaser that went out?

6  A.  I do not believe so.

7  Q.  Okay.

8  A.  No.

9  Q.  So those people that you spoke to didn't have the

10  benefit of knowing what they may have to be looking at in

11  the form of a contract at this point in time, correct?

12  A.  (Inaudible, audio cuts out) -- the teaser, and I can

13  read it for you, is that bids would be due April 15th.

14  Q.  And I appreciate that.  I understand that.  What I'm

15  looking at -- my question is focused on the definitive

16  agreement.  Those that saw the teaser didn't necessarily,

17  unless they went to their own effort in looking in the

18  Court's docket, see the definitive agreement proposal, did

19  they?

20  A.  Yeah, I don't know what the people did that I spoke

21  with.

22  Q.  You didn't provide the definitive agreement to them?

23  A.  We did not.

24  Q.  Okay.  I'm not sure if the question was asked:  I know

25  you've been asked about -- several times now about selling

1    equity, but I want to focus on your efforts pursuant to a

2    bankruptcy court order.  Have you sold assets through a

3    bankruptcy process for a debtor?

4    A.  Not in the last three years, for sure.

5    Q.  Okay.  Have you -- and I don't need to ask the question

6    about selling equity for a debtor because we've been told

7    you haven't sold equity.

8    A.  Yes.

9    Q.  Okay.  So you're really not familiar with the

10   bankruptcy code processes of selling assets versus

11   potentially selling equity?

12   A.  Not probably as familiar as you are, no.

13   Q.  I appreciate that.  What I'm getting at is:  You're not

14   able to say to this Court that it is, in this instance,

15   better to attempt to sell the equity than it is maybe to

16   attempt to sell assets under a provision like Section 365

17   of the code?  You're not able to analyze that, correct?

18   A.  Well, given time and given that section of the code, I

19   could probably analyze it.

20   Q.  Okay.  But you haven't at this point?

21   A.  That section of the code's not been provided for me,

22   no.

23   Q.  You understand that if the Court were to approve the

24   definitive agreement, that any buyer interested in making a

25   bid over the stalking horse has to follow the financial

```
 1    proposal, if you will, the business model of the definitive

 2    agreement?  Do you understand that?

 3    A.  I guess I don't understand that.  I thought that the

 4    business model and financial model was provided as an

 5    example, by way of example.  And I would, I would think

 6    that people, in doing their own due diligence, would come

 7    up with their own financial modeling.

 8    Q.  What about their own determination of what the capital

 9    requirements on a go-forward basis would be for their

10    model?  Do you think that that's up to them?

11    A.  I would think that people would try to come up with

12    their own assessment in their due diligence of what the

13    capital requirement moving forward would be.

14    Q.  At this early stage of the process, you have a teaser

15    out.  At this early stage, do you believe you need a formal

16    contract that everybody else needs to review and follow if

17    they were going to overbid, or could that come in a bit of

18    time from now?

19    A.  You know, we've done this before where we've provided a

20    form contract, and it works pretty nicely to be able to

21    compare apples to apples in the end.

22    Q.  But for the early stage, do you actually need that out

23    there?

24    A.  Well, at some point rather quickly, I would like to see

25    it in the war room, yes.  When we get closer to the point
```

1    in time where people would be asked to be putting together

2    their bids, I would want to see it in there.

3    Q.  You talked about the concept of the definitive

4    agreement not -- and I think your words:  Not impairing the

5    value of what you're going to sell.

6        Do you remember your testimony to that effect?

7    A.  I do.

8    Q.  Okay.  If the definitive agreement was less restrictive

9    and a party could bid on subsets, groups of assets, and

10   various contracts; and I'll represent to you that the

11   bankruptcy code has a method of transferring contracts --

12   A.  Okay.

13   Q.  -- would that be a less restrictive transaction that

14   would also not impair the process?

15   A.  I suppose I would like to see what was proposed and

16   compare it to the agreement that I've seen.

17            MR. WARNER:  Great, thank you.  I have no further

18   questions.

19            MR. MOORE:  Your Honor, may I?  Paul Moore.

20            THE COURT:  Mr. Moore.

21            MR. MOORE:  Do you mind if I do it from here?

22   I'm really boxed in now.

23            THE COURT:  Yes, yes you may.

24            MR. MOORE:  Thank you.

25                        CROSS-EXAMINATION

BY MR. MOORE:

Q.  Mr. Lehr, do you think it will enhance your ability to sell the assets if you sell the ski resort with the lodge as opposed to without it?

A.  Will it -- would you repeat the question?

Q.  Will it be easier to sell or will it enhance value if you sell the resort with the lodge as opposed to without a lodge?

A.  It's my understanding that there is a development pad connected to the lodge.  Are you talking about the underground parking structure connected to the lodge being part of the lodge?

Q.  No.  I'm referring to the base lodge that the club members use.  Is it easier to sell, is it easier to sell a resort with a base lodge as opposed to without a base lodge?

A.  I would think that it would be easier to sell it with the base lodge, yes.

Q.  Okay.  Is it easier to sell a ski resort that relies in part upon members' dues with members or without members?

A.  With members.

Q.  Okay.  Does CBRE do work with Credit Suisse?

A.  I believe that we disclosed in our application for employment the fact that we do --

Q.  Okay.

1   A.   -- and have.

2   Q.   And does that work include matters with respect to the

3   Yellowstone Club?  Because full disclosure is an issue in

4   this case.

5   A.   I believe that our valuation group was asked to do a

6   valuation.  I've not seen it, but that's just what I've

7   heard.

8   Q.   So you have, in fact, heard that CBRE did an appraisal

9   or a valuation of the Yellowstone Club assets for Credit

10  Suisse?

11  A.   Yes.  Now, I've heard that, but I have not seen it.

12  Q.   Do you know how recently that was?

13  A.   You know, I think that it -- from what I heard, it was

14  done sometime in late October -- (inaudible, audio cuts

15  out.)

16  Q.   Right about the time of the bankruptcy?

17  A.   What?

18  Q.   I'm sorry.  Shortly before the bankruptcy filing?

19  A.   I really don't know because I'm not sure of the exact

20  date of the bankruptcy filing.

21          MR. MOORE:  Okay, thank you.

22          THE COURT:  Anyone else?  Mr. Patten, any

23  redirect?

24          MR. PATTEN:  None, Your Honor.

25          THE COURT:  Okay.  Next witness?

1          MR. PATTEN:  Your Honor, may the witness be

2     excused?

3          THE COURT:  Yes, I have no problem with that

4     unless there's an objection.

5          You may be excused, which means you're free to

6     leave the room and go back to your other duties and work,

7     if you wish.

8          THE WITNESS:  Thank you, Your Honor.

9          MR. PATTEN:  Mr. Lehr?

10         THE COURT:  Oh, just a moment, just a moment.

11         MR. PATTEN:  Mr. Lehr?

12         UNIDENTIFIED SPEAKER:  Mr. Lehr?

13         UNIDENTIFIED SPEAKER:  Just a second.

14         THE COURT:  What's going on here?

15         MR. PATTEN:  Never mind, you can go.  Thank you.

16         THE COURT:  The witness may leave.

17         MR. REAM:  Good afternoon, Your Honor.  Larry

18    Ream on behalf of the debtors.

19         We started this out by Mr. Chehi saying he want

20    to -- it was his motion on CBRE.  So I'm not sure he's

21    finished before we move on.

22         THE COURT:  That's true.  It's actually his --

23    well, he didn't have any witnesses, so he's pretty much

24    done.

25         MR. CHEHI:  On CBRE.  And I think I stated what

1    our position is:  That they should be employed under a

2    revised form of order --

3            THE COURT:  A broader form.

4            MR. CHEHI:  -- which allows them to and, in fact,

5    directs them to market very broadly.

6            MR. REAM:  With that, Your Honor, we would move

7    forward, then, if the Court permits --

8            THE COURT:  Yes.

9            MR. REAM:  -- with the motion to vacate the bid

10   procedures order and approve the revised procedures.

11           And I would call Mr. Greenspan.

12           THE COURT:  Okay.  Mr. Greenspan, you may come

13   forward to be sworn.

14                RONALD GREENSPAN, WITNESS, SWORN

15                       DIRECT EXAMINATION

16   BY MR. REAM:

17   Q.  Mr. Greenspan, would you please state your name and

18   address for the record?

19   A.  Ronald Greenspan; 633 West Fifth Street, Los Angeles,

20   California.

21   Q.  And you've testified before His Honor previously in

22   this case?

23   A.  I have.

24   Q.  And your position with the debtor currently?

25   A.  I'm chief restructuring officer.

1    Q.   Mr. Greenspan, the Court, as you know, denied the

2    previous motion for approval of the bidding procedures.

3    Did you, did you read his memorandum decision?

4    A.   I did.

5    Q.   And what is your understanding what the Court's

6    concerns were with regard to those initial bid procedures?

7    A.   There were a number of concerns:  Number 1, the Court

8    expressed a concern about transparency; Number 2, the Court

9    was concerned that certain provisions in the proposed bid

10   procedures favored or tilted the playing field in favor of

11   CrossHarbor; and I think third, to a certain extent, the

12   Court was concerned that certain provisions in the proposed

13   procedures might not lead to obtain the highest and best

14   offer for the estate.

15   Q.   Did the Court suggest the debtors should reach out to

16   the committees, both the B's and the unsecured creditors

17   committee, regarding input to the bidding procedures?

18   A.   The Court did ask that.

19   Q.   And what did you do to undertake input from those

20   parties and any others?

21   A.   I did what we've been trying to do, and that is reached

22   out to all the parties, reached out both directly and

23   through counsel to the Official Committee of Unsecured

24   Creditors, reached out through counsel to the "B"

25   shareholders, and then I reached out to Credit Suisse.

1   Q.  And as a result of those communications, were there

2   changes made to the initial bid procedures?

3   A.  There were very substantial changes made.

4   Q.  Do you believe that the changes that were made satisfy

5   the Court's concerns as you understood them?

6   A.  I do.

7        MR. REAM:  Your Honor, I would like to approach

8   the witness with the exhibits that were filed last night.

9   It would be Docket No. 515.

10       THE COURT:  Okay, you may approach.

11       MR. REAM:  Thank you, Your Honor.

12  Q.  (By Mr. Ream)  Mr. Greenspan, would you turn to what's

13  been marked as Exhibit C?

14  A.  I have it.

15  Q.  Do you recognize this document?

16  A.  I do.

17  Q.  And what is the document?

18  A.  Well, it's, I believe, with the -- it's a red-line

19  that, as I understand, was attempted to be a red-line

20  between the submitted revised bid procedures and the bid

21  procedures that had originally been submitted.  But due to

22  some issues between Word and WordPerfect, I think this is

23  not quite the final one.  I think there's a paragraph in

24  the final one that's not in this.

25  Q.  So your understanding is that this document is

1   essentially a red-line between the initial bid procedures

2   and the one that was submitted to the Court for the

3   revised.  But there's an error on it, isn't there?

4   A.  That is correct.

5   Q.  And that error is that this particular red-line is, in

6   fact, missing a paragraph that's in the final order; is

7   that correct --

8   A.  That is correct.

9   Q.  -- the proposed order?

10      And what paragraph is that?  Can you explain it to the

11  Court?  And perhaps he could --

12  A.  I mean I don't have the final in front of me.  But what

13  it was, is there's another paragraph in between Paragraph 1

14  and Paragraph 2 here.  The actual final order contains a

15  mandate for CBRE to be retained and robustly pursue a sales

16  process.  So the actual order has a Paragraph 2 that deals

17  with -- says that about CBRE.  It's actually a relatively

18  short paragraph.

19      And then, as best I can tell, all the rest of these

20  paragraphs are, in fact, as they are changed in the

21  final -- the revised order that's been submitted; with the

22  only other exception being, of course, since there's

23  another paragraph added, each paragraph in the final order

24  is sequentially one number higher.

25              MR. REAM:  Your Honor, I'm not going to offer the

1    exhibit for admission, but I would like to be able to have

2    Mr. Greenspan refer to it repeatedly for illustrative

3    purposes.

4              THE COURT:  Okay.  I'll let you proceed.

5    Q.  (By Mr. Ream)  Mr. Greenspan, would you refer to what

6    is in this Exhibit C, Paragraph No. 3?

7    A.  Yes.

8    Q.  And there are interlineations shown on Exhibit C

9    showing additional changes.  What are those changes, and

10   why were they added?

11   A.  They were added in response to the Court's order and

12   to, I guess, memorialize the outreach and the involvement,

13   the formal involvement of additional parties.

14        In our original procedures, we had included the

15   official unsecured creditors committee as well as the ad

16   hoc members committee.  The Court appeared to want to add

17   the active involvement of the ad hoc Class B equity

18   interest group, and so we redefined "committee".  And so

19   you'll see through here there's many things -- that the

20   "committee", as a defined term, has involvement and

21   consultative rights.  And so we've added the ad hoc

22   committee so that when we use the term "committee" here,

23   it's now all three committees:  The UCC, the members, as

24   well as the "B" ad hoc.

25        Again, what we're trying to do is promote an active

1   bidding process.  We also added the specific provision

2   after that, that by including these people, there's many

3   members there and many of them, quite frankly, may have an

4   interest in bidding on this property.  We have reason to

5   believe that they do.  We want to be sure that we have a

6   clean and fair process.  And so part of the consultative

7   rights is to stay apprised of:  Who's bidding?  What are

8   they bidding?  What are they saying?  Who's touring the

9   property?

10       And we have the difficulty, particularly amongst a

11   number of the "B" members, that a number of those equity

12   holders may, in fact, want to actively participate as

13   bidders.  And so we wanted to put a provision in there.

14   And we'll just have to deal with that issue as it comes up

15   and act appropriately.

16   Q.  Turning to the next page, Mr. Greenspan, to

17   Paragraph No. 4.  There are changes made to 4(b)?

18   A.  Yes, there is.

19   Q.  And what changes were made to 4(b)?

20   A.  Several.  There were two significant objections voiced

21   at the last hearing regarding the -- what's best described

22   as the purchase money note, the financing being offered by

23   the estate.  There was an expression of concern that that

24   note was capped at $70 million.  I still have significant

25   concerns about increasing debt above that, but the

1    parties -- the committee wanted and Credit Suisse wanted to

2    see that note to be able to be bigger, so we increased the

3    amount of that note by 50 percent.  We did that in

4    consultation with the committee so that now the note can go

5    up to 105 million rather than 70 million.

6        I will tell everybody it would not surprise me to see

7    the very same people that complained the note was too low

8    challenge the feasibility of the plan when we present the

9    plan that the debt service is too high because you now have

10    a big note.  I still would rather have it at 70 million,

11    but the constituencies wanted it higher, and so we went

12    ahead and changed that up to 105 million, an increase of 50

13    percent.

14        The other thing, there was argument that the

15    specifications of the note had not been set forth in the

16    original procedures, and that's absolutely correct.  It was

17    still under negotiation as to what would be satisfactory.

18    We've now resolved those negotiations.  We've shared the

19    information from the committees, and we've laid out in here

20    some of the key terms set forth in the promissory note.

21    Q.  There's substantial revisions to Paragraph C; is that

22    correct?

23    A.  That is correct.

24    Q.  And those revisions relate to an addition as well as

25    subtractions from that paragraph; is that correct?

1    A.   Correct.

2    Q.   And what was deleted?  Let's start there.

3              THE WITNESS:  Let's start with:  What was deleted

4    is -- Your Honor, the provision before was that

5    CrossHarbor, if it is the successful bidder and does

6    continue to prosecute this development, intends to

7    contribute some property into the reorganized debtor.  And

8    what we've provided is, is that the carryback note would

9    include that as additional collateral to make it a safer

10   note for everybody who's getting deferred payments out of

11   the, out of the plan.

12             There was -- but in order to have bidding, you

13   need to have some apples to apples.  If additional

14   collateral is being put up by CrossHarbor, it's only fair

15   and the only way to really compare the remaining -- the

16   note that will be carried back is if there's additional

17   collateral posted by somebody else, by a competitive

18   bidder.

19             I still think it is advantageous for that note to

20   be more secure rather than less secure on an ongoing basis,

21   but due to the objections of the parties -- again, I think

22   that it's misunderstood, but due to the objections, have

23   struck that.  So CrossHarbor still would intend to -- as

24   anybody else can, can contribute to the reorganized debtor

25   whatever they want, but it will not be collateral for the

 1   note.  And since now the note will simply be secured by the

 2   existing assets of the debtor, there's no need for anybody

 3   else to contribute additional collateral or anything else.

 4   And so we pulled that out in response to both Credit

 5   Suisse's and committee concerns.

 6   Q.  (By Mr. Ream)  So to be clear, though, CrossHarbor is

 7   going to continue to put those in if it's the successful

 8   bidder, right?

 9       It will continue to pledge those 31 golf course lots as

10   additional collateral, but it's no longer a requirement of

11   any alternative bidders to match that collateral?

12   A.  No, I do not -- I believe it's CrossHarbor's business

13   plan to put that in if they're the successful bidder, but

14   they will not be pledged as collateral.

15       Quite frankly, I couldn't negotiate for them to pledge

16   it as collateral if somebody else that is in a competitive

17   bidding situation doesn't have to put anything in as

18   additional collateral.  So as I understand the definitive

19   agreement right now, it will not be additional collateral.

20   But that's what was asked for by Credit Suisse and the

21   committee.  They're going to be the ultimate beneficiaries

22   of the note.  If they want it less secured rather than

23   more, that's their choice.

24   Q.  The third line down, it makes reference to the CH

25   definitive agreement.  Do you see that?

1   A.  Yes.

2   Q.  And you've heard some discussion and objection to the

3   definitive agreement, but let me ask you a question first:

4   When do you anticipate an execution of the definitive

5   agreement?

6   A.  I would anticipate -- now that we've finished

7   negotiating the terms, I would expect that that would be

8   executed upon approval of the bidding procedures by the

9   Court, if it does approve the bidding procedures, such that

10   the bidder and thus the buyer protections are effective.

11   At that point, I understand CrossHarbor would be in a

12   position to execute and the debtor would be in a position

13   to execute.

14   Q.  Why wouldn't the debtor want this executed in advance

15   of the Court's approval of the bidding procedures?

16   A.  Well, frankly, I think they go hand in hand, but the

17   debtor certainly doesn't want to be obligated to make any

18   sort of payments or be bound in any way to CrossHarbor if

19   there's not an effective way to go forward with the

20   marketing of the assets.

21   Q.  There's also a change near the end of Paragraph C.

22   What is that change for?

23   A.  Yes.  I believe we've heard a lot of discussion last

24   time and we've heard some continued discussion today about

25   what I'll describe as rigidity.

1          And to adopt Mr. Beckett's analogy, we are trying to

2     get a vigorous horse race going.  But to get a vigorous

3     horse race, you do need to tell the horses and the jockeys

4     what time to show up, you do need to tell them the length

5     of the track, you do need certain rules and structures.

6          And, particularly, as has been expressed with a very

7     complex situation that involves collateral, noncollateral,

8     membership units, claims, and so forth, as a consequence, I

9     really do believe that we will have far more people

10    involved and we will have a much more workable process, a

11    process that can get to a successful end if, in fact, we

12    have some guidance.  What we've tried to do is -- I'll best

13    describe it as soften that guidance, make it more malleable

14    so that if people have particular proclivities, particular

15    things that are of particular importance to particular

16    buyers, we can try to accommodate that.

17         Here, specifically dealing with the working capital,

18    it's been -- the question -- our definitive agreement right

19    now requires that the successful bidder commit to, in fact,

20    a closing, put in $25 million in addition to the minimum

21    $30 million into the reorganized debtor.  It also

22    provide -- the definitive agreement requires that there be

23    $50 million of commitments into the acquiror to be

24    subsequently funded.

25         There's been the question of:  Is that too much?  Other

1    people may have different business plans.

2        And for clarity's sake, anybody can pursue whatever

3    business plan they want to.  There's not a single thing in

4    the definitive agreement or anyplace else that in any way,

5    shape, or form restricts the business plan that a

6    successful buyer can pursue.

7        And what we tried to do here is say that the working

8    capital that goes in, the subsequent working capital, needs

9    to be sufficient.  And that's what we've said "provides for

10   sufficient working capital".  We say:

11            "Not materially less than the amount to be

12   provided by the Purchaser in light of the capital structure

13   proposed by the bidder."

14            THE WITNESS:  And what that's attempting to

15   recognize, Your Honor, is that if somebody does want to buy

16   all cash, if somebody wants lower leverage such that there

17   is less working capital needed - because this project is

18   going to run at a loss for the next couple years no matter

19   who owns it, whether you do anything or don't do anything -

20   that if the actual working capital requirements are going

21   to be less and are projected to be less, we can accommodate

22   that.  And a prospective bidder would have to commit less

23   working capital if their structure provides that less is

24   going to, in fact, be needed.

25   Q.  (By Mr. Ream)  The next change is Paragraph D.  What's

1    the purpose of the change in Paragraph D?

2    A.  My recollection is that we just made it clear.  What we

3    made clear was that we, in fact, would accept a

4    contingency.  I mean we had always assumed it was a

5    contingency of the buyer being obligated, but that we made

6    it express that it would be okay for a buyer to bid with a

7    contingency being that the plan of reorganization against

8    substantially similar to that already filed or as might be

9    modified with the reasonable consent of the bidder.

10       And, again, trying to bring in some flexibility, that

11   the bidder will not be bound by exactly the plan that has

12   been filed, that there is opportunity for that to be

13   modified in an effort to broaden the field of potentially

14   interested bidders.

15   Q.  Let's turn to the next page.  And on the top of the

16   page is Subparagraph F.

17   A.  Yes.

18   Q.  What change was made here of significance?

19   A.  Again, in response to requests of both Credit Suisse

20   and the committees, they wanted a lower, nonrefundable

21   deposit.  I think in this environment and given the time

22   frame that our winning bidder has to, in fact, close or

23   we're out of cash, and given the magnitude of the asset

24   we're talking about, I think 10 million is still -- should

25   be a nonrefundable deposit.  Both the committee and Credit

1   Suisse wanted it lower, and so we cut it in half to

2   $5 million.  And we're doing that in order to accommodate

3   their wishes.

4   Q.  There's a substantial deletion from this paragraph, as

5   well, isn't there?

6   A.  That is correct.

7   Q.  And what is that deletion?

8   A.  That the -- and I believe this was the committee's

9   comment.  The committee did not want to see that

10  qualification presented or included within this paragraph,

11  and so we agreed to, to delete that qualification in

12  order -- I believe their perception was to ensure that we

13  had the full potential panel of qualified bidders bidding.

14  Q.  All right.  Moving to Paragraph H, this is a

15  confirmation, again, of a change made at the beginning

16  where decisions will be made in consultation with the

17  committees; is that correct?

18  A.  That is correct.  We specifically added:  "After

19  consultation with the Committees."  And as noted before, we

20  expanded the definition of "committees" to be all three.

21  Q.  And this is a determination of which factor in

22  reviewing the qualified alternative bid?

23  A.  This is to determine whether the alternative bidder has

24  sufficient financial wherewithal to go forward with it as

25  well as the nature of the adequate assurance of the

1    bidder's ability to perform in the future.

2       Again, there's a lot of constituencies here that not

3    only want to see value maximized, but also want to be sure

4    that what has happened to the club doesn't happen again.

5    And so there is -- and it's been a demand of both the ad

6    hoc committee as well as the UCC that the club, for lack of

7    better terms, be put into responsible hands and financially

8    capable hands.  And this -- we did provide that in the

9    original bidding procedures, but that was a determination

10   to be made by the debtors; it's now being made by the

11   debtors in consultation with all three of those other

12   groups.

13   Q.  Turn your attention now, Mr. Greenspan, to Paragraph M.

14   A.  Yes.

15   Q.  Could you please explain to the Court Paragraph M and

16   the purpose behind it?

