# 1.41 DEFINITIVE AGREEMENT

MEMBERSHIP INTERESTS PURCHASE AGREEMENT

by and among

YELLOWSTONE MOUNTAIN CLUB, LLC,

YELLOWSTONE DEVELOPMENT, LLC,

BIG SKY RIDGE, LLC,

And

NEW CH YMC ACQUISITION LLC

Dated as of March 17, 2009

1

Table of Contents

Article I DEFINITIONS ..................................................................................................1
Article II SALE AND PURCHASE ...............................................................................4
    2.1       New Membership Interests ...............................................................4
    2.2       Assets of Debtors .............................................................................4
    2.3       Purchase Price. .................................................................................4
        2.3.1.   Price and Payment ...........................................................................5
        2.3.2.   Adjustments .....................................................................................5
    2.4       Closing. ............................................................................................5
    2.5       Asset Purchase Tax Treatment. .......................................................6
Article III EMPLOYEE MATTERS ..............................................................................6
    3.1       Employees. .......................................................................................6
    3.2       Benefit Plans. ...................................................................................6
    3.3       Pre-Effective Date Obligations. .......................................................6
    3.4       Survival. ...........................................................................................7
Article IV REPRESENTATIONS AND WARRANTIES OF ACQUIRER .................7
    4.1       Existence and Power. .......................................................................7
    4.2       Due Authorization. ...........................................................................7
Article V COVENANTS .................................................................................................7
    5.1       Compliance with Joint Plan. ............................................................7
    5.2       Contract Designation Rights. ...........................................................8
    5.3       Amendments to Plan. .......................................................................8
    5.4       Use of Name. ....................................................................................8
    5.5       On-Going Operations. ......................................................................9
    5.6       Broker. ............................................................................................10
    5.7       Working Capital of Acquirer at Closing. .......................................10
    5.8       PSP; Associations. ..........................................................................10
Article VI CONDITIONS PRECEDENT TO OBLIGATIONS OF ACQUIRER ......11
    6.1       Effective and Closing Dates. ..........................................................11
    6.2       Compliance with Agreements and Covenants. ...............................11
    6.3       Illegality. ........................................................................................11
    6.4       Documents. .....................................................................................11
    6.5       Condition of the Business. ..............................................................11
    6.6       No Action Prohibiting Continued Business of the Debtors. ...........12
    6.7       Books, Records and Files. ...............................................................12
Article VII CONDITIONS PRECEDENT TO OBLIGATIONS OF DEBTORS .......12
    7.1       Compliance with Agreements and Covenants. ...............................12
    7.2       Documents. .....................................................................................12
Article VIII CLOSING ..................................................................................................13
    8.1       Deliveries by Debtors. ....................................................................13
    8.2       Deliveries by Acquirer. ..................................................................13
    8.3       Survival of Obligations. .................................................................13
Article IX TERMINATION ...........................................................................................13
    9.1       Termination. ....................................................................................13
    9.2       Effect of Termination. ....................................................................14
    9.3       Special Provisions in the Event of Higher or Better Offers. ..........14

i

Article X MISCELLANEOUS ............................................................................................. 14
    10.1        Expenses. ............................................................................................. 14
    10.2        Amendment. ......................................................................................... 14
    10.3        Notices. ................................................................................................. 14
    10.4        Waivers. ............................................................................................... 16
    10.5        Counterparts. ........................................................................................ 16
    10.6        Headings. ............................................................................................. 16
    10.7        Interpretation. ...................................................................................... 16
    10.8        Applicable Law. ................................................................................... 16
    10.9        Jurisdiction; Waiver of Jury Trial. ...................................................... 16
    10.10      Assignment. ......................................................................................... 17
    10.11      No Third Party Beneficiaries. .............................................................. 17
    10.12      Further Assurances. ............................................................................. 17
    10.13      Severability. ......................................................................................... 17
    10.14      Remedies Cumulative. ......................................................................... 18
    10.15      Entire Understanding; Delivery of Schedules. .................................... 18
    10.16      Time of Essence. .................................................................................. 18

**SCHEDULES**

Schedule 2.3          Escrow Provisions

Schedule 8.1          Closing Deliveries of Debtors

Schedule 8.2          Closing Deliveries of Acquirer

iii

**EXHIBITS**

Exhibit A          Plan Solicitation Order

Exhibit B          New Loan Documents

## MEMBERSHIP INTERESTS PURCHASE AGREEMENT

This MEMBERSHIP INTERESTS PURCHASE AGREEMENT is made as of March 17, 2009, by and among Yellowstone Mountain Club, LLC, a Montana limited liability company ("YC"), Yellowstone Development, LLC, a Montana limited liability company ("YD"), Big Sky Ridge, LLC, a Montana limited liability company ("Big Sky," together with YC and YD, collectively, the "Debtors" and each individually a "Debtor"), and New CH YMC Acquisition LLC, a Delaware limited liability company (or its assignee(s), designee(s) or nominee(s) as hereinafter permitted, the "Acquirer").

WHEREAS, Debtors are currently engaged in the ownership, management, operation, marketing and development of the planned resort-style residential community known as the Yellowstone Mountain Club located in Big Sky, Montana (including ski, golf, equestrian and other recreational facilities, amenities, activities and services, dining and lodging, as well as the provision of services in connection therewith (e.g., utilities, security, and public and life safety)) and the sale of memberships and real property therein (the "Business");

WHEREAS, YC, YD, and Big Sky, are debtors and debtors in possession in bankruptcy cases 08-61570, 61571, and 61572 before the U.S. Bankruptcy Court for the District of Montana (the "Bankruptcy Court"); and

WHEREAS if the Plan is confirmed by the Bankruptcy Court, all of the equity interests in Debtors will be fully and finally cancelled and each Debtor shall issue New Membership Interests to the Acquirer in accordance with and pursuant to the Plan;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, agreements and warranties herein contained, the Parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Unless otherwise defined in this Agreement, the terms set forth in this Section 1.1 shall have the meanings therein ascribed to such terms:

"Acquirer" shall have the meaning set forth in the introductory paragraph to this Agreement.

"Affiliate" shall mean, with respect to any specified Person: (1) any other Person which, directly or indirectly, owns or controls, is under common ownership or control with, or is owned or controlled by, such specified Person; and (2) any immediate family member of the specified Person or any of the foregoing Persons referred to in clause (1) who is an individual.

"Agreement" shall mean this Membership Interests Purchase Agreement, including all exhibits and schedules hereto, as amended from time to time.

"Association" shall mean any condominium association, property owners' association or similar membership organization which is directly or indirectly controlled by any Debtor, any affiliate of any Debtor or one or more of the employees of any Debtor or any affiliate of any Debtor and established for the governance, management, maintenance and/or operation of real estate and improvements affecting all or any portion of the Project and/or the remainder of the Yellowstone Mountain Club. As used herein, the term "control" shall mean the right and power to direct or cause the direction, directly or indirectly, of the management and policies of an entity or individual.

"Assumed Obligations" shall have the meaning ascribed thereto in the Plan subject to the proviso set forth in Section 4.3 thereof; provided, however, under no circumstances shall Assumed Obligations include any Claim, Lien, obligation or other liability that does not directly arise from or relate to the Project or operation thereof (unless such obligation or other liability relates to an executory contract or unexpired lease assumed under the Plan).

"Business" shall have the meaning set forth in the recitals to this Agreement.

"Business Day" shall mean a day other than Saturday, Sunday or any other day on which commercial banks in New York, New York and Butte, Montana are authorized or required by Law to be closed for business.

"Cash Payment" shall have the meaning set forth in Section 2.3.1.

"Claim" shall have the meaning ascribed thereto in the Plan.

"Closing" shall have the meaning set forth in Section 2.4.

"Closing Date" shall have the meaning set forth in Section 2.4.

"Contract" shall mean any contract, lease, commitment, indenture, mortgage, note or other agreement.

"Debtors" shall have the meaning set forth in the introductory paragraph to this Agreement.

"Governmental Authority" shall mean the government of the United States or any foreign country or any state or political subdivision thereof, and any entity, body or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including quasi-governmental entities established to perform such functions.

"Law" shall mean any law, statute, regulation, ordinance, rule, order, decree, judgment, consent decree, settlement agreement or governmental requirement enacted, promulgated, entered into, agreed to or imposed by any Governmental Authority.

"Lien" shall mean any mortgage, lien, charge, restriction, pledge, assessment, security interest, option, lease or sublease, claim, right of any third party, easement, encroachment or encumbrance.

2

"Material Adverse Effect" means, any event, change or effect with respect to the condition (financial or otherwise), properties, assets, liabilities, business, operations, or prospects of the relevant Person or business that is likely to be in the amount of One Million Dollars ($1,000,000) or more.

"New Loan Documents" shall mean, collectively, the documents and agreements evidencing and securing the Debt Payment which shall be on the terms of the Definitive Note Terms and are attached hereto and made a part hereof as Exhibit B.

"New Membership Interests" shall have the meaning ascribed thereto in the Plan.

"Permits" shall mean licenses, certificates, permits, plats, franchises, rights, and approvals with respect to the Project.

"Person" shall mean any individual, corporation, proprietorship, firm, partnership, limited partnership, trust, limited liability company, association, Governmental Authority, or other entity.

"Plan" shall mean that certain First Amended Joint Plan of Reorganization for the Debtors proposed by the Debtors and YCC filed on March 3, 2009, with the Bankruptcy Court, and all addenda, exhibits, schedules, supplements and other attachments thereto, as the same may be amended from time to time in accordance with this Agreement and applicable law.

"Plan Solicitation Order" shall mean the final order of the Bankruptcy Court for the District of Montana entered on March 6, 2009 and is attached and made a part hereof as Exhibit A.

"Project" shall have the meaning ascribed thereto in the Plan (which for the sake of clarity includes the Reserved Actions).

"PSP" shall mean Yellowstone Mountain Club Public Safety and Privacy, Inc., a not-for-profit corporation under the Laws of the State of Montana.

"Purchase Price" shall have the meaning set forth in Section 2.3.1.

"Transaction" shall mean the transactions contemplated by this Agreement including the purchase of the New Membership Interests by Acquirer on the terms and conditions set forth in this Agreement and the Plan.

"YCPOA" shall mean the Yellowstone Club Property Owners' Association.

"YD" shall have the meaning set forth in the introductory paragraph to this Agreement.

"Yellowstone Mountain Club" shall mean that certain exclusive membership club located in Big Sky, Montana.

"YCC" shall have the meaning ascribed thereto in the Plan.

3

"YC" shall have the meaning set forth in the introductory paragraph to this Agreement.

Capitalized terms not otherwise defined in this Agreement shall have the meaning given them in the Plan.

## ARTICLE II
## SALE AND PURCHASE

2.1    New Membership Interests

All of the current Equity Interests in Debtors will be fully and finally cancelled and each Debtor shall issue New Membership Interests to the Acquirer. On the terms and subject to the conditions of this Agreement, at the Closing, Debtors shall issue, sell, transfer, assign and deliver to Acquirer, or cause to be issued, sold, transferred, assigned and delivered to Acquirer, free and clear of any and all Liens, and Acquirer shall purchase from Debtors, all of the New Membership Interests of Debtors, such issuance, sale, transfer, conveyance, assignment and delivery of the New Membership Interests causing the entire right, title and interest in and to the New Membership Interests to be transferred beneficially and of record to Acquirer, free and clear of any and all Liens as well as free and clear of any and all subscriptions, warrants, options, voting agreements, voting trusts, proxies, or other arrangements or commitments obligating or which may obligate a Person to dispose of or vote any securities, including, without limitation, the New Membership Interests. At the Closing, Debtors will execute and deliver to the Acquirer such documents and agreements as may be reasonably required by Acquirer to facilitate and evidence Acquirer's acquisition of the New Membership Interests, including any documents included as part of the Plan Supplement and/or to avoid a dissolution or cessation of existence of any of the Debtors.

Pursuant to the Plan, on the Effective Date of the Plan, except as otherwise specifically provided for in the Plan, all Equity Interests in the Debtors and the First Lien Credit Documents shall (a) be deemed fully and finally cancelled; and (b) have no effect other than the right of the Holders of First Lien Lenders Claims to participate in the Distributions provided under the Plan from the Disbursing Agent, the Note Disbursing Agent, and from the Liquidation Trusts in respect of such Claims and the right of the Holders of Equity Interests to participate in Distributions from the Liquidation Trusts. As of the Effective Date of the Plan, all Liens, charges, encumbrances and rights related to any Claim or Equity Interest, except to the extent specifically permitted under ARTICLE III of the Plan, shall be terminated, null and void and of no effect.

2.2    Assets of Debtors

On the Closing Date, the only assets of the Debtors shall be the Project which shall be subject to no Claim, Lien, obligation or liability other than the Assumed Obligations, Class 2 Allowed Claims (as and to the extent provided in the Plan) and the Class 10b Allowed Claim. Prior to the Closing, the Debtors shall convey or otherwise transfer the Effective Date Estate Cash to the Disbursing Agent and all of their other assets (excluding the Project) to the Liquidation Trusts as contemplated by the Plan.

2.3    Purchase Price

4

### 2.3.1.  Price and Payment; Security

In consideration of the acquisition of the New Membership Interests, Acquirer shall pay to Debtors an aggregate purchase price of ONE HUNDRED MILLION AND NO/100 U.S. DOLLARS ($100,000,000.00) (the "Purchase Price"), subject to adjustment in accordance with this Agreement and the Plan, payable as follows:

2.3.1.1     THIRTY MILLION AND NO/100 U.S. DOLLARS ($30,000,000.00) shall be paid by Acquirer, (a) THREE HUNDRED SEVENTY FIVE THOUSAND AND NO/100 U.S. DOLLARS ($375,000.00) to the Liquidation Trusts for Debtors' Estates and TWENTY NINE MILLION SIX HUNDRED TWENTY FIVE THOUSAND AND NO/100 U.S. DOLLARS ($29,625,000.00) to the Disbursing Agent on behalf of Debtors on the Closing Date (the "Cash Payment");

2.3.1.2     the balance of the Purchase Price of SEVENTY MILLION AND NO/100 U.S. DOLLARS $70,000,000 (the "Debt Payment) shall be paid by Acquirer to the Disbursing Agent for Debtors' Estates on behalf of Debtors by the execution and delivery by the Reorganized Debtors to the Debtors (or as otherwise provided under the Plan) of the New Loan Documents on the Closing Date and the Debtors transfer of such documents to the Disbursing Agent in accordance with the Plan.

In order to secure the performance by Acquirer of its obligation to pay liquidated damages under Section 9.2 hereof in the event the Agreement is validly terminated in accordance with Section 9.1(e) hereof, Acquirer has contemporaneously deposited with Security Title Company of Montana (the "Escrow Agent") a letter of credit in the amount of $5,000,000 (the "Security"). The Security shall be held by Escrow Agent in escrow pursuant to the terms set forth on Schedule 2.3 attached hereto and made a part hereof.

### 2.3.2.  Adjustments

Except as otherwise provided herein or as provided in the Plan as to accrued employee vacation obligations in Section 6.4 thereof, there shall be no prorations or adjustments to the Purchase Price provided that there shall be an adjustment for real estate taxes such that the Debtors shall be obligated to pay for real estate taxes on the Project through the Effective Date and if such taxes have not yet been assessed they shall be based on the amount of the most recently assessed real estate taxes for the Project and an adjustment therefor shall be made against the Purchase Price.

### 2.4     Closing

On the terms and subject to the conditions of this Agreement, the closing of the Transaction (the "Closing") shall take place on the Effective Date; provided, however, that all of the conditions to Closing set forth in this Agreement have been satisfied or waived by the party for whom the condition must be satisfied (the "Closing Date"). All matters at the Closing shall be considered to take place simultaneously, and no delivery of any document or instrument shall be deemed complete until all transactions and deliveries of documents and instruments and payments contemplated by this Agreement are completed or have been waived by the party to whom delivery or payment was due hereunder. At the Closing, Debtors shall deliver to

5

Acquirer, and Acquirer shall deliver to Debtors, the respective documents, certificates, assignments, and other materials referenced in Article VII hereof.

    2.5    <u>Asset Purchase Tax Treatment.</u>

    Debtors are deemed to have acknowledged and agreed that for federal income tax purposes, (i) Acquirer is purchasing the assets of the Debtors and that (ii) the Debtors are aware that the indebtedness to which they are subject with respect to their assets is being restructured in connection with Acquirer's acquisition and for federal tax purposes the modifications and cancellation of any Claims are treated as taking place prior to Acquirer's purchase, consistent with Treas. Reg. §1.1274-5(b)(1). The provisions of this Section 2.5 shall survive the Closing.

**ARTICLE III**
**EMPLOYEE MATTERS**

    3.1    <u>Employees.</u>

    At least 21 days before the Closing Date, Debtors shall furnish to Acquirer a true, accurate and complete list of all employees of the Debtors (excluding, however, those employees that are parties to employment Contracts), which list shall include each individual's (a) stated name, (b) mailing address, (c) employment position (including relevant department or company), (d) compensation, (e) employment benefits, (f) duration of employment, and (g) employment classification (i.e., seasonal, part-time or full-time) (collectively, the "Applicable Employees"). At Closing, Reorganized Debtors shall offer to retain (directly or through an operator or manager engaged by Reorganized Debtor) all of the Applicable Employees upon comparable terms and conditions (including, as applicable, benefit plans and remaining balance of employment term for seasonal employees).

    3.2    <u>Benefit Plans.</u>

    Within 21 days of the date hereof, Debtors shall deliver to Acquirer an accurate and complete list of all "employee benefit plans" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("Benefit Plans") and each other stock, bonus, incentive, deferred compensation, severance, vacation, health or welfare or other fringe benefit plan, program, policy or arrangement to which (1) any Debtor is a party, contributes, sponsors or otherwise has any liability, or (2) any current or former employee of any Debtor (or beneficiary of such employee) is or may become entitled to a benefit as a result of his or her employment with any Debtor. All such plans, including the Benefit Plans, are collectively referred to as the "Employee Plans". At or prior to Closing, Debtors shall wind-up, dissolve or otherwise terminate the Employee Plans in accordance with, and take all such actions as are required by, applicable Law and, subject to the proration of vacation benefits as otherwise herein provided, pay all costs in connection therewith.

    3.3    <u>Pre-Effective Date Obligations.</u>

    Debtors shall be solely responsible for any obligations, liabilities or claims (including under the Fair Labor Standards Act) for all employees' compensation (including, without

6

limitation, salaries, wages, bonuses and benefits (including COBRA coverage but excluding vacation benefits for which Acquirer receives a proration)) but only to the extent the same arose or accrued to employees (whether pursuant to any employment Contract or otherwise) out of events prior to the Closing, and all such obligations shall be treated in accordance with the Plan.

3.4     Survival.

The provisions of this Article III shall survive the Closing.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF ACQUIRER

Acquirer represents and warrants to Debtors that:

4.1     Existence and Power.

Acquirer is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware, with all requisite power and authority to own, lease and operate its properties and to conduct its business and operations as they are now being owned, leased, operated and conducted.

4.2     Due Authorization.

Acquirer has full power and authority to enter into this Agreement and to consummate the Transaction. The execution, delivery and performance by Acquirer of this Agreement has been duly and validly authorized and no other actions or proceedings on the part of Acquirer is necessary to authorize this Agreement and the Transaction. Acquirer has duly and validly executed and delivered this Agreement. This Agreement constitutes the legal, valid and binding obligation of Acquirer, in each case enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar Laws in effect which affect the enforcement of creditors' rights generally and by equitable limitations on the availability of specific remedies. The execution and delivery of this Agreement and the consummation of the Transaction by Acquirer does not conflict with, and will not result in any violation of or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit under (any such event, a "Conflict") (i) any provision of the organizational documents of Acquirer or (ii) any mortgage, indenture, lease, contract or other material agreement or instrument, permit, concession, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Acquirer, its properties or assets.

## ARTICLE V
## COVENANTS

5.1     Compliance with Joint Plan.

Acquirer shall take all actions reasonably necessary to fulfill its obligations under the Plan. Likewise, Debtors shall take all actions reasonably necessary to fulfill their obligations under the Plan and shall cause YCC to take all actions reasonably necessary to fulfill its

7

obligations under the Plan. Neither the inclusion herein of provisions in the Plan nor the failure to include herein other provisions of the Plan shall be deemed a waiver of any rights or remedies of the parties hereto specified herein or in the Plan. The provisions of this Section 5.1 shall survive the Closing.

