## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **YELLOWSTONE MOUNTAIN CLUB, LLC,** | Case No.  **08-61570-11** |
| Debtor. | Jointly Administered with: |
| In re | |
| **YELLOWSTONE DEVELOPMENT, LLC,** | Case No.  **08-61571-11** |
| Debtor. | |
| In re | |
| **BIG SKY RIDGE, LLC,** | Case No.  **08-61572-11** |
| Debtor. | |
| In re | |
| **YELLOWSTONE CLUB CONSTRUCTION COMPANY, LLC,** | Case No.  **08-61573-11** |
| Debtor. | |

## *ORDER REGARDING BIDDING PROCEDURES and APPOINTMENT OF AN EXAMINER*

At Butte in said District this 9th day of April, 2009.

In the above-referenced Chapter 11 cases, after due notice, a hearing was held April 6,

1

2009, in Butte on approval of Credit Suisse's combined "Motion of Prepetition Lenders for Entry of Order Authorizing (I) Modified Bidding Procedures, (II) Credit Bidding and (III) Examiner to Evaluate and Report to the Court on Qualified Alternative Bids" filed March 16, 2009, at docket entry number 571.  The following appearances were made at the April 6, 2009, hearing:  James A. Patten of Billings, Montana, and Richard G. Birinyi and Tom Hutchinson of Seattle, Washington for the Debtors; Mark S. Chehi, Robert S. Saunders and Joseph O. Larkin of Wilmington, Delaware, Evan R. Levy of New York, New York, and Shane Coleman of Billings, Montana for Credit Suisse; Jonathan B. Alter of Hartford, Connecticut, and John Grant of Helena, Montana for the Ad Hoc Committee of Yellowstone Club Members ("Ad Hoc Committee"); Ronald A. Bender of Missoula, Montana for the Ad Hoc Group of Class B Unit Holders; Paul D. Moore and Barry Green of Boston, Massachusetts, and Benjamin P. Hursh of Missoula, Montana for CrossHarbor Capital Partners and CIP Yellowstone Lending, LLC ("CrossHarbor"); J. Thomas Beckett of Salt Lake City, Utah for the Official Committee of Unsecured Creditors (the "Committee"); Joel E. Guthals of Billings, Montana for Timothy Blixseth; James J. Screnar of Bozeman, Montana for Michelle Cameron Donaldson and Neal Donaldson; John L. Amsden of Bozeman, Montana, and Ross P. Richardson of Butte, Montana for Yellowstone Club World, LLC; Dean A. Stensland of Missoula, Montana for Prim Vintage Development, L.P.; and Daniel McKay for the Office of the United States Trustee.  Stephen Yankauer of Credit Suisse, Ronald Greenspan of FTI Consulting, Inc., and Christopher C. Seyfarth of Ernst & Young, LLP testified and Debtors' Exhibit 2 and Credit Suisse's Exhibits 3, 4 and parts 162, 102, 37, 186, 185, 7, 8, 113, 111, 33, 176, 21, 22, 19, 15, 145 and 92 of Exhibit 10 were admitted into evidence without objection.

In its Motion, Credit Suisse argues that the Court should enter an order approving the proposed Modified Procedures attached to Credit Suisse's Motion as Exhibit A, in order to promote robust bidding, enhance and maximize the value of the Debtors' estate and properties and recoveries to all creditors and other parties in interest, vindicate the credit bidding rights of Credit Suisse under 11 U.S.C. § 363(k), and address concerns previously expressed by this Court. At the hearing, counsel for Credit Suisse stated that the parties had been diligently working to resolve their differences regarding the bidding procedures and informed the Court that the parties' differences were now confined to paragraphs 4, 5(k), 5(m), 5(o), 6(c) and 6(f) of the Further Modified Bidding Procedures set forth in Credit Suisse's Exhibit 4.

