UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**YELLOWSTONE MOUNTAIN CLUB, LLC**,<br><br>　　　　　Debtor. | Case No. **08-61570-11**<br><br>Jointly Administered with: |
| In re<br><br>**YELLOWSTONE DEVELOPMENT, LLC**,<br><br>　　　　　Debtor. | Case No. **08-61571-11** |
| In re<br><br>**BIG SKY RIDGE, LLC**,<br><br>　　　　　Debtor. | Case No. **08-61572-11** |
| In re<br><br>**YELLOWSTONE CLUB CONSTRUCTION COMPANY, LLC**,<br><br>　　　　　Debtor. | Case No. **08-61573-11** |

## *MEMORANDUM of DECISION*

At Butte in said District this 13th day of May, 2009.

In the above-referenced Chapter 11 bankruptcies, after due notice, a hearing was held May 8, 2009, in Missoula on Credit Suisse's Emergency Motion for Valuation of Secured Claims

Pursuant to 11 U.S.C. §§ 105(a), 506(a) and Fed.R.Bankr.P. 3012 filed March 2, 2009, at Docket Entry No. 489; and on Credit Suisse's Motion Under 11 U.S.C. §§ 105(a), 361 & 363(e) for adequate protection filed April 9, 2009, at Docket Entry No. 729.  Credit Suisse was represented at the hearing by Mark S. Chehi, Robert S. Saunders and Joseph O. Larkin of Wilmington, Delaware, Evan R. Levy of New York, New York, and Shane Coleman of Billings, Montana; and the Debtors were represented at the hearing by James A. Patten of Billings, Montana, and David A. Ernst and Troy Greenfield of Seattle, Washington.  In addition to the foregoing appearances, J. Thomas Beckett of Salt Lake City, Utah appeared at the hearing on behalf of the Official Committee of Unsecured Creditors and Paul D. Moore and Barry D. Green of Boston, Massachusetts appeared at the hearing on behalf of CrossHarbor Capital Partners LLC ("CrossHarbor").  Credit Suisse's Exhibits 1, 2, 4, 17, 5, 6, 8, 9, 10, 11, 12, 13 and 15 were admitted into evidence as were Debtors' Exhibits A and I.  Testimony of expert witnesses Christopher Donaldson, Gregory Hartmann ("Hartmann") and Darius Hatami ("Hatami") was heard, as was testimony from fact witnesses Samuel T. Byrne, Ronald Greenspan, Jeff Woolson, Brad Foster and Mike DuCuennois.  After review of the record and applicable law, the matter is ready for decision.  For the reasons set forth below, the value of Credit Suisse's collateral is fixed by the Court at $232 million for purposes of cram down, confirmation and adequate protection, and because by separate Interim Order entered this same date in related Adversary Proceeding 09-00014, wherein Credit Suisse's secured claim was equitably subordinated to the debtor-in-possession financing and allowed unsecured claims, the Court finds it appropriate to deny Credit Suisse's  motion for adequate protection.  This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law.

FACTS

The history of these Debtors and this bankruptcy is set forth extensively in prior Orders and Memoranda of this Court and will not be repeated in this Memorandum except as necessary. In approximately March of 2008, Samuel T. Byrne ("Byrne") of CrossHarbor was proposing to purchase the assets of the Yellowstone Club for approximately $407 million. Byrne has testified that his willingness to purchase the Yellowstone Club for approximately $407 million was based upon months of due diligence wherein Byrne and CrossHarbor spent millions of dollars. The proposed 2008 asset sale fell through for various reasons. The Debtors subsequently filed for protection under the Bankruptcy Code on November 10, 2008.

Following a hearing held November 12, 2008, the Court entered an Interim Order on November 13, 2008, at Docket Entry No. 40, authorizing the Debtors to obtain 21 days of post-petition debtor-in-possession ("DIP") financing from Credit Suisse. Prior to expiration of the 21-day interim DIP financing, Debtors, Credit Suisse and other parties in interest believed that Credit Suisse would provide the Debtors with additional DIP financing that would allow the Debtors to continue with operations through at least the 2008-2009 ski season. However, less than twelve hours before a final DIP financing hearing scheduled for November 24, 2008, Credit Suisse advised the Debtors that it was unable to secure its members' approval for any continued DIP financing. Upon the Debtors' request, CrossHarbor stepped in and offered to provide the Debtors with DIP financing on terms substantially similar to those proposed by Credit Suisse. The Court approved CrossHarbor's DIP financing proposal on an interim basis on November 26, 2008, and later issued final approval of the CrossHarbor DIP financing on December 17, 2008.

