James A. Patten (1191)
**PATTEN, PETERMAN, BEKKEDAHL**
**& GREEN P.L.L.C.**
2817 - 2nd Avenue North, Ste. 300
Billings, MT 59101
Telephone (406) 252-8500
Facsimile (406) 294-9500
E-mail:  japatten@ppbglaw.com
Richard G. Birinyi
Lawrence R. Ream
**BULLIVANT HOUSER BAILEY PC**
1601 Fifth Avenue, Suite 2300
Seattle, Washington  98101-1618
Telephone: 206.292.8930
Facsimile: 206.386.5130
E-mail:  larry.ream@bullivant.com
E-mail:  rick.birinyi@bullivant.com

Attorneys for Debtors

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

| In re: | No.: 08-61570-11-RBK |
|---|---|
| YELLOWSTONE MOUNTAIN CLUB, LLC., et al., | |
| Debtors. | |

CONFIRMATION MEMORANDUM

THE DEBTORS above-named, YELLOWSTONE MOUNTAIN CLUB, LLC, YELLOWSTONE DEVELOPMENT, LLC, YELLOWSTONE CLUB CONSTRUCTION COMPANY, AND BIG SKY RIDGE, LLC, by and through their attorney James A. Patten, offer the following memorandum in support of confirmation of the proposed Chapter 11 plan.

# I. SUMMARY

1. The Debtors will have filed a Ballot Summary with respect to the percentages of acceptance and rejection of the Plan of Reorganization.

2. The Debtors believe that they have reached agreement with the Montana Department of Revenue with respect to certain non material modifications to the plan in connection with its claim.

3. The Debtors believe that they have reached agreement with the Internal Revenue Service with respect to certain non material modifications to the

4. Additionally, the Debtors anticipate that by the time of the confirmation hearing, there will be agreements in place with other creditors.

### A. BALLOTING

The Debtors will file a ballot report compiled by Kurtzman Carson Consultants LLC which will include a detailed summary of the balloting. The ballot report will show the following impaired classes have accepted or rejected the proposed chapter 11 plan by the requisite voting percentages.[1]

Class 3: REJECT

Class 4: ACCEPT

Class 6: ACCEPT

Class 7: REJECT

Class 8: REJECT

Class 9: ACCEPT

---

[1] The figures for Class 4 uses the listings the Debtors have prepared for undisputed claims. Under the Plan, the Liquidating Trustee will actually be filing objections, so the Debtors have not actually filed objections to the disputed claims. To the extent the Court deems it necessary, this Memorandum shall constitute an objection to those disputed claims for voting purposes.

Class 10: ACCEPT

Class 12: ACCEPT

Class 13: REJECT

Class 14: ACCEPT

The balloting shows sufficient impaired classes of non insider creditors have voted to accept the plan. The plan meets the requirements of 11 U.S.C. § 1129(a)(10).

### B.    UNFAIR DISCRIMINATION

Yellowstone Club World objects that the plan provides an impermissible classification scheme through the Convenience Class. The plan, at paragraph 3.5 proposes to pay general unsecured claims of $5000 or less a single lump sum payment of 100% of the allowed claims. Convenience class claims in general are permitted. See 11 U.S.C. sec. 1122(b). Here the total Convenience class claims total $500,000 which constitutes less than 0.5 % of the total filed unsecured claims and 6.5% of the recognized general unsecured claims. The convenience class allows a rational treatment of the relatively small claims and allows immediate payment of such claims which reduces future administration. Discrimination between classes of creditors is permitted, so long as it is fair. *Steelcase Inc. v. Johnston* (*In re Johnston*), 21 F.3d 323 328 (9th Cir. 1994).

Further, the Trade Creditor Fund does not create an impermissible classification scheme. As to the Trade Creditor Fund, such a sharing between a secured creditor and unsecured creditors has expressly been approved by the Courts. *See e.g. Official, Unsecured Creditors' Committee v. Stern* (*In re SPM Manufacturing Corp.*), 984 F.2d 1305 (1st Cir.1993)(secured creditor reached agreement with Unsecured Creditors' Committee to share proceeds of liquidation of collateral); *In re Exide Techs.*, 303 B.R. 48, 77 (Bankr.D.Del.2003) (relying on *SPM* to permit confirmation of chapter 11 plans that included such reallocations); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612

(Bankr.D.Del.2001)(same). In this case, there is, and can be little doubt that CrossHarbor and the Unsecured Creditors' Committee can reach an agreement regarding what CrossHarbor does with the repayment it receives on its DIP Loan. That does not violate the absolute priority rule, nor does it constitute unfair discrimination.

