IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

_____
                                    )
In Re:                              ) Case No. 08-61570
                                    )
Yellowstone Mountain Club, LLC,     )
                                    )
            Debtor.                 )
_____ )

THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

Butte, Montana
May 15, 2009

Electronic Recording Operator:   Patti Mahoney

Transcript Services:

Proceedings recorded by electronic recording;
transcript produced by reporting service.

```
 1                          APPEARANCES

 2

 3        FOR THE DEBTORS:

 4              JAMES A. PATTEN

 5              Attorney at Law

 6              Suite 300, The Fratt Building

 7              2817 Second Avenue North

 8              Billings, MT  59101

 9

10              RICHARD BIRINYI

11              Attorney at Law

12              Bullivant Houser Bailey, PC

13              1601 Fifth Avenue, Suite 2300

14              Seattle, WA  98101-1618

15

16      FOR THE OFFICE OF THE U.S. TRUSTEE:

17              DANIEL P. McKAY

18              U.S. Trustee's Office

19              Liberty Center, Suite 204

20              301 Central Avenue

21              Great Falls, MT  59401

22

23

24

25
```

```
 1                    APPEARANCES (continued)

 2

 3       FOR CREDIT SUISSE:

 4            MARK S. CHEHI

 5            Attorney at Law

 6            Skadden, Arps, Slate,

 7               Meagher & Flom

 8            One Rodney Square, Seventh Floor

 9            Wilmington, DE  19801

10

11            EVAN R. LEVY

12            Attorney at Law

13            Skadden, Arps, Slate,

14               Meagher & Flom

15            Four Times Square

16            New York, NY  10036-6652

17

18       FOR THE CREDITORS COMMITTEE:

19            J. THOMAS BECKETT

20            Attorney at Law

21            Parsons, Behle & Latimer

22            201 South Main Street

23            Salt Lake City, UT  84111

24

25
```

```
 1                    APPEARANCES (continued)

 2

 3      FOR THE AD HOC COMMITTEE OF YELLOWSTONE

 4      CLUB MEMBERS:

 5              JONATHAN B. ALTER

 6              Attorney at Law

 7              Bingham McCutchen, LLP

 8              One State Street

 9              Hartford, CT  06103

10

11      FOR THE CLASS B AD HOC MEMBERS COMMITTEE:

12              CLARK T. WHITMORE

13              Attorney at Law

14              Maslon Edelman Borman & Brand, LLP

15              3300 Wells Fargo Center

16              90 South Seventh Street

17              Minneapolis, MN  55402-4140

18

19      FOR CROSSHARBER CAPITAL PARTNERS, LLC:

20              PAUL D. MOORE

21              BARRY GREEN

22              Attorneys at Law

23              Duane Morris, LLP

24              470 Atlantic Avenue, Suite 500

25              Boston, MA  02210-2600
```

```
 1                    APPEARANCES (continued)

 2

 3      FOR TIMOTHY J. BLIXSETH:

 4           JOEL E. GUTHALS

 5           Attorney at Law

 6           Guthals, Hunnes & Ruess, PC

 7           P.O. Box 1977

 8           Billings, MT  59103

 9

10      FOR THE MONTANA DEPARTMENT OF REVENUE:

11           TERESA GRACE WHITNEY

12           Attorney at Law

13           Montana Department of Revenue

14           P.O. Box 7701

15           Helena, MT  59604-7701

16

17      FOR YELLOWSTONE CLUB WORLD, LLC:

18           JON AMSDEN

19           Attorney at Law

20           Back & Amsden, PLLC

21           1946 Stadium Drive, Suite 1

22           Bozeman, MT  59715

23

24

25
```

```
 1                  APPEARANCES (continued)

 2

 3      FOR THE INTERNAL REVENUE SERVICE:

 4           VICTORIA LAEDER FRANCIS

 5           Assistant US Attorney

 6           P.O. Box 1478

 7           Billings, MT  59103-1478

 8

 9    FOR MARK GROSVENOR, GREG LeMOND:

10           TRENT M. GARDNER

11           Attorney at Law

12           Goetz, Gallik & Baldwin, PC

13           P.O. Box 6580

14           Bozeman, MT  59771-6580

15

16    FOR GREG LeMOND:

17           DAVID L. MITCHELL

18           Attorney at Law

19           Robins, Kaplan, Miller & Ciresi

20           800 Lasalle Avenue, Suite 2800

21           Minneapolis, MN  55402-2015

22

23

24

25
```

```
 1                          I N D E X

 2    WITNESS:                                        PAGE:

 3    RONALD GREENSPAN

 4         Direct Examination by Mr. Patten   .   .   .   .   .   52

 5         Cross-Examination by Mr. Guthals   .   .   .   .   .   67

 6         Cross-Examination by Mr. Moore     .   .   .   .   .   77

 7         Cross-Examination by Mr. Chehi     .   .   .   .   .   79

 8         Cross-Examination by Mr. Whitmore  .   .   .   .   .   81

 9         Redirect Examination by Mr. Patten .   .   .   .   .   85

10    SAMUEL T. BYRNE

11         Direct Examination by Mr. Patten   .   .   .   .   .   89

12    STEVEN LEHR

13         Direct Examination by Mr. Patten   .   .   .   .   .   91

14    EDRA BLIXSETH

15         Direct Examination by Mr. Patten   .   .   .   .   .   96

16

17

18

19

20

21

22

23

24

25
```

1              YELLOWSTONE MOUNTAIN CLUB BANKRUPTCY

2                      BUTTE, MONTANA

3                          - - -

4          BE IT REMEMBERED THAT this matter came on for

5  hearing on May 18, 2009, in the United States Bankruptcy

6  Court, District of Montana, The Hon. Ralph B. Kirscher,

7  presiding:

8

9   The following proceedings were had:

10

11          THE COURT:  Please be seated.

12          Who wishes to give me an update?  Mr. Patten?

13          MR. PATTEN:  Your Honor, I'll allow the others to

14  give details, but after we left the courthouse Friday

15  evening, settlement discussions continued and progressed

16  over the weekend.  And I believe that there's now a fully

17  executed term sheet, that a copy can be provided to the

18  Court.  And I'll let Mr. Levy and Mr. Green describe the

19  details.

20          There remain a couple objections that have not

21  been resolved.  Most of the other objections have been

22  resolved.  They haven't necessarily been reduced to

23  writing, and Mr. Birinyi can describe which ones have been

24  resolved and which ones remain.  But I think we're down to

25  a couple objections; and, otherwise, we'll have everyone on

1    board with the plan.  The plan will be modified per the

2    term sheet.  It's our view that it doesn't require

3    resolicitation of bids that we can simply --

4              THE COURT:  Is it consensual?

5              MR. PATTEN:  -- incorporate it into the plan.

6              THE COURT:  Because it's consensual?

7              MR. PATTEN:  Yes.

8              THE COURT:  It will be a consensual plan --

9              MR. PATTEN:  Yes.

10             THE COURT:  -- provided the two objectors are

11   resolved?

12             MR. PATTEN:  Yes.

13             THE COURT:  Okay.  That's progress.

14             MR. PATTEN:  And with that, I'd leave it to

15   Mr. Green.

16             THE COURT:  Okay.  I'm not going to volunteer a

17   lot for the record at this point if there's a resolution.

18             So Mr. Green.

19             MR. GREEN:  Good morning, Your Honor, and thank

20   you again for your help last week.  We're all thrilled to

21   be here with signed settlement term sheets.

22             THE COURT:  Have they been signed?

23             MR. GREEN:  Yes.

24             THE COURT:  Wonderful.

25             MR. GREEN:  Your Honor should know that there's

1    one exhibit to the term sheet, which is the new credit

2    agreement for the 80 million loan portion of the

3    consideration.  And Mr. Levy and I are around 15 percent

4    through just marking that document up.  It's going to take

5    us another hour to finish it.  We're going to go into a

6    conference room while you hear the objections.  We have

7    every confidence that we will have no problem finishing it

8    up.  But the constituents wanted that to be attached as an

9    exhibit, and we've all agreed to that.  But I did want to

10   alert the Court to that.

11            THE COURT:  Okay.  Mr. Levy.

12            MR. LEVY:  Yes, Your Honor.  This settlement

13   addresses all the concerns of all parties - the UCC, the

14   debtors, and the prepetition lenders - to address all of

15   the outstanding litigation matters, appeal matters, and the

16   plan objections.  There is one matter we'd like to approach

17   the Court to -- approach the bench to discuss with the

18   Court relating to the settlement.

19            THE COURT:  Okay.  I have a question concerning

20   your settlement documents.  Now, what is your intention as

21   far as -- or is that document between the parties and to be

22   left between the parties, or is that something that would

23   be docketed?

24            UNIDENTIFIED SPEAKER:  It's incorporated into the

25   plan.

1           UNIDENTIFIED SPEAKER:  It's incorporated into the

2    plan.

3           MR. PATTEN:  Your Honor, the terms of the

4    settlement will be incorporated into the plan and modify

5    the plan.

6           THE COURT:  Okay, okay.  Mr. Chehi.

7           MR. CHEHI:  And just to be a little bit more

8    clear about that, the plan will incorporate a Rule 9019

9    settlement, which will, in effect, be a global settlement.

10   Effectuating this, various terms of the plan will be

11   modified to conform to the settlement, to make provisions

12   for various things that are required under the settlement

13   agreement.  And the parties hope to accomplish that, you

14   know, as rapidly as possible, given the fact that it takes

15   awhile, as you understand now, to actually document the

16   agreements.  We should be able to get to the plan documents

17   rather rapidly.

18           THE COURT:  Okay.

19           MR. CHEHI:  And then, you know, to the extent

20   that the Court would require a resolicitation of parties

21   other than, I think, the secured creditors who had rejected

22   the plan, the Class 3 and Class 8, you know, there would be

23   some sort of, hopefully, accelerated notice of some sort to

24   whoever the Court would feel requires to be resolicited, if

25   anybody.  There would have to be an opportunity, I think,

1    for the Class 3 and class 8 lender, holders of lender

2    claims to recast their ballots in favor of the plan,

3    because at this point, they've reject the plan.

4           THE COURT:  Okay.

5           MR. LEVY:  And if I could just say one point on

6    that.  While we're not soliciting or resoliciting outside

7    of the process, we have consulted with lenders holding a

8    majority of the interest in the loan.  Those lenders

9    constitute requisite lenders under our credit agreement,

10   those lenders have authorized and directed the prepetition

11   agent to enter into the settlement agreement, and have also

12   indicated to the agent that they intend to vote in favor of

13   the plan as modified contemplated by the term sheet.

14          THE COURT:  Very good, thank you.

15          Mr. Patten.

16          MR. PATTEN:  Well, I'm not sure that resoliciting

17   ballots is necessary.  I think, in our view, we wanted to

18   get confirmation completed today, if possible.

19          THE COURT:  Well, if, in fact, it's consensual

20   and we have representatives that can change their ballots

21   or withdraw any objections or can agree to file, I mean I

22   think we can move the process.

23          MR. CHEHI:  Your Honor, as it became apparent in

24   connection with the solicitation process, there are

25   numerous, numerous holders of prepetition lender claims

1    that exceed the holders' -- the identity of the holders on

2    the steering committee, which hold, you know, a dominant

3    amount of claims, and the like, but are nevertheless not

4    all of the holders.  I think it will be necessary to have

5    an opportunity for the -- to resolicit those lenders who

6    have already voted to change their vote on the plan.

7    Because we can't change their votes on the plan.  We

8    couldn't vote for them in the first place, the steering

9    committee couldn't vote for them in the first place.  The

10   steering committee has indicated, pursuant to the

11   settlement, that they are going to be recommending that

12   people support the plan as modified incorporating the

13   settlement.  And we, you know, are highly confident that

14   will be the outcome here.  But we actually have to go true

15   that mechanic, which again, we can do on a, you know, very

16   accelerated basis, giving notice to the folks what it is,

17   probably attaching a copy of this and saying that the plan

18   is going to be conformed and we ask that you vote for --

19   you know, we'll give them a new ballot, or something, that

20   reflects this, and they can vote to accept the plan as

21   modified consistent with this.

22            MR. PATTEN:  I'm not sure if there's another

23   purpose being accomplished here, but we have, under the

24   ballots that have been filed - and we filed the ballot

25   reports with the Court this morning - we have the

1    affirmative ballots of several impaired classes that -- we

2    meet the balloting requirement.  So I'm not sure that we

3    need the prepetition lender's vote in order to overcome

4    that hurdle.  I'm not sure how we're going to --

5            THE COURT:  Well, it's probably a cleaner deal if

6    they're all on board.

7            MR. PATTEN:  Yes.

8            MR. MOORE:  Your Honor, if I may, Paul Moore or

9    CrossHarbor.

10           I think we can address it in a different way.

11   I've had this issue in other cases.  If the Court were to

12   approve the settlement and the plan incorporates the

13   treatment under the settlement, then the case law suggests

14   that they are unimpaired.  We change their treatment to

15   unimpaired, and we treat them in accordance with the

16   settlement.  And I've got a couple citations for that

17   proposition, if you would like.

18           THE COURT:  That may be the way to go.  I'm

19   sensing that, that Mr. Chehi and the prepetition lenders

20   and the lending -- the prepetition lenders, he'd like to

21   have their ballots in there.

22           MR. CHEHI:  We don't want to disenfranchise the

23   numerous holders of the claims.  And, again, I think it can

24   be done on a very expressed type of basis.  Everyone has

25   been kept are pretty well informed.

1              THE COURT:  When you say that, how long do you

2    think?  What are we talking about on an "expressed basis"?

3              MR. MOORE:  Your Honor, when the ballots -

4    (inaudible) - mailed, we got 111 ballots back within a

5    week.  So we were able to convince our lender group that it

6    was important and they should vote.  We didn't tell them

7    how to vote; we just told them they should.  I would

8    suspect if we have the authorization of the appropriate

9    ballot, we could push it to our lenders today or tomorrow

10   morning with an indication to return it probably by Friday

11   before the holiday weekend.  And I would expect to get back

12   most of them.

13             MR. BIRINYI:  Your Honor, KCC, our balloting

14   agent --

15             THE COURT:  I'm sorry, you need to --

16             MR. BIRINYI:  Your Honor, Richard Birinyi.

17             KCC, the balloting agent, has the capacity,

18   literally -- they have an office in Memphis.  So they have

19   the capacity to get something into overnight mail almost

20   instantaneously.  If we decide that we have to go that way,

21   then we could send it out probably before the close of

22   business today with a balloting deadline of Friday, as

23   suggested.

24             THE COURT:  Well, I guess I'm wondering, can

25   something like that, rather than mailing it, can it be

1  e-mailed as an attachment to your group?

2          MR. LEVY:  We have an electronic posting system

3  called "Interlinks" that all of our lenders are linked to.

4  So if we have the new ballot, they would get it

5  instantaneously through Interlinks.

6          MR. CHEHI:  And the benefit of doing the

7  solicitation and the resolicitation of those lenders for

8  purposes of getting their votes and acceptance is, then,

9  once that class is voted by the requisite majorities, then

10  it binds, it's binding on everybody.  And I think that's

11  just the right thing to do here.

12          THE COURT:  Yeah, yeah.  I don't disagree.  Given

13  the numbers that we're dealing with, the numbers of people

14  that we're dealing with, I don't want to hold this thing up

15  any longer than it needs to be.  But if we can get some

16  stuff out to them through the various connections that were

17  just discussed by counsel, we could have something back --

18  I mean we might be seeing those coming back to the, to the

19  balloting agent by this afternoon, potentially.

