James A. Patten (1191)
**PATTEN, PETERMAN, BEKKEDAHL & GREEN, PLLC**
2817 2nd Avenue North, Suite 300
Billings, MT 59101
Phone: (406) 252-8500
Fax: (406) 294-9500
E-Mail: japatten@ppbglaw.com

Lawrence R. Ream, WSBA #18159
Richard G. Birinyi, WSBA #9212
**BULLIVANT HOUSER BAILEY PC**
1601 Fifth Avenue, Suite 2300
Seattle, Washington  98101-1618
Phone: (206) 292-8930
Fax: (206) 386-5130
Email: larry.ream@bullivant.com
Email: rick.birinyi@bullivant.com

Attorney for Debtors

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| IN RE: | Case No. 08-61570 |
| YELLOWSTONE MOUNTAIN CLUB, LLC, et al. | JOINTLY ADMINISTERED |
| Debtors. | |

**THIRD AMENDED JOINT PLAN OF REORGANIZATION
PROPOSED BY THE DEBTORS**

May 22, 2009

**Table of Contents**

**Page**

ARTICLE I DEFINITIONS AND GENERAL PROVISIONS ..................................................1

1.    Definitions. .........................................................................................................1

    1.1    "Acquirer" ..................................................................................................1

    1.2    "Administrative Expense Claim" .................................................................1

    1.3    "Allowed Claim" ........................................................................................1

    1.4    "Allowed              Claim" ..............................................................2

    1.5    "Amended LLC Agreements" ......................................................................2

    1.6    "American Bank Claim" ..............................................................................2

    1.7    "Assets" ......................................................................................................2

    1.8    "Assumed Obligations" ..............................................................................2

    1.9    "Avoidance Actions" ..................................................................................2

    1.10    "Ballot" .....................................................................................................3

    1.11    "Bankruptcy Code" ...................................................................................3

    1.12    "Bankruptcy Court" ..................................................................................3

    1.13    "Bankruptcy Rules" ..................................................................................3

    1.14    "Bankruptcy Schedules" ...........................................................................3

    1.15    "Big Sky" ..................................................................................................3

    1.16    "Business Day" ..........................................................................................3

    1.17    "Causes of Action" ....................................................................................3

    1.18    "Chapter 11 Cases" ...................................................................................3

    1.19    "Claim" .....................................................................................................3

    1.20    "Claim Estimation Procedure" ..................................................................3

    1.21    "Claims Bar Date" .....................................................................................3

    1.22    "Claims Objection Deadline" .....................................................................4

    1.23    "Class" ......................................................................................................4

    1.24    "Collateral" ...............................................................................................4

    1.25    "Committee" ..............................................................................................4

    1.26    "Company Member Rejection Claim" ..........................................................4

    1.27    "Company Modified Member Schedule" ......................................................4

    1.28    "Company Replacement Member Contract" .................................................4

    1.29    "Confirmation" .........................................................................................4

i

| | | |
|---|---|---|
| 1.30 | "Confirmation Date" | 4 |
| 1.31 | "Confirmation Hearing" | 4 |
| 1.32 | "Confirmation Order" | 5 |
| 1.33 | "Construction Lien Claims" | 5 |
| 1.34 | "Contract Assumption Schedule" | 5 |
| 1.35 | "Convenience Claim" | 5 |
| 1.36 | "Convenience Claim Election" | 5 |
| 1.37 | "Credit Suisse" | 5 |
| 1.38 | "Cure Amount" | 5 |
| 1.39 | "Current Equity Owners" | 5 |
| 1.40 | "Debtors" | 5 |
| 1.41 | "Definitive Agreement" | 5 |
| 1.42 | "Definitive Note Terms" | 6 |
| 1.43 | "DIP Lender" | 6 |
| 1.44 | "DIP Loan" and "DIP Loan Claims" | 6 |
| 1.45 | "Disbursing Agent" | 6 |
| 1.46 | "Disclosure Statement" | 6 |
| 1.47 | "Disputed Claim" | 6 |
| 1.48 | "Disputed Claim Reserve Account" | 6 |
| 1.49 | "Distribution" | 6 |
| 1.50 | "Distribution Date" | 6 |
| 1.51 | "Effective Date" | 7 |
| 1.52 | "Effective Date Estate Cash" | 7 |
| 1.53 | "Equity Distribution" | 7 |
| 1.54 | "Equity Interest" | 7 |
| 1.55 | "Equity Purchase Note" | 7 |
| 1.56 | "Equity Purchase Payment" | 7 |
| 1.57 | "Estates" | 7 |
| 1.58 | "Estates' Project Assets" | 7 |
| 1.59 | "Estimation Claim" | 7 |
| 1.60 | "Estimation Hearing" | 8 |
| 1.61 | "Exculpated Parties" | 8 |
| 1.62 | "Final Order" | 8 |

1.63   "First Lien Agent" ............................................................................. 8

1.64   "First Lien Credit Agreement" ........................................................ 8

1.65   "First Lien Credit Documents" ........................................................ 8

1.66   "First Lien Lender Claims" .............................................................. 8

1.67   "First Lien Lender Deficiency Claims" ........................................... 8

1.68   [Intentionally Omitted] ..................................................................... 8

1.69   "First Lien Lenders" ......................................................................... 8

1.70   "First Lien Obligations" ................................................................... 8

1.71   "Founder's Circle Member Rejection Claim" ................................. 9

1.72   "Founder's Circle Modified Member Schedule" ............................ 9

1.73   "Founder's Circle Replacement Member Contract" ...................... 9

1.74   "General Unsecured Claims" ........................................................... 9

1.75   "Golf Lots" ........................................................................................ 9

1.76   "Holder" ............................................................................................ 9

1.77   "Honorary Member Rejection Claim" ............................................. 9

1.78   "Honorary Modified Member Schedule" ......................................... 9

1.79   "Honorary Replacement Member Contract" ................................. 9

1.80   "Initial Distribution Date" ............................................................. 10

1.81   "Initial Liquidation Trust Deposit" .............................................. 10

1.82   "Intercompany Claim" ................................................................... 10

1.83   "LIBOR" ......................................................................................... 10

1.84   "Lien" .............................................................................................. 10

1.85   "Liquidation Trust" ........................................................................ 10

1.86   "Local Rules" ................................................................................. 10

1.87   "Member Assumption Schedule" .................................................. 10

1.88   "New Membership Interests" ........................................................ 10

1.89   "Other Secured Claims" ................................................................ 10

1.90   "Objecting Party" .......................................................................... 11

1.91   "Person" ......................................................................................... 11

1.92   "Petition Date" ............................................................................... 11

1.93   "Pioneer/Frontier Member Rejection Claim" .............................. 11

1.94   "Pioneer/Frontier Modified Member Schedule" .......................... 11

1.95   "Pioneer/Frontier Replacement Member Contract" .................... 11

1.96    "Plan" ........................................................................................ 11

1.97    "Plan Proponents" .................................................................... 11

1.98    "Plan Solicitation Order" ......................................................... 11

1.99    "Plan Supplement" .................................................................... 11

1.100   "Prim Claims" ........................................................................... 11

1.101   "Priority Non-Tax Claims" ....................................................... 12

1.102   "Priority Tax Claims" ............................................................... 12

1.103   "Professional Compensation Claim" ........................................ 12

1.104   "Project" .................................................................................... 12

1.105   "Pro Rata Share" ....................................................................... 12

1.106   "Rejection Claims" .................................................................... 12

1.107   "Reorganized Debtors" .............................................................. 12

1.108   "Reorganized YCC" ................................................................... 12

1.109   "Required Plan Payments" ........................................................ 12

1.110   "Reserved Actions" ................................................................... 12

1.111   "Retained Actions" .................................................................... 12

1.112   "Section 507(b) Claims" ........................................................... 13

1.113   "Section 510 Actions" ............................................................... 13

1.114   "Secured Claims" ...................................................................... 13

1.115   "Securities Act" ........................................................................ 13

1.116   "Trade Creditor Fund" .............................................................. 13

1.117   "Transferred Actions" ............................................................... 13

1.118   "Trustee" ................................................................................... 13

1.119   "Unsecured Claims" .................................................................. 13

1.120   "YC" .......................................................................................... 13

1.121   "YCC" ........................................................................................ 13

1.122   "YD" .......................................................................................... 13

1.123   "Yellowstone Club Settlement Term Sheet" ............................. 13

2.      Interpretation. .......................................................................... 13

3.      Computation of Time. .............................................................. 14

ARTICLE II CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
        INTERESTS .............................................................................. 14

ARTICLE III TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ......................... 15

3.1     Class 1 -- Priority Non-Tax Claims ......................................... 15

| | | |
|---|---|---|
| 3.2 | Class 2 -- Other Secured Claims. | 16 |
| 3.3 | Class 3 -- First Lien Lender Claims. | 16 |
| 3.4 | Class 4 -- General Unsecured Claims. | 17 |
| 3.5 | Class 5 -- Convenience Claims. | 17 |
| 3.6 | Class 6 -- Intercompany Claims. | 18 |
| 3.7 | Class 7 -- Equity Interests. | 18 |
| 3.8 | Class 8 -- Lender Deficiency Claims. | 19 |
| 3.9 | Class 9 – Pioneer/Frontier Member Rejection Claims. | 19 |
| 3.10 | Class 10 – American Bank Claims. | 20 |
| 3.11 | Class 11 – Allowed Prim Secured Claim. | 20 |
| 3.12 | Class 12 – Honorary Member Rejection Claims. | 21 |
| 3.13 | Class 13 – Founder's Circle Member Rejection Claims. | 22 |
| 3.14 | Class 14 – Company Member Rejection Claims. | 23 |

ARTICLE IV TREATMENT OF UNCLASSIFIED CLAIMS ........................ 24

| | | |
|---|---|---|
| 4.1 | Summary. | 24 |
| 4.2 | DIP Loan Claims. | 24 |
| 4.3 | Administrative Expense Claims. | 24 |
| 4.4 | Priority Tax Claims. | 24 |
| 4.5 | Professional Compensation Claims. | 24 |
| 4.6 | Interest on Tax Claims. | 25 |

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ... 25

| | | |
|---|---|---|
| 5.1 | Assumption or Rejection of Executory Contracts and Unexpired Leases. | 25 |
| 5.2 | Payment of Cure Amounts. | 27 |
| 5.3 | Objections to Assumption and Proposed Cure Amounts. | 28 |
| 5.4 | Rejection Claims Bar Date. | 28 |
| 5.5 | Post-Petition Contracts and Leases. | 29 |

ARTICLE VI MEANS FOR IMPLEMENTATION OF THE PLAN ....................... 29

| | | |
|---|---|---|
| 6.1 | Continued Entity Existence. | 29 |
| 6.2 | Amended LLC Agreements. | 29 |
| 6.3 | Ownership and Management of the Reorganized Debtors. | 29 |
| 6.4 | Employee Matters. | 29 |
| 6.5 | Issuance of New Membership Interests. | 30 |

| | | |
|---|---|---|
| 6.6 | Terminated Entity Existence. | 30 |
| 6.7 | Cancellation of Equity Interests and Other Instruments. | 30 |
| 6.8 | Corporate Action. | 30 |
| 6.9 | Dissolution of the Committee. | 30 |
| 6.10 | Pre-Effective Date Injunctions or Stays. | 31 |
| 6.11 | Exemption From Certain Transfer Taxes. | 31 |
| 6.12 | Section 1123(a)(5)(J) Issuance of New Membership Interests. | 31 |
| 6.13 | Disbursing Agents. | 31 |
| 6.14 | Creation and Funding of the Liquidation Trust. | 32 |
| 6.15 | [Intentionally Deleted] | 33 |
| 6.16 | The Plan Solicitation Order. | 33 |
| 6.17 | Creation of Trade Creditor Fund. | 33 |

ARTICLE VII DISTRIBUTIONS AND CLAIMS RECONCILIATION ... 34

| | | |
|---|---|---|
| 7.1 | Payments by Disbursing Agent. | 34 |
| 7.2 | Payment of Claims by Trustee. | 34 |
| 7.3 | No Interest on Allowed Claims. | 34 |
| 7.4 | Claims Administration Responsibility. | 34 |
| 7.5 | Objections to Claims. | 35 |
| 7.6 | Determination of Allowed Claims. | 35 |
| 7.7 | Procedures for Treating and Resolving Disputed and Contingent Claims. | 35 |
| 7.8 | Disputed Claim Estimation Procedure. | 36 |
| 7.9 | Delivery of Distributions. | 37 |
| 7.10 | Unclaimed Funds. | 37 |
| 7.11 | Bar Date For Certain Administrative Claims. | 37 |
| 7.12 | First Lien Lender Distributions. | 38 |
| 7.13 | De Minimis Distributions. | 38 |
| 7.14 | Disbursing Agent Setoffs and Recoupment. | 38 |
| 7.15 | Trustee Setoffs and Recoupment. | 38 |
| 7.16 | Compliance with Tax Requirements. | 38 |
| 7.17 | Ordering of Distributions from Trust. | 38 |

ARTICLE VIII EFFECT OF THIS PLAN ON CLAIMS AND INTERESTS. ... 39

| | | |
|---|---|---|
| 8.1 | Revesting of Assets. | 39 |
| 8.2 | Treatment of Reserved Actions and Transferred Actions. | 39 |

vi

8.3     Discharge of Claims and Termination of Equity Interests. ...................... 39

8.4     Exculpation and Limitation of Liability. .......................................... 40

8.5     Effect of Confirmation. ................................................................ 40

8.6     Substantive Consolidation. .......................................................... 40

8.7     Settlement Releases. ................................................................... 41

8.8     Incorporation. ............................................................................ 42

8.9     Effective Date Dismissals. ........................................................... 42

ARTICLE IX CONDITIONS PRECEDENT ........................................................ 42

9.1     Conditions to Confirmation. ......................................................... 42

9.2     Conditions to Occurrence of the Effective Date. .............................. 42

9.3     Waiver of Conditions. ................................................................. 43

ARTICLE X RETENTION AND SCOPE OF JURISDICTION OF THE
         BANKRUPTCY COURT .................................................................... 43

10.1    Retention of Jurisdiction. ............................................................ 43

10.2    Alternative Jurisdiction. ............................................................. 44

ARTICLE XI MISCELLANEOUS PROVISIONS ................................................. 44

11.1    Modification of the Plan. ............................................................ 44

11.2    Terms Binding. ......................................................................... 45

11.3    Successors and Assigns. ............................................................ 45

11.4    Confirmation Order and Plan Control. ........................................... 45

11.5    Governing Law. ......................................................................... 45

11.6    Severability. ............................................................................. 45

11.7    Incorporation by Reference. ........................................................ 46

11.8    Payment of Statutory Fees and Filing Reports. ............................... 46

11.9    Notice. .................................................................................... 46

11.10   Reservation of Rights. ............................................................... 47

11.11   Provisions Related to Priority Tax Claims. ..................................... 47

Yellowstone Mountain Club, LLC ("YC"), Yellowstone Development, LLC ("YD"), Big Sky Ridge, LLC ("Big Sky"), and Yellowstone Club Construction Company, LLC ("YCC"), each a debtor and debtor-in-possession in the above-captioned bankruptcy cases (collectively, the "Debtors"), hereby submit the following Joint Plan of Reorganization Proposed by Debtors (the "Plan") for the resolution of the outstanding claims against and interests in the Debtors. Reference is made to the Disclosure Statement (as hereinafter defined), distributed contemporaneously herewith, for a discussion of the Debtors' history, properties and business operations, projections for those operations, risk factors, summary and analysis of this Plan, and certain related matters, including, among other things, any securities to be issued under this Plan. Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Fed. R. Bankr. P. 3019, and Section 11.1 of this Plan, the Debtors reserve the right to alter, amend, modify or withdraw this Plan at any time prior to its substantial consummation.

# ARTICLE I

## DEFINITIONS AND GENERAL PROVISIONS

1.     Definitions.

The following terms (which appear in this Plan as capitalized terms) shall have the meanings set forth below.  Any capitalized term used in this Plan that is not defined herein, but is defined in either the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules.

1.1     "Acquirer" means the entity that will become the owner of the New Membership Interests or the Project pursuant to the Definitive Agreement.

1.2     "Administrative Expense Claim" means a Claim for payment of an administrative expense of the kind described in section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates or operating the businesses of the Debtors, (b) any actual indebtedness or obligations incurred or assumed by the Debtors during the pendency of the Chapter 11 Cases in the ordinary course of business, (c) any actual expenses necessary or appropriate to facilitate or effectuate this Plan, (d) any amount required to be paid under section 365(b)(1) of the Bankruptcy Code in connection with the assumption of executory contracts or unexpired leases pursuant to the Plan, (e) all Professional Compensation Claims to the extent allowed by the Bankruptcy Court under sections 328, 330 or 503 of the Bankruptcy Code, and (f) all fees and charges payable by the Debtors pursuant to Section 1930 of title 28 of the United States Code.