17   A.  Yes.  Contrary to what has been said from the podium,

18   there's no attempt by the debtor to cut off anybody's

19   rights under the code or anybody's credit bid rights.  What

20   we specifically provided here is that if the bankruptcy

21   Court determines that Credit Suisse has the right to credit

22   bid, then, in fact, Credit Suisse can -- we use the term

23   "credit bid".  It's really the nature of an offset.  It has

24   a right to offset their secured claim against what they

25   would otherwise bid.

1    And so, again, rather than trying and cut it off, when

2    we put this together, we were aware that there was likely

3    to be a suit; again, not by the debtor, but by the, by the

4    committee against Credit Suisse.  And what we specifically

5    provided is, is that if the Court says they have both a

6    secured claim and they have the right to credit bid, then,

7    of course, they get to credit bid.

8        Furthermore, after listening to what has been happening

9    today, the debtor will change this.  From the debtors'

10   perspective, from our perspective, we'll stipulate they

11   have a right, from the debtors' point of view, to credit

12   bid or offset their secured claim.  That doesn't resolve

13   the issue of whether they have a secured claim, but from

14   our perspective, we would say they satisfy this.

15              THE WITNESS:  Just so Your Honor can understand

16   the complications of a credit bid, whether it be for the

17   equity or whether it be a 363 sale of the physical assets,

18   first of all -- and I did this very early, is I solicited

19   all the parties' interests as to whether they thought we

20   should try to sell the collateral and the noncollateral

21   separate.  And it was uniformly agreed, and I don't think

22   I've heard anything from anybody to the contrary, that

23   you're going to get a better overall value, the pie's going

24   to be a lot bigger - let's not worry about how to split up

25   the pie for a moment - but the pie's going to be a lot

1   bigger for everybody if you combine the collateral and the

2   noncollateral.

3           And the issue there is, is -- and somebody's

4   referred to it as "the lodge".  The noncollateral is a

5   fundamental piece of this entire project.  When we talk

6   about a lodge, I mean it's 100 -- it's a huge structure.

7   There's $110 million in it.  It's the parking structure,

8   it's the entire base of operations.  Even though many of

9   the home sites are ski in and ski out, many of the members

10  drive down there and then leave from the high-speed chair

11  that starts at the bottom and then runs up.  It includes

12  the multistory parking structure.  The parking structure

13  was built, and you can see where it's unfinished to build

14  units on top of it.  I mean it is -- it really is the

15  centerpiece.  And that's not part of CS's collateral.  It's

16  where the pro shop is, it's where the gym is, it's where

17  the major restaurant is that serves the entire resort as

18  well as the mountain.  You can sell the two pieces

19  separately, and you're not going to get anywhere close to

20  the value as you will if a buyer can buy both of them.

21          But then, secondly, we also have an issue -- and

22  I mean amongst the three lawyers sitting there advising me,

23  you've got three different opinions as to whether -- I

24  think it's pretty clear Credit Suisse has a lien on the

25  memberships that have been sold already, but you have

1    unissued memberships.  And there's a vigorous debate going

2    on - and my guess is they probably have a vigorous debate

3    over on their table, too - as to whether unsold memberships

4    are after acquired property or not.  There's no cookie jar

5    of memberships sitting there that a lien attaches to today.

6    Those are created.  Those come into being.  The next 400

7    memberships only come into being when someone shows up,

8    buys a lot, gets offered a membership, and then buys a

9    membership that's created at that point.

10          And so I think there is a -- there's a

11   significant legal issue as to whether - and there's another

12   100 million, 150 million of revenue to be derived from

13   selling those yet-to-be-issued memberships - whether a lien

14   attaches to the future offering and creation of

15   memberships.  And I don't know the answer to that one.  And

16   I can tell you three lawyers over there have three

17   different opinions.  So it's not a simple issue.

18          If we're going to a 363 sale, even assuming we

19   would - and I think that's very problematic - but if you

20   were, first of all, Credit Suisse can't bid on everything

21   that's being sold with a credit bid; and then, secondly,

22   there's a huge legal issue as to whether they have a lien

23   on and whether they're -- the credit bid would include a

24   value of future, to-be-issued memberships.

25          So the reason we teed it up this way is we

1    believe these issues really do meet -- and we were express

2    from the beginning - never going to hide the ball - that we

3    believe these issues need to be resolved by the Court if

4    they were to be able to credit bid.  And so we've teed it

5    up as best we can.  There's no way the debtor can resolve

6    these issues, and there's no way I could even resolve the

7    allocation of value without it being a major fight.

8           And also, quite frankly, the debtor doesn't have

9    a dog in that fight.  I mean that is a fight between the

10   secured creditor, the unsecured creditors, and the "B"

11   holders.  Because to the extent they don't have a lien on a

12   lot of this property, there may be a lot more value that

13   goes down to, to the equity or to the unsecured.  So I

14   don't think the debtor has a dog in this fight.

15          The dollars that are paid in is what we want to

16   maximize, the size of the pie.  How that pie is allocated

17   according to this I think is largely a legal issue that's

18   going to have to be resolved by the Court.  It's a legal

19   issue as far as what 's collateral and whether they have a

20   lien, and I think it's a factual issue as to what's the

21   relative value between the collateral and the noncollateral

22   that's being sold.  And it's quite clear we are, I think --

23   I know agree that we are going to be selling noncollateral

24   has part of the package.

25          So to simply say they can credit bid doesn't

1    answer any question, doesn't get us through any mechanics

2    at all.  And that's why we did it originally, and that's

3    why we're still sticking to the original structure.

4    Q.  (By Mr. Ream)  Can I ask you a question about the

5    future memberships?  You mentioned that 400 future

6    memberships attach to a lot.  Are there lots in existence

7    to sell a membership to attach to?

8    A.  No, you can't -- no, they're not.  And we talk about

9    this whole concept of, boy, we could sell four different --

10   four bidders buy four different parts.

11            THE WITNESS:  There weren't four parts to sell,

12   Your Honor.  Remember, what we have here, for the most

13   part, is acreage with a master plan that confers dwelling

14   units to the entire master plan area, dwelling unit rights.

15   So you can't go and sell -- first of all, you don't have a

16   subdivider to sell; but, secondly, you right now don't have

17   any allocation between condominiums and single-family

18   residences.  You don't have any definitive plan with what's

19   happening with a - (inaudible) - face, whether it's going

20   to be strictly skiing, whether it's going to be skiing and

21   homes.

22            I've done a lot of work where we have what's

23   known as a master plan development, and the master

24   developer develops what are known as super pads.  And then,

25   in fact, you do have the type of sale we talked about where

 1    you've got cross easements and CC&Rs.  And you have a

 2    master developer who's putting in the infrastructure but

 3    can then sell off, and you can offer bids.  If you, say,

 4    have nine super pads, you can bid for one, you can bid for

 5    two, you can bid for all nine.  And it can be sliced and

 6    diced because you have stand-alone entities with

 7    contractual agreements as to how all the others are going

 8    to be developed and what's going to be there.

 9            None of that exists here.  If somebody was to go

10    in -- there is no parts to buy.  But if you were to buy

11    parts, what you really care about is what ultimately

12    happens on a - (inaudible) - on the ski lift.  You

13    ultimately care -- the Warren Miller Lodge isn't finished.

14    You care whether it's finished out or not; and, therefore,

15    you've got to be able to control that.

16            This is not a situation -- there may be, there

17    may be a bunch of different business plans different buyers

18    want to adopt, and that's why there's nothing here that

19    restricts it.  But you've heard a lot of people ask

20    hypotheticals about if somebody wanted to buy parts.

21    Nobody has ever shown me - and I don't really believe it

22    exists - any way you could sell any part of this

23    development -- other than, of course, you could sell the

24    lodge separate from everything else.  It is on its own

25    separate condominium parcel.  But otherwise, I don't think

1   there's any feasible way and certainly no feasible way to

2   get an interested buyer -- with just one other exception;

3   that is:  We do right now have 37 subdivided lots.  So

4   those 37 lots could be sold off separate from everything

5   else.

6           But other than that, other than that one, that

7   one item, there is no way to slice this up into multiple

8   buyers who could possibly pay more than what somebody's

9   going to buy for the whole.

10  Q.  (By Mr. Ream)  Would there be much interest in buying

11  the lodge if you couldn't use the ski lifts next to it?

12  A.  I don't know.  You would have to test the market.

13  There might be.

14  Q.  Let's focus back to Paragraph M a little bit more

15  because I believe that His Honor asked a question where

16  Counsel answered a little while ago regarding:  What if

17  Credit Suisse wants to bid?

18      Does Paragraph M address that?  Because the judge was

19  concerned if -- that Credit Suisse had to come up with all

20  new money.  How does Paragraph M address that question?

21  A.  And, again, prior to submitting the original

22  procedures, I mean we wrestled with this as well as a lot

23  of things.  I mean there's nothing in here that has not

24  been hotly debated and very extensively thought out.  We

25  may not have gotten everything right and we may not have

1   thought of all permutations, but it's been a heck of a lot

2   of thought into trying to craft something that actually

3   would work in the real world.

4       What is provided here is that, assuming the Court says

5   Credit Suisse has the right to credit bid - and, again, I

6   think in this context, we would have been better to have

7   used the term "offset" - then what we say is that they get

8   to bid less an offset.  And we say right there:

9           "For the portion of the cash component that would

10  be payable to Credit Suisse under the Plan, plus a note" -

11  and we've added - "substantially similar to the promissory

12  note in the amount equal to the Liquidating Trust's share,"

13  on the terms of the note.

14      And that is because what is going to be paid by a buyer

15  is going to be presumably cash in a note.  That cash is

16  largely going to be -- again, if it's $100 million, if

17  there's no overbid; if there's an overbid, these numbers

18  change.  But at the $100 million level, that cash is

19  largely consumed in repaying the DIP and paying some other

20  administrative expenses.  The remaining cash is provided to

21  go to the liquidating trusts, subject to certain clawbacks

22  by Credit Suisse.

23      The note, which is the bulk of the value, will be

24  allocated between Credit Suisse and the liquidating trusts

25  based on the first priority and first amount going to

1    Credit Suisse and the full satisfaction of their secured

2    claim.

3        So what we say here is that Credit Suisse gets the

4    right to offset on their bid by the amount of cash they

5    would get in the sale at their bid amount; as well as the

6    amount of the note for which they'd be the beneficial

7    owner, they don't have to bid the amount of the note that

8    they would get to carry back.  So all they'd have to do is

9    pay the differential in cash that would go to the

10   liquidating trust, and they'd have to put up the note -

11   because we're trying to give them the same rights as

12   everybody else - they'd have to put up the note only for

13   the amount that would otherwise go to the liquidating

14   trust.

15       So what we've done is we've given them the full offset

16   - which is what a credit bid tries to do, as best I can

17   tell - giving them a full offset for the full amount of

18   their secured claim against what they'd have to bid at the

19   auction.

20           THE WITNESS:  And that was -- and, Your Honor,

21   that was in the original bid procedures, and it carries

22   through to this.  I mean it's been there from Day 1.

23   Q.  (By Mr. Ream)  On a side note but related to

24   Paragraph M, His Honor asked Counsel if Credit Suisse were

25   to make the 1111(b) election whether or not the purchaser

1   would be deciding whether to return the collateral.  And I

2   believe that Counsel gave an incorrect answer.  What's the

3   correct answer?

4   A.  I apologize for all my -- (inaudible.)  I was trying to

5   get Counsel the -- I think that Counsel probably basically

6   misheard the question.  No, the 1111(b) election -- which

7   again, our plan fully preserves 100 percent of their right.

8   And I think Mr. Chehi is right that people won't know how

9   to bid -- how to vote if their 1111(b) option is hanging

10  out there.  And that's why the code provides that they must

11  make their election, every secured creditor must make their

12  election by the time the disclosure hearing is over, the

13  disclosure statement's approved.  And that has to be for

14  people to be able to do exactly what Mr. Chehi said they

15  wouldn't be able to do if that wasn't decided by then.

16      But, no, the plan provides -- it fully protects and

17  preserves their 1111(b) right in the entirety.  But what it

18  says is, is that if they elect the 1111(b), then the

19  debtor, not the purchaser at the -- not the purchaser at

20  the auction, but the debtor is the one that would then have

21  the right to decide whether to go forward with the plan as

22  drafted or to give them their full collateral back,

23  pursuant to their election.

24  Q.  And then counsel for Credit Suisse argued that if the

25  debtor were to elect to give the collateral back, the plan

```
 1   would not be feasible.  Is that correct?
 2   A.  I actually think the plan probably ends up being more
 3   feasible, but that's for a different day.  I mean that --
 4   there's no doubt they're a dominant creditor.  There would
 5   be nothing better, I think, for this estate than to satisfy
 6   them out of their collateral.  If that happened, there
 7   would be no deficiency judgment.
 8       The estate has a lot of other assets.  The estate has
 9   Farcheville, the estate has the lodge, the estate might
10   have 400 more memberships to sell, the estate has very
11   significant avoidance actions.  I think if they actually
12   made their election and we gave them their collateral, that
13   everybody else would be paid in full and there's probably a
14   lot of money left over for equity.
15   Q.  All right.  Mr. Greenspan, back to -- if I could direct
16   your attention back to Exhibit C, the next page.  The top
17   of the page is Paragraph N.
18       This is, again, a conforming change to consult with the
19   committee; is that correct?
20   A.  That is correct.
21   Q.  And the same change was made in 5(a)?
22   A.  That is correct.
23   Q.  And if we could turn, then, to --
24   A.  And, again, those are all the auction procedures.  It's
25   how the auction's conducted, it's at the auction.  It's
```

1    deciding who's the beginning bidder, who's an overbidder,

2    and so forth.  It will only be done with consultation with

3    all those parties.

4    Q.  So the control issues, transparency?  Is that what

5    those changes were made for?

6    A.  Correct.

7    Q.  And turning to the next page, Paragraph D, there are

8    numerous changes in that.  Why don't we take these a little

9    bit at a time.

10       At the very top of the Paragraph D, there's a change.

11   What's the first change for?

12   A.  The way this auction is designed, and many are, is that

13   you start with what is deemed to be the highest bidder.

14   And, again, that's a discretionary decision, hopefully

15   exercised properly.  But we've changed it so that all three

16   committees will have input into the decision of what is the

17   highest and best offer in order to begin the auction.

18       Do you want me to just continue down, or do you want to

19   just --

20   Q.  Yeah.  Well, in the middle of the paragraph, there's

21   some additional considerations.  How did those get in there

22   and why?

23   A.  Again, I wouldn't necessarily put those there, but the

24   committee specifically asked that those provisions be put

25   in to, I think, give, I think from their perspective,

1   greater objectivity to the touch points that will be

2   considered in evaluating the bids.  And we looked at those

3   and evaluated them and agreed that those were reasonable

4   items and that we would, in fact, include them as express,

5   if you will, transparent items that will be considered in

6   determining what is the highest and best bid.

7   Q.  And then the final third of that paragraph there is a

8   change.  What was that change for?

9   A.  Well, again, then just before you get to that, again,

10  in just even determining who's the winning bidder, it's

11  going to be done in consultation.

12      Towards the end -- and, again, you've heard it today

13  that people may want parts and pieces.  And Credit Suisse

14  in particular suggested that a bidder might want and might

15  find some synergies in the other assets owned by the

16  debtor.  And Credit Suisse requested that we make available

17  the other assets to be bought in combination.

18          THE WITNESS:  Again, kind of what you've heard,

19  Your Honor, this morning, about -- or this afternoon about

20  kind of the picking and choosing and assembling.

21          And so there are some discrete assets.  And to

22  the extent a bidder does want to bid on those and does want

23  to condition their bid as being a valid bid only if, in

24  fact, they are the successful bidder on all of those

25  assets, we've made that the provision.  We always were

1  going to include those assets in those deal room, the

2  electronic data room, and those are now specifically

3  included in the data room so that a bidder can bid on all

4  or in part.

5  Q.  (By Mr. Ream)  And that was a request made specifically

6  by Credit Suisse?

7  A.  And they're the only ones that made that request.

8  Q.  Did you read the Credit Suisse objection to these

9  revised bidding procedures?

10  A.  Yes.

11  Q.  And did you read that they allege that the debtors and

12  you did not negotiate with them in good faith?

13  A.  Yes.

14  Q.  Is that accurate?

15  A.  I don't think so.

16  Q.  And why don't you think that's accurate?

17  A.  Because immediately after the hearing, I mean before we

18  even had an order, Credit Suisse had obviously expressed

19  some objections.

20       THE WITNESS:  And so I went to Credit Suisse

21  before we had your order and asked them to, please, you

22  know, go through and enumerate what their objections are,

23  what are the issues that we could look at even if -- quite

24  frankly, even if you had signed the order, I'd deal with

25  their objections and their issues as best I could.

1        And they, in fact, did provide us a list.  You

2   know, the Skadden papers say they first heard about it on

3   the Saturday and had to file it on Monday.  I actually went

4   to them immediately after the hearing and, in fact,

5   received from them a list of issues.  Before you even

6   entered your order, I received a list of issues, I think,

7   on the Saturday before, a week before that.  And I

8   attempted to incorporate as many -- and I think I

9   incorporated virtually all of their comments at that stage

10  into the revisions.

11       Then, again, we also talked to them and then

12  subsequently provided them a revised document and asked for

13  their comments on the revised document itself.  And I

14  apologize to everybody for - and the Court included - the

15  short timing.  I mean the fact is:  Something gets filed at

16  midnight last night only because we're working up until the

17  time it gets filed.

18       This is, this isn't the way we'd like to do it,

19  but this is really a rocket docket.  And we've got a whole

20  bunch of people we're trying to please, and we're doing our

21  darndest to deal with them to incorporate and also deal

22  with, frankly, the litigation environment.

23  Q.  (By Mr. Ream)  So that communication of issues from

24  Credit Suisse, that was made to you in writing; is that

25  correct?

1    A.   Correct.

2    Q.   And would you turn to Exhibit A, please?

3    A.   I have it.

4    Q.   Do you recognize Exhibit A?

5    A.   Yes.

6    Q.   And what is Exhibit A?

7    A.   Exhibit A is the e-mail that Mr. Yankauer sent to me.

8    I think I called him on the Friday -- we had our hearing, I

9    think, on Wednesday, or so; flew back on Thursday; and I

10   called him on Friday, I believe, to talk to him about the

11   bidding procedure issues and their concerns.  And he sent

12   me this e-mail the next day, on Saturday.

13   Q.   And who's Mr. Yankauer?

14   A.   Mr. Yankauer is the point person for the agent on the

15   credit.

16   Q.   You mention that you reached out to Credit Suisse and

17   then attempted to incorporate Mr. Yankauer's concerns in

18   what is the revised bidding procedures, correct?

19   A.   Yes.

20   Q.   Did No. 1 of Mr. Yankauer's concerns make it into the

21   bidding procedures, the revised bidding procedures?

22   A.   I believe in a number of ways, No. 1 did make it in.

23   To the extent what, to the extent what Credit Suisse wants,

24   which is -- I can best describe it is kind of a rugby

25   scrum, and that is just anybody can make an offer on

1    anything, in any way, in any combination.  That would be a

2    disaster both in trying to get people to the table as well

3    as then trying to deal with what they put forward.

4        But other than just abandoning the concept that there

5    is a defined structure to how you're going to make offers,

6    other than sticking with that, we went as far as we could

7    to change the other terms with -- that the other assets of

8    the debtor can be included, the amount of the note could go

9    up by 50 percent.

10        And, of course, they can pay all cash, too.  The note's

11   not mandatory.  The note is simply an effort to try to get

12   higher prices and higher values as well as modifying the

13   terms so that they do not have to live exactly with that

14   note and they do not have to live exactly with the

15   contract, you know, what's been known as the definitive

16   agreement.

17   Q.  So there isn't unlimited potential for investors to

18   offer different structures, but there were changes made to

19   allow different structures, correct?

20   A.  That is correct.

21   Q.  Was everything that Mr. Yankauer asked in this

22   paragraph included in the revised bidding procedures?

23   A.  I'm sorry, I didn't understand the question.

24   Q.  Let me be more specific.  Did you agree that the

25   debtors should terminate exclusivity as part of the bidding

1   procedures?

2   A.  No, I did not.

3   Q.  All right.  Regarding Paragraph 2 --

4   A.  Yes.

5   Q.  -- were any changes made consistent with this request

6   by Mr. Yankauer?

7   A.  Yes.  Credit Suisse is the only one that made this

8   request, and we adopted it wholesale.  He was concerned

9   that people might want other assets.  And so we've opened

10  it up so that you can buy some or all of the assets, and

11  you can condition your bid upon getting all of the assets

12  if that's the only way you want any of them.  So I believe

13  I accepted his comments in toto.

14  Q.  Well, when we refers to, quote, Yellowstone Club World,

15  what assets or what change was made in the bid procedures

16  regarding the Yellowstone Club World?

17  A.  Well, as he specifically states there, the debtor, the

18  debtors own 100 percent of the stock in nonfiled

19  subsidiaries that -- again, if you further subsidiaries,

20  one owns property in St. Andrews, Scotland; and the other

21  owns the Chateau Farcheville.

22      So to the extent the buyer is interested in buying

23  Yellowstone Club in Montana and only wants those other --

24  only wants it if they can buy those other properties, they

25  can bid that way; or, frankly, if they just want to buy

1    Scotland or just want to buy Farcheville, the procedures

2    also allow that, as well.

3    Q.   What about Paragraph 3?  Did you make any changes to

4    the bid procedures proposal for Paragraph 3?

5    A.   No, I did not.  And what that is saying is, is that the

6    procedures only allow cash - (inaudible) - debt, but

7    there's other types of permutations such as warrants other

8    potential upside that might enhance recoveries.  And I did

9    not make any changes to accommodate that.

10   Q.   Did you accommodate any of Mr. Yankauer's concerns

11   regarding Paragraph No. 4?

12   A.   Yes, I did.

13   Q.   What were those?

14   A.   And that is what was -- he was concerned that we would

15   not allow a carryback paper more than 70 million.  We

16   increased that that by a full 50 percent, up to

17   $105 million.  And then I think he actually just has a typo

18   in the next line where it says:  "A purchaser paying a

19   big price with low leverage would be precluded."

20       It's just the opposite:  A purchaser paying a big price

21   with low leverage is encouraged.

22       But, in fact, we are trying to preclude big-price

23   purchasers with big leverage.  That's not, in this world, a

24   feasible, realistic way to go about any real-estate

25   development, particularly one that, frankly, is as

1    speculative as this one.  And I can't endorse as feasible

2    and as a reorganized debtor high price, high leverage.

3    Q.  When you say "high leverage", how does that affect

4    feasibility?

5    A.  Well, the higher the leverage, the greater the chance

6    of a subsequent reorganization and a failure.  It does two

7    things:  It, No. 1, increases the annual debt service that

8    has to be paid; and then obviously secondly, it also

9    increases the amount that has to be generated from the

10   project in order to repay that encumbered debt.

11       The other thing is, is that if you want to keep this

12   process, and for lack of better words, I'll call it

13   "honest", you need to limit the amount of debt.  If

14   somebody can bid relatively little cash and the rest paper,

15   you've essentially just created an option.  You've created

16   a situation where someone puts the money down, speculates

17   on the market change, speculates on being able to re-flip,

18   or something, and then can walk away.  Because on all of

19   these terms, these notes are not in recourse to the

20   ultimate buyer.  And so, consequently, if you don't require

21   a meaningful amount of cash, you cannot have big price, big

22   leverage without just opening yourself up to be back here

23   again in a year or two years.

24   Q.  So without limit, you could have a $200 million offer

25   at $10 million cash and $190 million in leverage?

1    A.  If you do not restrict the amount of leverage, that is

2    exactly what you could have.  And then you're in the

3    situation at the auction and dealing with the multiplicity

4    of constituencies trying to say -- if somebody else bid

5    180 million with low leverage and somebody bids 200 million

6    with high leverage, how do you really evaluate those two as

7    to what's better for the members, the vendors, Credit

8    Suisse, and every other constituency involved?  And you

9    would have, quite frankly, a vast difference of opinion.