    5.2    <u>Contract Designation Rights.</u>

    Acquirer has the right under the Plan to designate executory contracts and unexpired leases to be assumed or rejected by the Debtors under the Plan without approval of the Debtors or YCC, which it has preliminarily exercised by providing the Debtors with certain schedules that have been filed in connection with the Plan. In furtherance of the foregoing, however, at the request of Acquirer, Debtors agree that they will file any additional or amended schedule or exhibit to the Plan in connection with such designation of executory contracts and unexpired leases. The provisions of this Section 5.2 shall survive the Closing.

    5.3    <u>Amendments to Plan; Amendments to Plan Solicitation Order.</u>

    The Debtors shall not amend, modify, withdraw or revoke the Plan without the prior consent of Acquirer in any manner which materially affects the rights of the Acquirer under the Plan or this Agreement. To the extent that any exhibit or schedule to the Plan has not been filed as of the date of this Agreement, Debtors shall not file the same without the prior consent of the Acquirer. Likewise, the Debtors shall file any modification or amendment to the Plan requested by Acquirer provided the same relates to the rights of the Acquirer under the Plan or this Agreement.

    The Debtors shall not amend, modify, withdraw or revoke the Plan Solicitation Order or permit the same to be amended, modified, withdrawn or revoked, in each case without the prior consent of Acquirer in any manner which materially affects the rights of the Acquirer under the Plan, the Plan Solicitation Order or this Agreement. In furtherance of the forgoing and not in limitation thereof, any reduction or elimination of the termination fee and/or reimbursement of out of pocket expenses provided in the Plan Solicitation Order for the benefit of Acquirer without the consent of Acquirer shall be deemed to constitute a material amendment to the Plan Solicitation Order which shall entitle Acquirer to terminate this Agreement by notice to Debtors.

    The provisions of this Section 5.3 shall survive the Closing.

    5.4    <u>Use of Name.</u>

    From and after the Effective Date, Debtors agree that they shall cause all of the entities transferred to the Liquidation Trusts and their Affiliates not to, directly or indirectly, use in any manner any of the Debtors' intellectual property or any trade name, trademark, service mark, logo, domain name or other name that is similar thereto in sound or appearance (including the use of "Yellowstone", "Yellowstone Club", "YC", "Yellowstone Mountain Club", "Private Powder" and/or any similar variation thereof), and, if not done prior to Closing, shall cause the Trustees, immediately after the Closing, to change all signage, stationery and corporate or entity names that contain, and otherwise to discontinue the use of, the name "Yellowstone", "Yellowstone Mountain Club", "Yellowstone Club", "YC", or any combination or derivation of the foregoing. Notwithstanding the foregoing provisions of this Section 5.4, the names of the

8

Liquidation Trusts may incorporate the initials (i.e. YC, YD and BSR) of the Debtors. The provisions of this Section 5.4 shall survive the Closing.

    5.5    On-Going Operations.

        From and after the date hereof until the Closing Date, provided sufficient funding is available, Debtors shall operate the Business and cause the operation of the Associations and PSP only in a businesslike and prudent manner and in the ordinary and usual course of business in substantially the same manner as conducted prior to the date of this Agreement, and shall use their best efforts to (a) preserve substantially intact the present business organization and personnel of Debtors and maintain the Project and cause the Associations and PSP to maintain their respective assets in similar repair, working order and operating condition as exists on the date of this Agreement, subject only to ordinary wear and tear; (b) continue current business practices that are intended to preserve the goodwill and advantageous relationships of Debtors, Associations and PSP with customers, vendors, independent contractors, members of the Yellowstone Mountain Club, managers, employees and other individuals and/or entities material to the operation of the Business; (c) take best efforts designed to preserve in full force and effect its Permits; and (d) cause PSP and the Associations to take commercially reasonable efforts to preserve in full force and effect their respective Permits (if any). Without limiting the generality of the foregoing, from the date hereof until the Closing Date, the Debtors shall not (nor shall they permit or cause any affiliate, any Association or PSP to) take any of the following actions that might either individually or in the aggregate have a Material Adverse Effect on the Business, the Project, the Associations or their respective assets, PSP or its assets, without the prior written consent of Acquirer:

        a.    sell, transfer or assign (or enter into agreements in respect thereof) any lot, unit, density unit and/or other real and/or personal property comprising all or any part of the Project or acquire or lease any assets or make or render all or any portion of the Project subject to any Lien whatsoever;

        b.    grant, transfer, revoke or recall any memberships in the Yellowstone Mountain Club;

        c.    defer or postpone the payment of, or make alternative payment arrangements with respect to, any membership deposits, dues, fees or other charges of any member (residential, special, provisional, prospective or otherwise) in the Yellowstone Mountain Club or landowner in the Yellowstone Mountain Club, except for alternative payment arrangements which are consistent with reasonable collection practices;

        d.    enter into any new Contract, including any Contract for the sale of one (1) or more lots, density units and/or units within the Project (but excluding any Contract, agreement or understanding entered into by any Debtor, any affiliate of any Debtor, PSP or any Association in the ordinary course of business which is terminable at the time of Closing or upon thirty (30) days' notice without penalty or fee);

        e.    terminate, modify, amend or otherwise alter or change any of the terms or provisions of any Assumed Obligation;

    f.     terminate, modify, amend or otherwise alter or change any of the terms or provisions of, or consent to or permit any termination, modification or amendment of, any membership documents of the Yellowstone Mountain Club (including, without limitation, the Membership Plan, the Rules and Regulations, the Schedules of Dues and Charges and all membership agreements and Contracts setting forth the terms and conditions of any postponement or deferral (in part or in whole) of, or alternative payment arrangements with respect to, any membership deposits, dues, fees or other charges of any member (residential, special, provisional, prospective or otherwise) in the Yellowstone Mountain Club or landowner in the Yellowstone Mountain Club) or any condominium documents, property owners' association and similar membership organization documents for the Associations;

    g.     cause or permit any reduction, increase, postponement, deferral or waiver of Yellowstone Mountain Club or any Association membership fees, deposits, dues and/or other charges;

    h.     terminate, lay off or reduce by more than 50% the hours, or cause or permit the termination, laying off or reduction by more than 50% of the hours, of any employees of any Debtor, except for cause under applicable Law or except that employees who were hired on a seasonal basis may be terminated at the end of the applicable season consistent with the terms of their employment; and/or

    i.     prosecute the platting or subdivision of the Project or any part thereof and/or amend or otherwise modify any existing platting or subdivision of the Property or any part thereof, except as required to maintain the Debtors' Permits.

    5.6    <u>Broker.</u>

    On or after the Closing Date, as permitted by the Bankruptcy Court, Debtors shall pay out of the Purchase Price any fees or commissions due to CB Richard Ellis Inc. as well as to any other broker or finder engaged by Debtors in connection with the Transaction. On the Closing Date, Acquirer shall pay any fees or commissions due to any broker or finder engaged by Acquirer in connection with the Transaction. Neither Big Springs Realty, LLC, its personnel nor any other Person retained by Big Springs Realty, LLC participated in the Transaction and none of the foregoing Persons mentioned in this sentence shall be entitled to any fee or commission in connection with the Transaction. The provisions of this Section 5.6 shall survive the Closing.

    5.7    <u>Working Capital of Acquirer at Closing.</u>

    At or before Closing, Acquirer shall provide evidence reasonably satisfactory to Debtors that as of Closing Acquirer shall have working capital (in addition to the funds necessary for the Cash Payment) of at least TWENTY FIVE MILLION AND NO/100 U.S. DOLLARS ($25,000,000) plus commitments (issued by Persons whose creditworthiness is reasonably acceptable to the Debtors) for at least an additional FIFTY MILLION AND NO/100 U.S. DOLLARS ($50,000,000) in working capital.

    5.8    <u>PSP; Associations.</u>

10

On or before the Effective Date, Debtors shall have caused the resignation of all designees of any Debtor (or any affiliate of any Debtor) as members, officers, directors or other title holders of any governing board, review board, committee or sub-committee of each of any Association, the Yellowstone Mountain Club, and PSP to the extent permitted by existing Law. In furtherance of the foregoing, Debtors shall provide to Acquirer at Closing evidence reasonably satisfactory to Acquirer of such resignations. In addition, Debtors shall reasonably cooperate with Acquirer to effectuate the appointment of Acquirer's designee(s) to such vacated positions as Acquirer shall elect in its sole discretion to the extent permitted by existing Law. At the time of the Closing, the Debtors shall cooperate with Acquirer's efforts to obtain control over the Associations and PSP to the extent permitted by existing Law.

## ARTICLE VI
## CONDITIONS PRECEDENT TO OBLIGATIONS OF ACQUIRER

The obligations of Acquirer to consummate the Transaction are subject to the satisfaction (unless waived by Acquirer) of the following conditions:

6.1    Effective and Closing Dates.

The Effective Date and Closing Date shall occur no later than June 10, 2009 (except as otherwise extended by Acquirer), other than due to the breach by Acquirer of its obligations hereunder.

6.2    Compliance with Agreements and Covenants.

Debtors shall have performed and complied in all material respects with all of their respective covenants, obligations and agreements contained in this Agreement to be performed and complied with by them on or prior to the Closing Date.

6.3    Illegality.

There shall not be any Law that makes consummation of the Closing illegal or otherwise restrained or prohibited or any judgment, injunction, order or decree of any Governmental Authority having competent jurisdiction enjoining any Debtor or Acquirer from consummating the Closing.

6.4    Documents.

Acquirer shall have received each agreement, document and item required to be delivered by Debtors pursuant to this Agreement.

6.5    Condition of the Business

The Project shall be in substantially the same condition on the Closing Date as on the date of this Agreement, reasonable wear and tear not causing a Material Adverse Effect (either individually or in the aggregate) on the Project or Business excluded; provided, however, if there is a fully insured casualty or other damage to the Project Acquirer shall receive the proceeds of such insurance and if there is an uninsured or underinsured casualty or damage to the property,

11

Acquirer shall receive an assignment of insurance proceeds and with respect to the cost to repair or restore that is not insured the Debtors shall pay to Acquirer the amount of the cost to repair (as reasonably determined by Debtors and Acquirer) that is not so insured (including any deductible) (the "Uninsured Amount") up to $2 Million and if the Uninsured Amount is in excess of $2,000,000, then Acquirer shall have the right to terminate this Agreement.

    6.6    No Action Prohibiting Continued Business of the Debtors.

Excluding the pending bankruptcy proceedings of the Debtors, and related pending proceedings, on the Closing Date, there shall be no actions, suits, claims, notices of potential claims, requests for accommodation, arbitrations, regulatory proceedings or other litigation, proceedings or governmental investigations pending or threatened against or affecting any of the Debtors, the Project or the Business (or any part thereof) that might have a Material Adverse Effect (either individually or in the aggregate) on the continued operation of the Project or Business or the further development thereof.  Except with respect to Assumed Obligations with governmental entities set forth in the Schedules filed in connection with the Plan, including, but not limited to the existing consent decree with the EPA, on the Closing Date, neither the Business nor the Project (nor any part thereof) shall be subject to any order, judgment, decree, injunction, stipulation or consent order of or with any court or other Governmental Authority and there shall have occurred no revocation or suspension of any Permit that might materially impair the continued operation of the Project or Business or the further development thereof.

    6.7    Books, Records and Files.

Acquirer shall have received from Debtors originals or copies in Debtors' possession or control of all warranties, permits, plans, all books, records, manuals and other materials relating to the Business or Project, and keys to all locks at the Project.  Debtors shall have the right to retain copies of any such materials (other than keys) delivered to Acquirer.  Acquirer shall cooperate with the Trustees and the Disbursing Agent with respect to providing reasonable access to such records.

## ARTICLE VII
## CONDITIONS PRECEDENT TO OBLIGATIONS OF DEBTORS

The obligations of Debtors to consummate the Transaction are subject to the satisfaction (unless waived by Debtors) of the following conditions:

    7.1    Compliance with Agreements and Covenants.

Acquirer shall have performed and complied in all material respects with all of its respective covenants, obligations and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date.

    7.2    Documents.

Debtors shall have received each agreement, document and item required to be delivered by Acquirer pursuant to this Agreement.

## ARTICLE VIII
## CLOSING

### 8.1   Deliveries by Debtors.

At the Closing, in addition to any other documents or agreements required under this Agreement, Debtors shall deliver to Acquirer the documents set forth on Schedule 8.1 attached hereto and made a part hereof.

### 8.2   Deliveries by Acquirer

At the Closing, in addition to any other documents, consideration and agreements required under this Agreement, Acquirer shall deliver to Debtors the documents set forth on Schedule 8.2 attached hereto and made a part hereof.

### 8.3   Survival of Obligations.

Except as otherwise provided herein, in the Plan or in the documents executed in connection with the Closing, none of the representations and warranties or obligations of Debtors made in this Agreement or the documents delivered hereunder at Closing shall survive the Closing. Except as otherwise provided herein or in the Plan, the New Membership Interests are being issued and sold hereunder "AS IS," without any warranties as to merchantability or fitness for a particular purpose, and Acquirer shall be fully liable for the payment of the Purchase Price as and when required hereunder without any offset or reduction on account of any matter arising after Closing.

## ARTICLE IX
## TERMINATION

### 9.1   Termination.

This Agreement may be terminated at any time, on or prior to the Closing Date:

(a)      by mutual written consent of Debtors, on the one hand, and Acquirer, on the other hand;

(b)      by Acquirer, if any of the conditions in Article VI has not been satisfied in all material respects as of the Closing or if satisfaction of any such condition is or becomes impossible (other than through the failure of Acquirer to comply with its obligations under this Agreement) and Acquirer has not waived such condition at or before the Closing;

(c)      by Debtors, if any of the conditions in Article VII has not been satisfied in all material respects as of the Closing or if satisfaction of any such condition is or becomes impossible (other than through the failure of any Debtor to comply with its obligations under this Agreement) and Debtors have not waived such condition at or before the Closing;

(d)      by Acquirer, if the Closing does not occur due to a material breach of any covenant, representation or warranty of any Debtor hereunder; or

13

(e)    by Debtors, if the Closing does not occur due to a material breach of any covenant, representation or warranty of Acquirer hereunder.

## 9.2    Effect of Termination.

If this Agreement is terminated pursuant to Section 9.1, all obligations of the parties hereunder shall terminate, the Security shall be returned to Acquirer and this Agreement shall be of no further force or effect, except that in the event this Agreement is terminated pursuant to Section 9.1(e), Debtors shall be entitled to liquidated damages from Acquirer in the amount of $5,000,000 as the sole and exclusive remedy of Debtors on account of the material breach of Acquirer hereunder, which amount shall be paid from the proceeds of the Security.  In the event this Agreement is terminated pursuant to Section 9.1 (d), Acquirer shall be entitled to either (a) seek specific performance of this Agreement or (b) terminate this Agreement.  Notwithstanding anything to the contrary herein, the provisions of this Section 9.2 shall survive any termination of this Agreement.

## 9.3    Special Provisions in the Event of Higher or Better Offers.

Debtors will in accordance with the Plan Solicitation Order solicit higher or better offers for the New Membership Interests.  Subject to the Plan Solicitation Order, Acquirer and Debtors acknowledge that this Agreement is subject to the receipt by Debtors of any such higher or better offer that is approved by the Bankruptcy Court provided that Debtors comply with the Plan Solicitation Order including payment to Acquirer of the termination fee and diligence expenses provided in the Plan Solicitation Order if Acquirer is entitled to the payment thereof as provided in the Plan Solicitation Order.

## ARTICLE X
## MISCELLANEOUS

## 10.1    Expenses.

Subject to the Plan Solicitation Order, each party hereto shall bear its own costs and expenses (including the fees and disbursements of legal counsel, investment bankers and accountants) with respect to the Transaction.

## 10.2    Amendment.

This Agreement may be amended, modified or supplemented only by a written instrument signed by Acquirer and each Debtor.

## 10.3    Notices.

Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given:  (a) when received (or refused) if delivered in person; (b) on the next Business Day following its deposit with a nationally recognized overnight courier service for next day delivery; (c) on the date of transmission if sent by facsimile provided the transmission is received by the recipient during

14

normal business hours (otherwise on the next Business Day); or (d) three (3) Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

If to Debtors, addressed as follows:

c/o Yellowstone Mountain Club, LLC
One Yellowstone Club Trail
Big Sky, MT 59716
Attention: Edra Blixseth
Telecopy: (406) 995-7313

with a copy to:

James A. Patten
Patten Peterman Bekkedahl & Green
2817 Second Avenue North, Suite 300
Billings Mt 59101
Telecopy:

Lawrence R. Ream
Bullivant Houser Bailey PC
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telecopy: (206) 386-5130

If to Acquirer, addressed as follows:

c/o CrossHarbor Capital Partners LLC
One Boston Place, 23rd Floor
Boston, MA 02108-4406
Attention: Samuel T. Byrne
Telecopy: 617-624-8340

with a copy to:

Goulston & Storrs
400 Atlantic Avenue
Boston, MA 02110
Attention: Barry D. Green, Esq.
Telecopy: 617-574-7586

Duane Morris LLP
470 Atlantic Avenue
Boston, MA 02210
Attention: Paul D. Moore, Esq.
Telecopy: 857-401-3057

If to the Escrow Agent, addressed as follows:

15

Security Title Company
600 South 19th Avenue
Bozeman, MT 59718
Attention: Cory Berkram
Telecopy: (406) 522-5501

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

### 10.4   Waivers.

The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.  No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

### 10.5   Counterparts.

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

### 10.6   Headings.

The headings preceding the text of articles and sections included in this Agreement and the headings to schedules attached to this Agreement are for convenience only and shall not be deemed part of this Agreement or be given any effect in interpreting this Agreement.

### 10.7   Interpretation.

Unless otherwise indicated, words describing the singular number shall include the plural and vice versa, and words denoting each gender shall include the other gender and words denoting natural persons shall include corporations, partnerships and other entities and vice versa.  The use of the terms "including," "includes" or terms of similar import shall not be limiting and shall be interpreted as if the words "without limitation" immediately followed such terms.  Unless otherwise indicated, references to articles, sections, subsections or schedules shall refer to those portions of this Agreement.

### 10.8   Applicable Law.

The validity, construction and effect of this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Montana, without giving effect to the principles of conflicts of law of such State.

### 10.9   Jurisdiction; Waiver of Jury Trial.

16

Any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement shall be brought in the Bankruptcy Court, and each of the parties hereby consents to the jurisdiction of such court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 10.3 shall be deemed effective service of process on such party. Each party hereto hereby irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or related to this Agreement.

10.10  Assignment.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. The Trustee(s) and/or the Disbursing Agent(s) shall serve as the representative of the Debtors' estates for purposes of all obligations hereunder or under the Plan arising subsequent to Closing and shall, as applicable, be responsible for performing those obligations hereunder of Debtors that survive Closing.

Prior to Closing, Acquirer may not assign its rights under this Agreement, including by operation of law, without the prior written consent of Debtors, which may be withheld in Debtors sole discretion; provided, however, the Acquirer may assign this Agreement at any time to any Affiliate of Acquirer; provided, however, that no such assignment by Acquirer shall relieve Acquirer of any of its obligations under this Agreement.

10.11  No Third Party Beneficiaries.

Except as expressly set forth herein, this Agreement is solely for the benefit of the parties hereto and, to the extent provided herein, their respective Affiliates, directors, officers, attorneys, members, employees, stockholders, partners, managers, agents and representatives, the Disbursing Agent, and the Trustee and no provision of this Agreement shall be deemed to confer upon other third parties any remedy, claim, liability, reimbursement, cause of action or other right.

10.12  Further Assurances.

Each party shall on and after the Closing Date, upon the reasonable request of any other party hereto, execute and deliver such other documents, releases, papers, authorizations, forms, assignments and other instruments, and take all other actions, as may be reasonably requested to effectuate completely this Transaction, and to otherwise carry out the purposes of this Agreement.

10.13  Severability.

17

If any provision of this Agreement shall be held invalid, illegal or unenforceable, the validity, legality or enforceability of the other provisions shall not be affected thereby, and there shall be deemed substituted for the provision at issue a valid, legal and enforceable provision as similar as possible to the provision at issue.

10.14   Remedies Cumulative.

Except as otherwise specifically provided herein, the remedies provided in this Agreement shall be cumulative and shall not preclude the assertion or exercise of any other rights or remedies available by Law, in equity or otherwise.