After consideration of the testimony, the Court agrees with Credit Suisse that paragraphs 5(m) and 5(o) are vague, ambiguous and misleading and do not foster the robust marketing envisioned by this Court. The Court also agrees with Credit Suisse that paragraph 6(c) unduly restricts CBRE. Additionally, the Court in again reviewing and carefully considering the provisions of 5(m), 5(o) and 6(c) concludes that the proposed modified bidding procedures is an overt effort to limit robust marketing and bidding by limiting or excluding Credit Suisse, the Prepetition Lenders or other parties wishing to participate with Credit Suisse or the Prepetition Lenders from the bidding process. The Court does not condone such attempt. Paragraph 5(m) of Exhibit 4, last sentence ("The rights afforded under this subparagraph shall only be available if the Alternative bid is submitted by Credit Suisse for the Prepetition Lenders and not if parties other than the Prepetition Lenders are participating, directly or indirectly, in the Alternative Bid.") clearly is an effort to prevent Credit Suisse from forming a new consortium of participants who may wish to submit a Qualified Alternative Bid. Mr. Greenspan testified that the provision

3

was intended to avoid bidding gamesmanship involving various alternatives of adjusting the bid on collateral and non-collateral assets or equity interests and using credit bidding or setoff with or without cash for the non-collateral assets.  Paragraph 5(o) also is an attempt to avoid bidding gamesmanship and to insure that money is available for the estate, although the language is ambiguous and appears to be more directed at Credit Suisse and the Prepetition Lenders.  The Court has modified the provision to allow the Court to determine the merits of any disqualification of an Alternative Bidder.  The last provision requiring modification is paragraph 6(c).  By defining Qualified Bidders in paragraph 6(a) to include Purchaser and the people holding Qualified Alternative Bids in paragraph 6(c)(vi), the bidding procedure precludes Credit Suisse from subsequent bidding unless it is one of the five bidders holding one of the five highest and best Qualified Alternative Bids, or unless it is the bidder selected by CBRE.  Initially, the Court questioned this preclusion of Credit Suisse from bidding as one of the Auction Parties.  However, in further review, the Court concludes that if Credit Suisse wishes to submit a Qualified Alternative Bid comprised of any consortium of parties, then it should be required to meet the Qualified Alternative Bid requirements under paragraph 5 and not be able to wait as a preferred party (one of the Auction Parties) in paragraph 6 to submit Subsequent Bids except as one of the Qualified Bidders as defined in paragraph 6(a).  The Court thus grants Credit Suisse's Motion, in part, and will amend the aforementioned paragraphs of the Further Modified Bidding Procedures accordingly.  However, the Court will approve paragraphs 4, 5(k) and 6(f) as proposed by the Debtors.

     The Court's reasoning for rejecting Credit Suisse's proposed language with respect to paragraphs 4, (except for one phrase:  "unless such person identified above in (i) through (v) is

involved in submitting an Alternative Bid," which the Court is adding), 5(k) and 6(f) is driven, in part, by the Court's conclusion that there simply is not enough time nor enough evidence to interject an examiner into the bidding process at this juncture, particularly when Credit Suisse will receive copies of each and every bid under paragraph 4 of the Further Modified Bid Procedures.  Credit Suisse argues that the appointment of an examiner to evaluate and report to the Court on the bidding and auction process and competing bids "will ensure that the bidding, auction and reorganization process in these cases 'will both better promote robust bidding of the Debtors' assets and protect any rights that Credit Suisse may have.'"