The Court's Order of December 17, 2008, finally approving Debtors' DIP financing with

CrossHarbor followed a hearing held December 11 and 12, 2008, wherein Credit Suisse strenuously opposed CrossHarbor's DIP financing proposal on grounds that Credit Suisse was not adequately protected and thus, that CrossHarbor should not be entitled to obtain a lien position superior to that of Credit Suisse. Credit Suisse's position was based in large part on the testimony and appraisal of Christopher Donaldson ("Donaldson"), the Managing Director of Cushman & Wakefield of Colorado, Inc., which valued Credit Suisse's collateral at $310 million.[1] While the Debtors argued that the value of their assets was substantially more than $310 million, the Court determined in its December 17, 2008, Memorandum of Decision that Donaldson was a credible witness and that his valuation of $310 million was "the low-end, going concern value of the Debtors' assets[.]"

Since the filing of this bankruptcy proceeding, CrossHarbor has submitted a stalking horse bid of $100 million, consisting of cash and notes. When asked to explain the difference between his valuation determination of $407 million just over 13 months ago, and the stalking horse bid of $100 million, Byrne testified that he considered three macro factors. First, Byrne considered the value of the Yellowstone Club based on pricing and sales velocity, explaining that the Debtors have very little product to sell going forward until new product is planned and platted. Second, Byrne was concerned about the price the Yellowstone Club could obtain for its product and third, Byrne noted that approximately 142 units located within the boundaries of the Yellowstone Club are on the market, but are not owned by the Debtors. Byrne described this last macro factor as "secondary overhang." Byrne explained that it was very easy to reconcile the prior models on

---

[1] As set forth in Exhibit 9 from that hearing, the value conclusion of $310 million included "the going concern related to the Yellowstone Club revenues. The allocation of value to the going concern would be approximately $44,000,000 which would include all F, F, & E associated with the going concern."

pricing and the current model on velocity and then overlay that with the current macro environment to more fully see the impact on real estate and real estate prices.

**Donaldson Testimony & Appraisal**

Donaldson of Cushman & Wakefield is a certified Member of the Appraisal Institute ("MAI") who has prepared several appraisals of the Debtors' assets. Donaldson has testified before in this bankruptcy case as an expert and his qualifications are not in dispute. Donaldson's most recent appraisal of the Debtors' assets states that the market value of the "Credit Suisse Collateral Owners Revised Unit Mix" was $232 million as of April 1, 2009, with a market exposure period of 18 months. Donaldson's appraisal also asserts that the liquidation value of the "Credit Suisse Collateral Owners Revised Unit Mix" as of April 1, 2009, was $116 million.

Donaldson used the Developmental or Discounted Case Flow analysis to reach his valuation of $232 million. Donaldson's appraisal of $232 million differs from the HVS appraisal in several respects. For instance, Donaldson estimates that Debtors will sell their 150 National memberships over a five year period starting in 2012 at an average price of $700,000.00 each, for a total of $105 million.[2] Donaldson explained that he does not expect the Debtors to sell any National memberships until 2012 because it will take a couple of years to get back to reasonable demand and absorption in the market.

Donaldson also projects that the Debtors could sell three lots between April 1, 2009, and March 31, 2010, and projects five or six lot sales in the second year. Donaldson explained that the slow absorption in the first two years accommodates the present market and allows for

---

[2] In its 2005 appraisal for Credit Suisse, Cushman & Wakefield valued the National memberships at $600,000 each, and then goes on to conclude that "the present value of the unsold non-realty memberships is $304,000,000."

5

additional planning for future development.

Despite testimony that the Debtors have made bulk sales to various persons and entities at wholesale prices, Donaldson based his appraisal on an average price point of $2.5 million. Donaldson explained that the inflation in 2005 and 2006 "cranked" up pricing and for this kind of project, Donaldson explained that the idea was to hold the line on pricing. In Donaldson's opinion, once prices were discounted, it was hard for prices to recover. Given the nature of the development and the membership, Donaldson believed that it was important to hold pricing stable and delay absorption.

With respect to operating costs, the Yellowstone Club has been operating at a deficit since its inception.[3] Based upon historical figures and after reviewing the Debtors' ten year projections, Donaldson determined that the Debtors would incur additional net operating losses of $15,000,000 in 2010 down to $9,000,000 in 2019 for total net operating losses of $118,600,000 between 2010 and 2019.

Donaldson's appraisal excludes vertical development costs. As for infrastructure costs, Donaldson conferred with the Debtors' Chief Restructuring Office and concluded that future infrastructure development costs will total $154,809,473, fluctuating from as low as $1,763,663 in 2014 to as high as $46,200,000 in 2015. Donaldson recognizes in his report that the Debtors are scheduled to reimburse the initial Pioneer and Frontier Members $14,500,000 in year 8, but elected not to treat this as cash flow on the assumption that the Pioneer and Frontier members would forgo the reimbursement by purchasing a lot.