Finally, due to the equitable subordination ordered by this Court in Credit Suisse v. Official Committee, 09-00014, all allowed claims of unsecured creditors who are not insiders will be paid prior to any distribution to Credit Suisse of the sale proceeds. This subordination eliminates any claim of unfair discrimination as it will effectively provide a full recovery of all general unsecured claims.

### C. CREDIT SUISSE WILL RECEIVE THE INDUBITABLE EQUIVALENT OF ITS CLAIM

The Bankruptcy Code requires a secured creditor, such as Credit Suisse, to receive through a chapter 11 plan (i) the retention of liens securing its claims and the receipt of deferred cash payments totaling the allowed amount of its claim; (ii) the proceeds of a section 363 sale; or (iii) the indubitable equivalent of its claim. 11 U.S.C. §1129(b)(2)(A). Here, Credit Suisse receives the indubitable equivalent of its claim.

The value of the Credit Suisse claim is determined by the marketplace. Credit Suisse will retain a lien on the same and additional property (e.g., the Warren Miller Lodge). The issue is whether the sale process employed in this case resulted in the realization of the market value of the asset. *The Two S Corporation*, 875 F.2d 240, 243 (9th Cir. 1989)

> the price paid at a commercially reasonable sale is the best evidence of value. *In re Walkup*, 28 Bankr. 225, 227 (Bankr. N.D. Ind. 1983) ("Actual sales are the best evidence [of value]."); *In re The Kids Stop of America, Inc*., 64 Bankr. 397, 401 (Bankr. M.D. Fla. 1986) (If there is a disposition of the property, "then the valuation of the collateral should be based on the funds received from the disposition as long as the disposition was commercially reasonable."). Romley does not challenge the reasonableness of the sale. Therefore, the sale

>price is better evidence of the property's value than any prior appraisals.

CB Richard Ellis broker Steve Lehr has testified before that there is a declining market; property is losing value. Therefore a better price can be realized today than tomorrow. This means a proper marketing period is shorter, not longer. Further, CB Richard Ellis instituted a robust marketing program designed and directed to hit that portion of the market that would be interested in a purchase of the Yellowstone Club. There was a substantial response from the marketing yet ultimately the only two bidders were Credit Suisse and Cross Harbor. The two engaged in an auction. The auction represented the marketplace at the time of confirmation. The bidder with the highest and best bid at the auction spoke for the marketplace. The value so bid reflects the market and fixed the value of the debtors' assets and, consequently, the value of the Credit Suisse claim.

Code section 506(a)(1) requires the valuation of a creditor's interest in property "in light of the purpose of the valuation and of the proposed disposition or use of said property, and in conjunction with any hearing on such disposition or use of on a plan affecting such creditor's interest." Provided that the terms and conditions of the auction were free, open, and fair, the actual disposition of the property and the value realized properly values the Credit Suisse claim. Credit Suisse will no doubt argue that the fair market value of its collateral is set out in the Cushman Wakefield appraisal report and if that value is not realized, the indubitable equivalent will not be obtained. Section 506 does not require the fair market value be received, but only that the value be determined in light of the purpose and proposed disposition of the property.

In order to confirm the Plan over Class 3's rejection of the Plan under the cram down provisions of section 1129(b)(1), the Plan must not "discriminate unfairly" and must be "fair and equitable." 11 U.S.C. § 1129(b)(1) (2009). A plan is "fair and equitable as it applies to secured claims if one of the explicit requirements of clauses (i), (ii), or (iii) [of §

1129(b)(2)(A)], and if the technical fulfillment of these three clauses should not impose an unreasonable risk of the plan's failure on the secured creditor." *Friedman*, *supra*, at 1506-07. Jack Friedman, What Courts do to Secured Creditors in Chapter 11 Cram-down, 14 Cardozo L. Rev. 1496, 1502 (1993).

The Plan here is fair and equitable with respect to Credit Suisse's (CSFB) secured claim because it complies with the literal requirements of §§1129(b)(2)(A)(ii) and (iii).[2] If the sale of the equity interests in the Reorganized Debtors is a sale of property "that is subject to" CSFB's liens, then clearly the Plan satisfies § 1129(b)(2)(A)(ii). It is well settled that section implicates six (6) conditions: (1) a sale, (2) subject to § 363(k), (3) of property subject to the lien, (4) which sale is free and clear of the liens, (5) with the liens to attach to the proceeds, and (6) treatment of the liens on the proceeds under either clause (i)--deferred payments--or clause (iii)--indubitable equivalent. *Collier*, *supra*, at ¶1129.05[2][b]. As long as these six conditions are satisfied, the court must confirm a plan notwithstanding the existence of a non-consenting secured creditor class. *See* 11 U.S.C. §1129(b)(1) ("the court, on request of the proponent of the plan, *shall* confirm the plan notwithstanding the requirements of such paragraph …") (emphasis added). *See also* Report of the Committee on the Judiciary, United States Senate, to Accompany S. 2266, S. Rep. No. 989, 95th Cong., 2d Sess. (1978), reprinted in 1978 U.S.C.C.A.N. 5787, at 127 ("A plan may be confirmed against a dissenting class of secured claims if the plan or order of confirmation provides for the realization of their security ... (2) by a sale of the property and transfer of the claim to the