20          MR. PATTEN:  Well, Your Honor, I guess what I

21  would propose, then, is, one, that the Court order a short

22  deadline on the reballot of that class.  Can we proceed

23  with confirmation today, have everybody in town for it, and

24  then maybe just hold off, hopefully, on the order until

25  these ballots come in?

1           And I promised Mr. Whitmore I would advise -- I

2    said "everybody was on board".  I'm not speaking for the

3    Class B members when I say that.

4           THE COURT:  They're not on board?

5           MR. WHITMORE:  Your Honor, we have not been

6    invited to participate in the settlement to date.  I stand

7    here afraid that I'll be struck by lightening if I -- we

8    want there to be a settlement, we're supportive of a

9    settlement, but there are some -- we have objected to the

10   plan.  We've filed a conditional objection.  We received an

11   extension of time to object to the plan until two days

12   after the auction.  As you know, that timing ended up a

13   little bit different.  We have some things that we're going

14   to need added to the plan just to protect our interests as

15   Class B holders because we didn't get baked into the

16   settlement.  And so we want to reserve our rights with

17   respect to the plan of reorganization just until a couple

18   of sentences can be added, frankly.  And so it sounds like

19   there's going to be enough time anyway for that to be

20   accommodated.

21          But our principal concern is that the Class B

22   holders have an equity stake at the very -- you know, in

23   the scheme of things, they had a 1 percent -- each had a

24   1 percent stake in the Yellowstone Mountain Club.  And at a

25   time, that was worth a lot of money.  It was an

1    unencumbered asset.  And due to a variety of things that

2    occurred, that equity stake became diminished in value

3    greatly.  And that was a result of, we believe, some

4    wrongful acts by some various parties.

5          And we've commenced litigation against

6    Mr. Blixseth, Edra Blixseth, and BGI.  And in connection

7    with that, we're seeking equitable subordination of the

8    equity stakes that BGI and Edra have in the, in the club.

9    And I believe Mr. Blixseth's equity stake has already been

10   departed with or he's transferred that away.

11         But we may -- we would like to preserve the right

12   to do whatever the Class B holders want to do to vindicate

13   their personal rights - not rights that belong to the

14   estates - in connection with this whole mess.  And we're a

15   little bit concerned that the settlement involves turning

16   over of control of the liquidating trust to Credit Suisse;

17   although, we're on the board, as well.  And there are some

18   provisions in the plan that provide that only the

19   liquidating trustee has the right to pursue claims

20   objections, and those claims objections would include

21   subordinations of claims.

22         And we are very -- we just want to make sure that

23   our rights to pursue our existing equitable subordination

24   litigation against Edra and BGI is preserved and, frankly,

25   to preserve whatever equitable subordination rights we may

1    want to pursue as it may -- it won't stop the sale, won't

2    stop the settlement, but at the back end of the waterfall,

3    we want the right to come to Court and be heard about where

4    we ought to sit in that.  And if that can be accommodated,

5    we're more than happy to step aside.  We don't have any

6    real concerns about the other economics of the settlement.

7    We're supportive of it, we're happy that it occurred.

8            But we can't -- we're a little bit reluctant to

9    stand here today and say, "We'll just let other parties

10   completely rewrite the plan, and we'll all approve that

11   whatever they say is just fine."

12           THE COURT:  Well, have you discussed these two

13   sentences with Mr. Patten or counsel?

14           MR. WHITMORE:  I've tried, but they just finished

15   this term sheet, I think, in the middle of the night, Your

16   Honor.

17           THE COURT:  Okay.

18           MR. CHEHI:  You know, we've indicated --

19           THE COURT:  Mr. Chehi.

20           MR. CHEHI:  -- to counsel for the B's that we are

21   amenable to making a statement on the record, which I'll

22   make now.  And that is that:  This settlement and the plan

23   of reorganization is without prejudice to the rights and

24   opportunities of the liquidating trust and the "B" holders

25   to reach some sort of resolution or settlement of their

1    interests in respect of the waterfall - which is the

2    liquidating trust assets at the end of the day - such that,

3    you know, following the effective date of the plan, the

4    liquidating trust and the B's can enter into some sort of

5    understanding or agreement about how their interests might

6    be treated.

7              I would also say that, you know, the B's just

8    admitted their equity.  They seem to have a dispute with

9    other equity in the case.  And, you know, we don't have a

10   problem if they want to reserve their rights to, in some

11   sense, subordinate, you know, other equity interests that

12   otherwise would be pari passu with them to -- to them, but

13   we're not agreeable to having them reserve their rights to

14   somehow take a second bite at the apple and equitably

15   subordinate any claims of any creditors, which are part of

16   this waterfall scheme.  Because this settlement represents

17   a compromise of the various -- the priorities that would

18   otherwise exist under the code and otherwise with respect

19   to our secured claims and our deficiency claims, which all

20   are claims and not equity interests at the end of the day.

21   And so, that, we would not be agreeable to, but to the

22   extent they want to reserve their rights to equitably

23   subordinate other equity interest in the case, we don't

24   have a problem with that.  I don't know what the other

25   parties have to say.

1          And, again, we all do look forward to working to

2     come up with a consensual resolution, including some

3     language that we could put in the confirmation order or the

4     plan that would reflect what I've just said.

5          MR. WHITMORE:  I'm sorry to -- I don't want to

6     dwell on this at this point, but I think Mr. Chehi started

7     out by indicating that if Credit Suisse elects to enter

8     into an agreement with us, that he would remain flexible

9     enough so that that agreement could be effected.  And in

10    terms of preserving our rights, I was a little concerned

11    about that stopping short of what we're asking for.

12         We're simply saying that we have some personal

13    rights.  Equitable subordination isn't really an estate

14    right; it's really our right.  We're not baked into the

15    revised waterfall right now and -- because we're not a

16    party to the agreement.  And if they want to change the

17    waterfall, all we're asking is that whatever equitable

18    rights we may have to come to the Court and ask for an

19    adjustment of that waterfall down the road, based on the

20    harms that other people in this case have done to us, our

21    personal rights, that those are not forfeit as a result of

22    an agreement where everybody else has shared consideration

23    and worked out their own issues and not included us.  And

24    I --

25         THE COURT:  Well, Mr. Whitmore, you're talking

1    about claims that the "B" members have against other equity

2    interests.

3            MR. WHITMORE:  Well, that's part of it.  But

4    there's also a claim, Your Honor, that Credit Suisse, by

5    making -- by engaging in this lending transaction with

6    Mr. Blixseth may have done so with a knowledge that the

7    effect of what was going to happen was that Mr. Blixseth

8    wasn't going to be sharing -- or the equity distributions

9    that should have happened to our class at the time didn't

10   happen.  You know, that's something -- it's not in

11   litigation now; hopefully, it will never be in litigation.

12   We're trying to, you know, work through that issue.  But if

13   there's something that a nondebtor did that caused harm to

14   another nondebtor, then, you know, all rights and

15   privileges related to, you know, those claims are

16   preserved.

17           THE COURT:  You know, it sounds like the B's

18   should be -- you want so much of this money.  You should be

19   putting in some money.

20           MR. WHITMORE:  Well, Your Honor, I think what

21   we're, what we're possibly talking about would be

22   contributing the claims that the Class B holders have

23   against certain parties into the liquidation trust and then

24   joining forces with the liquidating trust to work

25   effectively rather than potentially being at

1    cross-purposes.  So we are trying to -- we're just trying

2    to work through that issue.

3            And while we're getting that sorted out, since

4    this all just happened in the middle of the night, I'm just

5    asking the Court not to approve a settlement that affects

6    our rights; certainly, at a minimum, to say that our right

7    to object to the plan is preserved, and we'll deal with it

8    later.

9            THE COURT:  Well, but you're not a signatory to

10   the term sheet, right?

11           MR. WHITMORE:  I'm sorry?

12           THE COURT:  You're not a signatory to the term

13   sheet.

14           MR. WHITMORE:  I'm not a signatory to the term

15   sheet.  And if nothing --

16           THE COURT:  How can whatever rights you have be

17   affected?

18           MR. WHITMORE:  Well, as long as this Court

19   doesn't go through the short step, short step that someone

20   was suggesting that, by approving the agreement, that

21   somehow it becomes dictated over our potential objections

22   to the plan, that the plan will be changed in accordance

23   with the term sheet, you're right, we're not a party to it.

24   And if the Court wants to approve it, subject to a

25   reservation of whatever rights we have to object to the

1    plan, and those aren't affected, that's fine for purposes

2    of this morning.

3              THE COURT:  Mr. Patten.

4              MR. PATTEN:  Your Honor, it seems to me that the

5    equity is the last person in line to get paid.  And if,

6    ultimately, there's money or property to distribute to the

7    equity, then the A's and the B's can fight over that money

8    at that point in time.  And I don't think the plan is

9    preclusive of the A's and B's fighting over whatever would

10   be distributed to them.

11             I do think, though, that the settlement reach

12   with Credit Suisse by the estate, by the debtors, is

13   binding on the B's.  The B's claim derive through the

14   debtors, and so it seems to me that the settlement that --

15   if this Court approves it, that settlement will be binding

16   on the B's.  To the extent the B's have claims against

17   other parties, then that's different.  And if the B's and

18   the liquidating trust want to work out some arrangement

19   where they contribute their B's claim into the liquidating

20   trust, as long as the "A" interests have the ability to

21   participate in the discussions, the, you know, objective,

22   if the A's are somehow being cut out, then I don't think

23   there's any, any problem that we have with the B's.

24             It just seems to me that the plan doesn't

25   preclude what Mr. Whitmore is concerned about, and that's

1    just a fight that will have to be made down the road if

2    there's any property to distribute to the equity.

3                    THE COURT:  Okay.

4                    MR. GUTHALS:  Your Honor, this is Joel Guthals in

5    Billings.  May I speak?

6                    THE COURT:  You may.

7                    MR. GUTHALS:  Thank you, Your Honor.  Today, Your

8    Honor, I'm representing Mr. Blixseth, who's objected to the

9    confirmation of the plan; and also Desert Ranch, LLLP,

10   which is a transferee of the claim of Prim.

11                   And I have filed objections to confirmation on

12   behalf of both of my clients, neither of whom are

13   signatories to the settlement nor know anything about the

14   settlement.  I understand from the dynamics of this case,

15   as I have been involved in it for quite awhile, that the

16   plan is likely to be confirmed, given the settlement that

17   is reached.  But I did want to state for the record that

18   the settlement, to my knowledge, does not resolve the

19   objections of my two clients.

20                   THE COURT:  Okay.

21                   MR. GUTHALS:  Thank you.

22                   MR. AMSDEN:  Your Honor, John Amsden, counsel for

23   Ross Richardson; Chapter 7 trustee for Yellowstone Club

24   World.

25                   We had filed limited objections to the

1    confirmation of the plan.  I've talked to Mr. Patten and

2    Mr. Birinyi about that, and I think that they are resolved.

3    And, hopefully, with some clarifying language, either

4    separately or a part of the plan, we would withdraw our

5    objection.  The general concept is that Ross Richardson

6    will have a full and fair opportunity to establish the

7    amount and proper classification of his claim and that the

8    exculpatory provisions in the plan won't affect any of

9    Mr. Richardson's potential claim against any other persons

10   or matters outside the scope of various principals, either

11   prepetition or postpetition.  But we're working with

12   Mr. Patten on that and hope to get that resolved.

13             THE COURT:  Okay.  Ms. Francis?

14             MS. FRANCIS:  Yes, Your Honor.  I'm here on

15   behalf of the IRS.

16             I do believe we can reach a stipulation, but due

17   to the focus on all the many ongoing hearings and

18   settlement discussions, haven't had a chance to finalize

19   that.  My concern is that there's some outstanding tax

20   returns that remain to be filed.  I believe that the

21   debtors have indicated that they would endeavor to file

22   those in the near future.  I would like a defined date.

23   And I don't think the plan can be confirmed unless the tax

24   returns are filed because you must pay the priority claim,

25   and we cannot determine what the total priority claim is

1    until the tax returns are filed.  I've itemized the

2    remaining returns in our objection.

3              So I would ask that we be allowed to file a

4    stipulation and that the confirmation be subject to both of

5    us filing the stipulation so we can work out -- I think

6    it's highly likely we will resolve these, but until that's

7    done, I can't withdraw my objection.

8              THE COURT:  Okay.

9              MR. PATTEN:  Your Honor, I'm told that the

10   unfiled return is a fourth-quarter 2007 941 return.  We

11   believe and will commit to file it before the effective

12   date of the plan.

13             THE COURT:  Okay.  Is that correct, Ms. Francis?

14             MS. FRANCIS:  As long as they have a date.  I

15   think they were intending on doing that, in filing the

16   effective date.  And then the priority claim has to be

17   paid.  I think they indicate they're going to pay it, but

18   I'm not sure if there's enough money - based on everything

19   else, because I haven't seen the settlement terms - to pay

20   it.  So our priority claim has to be paid.

21             And I don't know if the settlement has enough

22   money to pay us, Andy.

23             MR. PATTEN:  Unless that claim is unbelievably

24   huge, there will be sufficient money to pay a priority tax

25   claim on the effective date.

1          THE COURT:  And it's just a fourth-quarter 941,

2    right?

3          MR. BIRINYI:  That's the only one that's unfiled.

4    There is some existing claim --

5          THE COURT:  Oh, okay.

6          MR. BIRINYI:  -- that we do know about that was

7    included in the numbers that we talked about last week,

8    Your Honor.  I think the taxing authorities' total were --

9          MR. WHITMORE:  Well, actually, it's the

10   Yellowstone Mountain Club's fourth quarter, the Yellowstone

11   Development's fourth quarter 2007, the Yellowstone Club

12   Construction's fourth quarter 2007, and the partnership

13   return for 2006 and 2007 for Yellowstone Club Construction.

14         THE COURT:  Is that your understanding?

15         MR. PATTEN:  Yes.

16         THE COURT:  Okay.  Mr. Green -- oh.

17         MS. WHITNEY:  Good morning, Your Honor.  Teresa

18   Whitney with the Montana Department of Revenue.

19         We had also filed an objection based on the

20   exculpation provision in Paragraph 8.4 of the plan.  And we

21   have been in contact with Debtors' counsel regarding

22   proposed language that we would like to see in the plan

23   regarding the Montana Department of Revenue.

24         And I believe I was sent an e-mail late last

25   night or late yesterday, and I did not have an opportunity

1    to review the language.  They made some changes to it.

2    I've been assured that it basically encompasses what we

3    requested in our proposed language.  And once I get back to

4    the office, I will review that language.  If it does

5    substantially state what we wanted, then our objection is

6    cured in that plan.

7              THE COURT:  Okay, thank you.

8              MS. WHITNEY:  Thank you.

9              MR. BIRINYI:  Your Honor, on that issue - Richard

10   Birinyi again - the IRS wanted some additional language in

11   the plan, too.  And the language that I circulated Saturday

12   morning attempted to address both the IRS-requested

13   additional language and the Montana Department of

14   Revenue's.  So we will work that out in the process of

15   producing the modified plan documents so that it will be

16   acceptable to both the IRS and the Montana Department of

17   Revenue.

18             THE COURT:  Okay, very good.  Mr. Green.

19             MR. GREEN:  Your Honor, I'm not sure -- I

20   understand you have a copy of the settlement term sheet.