1.3     "Allowed Claim" means a Claim that is not a Disputed Claim and is either (a) a Claim against any of the Debtors with respect to which a proof of claim was or will be timely filed with the Bankruptcy Court and has not been withdrawn or superseded, or by order of the Bankruptcy Court is not or will not be required to be filed, (b) a Claim that has been listed in the Schedules as neither disputed, contingent or unliquidated, and for which no proof of claim has been timely filed, or (c) a Claim allowed pursuant to this Plan or an order of the Bankruptcy Court, which order has not been stayed or reversed on appeal; provided, however, that with

respect to any Claim described in clauses (a) or (b) above, such Claim shall be allowed only if (i) no objection to allowance thereof has been interposed within the applicable period of time fixed by the Plan or the Bankruptcy Court, or (ii) such an objection is so interposed and the Claim is nevertheless allowed by an order of the Bankruptcy Court (but only if such allowance was not solely for the purpose of voting to accept or reject the Plan).  Unless otherwise specified in this Plan or in an order of the Bankruptcy Court allowing such Claim, an Allowed Claim shall not include (x) any interest on the amount of such Claim accruing from and after the Petition Date, (y) any punitive or exemplary damages, or (z) any fine, penalty or forfeiture.

1.4    "Allowed              Claim" means a Claim of the particular type specified that is also an Allowed Claim (e.g., an Allowed Administrative Expense Claim is an Administrative Expense Claim that is also an Allowed Claim).

1.5    "Amended LLC Agreements" has the meaning assigned to such term in Section **Error! Reference source not found.** of this Plan.

1.6    "American Bank Claim" means the Claims of American Bank against YD, which Claims are secured by, among other things, condominium units in the Warren Miller Lodge.

1.7    "Assets" means all property of the Estates within the meaning of section 541 of the Bankruptcy Code, of any nature whatsoever, including, without limitation, all property, real and personal, tangible and intangible, wherever situated, as such property exists on the Effective Date or thereafter, including all Causes of Action except those released, waived or extinguished by the Debtors pursuant to this Plan or a Final Order of the Bankruptcy Court.

1.8    "Assumed Obligations" means, collectively, (a) all payment and performance obligations of the Debtors under executory contracts, leases, and other obligations assumed by the Debtors pursuant to this Plan, including all obligations of the Debtors to members of the Yellowstone Club as set forth in the membership plan and the individual membership agreements (including all obligations to honor membership deposits); assumed by the Debtors pursuant to this Plan; and (b) the Debtors' governmental and entitlement rights and obligations vis-à-vis Madison County, Montana and other local governmental entities with respect to zoning and completion of infrastructure at the Project, all as identified on the Contract Assumption Schedule and the Member Assumption Schedule and to the extent the foregoing are assumed by the Reorganized Debtors in accordance with Section **Error! Reference source not found.** of this Plan.  For the sake of clarity, in no event shall (a) the Reorganized Debtors have any obligations arising under or in connection with any purchase and sale agreement, including, but not limited to any warranty Claims, except those (if any) expressly assumed under the Plan, and (b) Assumed Obligations include any Claim, Lien, obligation or other liability that does not directly arise from or relate to the Project or operation thereof (unless such obligation or other liability relates to an executory contract or unexpired lease assumed under this Plan).

1.9    "Avoidance Actions" means any Causes of Action of the Estates, including any such Causes of Action brought on behalf of the Estates, arising under sections 542, 543, 544, 545, 546, 547, 548, 549, 550 or 553 of the Bankruptcy Code, regardless of whether or not such Cause of Action was commenced prior to the Effective Date.

1.10    "Ballot" means each of the ballot forms for voting to accept or reject this Plan distributed to all Holders who are entitled to vote on the Plan.

1.11    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended from time to time, and also includes §§ 157, 158, 1334, 1408, 1412 and 1452 of title 28 of the United States Code to the extent applicable to the Chapter 11 Cases.

1.12    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Montana, in which the Chapter 11 Cases were filed, or any other court that exercises jurisdiction over the Chapter 11 Cases.

1.13    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated under 28 U.S.C. § 2075, and any applicable Local Rules and standing orders of the Bankruptcy Court, as amended from time to time.

1.14    "Bankruptcy Schedules" means, with respect to any Debtor, the schedules of assets and liabilities filed by such Debtor with the Bankruptcy Court pursuant to section 521(1) of the Bankruptcy Code and Bankruptcy Rule 1007(b), as such schedules have been or may be amended or supplemented by the Debtors from time to time.

1.15    "Big Sky" means Big Sky Ridge, LLC, a Montana limited liability company and one of the Debtors.

1.16    "Business Day" means any day other than a Saturday, Sunday or a "legal holiday," as such term is defined in Bankruptcy Rule 9006(a).

1.17    "Causes of Action" means any and all Claims and causes of action held by or capable of assertion by the Debtors or their Estates, including, without limitation, all Avoidance Actions, all Section 510 Actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable, directly or derivatively, in law, equity or otherwise.

1.18    "Chapter 11 Cases" means, collectively, the reorganization proceedings of the Debtors under chapter 11 of the Bankruptcy Code, Case Nos. 08-61570-11, 08-61571-11, 08-61572-11, and 08-61573-11, filed with the Bankruptcy Court on the applicable Petition Date and jointly administered under Case No. 08-61570-11.

1.19    "Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code.

1.20    "Claim Estimation Procedure" has the meaning ascribed to it in Section **Error! Reference source not found.** of this Plan.

1.21    "Claims Bar Date" means, as applicable, either (i) March 18, 2009, the final date for all Persons asserting certain Claims against any of the Debtors to file proofs of claim on account of such Claims, (ii) thirty (30) days after notice of an amendment to the Schedules with respect to a Claim that previously was scheduled in a liquidated, non-contingent, and undisputed

amount, which amendment either (a) reduces the amount or lowers the priority status of such Claim, or (b) changes the status of such Claim to unliquidated, contingent, or disputed, (iii) such other date as the Bankruptcy Court may fix as the final date for filing proofs of claim on account of Rejection Claims pursuant to Section **Error! Reference source not found.** of this Plan, or (iv) such other date as the Bankruptcy Court may fix as the final date for filing proofs of claim on account of Administrative Expense Claims pursuant to Section 7.6 of this Plan.

 1.22 "Claims Objection Deadline" means, unless such deadline is extended for good cause by an order of the Bankruptcy Court, the later of (a) one hundred and twenty (120) days after the Confirmation Date or (b) thirty (30) days after the filing of any Claim, including any Rejection Claim; provided, however, that the Claims Objection Deadline shall not apply to any Claim filed after the applicable Claims Bar Date, which shall automatically be treated as a Disputed Claim under this Plan.

 1.23 "Class" means a category or group of substantially similar Claims or Equity Interests as designated in Articles II and III of this Plan.

 1.24 "Collateral" means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, or the proceeds of such property or interest, which Lien is neither subject to avoidance nor otherwise invalid under the Bankruptcy Code or applicable state law.

 1.25 "Committee" means the Official Committee of Unsecured Creditors appointed in YC's, YD's, Big Sky's, and YCC's Chapter 11 Cases by the Office of the United States Trustee.

 1.26 "Company Member Rejection Claim" means any Claims, if any, of members arising from the rejection of membership contracts in accordance with the provisions of Section **Error! Reference source not found.**.

 1.27 "Company Modified Member Schedule" means Schedule **Error! Reference source not found.** to the Plan which contains a listing of those Company members whose membership contracts are being rejected under the Plan and a form of Company Replacement Member Contract.

 1.28 "Company Replacement Member Contract" means the modified member contract which shall govern the relationship after the Effective Date between the Reorganized Debtors and those members listed on Schedule **Error! Reference source not found.** to the Plan in the event any such member elects to waive all claims arising from the rejection of its membership contract and voluntarily agree to the terms of such modified member contract.

 1.29 "Confirmation" means the Bankruptcy Court's entry of the Confirmation Order with respect to the Chapter 11 Cases.

 1.30 "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order with respect to the Chapter 11 Cases.

4

1.31    "Confirmation Hearing" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

1.32    "Confirmation Order" means an order and related findings of fact and conclusions of law of the Bankruptcy Court approving and confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.33    "Construction Lien Claims" means all Other Secured Claims that are asserted by contractors, subcontractors, and all other Persons performing any services or furnishing any materials or equipment used in the construction, alteration or improvement of any building, structure or improvement to any premises at the Project in any manner, as provided in M.C.A. sec. 71-3-501 et seq. or otherwise applicable non-bankruptcy law.

1.34    "Contract Assumption Schedule" means Schedule **Error! Reference source not found.** to the Plan, which identifies all executory contracts, unexpired leases, and other Assumed Obligations to be assumed by the Reorganized Debtors pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

1.35    "Convenience Claim" means (a) any Unsecured Claim in an amount equal to or less than $5,000 or (b) any Unsecured Claim in an amount greater than $5,000 whose Holder has agreed to voluntarily reduce such Unsecured Claim to $5,000 in accordance with the Convenience Claim Election.

1.36    "Convenience Claim Election" means the election available to Holders of Unsecured Claims in an amount greater than $5,000 pursuant to Section **Error! Reference source not found.** of this Plan.

1.37    "Credit Suisse" means Credit Suisse, Cayman Islands Branch.

1.38    "Cure Amount" means an amount sufficient to satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code with respect to the Debtors' assumption of an executory contract or unexpired lease in accordance with the provisions of Article V of this Plan, as either (a) set forth on the Contract Assumption Schedule; (b) the Member Assumption Schedule; or (c) if a non-debtor party to such an executory contract or unexpired lease objects to the amount set forth on the Contract Assumption Schedule, an amount agreed to by the Debtors or the Reorganized Debtors and such non-debtor party or, absent such agreement, an amount to be determined by the Bankruptcy Court.

1.39    "Current Equity Owners" means the entities or persons identified on Schedule **Error! Reference source not found.**, as the Holders of Equity Interests in each of YC, Big Sky, YD and YCC.

1.40    "Debtors" means, as applicable, one or more of YC, Big Sky, YD, and YCC, including in their capacities as debtors-in-possession in the Chapter 11 Cases under sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

5

1.41    "Definitive Agreement" means Schedule **Error! Reference source not found.** to the Plan which is a copy of the Agreement, as amended on or about May 22, 2009, by and between Acquirer and the Debtors obligating the Acquirer to acquire the New Membership Interests of YC, YD, and Big Sky on the Effective Date.  To the extent any obligations of the Debtors under the Definitive Agreement survive the Effective Date, the same shall become the responsibility of the Trustee(s) and Disbursing Agent(s) as applicable.

1.42    "Definitive Note Terms" shall mean an interest only note having an interest rate of LIBOR plus 500 basis points with an initial five year term with two one year extensions at a fee of 50 basis points of the then outstanding indebtedness, having a weighted average lot release price of $500,000 and with the right to cause the holder thereof to subordinate to third-party construction financing (without payment of release prices) for up to 50 lots in the aggregate at any time and from time to time up to an aggregate amount of $45 million at any time and governmental infrastructure financing of up to $25,000,000.

1.43    "DIP Lender" means CIP Yellowstone Lending LLC, the Holder of the DIP Loan Claims.

1.44    "DIP Loan" and "DIP Loan Claims" means, respectively (a) the debtor-in-possession financing facility the DIP Lender provided pursuant to the Bankruptcy Court's Order dated December 18, 2008, and the prior interim order with respect thereto, and any extensions or other amendments thereto, and (b) the Claims of the DIP Lender arising thereunder.

1.45    "Disbursing Agent" means one or more disbursing agents selected pursuant to Section **Error! Reference source not found.** of this Plan for the purpose of receiving and making Distributions to Holders of Allowed Claims as provided in Article VII of this Plan, without the necessity of posting a bond.

1.46    "Disclosure Statement" means the disclosure statement approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, on or about April 7, 2009, and all supplements, schedules and exhibits thereto.

1.47    "Disputed Claim" means any Claim against a Debtor to the extent that (a) the allowance of such Claim or any portion thereof is the subject of an objection, appeal or motion to disallow or estimate that has been timely filed by a party in interest and which objection, appeal or motion has not been determined by an order of the Bankruptcy Court, (b) such Claim is listed in the Schedules as either disputed, contingent and/or unliquidated, (c) during the period prior to the Claims Objection Deadline, such Claim is in excess of the amount scheduled by the Debtors in the Schedules as other than disputed, contingent and/or unliquidated, or (d) such Claim is filed after the applicable Claims Bar Date.

1.48    "Disputed Claim Reserve Account" means a segregated, interest bearing account maintained and administered by the Disbursing Agent with respect to Required Plan Payments or by the Trustee with respect to Unsecured Claims and the First Lien Lender Deficiency Claims, for the purpose of holding cash for Distribution on account of Disputed Claims pursuant to Section **Error! Reference source not found.** of this Plan.  The Disputed Claim Reserve Account held by the Disbursing Agent shall be funded by the Equity Purchase Payment.

1.49    "Distribution" means any distribution by the Trustee or a Disbursing Agent to the Holders of Allowed Claims pursuant to **Error! Reference source not found.** of this Plan.

1.50    "Distribution Date" means (a) the Initial Distribution Date, (b) the first Business Day after the end of the months of June and December, commencing with the first such date to occur more than ninety (90) days after the Initial Distribution Date and until the Final Distribution Date, or (c) the Final Distribution Date; provided, however, that (i) a Distribution Date (other than the Initial Distribution Date and Final Distribution Date) shall not occur if the aggregate value of the scheduled Distributions on account of all Allowed Claims on any Distribution Date is less than $50,000, in which case the amount to be distributed shall be retained and added to the amount to be distributed on the next Distribution Date, and (ii) any General Unsecured Claim that becomes an Allowed Claim less than twenty (20) Business Days prior to a Distribution Date shall be treated as a Disputed Claim for purposes of the Distribution occurring on such Distribution Date, and the Holder of such General Unsecured Claim shall not receive a Distribution until the Distribution Date immediately succeeding such Distribution Date.

1.51    "Effective Date" means the date specified by the Plan Proponents in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect, which date shall not be more than five (5) Business Days after the date on which the conditions to occurrence of the Effective Date under Article IX of this Plan have been satisfied or waived.

1.52    "Effective Date Estate Cash" means the cash held by the Debtors' (other than YCC) on the Effective Date.

1.53    "Equity Distribution" shall have the meaning as defined in each of the Liquidating Trusts.

1.54    "Equity Interest" means (i) the interest of any Holder of equity securities or other ownership interests of a Debtor represented by any issued and outstanding shares of common, preferred or convertible preferred stock, membership interests or other equity instrument evidencing a present ownership interest in such Debtor, whether or not transferable, or any options, warrants, or rights, contractual or otherwise, obligating the Debtor to issue, transfer, purchase, redeem, or sell any equity securities or other ownership rights, any rights under any stock option plans, voting agreements and registration rights agreements regarding equity securities or other ownership interests of such Debtor, (ii) any claims arising from the rescission of a purchase, sale or other acquisition of any equity security or other ownership interests (or any right, claim, or interest in and to any common stock or equity security) of such Debtor, (iii) any claims for the payment of dividends on any shares of common, preferred or convertible preferred stock or membership interests of such Debtor, (iv) any claims for damages or any other relief arising from the purchase, sale, or other acquisition of any equity securities or other ownership interests issued by the Debtors, and (v) any claims for dividends or distributions, or payments in respect thereof, owed or owing, in regard to any such equity security interests.

1.55    "Equity Purchase Note" means the note portion of the Equity Purchase Payment.

1.56    "Equity Purchase Payment" means the Purchase Price specified in the Definitive Agreement.

1.57    "Estates" means the estates of the Debtors, individually or collectively, as is appropriate in the context, created by the commencement of the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code and consisting of all Assets of the Debtors.

1.58    "Estates' Project Assets" means the unencumbered and underencumbered Assets that are included in the Project.

1.59    "Estimation Claim" has the meaning ascribed to it in Section **Error! Reference source not found.** of this Plan.

1.60    "Estimation Hearing" has the meaning ascribed to it in Section **Error! Reference source not found.** of this Plan.

1.61    "Exculpated Parties" has the meaning ascribed to it in Section **Error! Reference source not found.** of this Plan.

1.62    "Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the subject matter (a) that has not been reversed, stayed, modified or amended and as to which (i) any right to appeal or seek certiorari, review, reargument, stay or rehearing has been waived or (ii) the time to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending or (b) as to which an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought or (ii) the time to further appeal or seek certiorari, further review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, further review, reargument, stay or rehearing is pending.

1.63    "First Lien Agent" means Credit Suisse in its capacities as administrative agent and collateral agent under the First Lien Credit Agreement.

1.64    "First Lien Credit Agreement" means that certain Credit Agreement dated as of September 30, 2005 (as amended, restated, supplemented or otherwise modified from time to time), by and among YC, Big Sky, and YD as borrowers, the First Lien Agent and the First Lien Lenders.

1.65    "First Lien Credit Documents" means collectively, the First Lien Credit Agreement and all other agreements, instruments, notes, guaranties and other documents executed in connection therewith and all collateral and security documents executed by the Debtors in favor of the First Lien Agent and the First Lien Lenders.

1.66    "First Lien Lender Claims" means the First Lien Obligations, in the  aggregate Allowed Claim amount of $309,376,110.42, jointly and severally owing by each of the Debtors (other than YCC) under the First Lien Credit Agreement and the other First Lien Credit Documents as of the Effective Date.  The First Lien Lender Claims shall not include any Section 507(b) Claims.