10       The same thing -- one of the reasons why I said "no", I

11   don't believe warrants or equity kicker are going to the

12   constituencies.  The value of those warrants and equity

13   kickers are going to depend strictly upon the projections

14   you use.  And I guarantee you, if we have 5 bidders and 6

15   parties here, that's 11 different entities.  We're going to

16   have 12 projections.  I mean nobody's going to come eye to

17   eye on projections.  And that's fine.  That's what makes

18   bidders and buyers and sellers.  But for us to try to

19   reconcile those and actually say what leads to highest and

20   better in this environment I think would be an impossible

21   task.

22   Q.  How did you address Mr. Yankauer's concerns in

23   Paragraph 5?

24   A.  What he says is that the note terms were not specified.

25   In fact, that was absolutely correct when we were here with

1    the bidding procedure before.  And that's been remedied.

2    Not only do we spell out in the order the major terms of

3    the note, but we've attached a copy of the proposed note to

4    the disclosure statement.

5    Q.  You've heard some argument of counsel regarding the

6    note rate, 5 percent above LIBOR.  How does that affect

7    value, in your opinion?

8    A.  Well, I suspect there's going to be an ongoing fight as

9    to whether that's -- those are market terms or not market

10   terms; however, the fact is - and I think every one of the

11   valuation people and every one of the appraisers will tell

12   you - the very fact that we're offering a note here is

13   likely to -- it certainly will not result in a price less

14   than market value and is likely to result in a price higher

15   than market value.  Because market value is an all-cash

16   purchase and sale.

17       And so to the extent you're inducing buyers with

18   leverage, and particularly if you're inducing buyers with

19   leverage on a note they can't get out in the market, which

20   this may or may not be, but to the extent that is, then

21   you're actually generating for the parties a higher nominal

22   price.  And so the issue of whether, whether the note bears

23   a market rate of interest or not may have something to do

24   with confirmation ultimately.  But, if anything, if Credit

25   Suisse is correct in the papers they just filed that the

1  note actually is below market rate of interest, it's

2  actually going to induce a higher than market price paid

3  for the assets.

4  Q.  In Paragraph 6, Mr. Yankauer makes reference to his

5  concerns about qualified alternative bidders having to put

6  up additional collateral.  That was resolved, wasn't it?

7  A.  Again, it was resolved by taking it out.  Again, I

8  continue to believe that's a mistake, but they asked for it

9  and the committee asked for it, so we took it out.

10  Q.  And what about Mr. Yankauer's concerns in No. 7?

11  A.  Well, again, the major concern there was that they did

12  not know what the terms of the definitive agreement is.

13  And we have -- or are, I apologize -- we've -- it wasn't

14  done then, but we wanted to get the marketing process

15  started.

16      And so we've now concluded that, and we've attached it.

17  So the issue that it's no longer, no longer disclosed, of

18  course, is not the case.  And what we've done in the

19  bidding procedures order itself is changed the language to

20  basically be substantially similar to give modification

21  opportunity that we are not holding anybody to those exact

22  terms.

23      And then, secondly, I think we very well may -- you

24  know, it was all these documents.  I mean if this was a

25  collusive situation, we would have had documents to you two

1    months ago.  Every one of these documents have continued to

2    be negotiated for 60 days or 45 days up until last night.

3    So these were negotiated documents.  And we've tried to

4    make them documents that both give the estate sufficient

5    rights but also are attractive enough to a prospective

6    buyer that the buyers are not dissuaded from participating.

7        I mean I could, I could have a killer document for the

8    estate, but all it does is depress the value these people

9    want and keeps the bidders away.  The flip side is:  If

10   it's too good for the bidder, the allegations are going to

11   be it's a sweetheart deal with CrossHarbor.

12       The reality is:  Every single bidder is being offered

13   -- to the extent it's a good deal for CrossHarbor, every

14   other bidder is being offered that or better through the

15   document.

16   Q.  Finally, what about Mr. Yankauer's concerns with the

17   capital structure set forth in Paragraph 8?

18   A.  And, again, we're -- anybody who buys it, heaven help

19   them with their business plan.  I mean they can have

20   whatever business plan they want.  We've looked at a number

21   of different models.  What we did in the disclosure

22   statement is, is -- my model doesn't agree with

23   CrossHarbor's model.  We put in two different models

24   because one reflects what the bidder believes -- the

25   stalking-horse bidder believes is the right way to look at

1    it and the way they value it; there's another that is mine

2    and the debtors' perspective.  Any other bidder could have

3    any other perspective.

4        I've yet to see a model or a concept that does not

5    require very substantial working capital.  And, also, if we

6    are proposing a reorganized debtor and we're proposing that

7    the creditors and Credit Suisse, and so forth, stake their

8    recovery out of this estate upon the ability to continue to

9    service the debt and prosecute the development, we owe it

10   to them and we owe it to the creditors and we owe it to the

11   members to ensure that there's sufficient capitalization.

12       And I've tried to walk the line.  There's a lot of

13   arguments that it should be more than 75 million.  I have

14   yet to see any argument that it should be anything

15   meaningfully less than 75 million.  But we did change the

16   language so that if somebody proposes a capital structure

17   that indicates that you need less than 75 million, that

18   then they can go ahead and bid, and that will be evaluated,

19   and they can bid with less than a $75 million commitment.

20       So we've attempted to accommodate it.  Again, we can

21   spin out whatever hypotheticals we want.  It's going to

22   require darn close to 75 million, if not more, capital.

23   And so we can talk about, "Yes, we'd like more

24   flexibility."  We've built in flexibility, but we want a

25   successful reorg, not a 22.

1  Q.  You then communicated with Mr. Yankauer after the bid

2  procedures were revised, is that correct, and gave him an

3  opportunity to comment on the revised bid procedures?

4  A.  I believe, I believe we sent them to them.

5  Q.  And when you heard back from Mr. Yankauer, what did you

6  hear back?

7  A.  I don't -- I mean I don't -- I'm long beyond being able

8  to recollect specific conversations.

9  Q.  All right.  At least as to the eight provisions in his

10  communication of February 14th, though, substantially all

11  of them were included; is that correct?

12  A.  I believe so.

13  Q.  All right.  You mentioned this actually just a minute

14  or two ago:  Is CrossHarbor controlling this Chapter 11

15  process?

16  A.  I certainly don't believe so.

17  Q.  Is CrossHarbor controlling the revised bid procedures?

18  A.  No.

19  Q.  Is CrossHarbor dictating to you what terms you're

20  agreeing to and what you're not going to agree to?

21  A.  They are -- and I take offense to the term "dictate".

22  They are the other party to the contract, so nothing --

23  there's nothing hidden or secret about this:  There's

24  nothing in that contract they don't ultimately agree to.

25  And there's nothing that -- therefore, if you want to use

1    the term, there's nothing in that contract they don't

2    insist upon as ultimately a bottom line.

3        The deals, the terms, these bidding procedures, and

4    everything else don't look anywhere close to what they

5    started with or, frankly, what I started with.  This has

6    been a long, negotiated process.

7        It has resulted in mutual agreement.  Ultimately,

8    that's what you need in order to get any document and deal

9    signed; and, frankly, quite -- and it also includes now

10   mutual agreement from the unsecured creditors committee.  I

11   mean, again, they haven't dictated terms here any more than

12   CrossHarbor has.  Certain changes were needed in order to

13   induce their consent.  But I don't believe they or anybody

14   else are dictating -- any more than I'm dictating the

15   terms.  I mean these terms are only there if we can get all

16   the parties who have to sign on to sign on.

17   Q.  And so would you characterize it as an arm's length

18   negotiation, then, between you and the committees and

19   CrossHarbor?

20   A.  I certainly believe so.

21   Q.  Has any entity other than CrossHarbor expressed any

22   interest in stepping forward to be an alternate stalking

23   horse in this matter?

24   A.  No.

25   Q.  Any expressions of interest?

1    A.  Well, there's been a number of parties who expressed an

2    interest in Yellowstone Club, but nobody has moved forward

3    to the point of even talking about making a commitment.  I

4    mean we're talking about a binding commitment to put up a

5    lot of cash and take this subject to a note.  Nobody else

6    has expressed a commitment to do that at any number.

7    Q.  His Honor has expressed concern regarding the debtor

8    somehow attempting to take away Credit Suisse's credit bid

9    rights.  You've already testified that that is absolutely

10    not the intent of the debtors.  Then why is this plan

11    structured as an equity sale instead of an asset sale where

12    they could credit bid?

13    A.  Two reasons is, is -- one:  I believe and everybody

14    I've talked to believes that being able to convey this

15    asset with a reasonable understanding, a group of

16    memberships intact is the way to maximize value and is the

17    only way to get the consent of the unsecured creditors

18    committee, the ad hoc committee.

19        So to the extent we are looking for a consensual

20    process, the only way to do that is through a process that,

21    in fact, spells out and assumes the membership agreements,

22    at least the -- what we'll describe as the normal

23    membership agreements, which is what our plan provides for.

24    Going out in an unencumbered 363 sale can never achieve

25    that.

1    And try to picture the concept of getting -- I mean

2    we -- and, again, this will be -- there's other things that

3    aren't in here, but in response, I mean everybody's wanted

4    the broadest marketing process possible.  I've expressed

5    some reservations about a total broadcast.  But, again,

6    basically listening to what's been -- what everybody said,

7    is I told Coldwell Banker to go ahead -- or CBRE to go

8    ahead and do the very broadest broadcast they have, which

9    is 18,500 qualified entities and institutions.

10        THE WITNESS:  You can only imagine, you know, in

11   the, in the first day -- and from the day you signed your

12   order, they've been working.  I mean don't let anybody tell

13   you to the, to the contrary.  Between site inspections,

14   doing the memorandum, getting the teaser in order putting

15   together the logistics of handling the responses now has

16   taken two weeks.  And that's why they -- whenever I talk to

17   them about their marketing period, they believe their

18   marketing period started the day we gave the go-ahead.

19        Just handling what's now going to happen -- and

20   if you layer onto that that if there's no agreement with

21   members, there's no structure as to what's happening with

22   members, you're going to suddenly have 40, 50, 60, 100

23   different buyer groups on the property trying to approach

24   and, quote, make a deal with members that they are going to

25   presumably do post-confirmation whether the membership

1    agreements are rejected or accepted.

2         No buyer can just walk into that structure and

3    then try to make heads or tails and try to make -- what

4    we're looking for is north of a $100 million commitment

5    investment.  Now, this isn't somebody taking a flyer on

6    this; this is somebody that's going to do a massive amount

7    of due diligence and is going to commit huge resources.  So

8    I don't believe that, unless you give them a structure they

9    can step into -- and, again, we've tried to modify it or

10   round the edges so they can change the definitive

11   agreement, they can change the terms of the note.  But

12   unless you get a structure that involves a way, for

13   example, to ensure that the member agreements are assumed

14   -- if they buy the asset and might reject the member

15   agreements, then there's a whole other issue; or if they

16   buy, then, and they don't honor the member agreements,

17   we're back to a point of adequate assurances.  If they buy

18   the assets out of the estate, how do I show adequate

19   assurance that I can perform on the member agreements?

20   Because I no longer control the assets.

21        So then we walked through the issues of:  How do

22   you actually get buyers to the table and to perform?

23        And then, secondly, when you actually walk

24   through what's involved in bankruptcy claims, which is what

25   the member agreements are, and the acceptance or rejection,

```
 1    we came to the conclusion - and I still believe it - that
 2    the only way to have a really robust process is through a
 3    plan equity process.  And that, in fact, what somebody is
 4    going to bid for the plan equity will far surpass what
 5    they're going to bid for the 363 assets where there is no
 6    member tails that go along, where there is no membership,
 7    cohesive membership.  And I said, also, we would never get
 8    consent.  I don't think we'd consent from the committee and
 9    we'd never get consent from the ad hoc members committee to
10    do a process like that.
11            So I do think that it's both necessary if we're
12    going to get to a confirmed plan as well as a way to
13    maximize the value of the assets we're trying to sell.  And
14    that is to do it through a tidy unit but people know where
15    it's going, rather than have rejection or acceptance of
16    memberships and simply the unencumbered assets being sold
17    off.
18            Plus, you then have the second issue of:  We've
19    got both collateral and noncollateral.  And I, frankly,
20    have never seen a 363 sale where those have been bundled
21    together.  I don't know how you would approach that sale.
22    I'm not sure what you do about a credit bid.  And I'm not
23    sure what you do if one person comes in and says, "I'm
24    willing to pay more for just one than the other," and then
25    what the estate does with what's left over.
```

1  Q.  (By Mr. Ream)  Does a $300 million credit bid chill

2  bidding?

3  A.  I'm sorry you didn't ask CBRE when they were here.  I

4  certainly think the prospect of a credit bid is usually

5  believed to chill bidding.  And, again, let's -- by "chill

6  bidding", I mean that seems to have bad connotations.

7  Let's separate out the -- does it improperly chill bidding?

8  No.  I mean they're entitled to credit bid under the code.

9      Does it diminish potential interest?  Yes.  But I mean

10  that's the same thing with the fact that CrossHarbor's been

11  involved in the property for the last year and a half.  We

12  talk about it chilling bidding.  It does dissuade some

13  people.  Is it improper chilling?  No, it's no more

14  improper chilling than their right to credit bid.

15      It does affect market perceptions, and so does the

16  capacity of somebody without putting up any new cash to

17  come in and overbid every other bid up to 310.  But I -- we

18  didn't try to take away that right of theirs, we're not

19  trying to take it away now.  As I said, we will, we'll

20  agree that if the Court determines they have a secured lien

21  in a particular amount or in an amount up to the face value

22  of, of their note, we've provided for a mechanism that, I

23  think, effectively gives them the full equivalent of credit

24  bid through offset rights and an equity bidding process.

25  Q.  Do you recall from the judge's memorandum decision that

1    he said he wanted bidding procedures that didn't overly

2    favor CrossHarbor or Credit Suisse?

3    A.  Yes.

4    Q.  The revised bidding procedures, in your opinion, do

5    they overly favor either CrossHarbor or Credit Suisse?

6    A.  I don't believe so.

7    Q.  Lastly, what would delay -- what are the consequences

8    of delay from today?  If we don't move forward with CBRE

9    and these bidding procedures, what's the real practical

10   consequences?

11   A.  Well, we've got CBRE moving immediately, and I think

12   they are going to continue to move immediately.  But what

13   we are -- because we do have a limited window here, is that

14   they are going to have to be more specific -- well,

15   actually, well, there's two things:  If we don't move

16   forward with the bidding procedures, then we obviously

17   don't have a stalking horse, and that creates whole other

18   different issues with the estate as far as funding and as

19   far as certainty; and, secondly, if the world knows we

20   don't have a stalking horse, then you start having the

21   prospect of the people coming in -- everybody wants to come

22   in and take a shot at a $25 million offer thinking maybe

23   nobody else will show up.

24       So I mean that's -- there's real legitimate reasons why

25   you have a stalking horse both for this estate and in

1    general.  But beyond that, very soon CBRE has to move

2    beyond describing what somebody is buying in the tangible

3    sense and telling them the structure by which they're going

4    to buy it.  And that's really probably going to have to be

5    done before most people start their due diligence.  They're

6    not going to spend the six figures necessary to

7    appropriately due-diligence this deal unless they

8    understand the road map of if they spend the money and if

9    they are the prevailing -- and what are they going to be

10   bidding on?  How are they going to be bidding?  And what's

11   going to determine whether they're the prevailing bidder?

12       And it's only by having bidding procedures in place

13   that we get there.

14               MR. REAM:  If I could have a moment, Your Honor.

15               THE COURT:  You may.

16               MR. REAM:  One final small area -- sort of small,

17   Your Honor.

18   Q.  (By Mr. Ream)  Mr. Greenspan, over the break, did you

19   have some negotiations with CrossHarbor regarding the

20   potential of a short continuance of both the auction

21   deadline and the confirmation deadline if we can be moving

22   forward on these bid procedures?

23   A.  Yes.

24   Q.  And what were those negotiations?

25   A.  Well, the negotiate -- I mean the genesis of the

1  negotiations is to give more time as well as, given now

2  what looks like a trial schedule -- because there are a

3  number of issues that necessarily need to be resolved, I

4  believe, before we can have the auction and know what

5  everybody's rights are within that auction that --

6  CrossHarbor agreed that if we can get bidding procedures

7  done and if we -- if this process is actually moving

8  forward, that they would extend all the deadlines by 21

9  days, that we'd get yet -- so instead of, basically, it

10  being the end of April, we're looking at -- we push back

11  the auction by about three weeks, and we could push back

12  the plan confirmation and all the other steps three weeks.

13      So instead of being the end of April, we'd be -- or the

14  plan approval, instead of it being the end of April, we'd

15  be looking at somewhere around the 20th of May for

16  confirmation and then hopefully a closing that's quickly

17  thereafter.  There's still funding issues we've got to deal

18  with on that.  We only have a budget through April.  But

19  assuming we can get through the funding issues, they've

20  agreed to extend by another three weeks.

21          MR. REAM:  I have no further questions, Your

22  Honor.

23          THE COURT:  Who wishes to go first?

24  Mr. Saunders?

25          MR. SAUNDERS:  I'd love to, Your Honor.  I don't

1    know what Your Honor's practice is in whether you have a

2    time in mind for an afternoon break or --

3             THE COURT:  I'm having trouble hearing you.

4             MR. SAUNDERS:  I don't know what Your Honor's

5    practice is in whether you have a time in mind for an

6    afternoon break or if you just want to plow through.  But

7    I'm happy to keep going.

8             THE COURT:  Let's proceed.

9                       CROSS-EXAMINATION

10   BY MR. SAUNDERS:

11   Q.  Mr. Greenspan, I think you testified that one of the

12   downsides of permitting a bidder to propose a low cash/high

13   note combination is that, essentially, it would be giving

14   that bidder an option; is that right?

15   A.  Well, the -- if they prevailed and put down very little

16   cash, that, in essence, is just an option, yes.

17   Q.  Okay.  And that would be a bad thing, right?

18   A.  I believe it's a bad thing for a reorganized debtor and

19   for the community.

20   Q.  Okay.  There is no executed definitive agreement with

21   CrossHarbor, right?

22   A.  Right now there isn't, but when we have approved

23   bidding procedures, I understand there will be.

24   Q.  Okay.  But CrossHarbor hasn't signed anything and

25   they're not contractually committed to anything at this

1   point, right?

2   A.  Nor is the debtor.

3   Q.  Sure.  But CrossHarbor is not, correct?

4   A.  Correct.  I'm sorry, correct.

5   Q.  Okay.  So if the world changes tomorrow or their

6   opinion of things change tomorrow, they can -- even after

7   the bidding procedures are approved, they're not obligated

8   to do anything, right?

9   A.  That is correct.

10  Q.  Okay.  And even if you were to sign up, even if the

11  bidding procedures were to be approved and you were to sign

12  up the definitive agreement in the form that's been filed

13  with CrossHarbor, there is a liquidated damages provision

14  in that definitive agreement that would cap the debtors'

15  remedy in the event of any CrossHarbor breach at

16  $5 million, right?

17          THE WITNESS:  Again, Your Honor, this is my

18  point.

19          Yes, I had it at 10 million so it was meaningful.

20  Your client and the committee asked that it be reduced.

21  So, yes, it is only 5 million, but not out of my choice.

22  Q.  (By Mr. Saunders)  Okay.  Well, let's be perfectly

23  clear about what we're talking about.  I'm not talking

24  about the deposit that's required or the letter of credit

25  that's required under the bidding procedures.  Okay?

1       Because that doesn't apply to CrossHarbor anyway,

2    right?  They're exempted from that requirement, right?

3    A.  No, because we --

4    Q.  Well, let's take one.

5    A.  I'm sorry, no, they're not.  They have right now about

6    10 million up that will be an admin claim.  They'll have

7    about 20 million in the DIP.  And so we have the right to

8    offset against that.  Just like Credit Suisse doesn't have

9    to put up any new money, they would be subject to the same

10   penalty just like CrossHarbor, just like any new bidder.

11   So the penalty they'll be subject to - because they've got

12   real cash up - is exactly the same and it carries through.

13   Q.  Okay.  Could you take a look at the red-lined version

14   of the bid procedures that's Exhibit C --

15   A.  Yes, sir.

16   Q.  -- in the set of exhibits you already have?

17   A.  Yes.

18   Q.  Okay.  Now, the introductory language on page 2 at

19   Section 4 for qualified alternative bid, do you see that?

20   A.  Yes.

21   Q.  Okay.  It says:  "An Alternative Bid will qualify for

22   consideration only if the Alternative Bid is a 'Qualified

23   Alternative Bid.'  To be a Qualified Alternative Bid, the

24   Alternative Bid shall either be submitted by Purchaser" -

25   which is CrossHarbor - "or must."

1     So all of the things that follow are requirements that

2  apply only to people other than CrossHarbor, right?

3  A.  Correct.

4  Q.  Okay.  So including, for instance, the requirement in

5  Subparagraph F that an alternative bid be accompanied by a

6  cash deposit or a letter of credit in the amount of

7  $5 million?  That Subparagraph F requirement does not apply

8  to CrossHarbor, correct?

9  A.  It does not apply to CrossHarbor or Credit Suisse, that

10  is correct.

11  Q.  Okay.  And under the form of definitive agreement,

12  okay, that you've filed, there is a liquidated languages

13  provision, okay, that provides the sole and exclusive

14  remedy to the debtors in any event that CrossHarbor were to

15  breach that definitive agreement, right?

16  A.  Yes.

17  Q.  Okay.  Liquidated damages of -- capped at $5 million,

18  right?

19  A.  And that is why "F" doesn't apply to them because it's

20  in their -- it's in the definitive agreement.

21  Q.  Okay.  So if you were to sign up the definitive

22  agreement and we went down this path, and 45 days from now,

23  whenever it is, CrossHarbor decided the world had changed

24  and it no longer wanted to go forward with this transaction

25  - it had no contractual basis to refuse to go forward but

1  it just decided it didn't want to - it would be entitled to

2  give you $5 million and walk away, and that would be it,

3  right?

4  A.  And I spent weeks negotiating them up to 10 million and

5  then, at your request, lowered it to 5 million.

6  Q.  Okay.  In the definitive agreement, the liquidated

7  damages provision is $5 million, right?

8  A.  Yes.

9  Q.  Okay.  Now, what is the purchaser or who is the

10  purchaser under the definitive agreement?

11  A.  It is CrossHarbor Capital, and it can be a permitted

12  assignee that they control.

13  Q.  Well, isn't it true that the actual purchaser, the

14  party to the form definitive agreement is New CHYMC

15  Acquisition, LLC?

16  A.  I'm sorry, yes, correct.

17  Q.  Okay.  CrossHarbor Capital Partners is not proposed to

18  be a party to the definitive agreement, right?

19  A.  I believe you're correct.

20  Q.  Okay.  Do you know whether New CHYMC Acquisition, LLC,

21  even exists?

22  A.  I personally don't have knowledge of that.

23  Q.  Okay.  You've never seen Delaware documentation or

24  documentation from any other state that shows that that LLC

25  actually exists?

1    A.  At this stage, I have not.

2    Q.  Okay.  Have you been given any information about how

3    New CHYMC Acquisition, LLC, is capitalized, if at all,

4    whether it has any assets or any money?

5    A.  I am advised they have commitments for capital.

6    Q.  Okay.  Commitments for capital by people who are not

7    parties to the definitive agreement?

8    A.  Correct.  The only parties to the definitive agreement

9    are the debtors and that entity you've just described.

10   Q.  The shell?

11   A.  The buyer.

12   Q.  Okay.  The shell, New CHYMC Acquisition, LLC, right?

13   A.  I don't know if it's a shell or not.

14   Q.  Okay.  So as far as you know, if we go down this path

15   and the bidding procedures are approved and the definitive

16   agreement is signed up, and in 45 days, New CHYMC

17   Acquisition, LLC, says, "The world's changed.  We no longer

18   wish to go forward with this, we breach the contract.  We'd

19   like to give you $5 million, but we don't have $5 million,"

20   the debtors are out of luck, right?