10.15   Entire Understanding; Delivery of Schedules.

This Agreement together with the exhibits and schedules hereto set forth the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersede any and all prior and contemporaneous agreements, arrangements and understandings among the parties hereto.

10.16   Time of Essence.

Time is of the essence of each and every term, provision and covenant of this Agreement.

\* \* \* \* \*

SIGNATURE PAGE FOLLOWS

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**DEBTORS:**

Yellowstone Mountain Club, LLC

By:  BLX Group, Inc., its manager

By: _____
Name: Dru Blixseth
Title: CEO

Yellowstone Development, LLC

By:  BLX Group, Inc., its manager

By: _____
Name: Dru Blixseth
Title: CEO

Big Sky Ridge, LLC

By: _____
Name: Dru Blixseth
Title: manager

**ACQUIRER:**

New CH YMC Acquisition LLC

By: _____
Name: _____
Title: _____


**ESCROW AGENT:**

Security Title Company of Montana

By: _____
Name: _____
Title: _____

19

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

DEBTORS:

Yellowstone Mountain Club, LLC

By: BLX Group, Inc., its manager

By: _____
    Name:
    Title:

Yellowstone Development, LLC

By:  BLX Group, Inc., its manager

By: _____
    Name:
    Title:

Big Sky Ridge, LLC

By: _____
    Name:
    Title:

ACQUIRER:

New CH YMC Acquisition LLC

By: _____
    Name:  Robert Garrow
    Title:  Vice President

ESCROW AGENT:

Security Title Company of Montana

By: _____
    Name:
    Title:

19

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**DEBTORS:**

Yellowstone Mountain Club, LLC

By:  BLX Group, Inc., its manager

By:    _____
       Name:
       Title:

Yellowstone Development, LLC

By:    BLX Group, Inc., its manager

By:    _____
       Name:
       Title:

Big Sky Ridge, LLC

By:    _____
       Name:
       Title:

**ACQUIRER:**

New CH YMC Acquisition LLC

By:    _____
       Name:
       Title:

**ESCROW AGENT:**

Security Title Company of Montana

By:    _____
       Name:  CORY D. BERKRAM
       Title: PRESIDENT

19

Schedule 2.3

Escrow Provisions

If the Closing takes place in accordance with the terms and conditions of the Agreement, the Escrow Agent shall automatically return the Security to Acquirer on the Closing Date.

If the Agreement is terminated by Acquirer and/or Debtors in accordance with the terms and conditions of Section 9.1 of the Agreement, then the Escrow Agent shall promptly deliver the Security to the party entitled thereto in accordance with the provisions of Section 9.2 of the Agreement and this Schedule 2.3.

Upon receipt of a written demand from Debtors or Acquirer claiming the Security, the Escrow Agent shall promptly forward written notice of Escrow Agent's receipt of such demand together with a copy thereof to the other party hereto. Unless such other party, within five (5) Business Days after receipt of such notice, notifies the Escrow Agent in writing of any objection to such requested delivery of the Security, the Escrow Agent shall deliver the Security to the party demanding the same (if such demand is made by Debtors, Escrow Agent shall draw upon the letter of credit and deliver the proceeds thereof to the Debtors) and thereupon shall be released and discharged from any further duty or obligation hereunder by all parties hereto; provided, however, in the event the Security is returned to Acquirer in accordance with the terms of the Agreement (including, without limitation, this Schedule 2.3), Escrow Agent shall execute and deliver such documents, releases, forms and/or other instruments, and take all other actions, reasonably requested by Acquirer to release and terminate the Security. In no event shall the Escrow Agent deliver the Security to either party hereto without first giving the written notice specified in the first sentence of this paragraph and the failure of the party to whom the notice is sent to object to such delivery within five (5) Business Days after its receipt of such notice.

If, by not less than fifteen (15) days prior to the then-relevant expiry date of the letter of credit, Acquirer has failed to provide either (i) an extension of the letter of credit for a term of not less than three (3) months from the then-current expiry date, or (ii) a substitute letter of credit in substantially the same form as the prior letter of credit issued by an issuing bank reasonably acceptable to Debtors, Escrow Agent shall draw upon the letter of credit in the full face amount thereof and shall hold the proceeds as the Security.

The Escrow Agent shall hold the Security as escrow agent in accordance with the terms and provisions of the Agreement, subject to the following:

*Obligations*. The Escrow Agent undertakes to perform only such duties as are expressly set forth in the Agreement and no implied duties or obligations shall be read into the Agreement against the Escrow Agent.

*Reliance*. The Escrow Agent may act in reliance upon any writing or instrument or signature which it, in good faith, believes to be genuine, and any statement or assertion contained in such writing or instrument, and may assume that any person purporting to give any writing,

20

notice, advice, or instrument in connection with the provisions of the Agreement has been duly authorized to do so. The Escrow Agent shall not be liable in any manner for the sufficiency or correctness as to form, manner and execution, or validity of any instrument deposited in escrow, nor as to the identity, authority, or right of any person executing the same.

*Indemnification.* Unless the Escrow Agent discharges any of its duties under the Agreement in a negligent manner or is guilty of willful misconduct with regard to its duties under the Agreement, Debtors and Acquirer shall indemnify the Escrow Agent and hold it harmless from any and all claims, liabilities, losses, actions, suits or proceedings at law or in equity, or other expenses, fees, or charges of any character or nature, which it may incur or with which it may be threatened by reason of its acting as escrow agent under the Agreement; and in such connection Debtors and Acquirer shall indemnify the Escrow Agent against any and all expenses including reasonable attorneys' fees and the cost of defending any action, suit or proceeding or resisting any claim in such capacity.

*Disputes.* If the parties (including the Escrow Agent) shall be in disagreement about the interpretation of the Agreement, or about their respective rights and obligations, or the propriety of any action contemplated by the Escrow Agent, or the application of the Security, the Escrow Agent shall have the right to hold the Security until the receipt of written instructions from both Acquirer and Debtors or a final order of the Bankruptcy Court. In addition, in any such event, the Escrow Agent may, but shall not be required to, file an action in interpleader to resolve the disagreement. The Escrow Agent shall be indemnified for all costs and reasonable attorneys' fees in its capacity as escrow agent hereunder in connection with any such interpleader action and shall be fully protected in suspending all or part of its activities under the Agreement until a final judgment in the interpleader action is received.

Schedule 8.1

Closing Deliveries of Debtors

1.   The documents, instruments and/or agreements required by Section 2.1 hereof
     (including, without limitation, new limited liability company agreements for the
     Reorganized Debtors and documents evidencing the cancellation of existing
     membership interests and issuance of new membership interests in the
     Reorganized Debtors);

2.   Evidence reasonably satisfactory to Acquirer that the Employee Plans have been
     dissolved or otherwise terminated in accordance with Article 3 hereof;

3.   Evidence reasonably satisfactory to Acquirer that all of the entities transferred to
     the Liquidation Trusts and their Affiliates have changed their names and taken all
     such other actions as required by Section 5.4 hereof;

4.   Evidence reasonably satisfactory to Acquirer that all representatives and/or
     designees of Debtors have resigned as members, officers, directors or other title
     holders of any governing board, review board, committee or sub-committee of
     each of the Yellowstone Mountain Club, PSP and any Association and that all
     designees of Acquirer have been appointed to such vacated positions in
     accordance with Section 5.8 hereof;

5.   An executed counterpart of a closing statement in form reasonably satisfactory to
     Debtors and Acquirer (the "Closing Statement");

6.   The documents, instruments and/or agreements necessary to transfer any element
     of the Project to the Reorganized Debtors from the entities to be transferred to the
     Liquidation Trusts (and their Affiliates);

7.   Evidence reasonably satisfactory to Acquirer that all designees and/or
     representatives of Debtors on any accounts that are part of the Project have been
     removed and that the designees of Acquirer have been substituted therefor;

8.   Such affidavits and information that are routinely exchanged in transactions of
     this type, including, without limitation, title affidavits and non-imputation
     affidavits;

9.   Such transfer documentation as may be necessary to effectuate a transfer of any
     domain names or websites relating to the Project including, without limitation,
     any such documentation required by a web registrar;

10.  Evidence reasonably satisfactory to Acquirer that all necessary insurance policies
     are in place and will not expire until a date beyond the closing;

22

11.   All materials required by Section 6.7 hereof (including, without limitation, corporate minute books and records); and

12.   Such other documents reasonably requested by Acquirer to facilitate the consummation of the transactions contemplated by this Agreement.

<u>Schedule 8.2</u>

Closing Deliveries of Acquirer

1.   Executed counterparts of any documents required pursuant to Section 2.1 hereof to which Acquirer is a party;

2.   The New Loan Documents executed by the Reorganized Debtors;

3.   Evidence of working capital as required by Section 5.7 hereof;

4.   An executed counterpart of the Closing Statement; and

5.   Such other documents reasonably requested by Debtors to facilitate the consummation of the transactions contemplated by this Agreement.

<u>Exhibit A</u>

Plan Solicitation Order

[attached]

25

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | Case No. **08-61570-11** |
| **YELLOWSTONE MOUNTAIN CLUB, LLC,** | Jointly Administered with: |
| Debtor. | |
| In re | |
| **YELLOWSTONE DEVELOPMENT, LLC,** | Case No. **08-61571-11** |
| Debtor. | |
| In re | |
| **BIG SKY RIDGE, LLC,** | Case No. **08-61572-11** |
| Debtor. | |
| In re | |
| **YELLOWSTONE CLUB CONSTRUCTION COMPANY, LLC,** | Case No. **08-61573-11** |
| Debtor. | |

*O R D E R*

At Butte in said District this 6th day of March, 2009.

1

In accordance with the Memorandum entered in the above-referenced Chapter 11 bankruptcies on this same date,

IT IS ORDERED that

1.    Credit Suisse's Objection and Request for Reconsideration filed February 20, 2009, at docket entry no. 415, is granted in part and denied in part; and CBRE shall vigorously market not only the equity interests in the Debtors, but also all the Debtors' assets, which assets could conceivably be sold with a prospective bidder's written agreement to assume the Membership Contracts as outlined in Debtors' Schedule of assumed and modified Membership Agreements;

2.    CrossHarbor Capital Partners, LLC's ("CrossHarbor") Motion for Protective Order filed February 27, 2009, at docket entry no. 468; is denied; and

3.    The Debtors' Motion to Vacate Order Denying Debtors' Motion for Bidding and Solicitation Procedures or in the Alternative, Renewed Motion for Bidding and Solicitation Procedures filed February 24, 2009, at docket entry no. 427, is granted, and the following bidding and solicitation procedures are hereby adopted by the Court, but may be subject to future modification in order to promote a more robust bidding and sale procedure that may better protect the rights of parties-in-interest:

1.    **Confidentiality Agreement.**  Upon execution of a confidentiality agreement reasonably acceptable to Debtors, any qualified party that wishes to conduct due diligence may be granted access to all material information that has been or will be provided to any potential bidder.

2.    **Engagement of CBRE.**  CBRE shall be engaged by Debtors to undertake a robust marketing process in accordance with these bid procedures and any subsequent amendment to these bid procedures that the Court may implement by future order.

2

3.      **Alternative Bid Deadline.** All Alternative Bids must be submitted not later than 12:00 p.m. (MST) on the tenth day prior to the Confirmation Hearing (the "Alternative Bid Deadline") to:

> Yellowstone Club
> 71713 Highway 111
> Rancho Mirage, CA 92270

with copies to:

> Ron Greenspan
> c/o FTI Consulting, Inc.
> 633 West Fifth Street, 16th Floor
> Los Angeles, CA 90071

> James A. Patten
> Patten Peterman Bekkedahl & Green
> 2817 Second Avenue North, Suite 300
> Billings Mt 59101

> Lawrence R. Ream
> Bullivant Houser Bailey PC
> 1601 Fifth Avenue, Suite 2300
> Seattle, Washington  98101-1618

4.      **Distribution of Alternative Bid.** Upon receipt of an Alternative Bid, the Debtors shall immediately distribute a copy of such Alternative Bid to counsel of record for (I) the Purchaser, (ii) Credit Suisse, (iii) the Official Unsecured Creditors Committee (the "Committee"), (iv) the Ad-Hoc Members' Committee (the "Ad-Hoc Committee"), and (v) the Ad-Hoc Class "B" Equity Interest Holders' Group (the "B" Committee) (collectively, with the Committee and the Ad Hoc Committee, the "Committees"); provided, that each such party shall take reasonably satisfactory precautions to ensure that such information does not come into the possession of any person who is interested in the acquisition of the Equity Interests, or be subject to sanctions by the Court for violation of the bidding procedures and this Order, upon a party-in-interest moving for such relief.

5.      **Qualified Alternative Bid.** An Alternative Bid will qualify for consideration only if the Alternative Bid is a "Qualified Alternative Bid." To be a Qualified Alternative Bid, the Alternative Bid shall either be submitted by Purchaser or must:

        a.      Identify the proponent of the Alternative Bid (the "Alternate Bidder") and

3

an officer or authorized person who is authorized to appear and act on behalf of and bind Alternative Bidder in connection with all proceedings related to such bid;

b.   Propose in writing a transaction with the cash component of the purchase price greater than or equal to the sum of (x) the cash component of the purchase price set forth in the Plan, plus (y) $3,500,000.00 (the "Initial Overbid Amount"), and in the case of any subsequent Qualified Alternative Bids, $1,000,000.00 over the immediately preceding Qualified Alternative Bid (the "Subsequent Overbid Amount"), and in all cases the debt component of the purchase price cannot exceed 70% of the purchase price up to a purchase price of $150 million, and thereafter, the debt component of the purchase price shall not exceed the amount of One Hundred Five Million Dollars ($105 Million).  The debt component shall be secured by the Project and be evidenced by an interest only note having an interest rate of LIBOR plus 500 basis points with an initial five year term with two one-year extensions at a fee of 50 basis points of the then outstanding indebtedness, having a lot release price of $500,000 and with the right to cause the holder thereof to subordinate to third-party construction financing (without payment of release prices) for up to 100 lots in the aggregate at any point in time;

c.   Consist of an agreement in the form of the Agreement to be entered into with Purchaser to effectuate the purchase contemplated by the Plan (the "CH Definitive Agreement"), marked to show changes thereto that is on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the CH Definitive Agreement and provides for sufficient working capital in an amount not materially less than the amount to be provided by the Purchaser in light of the capital structure proposed by the bidder;

d.   Not be subject to any contingencies related to due diligence, financing or further approval, such as by senior management or board of directors—the only contingency being approval by April 30, 2009 of a Plan of Reorganization substantially similar to that filed by the Debtor or as such plan might be modified with the reasonable consent of such bidder;

e.   Not be subject to termination by such bidder except on the same terms as the CH Definitive Agreement and state such Alternative Bid is irrevocable until the effective date of the Plan and, if it is not the winning bid, may be accepted nonetheless for a period of thirty (30) days following the effective date if the winning bidder fails timely to close;

4

f.    Be accompanied by (I) a cash deposit or letter of credit in the amount of $5,000,000, refundable only in the event that the prospective bidder is not a bidder required to close under these Bidding Procedures;

g.    Not be subject to any conditions precedent other than the approval of such Alternative Bid by the Bankruptcy Court in connection with the confirmation of a plan incorporating such alternative Agreement;

h.    Contain such financial and other information that will allow the Debtors after consultation with the Committees to make a reasonable determination as to the Alternative Bidder's financial wherewithal to consummate the transactions contemplated by the Alternative Bid, including to provide adequate assurance of such bidder's ability to perform in the future under any assumed executory contract, and to show that the Plan is feasible;

I.    Identify with particularity each and every executory contract agreement and unexpired lease, the assumption and assignment of which is a condition to closing;

j.    Not request or entitle the bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment;

k.    Fully discloses the identity of each entity that will be bidding for the equity interests or otherwise participating in connection with such bid and the complete terms of any such participation;

l.    If the Alternative Bid is submitted by Credit Suisse as administrative agent for the existing secured lenders there shall be no requirement of a cash deposit or letter of credit (although it shall be subject to a comparable $5,000,000 forfeiture if it should be the prevailing bidder and not close);

m.    If an Alternative Bid is submitted by Credit Suisse and if, prior to the Auction, the Bankruptcy Court has determined that Credit Suisse has the right to credit bid or setoff, then it shall have the right to pay its bid in the form of cash equal to the cash component of the Alternative Bid less a setoff for the portion of the cash component that would be payable to Credit Suisse under the Plan, plus a note substantially similar to the promissory note in the amount equal to the Liquidating Trust's share, on the Definitive Note Terms as provided above. Any right of Credit Suisse to credit bid or setoff will not affect its obligation to provide working capital not materially less than the amount to be provided by the Purchaser in light of the capital structure proposed by the Credit Suisse Alternative Bid.

5

n.    Contain evidence that the bidder has received equity funding commitments or has financial resources readily available sufficient in the aggregate to finance the purchase of the equity interests and establish the working capital, which evidence is reasonably satisfactory to the Debtors after consultation with the Committees.

6.    **Auction, Bidding Increments and Bids Remaining Open.** If the Debtors do not receive any Qualified Alternative Bids, the Debtors will report the same to the Bankruptcy Court and will proceed with the Motion for approval of the plan based on the CH Definitive Agreement. If the Debtors receive a Qualified Alternative Bid:

a.    The Debtors shall conduct an open auction (the "Auction") at a location to be provided to all Auction Parties (as hereinafter defined), at least five business days in advance, on the business day five days immediately prior to the Confirmation Hearing, beginning at 10:00 a.m. local time or such later time or other place as the Debtors shall notify the Purchaser and all bidders who have submitted Qualified Alternative Bids (Purchaser and such bidders collectively, "Qualified Bidders"). Only the Debtors, representatives of Credit Suisse, the Committees, the U.S. Trustee, the Purchaser, and any other Qualified Bidders, together with their respective legal counsel and financial advisors, shall be entitled to attend the Auction, and only the Qualified Bidders shall be entitled to make any additional bids ("Subsequent Bids") in increments of the Subsequent Overbid Amount at the Auction. All Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Bid will be fully disclosed to all other bidders throughout the entire Auction. The Debtors may announce at the Auction additional procedural rules that they determine, in consultation with the Committees, are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent alternative bids) for conducting the Auction so long as such rules are not inconsistent with these Bidding Procedures.

b.    As a condition of participating in the Auction, each Qualified Bidder shall certify prior to the commencement of the Auction that (I) its representatives attending the auction have the full power and authority to act on behalf of and legally bind the bidder to any bids made at the auction and (ii) any bid made shall constitute a binding and legally enforceable contract of the bidder to timely close a purchase of 100% of the Debtors' equity at the price bid in the event an order is entered approving a plan based upon such bid.

6

c.    At least two business days prior to the Auction, the Debtors shall provide to all Qualified Bidders copies of all other Qualified Alternative Bids. In addition, the Debtors will inform the Purchaser and each other Qualified Bidder who has expressed its intent to participate in the Auction of the identity of all Qualified Bidders that may participate in the Auction.

d.    At the Auction, bidding shall begin with the Qualified Alternative Bid that the Debtors, in consultation with the Committees, believes to be the highest and best pending offer, and continue in increments of the Subsequent Overbid Amount in one or more rounds of bidding and shall conclude after each Qualified Bidder has had the opportunity to but has declined to submit an additional Subsequent Bid. For the purpose of evaluating which bid is the highest and best bid, the value of a bid shall be determined by the Debtors, in consultation with the Committees, after considering all relevant factors, including the following: (I) the net consideration payable to the Debtors, after giving effect to any Termination Fee that may be payable to Purchaser under the Bidding Procedures Order; (ii) the contracts to be assumed under the bid; (iii) the adequate assurance of future performance to non-debtor parties under the bid; (iv) the debt to equity ratio of the Reorganized Debtor under the bid; (v) the waiver of any claims against the Debtors; (vi) the commitments regarding future employment of employees under the bid; and (vii) the feasibility of the Plan if the bid were accepted. At the conclusion of the bidding, the Debtors, in consultation with the Committees, shall announce their determination as to the bidder submitting the highest and best bid, which bid shall be submitted to the Bankruptcy Court for approval at the Confirmation Hearing. Debtor will also consider bids that include the sale of other assets owned by Debtor, including the Chateau Farcheville and St. Andrew's assets, and will consider whether any such bid would likely produce greater value for the Debtor than the sale of the Project and the separate, subsequent sale of such other assets. The Purchaser shall be deemed a party-in-interest with standing to appear and be heard in connection with any motions, hearings, or other proceedings relating to the CH Definitive Agreement and any Alternative Bid or Subsequent Bid. That standing, however, shall not entitle the Purchaser to propose any Subsequent Bid at any such hearing.

e.    The Purchaser shall be entitled to a termination fee (the "Termination Fee") in the amount of (a) $2,000,000 (being 2% of Purchaser's acquisition price of $100 Million) plus (b) all out of pocket expenses incurred by CrossHarbor or Purchaser subsequent to November 10, 2008 in pursuing the acquisition of the Debtors' equity interests but not to exceed the sum of $1,000,000 in the aggregate, in the event (I) the Bankruptcy Court

7

approves a sale of 100% of the Debtors' equity to an entity other than the Purchaser, and (ii) the Purchaser remained at all times through and including seven (7) business days immediately following such Bankruptcy Court approval, ready, willing and able to consummate the CH Definitive Agreement.

    f.    The bidding at the Auction will be transcribed.