Credit Suisse has qualified counsel and advisors to evaluate the submitted bids to determine whether such bids are "Qualified Alternative Bids" and to compare the bids and ascertain, in its opinion, which bids offer the highest and best price for either Debtors' assets or Debtors' equity interests.  If there are disagreements between the parties as to the selection of the "five highest and best Qualified Alternative Bids," the Court will be available to the parties to resolve such dispute on Monday, May 11, 2009.  The involvement of Credit Suisse in the bidding process, combined with this Court's oversight of the process, negates the need to add another layer of professional expense to this already costly bidding process.[1]

Finally, given the nature of the pending litigation between Credit Suisse and the Committee, the Court will reserve ruling on Credit Suisse's request for an order authorizing Credit Suisse to credit bid at the auction.  In accordance with the foregoing,

---

[1] On the one hand, Credit Suisse wants the estate to bear the cost of bringing an examiner up to speed to oversee the bidding process, but on the other hand, opposes the Debtors' request to employ a forensic accountant on grounds that such professional "represents an enormous waste of scarce resources - - and a colossal duplication of litigation efforts."

IT IS ORDERED that Credit Suisse's Motion Authorizing Credit Bidding will be held in abeyance and will be determined in conjunction with Adversary Proceeding Nos. 09-00014 and 09-00017; Credit Suisse's Motion for the Appointment of an Examiner to Evaluate and Report to the Court on Qualified Alternative Bids is DENIED; and Credit Suisse's Motion of Prepetition Lenders for Entry of Order Authorizing Modified Bidding Procedures is granted, in part, and denied, in part, and the following Further Modified Bidding Procedures are hereby adopted by this Court:

FURTHER MODIFIED BIDDING PROCEDURES

1.   **Confidentiality Agreement**.  Upon execution of a confidentiality agreement reasonably acceptable to Debtors and the potential bidder, any qualified party that wishes to conduct due diligence may be granted access to all material information that has been or will be provided to any potential bidder.

2.   **Engagement of CBRE**. CB Richard Ellis, Inc. ("CBRE") shall be engaged by the Debtors to undertake a robust and comprehensive marketing effort designed and intended to encourage and obtain alternative bids (each an "Alternative Bid") for the acquisition or sale of all or substantially all of the land, buildings and improvements and other business assets, properties and property rights of the Debtors comprising the Project or for the sale of all of the equity interests in the Debtors as they may be reorganized pursuant to an Alternative Bid (excluding Yellowstone Construction Company LLC and referred to herein as "Reorganized Debtors").  CBRE's robust marketing effort shall include, without limitation, marketing for a sale of equity interests in the Reorganized Debtors as contemplated and proposed by the Definitive Agreement between CrossHarbor and the Debtors and their proposed plan of reorganization filed with the Court, in addition to marketing for any other alternative acquisition, sale or other investment or reorganization proposals comprising the Project and bids for all or substantially all of the land, buildings and improvements and other business assets, properties and property rights owned by the Debtor comprising the Project, or for equity interests in the Reorganized Debtors, that may be proposed by any Alternative Bid.

3.   **Alternative Bid Deadline**.  All Alternative Bids must be submitted not later than

12:00 p.m. (MDT) on May 6, 2009.  Alternative Bids should be submitted to:

> Yellowstone Club
> 71713 Highway 111
> Rancho Mirage, CA 92270

with copies to:

> Ron Greenspan
> c/o FTI Consulting, Inc.
> 633 West Fifth Street, 16th Floor
> Los Angeles, CA 90071

> James A. Patten
> Patten Peterman Bekkedahl & Green
> 2817 Second Avenue North, Suite 300
> Billings Mt 59101

> Lawrence R. Ream
> Bullivant Houser Bailey PC
> 1601 Fifth Avenue, Suite 2300
> Seattle, Washington  98101-1618

4.  **Distribution of Alternative Bid.** Upon receipt of an Alternative Bid, the Debtors shall immediately distribute a copy of such Alternative Bid to counsel of record for (i) CrossHarbor, (ii) Credit Suisse, (iii) the Official Unsecured Creditors Committee (the "Committee"), (iv) the Ad-Hoc Members' Committee (the "Ad-Hoc Committee"), and (v) the Ad-Hoc Class "B" Equity Interest Holders' Group (the "B Committee") (collectively, with the Committee and the Ad Hoc Committee, the "Committees"); provided, that each such party shall take reasonably satisfactory precautions to ensure that such information does not come into the possession of any person who is interested in the acquisition of the equity interests or assets unless such person identified above in (i) through (v) is involved in submitting an Alternative Bid, or be subject to sanctions by the Court for violation of the bidding procedures and this Order, upon a party-in-interest moving for such relief.