In reaching an applicable discount rate, Donaldson relied to some extent on investor

---

[3] Page 111 of Donaldson's appraisal reflects that the Debtors' net operating income was a negative 14,588,364 in 2007 and $20,932,407 in 2008.

6

surveys and market outlooks.  Donaldson focused particularly on the discount rates for conventionally financed developments in the "Mtn. Region Resort & Second Home" region as reported at RealtyRates.com, which shows a discount range of 16.46% to 26.85%.  Donaldson elected to pick a discount rate in the middle of the above range because the amenities at the Yellowstone Club are significantly completed, which reduces the risk associated with the project.  Donaldson also concluded that households with higher levels of wealth may be less affected by economic changes such as those that exist in the current market.  Donaldson did, however, conclude that marketing risk remains high.  Based upon the foregoing, Donaldson applied a discount rate of 21% to reach his fair market valuation of $232 million.

Finally, Donaldson attributed a separate fair market value of $6 million to two unsold condominium units at the Warren Miller Lodge and also attributed $44 million as the going-concern value of the Yellowstone Club.  Donaldson stated that a significant portion of the $44 million could be attributed to the Warren Miller Lodge, agreeing that the gong concern value is "tied to the ski, golf, [Warren Miller] Lodge, and other amenities[.]"

**HVS Appraisal and Hartmann and Hatami Testimony.**

Hartmann is an MAI appraiser.  Hatami is not an MAI appraiser.  Hartmann and Hatami appraised the Debtors' property and determined that the market value of the Debtors' assets as of June 1, 2009, will be $113 million, with a market exposure period of three to eighteen months.  Hartmann's and Hatami's qualifications were challenged by Credit Suisse and are in dispute.  Hartmann has appraised in excess of 5,000 properties, including residential communities and hotels.  However, Hartmann has never appraised a master-planned community such as the Yellowstone Club.

7

Hartmann and Hatami used the Income Capitalization approach, reasoning that such "approach produces the most supportable value estimate, and it is generally given the greatest weight in the valuation process." Hartmann's and Hatami's appraisal is similar to Donaldson's appraisal in many respects. For instance, Hartmann and Hatami project that the Debtors will sell two lots in 2009/2010 and six lots in 2010/2011. Hartmann's and Hatami's slow absorption rate in the first few years of their future projections is based in large part on the significant competitive inventory.

Hartmann and Hatami estimate that roughly $160 million is needed to reach full build-out of the remaining infrastructure and amenities. Hatami explained that the difference between HVS' $160 million estimate and Donaldson's estimate of $154 million is the 3% inflation factor used by Hartmann and Hatami.

Hartmann and Hatami also recognize that the Yellowstone Club has been operating at a deficit since its inception and forecast that the Debtors will continue to operate at a deficit at least into 2021/2022. Hartmann and Hatami calculate that the net operating losses through 2019 will be $132,162,000 as opposed to Donaldson's estimated total net operating losses of $118,600,000 between 2010 and 2019.

The two appraisals, however, differ in other respects. For example, in reaching their valuation, Hartmann and Hatami concluded that the Debtor would sell the 150 National memberships "only after developer real estate is sold out" and Hartmann and Hatami project that such memberships will sell for $300,000. Such projected price is in stark contrast to Donaldson's projected sales price of $700,000.

In addition, Donaldson looked at the more specific "Mtn. Region Resort & Second Home"

8

region as reported at RealtyRates.com in reaching a discount rate of 21%. In contrast, Hartmann and Hatami looked at the rates on RealtyRates.com for the "Mountains - Subdivisions & PUDs" region and the *Korpacz Real Estate Investor Survey - Fourth Quarter 2008* published by PricewaterhouseCoopers reported discount rates for development land to reach a discount rate of 25%. Donaldson noted that he thought a discount rate of 25% was harsh for a project as far along in the development process as the Yellowstone Club.

Finally, Hartmann and Hatami attributed $20.4 million of the $113 million valuation to the Warren Miller Lodge. Hartmann testified that the Debtors have spent roughly $100 million to date on the Warren Miller Lodge, but characterized the Lodge as an opulent over-improvement.

DISCUSSION

The instant case presents the opinions on the value of the Debtors' property by Donaldson, on the one hand, and Hartmann and Hatami, on the other. After observing Donaldson, Hartmann and Hatami, in conjunction with the other witnesses and after carefully reviewing the appraisal reports, the Court concludes that Donaldson's appraisal is more persuasive, more accurately reflects current market conditions and is thus entitled to greater weight.

As previously noted, Donaldson's appraisal differs from that of Hartmann and Hatami appraisal in two important respects: the value assigned to the National memberships and the projected discount rate. Both items are very subjective. However, the additional testimony and evidence convinces this Court that the HVS has undervalued Credit Suisse's collateral.