---

[2] 11 U.S.C. §1129 provides in pertinent part:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
. . .
(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph;

proceeds of sale if the secured creditors were permitted to bid at the sale and set off against the purchase price up to the allowed amount of their claims ...").

The limited number of decisions addressing the application of § 1129(b)(2)(A)(ii) largely focus on whether the secured creditor was properly permitted to "credit bid" consistent with § 363(k). *See In re Swiftco, Inc.*, 1988 Bankr. LEXIS 2251, Case No. 85-07083-H1-5, at *42-43(Bankr. S.D. Tex. 1988) (noting "[t]here are few reported cases which provide guidance on the fulfillment of this provision."); *Friedman*, *supra*, at 1531 and n.162. Only one reported decision was found, *In re Yagow,* 60 B.R. 543, 545 (Bankr. D.N.D. 1986), involving the confirmation of a plan over a non-accepting secured creditor class pursuant to § 1129(b)(2)(A)(ii). In *Yagow*, certain creditors proposed a plan of liquidation premised on the foreclosure and sale of the debtor's real property which was accepted by all but two classes, the debtor and one of its secured creditors. 60 B.R. at 545-46. In confirming the plan, the court held, in relevant part:

> Class 12, a non-accepting class consisting only of the [secured] claim of Lisbon Farmers Union Credit Union, will receive the proceeds from the sale of its secured collateral and the Credit Union is allowed to bid in its claim at the auction sale where its collateral will be sold. Thus, the fair and equitable requirement of section 1129(b)(1) is met pursuant to section 1129(b)(2)(A)(ii).

*Id.* at 547.

Although the *Yagow* court did not provide substantial analysis to its decision, the test is straightforward and formulaic: if: (i) the plan provides for the sale of the creditor's collateral, (ii) the creditor is allowed to credit bid at the auction, and (iii) the liens will attach to the proceeds of the sale, which will be distributed to the creditor (or some indubitable equivalent provided), then the plan is fair and equitable with respect to that creditor. CSFB cannot dispute that these requirements have been satisfied, and accordingly the Plan is fair and equitable with respect to CSFB and must be confirmed notwithstanding its rejection thereof.

7

The Plan here complies with all of these requirements.  The Plan provides "for the sale, subject to section 363(k)" of the right to purchase the equity of the Reorganized Debtors.  CSFB's secured claims will be satisfied from the proceeds of the equity auction sale.  There is no serious question that CSFB was provided full opportunity to credit bid its lien in an amount painstakingly determined by this Court to be equal to the value of its interest in the property.

Similarly, it is obvious as well that the Plan meets the requirements of §1129(b)(2)(A)(ii) that it treat CSFB's liens on sale proceeds, *inter alia*, "under clause . . . (iii) of [§1129(b)(2)(A)].  Pursuant to clause (iii), the Plan is fair and equitable if CSFB will realize the "indubitable equivalent" of its secured claim in this case.  The phrase "indubitable equivalent" derives from Judge Learned Hand's opinion in *In re Murel Holding Corp.*, 75 F. 2d 941, 942 (2nd Cir. 1935).  *See generally*, *Collier, supra,* ¶361.03[4].  The Ninth Circuit has recognized two components of an "indubitable equivalent" treatment.  The treatment must both "compensate for present value" and "insure the safety of the principal."  *Wiersma v. Bank of the West (In re Wiersma)*, 227 Fed.Appx. 603, 607 (9th Cir. 2007), *quoting* <u>Crocker Nat'l Bank v. Am. Mariner Indus., Inc. (In re Am. Mariner Indus., Inc.), 734 F. 2d 426, 433 (9th Cir. 1984)</u> (abrogated on other grounds).

As the Plan makes clear, some of CSFB's collateral will be retained by the Reorganized Debtor and some will be transferred to the Liquidating Trust.  The treatment of CSFB's secured claim with respect to both retained and transferred collateral is described in section 3.3.3. of the Plan.  With respect to retained collateral, the Plan provides CSFB will receive the "amount of the Equity Purchase Payment allocated to [CSFB's] Collateral being retained by the Reorganized Debtor."  This means, with respect to the retained collateral, that CSFB will receive both compensation for present value of its allowed secured claim, thereby satisfying the first component of indubitable equivalence.  *Id*.  Since the amount allocated

will equal the amount of CSFB's secured claim, CSFB will receive precisely the amount of its principal, thereby satisfying the second component of indubitable equivalence. *Id*. Thus, the Plan's treatment of CSFB's collateral retained by the Reorganized Debtor satisfies §1129(b)(2)(A)(iii).

The Plan also satisfies §1129(b)(2)(A)(iii) with respect to CSFB's collateral transferred to the Liquidating Trust. Subject to pending challenges to the extent, priority and validity of CSFB's liens (including this Court's prior orders equitably subordinating CSFB's liens pursuant to 11 U.S.C. §510(c)), CSFB will retain its liens and enforcement rights on its collateral transferred to the Liquidation Trust. Thus, CSFB is receiving not simply the "indubitable" equivalent of its claim with respect to that collateral – it is receiving the precise equivalent of its claim, since CSFB retains its rights under applicable non-bankruptcy law (subject to the exceptions set forth in section 3.3.3 of the Plan) to recover its collateral and to apply that collateral to its secured claims.

The proposed plan provides for the sale of the membership interests of the debtor limited liability companies to the auction participant making the highest and best bid. The auction was the culmination of a robust marketing effort undertaken by CB Richard Ellis. This robust marketing effort allowed an appropriate exposure to the market. The amounts bid at auction reflect the market's view of the value of the property interests for sale.

### D. **GOOD FAITH**

A plan whose purpose is to achieve a result contemplated by the Bankruptcy Code meets the good faith requirement. As stated by the Court of Appeals in *Platinum Capital Inc. V. Sylmar Plaza L*P (*In re Sylmar Plaza*), 314 F.3d 1070 (9th Cir. 2002) (at page 1074):

> Section 1129(a)(3) does not define good faith. *In re Madison Hotel Assocs*., 749 F.2d 410, 425 (7th Cir. 1994). A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code. *Ryan v. Loui* (*In re Corey*), 892 F.2d 829, 835 (9th Cir. 1989); see also, Madison Hotel, 749 F.2d at 425 ("For purposes of determining good faith

> under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."). The requisite good faith determination is based on the totality of the circumstances. *Stolrow v. Stolrow's, Inc.* (*In re Stolrow's, Inc.*), 84 B.R. 167, 172 (9th Cir. BAP 1988).

Good faith in proposing a plan of reorganization is assessed by the bankruptcy judge and viewed under the totality of the circumstances. *In re Jorgensen*, 66 B.R. 104, 108-109 (9th Cir. BAP 1986). Good faith requires requires a fundamental fairness in dealing with one's creditors. *Id.*

Here the claims of good faith are predicated upon alleged collusive activities between the individual in control of the debtors, Edra Blixseth, and the purchaser, Cross Harbor Capital Partners. The alleged collusive activities predate the filing of these cases and the evidence shows that Blixseth and Cross Harbor were considering a business transaction whereby Cross Harbor would acquire the Yellowstone Club assets of the debtors. These collusive activities are consistent with Cross Harbor's attempt to acquire the assets from Tim Blixseth in 2007 and early 2008. That Cross Harbor would continue its efforts with the new owner, Edra Blixseth, is not surprising. That Cross Harbor would actually communicate with the prospective seller is not surprising. This Court has heard hours of repetitive testimony offered to show the existence of a spider-web of interrelationships and conspiracies, yet all that has been demonstrated is communications toward a particular goal: Cross Harbor's acquisition of the Yellowstone Club.

The collusion can hardly be demonstrated post petition. As this Court will well remember, the debtors originally requested and obtained authority to incur debtor in possession financing from Credit Suisse. If there was collusion, then the debtors would have, rationally, sought such financing from Cross Harbor particularly when that financing was readily available. This fact alone should dispel any notion of improper collusion.

In any event, the test of good faith is whether the plan achieves the objectives of the Code and whether the creditors are treated fairly. There can be no question but that the object of the plan is to sell the Yellowstone Club as a going concern for the benefit of all interested parties, creditors, members and equity owners alike. The distributions occurring under the plan are consistent with the Code's priorities as modified by this Court's order in the adversary proceedings. The plan offered the Club to the market and after a robust marketing effort and an appropriate exposure to the market, the market has spoken. Plainly the plan meets the good faith requirements of the Code.

### E. BALLOTING

Credit Suisse complains that the plan cannot be confirmed because the prepetition lenders were not mailed ballots prior to the April 15 deadline. Credit Suisse failed to file a verified statement disclosing the names and addresses of the creditors on whose behalf Credit Suisse was acting as required by Bankruptcy Rule 2019. The Proof of Claim that Credit Suisse did file listed only one address. Under Bankruptcy Rule 2002, the Debtors are to use the address in the Proof of Claim. After the initial mailing, Credit Suisse did provide mailing information for holders of interests in the notes and the Debtors sent solicitation materials to the identified entities via overnight delivery. Credit Suisse has no basis to object as it failed to provide the information necessary for service of the ballot to the prepetition lenders by the date specified in the Court's Order. Finally, the prepetition lenders have received ballots and have voted.

### F. EXCULPATION AND RELEASE

The plan provides (at 7.7.5) that no holder of a disputed claim shall have recourse against the debtors, the estate, the trustee, the reorganized debtors, the disbursing agent or the professionals in the event the disputed claim reserve account is insufficient to pay the portion of the disputed claim that becomes an allowed claim. The plan further provides (at 8.4) that

the debtors, the reorganized debtors, the committee and its individual members, the DIP lender, the current equity owners, Cross Harbor, the acquirer, and their professionals are exculpated from liability arising out of the chapter 11 cases except for willful misconduct or gross negligence. These plan provisions do not allow inappropriate releases.

The plan does not provide for releases of any third parties or of their debts, which is prohibited by Code section 524(e). Instead the plan provides for a release of claims arising during the chapter 11 cases. This Court has the authority under Code section 105 to enjoin lawsuits against non-debtors where such is essential to the confirmation of a plan. *DJS Properties L.P. v. Sim*plot, 397 B.R. 493, 503-04 (D.C.Id. 2008); *Gillman v. Continental Airlines Inc.*, 254 B.R. 93, 97 (D.C.Del. 1998); *Master Mortgage Inv. Fund*, 168 B.R. 930, 934-35 (Bankr. W.D. Mo. 1994).

### G. DEBTS ARISING FROM THE SALE OF EQUITY ARE SUBORDINATED

Code section 510(b) makes clear that debts arising from the sale of a security of the debtor or for damages arising from the sale of securities shall be subordinated to the claims that are senior to the claim. *American Broadcasting System v. Nugent* (*In re Betacom of Phoenix, Inc.*), 240 F.3d 823, 828-29 (9th Cir. 2001). This is true even if the claim is predicated on a settlement agreement. *Anchorage Police & Fire Ret. Sys. V. Official Committee of Unsecured Creditors* (*In re Conseco, Inc.*), 2004 U.S. Dist. LEXIS 11734 (D.C. N.D. Ill. 2004); *In re Granite Partners L.P.*, 208 B.R. 332, 341 (Bankr. S.D. N.Y. 1997); *Am. Wagering Inc. v. Racusin* (*In re Am. Wagering, Inc.*), 326 B.R. 449, 452 (9th B.A.P. 2005).

The Debtors have filed an adversary proceeding to determine that any claims by the LeMond claimants should be treated as equity. Because the Debtors planned on filing the pending adversary proceeding, by the time they prepared the final schedule of claims that accompanied the Disclosure Statement, the LeMond claimants were listed in accordance with

the Debtors' view of the probable outcome of the adversary proceeding. That schedule, however, is not binding on any party, and certainly does not represent a determination by the Court. The LeMond claimants have the right to contest that claim in the adversary proceeding and an answer is not yet due. If the outcome of the adversary proceeding establishes that their claims against the Debtor should not be subordinated pursuant to § 510(b), then their claims will be treated on a par with other similar creditors. The objection to confirmation is, therefore, based on a total misunderstanding of the effect of the Plan on the classification of the claim. It should be rejected.

## II. CONCLUSION

There are no valid grounds for denial of confirmation. The objections raised are not supported by the facts or the law.

DATED this 17th day of May, 2009.

        Richard G. Birinyi
        Lawrence R. Ream
        **BULLIVANT HOUSER BAILEY PC**
        1601 Fifth Avenue, Suite 2300
        Seattle, WA 98101-1618

        James A. Patten (1191)
        **PATTEN, PETERMAN, BEKKEDAHL & GREEN, PLLC**
        2817 – 2nd Avenue North, Suite 300
        Billings, MT 59101
        Attorneys for Debtors

          /s/ J.A.Patten
        James A. Patten

11596761.1