21   I'm not sure if you're interested in us describing the

22   terms of it.  And there's also one matter, as Mr. Levy

23   mentioned, that we wanted to discuss with you at bench

24   side.

25             THE COURT:  Okay.

```
 1                    MR. GREEN:  So however you would like to proceed.
 2                    THE COURT:  For the sidebar, how many are
 3       involved?
 4                    UNIDENTIFIED SPEAKER:  Many.  A big, happy
 5       family.
 6                    THE COURT:  Four people?
 7                    UNIDENTIFIED SPEAKER:  Five people.
 8                    THE COURT:  Five people?  You know, because of
 9       the limitation of -- I mean there's quite a bit of space up
10       here, but there's some limitation.  Why don't the five --
11       whoever is involved with the sidebar, let's just go in the
12       jury room right back there.
13                    Okay, we'll be in recess for just a moment.
14                    (A brief recess was taken.)
15                    THE COURT:  Please be seated.
16                    MR. GREEN:  Your Honor.
17                    THE COURT:  Mr. Green.
18                    MR. GREEN:  Barry Green for CrossHarbor Capital.
19       I'm here with Evan Levy from Skadden-Arps, representing
20       Credit Suisse.
21                    As Your Honor knows, we have a fully executed
22       settlement term sheet.  And Mr. Levy and I will walk
23       through the basic parameters of that, starting with,
24       frankly, who the parties are to the settlement term sheet.
25       They are each of the debtor entities, so Yellowstone
```

1    Mountain Club, Yellowstone Development, Big Sky Ridge, and

2    Yellowstone construction -- Yellowstone Club Construction

3    Company.

4          Then the Official Committee of Unsecured

5    Creditors has executed the document; as has Credit Suisse,

6    as prepetition agent for the prepetition lenders; as has

7    the acquirer under the definitive agreement, the parties

8    submitting the stalking-horse bid, has also executed the

9    settlement term sheet.

10         In addition, a number of CrossHarbor entities

11   have joined in the settlement term sheet for purposes of

12   reflecting their agreement to the releases set forth in the

13   term sheet.  And these CrossHarbor affiliates are entities

14   that have interests within the Yellowstone Club either

15   because they are the DIP lender or they hold an interest in

16   the prepetition loan or they are the ultimate parent

17   entity.  So that's who the parties are to the document.

18         The document, as stated earlier, effectuates a

19   global settlement between these parties relating to the

20   matters that have been before the Court.  Very quickly,

21   I'll hit some of the highlights, and Mr. Levy will chime in

22   from time to time, I'm sure, as well.

23         There are numerous stipulations, Your Honor,

24   regarding dismissal of the pending appeal for the

25   CrossHarbor DIP loan.  That's going to be withdrawn, and

1    the parties agree to support the plan as modified by this

2    term sheet.  In addition, the parties agree to support the

3    Skadden-Arps fee applications to the extent that money is

4    left within the interim DIP for payment of their fees; and,

5    likewise, the parties agree to support the motions for

6    CrossHarbor's legal fees to the extent funds are available

7    within the CrossHarbor final DIP loan for payment of those

8    fees.  Obviously, both of those, to the extent required,

9    are subject to your court's -- to the Court's approval.

10         Do you want to do the next part about the

11   settlement in terms of the lawsuits?

12         MR. LEVY:  Sure.  The parties have agreed, as

13   between the debtors, the UCC, and the prepetition agent of

14   the prepetition lenders to dismiss all of the litigation in

15   the two adversary proceedings.  We had made a request -- or

16   are making a request to the Court to consider the Court's

17   rulings with respect for interim and partial rulings with

18   respect to the adversary proceedings in light of the

19   settlement of the overall proceedings.  None of those

20   settlements will affect any claims that have been asserted

21   against Mr. Blixseth, which are still before this Court.

22   The settlement also provides for releases of all parties

23   for all the claims that were made in those adversary

24   proceedings other than the actions that remain before this

25   Court with respect to Mr. Blixseth.

1          Okay.  The term sheets -- or in addition to

2     stipulations, the term sheet had three components.  One

3     stipulation of the parties is really dealing with the

4     settlement of litigated matters; secondly, agreed-upon

5     modifications to the CrossHarbor definitive agreement with

6     the debtors to acquire the equity in the reorganized

7     debtors; and, third, agreements to modification of the plan

8     of reorganization to address both the changes in the

9     definitive agreement and the economic rights and sharings

10    of the various parties.

11          Do you want to talk about the definitive

12    agreement?

13          MR. GREEN:  Yeah.  Why don't I start with how the

14    definitive agreement is being modified.  And as Your Honor

15    noted last week, some of these may sound familiar.  First

16    of all, the purchase price under the definitive agreement

17    is being increased from 100 million to 115 million, the

18    debt portion will increase from 70 million to 80 million,

19    and the cash portion will increase from 30 million to

20    35 million.

21          We then have a series - and I won't go into

22    tremendous detail on them - a series of amendments to what

23    is a permitted construction financing under the, under the

24    definitive agreement loan documents that will be delivered.

25    And they relate to including that an institutional lender

1    must provide it, a $45 million aggregate limit on vertical

2    construction, subordinate senior financing with 50

3    residential density units being effected at any one point

4    in time.  That 50 represent as decrease from 100, and the

5    45 million is a new provision.  There's also provisions

6    limiting loan to costs as well as payments to affiliates of

7    the CrossHarbor and Discovery entities to the extent that

8    those fees are -- need to be market-rate based.

9             We've also agreed, as we indicated at the

10   beginning of the hearing, that we would use a form of

11   credit agreement similar to that that was used in

12   connection with the original loan.  Mr. Levy and I will

13   excuse ourselves shortly after this presentation to finish

14   marking that document up.  We should have that done within

15   90 minutes, or so.

16            I think the other agreement that also relates to

17   the amendments to the definitive agreement and is really a

18   CrossHarbor/Credit Suisse matter is we are giving Credit

19   Suisse the ability to co-invest in the acquisition of the

20   reorganized debtors.  They'll have that open until we

21   actually close and the plan becomes effective.

22            Want to do the plan modifications?

23            MR. LEVY:  I thought I'd walk through the

24   proposed modifications to the plan of reorganization.

25   Firstly, the trade creditor fund, which was identified in

1    the plan of reorganization as $7.5 million, will be doubled

2    to $15 million.  Also, the control and governance of that

3    trade creditor fund will be modified to provide that it

4    will be administered by the official unsecured creditors

5    committee in consultation with both CrossHarbor and the ad

6    hoc committee members.

7            In addition to that, the liquidating trust will

8    be established with more substantial funds to pursue claims

9    and recoveries for all of the creditors.  The amount being

10   funded to liquidating the trust at closing will be

11   increased by $2 million, from $375,000 to $2,375,000.

12           The governance of the liquidating trust is also

13   being addressed.  The liquidating trust will be established

14   with a seven-member board.  Four of the members will be

15   appointed by the prepetition agent, two by the Official

16   Committee of Unsecured Creditors, and one by the ad hoc

17   Class B members.  The parties have also agreed to designate

18   initial counsel for the liquidating trust.  The concern is

19   the trust should proceed actively to maximize the recovery

20   of all stakeholders.  And Holland & Hart has been

21   designated as the initial counsel to represent the trust in

22   obtaining further recoveries for the creditors and other

23   stakeholders.

24           There are certain designated matters.  All

25   matters of the liquidating trust will require the majority

1    vote of the board with two exceptions:  Any removal of

2    legal counsel or retention of additional legal counsel will

3    require a unanimous vote; and resolution or settlement of

4    certain designated matters, which are attached as an

5    exhibit to the settlement term sheet, will require a

6    five-member vote of the board.

7              Initially, those designated claims that require

8    the five-member vote, the Official Committee of Unsecured

9    Creditors will take the lead in attempting to settle those

10   matters during a 45-day period, will have the exclusive

11   right to seek to settle those claims in a 45-day period.

12   The distributions out of the liquidating trust were also

13   addressed and a waterfall of sorts was identified to

14   establish the ranking or priority of payments of recoveries

15   out of the liquidating trust.  The first $2 million will be

16   funded to the trade creditor fund to, again, increase the

17   trade creditor fund from $15 million to $17 million.

18             Secondly, up to $15 million will be paid to CIP

19   lending.  The DIP lender, the initial funder of the trade

20   creditor fund, they'll have the right to recover 15 million

21   to the extent the trade creditor fund was used to pay or to

22   purchase allowed Class 4 claims, unsecured claims.

23             Third in the waterfall, an additional $10 million

24   will go to pay allowed Class 4 general unsecured claims.

25   And the balance of any recoveries will be shared pro rata

1    among all allowed unsecured claims -- all allowed claims,

2    both secured and unsecured.

3          It was also contemplated that the debt portion of

4    the payable under the definitive agreement, the $80 million

5    promissory note, will be allocated exclusively to the

6    Class 3 claims, the prepetition secured claims.

7          Similarly, the prepetition claims will be

8    allocated all recoveries from the Farcheville property to

9    pay the prepetition secured and unsecured claims of the

10   prepetition lenders.

11         The agreement then provides the plan will be

12   modified to include the prepetition agent and prepetition

13   lenders as exculpated parties under Section 8.4 of the plan

14   and also provides for the exchange of mutual releases

15   between the parties that are parties to the settlement

16   agreement.

17         The settlement will be subject to Court approval

18   under Section -- or Bankruptcy Procedure 9019.  And there

19   are contemplated provisions relating to the Court's

20   existing interim partial order and other orders that

21   reference those.  As Mr. Green said, there is an ability to

22   co-invest.

23         The DIP loan.  There's a request being made for

24   the Court to extend the DIP loan to the earlier of June

25   30th or the closing date under the definitive agreement --

1   June 30th?

2          UNIDENTIFIED SPEAKER:  Oh I'm sorry, that's

3   the -- (inaudible, out of range of microphone.)

4          MR. LEVY:  -- right, June 30th, to allow time for

5   the plan to be modified and the closing to occur without

6   the DIP loan expiring, which I believe expires this

7   Wednesday.

8          I think Mr. Green has two other things he needs

9   to add.

10          THE COURT:  Okay.  Mr. Green.

11          MR. GREEN:  We're communicating very well these

12   days.

13          One of the stipulations that we neglected to

14   mention was that CIP Lending, which is the holder of the

15   first mortgage lien on Porcupine Creek, has agreed to

16   forbear from completing its foreclosure sale on that

17   property to the earlier -- to occur on July 30 and 30 days

18   after the effective date.

19          One additional item in terms of the way the cash

20   proceeds are flowing, just so Your Honor understands, with

21   respect to the 5 million increase in the purchase price,

22   the cash portion, a small amount of that is going to go, we

23   expect, to admins.  I think it's approximately -- it's less

24   than $1 million.  As Mr. Levy mentioned, 2 million of that

25   is going to the -- from the disbursing agent to the

1  liquidating trust to cede expense money.  And then the

2  unsecured creditors, through the trade creditor fund, gets

3  that money back.

4      In addition, to that, the gap amount, that little

5  bit over $2 million will also be used for the payment of

6  general unsecured claims so that -- just wanted to make

7  sure that there was a full tracing of that full 35 cash

8  portion.

9      THE COURT:  Mr. Beckett?

10      MR. BECKETT:  Just a clarification:  The gap

11  amount, the excess amount, does not go to general unsecured

12  claims; it goes back up into the trade creditor fund.

13      UNIDENTIFIED SPEAKER:  Fair enough.

14      MR. BECKETT:  And so while he's checking, Your

15  Honor, that brings the trade creditor fund - which was at

16  7.5, then went to 15 - to $19 million.

17      MR. GREEN:  Almost 20.  I think we both agree

18  that's basically it.

19      MR. LEVY:  Thank you, Your Honor.

20      THE COURT:  Okay, thank you.  I appreciate the

21  information.

22      Now, I just wanted to clarify -- well, let me

23  take up with the debtors.  That's fine, thank you.

24      MR. PATTEN:  Your Honor, what I'd like to do is

25  have Mr. Birinyi go through the other remaining objections,

1    most of which has been resolved.  But I'd like Mr. Birinyi

2    to address those, and then we can -- we haven't resolved

3    every objection, so we'll need to go through the

4    evidentiary part.

5              THE COURT:  Okay.

6              MR. PATTEN:  And we'll do that after

7    Mr. Birinyi's done.

8              THE COURT:  Okay.  Mr. Birinyi.

9              MR. LEVY:  Your Honor, if you have no more

10    questions for me or Mr. Green, we would like to continue

11    working on our new credit agreement.

12              THE COURT:  Absolutely.

13              MR. LEVY:  Thank you, Your Honor.

14              MR. BIRINYI:  Good morning, Your Honor.  Richard

15    Birinyi.

16              Let me go through -- I don't know how you have

17    them set up, but we have resolved with Mr. Grosvenor --

18              UNIDENTIFIED SPEAKER:  Grosvenor.

19              MR. BIRINYI:  Mr. Grosvenor.  His objection was

20    basically -- or primarily to the amount of the cure listed

21    in the schedule of assumed contracts.  He has actually got

22    a purchase and sale agreement for one of the condominium

23    units in the Warren Miller Lodge that has not closed.  He

24    spent a significant amount of money in upgrades when the

25    company didn't have enough money to finish the build-out of

1    the unit and basically didn't -- the debtor didn't have

2    enough money to close.  We put a zero amount in as a

3    placeholder for the cure.  That closing is still to take

4    place.  CrossHarbor, as the buyer, has assumed the

5    contract.  There may be a shortfall in the payment of the

6    American Bank lien to get clear title.  That's going to be

7    CrossHarbor's obligation under the plan.  To the extent

8    that there's any little fluff cure amount, that's going to

9    be the estate's obligation.  And the estate, as a Class 2

10   creditors, there's a bunch of construction liens on the

11   unit that will be cleaned up as a Class 2 claim.

12            So we just wanted to put on the record that we

13   have reached an agreement that the zero dollar amount in

14   the schedule is not binding because the people need to work

15   through the closing.

16            And I think his counsel is in court.

17            THE COURT:  So I guess to clarify, how was his

18   vote?

19            MR. BIRINYI:  I believe he voted in favor of the

20   plan.

21            THE COURT:  Okay.

22            MR. BIRINYI:  The objection was just to clarify

23   the zero dollar amount placeholder in the schedule of

24   assumed contracts.

25            THE COURT:  Okay, very good.

1          MR. GARDNER:  Your Honor, Trent Gardner for Mark

2     Grosvenor.

3          And we did vote for the plan.  As Mr. Birinyi

4     stated, it was more of a clarification.  We'll need to get

5     together after all of this to come up with a final dollar

6     amount for closing.

7          THE COURT:  Okay, very good.  Thank you.

8          MR. GARDNER:  Thank you.

9          MR. BIRINYI:  The next objection is, I think, the

10    LeMond Group.  And there are two different -- there's

11    Mr. LeMond's individual claim -- or individual objection

12    that's based on his, I guess you would say the promotional

13    wage claim that's different than the settlement claim for

14    his "B" shareholders; and then there's his collective

15    claim.

16          As I understand it, based on the provision of the

17    term sheet that authorizes the unsecured creditors

18    committee to be the exclusive negotiating agent with

19    respect to those claims for the first 45 days, they're

20    withdrawing their objections.

21          THE COURT:  Okay.

22          MR. BIRINYI:  So I think that's resolved as an

23    adjunct to the term sheet.

24          THE COURT:  Okay.

25          UNIDENTIFIED SPEAKER:  Your Honor?

1          THE COURT:  Yes.

2          MR. BIRINYI:  Oh, there was one clarification.

3   As he stood up, I remembered that I forgot the one

4   clarification.  And everybody is in agreement that -- and

5   it was not the intent, so this is -- it's no different.

6   Mr. LeMond and these other folks, because they have

7   residual claims, they are also pioneer members.  And if you

8   recall under the provisions related to pioneer members to

9   achieve uniformity with respect to the pioneer membership

10  claims going forward, the plan provides that the old

11  membership agreements were rejected and those people had an

12  option to enter into new pioneer agreements with the

13  reorganized debtor going forward after the effective date.

14          Some of the language in that election on the

15  ballot could be read as saying that they waive their claims

16  that were independent of the pioneer membership claims,

17  which is the -- they are claims based on the settlement

18  agreement of their "B" -- of their shareholder litigation

19  and the -- and Mr. LeMond's claim.  We've agreed that those

20  claims will continue to be in existence in the estate,

21  subject to your resolution, and not -- and nobody will

22  assert that the ballot waiver and election to take the new

23  membership waives those claims.  I think I said that right.

24          MR. MITCHELL:  That's accurate.

25          THE COURT:  If you could come up and just

1    acknowledge that, and also state your name for the record.

2           MR. MITCHELL:  I'm sorry, Your Honor.  David

3    Mitchell, representing the LeMond claims.

4           And Mr. Birinyi has accurately reflected our

5    understanding.

6           THE COURT:  Okay, thank you.

7           MR. BIRINYI:  The next one is the Lone View.

8           THE COURT:  The what?  Pardon?

9           MR. BIRINYI:  Lone View.  The Lone View objection

10   is, again, more or less a clarification.  The Lone View

11   transaction, Your Honor, was:  Lone View bought nine lots,

12   nine platted lots.  But the agreement was that they were

13   actually only going to buy six density units, and the nine

14   lots were going to be reconfigured into six lots.

15          My understanding is that the documentation of

16   that transaction is kind of confusing to the, to the

17   CrossHarbor real-estate lawyers.  And I've spoken with

18   Mr. Elsaesser, and he's advised me that I can advise the

19   Court what we're going to do on that is enter into a side

20   letter as to how that's going to continue to close.

21          The substance, the economic substance of the deal

22   is going to be worked out between CrossHarbor and Lone

23   View, but the technical -- technically, it's still going to

24   be rejected as an executory contract because they need to

25   rework slightly the deals.  The Goulston lawyers and

1    Mr. Elsaesser are going to work - triple tracks now - are

2    going to work over the next few days prior to us presenting

3    the actual confirmation order to achieve that resolution.

4            THE COURT:  Okay.

5            MR. BIRINYI:  And they're going to be in touch

6    starting this afternoon to try and resolve that.  I don't

7    think it's, it's -- once again, I think it's a win-win for

8    both sides.  So that's one of those deals where it's an

9    economic deal that makes sense to everybody because the

10   reorganized debtor gets three more density units that it

11   can sell; and the Lone View folks, they've basically

12   already paid for the nine units, so they're giving up three

13   density units.  They just need to figure out how to

14   reconfigure that.

15           Now, Mr. Elsaesser also represents - and these

16   are the individuals that are the Yellowstone Club World

17   members - MacNaughton and -- I think they are, I think

18   there are eight of them.  The same way as the LeMond folks

19   did, in recognition of the settlement agreement's term that

20   gives exclusive authority to the uniform creditors under --

21   yeah, to the -- "uniform".  "UCC", and it always confuses

22   me.  But the unsecured creditors committee, to negotiate,

23   they've agreed to withdraw their objection, as well.  And

24   he authorized me to make that representation to the Court

25   this morning.

1          THE COURT:  Okay.

2          MR. BIRINYI:  The final one, and I have to --

3   because Mr. Bolter lives in -- Dubai, he lives in Dubai.

4          THE COURT:  Did you say "Bolter"?

5          MR. BIRINYI:  Mr. Bolter is the -- we've been in

6   communication with his counsel.  He, as well, had an

7   objection that actually requests clarification on the cure

8   amount in the schedules.  He's a member, a residential

9   member, but he had, shortly before the filing, put a large

10  deposit that is reflected as a credit right now on his

11  account.  We have proposals out to him, and his client is

12  considering them.  CrossHarbor has tentatively agreed to

13  indicate that they would agree that he could continue to

14  keep that credit on the books for use against rental of

15  company-owned properties in the future.  He hasn't built

16  his house yet, apparently, so when he comes to the club,

17  which he does for about 20 to 30 days each year, he has to

18  rent the piece of property.

19          And I think that's the ones that have been

20  resolved.  We already talked about the two taxing

21  authorities.  The only ones that I believe -- we haven't

22  addressed the members.

23          Jonathan, did you put a placeholder in?

24          MR. ALTER:  Jonathan Alter, Your Honor, on behalf

25  of the members.

1           We filed a conditional objection to the plan,

2    based upon a reservation of rights in light of what

3    happened at the auction.  Suffice it to say that in light

4    of this settlement, the members are very gratified, very

5    happy a resolution could be reached.  And we withdraw the

6    objection.

7           THE COURT:  Very good.  Thank you.

8           MR. ALTER:  You're very welcome.

9           MR. BIRINYI:  And Mr. Beckett reminded me --

10   what's Yoav's last name?

11           UNIDENTIFIED SPEAKER:  Rubinstein.

12           MR. BIRINYI:  Rubinstein.  There was a glitch in

13   the -- one of the schedules that we're going to modify.

14   Mr. Rubinstein actually owns two residential memberships.

15   And the second one, somehow or another, was omitted from

16   the schedule.  That's going to be added.  So I think that

17   leaves us --

18           MR. WHITMORE:  Your Honor?

19           THE COURT:  Mr. Whitmore.

20           MR. WHITMORE:  Your Honor, I just want to

21   clarify, if I could, for the Class B folks, who voted in

22   favor of the plan in its prior version and have filed a

23   conditional objection receiving an extension of time to

24   object, but I assume there will be an opportunity to review

25   the revised plan and to either withdraw our objection or

1    consent to the revised plan at some appropriate time, and

2    that that moment isn't passing here as we speak.

3              THE COURT:  Okay.  Mr. Birinyi.

4              MR. BIRINYI:  Okay.  Those are the resolved ones,

5    which leaves us with, by my count, three unresolved ones:

6    Mr. Sumpter, Mr. Blixseth, and Desert Ranch, LLP.

7              Mr. Blixseth and Desert Ranch, LLP, as I recall,

8    incorporate all of the Credit Suisse objections, so those

9    will require the testimony that Mr. Patten's going to give

10   you.

11             Mr. Sumpter, I believe, is actually a legal

12   argument that we can basically take up either now or later,

13   but at your convenience.  I'm going to do the legal --

14             THE COURT:  Is there anyone here representing

15   Mr. Sumpter?

16             MR. BIRINYI:  Stephen Mackey filed the objection,

17   Your Honor.

18             THE COURT:  Okay.  Why don't you just give me a

19   brief -- and maybe we have to take that up later.  We'll

20   see.

21             MR. BIRINYI:  Mr. Sumpter has what's labeled as a

22   residential contract, membership contract, but it is

23   actually a nonstandard, if you will, residential contract

24   because it requires the payment of dues never.  So it's got

25   free dues.  Mr. Sumpter was -- and if -- we're prepared to

1    present testimony about this, if you want us to, but

2    Mr. Sumpter was a general manager at the time Mr. Blixseth

3    controlled the property.

4            On July 9th, at the same time that the marriage

5    settlement agreement was signed, Mr. Blixseth and

6    Mr. Sumpter signed a modification to his employment

7    contract and converted his prior, prior membership interest

8    into this unusual - as in it's the only one, as I

9    understand it - but this unusual residential agreement that

10   provided for no dues ever.

11           In addition, he has some estate assets that he

12   hasn't turned over.  I think we have -- he has a Porsche

13   that the estate has title to, and he also has the liquor

14   license for the Buck's T-4 property in his name.  Of

15   course, Montana liquor licenses have been to be in

16   individual names.  But the tenor of his objection to the

17   plan is that the debtors, in their exercise of business

18   judgment, shouldn't reject his residential membership

19   contract.

20           The legal standard is business judgment and, I

21   think, given all the facts and circumstances, the high

22   probability that there's a dispute over his claim.  In

23   point of fact, it may well be that it was a fraudulent

24   transfer at the time.  Certainly, we take the position that

25   the change in the terms of his employment agreement for no

1    consideration was a fraudulent transfer so that his claim

2    is, in all likelihood, going to be objected to.

3            So we just think that the exercise of business

4    judgment is clearly on our side and that his objection,

5    therefore, is not well-taken to the, to the confirmation of

6    the plan because, like I say, he just says we should assume

7    it and, instead, we reject it.

8            THE COURT:  You know, you are prepared to put on

9    some testimony to that?

10           MR. BIRINYI:  Yes, Your Honor, if you want.

11           THE COURT:  I think we should.  Obviously, if he

12   raises the objection, he has the opportunity to attend this

13   hearing and raise it.  Why don't we take it up.

14           MR. BIRINYI:  Okay.  So Mr. Patten was going to

15   do the witness examination, because I think -- I don't know

16   whether you want opening statements on the Blixseth and

17   Desert Ranch objections or just go into testimony.

18           THE COURT:  I think we just go to testimony,

19   sure.

20           MR. BIRINYI:  Okay.

21           THE COURT:  Mr. Patten -- oh, Mr. McKay.

22           MR. McKAY:  Before we get into that, Your Honor,

23   I'm happy to come here on some more mundane matters just to

24   inform the Court that the debtor is current -- debtors are

25   all current, excuse me, in filing their monthly operating

1  reports.  When I last left the office last Wednesday, the

2  first-quarter fee had not been paid.  Mr. Rezentes, I

3  talked to him this morning, and it was his understanding

4  from a conversation in probably April in Andy's office that

5  those fees had been mailed as of Friday.  So I haven't been

6  able to confirm that, but I'm sure that they're good for

7  the fees.

8        We have our outstanding motion to appoint a

9  trustee and, Your Honor, I will withdraw that at this time

10  without prejudice.  Hopefully, things will go along and it

11  will not be required to refile.

12        And lastly, because of this somewhat unusual plan

13  structure and the liquidating trust, and so forth, I

14  haven't had a chance to really think through everything

15  thoroughly myself or discuss this with the debtors.  But I

16  would just ask the Court to retain jurisdiction of over any

17  issues that we may have as to what will constitute a

18  disbursement for quarterly fee purposes as we go forward

19  and these transactions come to fruition.

20        THE COURT:  Okay.  I'm certain they really want

21  to move it along quickly so they're not continuing to pay

22  trustee fees.

23        MR. McKAY:  Oh, I'm sure they will.  And I think

24  they can probably get a final decree entered and have the

25  liquidating trust exist as an independent entity going

1   forward.  But I just want to make sure that if we have a

2   dispute, we will certainly do everything we can to work

3   things out.

4            THE COURT:  Okay.

5            MR. McKAY:  But we never know, so --

6            THE COURT:  Right, I understand.

7            MR. McKAY:  Thank you, Your Honor.

8            THE COURT:  Mr. Patten.

9            It sounded like somebody was getting their money

10  out back there to contribute, I guess, to the fund.

11           MR. PATTEN:  Your Honor, I'd call Ron Greenspan.

12           THE COURT:  Okay.  Mr. Greenspan, if you would

13  come forward to be sworn, please.

14                RONALD GREENSPAN, WITNESS, SWORN

15                     DIRECT EXAMINATION

16  BY MR. PATTEN:

17  Q.  Please state your name.

18  A.  Ronald Greenspan.

19  Q.  Mr. Greenspan, you're the CRO --

20  A.  Yes.

21  Q.  -- in this case?

22  A.  I'm sorry.  Yes.

23  Q.  Are you familiar with the proposed Chapter 11 plan?

24  A.  I am.

25           THE COURT:  Mr. Patten, maybe just for the

1    record, disclose what "CRO" is.

2    Q.  (By Mr. Patten)  Could you briefly describe what is

3    meant by "CRO"?

4    A.  It stands for "chief restructuring officer".  And I've

5    been responsible for most of the negotiations and have been

6    involved in the development of the plan of reorganization.

7    Q.  Have you acted as a CRO in any other cases?

8    A.  Yes.

9    Q.  How many?

10   A.  As absolute formally a CRO, I mean a handful; and doing

11   those responsibilities as financial adviser, in very many.

12   Q.  Is that what you -- that's the focus of your work,

13   right?

14   A.  The sole focus of my work is debtor and creditor work

15   involved in major bankruptcies.

16          THE COURT:  That's sufficient.  I just wanted to

17   make sure that "CRO", people knew what that meant in the

18   record.

19          MR. PATTEN:  Okay.

20   Q.  (By Mr. Patten)  Mr. Greenspan, have you helped

21   formulate the terms of the proposed plan?

22   A.  Yes, I did.

23   Q.  And you're familiar with the Credit Suisse/CrossHarbor

24   settlement that Mr. Levy and Mr. Green described earlier?

25   A.  I am.

1   Q.   Were you involved in the negotiation of terms of that

2   settlement?

3   A.   Yes.

4   Q.   Does the settlement, if incorporated into the plan, put

5   into effect the Court's order issued about a week ago on

6   subordinating a Credit Suisse loan to the claims of the

7   general unsecured creditors?

8   A.   I believe it has that economic effect.

9   Q.   Will the plan discriminate between any non-insider

10   general unsecured creditors?

11   A.   I do not believe so.

12   Q.   Will the plan, as modified by the settlement, provide

13   for full payment of the general unsecured claims,

14   non-insider general unsecured claims?

15   A.   It's certainly our estimate and expectation that it

16   does.

17   Q.   Will the plan, as modified by the settlement, pay the

18   claims in the correct order of priority, given -- taking

19   into consideration the Court's order issued in the

20   adversary a week ago subordinating the Credit Suisse

21   claims?

22   A.   Yes.

23   Q.   The first claims to be paid will be the administrative?

24   A.   Correct.

25   Q.   Then the priority unsecured?

1   A.   Correct.

2   Q.   Then the general unsecured?

3   A.   Yes.

4   Q.   And then the remaining funds will be distributed pro

5   rata, pari passu between the deficiency claim of Credit

6   Suisse and whatever the remaining unpaid unsecured claims

7   are, including the insider unsecured claims?

8   A.   Yes.

9   Q.   Will any of the -- you're knowledgeable of the current

10  officers and directors, persons in control of the debtor

11  entities?

12  A.   Yes.

13  Q.   Is that Edra Blixseth?

14  A.   Yes.

15  Q.   Will she remain in control of the reorganized debtor?

16  A.   No.

17  Q.   Do you know who will be in control of the reorganized

18  debtors?

19  A.   It will be a fund affiliated with CrossHarbor Capital.

20  Q.   Okay.  And to your knowledge, is that fund currently in

21  control of the debtors?

22  A.   No.

23  Q.   Has the liquidating trustee been identified?

24  A.   I don't believe so.

25  Q.   Do you know if it's anticipated that Edra Blixseth

1  would be the liquidating trustee?

2  A.  I do not think she will be.

3  Q.  Okay.  And are you aware of who will direct the trustee

4  in the administration of the liquidating trusts?

5  A.  Yes.

6  Q.  Who was that?

7  A.  There's a board constituted, I believe, of seven

8  members initially, four of which are -- I'm sorry -- yeah,

9  four of which are appointed by the prepetition secured

10  creditors, two by the UCC, and one by the Class B; with

11  most decisions requiring a majority vote, but some

12  decisions requiring unanimity, particularly the choice of

13  counsel.

14  Q.  You were present at the auction that was conducted last

15  week in Billings?

16  A.  Yes.

17  Q.  And you're familiar with the various bids that were

18  made at the auction?

19  A.  Yes.

20  Q.  Is the settlement price -- terms of the settlement, how

21  does that compare with where the bids were at the time the

22  auction was recessed?

23  A.  At the point the auction was recessed, the then open

24  bid was $150 million composed of approximately 40 million

25  of cash and the balance credit bid.  The settlement

1    provide -- the settlement is nominally at 100 -- I want to

2    say $115 million; yeah, $115 million, but provides

3    meaningfully more cash to satisfy various unsecured

4    creditors and to fund the litigation trust.

5    Q.  Do you recall how the CrossHarbor bid was ratcheted up

6    during the course of the auction in relationship with the

7    Credit Suisse bid?

8    A.  Yes.

9    Q.  Was there an amount allocated to the CrossHarbor bid

10   taking into consideration the working capital that Credit

11   Suisse had -- or, excuse me, CrossHarbor had committed to

12   invest in the reorganized debtor?

13   A.  Yes.  I believe there was a $10 million increment

14   associated -- a benefit given to the CrossHarbor bid on

15   account of the more favorable and secure terms.

16   Q.  Okay.  Had you had an opportunity during or before the

17   auction process to review the Credit Suisse business plan?

18   A.  Yes.

19   Q.  And did you have any concerns regarding --

20              THE COURT:  Mr. Chehi?

21              MR. CHEHI:  I'm going to object to the line of

22   questioning, unless there's a proffer of some sort to

23   justify why we would be exploring at this stage of this

24   confirmation hearing the valuations, and the like, in

25   respect of the auction process.  Because we would certainly

1   take issue with the debtors' views of values and relative

2   values and merits of the respective bids that were made by

3   the parties during the auction which was truncated and not

4   concluded.  And with that, I -- you know, again, there may

5   be some reason to get into this; but, otherwise, we're

6   going to object to any proposed findings that would be

7   determinative of the values of our bids, at least.

8          THE COURT:  Okay.

9          MR. PATTEN:  What I'm trying to establish, Your

10  Honor, is:  We do have an objection from Mr. Blixseth that

11  incorporated all of the Credit Suisse objections.  And so I

12  think that it's necessary to have a record as to the

13  adequacy of the terms of the Credit Suisse/CrossHarbor

14  settlement to reflect what I believe is, is the --

15  essentially, the stage of the auction when it was

16  terminated.

17         THE COURT:  Well, is there any disagreement that,

18  in fact, the settlement is, in fact, more value than where

19  we were at at the time the auction was recessed?

20         MR. PATTEN:  Not, not by the debtors, Your Honor,

21  but Mr. Blixseth may argue that it isn't.  And I need to

22  have a record for that eventuality.

23         THE COURT:  Mr. Chehi.

24         MR. CHEHI:  I think Mr. Greenspan testified just

25  a few minutes ago that the consideration available to

1   creditors directly through the settlement process and the

2   consideration available through the settlement to fund the

3   liquidating trust for purposes of generating additional

4   value for creditors, under the settlement exceeded those

5   respective values that were available under any of the

6   proposals at the auction.  And I think that would satisfy

7   the showing that the settled outcomes and values are

8   superior to whatever might have emerged on a preliminary

9   basis at the auction.

10          THE COURT:  Okay.

11          MR. PATTEN:  What I'd like in the record, Your

12   Honor, is Mr. Greenspan's -- I would like evidence that the

13   terms of the settlement reflect a fair value for the

14   property being conveyed to the reorganized debtor.

15          THE COURT:  Well, you may be able to just ask him

16   that.

17          MR. PATTEN:  Okay.

18          THE COURT:  I mean and maybe he already stated

19   that.

20          MR. CHEHI:  And, again, the clarification, it's

21   the terms of the settlement are providing for and

22   incorporating and adjusting the value that's being paid by

23   the CrossHarbor acquisition entity for the equity of the

24   reorganized company and not for the property of the

25   debtors' estates or the assets.

1          MR. PATTEN:  Okay.

2          THE COURT:  I mean, also, I guess, you know, to

3   add to the record, having been involved somewhat, I guess,

4   as a facilitator for a period of time in the matter, it

5   would appear, based upon what a has been related to me this

6   morning as to the conditions and the material contained in

7   the term sheet that, in fact, the settlement is of greater

8   value to the estate than where the bids were at the time, I

9   guess, I recessed the auction to allow parties to go back

10  to the hotel to continue, if they wished to do so.

11  Q.  (By Mr. Patten)  Mr. Greenspan, did you just hear the

12  Court's comments on the fair value?

13  A.  I did.

14  Q.  Do you concur with that?

15  A.  I concur completely.

16  Q.  Thank you.

17          THE COURT:  Would it matter?

18          MR. PATTEN:  I need a record, Your Honor.

19          THE COURT:  I know.

20          MR. PATTEN:  Maybe.

21  Q.  (By Mr. Patten)  Mr. Greenspan, are you familiar with

22  the CrossHarbor business plan?

23  A.  Yes.

24  Q.  And are you familiar with the projections of revenue

25  and expense?

1    A.   Yes.

2    Q.   And in the course of your involvement as chief

3    restructuring officer, have you become familiar with the

4    historic revenue and expense of the various Yellowstone

5    Club entities?

6    A.   Yes.

7              MR. PATTEN:   Your Honor, may I approach the

8    witness?

9              THE COURT:   You may.

10              THE WITNESS:   Thank you.

11   Q.   (By Mr. Patten)   Mr. Greenspan, I've handed you what's

12   been marked as Exhibits A, B, and C.   Do you recognize

13   those documents?

14   A.   Yes, yes.

15   Q.   Can you tell the Court what Exhibit A is?

16   A.   Oh, after the late nights, I can't read small print

17   anymore, but the Exhibit A is the liquidation analysis that

18   was attached to the disclosure statement.

19   Q.   And was Exhibit A prepared under your supervision and

20   direction?

21   A.   Yes, it was.

22   Q.   Was it prepared based on information that you obtained

23   in the course of your acting as chief restructuring

24   officer?

25   A.   Yes.

1   Q.  And is it prepared in accordance with your knowledge of

2   bankruptcy law and priorities, and such?

3   A.  Yes.

4           MR. PATTEN:  Your Honor, I'd move the admission

5   of Exhibit A.

6           THE COURT:  Any objection?  Exhibit A is

7   admitted.

8                EXHIBIT A ADMITTED INTO EVIDENCE

9   BY MR. PATTEN:

10  Q.  Can you describe to the Court what Exhibit B is?

11  A.  Exhibit B also is attached to the disclosure statement,

12  and it is the summary analysis of the distribution of cash

13  payment as of the effective date pursuant to the filed

14  disclosure statement and plan.

15  Q.  And was Exhibit B also prepared under your supervision

16  and instruction?

17  A.  Yes.

18  Q.  And is it based consistent with your knowledge of the

19  then proposed distribution of cash as of the effective

20  date?

21  A.  I'm sorry, yes.

22  Q.  The proposed distribution has been modified under the

23  settlement reached between Credit Suisse and CrossHarbor,

24  correct?

25  A.  That is correct, as well as more cash available at

1   closing than indicated on this exhibit.

2   Q.  Okay.

3         MR. PATTEN:  I'd move the admission of Exhibit B.

4         THE COURT:  Any objection?  Exhibit B is

5   admitted.

6         EXHIBIT B ADMITTED INTO EVIDENCE

7   BY MR. PATTEN:

8   Q.  And then, finally, can you identify what Exhibit C is?

9   A.  Exhibit C is the pro forma projections of future

10  operations and cash flows as attached to the disclosure

11  statement.

12  Q.  Was Exhibit C prepared by CrossHarbor?

13  A.  Yes.  For clarification, we have two sets of

14  projections that were attached to the disclosure statement:

15  One showed, for lack of better description, the CrossHarbor

16  anticipated business operations; and a second one, which

17  was an alternative debtor projections.

18      This is, in fact, the CrossHarbor ones that we had

19  reviewed.

20  Q.  Okay.  And you're familiar with the projections set out

21  in the CrossHarbor --

22  A.  Yes, I am.

23  Q.  And does Exhibit C reflect the CrossHarbor business

24  plan or at least the financial parts of the business plan?

25  A.  As I understand it, yes.

1    Q.  Is Exhibit C the business plan, as you know it, going

2    forward from the effective date?

3    A.  That is my understanding.

4           MR. PATTEN:  Your Honor, I'd move the admission

5    of Exhibit C.

6           THE COURT:  Any objection?  Exhibit C is

7    admitted.

8              EXHIBIT C ADMITTED INTO EVIDENCE

9    BY MR. PATTEN:

10   Q.  Look, if you would, Mr. Greenspan, at Exhibit B.

11   A.  Yes, sir.

12   Q.  Taking into account the additional funds that will be

13   provided, cash funds that will be provided under the

14   CrossHarbor/Credit Suisse settlement, are you satisfied

15   that there will be sufficient monies available to pay the

16   administrative expenses of the estate?

17   A.  Yes.

18   Q.  And have you obtained information from the various

19   professionals as to the amount of the administrative

20   expenses of the estate?

21   A.  Yes.

22   Q.  Will there be sufficient funds under the settlement to

23   pay the debtor-in-possession loan?

24   A.  Yes.

25   Q.  Will there be sufficient funds available under the

1  settlement to pay the allowed priority claims?

2  A.  Yes.

3  Q.  And do you have an opinion as to whether the funds

4  available will be sufficient to pay all of the general

5  unsecured non-insider claims?

6  A.  I believe they should be.

7  Q.  So the funds under the settlement which were

8  incorporated into the plan will pay all the costs of

9  administration, all the priority claims, and will satisfy

10  all of the general unsecured nonpriority claims?

11  A.  They should.

12  Q.  And do you have any anticipation that there will be

13  funds above and beyond that that would be applied to the

14  insider unsecured claims and the Credit Suisse deficiency

15  claim?

16  A.  There certainly should be.

17  Q.  Do you have an opinion as to whether the plan, as

18  modified by the settlement, reflects the best outcome for

19  the general unsecured creditors in this case?

20  A.  I think it definitely does.

21  Q.  Do you have an opinion about whether it reflects the

22  best outcome for the non -- or, excuse me, for the insider

23  general unsecured claims in this case?

24  A.  I mean I believe so.

25  Q.  Looking at Exhibit C, are you satisfied that the

1    projections set out in Exhibit C are achievable in today's

2    economic climate?

3    A.   I certainly think they're reasonable and probably

4    achievable.  And given the contingency, the availability,

5    the capital commitment availability, I don't think there is

6    a significant probability that they won't be achieved.

7    Q.   And have you done -- have you been provided any

8    information demonstrating or verifying the funds available,

9    the money available to CrossHarbor to invest this working

10   capital?

11   A.   Yes, I've seen the auditor's reports.

12   Q.   And does Credit Suisse have -- excuse me, does

13   CrossHarbor have the funds available to perform under this

14   plan, including the injection of the working capital that's

15   contemplated under the plan?

16   A.   It certainly appears so.

17   Q.   Do you have an opinion about whether or not a

18   liquidation or further restructure is going to be necessary

19   in this case?

20   A.   I do.

21   Q.   What's that opinion?

22   A.   That it is not likely.

23   Q.   Under the settlement, will the nonprepetition lenders

24   retain their liens under the plan or be paid the value of

25   their liens --

```
 1    A.  I --

 2    Q.  -- under the plan?

 3    A.  I'm sorry.  I believe so.

 4    Q.  Are you familiar with the exculpation clause in the

 5    plan?

 6    A.  Yes.

 7    Q.  Have any of the professionals in this case been

 8    threatened during the course of these proceedings?

 9    A.  Well, people might have different opinions on that.  I

10    think so.

11    Q.  Is that a basis or purpose for the exculpation clause?

12    A.  I think that's one of them.

13              MR. PATTEN:  Thank you.  That's all I have.

14              THE COURT:  Mr. Patten?

15              MR. PATTEN:  That's all I have.

16              THE COURT:  Mr. Guthals.

17              MR. GUTHALS:  Thank you, Your Honor.

18                        CROSS-EXAMINATION

19    BY MR. GUTHALS:

20    Q.  Mr. Greenspan, I'm Joel Guthals.  You and I have met

21    before, right?

22    A.  We have.

23    Q.  Good morning.  I represent Mr. Blixseth and also Desert

24    Ranch, LLLP.

25       On your Exhibit B that you were looking at just a few
```

1    minutes ago, there is an amount at the bottom of that

2    document that sets forth the claim of Prim; is that right?

3    A.  That is correct.

4    Q.  What's the amount of that claim?

5    A.  What is shown on Exhibit B is $10,095,123.

6    Q.  Okay.  Are you familiar with the Prim claim?

7    A.  Yes.

8    Q.  Okay.  And you're aware that Prim filed an amended

9    proof of claim --

10   A.  Yes -- oh, I'm sorry.

11   Q.  -- in which they stated a secured claim in the amount

12   of $4 million and an unsecured claim in the amount of

13   $6,095,123.29.  Are you aware of that?

14   A.  I'm aware of the amended claim with that type of

15   breakdown between secured and unsecured.  I don't, sitting

16   here, recollect the exact dollar amounts, but it's in the

17   range of what you said.

18        MR. GUTHALS:  Your Honor, for the record, that is

19   Claim No. 224; and the amendment is 224, too, I believe.

20        THE COURT:  Thank you.

21   Q.  (By Mr. Guthals)  Mr. Greenspan, I'm looking at the

22   claim, and it's dated March 18, 2009.  Do you disagree with

23   that?

24   A.  Well, I mean I -- do I disagree that you're looking at

25   it?  No, I don't know.  What I just told you was that I --

1   Q.   You disagree that the amended claim was filed in

2   March 18, 2009.

3   A.   I mean I know it was filed after the disclosure

4   statement, after the date of the schedule.  I don't

5   recollect sitting here the exact date.

6   Q.   Okay.  And as chief restructuring officer of the

7   debtor, has the debtor done anything to object to this

8   claim?

9   A.   My recollection sitting here is we have not filed an

10  objection yet.

11  Q.   Okay.  And you're a bankruptcy expert, right?  Is that

12  correct, you're a bankruptcy expert?

13  A.   I think so.

14  Q.   Yes.  And so you're aware that if a proof of claim is

15  filed and no objection is filed against it, then that claim

16  is deemed allowed; is that right?

17  A.   Well, if no objection is ultimately filed, that's

18  correct.

19  Q.   Well, as we are here today at the confirmation hearing,

20  we have a claim for which no objection has been filed,

21  right?

22  A.   That's my recollection.

23  Q.   Okay.  And so as we are here at the confirmation

24  hearing this morning, this claim, which is $4 million

25  secured and $6 million unsecured, is deemed allowed, right?

1    A.   Well, I'll leave that to the lawyers and judge to

2    determine the legal effect.

3    Q.   Okay.  And what the plan seeks to do upon the

4    confirmation is to have a satisfaction of the claim that

5    Prim exercises its foreclosure remedies, its full

6    satisfaction for the claim, right?

7    A.   At the time that the disclosure statement was filed,

8    Prim's claim was fully a secured claim.  It was prior to

9    the amendment.  So I think the treatment you describe is,

10   in fact, what's set forth in the disclosure statement and

11   plan.

12   Q.   Well, it's set forth in the second amended plan, is it

13   not?

14   A.   I believe so, which I believe was early March.

15   Q.   And, in fact, the plan -- I'm reading 1.100 of the

16   second amended plan, which is the plan that's before the

17   Court this morning.  It says that (quoted as recorded):

18          "The Prim claims, meaning the claims of Prim

19   Vintage Development, LP, against YB and YC, which claims

20   are alleged secured by the 160-acre tract of land located

21   within the Yellowstone Club and evidenced by a proof of

22   claim dated January 22, 2009, as amended by a proof of

23   claim dated March 18, 2009."

24       Will you agree with that?

25   A.   I believe so.

1   Q.   Okay.  And then if we go to page -- I think this is

2   page 23 of the second amended plan, this is the table that

3   shows --

4             THE COURT:  Mr. Patten.

5             MR. PATTEN:  Your Honor, may I approach the

6   witness and give him a copy of the plan so he can read

7   along with the --

8             THE COURT:  Certainly.  You may approach.

9             THE WITNESS:  Mr. Guthals, I'm sorry, can you

10  please repeat which section you're reading from?

11  Q.   (By Mr. Guthals)  Yes.  I think, Mr. Greenspan, it's on

12  page 23 of the plan that sets the Court's docket number on

13  it.  This is the table that summarizes how the claims are

14  going to be treated.

15  A.   Are you looking at the first mended or the second

16  amended?

17  Q.   Second amended plan, sir.

18  A.   Okay.

19  Q.   This is the table that is in front of the section that

20  begins Article III.

21  A.   Okay, I have that.  That's on page 15 of the version I

22  have, but it is the --

23  Q.   Okay.

24  A.   -- table that lists each of the classes and the claim

25  and the interest and the status.

1   Q.   Okay.  And then on that table, you'll see:  Class 11-B

2   Prim secured claims.

3        Right?

4   A.   Yes.

5   Q.   Do you see that?  And the status is that it's

6   unimpaired, right?

7   A.   Correct.

8   Q.   And that it's not entitled to vote, right?

9   A.   Correct.

10  Q.   Okay.  And then if you will turn a few pages into the

11  second amended Chapter 11 plan, you'll come to

12  Section 3.11.

13  A.   Yes.

14  Q.   And that takes care of - (inaudible) - Class 11, the

15  Prim claim, right?

16  A.   Actually, I think that's probably 3.1.1.  Let me -- or,

17  I'm sorry, 3.11.

18  Q.   Yeah, 3.11.  And that entire paragraph, then, covers

19  the Prim claim, right?

20  A.   That is correct.

21  Q.   And what this provides is that (quoted as recorded):

22          "The holder of the allowed Prim secured claim

23  shall be entitled to commence any collection action

24  pursuant to Montana law.  And that's its sole and exclusive

25  remedy."

1      Is that right?

2   A.   Correct.

3   Q.   Okay.  And then it further says that (quoted as

4   recorded):

5           "Provided, however, that in no event shall the

6   reorganized debtor be obligated in any way on account of

7   any Prim claim."

8      That's what it says, right?

9   A.   I'm sorry, where are you reading from?

10  Q.   The same paragraph, just down a few lines.

11  A.   Okay, let me get caught up with you.

12  Q.   Okay.  I'm at 3.11.3, treatment.

13  A.   Yes.

14  Q.   Okay.  So I just want to make sure that we have a good

15  record of this, that --

16           MR. PATTEN:  Your Honor --

17           MR. GUTHALS:  I'm sorry, did somebody say

18  something?

19           THE COURT:  I was looking around myself,

20  Mr. Guthals.  I didn't see who said something.

21           Mr. Patten?

22           MR. PATTEN:  We were going to start an objection,

23  but we were premature, so --

24           THE COURT:  Oh, okay.  Please proceed,

25  Mr. Guthals.

1          MR. GUTHALS:  Thank you, Your Honor.

2    Q.  (By Mr. Guthals)  And the plan provides that (quoted as

3    recorded):

4          "The sole exclusive remedy will be the

5    foreclosure action, and that in no event shall the

6    reorganized debtor shall be obligated in any way on account

7    of any Prim claim."

8       Is that right?

9    A.  Correct.

10   Q.  Okay.  And then it further goes on to say that (quoted

11   as recorded):

12          "On the effective date, the reorganized debtors

13   will receive an option to purchase the Prim collateral from

14   the owner of the Prim claim for $1."

15      Is that what it says?

16   A.  Yes.

17   Q.  And what happened, Mr. Greenspan -- we've seen what

18   happened to the Prim secured claim, but what happened to

19   the Prim unsecured claim of $6 million?

20          MR. PATTEN:  Your Honor.

21          THE COURT:  Mr. Patten.

22          MR. PATTEN:  I want to make an objection.  It

23   calls for a legal conclusion.  Whether or not Mr. Prim is

24   entitled to a deficiency is a legal issue.  Your Honor, we

25   have a seller-financed mortgage.  And under Montana law,

1    purchase money mortgages are not entitled to deficiencies.

2              MR. GUTHALS:  Your Honor, I'm just asking the

3    witness to explain what the plan provides.

4              THE COURT:  Mr. Patten.

5              MR. PATTEN:  Well, if that's the case, the plan

6    speaks for itself.

7              THE COURT:  Sustained.

8              MR. GUTHALS:  I have a few more questions, Your

9    Honor, if I may just have a moment here.

10             THE COURT:  You may.

11             MR. GUTHALS:  Thank you.

12   Q.  (By Mr. Guthals)  Mr. Greenspan, it's my understanding

13   that in the settlement agreement that has been reached

14   between Credit Suisse and CrossHarbor, there will continue

15   to be nondebtor releases; is that right?

16   A.  Well, the settlement agreement involves additional

17   parties than those two you just mentioned, but it does

18   include nondebtor releases.

19   Q.  Okay.  And none of us have seen these terms.

20   Apparently, they're being worked out right now; is that

21   correct?  They're being hammered out in a separate room?

22   A.  No.  I believe those terms have been finalized and are

23   part of the term sheet that was executed.  What is being

24   worked on right now is simply the details of the

25   post-confirmation credit agreement governing the

1    $80 million note.

2    Q.  Well, then you know what, what parties are covered by

3    these releases; is that correct?

4    A.  I've certainly read it, yes.

5    Q.  So can you tell me:  Is Edra Blixseth covered by the

6    releases?

7    A.  My recollection --

8              MR. PATTEN:  Your Honor, may I approach the

9    witness and provide him with a copy of the term sheet?

10             THE COURT:  You may.

11             THE WITNESS:  Thank you.  Mr. Guthals, I'm sorry,

12   the question was?

13   Q.  (By Mr. Guthals)  I'm asking you, sir, if you can tell

14   us who was covered by these releases.

15   A.  Well, first, it starts with the releases that are

16   provided in the plan, the second amended plan.  So it

17   starts with those.  In addition, the pre -- excuse me, the

18   prepetition agent and the prepetition lenders are added as

19   additional exculpated parties, as defined in the plan.  And

20   then in addition, CrossHarbor, CrossHarbor Institutional

21   Partners, CIP Lending, CrossHarbor Capital Partners, LLC,

22   and their affiliates with interest in the Yellowstone Club;

23   in addition, the UCC and the members of the UCC, solely in

24   their capacities as members thereof, the debtors, the

25   reorganized debtors, the prepetition agent and prepetition

```
 1   lenders with respect to releases dealing with the

 2   Yellowstone Club or the debtors.

 3       And then it further provides that the releases do not

 4   apply to any willful misconduct by any individual person

 5   with the fiduciary duties to the UCC, the debtors, or the

 6   debtors' estates.

 7   Q.  Okay.  Sir, does the second amended plan still call for

 8   a substantive consolidation?

 9   A.  It provides for a substantive consolidation only

10   amongst two of the - (inaudible) - been late; two of, I

11   want to say, four debtors.  But there's two entities that

12   are substantively consolidated.  But that's not changed.

13           MR. GUTHALS:  Okay.  That's all the questions I

14   have.  Thank you.

15           THE COURT:  Thank you, Mr. Guthals.

16           Mr. Patten?

17           MR. PATTEN:  No redirect.

18           THE COURT:  Mr. Moore.

19           MR. MOORE:  Thank you.

20                       CROSS-EXAMINATION

21   BY MR. MOORE:

22   Q.  Mr. Greenspan, you're familiar with the terms of the

23   original plan and the treatment of creditors who are

24   impaired and unimpaired under the plan?

25   A.  Yes.
```

1    Q.   Okay.  And you're also familiar with the settlement

2    agreement and how it affects the various classes of claims?

3    A.   Yes.

4    Q.   Does the settlement agreement adversely impact any of

5    those classes of claims other than those who have agreed to

6    the treatment provided under the settlement agreement?

7    A.   I do not believe that it adversely affects any such

8    class.

9    Q.   Okay.  And with respect to the -- excuse me, the

10   Class 11 treatment in 3.11 --

11   A.   You'll have to refresh my recollection of which is

12   Class 11.

13   Q.   It's page 21.

14   A.   Oh, the Prim secured claims.

15   Q.   Yes.

16   A.   Go ahead.

17   Q.   Is it fair to say that section addresses the treatment

18   of the allowed secured claim of Prim?

19   A.   Yes.

20   Q.   Is there a separate section of the plan that treats any

21   allowed unsecured claims that the Court may deem to be

22   allowed unsecured claims?

23   A.   Yes.  If and to the extent there is an allowed

24   unsecured claim, it would be a Class 4 general unsecured

25   claim.

1   Q.  So if the Court were to disagree with the debtors'

2   theory as to Montana law and Prim had an allowed unsecured

3   claim, where would that be treated under the plan?

4   A.  Well, I think, given the objections that are likely to

5   be lodged against that claim, I think it would take more

6   than just a reversal on that one theory.  But if Prim were

7   to have -- which it's now, of course, been transferred to a

8   Tim Blixseth-owned entity.  But if that entity were, in

9   fact, to have an allowed unsecured claim, it would be

10  treated as a Class 4 claim.

11  Q.  And it would be getting the same treatment and

12  distribution as any other unsecured claim?

13  A.  Yes.

14          MR. MOORE:  Thank you.  That's it.

15          THE COURT:  Mr. Chehi.

16          Mr. Whitmore, you're right after Mr. Chehi.

17                    CROSS-EXAMINATION

18  BY MR. CHEHI:

19  Q.  Mr. Greenspan, you're familiar with the treatment of

20  the prepetition lender claims under the plan as it would be

21  modified to conform with the settlement agreement?

22  A.  Yes.

23  Q.  And does that treatment, in effect, provide that the,

24  that the claims of various administrative creditors and

25  Class 4 general unsecured creditors will be paid ahead of

1    the prepetition lender claims?

2    A.   I'm sorry, Mr. Chehi, I lost the question.

3    Q.   The question is:   Does the -- will the plan, as

4    modified by the settlement, provide that Class 4 general

5    unsecured creditors will be paid in advance of the

6    prepetition secured creditors with respect to funds that

7    are made available under the plan?

8    A.   Yes.

9    Q.   And you recall that the prepetition lender claims and

10   liens were subject to and are subject to some pending

11   litigation in this Court in an adversary proceeding?

12   A.   Yes.

13   Q.   And is it your understanding that that litigation is

14   complex and difficult and, in some senses, create some

15   uncertainty as to ultimate outcome?

16   A.   Yes.

17   Q.   And do you believe that the settlement of the treatment

18   of the prepetition lender claims and liens under the

19   settlement term sheet, which would be incorporated in the

20   modified plan, is a fair and reasonable settlement under

21   all the circumstances?

22   A.   Yes.

23   Q.   And do you believe that it's in the best interest of

24   creditors generally in this case that that settlement be

25   incorporated in the plan as modified?

```
1    A.  Yes.
2              MR. CHEHI:  No further questions, Your Honor.
3              THE COURT:  Mr. Whitmore.
4              MR. WHITMORE:  Your Honor, Clark Whitmore.  The
5    Class B creditors do not support the Prim objection.  I'm
6    just here to, if I could, just make a record on a couple
7    minor points relating to our continuing concerns.
8                         CROSS-EXAMINATION
9    BY MR. WHITMORE:
10   Q.  So, Mr. Greenspan, has the final version of the trust
11   agreement been prepared yet and circulated?
12   A.  I believe there was a form that was attached to the
13   disclosure statement.  To the best of my knowledge, there's
14   been no modifications actually negotiated or agreed to.
15   Subsequently, I believe there will probably be some effort
16   to make some procedural operational improvements to that,
17   but that has not been a priority up until now.  But I'm
18   sure it will be done before the trust is effective.
19   Q.  The trust agreement provided for a trust advisory
20   board; isn't that correct?
21   A.  That is correct.
22   Q.  And the initial version filed with the disclosure
23   statement in April provided for the ad hoc "B" members
24   group to have input on the selection of two members of the
25   board ; isn't that right?
```

1   A.   I believe that is correct.

2   Q.   And then there was three members from the Class 4

3   claims that would also be on the board; isn't that right?

4   A.   That is correct.

5   Q.   And that's -- that would change the result of the

6   settlement?

7   A.   Correct.

8   Q.   And so the Class B holders would have an opportunity to

9   get one out of seven members on the board; isn't that

10  correct?

11  A.   Well, the Class B holders were going to be a minority

12  before and they will continue to be a minority, but the

13  current settlement agreement provides for one member.

14  Q.   Yes, you're right.  They're a minority in both

15  situations, but they're a different minority; isn't that

16  correct?

17  A.   They're still shy of 51 votes, but that's correct.

18  Q.   And there's going to be a number of other changes to

19  the trust agreement, right?

20  A.   Well, I would anticipate -- I mean you've pointed up a

21  number of items that it would be beneficial to clean up and

22  change, but I would anticipate there would be changes, but

23  many of them at your suggestion.

24  Q.   Yes.  And has a trustee been selected yet?

25  A.   Not that I know of.

1  Q.  And this calls for the board to select the trustee;

2  isn't that right?

3  A.  I believe so.

4  Q.  And is it the debtors' intention to file a revised plan

5  and then to go through at least a resolicitation with the

6  prepetition lenders and then have a follow-up hearing, or

7  are we here to -- is it your understanding that today is

8  the actual confirmation of some sort of modified plan?

9  A.  Well, again, I will defer to the lawyers.  I would like

10  to believe that we will be able to achieve a confirmation,

11  subject to certain post-hearing events such as a revote by

12  the prepetition secured creditors.  But I'll defer to the

13  judge and counsel on the actual effect of this and the

14  mechanics.

15  Q.  And the revised -- the modified plan will add the

16  prepetition lenders to the parties who are receiving an

17  exculpation and sort of a release of claims under the plan;

18  isn't that right?

19  A.  That is correct.

20       MR. CHEHI:  I'll object to the characterization

21  as a "release".  It's an exculpation - (inaudible) -

22  limitation of liability for defined purposes.

23       THE COURT:  Sustained.

24  Q.  (By Mr. Whitmore)  Is it your understanding,

25  Mr. Greenspan, that the exculpation provided here is

1   greater than the exculpation contemplated by the bankruptcy

2   code for participants in the plan process?

3   A.   I mean I stopped practicing law 26 years ago, so I'll

4   leave that to the lawyers and the judge to determine.

5   Q.   All right.   Could you turn to Section 8.4 of the second

6   amended claim?

7   A.   Yes, sir.

8   Q.   I won't ask you to read what it says, but do you have

9   an understanding as to the intended scope of what's being

10  provided for here?

11  A.   Do I have an understanding?

12  Q.   Yes.

13  A.   I believe so.

14  Q.   And what is your understanding of the protections that

15  would be afforded to the parties who were included within

16  this?

17  A.   Well, I mean again, I would think the best thing to do

18  is to read what the language says.   And under 8.4, about

19  halfway down, it says (quoted as recorded):

20          "These parties, the exculpated parties, they

21  shall not have or incur any liability to any person for any

22  act or omission in connection with, relating to, or arising

23  out of the Chapter 11 cases, the formulation negotiation,

24  implementation, and confirmation -- or consummation of this

25  plan, the disclosure statement" - I'm skipping some

1   language - "entered into during the Chapter 11 cases, or

2   otherwise created in connection with this plan."

3      And then it goes on to say it doesn't include willful

4   misconduct or gross negligence.  And so what it was

5   intended, as that states, is that it would be an

6   exculpation for activities that occurred post-filing and up

7   until confirmation and excluding willful misconduct or

8   gross negligence.

9   Q.  Right.  So it's not intended to include - (inaudible) -

10  release of any claims for any misconduct that occurred

11  prior to the bankruptcy case; is that right?

12  A.  8.4 was not intended to, correct.

13          MR. WHITMORE:  No further questions, Your Honor.

14          THE COURT:  Thank you.  Mr. Patten.

15          MR. PATTEN:  One question that Mr. Moore asked

16  raised one with me.

17                  REDIRECT EXAMINATION

18  BY MR. PATTEN:

19  Q.  Mr. Greenspan, you understand the duties and functions

20  of the liquidating trust?

21  A.  I believe so.

22  Q.  Does that include objecting to claims?

23  A.  Yes, it does.

24  Q.  So if there was an objection to the Desert

25  Ranch/Blixseth/Prim claim, that would be done by the

1    liquidating trust?

2    A.  Well, either by the debtor in the next five - six weeks

3    or the liquidating trust after its creation.

4              MR. PATTEN:  Thank you.

5              THE COURT:  Mr. Greenspan, you may step down.

6              THE WITNESS:  Your Honor, may I just make one

7    comment?

8              THE COURT:  I'll allow you to make a comment.

9              THE WITNESS:  Thank you.

10             THE COURT:  What comment would you like to make?

11             THE WITNESS:  I just wanted to say:  Everybody on

12   all sides have put in, you know, tremendous hours

13   throughout this case.  But, you know, after we left here

14   Friday the parties did relatively quickly reach an

15   agreement and then there's just been absolutely yeoman's

16   work done by Skadden, by Credit Suisse, by the Bullivant

17   firm, by Mr. Patten, Mr. Beckett, and the members.  And I

18   think throughout particularly the last three to four days,

19   and, quite frankly, through most of this procedure, there's

20   been a high degree of professionalism and certainly a great

21   deal of effort to get this to where it is today.

22             And then, also, I'd like to -- and, also, there's

23   been some commentary through this case about potentially

24   improper relationships.  And I'll just tell you that in my

25   time being here, I haven't seen any of that.  And I think a

1    number of the parties, quite frankly, to some of their own

2    personal detriment, have acted in the best interest of this

3    estate.

4            THE COURT:  Thank you, Mr. Greenspan.

5            THE WITNESS:  Thank you.

6            THE COURT:  Mr. Patten.

7            MR. PATTEN:  We call Brad Foster.

8            THE COURT:  Mr. Foster, if you would come

9    forward, please, to be sworn.

10            MR. GREENSPAN:  And I forgot to include

11    Mr. Green, who's probably the one who hasn't gotten any

12    sleep in the last 72 hours, in that list.

13            THE COURT:  I would acknowledge that.  While

14    you're stepping down and we're making room for Mr. Foster,

15    I echo Mr. Greenspan's thoughts.  Having spent quite a bit

16    of time with, well, many of the parties, certainly probably

17    all the attorneys, some that are here and some that aren't,

18    I've been very impressed with, with the professionalism

19    overall and the manner in which the parties have sought to

20    reach resolution in this case, which probably from early --

21    well, from about Thanksgiving on, I felt was going to have

22    to happen if there was going to be any success in this

23    case.  It took awhile to get there, but there was that

24    ultimate success, it appears.  Although, I guess there's

25    been no ruling yet on the settlement agreement itself

1   because of the taking of testimony, but I do commend all

2   the attorneys on the very professional work that they've

3   done in this case.

4         Mr. Foster, you can come forward to be sworn.

5         CHARLES BRADLEY FOSTER, WITNESS, SWORN

6   BY MR. PATTEN:

7   Q.  State your name, please.

8   A.  Charles Bradley Foster.

9   Q.  And, Mr. Foster, you work for FTI?

10  A.  I do.  I'm a managing director for FTI Consulting.

11  Q.  Okay.  And so you've been working with Mr. Greenspan --

12  A.  I have.

13  Q.  -- in his role as chief restructuring officer?

14  A.  I have.

15  Q.  In the course of your work, have you become familiar

16  with the membership agreements?

17  A.  I have.

18  Q.  In particular, are you familiar with the Robert Sumpter

19  membership agreement?

20  A.  I have an understanding of the agreement, yes.

21  Q.  Do you know the date of the agreement?

22  A.  Not offhand.

23  Q.  Do you know if it has any out-of-the-ordinary terms or

24  conditions?

25  A.  I do understand that it is characterized as a

 1   residential membership with some unusual aspects,

 2   particularly the nonpayment of dues.

 3   Q.  Okay.  Are you familiar with any other residential

 4   memberships that provide that there's no payment of dues?

 5   A.  None that I'm aware of.

 6              MR. PATTEN:  Thank you.  That's all I have.

 7              THE COURT:  Does anyone have questions for this

 8   witness?

 9              You may step down.

10              THE WITNESS:  Thank you, Your Honor.

11              THE COURT:  Mr. Patten.

12              MR. PATTEN:  I call Sam Byrne.

13              THE COURT:  Mr. Byrne, if you would come forward

14   to be sworn, please.

15                  SAMUEL T. BYRNE, WITNESS, SWORN

16                        DIRECT EXAMINATION

17   BY MR. PATTEN:

18   Q.  Please state your name.

19   A.  Samuel T. Byrne.

20   Q.  Mr. Byrne, you're a principal at CrossHarbor?

21   A.  That's correct.

22   Q.  And are you familiar with the development of the

23   debtors' proposed Chapter 11 plan?

24   A.  I am.

25   Q.  Are you familiar with the terms in the plan?

1   A.   I am.

2   Q.   And, in particular, are you familiar with the so-called

3   "trade creditor fund" of the plan?

4   A.   I am.

5   Q.   Was that trade creditor fund included at the request or

6   insistence of CrossHarbor?

7   A.   It was.

8   Q.   What is the purpose of the trade creditor fund?

9   A.   The trade creditor fund was critical to our

10  going-forward business plan if we were to be the acquiror

11  of the club in order to provide for payment to,

12  particularly to local and regional trades people and other

13  unsecured creditors that we would have to do business with

14  going forward in the community to ensure the success of the

15  club.

16  Q.   So you would need to have a positive relationship with

17  them in order to continue to receive goods and services?

18  A.   That's correct.

19          MR. GUTHALS:   Objection.   Your Honor, I object on

20  the grounds of leading.

21          THE COURT:   Overruled.

22  Q.   (By Mr. Patten)   And, Mr. Byrne, was that determination

23  made for business purposes for CrossHarbor going forward?

24  A.   It was made for business purposes for CrossHarbor going

25  forward should it be the acquiror of the club.

```
 1    Q.   Is that trade creditor fund, the net business purpose,

 2    is that essential or important, I'll say, to the business

 3    plan of CrossHarbor going forward?

 4    A.   We felt that it was very important to the business plan

 5    going forward and to the success of that business plan.

 6    Q.   Was there a purpose in establishing the trade creditor

 7    fund in order to gerrymander a vote of the trade class of

 8    creditors?

 9    A.   Absolutely not.

10              MR. PATTEN:  Thank you.  That's all I have.

11              THE COURT:  Anybody have questions of Mr. Byrne?

12              Mr. Byrne, you may step down.

13              THE WITNESS:  Thank you.

14              MR. PATTEN:  I call Steve Lehr.

15              THE COURT:  If you could come forward, please, to

16    be sworn.

17                      STEVEN LEHR, WITNESS, SWORN

18                          DIRECT EXAMINATION

19    BY MR. PATTEN:

20    Q.   Can you state your name?

21    A.   Steven Lehr.

22    Q.   Mr. Lehr, you've testified here before, right?

23    A.   Yes.

24    Q.   You're with CBRE?

25    A.   I am.
```

1   Q.   And are you the managing broker?

2   A.   Managing director for the Land Service Group.

3   Q.   Okay.  And you've been responsible for the marketing of

4   the Yellowstone Club, I'll say, as part of this bankruptcy

5   plan?

6   A.   Yes, I have.

7   Q.   I know you've testified about this before, but would

8   you briefly describe to the Court what the marketing plan

9   consisted of?  What steps were taken in order to expose

10  this property to the market?

11  A.   Well, first of all, we did our own due diligence, went

12  to the club, visited it.  We prepared an offering

13  memorandum, we sent out a brief summary of the offering

14  memorandum to roughly 18,000 potential investor funds, and

15  then we received confidentiality agreements based on the

16  interest of those people that were solicited.  And we

17  received about 100 signed confidentiality agreements, and

18  then we proceeded to follow up with them throughout the

19  course.

20  Q.   Is directing an offering memorandum to 18,000 people,

21  is that ordinary in your work?

22  A.   Yeah; for my group, yes.

23  Q.   Ordinary in terms of the number of people that are

24  contacted?

25  A.   Yes.

1    Q.   Does the process usually, then, involve also

2    the execution of confidentiality agreements?

3    A.   Yes.   And it varies per, per deal.

4    Q.   Is it ordinary to have 100 confidentiality agreements

5    signed?

6    A.   No.   That was an extraordinarily high number.

7    Q.   Did you say very high number?

8    A.   Yes.

9    Q.   Could you describe to the Court the level of, I'll say,

10   market response to the offering memorandum and, and --

11   A.   We received a tremendous response to the offering

12   memorandum, to the teaser that we put out.   We had one of

13   the potential bidders even go so far as to say that when he

14   was trying to find his funding, he had contacted someone in

15   Switzerland and that person in Switzerland had received our

16   offering.   And so they were aware of the deal.

17   Q.   How long have you been in the real-estate business?

18   A.   Well, I practiced law for about 8 to 10 years and then

19   have been in the real-estate business for about 12.

20   Q.   Is the nature of your work in the real-estate business

21   selling projects sort of, kind of like the Yellowstone Club

22   or of the same magnitude or complexity as the Yellowstone

23   Club?

24   A.   We've not encountered anything this complex, or --

25   Q.   But you sell undeveloped --

1    A.   Yes.

2    Q.   -- property?

3    A.   Developed, undeveloped, and various stages of

4    entitlement.

5    Q.   So sort of the general nature of the business is

6    something that CBRE does have experience with?

7    A.   Absolutely.

8    Q.   Do you have an opinion as to whether the time period

9    that the property was exposed to the market from when you

10   sent out your initial brief offering memorandum until the

11   auction last week, whether that is -- do you have an

12   opinion about whether that's an adequate time to expose the

13   property to the market?

14   A.   Yes, I do.

15   Q.   Are there any factors that you rely on significantly to

16   conclude that that's an appropriate marketing period?

17   A.   I think, you know, in my prior testimony, I have stated

18   that in this environment where the market is literally

19   moving away from us and given how difficult it is to get

20   credit and funds into projects these days, that a shorter

21   marketing period might be beneficial if the market is

22   continuing to go down.

23   Q.   And does that continue to be your opinion up through

24   today?

25   A.   I believe the market is still moving away from us.

1    Q.   Do you have any reservations about the adequacy of the

2    time that's been allowed for you to market this property?

3    A.   No.

4    Q.   You're familiar with the bids that were received --

5    A.   I am.

6    Q.   -- on this?

7         You were at the auction for several days?

8    A.   I was.

9    Q.   Do you have any reservations about the process that led

10   to the auction?

11   A.   The process that led to the auction?

12   Q.   Yeah.

13   A.   No.

14   Q.   Do you believe that the auction brought out the market

15   in terms of acquiring this property?

16   A.   Well, I'm not as familiar with the exact bidding that

17   went back and forth toward the end, as I had to leave.  But

18   based on what I've seen, I believe that there was an awful

19   lot of scrutiny put into taking a look at what the

20   different components would be.  And I believe that the

21   price is a fair price, if that's what your question is.

22   Q.   There were only two bidders, correct?

23   A.   Yes.

24   Q.   Do you have any concern that either the process or the

25   time period and the resulting two bidders, that there was a

1   defect someplace in either the time period or in the

2   process by which this was exposed to the market?

3   A.  I guess my only commentary is that it took an awful

4   long time to get to this point, and I would have thought

5   that it could have been done a little quicker.  But that

6   would be my general overall comment.

7   Q.  As a broker, are you satisfied with the result, at

8   least as much as you know it, from the auction?

9   A.  Yeah, I am.

10              MR. PATTEN:  Thank you.  That's all I have.

11              THE COURT:  Anybody have questions for this

12   witness?

13              You may step down.  Thank you.

14              MR. PATTEN:  My last witness is Edra Blixseth.

15              THE COURT:  If you could come forward to be

16   sworn, please?

17                EDRA BLIXSETH, WITNESS, SWORN

18                     DIRECT EXAMINATION

19   BY MR. PATTEN:

20   Q.  Please state your name.

21   A.  Edra Blixseth.

22   Q.  Ms. Blixseth, you were formerly married to Tim

23   Blixseth?

24   A.  That's correct.

25   Q.  Are you familiar with the various business enterprises

1    that one or both of you owned during the course of your

2    marriage?

3    A.   Oh, pretty much.

4    Q.   Are you familiar with the Desert Ranch?

5    A.   I'm familiar with what we call "Desert Ranch", yes.

6    Q.   Who owns Desert Ranch?

7    A.   Tim received Desert Ranch in one of our many

8    settlements prior to the MSA.

9    Q.   Okay.  So the Prim claim that Mr. Guthals has been

10   questioning Mr. Greenspan about, that claim was owned by an

11   entity owned by your former husband, Tim Blixseth?

12   A.   I don't know about an entity.  When he -- it was in our

13   personal names.  And when that was divided in the second

14   mini settlement, I believe it was, that went to Tim.  And

15   it was in his personal name at the time.  And if it's

16   changed to an entity now, I'm not aware of it.

17              MR. PATTEN:  Okay, that's all I have.  Thank you.

18              THE COURT:  Does anyone have any questions for

19   Ms. Blixseth?

20              You may step down.  Thank you.

21              THE WITNESS:  Thank you.

22              MR. PATTEN:  I have no further witnesses, Your

23   Honor.

24              THE COURT:  Okay.  Does anyone else have

25   witnesses?

1          Mr. Patten.

2          MR. PATTEN:  There's one more matter, Your Honor.

3          THE COURT:  Okay.

4          MR. PATTEN:  The liquidating trust is anticipated

5   to take some time period to set up.  About a month ago at

6   an emergency hearing - maybe a little bit longer - the

7   debtors were instructed not to interfere with a prospective

8   sale of the Farcheville Chateau.  Just so that, I guess,

9   the record is clear and the debtors understand their duties

10  and powers and obligations, I would move the Court to

11  clarify that, pending the establishment of the liquidating

12  trust, which will then have authority over Farcheville,

13  that during that gap period, that the debtors have the

14  authority to control the affairs of the entities that own

15  the Farcheville Chateau.

16          THE COURT:  Anyone have any objection to that,

17  wish to add to that?

18          Mr. Chehi.

19          MR. CHEHI:  The prepetition lenders have no

20  objection to that, Your Honor.  And, in fact, under the

21  settlement agreement, we have a special interest in

22  Farcheville at this point.

23          And I think what Mr. Patten and we had discussed

24  asking the Court for a clarification is that, to the extent

25  that the debtors exercise their rights with respect to the

1   subsidiaries and the Farcheville asset during this gap

2   period, pending the establishment of the liquidating trust,

3   that will not be in derogation or conflict with your prior

4   order entered on the emergency motion which required people

5   not to interfere with the sale of Farcheville.  And we

6   agree that the debtors' appropriate management of those

7   issues would not, at this point, be an interference in

8   contravention of your order.

9           THE COURT:  Okay.  I appreciate the comment.

10          Mr. Patten.

11          MR. PATTEN:  And I agree with what Mr. Chehi just

12   said.  That's what I intended.

13          THE COURT:  Mr. Amsden.

14          MR. AMSDEN:  Your Honor, just a point of

15   clarification:  We understand from French counsel that the

16   Farcheville entity is in an involuntary French bankruptcy.

17   And that may not be accurate information.  But what we

18   understand is that proceeding is proceeding in France.  And

19   so with respect to the ultimate control of that asset and

20   any recovery from that asset, my understanding is that that

21   is in other country's jurisdiction.

22          THE COURT:  Well, from the standpoint of to the

23   extent debtors in this gap period have any -- well, need to

24   do anything, obviously this has been an asset that I've

25   been very concerned about for some time, and I'm going to

1   direct that Debtors do anything that is within their

2   organizational powers with various entities to see what the

3   status is and to proceed accordingly in this gap period --

4           MR. AMSDEN:  Mine was just a --

5           THE COURT:  -- to maximize that asset, which I've

6   always felt should be done.  I appreciate your comment to

7   the Court, though, about possible involuntary status of

8   some proceeding over there.  Obviously, it may be an item

9   that has an impact by French government.

10          MR. AMSDEN:  And, Your Honor, mine was just a

11  point of information; no more.

12          THE COURT:  Okay, thank you.  Obviously, debtors

13  should check into that and see what the deal is and act

14  accordingly.

15          MR. PATTEN:  Your Honor, if I understand the

16  procedure that we're following here, the debtor, Credit

17  Suisse, and CrossHarbor will submit the term sheet to the

18  Court as an amendment to the proposed plan.

19          THE COURT:  Apparently when -- the exhibit, is it

20  finished, that is being worked on by Mr. Green and

21  Mr. Levy?

22          MR. CHEHI:  That's right.  When the transactional

23  attorneys have finalized that attachment to the term sheet,

24  I believe that term sheet, with the attachment, you know,

25  fully executed, will be filed in the court as a public

1    record with a notice so that everyone has access to that.

2    And then the parties would plan to, over the course of this

3    week, as soon as possible, modify the existing plan to

4    incorporate and conform it to the term sheet terms and the

5    transactions contemplated thereby and then file that,

6    also -- (inaudible.)

7            THE COURT:  Yes, this Court would certainly want,

8    I think, one document so that people aren't wondering where

9    the provisions are that are governing.

10           MR. CHEHI:  And I believe the parties have also

11   agreed submitting an agreed form of confirmation order that

12   would - if the Court is inclined to confirm the plan and

13   approve the settlement pursuant to the plan - submit an

14   order accomplishing all of that at the same time the

15   modified plan is submitted.  And dual-tracking beginning

16   today, as soon as possible, the debtors will resolicit the

17   prepetition lenders with the assistance of the agent so

18   that it can be accomplished electronically in addition to

19   hard-copy solicitation to seek their revote and reballoting

20   on the plan as it will be modified pursuant to the term

21   sheet.  And they will receive a copy of the term sheet with

22   that solicitation and appropriate solicitation letters.

23           MR. PATTEN:  But we'll need -- I think we'll need

24   an order of the Court directing that prepetition lenders be

25   resolicited in having a deadline fixed for the submission

1    of ballots.

2         THE COURT:  We'll issue an order to that effect

3    as well as that there can be electronic transmission to

4    various, various people and have members so that -- to

5    expedite that process.  We'll do so.

6         MR. PATTEN:  Very good.

7         MR. CHEHI:  And just to close the record, Your

8    Honor, we had filed an objection to confirmation of the

9    plan asserting various grounds, and those are hereby

10   withdrawn.  To the extent that the Court is approving this

11   settlement and the plan as modified, we would not be

12   asserting these objections in that circumstance.

13        THE COURT:  Okay, thank you.  Mr. Patten.

14        MR. PATTEN:  And just a point of clarification,

15   You Honor.  And without making any presumptions regarding

16   the outstanding objections, is the Court issuing a

17   tentative or preliminary order confirming the plan subject

18   to the reballoting and the other documents that have just

19   been described, or --

20        THE COURT:  Or what?

21        MR. PATTEN:  Or is it being held in abeyance

22   until all of these documents come in, and so forth?

23        THE COURT:  Well, I'm sure what Mr. Whitmore is

24   going to ask is that he have a chance to, if he doesn't

25   agree with the language in the amended plan, to file an

1     objection.  I suspect that's where he's at.

2              MR. PATTEN:  Okay.

3              THE COURT:  And he's right on your left arm,

4     so --

5              MR. PATTEN:  All right.  And he usually is.

6              MR. WHITMORE:  You're absolutely correct, Your

7     Honor.  I think that there ought to be some -- in addition

8     to the resolicitation of whoever they decide to resolicit,

9     I think that some sort of backup date should be set just in

10    case the modified plan and all the -- and the trust

11    agreement and all the schedules, when they get filed along

12    with a confirmation order, if that can all be worked out,

13    that's great; but absent that, there ought to be, you know,

14    some opportunity to, to file a very limited objection and

15    to be heard on the remaining outstanding points.

16             THE COURT:  Well, you know, I would really like

17    to just do it by notice and have whatever dispute you have

18    worked out with the parties that are involved, to be quite

19    honest.  You know, I realize we've spent a lot of time

20    together in the last week, or so.  We know how sometimes

21    that takes a little time to get accomplished.  But I would

22    really like to get to confirmation, subject to

23    conditionally upon them submitting the amended plan with

24    the incorporation of the term sheet terms.

25             MR. WHITMORE:  And all we're asking for is an

1    opportunity to see it all --

2              THE COURT:  I know.

3              MR. WHITMORE:  -- and have an opportunity to file

4    an objection and be heard on that, in the hope and

5    expectation that that won't be necessary, but just as a

6    matter of due process.

7              THE COURT:  Okay.  I'm going to take about a

8    10-minute break just so I can stretch a little bit.  And

9    I'll be back with a ruling.

10             (A brief recess was taken.)

11             THE COURT:  Please be seated, as you get back to

12   your chair.  Also, I didn't mean to overlook the

13   opportunity for anyone.  Many of you already have made your

14   appearances.  If there's anyone who's not made an

15   appearance for the record and you want to make sure you're

16   identified as having been here for whatever reason, you

17   certainly can come to the podium and make your appearances.

18   Certainly, I didn't want to exclude anyone.  Okay, no one

19   wants to do that.

20             So, obviously, this is the evidentiary hearing on

21   confirmation, so I'll preface that if there's anybody who

22   wants to put any more on the record, this is the time to do

23   it.  Okay.

24             MR. CHEHI:  I'll just ask the Court to take

25   notice of the entire record of the Chapter 11 cases for

1    purposes of a decision of the confirmation order.

2            THE COURT:  Certainly.  Oh, it looks like we have

3    some people back that maybe have been drafting, or maybe

4    just for this.

5            Just from a timeline and a procedure standpoint,

6    and it's been kind of the rule of this Court:  When we

7    started getting a lot of stipulations and additions to a

8    plan that's before me, my experience has been the first

9    thing that happens down the road, if there is an issue,

10   somebody doesn't have the right document because they

11   forgot that something was incorporated by agreement or by

12   stipulation as to what governs what, or whatever.  So based

13   on that, as we've already discussed, I do want a modified

14   plan incorporating the things that have occurred that are

15   inconsistent with where we are today.  Obviously, that was

16   filed almost two months ago, about six weeks ago.  Things

17   have changed.  So I do want one document.

18           Also, I already did the order on electronic

19   transmission for the purposes of getting material out and

20   balloting out for prepetition investors.  I think that was

21   for -- was that for Class 3 and Class 8?  Is that correct?

22               UNIDENTIFIED SPEAKER:  Yes, Your Honor.

23               UNIDENTIFIED SPEAKER:  That's correct, Your

24   Honor.

25               THE COURT:  And that can be done by electronic

1    transmission.  And I guess I'm wondering:  Can those be

2    back by Friday?

3           MR. CHEHI:  I think it would be likely that most,

4    if not all, would be able to respond within that period of

5    time, assuming the solicitation goes out later today or the

6    first thing tomorrow.

7           THE COURT:  Okay.  Mr. Birinyi.

8           MR. BIRINYI:  From the debtors' perspective,

9    that's certainly reasonable, Your Honor.

10          THE COURT:  Okay.  Let's shoot for that, then,

11   unless there's an issue that comes to my attention later

12   this week that, for whatever reason, something didn't --

13   you know, the transmission lines were out, or something.

14          MR. BIRINYI:  I think that those same parties

15   managed to get hard ballots in within a six-day period of

16   receiving the solicitation package because we got the --

17   through glitches, we got the addresses late.

18          THE COURT:  Okay.  And so I guess what I'm

19   understanding, they'll receive --

20          MR. BIRINYI:  They'd receive the electronic

21   notification today.  And if we can do electronic submission

22   of the ballots, I'd suspect we'd probably have them

23   actually back, most of them, Wednesday or Thursday rather

24   than Friday.

25          THE COURT:  Okay.

1          MR. BIRINYI:  But if the deadline is Friday --

2          MR. CHEHI:  I'd give it to Friday, you know, with

3     leave to extend if the actual results are, you know, short

4     of, you know, actually getting --

5          THE COURT:  So ordered.  So we've got the

6     document, we've got the term sheet.  It looks like they're

7     working on the attachments.  That will be part of the

8     record, as well.

9          As it relates to confirmation and the remaining

10    objections - some of which may be resolved, some may not -

11    basically, I'm going to, upon receipt of the modified plan

12    and the receipt of the ballots, rule on the, on the

13    confirmation and rule on the objections that are pending.

14         And I guess I'm hopeful that there's a

15    resolution, to the extent there can be, on the outstanding

16    objections within that time period, as well, so that I'm

17    not faced with something coming in that -- what I'm trying

18    to do is not have to go to another hearing on this.  And

19    that's why I feel that since this is the evidentiary

20    hearing, I'm going to rule on the objections as I see them,

21    based on the evidence and the record, and go from there.

22         Mr. Chehi.

23         MR. CHEHI:  And, Your Honor, will you also be

24    ruling either today or conditionally today on approval of

25    the settlement terms as presented to the Court, based upon

1    the evidence, and the like?

2            THE COURT:  I'm glad you brought that up.  I just

3    kind of overlooked it.

4            Based upon Rule 9019, my consideration of the

5    testimony, of the term sheet, negotiations that went into

6    that, and based upon the - (inaudible) - property factors,

7    the settlement set forth in the term sheet and its

8    attachments is approved.  We'll issue an order to that

9    effect.

10           Is there anything I've missed?  Is everybody kind

11   of clear where I'm at?

12           MR. BIRINYI:  Would you like us to, when we file

13   the modified plan, file a notification of which remaining

14   objections are outstanding?  When we file the modified

15   plan, would you like a notification of which objections we

16   haven't been able to resolve?

17           THE COURT:  Yes, I would, absolutely.  And, also,

18   you'll submit a proposed confirmation order.

19           MR. BIRINYI:  Correct, Your Honor, and proposed

20   findings.

21           THE COURT:  That's fine, yes.  Anything else?

22           Mr. Whitmore.

23           MR. WHITMORE:  Yes.  I guess it would just be

24   helpful to know from a timing perspective when these

25   documents are going to be filed.

1          THE COURT:  Within the next, well, three days,

2     two days.

3          MR. CHEHI:  They'll be filed by the end of the

4     week, Your Honor, and they'll be circulated.  And

5     Mr. Whitmore will get a copy of them once they're in a form

6     appropriate to be circulating around for comments.  I think

7     the debtors or counsel will take the laboring oar on that

8     and get some comments.  But you should see that as soon as

9     they start to materialize.

10          THE COURT:  I certainly want all the parties and

11     all the people who have been involved to get copies.

12          MR. WHITMORE:  And if we could just have copies

13     for, you know, a couple of days before an order is entered,

14     or a day, as a matter of process, that would be

15     appreciated.

16          THE COURT:  Okay.  Thank you, Mr. Whitmore.

17          Mr. Patten.

18          MR. PATTEN:  We will make sure that Mr. Whitmore

19     is included on the circulation of the drafts as they

20     progress.

21          THE COURT:  Yes.  Oh, that was the other thing:

22     Did you wish to, in the modification and the plan, do a --

23     I call it "red line" and you call it "black line", the

24     final black line as well as the final plan without, without

25     black line?  Do you wish to file for ease of people

1  reviewing?

2          MR. PATTEN:  When we file the plan, we'll file a

3  notice with a black-lined copy attached.

4          THE COURT:  Okay, very well.  Mr. Levy?

5          MR. LEVY:  You Honor, just on a procedural

6  matter, we're nearly complete with finalizing our comments

7  and revisions to the - (inaudible) - creditor agreement.

8  However, we have a hand markup.  It will take -- you know,

9  they would have it all word-processed, and we'll be

10  traveling back.  I think we'd be prepared to file the

11  settlement term sheet and have the attachment following the

12  next day or two.

13          THE COURT:  Very well, very well.  I appreciate

14  your quick work on that.

15          MR. LEVY:  Okay, thank you.

16          MR. MOORE:  Your Honor.

17          THE COURT:  Mr. Moore.

18          MR. MOORE:  Paul Moore for the record again.

19  Just one more clarification:  The Court's approving the

20  extension of the DIP loan which is part of the settlement

21  agreement?

22          THE COURT:  It is approved --

23          MR. MOORE:  Thank you.

24          THE COURT:  -- for the extension.  And,

25  Mr. Moore, just for the record so that I don't mix it with

1   another date that I might have written down, what is the

2   extension dates?

3           MR. MOORE:  I think it was the later of the --

4   the earlier of the closing date or June 30th, as I recall.

5           UNIDENTIFIED SPEAKER:  That's correct.

6           MR. MOORE:  Oh, I got it right.

7           THE COURT:  Okay, that's correct.  Is there

8   anything else?

9           Again, thank you all.  I have appreciated getting

10  to know you professionally through these last few months.

11  Obviously, it's been a packed time period.  Obviously,

12  there's still some matters out there that we'll probably be

13  seeing some of you, at least, in.  So, anyway, again, thank

14  you all, and good travels.

15

16                        *  *  *  *  *

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3      I certify that the foregoing is a correct transcript

4  from the electronic recording of the proceedings in the

5  above-entitled matter, all done to the best of my skill and

6  ability.

7

8      _____   _____

9  Jonny B. Nordhagen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```