1.67    "First Lien Lender Deficiency Claims" has the meaning ascribed to it in Section **Error! Reference source not found.** of this Plan.

1.68    [Intentionally Omitted]

1.69    "First Lien Lenders" means the lender parties from time to time to the First Lien Credit Agreement.

1.70    "First Lien Obligations" means all obligations of the Debtors arising under the First Lien Credit Agreement or any other First Lien Credit Document, including all loans, advances, debts, liabilities, fees, charges, expenses and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the First Lien Agent or the First Lien Lenders, of any kind or nature, whether or not evidenced by any note, agreement or other instrument.

1.71    "Founder's Circle Member Rejection Claim" means any Claims, if any, of members arising from the rejection of membership contracts in accordance with the provisions of Section **Error! Reference source not found.**.

1.72    "Founder's Circle Modified Member Schedule" means Schedule **Error! Reference source not found.** to the Plan which contains a listing of those Founder's Circle members whose membership contracts are being rejected under the Plan and a form of Founder's Circle Replacement Member Contract.

1.73    "Founder's Circle Replacement Member Contract" means the modified member contract which shall govern the relationship after the Effective Date between the Reorganized Debtors and those members listed on Schedule **Error! Reference source not found.** to the Plan in the event any such member elects to waive all claims arising from the rejection of its membership contract and voluntarily agree to the terms of such modified member contract.

1.74    "General Unsecured Claims" means all Claims that do not qualify as either Administrative Expense Claims, Convenience Claims, First Lien Lender Claims, Lender Deficiency Claims, Intercompany Claims, Other Secured Claims, Priority Non-Tax Claims, Priority Tax Claims, or Professional Compensation Claims.  For the avoidance of doubt, the General Unsecured Claims shall not include any Unsecured Claims held by the First Lien Lenders.

1.75    "Golf Lots" means Lots 712, 713, 714, 715, 716, 717, 718, 719, 720, 721, 722, 723, 724, 725, 726, 727, 728, 729, 730, 731, 732, 733, 734, 735, 736, 737, 738, 739, 740, 741 and 742, of Yellowstone Mountain Club Golf Course Subdivision Phase 1, in Madison County, Montana, located in the S1/2 of Section 7, the SW1/4 of Section 8, Section 17, and the N1/2 of Section 18, Township 7 South, Range 3 East, P.M.M., Madison County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder, Madison County, Montana, (Plat reference in Book 4 of Plats, Page 560, records of Madison County, Montana.), and all permits, development rights and other personal property related to the development thereof held by the owner of the foregoing 31 lots.

1.76    "Holder" means any Person holding a Claim or an Equity Interest.

9

1.77    "Honorary Member Rejection Claim" means any Claims, if any, of members arising from the rejection of membership contracts in accordance with the provisions of Section **Error! Reference source not found.**.

1.78    "Honorary Modified Member Schedule" means Schedule **Error! Reference source not found.** to the Plan which shall contain a listing of those Honorary members whose membership contracts are being rejected under the Plan and a form of Honorary Replacement Member Contract which schedule shall be filed with the Bankruptcy Court no later than February 23, 2009 or ten (10) Days before the Disclosure Statement hearing and included in the Disclosure Statement mailing.

1.79    "Honorary Replacement Member Contract" means the modified member contract which shall govern the relationship after the Effective Date between the Reorganized Debtors and those members listed on Schedule **Error! Reference source not found.** to the Plan in the event any such member elects to waive all claims arising from the rejection of its membership contract and voluntarily agree to the terms of such modified member contract.

1.80    "Initial Distribution Date" means the first Business Day that is ten (10) days after the Effective Date

1.81    "Initial Liquidation Trust Deposit" means the initial funds transferred to the Liquidation Trust on the Effective Date, in the amount of $375,000, plus the sum of $2,000,000..

1.82    "Intercompany Claim" means a Claim by a Debtor against another Debtor.

1.83    "LIBOR" means the one month London Inter-Bank Offered Rate, as reported in The Wall Street Journal on any date of determination.

1.84    "Lien" means, with respect to any interest in property, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind affecting such interest in property.

1.85    "Liquidation Trust" means the  trust created pursuant to this Plan (one trust after giving effect to the substantive consolidation provided for in section **Error! Reference source not found.** and the priority provisions contained in the Yellowstone Club Settlement Term Sheet) governed by a trust agreement in the form of  Schedule **Error! Reference source not found.** to the Plan.

1.86    "Local Rules" means the Local Rules of the United States Bankruptcy Court for the District of Montana, as amended.

1.87    "Member Assumption Schedule" means Schedule **Error! Reference source not found.** to the Plan which contains a listing of all membership contracts that are to be assumed by the Reorganized Debtors pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  As reflected on Schedule 1.87, certain membership deposit postponement agreements were executed in connection with the purchase of certain residential units with the Yellowstone Club; a number of those postponements agreements have expired (requiring that a membership deposit be provided and a new membership agreement be executed in connection with the relevant residential unit), while others may still be in effect.  Accordingly, Schedule 1.87 will also include

10

a list of any postponement agreements that will be assumed.  Further, to the extent that postponement agreements are being rejected or postponement rights are contained in agreements that are otherwise being rejected and CrossHarbor Capital Partners LLC or an affiliate thereof is the Acquirer, then the Reorganized Debtors will consider entering into new postponement agreements with holders of such rejected postponement agreements or other agreements that contain postponement rights subsequent to the Effective Date

1.88    "New Membership Interests" means the new limited liability company membership interests to be issued by each Reorganized Debtor on the Effective Date.

1.89    "Other Secured Claims" means Secured Claims that were senior in Lien priority to the First Lien Lender Claims with respect to such holder's Collateral as of the Petition Date or were Secured Claims encumbering Collateral other than that encumbered by the First Lien Lender Claims as of the Petition Date, in either case that are not included in any other Class.

1.90    "Objecting Party" means the Disbursing Agent, Reorganized Debtors or the Trustee when exercising claim objection rights or claim estimation rights under **Error! Reference source not found.**, as the case may be.

1.91    "Person" means any person or entity, including, without limitation, any individual, partnership, joint venture, association, corporation, limited liability company, limited liability partnership company, trust, estate, unincorporated organization or governmental unit.

1.92    "Petition Date" means the dates on which the Chapter 11 Cases were commenced; specifically November 10, 2008.

1.93    "Pioneer/Frontier Member Rejection Claim" means any Claims, if any, of members arising from the rejection of membership contracts in accordance with the provisions of Section **Error! Reference source not found.**.

1.94    "Pioneer/Frontier Modified Member Schedule" means Schedule **Error! Reference source not found.** to the Plan which contains a listing of those Pioneer and Frontier members whose membership contracts are being rejected under the Plan and a form of Pioneer/Frontier Replacement Member Contract.

1.95    "Pioneer/Frontier Replacement Member Contract" means the modified member contracts (one for Pioneer members and another for Frontier members) which shall govern the relationship after the Effective Date between the Reorganized Debtors and those members listed on Schedule **Error! Reference source not found.** to the Plan in the event any such member elects to waive all claims arising from the rejection of its membership contract and voluntarily agree to the terms of such applicable modified member contract.

1.96    "Plan" means this Joint Plan of Reorganization for the Debtors proposed by the Debtors, and all addenda, exhibits, schedules, supplements and other attachments hereto, all of which are incorporated herein by reference, as the same may be amended from time to time.

1.97    "Plan Proponents" means, either individually or collectively, the Debtors as the proponents of this Plan, within the meaning of section 1127 of the Bankruptcy Code.

1.98    "Plan Solicitation Order" means the order entered on April 9, 2009, by the Bankruptcy Court approving the bid procedures in connection with the confirmation of this Plan and the exposure of the Definitive Agreement to the market.

1.99    "Plan Supplement" means Schedule **Error! Reference source not found.** to the Plan that contains the Amended LLC Agreements  and any other definitive documentation for the New Membership Interests.  The Plan Proponents shall file the Plan Supplement with the Bankruptcy Court at least ten (10) Business Days prior to the Confirmation Hearing.

1.100    "Prim Claims" means the Claims of Prim Vintage Development, L.P. against YD and YC, which Claims are allegedly secured by a 160 acre tract of land located within the Yellowstone Club and evidenced by a proof of claim dated January 22, 2009, as amended by a proof of claim dated March 18, 2009, which claim has been transferred to Desert Ranch, LLLP, according to a Notice of Transfer of Claim dated May 7, 2009, and filed with the Bankruptcy Court on May 11, 2009 (Dkt. No. 858).

1.101    "Priority Non-Tax Claims" means any Claims that are entitled to priority pursuant to section 507(a) of the Bankruptcy Code (other than Administrative Expense Claims, Priority Tax Claims, and Professional Compensation Claims).

1.102    "Priority Tax Claims" means any Claims of a governmental unit of the kind entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

1.103    "Professional Compensation Claim" means any Claims for compensation, indemnification or reimbursement of expenses incurred by any attorneys, financial advisors, and other professionals retained by the Debtors and the Committee pursuant to sections 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with the Chapter 11 Cases.

1.104    "Project" means all of the Assets of the Debtors that comprise or relate to the master-planned private resort community located on approximately 13,000 acres in Madison County, Montana and known as the Yellowstone Club, which the Debtors own, operate and are developing, including, without limitation, all real and personal property (tangible and intangible including, without limitation, all intellectual property) listed on Schedule **Error! Reference source not found.** to the Plan.

1.105    "Pro Rata Share" means, with reference to any Distribution on account of any Allowed Claim in any Class, a Distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in the same Class.

1.106    "Rejection Claims" means any Claims against the Debtors arising from the rejection of an executory contract, membership contract, or unexpired lease pursuant to the Plan or otherwise, including any Claims of lessors for damages resulting from the rejection of a lease of nonresidential real property calculated in accordance with section 502(b)(6) of the Bankruptcy Code.  All Rejection Claims shall constitute General Unsecured Claims or Convenience Claims for purposes of this Plan.

1.107 "Reorganized Debtors" means, as applicable, YC, YD, and Big Sky, individually or collectively as they will be reorganized as of the Effective Date in accordance with this Plan.

1.108 "Reorganized YCC" means YCC as it will be reorganized as of the Effective Date in accordance with this Plan.

1.109 "Required Plan Payments" means the payments to all Administrative Expense Claims not being assumed by the Reorganized Debtors, payments on account of Cure Amounts, Allowed Convenience Claims and the payments on the DIP Loan Claims.

1.110 "Reserved Actions" means all Retained Actions that are related to the continued operations of the Project, but excluding any Avoidance Actions and excluding any Section 510 Actions.

1.111 "Retained Actions" means all Causes of Action that the Debtors or their Estates could assert immediately prior to the Effective Date, but excluding all Causes of Action released, waived or extinguished by the Debtors pursuant to this Plan or a Final Order of the Bankruptcy Court.

1.112 "Section 507(b) Claims" means any Claims allowable under section 507(b) of the Bankruptcy Code.

1.113 "Section 510 Actions" means claims to subordinate one or more claims to other claims that would otherwise be included in a Class of Claims, including, but not limited to claims under § 510(b) requiring subordination of claims related to the purchase or sale of any security of the Debtors.

1.114 "Secured Claims" means any Claims secured by valid, perfected and non-avoidable Liens on Collateral to the extent of the value of such Collateral (a) as set forth in this Plan, (b) as agreed to by the Holder of such Claim and the Debtors, Reorganized Debtors, or Trustee, as applicable, or (c) as determined by a Final Order of the Bankruptcy Court in accordance with section 506(a) of the Bankruptcy Code or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff; provided that, in all cases, except as otherwise agreed, any such Claim shall be reduced by any surcharges against the Collateral securing such Claim under § 506(c)

1.115 "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

1.116 "Trade Creditor Fund" means the fund created pursuant to Section **Error! Reference source not found.**.

1.117 "Transferred Actions" means all Retained Actions that are not Reserved Actions.

1.118 "Trustee" means the acting Trustee under the terms of the Liquidation Trust.

1.119   "Unsecured Claims" means any Claims that are not Secured Claims, First Lien Lender Claims, Priority Non-Tax Claims, Priority Tax Claims, or Administrative Expense Claims.

1.120   "YC" means Yellowstone Mountain Club, LLC, a Montana limited liability company and one of the Debtors.

1.121   "YCC" means Yellowstone Club Construction Company, LLC, a Montana limited liability company and one of the Debtors.

1.122   "YD" means Yellowstone Development, LLC, a Montana limited liability company and one of the Debtors.

1.123   "Yellowstone Club Settlement Term Sheet" means Schedule **Error! Reference source not found.** which is the executed Term Sheet by and between the Debtors, the Committee, the First Lien Agent, the Acquirer, the DIP Lender, CrossHarbor, CrossHarbor Institutional Partners, L.P., and CrossHarbor Capital Partners LLC , which was approved by the Bankruptcy Court on May 18, 2009.

2.   Interpretation.  For purposes of this Plan:  (a) whenever appropriate, each term stated herein, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) unless otherwise provided in this Plan, any reference in this Plan to an existing document or exhibit means such document or exhibit, as it may have been or may be amended, modified or supplemented pursuant to this Plan; (d) unless otherwise specified herein, any reference to an entity as a Holder of a Claim includes that entity's successors, assigns and affiliates; (e) unless otherwise specified, all references in this Plan to Sections, Articles, schedules and exhibits are references to Sections, Articles, schedules and exhibits of or to this Plan; (f) the words "herein", "hereto" and "hereunder" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections of this Plan are inserted for convenience of reference only and are not intended to limit or otherwise affect the provisions of this Plan; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the construction of this Plan; (i) any references to the Debtors shall to the extent required refer to the Disbursing Agent acting on behalf of the Debtors from and after the Effective Date and (j) references to the Debtors shall exclude YCC when relating to matters affecting the Reorganized Debtors and the Reorganized Debtors shall not be assuming any obligations whatsoever as to YCC or Reorganized YCC.

3.   Computation of Time.  In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II

## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

Pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, the categories of Claims and Equity Interests set forth below classify all Claims against and Equity Interests in each of the Debtors for all purposes, including voting and Distributions pursuant to the Plan.  A Claim or Equity Interest shall be deemed classified in a particular Class for purposes of voting on, and of receiving Distributions pursuant to, this Plan only to the extent that such Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest shall be deemed to be in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date. The Claims and Equity Interests with respect to each Debtor are separately classified in their own distinct sub-classes, sub-class a for YC, sub-class b for YD, sub-class c for Big Sky, and sub-class d for YCC.  Nothing in this Plan is intended to effectuate a substantive consolidation of the Debtors or their Estates.

The classification of Claims against and Equity Interests in the Debtors pursuant to this Plan is as follows:

| Class | Claim/Interest | Status | Entitled to Vote |
|---|---|---|---|
| 1 a-d | Priority Non-Tax Claims | Unimpaired | No |
| 2 a-d | Other Secured Claims | Unimpaired | No |
| 3 a-c | First Lien Lender Claims | Impaired | Yes |
| 4 a-d | General Unsecured Claims | Impaired | Yes |
| 5 a-d | Convenience Claims | Unimpaired | No |
| 6 a-d | Intercompany Claims | Unimpaired | No |
| 7 a-d | Equity Interests | Impaired | Yes |
| 8 a-d | First Lien Lender Deficiency Claims | Impaired | Yes |
| 9a | Pioneer/Frontier Member Rejection Claim Claims | Impaired | Yes |
| 10b | American Bank Secured Claims | Impaired | Yes |
| 11b | Prim Secured Claims | Unimpaired | No |
| 12a | Honorary Member Rejection Claims | Impaired | Yes |
| 13a | Founders' Circle Rejection Claims | Impaired | Yes |
| 14a | Company Member Rejection Claims | Impaired | Yes |

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Loan Claims, Administrative Expense Claims, Priority Tax Claims, and Professional Compensation Claims have not been classified and are excluded from the foregoing Classes.

# ARTICLE III

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

3.1     Class 1 -- Priority Non-Tax Claims.

    3.1.1.     Classification.  Class 1 consists of all Priority Non-Tax Claims.

    3.1.2.     Allowance.  Claims in Class 1 shall be allowed or disallowed in accordance with Section **Error! Reference source not found.** of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

    3.1.3.     Treatment.  The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims with respect to accrued but unpaid vacation (but not other benefits) of existing employees shall remain unaltered by this Plan and shall be assumed by the Reorganized Debtors and the Definitive Agreement will provide for a proration of vacation benefits whereby the Reorganized Debtors will receive a credit in the amount of the unpaid vacation claims.  As to all other Allowed Priority Non-Tax Claims, on the Effective Date, except to the extent a Holder of an Allowed Priority Non-Tax Claim and the Debtors agree to a different treatment of such Claim (in which event such agreement shall govern), each Holder of such an Allowed Priority Non-Tax Claim shall receive on account of and in full and complete settlement, release and discharge of such Claim,  cash in the amount of such Allowed Priority Non-Tax Claim in accordance with section 1129(a)(9) of the Bankruptcy Code or (ii) such other treatment required to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.

    3.1.4.     Impairment and Voting.  Class 1 is unimpaired and the Holders of Claims in Class 1 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 1 are not entitled to vote to accept or reject this Plan.

3.2     Class 2 -- Other Secured Claims.

    3.2.1.     Classification.  Class 2 consists of all Other Secured Claims, including, without limitation, all Construction Lien Claims.

    3.2.2.     Allowance.  Claims in Class 2 shall be allowed or disallowed in accordance with Section **Error! Reference source not found.** of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

    3.2.3.     Treatment.  Each Allowed Other Secured Claim shall, at the sole option of the Reorganized Debtors, be treated as follows:  (i) the Plan will leave unaltered the legal, equitable and contractual rights to which such Claim entitles the Holder thereof, (ii) the relevant Debtors shall surrender all Collateral securing such Allowed Other Secured Claim to the Holder thereof on the Effective Date, without representation or warranty by or recourse against the Debtors or the Reorganized Debtors and in full and complete settlement, release and discharge of such Claim, or (iii) notwithstanding any contractual provision or applicable law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to the stated maturity of such Claim from and after the occurrence of a default, such

16

Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code. To the extent that any Allowed Construction Lien Claims are assumed or satisfied, then the Reorganized Debtors shall be deemed to have assumed the contract(s) that were the basis for such Allowed Construction Lien Claims free of any further liabilities or claims as of the Effective Date.

> 3.2.4.    Impairment and Voting.  Class 2 is unimpaired and the Holders of Claims in Class 2 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 2 are not entitled to vote to accept or reject this Plan.

3.3    Class 3 -- First Lien Lender Claims.

> 3.3.1.    Classification.  Class 3 consists of all First Lien Lender Claims.

> 3.3.2.    Allowance.  In accordance with ¶ 11 of the Yellowstone Club Settlement Term Sheet, (i) the First Lien Lenders' Claims (both Class 3 and Class 8) are allowed in the amount of $309,376,110.42, (ii) the First Lien Lenders have a secured claim in the amount of $232,000,000, (iii) the value of the Prepetition Lenders' collateral is set at $232,000,000 and (iv) the Prepetition Lenders' liens, mortgage and security interests extend to the Prepetition Loan Collateral .

> 3.3.3.    Treatment.  Each Holder of an Allowed First Lien Lender Claim shall receive, on account of and in full and complete settlement, release and discharge of such Claim, such Holder's Pro Rata Share of 100% of the Equity Purchase Note plus such Holder's Pro Rata Share of (i) 100% of the net proceeds from the sale or other disposition of the Debtors' interest in its Farcheville property and (ii) the Distributions from the Liquidation Trust on account of any remaining unpaid Allowed First Lien Lender Claim in the priority established by the Yellowstone Club Settlement Term Sheet.  To be free from doubt, all First Lien Lenders' liens on Project Assets shall be satisfied and extinguished pursuant to Section 1123(a)(5)(E) of the Bankruptcy Code.  The First Lien Lenders shall retain their liens on any Collateral transferred to the Liquidation Trusts, but have agreed to waive the right to enforce such liens in exchange for the releases and other consideration set forth in the Yellowstone Club Settlement Term Sheet. Until such time as all Class 3 (and Class 8 Claims) are paid in full any recovery of net proceeds from the sale or other disposition of Farcheville shall be the exclusive property of the First Lien Agent and the Holders of First Lien Lender Claims, and the First Lien Agent shall have all decision-making authority as to the handling of Farcheville (including, without limitation, the marketing and sale thereof).

> 3.3.4.    Impairment and Voting.  Class 3 is impaired and, pursuant to section 1126 of the Bankruptcy Code, each Holder of a First Lien Lender Claim in Class 3 shall be entitled to vote to accept or reject this Plan.

3.4    Class 4 -- General Unsecured Claims.

> 3.4.1.    Classification.  Class 4 consists of all General Unsecured Claims.

3.4.2.      <u>Allowance</u>.  Claims in Class 4 shall be allowed or disallowed in accordance with Section **Error! Reference source not found.** of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

3.4.3.      <u>Treatment</u>.  Each Holder of an Allowed General Unsecured Claim shall receive, on account of and in full and complete settlement, release and discharge of such Claim, on the later of (i) the Initial Distribution Date or (ii) the first Distribution Date after the date on which such General Unsecured Claim becomes an Allowed Claim, such Holder's Pro Rata Share of the Distributions from the Liquidation Trust in accordance with the priority established by the Yellowstone Club Settlement Term Sheet.  If a Holder of a Claim in Class 4 asserts otherwise identical General Unsecured Claims against more than one Debtor, no more than one such General Unsecured Claim shall be treated as Allowed for purposes of receiving distributions from the Liquidation Trust, unless the Bankruptcy Court orders otherwise.

3.4.4.      <u>Impairment and Voting</u>.  Class 4 is impaired and, pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim shall be entitled to vote to accept or reject this Plan.

3.5      <u>Class 5 -- Convenience Claims</u>.

3.5.1.      <u>Classification</u>.  Class 5 consists of all Convenience Claims.

3.5.2.      <u>Allowance</u>.  Claims in Class 5 shall be allowed or disallowed in accordance with Section **Error! Reference source not found.** of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

3.5.3.      <u>Treatment</u>.  Each Holder of an Allowed Convenience Claim shall receive, on account of and in full and complete settlement, release and discharge of such Claim, on the later of (i) the Effective Date or (ii) the first business day after the date on which such Convenience Claim becomes an Allowed Claim, payment of cash in the amount equal to 100% of such Allowed Convenience Claim from the Liquidation Trust.  If a Holder of a Claim in Class 5 asserts otherwise identical Convenience Claims against more than one Debtor, no more than one such Convenience Claim shall be treated as Allowed for purposes of receiving distributions under the Liquidation Trust, unless the Bankruptcy Court orders otherwise.

3.5.4.      <u>Convenience Claim Election</u>.  Each Holder of an Unsecured Claim in an amount greater than $5,000 may elect to voluntarily reduce its Unsecured Claim to $5,000 and be treated as the Holder of a Convenience Claim for purposes of this Plan by designation on such Holder's timely-submitted Ballot.

3.5.5.      <u>Impairment and Voting</u>.  Class 5 is unimpaired and the Holders of Claims in Class 5 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 5 are not entitled to vote to accept or reject this Plan

3.6      <u>Class 6 -- Intercompany Claims</u>.

3.6.1.      <u>Classification</u>.  Class 6 consists of all Intercompany Claims.

18

3.6.2.     <u>Allowance</u>.  Claims in Class 6 shall be deemed Allowed.

3.6.3.     <u>Treatment</u>.  Allowed Intercompany Claims shall be deemed satisfied in full after giving effect to the substantive consolidation provided for in section **Error! Reference source not found.** and the priority provisions contained in the Yellowstone Club Settlement Term Sheet.

3.6.4.     <u>Impairment and Voting</u>.  Class 6 is unimpaired by reason of the respective Debtors' execution of the Yellowstone Club Settlement Term Sheet, and pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Intercompany Claim shall not be entitled to vote to accept or reject this Plan.

3.7     <u>Class 7 -- Equity Interests</u>.

3.7.1.     <u>Classification</u>.  Class 7 consists of all Equity Interests in the Debtors.

3.7.2.     <u>Allowance</u>.  Equity Interests in each Debtor shall be deemed allowed on the Effective Date pursuant to this Plan.

3.7.3.     <u>Treatment</u>.  Equity Interests in the Debtors shall be cancelled and duly extinguished on the Effective Date, and the Holders of Equity Interests in the Debtors shall only be entitled to receive such Holder's Pro Rata Share of any Equity Distribution from the Liquidation Trust.

3.7.4.     <u>Impairment and Voting</u>.  Class 7 is impaired, and pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Equity Interest shall be entitled to vote to accept or reject this Plan.

3.8     <u>Class 8 -- Lender Deficiency Claims.</u>

3.8.1.     <u>Classification</u>.  Class 8 consists of all Claims of the First Lien Lenders, but only to the extent such Claims are unsecured (the "<u>First Lien Lender Deficiency Claims</u>").

3.8.2.     <u>Allowance</u>.   In accordance with ¶ 11 of the Yellowstone Club Settlement Term Sheet, the First Lien Lender Deficiency Claims are allowed in the amount of $309,376,110.42 less the sum of (i) the amount of the Equity Purchase Note plus (ii) the dollar amount of any other distributions actually made on account of the First Lien Lenders' Secured Claims.

3.8.3.     <u>Treatment</u>.  Each Holder of an Allowed First Lien Lender Deficiency Claim shall receive on account of and in full and complete settlement, release and discharge of such Claim, such Holder's Pro Rata Share of the Distributions from the Liquidation Trust on account of any remaining unpaid Allowed First Lien Lender Deficiency Claims in the priority established by the Yellowstone Club Settlement Term Sheet.

3.8.4.     <u>Impairment and Voting</u>.  Class 8 is impaired and, pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Claim in Class 8 shall be entitled to vote to accept or reject this Plan.  Notwithstanding any provisions of this Plan to the contrary, in

the event the Bankruptcy Court determines, at or before the Confirmation Hearing, that the separate classification of the Class 8 Claims violates the provisions of § 1122, then all Allowed Claims in Class 8 shall be deemed to be Allowed Claims in Class 4 and any timely acceptances or rejections of this Plan submitted by the Holder of any such Allowed Claims shall be deemed to be an acceptance or rejection by the Holder of a Class 4 Allowed Claim.

      3.9        <u>Class 9 – Pioneer/Frontier Member Rejection Claims</u>.

      3.9.1.      <u>Classification</u>.  Class 9 consists of all Pioneer/Frontier Member Rejection Claims.

      3.9.2.      <u>Allowance</u>.  Claims in Class 9 shall be allowed or disallowed in accordance with Section **Error! Reference source not found.** of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

      3.9.3.      <u>Treatment</u>.  Unless a Holder elects to waive such Claim and receive the treatment specified in Section **Error! Reference source not found.**, Holders of Allowed Pioneer/Frontier Member Rejection Claims shall be deemed to have General Unsecured Claims and shall receive, on account of and in full and complete settlement, release and discharge of such Claim, on the later of (i) the Initial Distribution Date or (ii) the first Distribution Date after the date on which such Pioneer/Frontier Member Rejection Claim becomes an Allowed Claim, such Holder's Pro Rata Share of the General Unsecured Claim Distribution from the Liquidation Trust.  If a Holder of a Claim in Class 9 asserts otherwise identical Pioneer/Frontier Member Rejection Claims against more than one Debtor, no more than one such Pioneer/Frontier Member Rejection Claim shall be treated as Allowed for purposes of receiving distributions under the Liquidation Trust, unless the Bankruptcy Court orders otherwise.

      3.9.4.      <u>Pioneer/Frontier Member Rejection Claim Election</u>.  Each Holder of a Pioneer/Frontier Member Rejection Claim may elect to voluntarily waive any Claim on account of the rejection of such member's membership agreement and enter into a Pioneer/Frontier Replacement Member Contract with the relevant Reorganized Debtor which shall govern the relationship between the parties after the Effective Date and which shall be on account of and in full and complete settlement, release and discharge of such Pioneer/Frontier Member Rejection Claim. including, without limitation, any rights in addition to membership.  The election to receive the treatment specified in this Section **Error! Reference source not found.** shall be made by designation on such Holder's timely-submitted Ballot.

      3.9.5.      <u>Impairment and Voting</u>.  Class 9 is impaired and pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Pioneer/Frontier Member Rejection Claim shall be entitled to vote to accept or reject this Plan

      3.10      <u>Class 10 – American Bank Claims</u>.

      3.10.1.      <u>Classification</u>.  Class 10 consists of the American Bank Claims.

      3.10.2.      <u>Allowance</u>.  Claims in Class 10 shall be allowed or disallowed in accordance with Section **Error! Reference source not found.** of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

3.10.3.    Treatment.  American Bank shall retain all its liens encumbering the Collateral and shall receive cash payments of interest in arrears only for the first 23 months commencing on the 15th day of the first full month following the Effective Date and a balloon payment equal to the Allowed amount of such Claim on the 15th day of the 24th month.  The interest rate shall be the non-default rate under the American Bank loan documents.  The applicable Reorganized Debtor's rights to prepay all or any part of the Claim as well as the release prices with respect to the Collateral shall be in accordance with the terms of the existing American Bank loan documents.

3.10.4.    Impairment and Voting.  Class 10 is impaired and pursuant to section 1126 of the Bankruptcy Code, American Bank shall be entitled to vote to accept or reject this Plan.

3.11    Class 11 – Allowed Prim Secured Claim.

3.11.1.    Classification.  Class 11 consists of the Allowed Prim Secured Claim.

3.11.2.    Allowance.  Claims in Class 11 shall be allowed as a fully Secured Claim in accordance with the proof of claim filed by Prim and dated January 22, 2009, unless disallowed in whole or in part by the Bankruptcy Court.

3.11.3.    Treatment.  The Allowed Prim Secured Claim shall be treated as follows: the Prim Collateral shall not be revested in the Reorganized Debtor and the Plan will leave unaltered the legal, equitable and contractual rights to which such Claim entitles the Holder of the Allowed Prim Secured Claim, and the Holder of the Allowed Prim Secured Claim shall be entitled to commence any collection action pursuant to Montana law with respect to its Collateral as its sole and exclusive remedy with respect to the Allowed Prim Secured Claim and in full and complete settlement, release and discharge of such Claim and any stay imposed with respect to such Collateral shall be terminated on the Effective Date; provided, that in no event shall any Reorganized Debtor be obligated in any way on account of any Prim Claim.  On the Effective Date, the Reorganized Debtors will receive an option to purchase the Prim Collateral from the owner of the Prim Collateral for $1.00, which option will be subject and subordinate to the Allowed Prim Secured Claim and require consent of the Reorganized Debtors to any agreements affecting the Prim Collateral entered into by the owner of the Prim Collateral prior to the option being extinguished as a result of the completion of foreclosure proceedings with respect to the Allowed Prim Secured Claim.

3.11.4.    Impairment and Voting.  Class 11 is unimpaired and the Holder of the Claim in Class 11 is conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holder of the Claim in Class 11 is not entitled to vote to accept or reject this Plan.

3.12    Class 12 – Honorary Member Rejection Claims.

3.12.1.    Classification.  Class 12 consists of all Honorary Member Rejection Claims.

3.12.2.    <u>Allowance</u>.  Claims in Class 12 shall be allowed or disallowed in accordance with Section **Error! Reference source not found.** of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

3.12.3.    <u>Treatment</u>.  Unless a Holder elects to waive such Claim and receive the treatment specified in Section **Error! Reference source not found.**, Holders of Allowed Honorary Rejection Claims shall be deemed to have General Unsecured Claims and shall receive, on account of and in full and complete settlement, release and discharge of such Claim, on the later of (i) the Initial Distribution Date or (ii) the first Distribution Date after the date on which such Honorary Member Rejection Claim becomes an Allowed Claim, such Holder's Pro Rata Share of the General Unsecured Claim Distribution from the Liquidation Trust.

3.12.4.    <u>Honorary Member Rejection Claim Election</u>.  Each Holder of a Honorary Member Rejection Claim may elect to voluntarily waive any Claim on account of the rejection of such member's membership agreement and enter into a Honorary Replacement Member Contract with the relevant Reorganized Debtor which shall govern the relationship between the parties after the Effective Date and which shall be on account of and in full and complete settlement, release and discharge of such Honorary Member Rejection Claim, including, without limitation, any rights in addition to membership as may be set forth in any such member's rejected membership agreement.  The election to receive the treatment specified in this Section **Error! Reference source not found.** shall be made by designation on such Holder's timely-submitted Ballot.  The Honorary Replacement Member Contract shall create uniform provisions that advance the important purposes served by having Honorary members of the Yellowstone Club as opposed to the existing Honorary member contracts that are non-uniform and treat current Honorary members in an inconsistent manner.

3.12.5.    <u>Impairment and Voting</u>.  Class 12 is impaired and pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Honorary Member Claim shall be entitled to vote to accept or reject this Plan.

3.13    <u>Class 13 – Founder's Circle Member Rejection Claims</u>.

3.13.1.    <u>Classification</u>.  Class 13 consists of all Founder's Circle Member Rejection Claims.

3.13.2.    <u>Allowance</u>.  Claims in Class 13 shall be allowed or disallowed in accordance with Section **Error! Reference source not found.** of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

3.13.3.    <u>Treatment</u>.  Unless a Holder elects to waive such Claim and receive the treatment specified in Section **Error! Reference source not found.**, Holders of Allowed Founder's Circle Rejection Claims shall be deemed to have General Unsecured Claims and shall receive, on account of and in full and complete settlement, release and discharge of such Claim, on the later of (i) the Initial Distribution Date or (ii) the first Distribution Date after the date on which such Founder's Circle Member Rejection Claim becomes an Allowed Claim, such Holder's Pro Rata Share of the General Unsecured Claim Distribution from the Liquidation Trust.

3.13.4.     Founder's Circle Member Rejection Claim Election.  As provided in Section **Error! Reference source not found.**, all Founder's Circle members listed on the Founder's Circle Modified Member Schedule are having their membership contracts rejected as of the Effective Date.  On each such Holder's timely-submitted Ballot, such Holder may request that the applicable Reorganized Debtor enter into a Founder's Circle Replacement Member Contract with such Holder. If the applicable Reorganized Debtor elects in its sole discretion to enter into a Founder's Circle Replacement Member Contract with such Holder, then such Holder of a Founder's Circle Member Rejection Claim shall be deemed to have elected to voluntarily waive any Claim on account of the rejection of such member's membership agreement and shall enter into a Founder's Circle Replacement Member Contract with the relevant Reorganized Debtor which shall govern the relationship between the parties after the Effective Date and which shall be on account of and in full and complete settlement, release and discharge of such Founder's Circle Member Rejection Claim, including, without limitation, any rights in addition to membership as may be set forth in any such member's rejected membership agreement.  The election to receive the treatment specified in this Section **Error! Reference source not found.** shall be made by designation on such Holder's timely-submitted Ballot.  The decision whether to offer a Founder's Circle Replacement Member Contract shall be made by the relevant Reorganized Debtor once a determination has been made as to the existing rights of a Founder's Circle member in light of the poor record keeping of the Debtors and the lack of reliable documentation governing the rights and identities of Founder's Circle members.  Importantly, those Founder's Circle members that acquired residential units within the Yellowstone Club and should have converted to residential memberships under the terms of their Founder's Circle membership agreements, will not be offered new Founder's Circle memberships, but will instead be required to enter into residential membership agreements.

3.13.5.     Impairment and Voting.  Class 13 is impaired and pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Founder's Circle Member Rejection Claim shall be entitled to vote to accept or reject this Plan.

3.14     Class 14 – Company Member Rejection Claims.

3.14.1.     Classification.  Class 14 consists of all Company Member Rejection Claims.

3.14.2.     Allowance.  Claims in Class 14 shall be allowed or disallowed in accordance with Section **Error! Reference source not found.** of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

3.14.3.     Treatment.  Unless a Holder elects to waive such Claim and receive the treatment specified in Section **Error! Reference source not found.**, Holders of Allowed Company Rejection Claims shall be deemed to have General Unsecured Claims and shall receive, on account of and in full and complete settlement, release and discharge of such Claim, on the later of (i) the Initial Distribution Date or (ii) the first Distribution Date after the date on which such Company Member Rejection Claim becomes an Allowed Claim, such Holder's Pro Rata Share of the General Unsecured Claim Distribution from the Liquidation Trust.

23

3.14.4.    <u>Company Member Rejection Claim Election</u>.  As provided in Section **Error! Reference source not found.**, all Company members listed on the Company Modified Member Schedule are having their membership contracts rejected as of the Effective Date.   On each such Holder's timely-submitted Ballot, such Holder may request that the applicable Reorganized Debtor enter into a Company Replacement Member Contract with such Holder. If the applicable Reorganized Debtor elects in its sole discretion to enter into a Company Replacement Member Contract with such Holder, then such Holder of a Company Member Rejection Claim shall be deemed to have elected to voluntarily waive any Claim on account of the rejection of such member's membership agreement and shall enter into a Company Replacement Member Contract with the relevant Reorganized Debtor which shall govern the relationship between the parties after the Effective Date and which shall be on account of and in full and complete settlement, release and discharge of such Company Member Rejection Claim, including, without limitation, any rights in addition to membership as may be set forth in any such member's rejected membership agreement. The election to receive the treatment specified in this Section **Error! Reference source not found.** shall be made by designation on such Holder's timely-submitted Ballot.  The offering of a Company Replacement Member Contract shall be in the sole discretion of the relevant Reorganized Debtor once a determination has been made as to the existing rights of a Company member in light of the poor record keeping of the Debtors and the lack of reliable documentation governing the rights and identities of Company members as well as the appropriateness of such member holding a Company membership in light of such person's relationship to the Yellowstone Club.

3.14.5.    <u>Impairment and Voting</u>.  Class 14 is impaired and pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Company Member Rejection Claim shall be entitled to vote to accept or reject this Plan.

## ARTICLE IV

## TREATMENT OF UNCLASSIFIED CLAIMS

4.1    <u>Summary</u>.  Pursuant to section 1123(a)(1) of the Bankruptcy Code, DIP Loan Claims, Administrative Expense Claims, Priority Tax Claims, and Professional Compensation Claims are not classified for purposes of voting on, or receiving Distributions under, this Plan, and the Holders of such unclassified Claims are thus not entitled to vote to accept or reject the Plan.  All such Claims are instead treated separately in accordance with this Article IV and the requirements set forth in section 1129(a)(9)(A) of the Bankruptcy Code.

4.2    <u>DIP Loan Claims</u>.  All DIP Loan Claims shall be paid in full in cash on the Effective Date with the cash portion of the Equity Purchase Payment.  Upon such payment, all Liens securing the DIP Loan Claims shall be released.

4.3    <u>Administrative Expense Claims</u>.  Subject to certain additional requirements for professionals set forth in Section 4.5 of this Plan, the Disbursing Agent will pay to each Holder of an Allowed Administrative Expense Claim, on account of and in full and complete settlement, release and discharge of such Claim, cash equal to the full unpaid amount of such Allowed Administrative Expense Claim on either (a) the latest of (i) the date such Claim becomes an Allowed Administrative Expense Claim, or (ii) such other date as may be agreed upon by the

24

Disbursing Agent and the Holder of such Claim, or (b) such other date as the Bankruptcy Court may order; provided, however, that Allowed Administrative Expense Claims incurred by the Debtors (other than YCC) in the ordinary course of business to the extent relating to the Project (including pro rated Administrative Expense Claims of governmental units for real estate taxes) and for which the initial invoice on account thereof has not been received in the ordinary course on or before the Effective Date will be assumed by the applicable Reorganized Debtor on the Effective Date and paid, performed or otherwise settled by such Reorganized Debtor when due in accordance with the terms and conditions of the particular agreements or non-bankruptcy law governing such obligations.

4.4     Priority Tax Claims.  Unless otherwise agreed by the Debtors  and the Holder of an Allowed Priority Tax Claim (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim against any of the Debtors shall receive, on account of and in full and complete settlement, release and discharge of such Claim, cash equal to the amount of such Allowed Priority Tax Claim on the later of the (i) Effective Date or (ii) and the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as practicable.  All such payments shall be made by the Disbursing Agent.

4.5     Professional Compensation Claims.  All Persons seeking an award by the Bankruptcy Court of a Professional Compensation Claim incurred through and including the Effective Date are required (unless otherwise ordered by the Bankruptcy Court) to file final applications for the allowance of compensation for services rendered and reimbursement of expenses incurred for the period through the Effective Date within thirty (30) days after the Effective Date.  All Persons seeking an award by the Bankruptcy Court of a Professional Compensation Claim for an Administrative Expense for the period after the Effective Date shall file applications for allowance as required by the Bankruptcy Court.   Holders of Professional Compensation Claims that file final applications in accordance with the Plan will be paid in full in cash in the amounts approved by the Bankruptcy Court:  (a) on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which the order relating to the allowance of any such Professional Compensation Claim is entered; or (b) on such other terms mutually agreed upon by the Debtors and the Holder of an Allowed Professional Compensation Claim. All such payments shall be made by the Disbursing Agent.

4.6     Interest on Tax Claims.  In accordance with the provisions of 11 U.S.C. § 511(a) & 1129(a)(9)(C) to the extent any portion of any Priority Tax Claim is not paid in full on the Effective Date, then any such unpaid amount shall bear interest at the applicable statutory rate of interest, determined as of the calendar month in which the Confirmation Order is entered.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1     Assumption or Rejection of Executory Contracts and Unexpired Leases.

5.1.1.     Rejected Contracts and Leases.  On the Effective Date, all executory contracts and unexpired leases to which any of the Debtors is a party shall be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy

Code, except those executory contracts, unexpired leases, and other obligations that (i) have previously been assumed by the Debtors pursuant to an order of the Bankruptcy Court, (ii) are the subject of a motion to assume filed by the Debtors at any time prior to the Effective Date, (iii) are Assumed Obligations listed in the Contract Assumption Schedule, or (iv) are Assumed Obligations listed in the Member Assumption Schedule. The Debtors may identify additional executory contracts, unexpired leases, and other obligations for the Debtors to assume and reserve the right to seek such assumption at any time prior to the Effective Date.

       5.1.2.    Assumed Obligations. Entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the Reorganized Debtors' assumption of the Assumed Obligations listed in the Contract Assumption Schedule, as of the Effective Date pursuant to section 365(a) of the Bankruptcy Code.

       5.1.3.    Assumed Club Member Agreements. Entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the Reorganized Debtors' assumption of the member contracts listed in the Member Assumption Schedule (which contracts shall be treated as executory for purposes of section 365 of the Bankruptcy Code) and shall establish (i) that no defaults by the Debtors currently exist under or with respect to such contracts (including, without limitation, any claims for fraud or misrepresentation that may be asserted by the non-Debtor parties to such contracts) or, (ii) alternatively, that the assumption of such contracts shall satisfy or eliminate any damage claims that the non-Debtor parties thereto may be able to assert as to such existing defaults, without the necessity of paying any Cure Amounts to such non-Debtor parties on the Effective Date. To the extent an owner of a residential unit within Yellowstone Club does not have valid membership rights or a valid postponement agreement, such owner will be required to purchase a membership, failing which they will have no rights to use Yellowstone Club facilities.

       5.1.4.    Pioneer/Frontier Modified Member Schedule Agreements. To be free from doubt, the Pioneer/Frontier Modified Member Schedule shall set forth Pioneer and Frontier membership contracts (which contracts shall be treated as executory for purposes of section 365 of the Bankruptcy Code) with identified Pioneer and Frontier members of the Yellowstone Club which contracts are deemed rejected as of the Effective Date and the Holders of Claims based on such rejection shall be Holders of Pioneer/Frontier Member Rejection Claims and treated in accordance with the provisions of Section **Error! Reference source not found.**. In the event a Holder elects the treatment in section **Error! Reference source not found.** of the Plan, then such Holder's contract shall (a) be deemed amended in accordance with the provisions of Section **Error! Reference source not found.**, and such election shall constitute an agreement that (i) no defaults by the Debtors currently exist under or with respect to the rejected contract or Pioneer/Frontier Replacement Member Contract (including, without limitation, any claims for fraud or misrepresentation that may be asserted by the non-Debtor parties to such contracts) or, (ii) alternatively, that the parties' agreement to the terms of the Pioneer/Frontier Replacement Member Contract shall satisfy or eliminate any damage claims that the non-Debtor parties thereto may be able to assert as to any defaults, without the necessity of the Debtors having to pay or be liable for any damages to such non-Debtor parties on the Effective Date.

       5.1.5.    Honorary Modified Member Schedule Agreements. To be free from doubt, the Honorary Modified Member Schedule shall set forth Honorary membership contracts

(which contracts shall be treated as executory for purposes of section 365 of the Bankruptcy Code) with identified Honorary members of the Yellowstone Club which contracts are deemed rejected as of the Effective Date and the Holders of Claims based on such rejection shall be Holders of Honorary Member Rejection Claims and treated in accordance with the provisions of Section **Error! Reference source not found.**.  In the event a Holder elects the treatment in section **Error! Reference source not found.** of the Plan, then such Holder's contract shall (a) be deemed amended in accordance with the provisions of Section **Error! Reference source not found.**, and such election shall constitute an agreement that (i) no defaults by the Debtors currently exist under or with respect to the rejected contract or Honorary Replacement Member Contract (including, without limitation, any claims for fraud or misrepresentation that may be asserted by the non-Debtor parties to such contracts) or, (ii) alternatively, that the parties' agreement to the terms of the Honorary Replacement Member Contract shall satisfy or eliminate any damage claims that the non-Debtor parties thereto may be able to assert as to any defaults, without the necessity of the Debtors having to pay or be liable for any damages to such non-Debtor parties on the Effective Date.

5.1.6.     Founder's Circle Modified Member Schedule Agreements.  To be free from doubt, the Founder's Circle Modified Member Schedule shall set forth Founder's Circle membership contracts (which contracts shall be treated as executory for purposes of section 365 of the Bankruptcy Code) with identified Founder's Circle members of the Yellowstone Club which contracts are deemed rejected as of the Effective Date and the Holders of Claims based on such rejection shall be Holders of Founder's Circle Member Rejection Claims and treated in accordance with the provisions of Section **Error! Reference source not found.**.  In the event a Holder elects the treatment in Section **Error! Reference source not found.** of the Plan, then such Holder's contract shall (a) be deemed amended in accordance with the provisions of Section **Error! Reference source not found.**, and such election shall constitute an agreement that (i) no defaults by the Debtors currently exist under or with respect to the rejected contract or Founder's Circle Replacement Member Contract (including, without limitation, any claims for fraud or misrepresentation that may be asserted by the non-Debtor parties to such contracts) or, (ii) alternatively, that the parties' agreement to the terms of the Founder's Circle Replacement Member Contract shall satisfy or eliminate any damage claims that the non-Debtor parties thereto may be able to assert as to any defaults, without the necessity of the Debtors having to pay or be liable for any damages to such non-Debtor parties on the Effective Date

5.1.7.     Company Modified Member Schedule Agreements.  To be free from doubt, the Company Modified Member Schedule shall set forth Company membership contracts (which contracts shall be treated as executory for purposes of section 365 of the Bankruptcy Code) with identified Company members of the Yellowstone Club which contracts are deemed rejected as of the Effective Date and the Holders of Claims based on such rejection shall be Holders of Company Member Rejection Claims and treated in accordance with the provisions of Section **Error! Reference source not found.**.  In the event a Holder elects the treatment in Section **Error! Reference source not found.** of the Plan, then such Holder's contract shall (a) be deemed amended in accordance with the provisions of Section **Error! Reference source not found.**, and such election shall constitute an agreement that (i) no defaults by the Debtors currently exist under or with respect to the rejected contract or Company Replacement Member Contract (including, without limitation, any claims for fraud or misrepresentation that may be asserted by the non-Debtor parties to such contracts) or, (ii) alternatively, that the parties'

27

agreement to the terms of the Company Replacement Member Contract shall satisfy or eliminate any damage claims that the non-Debtor parties thereto may be able to assert as to any defaults, without the necessity of the Debtors having to pay or be liable for any damages to such non-Debtor parties on the Effective Date

       5.1.8.    Right to Reject Obligations.  Notwithstanding anything to the contrary in this Section **Error! Reference source not found.**, the Debtors or Reorganized Debtors (as applicable) shall have the right (a) to modify the Contract Assumption Schedule, the Member Assumption Schedule,  the Modified Member Schedule, Honorary Modified Member Schedule, Founder's Circle Modified Member Schedule or Company Modified Member Schedule at any time prior to 15th business day prior to the Confirmation Hearing unless such date is extend by order of the Bankruptcy Court, or (b) to abandon the assumption of any Assumed Obligation, and to treat such Assumed Obligation as rejected under the Plan, at any time during the thirty (30) day period following the Bankruptcy Court's resolution of any objection by the non-Debtor party to the assumption of such Assumed Obligation (including, but not limited to, any objection by the non-Debtor to the Cure Amount, if any, proposed with respect to such Assumed Obligation).  In the event an affiliate of the DIP Lender is the Acquirer, then the Debtors and the Acquirer shall jointly endeavor to reach an agreement with respect to the exercise of rights under this Section.

     5.2    Payment of Cure Amounts.  The Contract Assumption Schedule and the Member Assumption Schedule shall list the proposed Cure Amount, if any, with respect to each Assumed Obligation included therein.  Cure Amounts with respect to any Assumed Obligations will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, (i) by payment by the Disbursing Agent of the Cure Amount in cash on the Effective Date or, (ii) in the event a timely objection to assumption of the Assumed Obligation or to the proposed Cure Amount is raised in accordance with Section **Error! Reference source not found.** of this Plan, as soon as practicable after the Cure Amount is determined by the Bankruptcy Court in a Final Order and the expiration of the time for the Reorganized Debtor or Debtor (as applicable) to elect to treat such agreement as rejected pursuant to Section **Error! Reference source not found.**, or agreed to by the Debtors or Reorganized Debtors (as applicable) and the non-Debtor party to the Assumed Obligation.

     5.3    Objections to Assumption and Proposed Cure Amounts.

       5.3.1.    Requirement of Timely Objection.  If any non-Debtor party to an Assumed Obligation opposes the Reorganized Debtors' assumption of such Assumed Obligation for any reason (including, but not limited to, (i) the assertion of the existence of a default under such Assumed Obligation, (ii) any dispute as to the Cure Amount set forth in the Contract Assumption Schedule or Member Assumption Schedule, (iii) any dispute as to the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or (iv) any dispute concerning the Plan's ability to modify such contractual provisions, then such non-Debtor party to the Assumed Obligation must file an objection no later than the deadline for filing objections to Confirmation of this Plan.  Such objection shall be served on the Debtors and the Committee and shall state (i) the Cure Amount to which such non-Debtor party claims it is entitled; (ii) the amount of the Rejection Claim which such non-Debtor would be able to assert if the Assumed Obligation were rejected

by the Debtors; (iii) the nature of any defaults with respect to such Assumed Obligation; and (iv) any other basis upon which the non-Debtor party opposes the assumption of the Assumed Obligation.  Pending the Bankruptcy Court's ruling on such an objection, the Assumed Obligation at issue shall be treated as assumed by the Reorganized Debtors unless otherwise ordered by the Bankruptcy Court.

       5.3.2.     <u>Consequences of Failure To Object</u>.  Failure to timely file and serve an objection in accordance with this Section **Error! Reference source not found.** shall constitute the non-Debtor party's consent to the Reorganized Debtors' assumption of the Assumed Obligation, a determination by the Bankruptcy Court that, upon the Disbursing Agent's payment of the Cure Amount (if any), no defaults shall exist under such Assumed Obligation, and with respect to member agreements listed on the Modified Member Schedule, Honorary Modified Member Schedule, Founder's Circle Modified Member Schedule or Company Modified Member Schedule that have made the election under any of Sections **Error! Reference source not found.**, **Error! Reference source not found.**, **Error! Reference source not found.**. or **Error! Reference source not found.**, a determination that each identified member and the applicable Reorganized Debtor have voluntarily agreed to a modification of the affected member agreement in accordance with applicable non-bankruptcy law.  Any non-Debtor party that fails to object timely to the proposed Cure Amount or to the Debtors' assumption of any contract, unexpired lease, or other obligation to which it is a party shall be forever barred and estopped from asserting any Claims against the Debtors, the Reorganized Debtors, or any Person acting on behalf of the Debtors that arose prior to the Effective Date with respect to such contract or unexpired lease or with respect to any additional agreements, either oral or written, that may be related thereto, including, without limitation, any Claims for fraud or misrepresentation that may be asserted by such non-Debtor party against the Debtors or any Person acting on behalf of the Debtors in connection with, or related to, its contractual relationship with the Debtors, and any such Claims shall be deemed Disallowed.

       5.4     <u>Rejection Claims Bar Date</u>.  All proofs of claim with respect to Rejection Claims arising from the rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise must be filed with the Bankruptcy Court within thirty (30) days after the entry of an order by the Bankruptcy Court, which may be the Confirmation Order, authorizing the rejection of such executory contract or unexpired lease.  All Rejection Claims that become Allowed Claims shall be treated as General Unsecured Claims (or Convenience Claims, if applicable). Any Rejection Claims that are not timely filed in accordance with the foregoing provision shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or the Liquidation Trust, or any property of the Debtors or the Reorganized Debtors unless otherwise ordered by the Bankruptcy Court. No bar date has yet been established for governmental units; however, Bankruptcy Rule 3002(c)(1) provides, with certain limited exceptions, a bar date for governmental units of 180 days after the Petition Date.

       5.5     <u>Post-Petition Contracts and Leases</u>.  All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors (excluding YCC) and relating to the Project after the Petition Date shall be deemed assigned by the Debtors to the Reorganized Debtors on the Effective Date; provided that as to such matters entered into after the Petition Date the same shall only be so assumed if they are set forth on Schedule **Error! Reference**

**source not found.** which schedule shall be filed with the Bankruptcy Court no later than five (5) Business Days after entry of an order approving the Disclosure Statement.

# ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

6.1     Continued Entity Existence.  All of the Reorganized Debtors will continue to exist after the Effective Date as separate limited liability companies in accordance with applicable Montana law and pursuant to their respective articles of organization, operating agreements, and other organizational documents in effect prior to the Effective Date, except to the extent such articles of organization, operating agreements, and other organizational documents are amended pursuant to this Plan.

6.2     Amended LLC Agreements.  On the Effective Date, or as soon thereafter as is practicable, the operating agreements of all of the Reorganized Debtors (collectively, the "Amended LLC Agreements") shall be amended as necessary to satisfy the provisions of this Plan and the Bankruptcy Code, including, without limitation, the prohibition against the issuance of non-voting equity securities set forth in section 1123(a)(6) of the Bankruptcy Code.  The forms of Amended LLC Agreements shall be included in the Plan Supplement.  After the Effective Date, the Amended LLC Agreements shall be subject to such further amendments or modifications as may be made by law or pursuant to such Amended LLC Agreements.

6.3     Ownership and Management of the Reorganized Debtors.  The Acquirer shall be the sole member of each Reorganized Debtor and shall manage the business and affairs of each Reorganized Debtor in such capacity and the identities and affiliations of all persons specified in § 1129(a)(4) shall be set forth in the Plan Supplement.

6.4     Employee Matters.  On or prior to the Effective Date, Debtors shall wind-up, dissolve or otherwise terminate all of their "employee benefit plans" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended and each other stock, bonus, incentive, deferred compensation, severance, vacation, health or welfare or other fringe benefit plan, program, policy or arrangement in accordance with, and take all such actions as are required by, applicable law and, subject to the proration of vacation benefits as otherwise provided in the Definitive Agreement, pay all Claims and costs in connection therewith.  From and after the Effective Date, the Reorganized Debtors shall each have the authority, consistent with the Amended LLC Agreements, to enter into, amend and terminate employment, retirement, indemnification and other agreements with their respective directors, officers and employees and to implement, amend or terminate incentive compensation plans, benefit and retirement plans, and other plans for their respective officers and employees.  All Claims by existing employees up to the Effective Date as well as those provided in the Definitive Agreement, except  those accrued vacation obligations expressly assumed by the Reorganized Debtors shall be treated solely in accordance with the Plan and the Reorganized Debtors shall have no liability on account of such Claims.

6.5     Issuance of New Membership Interests.  On the Effective Date, if applicable, each Reorganized Debtor shall issue the New Membership Interests for distribution to the Acquirer.

6.6     Terminated Entity Existence.  The Reorganized YCC will continue to exist until the Effective Date as a separate limited liability company in accordance with applicable Montana law and pursuant to its articles of organization, operating agreements, and other organizational documents in effect prior to the Effective Date, and it shall transfer all its assets to the Trust on the Effective Date and shall thereupon cease to exist and all payments under the Plan on account of Claims against YCC shall be paid by the Trustee.

6.7     Cancellation of Equity Interests and Other Instruments.  On the Effective Date, except as otherwise specifically provided for herein, all Equity Interests in the Debtors and the First Lien Credit Documents shall (a) be deemed fully and finally cancelled; and (b) have no effect other than the right of the Holders of First Lien Lenders Claims to participate in the Distributions provided under this Plan from the Disbursing Agent and from the Liquidation Trust in respect of such Claims and the right of the Holders of Equity Interests to participate in Distributions from the Liquidation Trust.  As of the Effective Date, all Liens, charges, encumbrances and rights related to any Claim or Equity Interest, except to the extent specifically permitted under **Error! Reference source not found.**of this Plan, shall be terminated, null and void and of no effect.

6.8     Corporate Action.  Each of the matters provided for under this Plan involving the structure of any Reorganized Debtor or corporate action to be taken by or required by any Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by the stockholders, members, creditors or managers of any Reorganized Debtor.

6.9     Dissolution of the Committee.  The Committee shall cease to exist after the Effective Date; provided, however, that it shall continue to exist for sixty (60) days after the Effective Date for the limited purposes set forth in the Yellowstone Club Settlement Term Sheet. Except as otherwise provided in this Plan, on the Effective Date the members of the Committee shall be released and discharged of and from all duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases. Upon the Effective Date, the Committee shall be deemed for all purposes to have transferred to the Liquidating Trust any and all Avoidance Actions that it has brought, or that it could have brought, on behalf of the Estates.

6.10    Pre-Effective Date Injunctions or Stays.  All injunctions or stays, whether by operation of law or by order of the Bankruptcy Court, provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise that are in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

6.11    Exemption From Certain Transfer Taxes.  Pursuant to Section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with this Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated in

31

this Plan (whether to one or more of the Reorganized Debtors, the Liquidation Trust or otherwise) and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

6.12    Section 1123(a)(5)(J) Issuance of New Membership Interests.  Pursuant to the provisions of section 1123(a)(5)(J) of the Bankruptcy Code, the Plan Solicitation Order, and subject to Bankruptcy Court approval in connection with Confirmation of this Plan, the Reorganized Debtors shall issue the New Membership Interests to Acquirer in accordance with the Definitive Agreement for the purpose of acquiring the funds and other consideration necessary for the consummation of the Plan.

6.13    Disbursing Agents.

6.13.1.    Appointment.  The Confirmation Order shall appoint an entity designated by the Debtors in consultation with the Committee as the Disbursing Agent to make the Distributions of the Required Plan Payments.

6.13.2.    Effective Date Transfers to Disbursing Agent.  On the Effective Date, the Reorganized Debtors shall pay to the Disbursing Agent the cash portion of the Equity Purchase Payment less the Initial Liquidation Trust Deposit (which shall be paid to the Trustee pursuant to section 6.14.2), and the Excess Closing Proceeds (as defined in the Yellowstone Club Settlement Term Sheet) shall be allocated to the Trade Creditor Fund.

6.13.3.    First Lien Agent as Disbursing Agent for Note Payments.  With the consent of the Trustee, the First Lien Lenders, and the First Lien Agent, the First Lien Agent may serve as Note Disbursing Agent with respect to the collection and Distribution of any payments on the Equity Purchase Note from the Reorganized Debtors with such rights and obligations as the parties shall agree.  In the event the parties do not agree to the First Lien Agent serving in such capacity, then the Bankruptcy Court shall appoint a Note Disbursing Agent for such payments.

6.14    Creation and Funding of the Liquidation Trust.

6.14.1.    Order of Steps on the Effective Date and Knowledge of Restructure of Indebtedness.  Notwithstanding anything to the contrary contained herein, all steps taken in implementation of this Plan and effective on the Effective Date shall be deemed to occur sequentially such that, for all purposes of the Plan and the Confirmation Order, the following actions occur in the following order: (1) discharge of any Claims or other indebtedness; (2) cancellation of Equity Interests, and (3) issuance of New Membership Interests in Reorganized

Debtors to Acquirer.  Further, the Debtors are deemed to have acknowledged and agreed that for federal income tax purposes, (i) Acquirer is purchasing certain assets of the Debtors (other than YCC) and that (ii) the Debtors are aware that the indebtedness to which they are subject with respect to their assets is being restructured in connection with Acquirer's acquisition and for federal tax purposes the modifications and cancellation of any Claims are treated as taking place prior to Acquirer's purchase, consistent with Treas. Reg. §1.1274-5(b)(1).

  6.14.2. <u>Effective Date Transfers</u>.  On the Effective Date, and prior to the transfers required under Section **Error! Reference source not found.**, each Debtor and the Committee shall convey to the Liquidation Trust for such Debtor's Estate all of its assets and property except the Project (including, without limitation, the Reserved Actions).  Immediately thereafter, the Closing under the Definitive Agreement shall occur and the Reorganized Debtors shall transfer the Initial Liquidation Trust Deposit with respect to the relevant Debtor (other than YCC) to the Liquidation Trust for such Debtor's Estate.

  6.14.3. <u>Final Transfer</u>.  After the payment of all Required Plan Payments and the Distributions to the Holders of Convenience Class Claims, Priority Tax Claims, and Priority Non Tax Claims the Disbursing Agent shall transfer the Excess Closing Proceeds to the Trade Creditor Fund.

  6.14.4. <u>Duty to Cooperate.</u>  The Reorganized Debtors shall reasonably cooperate with the Trustee in pursuing Transferred Claims and liquidating estate property transferred to the Trust and shall make available reasonable access during normal business hours, on reasonable notice, to personnel and books and records of the Reorganized Debtors to representatives of the Trust to enable the Trustee to perform the Trustee's tasks under the Trust Agreement and the Plan. The Reorganized Debtors shall be entitled to reasonable, out of pocket compensation or reimbursement (including reimbursement for professional fees) with respect to fulfilling their obligation as set forth in this Section. The Trustee shall reasonably cooperate with the Reorganized Debtors in pursuing Reserved Claims and operating the Project and shall make available reasonable access during normal business hours, on reasonable notice, to personnel and books and records of the Trustee to representatives of the Reorganized Debtors to enable the Reorganized Debtors to operate and manage the Project. The Trustee shall be entitled to reasonable, out of pocket compensation or reimbursement (including reimbursement for professional fees) with respect to fulfilling its obligation as set forth in this Section.

  6.15 <u>[Intentionally Deleted]</u>

  6.16 <u>The Plan Solicitation Order</u>.  To be free from doubt, pursuant to the Plan Solicitation Order, and subject to Bankruptcy Court approval in connection with Confirmation of this Plan, the Plan Proponents shall sell the New Membership Interests to the Acquirer, pursuant to the terms of the Definitive Agreement, after marketing the equity of the Reorganized Debtors and the Project assets in accordance with the terms set forth in the Plan Solicitation Order.  As contemplated by the Plan Solicitation Order, the Acquirer under any alternative Definitive Agreement shall be required to provide working capital (in addition to the Purchase Price) to the Reorganized Debtors or their successors as owner of the Project on the Effective Date in an amount sufficient to provide evidence that the Plan is feasible.

6.17    Creation of Trade Creditor Fund.  In the Event an affiliate of the DIP Lender is the Acquirer, then out of the proceeds from the DIP Loan repayment the Acquirer shall establish the Trade Creditor Fund in an amount up to $15,000,000 for payment of Allowed Claims of local trade and other unsecured creditors as deemed appropriate and necessary by the Acquirer to preserve and enhance the reputation and good standing of the Reorganized Debtors in the Big Sky and Yellowstone Club Communities and in recognition of the sacrifice and hardships endured by such creditors as a result of the financial problems of the Yellowstone Club.  The Trade Creditor Fund will be administered by the DIP Lender or its designee in accordance with the following provisions:

6.17.1.    Identification of Covered Trade Creditors.  On or after the Effective Date and before it terminates, the Committee in its sole discretion but after consultation with the Reorganized Debtors and the Ad Hoc Member Committee shall identify Holders of Unsecured Claims entitled to distribution from the Trade Creditor Fund and pay to them the amount of their Allowed Claims and on account thereof the Reorganized Debtors shall be subrogated to the rights of such Holders to receive payments and Distributions under this Plan on account of such Allowed Claims.

6.17.2.    Assignment of Allowed Claim.  Any Holder who receives payment of its Allowed Claim from the Trade Creditor Fund shall execute such documents as may be reasonably requested to assign such Claim to the Reorganized Debtors, without representation, warranty or recourse.

6.17.3.    No Transferees Eligible.  The Trade Creditor Fund is being created for the sole benefit of local trade and other creditors and no transferee or other successor to an eligible Holder shall have the right to participate or assign claims.

## ARTICLE VII

## DISTRIBUTIONS AND CLAIMS RECONCILIATION

7.1    Payments by Disbursing Agent.  The Disbursing Agent shall make the following payments.

7.1.1.    Payment of Claims.  Unless otherwise specified herein, the Disbursing Agent shall make the Required Plan Payments, on the later of the (i) the Effective Date or (ii) the first business day after the date on which a Claim entitled to receive a Required Plan Payment becomes an Allowed Claim, or as soon as practicable thereafter, in accordance with the provisions of Article III of this Plan.

7.1.2.    Payment of Funds from Trade Creditor Fund.  The DIP Lender or its designee shall make the payments of funds from the Trade Creditor Fund as directed by the Committee, after consultation with the Reorganized Debtors and the Ad Hoc Member Committee, as provided in Section 6.17.1 and any undisbursed funds in the Trade Creditor Fund (after payment of all funds as directed by the Committee) when the Committee terminates shall remain the property of the DIP Lender.

7.2     Payment of Claims by Trustee.  Except as otherwise ordered by the Bankruptcy Court, Distributions to Holders of Claims from the Liquidation Trust shall be made by the Trustee on the Initial Distribution Date and on each Distribution Date thereafter.

7.3     No Interest on Allowed Claims.  Unless otherwise specifically provided for in this Plan, the Confirmation Order, or a post-petition agreement in writing between the Debtors and a Holder of an Allowed Claim, post-petition interest shall not accrue or be paid on Allowed Claims, and no Holder of an Allowed Claim shall be entitled to interest accruing on such Claim from and after the Petition Date.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date (i) such Disputed Claim becomes an Allowed Claim or (ii) the date a Final Distribution is made with respect to such Allowed Claim.

7.4     Claims Administration Responsibility.

7.4.1.     Responsibility of the Disbursing Agent.  On and after the Effective Date, the Disbursing Agent shall have sole responsibility and authority for administering, disputing, objecting to, compromising and settling, or otherwise resolving and making Distributions with respect to all Claims entitled to receive a Required Plan Payment.

7.4.2.     Responsibility of Trustee.  On and after the Effective Date, the Trustee shall have sole responsibility and authority for administering, disputing, objecting to, compromising and settling, or otherwise resolving all General Unsecured Claims, First Lien Lender Claims, and First Lien Lender Deficiency Claims.

7.4.3.     Responsibility of Committee.  The Committee shall have the exclusive right for forty-five (45) days after the Effective Date to negotiate proposed terms of any settlement of the Designated Claims (as defined in the Yellowstone Club Settlement Term Sheet), subject to the approval of the Trust Advisory Board.

7.4.4.     Responsibility of Reorganized Debtors.  The Reorganized Debtors shall have sole responsibility and authority for administering, disputing, objecting to, compromising and settling, or otherwise resolving any Claims payable by the Reorganized Debtors, including, without limitation, Class 2 and Class 10, and the Reorganized Debtors' rights with respect to Claims in Class 11b (option) and Classes 9 and 12 through 14 (membership agreements).

7.5     Objections to Claims.  Unless otherwise extended by the Bankruptcy Court, any objections to Claims shall be served and filed on or before the Claims Objection Deadline. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder thereof if the Disbursing Agent, Reorganized Debtors or Trustee (as applicable) effect service of such objection in any of the following manners:  (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable in the Chapter 11 Cases by Bankruptcy Rule 7004; (ii) to the extent counsel for a Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory to the applicable proof of claim or other representative identified in the proof of claim or any attachment thereto; or (iii) by first class

mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.

7.6    Determination of Allowed Claims.  Except as otherwise agreed to by the Disbursing Agent or the Trustee (as applicable) in writing or as set forth in this Plan, the Allowed amount of any Claim as to which a proof of claim was timely filed in the Chapter 11 Cases, and which Claim is subject to an objection filed before the Claims Objection Deadline, shall be determined and liquidated pursuant to an order of the Bankruptcy Court.  Upon such determination, the Claim shall become an Allowed Claim and will be satisfied in accordance with this Plan.  Furthermore, the Bankruptcy Court shall have the authority to estimate the amount of Claims for the purpose of enabling Distributions in accordance with the provisions of Section **Error! Reference source not found.**.

7.7    Procedures for Treating and Resolving Disputed and Contingent Claims.

7.7.1.    No Distributions Pending Allowance.  No Distributions shall be made with respect to any portion of a Disputed Claim unless and until such Disputed Claim has become an Allowed Claim.  All objections to Claims shall be filed on or before the Claims Objection Deadline, and all Claims with respect to which objections have been filed on or before the Claims Objection Deadline shall be treated as Disputed Claims for purposes of this Plan.

7.7.2.    Disputed Claim Reserve Accounts.  The Disbursing Agent with respect to Claims entitled to receive a Required Plan Payment shall establish the Disputed Claim Reserve Account as soon as practicable after the Effective Date with Equity Purchase Payment funds held by the Disbursing Agent in trust. The Trustee with respect to General Unsecured Claims, First Lien Lender Claims, and First Lien Lender Deficiency Claims shall establish the Disputed Claim Reserve Account as soon as practicable after the Effective Date with funds held by the Trustee. The Disputed Claim Reserve Account shall hold cash in such amount as the Disbursing Agent or the Trustee reasonably determine is necessary to enable them to make the Distributions (whether interim or final) required to be made once the allowance or disallowance of each Disputed Claim or other contingent Claim, including any filed or anticipated Rejection Claims, is ultimately determined.

7.7.3.    Trustee Distributions After Allowance.  Promptly after a Disputed Claim payable by the Trustee becomes an Allowed Claim, the Trustee will distribute on the next succeeding Distribution Date to the Holder of such Allowed Claim any cash or other property that would have been distributed to the Holder of such Allowed Claim on the dates Distributions were previously made to Holders of other Allowed Claims had such Claim been an Allowed Claim on such date or dates.

7.7.4.    Reorganized Debtor Distributions After Allowance.  Promptly after a Disputed Claim payable by a Reorganized Debtor becomes an Allowed Claim, the Disbursing Agent will distribute to the Holder of such Allowed Claim any cash or other property held in the Disputed Claim Reserve Account on account of the Disputed Claim.

7.7.5.    No Recourse.  No Holder of a Disputed Claim shall have any recourse against the Debtors, the Estates, the Trustee, the Reorganized Debtors, the Disbursing Agent, or

any of their respective directors, officers, employees, agents, partners, members, attorneys, investment bankers, restructuring consultants and financial advisors, in the event that the Disputed Claim Reserve Account established by the Disbursing Agent or the Trustee pursuant to this Plan is insufficient to pay the portion of such Disputed Claim that becomes an Allowed Claim.

7.7.6.    Compromises and Settlements.  From and after the Effective Date, the Disbursing Agent and the Trustee, as applicable, shall be authorized to compromise and settle any Disputed Claim and to execute all necessary documents, including a stipulation of settlement or release, in their sole discretion, without notice to any party, and without the need for Bankruptcy Court's approval.

7.8    Disputed Claim Estimation Procedure.  The Disbursing Agent and the Trustee shall have the authority to estimate the maximum allowable amount of any Disputed Claim (the "Estimation Claim") pursuant to the following procedure (the "Claim Estimation Procedure"):

7.8.1.    Filing Objection and Scheduling Hearing.  The Objecting Party may file an objection to an Estimation Claim by the applicable Claims Objection Deadline, along with a "Notice of Applicability of Estimation Procedure."  An estimation hearing (the "Estimation Hearing") shall be scheduled on the first available date that is at least ninety (90) days thereafter.

7.8.2.    Claim Holder Response.  The Holder of the Estimation Claim shall deliver to the Objecting Party a narrative description of the factual and legal basis for such Claim and a copy of all evidence in support of such Claim within thirty (30) days after service of the Objection and Notice of Applicability of Estimation Procedure.

7.8.3.    Discovery.  The Objecting Party and Claim Holder may take discovery within the following sixty (60) days, including no more than two (2) depositions each.

7.8.4.    Pretrial Statement.  The Objecting Party and Claim Holder shall file a joint pretrial statement at least five (5) days before the commencement of the Estimation Hearing.

7.8.5.    Evidence.  At the Estimation Hearing, all direct evidence shall be presented by declaration, with all declarants present in the Court for cross-examination.  The Claim Holder and the Objecting Party shall share hearing time equally.

7.8.6.    Use of Estimation.  The Bankruptcy Court's ruling on the Estimation Claim amount shall be used for purposes of determining the amount of the Disputed Claim Reserve Account attributable to such Claim.

7.9    Delivery of Distributions.  Distributions to Holders of Allowed Claims shall be made by the Trustee or the Disbursing Agent, as applicable, (a) at the addresses set forth on the proofs of claim filed by such Holders (or at the last known addresses of such Holders if no proof of claim is filed), (b) at the addresses set forth in any written notice of change of address delivered to the Debtors, the Disbursing Agent, or the Trustee after the date of filing of any related proof of claim, or (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Debtors or the Disbursing Agent have not received a written notice of a

37

change of address.  If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Disbursing Agent or the Trustee are notified of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest.  Amounts in respect of undeliverable Distributions made in cash shall be retained by the Disbursing Agent or the Trustee until such Distributions are claimed.  All cash Distributions returned to the Disbursing Agent or Trustee and not claimed within six (6) months of return shall be irrevocably retained by the Disbursing Agent or Trustee.

7.10    Unclaimed Funds.  Checks issued by the Disbursing Agent or the Trustee on account of Allowed Claims, and not returned as undeliverable, shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Disbursing Agent or the Trustee by the Holder of the Allowed Claim with respect to which the check was originally issued.  Any Claim in respect of a voided check shall be made on or before the six (6) month anniversary of the date of issuance of such check.  After such date, all Claims and respective voided checks on account thereof shall be discharged and forever barred and the Disbursing Agent or the Liquidation Trust shall retain all moneys related thereto notwithstanding any federal or state escheat laws to the contrary.

7.11    Bar Date For Certain Administrative Claims.  All applications for final allowance of Professional Compensation Claims of professional persons employed by the Debtors or the Committee pursuant to orders entered by the Bankruptcy Court and on account of services rendered prior to the Effective Date, and all other requests for payment of Administrative Expense Claims (except trade debt incurred by the Debtors in the ordinary course after the Petition Date) shall be filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date and served on the Disbursing Agent at the address set forth in Section 11.9 of this Plan.  Any such Claim that is not served and filed within this time period shall be discharged and forever barred.  Objections to any application for allowance of an Administrative Expense Claim must be filed within twenty (20) days after the filing thereof.  The Disbursing Agent shall have sole responsibility for filing objections to requests for allowance of Administrative Expense Claims, provided, however, that the Office of the United States Trustee and any party in interest may be heard with respect to Professional Compensation Claims.

7.12    First Lien Lender Distributions.  Distributions to Holders of First Lien Lender Claims shall be made by the First Lien Agent as agent for such Holders.

7.13    De Minimis Distributions.  The Disbursing Agent shall have no obligation to make a Distribution on account of an Allowed Claim from the Disputed Claim Reserve Account or otherwise if the amount to be distributed on account of such Allowed Claim is less than fifty dollars ($50.00).  In the event a Holder of an Allowed Claim is entitled to a Distribution that is not a whole dollar amount, the actual payment or issuance made may reflect a rounding of such fractional portion of such Distribution down or up to the nearest whole dollar.

7.14    Disbursing Agent Setoffs and Recoupment.  The Disbursing Agent may, but shall not be required to, setoff or recoup against any Allowed Claim and the Distributions to be made pursuant to this Plan on account of such Claim, Transferred Actions of any nature that the Debtors may have against the Holder of such Allowed Claim.

7.15    Trustee Setoffs and Recoupment.  The Trustee may, but shall not be required to, setoff or recoup against any Allowed Claim and the Distributions to be made pursuant to this Plan on account of such Claim, Transferred Actions of any nature that the Debtors may have against the Holder of such Allowed Claim.

7.16    Compliance with Tax Requirements.  In connection with this Plan, to the extent applicable, the Disbursing Agent and Trustee shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all Distributions pursuant to this Plan that may be necessary or appropriate to comply with such withholding and reporting requirements.  Notwithstanding any other provision of this Plan, each Person that has received any Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

7.17    Ordering of Distributions from Trust.  All funds received by the Trust after the Effective Date (net of reserves for expenses) following the liquidation of any Trust Asset Non-Project Assets (excluding Farcheville) shall be paid first, the amount of $2,000,000 to the Trade Creditor Fund; second, up to the amount of $15,000,000 to pay CIP Lending or its assignees on account of Allowed Class 4 Claims paid by the Trade Creditor Fund; third, up to the next $10,000,000 to pay any Allowed Class 4 Claims; and fourth, the balance shall be paid pro rata among all unpaid Allowed Claims including all unpaid Allowed Claims of the Prepetition Agent and Prepetition Lenders after application of the Equity Purchase Note and the net proceeds from Farcheville, all  on a pari passu basis.

## ARTICLE VIII

## EFFECT OF THIS PLAN ON CLAIMS AND INTERESTS

8.1    Revesting of Assets.  Except as otherwise explicitly provided in this Plan, on the Effective Date, all property of the Estates, to the fullest extent of section 541 of the Bankruptcy Code, and any and all other rights and Assets of the Debtors of every kind and nature (including the Retained Actions and Avoidance Actions) shall revest in each of the Reorganized Debtors that owned such property or interest in property as of the Petition Date, free and clear of all Liens, Claims and Equity Interests, except as specifically provided for in this Plan.  As of the Effective Date, the Reorganized Debtors shall be authorized to operate their businesses and to use, acquire, and dispose of property, or Reserved Actions without supervision of the Bankruptcy Court and without notice to any party, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, except those restrictions explicitly imposed by this Plan and the Confirmation Order.

8.2    Treatment of Reserved Actions and Transferred Actions.

8.2.1.    Reserved Actions.  Except as otherwise set forth in this Plan, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, on the Effective Date, all Reserved Actions of any kind or nature whatsoever against third parties arising before the Confirmation Date shall become property of the Reorganized Debtors.  From and after the Effective Date, the Reorganized Debtors may commence any suit or other proceeding for the enforcement of

Reserved Actions. Furthermore, the Reorganized Debtors shall be authorized to assert such Reserved Actions (other than with respect to the Released Parties) for purposes of objecting to the allowance of any Claim pursuant to section 502(d) of the Bankruptcy Code.

8.2.2.    Transferred Actions. Except as otherwise set forth in this Plan, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, on the Effective Date, all Transferred Actions of any kind or nature whatsoever against third parties arising before the Confirmation Date shall be transferred by the Debtors to the Liquidation Trust. From and after the Effective Date, the Trustee on behalf of the Estate and for the benefit of the beneficiaries of the Trust may commence any suit or other proceeding for the enforcement of any Transferred Actions. Furthermore, the Trustee shall be authorized to assert such Transferred Actions for purposes of objecting to the allowance of any Claim pursuant to section 502(d) of the Bankruptcy Code.

8.3    Discharge of Claims and Termination of Equity Interests.

8.3.1.    Discharge. Pursuant to section 1141(d) of the Bankruptcy Code, and except as provided in the Confirmation Order, the Distributions and rights provided in this Plan and the treatment of Claims and Equity Interests under this Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and satisfaction or termination of all Equity Interests, including any interest accrued on Claims from and after the Petition Date. Except as otherwise provided in this Plan or the Confirmation Order, Confirmation shall, as of the Effective Date: (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (x) a proof of claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (y) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (z) the Holder of a Claim based on such debt has accepted this Plan; and (ii) terminate and cancel all Equity Interests in the Debtors.

8.3.2.    Prohibition on Assertion of Discharged Claims and Equity Interests. As of the Effective Date, except as otherwise provided in this Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or property, any other or further Claims, demands, debts, rights, Causes of Action, liabilities or Equity Interests based upon any act, omission, cause, transaction, state of facts, or other activity of any kind or nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in this Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of discharge of all such Claims and other debts and liabilities against the Debtors and satisfaction, termination or cancellation of all Equity Interests pursuant to sections 524 and 1141 of the Code, and such discharge will void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

8.4    Exculpation and Limitation of Liability. None of (a) the Debtors or the Reorganized Debtors, (b) the Committee, (c) the individual members of the Committee in their capacities as such, (d) the DIP Lender, any other lenders of (or participants in) the DIP Loan and any agent thereof, (e) the Current Equity Owners, (f) CrossHarbor Capital Partners LLC and all affiliates thereof, (g) the Acquirer, (h) the First Lien Lenders and the First Lien Agent, and (i) with respect to each of the foregoing Persons, each of their respective directors, officers,

employees, agents (including Edra Blixseth, as managing member of the Current Equity Owners), representatives, shareholders, partners, members, attorneys, investment bankers, restructuring consultants and financial advisors in their capacities as such (collectively, the "Exculpated Parties"), shall have or incur any liability to any Person for any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the formulation, negotiation, implementation, confirmation or consummation of this Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document entered into during the Chapter 11 Cases or otherwise created in connection with this Plan; provided, however, that nothing in this Section **Error! Reference source not found.** shall be construed to release or exculpate any Exculpated Party from willful misconduct or gross negligence as determined by a Final Order or any breach of the Definitive Agreement or any documents entered into in connection therewith.

8.5     Effect of Confirmation.  On the Confirmation Date, the provisions of the Plan shall become binding on the Debtors, the Estates, the Acquirer, the Reorganized Debtors, all Holders of Claims against or Equity Interests in the Debtors, and all other parties in interest in the Chapter 11 Cases whether or not such Holders of Claims or Equity Interests are impaired and whether or not such Holders of Claims or Equity Interests have accepted this Plan.

8.6     Substantive Consolidation.  Except as expressly provided in the Plan, the Reorganized Debtors shall continue to maintain their separate corporate existence for all purposes other than the treatment of Claims under the Plan.  The Debtors are proposing that the Debtors be substantively consolidated under this Plan on the Effective Date pursuant to Section 1123(a)(5)(C) of the Bankruptcy Code and the Confirmation Order.  The effect of such substantive consolidation would be that: (i) all assets (and all proceeds thereof) and liabilities of each Debtor shall be deemed merged or treated as though they were merged into and with the assets and liabilities of all other Debtors, (ii) no distributions shall be made under the Plan on account of intercompany Claims among the Debtors and all such Claims shall be eliminated, (iii) all guarantees of any Debtor of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any claim against any Debtor and any guarantee thereof executed by the other and any joint or several liability of any Debtor shall be deemed to be one obligation of the consolidated cases, (iv) each and every Claim filed or to be filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors and (v) for purposes of determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of Section 553 of the Bankruptcy Code, debts due to any Debtor may be set off against the debts of any other Debtor.  Such substantive consolidation shall not (other than for purposes related to the Plan) affect the legal and corporate structures of the Reorganized YC or YD or BSR.  There shall be only one Trust for the purpose of administering the Liquidating Trust.

8.7     Settlement Releases.

8.7.1.     Litigation Releases.  The Debtors, the Reorganized Debtors and the Committee for themselves and the Debtors' estates shall, and shall be deemed to, dismiss, waive and forever release with prejudice all actual, potential or threatened claims, causes of action and challenges that have been, might have been or might be asserted by the Committee, the Reorganized Debtors, the Debtors or their estates against the Prepetition Agent and Prepetition

Lenders with respect to any and all acts and omissions occurring prior to the satisfaction of the Effectiveness Conditions excluding, however, enforcement of this Term Sheet and the Modified Plan. The foregoing includes, without limitation, the release of any Reserved Actions, Retained Actions and Transferred Actions, the dismissal with prejudice of all claims, causes of action and challenges asserted in Adversary Proceedings against the Prepetition Lenders and Prepetition Agent or against their claims and liens under the Prepetition Loan and any adequate protection liens of the Prepetition Agent and Prepetition Lenders; and the waiver and release of all possible claims under 11 U.S.C. § 506(c) against the Prepetition Agent, the Prepetition Lenders, the Prepetition Loan Collateral and any adequate protection liens of the Prepetition Agent and Prepetition Lenders.

        8.7.2.    <u>Plan Releases</u>. Subject to the occurrence of and upon the Effective Date, CrossHarbor, CrossHarbor Institutional Partners, L.P., CIP Lending, CrossHarbor Capital Partners LLC (and their affiliates with interests in the Yellowstone Club) (collectively, the "CrossHarbor Entities"), the Committee (and as to the Committee also the members of such committee but solely in their capacities as members thereof for their acts or omissions relating to the Committee), the Debtors, the Reorganized Debtors, the First Lien Agent and the First Lien Lenders shall be deemed to have exchanged mutual releases with respect to any and all acts or omissions on or before the Confirmation Date relating to the Yellowstone Club or the Debtors; provided, however, that the foregoing mutual releases shall not (i) apply to any willful misconduct by any individual person with fiduciary duties to the Committee, the Debtors or the Debtors' estates, (ii) release the Parties' respective rights and obligations under the Definitive Agreement, the Yellowstone Club Settlement Term Sheet and the Plan, (iii) extend to or include any claims, rights or causes of action against BLX, Big Springs Realty, LLC, or Sunrise Ridge at Yellowstone Club, LLC, (iv) extend to or include any rights to enforce or defenses to the enforcement of the BGI Notes or the Bridge Loan (including, without limitation, the liens and documents relating thereto), or (v) impair CIP Lending's rights under the CH DIP Loan until such time as such loan is paid in full or the rights of CrossHarbor Institutional Partners, L.P. to receive distributions under the Modified Plan in its capacity as a Prepetition Lender (the matters specified in clauses (x) through (z) collectively, the "Reserved Matters"). Except as to enforcement of the Yellowstone Club Settlement Term Sheet and the Plan, the Reserved Matters shall not include any actions, claims or causes of action (but not defenses) against the First Lien Agent or First Lien Lenders.

    8.8    <u>Incorporation</u>. To be free from doubt, the terms and provisions of the Yellowstone Club Settlement Term Sheet are expressly incorporated in this Plan, and the entry of the Confirmation Order shall approve the Yellowstone Club Settlement Term Sheet and the transactions contemplated thereby as a compromise and settlement under Fed. Rule Bankr. Pro. 9019 and that the Plan that is fair and reasonable and in the best interest of creditors.

    8.9    <u>Effective Date Dismissals</u>. Upon the occurrence of the Effective Date, the causes of action asserted against the Committee and the Debtors in the Adversary Proceeding brought by the First Lien Agent and First Lien Lenders and the causes of action asserted against the First Lien Agent and First Lien Lenders in the Adversary Proceeding brought by the Debtors and the Committee shall be deemed settled and resolved and dismissed with prejudice by the Plan in accordance with the Yellowstone Club Settlement Term Sheet.

# ARTICLE IX

## CONDITIONS PRECEDENT

9.1     Conditions to Confirmation.  The following are conditions precedent to confirmation of this Plan that may be satisfied or waived in accordance with Section **Error! Reference source not found.** of this Plan:

9.1.1.     The Bankruptcy Court shall have approved a Disclosure Statement with respect to this Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

9.1.2.     The Confirmation Order shall be reasonably acceptable to the Debtors, the Acquirer, and the First Lien Agent.

9.2     Conditions to Occurrence of the Effective Date.  The following are conditions precedent to the occurrence of the Effective Date, each of which, except for Section **Error! Reference source not found.** and Section 9.2.5, may be satisfied or waived in accordance with Section **Error! Reference source not found.** of this Plan:

9.2.1.     The Confirmation Order shall have been entered by the Bankruptcy Court and shall not be subject to any stay and shall otherwise be in full force and effect.

9.2.2.     Each exhibit, document or agreement to be executed in connection with this Plan shall be reasonably acceptable to the Debtors and the Acquirer.

9.2.3.     The Confirmation Order shall have become a Final Order.

9.2.4.     The Debtors and the Committee shall have filed a dismissal with prejudice of their claims and causes of action asserted against the First Lien Agent and the First Lien Lenders (but not their claims and causes of action asserted against Timothy L. Blixseth) in Adversary Proceeding Nos.  09-00014 and 09-00017.

9.2.5.     The Court shall have taken the required actions specified in paragraphs 8 & 11 of the Yellowstone Club Settlement Term Sheet.

9.3     Waiver of Conditions.  The conditions precedent set forth in Section **Error! Reference source not found.** or **Error! Reference source not found.** (except Sections 9.2.4 and  9.2.5) of this Plan may be waived by the Debtors and the Acquirer, in whole or in part, without notice to any other parties in interest and without the Bankruptcy Court's approval.  The failure to satisfy or waive any condition to Confirmation or to the occurrence of the Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied.

## ARTICLE X

## RETENTION AND SCOPE OF JURISDICTION OF THE BANKRUPTCY COURT

10.1    Retention of Jurisdiction.  On and after the Effective Date, the Bankruptcy Court shall have or retain jurisdiction for the following purposes:

10.1.1.    To adjudicate objections concerning the allowance, priority, or classification of Claims and Equity Interests;

10.1.2.    To liquidate the amount of any disputed, contingent or unliquidated Claim and to estimate the amount of any disputed, contingent or unliquidated Claim;

10.1.3.    To resolve all matters related to the rejection, assumption, and/or assumption and assignment of any executory contract or unexpired lease of the Debtors, including the determination of Cure Amounts;

10.1.4.    To hear and rule upon all Reserved Actions, Transferred Actions or other Causes of Action commenced and/or pursued by the Trustee, the Debtors and/or the Reorganized Debtors (but only to the extent that such Causes of Action are not released or otherwise prohibited by the terms of this Plan);

10.1.5.    To hear and rule upon all applications for allowance of Administrative Expense Claims and Professional Compensation Claims;

10.1.6.    To modify this Plan pursuant to section 1127 of the Bankruptcy Code, to remedy any apparent defect or omission in this Plan, or to reconcile any inconsistency in this Plan as may be necessary to carry out its intent and purposes;

10.1.7.    To construe or interpret any provisions of this Plan and to issue such orders as may be necessary for the implementation, execution, and consummation of the Plan, to the extent authorized by the Bankruptcy Code;

10.1.8.    To adjudicate controversies arising out of the administration of the Estates, the implementation of this Plan, or the administration of the Liquidation Trust;

10.1.9.    To make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including the enforcement of releases and injunctions, the Distribution of funds from the Estates, and the payment of Allowed Claims;

10.1.10.    To determine any suit or proceeding brought by the Trustee, the Debtors and/or the Reorganized Debtors to recover property under any provision of the Bankruptcy Code;

10.1.11.    To hear and determine any matters concerning local, state and federal tax liabilities of the Debtors in accordance with sections 346, 505 and 1146 of the Bankruptcy

44

Code, and to determine any tax claims that may arise against the Debtors or the Reorganized Debtors as a result of the transactions contemplated by this Plan;

10.1.12.   To determine such other matters as may be provided for in the Plan or the Confirmation Order or as may be authorized by or under the provisions of the Bankruptcy Code;

10.1.13.   To determine any controversies, actions or disputes that may arise under the provisions of this Plan, or the rights, duties or obligations of any Person under the provisions of this Plan;

10.1.14.   To determine all matters that may be pending before the Bankruptcy Court on or before the Effective Date; and

10.1.15.   To enter a final decree closing the Chapter 11 Cases pursuant to section 350 of the Bankruptcy Code.

10.2   <u>Alternative Jurisdiction</u>.  In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then such matter may be brought before any court having jurisdiction with regard thereto.

## ARTICLE XI

## <u>MISCELLANEOUS PROVISIONS</u>

11.1   <u>Modification of the Plan</u>.  The Plan Proponents reserve the right to modify this Plan at any time before the Confirmation Date in accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  Subject thereto, the Plan Proponents may modify this Plan, before or after the Confirmation Date but prior to the substantial consummation of this Plan, without notice or hearing, or after such notice and hearing as the Bankruptcy Court deems appropriate, if the modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto.  In the event of any modification of this Plan on or before the Confirmation Date, any votes to accept or reject the Plan shall be deemed to be votes to accept or reject the Plan as modified, unless the Bankruptcy Court finds that the modification materially and adversely affects the rights of parties which have cast said votes.   Further, the Debtors reserve the right to revoke or withdraw this Plan at any time before entry of the Confirmation Order.  If the Debtors revoke or withdraw this Plan prior to the Confirmation Date, or if the Confirmation or the Effective Date does not occur, then this Plan shall be deemed to be null and void.  In such event, nothing in this Plan or any Disclosure Statement relating to this Plan shall be deemed to constitute an admission of validity, waiver or release of any Claims by or against the Debtors or any Person or to prejudice in any manner the rights of the Debtors or any Person in any proceeding involving the Debtors. Nothing in this Section 11.1 shall give the Plan Proponents the right to take any action that materially affects the rights or obligations of the Acquirer or the terms of the Definitive Agreement.  Further, Debtors' rights under this Section 11.1 are subject to the terms of the Definitive Agreement.

11.2    <u>Terms Binding</u>.  Upon the entry of the Confirmation Order, all provisions of this Plan, including all agreements, instruments and other documents filed in connection with this Plan and executed by the Debtors or the Reorganized Debtors in connection with this Plan, shall be binding upon the Debtors, the Reorganized Debtors, all Holders of Claims and Equity Interests, and all other Persons that are affected in any manner by this Plan.  All agreements, instruments and other documents filed in connection with this Plan shall have full force and effect, and shall bind all parties thereto as of the entry of the Confirmation Order, whether or not the same shall be issued, delivered or recorded on the Effective Date or thereafter.

11.3    <u>Successors and Assigns</u>.  The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the heir, executor, administrator, successor or assignee of such Person.

11.4    <u>Confirmation Order and Plan Control</u>.  Except as otherwise provided in this Plan, in the event of any inconsistency between this Plan and the Disclosure Statement, any schedule to this Plan or any other instrument or document created or executed pursuant to this Plan, this Plan shall control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

11.5    <u>Governing Law</u>.  Except to the extent that the Bankruptcy Code or any other federal law is applicable or to the extent the law of a different jurisdiction is validly elected by the Debtors, the rights, duties and obligations arising under this Plan shall be governed in accordance with the substantive laws of the United States of America and, to the extent federal law is not applicable, the laws of the State of Montana.

11.6    <u>Severability</u>.  If the Bankruptcy Court determines at the Confirmation Hearing that any material provision of this Plan is invalid or unenforceable, such provision, subject to section 1127 of the Bankruptcy Code, shall be severable from this Plan and shall be null and void, and, in such event, such determination shall in no way limit or affect the enforceability or operative effect of any or all other portions of this Plan.

11.7    <u>Incorporation by Reference</u>.  Each exhibit or schedule to this Plan, including each document included in the Plan Supplement, is incorporated herein by reference.

11.8    <u>Payment of Statutory Fees and Filing Reports</u>.  With respect to each Chapter 11 Case, all fees payable pursuant to section 1930(a)(6) of title 28 of the United States Code shall be paid by the Trustee on a quarterly basis until such Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.  Following confirmation of the Plan, the Trustee shall file with the Bankruptcy Court and serve on the United States Trustee quarterly financial reports regarding all income and disbursements, including all Distributions under the Plan, for each quarter (or portion thereof) the Chapter 11 Cases remain open; provided, that the Disbursing Agent shall provide a quarterly report of their disbursements to the Trustee by no later than the 15th day of the month following the end of a quarter, and the Trustee shall be entitled to rely on those reports with no further investigation for the purpose of filing post-confirmation reports with the U.S. Trustee.

11.9   Notice.  For any notice, request or demand to or upon the Debtors, the Reorganized Debtors or the Disbursing Agent to be effective, it shall be in writing (including by facsimile transmission or electronic mail) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission or electronic mail, when received and telephonically or electronically confirmed, addressed as follows:

If to the Debtors:

> Yellowstone Club
> 71713 Highway 111
> Rancho Mirage, CA 92270

with copies to:

> Ron Greenspan
> c/o FTI Consulting, Inc.
> 633 West Fifth Street, 16th Floor
> Los Angeles, CA 90071

> James A. Patten
> Patten Peterman Bekkedahl & Green
> 2817 Second Avenue North, Suite 300
> Billings Mt 59101

> Lawrence R. Ream
> Bullivant Houser Bailey PC
> 1601 Fifth Avenue, Suite 2300
> Seattle, Washington  98101-1618

If to the Committee:

> J. Thomas Beckett
> David P. Billings
> Parsons, Behle & Latimer
> P.O. Box 45898
> Salt Lake City, UT 84145-0898
> Telephone (801)-532-1234
> Email:  tbeckett@parsonsbehle.com
>              dbillings@parsonsbehle.com

11.10   Reservation of Rights.  Except as expressly set forth herein, the Plan shall have no force and effect unless the Bankruptcy Court has entered the Confirmation Order.  The filing of the Plan, any statement or provision contained in the Plan, or the taking of any action with respect to the Plan shall not be and shall not be deemed to be an admission or waiver of any rights with respect to the Holders of Claims and Equity Interests.

      11.11   <u>Provisions Related to Priority Tax Claims</u>.  The following provisions apply with respect to the holders of any Priority Tax Claims.

          11.11.1.   If the payment of a Priority Tax Claim is not made within thirty (30) days of the later of (i) Effective Date or (ii) and the date such Priority Tax Claim becomes an Allowed Claim, then unless such delinquency is cured within thirty (30) days after written notice from the holder of such Priority Tax Claim to the Disbursing Agent and the Liquidation Trustee, then the holder of such delinquent Priority Tax Claim may pursue enforcement of its tax claims as allowed by applicable non-bankruptcy law; provided, however that nothing in this § **Error! Reference source not found.** shall cause the Reorganized Debtor or the Project to be liable in any way for the payment of any such Priority Tax Claim.

          11.11.2.   Notwithstanding anything stated herein, this Plan, and any amendments or modifications, does not affect the ability of any taxing agency, including, but not limited to the Montana Department of Revenue to proceed with audit, assessment, and collection of taxes against non-debtor individuals and entities under applicable non-bankruptcy law, including Montana state law.

Signature lines on next page.

**YELLOWSTONE MOUNTAIN CLUB, L.L.C.**, a Montana liability company

By:     Blixseth Investment Group, LLC, as Managing Member

By:  /s/ _____
            Name:  Edra Blixseth
            Title:  Managing Member

**YELLOWSTONE DEVELOPMENT, L.L.C.**, a Montana limited liability company

By:     Blixseth Investment Group, LLC, as Managing Member

By:  /s/ _____
            Name:  Edra Blixseth
            Title:  Managing Member

**BIG SKY RIDGE, L.L.C.**, a Montana limited liability company

By:     Blixseth Investment Group, LLC, as Managing Member

By:  /s/ _____
            Name:  Edra Blixseth
            Title:  Managing Member

**YELLOWSTONE CONSTRUCTION, L.L.C.**, a Montana limited liability company

By:     Blixseth Investment Group, LLC, as Managing Member

By:  /s/ _____
            Name:  Edra Blixseth
            Title:  Managing Member

49

/s/ _____
James A. Patten (1191)
**PATTEN, PETERMAN, BEKKEDAHL &**
**GREEN, PLLC**
2817 2nd Avenue North, Suite 300
Billings, MT 59101
Phone: (406) 252-8500
Fax: (406) 294-9500
E-Mail: japatten@ppbglaw.com

Lawrence R. Ream, WSBA #18159
Richard G. Birinyi, WSBA #9212
**Bullivant Houser Bailey PC**
1601 Fifth Avenue, Suite 2300
Seattle, Washington  98101-1618
Phone: (206) 292-8930
Fax: (206) 386-5130
Email: larry.ream@bullivant.com
Email: rick.birinyi@bullivant.com

Reorganization Counsel for Debtors and Debtors in
Possession

SCHEDULES

The following Schedules are part of the Plan

Schedule #                              Document

**Error! Reference source not found.**          Schedule of Company Modified contracts

**Error! Reference source not found.**          Schedule of Assumed Obligations

**Error! Reference source not found.**          Schedule of equity holders

**Error! Reference source not found.**          Definitive Agreement

**Error! Reference source not found.**          Schedule of Founder's Circle Modified contracts

**Error! Reference source not found.**          Schedule of Honorary Modified contracts

**Error! Reference source not found.**          Form Liquidation Trust Agreement

**Error! Reference source not found.**          Assumed Membership Agreements

| **Error! Reference source not found.** | Schedule of Pioneer/Frontier Modified Membership Agreements |
|---|---|
| **Error! Reference source not found.** | Plan Supplement |
| **Error! Reference source not found.** | Schedule of Project Assets |
| **Error! Reference source not found.** | Yellowstone Club Settlement Term Sheet |
| **Error! Reference source not found.** | Schedule of Post-Petition Contracts and Leases to be assumed |