21   A.  I believe, and I would go so far as to say I'd make it

22   a requirement if it's not already there, that the entity

23   which is yet - (inaudible) - a specific entity, the entity

24   that's providing the DIP financing would agree that the DIP

25   that they've advanced, that 5 million of that DIP is the

1    liquidated damages that they -- there's no intent here that

2    anybody have a free look or a free walk.

3    Q.  Okay.  But that's the current situation, right?

4    A.  As I just said, if that is a shortcoming of the

5    documents we have, I would insist upon that that entity

6    that is the DIP lender agree that 5 million of the DIP be

7    at risk for the breach of the buyer.  I'm viewing them --

8    and I think you pointed up a good point, is - which

9    nobody's ever mentioned before, but thank you for doing it

10   - is that there should be -- that I'm viewing them as, as

11   similarly liable.  And that should be explicit.

12   Q.  Okay.  Now, you made, you made some reference in your

13   testimony to the Warren Miller Lodge.  Do you recall that?

14   A.  Yes.

15   Q.  Okay.  You don't have any professional opinion as to

16   how much the Warren Miller Lodge is worth, right?

17   A.  I personally do not.

18   Q.  Okay.  How many residential units are there in the

19   lodge left to be sold?  Do you know?

20   A.  Two.

21   Q.  Okay.  And do the operations of the lodge run at a loss

22   or a gain?

23   A.  Well, one of the reasons we've asked for substantive

24   consolidation or are proposing substantive consolidation

25   between YMC and YDC, or "YDI" as we call it, is because

1   they've essentially been operated as one.  You can't tell

2   right now if the lodge runs at a profit or loss because I'm

3   not sure what the lodge is.  When you say, "Does the lodge

4   operate at a profit?" what is "the lodge"?

5       There's food service operations in there.  I can tell

6   you who makes the payroll on it, but there's no rent paid.

7   There's the ski shop, there's a gym.  There's no rent paid

8   for any of those.  I can tell you who pays the employees on

9   those.  And there's no revenue generated there, either.

10  You have member dues that are paid in, which are not

11  specifically allocated to the lodge or anyplace else.

12      So I don't think that's -- as it's presently operated,

13  I don't think it's susceptible to answering the question of

14  whether the, quote, lodge operates at a profit or loss.

15      For example, they don't charge anybody to park there.

16  Q.  Okay, right.  So it sounds like it would run at a loss,

17  right?

18  A.  I'm sorry?

19  Q.  Just providing all these things and not charging

20  anybody, right?

21  A.  No.  Every consumable is charged through to a member.

22  But my question is, is:  Who's actually providing that food

23  service from a, quote, lodge standpoint?

24      When you say "the lodge", the lodge is not a -- there's

25  no, there's no separate legal entity that's the lodge;

```
 1   there's no, there's no journal that says:  Here's the lodge
 2   journal to look at.
 3       So that's what I'm saying.  I don't think, I don't
 4   think that's an answerable question.  I'm not sure it even
 5   is a question.  It's not an answerable question as to
 6   whether the lodge makes money or loses money.
 7   Q.  Okay.  And the lodge is unfinished; is that right?
 8   A.  That's correct.
 9   Q.  Okay.  I want to ask you about credit bidding.  If you
10   could take a look again at the black-line that you
11   testified about.  Footnote 2 on page 3, do you see that
12   footnote?
13   A.  Yes.
14   Q.  It says (quoted as recorded):  "By including this
15   provision, the debtors are not conceding that Credit Suisse
16   has the right to credit bid with respect to the plan."
17       Do you see that?
18   A.  Yes.
19   Q.  Okay.  Am I correct in understanding that, from your
20   direct testimony, that the debtors are now willing to do
21   that?
22   A.  Well, yes.
23   Q.  Okay.
24   A.  With respect -- the debtors are certainly willing to do
25   it subject to what's within our power to confer.  I mean
```

1    the Court, the Court is the one who, I think, ultimately

2    has to make a decision as to whether they can or not.  But

3    from the debtors' perspective, we're not and, frankly,

4    never have contested the right to make a credit bid.

5    Q.  Okay.  When did you decide that it would be in the best

6    interest of the process for the debtors to concede that

7    Credit Suisse had the right to credit bid?

8    A.  When we took the break and I sat and I watched what

9    happened in the morning and said -- just like, to me, the

10   golf course lots -- people appear to be making a huge issue

11   claiming that there's an infirmity in these procedures over

12   something that we actually tried to affirmatively include.

13   I mean we specifically brought up that if the Court allows

14   you to credit bid, and we laid out how we thought the

15   process could possibly work.  And we further went on and

16   said that Credit Suisse, if they're bidding, don't have to

17   put up their own 5 million because they already have more

18   than that in.  And we said, "You don't have to qualify as a

19   bidder even though the agent group that you represent

20   couldn't come up with the DIP money."  I mean there's no

21   showing of financial capability of your entity as opposed

22   to Credit Suisse itself.

23       So what I said is -- at the break to the counsel and

24   everybody else, is I said, "Everybody appears to be making

25   an argument that we're trying to stop credit bidding.

```
 1   Let's just come in and say specifically that Debtor is not
 2   taking that position, hasn't taken the position, and
 3   affirmatively say, 'Yes, as far as we're concerned, credit
 4   bid.'"  But we're not dispositive on that issue.  The Court
 5   is and the unsecured creditors committee is challenging
 6   that right.
 7   Q.  Let's take a look at the Exhibit A that is the e-mail
 8   from Mr. Yankauer that you testified about.
 9   A.  Yes.
10   Q.  Do you know whether -- I'm sorry, let's jump back for a
11   second.  I've been handed another question to ask you.
12       Are all of the committees and CrossHarbor willing to
13   stipulate to Credit Suisse's right to credit bid, to your
14   understanding?
15   A.  I don't know.  I would doubt that the, I would doubt --
16   I don't know if, I don't know if the unsecured creditors
17   committee will or will not.  I mean I'm just judging from
18   their pleadings and my conversations with them, is they're
19   not willing to concede that you have a secured claim or in
20   what amount.  So I know they have that position.  I don't
21   know what they're willing to do.  And I don't control them,
22   either.
23   Q.  Okay.  So you don't know?
24   A.  Correct.
25   Q.  Okay.  So let's look at Mr. Yankauer's e-mail, Item 4.
```

1    A.   Hm-hmm.

2    Q.   This was the:  "As you highlighted, your procedures

3    prohibit the debt component of purchase price greater than

4    $70 million.  A purchaser paying a big price with low

5    leverage would be precluded."

6         The way you have proposed to change the bidding

7    procedures is to increase the absolute cap on the face

8    value of the note from 70 million to 105 million; is that

9    right?

10   A.   Correct.

11   Q.   Okay.  You don't have any professional opinion on the

12   value of the reorganized debtors, right?

13   A.   Sitting here today, I do not.

14   Q.   Right.  And so I mean as I understood the position

15   that, you know, Mr. Patten and you have been advocating,

16   it's that you're going to let the market decide, right?

17   A.   I certainly think that's the best indication, yes.

18   Q.   Okay.  And so as far as you're concerned or as far as

19   you know, it's possible that the market might decide that

20   the value of the reorganized debtors is, you know,

21   $200 million - $300 million, but let's just pick

22   $200 million, right?

23   A.   Okay.

24   Q.   Okay.  As far as you know, in your professional

25   opinion, the market could decide that it's worth

1   $200 million, right?

2   A.  Yes.

3   Q.  Okay.  And the -- at the same 70 percent loan to value

4   ratio that you've prescribed in the new bidding procedures,

5   right, a $200 million purchase price would amount to a

6   $140 million note, face value, right?

7   A.  That's the mathematics.

8   Q.  Right, okay.  And that would be prohibited under even

9   the revised bidding procedures, right?

10  A.  Correct.

11  Q.  Okay.

12  A.  Because the definition of "fair market value" is a cash

13  purchase.  If somebody's insisting upon even 100 -- if

14  somebody's insisting upon a $10 note to bid $200 million,

15  that means 200 million exceeds market value.  If they

16  insist upon a $140 million note, then 200 million probably

17  substantially exceeds market value.  Fair market value is

18  what they would pay with no note.  The only reason we're

19  offering any note is to try to assist us to make the pie

20  bigger.  And what we're trying to do is assist making the

21  pie bigger within a prudent limit.

22  Q.  Okay.  Somebody who wanted to make a proposal that was

23  $60 million in cash and a $140 million face-value note,

24  right, that wouldn't count as a qualified alternative bid,

25  right?

1   A.   Correct.

2   Q.   Okay, thank you.  Number 5 is:  "The Procedures do not

3   specify the terms of the note that must be matched, and do

4   not appear to offer bidders the opportunity to offer better

5   note terms that might enhance recoveries."

6        Do you see that?

7   A.   Yes.

8   Q.   Okay.  That note -- I was a little confused about

9   Mr. Lehr's testimony.  Is there a note that's ever been

10  filed before midnight last night?

11  A.   Not that I'm aware of.

12  Q.   Okay.  Item 7 is the requirement that (quoted as

13  recorded):  "Bidders agree to terms no less favorable to

14  the debtors than the CH definitive agreement, and we don't

15  know what that says yet."

16  A.   Yes.

17  Q.   Do you see that one?

18  A.   Yes.

19  Q.   Okay.  And we still don't know what the CH definitive

20  agreement says for sure yet because it hasn't been signed

21  up, right?

22  A.   No, I think you know what the definitive agreement

23  says.  It was filed.  Right now, there's no intentions to

24  make any changes in it.  I mean not only was it filed, but

25  it was filed as part of a proposed disclosure statement.  I

1   mean the full intent is not to change it.

2   Q.  Okay.  But nobody's bound themselves to it yet, and so

3   it could be changed, right?

4   A.  It certainly could be.

5   Q.  Okay.  And the procedures require -- I was a little bit

6   confused by your testimony on direct.  I don't mean to put

7   words in your mouth, but I sensed that maybe you were

8   confused in your recollection of how the negotiations have

9   proceeded.  But even the revised bidding procedures still

10  require that any other bidders' definitive agreement or -

11  (inaudible) - of definitive agreement be no worse for the

12  debtors than the CH definitive agreements, right --

13  definitive agreement?

14  A.  Correct.

15  Q.  Okay.  I think you said something about substantially

16  similar.  That's not in the revised bidding procedures,

17  right?

18  A.  No, I --

19  Q.  Let's take a look.  Because somebody behind me said

20  "yes, it is", so I want to make sure we get it right.

21      Could you take a look at page 2, Paragraph 4(c)?

22  Paragraph 4(c) -- I'm sorry, are you with me on the

23  black-line?

24  A.  Yes, I am.

25  Q.  "Consist of an agreement in the form of the Agreement

```
 1    to be entered into with Purchaser to effectuate the

 2    purchase contemplated by the Plan (the 'CH Definitive

 3    Agreement'), marked to show changes thereto that is on

 4    terms and conditions no less favorable to the Debtors than

 5    the terms and conditions contained in the CH Definitive

 6    Agreement."

 7         Right?  That's what it says?

 8    A.  Yeah, that's -- you read it right.

 9    Q.  Okay, thanks.

10    A.  I'm sorry, what was the question?

11    Q.  Well, the question is:  So there's no -- it's not

12    required merely that the terms proposed by another bidder

13    be substantially similar; it's required that they be no

14    worse off for the debtors than the provisions that are in

15    the CH definitive agreement, right?

16    A.  Right -- well, actually, the way this is written, it's

17    much broader than what I said.  And that is:  There's no

18    limitation that it has to even be substantially similar.

19         We provide that you can submit your own form agreement

20    as long as you mark it to show the changes as long as the

21    debtor is not harmed by those, as long as it's not less

22    favorable.  I don't understand why we would be entertaining

23    a bid for a contract that's inferior.  So as long as it's

24    not inferior, we've basically given people full right to

25    mark up the contract.
```

```
1    Q.   Who is the maker of the note that is proposed?

2    A.   The maker is the reorganized debtor.

3    Q.   Okay.  Not the current debtor and not CrossHarbor, but

4    the reorganized debtor?

5    A.   Correct.

6    Q.   The new company to come out of the reorganization?

7    A.   It's actually three of them, yes.

8    Q.   Okay.  I think you testified on your direct about the

9    prospect of bad things happening if these procedures are

10   not approved.  And I guess I'm wondering:  How long do you

11   think it would take to liquidate the debtors' assets?

12   A.   Probably do an auction in seven days.

13        I mean when you say "how long would it take?" again, I

14   work with plenty of auction firms.  We could publish in the

15   Wall Street Journal, we could get the judge to issue an

16   order, and we could go to auction in a week.

17   Q.   Okay.  In your experience, is 45 days a period of time

18   to market high-end real estate that is more consistent with

19   a liquidation sale than a full, robust marketing process?

20   A.   I think it depends upon the preparation and the

21   visibility.  I mean as I said before, would I like to have

22   more than -- I mean if you talk to CB, I mean they keep

23   talking about a 90-day period because they're 45 days is

24   from the day the mailer went out to the day bids were due.

25   And now we're talking about extending that by three weeks.
```

1    So you're talking about more than a full two months while

2    that's done.  And you have all the premarketing process

3    which often goes into that time from when you say, "I'm

4    going to start doing a liquidation."  You've got to do

5    everything we've done over the last two months to get ready

6    for that.  So you really have -- you've got a vigorous

7    almost 120-day period, as they measure it.  But 60 days out

8    on the street with something that you've been working to

9    put together for 2 to 4 weeks before that, I don't consider

10   that a liquidation sale in any way, shape, or form,

11   especially given the coverage, the quality of the

12   professionals that have been retained, the interest.  This

13   is not going to look like, if there's anything I can do

14   about it, look like a liquidation.

15   Q.  Okay.  So your testimony is that, based on your

16   experience, 45 days from initiating the sending out the

17   teaser, right, to bids are due, that's not a liquidation;

18   is that right?

19   A.  I mean, again, you're talking abstracts and

20   hypothetical.

21   Q.  Yeah.

22   A.  In this context, I don't believe -- I mean, again, what

23   do you mean by "liquidation"?  Any sale -- if you go look

24   at Webster's, Webster's says a liquidation is a sale.  If

25   what you're talking about -- usually the connotation of

1    "liquidation" is that you're sacrificing price.

2        And to give you an example, we put a liquidation

3    analysis in the disclosure statement.  And I believe that

4    under what I describe as a liquidation, we're going to get

5    a fraction of the stalking-horse price.  And that's what I

6    put in the disclosure statement.  I believe if you went to

7    what I describe in this circumstance as a "liquidation",

8    you're going to get less than the stalking horse.  I think

9    we know we're going to get at least the stalking horse,

10   hopefully considerably more.  And I don't think the sale

11   process and the marketing process we're going through would

12   be described in what I'll describe as the pejorative

13   "liquidation", meaning getting less than fair value.

14   Q.  All right.  Last question:  How did you go about coming

15   up with a liquidation in value if you didn't have a

16   professional opinion about -- (inaudible)?

17   A.  I came about it because I believe if we have to go --

18   based on everybody who's been on the property and

19   everything I've seen, that if we have to go to an immediate

20   sale, you are likely only to get either CrossHarbor -- who

21   I don't think is going to stand by their present offer if

22   there's no competition at all.  If somebody just tears up

23   the rule book and says, "Okay, you've got seven days, you

24   or somebody else," I think they're going to offer less, and

25   I think anybody who's going to come out of the woodwork to

1  buy under those type of circumstances is going to offer

2  less than what they put on the table to date.

3           MR. SAUNDERS:  Okay.  Thank you very much.

4           THE COURT:  Mr. Warner.

5           MR. WARNER:  Thank you, Your Honor.

6                    CROSS-EXAMINATION

7  BY MR. WARNER:

8  Q.  I want to focus first on the definitive agreement which

9  was filed last night, so I really haven't seen it.

10      So I'm going to deal with the one that I know of which

11  was filed a day, or so, ago.  The purchase price is

12  100 million of which 30 is cash and 70 is a note, correct?

13  A.  Just so I can -- being able to recollect who said what

14  on which conversation, I can't sit here -- recollect the

15  difference between -- I can't actually tell you the

16  difference between what was filed two days ago and what was

17  filed last night.  So I only know last night as far as my

18  recollection right now.  If you want to show me the, if you

19  want to show me the document, I can tell you whether you're

20  right or wrong.

21  Q.  Let's forget it, then.  What you've filed last night,

22  I'm going to represent I haven't seen it, so you tell me :

23  Is it $30 million cash and a $70 million note?

24  A.  In the definitive agreement, that is correct.

25  Q.  Okay.  And the note, at least in the original form of

1    the definitive agreement, said it would be a new loan

2    document that would be supplied.  The first time that was

3    filed with the Court was last night?

4    A.  I don't handle the filings.  I believe so.

5    Q.  Okay.  But it has not -- the form of the note has not

6    been public until last night?

7    A.  I believe that's correct.

8    Q.  Okay.

9    A.  But when I say that, I don't know who's seen drafts and

10   not.  I mean I don't know, frankly, who's commented on it

11   or not, so I don't -- when you say it hasn't been public,

12   to the best of my knowledge, it hasn't been filed.  It very

13   well may have been circulated.  I don't know.

14   Q.  Okay, that's fair.  I want to make a few assumptions

15   with you.

16       Assume no other buyers than CrossHarbor and Credit

17   Suisse at the auction.

18       Assume, also, that the Court says Credit Suisse has a

19   right to credit bid.  You used the word "offset"; I'm going

20   to use "credit bid" because I think that's the legal term.

21       And assume, third point, that the Court says that

22   Credit Suisse has a $310 million claim that it can credit

23   bid.  Credit Suisse shows up to the auction, the only other

24   player there.

25       The minimum overbid is 3.5 million, correct?

1   A.  Correct.

2   Q.  So Credit Suisse bids 103 million -- 103.5 million,

3   minimum, right?

4   A.  Correct.

5   Q.  How much cash under this proposal, under the bid

6   procedures, Paragraph 6(m), does Credit Suisse actually

7   have to have in cash?

8   A.  If I was to write the judge's order that's going to

9   come out -- because this is the same issue on a 363 sale.

10  The judge is going to have to write an order coming out of

11  that hearing.  And Credit Suisse, as we know, is going to

12  be bidding on collateral and noncollateral, and so -- and

13  they don't have any right to credit bid on the

14  noncollateral.  So they have to pay cash or cash and an

15  approved note for the noncollateral they're buying at the

16  sale.

17      So one of the things that has to happen first is, I

18  believe -- one of two things.  If the Court allows the

19  credit bid -- and it may be, it may be that in a mixed

20  collateral/noncollateral sale, even a 363, the Court might

21  decide they don't have a right to credit bid.  I don't

22  know.  I mean I've never seen that type of mixed sale

23  before, so -- let me just finish.  So you're asking me for

24  some definitive answers to a situation that I don't know if

25  anybody in this courtroom's ever seen before.

1      So we have a sale of collateral and noncollateral.  I

2  believe the judge is going to have to rule what the value

3  is of -- out of the whole, what share is collateral and

4  what share is noncollateral.  So I do believe they're going

5  to have to bid in cash or note at least the noncollateral

6  value because they don't have credit bid rights on that.

7      Then, secondly, the way -- we've structured it this

8  way, is that it's essentially going to take just about

9  $30 million in order to repay the DIP which is due at that

10  time, which is a lien on the collateral that they're going

11  to be credit bidding.  And so -- and there's going to be

12  some additional administrative costs.  So the way this is

13  structured is they get a right to credit bid, but for -- or

14  you get it offset, but for the cash component.

15      And so I actually believe that when you read this,

16  coupled with how I would -- how I view the Court ruling

17  would be, is that they essentially are going to have to bid

18  in cash the greater of the noncollateral they're bidding

19  for or the 30 million less all portion of that 30 million

20  of cash.  And that's what this says.  All portion of that

21  30 million of cash that would go to them under the plan,

22  they get the right to offset.  So we're never asking them

23  to put up money that they would otherwise get back, which

24  is the concept of credit bid.

25      So let's say it's probably going to be 30 million or

```
 1   more if -- at an opening bid.
 2   Q.  I fully understand your answer.
 3   A.  Or 33.5 or more.
 4   Q.  I understand your answer, but I have some concerns.
 5   The auction takes place before confirmation.
 6   A.  Correct.
 7   Q.  Credit Suisse walks in and says, "I have an order that
 8   allows me to credit bid up to $300 million" --
 9   A.  Okay.
10   Q.  -- "310 million."  They don't know at the time of the
11   auction, the way this is structured, how much cash they
12   have to come up with.  Because, as you said, they're
13   proposing to buy things they don't have a lien on under
14   this structure.  And so what if they walked in and credit
15   bid $300,000,001 for all the stuff they have no lien on?
16   Why isn't that a better deal, and how can you not tell me
17   at the time of the auction that that's not the appropriate
18   price?  My problem.
19   A.  Well, your problem -- well, and I lost part of the
20   middle of your question, but I think I can answer as
21   follows, is:  What we do in our real world where we're not
22   fighting in court is we put together the financial models;
23   and we work with Loughlin Meghji or whoever you presently
24   have, whoever Credit Suisse presently has employed; and
25   we'll work with the committee, the three committees to put
```

1   together a distribution model.

2       I mean we have a distribution model now for the plan.

3   And I actually have -- Steve Yankauer -- a diagram kind of

4   showing the waterfalls and different dollar amounts in and

5   out.  So I mean we've put together a computer model that

6   shows, based on what allocation the Court gives to

7   collateral and noncollateral, how that would flow through

8   and what the credit that would ultimately flow to Credit

9   Suisse would be so that you could actually determine what

10  the net amount is they would have to bid in cash.

11  Q.  Great.  When are you asking the Court to create that

12  allocation?

13  A.  That allocation would have to be at the time when it's

14  litigated whether Credit Suisse has a credit bid, and then

15  how much.  And we can handle the exact same thing.  If the

16  Court rules that they have a secured interest and it is up

17  to the market value of the property, and the market value

18  of the -- I'm sorry, of the collateral, and the market

19  value of the collateral is going to be determined by the

20  sale process, and that after hearing the evidence the Court

21  believes that the collateral is 60 percent of the entirety,

22  then at that moment forward, as soon as we hear that from

23  the Court, we can tell exactly how much CS would have to

24  bid in cash at every level.

25  Q.  Is that before or after this auction?

1   A.   Before the -- it would be immediately -- assuming --

2   and that's one of the reasons for pushing out the entire

3   process by 21 days besides giving more time to market:  It

4   allows the litigation schedule that was discussed between

5   the Court and the parties this morning, it allows that

6   litigation schedule to run its course and for us to have an

7   answer from the Court prior to going into the auction.

8   Q.   So prior to the auction, you're going to ask the Court

9   to determine an allocation of the collateral and

10  noncollateral as to the purchase price?

11  A.   If Credit Suisse is to credit bid, I think you

12  absolutely need that.  There's no other way to run the

13  auction and figure out how much they can bid without that.

14  If they can't credit bid, it's immaterial, it can be

15  handled at a confirmation hearing; but if they're going to

16  credit bid, as you say, they have to know how much they

17  have to bid in cash.

18  Q.   I've read most of the pleadings.  I know they're being

19  filed fast and furious.  But where is the debtors' motion

20  before the Court seeking to allocate between collateral --

21  alleged collateral, for the moment, because maybe the lien

22  - (inaudible) - question, alleged collateral and clearly

23  not collateral?  Where is that motion?  When is that being

24  teed up if it has to be teed up before we have these --

25  before we have this auction?

1  A.  Right.  The debtor has to answer the complaint, and I

2  believe that's part of the answer in the complaint.  The

3  debtor has been sued.  An adversary's been launched, and

4  the debtor and the committee are both defendants.  As part

5  of that answer, I believe, is a request or will be a

6  request that the Court is going to make that allocation.

7  Q.  I hate to differ with you, but my reading of the

8  complaint says it has nothing to do with valuation of the

9  noncollateral.  And that's the problem we're facing here.

10  You're asking that if they have a right to credit bid --

11  you're not telling them how much cash they have to come up

12  with.  And at this moment, the complaint that's before the

13  Court is not to determine that.

14  A.  Okay.  Well, the alternative, the only alternative to

15  that -- there's only two alternatives to the Court

16  resolving it beforehand, and that is:  Either, "A", Credit

17  Suisse cannot credit bid, okay; or that we go to sale of

18  the collateral and the noncollateral separately.

19      And I do suggest to you that that is going to lead to

20  one of two things:  Either the person who bids on the

21  Warren Miller Lodge is going to be the only person who's

22  going to show up to bid, and they'll bid $1 for the Credit

23  Suisse collateral, okay; or you could run the auction in

24  the opposite - (inaudible) - and, therefore, have a bid on

25  the collateral.  And there you're going to have massive

1  chilling because anybody who bids on the collateral has no

2  idea what they're ultimately going to have to pay for the

3  lodge; and, consequently, you're going to discourage

4  bidding.

5      So all I'm saying is the issues you're bringing up are

6  precisely what we have wrestled with for two months.  I

7  mean if you think -- if you don't think we've spent two and

8  three weeks wrestling over how to fashion "M" and walking

9  through the permutations on what to do -- I believe we

10  fashioned, frankly, the only thing that works.  And you're

11  absolutely right, it depends upon, prior to the auction,

12  the Court determining if Credit Suisse can credit bid; and

13  if so, what's the allocation between the collateral and the

14  noncollateral?

15      As I say, I mean there's -- the easy alternatives is

16  they either can't credit bid or we go to two separate

17  auctions.  If we go to two separate auctions, I suggest to

18  you you're going to have mush.

19  Q.  And I appreciate that.  I think my point is:  In "M",

20  it does not reference the procedure to create the

21  allocation, and the pending litigation does not focus on

22  that.

23  A.  Okay.

24  Q.  So encourage your to think about that because we're now

25  faced with trying to get some procedures out.  And I guess

1   the concern I have is - and I hope you have this concern -

2   unless we know that allocation, other bidders will either

3   be stifled, surprised, unwilling to come to the table, but

4   could be affected by not knowing that allocation.

5           THE COURT:  Mr. Warner?

6           MR. WARNER:  Hm-hmm.

7           THE COURT:  Why don't I just order under "M" that

8   you can offset and credit bid up to your -- up to the debt,

9   up to the claim, but they better come up with 33 million in

10  cash?

11          MR. WARNER:  The amount of the DIP, the amount --

12          THE COURT:  Or 33.5 I guess is what it would be.

13          MR. WARNER:  You're talking because the break-up

14  fee?

15          THE COURT:  The cash component.  Use the cash

16  component and just add the 33.5.

17          MR. WARNER:  But, logically, if it's two pieces

18  -- if it's the DIP amount, then it has to be taken out

19  because it's a senior lien; and the break-up fee expense

20  reimbursement.  Logically, I think that that makes a lot of

21  sense.

22          THE WITNESS:  But, Your Honor, it doesn't work.

23          MR. WARNER:  I'd like to talk to Credit Suisse.

24          THE WITNESS:  It doesn't work.  Let's assume the

25  noncollateral is worth 60 million.  Then you're letting

1    them credit bid where they don't put up any cash, put up a

2    note, or anything.  They're walking away -- if they only

3    have to put up 33.5 in cash, they're walking away with --

4             THE COURT:  Well, they have to put in the working

5    capital, too.

6             THE WITNESS:  But the working capital doesn't --

7             THE COURT:  Is different, is different.

8             THE WITNESS:  Well, and doesn't go to the

9    creditors.  So you have the unsecured creditors; and,

10   frankly, equity who have an asset there that they're

11   entitled to get the full value for.  Credit Suisse, when

12   they credit bid, puts nothing up.

13            THE COURT:  Well, what if the order directs that

14   they come up with the cash component so you can do the

15   bidding and that, upon the allocation, they'll need to come

16   up with an amount for the noncollateral?

17            THE WITNESS:  That would probably work.  I mean,

18   you know, again, on first impression.  We would have to

19   sift through and actually work the mechanics, but that

20   might work.

21            THE COURT:  I don't know if you heard that.  You

22   were --

23            MR. WARNER:  I'm sorry, we were trying to

24   understand the effect.

25            THE COURT:  You were conversing.  Basically, what

1    if I just put in that provision, since it's my order, that

2    you've got an offset or credit bid, whatever is the proper

3    term, up to the amount of your claim; and you put in

4    33.5 million as your cash because you have to do the

5    30 million plus the 3.5 million; and upon the allocation as

6    to what the noncollateral is, you come up with that

7    additional cash?

8              MR. WARNER:  First of all, I'm not sure that the

9    DIP is 30.  I thought it was closer to 20.

10             THE COURT:  All I'm saying is:  As it stands

11   right now, the proposal is that you come up with the amount

12   of cash component of the purchase price set forth in the

13   plan.  As I understand it, that's $30 million.  Correct?

14             MR. WARNER:  Yes, but that would be to buy all

15   assets, right?

16             THE COURT:  That's to buy the equity interest.

17             MR. WARNER:  Yes.

18             THE COURT:  Right?

19             MR. WARNER:  That may not be semantics, but --

20             THE COURT:  So you would come up with 30 million

21   plus the 3.5 million for the additional amount.

22             MR. WARNER:  And what do you get for that?

23             THE COURT:  You get the equity interests and --

24   if you get the equity interests, I'm not so certain that --

25             MR. WARNER:  See, I think I that's the problem.

1          THE COURT:  Because then you don't need the

2     allocation if they're the equity interests.

3          MR. CHEHI:  Your Honor, we just don't want to get

4     too far of it because I think it's a little bit more

5     complicated than that.  The value of the Warren Miller

6     Lodge is much less than one might think it is.

7          And the issue of the assets that are not our

8     collateral, we may very well be very happy just to take our

9     collateral and go home.  That may not be what everybody

10    else has in mind here, but that actually works very well.

11    We don't need the Warren Miller Lodge.  The Warren Miller

12    Lodge is not a big asset.  People can talk about how

13    important it is; it's not all that important.  It is not

14    a -- does not have a lot of inherent value.  It's an

15    unfinished asset that is -- runs at a deficit, and it

16    doesn't have anything much in the way of units to be sold

17    in it, which is the only real revenue source from it.

18    They're selling two condominiums that have to be sold.

19         But all of that is sort of evidentiary.  And we

20    can talk about that, but going for the equity is not

21    necessarily what the lenders would want to accomplish to

22    buy the equity.  There are other ways to accomplish a

23    comprehensive solution in connection with the sale.

24         THE COURT:  Well, Mr. Warner brought up the

25    question.

1           MR. CHEHI:  Yeah, I know he did.

2           THE COURT:  And I told him what I thought might

3   be a solution in that.

4           MR. WARNER:  I think the question, Your Honor,

5   that I was raising, or the back-and-forth with the witness,

6   really focused on:  This allocation is relevant because if

7   we have the -- if Credit Suisse has the right to credit

8   bid, it needs to know how much cash it needs to come up

9   with if it's forced to stay within the structure of the bid

10  procedures.  That sort of highlights the reason why these

11  bid procedures are so restrictive.  If we were able to

12  credit bid 300 million and have no interest in acquiring

13  the noncollateralized assets, why should we have to come up

14  with that additional cash?  And we're forced to.

15          I have one final question because it's sort of

16  the same issue for this witness.

17  Q.  (By Mr. Warner)  And I gave the witness -- I gave you

18  this example of:  I'm the only other bidder, and I bid

19  310 million or I bid 103.5 million.  It doesn't really

20  matter; I overbid.  And the question was cash.  Assume

21  nobody else shows up.  You have CrossHarbor with

22  $30 million cash and a $70 million note.

23      What's the allocation at this moment in time among the

24  collateralized and noncollateralized assets?

25  A.  Similarly, the Court is going to have to ultimately

1  make that determination.  And I mean the debtor can propose

2  something or not, but it's ultimately going to have to be

3  an issue the Court determines because it's the allocation

4  of value between those two parties, between the unsecured

5  creditors and the secured creditor.

6  Q.  What's the debtors' position on that allocation at this

7  time?

8  A.  We are intending to engage a valuation firm to try to

9  make that determination.  But I don't -- what I can tell

10  you is we have -- and you're into a very interesting area

11  of valuation theory.  Whenever you have two parts, neither

12  one of which - in all due respect to Mr. Chehi - neither

13  one of which functions very well independently and who have

14  a combined value substantially greater, there's always a

15  tug-of-war between how you allocate that value.

16      And I mean the greatest -- the comparable example is in

17  patent litigation where somebody infringes on a patent,

18  they have 100 patents that go into a device and they

19  infringe on 1.  That device fails if you pull that 1 patent

20  out, but that 1 patent alone -- the device doesn't work if

21  any of the other 99 aren't there.  So there has to be an

22  allocation of the value of the entirety.

23      What we did in the disclosure statement is:  For lack

24  of anything better right now, one of the concepts that's

25  utilized is an allocation of cost.  The theory being that

1    if you've got a unified activity, you're making a capital

2    investment into producing the results of that activity on a

3    unified basis using a cost allocation method.

4        And there's only two units left for sale, the

5    condominiums.  Those have been -- again, everything we've

6    talked about here is simplified for what you really have.

7    So you have American Bank's liens on the Warren Miller

8    Lodge and on those two units.  And you have people who have

9    contracted to buy those two units, and they're purchase is

10    less than the release price off the American Bank lien.  So

11    what we're talking about being unencumbered assets really

12    aren't unencumbered; they're just not encumbered by Credit

13    Suisse, they're encumbered by somebody else.  And then the

14    residual value behind those encumbrances is essentially for

15    the benefit of the unsecureds.  So if you take away those

16    two unsold units and assuming they go away for the lien

17    value or for their lease amount, there's approximately --

18    it's almost a 50/50 split between cost of the lodge and

19    cost of the balance of the development.

20        And so for purposes of the liquidation analysis, since

21    we have to show something, we made the calculation based

22    on, on cost basis, which is of -- quite frankly, is a very

23    accepted methodology when you have a unified whole and you

24    have to allocate value from that whole to the parts.

25        But as I say, ultimately, we will have a valuation

1    expert which will give -- the valuation expert will opine;

2    and, ultimately, I think this Court will make a decision.

3    Q.  You made the comment that --

4    A.  I'm sorry, and that also skirts the issue of the

5    yet-to-be-issued member units.  And I think, again, I think

6    that's going to ultimately be a legal decision as to

7    whether that's collateral or not.

8    Q.  I appreciate that, but -- okay.  You made the comment

9    that the combined value is substantially greater.  But then

10   we just heard Mr. Chehi say that in his belief or his

11   client's belief, the lodge doesn't have a lot of value.

12   What are you basing your statement that the combined value

13   is substantially greater than the -- what you've almost

14   said is 50/50, the collateralized assets versus the

15   noncollateralized assets?

16   A.  Well, every person I've spoken to in this case,

17   including Credit Suisse - and they can change their mind -

18   but every person I've spoken to in this case believes that

19   the combined -- the offering the -- the market value of the

20   combined assets will exceed the market value of those

21   assets offered independently.  I haven't heard, other than

22   Mr. Chehi testify, that anybody said that you can get more

23   selling those assets separately than you can as a combined

24   whole.

25       Secondly, my experience -- I mean I've been around this

1    a long time.  My experience leads me to believe that.  And

2    one of the questions you had asked me is:  Well, show me a

3    place where they've been sold separately.  How can you

4    prove that?

5        And the answer is:  Nobody's ever been stupid enough to

6    try to sell them separately.

7        When you say how -- every time -- I have never seen a

8    golf subdivision sold without the parking lot, the

9    clubhouse, the golf cart shop, all the major structures.

10   Nobody has ever, that I know of, tried to sell the golf

11   course without those amenities.  And why not?  If people

12   would offer more to buy the third hole and not the other

13   17, you would do it.  You've never seen that done.

14   Q.  Sure.

15   A.  And that's why I believe it.  And as I said, I mean if

16   somebody, somebody would pick up the phone and call me and

17   tell me they believe differently -- nobody has ever done

18   that.  And I've asked every person in this case.

19   Q.  I think the problem, though - and you would agree with

20   me, right - that if there were a $300 million credit bid

21   just for the collateralized assets, someone is not likely

22   to pay more than that for all.  Isn't that the problem?

23   A.  Well, I don't know.  Mr. Chehi says somebody's going to

24   pay $310 million for the whole.  So we're going to find

25   out.

1          MR. WARNER:  I think that's all.  Thank you.

2          THE COURT:  I do have a question for you.  Other

3   witnesses on this matter?

4          UNIDENTIFIED SPEAKER:  No, Your Honor.

5          THE COURT:  Okay.  Do you have other witnesses?

6          MR. SAUNDERS:  Yes, we do, Your Honor.

7          THE COURT:  You do?

8          MR. SAUNDERS:  Hm-hmm.

9          THE COURT:  Okay.  You have about 45 minutes to

10   wrap it all up.

11          So, Mr. Beckett, you had a question?

12          MR. BECKETT:  I'll ask him later.

13          THE COURT:  Any redirect?

14          MR. MOORE:  Your Honor, Paul Moore, if I may.

15          THE COURT:  Yes.

16          MR. MOORE:  I'm still landlocked.  Can I stay

17   here?

18          THE COURT:  Yes.

19          MR. MOORE:  Thank you.

20                    CROSS-EXAMINATION

21   BY MR. MOORE:

22   Q.  Just quickly, with time period, again - we've done this

23   before - the original time periods were set by Credit

24   Suisse in its DIP loan, correct?

25   A.  Yes.

```
 1   Q.   And you testified last time that, as part of the bid

 2   procedures or the sale procedures, that you had negotiated

 3   an additional 30 days to April 30th from us; is that

 4   correct?

 5   A.   I insisted on it, and you granted it.

 6   Q.   And notwithstanding the fact that that wasn't approved

 7   today, you've negotiated, if it's approved this time,

 8   another 21 days; is that correct?

 9   A.   That is correct.

10   Q.   So we're about 60 days beyond the deadlines that Credit

11   Suisse originally set?

12   A.   Fifty-one.

13   Q.   Okay.  With respect to liquidated damages, you have a

14   provision in here that the lenders don't have to put up any

15   deposit; is that correct?

16   A.   Correct.

17   Q.   Okay.  Credit Suisse - Cayman Islands is the agent for

18   the lenders?

19   A.   Correct.

20   Q.   Do you know how much of the loan is held by Credit

21   Suisse - Cayman Islands?

22   A.   What I hear is somewhere between very little or none.

23   Q.   Okay.  Do you know who the other lenders are?

24   A.   I mean I've heard various names, including CrossHarbor.

25   Q.   Okay.  But do you know the other 39 or 38, if you
```

```
 1   count --
 2   A.   I've probably heard half their names occasionally.
 3   Q.   Okay.  And with respect to some of those, they're like
 4   CLOs of Highland, or something, or --
 5   A.   Right.  I mean there's no reason to believe a bunch of
 6   them have any capacity to put money up or would put money
 7   up.
 8   Q.   So you don't know anything about their
 9   creditworthiness, correct?
10   A.   Again, I don't know about the specific legal entities.
11   I know generally about some of the reputations of some of
12   them.
13   Q.   But you don't know which subsidiary or affiliate,
14   whether it's one of those famous CLOs or the like?
15   A.   I don't have any idea.
16   Q.   Okay.  So to the extent Credit Suisse says you should
17   amend this agreement if it's not already provided so that
18   CrossHarbor is standing behind any liquidated -
19   (inaudible) - then the same change, in fairness, ought to
20   be made with respect to the lenders, correct, particularly
21   given their history of defaulting on the DIP loan?
22   A.   Well, that would, that would keep symmetry.
23   Q.   Okay.  The same thing with respect to the credit bid.
24   How would you administer that if there 's 40 different
25   lenders?  Would they all come to the auction and wave their
```

08-61570-RBK  Doc#: 685  Filed: 04/03/09  Entered: 04/03/09 11:05:32  Page 263 of 333

263

1    hands if they're credit bidding or not agreeing to credit

2    bid?

3    A.  My presumption is that Credit Suisse has -- as agent,

4    has to be speaking for all of them and has to have the

5    capacity to commit whatever the entity is that is credit

6    bidding.  I don't know their internal dynamics.  I've never

7    seen their documentation.  I don't know what authority

8    Credit Suisse has or doesn't have.  But they would have to

9    represent -- I think we put in here that they have to

10   represent -- they've got -- they and anybody else has

11   capacity to bid and bind.

12   Q.  Would that include the credit bid?  Would you require

13   proof that they have authority to credit bid for people?

14   A.  I think you're right.  I think we took that out

15   originally because I didn't want anything that restricted

16   Credit Suisse.  But so I think right now it does say that

17   Credit Suisse can just bid out of a black box.

18   Q.  When they made their interim DIP loan to you, did they

19   tell you it was contingent upon whether they all got

20   together and cobbled together the money at the final

21   hearing?

22   A.  No.

23   Q.  Okay.  With respect to a sale of the whole or sale of

24   the parts, you said you've talked to everybody including

25   Credit Suisse.  Who did you talk to?

```
 1    A.   I asked Mr. Yankauer real early on.

 2    Q.   He's in the front row over there?

 3    A.   Yes.

 4    Q.   What did he say about the sale of the whole versus the

 5    sale of the parts?

 6    A.   He agreed with me that it made sense to go to market,

 7    try to sell the entirety rather than trying to sell the

 8    collateral in one lot and then noncollateral in another.

 9    Q.   Did you talk about the lodge and the ability to park if

10    you were going to this high-end private ski resort?

11    A.   You know, I never got into the details.  Except for

12    litigation purposes, it's not an issue that anybody really

13    gives two thoughts to.  As I've said, you've never seen

14    somebody sell the 13th hole of a golf course, or -- it's

15    too integral to that development and to the ongoing --

16    again, somebody who's buying this is buying on the

17    assumption that people are going to continue to come in and

18    pay multimillion dollars per lot they're going to resell.

19    They're going to do that with a hole in the middle of the

20    development.

21    Q.   Okay.  And you were asked about your negotiations with

22    respect to CrossHarbor with respect to the plan and the

23    sales procedures.  Have they been civil in all respects

24    throughout?

25    A.   You're the only one I've had a shouting match with.
```

1   But, yeah, everybody else has been civil.

2   Q.  Relatively speaking?

3   A.  Yeah, yeah.  I'll deal with Barry anytime instead of

4   you.

5   Q.  And you were complaining just recently that I wasn't

6   arguing with you.  So they've been relatively professional,

7   too, have they not?

8   A.  They have been, yes.

9   Q.  Has any effort been made to go around you to

10   Ms. Blixseth, to your knowledge?

11   A.  Not that I'm -- I mean there was clearly an early

12   meeting with Ms. Blixseth that I testified to I did not

13   attend.  But I don't consider that, quote, going around me.

14   And, subsequently, I'm not sure they've had -- I mean to

15   the best of my knowledge, they've had no direct substantive

16   discussions with her.  But you would have to ask her.  But

17   I'm not aware of any aware of any.  And, certainly,

18   anything they've -- any discussions that they might have

19   had with her - that I'm not aware of any - haven't found

20   their way into the negotiations.

21   Q.  Well, just quickly to supplement the record with

22   respect to that, you're talking about that California

23   meeting you testified to last time?

24   A.  Yeah, because -- well, I know when it was.  It was in

25   the first week of January, yes.

1   Q.  And you were invited to that, correct?

2   A.  I was.

3   Q.  And I was invited to that, correct?

4   A.  I don't know.

5   Q.  At some point, were you told that I was on hold to come

6   but I wasn't going to come if you weren't going to be --

7           THE COURT:  What does this have to do with

8   anything?

9           MR. MOORE:  I was just going into the

10  negotiation, Your Honor.  I'll move on if you want me to

11  move on.

12          THE COURT:  Let's move on.

13          MR. MOORE:  Thank you.

14          THE COURT:  We're not having a chat here.

15          MR. MOORE:  Okay.

16  Q.  (By Mr. Moore)  At any time, has CrossHarbor made any

17  threats against you or your firm in order to induce you to

18  do anything in this case?

19  A.  No.

20  Q.  Okay.  Has anyone else?

21  A.  I think so.

22  Q.  Okay.  And who would that be?

23  A.  Skadden.

24  Q.  Okay.  And would you describe those threats, please?

25  A.  Well, only if the judge wants me to.

```
 1            THE COURT:  You know, at this point, this isn't

 2    discovery, either.

 3            MR. MOORE:  Your Honor, Credit Suisse has been

 4    making all kinds of allegations about --

 5            THE COURT:  Well, how does this relate to the

 6    bidding and solicitation?

 7            MR. MOORE:  It relates to their efforts to

 8    frustrate the bidding and the plan.  These discussions were

 9    in connection with the plan and disclosure statement and

10    efforts to resolve those issues.  And I think they're

11    relevant.  I think their much more relevant than a lot of

12    the:  What happened back in the early days of 2008 with

13    respect to Tim Blixseth?

14            THE COURT:  I'll give you a little latitude.

15            MR. MOORE:  I'll be very quick.

16    Q.  (By Mr. Moore)  What were those threats?

17    A.  I believe that Skadden threatened all of the debtor

18    professionals that if the plan wasn't confirmed and there

19    was a diminution value as a result, that they would hold

20    the professionals liable.

21    Q.  Personally liable?

22    A.  Yes.

23    Q.  And as a result of that, did you notify your firm?

24    A.  Yes.

25    Q.  Did you consider notifying your carrier?
```

1    A.  No.

2    Q.  Okay.  Did you consider resigning?

3    A.  Yes.

4          MR. MOORE:  Okay, thank you.  That's all, Your

5    Honor.

6          THE COURT:  Thank you.  You had a question?

7          MR. GEARIN:  Your Honor, I just had two or three

8    real brief questions as representing Mr. Blixseth, who is a

9    prospective purchaser.

10                    CROSS-EXAMINATION

11   BY MR. GEARIN:

12   Q.  Mr. Greenspan, have you seen the pleadings in which my

13   client did express an interest in participating in the plan

14   process or acquiring rights in the -- of the debtor?

15   A.  Yes.

16   Q.  And you were aware that Mr. Blixseth actually is

17   interested in pursuing -- acquiring the club back; is that

18   right?

19   A.  That is what I've heard.

20   Q.  Okay.  I'd just like to focus very briefly on the

21   black-line to the DIP procedures.

22          THE COURT:  Just a moment.

23          MS. BLIXSETH:  Your Honor, I can't, I can't hear

24   what the attorney is saying.

25          THE COURT:  We'll have him move closer to the

```
 1   mike.

 2              MR. GEARIN:  Okay, thank you.

 3              THE COURT:  Is that better.

 4              MR. GEARIN:  Can you hear me now?

 5              MS. BLIXSETH:  Yes, thank you.

 6              MR. GEARIN:  Okay.

 7   Q.  (By Mr. Gearin)  I want to focus back on the black-line

 8   to the bid procedures that you've submitted as an exhibit

 9   here.  And I really want to look at Paragraph 5(d), which I

10   think is an addition to the prior bid procedures.  And down

11   at the bottom of that, the language says:  "The only

12   contingency" --

13   A.  I'm sorry, Mr. Gearin, if you would let me get up to

14   it.

15   Q.  Sure.

16   A.  Okay.  Yes, sir.  Where are you?

17   Q.  Did you find that?

18   A.  Hm-hmm.

19   Q.  So this is an add, right, to the prior procedures, is

20   it not?

21   A.  Everything underlined is an add.

22   Q.  Right.  And the add is:  "The only contingency being

23   approval by April 30, 2009" --

24   A.  I'm sorry, I thought you said 5(d).

25   Q.  That's what I'm reading from is 5(d).
```

```
 1            THE COURT:  5(d), page 4.  He's about the third

 2   line down.

 3            THE WITNESS:  Oh, you know, what's happened is

 4   you were actually -- if you're looking at the actual ones,

 5   there's a numbering error with what I'm looking at.  So

 6   5(d) on what you're looking at is probably really 4(d) on

 7   mine.

 8   Q.  (By Mr. Gearin)  I'm looking at the one that was filed

 9   with the Court.

10            THE COURT:  It is 4(d) under yours.

11            THE WITNESS:  Yes.  That was the confusion, Your

12   Honor.  Thank you.

13            Okay, so 4(d).

14   Q.  (By Mr. Gearin)  Okay:  "The only contingency being

15   approval by April 30, 2009 of a Plan of Reorganization

16   substantially similar of that filed by the Debtor or as

17   such plan might be modified with the reasonable consent of

18   such bidder."

19       Do you see that language?

20   A.  Yes.

21   Q.  Okay.  Now, I actually note down in "G" down below,

22   there's a very similar provision that was already in the

23   prior bid procedures, right?  And that provision says:

24            "Not be subject to any conditions precedent other

25   than approval of such Alternative Bid by the Bankruptcy
```

1   Court in connection with the confirmation of a plan

2   incorporating such alternative Agreement."

3       Do you see that?

4   A.  Yes.

5   Q.  What was the intent of the modification in "D"?  Which

6   plan is that referring to in Paragraph D?

7       The plan substantially similar to that filed by the

8   debtor, which plan is that?

9   A.  That would be the plan of reorganization that is

10  attached to the, the final disclosure statement.  So I --

11  reading that as the -- basically, the plan that was filed.

12  I think it was just filed last night --

13  Q.  So that would be a plan --

14  A.  -- or early this morning.

15  Q.  I'm sorry to interrupt you.  That would be a plan that

16  was filed last night at midnight; is that right?

17  A.  Correct.

18  Q.  Okay.  If my client comes in and wants to bid on this

19  property, is my client bound by that plan?  Can my client

20  make proposals to modify that plan?

21      For example, can my client propose to reject the

22  membership agreements of CrossHarbor?

23  A.  I believe it can.  The debtor, in conjunction with the

24  committees, as required by this, would have to evaluate

25  that.  One of the things that goes -- and, for example, one

1    of the things that goes with a rejection would be a very

2    substantial rejection claim.  So we're trying not to rule

3    anything out, but it would be evaluated as for its

4    reasonableness, cost upon the estate, and whether it's in

5    the best interests of all the stakeholders to this

6    proceeding.

7    Q.  I think I heard earlier testimony that says that you

8    had a DIP order that has a provision in it that says that

9    any plan you're going to propose has to be agreeable, has

10   to be done with the consent of the DIP lender.  Is that

11   true?

12   A.  We've had a fight over that one, too.  The requirement

13   of the DIP is that the plan had to be filed by a date,

14   which is the 13th, and that plan be approved, be subject to

15   their approval.  We've had something of a debate of whether

16   I can amend that plan now and whether that's a default

17   under the DIP.  The DIP does not say I can't amend it.  So

18   I'm not going to get -- I don't give legal -- I'm not going

19   to give you a legal opinion as to whether I can go and

20   amend that and whether that would trigger the DIP or not.

21   There may be a difference of opinion between the DIP lender

22   and me on that.

23   Q.  Well, let me see if I can reframe it.  I mean what I

24   want to know is:  My client coming in as a prospective

25   purchaser, is my client bound to a plan that is subject to

1    the consent of both the debtor and CrossHarbor?  And is

2    that plan now binding upon my client as a prospective

3    purchaser?

4    A.   The answer is:  There is nothing you -- from my

5    perspective - and I don't think there is anything written

6    down to the contrary; and if there is, we ought to work to

7    change it - when we're talking about the auction,

8    CrossHarbor is a bidder, okay, just like everybody else.

9    And they don't have rights of veto or anything else.

10       So your client is, is free, like anybody else, to

11   propose anything.  And they don't have any rights of veto.

12   And you have rights under this to make proposed

13   modifications to the plan, and those will be considered for

14   all the ramifications on -- by all the parties that are now

15   involved in making that decision.

16   Q.   And so your position is:  If my client were to make an

17   offer and propose modifications to the plan, they still

18   could be construed as a qualified bidder under these

19   bidding procedures; is that right?

20   A.   I believe so.

21   Q.   Okay.  Let me turn to one other topic, and I'll be very

22   brief about this.

23       I guess I want to explore -- I've heard you testify

24   just a bit earlier -- what is the stalking-horse bid?  As I

25   understand it, the stalking horse bid is $30 million in

1    cash and a $70 million note.  And the $70 million note, I

2    heard you earlier testify, is not a note from CrossHarbor

3    or from its newly formed entity; it's a note from the

4    reorganized debtor.  Is that right?

5    A.  That is correct.  It's the equivalent of -- described

6    as what we call in the real-estate business carryback

7    paper.  It's a note from the reorganized debtor that will

8    be in favor of the secured creditor and the liquidating

9    trusts.  There's a lot of other conditions or there's other

10   financial and other requirements on the bidder, including

11   things like the working capital, but that -- as far as

12   saying who the note's from, that is correct, the note's

13   from the reorganized debtor.  It will go to the

14   custodian -- well, it will go to -- beneficial interests

15   will be assigned to the secured creditor and the

16   liquidating trusts.

17   Q.  Well, what I want to focus on is actually what tangible

18   benefit, what benefit CrossHarbor is bringing to the table

19   as a stalking-horse bidder.  And I understand that to be

20   30 million in cash.  That's really all they're bringing;

21   isn't that right?

22   A.  No.  They're bringing the 30 million in cash plus the

23   25 million of cash working capital that has been to be

24   injected, plus the evidence of 50 million of additional

25   capital commitments to them so that would be available to

1    prosecute the project.  And so, essentially, they're going

2    at risk for the $55 million with essentially an undertaking

3    as part of the plan to go ahead and prosecute the project.

4    Essentially encumbering that, there's a whole bunch of

5    other things within the plan.  I mean things like all the

6    contracts that are being assumed, that debtor is going to

7    have to show adequate -- capacity of adequate performance;

8    and, in fact, is going to have to perform all of the

9    assumed contracts, which includes the member contracts.

10   And failure to do that would subject the debtor at which

11   they've invested 55 million to failure.

12   Q.  The 30 million in cash, Mr. Greenspan, I think I heard

13   you earlier say that it would be -- the DIP loan, the

14   balance of the DIP loan by time you get to the effective

15   date would be about $30 million.  Is that your prior

16   testimony?

17   A.  I'm sorry.  If I said that, I misspoke.  I think what I

18   said was the DIP loan at the effective date, assuming we

19   spend all of it, the DIP loan would be about 20 -- I want

20   to say 23.3 million, or so.  In addition, there are some --

21   there's some convenience, the convenience class payments,

22   the priority payments, the prepetition taxes, the property

23   taxes.

24       And given what's gone on, I'm assuming our

25   administrative costs are substantially greater than the --

1   don't get me -- the DIP budget was proposed at the time we

2   had a consensual DIP, so not a whit of this litigation,

3   historic or go-forward, is included in the DIP budget.  So

4   we have very substantial admins in excess.  And so all of

5   that still leaves a little bit left out of the 30 million,

6   but basically the 30 million is what it takes to retire all

7   the admins as well as the DIP.

8   Q.  Okay.  But of the 30 million that CrossHarbor is going

9   to propose to pay, 23 million or 24 million of that is

10  going to go back to them to pay their DIP loan; is that

11  right?

12  A.  Well, again, now, separate entities, presumably.  But,

13  that's correct, it will go back to a CrossHarbor affiliate.

14  Q.  Okay, thank you.

15          MR. GEARIN:  I have nothing more, Your Honor.

16          THE COURT:  Any redirect?

17          MR. REAM:  I only have a couple questions, Your

18  Honor.

19                  REDIRECT EXAMINATION

20  BY MR. REAM:

21  Q.  Mr. Greenspan, would the debtors agree to add a

22  provision to the bid procedures that they only become

23  effective upon an execution of the definitive agreement by

24  both the debtors and CrossHarbor?

25  A.  I'm sorry, I lost the question.

```
 1   Q.  I'll try it again.

 2   A.  Thank you.

 3   Q.  Would the debtors agree to adding a provision to the

 4   bidding procedures that they don't become effective unless

 5   the debtors and CrossHarbor sign the definitive agreement?

 6   A.  Yes.

 7   Q.  And would the debtors agree to a provision that says

 8   the DIP financing entity, whichever entity that currently

 9   is, agrees that the $5 million required under the

10   procedures is essentially at risk under the definitive

11   agreement?

12   A.  The debtor would certainly agree, and I think

13   CrossHarbor should agree to that.

14          MR. REAM:  Your Honor, I failed to offer

15   Exhibit A into evidence.  I did not seek to admit "C", but

16   I am offering "A".

17          THE COURT:  Any objection?  Exhibit A is

18   admitted.

19            EXHIBIT A ADMITTED INTO EVIDENCE

20          MR. REAM:  No further questions, Your Honor.

21          THE COURT:  Thank you.  Mr. Greenspan, you may

22   step down.  Thank you.

23          THE WITNESS:  Thank you.

24          THE COURT:  Oh, yes, he's calling a witness, I

25   think.
```

1      MR. SAUNDERS:  I'm getting ahead of myself.  We'd

2  call Ms. Blixseth.

3      THE COURT:  Okay.

4          EDRA BLIXSETH, WITNESS, SWORN

5              DIRECT EXAMINATION

6  BY MR. SAUNDERS:

7  Q.  Good afternoon, ma'am.  Do you still owe CrossHarbor

8  the $35 million that we've talked about previously?

9  A.  Yes, I do.

10  Q.  Okay.  In January of this year, you asked Mr. Byrne by

11  e-mail if he would lend you more money personally, right?

12  A.  Correct.

13  Q.  So in the middle -- January 30th, in the middle of the

14  debtors negotiating their plan of reorganization and these

15  bidding procedures with CrossHarbor, you personally asked

16  Mr. Byrne if he would lend you more money, right?

17  A.  Yes, that's what I just said; yes.

18  Q.  Okay.

19      MR. SAUNDERS:  No further questions, Your Honor.

20      THE COURT:  Does anyone have questions for

21  Ms. Blixseth?

22      MR. PATTEN:  No, Your Honor.

23      THE COURT:  That will conclude your testimony,

24  thank you.

25      THE WITNESS:  Thank you.

1             THE COURT:  Next witness?

2             MR. SAUNDERS:  I would call Sam Byrne, Your

3    Honor.

4             THE COURT:  Okay.  Mr. Byrne, if you could come

5    forward, please.

6                  SAMUEL T. BYRNE, WITNESS, SWORN

7                       DIRECT EXAMINATION

8    BY MR. SAUNDERS:

9    Q.  Good afternoon, Mr. Byrne.  How are you?

10   A.  Good, thank you.

11   Q.  You first talked to Discovery Land Company about

12   getting involved with the Yellowstone Club back in February

13   of 2008 when you were planing to buy the club from

14   Mr. Blixseth, right?

15   A.  It may have been prior to then, I don't recall.  But it

16   was at least that long ago.

17   Q.  Okay.  And it was CrossHarbor who got Discovery Land

18   Company involved with the Yellowstone Club this past fall,

19   not Ms. Blixseth, right?

20   A.  People have a different opinion of it.  I mean we were

21   happy to have them in there, and I think Ms. Blixseth had a

22   relationship with them that preexisted our relationship

23   with her.  And she was happy to have them in there.

24   Q.  Okay.

25             MR. SAUNDERS:  May I approach, Your Honor?

1          THE COURT:  You may.

2          MR. SAUNDERS:  Thank you, Your Honor --

3    (inaudible, out of range of microphone.)

4          THE COURT:  Thank you.  You may approach.

5          MR. SAUNDERS:  Your Honor, this is a binder of

6    documents that we received in discovery after we filed our

7    exhibit list on Friday night, so they haven't been filed

8    electronically.  I would like to try to move some of them

9    into evidence in the course of the proceedings; and if they

10   are admitted, then we'll file them electronically.

11         They're also all designated as confidential by

12   CrossHarbor, so I'll need to get Mr. Moore's permission

13   under the protective order to read them or have them

14   admitted.  But we'll deal with that one by one.

15         Exhibit 27 was the first one.

16         MR. MOORE:  (Inaudible, out of range of

17   microphone.)

18         MR. SAUNDERS:  I understand Mr. Moore to have no

19   objection.

20   Q.  (By Mr. Saunders)  Do you have Tab 27?

21   A.  I do.

22   Q.  Okay.  This is an e-mail exchange between you and

23   Michael Meldman of Discovery Land Company, right?

24   A.  That's correct.

25   Q.  Okay.  And you wrote -- this is on Wednesday, November

1  12th, which is the same day of a court hearing, I believe,

2  in this case:

3           "It is clear from all of the written commentary

4  back from the MT courts that both CH and DLC are viewed

5  adversarial by Skadden.  Edra also testified that DLC was

6  never part of any CH plan and that she brought them in.

7  Said she studied our business plan(?) and DLC and was not

8  part of that equation."

9       You wrote those words, right?

10  A.  Yeah.

11  Q.  And Mr. Meldman's response in one word was "perjury",

12  right?

13  A.  I'm sure jokingly, yes.

14  Q.  Okay.  That's the word he wrote?

15  A.  It is.  But what's the --

16  Q.  Okay.  Did you ever tell the Court that you thought

17  Ms. Blixseth's testimony was incorrect on that day?

18  A.  I don't --

19  Q.  "Yes" or "no", sir.

20  A.  Did I ever tell the Court?

21  Q.  That's --

22  A.  What would be, what would be my opportunity to tell the

23  Court?

24  Q.  Did you ever the tell the Court that you thought that

25  her testimony on that day was incorrect?

1   A.   No.

2   Q.   Okay.  The agreement to form that we've had some

3   testimony about in this case, that gave CrossHarbor

4   important control rights over the Yellowstone Club, right?

5   A.   Prior to the bankruptcies, that's correct.

6   Q.   Okay.

7   A.   Not -- control rights?

8   Q.   Yeah.

9   A.   I don't know.  You would have to -- it's all -- that's

10   a relative term.

11   Q.   Okay.  Could you take a look at Exhibit 16?

12   A.   Yeah.

13   Q.   This is an e-mail exchange between -- it starts off

14   between you and Ms. Blixseth on Wednesday, August 13th.

15   That was the day that you financed her closing on the

16   marital settlement agreement, right?

17   A.   I don't know if that was specifically the day, but I'll

18   take your word for it.

19   Q.   Okay.  And you respond to an e-mail from Ms. Blixseth

20   with an e-mail to Mr. Harris at 8:52 p.m.  Do you see that?

21   A.   Yeah.

22   Q.   Mr. Harris, he's with CrossHarbor, too, right?

23   A.   He's a consultant for CrossHarbor.

24   Q.   Okay.  And you told Mr. Harris:  "Don't let her out of

25   your sight!"

1     Do you see that?

2  A.  Right.

3  Q.  Okay.  And then Mr. Harris responded later that

4  evening:

5          "She is blowing me off completely on the

6  announcement- don't know if its because she doesn't want to

7  acknowledge our control/involvement or if she is just to

8  tired to deal."

9      You wrote those words, right?

10  A.  I did.  This was in regard to a -- oh, that's Joe's to

11  me, I believe.

12  Q.  Fair enough.  Mr. Harris wrote those words?

13  A.  And that was in regards to a press release that we had

14  authority over, and we were trying to get it out before the

15  end of the day.  And that's all it was in regard to.

16  Q.  Okay.  And your response to Mr. Harris was:  "She will

17  come around - she has to."

18      Right?  That's what you wrote?

19  A.  Yes, because she was obligated to get our approval over

20  the press release.

21          MR. SAUNDERS:  Your Honor, I would move

22  Exhibit 16 into evidence.

23          THE COURT:  Any objection?

24          UNIDENTIFIED SPEAKER:  No, Your Honor.

25          THE COURT:  Exhibit 16 is admitted.

1          EXHIBIT 16 ADMITTED INTO EVIDENCE

2     BY MR. SAUNDERS:

3     Q.   Now, Ms. Blixseth personally and her company, BGI, were

4     both parties to the agreement to form, right?

5     A.   That's correct.

6     Q.   And they are not debtors, right?

7     A.   In this case?

8     Q.   Right.

9     A.   I don't -- no, correct.

10    Q.   Okay.  And the agreement to form has never been

11    terminated, right?

12    A.   Not formally, no.

13    Q.   Okay.  And you've never canceled the mortgage that you

14    have on Ms. Blixseth's personal real estate that secures

15    her compliance with the agreement to form, right?

16    A.   No.

17    Q.   Correct?

18    A.   I said "no".

19    Q.   Okay.  "No" meaning you have never done it?

20    A.   I have not canceled the mortgage --

21    Q.   Okay.

22    A.   -- which was your question.

23    Q.   Great.  The loan, the $35 million loan to Ms. Blixseth

24    was originally due to be repaid on September 30, 2008,

25    right?

1    A.   Correct.

2    Q.   Okay.  And on September 29th, you asked Ms. Blixseth to

3    have a private conversation with you about the loan, right?

4    A.   I may well have.

5    Q.   Okay.

6    A.   I don't know if I did or --

7    Q.   Could you take a look at Tab 17?  This is an e-mail

8    from you to Ms. Blixseth on Monday, September 29th.  And

9    you wrote:  "Let me know what time we can talk this

10   afternoon about the $35m loan.  Just needs to be you

11   and I."

12       You wrote those words, right?

13   A.   That was in response to her request for a meeting with

14   me about the loan without lawyers.  She wanted to talk

15   about the fact that it wasn't going to be paid back the

16   following day.

17   Q.   Okay.

18            MR. SAUNDERS:  Your Honor, I would move

19   Exhibit 17 into evidence.

20            THE COURT:  Any objection?

21            UNIDENTIFIED SPEAKER:  Only as to relevance, Your

22   Honor.

23            THE COURT:  Exhibit 17 is admitted.

24            EXHIBIT 17 ADMITTED INTO EVIDENCE

25   BY MR. SAUNDERS:

```
1    Q.  Now, in October of 2008, CrossHarbor was closely

2    involved in preparing the Yellowstone Club for bankruptcy,

3    right?

4    A.  I don't know if we were closely involved.  At the time,

5    it was becoming clear that there would not be a closing on

6    Farcheville, there was not going to be a financing from

7    Archer.  The club was hopelessly insolvent.  We were trying

8    to get Edra to focus on what she was going to have to deal

9    with.  And we were having conversations her and Credit

10   Suisse about how they could organize a more controlled

11   crash rather than an uncontrolled crash.

12   Q.  Okay.  And you and CrossHarbor formed a plan,

13   prepetition, in October of 2008 to use bankruptcy as a way

14   to acquire or address the Yellowstone Club secured debt and

15   come out on the other side of the bankruptcy owning the

16   club, correct?

17   A.  No, that's not correct.

18   Q.  No?

19   A.  No.

20   Q.  Okay.  Could you please turn to exhibit --

21            THE COURT:  You might want to be a little louder,

22   because I'm not sure if that answer was even picked up.

23   Q.  (By Mr. Saunders)  Could you please turn to Exhibit 18?

24       Exhibit 18 is an e-mail from Mr. Harris to Mr. Arenson.

25   And Mr. Arenson is Discovery Land Company, right?
```

```
 1    A.   That's correct.

 2    Q.   Okay.  And he says:  "Hey, Joey - Could you email Matt

 3    and I the current version of DLC's business plan as we get

 4    prepared for a pre-pack filing?"

 5         Right?

 6    A.   That's what it says, that's correct.

 7    Q.   Okay.

 8              MR. SAUNDERS:  Your Honor, I would move

 9    Exhibit 18 into evidence.

10              THE COURT:  Exhibit 18 is admitted.

11                 EXHIBIT 18 ADMITTED INTO EVIDENCE

12    BY MR. SAUNDERS:

13    Q.   Okay.  Could you turn to Exhibit 19, please?

14    Exhibit 19 is a multipage e-mail chain with a Bates No.

15    CHE04659 through 4662.  Could you turn to the last e-mail,

16    which is, of course, the first one chronologically on the

17    last page?

18         This is an e-mail sent from Schuyler Joyner on Friday,

19    October 24th, to Joe Harris and Matthew Kidd.  Mr. Joyner

20    is with Discovery Land Company, right?

21    A.   That's correct.

22    Q.   Okay.  And he writes (quoted as recorded):

23              "Mat and Joe, please find the attached worksheet

24    with the changes we discussed on the BK atty call and your

25    other comments.
```

1          "There are two files.  One has just the line

2  items and columns that need to be shown with fixed numbers

3  for purposes of sharing with the other creditors.  The

4  other is the full version for our internal use.  Sky."

5    Do you see that?

6  A.  I do.

7  Q.  Okay.  So Discovery Land Company in October was sharing

8  with CrossHarbor their internal models for the Yellowstone

9  Club, right?

10  A.  We had put together a combined model in early September

11  for the work that was going to be done under the agreement

12  to form.

13  Q.  Okay.  Can you look at the page earlier, the one with

14  the Bates No. 4661?  At the top of the page is an e-mail

15  from Joe Harris to Tim Barns.  Do you see that?

16  A.  I do.

17  Q.  Okay.  Mr. Harris writes:  "Tim - Attached is a

18  spreadsheet with multiple tabs that we've been working on

19  with Discovery Land, who is currently managing the Club."

20    Did I read that right?

21  A.  Hm-hmm.

22  Q.  Okay.  And then the second paragraph, you write:  "We

23  should also brainstorm about how we can best" --

24  A.  I'm sorry, you said I write?

25  Q.  I'm sorry, Mr. Harris writes.

1   A.   Okay.

2   Q.   Correct, thank you.  The second paragraph --

3   A.   He was working for Ms. Blixseth at the time, right?

4   Q.   Okay.  He's a consultant to CrossHarbor, right?

5   A.   Well, he was employed as the -- you know, working at

6   the club, helping her out.

7   Q.   Okay.  Was he still serving as interim CEO in October

8   of --

9   A.   I don't, I don't know the dates.

10  Q.   -- of 2008?

11  A.   He may technically have been.  I don't know.

12  Q.   Okay.  The second paragraph (quoted as recorded):  "We

13  should also brainstorm about how we can best work together

14  on the larger strategy of acquiring the bonds at a

15  substantial discount to face, as well as the need for new

16  money- probably in the form of preferred equity in the

17  $100 million range- and strategies for dealing with the

18  lender group and the timing of the filing.  Sam and I" --

19  do you think you're Sam?

20  A.   I assume so, yes.

21  Q.   Okay (quoted as recorded):  "Sam and I were thinking

22  broadly of a 90 percent Bain/10 percent CrossHarbor capital

23  contribution commitment, with some form of promote to Cross

24  Harbor for doing the work and managing through the BK and

25  beyond."

1      Do you think "BK" means "bankruptcy"?

2 A.  I assume so, yeah.

3 Q.  Okay.  (Quoted as recorded):  "We received a call from

4 Sandelman yesterday inquiring as to whether we might want

5 to buy out their position, so the opportunities are already

6 beginning to present themselves now that the lender group

7 has been informed of the insolvency of their borrower."

8      Did I read that right?

9 A.  You do.

10         MR. SAUNDERS:  Okay.  Your Honor, I would move

11 Exhibit 19 into evidence.

12         THE COURT:  Any objection?

13         UNIDENTIFIED SPEAKER:  No objection, Your Honor.

14         THE COURT:  Nineteen is admitted.

15            EXHIBIT 19 ADMITTED INTO EVIDENCE

16 BY MR. SAUNDERS:

17 Q.  Could you turn to Exhibit 20, please?

18         MR. SAUNDERS:  Paul?

19         MR. MOORE:  That's fine.

20 Q.  (By Mr. Saunders)  Exhibit 20 is two consecutive

21 e-mails with the Bates Nos. CHE04632 and 4633.  The first

22 one is an exchange between you and Mr. Harris and Mr. Kidd

23 on October 27th.

24      And in the first e-mail you write:  "I am going to

25 write the 'plan' tonight to solve the entire YC debacle.

1    It could be brilliant."

2        You wrote those words, right?

3    A.  I did.

4    Q.  Mr. Harris responded, Mr. Harris responded (quoted as

5    recorded):  Sounds dangerous.  And possibly evil.  It could

6    be worth over 1 billion dollars."

7    A.  Right.

8    Q.  "I hope it includes a dip and filing by friday."

9    A.  That's his --

10   Q.  That's what he said to you, right?

11   A.  Right, that's his --

12   Q.  And you wrote back?

13   A.  -- his Dr. Evil joke.

14   Q.  And you wrote back:  "It is brilliant," right?

15   A.  Yes, that's my --

16   Q.  Okay.

17   A.  -- response to his Dr. Evil joke.

18   Q.  And on the next page, Mr. Kidd wrote:  "Excellent...I

19   am working on proving out it's brilliance."

20       Right?

21   A.  Mr. Kidd's response to the Dr. Evil joke.

22            MR. SAUNDERS:  Okay.  Could you turn to -- Your

23   Honor, I'd move Exhibit 20 into evidence, please.

24            THE COURT:  Any objection?

25            UNIDENTIFIED SPEAKER:  No, Your Honor.

```
 1              THE COURT:  Exhibit 20 is admitted.
 2                EXHIBIT 20 ADMITTED INTO EVIDENCE
 3   BY MR. SAUNDERS:
 4   Q.  Okay.  Could you take a look at Exhibit 21, please,
 5   sir?
 6        Exhibit 21 is an e-mail from Mr. Kidd to you two days
 7   later on October 29th?
 8   A.  That's correct.
 9   Q.  And he writes:  "I thought that went well...basically
10   we need to help Edra get the club into BK."
11        Again, any doubt in your mind that "BK" is
12   "bankruptcy"?
13   A.  No, I have no doubt.
14   Q.  "(Really I think we've done that), let the bondholders
15   squirm a bit and realize what they have (hopefully DLC
16   helped with that today), and then we position ourselves as
17   part of the solution (that call was step 1).  New capital
18   should come from the members, and you can deliver that.
19   DLC is with you.  We are in a good position.  I think we
20   can get the deal done that you proposed the other night,
21   although there are sure to be twists and turns along the
22   way."
23        That's what Mr. Kidd wrote to you, right?
24   A.  He did.
25   Q.  Okay.  And that deal that you had proposed the other
```

1   night is the deal that was referred to in Exhibit 20,

2   right?

3   A.  No.  Exhibit 20 is not referring to any deal.  I'm sure

4   there -- I mean these -- there are, there are probably 30

5   discussions ongoing between Credit Suisse, ourselves, any

6   number of the Credit Suisse note holders who had reached

7   out to us.  I mean any number of things were going on at

8   the time.

9           MR. SAUNDERS:  Your Honor, I would move

10  Exhibit 21 into evidence.

11          THE COURT:  Any objection?

12          UNIDENTIFIED SPEAKER:  No objection, Your Honor.

13          THE COURT:  Twenty-one is admitted.

14          EXHIBIT 21 ADMITTED INTO EVIDENCE

15  BY MR. SAUNDERS:

16  Q.  Okay.  Now, postpetition, you continued to work

17  together with Ms. Blixseth and Discovery Land Company to

18  try to accomplish the plan that you had formulated in

19  October, right?

20  A.  No.

21  Q.  Okay.  Could you take --

22  A.  The plan in --

23  Q.  Could you take a look at Exhibit 22, please?

24          THE COURT:  Did you allow him to answer the

25  question?

1           MR. SAUNDERS:  I'm sorry, Your Honor.

2           THE WITNESS:  He doesn't want me to answer the

3      question.

4           THE COURT:  Okay.

5      Q.  (By Mr. Saunders)  Do you have Exhibit 22, sir?

6      A.  I have it.

7      Q.  Okay.

8           MR. SAUNDERS:  Mr. Moore?

9           MR. MOORE:  No problem.

10     Q.  (By Mr. Saunders)  Okay.  Exhibit 22 is an e-mail from

11     you to Ms. Blixseth on Friday, November 7th.  And you write

12     to her:

13          "Edra, it is really unfair that Joe didn't

14     respect the confidentiality of our DIP terms sheet,

15     particularly in the context of asking us not to do so with

16     the member group, etc...  I need to have confidence that we

17     are not being played or shopped.  This is not in the spirit

18     of trying to work together."

19          You wrote those words, right?

20     A.  I did, in response to Edra's request similar to the

21     e-mail back from Bain that we provide or look into

22     providing her alternative DIP financing at the request of

23     Mr. Yankauer in a telephone call in which I participated

24     with Ms. Blixseth.

25          MR. SAUNDERS:  Okay.  Your Honor, I would move

1    Exhibit 22 into evidence.

2             UNIDENTIFIED SPEAKER:  No objection, Your Honor.

3             THE COURT:  Exhibit 22 is admitted.

4                 EXHIBIT 22 ADMITTED INTO EVIDENCE

5    BY MR. SAUNDERS:

6    Q.  Could you turn to Exhibit 23, please, sir?

7    A.  Sure.

8    Q.  Okay.  Exhibit 23 is an e-mail from you to Mr. Meldman

9    of Discovery Land and Ms. Blixseth and Mr. Arenson of

10   Discovery Land on November 8th, right?

11   A.  Correct.

12   Q.  Okay.  And you write:  "We need to be on message in

13   this thing or it won't work.  We are either together or

14   not.  At this point we have to decide if we are and moving

15   forward together."

16       You wrote those words, right?

17   A.  In regard to what?

18   Q.  Did you write those words in this e-mail, sir?  That's

19   all I'm asking.

20   A.  I did, but I --

21   Q.  Okay.

22   A.  -- you know, I don't know what it's referring to.

23   Q.  Okay.  Could you go to the next-to-last paragraph, sir?

24   It says:  "Assuming that is the case, we must all be on the

25   same message and all (including lawyers) be aggressively

1    advocating in one singular direction."

2        Did you write those words?

3    A.   That's correct.  And this was in response to having a

4    DIP that actually would fund the whole ski season and not a

5    DIP that would last for 21 days or a DIP that would last

6    for a short period of time leading to the liquidation of

7    the club, which is not in my best interest.

8              MR. SAUNDERS:  Okay.  Your Honor, I'd move

9    Exhibit 23 into evidence.

10             UNIDENTIFIED SPEAKER:  No objection, Your Honor.

11             THE COURT:  Twenty-three is admitted.

12                 EXHIBIT 23 ADMITTED INTO EVIDENCE

13   BY MR. SAUNDERS:

14   Q.   Okay.  Could you turn to Exhibit 24, please?

15   Exhibit 24 is an e-mail exchange between you and

16   Ms. Blixseth and Mr. Meldman of Discovery Land on November

17   9th, right?

18   A.   That's correct.

19   Q.   Okay.  And you write in the first e-mail at the bottom:

20             "I feel that I need to point out that if CS'

21   terms ultimately prohibit you from filing a plan, or

22   restrict you from filing a plan that is not acceptable to

23   them (all likely), then it effectively leaves out on the

24   street to fend for ourselves and opens the doors to any

25   number of third parties coming in (eg Tim), likely

```
 1   alienating the membership once and for all."

 2       You wrote those words, right?

 3   A.  I did, yeah.

 4   Q.  Okay.  The next paragraph:  "I understand that there

 5   may not be any choice on your part, but it is important

 6   that people know the direction that CS is driving things

 7   for all parties involved.  If their efforts towards

 8   disintermediation of CrossHarbor are successful, we are

 9   going to be in a difficult spot and a lot of good will is

10   down the drain."

11       You wrote those words, as well, sir?

12   A.  I absolutely did.

13   Q.  Okay.  The next-to-last paragraph:  "They will be" --

14   A.  I'm sorry, you skipped over one paragraph.  Could we

15   read that one, too?

16   Q.  Well, I get to ask the questions.

17   A.  (Quoted as recorded):  "I am happy for CS to provide

18   the DIP if it meets peoples requirements for operating the

19   YC and protecting our property values.  I don't know where

20   the same hearty battle with them is that Joe put up with us

21   about 'assurances that we will be able to fund the entire

22   season, sit down at the table, etc, etc.....'?"

23   Q.  And the next to last paragraph says:  "They will be

24   inside the tent, and that will be the beginning of the end

25   unless people come at them with both barrels loaded."
```

1      You wrote those words, right?

2  A.  I did, yeah, absolutely.

3  Q.  And the "them" is CS, right?

4  A.  Yeah.

5  Q.  Okay.

6          MR. SAUNDERS:  Your Honor, I would move

7  Exhibit 24 into evidence.

8          THE WITNESS:  (Quoted as recorded):  "And they

9  will be agreeing to be prohibited from the fight for 28

10  days of money that doesn't even get the ski season open for

11  the season," which was the whole point.

12          And my contention was and continues to be today

13  that they never had any intention to fund the second half

14  of the ski season.  It was a complete ruse to get around

15  the issue of foreclosing on the property.

16          MR. SAUNDERS:  Your Honor, I'm trying to hit Your

17  Honor's time deadline as quickly as possible.

18          THE WITNESS:  I'm sure.

19          MR. SAUNDERS:  I'm just asking "yes" or "no"

20  questions.

21          THE COURT:  Any objection to 24?

22          UNIDENTIFIED SPEAKER:  No, Your Honor, as long as

23  it's admitted in its entirety.

24          THE WITNESS:  Yeah.

25          MR. SAUNDERS:  Of course, Your Honor.

1            THE COURT:  They're all admitted in their

2   entirety.

3            MR. SAUNDERS:  Of course, Your Honor.

4            UNIDENTIFIED SPEAKER:  Thank you.

5   Q.  (By Mr. Saunders)  Could you turn to Exhibit 25,

6   please?

7            THE COURT:  We could just stipulate that they're

8   all admitted.

9            THE WITNESS:  Why don't we do that.

10            MR. SAUNDERS:  Okay, we don't have any objection

11   to that.

12            THE COURT:  Mr. Saunders, we could just stipulate

13   that they're all admitted and save you the time.

14            MR. SAUNDERS:  That would be great.  I'm just

15   trying to make sure that Mr. Moore doesn't have any

16   confidentiality objection.

17            MR. MOORE:  As long as I can look through them,

18   Your Honor.

19            THE COURT:  Certainly.  Why don't you take a

20   moment.

21            MR. MOORE:  And Mr. Byrne, perhaps, too, just to

22   both look through them.

23            THE WITNESS:  Take a look at them?  Sure.

24            MR. SAUNDERS:  You're still waiting for

25   Mr. Byrne, or any objection?

1              I don't think there's any objection, Your Honor.

2              THE COURT:  No objection?

3              MR. MOORE:  No, Your Honor.  I would just ask if

4    looking at this you would take this into consideration in

5    your order regarding the $1 million of further discovery,

6    because we obviously haven't tried to hide anything.  If

7    this is what we're looking for, I think it's an incredible

8    waste of money to --

9              THE COURT:  Okay.

10             MR. MOORE:  -- say "ah-ha" for these things.

11   Q.  (By Mr. Saunders)  Could you take a look at Exhibit 25,

12   please, sir?

13             MR. MOORE:  I thought we were done.

14             THE COURT:  Well, just a moment.  Let me get

15   these exhibits admitted that have been agreed to.

16             MR. SAUNDERS:  I apologize, Your Honor.

17             THE COURT:  So we're looking at 25 through 32,

18   correct?

19             MR. SAUNDERS:  Yes, Your Honor.

20             THE COURT:  And what's at the beginning?  I guess

21   it was only 15.

22             MR. SAUNDERS:  It started with --

23             THE COURT:  You started with 16, I think, unless

24   I'm missing.

25             MR. SAUNDERS:  I think we started with 15 because

1  there were 14 on our original exhibit list that was filed

2  Friday night.

3          THE COURT:  Okay.  We'll admit 15, as well.

4      EXHIBITS 15 and 25 - 32 ADMITTED INTO EVIDENCE

5          THE COURT:  You may proceed.

6  BY MR. SAUNDERS:

7  Q.  Okay.  Would you turn to -- well, let me ask you a

8  question first:  One of your goals at the outset of the

9  bankruptcy case was to try to use Discovery Land Company to

10 deter bondholders from making a DIP, right?

11 A.  How is that -- no.  Deter the bondholders --

12 Q.  Correct.

13 A.  -- from making a DIP?

14 Q.  Right.

15 A.  How would I do that?

16 Q.  Okay.  Well, let's take a look.  Take a look at Tab 26.

17 The last e-mail in Tab 26 is an e-mail to Mr. Meldman of

18 Discovery Land Company.  You'll see:  "I figured - Sky

19 previewed."  That's a follow-up.

20     And then you write:  "I do want Edra to get something

21 here, and I think we can help her get insulated at the end

22 of the day, but tough love with the bondholders is going to

23 be necessary.  Hopefully she will understand that when it

24 comes to DLC."

25     Did I read that right?

1   A.   Okay.

2   Q.   And in the third paragraph, you say:  "The bondholders

3   are asking to get together in NYC next week without CS for

4   a 'very frank discussion' according to Babson.  Sky and the

5   boys" -- and "Sky and the boys", that's Discovery Land

6   Company, right?

7   A.   It may well be.

8   Q.   Okay.  You wrote it.  Is that what you intended?

9   A.   I don't really recall.

10  Q.   Okay:  "Sky and the boys just need to continue to

11  hammer into them what a mess that they have and that we can

12  get them out of it."

13       You wrote those words, right?

14  A.   To make sure that they were paying attention to the

15  truth.  And the point here was:  We were invited by a group

16  of the sub-bondholders to meet them in New York to have a

17  discussion about the collateral.  And this was in response

18  to -- but this has nothing to do with them and the DIP

19  whatsoever.

20  Q.   The timing of that e-mail is after the initial, the

21  initial -- hearing on initial DIP and prior to the hearing

22  on the final DIP, right?

23  A.   I don't know.  I don't have a calendar in front of me.

24  But this was -- has nothing to do with the DIP; this had to

25  do with the requests of the bondholders to meet with us.

1    Q.   Okay.  And what did your statement about Sky and the

2    boys refer to, then?

3    A.   I'm sure I was telling them that they needed to

4    continue to try to give them some education about what was

5    really going on with the collateral.

6    Q.   Okay.  With a hammer?

7    A.   I said "to hammer into them".  I mean that's a

8    statement of, you know --

9    Q.   Okay.  Could you take a look at Exhibit 30, please?

10   Exhibit 30 is an e-mail from you to Ms. Blixseth on January

11   8th.  You wrote:  "Ron didn't know we had plan approval in

12   the document."

13        What document were you referring to?

14   A.   In the DIP loan.

15   Q.   "And got way out in front of it with CS.  Now he needs

16   to craft the story to fit the circumstances.  It is ok if

17   he messed up, but not at our expense."

18        You wrote those words, right?

19   A.   I did, yeah.

20   Q.   And the third paragraph, you write:  "This feels very

21   unfair and not at all what was agreed."

22        Right?

23   A.   I've just got to read the whole thing in context.  The

24   timeline -- I mean, yeah.

25   Q.   Okay.  And then the last paragraph, you write to

1    Ms. Blixseth:  "If he needs cover" -- and the "he" there is

2    Ron, right?

3    A.  That's correct.

4    Q.  Okay:  "If he needs cover we can give it to him, but

5    that is different than waiving rights.  You should ask

6    counsel independently of Ron and Andy."

7        You wrote those words, right?

8    A.  "Is different than waiving rights" -- yeah, I did.  I

9    did, yeah.

10   Q.  Okay.  Could you take a look at Exhibit 32, please?

11   Exhibit 32 is an e-mail exchange between Brad Foster of FTI

12   -- Mr. Foster works for Mr. Greenspan, right?

13   A.  He does.

14   Q.  Okay, between Mr. Foster and Mr. Kidd and Joe Harris.

15   And do you see at the bottom of the page, Mr. Foster

16   writes:

17           "Guys - As part of the reorg plan and

18   accompanying disclosure statement, the debtors must file

19   financial projections.  Rather than add your model to our

20   filing...I want to make my model mirror yours and present

21   the information in our format."

22        Did I read that right?

23   A.  You did.

24   Q.  Okay.  And then two e-mails up from that, Mr. Foster

25   writes again to Mr. Kidd and Mr. Harris:

1           "It's the same format that's on the Datasite.  CS

2     is familiar with the format and their advisors have been

3     tearing through it.  My real goal is to create the optics

4     of separation between the debtors plan and CH."

5         Did I read that right?

6     A.  I have no idea what the context was since I'm not party

7     to the e-mail.

8               MR. SAUNDERS:  Nothing further, Your Honor.

9               THE COURT:  Any cross-examination?

10               UNIDENTIFIED SPEAKER:  No questions, Your Honor.

11               THE COURT:  You may step down.

12               Next witness?  Is that it?

13               MR. SAUNDERS:  Respectful of Your Honor's

14     deadline --

15               THE COURT:  Pardon?

16               MR. SAUNDERS:  No further witnesses, Your Honor,

17     I guess.

18               THE COURT:  Did you intend any witnesses, any

19     additional witnesses?

20               MR. SAUNDERS:  I think we've made the decision

21     not to call any more, Your Honor.

22               THE COURT:  Okay.

23               MR. REAM:  Your Honor, I would like to call

24     Mr. Greenspan in rebuttal since the last e-mail that was

25     provided was actually not related to Mr. Byrne at all but

1  related to Mr. Foster.

2  　　　　THE COURT:  Okay.  Mr. Greenspan, I'll remind you

3  that you're still under oath.

4  　　　　　　　　REBUTTAL DIRECT EXAMINATION

5  BY MR. REAM:

6  Q.  Do you still have an exhibit book up there?

7  A.  I've never seen an exhibit book, but I heard what was

8  said.  But, okay, I'll take --

9  　　　　MR. REAM:  Well, may I just hand it to him?

10  　　　　THE COURT:  You may approach.  Here, I'll give

11  you mine.

12  　　　　MR. REAM:  Thank you, Your Honor.

13  　　　　THE WITNESS:  Thank you, Your Honor.

14  Q.  (By Mr. Ream)  So I think he was referring to the last

15  portion of this Exhibit 32.

16  A.  Yes.

17  Q.  Can you provide to the Court some context for this?

18  A.  Yes.  I mean we've just been working under incredible

19  deadlines.  And at that time when this was done, we

20  wanted -- we needed a model because we thought it would

21  help bidders and expand the population if they actually

22  didn't have to go through all the effort we went through to

23  build a model.  And so we've actually done that.  We've

24  posted a live model to the data room.  But what we didn't

25  think was appropriate was posting something that said

1    "CrossHarbor".  They had done a lot more work and had a big

2    head start.  I mean there was a lot of formulas, and so

3    forth, that we can copy over.

4        As I think the Court understands, we actually have

5    filed instead of -- I mean what I'm objecting to is the

6    implication was that we were somehow in cahoots with

7    CrossHarbor and all we've presented is CrossHarbor's.

8        We've actually filed two separate models.  We filed one

9    that's designated as "CrossHarbor" and another that is

10   completely different.  And we've borrowed some modelling

11   and some formulas.  But the model that the debtor is

12   endorsing is not the CrossHarbor model.  It's not their

13   assumptions, it's not their projections, it's not their

14   result.  And we've offered, quite frankly, the world - all

15   the creditors and everybody else - to look at the two of

16   them and make their own decision.  But there's absolutely

17   nothing that we were doing that was taking CrossHarbor's

18   and branding it as debtors' or any other way, shape, or

19   form.

20              MR. REAM:  No further questions, Your Honor.

21              THE COURT:  Any questions, Mr. Saunders?

22              MR. SAUNDERS:  No, Your Honor.

23              THE WITNESS:  Thank you, Your Honor.

24              THE COURT:  You may step down.

25              That concludes the witnesses?

1          MR. REAM:  We have no further witnesses, Your

2     Honor.

3          THE COURT:  Okay.  I did want to make a note

4     regarding Mr. McKay's comment about the consolidation.

5     1123 does, certainly, provide that a plan can contain

6     provisions regarding consolidation.  And I believe the

7     disclosure statement and the plan do have provisions

8     regarding that, so I don't see the need for a separate

9     motion.  Everybody's familiar, there's no due process

10    issue.  And we'll proceed on that basis.

11         As it relates to -- a concern I have that came up

12    kind of in our discussion with Mr. Greenspan and Mr. Warner

13    and the example and what happens on the offset credit bid,

14    etc., obviously, there's a proposed order here that people

15    want me to sign.  I guess I have a question concerning

16    that, based upon what has been commented about as it

17    relates to the bidding and the credit bid, if there is one;

18    or the offset, if there is one, as to what cash is

19    required.  It seemed Mr. Warner was wanting to have a

20    dollar amount.

21         MR. WARNER:  Your Honor, with all due respect,

22    I'm not sure I wanted a dollar amount.  I wanted to know

23    the debtors' mechanism to deal with it at the auction.  And

24    the debtor had no mechanism.  That was the problem.

25         THE COURT:  And you guess I interjected myself at

1   that point and said, "We'll solve that problem if there's a

2   problem," right?

3          MR. WARNER:  Well, I'm not sure, though, that

4   that solves the problem.

5          THE COURT:  Okay.  Well, before I sign an order,

6   that kind of leaves that hanging, unless everybody's

7   comfortable with it, as it relates to Provision M on the

8   credit bid and what has to be paid by Credit Suisse in the

9   event of bidding.  Is there going to be an issue that we

10  still need to deal with and flush that out as we get closer

11  to the time for this bidding?

12         MR. REAM:  We are going to have an allocation,

13  Your Honor, and that's how this will get determined.  And

14  so we're prepared to move forward with Your Honor signing

15  the order and resolving that at that time.

16         THE COURT:  Okay.  So if, in fact, there's a

17  credit bid or an offset of $310 million - just totally as

18  an example, 310 million - basically, there's no cash that

19  need to come into the equation?

20         MR. REAM:  That's not accurate.  There will be

21  two parts.  One will be the $30 million, the second will be

22  anything more than that that equates to the portion of the

23  noncollateral that you determine is allocated to the whole.

24         THE COURT:  So there is, in fact, a cash amount

25  of 30 million plus the overbid bid of 3.5?

1          MR. REAM:  Yes, Your Honor.

2          THE COURT:  Okay.  That was the point I was

3     trying to make earlier, that there is some cash that's --

4          MR. REAM:  Absolutely, Your Honor.

5          MR. CHEHI:  You know, the concern I have here,

6     Your Honor, is that the -- this discussion is mixing apples

7     and oranges.  Credit bidding is permitted under the

8     bankruptcy code when one is bidding for one's collateral.

9     We're talking about an acquisition of equity in the

10    reorganized company --

11         THE COURT:  I understand.

12         MR. CHEHI:  -- and some post-auction allocation

13    of value as between some portion of assets underlying the

14    equity and some other portion of assets underlying the --

15    in the entity that the equity covers.  And in working from

16    that assumption that that is an appropriate division of, I

17    guess, purchase price consideration at the end of the day,

18    back to "what can we credit bid for and what do we have to

19    pay in cash?" I think that's a problem.

20         I have not heard that everyone -- all the parties

21    in interest here have agreed that we have a right to credit

22    bid apart from lien validity, validity of claims, allowance

23    of claims.

24         THE COURT:  Well, and this Court hasn't decided

25    you do, either.

1           MR. CHEHI:  Right, right.  You know, our big

2   concerns with the procedures, Your Honor, are some of the

3   same concerns that we had with the original procedures and

4   the concerns, I think, that the Court expressed in

5   rejecting the original procedures.  And that was that the

6   entire procedure is geared toward allowing CrossHarbor and

7   Discovery Land Company, through the plan process, to

8   succeed at gaining control of the Yellowstone Club assets,

9   substantially all of the debtors' assets.

10          Given the testimony today and the record that

11  shows that there's been a long-standing involvement which

12  had not been previously disclosed to the Court and, in

13  fact, notwithstanding all the testimony of the DIP

14  financing hearings about how there were no arrangements

15  between the parties, how Discovery Land Company came in

16  late in the process, how all there was was this MOU and the

17  agreement to form all disclosed, you get a different

18  picture of the many months of the prior last year in which

19  there was an agreement, an arrangement, at least as of

20  February, if not earlier, from Mr. Byrne's testimony --

21          THE COURT:  Well, I guess we haven't had the

22  benefit of the e-mail exchanges between your people.

23          MR. CHEHI:  In what sense, Your Honor?

24          THE COURT:  Credit Suisse.

25          MR. CHEHI:  And what would that have to do --

1           THE COURT:  Well, you know, you point the finger

2    downstream or one way, and yet, obviously, in a complex

3    transaction like this, I would be shocked if there wasn't

4    concerns by Credit Suisse and CrossHarbor and members as to

5    where this thing was going in about August.  And there's

6    probably been a flurry of activity prepetition.  And I

7    guess what I'm looking at right now is how we get to the

8    end --

9           MR. CHEHI:  I agree.

10          THE COURT:  -- and to get some conclusion.

11          MR. CHEHI:  I agree, Your Honor.

12          THE COURT:  You know, we need to get some

13   conclusion because, otherwise, this thing is just hanging

14   up in the air and we've got about 15 balls bouncing.

15          MR. CHEHI:  Let me suggest a conclusion or a

16   resolution of these immediate issues which we think would

17   end up in a fair process.  And that is:  Number 1,

18   CrossHarbor should not, as an insider and as a party that

19   has been deeply involved in doing due diligence and doing

20   transactions with these debtors for the last couple of

21   years at least, be entitled to a termination fee, a

22   break-up fee as a stalking-horse bidder that, in effect,

23   erects yet another obstacle to any other party who might be

24   interested in bidding on the plan configuration and the

25   proposal that they're putting on the table, the debtors.

1          THE COURT:  See, the problem I have with this,

2     though:  I haven't really heard anything to refute what I

3     have before me as far as what's the best way to go.  I

4     haven't had anybody testify saying, "No it shouldn't be

5     done this way; it should be done this way."

6          All I hear is, "No, that's not the right way to

7     do it."

8          MR. CHEHI:  I'm just saying, Your Honor, that

9     that should not be the only way that it gets done.  And

10    that is what the procedures --

11         THE COURT:  But nobody's given me any other

12    alternative.

13         MR. CHEHI:  Well, Your Honor, we're all laboring

14    under exclusivity, No. 1 --

15         THE COURT:  Well, but you can still, through

16    testimony and witnesses, establish what's a better bidding

17    solicitation procedure than what the debtor is proposing.

18         MR. CHEHI:  Let the parties -- let the debtors

19    set up a deadline for bids.  Let them set up whatever

20    qualification for bidders they want to set up so that

21    you're dealing with real people.  Make sure that there's a

22    level playing field for any of these interested parties

23    that CB Richard Ellis, apparently, has located in the last,

24    you know, couple of days - and anybody else, for that

25    matter - so that they can throw their hat in and make

1   expressions of interest to accomplish a transaction but not

2   just the transaction that the plan proposes, the sale of

3   equity.  That has a lot of risks because that plan may not

4   be confirmable.

5         Number 2, it is not the only way to reorganize

6   companies.  A sale of the equity of a reorganized company

7   is just one of a great variety of ways to reorganize

8   companies, to capitalize a reorganized company, to

9   transition ownership of the company to someone who wants to

10  invest in it.  And if these sale procedures do not permit

11  those all alternatives, then we're fine with that.

12        And it should be a level playing field.

13  CrossHarbor doesn't need to have any greater advantage than

14  it already has.  The debtors' own motions to approve these

15  procedures admit that one of the major issues in the whole

16  process of selling and marketing these assets or businesses

17  or equity is the fact that CrossHarbor is perceived to be

18  in control, have had a great head start on a lot of other

19  parties.  And that dampens enthusiasm from competing

20  parties, especially if they're going to be constrained to

21  bid against CrossHarbor on its terms under its plan.

22        If there are other possible proposals that can be

23  made over the next, you know, 60 days or whatever the time

24  period is remaining, the Court should authorize procedures

25  that accommodate that and not do what was done with the

1   application to employ CB Richard Ellis and these bidding

2   procedures, the new renewed one as much as the original

3   ones, which is restrict the entire transactional

4   possibilities to the plan that's on the table, the capital

5   structure that the debtors have decided with CrossHarbor is

6   the right way to go.  We think that it should be a fair and

7   level playing field.  There's no need for the break-up fee.

8            CrossHarbor's fully invested in this case and in

9   this business and it was long before these cases were

10  commenced.  They're not going anywhere.  They're going to

11  be at the table to bid.  We, our client and its

12  constituents, are likely to be there in some capacity, but

13  there are going to be third parties who will be involved,

14  can be involved working with the lenders, can be involved

15  working with other parties.  They could bring in their own

16  financing to make proposals to either outbid CrossHarbor on

17  its terms or propose an alternative transaction which

18  doesn't mean that, in that alternative transaction, the

19  business burns down, the Yellowstone Club goes away.  I'm

20  talking about a successful reorganization.  It happens all

21  the time.  Buyers come in and buy substantially all the

22  assets, and they assume all the membership agreements,

23  assume all the contracts of a business, and it goes on from

24  there.

25            It does not have to be done in the context of a

1    sale of the equity, but it's being done that way for a

2    number of reasons.  One is to make it more difficult for

3    the lenders to credit bid.  It makes it more difficult for

4    other third parties to make competing proposals.  And that

5    was the spirit, we thought, of the last order Your Honor

6    entered on the initial bidding procedures.

7           And we came here today to say, "Let's get CB

8    Richard Ellis out there marketing, but let's not confine

9    them to marketing the equity in the company.  Let them go

10   out there and talk about any and all proposals people might

11   want to make within a short period of time.  Let them talk

12   to the lenders, let them talk to all the parties in

13   interest.  And if there's another alternative to the

14   CrossHarbor plan, then you're going to have some

15   competitive bidding."  And the debtors can decide along

16   with the Court and the other parties in interest whether --

17   the CrossHarbor proposal, as it might be made at the

18   auction, an alternative proposal, a different transaction

19   structure, which is the highest-valued outcome in the case.

20          And if in the course of this process there's an

21   opportunity to essentially resolve these so-called

22   "litigation issues" involving our claims, all the better.

23   There may be room for a consensual outcome.  But I can

24   assure you, Your Honor, that the plan construct that is on

25   the table right now is not one that accommodates a

1  consensual outcome for our claims, and so we are going to

2  be in the position of having to resist it.  And we're going

3  to go through this litigation over the claims and the

4  valuation.

5  There are a lot of confirmation issues that maybe

6  we can say, "We'll take care of all those at the

7  confirmation hearing."  We may get to the confirmation

8  hearing and, as a matter of law, whatever everybody spent

9  the last, you know, 60 days or more trying to accomplish

10  just can't get done.  That's why you need to have

11  flexibility to propose other alternatives.  And through

12  that, that will bring the parties together to have a --

13  reach an agreement on a consensual resolution.  That's the

14  way to proceed.  I think that's the right way to go.

15  I think adjust the CBRE employment order today.

16  You don't need to approve the bidding procedures today.

17  Let the debtors come back with a streamlined version of

18  bidding procedures that accommodate different transactional

19  possibilities, and don't create another barrier to

20  competitive bidding by forcing all offers to come in

21  through the CrossHarbor plan door and be subject to a

22  CrossHarbor break-up fee.  That's all we're asking for is a

23  level playing field.

24  THE COURT:  Thank you.  Based upon the record

25  before me, the testimony, the motion to reconsider the

```
 1    appointment of CB Richard Ellis is granted in part and

 2    denied in part.  I'm going to qualify.

 3           I do want the company to proceed with robust

 4    marketing, obviously.  Obviously, it calls for an equity

 5    purchaser.  However, I want the professional team to also

 6    see what, what might come in just from an asset standpoint.

 7    I mean if anybody approaches them about an asset prospect,

 8    I guess I want to know about that so that we broaden their

 9    scope a bit to include and look at that.  However, as it

10    relates to the equity interest sale, I want that to go

11    forward, as well.

12           As it relates to the bidding and solicitation,

13    given the proposal before me, the record, the extensive

14    testimony that we've had, the revisions that have been made

15    to the agreement -- and I suspect this has been presented

16    in PDF.

17           Mr. Patten, is there a WordPerfect document, as

18    well?

19           MR. PATTEN:  I believe we filed a WordPerfect

20    copy when we filed the order -- not "filed it", but

21    delivered it to the Court in the usual manner.

22           THE COURT:  Okay, okay.  In that, obviously in

23    Paragraph 7, there's a reference and a date for disclosure

24    statement hearing that will need to be filled in.

25           Looking at the dates, we also have the motion for
```

1    valuation.  We already have the motion to modify set for

2    next Tuesday.

3            MR. PATTEN:  Your Honor?

4            THE COURT:  Mr. Patten.

5            MR. PATTEN:  Anticipating that there will be

6    objections from at least one party to the disclosure

7    statement, if those objections were due, as I mentioned

8    earlier, whether it's Friday or Monday, if we got put on

9    the Missoula docket, then that would give us a couple more

10   days to address those objections before we're back in front

11   of the Court.

12           THE COURT:  On the 12th?

13           MR. PATTEN:  Yeah.

14           THE COURT:  You know, rather than have you -- I

15   would put it onto the 13th, which is Friday.  The reason I

16   say that is:  With the Missoula hearing calendar, I don't

17   know how extensive it is right now, and I hate to have all

18   of, all of you sitting.  Your time is too valuable to have

19   you sitting with other hearings.  So I would move you to a

20   date and time certain on the 13th.  That's my thought.

21           And maybe that goes along with the, the e-mail

22   commentary about Dr. Evil.  We'll do it on the 13th.  I'm

23   trying to make a little bit light on a long day here.

24           MR. PATTEN:  Well, the original plan was filed on

25   Friday the 13th as well, Judge, so it would be fitting.

1              THE COURT:  Yes, it was, at about midnight.

2              MR. PATTEN:  11:58, I think, Your Honor.

3              THE COURT:  Yes, yes.  My thought is to set those

4      for the 13th in Missoula.  And that would be the valuation

5      -- let's see, valuation is a problematic thing.  We do need

6      to deal with that.

7              MR. PATTEN:  Your Honor, I need until April 1st

8      to have a report on value.

9              THE COURT:  Yes, I know.  Well, we have -- let's

10     see, is that a disclosure statement hearing in Palmer on

11     the 3rd?

12             MR. PATTEN:  Your Honor, can't we just combine

13     this with the adversary proceeding?

14             THE COURT:  I'm not sure if we can.

15             MR. CHEHI:  It's a different cup of tea, Your

16     Honor.  I think it's a, it's a contested matter, it's not

17     an adversary proceeding, and it's a valuation hearing.

18             And to the extent that there's a disclosure

19     statement without the valuation occurring, I think that's

20     problematic.  It's going to be important for us, again, in

21     terms of 1111(b) and giving, you know, all the parties

22     notice of what the fundamental economics are -- there are

23     economic risks associated with, with our claims in these

24     cases.

25             THE COURT:  I'm looking for some dates here.  I

1    may not have them.  On my order, I had some dates

2    photocopied.  No, that's not it.

3           Here they are.  You know, I was thinking about

4    setting it for April 7th.  It's a Tuesday.  It's not ideal.

5    We've got the amended disclosure statement --

6           MR. CHEHI:  Your Honor, we would recommend and

7    request that we have -- you know, combine the disclosure

8    statement hearing with the, with the valuation.  And we can

9    work on the disclosure statement.  We hear Your Honor

10   about, you know, what's in the disclosure statement.  The

11   important issues for us with the disclosure statement are

12   amount allowability and value of claim.  And I think we can

13   get through value of collateral in time for having the

14   disclosure statement hearing, and the parties can work that

15   out.  We'll exercise best efforts to agree or not with

16   Mr. Patten about what's in his disclosure statement.  And

17   it's his to put in whatever he wants to put in.  We're

18   raising issues so that the Court knows about them.  And if

19   you wanted to leave them until confirmation, that's fine,

20   too.

21          THE COURT:  Mr. Patten, you had some

22   consultation.

23          MR. PATTEN:  Well, I'm trying to figure out --

24   I'm trying to calculate backwards from when the

25   confirmation hearing would be.  But, Your Honor, the total

1  page numbers of the plan and disclosure statement are --

2        THE COURT:  I know.

3        MR. PATTEN:  -- 200 or 300 or 400 pages, and we

4  have lots of creditors.  And there's going to be a

5  substantial printing job to get that out and in the mail.

6        THE COURT:  Yeah.

7        MR. PATTEN:  So we would need time after the

8  disclosure statement's approved to do that.  It isn't going

9  to be the next day.  It's going to have to be --

10       THE COURT:  It really needs to be pushed.  We

11  need to push it closer.

12       MR. CHEHI:  Another thing that can be done, Your

13  Honor, and has been done in other cases is you can prepare

14  a summary plan and disclosure statement that --

15       THE COURT:  For mailing, yes.

16       MR. CHEHI:  -- that contains, you know, the nuts

17  and bolts for interest to the garden-variety trade

18  creditors, and the like.  And then you can have the

19  full-blown documents available for those who request them,

20  available electronically, and it will reduce the mailing

21  cost and the time it takes to actually do that.

22       THE COURT:  The rule provides for that, so you

23  might want to take a look at that.  Because that may

24  assist.  I think you can send one to each of the classes,

25  even.

1           Well, we have, what, 21 days past the end of --

2    we're past April.  We're into May, right -- yes.  I would

3    say maybe let's put this on the 7th because that, then,

4    gives us the time.  I'll tell you what:  Obviously, it's

5    late and we've been here a long time.  That's my thought is

6    to put it on the 7th.  I will welcome any comments you have

7    through e-mail to Kelli as to date.

8           MR. PATTEN:  So we're looking at waiving off the

9    hearing next week on the disclosure statement and pushing

10   that all off into April sometime?  Is that --

11          THE COURT:  Well, I was trying to tie that with

12   the valuation, but maybe we don't need to do the valuation

13   with the disclosure.  We'll do the disclosure first, and

14   we'll get the valuation, then, done in April.

15          MR. PATTEN:  Your Honor, the disclosure statement

16   describes the plan.  And as I think I've said ad nauseam

17   today, the valuation is through the marketing.

18          THE COURT:  I know, I know.

19          MR. PATTEN:  And so --

20          THE COURT:  I've heard that, I've heard that over

21   and over.

22          MR. PATTEN:  I must have said it ad nauseam.  But

23   I think that certainly permits getting the disclosure

24   statement out.  We don't need to hold a disclosure

25   statement up for the valuation.

```
 1              THE COURT:  I think you're exactly right.

 2              MR. CHEHI:  Your Honor, the issue, though, as a

 3   fundamental matter, and it really has material implications

 4   for the confirmability of the plan and everything else,

 5   notwithstanding everybody's arguments that it might not, is

 6   that if this 1111(b) election will be made, it should not

 7   have to be made before there's a valuation of the

 8   collateral and, in fact, a determination of the allowance

 9   of the claims.  But the disclosure statement hearing,

10   unless the Court orders the 1111(b) election to be carried

11   beyond that, it has to be made by the end of the disclosure

12   statement hearing.

13              THE COURT:  Right.

14              MR. CHEHI:  The problem in this case is that the

15   implications of our exercising our right to make that

16   election will have profound consequences for the

17   confirmability of the plan and the outcome, the real

18   bricks-and-mortar outcome for this reorganized debtor.  And

19   that's why I think it would be imprudent to go forward and

20   solicit acceptances with a disclosure statement that isn't

21   prominent about those issues.  And you're not going to

22   really know how to -- what the magnitude of that issue is

23   until you have the valuation.  And we think we could, we

24   could line all those up and be done with both of them by

25   April 7th or on April 7th because I don't think we're going
```

1   to have an a big dispute on the disclosure statement.

2          MR. WARNER:  Your Honor, there's another issue.

3   With respect to the 1111, if the election is made and the

4   disclosure has already been approved and sent out,

5   creditors will not understand that they -- that election

6   will either force the debtor to make a drastically new

7   plan, hand collateral over to the lender under 1129(b) --

8   that implication is so important to put in the disclosure

9   statement because you will be voting on a plan that

10  theoretically could never or will never get confirmed

11  because the debtor won't even go forward if the election is

12  made.  And so it's a cart-before-the-horse problem.  And

13  that's why if you tie at least the valuation hearing and

14  the disclosure, you at least address that issue.

15          MR. PATTEN:  Your Honor, can I add something?

16  Credit Suisse knows what they think their collateral is

17  worth.  Why do we need to wait to make the 1111(b)

18  election?  Make it now.

19          THE COURT:  I hear you, and I don't disagree.

20  But if we do this on the 7th, that gives you adequate time

21  because we have until the 21st, or so, of May, right,

22  regarding approval of a disclosure statement and getting it

23  out to everybody?  You've got six weeks.

24          MR. PATTEN:  But let me add this, Your Honor:

25  When we get to the 7th, we still haven't tried whether or

1       not the unsecured creditors committee's claims against

2       Credit Suisse have merit.

3               THE COURT:  That's right.

4               MR. PATTEN:  And until that's done, we don't know

5       what the amount of their claim is; and until that's done,

6       they're going to tell us they can't make the 1111(b)

7       election.

8               MR. CHEHI:  No, we're not going to say that.

9       What we're going to say is that we're going to know after

10      the valuation of our claims whether we're going to be

11      treated as fully secured or whether we're going to have a

12      deficiency claim and in what amount.  And the size of that

13      deficiency claim - whether it's, you know, 10 million or

14      50 million or zero - is going to have a significant

15      implication for other general unsecured creditors who are

16      going to be taking from the same pot.  And that's why it is

17      material not just to us, but to everyone else.  And the

18      value is very important.

19              MR. PATTEN:  But you don't need the Court to

20      value that claim.  What you -- you can make the election.

21              THE COURT:  Gentlemen, address your comments to

22      me.

23              MR. PATTEN:  I apologize, Your Honor; and I

24      apologize to Mr. Chehi.

25              They don't need the Court to make the

1    determination of the amount of the claim.  They get to make

2    the election.

3           THE COURT:  Well, I guess I'm not so certain that

4    there's any problem with having it on the 7th.

5           MR. CHEHI:  And I'll add this, Your Honor:  In

6    the interest of peace and harmony, if there's any

7    opportunity for any global resolution of these cases short

8    of a contested knockdown, drag-out confirmation hearing,

9    and the like, which, you know, has risks for everybody, it

10   will come over the course of what I'll call this next month

11   before this disclosure state hearing.  And if you push this

12   disclosure statement hearing ahead and we're just doing the

13   litigation and there's no opportunity for people to talk,

14   it will end up being a knockdown, drag-out with an

15   unpredictable out come for everybody.

16          THE COURT:  Well, I'm going to set those for

17   April 7th.

18          MR. PATTEN:  Both hearings, Your Honor?

19          THE COURT:  Pardon?

20          MR. PATTEN:  The disclosure statement hearing and

21   the --

22          THE COURT:  And the disclosure and the valuation.

23          MR. PATTEN:  Will the Court set a date by which

24   objections to the disclosure statement might be made?

25          THE COURT:  Absolutely, absolutely.

1          MR. PATTEN:  Thank you.

2          MR. CHEHI:  And if we can ask the debtors to file

3    with the Court black-lined versions of their new documents

4    that they filed last night compared to the last version of

5    the plan that was out, you know, electronically CompareRite

6    versions so we can see what changes were made in the

7    documents, how the documents that were filed at midnight

8    last night vary from the ones that were filed a few days

9    earlier in the first plan, that would be helpful, I think,

10   to all the parties to know what the changes were.

11         MR. PATTEN:  And we can do that, Your Honor.  In

12   fact, I think when we filed the disclosure statement on

13   Monday, I sent -- I didn't file it with the Court, but I

14   sent everybody a black-lined copy -- all counsel of record,

15   anyway, a black-lined copy.  So whether we file it with the

16   Court or we send it out electronically to everybody, that's

17   fine with us.

18         THE COURT:  Why don't you do it electronically.

19   Because you'll probably catch everybody that way.

20         UNIDENTIFIED SPEAKER:  Just so we know, would it

21   be more helpful to the Court and to parties and -- the

22   interim that we've filed was just to try and advise all of

23   the people that participated in the meeting of counsel last

24   week as to how far we had gotten by Monday, because we

25   wanted people to have an opportunity -- it would seem to me

1   that the better black-line is from the original one that

2   was filed on the 13th as opposed to the interim one.

3           THE COURT:  Okay.  Well, I'll let you decide

4   which is the better one to show as a comparison or to use

5   for a comparison.  So then I guess that takes care of

6   anything for the 13th.  And we'll still have the motion

7   with, what is it, GMAC?  Is it GMAC?

8           MR. PATTEN:  Your Honor, I think we'll work that

9   out, I'm pretty sure.

10          THE COURT:  We'll leave that set for the 10th and

11  allow you to work it out.  Any other dates up in the air?

12          Kelli, what about did we hear anything back from

13  Judge Peterson?

14          MS. HARRINGTON:  Yes.  Judge Peterson is not

15  available on April 2nd or April 6th through the 9th if

16  anybody's interested in him mediating.  And he would

17  require that position statements be filed at least three

18  business days before a mediation.

19          MR. PATTEN:  I apologize, Judge, I did not hear

20  that.

21          MS. HARRINGTON:  He is not available on April 2nd

22  or April 6th through the 9th.

23          THE COURT:  Did you hear that?

24          MR. PATTEN:  Yes, yes.

25          THE COURT:  April 2nd and 6th through the 9th

```
 1    he's not available, but he is otherwise.  So if you wish to

 2    look at some mediation, discuss between yourselves what

 3    might be an acceptable date to do that and then be in touch

 4    with Kelli or Terry to get that lined up if you wish to do

 5    that.

 6            MR. CHEHI:  We'll do that, Your Honor.  And if he

 7    has a requirement of position of papers, or whatever, I

 8    think we just want to factor that in so we all have time to

 9    do it in due course as opposed to on a rush basis.

10            THE COURT:  Yes.

11            MR. CHEHI:  And as far as a deadline for

12    objections to the disclosure statement, did you say that

13    you'll set one?

14            THE COURT:  There will be one set.

15            MR. CHEHI:  And that doesn't have to go way out.

16    You know, I think, you know, give us --

17            THE COURT:  Five days before?

18            UNIDENTIFIED SPEAKER:  Five days from now?

19            MR. CHEHI:  Not five days from now, but why don't

20    we do, you know, the 15th, or something like that, to give

21    us an opportunity to actually look at your documents.  And

22    I don't think your documents are entirely complete.  So by

23    the time they get complete and --

24            THE COURT:  So objections to the second amended

25    plan or disclosure statement need to be in by -- March 15th
```

 1  is a Sunday, so why don't we go to the 16th of March.  Does

 2  that, then, give you some time to address those objections

 3  prior to the 7th?

 4         MR. PATTEN:  That will work for us, Your Honor.

 5         MR. CHEHI:  And we'll make a good-faith effort

 6  not to have outstanding disclosure statement objections

 7  other than, you know, substantive things.  You know,

 8  whatever the language is, you know, we'll work that out.

 9         THE COURT:  I wouldn't expect anything less.

10         MR. PATTEN:  Not to push my luck, Your Honor,

11  but --

12         THE COURT:  Mr. Patten.

13         MR. PATTEN:  -- I think it's important for the

14  parties here to --

15         THE COURT:  I'm having a hard time hearing you.

16         MR. PATTEN:  I'm sorry.  Does the Court intend to

17  sign the bid procedures order with the modifications that

18  were -- the date changes that we've talked about?

19         THE COURT:  I will probably do that when I step

20  off this bench.

21         MR. PATTEN:  Thank you, Your Honor.

22         THE COURT:  Mr. Beckett, did you have something

23  you --

24         MR. BECKETT:  I couldn't get back to my seat,

25  Your Honor.  And, Your Honor, thank you very much for your

1   time and your patience.

2          THE COURT:  I appreciate all of your patience and

3   time today.  Obviously, you never cease to amaze me how

4   prepared you are for these matters.  I appreciate that.

5   We'll go forward to the next hearing.

6          We'll be in recess.

7

8                      *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3       I certify that the foregoing is a correct transcript

4    from the electronic recording of the proceedings in the

5    above-entitled matter, all done to the best of my skill and

6    ability.

7

8    _____   _____

9    Jonny B. Nordhagen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25