7.    The "benchmark" set out in the CrossHarbor term sheet for its debtor-in-possession financing approved by this Court on December 17, 2008 [Docket No. 182] ("Final Order"), fixed a plan confirmation deadline of March 31, 2009, and an end of the exclusivity period if a plan is not filed by February 13, 2009; CrossHarbor has consented to the extension of the March 31, 2009, plan confirmation deadline until April 30, 2009, and the deadline is so extended and the Final Order is so modified.

8.    Nothing in this Order is intended to effect a substantive consolidation of the Estates, affect the allocation of proceeds amongst the Estates, or affect the rights or interests of the parties to these bankruptcies except as is set forth herein or required to effectuate the intents and purposes of this Order.

BY THE COURT

_Ralph B. Kirscher_

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

8

<u>Exhibit B</u>

New Loan Documents

[attached]

PROMISSORY NOTE

$70,000,000.00                                                    _____, 2009

FOR VALUE RECEIVED, Yellowstone Mountain Club, LLC, a Montana limited liability company, ("YMC"), Yellowstone Development, LLC, a Montana limited liability company ("YD") and Big Sky Ridge, LLC, a Montana limited liability ("BSR" and jointly and severally with YMC and YD, "Maker"), hereby promises to pay to the order of _____ [YMC Liquidating Trust] ("Payee"), the principal sum of Seventy Million and No/100 US Dollars ($70,000,000.00), together with interest thereon, as follows.

1.      Definitions.  As used herein, the following terms shall have the indicated meanings:

"Business Day" means any day which is neither a Saturday or Sunday nor a legal holiday on which commercial banks are authorized or required to be closed in Massachusetts or Montana.

"Default Rate" shall mean a rate per annum equal to 4% above the LIBOR Rate plus the LIBOR Margin.

"Event of Default" shall have the meaning assigned to that term in Section 20 of the Mortgage (as hereinafter defined).

"Extension Option" shall have the meaning assigned to that term in Section 6 hereof.

"First Extended Maturity Date" shall have the meaning assigned to that term in Section 6 hereof.

"Funding Date" means the __ day of _____, 2009.

"Initial Maturity Date" shall have the meaning assigned to that term in Section 6 hereof.

"Interest Payment Date" means initially, the first day of ___, 2009 and thereafter the day of each succeeding month which numerically corresponds to such date.

"Interest Period" means:

(i)      initially, the period beginning on (and including) the Funding Date and ending on (but excluding) _____ 1, 2009 (the "Stub Period"); and

(ii)     then the period commencing on (and including) the last day of the Stub Period and ending on (but excluding) the day which numerically corresponds to such date one month thereafter; and

(iii)    thereafter, each period commencing on (and including) the last day of the next preceding Interest Period and ending on (but excluding) the date which is one month thereafter;

-1-

provided, however, that

(a)      if such Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next following Business Day unless such day falls in the next calendar month, in which case such Interest Period shall end on the first preceding Business Day; and

(b)      no Interest Period may end later than the termination of this Agreement.

"LIBOR Margin" means 5.00% per annum.

"LIBOR Rate" means, relative to any Interest Period, the offered rate for delivery in two London Banking Days of deposits of U.S. Dollars for a term coextensive with the designated Interest Period which the British Bankers' Association fixes as its LIBOR rate as of 11:00 a.m. London time on the day on which such Interest Period commences.  If the first day of any Interest Period is not a day which is both a (i) Business Day, and (ii) a London Banking Day, the LIBOR Rate shall be determined by reference to the next preceding day which is both a Business Day and a London Banking Day.  If, for any reason, the LIBOR Rate is unavailable and/or Payee is unable to determine the LIBOR Rate for any Interest Period, Payee may, at its discretion select a replacement index based on the arithmetic mean of the quotations, if any, of the interbank offered rate by first class banks in London or New York for deposits with comparable maturities.

"Loan" means all amounts outstanding under this Note.

"Loan Documents" shall mean this Note and the Mortgage, as the same may be amended, modified or supplemented from time to time.

"London Banking Day" means a day on which dealings in US dollar deposits are transacted in the London interbank market.

"Maturity Date" shall mean the Initial Maturity Date or, if the Extension Option is duly exercised, the First Extended Maturity Date or the Second Extended Maturity Date, as applicable, unless accelerated sooner pursuant to the terms hereof.

"Mortgage" shall mean that certain Mortgage and Security Agreement by Maker for the benefit of Payee dated of even date herewith, as the same may be amended, modified or supplemented from time to time.

"Person" shall mean an individual, corporation, partnership, limited liability company, trust, unincorporated association, joint venture, joint-stock company, government (including political subdivisions), or agency, or any other entity.

"Second Extended Maturity Date" shall have the meaning assigned to that term in Section 6 hereof.

2.      Interest Rates.

(a)      Interest Rate.  Subject to the terms and conditions hereof, principal amounts outstanding under the Loan shall accrue interest during each Interest Period applicable thereto at an annual rate equal to the sum of the LIBOR Rate plus the LIBOR Margin and shall be due and payable on each Interest Payment Date and the Maturity Date.

-2-

(b)     Default Rate.  During the continuation of any Event of Default and/or after the maturity hereof (whether by acceleration or otherwise), both before and after judgment, the Loan shall bear interest at the Default Rate.

(c)     Calculations.  Each interest rate hereunder shall be based on a year of 360 days and actual days lapsed.

3.     LIBOR Breakage Fee.  Upon any prepayment of the Loan on any day that is not the last day of the relevant Interest Period (regardless of the source of such prepayment and whether by acceleration or otherwise), the Maker shall pay an amount ("LIBOR Breakage Fee"), as calculated by Payee, equal to the amount of any losses, expenses and liabilities that Payee may sustain as a result of such default or payment.  The Maker understands, agrees and acknowledges that: (i) Payee does not have any obligation to purchase, sell and/or match funds in connection with the use of the LIBOR Rate as a basis for calculating the rate of interest on the Loan, (ii) the LIBOR Rate may be used merely as a reference in determining such rate, and (iii) the Maker has accepted the LIBOR Rate as a reasonable and fair basis for calculating the LIBOR Breakage Fee and other funding losses incurred by Payee.  Maker further agrees to pay the LIBOR Breakage Fee and other funding losses, if any, whether or not Payee elects to purchase, sell and/or match funds.

4.     Taxes.  All payments by the Maker of principal of, and interest on, the Loan and all other amounts payable hereunder shall be made free and clear of and without deduction for any present or future income, excise, stamp or franchise taxes and other taxes, fees, duties, withholdings or other charges of any nature whatsoever imposed by any taxing authority.

5.     Interest Payment Dates.  Interest hereunder shall be due and payable in arrears on the first day of each calendar month.  After maturity hereof (by acceleration or otherwise), interest hereunder shall be due and payable on demand.

6.     Maturity.  Subject to the acceleration rights of Payee referred to in Section 10 of this Note, this Note shall mature on _____, 2014 (the "Initial Maturity Date"); provided, however, that Maker shall, subject to the terms and conditions set forth herein, have the option (the "Extension Option") to extend the maturity hereof to ___, 2015 (the "First Extended Maturity Date") and to _____, 2016 (the "Second Extended Maturity Date").  It is a condition to the exercise of each Extension Option that: (a) Maker shall have given Payee written notice of the exercise of such Extension Option not less than thirty (30) days prior to the Initial Maturity Date or the First Extended Maturity Date, as applicable; (b) a nonrefundable extension fee equal to 50 basis points (one half of one percent (0.50%)) of the outstanding loan amount shall be paid to Payee by Maker at the time Maker provides written notice of the exercise of each Extension Option, (c) any previous extension shall have been satisfactorily exercised; and (d) as of the date of extension there shall not exist any Event of Default nor any event, which, with the passage of time or giving of notice or both, would constitute an Event of Default.  On the Maturity Date (or, if acceleration occurs, the date to which the maturity is accelerated) the entire unpaid principal balance hereof, together with accrued interest thereon, shall become due and payable in full.

7.     Prepayments.

(a)     Optional.  Maker shall have the right at its option to prepay this Note in whole at any time or in part from time to time without premium or penalty (subject to the provisions of paragraph 3 hereof).

(b)     Notice of Prepayment.  Maker shall give Payee not less than four (4) Business Days' prior notice of any prepayment permitted by this paragraph 7, specifying the date of prepayment (which shall be a Business Day) and the total principal amount to be prepaid.

-3-

8.    <u>Payments</u>. All payments of interest, principal and fees shall be made in immediately available funds, without counterclaim or set off and free and clear of, and without any deduction or withholding for, any taxes or other payments: (a) by check or wire transfer to Payee at its office at _____ or (b) to such other Person or address as the holder of the Loan may designate in a written notice to Maker. Payments will be applied, at Payee's option, first to any fees, expenses or other costs Maker is obligated to pay under this Note or the other Loan Documents, second to current interest due on this Note, third to any past due interest payable under this Note and fourth to the outstanding principal balance of this Note. Payments shall be credited on the Business Day on which immediately available funds are received prior to 12:00 Noon Eastern Time; payments received after 12:00 Noon Eastern Time shall be credited to the Loan on the next Business Day. Payments which are by check shall not be credited to the Loan until such funds become immediately available to Payee, and, with respect to payments by check, such credit shall be provisional until the item is finally paid by the payor bank. To the extent permitted by law, after there shall have become due (by acceleration or otherwise) interest or any other amounts due from Maker hereunder or under any other Loan Document, such amounts shall bear interest for each day until paid (before and after judgment), payable on demand, at the Default Rate.

9.    <u>Late Charge</u>. In the event that any monthly installment of interest shall become overdue for a period in excess of ten days, a "late charge" in the amount of 4% of such overdue installment shall be paid by Maker to Payee, which "late charge" shall be payable on demand. This charge shall be in addition to, and not in lieu of, any other remedy Payee may have and is in addition to the imposition of Default Rate interest and any reasonable fees and charges of any agents or attorneys which Payee is entitled to employ on any default hereunder, whether authorized herein, or by law.

10.    <u>Default</u>. If an Event of Default shall occur and be continuing, Payee may, at its option and without notice (such notice being expressly waived), declare this Note immediately due and payable and may exercise the other rights and remedies provided it in the Mortgage and the other Loan Documents, as well as those it may have at law or in equity. Payee's rights, remedies and powers, as provided in this Note and the other Loan Documents, are cumulative and concurrent, and may be pursued singly, successively or together against Maker, the security described in the Loan Documents, and any other security given at any time to secure the payment hereof, all at the sole discretion of Payee. Additionally, Payee may resort to every other right or remedy available at law or in equity without first exhausting the rights and remedies contained herein, all in Payee's sole discretion. Failure of Payee, for any period of time or on more than one occasion, to exercise its option to accelerate the Maturity Date shall not constitute a waiver of the right to exercise the same at any time during the continued existence of an Event of Default or any subsequent Event of Default.

11.    <u>Jurisdiction</u>. Maker irrevocably (a) agrees that Payee may bring suit, action or other legal proceedings arising out of this Note, the Mortgage or any other Loan Document, or the transactions contemplated hereby or thereby, in the courts of the State of Montana or the courts of the United States for the District of Montana; (b) consents to the jurisdiction of each such court in any such suit, action or proceeding; (c) waives any objection which Maker may have to the laying of the venue of any such suit, action or proceeding in any of such courts; and (d) waives any right it may have to a jury trial in connection with any suit, action or proceeding arising out of this Note, the Mortgage or any other Loan Document or the transactions contemplated hereby or thereby.

12.    <u>Miscellaneous</u>. This Note evidences the Loan and all other amounts payable by Maker hereunder or under any other Loan Document. This Note is the "Note" referred to in the Mortgage. This Note is secured by and is entitled to the benefits of the Mortgage and the other Loan Documents.

-4-

Maker hereby expressly waives presentment, demand, notice (except for those notices required by the Loan Documents) and protest in connection with the delivery, acceptance, performance, default or enforcement of this Note, the Mortgage and the other Loan Documents, and an action for amounts due hereunder or thereunder shall immediately accrue.

All notices, requests, demands, directions and other communications (collectively, "notices") under the provisions hereof shall be in writing (including facsimile communication) unless otherwise expressly permitted hereunder, shall be sent as provided in the Mortgage and shall be effective when received if received on a Business Day, otherwise, on the next succeeding Business Day.

If this Note is placed in the hands of an attorney at law for collection by reason of default on the part of Maker, Maker hereby agrees to pay to Payee in addition to the sums stated above, the reasonable costs of collection, including a reasonable sum as attorneys' fees and costs.

This Note may not be amended, modified or supplemented orally.

If any term or provision of this Note or the application thereof to any Person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Note, or the application of such term or provision to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Note shall be valid and enforceable to the fullest extent permitted by law.

All agreements between Maker and Payee are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of maturity of the indebtedness evidenced hereby or otherwise, shall the amount paid or agreed to be paid to Payee for the use or the forbearance of the indebtedness evidenced hereby exceed the maximum permissible under applicable law. As used herein, the term "applicable law" shall mean the law in effect as of the date hereof, provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, then this Note shall be governed by such new law as of its effective date. In this regard, it is expressly agreed that it is the intent of Maker and Payee in the execution, delivery and acceptance of this Note to contract in strict compliance with the laws of the State of Montana from time to time in effect. If, under or from any circumstances whatsoever, fulfillment of any provision hereof or of any of the Loan Documents at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by applicable law, then the obligation to be fulfilled shall automatically be reduced to the limit of such validity, and if under or from any circumstances whatsoever Payee should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal balance evidenced hereby and not to the payment of interest. This provision shall control every other provision of all agreements among Maker and Payee.

This Note and each of the other Loan Documents has been negotiated and executed in the State of Montana and shall in all respects be governed, construed, applied and enforced in accordance with the internal laws of the State of Montana without regard to principles of conflicts of law.

The obligations of Maker under this Note shall be joint and several. Payee may proceed against any of the Maker parties individually or against two or more of the Maker parties in one action, without affecting the right of Payee to proceed against any other Maker party for amounts that are covered by this Note or any other Loan Document. Any inability of Payee to proceed against any Maker (whether caused by actions of a Maker or of Payee) will not affect Payee's right to proceed against any or all remaining Maker parties for all or part of the Note.

This obligation shall bind Maker and its successors and assigns, and the benefits hereof shall inure to Payee and its successors and assigns.

No direct or indirect manager, member, shareholder, partner, director, officer, trustee, employee, representative or beneficiary of Maker (or any shareholder, director, officer, trustee, employee, representative, beneficiary, manager, member, partner, principal, parent, subsidiary or other affiliate, whether disclosed or undisclosed, or direct or indirect, of a manager, member, partner or shareholder; all of which shall be referred to collectively as "Members of Maker") shall be personally liable for the payment of the indebtedness or the performance of any obligations evidenced by or created or arising under this Note or any of the other Loan Documents and any judgment or decree in any action brought to enforce such obligations of Maker shall not be brought against any Members of Maker. Notwithstanding the foregoing, nothing contained in this paragraph shall affect or limit the ability of Payee to enforce any of its rights or remedies with respect to any property encumbered by the Mortgage or by any of the other Loan Documents.

IN WITNESS WHEREOF, Maker has duly executed and delivered this Promissory Note as of the date and year first above written.


Yellowstone Mountain Club, LLC

By: _____
        Name:
        Title


Yellowstone Development, LLC

By: _____
        Name:
        Title:


Big Sky Ridge, LLC

By: _____
        Name:
        Title:

PREPARED BY, AND WHEN
RECORDED RETURN TO:

_____
_____
_____

_____

(above for recorder's use only)

## MORTGAGE AND SECURITY AGREEMENT

**THIS MORTGAGE AND SECURITY AGREEMENT** is made as of this ____ day of
_____, 2009, by and between Yellowstone Mountain Club, LLC, a Montana limited
liability company ("YMC"), Yellowstone Development, LLC, a Montana limited liability
company ("YD"), and Big Sky Ridge, LLC, a Montana limited liability company ("BSR";
together with YMC and YD, collectively, "Mortgagor"), and [YMC Liquidating Trust], a
_____ ("Mortgagee").

     **WITNESSETH**: Mortgagor hereby irrevocably mortgages to Mortgagee, its successors
and assigns, all of Mortgagor's right, title and interest in and to the following (collectively, the
"Premises"):

     A.    **REAL PROPERTY**: That certain real property located in Madison County,
Montana, more particularly described on Exhibit A attached hereto and made a part hereof,
together with all rights in and to lands lying in streets, alleys and roads adjoining the real property
and all buildings, fixtures, and improvements thereon and all water and ditch rights, rights of
way, tenements, hereditaments, privileges and appurtenances thereto, now owned or hereafter
acquired, however evidenced, used or enjoyed with said property; and

     B.    **PERSONAL PROPERTY**: All equipment, fixtures and personal property now
or hereafter attached to, placed in or upon or necessary or convenient to the use of said real
property or improvements thereon, or construction thereof, and owned by Mortgagor, including,
but not limited to, all machinery, plumbing, fittings, fixtures, apparatus, equipment or articles

1

used to supply heating, gas, electric, air conditioning, water, light, waste disposal, power, refrigeration, ventilation and fire protection, as well as all elevators, escalators, cranes, hoists, assists and the like, and all furnishings, draperies, floor coverings, screens, storm windows, blinds, awnings, shrubbery and plants, ranges, ovens, refrigerators, garbage disposals and compactors, supplies and maintenance and repair equipment, signs, artwork, construction equipment, golf equipment, ski equipment, golf carts and other vehicles used in connection with the golf course and/or ski trails, tractors, lawn mowers and other landscaping equipment, snowmaking equipment, aerators, sprinklers, and sprinkler and irrigation equipment, all golf course operating and maintenance equipment, as well as renewals, replacements, alterations, accessories, increases, parts, fittings, substitutes, and proceeds thereof, and all patents, trademarks, tradenames, copyrights and other intellectual property rights and privileges; all water and water rights, timber, crops, and mineral interests pertaining to the Premises; any contracts, including all construction related agreements, license agreements, service agreements, maintenance agreements, management agreements and other agreements relating to the development of the Premises; all proceeds (including premium refunds) of each policy of insurance; all deposits, bank accounts, financial assets, funds, instruments, investment property, notes or chattel paper; to the extent assignable, all community facilities districts or any similar public financing vehicles which related to the Premises and any reimbursement rights of Mortgagor relating thereto; to the extent assignable, any documents, contract rights, accounts, commitments, construction contracts, architectural agreements, and general intangibles; to the extent assignable, all permits, approvals (including, without limitation, approved preliminary and final subdivision plats), licenses, franchises, certificates and all other rights. privileges and entitlements (collectively, the "Personal Property"); and

      C.     **RENTS, LEASES AND PROFITS**: All rents, issues, royalties and profits now due or which may hereafter become due under or by virtue of any present and future lease, license, sublease, or agreement, written or verbal, for the use or occupancy of the Premises or any part thereof (collectively, the "Rents, Leases and Profits"); and

      D.     **JUDGMENTS AND AWARDS**: All awards and other compensation heretofore or hereafter to be made for any taking or damaging by eminent domain, either permanent or temporary, of all or any part of the Premises or any easement or appurtenances thereof; and

      E.     **BUILDING MATERIALS**: All materials intended for construction, reconstruction, alteration or repairs of improvements now or hereafter erected on the Premises, all of which materials shall be deemed to be included within the described Premises immediately upon the delivery thereof to the Premises;

      F.     **AFTER ACQUIRED PROPERTY**: All right, title and interest hereafter acquired in or to any of the property, real or personal, described above, hereby also releasing, relinquishing and waiving all exemptions in or to said property, vested or inchoate.

      **FOR THE PURPOSE OF SECURING**: (a) payment of that certain Promissory Note of even date herewith given by Mortgagor to Mortgagee in the principal sum of Seventy Million Dollars ($70,000,000) (as amended, restated, superseded, renewed, substituted, replaced or otherwise modified, the "Note"), with interest and other charges thereon, under which the final

payment is due on _____, 20____, unless extended according to the terms of the Note; (b) payment of all other sums, with interest thereon, becoming due or payable under the provisions hereof or the Note; and (c) performance of each agreement and covenant of Mortgagor contained herein and in the Note .

**WARRANTIES:** Mortgagor represents and warrants to the Mortgagee as follows:

Mortgagor is the lawful owner of and has good and marketable title to the Premises; Mortgagor has good right and lawful authority to grant, bargain, sell, convey, warrant, mortgage, assign and pledge the same as provided herein; and the Premises are free and clear of all mortgages, liens, pledges, charges and encumbrances, excepting only real estate taxes not yet due, the exceptions set forth on <u>Schedule 1</u> attached hereto and incorporated herein by this reference (collectively, "<u>Permitted Exceptions</u>"), and any Permitted Construction Financing. Mortgagor warrants and will defend the title to the Premises against all claims and demands whatsoever not expressly excepted herein.

The execution, delivery and performance of this Mortgage by Mortgagor will not violate, conflict with or constitute a breach of any of the terms or provisions of, or a default under (or an event that, with notice or the lapse of time, or both, would constitute a default), or require consent under, or result in the imposition of a lien on any properties of Mortgagor or an acceleration of indebtedness pursuant to: (i) Mortgagor's operating agreement or other organizational documents, or (ii) any bond, debenture, note, promissory note, security agreement, loan documents, mortgage, or other agreement or instrument to which Mortgagor are parties or by which Mortgagor or the Premises is or may be bound.

**TO PROTECT THE SECURITY OF THIS MORTGAGE, AND FOR OTHER PURPOSES, IT IS AGREED:**

1. **PAYMENT OF INDEBTEDNESS.** Mortgagor agrees to pay promptly when due the principal and interest on the Note secured hereby. Mortgagor shall cause this Mortgage and any related financing statements and all amendments, supplements and extensions thereto and substitutions therefor to be recorded, filed, re-recorded and refiled as necessary to carry out the purpose of this Mortgage and the Note, and shall pay all such recording, filing, re-recording and refiling fees, title insurance premiums and other charges.

2. **PAYMENT OF IMPOSITIONS.** Subject to Mortgagor's right to contest pursuant to Section 5 below, Mortgagor shall pay when due and before any penalty all taxes, assessments, water charges, sewer charges, and other fees, taxes, charges and assessments of every kind and nature whatsoever assessed or charged against or constituting a lien on the Premises or any interest therein, or the indebtedness secured hereby ("<u>Impositions</u>"); and will upon written demand furnish to Mortgagee proof of the payment of any such Impositions. In the event of a court decree or an enactment after the date hereof by any legislative authority of any law imposing upon a mortgagee under a mortgage the payment of the whole or any part of the Impositions herein required to be paid by Mortgagor; or changing in any way the laws relating to the taxation of debts secured by mortgages or a mortgagee's interest in property conveyed as security, so as to impose such Imposition on the Mortgagee, then, in any such event, Mortgagor

3

shall bear and pay the full amount of such Imposition, provided that if for any reason payment by Mortgagor of any such Imposition would be unlawful, or if the payment thereof would constitute usury or render the indebtedness secured hereby wholly or partially usurious, Mortgagee, at its option, may declare the whole sum secured by this Mortgage with interest thereon to be immediately due and payable, without prepayment premium, or Mortgagee at its option, may pay that amount or portion of such Imposition as renders the indebtedness secured hereby unlawful or usurious, in which event Mortgagor shall concurrently pay the remaining lawful and non-usurious portion or balance of said Imposition.

3.    **INSURANCE.**  Mortgagor shall obtain and maintain continuously in effect with respect to the Premises policies of insurance against such risks, in such amounts and with such companies reasonably satisfactory to Mortgagee, with a mortgagee clause reasonably satisfactory to Mortgagee.  Policies or certificates evidencing such insurance shall be deposited with Mortgagee promptly upon written demand therefor.  Each policy shall provide that the insurer will not cancel, refuse to renew, or materially modify the policy without giving at least thirty (30) days advance written notice to Mortgagee.

4.    **LIENS.**  Subject to Mortgagor's right to contest the same by appropriate proceedings pursuant to Section 5 below, Mortgagor shall keep the Premises free from statutory liens of every kind and shall pay promptly and discharge all encumbrances, charges and liens on the Premises whether inferior or superior to the lien of this Mortgage, other than Permitted Exceptions and any Permitted Construction Financing (hereinafter defined), which Permitted Exceptions and Permitted Construction Financings are expressly consented to by Mortgagee. Subject to Mortgagor's right to contest the same by appropriate proceedings pursuant to Section 5 below, Mortgagor shall keep and maintain the Premises free from the claims of all persons supplying labor or materials which will enter into the construction, repair, alteration or improvement of any and all buildings now on, now being erected, or which hereafter may be erected on the Premises subject to the terms of this Mortgage, the Permitted Exceptions and any Permitted Construction Financing.

5.    **CONTEST OF LIENS AND IMPOSITIONS.**  Mortgagor shall not be in default hereunder in respect to the payment of any taxes, payments in lieu of taxes, assessments, levies or other charges or Impositions which Mortgagor shall be required by any provision hereof to pay, nor in respect of any encumbrances or liens on the Premises which Mortgagor is required to discharge, so long as Mortgagor shall first notify the Mortgagee in writing prior to the due date thereof of Mortgagor's intention to contest such payment and shall thereafter, in good faith and with all possible promptness and due diligence, contest such payment; provided, however, that Mortgagor shall furnish to the Mortgagee, prior to commencing any such protest or other contest, cash or other security reasonably satisfactory to Mortgagee to indemnify Mortgagee against any loss or liability by reason of any such protest or other contest and to pay any such taxes, assessments, levies or other charges, together with interest and penalty thereon, if any, if said contest should fail.  Upon a final adjudication of any such protest or other contest, and in any event prior to the date on which the interest of Mortgagee in the Premises will forfeit by reason of the nonpayment of any such taxes, assessments, levies or other charges or Impositions, Mortgagor shall pay the amount thereof then due.  Mortgagee may, at its option, make such payment from the security deposited by Mortgagor.

6.    **MAINTENANCE**.  Mortgagor agrees to keep and maintain the Premises in good condition, repair and operating condition free from any waste or misuse, and to comply in all material respects with all requirements of applicable law, municipal ordinances, regulations, restrictions, and covenants affecting the Premises and their use.  Mortgagor further agrees that without the prior consent of Mortgagee, Mortgagor will not: (a) other than in connection with improvements contemplated by Permitted Construction Financing, remove, alter, or demolish any building thereon, or sever or remove any fixtures or appliances from said buildings; (b) other than in connection with improvements contemplated by Permitted Construction Financing, make any additions, alterations, or expansions to the Premises which will materially and negatively affect the market value of the Premises; or (c) abandon or vacate the Premises.  Mortgagee may enter upon and inspect the Premises at any reasonable time and effect, if Mortgagor fails to provide, after the applicable notice and cure period under Section 20 below, whatever repairs or replacements Mortgagee may reasonably require to maintain the Premises in good condition, the costs of which shall be deemed a demand obligation owing by Mortgagor to Mortgagee hereunder, together with interest thereon at the default rate specified in the Note (the "Default Rate") (provided Mortgagee shall have no duty to make inspections and shall not incur any liability or obligation for making or not making any inspections).

7.    **ENVIRONMENTAL MATTERS**.

(a)    As used in this paragraph, the following terms have the following definitions:

(1)    "Environmental Law" and "Environmental Laws" means federal, state and local laws, rules, ordinances and regulations applicable to the Premises or Mortgagor and relating to the environment and environmental conditions, as may be in effect from time to time (including the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §6901 et seq.), the Montana Hazardous Waste and Underground Storage Tank Act (MCA §75-10-401 et. seq.), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601 et seq.), and the Montana Comprehensive Environmental Cleanup and Responsibility Act (MCA §75-10-701 et seq)).

(2)    "Hazardous Materials" means (a) any "hazardous waste" or "hazardous substance" as defined by Environmental Laws; (b) asbestos; (c) oil, petroleum, and petroleum products; (d) any substance the presence of which on the Premises is regulated or prohibited by any Environmental Law; and (e) any other substance which pursuant to Environmental Laws requires special handling in, or as a result of, its collection, storage, use, generation, treatment, transportation, disturbance, or disposal.

(b)    During the term of this Mortgage, Mortgagor agrees:

(1)    to give notice to Mortgagee promptly upon acquiring knowledge of (i) the presence of any Hazardous Materials on the Premises in violation of any Environmental Law; (ii) any action by an governmental authority is instituted or threatened in writing under any Environmental Laws against Mortgagee or the Premises (including any written notice of inspection, abatement or noncompliance); and (iii) any written claim is made or threatened in

5

writing by any third party against Mortgagor or the Premises relating to any Hazardous Materials or a violation of any Environmental Laws;

(2)     to comply with all Environmental Laws, except to the extent Mortgagor is contesting the validity or applicability of such Environmental Laws in good faith and with all possible promptness and due diligence by appropriate legal proceedings; provided, however, that Mortgagor shall furnish to the Mortgagee, prior to commencing any such protest or other contest, cash or other security reasonably satisfactory to Mortgagee to indemnify Mortgagee against any loss or liability by reason of any such protest or other contest, together with interest and penalty thereon, if any, if said contest should fail. Upon a final adjudication of any contest of the validity or applicability of any Environmental Laws, and in any event prior to the date on which the interest of Mortgagee in the Premises will forfeit by reason of noncompliance with Environmental Laws, Mortgagor shall take all necessary actions to comply with such Environmental Laws. To the extent required by any Environmental Law, Mortgagor shall, at Mortgagor's own expense, take all necessary remedial action in connection with any storage, use, handling, disposal, releases or discharges of Hazardous Materials on, into, or from the Premises and all such remedial action shall be taken in material compliance with Environmental Laws. Except for the storage, use, handling and disposal of Hazardous Material performed in the ordinary course of business of constructing and operating the Premises and in strict compliance with all Environmental Laws, Mortgagors shall not (a) release, or permit, allow or suffer any release or threat of release of any Hazardous Material into or on the Premises or from the Premises onto or into any properties adjacent to the Premises in violation of Environmental Laws; or (b) store or permit, allow or suffer Hazardous Materials to be stored on or in the Premises in violation of Environmental Laws;

(3)     during the existence of an Event of Default, upon the request of Mortgagee, Mortgagor will provide at Mortgagor's sole expense an inspection or audit of the Premises from an engineering or consulting firm approved by Mortgagee, indicating the presence or absence of Hazardous Materials on or in the Premises. If Mortgagor fails to provide such inspection report or audit after reasonable notice, Mortgagee may order same, and Mortgagor grants to Mortgagee and its employees and agents access to the Premises for the purpose of inspecting and testing for the presence of Hazardous Materials in violation of Environmental Laws. The cost of such tests shall be a demand obligation owing by Mortgagor to Mortgagee hereunder, together with interest thereon at the Default Rate.

(4)     to indemnify, defend and hold harmless Mortgagee from all fines, judgments, penalties, costs, damages, suits, proceedings, liabilities, claims and actions of any kind (including, without limitation, all sums paid for settlement of claims, attorney fees, consultants, and expert fees) arising out of or in any way connected with any spills, releases, or discharges of Hazardous Materials on, into or from the Premises; and from all fines, judgments, penalties, costs, damages, suits, proceedings, liabilities, claims and actions of any kind arising out of Mortgagor's failure to provide all information, make all submissions and take all steps required under any Environmental Law. This indemnification includes, without limitation, any and all costs incurred because of any investigation of the Premises or any clean-up, removal, remediation, or restoration mandated by a federal, state, county or municipal agency or subdivision.

6

(c)     Mortgagor's obligations and liabilities under this Section 7 shall continue notwithstanding a foreclosure, deed in lieu of foreclosure or similar proceeding or transaction involving the Premises or any part thereof or other exercise by Mortgagee of its remedies under this Mortgage, at law or in equity, until the earlier to occur of (x) two (2) years after the satisfaction of the indebtedness secured by this Mortgage and (y) three (3) years after a transfer of the Premises due to a foreclosure or deed-in-lieu of foreclosure; provided, however, that any claims made or asserted prior to the expiration of such time periods shall survive beyond such time periods.

8.      **CONDEMNATION AND INSURANCE ACTIONS AND PROCEEDS.**

(a)     In the event of any casualty, damage or injury, by fire or otherwise, to the Premises or any part thereof (a "Casualty"), Mortgagor shall give prompt notice of such Casualty to Mortgagee and shall, subject to applicable law, rules and regulations of any governmental authority, promptly commence and diligently prosecute to completion the repair and restoration of the Premises as nearly as possible to the condition the Premises was in immediately prior to such Casualty (a "Casualty Restoration") and otherwise in accordance with this Section 8. Mortgagor shall pay all costs of such Casualty Restoration whether or not such costs are covered by insurance. Mortgagee may, but shall not be obligated to, make proof of loss if not made promptly by Mortgagor. In the event of a Casualty where the loss does not exceed $5,000,000 (the "Restoration Threshold"), Mortgagor may settle and adjust such claim provided that (a) no Event of Default has occurred and is continuing and (b) such adjustment is carried out in a commercially reasonable and timely manner. In the event of a Casualty where the loss exceeds the Restoration Threshold or if an Event of Default then exists, Mortgagor may settle and adjust such claim only with the consent of Mortgagee and Mortgagee shall have the opportunity to participate, at Mortgagor's cost, in any such adjustments.

(b)     Mortgagor shall give Mortgagee prompt notice of any actual or threatened taking by any governmental authority as the result, or in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain of all or any part of the Premises (a "Condemnation") and shall deliver to Mortgagee a copy of any and all papers served in connection with such proceedings. Provided no Event of Default has occurred and is continuing, in the event of a Condemnation where the amount of the taking does not exceed the Restoration Threshold, Mortgagor may settle and compromise such Condemnation provided that the same is effected in a commercially reasonable and timely manner. In the event of a Condemnation where the amount of the taking exceeds the Restoration Threshold or if an Event of Default then exists, Mortgagor may settle and compromise the Condemnation only with the consent of Mortgagee and Mortgagee shall have the opportunity to participate, at Mortgagor's cost, in any litigation and settlement discussions in respect thereof and Mortgagor shall from time to time deliver to Mortgagee all instruments requested by Mortgagee to permit such participation. If the Premises or any portion thereof is taken by any governmental authority, Mortgagor shall, subject to applicable law, rules and regulations of any governmental authority, promptly commence and diligently prosecute to completion the repair, rebuilding or restoration of the Premises (or portion thereof) to an integral unit, structure or property (as applicable) as substantially similar as possible, taking into account the extent of the Taking, to the condition the Premises (or portion

7

thereof) was in immediately prior to the Taking (a "Taking Restoration") and otherwise in accordance with this Section 8.

(c)     If a Casualty or Condemnation has occurred and the net amount of all insurance proceeds payable as a result of such Casualty (after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such insurance proceeds), or the net amount of the compensation paid by any governmental authority in connection with such Condemnation (after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, in collecting such compensation) (collectively, "Net Proceeds") shall be less than the Restoration Threshold, and provided no Event of Default shall have occurred and remain uncured, the Net Proceeds will be disbursed by Mortgagee to, or as directed by, Mortgagor. Promptly after receipt of the Net Proceeds, subject to applicable law, rules and regulations of any governmental authority, Mortgagor shall commence and complete with due diligence and in a good and workmanlike manner the Casualty Restoration or Condemnation Restoration, as applicable. If any Net Proceeds are received by Mortgagor from the insurer, governmental authority or otherwise and Mortgagor is entitled to the same pursuant to the terms of this Section 8 for Casualty Restoration or Condemnation Restoration, as applicable, such Net Proceeds shall, until completion of the Casualty Restoration or Condemnation Restoration, as applicable, be held in trust for Mortgagee and shall be segregated from other funds of Mortgagor to be used to pay for the cost of the Casualty Restoration or Condemnation Restoration in accordance with the terms hereof.

(d)     If a Casualty or Condemnation has occurred and the Net Proceeds are equal to or greater than the Restoration Threshold, Mortgagee shall make the Net Proceeds available for the Casualty Restoration or Condemnation Restoration, as applicable, provided that each of the following conditions are met:

(i)     no Event of Default shall have occurred and be continuing; and

(ii)     Mortgagor shall have demonstrated to the reasonable satisfaction of Mortgagee that the Casualty Restoration or Condemnation Restoration, as applicable, can be completed within nine (9) months (but no later than the maturity date under the Note or such earlier time as may be required by applicable law).

If the foregoing conditions are satisfied, the Net Proceeds shall be disbursed by Mortgagee to, or as directed by, Mortgagor from time to time during the course of the Casualty Restoration or Condemnation Restoration, as applicable.

(e)     All Net Proceeds not required to be made available for the applicable Casualty Restoration or Condemnation Restoration in accordance with the terms of this Section 8 may be retained and, if retained, shall be applied by Mortgagee toward the payment of the indebtedness secured by this Mortgage (without the requirement that any prepayment premium or penalty be made in connection therewith), whether or not then due and payable.

8

(f)     The terms and provisions of this Section 8 shall be subject in all respects to the terms and provisions of any Permitted Construction Financing and any condominium documents affecting the Premises.

9.      **INDEMNIFICATION.** Mortgagor agrees to indemnify, defend and save Mortgagee harmless from all costs and expenses (including reasonable attorney's fees and costs) incurred by reason of any action or proceeding before any court or administrative body in which Mortgagee may be or become a party by reason hereof, including but not limited to condemnation, bankruptcy, probate and administration proceedings, as well as any other proceeding similar to the foregoing wherein proof of claims is by law required to be filed or in which it becomes necessary to defend or uphold the terms of the lien created by this Mortgage, and all money paid or expended by Mortgagee in that regard, together with interest thereon from date of such payment at the Default Rate, shall be so much additional indebtedness secured hereby and shall be immediately and without notice due and payable by Mortgagor.

10.     **COSTS AND EXPENSES.** Except as otherwise expressly provided herein, Mortgagor agrees to pay without demand, all reasonable costs, fees and expenses of this Mortgage, including, without limitation, costs of search and evidence and insurance of title, advertising and recording expense, documentary taxes, reasonable attorney and paralegal fees as allowed by law, and all other sums expended hereunder or in connection herewith by Mortgagee with interest from the date of expenditure at the Default Rate. Any amounts disbursed by Mortgagee pursuant to this Section including, without limitation, reasonable attorneys' fees, whether or not the indebtedness as a result thereof shall exceed the face amount of the Note, shall be additional indebtedness of Mortgagor secured by this Mortgage.

11.     **BOOKS AND RECORDS.** Mortgagor shall maintain proper books and records and shall account for all transactions relating to the operation of the Premises, and shall permit Mortgagee to examine such books and records at any time upon reasonable notice; and shall furnish to Mortgagee an income statement and balance sheet upon reasonable request but no more than once in any 12 month period. All books and records shall be kept and maintained in accordance with generally accepted accounting principles, consistently applied. During the existence of an Event of Default, Mortgagee may cause an audit to be made of the respective books and records at Mortgagor's sole cost and expense.

12.     **PROTECTION OF SECURITY.** If an Event of Default exists, or if Mortgagee in its sole discretion deems it necessary to expend funds, appear in actions or take other action to protect the full security interest intended to be created by this instrument, then Mortgagee, without obligation to do so, without notice to or demand upon Mortgagor, and without releasing Mortgagor from any obligation hereof, may make such appearances, expend such funds and take such action as either may deem necessary to protect the security hereof, Mortgagee being authorized to enter upon the Premises for such purposes. Mortgagor will on demand reimburse Mortgagee for all amounts expended, including reasonable attorneys' fees, pursuant to this paragraph, together with interest thereon at the Default Rate.

13.     **ASSIGNMENT OF RENTS.** Mortgagor hereby assigns to Mortgagee all rents, issues, royalties and profits of the Premises, provided that Mortgagor shall have the right to

9

collect all such rents, issues, royalties and profits, but only as they become due and payable and so long as an Event of Default does not exist. If an Event of Default exists, Mortgagee shall have the right, with or without taking possession of the Premises, to collect the same. During the existence of such Event of Default, Mortgagee may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court (Mortgagor hereby consenting to the appointment of Mortgagee as such receiver), and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of the Premises or any part thereof, in its own name sue for or otherwise collect said rents, issues, royalties and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection including reasonable attorneys' fees, upon any indebtedness secured hereby. Nothing contained herein, nor the exercise of rights hereunder by Mortgagee, shall be construed or considered an affirmation of any tenancy, lease or option, nor an assumption of liability under nor subordination of the lien or charge of this Mortgage to, such tenancy, lease or option.

14.    **NON-WAIVER**. The entering upon and the taking possession of the Premises, the collection of rents, issues, royalties, profits, proceeds of insurance or condemnation awards or the application thereof to the indebtedness hereby secured shall not cure or waive any default or notice of default, invalidate any act done pursuant to such notice, nor extend or postpone the due date of any payment secured hereby.

15.    **APPLICATION OF PAYMENTS**. Except as otherwise required by law or as provided herein or in the Note, all payments made to Mortgagee and any amounts applied to the indebtedness secured hereby shall be applied to the various amounts secured hereby in any order Mortgagee may determine. In the event any portion of the Note is not, for any reason whatsoever, secured by this Mortgage, the full amount of all payments made on the Note shall first be applied to such unsecured portion of the Note until the same has been fully paid.

16.    **POWERS OF MORTGAGEE**. Without affecting the liability of any person, including Mortgagor, for the payment of any indebtedness secured hereby or the lien of this Mortgage on the remainder of the Premises for the full amount of any indebtedness unpaid, Mortgagee is empowered as follows: Mortgagee may from time to time, without notice and without regard to the consideration, if any, paid therefor, and notwithstanding the existence at that time of any inferior liens thereon: (a) release any person liable for the payment of any of the indebtedness; (b) extend the time or otherwise alter the terms of payment of any of the indebtedness; (c) alter, substitute or release any property securing the indebtedness; (d) accept any additional security or resort to any security in such order as Mortgagee may determine; (e) consent to the making of any map or plat of the Premises; (f) join in granting any easement or creating any restrictions thereon; (g) join in any subordination or other agreement affecting this Mortgage or the lien or charge thereof; or (h) release all or any part of the Premises.

Mortgagee shall not be required, prior to exercising its rights against any person or at any other time, by reason of any demand or otherwise, to commence proceedings against any person liable under this Mortgage or under any note or instrument secured hereby.

17.    **SECURITY AGREEMENT UNDER UNIFORM COMMERCIAL CODE**. This Mortgage shall constitute a security agreement as defined in the Uniform Commercial Code

(the "Code") and Mortgagor hereby grants to Mortgagee a security interest within the meaning of the Code in favor of Mortgagee on the Personal Property and Rents, Leases and Profits (the "Collateral") comprising the Premises. Mortgagor is and will be the lawful owner of the Collateral mentioned in any financing statement, subject to the lien hereof, Permitted Exceptions and any Permitted Construction Financing. Such Collateral shall be used by Mortgagor solely for business purposes and shall be installed upon the Premises for Mortgagor's own use or as the equipment and furnishings leased or furnished by Mortgagor. Neither this paragraph nor the filing of a financing statement shall in any way impair the intent that all of the equipment, personal property and fixtures included within the Collateral, at all times and for all purposes including Mortgagee's remedies upon default, shall be deemed a part of the realty. Mortgagor shall, upon request by Mortgagee, execute and deliver any financing statement or further documents deemed necessary by Mortgagee to perfect or continue the security interest created hereby.

18. **DUE ON SALE OR ENCUMBRANCE**. Except as otherwise set forth in this Mortgage (including, without limitation, Sections 27 and 28 hereof), if the Premises or any portion thereof is directly or indirectly sold, conveyed, transferred or further mortgaged or encumbered, without the prior written consent of Mortgagee, Mortgagee may, at Mortgagee's option, declare an immediate Event of Default hereunder and declare all indebtedness secured hereby immediately due and payable in full; provided, however, transfers of direct or indirect interests in Mortgagor shall be permitted from time to time so long as, after giving effect to any such transfers, CrossHarbor Capital Partners LLC controls (directly or indirectly) the day to day management and policies of the Mortgagor. Consent as to any one transaction shall not be deemed to be a waiver of the right to require consent to future or successive transactions.

19. **REPLACEMENT OF PERSONAL PROPERTY**. Notwithstanding any other provision hereof and without giving Mortgagee the right to accelerate the indebtedness secured hereby, Mortgagor may remove, dispose of, replace or substitute any items included within the terms of subparagraph (B) of the description of Personal Property hereby conveyed, but only upon the following terms and conditions: (a) the item or items must be inadequate, obsolete or worn out or unsuitable, undesirable or unnecessary for the operation of the Premises; (b) the removal, disposal, replacement or substitution must not adversely affect the value of the Premises; and (c) all amounts received or allowed upon the sale or other disposition of the item or items must be applied first against the cost of acquisition and installation of any replacement or substituted item.

20. **EVENTS OF DEFAULT**. The following shall each constitute an "Event of Default" under this Mortgage:

(a) Failure of Mortgagor to pay within five (5) days after the same is due any amount under the Note or any obligation requiring the payment of money hereunder (provided, however, the failure to pay the principal of, and accrued and unpaid interest on, the Note upon maturity (whether at the stated maturity date or earlier following acceleration) shall constitute an immediate Event of Default);

11

(b)      Mortgagor shall file a voluntary petition in bankruptcy proceeding, shall consent to voluntary or involuntary adjudication to bankruptcy or to reorganization, or shall be adjudged bankrupt or insolvent under any applicable law or laws, or admits, in writing to having become insolvent, or makes an assignment for the benefit of creditors, or shall apply for, or consents to, the appointment of a trustee or receiver for a substantial portion of its assets;

(c)      An involuntary bankruptcy proceeding shall be commenced against Mortgagor and continues without dismissal for sixty (60) days;

(d)      A trustee or receiver is appointed for Mortgagor or for a substantial portion of Mortgagor's assets and is not discharged within sixty (60) days after such appointment;

(e)      Default by Mortgagor under any terms, covenants, representations, warranties, and conditions of this Mortgage or the Note not involving the payment of money, that continues for more than thirty (30) days after notice to Mortgagor (provided, that if the Mortgagor has diligently commenced the cure of such default within such thirty (30) day period but the nature of the default is such that additional time is reasonably required for such cure, the cure period shall be extended for such additional time so long as Mortgagor diligently pursues such cure to completion during such additional time); and/or

(e)      Any representation or warranty made by Mortgagor to Mortgagee herein or in the Note proves to be untrue in any material respect when made;

then, in any such case, Mortgagee or its attorney, may, at its option, without further written notice to Mortgagor, declare the principal of and the accrued interest on the Note and all sums advanced hereunder, with interest, to be immediately due and payable, and thereupon the Note, including both principal and all interest accrued thereon, and all sums advanced hereunder and interest thereon, shall be and become immediately due and payable without presentment, demand or further notice of any kind.

21.      **MORTGAGEE'S REMEDIES.**  During the existence of an Event of Default entitling the holder of the Note to accelerate the maturity thereof, or in case the principal of the Note shall have become due and payable, whether by maturity or by acceleration, then and in every such case Mortgagee may:

(a)      Proceed to protect and enforce its rights by a suit or suits in equity or at law, either for the specific performance of any covenant or agreement contained herein or in the Note, or in aid of the execution of any power herein or therein granted, or for the foreclosure of this Mortgage, or for the enforcement of any other appropriate legal or equitable remedies. Mortgagee may be the purchaser at any foreclosure sale, and Mortgagee shall have the right to credit upon the amount of its bid at sale the amount payable to Mortgagee out of the net proceeds of the sale.

(b)     Pursuant to the power of sale hereby granted, sell the Premises in accordance with the laws of Montana. The Premises shall be sold either as a whole or in such parcels and in such order as designated by Mortgagee.

(c)     In any action to foreclose, appoint a receiver of the rents, issues and profits of the Premises as a matter of right and without notice, with power to collect the rents, issues and profits of the Premises due and coming due during the pendency of such action, without regard to the value of the Premises or the solvency of any person or persons liable for the payment of the Note involved in the action. Mortgagor, for itself and any subsequent owner or owners, hereby waives any and all defenses to the application for a receiver as above provided, and hereby specifically consents to such appointment without notice; but nothing herein contained is to be construed to deprive Mortgagee of any other right, remedy or privilege it may now have under the law to have a receiver appointed. The provision for the appointment of a receiver of the rents and profits is made an express condition upon which the loan evidenced by the Note is made.

(d)     Have, without limitation, all of the rights and remedies provided by the Code, including the right to proceed under the Code provisions governing default as to any personal property which may be included in the Premises separately from the real estate included herein, or to proceed as to all of the property included in the Premises in accordance with its rights and remedies in respect of said real estate. If Mortgagee shall elect to proceed separately as to such personal property, Mortgagor agrees to make such personal property available to Mortgagee at a place or places acceptable to Mortgagee, and if any notification of intended disposition of any of such personal property is required by law, such notification shall be deemed commercially reasonable and reasonably and properly given if given at least ten (10) days prior to such intended disposition and may be given by posting or advertisement in a newspaper accepted for legal publications, either separately or as part of a notice given to sell or foreclose the real property or may be given by private notice if such parties are known to Mortgagee.

22.     **SURRENDER OF POSSESSION AFTER SALE.** Mortgagor agrees to surrender possession of the Premises to the purchaser at foreclosure sale immediately following said sale, in the event such possession has not previously been delivered by Mortgagor.

23.     **TITLE EVIDENCE AND INSURANCE POLICIES.** Each title insurance policy, all other evidences of title and all insurance policies placed or deposited with Mortgagee (including proceeds from such policies) shall be deemed an incident to the title to the Premises and upon foreclosure shall pass to the purchaser and the same are hereby pledged as additional security for the payment of the indebtedness secured hereby.

24.     **EFFECT OF DISCONTINUANCE OF PROCEEDINGS.** Mortgagee shall have the unqualified right, after invoking any remedy permitted under this Mortgage, to discontinue the same, and in such event Mortgagor and Mortgagee shall be restored to their former positions with respect to the indebtedness secured hereby; and this Mortgage, the Premises and all rights, remedies and recourse of Mortgagee shall continue as if the same had not been invoked.

25.     **COSTS OF INVOKING REMEDIES.** Except as may be otherwise provided herein, Mortgagor agrees to pay Mortgagee the reasonable costs and expenses, including reasonable attorney and paralegal fees, incurred by Mortgagee: (a) in instituting, prosecuting or defending any court action in which Mortgagor does not prevail, if such action involves the interpretation hereof or performance hereunder by a party hereto or the breach of any provision hereof, including but not limited to an action to obtain possession of the Premises after foreclosure sale hereunder; and (b) in attempts, which fall short of instituting an action or commencing foreclosure, to secure performance hereof.

26.     **WAIVERS AND CUMULATIVE RIGHTS.** Waiver by Mortgagee of any default by Mortgagor, or acceptance of payment in default or partial payment, shall not constitute a waiver by Mortgagee of any continuing or subsequent default. Failure by Mortgagee to exercise any right, power, privilege or remedy which Mortgagee may have by reason of a default by Mortgagor shall not preclude the exercise of such right, power, privilege or remedy so long as such default remains uncured or if a subsequent default occurs. Each right, power, privilege and remedy herein conferred upon Mortgagee is cumulative and in addition to every other right, power, privilege and remedy available to Mortgagee at law or in equity, under the Code, or under any other agreement, and each and every right, power, privilege and remedy herein set forth or otherwise so existing may be exercised from time to time as often and in such order as may be deemed expedient by Mortgagee and such exercise shall not be a waiver of the right to exercise at any time thereafter any other right, power, privilege or remedy.

27.     **PERMITTED COLLATERAL RELEASE.** (a) Notwithstanding anything to the contrary contained herein (including, without limitation, Section 18 hereof), provided that no Event of Default has occurred and is continuing and the portion(s) of the Premises to be released has been legally subdivided in accordance with all applicable laws such that the portion(s) of the Premises to be released and the remaining real property portion of the Premises constitute separate parcels, Mortgagor shall be entitled to releases of Residential Units from the lien of this Mortgage at any time and from time to time upon the payment to Mortgagee of the Unit Release Payment for each Residential Unit to be released. Mortgagor shall provide Mortgagee with a request for a release at least three (3) business days prior to the scheduled closing of the sale of the applicable Residential Unit(s). Upon receipt of the Unit Release Payment for each Residential Unit to be released, Mortgagee shall provide Mortgagor with an acceptable instrument in recordable form to effectuate the absolute release of the applicable Residential Unit(s). Mortgagor shall pay to Mortgagee its reasonable costs and expenses, including reasonable attorneys' fees, reasonably incurred by Mortgagee in connection with any such release.

(b)     The outstanding principal balance under the Note shall be immediately and automatically reduced by $500,000 for each Residential Unit for which a Unit Release Payment has been made.

(c)     As used herein, the following terms have the following definitions:

"Residential Unit" means a single lot upon which no more than a single dwelling is permitted to be constructed under applicable law, a unit (including, without limitation, a density

14

unit) or a dwelling that comprises a portion of the Premises. Any further subdivision of any such Residential Unit after release of the same from the lien of this Mortgage in accordance with the terms hereof shall result in the immediate reimposition of the lien of this Mortgage upon the same.

"Unit Release Payment" means Five Hundred Thousand US Dollars ($500,000.00).

28.   **PERMITTED CONSTRUCTION FINANCING; PLATTING.**   (a) Notwithstanding anything to the contrary contained herein or in the Note, Mortgagor shall be entitled to incur Permitted Construction Financing at any time and from time to time during the term of this Mortgage. In the event Mortgagor incurs any Permitted Construction Financing, the indebtedness secured hereby and/or evidenced by the Note, the lien(s) of this Mortgage and any other documents securing the Note, the terms, covenants and conditions of the Note and Mortgage and all rights and interest of Mortgagee in and to the Premises shall be immediately and automatically subject, subordinate and inferior in all respects (including, without limitation, in payment and priority) to such Permitted Construction Financing, the lien(s) of any document or instrument evidencing or securing such Permitted Construction Financing (collectively, "Permitted Construction Financing Documents"), all advances thereunder without regard to the application of such proceeds, together with all interest and all other sums due under such Permitted Construction Financing, and all of the terms, covenants and conditions of the Permitted Construction Financing Documents (including any amendments, modifications, replacements, extensions and renewals thereof). By its acceptance of this Mortgage, Mortgagee acknowledges and agrees that no further document or instrument shall be necessary to evidence the foregoing subordination; provided, however, Mortgagee shall execute such documents and take any and all actions as are necessary to evidence of record the subordination of this Mortgage (including, without limitation, the indebtedness secured hereby and/or evidenced by the Note, the terms, covenants and conditions of the Note and Mortgage and all rights and interest of Mortgagee in and to the Premises) to such Permitted Construction Financing as reasonably requested by Mortgagor or the provider of such Permitted Construction Financing from time to time. As used in this Mortgage, the term "Permitted Construction Financing" means (i) vertical construction financing obtained in the ordinary course of business by Mortgagor for the development of up to one hundred (100) Residential Units in the aggregate at any time and from time to time, provided that any Residential Unit to which this paragraph applies shall continue to be counted toward the foregoing 100 Residential Unit aggregate maximum until Mortgagee has been paid the Unit Release Payment on account of such Residential Unit, and (ii) up to $25,000,000 in government sponsored infrastructure bonds obtained by Mortgagor at any time and from time to time on terms reasonably acceptable to Mortgagee in connection with horizontal infrastructure improvements at the Premises.

(b)   By its acceptance of this Mortgage, Mortgagee acknowledges and agrees that it shall promptly consent to, execute and deliver such subdivision plats, documents and other instruments necessary for the planning, subdivision and/or development of all or any part of the Premises (including, without limitation, such documents or other instruments necessary for filing with, or submission to, any governmental authority or agency in connection with the planning, subdivision and/or development of all or any part of the Premises).

29.  **INTEREST LIMITATIONS**. Notwithstanding any other provision of this Mortgage or the Note (referred to collectively as the "Loan Documents"), Mortgagor does not agree, and shall not be charged with, or obligated to pay, any amount which would render the Loan Documents usurious. It is the intention of Mortgagee to conform strictly to the applicable usury laws presently in force, and any agreement for taking, receiving, reserving or charging interest shall be held to be subject to reduction to the amount allowed under said usury laws, so that if from any circumstance any amount deemed interest under applicable law is in excess of the maximum permitted by law, such excess shall be canceled automatically, and if theretofore paid, shall be credited on the principal amount of the obligation secured hereby or, at Mortgagee's option, refunded to Mortgagor. All sums charged, paid or agreed to be paid under any of the Loan Documents for the use, forbearance, or detention of the indebtedness secured hereby which is in excess of the maximum permitted by law shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full stated term of the indebtedness until payment in full so that the rate or amount of interest does not exceed the applicable maximum lawful rate for so long as the indebtedness is outstanding. This provision shall control any provisions of the Loan Documents which are inconsistent with this paragraph.

30.  **FURTHER ASSURANCES**. Mortgagor agrees upon request by Mortgagee to execute and deliver such further security agreements, financing statements under the Code and other agreements as may be necessary or proper to carry out more effectively the purposes of this Mortgage or any property intended to be subjected hereto by the granting clause hereof.

31.  **RIGHT TO DEAL WITH SUCCESSORS**. If ownership of the Premises becomes vested in a person or persons other than Mortgagor, Mortgagee may continue to deal with Mortgagor without any obligation to deal with such successor until notified of such vesting. Upon such notification, Mortgagee may thereafter deal with such successor in place of Mortgagor without any obligation to thereafter deal with Mortgagor and without waiving any liability of Mortgagor hereunder or under the Note. Mortgagor shall give immediate written notice to Mortgagee of any change of ownership of the Premises but nothing in this paragraph shall constitute consent of Mortgagee to any such change or negate any provisions elsewhere in this Mortgage giving Mortgagee the right to declare the entire unpaid balance of the indebtedness secured hereby due and payable immediately on such vesting.

32.  **NO CLAIM AGAINST MORTGAGEE**. Nothing contained in this Mortgage shall constitute any consent or request by Mortgagee, express or implied, for the performance of any labor or services or for the furnishing of any materials or other property in respect of the Premises or any part thereof, nor as giving Mortgagor or any party in interest with Mortgagor any right, power or authority to contract for or permit the performance of any labor or services for the furnishing of any materials or other property in such fashion as would create any personal liability against Mortgagee in respect thereof or would permit the making of any claim that any lien based on the performance of such labor or services or the furnishing of any such materials or other property is prior to this Mortgage. Mortgagor will permit Mortgagee's authorized representatives to enter the Premises at all reasonable times for the purpose of inspecting the same; provided Mortgagee shall have no duty to make such inspections and shall not incur any liability or obligation for making or not making any such inspections.

16

33.    **GOVERNING LAW**.  This Mortgage and all rights and indebtedness secured hereby shall be governed by the laws of Montana.

34.    **SEVERABILITY**.  The unenforceability or invalidity of any provisions hereof shall not render any other provision or provisions herein contained unenforceable or invalid.

35.    **TIME**.  Time shall be of the essence of this Mortgage.

36.    **NOTICES**.  Any notices which any party hereto may desire or may be required to give to any other party shall be in writing and shall be deemed properly given if sent by U.S. certified or registered mail, return receipt requested, or by overnight delivery service or hand delivered to the parties at the addresses set forth below, or to such other places any party hereto may hereafter by notice in writing designate.

If to Mortgagor:

c/o Yellowstone Mountain Club, LLC

_____

_____

_____

Telecopy: _____

With a copy to:

_____

Telecopy: _____

If to Mortgagee:

_____

_____

Telecopy: _____

With a copy to:

_____

Telecopy: _____

37.    **WAIVER OF MARSHALING AND CERTAIN RIGHTS**.  To the extent that Mortgagor may lawfully do so, Mortgagor hereby expressly waives any right pertaining to the

marshaling of assets, the administration of estates of decedents, or other matters to defeat, reduce or affect (a) the right of Mortgagee to sell all or any part of the Premises for the collection of the Note (without any prior or different resort for collection) pursuant to its remedies hereunder during the existence of an Event of Default, or (b) the right of Mortgagee to the payment of the Note out of the proceeds of the sale of all or any part of the Premises following foreclosure in preference to every other person and claimant.

38.    **BINDING ON SUCCESSORS, HEADINGS, WORDS AND PHRASES.** This Mortgage shall apply to, inure to the benefit of, and bind all parties hereto, their permitted lessees, licensees, tenants, successors and assigns. The term "Mortgagee" shall include the owner and holder, including any pledgee, of the Note. Whenever the context requires or permits the masculine, feminine and neuter shall be freely interchangeable, the singular shall include the plural and the plural shall include the singular. The headings of the paragraphs are for convenience only and shall not be construed as limiting in any way the scope of the provisions hereof.

39.    **JOINT AND SEVERAL.**    The obligations of Mortgagor hereunder shall be joint and several among YMC, YD and BSR.

40.    **NON-RECOURSE.** The obligations of Mortgagor hereunder are subject to the limitations on recourse set forth in the last paragraph of Section 12 of the Note, and the provisions of the last paragraph of Section 12 of the Note are incorporated by reference herein.


[SIGNATURE PAGE FOLLOWS]

18

IN WITNESS WHEREOF, Mortgagor has executed this instrument the day and year first above written.

Yellowstone Mountain Club, LLC

By: _____
    Name:
    Title

Yellowstone Development, LLC

By: _____
    Name:
    Title:

Big Sky Ridge, LLC

By: _____
    Name:
    Title:

STATE OF _____          )
                                   :ss.
County of _____         )

    This instrument was acknowledged before me on _____ ____, 200___, by _____, _____ of Yellowstone Mountain Club, LLC.

_____

Notary Public for the State of _____

( S E A L )                       _____
                                            (Printed Name)
                                  Residing at:_____[city & state]
                                  My commission expires:_____

STATE OF _____          )
                                   :ss.
County of _____         )

    This instrument was acknowledged before me on _____ ____, 200___, by _____, _____ of Yellowstone Development, LLC.

_____

Notary Public for the State of _____

( S E A L )                       _____
                                            (Printed Name)
                                  Residing at:_____[city & state]
                                  My commission expires:_____

STATE OF _____          )
                                   :ss.
County of _____         )

    This instrument was acknowledged before me on _____ ____, 200___, by _____, _____ of Yellowstone Mountain Club, LLC.

_____

Notary Public for the State of _____

( S E A L )                       _____
                                            (Printed Name)
                                  Residing at:_____[city & state]
                                  My commission expires:_____

Exhibit A

LEGAL DESCRIPTION OF REAL PROPERTY

All real property interests owned by the Debtors in Madison County, Montana or Gallatin County, Montana that comprise or relate to the master-planned private resort community located on approximately 13,000 acres in Madison County, Montana and known as the Yellowstone Club, including, without limitation, the following:

PARCEL I

Township 7 South, Range 2 East, P.M.M., Madison County, Montana

Section 1:    All (fractional), EXCEPTING THEREFROM all that part lying within Yellowstone Mountain Club Subdivision, Phases 1 and 2, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 408, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all that part lying within all of The Amended Plat of Yellowstone Mountain Club Subdivision, Phases 1, 1A & 2, being the Amended Plat of Lots 6, 58-61, 63-66, 69, 70, 72, 73, 76-78, 127, 136-145, 150, 152, 155-157, 199, 255-257, 262, Tract 1, and Open Space "A", and deleted Lots 118, 153 & 154, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat Reference in Book 4 of Plats, Page 467, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all that part lying within all of Andesite Pointe Subdivision, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 470, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all that part lying within Rainbow Minor Subdivision No. 461, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 461, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all that part lying within Yellowstone Mountain Club Subdivision, Phase 3, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 499, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all of Plat of Slopeside Subdivision, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4, Page 536, records of Madison County, Montana)

Section 2:    All (fractional), EXCEPTING THEREFROM all that part lying within Yellowstone Mountain Club Subdivision, Phase 3, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 499, records of Madison County, Montana)

EXCEPTING THEREFROM Tract 1, of Corrected Certificate of Survey, recorded in Book 7 of Surveys, Page 1873-A, records of Madison County, Montana, located in Sections 2 and 3, Township 7 South, Range 2 East, P.M.M., Madison County, Montana, according to the official survey thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana.

Section 3:    All (fractional), EXCEPTING THEREFROM Tract 1, of Corrected Certificate of Survey, recorded in Book 7 of Surveys, Page 1873-A, records of Madison County, Montana, located in Sections 2 and 3, Township 7 South, Range 2 East, P.M.M., Madison County, Montana, according to the official survey thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana.

Section 4:    SE1/4

Section 9:    All

Section 10:   All

Section 11:   All

Section 12:   All, EXCEPTING THEREFROM all of Club Cabin Minor Subdivision No. 484, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 484, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all that part lying within Rainbow Minor Subdivision No. 461, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 461, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all of Warren Miller Minor Subdivision No. 447, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 447, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all that part lying within Yellowstone Mountain Club Subdivision, Phase 4, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 493, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all of the Yellowstone Mountain Club Subdivision, Phase 5, recorded in Book 4 of Plats, Page 449, records of Madison County, Montana, Amended Plat of Yellowstone Mountain Club Subdivision, Phase 5, recorded in Book 4 of Plats, Page 459, records

of Madison County, Montana, and Amended Plat of the Amended Plat of Yellowstone Mountain Club Subdivision, Phase 5, recorded in Book 4 of Plats, Page 459-A, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana.

FURTHER EXCEPTING THEREFROM all that part lying within all of The Amended Plat of Yellowstone Mountain Club Subdivision, Phases 1, 1A & 2, being the Amended Plat of Lots 6, 58-61, 63-66, 69, 70, 72, 73, 76-78, 127, 136-145, 150, 152, 155-157, 199, 255-257, 262, Tract 1, and Open Space "A", and deleted Lots 118, 153 & 154, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat Reference in Book 4 of Plats, Page 467, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all of Yellowstone Mountain Club Subdivision, Phase 6, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 492, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all of Yellowstone Mountain Club Subdivision, Phase 6A, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 501, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all of Plat of Slopeside Subdivision, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4, Page 536, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all of Tract 1, of Certificate of Survey, recorded in Book 7 of Surveys, Page 1962, records of Madison County, Montana, located in the W1/2 of Section 7, Township 7 South, Range 3 East, P.M.M., and the E1/2 of Section 12, Township 7 South, Range 2 East, P.M.M., Madison County, Montana, according to the official survey thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana.

Section 13:     All

Section 14:     All

Section 15:     All

Section 23:     All

Section 24:     All

Township 7 South, Range 3 East, P.M.M., Madison County, Montana

Section 7:      All (fractional), EXCEPTING THEREFROM all that part lying within Yellowstone Mountain Club Subdivision, Phase 4, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 493, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all that part lying within all of The Amended Plat of Yellowstone Mountain Club Subdivision, Phases 1, 1A & 2, being the Amended Plat of Lots 6, 58-61, 63-66, 69, 70, 72, 73, 76-78, 127, 136-145, 150, 152, 155-157, 199, 255-257, 262, Tract 1, and Open Space "A", and deleted Lots 118, 153 & 154, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat Reference in Book 4 of Plats, Page 467, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all of the Amended Plat of Lot 11, of Yellowstone Mountain Club Subdivision, Phases 1 and 2, being Lot 11 of Yellowstone Mountain Club Subdivision Phases 1 and 2 and Tract 1 of Certificate of Survey, recorded in Book 7 of Surveys, Page 1554, located in the SW1/4 of Section 5, the N1/2 of Section 7, and the NW1/4 of Section 8, and an unplatted tract of land located in the NW1/4 of Section 8, Township 7 South, Range 3 East, P.M.M., Madison County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 513-BA, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all of Plat of Slopeside Subdivision, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4, Page 536, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all of Tract 1, of Certificate of Survey, recorded in Book 7 of Surveys, Page 1962, records of Madison County, Montana, located in the W1/2 of Section 7, Township 7 South, Range 3 East, P.M.M., and the E1/2 of Section 12, Township 7 South, Range 2 East, P.M.M., Madison County, Montana, according to the official survey thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana.

FURTHER EXCEPTING THEREFROM all of Yellowstone Mountain Club Golf Course Subdivision Phase 1, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 560, records of Madison County, Montana)

Section 8:   All, EXCEPTING THEREFROM all of the Amended Plat of Lot 11, of Yellowstone Mountain Club Subdivision, Phases 1 and 2, being Lot 11 of Yellowstone Mountain Club Subdivision Phases 1 and 2 and Tract 1 of Certificate of Survey, recorded in Book 7 of Surveys, Page 1554, located in the SW1/4 of Section 5, the N1/2 of Section 7, and the NW1/4 of Section 8, and an unplatted tract of land located in the NW1/4 of Section 8, Township 7 South, Range 3 East, P.M.M., Madison County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 513-BA, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all that part lying within Yellowstone Mountain Club Subdivision, Phases 1 and 2, in Madison County, Montana, according to the official plat thereof on file and of

record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 408, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all that part lying within all of The Amended Plat of Yellowstone Mountain Club Subdivision, Phases 1, 1A & 2, being the Amended Plat of Lots 6, 58-61, 63-66, 69, 70, 72, 73, 76-78, 127, 136-145, 150, 152, 155-157, 199, 255-257, 262, Tract 1, and Open Space "A", and deleted Lots 118, 153 & 154, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat Reference in Book 4 of Plats, Page 467, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all that part lying within Certificate of Survey, recorded in Book 7 of Surveys, Page 1738, records of Madison County, Montana, located in Sections 8 and 17, Township 7 South, Range 3 East, P.M.M., Madison County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder, Madison County, Montana.

FURTHER EXCEPTING THEREFROM all of Yellowstone Mountain Club Golf Course Subdivision Phase 1, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 560, records of Madison County, Montana)

Section 17:     All, EXCEPTING THEREFROM all that part lying within Certificate of Survey, recorded in Book 7 of Surveys, Page 1738, records of Madison County, Montana, located in Sections 8 and 17, Township 7 South, Range 3 East, P.M.M., Madison County, Montana, according to the official survey thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana.

FURTHER EXCEPTING THEREFROM all of Yellowstone Mountain Club Golf Course Subdivision Phase 1, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 560, records of Madison County, Montana)

Section 18:     All (fractional), EXCEPTING THEREFROM Tract 1, of Certificate of Survey, recorded in Book 7 of Surveys, Page 1943, records of Madison County, Montana, located in the SE1/4 of Section 18, Township 7 South, Range 3 East, P.M.M., Madison County, Montana, according to the official survey thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana.

FURTHER EXCEPTING THEREFROM all of Yellowstone Mountain Club Golf Course Subdivision Phase 1, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 560, records of Madison County, Montana)

Section 19:     All (fractional)

Section 20: All, EXCEPTING THEREFROM NE 1/4 of Section 20, Township 7 South, Range 3 East, P.M.M., Madison County, Montana.

Township 6 South, Range 2 East, P.M.M., Madison County, Montana

Section 34: SE1/4; SE1/4NE1/4

PARCEL II

Open Space-1, Open Space-2, and all roadways as shown on the plat of Yellowstone Mountain Club Subdivision, Phase 6, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 492, records of Madison County, Montana)

PARCEL III

Lots 1 and 12, of Yellowstone Mountain Club Subdivision, Phases 1 and 2, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 408, records of Madison County, Montana)

PARCEL IV

Lots 408, 411, 413, 414, 416, 420, 426, 427, 435, 438, 439, 440, 441, 442, 446, 447, 451, 452, 453, 454, 455, 456, 458, 464, 473, O.S. 1, O.S. 3, O.S. 4, O.S. 6, O.S. 8, O.S. 9, O.S. 10, O.S. 11, O.S. 12, O.S. 13 and O.S. 14, of Yellowstone Mountain Club Subdivision, Phase 3A, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 517, records of Madison County, Montana)

PARCEL V

Open Space A-2, of Amended Plat of Lot 107 and Open Space A-1 of The Amended Plat of Yellowstone Mountain Club Subdivision, Phases 1, 1A and 2, and the Final Plat of Yellowstone Mountain Club Subdivision, Phases 1 and 2, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 482-BA, records of Madison County, Montana)

EXCEPTING THEREFROM that portion formerly described as Lot 6 of Yellowstone Mountain Club Subdivision, Phases 1 and 2, in Madison County, Montana. (Plat reference in Book 4 of Plats, Page 408, records of Madison County, Montana)

FURTHER EXCEPTING THEREFROM all of Amended Plat of Open Space A-2, of Yellowstone Mountain Club Subdivision, Phases 1 and 2, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 516, records of Madison County, Montana)

PARCEL VI

All roadways as shown and delineated on the recorded plat of Yellowstone Mountain Club Subdivision, Phases 1 and 2, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 408, records of Madison County, Montana)

EXCEPTING THEREFROM all of Amended Plat of Open Space A-2, of Yellowstone Mountain Club Subdivision, Phases 1 and 2, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and

Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 516, records of Madison County, Montana)

PARCEL VII

Lots 306, 330 and Open Space, of Yellowstone Mountain Club Subdivision, Phase 3, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 499, records of Madison County, Montana)

PARCEL VIII

Open Space 2A, Open Space 2B, Open Space 2C, Open Space 2D, Open Space 2E, Open Space 2F, Open Space 2G and Open Space 2H, of Amended Plat of Open Space A-2, of Yellowstone Mountain Club Subdivision, Phases 1 and 2, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 516, records of Madison County, Montana)

PARCEL IX

Tract 2 (Open Space Lot), of Yellowstone Mountain Club Subdivision, Phase 4, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 493, records of Madison County, Montana)

PARCEL X

Open Space 102A, of Plat of Overlook Subdivision, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 541, records of Madison County, Montana)

PARCEL XI

Unit No. 1, 301 and 309, of WM Lodge Condominiums, located on Tract 1 of Yellowstone Mountain Club Subdivision, Phase 4, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder, Madison County, Montana, in Book 4 of Plats, Page 493, records of Madison County, Montana. Together with an undivided 44.983% interest, 3.5012% interest and 4.6002% interest, respectively, in the general common elements as set out and established in the Restated and Revised Declaration for WM Lodge Condominiums, recorded February 23, 2005 in Book 526, Page 228, records of Madison County, Montana. Said unit is for commercial purposes only.

PARCEL XII

Open Space A-1, of Final Plat of Andesite Pointe, being the Amended Plat of Yellowstone Mountain Club Subdivision, Phases 1 and 2, Lot 200-A-B, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 470, records of Madison County, Montana)

PARCEL XIII

Open Space 1, of Plat of Slopeside Subdivision, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 536, records of Madison County, Montana)

PARCEL XIV

Tract 1, of Certificate of Survey, recorded in Book 7 of Surveys, Page 1943, records of Madison County, Montana, located in the SE1/4 of Section 18, Township 7 South, Range 3 East, P.M.M., Madison County, Montana, according to the official survey thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana.

PARCEL XV

Rights granted by a certain Utility and Access Easement and Agreement, recorded August 1, 2000 in Book 443, Page 235, records of Madison County, Montana, including, without limitation, a permanent easement in, through and across a strip of land for the installation, construction, operation and maintenance of a water line.

PARCEL XVI

All rights granted in that certain Yellowstone Mountain Club Restated and Revised Roadway Easement Declaration, recorded August 24, 2007, under Document No. 121627, records of Madison County, Montana (collectively, the "Declaration"), including, without limitation, a non-exclusive easement for ingress and egress to and from and over the Roads and Emergency Roads (as such terms are defined in the Declaration defined herein) by the use of Conventional Motor Vehicles.

PARCEL XVII

All roadways, private streets and drives, if any, as shown on the following Plats:

- Yellowstone Mountain Club Subdivision, Phases 1 and 2 (Book 4 of Plats, Page 408)
- Yellowstone Mountain Club Subdivision, Phase 1A (Book 4 of Plats, Page 432)
- Amended Plat of Yellowstone Mountain Club, Phases 1, 1A and 2 (Book 4 of Plats, Page 467)
- Andesite Pointe Subdivision (Book 4 of Plats, Page 470)
- Amended Plat of Yellowstone Mountain Club Subdivision (Book 4 of Plats, Page 482-BA)
- Club Cabin Minor Subdivision No. 484 (Book 4 of Plats, Page 484)
- Yellowstone Mountain Club Subdivision, Phase 5 (Book 4 of Plats, Page 449)
- Amended Plat of Yellowstone Mountain Club Subdivision, Phase 5 (Book 4 of Plats, Page 459)
- Amended Plat of the Amended Plat of Yellowstone Mountain Club Subdivision, Phase 5 (Book 4 of Plats, Page 459-A)
- Yellowstone Mountain Club Subdivision, Phase 6 (Book 4 of Plats, Page 492)
- Yellowstone Mountain Club Subdivision, Phase 4 (Book 4 of Plats, Page 493)
- Yellowstone Mountain Club Subdivision, Phase 3 (Book 4 of Plats, Page 499)
- Amended Plat of Yellowstone Mountain Club Subdivision (Book 4 of Plats, Page 516-BA)
- Yellowstone Mountain Club Subdivision, Phase 3A (Book 4 of Plats, Page 517)
- Slopeside Subdivision (Book 4 of Plats, Page 536)
- Sunrise Ridge Phase 1 (Book 4 of Plats, Page 527)
- Yellowstone Mountain Club Golf Course Subdivision Phase 1 (Book 4 of Plats, Page 560)

PARCEL XVIII

All rights set forth in that certain Restated and Revised Declaration of Protective Covenants, Conditions and Restrictions for The Yellowstone Mountain Club Property,

recorded November 13, 2002, in Book 476, Page 252, records of Madison County, Montana.

## PARCEL XIX

Lots 701, 702, 703, 704, 705, 706, 707, 708, 709, 710, 711, Open Space 701A, Open Space 701B, Open Space 701C, Open Space 703, Open Space 704, Open Space 705 and Open Space 706, of Plat of Yellowstone Mountain Club Golf Course Subdivision Phase 1, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 560, records of Madison County, Montana)

## PARCEL XX

Tract 1, of Certificate of Survey, recorded in Book 7 of Surveys, Page 1962, records of Madison County, Montana, located in the W1/2 of Section 7, Township 7 South, Range 3 East, P.M.M., and the E1/2 of Section 12, Township 7 South, Range 2 East, P.M.M., Madison County, Montana, according to the official survey thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana.

## PARCEL XXI

R/W Open Space, of Final Plat of Sunrise Ridge Phase 1, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 527, records of Madison County, Montana)

## PARCEL XXII

Open Space 2A, Open Space 5A and Open Space 7A, of the Amended Plat of Open Spaces 2, 5, 7 & 15, of Yellowstone Mountain Club Subdivision, Phase 3A, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 569-BA)

## PARCEL XXIII

Open Space 15B, of Amended Plat of Lot 410, of Yellowstone Mountain Club Subdivision, Phase 3A, and Open Space 15A, of the Amended Plat of Open Space 2, 5, 7 & 15, of Yellowstone Mountain Club Subdivision, Phase 3A, in Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana. (Plat reference in Book 4 of Plats, Page 570-A)

## PARCEL XXIV

All rights contained in the Non-Exclusive Easement for Ingress, Egress and Utilities, recorded September 2, 1999, in Book 433, Page 495, records of Madison County, Montana, including, without limitation, to a non-exclusive easement for ingress, egress and utilities.

First Amendment to Non-Exclusive Easement for Ingress, Egress and Utilities, recorded October 20, 2000, in Book 445, Page 808, records of Madison County, Montana.

Assignment of Easements, recorded June 9, 2000, in Book 441, Page 786, records of Madison County, Montana.

PARCEL XXV

All rights contained in that certain Yellowstone Mountain Club Recreational Easement Declaration (Sections 8 and 17), recorded March 11, 2005, in Book 527, Page 620, records of Madison County, Montana.

PARCEL XXVI

Easement as contained in Easement and Maintenance Agreement, recorded August 5, 2002, in Book 471, Page 577, records of Madison County, Montana.

PARCEL XXVII

All rights contained in that certain Ski Run Easement, recorded December 6, 2007, under Document No. 123417, records of Madison County, Montana.

PARCEL XXVIII

Easement as contained in Mutual Emergency Access Easement, recorded January 11, 2006, in Book 550, Page 874, Document No. 111131, records of Madison County, Montana.

PARCEL XXIX

Easement for ingress and egress by Exclusive Easement for Ingress, Egress and Utilities, recorded August 9, 1999, in Film 201, Page 2852, records of Gallatin County, Montana and Assignment of said Easement, recorded June 2, 2000, Document No. 2013672, records of Gallatin County, Montana.

PARCEL XXX

Easement for ingress and egress by Non-Exclusive Access and Utility Easement, recorded October 14, 1997, in Film 177, Page 3905, records of Gallatin County, Montana.

PARCEL XXXI

Easement for ingress and egress by Non-Exclusive Access and Utility Easements, recorded October 16, 1997, in Film 177, Page 4496, records of Gallatin County, Montana.


*[Note:  This Exhibit may require further revision to reflect the final Plan including, without limitation, treatment of Prim Claims and Lone View transaction.]*

Schedule 1

PERMITTED EXCEPTIONS

1.    Statement of Interest, recorded June 13, 1991 in Book 354, Page 165, records of
      Madison County, Montana.

          Termination of Certain National Forest Trail Easements Described in
          Statement of Interest, recorded September 14, 2000 in Book 444, Page
          763, records of Madison County, Montana.

          Notice of Easements for Trails and Trailhead, executed by the United
          States of America, recorded April 1, 2003 in Book 483, Page 722, records
          of Madison County, Montana.

2.    Deed, recorded July 7, 1989 in Book 339, Page 702, records of Madison County,
      Montana, Terms of Partial Waiver of Surface Use Rights, recorded December 6,
      1991 in Book 358, Page 107, records of Madison County, Montana, and
      Correction Deed, rerecorded July 31, 1992 in Book 363, Page 442, records of
      Madison County, Montana.

3.    Trail Easement (Non-motorized Public Use Only), recorded February 1, 1999 in
      Book 427, Page 410, records of Madison County, Montana.

4.    Non-Exclusive Easements for Ingress, Egress and Utilities, recorded August 4,
      1999 in Book 432, Page 540, records of Madison County, Montana.

          Assignment of Easements, recorded June 9, 2000 in Book 441, Page 786,
          records of Madison County, Montana.

5.    Patent, recorded February 1, 2000 in Book 437, Page 782, records of Madison
      County, Montana.

6.    Patent, recorded February 1, 2000 in Book 437, Page 785, records of Madison
      County, Montana.

7.    Conservation Easement, recorded February 1, 2000 in Book 437, Page 793,
      records of Madison County, Montana.

          Assignment of Easements, recorded June 9, 2000 in Book 441, Page 786,
          records of Madison County, Montana.

          Amendment to Conservation Easement, recorded November 5, 2007,
          under Document No. 122855, records of Madison County, Montana.

8.    Non-Exclusive Easement for Emergency Access, recorded July 25, 2000 in Book
      442, Page 953, records of Madison County, Montana.

          Assignment of Non-Exclusive Easements (Madison County, Montana) to
          South Fork Montana, LLC, a Colorado limited liability company, recorded
          June 15, 2005, in Book 534, Page 846, records of Madison County,
          Montana.

9.   Utility and Access Easement and Agreement, recorded August 1, 2000 in Book 443, Page 235, records of Madison County, Montana.

10.  Drainfield Easement Conditions, recorded March 31, 2003 in Book 483, Page 530, records of Madison County, Montana.

11.  Access Easement Conditions, recorded March 31, 2003 in Book 483, Page 536, records of Madison County, Montana.

12.  Dedication of Septic System Easement, recorded May 10, 2004 in Book 507, Page 71, records of Madison County, Montana.

13.  Driveway Easement, executed by Yellowstone Mountain Club, LLC, a Montana limited liability company, to Richard W. Alvord and Nancy L. Alvord, recorded September 21, 2005, in Book 542, Page 446, records of Madison County, Montana.

14.  Mutual Emergency Access Easement, executed by and between Big Sky Ridge, LLC, a Montana limited liability company, Yellowstone Mountain Club, LLC, a Montana limited liability company, Big Sky Resort, LLC, a Michigan limited liability company, and Boyne USA, Inc. (successor by merger to Big Sky of Montana, Inc.) a Michigan corporation, (Big Sky Resort, LLC and Boyne USA, Inc.), recorded January 11, 2006, in Book 550, Page 874, under Document No. 111131, records of Madison County, Montana.

15.  Declaration of Well Control Zone, recorded October 4, 2006, under Document No. 116252, records of Madison County, Montana.

16.  Easements for roadways and access as set out on the recorded plats of Rainbow Subdivision No. 461, recorded in Book 4 of Plats, Page 461, Certificate of Survey, recorded in Book 7 of Surveys, Page 1643-ME, Club Cabin Minor Subdivision 484, recorded in Book 4 of Plats, Page 484, Warren Miller Minor Subdivision No. 447, recorded in Book 4 of Plats, Page 447, Yellowstone Mountain Club Subdivision, Phase 4, recorded in Book 4 of Plats, Page 493, Yellowstone Mountain Club Subdivision, Phase 5, recorded in Book 4 of Plats, Page 449, Amended Plat of Yellowstone Mountain Club Subdivision, Phase 5, recorded in Book 4, Page 459, Amended Plat of the Amended Plat of Yellowstone Mountain Subdivision, Phase 5, recorded in Book 4 of Plats, Page 459-A, and Yellowstone Mountain Club Subdivision, Phase 6, in Book 4 of Plats, Page 492, records of Madison County, Montana.

17.  Recorded plat of Yellowstone Mountain Club Subdivision, Phases 1 & 2, recorded in Book 4 of Plats, Page 408, Amended Plat of Yellowstone Mountain Club Subdivision, Phases 1 and 2, recorded in Book 4 of Plats, Page 448-BA, Amended Plat of Yellowstone Mountain Club Subdivision, Phases 1 & 2, Lot 200A, recorded in Book 4 of Plats, Page 457, Yellowstone Mountain Club

Subdivision, Phase 4, recorded in Book 4 of Plats, Page 493, Amended Plat of Yellowstone Mountain Club Subdivision, Phases 1, 1A, and 2, recorded in Book 4 of Plats, Page 467, Andesite Pointe Subdivision, in Book 4 of Plats, Page 470, Amended Plat of Lot 107, and Open Space A-1, of The Amended Plat of Yellowstone Mountain Club Subdivision Phases 1, 1A, and 2, and the Final Plat of Yellowstone Mountain Club Subdivision, Phase 1 and 2, recorded in Book 4 of Plats, Page 482-BA, Amended Plat of Yellowstone Mountain Club Subdivision, in Book 4 of Plats, Page 483-BA, Yellowstone Mountain Club Subdivision, Phase 5, recorded in Book 4 of Plats, Page 449, Amended Yellowstone Mountain Club Subdivision, Phase 5, recorded in Book 4 of Plats, Page 459, Amended Plat of the Amended Plat of Yellowstone Mountain Club Subdivision, Phase 5, recorded in Book 4 of Plats, Page 459-A, Yellowstone Mountain Club Subdivision, Phase 3, in Book 4 of Plats, Page 499, Amended Plat of Yellowstone Mountain Club in Book 4 of Plats, Page 516, Yellowstone Mountain Club Subdivision, Phase 3A, in Book 4 of Plats, Page 517, Final Plat of Sunrise Ridge Phase 1, in Book 4 of Plats, Page 527, Slopeside Subdivision, in Book 4 of Plats, Page 536, Overlook Subdivision, in Book 4 of Plats, Page 541, Certificate of Survey, recorded in Book 7 of Surveys, Page 1943, Certificate of Survey, recorded in Book 7 of Surveys, Page 1962, Yellowstone Mountain Club Golf Course Subdivision Phase 1, in Book 4 of Plats, Page 560, Amended Plat of Yellowstone Mountain Club Subdivision, Phase 3A, in Book 4 of Plats, Page 569-BA, and Amended Plat of Yellowstone Mountain Club Subdivision, Phase 3A, in Book 4 of Plats, Page 570, records of Madison County, Montana.

18. Subdivision Improvements Agreement, recorded August 23, 2004 under File No. 107 and Document No. 100890, records of Madison County, Montana.

> Partial Release of Letter of Credit, filed January 7, 2008, under File No. 107-A, Document No. 123928, records of Madison County, Montana.

19. Subdivision Improvements Agreement, recorded December 27, 2004, under File No. 107, and Document No. 103363, records of Madison County, Montana.

> Replacement Letter of Credit, filed November 23, 2005, under File No. 107-A, Document No. 110349, records of Madison County, Montana.

20. Restated and Revised Declaration of Protective Covenants, Conditions and Restrictions for The Yellowstone Club Property, recorded November 13, 2002 in Book 476, Page 252, records of Madison County, Montana.

> Third Supplemental Declaration of Protective Covenants, Conditions, and Restrictions for The Yellowstone Club Property, recorded October 24, 2002 in Book 475, Page 147, records of Madison County, Montana.

> Fourth Supplemental Declaration of Protective Covenants, Conditions, and Restrictions for The Yellowstone Club Property, recorded March 27, 2003 in Book 483, Page 353, records of Madison County, Montana.

Fifth Supplemental Declaration of Protective Covenants, Conditions, and Restrictions for The Yellowstone Club Property, recorded November 13, 2003 in Book 497, Page 300, records of Madison County, Montana.

Sixth Supplemental Declaration of Protective Covenants, Conditions, and Restrictions for The Yellowstone Club Property, recorded May 13, 2004 in Book 507, Page 268, records of Madison County, Montana.

Seventh Supplemental Declaration of Protective Covenants, Conditions, and Restrictions for The Yellowstone Club Property, recorded August 26, 2004 in Book 515, Page 133, records of Madison County, Montana.

Eighth Supplemental Declaration of Protective Covenants, Conditions, and Restrictions for The Yellowstone Club Property, recorded August 24, 2004 in Book 514, Page 982, records of Madison County, Montana.

Ninth Supplemental Declaration of Protective Covenants, Conditions, and Restrictions for The Yellowstone Club Property, recorded December 28, 2004 in Book 523, Page 7, records of Madison County, Montana.

Tenth Supplemental Declaration of Protective Covenants, Conditions, and Restrictions for The Yellowstone Club Property, recorded March 11, 2005 in Book 527, Page 637, records of Madison County, Montana.

Eleventh Supplemental Declaration of Protective Covenants, Conditions and Restrictions for The Yellowstone Club Property, recorded April 20, 2005 in Book 530, Page 449, records of Madison County, Montana.

Twelfth Supplemental Declaration of Protective Covenants, Conditions and Restrictions for The Yellowstone Club Property (Phase 3A), recorded January 11, 2006 in Book 550, Page 883, Document No. 111132, records of Madison County, Montana.

Thirteenth Supplemental Declaration of Protective Covenants, Conditions and Restrictions for The Yellowstone Club Property, recorded November 16, 2006, under Document No. 117024, records of Madison County, Montana

Fourteenth Supplemental Declaration of Protective Covenants, Conditions, and Restrictions for The Yellowstone Club Property, recorded August 24, 2007, under Document No. 121629, records of Madison County, Montana.

Fifteenth Supplemental Declaration of Protective Covenants, Conditions, and Restrictions for The Yellowstone Club Property, recorded March 11, 2008, under Document No. 124976, records of Madison County, Montana.

21. Yellowstone Mountain Club Restated and Revised Roadway Easement Declaration, recorded August 24, 2007, under Document No. 121627, records of Madison County, Montana.

22. Certificate of Subdivision Plat Approval, recorded December 27, 2004, in Book 522, Page 829, records of Madison County, Montana. (Affects

23. Yellowstone Mountain Club Utility Easement Declaration (Ranches Extension), recorded March 11, 2005 in Book 527, Page 615, records of Madison County, Montana.

24.    Subdivision Improvements Agreement, filed August 19, 2002, under File No. 107, Document No. 87865, filed February 10, 2003, under File No. 107, Document No. 90673, and filed May 25, 2004, under File No. 107, Document No. 98885, records of Madison County, Montana.

        First Amendment to Subdivision Improvements Agreement, recorded August 23, 2004, under File No. 107, Document No. 100897, records of Madison County, Montana.

25.    Warranty Deed, recorded April 3, 2002 in Book 466, Page 753, records of Madison County, Montana.

26.    Certificate of Subdivision Plat Approval, recorded January 23, 2002, in Book 463, Page 568, under Document No. 84796, records of Madison County, Montana.

27.    Certificate of Subdivision Plat Approval, recorded January 11, 2006 in Book 550, Page 851, records of Madison County, Montana.

28.    Certificate of Subdivision Plat Approval, recorded May 25, 2004 in Book 508, Page 146, records of Madison County, Montana.

29.    Restated and Revised Declaration for WM Lodge Condominiums, recorded February 23, 2005 in Book 526, Page 228, records of Madison County, Montana, but deleting from the hereinabove declaration any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

30.    Bylaws of WM Lodge Condominiums Owners Association, Inc., recorded February 11, 2008, under Document No. 124489, records of Madison County, Montana, , but deleting from the hereinabove declaration any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

31.    Subdivision Improvements Agreement, recorded December 22, 2006, Document No. 117632, records of Madison County, Montana.

32.    Certificate of Subdivision Plat Approval, recorded December 22, 2006, Document No. 117627, records of Madison County, Montana.

33.    Certificate of Subdivision Plat Approval, recorded December 22, 2006, Document No. 117628, records of Madison County, Montana.

34.    Easement and Maintenance Agreement, executed by and between Gregpenn Properties, LLC and Yellowstone Development, LLC and Yellowstone Mountain Club, LLC, recorded August 5, 2002 in Book 471, Page 577, records of Madison County, Montana.

35.  Certificate of Subdivision Plat Approval, recorded October 20, 2003 in Book 496, Page 114, Document No. 95067, records of Madison County, Montana.

36.  Ski Access Easement Declaration for Andesite Pointe Lots, recorded June 9, 2006, under Document No. 113729, records of Madison County, Montana.

37.  Subdivision Improvements Agreement (Y.C. Slopeside Condominiums), recorded November 15, 2006, under Document No. 117003, records of Madison County, Montana.

>    Partial Release of Letter of Credit, filed January 7, 2008, under File No. 107-A, Document No. 123930, records of Madison County, Montana.

38.  Certificate of Subdivision Plat Approval, recorded November 15, 2006, under Document No. 116996, records of Madison County, Montana.

39.  Unrecorded Lease, dated October 18, 2006, executed by and between The Yellowstone Mountain Club, LLC and Yellowstone Development, LLC, as Lessors, and GTP Acquisition Partners II, LLC, a Delaware limited liability company, as Lessee, as disclosed by Form of Memorandum of Lease, recorded April 18, 2007, under Document No. 119535, records of Madison County, Montana.

Assignment and Assumption of Ground Lease, dated May 25, 2007, executed by GTP Acquisition Partners II, LLC, a Delaware limited liability company, as Assignor, and Global Tower Sites I, LLC, a Delaware limited liability company, as Assignee, recorded June 11, 2007, under Document No. 120425, records of Madison County, Montana.

>    The interest above is also subject to the following:
>
>    MORTGAGE, FIXTURE FILING, SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS to secure an indebtedness and any other amounts and/or obligations secured thereby:
>
>    Dated: February 29, 2008
>
>    Mortgagor: GTP Towers I, LLC, a Delaware limited liability company
>
>    Mortgagee: The Bank of New York, as Indenture Trustee
>
>    Amount: See Document
>
>    Recorded: April 28, 2008, Document No. 125715, records of Madison County, Montana.

40.  Yellowstone Mountain Club Golf Course Subdivision Utility Easement Declaration (Phase 1, Madison County), recorded August 24, 2007, under Document No. 121628, records of Madison County, Montana. (Affects Parcel XIX)

41.  Subdivision Improvements Agreement, filed August 24, 2007, under Document No. 121631, records of Madison County, Montana.

Partial Release of Letter of Credit, filed January 7, 2008, under File No. 107-A, Document No. 123929, records of Madison County, Montana.

42. Certificate of Subdivision Plat Approval, recorded August 24, 2007, Document No. 121625, records of Madison County, Montana.

43. Consent Decree, by and between United States of America, as Plaintiff, and Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Blixseth Group, Inc., and The Ranches at Yellowstone Club, LLC, filed January 14, 2005, in Book 524, Page 1, under Document No. 103674, records of Madison County, Montana.

44. TRUST INDENTURE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FINANCING STATEMENT to secure an indebtedness and any other amounts and/or obligations secured thereby:

Dated: July 31, 2007

Grantor: Yellowstone Development, LLC, a Montana limited liability company, and Yellowstone Mountain Club, LLC, a Montana limited liability company

Trustee: Security Title Company

Beneficiary: American Bank

Amount: See Document

Recorded: July 31, 2007, Document No. 121232, records of Madison County, Montana.

45. Ski Run Easement, dated October 30, 2007, executed by Big Sky Ridge, LLC, to Big Sky Resort, LLC, recorded December 6, 2007, under Document No. 123418, records of Madison County, Montana.

46. Maintenance and Ski Run Easement, dated October 18, 2007, executed by and between Big Sky Ridge, LLC, Yellowstone Development, LLC, Yellowstone Mountain Club, LLC and Big Sky Resort, LLC, recorded December 6, 2007, under Document No. 123419, records of Madison County, Montana.

47. Grant of Easement, executed by Yellowstone Development, LLC and Yellowstone Mountain Club, LLC, to Scott and Sabra Libertore, recorded September 29, 2008, under Document No. 128238, records of Madison County, Montana.

48. Roadway Easement, executed by Yellowstone Mountain Club, LLC, and Yellowstone Development, LLC to Joy Craft Malcolm, as Trustee of the 2000 Joy Craft Malcolm Trust U/D/T dated July 12, 2000, recorded November 25, 2008, under Document No. 129140, records of Madison County, Montana.

49. Bargain and Sale Deed, recorded December 6, 2007, under Document No. 123410, records of Madison County, Montana.

50.   Abstract of Memorandum of Ground Lease, dated October 30, 2007, executed by and between Yellowstone Mountain Club, LLC, a Montana limited liability company, and Yellowstone Development, LLC, a Montana limited liability company, as Lessors, and Big Sky Resort, LLC, a Michigan limited liability company, Boyne USA, Inc., a Michigan corporation, as Lessees, recorded December 6, 2007, under Document No. 123420, records of Madison County, Montana.

51.   Ski Run Easement, recorded December 6, 2007, under Document No. 123417, records of Madison County, Montana.

52.   Non-Exclusive Easement for Ingress, Egress and Utilities, recorded September 2, 1999, in Book 433, Page 495, records of Madison County, Montana.

      Assignment of Easements, recorded June 9, 2000, in Book 441, Page 786, records of Madison County, Montana.

53.   Ground Lease, executed by and between Big Sky Ridge, LLC and Spanish Peaks Holdings, LLC, both Montana limited liability companies, as Lessors, and Big Sky Resort, LLC, a Montana limited liability company and Boyne USA, Inc., a Michigan corporation, as Lessees, dated March 30, 2002.

54.   Unrecorded Right of First Refusal Agreement (Base Lodge Area, Yellowstone Mountain Club Subdivision, Big Sky, Montana), executed by and between Yellowstone Development, LLC, a Montana limited liability company, and Yellowstone Mountain Club, LLC, a Montana limited liability company, and CIP Yellowstone Acquisition LLC, a Delaware limited liability company, as disclosed by Abstract of Right of First Refusal, recorded November 5, 2008, under Document No. 128901, records of Madison County, Montana.

55.   Unrecorded Right of First Refusal Agreement (Golf Course Subdivision, Yellowstone Mountain Club Subdivision, Big Sky, Montana), executed by and between Yellowstone Development, LLC, a Montana limited liability company, and Yellowstone Mountain Club, LLC, a Montana limited liability company, and CIP Yellowstone Acquisition LLC, a Delaware limited liability company.

56.   Order recorded December 24, 2008, Document No. 129465, records of Madison County, Montana.

57.   Assignment of Declarant's Rights, recorded December 30, 2008, Document No. 129513, records of Madison County, Montana.

58.   Real estate taxes not yet due.

59.   Any and all easements entered into after the date hereof which are necessary for the development and/or operation of the Premises (including, without limitation, easements relating to utilities and access).

*[Note:  This Exhibit may require further revision to reflect the final Plan including, without limitation, treatment of Class 2 Allowed Claims, Prim Claims and Lone View transaction.]*