5.  **Qualified Alternative Bid**.  An Alternative Bid will qualify for consideration only if the Alternative Bid is a "Qualified Alternative Bid."  To be a Qualified Alternative Bid, the Alternative Bid shall either be submitted by Purchaser or must:

   a.  Identify the proponent of the Alternative Bid (the "Alternate Bidder") and

7

an officer or authorized person who is authorized to appear and act on behalf of and bind Alternative Bidder in connection with all proceedings related to such bid;

b.   Propose in writing a transaction for all or substantially all of the land, buildings and improvements comprising the Project owned by the Debtors or for all of the equity interests in the Reorganized Debtors;

c.   Provide for a cash component of the purchase price greater than or equal to $33,500,000.00, and in the case of any subsequent Qualified Alternative Bids, $1,000,000.00 over the immediately preceding Qualified Alternative Bid (the "Subsequent Overbid Amount");

d.   Consist of an agreement marked to show changes from the form of definitive agreement identified in Attachment 3, Exhibit 1 Part 3 of 5 (1.41 Definitive Agreement) ( "Definitive Agreement"), attached to the Disclosure Statement, doc. no. 692, approved by this court by Order, doc. no. 715, and which shall be made available by Debtors to an Alternative Bidder or Purchaser, and provide for sufficient working capital for the continued operation of Reorganized Debtors or their successors as owners of the Project as contemplated in such Definitive Agreement;

e.   Not be subject to any contingencies for due diligence, financing or further approval, such as by senior management or board of directors of the Alternative Bidder;

f.   Not be subject to termination by the Alternative Bidder following the acceptance of the Alternative Bidder of an invitation to participate in the Auction and, if it is not the winning bid at the Auction, may be accepted nonetheless for a period of thirty (30) days following the Auction if the winning bidder at the Auction fails timely to close;

g.   Require payment of a cash deposit or letter of credit in the amount of $5,000,000 upon acceptance of an invitation to participate in the Auction, refundable only in the event that the Alternative Bidder's Definitive Agreement is not approved by the Bankruptcy Court following the Auction or the Debtors fail to close under such Definitive Agreement pursuant to the terms thereof within thirty (30) days following the Auction;

h.   Not be subject to any conditions precedent other than as set forth in the Alternative Bidder's Definitive Agreement and the approval of such Alternative Bid by the Bankruptcy Court in connection with the confirmation of a plan incorporating such Definitive Agreement;

8

i.    Contain such financial and other information that will allow Debtors, after consultation with the Committees, to make a reasonable determination as to the Alternative Bidder's financial wherewithal to consummate the transactions contemplated by the Alternative Bid, including to provide adequate assurance of the Alternative Bidder's ability to perform in the future under any assumed executory contract identified in the Alternative Bidder's Definitive Agreement, and to show that the Plan is feasible;

j.    Identify with particularity each and every executory contract, agreement and unexpired lease, the assumption and assignment or rejection and termination of which is a condition to closing;

k.    Not request or entitle the Alternative Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment;

l.    Fully discloses the identity of each entity that will be directly or indirectly participating in such Alternative Bid and the complete terms of any such participation;

m.    If an Alternative Bid is submitted by Credit Suisse, as administrative and collateral agent ("Credit Suisse") for the prepetition lenders (the "Prepetition Lenders") under that certain Credit Agreement, dated as of September 30, 2005 (the "Prepetition Credit Agreement"), such Alternative Bid shall, with respect to the portion thereof attributable as determined by the Bankruptcy Court to the collateral securing the claims of Credit Suisse and the Prepetition Lenders under the Prepetition Credit Agreement be deemed to be and treated as a credit bid or setoff as may be determined by this Court in the reserved ruling on such issue that the Court will enter after the conclusion of the trial in the pending Adversary Proceeding Nos. 09-00014 and 09-00017; provided , that any credit bid or setoff cannot be extended to non-collateral assets or to the equity interests of Debtors.  The Alternative Bid of Credit Suisse and any other participating party with Credit Suisse, must be exclusive of the credit bid or setoff submitted by Credit Suisse or the Prepetition Lenders and be available for the Debtors' estate.  Credit Suisse and the Prepetition Lenders or other participating party shall have the right to make an Alternative Bid for any assets that are not collateral under the Prepetition Credit Agreement or any equity interest of Debtors; provided, the bid includes a monetary amount in excess of any credit bid or setoff.  Any right of Credit Suisse and the Prepetition Lenders or other participating party to submit an Alternative Bid, and its making of any such Alternative Bid, shall not limit the rights of Credit Suisse and the Prepetition Lenders as secured creditors under the Bankruptcy Code.  Nothing in this

provision(5(m)) is intended to prevent Credit Suisse and the Prepetition Lenders from forming any consortium with other participating investors in submitting an Alternative Bid that may be considered for qualification under paragraph 5.

n.     Contain evidence that the Alternative Bidder has received equity funding commitments or has financial resources readily available sufficient in the aggregate to finance the Alternative Bid, which evidence is reasonably satisfactory to the Debtors after consultation with the Committees; and

o.     Notwithstanding any other provision of these procedures, the Debtors, after consultation with the Committees, may determine that a bid for the Project assets or equity of the Reorganized Debtors is not a Qualified Alternative Bid. In that event, such disqualified Alternative Bidder may immediately request a hearing before this Court to determine the merits of the disqualification.

6.    **Auction, Bidding Increments and Bids Remaining Open**. If the Debtors do not receive any Qualified Alternative Bids, the Debtors will report the same to the Bankruptcy Court and will proceed with the Motion for approval of the plan based on the CrossHarbor Definitive Agreement, subject to the rights of secured creditors pursuant to the Bankruptcy Code. If the Debtors receive a Qualified Alternative Bid:

a.     On May 13, 2009, the Debtors shall conduct an open auction (the "Auction") at a location to be provided to all Auction Parties (as hereinafter defined), no later than May 8, 2009, which Auction shall begin at 10:00 a.m. local time or such later time as the Debtors shall notify the Purchaser and those bidders who have submitted Qualified Alternative Bids as specified in subparagraph (c)(vi) and (c)(vii) below (Purchaser and such bidders collectively, "Qualified Bidders").

b.     The Debtors shall provide all Auction Parties with copies of all anticipated Plan Supplements at least ten (10) business days prior to the Auction.

c.     Only the (i) Debtors, (ii) representatives of Credit Suisse, (iii) representatives of the Committees, (iv) the U.S. Trustee, (v) representatives of CrossHarbor, (vi) the parties that the Debtors, after consultation with the Committees, believe to have submitted the five highest and best Qualified Alternative Bids, and (vii) any other party that submitted a Qualified Alternative Bid that has been identified by CBRE for participation in the Auction, together with each such parties respective legal counsel and financial advisors (the "Auction Parties" inclusive of (i)

through (vii)), shall be entitled to attend the Auction, and only the Qualified Bidders shall be entitled to make any additional bids ("Subsequent Bids") at the Auction. All Auction Parties shall be entitled to be present for all bidding with the understanding that the true identity of each bidder shall be fully disclosed to all other Auction Parties and that all material terms of each Bid will be fully disclosed to all Auction Parties throughout the entire Auction. The Debtors may announce at the Auction additional procedural rules that they determine, in consultation with the Committees, are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent alternative bids) for conducting the Auction so long as such rules are not inconsistent with these Bidding Procedures.

d.   As a condition of participating in the Auction, each Qualified Bidder invited to participate in the Auction shall certify prior to the commencement of the Auction that (i) its representatives attending the auction have the full power and authority to act on behalf of and legally bind the bidder to any bids made at the Auction and (ii) any bid made shall constitute a binding and legally enforceable contract of the bidder to timely close pursuant to such bidder's Definitive Agreement at the price bid in the event an order is entered approving a plan based upon such bid.

e.   On or prior to May 11, 2009, the Debtors shall provide to all Auction Parties copies of all Qualified Alternative Bids.  In addition, the debtors will inform the Purchaser and each other Qualified Bidder who has expressed its intent to participate in the Auction of the identify of all Qualified Bidders that may participate in the Auction.

f.   At the Auction, bidding shall begin with the Qualified Alternative Bid that the Debtors, in consultation with the Committees, believe to be the highest and best pending offer, and continue in increments of the Subsequent Overbid Amount in one or more rounds of bidding and shall conclude after each Auction Party has had the opportunity to but has declined to submit an additional Subsequent Bid.  For the purpose of evaluating which bid is the highest and best bid, the value of a bid shall be determined by the Debtors, in consultation with the Committees, after considering all relevant factors, including the following: (i) the net consideration payable to the Debtors after giving effect to any Termination Fee that may be payable to Purchaser under the Bidding Procedures Order; (ii) the contracts, agreements and leases to be assumed and rejected under the bid; (iii) the adequate assurance of future performance to non-debtor parties under the bid including the amount of working capital to be contributed to the Reorganized Debtors or their successors as owners of the Project on

11

the Effective Date and to be committed to the Reorganized Debtors or their successors as owners of the Project in the future; (iv) the commitments regarding future employment of employees under the bid; and (v) the feasibility of the Plan if the bid were accepted. At the conclusion of the bidding, Debtors, in consultation with the Committees, shall announce their determination as to the bidder submitting the highest and best bid, which bid shall be submitted to the Bankruptcy Court for approval at the Confirmation Hearing. Debtors will also consider bids that include the sale of assets other than the Project owned directly or indirectly by Debtors, including the Chateau Farcheville and St. Andrew's assets, and will consider whether any such bid would likely produce greater value for the Debtors than the sale of the Project or equity interests in the Reorganized Debtors and the separate, subsequent sale of such other assets.  The Purchaser shall be deemed a party-in-interest with standing to appear and be heard in connection with any motions, hearings, or other proceedings relating to the CH Definitive Agreement and any Alternative Bid or Subsequent Bid.  That standing, however, shall not entitle the Purchaser to propose any Subsequent bid at any such hearing.

g.      The Purchaser shall be entitled to a termination fee (the "Termination Fee") in the amount of (a) $2,000,000 (being 2% of Purchaser's acquisition price of $100 Million) plus (b) all out of pocket expenses incurred by CrossHarbor or Purchaser subsequent to November 10, 2008, in pursuing the acquisition of the Reorganized Debtors' equity interests but not to exceed the sum of $1,000,000 in the aggregate, in the event (i) the Bankruptcy Court approves a sale of the Reorganized Debtors' equity or all or substantially all of the Project to an entity other than the Purchaser, and (ii) the Purchaser remained at all time through and including seven (7) business days immediately following such Bankruptcy Court approval, ready willing and able to consummate the CH Definitive Agreement.

h.      The bidding at the Auction will be transcribed.

7.      The "benchmark" set out in the CrossHarbor term sheet for its debtor-in-possession financing approved by this Court on December 17, 2008 [Docket No. 182] ("Final Order"), fixed a plan confirmation deadline of March 31, 2009, and an end of the exclusivity period if a plan is not filed by February 13, 2009; CrossHarbor has consented to the extension of the March 31, 2009, plan confirmation deadline until May 21, 2009, and the deadline is so extended and the Final Order is so modified.

12

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

13