Mike DuCuennois (DuCuennois"), the Senior Director of Development at the Yellowstone Club, testified that he thought Donaldson's absorption rate was very aggressive, that it appeared Donaldson was contemplating the sale of units before they were developed and that

9

Donaldson failed to adequately account for what was referred to as secondary market overhang. DuCuennois testified that while he never met with Donaldson, Donaldson did use DuCuennois projections in his appraisal. DuCuennois contrasted the fact that he never met with Donaldson with the fact that he spent 600 to 700 hours with Byrne when Byrne was doing his due diligence investigation in late 2007 and early 2008. Based on his extensive due diligence, Byrne maintains that he was willing to purchase the Yellowstone Club in March of 2008 for $407 million.

Keeping the $407 million price in mind, which price was founded on enormous due diligence, Hatami testified that real estate prices have dropped 20 to 50%. Hatami did not explain whether such drop in price was from the 2003 to 2005 housing bubble or a later date. Assuming for Debtors' benefit that the 20 to 50% drop occurred since March of 2008 and applying such rate to Byrne's March 2008 value of $407 results in a discounted price today of $325,600,00 to $203,500,000. The Court acknowledges that the price of $407 million that Byrne was willing to pay for the Yellowstone Club in 2008 included the Warren Miller Lodge, but even if the Court added Hartmann's and Hatami's value for the Lodge of $20.4 million to Donaldson's appraisal of $232 million, the Court reaches a total price of $252.4 million, which amount is close to a 38% discount off the price that Byrne claims he was willing to pay for the Yellowstone Club just thirteen months ago. Moreover, a total value of $252.4 million is in the middle of the 20 to 50% market drop mentioned by Hatami. Hatami's statement as to the percentage drop in the real estate market is inconsistent with the HVS appraisal.

In addition, the Court is not convinced by Hatami's testimony that sale of the National memberships would cannibalize the Yellowstone Club. Rather, the Court agrees with Donaldson that the National memberships offer a different form of membership and revenue for the

Yellowstone Club.[4] The Court also finds it reasonable to believe that the National memberships would sell for more than the Resident memberships, which require that the purchaser also buy a lot in the Yellowstone Club.

Finally, the Court finds that Donaldson's reliance on a discount rate that is derived from a more specific region, namely the "Mtn. Region Resort & Second Home" region, is more persuasive than the discount rate adopted by Hartmann and Hatami that was derived from a more general geographic region.

For the reasons discussed above, the Court finds that Donaldson's opinion concerning the value of Credit Suisse's collateral is entitled to greater weight, and thus, the Court adopts Donaldson's valuation estimate of $232 million as the value of Credit Suisse's collateral. Donaldson did not assign a specific value to the Warren Miller Lodge and Credit Suisse did not appear to dispute Hartmann's and Hatami's valuation of $20.4 million. Accordingly, the Court assigns a separate value of $20.4 million to the Warren Miller Lodge, which amount is in addition to the value of $232 million assigned to Credit Suisse's collateral.

Also at the hearing, counsel for Credit Suisse lodged an oral motion to extend the deadline for Credit Suisse to make an election under 11 U.S.C. § 1111(b) to May 14, 2009. Debtors opposed Credit Suisse's request, arguing that Credit Suisse should make its election sooner rather than later. After considering the comments of counsel, the Court concluded that Credit Suisse would have through May 12, 2009, to make an election under 11 U.S.C. § 1111(b).

Finally, Credit Suisse also has a pending Motion for Adequate Protection. As noted

---

[4] Cushman & Wakefield's July 1, 2005, appraisal similarly states that "National memberships are typically higher than resident memberships in similar types of resort communities because no real estate purchase is required."

11

earlier in this Memorandum of Decision, the Court is entering contemporaneously herewith an Interim and Partial Order in Adversary Proceeding 09-00014 wherein the Court is equitably subordinating Credit Suisse's $232 million secured claim to that of CrossHarbor's debtor-in-possession financing and to the allowed claims of unsecured creditors and administrative fees and costs.

For the reasons discussed above, the Court will enter a separate order providing as follows,

IT IS ORDERED that Credit Suisse's Emergency Motion for Valuation of Secured Claims Pursuant to 11 U.S.C. §§ 105(a), 506(a) and Fed.R.Bankr.P. 3012 filed March 2, 2009, at Docket Entry No. 489, is GRANTED; and the value of Credit Suisse's collateral is set at $232 million. The Warren Miller Lodge, which is not part of Credit Suisse's alleged collateral is assigned a separate and additional value of $20.4 million.

IT IS FURTHER ORDERED that Credit Suisse's Motion Under 11 U.S.C. §§ 105(a), 361 & 363(e) for adequate protection filed April 9, 2009, at Docket Entry No. 729 is DENIED.

IT IS FURTHER ORDERED that Credit Suisse shall have through May 12, 2009, to make an election under 11 U.S.C. § 1111(b).

BY THE COURT

_____
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana