IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

_____
                                    )
In Re:                              ) Case No. 08-61570
                                    )
Yellowstone Mountain Club, LLC,     )
                                    )
        Debtor.                     )
_____   )

THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

Butte, Montana
June 1, 2009

Transcript Services:

Proceedings recorded by electronic recording;
transcript produced by reporting service.

```
 1                        APPEARANCES

 2

 3      FOR THE DEBTORS:

 4           JAMES A. PATTEN

 5           Attorney at Law

 6           Suite 300, The Fratt Building

 7           2817 Second Avenue North

 8           Billings, MT  59101

 9

10           RICHARD BIRINYI

11           Attorney at Law

12           Bullivant Houser Bailey, PC

13           1601 Fifth Avenue, Suite 2300

14           Seattle, WA  98101-1618

15

16      FOR CREDIT SUISSE:

17           MARK S. CHEHI

18           Attorney at Law

19           Skadden, Arps, Slate,

20             Meagher & Flom

21           One Rodney Square, Seventh Floor

22           Wilmington, DE  19801

23

24

25
```

```
 1                    APPEARANCES (continued)

 2

 3      FOR CREDIT SUISSE:

 4           SHANE P. COLEMAN

 5           Attorney at Law

 6           Holland & Hart

 7           401 North 31st Street, Suite 1500

 8           Billings, MT  59101

 9

10           EVAN R. LEVY

11           Attorney at Law

12           Skadden, Arps, Slate,

13             Meagher & Flom

14           Four Times Square

15           New York, NY  10036-6652

16

17      FOR HIGHLAND CAPITAL MANAGEMENT, LLP:

18           MICHAEL D. WARNER

19           JEFFREY R. ERLER

20           Attorneys at Law

21           Warner Stevens, LLP

22           301 Commerce Street, Suite 1700

23           Fort Worth, TX  76102

24

25
```

```
 1                    APPEARANCES (continued)

 2

 3        FOR THE AD HOC COMMITTEE OF YELLOWSTONE

 4        CLUB MEMBERS:

 5             JOHN H. GRANT

 6             Attorney at Law

 7             Jackson, Murdo & Grant, PC

 8             203 North Ewing

 9             Helena, MT  59601

10

11             JONATHAN B. ALTER

12             Attorney at Law

13             Bingham McCutchen, LLP

14             One State Street

15             Hartford, CT  06103

16

17        FOR THE CLASS B AD HOC MEMBERS COMMITTEE:

18             RONALD A. BENDER

19             Attorney at Law

20             Worden Thane, PC

21             P.O. Box 4747

22             Missoula, MT  59806

23

24

25
```

```
 1                    APPEARANCES (continued)

 2

 3        FOR THE UNSECURED CREDITORS COMMITTEE:

 4            JAMES H. COSSITT

 5            Attorney at Law

 6            James H. Cossitt, PC

 7            202 KM Building, 40 Second Street East

 8            Kalispell, MT  59901-4563

 9

10        FOR CROSSHARBER CAPITAL PARTNERS, LLC:

11            PAUL D. MOORE

12            BARRY GREEN

13            Attorneys at Law

14            Duane Morris, LLP

15            470 Atlantic Avenue, Suite 500

16            Boston, MA  02210-2600

17

18            BENJAMIN P. HURSH

19            Attorney at Law

20            Crowley, Haughey, Hanson,

21              Toole & Dietrich, PLLP

22            P.O. Box 7099

23            Missoula, MT  59807

24

25
```

```
 1                  APPEARANCES (continued)

 2

 3       FOR TIMOTHY J. BLIXSETH:

 4            JOEL E. GUTHALS

 5            Attorney at Law

 6            Guthals, Hunnes & Ruess, PC

 7            P.O. Box 1977

 8            Billings, MT  59103

 9

10       FOR ROBERT SUMPTER:

11            STEPHEN MACKEY

12            Attorney at Law

13            Towe, Ball, Enright,

14              Mackey & Sommerfeld, PLLP

15            P.O. Box 30457

16            Billings, MT  59107-0457

17

18       FOR NORMANDY HILL CAPITAL:

19            QUENTIN M. RHOADES

20            Attorney at Law

21            Sullivan Tabaracci & Rhoades

22            1821 South Avenue West, Third Floor

23            Missoula, MT  59801

24

25
```

```
 1                            I N D E X

 2   WITNESS:                                      PAGE:

 3   ROBERT SUMPTER

 4        Direct Examination by Mr. Mackey   .   .   .   .   .   23

 5        Cross-Examination by Mr. Patten    .   .   .   .   .   46

 6        Cross-Examination by Mr. Moore     .   .   .   .   .   59

 7        Redirect Examination by Mr. Mackey .   .   .   .   .   77

 8        Recross-Examination by Mr. Patten  .   .   .   .   .   84

 9   MATTHEW KIDD

10        Direct Examination by Mr. Patten   .   .   .   .   .   86

11        Cross-Examination by Mr. Mackey    .   .   .   .   .   99

12        Redirect Examination by Mr. Patten .   .   .   .   .  112

13        Cross-Examination by Mr. Moore     .   .   .   .   .  113

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              YELLOWSTONE MOUNTAIN CLUB BANKRUPTCY

 2                      BUTTE, MONTANA

 3                          - - -

 4          BE IT REMEMBERED THAT this matter came on for

 5     hearing on June 1, 2009, in the United States Bankruptcy

 6     Court, District of Montana, The Hon. Ralph B. Kirscher,

 7     presiding:

 8

 9      The following proceedings were had:

10

11          THE COURT:  Good morning.  Please be seated.

12     This is the date set for a number of matters in Yellowstone

13     Club, 08-61570.

14          Before we commence, I will go ahead and have

15     everyone state their appearances -- actually, I'm going to

16     do one thing before we continue.  It will just be a moment.

17          Thank you.  Let me ask for everybody's

18     appearances before we proceed.  I did some moving around of

19     the video screen here in Missoula so I could better see you

20     directly rather than from an angle.  Why don't we start

21     with, how about --

22          MR. ALTER:  Good morning, Your Honor.  Jonathan

23     Alter, on behalf of the ad hoc committee of members.

24          THE COURT:  Okay, very good.  Boston.

25          MR. MOORE:  Good morning, Your Honor.  Paul
```

1     Moore, on behalf of CrossHarbor Capital.

2               To my left is Matt Kidd.

3               MR. GREEN:  Barry Green, CrossHarbor Capital.

4               And to my left is Joe Harris.

5               THE COURT:  You know, I'm going to really need to

6     have you really close to wherever your mike is so that I

7     can hear you.

8               Who else is in the room, as well?

9               MR. MOORE:  Your Honor, Joe Harris is here next

10    to Mr. Green - (inaudible, out of range of microphone) -

11    for CrossHarbor Capital.  And Matt Kidd, as I said, is to

12    my left, for CrossHarbor Capital.

13              THE COURT:  Okay, so there are four people.  And

14    in Missoula.

15              UNIDENTIFIED SPEAKER:  Your Honor, we are

16    expecting Mr. Byrne to arrive, and he will be the only

17    other person joining us as soon as he's available.

18              THE COURT:  Okay, thank you.  Besides the four

19    that I see, there's no one else in your room, correct?

20              MR. MOORE:  That's correct, Your Honor.

21              THE COURT:  Okay.  And, Mr. Alter, there's no one

22    else in your room, correct, that I can't see?

23              MR. ALTER:  There is not.  I am alone, Your

24    Honor.

25              THE COURT:  Okay.  Now in Butte.  I think

1    probably for convenience, let's start with Mr. Patten,

2    who's probably on the end to the left, and just work around

3    the counsel tables.

4            MR. PATTEN:  Andy Patten for the debtors.

5            THE COURT:  Okay.

6            MR. BIRINYI:  Your Honor, Richard Birinyi for the

7    debtors.

8            THE COURT:  Okay.

9            MR. COSSITT:  Jim Cossitt for the unsecured

10   creditors committee.

11           MR. WARNER:  Good morning, Your Honor.  Michael

12   Warner of Warner Stevens and Jeff Erler of Warner Stevens,

13   on behalf of Highland Capital Management, LP, as advisors

14   for various institutional funds.

15           THE COURT:  Okay.

16           MR. MACKEY:  Steve Mackey, Your Honor, for Robert

17   Sumpter.

18           MR. COLEMAN:  Shane Coleman, Your Honor, for

19   Credit Suisse.

20           THE COURT:  Okay.

21           MR. CHEHI:  And Mark Chehi for Credit Suisse.

22           MR. LEVY:  Good morning, Your Honor.  Evan Levy

23   for Credit Suisse.

24           THE COURT:  Okay.  Any other appearances for the

25   people in -- oh, Mr. Grant.

```
 1              MR. GRANT:  Yes.  John Grant for the ad hoc
 2    committee.
 3              THE COURT:  Okay.  Anyone else wish to make
 4    appearances?
 5              MR. BENDER:  Ronald A. Bender of the firm of
 6    Worden Thane in Missoula, representing the Class B members.
 7    And I'm in the jury box, Your Honor.
 8              THE COURT:  Okay.
 9              MR. HURSH:  Benjamin Hursh, on behalf of
10    CrossHarbor.
11              MR. RHOADES:  Quentin Rhoades, on behalf of
12    Normandy Hill Capital.
13              MR. GUTHALS:  Good morning, Your Honor.  Joel
14    Guthals, on behalf of Mr. Blixseth and also on behalf of
15    Yellowstone L30, LLC; and Yellowstone 123, LLC.
16              THE COURT:  Okay.  Anyone else?
17              The matters set for hearing involve - and I'll
18    try to just paraphrase these and summarize; and if I miss
19    anything, let me know - there's an objection filed by
20    Highland Capital Management to the third amended plan; and,
21    also, there's a response to that filed by Credit Suisse.
22              There may be some pending portions of a prior
23    Credit Suisse motion that may still be at issue - I'm not
24    positive about that - concerning prepetition lenders
25    authorizing modified bidding procedures, which seems to be
```

1  moot; credit bidding seems to be moot; and examiner to

2  evaluate.  This one may be all taken care of; it just shows

3  up on the calendar.

4         Let's see, the next one is Yellowstone World Club

5  Chapter 7 trustee's amended motion to reconsider.  That may

6  be resolved; I'm not certain.

7         Motion to allow claims for voting purposes filed

8  by four individuals.

9         Mr. Sumpter's amended motion to amend

10  Schedule 1.87 regarding member assumption; also, his

11  amended motion for a new trial or to alter or amend

12  judgment for relief of judgment or order from my prior

13  order; also, a hearing on Yellowstone L30 and Yellowstone

14  123 for amending Schedule 1.87, both of those which may be

15  resolved.

16         There was also an emergency motion filed

17  yesterday for judicial notice by Highland Capital to take

18  judicial notice of their objection to confirmation; a

19  notice to the Court, our order of May 19th.  There's a

20  number of matters, about 16 of them, that are referenced

21  there, many of them are docket entries, which I will take

22  notice of those as appropriate.  So, in part, I guess that

23  motion is granted.

24         Mr. Patten, maybe you can update me as to if

25  there are resolutions on some of these motions.

1          I will also note for the record, although it's

2    not on my listing at this point, the U.S. Trustee withdrew

3    its motion, too.

4          MR. PATTEN:  Your Honor, there's two matters that

5    I know are resolved.  The Yellowstone World Chapter 7

6    trustee and the debtors have entered into a stipulation.

7    The effect of the stipulation is simply to reserve whatever

8    claims and classification of those claims that the trustee

9    may assert in these cases.

10         THE COURT:  Right.

11         MR. PATTEN:  And so that stipulation was filed on

12   Friday, and that takes care of the trustee's motion for

13   reconsideration.

14         THE COURT:  Yes.  And that stipulation's been

15   approved.  It looked like there was resolution, as well, on

16   L30 and 123.

17         MR. PATTEN:  Your Honor, I'll let Mr. Guthals or

18   Mr. Moore address that.  That's my understanding.

19         But, also, on the motion of McNaughton and others

20   to be allowed claims for voting purposes, that motion's

21   been withdrawn.  And we filed a stipulation to that effect

22   on Friday, too.

23         THE COURT:  Okay, very good.  Thank you.

24         MR. GUTHALS:  Your Honor.

25         THE COURT:  Mr. Guthals.

1          MR. GUTHALS:  The Court is correct, we have

2     resolved the motions concerning Yellowstone L30, LLC; and

3     Yellowstone 123, LLC.  I believe a stipulation was filed

4     over the weekend.  Basically, what we have done is reached

5     an agreement in which there are going to be replacement

6     membership agreements that will be provided to these two

7     companies and, in return, the two companies have settled

8     their motion to require Schedule 1.87 to be amended.  It

9     does not have to be amended since these replacement

10    agreements have been provided.

11          THE COURT:  Okay, very well.  Those will be

12    noted.

13          MR. GUTHALS:  And I think Mr. Moore can confirm

14    this.

15          THE COURT:  Mr. Moore, do you confirm?

16          MR. MOORE:  Yes, Your Honor, I do confirm that.

17    Thank you.

18          THE COURT:  Okay, thank you.  So those are taken

19    off.

20          And, also, Mr. Chehi, concerning the reference I

21    made to outstanding portions of Credit Suisse's motion on

22    prepetition lender's entry of order for modified bidding,

23    credit bidding, and examiner, is there anything left in

24    that motion?

25          MR. CHEHI:  Your Honor, I believe not.  And, you

1    know, we're happy with to withdraw that, those requests for

2    relief under those motions without prejudice, you know,

3    subject to the entry of a confirmation order and this case

4    actually, you know, resolving and settling itself and the

5    dust clearing.  So it would be without prejudice to the

6    possibility of - which we hope never occurs - this thing

7    doesn't get confirmed.  Then we might end up being back at

8    the table and we might want to ask for the same sort of

9    relief next round.

10          THE COURT:  I understand.  So ordered with the

11   reservation.  So it appears to me, then, we've boiled it

12   down to basically two matters, correct, the Highland

13   Capital matter and the Sumpter matter?

14          UNIDENTIFIED SPEAKER:  That's correct, Your

15   Honor.

16          THE COURT:  Okay, very good.

17          MR. BIRINYI:  Your Honor, Richard Birinyi on

18   behalf of the debtors.

19          I think there's three -- I think Mr. Blixseth and

20   his company's objection to confirmation has still not been

21   resolved.

22          THE COURT:  Mr. Guthals; is that correct?

23          It must not be; it must be resolved.  So we'll go

24   with the other two.

25          UNIDENTIFIED SPEAKER:  No, he's coming to the

1    podium, Your Honor.

2              MR. BIRINYI:  He's walking to the podium, Your

3    Honor.

4              MR. GUTHALS:  Your Honor, I'm kind of sitting in

5    the back there.  Sorry.

6              Yes, those objections are still pending, but

7    there's no hearing on them today.  They've been submitted

8    to the Court.

9              THE COURT:  Okay.  Just submitted for ruling,

10   based upon the filings, correct?

11             MR. GUTHALS:  That's correct.

12             THE COURT:  Okay.  So is there preference by

13   counsel as to which matter we take up first?

14             MR. CHEHI:  Your Honor, Mark Chehi here.

15             We would respectfully request that the

16   non-Highland, non-Normandy objections be addressed first

17   because there's actually developments taking place as we

18   sit here which may assist a resolution of the -- at least

19   the Highland objection and the Normandy objection from the

20   prepetition lender's point of view.

21             THE COURT:  Okay.  Shall we take up the Sumpter

22   matter, then?  Mr. Mackey.

23             MR. WARNER:  Your Honor?

24             THE COURT:  Oh, go ahead.

25             MR. WARNER:  I'm sorry.  I don't even know if you

1    can see me.

2          THE COURT:  Yes.

3          MR. WARNER:  Great.  Based on Mr. Chehi's

4    comments, Your Honor, is it okay if we be excused and go to

5    the hall while the Sumpter matter is being pursued?

6          THE COURT:  Absolutely.

7          MR. WARNER:  Thank you, sir.

8          THE COURT:  With that, Mr. Mackey, I'll let you

9    proceed.

10          MR. MACKEY:  Thank you, Your Honor.  I would

11    request that witnesses be excluded prior to their

12    testimony.  We're informed, from the witness, list that

13    that would include Moses Moore, Mr. Calendar, and Mr. Kidd.

14    And I believe those would be the ones that would have to be

15    excluded.

16          THE COURT:  Okay, so excluded.  I would ask that

17    they leave the room.  As we need you for witness, you will

18    be called back into the room.  Thank you.

19          MR. MACKEY:  And I assume the folks in Boston

20    won't have speakers on, or something like that.

21          THE COURT:  With that --

22          MR. LEVY:  Your Honor, is there objection to --

23    I'm sorry, Your Honor.

24          THE COURT:  Before you proceed, I do want to make

25    a comment:  If there are news people in the Butte

1    courtroom, I'm going to restrict Twittering at this point

2    because of the ability to paraphrase testimony.  So I'm

3    going to exclude that at this time.  Certainly, news people

4    can report, but not verbatim what is being said by any

5    witness.

6                 MR. LEVY:  Your Honor, I'm not sure if you can

7    see me.  Evan Levy on behalf of Credit Suisse.

8                 I have sitting next to me Steve Yankauer, who's

9    on the witness list for today.  Is it acceptable for him to

10   remain in the courtroom?

11                THE COURT:  He was not asked to leave.

12                MR. MACKEY:  No problem with the Credit Suisse

13   people.

14                MR. LEVY:  Okay, thank you.

15                THE COURT:  Okay.

16                MR. MACKEY:  Your Honor, Steve Mackey, appearing

17   on behalf of Robert Sumpter.

18                First of all, I'm wondering if we can, perhaps,

19   dispose of something that is kind of an easy matter to take

20   care of, and that would be our objection based upon the

21   fact that Mr. Sumpter does not have a company membership.

22   There's been no evidence put in the record that he has a

23   company membership.  And, in fact, at the proceeding that

24   took place on May 18th, I believe it was generally conceded

25   and perhaps stated, even, by counsel for the debtor that

1   Mr. Sumpter has a residential membership.  It was

2   characterized as nonstandard, but the bottom line is:

3   There was no company membership.  There's no, really,

4   dispute on that.

5         And the objection that we filed in that regards

6   was simply to point out to the Court that we don't want a

7   Court ruling saying he's got a company membership, that he

8   shouldn't have a vote in that class because he really

9   wasn't a company member -- well, he was a long time ago,

10   but he's not now.  And I think that objection, upon

11   reconsideration, could just be sustained because I don't

12   believe there's any factual issue there.

13         THE COURT:  Okay.  Mr. Patten or Mr. Birinyi,

14   your position on that?

15         MR. PATTEN:  Your Honor, the debtors will

16   acknowledge that Mr. Sumpter does not have a company

17   membership and he has what we believe is a nonstandard

18   residential membership dated July of 2008, and that that's

19   the pertinent membership for purposes of this hearing.

20         THE COURT:  Very well.  So stipulated, so

21   ordered.

22         MR. MACKEY:  Thank you, Your Honor.  I filed a

23   brief in response to the objections filed by CrossHarbor

24   and the debtor regarding the pending matter before the

25   Court with regard to Schedule 1.87.  And I pointed out in

1    there that I believe that that's really a legal issue for

2    the Court since it involves an issue of contract

3    interpretation.  We are certainly prepared to put on

4    testimony and evidence concerning Mr. Sumpter's residential

5    contract; the circumstances that led to it; and some

6    evidence, if necessary, with regard to the issue of the

7    business judgment rule.

8                THE COURT:  Well, Mr. Mackey?

9                MR. MACKEY:  Yes.

10               THE COURT:  Mr. Mackey, here's the question I

11   have:  You're basically wanting me to deal with -- I've

12   already ruled on it.  You're asking me to reconsider my

13   ruling.  You had the opportunity to appear at the

14   confirmation hearing to go forward with your objection, to

15   which no appearances were made.  And under the motion to

16   reconsider, one of the standards is that evidence that --

17   it wasn't available at the time of that hearing.  It sounds

18   to me like all the evidence was available.  And I guess I'm

19   not certain how you're going to establish or satisfy the

20   standards for me reconsidering this matter.

21               MR. MACKEY:  Well, Your Honor, we set that forth

22   in our motion, and I'm prepared to put Mr. Sumpter on the

23   stand with regard to that.  As I indicated in my filing

24   with the Court, our belief that the only issue before the

25   Court was the one that we just addressed, and that was:

1    Did he have a company membership or not?

2         And he didn't.  We sent the residential

3    membership contract to them, they received it, and no

4    objection was given to us, no indication has been made that

5    it was not valid and not in good standing.  And perhaps it

6    was a mistake on my part, but I was surprised that

7    testimony and evidence was taken with regard to assumption

8    or rejection of a residential membership when we believed -

9    and perhaps it was incorrect - that the only issue was:

10   Did he have a company membership or not?

11        I believe that I've set forth in the briefs the

12   grounds for our stating that we were surprised or that

13   there was a mistake and that we're entitled to relief under

14   9023 or 9024.  And it's not really a matter whether the

15   evidence was available; it's an issue of whether we feel we

16   had notice that this issue was going to come up, especially

17   in light of the fact, as I've pointed out in my recent

18   brief, that there's nothing in the plan or in the

19   disclosure statement that states that they were going to

20   reject -- seek rejection of a residential membership.  That

21   came as a total surprise.

22        THE COURT:  Well, would you disagree, Mr. Mackey,

23   that there's no reason they can't reject it or assume it,

24   but certainly to reject it if, in fact, it's a

25   no-assessment membership?

 1          MR. MACKEY:  Yes.

 2          THE COURT:  I mean that's part of the problem of

 3     why they're probably here is because the assessments

 4     haven't been proper.

 5          MR. MACKEY:  I'm not sure what you mean by "the

 6     assessments haven't been proper."

 7          THE COURT:  The membership assessments.  As I

 8     understand it, this is a freebie to Mr. Sumpter forever.

 9          MR. MACKEY:  Well, he paid his $250,000.  Unlike

10     the statements -- and I do not ascribe any ill motive in

11     this regard, but statements were made at the hearing on May

12     18th that were plainly in error.  They stated that

13     Mr. Sumpter received his residential membership for nothing

14     in a fraudulent transfer.  And we are prepared to put on

15     evidence to show his $250,000 deposit that's been paid and

16     also the fact that the terms of his residential membership

17     had been in existence for years before it occurred.  It was

18     not some last-minute deal that was made by Mr. Blixseth and

19     Mr. Sumpter; it was back in a 2007 employment agreement and

20     continued all the way through that.

21          THE COURT:  Mr. Mackey --

22          MR. MACKEY:  With regard --

23          THE COURT:  Mr. Mackey, I just have a follow-up

24     question, and then I'll have you call your witness.

25          MR. MACKEY:  Okay.

```
 1                THE COURT:  But isn't it true that, in fact, he
 2   is not obligated for any assessments, membership annual
 3   assessments going forward?
 4                MR. MACKEY:  That's correct.
 5                THE COURT:  Okay.  You can call your witnesses.
 6                MR. MACKEY:  Okay, thank you.  We'll call Robert
 7   Sumpter to the stand.
 8                THE COURT:  Mr. Sumpter, if you would come
 9   forward to be sworn by the clerk.
10                ROBERT SUMPTER, WITNESS, SWORN
11                      DIRECT EXAMINATION
12   BY MR. MACKEY:
13   Q.  You might need to pull that microphone a little closer
14   to you and then try to speak into the microphone.
15       Would you state your name, please?
16   A.  Robert Sumpter.
17   Q.  And where do you reside?
18   A.  My residence is in Montana, but I also have a home in
19   Los Angeles, California.
20   Q.  Mr. Sumpter, were you employed by Tim Blixseth in
21   connection with the Yellowstone Club?
22   A.  I was employed by the Yellowstone Club beginning in
23   1999.
24   Q.  Okay.  And when you were hired by the Yellowstone Club
25   in 1999, what position were you hired for?
```

1    A.   Originally, I was -- I actually had three, three sets

2    of duties.  I was the -- I had sales marketing and

3    development underneath my management.

4    Q.   Okay.  And so just describe for the Court, if you

5    would, give us sort of a thumbnail description of what your

6    job responsibilities were, what the scope of your

7    employment was, and just basically what you did at the club

8    during your employment there.

9    A.   In the first year, a lot of my focus was, again, on the

10   sales and marketing, but also on the development side of

11   it.  At the time, we had two offerings that were in

12   process, which one was the Pioneer offering, the other was

13   the Frontier offering.  And when I showed up, 23 of the 25

14   Pioneers had been sold.  The final two hadn't been sold,

15   and none of the Pioneers had, had been sold at that point.

16   So I had to finish selling out the Pioneer membership as

17   well as the Frontier membership and close out those, those

18   transactions.  That was in -- that was kind of in the first

19   year.

20       Going into early 2001, my duties changed in that we

21   brought a head of sales and, later on, a head of marketing

22   into the company.  So I was there to mostly focus on the

23   development side.

24       My duties in development are fairly broad, and to try,

25   to try and describe it has kind of been interesting.   I

1  handle all the governmental affairs, all the budgeting for

2  the infrastructure, oversight of construction of all the

3  infrastructure.  It went into -- and then kind of various

4  duties that, you know, would have been required.

5      Also, I was involved in all the planning, everything

6  necessary to get a piece of property ready to sell.  That

7  included things such as water rights, which were

8  nonexistent when I showed up; it included, you know,

9  putting together the structure so that we would have our

10  own fire department.  Basically, we created - a lot of

11  people don't realize this - we basically created a

12  municipality up there.  There's over 40 miles of

13  infrastructure.  Again, we have our own fire department,

14  our own emergency medical service.  It's a big place:

15  Several thousand acres of ski terrain, an 18-hole

16  championship golf course.

17      And so, basically, when you drive on the property, you

18  know, the road that you drive on, the faucet that you turn

19  on, those kind of things, that all fell under my purview.

20          MR. MACKEY:  I'd like to -- well, first of all,

21  Your Honor, I believe Mr. Patten and I stipulated prior to

22  the hearing - correct me if I'm wrong, Andy - that the

23  exhibits identified on our witness list and the exhibits

24  identified on Mr. Patten's witness list may be received

25  without objection.

1              MR. PATTEN:  That's correct, Your Honor.

2              THE COURT:  Okay.  Is that correct, Mr. Patten?

3              MR. PATTEN:  Yes, it is.

4              THE COURT:  Okay.  I'd like those identified,

5     just so that there's no confusion.

6              MR. MACKEY:  Thank you, Your Honor.

7              THE COURT:  If you could identify yours,

8     Mr. Mackey.

9              MR. MACKEY:  Okay.  Exhibit No. 1 is an

10    employment contract between Yellowstone Mountain Club and

11    Yellowstone Development, on the one hand, with Robert

12    Sumpter dated -- well, to take effect January 1, 2007.

13    It's dated April 30, 2007.  And it's signed by Dieter

14    Huckestein, CEO and president on behalf of the employers;

15    and by Mr. Sumpter.

16             Exhibit No. 2 is a second employment agreement

17    which takes place -- or, excuse me, commences on January 1,

18    2008; and ends on April 15, 2008.  The same parties, Your

19    Honor, and the same signatories:  Mr. Huckestein, on behalf

20    of the employers; and Mr. Sumpter.

21             Exhibit No. 3 is entitled "first amendment to

22    employment agreement", and it is dated April 14, 2008.

23    It's again, signed by Mr. Huckestein and Mr. Sumpter.  And

24    it basically addressed -- it just basically extended

25    Mr. Sumpter's employment for a term of another six months.

```
 1              Exhibit No. 4 is Mr. Sumpter's membership

 2   agreement for resident member.  It's dated July 9.  It's

 3   signed by Mr. and Mrs. Sumpter; and it's signed by Michael

 4   W. Doyle, attorney in fact, on behalf of Timothy Blixseth,

 5   president of Yellowstone Mountain Club, LLC.

 6              THE COURT:  What year is that?

 7              MR. MACKEY:  That's 2008, Your Honor.

 8              THE COURT:  Thank you.

 9              MR. MACKEY:  Exhibit No. 5 is Mr. Sumpter's check

10   in the amount of $250,000 payable to the Yellowstone

11   Mountain Club.  And it's a copy of the front and the back

12   showing that it was deposited to the account of the

13   Yellowstone Mountain Club.  And that date is also July 9 of

14   2008.

15              Finally, Your Honor, Exhibit No. 6 is a second

16   amendment to the employment agreement.  This comes after

17   the membership was already done.  And it's dated August 8,

18   2008.  It's signed by Timothy Blixseth, on behalf of the

19   employers; and by Mr. Sumpter, on behalf of himself.

20              THE COURT:  Thank you.  By agreement, Exhibits 1

21   through 6 submitted by Mr. Sumpter are admitted.

22              EXHIBITS 1 -6 ADMITTED INTO EVIDENCE

23              MR. MACKEY:  And just for convenience, Your

24   Honor, I believe that the Debtor's Exhibits A through D are

25   the same as our Exhibits 1 through -- excuse me, 1, 2, 3,
```

```
 1   and 6.
 2              THE COURT:  Okay.  "A", "B", "C", and "D" are
 3   admitted by agreement.
 4              EXHIBITS A - D ADMITTED INTO EVIDENCE
 5              MR. MACKEY:  May I approach the witness just to
 6   hand him these exhibits as a packet?
 7              THE COURT:  You may approach.
 8   BY MR. MACKEY:
 9   Q.  Okay.  Mr. Sumpter, I'd like you to take a look at
10   Exhibit No. 1.  And what is that?
11   A.  It's my 2007 employment agreement.
12   Q.  Okay.  And what's the date of it?
13   A.  The effective date is January 1 of 2007.  The actual
14   signatures happened in -- I think mine was in April, and I
15   think Dieter ended up signing it in early May.
16   Q.  And who did you negotiate that agreement with?
17   A.  Dieter Huckestein, the CEO of the club; and Mike Doyle,
18   the club's attorney.
19   Q.  Okay.  The document is in evidence and the Court can
20   certainly read it, but for convenience, is there a
21   provision in there that addresses your membership at the
22   Yellowstone Club?
23   A.  Yes.
24   Q.  Okay.  And can you just tell us what the paragraph
25   number of that is?
```

1   A.  9.2.

2   Q.  Okay.  And, again, about the middle of that or,

3   perhaps, a little further down, it addresses your company

4   membership and then also your resident membership.

5   A.  Correct.

6   Q.  Okay.

7   A.  Basically, it says I paid a deposit of $250,000.  I can

8   actually read from it, if you'd like.  Basically, it says I

9   paid $250,000; that there are no annual dues; and that if I

10  sell my piece of property at some point in the future and

11  want to convert it to a national membership, that I have

12  the ability to do that for consideration.

13  Q.  Okay.  Now, that contract was for a term of one year;

14  is that correct?

15  A.  Yes.

16  Q.  And why was it for a term of one year as opposed to

17  longer?

18  A.  Yeah.  Dieter was concerned -- we had several, we had

19  several executives at the club who had high-six-figure to

20  seven-figure compensation packages.

21  Q.  Other than yourself?

22  A.  Yes.  And Dieter was concerned that we were opening

23  ourselves up to some fairly huge damages in wrongful

24  termination if we didn't do it on a yearly basis.

25  Q.  Okay.  Take a look at Exhibit 2, if you would, please,

1    and just tell us what that is, what the date of it is.

2    A.  That's my 2008 employment agreement.

3    Q.  And it's dated what?

4    A.  I'm getting there.  Dieter signed it on 1/11/08, and I

5    had signed it in, I had signed it in December.

6    Q.  Of '07?

7    A.  Of '07.

8    Q.  Okay.  And who did you negotiate that with?

9    A.  The terms of this contract are -- except for the actual

10   length of the contract, are exactly the same as my previous

11   agreement.  So the only issue was the, was the term.  And

12   it was dealt with Dieter and Mike Doyle, again.

13   Q.   Okay.  Now, I note the term of this agreement is only

14   for three and a half months, from January 1 of '08 to April

15   15 of '08.  Why such a short term?

16   A.  I think we were still under the letter of intent at

17   that time, but basically, we had been negotiating with

18   CrossHarbor Capital to purchase the club since June of '07.

19   And one of the requirements from CrossHarbor is that we

20   present -- one, we had to present them with all of our

21   employment contracts in the fall of '07 so they had those

22   on file to review.

23       And one of the things that came out of that was they

24   wanted us to -- it was estimated that the closing date of

25   the transaction would be April 15th of 2008, and they

1    wanted to terminate -- have all the senior managers

2    terminated so they didn't have any issues there if they

3    chose not to continue those contracts.  So this was done to

4    accommodate the transaction.

5    Q.  Okay.  Was a copy of this employment contract and your

6    prior one delivered to CrossHarbor?

7    A.  I'm not -- this one had not been executed yet.  My

8    prior one, my '07 one, had been given to CrossHarbor.

9    Q.  By whom?

10   A.  By me.

11   Q.  When?

12   A.  In the fall of '07.

13   Q.  Why?

14   A.  They had requested it as part of their due diligence.

15   Q.  Okay.

16   A.  Can I clarify something?  When I say "by me", I caused

17   it to happen by having the human resources department

18   provide it to them.

19   Q.  Okay, thank you.  Take a look, if you would, please, at

20   Exhibit 3.  What is that and the date of it?

21   A.  The date is April 14th.

22   Q.  Of what year?

23   A.  Of '08.

24   Q.  And that is a first amendment to your employment

25   agreement?

1    A.   Yes.

2    Q.   And what does it do?

3    A.   It extends the term from the previous agreement to

4    October 15th from April 15th.

5    Q.   So basically another six months?

6    A.   Correct.

7    Q.   Okay.  And why did you -- why was your employment

8    extended for just six months into October of 2008?

9    A.   Well, this amendment was a result of the CrossHarbor

10   deal not going through.  So the deal didn't go through, we

11   had to renew the -- they didn't renew all of them, but they

12   renewed most of the senior manager's contracts.  And we put

13   it through October 15th basically due to seasonality

14   reasons.  The fall is better time to deal with -- you know,

15   it's kind of a break in between the summer and the winter

16   seasons.

17   Q.   Okay.  Now, let's take a look at your resident

18   membership agreement.  Grab Exhibit 4, if you would,

19   please.  Do you have that in front of you?

20   A.   I do.

21   Q.   And what's the date on that?

22   A.   I believe it's July 9th.  I will confirm that.  Yes,

23   July 9th.

24   Q.   Of?

25   A.   Of 2008.

1   Q.  Okay.  And that's signed by you and your wife on behalf

2   of yourselves.  And who signed it on behalf of Yellowstone

3   Mountain Club?

4   A.  Mike Doyle.

5   Q.  Okay.  In what capacity?

6   A.  As attorney in fact.  This was pretty typical.  Over

7   the past three years, Mike probably signed the majority of

8   these agreements.

9   Q.  Okay.  So the circumstances of who executed it wasn't

10  an unusual deal?

11  A.  No.  And the terms are consistent with my employment

12  agreement.

13  Q.  Well, that's my next question.

14  A.  Oh, I'm sorry.

15  Q.  How, if at all, did the terms in this resident

16  membership agreement differ from the terms of your

17  employment agreement?

18  A.  They didn't.  They were the same.

19  Q.  And up until that time, what kind of membership did you

20  have?

21  A.  A company membership.

22  Q.  And what happened to your company membership upon your

23  becoming a resident member?

24  A.  It was canceled contemporaneously with this

25  transaction.

1    Q.   Take a look at Exhibit 5, if you would, please.  What

2    is that?

3    A.   That's a check made out to -- excuse me, it's a copy of

4    a canceled check made out to Yellowstone Mountain Club in

5    the amount of $250,000.  And in the memo section, it says

6    "membership deposit".  This was a copy of the check that I

7    used to pay for our membership.

8    Q.   Okay.  This is your own personal check?

9    A.   Yes.

10   Q.   And it's endorsed on -- or, yeah, it's endorsed on the

11   back with a stamp for deposit to the Yellowstone Mountain

12   Club bank account; is that correct?

13   A.   Correct.

14   Q.   Mr. Sumpter, at any time since July 9 of 2008, have you

15   been advised by Yellowstone Mountain Club, CrossHarbor,

16   either of the Blixseths, or anyone else that your

17   residential membership agreement was not valid?

18   A.   No one has notified me that there was any problem or

19   any reason that my agreement was not valid.

20   Q.   Okay.  Since July 9 of 2008, has Yellowstone Mountain

21   Club, CrossHarbor, the Blixseths, or anybody else made any

22   indication to you that your residential membership was not

23   in good standing?

24   A.   I want to make sure I answer this correctly.  No one's

25   ever questioned the good-standing of my membership.

1  Q.  Okay.  Take a look at Exhibit 6, if you would.  What's

2  that, and what's the date of that?

3  A.  It's the second amendment to my employment agreement,

4  and it's dated August 8th of '08.

5  Q.  Okay.  And that's signed by whom?

6  A.  Tim Blixseth and Bob Sumpter.

7  Q.  To Mr. Blixseth, on behalf -- as president of the

8  Yellowstone Mountain Club and Yellowstone Development?

9  A.  Well, actually, as president of the Blixseth Group,

10  which was the manager of -- I'm sorry, if you look at the

11  signature block, yes.

12  Q.  In what way did this amendment to your employment

13  agreement that was signed on August 8th influence or impact

14  the residential membership that you were entitled to have

15  under the terms of your employment agreement?

16  A.  I had purchased the residential membership well over a

17  month earlier.  This had absolutely no impact on it.  It

18  had nothing to do with it.  This had to do with termination

19  and -- you know, termination issues and competition issues.

20  Q.  Okay.  Are you still employed by Yellowstone Mountain

21  Club and Yellowstone Development?

22  A.  No.  My employment was terminated on August 13th, again

23  contemporaneously, as per this, with Edra Blixseth taking

24  control of our, you know, buying out, or however you want

25  to phrase it, of the Yellowstone Club from Tim Blixseth.

```
 1    Q.  And just to be clear, that's August 13th of 2008?
 2    A.  Correct.
 3    Q.  Okay.  Now, one of the motions we have before the Court
 4    is for the Court to grant us relief under Rule 9024 and
 5    9023, alleging a surprise or mistake, and requesting that
 6    we be allowed to address this rejection assumption issue.
 7        Why did you not appear at the hearing that was set on
 8    May 18, 2009, in this matter?
 9    A.  The objection that we filed had -- you know, it had
10    nothing to do with my residential membership.  It was:  I
11    had been classified incorrectly as a company member.  All I
12    was trying to do was set the record straight that I wasn't
13    a company member.  My understanding of the plan is that a
14    non-vote equates to a "yes" vote.  I didn't want it on the
15    record that I had, that I had voted, let alone voted "yes",
16    and that's all it was.  I mean and somehow it got turned
17    into what we're doing now.
18    Q.  Prior to that date, had you read the disclosure
19    statement?
20    A.  Yes.
21    Q.  Okay.  And do you recall language in there that gave a
22    direction or a suggestion as to what you should do because
23    of the imperfect record-keeping of residential memberships
24    by the club?
25    A.  Yes.  And I believe it's Schedule 1.87.  It's actually
```

1   fairly, fairly detailed on what you're supposed to do.

2   Q.  Well, 1.87 is --

3   A.  I'm sorry, that's part of the plan.  But, yes, there is

4   a -- in the, in the disclosure statement, it -- I'm sorry,

5   I've lost my train of thought.

6       Can you repeat the question, please?

7   Q.  Yeah.  Was there anything in the disclosure statement

8   that gave you direction as to what to do if you had a

9   residential membership and you were not already reflected

10  on Schedule 1.87?

11  A.  Yes.  You were supposed to contact, I believe it was -

12  if I have the gentleman's name right - Brad Foster.  And

13  it's a consulting firm that was handling that, and I'm not

14  sure what -- it's "CTI", or something.  And you and I had

15  discussed it, and I instructed you to let them know, you

16  know, to follow up and provide them with the information.

17  Q.  And was that done?

18  A.  Yes.

19  Q.  Okay.  And are you aware of other people to whom copies

20  of your residential membership agreement were sent to?

21  A.  I believe it was sent to Brad Foster, I believe it was

22  sent to local counsel for the debtor, it was sent to

23  CrossHarbor.  CrossHarbor also requested a copy of the

24  canceled check, which they received.  And I believe there

25  was one other, and I -- one other group, and I can't

1   remember.

2   Q.  Mr. Birinyi's firm?

3   A.  Mr. Birinyi's firm.  And that all happened before the

4   hearing.

5   Q.  Okay.  And after you sent that in, did anybody -- did

6   you receive any indication that they were rejecting or

7   going to reject that residential membership or had any

8   question about its validity or good-standing?

9   A.  No.

10  Q.  Now, one of the issues before the Court is the decision

11  by the debtor and, I believe, CrossHarbor to reject your

12  residential membership, which invokes what we call the

13  "business judgment rule".  Do you believe that business

14  judgment compels rejection or justifies rejection of your

15  contract?

16  A.  No.

17  Q.  Okay.  Have you read the plan?

18  A.  Yes.

19  Q.  Are there, are there other members or classes of

20  members that do not pay dues or have a dues holiday?

21  A.  Yes.  There are three -- in the plan, there are three

22  classifications of membership that don't pay dues or have

23  freebies, as was suggested earlier:  The Pioneer

24  membership, the honorary membership, and the company

25  memberships.

1    Q.   Okay.  How many Pioneer memberships are there that have

2    this dues benefit?

3    A.   Twenty-three.

4    Q.   And for how long does that dues benefit last?

5    A.   If they exercise -- the way I read the plan is if they

6    exercise their options to do a new contract, they would

7    have a dues holiday until the club is converted to an

8    equity membership.

9    Q.   All right.  And that's 23 Pioneer memberships?

10   A.   Correct.

11   Q.   You mentioned honorary memberships.  How many honorary

12   memberships are there that are identified in the plan that

13   don't have to pay dues?

14   A.   I'm going off of memory here.  Let's see, I believe

15   there's nine.

16   Q.   Okay.  And how long do the honorary members receive the

17   benefit of not having to pay dues?

18   A.   Same term, until -- well, you'll have to go look at

19   their contracts, but I believe they allow them to, again,

20   convert -- that they have to convert when the club goes to

21   an equity.

22       The interesting thing about the honoraries is they also

23   don't have to pay membership deposits.

24   Q.   We'll get to that.

25   A.   Okay.

1   Q.  The company memberships that don't pay dues, how many

2   of those are there?

3   A.  If you exclude my name, because it was listed on there,

4   there are 15 of those.

5   Q.  Okay.  So 23, 9, and 15; there's 47 other contracts

6   that don't have to pay -- or contracts going into the

7   future that have a dues holiday or don't have to pay dues?

8   A.  Correct.

9   Q.  By the way, how long do the company members receive

10  dues-free memberships?

11  A.  Again, as long as they're company members.

12  Q.  Okay.  Are there memberships that are being offered

13  under the plan that don't have to pay deposits?

14  A.  Yes.

15  Q.  To which ones?

16  A.  There are two classes, again:  The honorary and the

17  company memberships.

18  Q.  So that's the 9 honorary and the 15 companies?

19  A.  Yes.

20  Q.  So that's 24.  And what are the current deposits at the

21  club?

22  A.  Unless it's changed during these proceedings, when I

23  left, it was $300,000.

24  Q.  So that's another 24 memberships that don't have to pay

25  the deposit like you did?

1  A.  That's $7.2 million.

2  Q.  Okay.  Are there any classes that -- well, first of

3  all, what's the normal provision with regard to the

4  deposits?  Do the members ever get those back?

5  A.  It's a 30-year -- the deposits are based on a 30-year

6  deposit.  So they, they put it up, and if they make it to

7  their 30 years, then they get their deposit back and they

8  get to continue on as members.

9  Q.  Okay.  Are there memberships that get on early refund

10  benefit going forward?

11  A.  Yes.  The Pioneer and Frontier memberships both have an

12  early refund event.  The Pioneer, the 23 Pioneer members

13  have an early refund event of $500,000 that takes place, I

14  believe, at 650 memberships.  And, again, if my memory

15  serves me, in the projections in the plan, I think that

16  happens in Year 7.  The Frontier --

17  Q.  Which would be 2016?

18  A.  Yeah.  I'm sorry, yeah, from now, so 2016.

19  Q.  And how many of the Frontier memberships are there?

20  A.  I believe the plan had 11 Frontiers.

21  Q.  Okay.

22  A.  And but they only get --

23  Q.  And do they get, do they get a deposit refund?

24  A.  Yes, but they only get 250,000.

25  Q.  But they get that early, also?

1   A.   Correct.

2   Q.   The same time the Pioneer members do?

3   A.   I believe it's in order.  And what I mean by that is

4   the Pioneers will get it first because they were first and

5   the Frontiers would get it second.  So I don't know that it

6   all happens at once.

7   Q.   Okay.  Now, with regard to these classes of memberships

8   that they have provided for in the plan going forward that

9   don't have to pay dues, did you calculate what the 47

10   memberships that they have that aren't having to pay dues

11   until the club is converted, what that totals up to if we

12   use a $30,000 membership dues as has been someplace, I

13   think I've heard, as in the offing?

14       Have you totaled up how much the company is granting

15   relief on for those 47 memberships?

16   A.   It's approximately 1.4 million -- it's actually

17   1.41 million a year.

18   Q.   $1,410,000 a year?

19   A.   Yes.

20   Q.   And that's every year?

21   A.   Every year until they convert to equity.

22   Q.   And the revenues that they're giving up by not

23   requiring deposits of those 24 memberships and the honorary

24   and company memberships, what does that total up to?

25   A.   I think we said that the number was, I think we said it

1  was 7.2 million.

2  Q.  Well, that would be 300,000 times 24?

3  A.  Yes.

4  Q.  Okay.  And I guess the early deposits, refunds to the

5  -- the $500,000 early refunds to the Pioneer members and

6  the $250,000 refunds to the Frontier members, what does

7  that all total up to?

8  A.  I believe it totals up to 14.25 million.

9  Q.  Okay.

10  A.  In the plan, I think, yeah, it was 14.5.

11  Q.  Okay, $14,500,000 or $14,250,000.  So if you take all

12  those benefits over the eight years under the projection in

13  the disclosure statement, I think they go through like from

14  2000 -- a fraction of 2009 and then 2010 through 2017, and

15  that's, say, eight years.  If you total up all the dues

16  that they're forgiving in that period of time, all the

17  deposits that they're forgiving, and the early dues refunds

18  during that period of time, what does that all total up to?

19  A.  It's approximately 32,700,000 - 32,800,000.

20  Q.  Okay, 32 million and change.

21  A.  Just under 33 million, yes.

22  Q.  Okay.  During that same period of time at $30,000 a

23  year, what would your eight years worth of nonpayment of

24  dues total up to at 30,000?

25  A.  $240,000.

 1   Q.  Okay.  Did you compare what percentage the $240,000

 2   that you're not paying is to the $32 million of other

 3   monies that they're not collecting in terms of like a

 4   percentage?

 5   A.  Yes.

 6   Q.  And what percentage of that total does your $240,000

 7   represent?

 8   A.  It represents .00075, so 7 -- actually, one more zero;

 9   seven and a half hundredths of 1 percent.

10   Q.  I think it's .0075.

11   A.  Right.

12   Q.  It's 75 -- it's three-quarters of 1 percent of the

13   other amount; is that correct?

14   A.  Right.

15   Q.  Okay.  Did you review the cash projections --

16   A.  Yes.

17   Q.  -- that are contained towards the end of the disclosure

18   statement for the operation of the club through the year

19   2017?

20   A.  Yes.

21   Q.  And you can refer to the disclosure if you don't

22   remember, but in preparing for this hearing, we reviewed

23   those.  And, of course, the disclosure speaks for itself,

24   but do you recall approximately what that total net cash

25   flow is to the club for that eight years?

```
1    A.   I believe it was 608 million.
2    Q.   Yes, a little over $608 million.  And what percentage
3    of that $608 million does the $240,000 that they're not
4    receiving from you, what percentage is that?
5    A.   It's .0004, so four-tenths of 1 percent.
6    Q.   Four-one hundredths of 1 percent.
7    A.   I'm sorry, four-one hundredths of a percent.
8    Q.   These other memberships - the honoraries, the Pioneers,
9    the companies, the Frontiers - did you notice if there were
10   rejection claims provided for them in the plan?
11   A.   Yes, there were.
12   Q.   And were there even classes of rejection claims for
13   them?
14   A.   Yes, there were.
15   Q.   Was there a rejection claim provided for your
16   membership, your residential membership in the plan?
17   A.   No, because they said on Schedule 1.87 that they were
18   assuming all resident memberships.
19   Q.   Well, I believe that's the disclosure statement.
20   A.   Oh, I'm sorry, the disclosure statement.
21   Q.   Did you even receive a ballot for a rejection claim for
22   your residential membership?
23   A.   No.  In fact, I received a rejection ballot for a
24   founder's circle membership.
25   Q.   Do you have a founder's circle membership?
```

```
1   A.  No.

2   Q.  Okay.  So you didn't even receive a ballot for it.

3   A.  No.

4            MR. MACKEY:  That's all I have at this time, Your

5   Honor.

6            THE COURT:  Thank you, Mr. Mackey.

7            MR. MACKEY:  Pardon me?

8            THE COURT:  Who wishes to cross-examine?

9   Mr. Patten?

10                      CROSS-EXAMINATION

11  BY MR. PATTEN:

12  Q.  Good morning, Mr. Sumpter.

13  A.  Good morning.

14  Q.  You testified that, pursuant to what you understood the

15  disclosure statement to require, you notified Brad Foster

16  that you had a residential membership?

17  A.  Correct.

18  Q.  And I think you also testified that you sent copies to

19  me, CrossHarbor, and to Mr. Birinyi or Mr. Ream.

20  A.  I instructed Steve Mackey to do that.

21  Q.  Okay.  And you believe that that was all done?

22  A.  And I believe that that happened.

23  Q.  And that was in March?

24  A.  Yes.

25  Q.  Okay.  And you looked at the --
```

1   A.  Actually, it was -- I'd have to go -- I can't remember

2   the deadline, but it was certainly before the deadline.

3   Q.  Okay.  And you looked at the bankruptcy plan that was

4   served on you, as a member?

5   A.  Yes.

6   Q.  And that was sometime in April?

7   A.  I can't remember the actual time; whenever I received

8   the ballot from the company that delivered the ballots.

9   Q.  Okay.  And at the same time you got the ballot, you got

10   a copy of the plan and the disclosure statement --

11   (inaudible, talking over each other)?

12   A.  Yeah.  This is the front -- I'm sorry.  This is the

13   founder's circle ballot.  And it had the plan on disk, and

14   I have the plan on disk with me.

15   Q.  Okay.  And you looked at all of the -- you looked at

16   the plan that was provided to you on the disk?

17   A.  Yes.

18   Q.  And you looked at the attachments and schedules to the

19   plan?

20   A.  Yes.

21   Q.  And you looked at Schedule 1.87?

22   A.  Yes.

23   Q.  And you did not see your name on Schedule 1.87?

24   A.  Correct.

25   Q.  So you knew two weeks ago that your membership was not

1    listed on the memberships to be accepted under the plan,

2    correct?

3    A.   That is not correct.

4    Q.   You knew your name was not on the list, right?

5    A.   The plan provided -- or the schedule provided that if

6    your name wasn't on the list, that the records were

7    incorrect and that any resident member who had a valid and

8    was in good standing would be added at some point in the

9    future, which is why we went through the process of sending

10   everybody our resident membership so that we were included

11   on 1.87.

12   Q.   But even after you sent everybody copies of your

13   membership, you still didn't get added to Schedule 1.87,

14   right?

15   A.   I don't believe we're on 1.87 as of today.

16   Q.   Correct.  So you knew two weeks ago that you weren't

17   scheduled to be -- your membership was not scheduled to be

18   accepted.

19   A.   No.  I didn't accept -- that's not -- I want to make

20   sure I answer that correctly.

21        Can you repeat the question, please?

22   Q.   You knew as of May 18th that your membership was not on

23   the schedule of memberships to be accepted.

24   A.   I did not -- again, with the way the Schedule 1.87 is

25   written, there was nothing to suggest that I shouldn't be

1    on 1.87.

2    Q.  Perhaps, maybe, there was nothing to suggest that you

3    shouldn't be on it, but, in fact, your name's not on the

4    list.

5    A.  The process wasn't completed.  The plan hasn't been

6    confirmed yet, and the process hasn't been completed.

7    Q.  Part of your responsibilities was to market the Pioneer

8    memberships?

9    A.  Correct.

10   Q.  And I didn't write the numbers down, but when you first

11   came on board, how many of the Pioneer memberships had been

12   sold?

13   A.  Twenty-three had been committed, out of twenty-five.

14   Q.  What was the, what was the benefit of being a Pioneer

15   member?

16   A.  They were the first group in.  They essentially put up

17   1,250,000.  Of the 1,250,000, there was a $50,000 option,

18   there was 200,000 towards land, there was 250,000 towards

19   membership deposit, and 750,000 was in the form of a pledge

20   of either a letter of credit or a certificate of deposit

21   that we could then leverage.  That was the basic structure.

22       The deal for them was:  They didn't, they didn't have

23   to pay dues; they had a one-time transferability to heirs,

24   excuse me, they had a one-time transferability to their

25   heirs; and at, I believe it was either five years or 450

1 members, whichever occurred latter, they would get their,

2 they would get their $250,000 -- they had an early refund

3 event on their $250,000 membership deposit, and they would

4 get $250,000 back for their, for their land purchase.

5 Q.  They were the members that got the impetus going for

6 all of the memberships.  Would that be correct?

7 A.  Yeah, they were the early guys, just like me.  I mean I

8 was there at the same time.

9 Q.  Okay.  And you had to create a certain amount of

10 momentum in order to make it a viable membership

11 organization, right?

12 A.  Absolutely.

13 Q.  And the Pioneer members were the genesis of that

14 impetus, right?

15 A.  Yeah, they were part of it.

16 Q.  Okay.  The honorary members are people like Warren

17 Miller and, I think, former Vice President Quayle; is that

18 right?

19 A.  Yes.

20 Q.  And those were to get some, some well-known names to

21 create a certain cache, if you will, for the Yellowstone

22 Club?

23 A.  Sure.

24 Q.  And that was also a part of the impetus to build the

25 membership momentum for the club, right?

1  A.  Yes.

2  Q.  You're familiar with who the honorary members are?

3  A.  Generally.  I would have to look at the list again, but

4  generally speaking, yes.

5  Q.  And you would agree with me, Mr. Sumpter, wouldn't you,

6  that you and the Pioneer members, I'll say, aren't in the

7  same -- don't have the same name recognition around the

8  country that the honorary members do?

9  A.  I'm sorry, could you repeat that?

10  Q.  You don't have the same name recognition around the

11  country that the honorary members have, correct?

12  A.  I think you said me and the Pioneers don't, and that is

13  true.

14  Q.  Okay.

15  A.  Neither the Pioneers nor myself have the same name

16  recognition as the, as the honoraries.

17  Q.  And that name recognition was the purpose of getting

18  the honorary members in.

19  A.  Sure.  It was a marketing deal.

20      I would say, though, that most of those, most of those

21  agreements, you know, had expired.  And in addition to

22  getting their free membership deposit and their free dues,

23  a number of those people were given pieces of property, I

24  mean substantial pieces of property, houses built for them.

25  And some of these houses are in the -- you know, it could

1  be argued, are in pre-now, you know, in a pre-now market,

2  certainly several million dollars.  And, you know, having

3  said that, you know, Jim Gray is an honorary member.  He's

4  a sportscaster.  It was a freebie.

5  Q.  But that was the purpose of the honorary memberships:

6  You get some big names in so that people recognize, and it

7  adds momentum to building your membership roster?

8  A.  I would say people on that list, yes; and some people

9  on that list, no.

10  Q.  Now, the Pioneer members ultimately have to pay dues,

11  right?

12  A.  My understanding is that when there's an equity

13  conversion, they will have to pay dues.

14  Q.  Okay.  And it's correct, isn't it, that you will never

15  have to pay dues?

16  A.  That's not correct.

17  Q.  Does it provide in your membership agreement that at

18  some point, you have to pay dues?

19  A.  Well, I'm sorry?  Say that again.

20  Q.  Doesn't your membership agreement provide that you

21  never pay dues?

22  A.  Yes.  But you used the word "never", and "never"

23  implies kind of forever.

24  Q.  Yeah.

25  A.  So, I mean, I could pass away tomorrow, I could get hit

1   by a bus tomorrow.  I mean this notion that somehow

2   they're -- I get to be there forever is just ridiculous.  I

3   mean 4 percent, 4 percent of the memberships, of the

4   membership agreements, the 30-year membership deposits are

5   the only ones that will make it, on a national average,

6   will make it to the 30 years.

7   Q.  Okay.  Let me ask my question more specifically:

8   During your lifetime, you will never have to pay dues,

9   right?

10  A.  No.

11  Q.  When will you have to pay dues under your membership?

12  A.  You're suggesting I'm going to be a member forever, and

13  that may not be the case.

14  Q.  Okay.  As long as you maintain your membership and you

15  are alive, you won't pay dues, right?

16  A.  That is correct.

17  Q.  Okay.  Why was your company membership terminated?

18  A.  Because I bought the residential membership.  It was a

19  contemporaneous --

20  Q.  Why did you buy your company membership?

21  A.  It was, it was evident that Edra was going to take

22  over -- or take over, buy, however the transaction

23  happened, the club from Tim.  And it just seemed like -- I

24  was going to have to do it anyway, and it just seemed like

25  the prudent thing to do.

1    Q.  Were you negotiating your second amendment to the

2    employment agreement, which is Schedule -- or, excuse me,

3    Exhibit 6?  You should have it in front of you.

4    A.  I'm sorry?

5    Q.  Do you have Exhibit 6 in front of you?

6    A.  Excuse me.  Yes, I do.

7    Q.  Were you negotiating the Exhibit 6 at the same time you

8    were acquiring your residential membership?

9    A.  No.  There's no reason to.  The membership was inherent

10   in my contract.  I just had to pull the trigger.  The

11   suggestion that there was something happening is -- just

12   didn't happen.

13   Q.  Well, something was happening.  You knew that Edra was

14   going to take over control of the club from Tim.

15   A.  That's because she broadcast it to the world that she

16   was going to take over the club.  It was evident.

17   Q.  Okay.  So that was happening at the time you bought

18   your residential membership?

19   A.  Yes, because like I said, I was going to have to do it

20   anyway.

21   Q.  What prompted the execution of Exhibit No. 6?

22   A.  If you go to -- I guess it's probably best to go to

23   Exhibit 2, which I think is my '08 agreement.  I had the

24   right in my agreement to veto the assumption of my contract

25   in the event of a change of control.  A change of control

1   was imminent, and I requested that the terms of it, instead

2   of it just being an option where I could say, "Yes, you can

3   take my contract," or "No, you can't," I was leaving the

4   company.  I had mentally prepared myself to leave the

5   company for the CrossHarbor transaction.  I was going to

6   leave the company.  It was going to happen.  And all I did

7   was ask that it be an automatic termination as opposed to,

8   as opposed to my right to veto an assumption of my

9   contract.

10  Q.  And it gave you a right to the remaining base salary

11  payable over the term of your contract?

12  A.  Yeah, the assumption provision of my original contract

13  does.  So it's consistent with that.

14  Q.  But if you voluntarily terminated under your, I'll call

15  it, original contract, you wouldn't be entitled to your

16  base salary for the whole period of the contract, correct?

17  A.  Yeah, but there was a change in control, so the change

18  in control governed.  There was no voluntary termination.

19  Q.  Well, what was the purpose, then, of Exhibit 6?

20  A.  Like I said, I knew I was leaving.  I just wanted to

21  make it automatic, that once the change in control

22  happened, that I would be gone.

23  Q.  But you had that same provision in your earlier

24  contracts?

25  A.  Well, what was in my earlier contract is that I could

1    approve an assumption of my contract.  So it would have

2    been -- you know, with all that's been made of this, I

3    probably -- you know, I mean this is just, it's not that

4    big a deal.

5    Q.  Well, it left Edra Blixseth with an obligation that

6    happened automatically upon the execution of her marital

7    settlement resulting in an obligation to you.

8    A.  But how was I suppose to know about that?  I wasn't

9    privy to the marital settlement agreement.  It was done on

10   a confidential basis.  I was not involved in those

11   discussions because Steven Klogney (phonetic), Tim's

12   attorney, his divorce attorney, was very adamant that

13   anyone -- any outside presence could potentially waive the

14   attorney-client privilege.  So I had no idea of what the

15   financial arrangements were on what Tim was going to pay,

16   what Edra was going to pay.  And, quite frankly, I didn't

17   care.  I was employed by the club.

18   Q.  But you knew that there was a settlement being

19   negotiated between Tim and Edra?

20   A.  As I previously stated, Edra made it well-known to the

21   entire world that she was taking over the club.  So, yes, I

22   knew this was happening.

23   Q.  And I think you testified before that you currently

24   have some development projects going in conjunction with

25   Tim Blixseth, correct?

1   A.   No, I didn't testify to that.

2   Q.   And, I'm sorry, I think you testified in Missoula a

3   month ago, or thereabouts, that you had some development

4   projects in the works with Tim Blixseth.

5   A.   That's not what I testified to.

6   Q.   Do you have any deals going with Tim?

7   A.   Right now, no.

8   Q.   Do you have any prospective deals going with Tim?

9   A.   Right now, no.  What I testified to was -- you had

10  asked me before, and I said in the previous 90 days, we had

11  looked at some deals, and nothing had come of them.

12  Q.   Okay.

13  A.   But I have nothing going on with Tim Blixseth right

14  now.

15  Q.   Okay.  But you've looked at deals together sometime

16  this year?

17  A.   It would have been early this year.  It would have been

18  January.

19  Q.   Okay.  Just to be clear, in July of 2008 when you

20  acquired the membership agreement, you were employed at the

21  Yellowstone Club?

22  A.   Correct.

23  Q.   And you were entitled, as a condition of that

24  employment, to a company membership at that time?

25  A.   Yes.

1          MR. PATTEN:  Excuse me a minute.

2          Thank you, Mr. Sumpter.  That's all I have.

3          THE WITNESS:  Thank you.

4          THE COURT:  Does anyone wish to --

5          MR. MOORE:  Your Honor --

6          THE COURT:  Mr. Moore.

7          MR. MOORE:  Oh, I'm sorry, if Mr. - (inaudible,

8    out of range of microphone) - wants to go, that's fine.

9          THE COURT:  I couldn't hear you.

10          MR. MOORE:  I was going to go, but if someone

11    there prefers to go first, that would be fine, Your Honor.

12          THE COURT:  Okay.  Mr. Moore, I'm still having a

13    hard time hearing you.

14          MR. MOORE:  Your Honor, I was prepared to go, but

15    if someone there would rather go first, that's fine.

16          THE COURT:  Well, I think if you have questions

17    for this witness, please proceed.  Go ahead and proceed.

18          MR. MOORE:  Your Honor, do you want me to see if

19    I can get somebody in here to adjust the volume --

20    (inaudible, out of range of microphone)?

21          THE COURT:  Yes.  I am having a hard time hearing

22    you.

23          THE WITNESS:  And, Your Honor, I can't hear him

24    either.

25          MR. MOORE:  Your Honor, I think this mike may

```
1    work better.  Does that work better?

2              THE COURT:  That's much better.

3              MR. MOORE:  I'll just move down.

4                       CROSS-EXAMINATION

5    BY MR. MOORE:

6    Q.  Mr. Sumpter, is it the case that Pioneer memberships

7    weren't offered after 1999?

8    A.  Correct.

9    Q.  And you didn't have a Pioneer membership?

10   A.  Correct.

11   Q.  All right.  Now, the membership you had was purchased

12   pursuant to your employment agreement; is that correct?

13   A.  Yes.  And that agreement had been provided to

14   CrossHarbor, your client, back in the fall of 2007.

15   Q.  The membership agreement wasn't, was it?

16   A.  I'm sorry, the membership agreement wasn't; the

17   employment contract which had the provisions for membership

18   agreement was.

19   Q.  Now, the membership agreement, Exhibit 4, if

20   CrossHarbor were to assume that, it would require

21   CrossHarbor to repay your deposit; is that correct?

22   A.  Yes.  And that's the same as if CrossHarbor had

23   consummated the transaction in March/April of 2008.  If

24   they would have completed the transaction, they would have

25   been burdened with this exact same agreement.
```

1  Q.  I see, okay.  And whatever sum you paid for that

2  membership isn't in escrow, or anything, is it?

3  A.  Actually, I'd like to, I'd like to correct your

4  statement because this membership is actually tied to my

5  land ownership.  And the only way CrossHarbor would be

6  obligated -- again, this goes to the 30-year issue.  The

7  only issue that -- the only way CrossHarbor would ever be

8  obligated to pay me back the 250,000 would be if I stayed

9  the 30 years and they still owned the club at the time.

10      The realistic way that this happens is:  If I sell my

11 piece of property, the person buying my piece of property,

12 assuming they're approved for membership, puts up the

13 250,000, and they basically flow the cash through from the

14 new buyer directly to me.  So, again, unless I make it to

15 80 years old and -- or 81 and CrossHarbor still owns the

16 club, they will never have this obligation.

17 Q.  And my last question was:  Whatever sum you paid for

18 this membership wasn't placed in escrow, was it?

19 A.  No.  It was deposited into whatever account was on the

20 back of the check.

21 Q.  So CrossHarbor is not getting the benefit of that

22 deposit, is it?

23 A.  Well, just like they're not getting the benefit of the

24 previous 300, you know, or however memberships there are.

25 Q.  So the answer is "yes".

1    A.   I'm sorry, are you waiting for me?

2    Q.   Never mind.  Under the terms of the membership

3    agreement, again you've testified that you're not obligated

4    to pay dues for so long as you've remained a member; is

5    that correct?

6    A.   Correct.

7    Q.   And it also allows you either -- to convert to a

8    national membership for an additional $50,000 with no

9    annual dues; is that correct?

10   A.   Correct.

11   Q.   Okay.  Well, let me back up.  If you sell the lot,

12   that's Lot 327, is that correct --

13   A.   Correct.

14   Q.   -- then your membership agreement provides that a

15   residential membership is reserved for the buyer; is that

16   correct?

17   A.   Correct.

18   Q.   And particularly in light of your last testimony, it

19   also allows you, in addition to that, to either convert to

20   a national membership for $50,000 with no annual dues or to

21   transfer that membership to another lot you own; is that

22   correct?

23   A.   Correct.

24   Q.   Okay.  And do you recall what the price was for a

25   national membership?

1  A.  At the time I negotiated this, I believe it was

2  $300,000.

3  Q.  Isn't it the case that it was never any less than

4  $500,000?

5  A.  No.  Jim Sievers, who I believe is the only national

6  member on the, on the list, paid $300,000 for his national

7  membership.

8  Q.  Okay.  So it was at least three --

9  A.  I think you're thinking of the founder's circle

10  membership.

11  Q.  Okay.  So it was at least $300,000; is that correct?

12  A.  Yes, which is consistent with the time that this was

13  negotiated.

14  Q.  Okay.  And are you aware of any other residential

15  membership that permits a residential member to have the

16  same privileges that you seek to --

17  A.  Actually, yes.  Technically speaking, the Pioneer and

18  Frontier memberships are, in fact, resident memberships

19  because they require the ownership of land or some kind of,

20  some kind of structure.

21  Q.  Are you aware of any document that says "residential

22  membership" at the top of the page that permits any

23  residential member to convert to a national membership for

24  $50,000?

25  A.  No, I'm not aware, but I'm not aware of one that could

1   say that.

2   Q.   Are you aware of any other residential membership that

3   permits a member to sell its lot to reserve a membership

4   for the purchaser of that lot and to transfer the existing

5   membership to another lot free of any membership

6   obligations?

7   A.   That's the way the club works.  I mean that's

8   consistent for basically everybody.  There's 864

9   residential memberships, there's 864 lots.  It's a

10  one-to-one situation.  So the only time you'd have a

11  bifurcation or a severance of the membership from the lot

12  would be in a situation where, if somebody was crazy enough

13  to do it, they would come in and -- let me actually back

14  up.

15      When we were operating the company, it was a

16  requirement of first-time buyers, so buyers who were buying

17  developer property, that they had to purchase a membership.

18  We can't control -- we were never able to control

19  third-party transactions because of, you know, competition

20  issues.  So if somebody wanted to put their lot up for sale

21  and the person coming in wanted to buy it without

22  purchasing a membership - which again, is crazy, and I

23  can't ever imagine an instance where it happens - then they

24  could do that.

25      And there's actually a process.  There's a three-in-one

1    process, three-in-one -- or four-in-one process where the

2    membership gets put on a resignation list.  And, again,

3    this is so the developer is never out of pocket cash.  And

4    on the fourth membership, the money -- the fourth new

5    membership, the money comes back in if it's on the

6    resignation list.

7        So for all practical purposes, anybody who sells their

8    lot, you know, the next guy in is going to buy the

9    membership.  And, quite frankly, that's in CrossHarbor's

10   best interest.  If I sell my lot, they get the membership

11   benefit of whoever that person -- or, actually, I get the

12   membership of that unless I'm going to another lot.  And

13   then that -- I'm kind of -- I'm being a little -- I'm

14   talking a little bit too much here, but --

15   Q.  Well, perhaps I wasn't clear, Mr. Sumpter, and if

16   that's the case, I apologize.  I understand the notion of

17   when somebody buys your lot, a membership gets transferred.

18       My question was:  Over and above that, you have the

19   right to not only have a membership reserved for your

20   buyer, but also to assign your dues-free membership to

21   another lot you own in the club; is that correct?

22   A.  Yes.  The Pioneers and, I believe, the Frontiers have

23   the same thing.  And for practical purposes, that's how it

24   works.  If I were to buy another lot, the people with the

25   quote/unquote special memberships have always been able to

1   move their memberships to their new lots, and there's

2   always been a membership for the lot they were selling.

3   Q.   But you didn't have a quote/unquote special membership,

4   correct?

5   A.   I'm talking about the Pioneer and the Frontiers.

6   Q.   Yours is special only in the sense that you have terms

7   negotiated in here that are not standard for residential

8   membership; isn't that correct?

9   A.   That's not correct.

10  Q.   Okay.  Are you aware of any other document that says

11  "residential membership" at the top of the page that allows

12  the so-called residential member to convert to -- to either

13  convert to a national membership upon the payment of

14  $50,000 or to transfer that membership to another lot that

15  doesn't have a membership?

16  A.   And as I previously testified, I'm not aware, but I'm

17  not also not aware that one might exist.

18  Q.   Well, you have other lots on the club, don't you?

19  A.   Correct.

20  Q.   How many?

21  A.   Actually, let me qualify that.

22  Q.   No, just answer my question -- I'm sorry, go ahead.

23  A.   They're owned through partnerships.  So all I was

24  trying to do was clarify that it wasn't a personal thing.

25  Q.   Okay.  Well, don't you still own a lot, the lot in

1    question?

2    A.   I'm not sure what the "lot in question" is.

3    Q.   Three twenty-seven.

4    A.   Yes, I own Lot 327 personally.

5    Q.   Okay.  And do you have entities that also own lots?

6    A.   I have partnerships where I have another partner, and

7    we own two other lots.

8    Q.   And who's the other partner?

9    A.   A gentleman by the name of Paul Buyer.

10   Q.   And those would be Lots 470 and 471?

11   A.   Yes.  And Paul, Paul is also a member.

12   Q.   And they're owned by SD 470 and SD 471; is that

13   correct?

14   A.   Correct.

15   Q.   Are there memberships attributed to those lots?

16   A.   They have postponement agreement.

17   Q.   Postponements.  You've read the plan and the disclosure

18   statement.  All postponement agreements are rejected; is

19   that correct?

20   A.   Correct.

21   Q.   So those lots don't have memberships?

22   A.   Under the plan, the postponements have been rejected.

23   Q.   And in connection with those postponement agreements

24   with respect to those two lots, were you permitted to have

25   a postponement agreement without paying any membership fee?

1    A.  Yes.

2    Q.  And was that approved by Mr. Blixseth at your request?

3    A.  It was actually at Paul Buyer's request.  And, yes, it

4    was accepted.

5    Q.  Does it refresh your recollection that in or about

6    December 18, 2006, you requested a membership deferral from

7    Mr. Blixseth in an e-mail, as we had done on the chalet

8    units?

9    A.  If you have something in front of you that says that,

10    I'm sure I did.  But that doesn't preclude that when Paul

11    Buyer bought -- you know -- Paul Buyer is the one who

12    contracted for the lots.

13    Q.  Okay.

14    A.  And, you know, the biggest benefactor of postponement

15    agreements is your client.  Between the golf course lots

16    and Sunrise Ridge, they got over 60 postponement

17    agreements.

18    Q.  Okay.

19    A.  So postponement agreements were pretty -- there was

20    nothing unique about them in that time frame.

21    Q.  And, Mr. Sumpter, again, you've read the plan.  And is

22    it your, is it your understanding the plan rejects all

23    postponement agreements?

24    A.  Yes.  But as we heard, as we heard Mr. Guthals testify,

25    it sounds like CrossHarbor is, in fact -- and the plan

1    provides for the re-issuance of some postponement

2    agreements going forward.

3    Q.  So the plan provides for the rejection of CrossHarbor's

4    postponement agreements, too, correct?

5    A.  Actually, it doesn't, because the contracts for

6    those -- the contracts under which those postponement

7    agreements were made were assumed by CrossHarbor.

8    Q.  With respect to Mr. Blixseth's agreement to defer your

9    deposits on Lots 470 and 471, did you subsequently send an

10   e-mail to Mike Doyle and Charlie Calendar?

11   A.  I'm sure -- it's obvious that you have something in

12   front of you, so I'm sure I did.

13   Q.  Okay.  And did you, in that e-mail, ask them to handle

14   the deferrals, quote (quoted as recorded):

15          "Outside of sale so it doesn't create any,

16   'precedent issues' with the sales guys.  I think we can do

17   the membership transaction outside of closing.  Let's talk

18   as to the best way to do this"?

19   A.  If that's what it says.

20   Q.  You have no reason to believe you didn't say that,

21   correct?

22   A.  Again, it was a pretty standard procedure at the time

23   to do postponement agreements.  In Phase 3-A, there were a

24   number of postponement agreements.  As a matter of fact, in

25   Phase 3, almost the entire subdivision of 36 lots was done

1    on a postponement agreement.

2    Q.   Okay.  And were they done outside of closing and off

3    the books, whatever else you were asking to do here?

4           MR. MACKEY:  I'm going to object to the phrase

5    "off the books", Your Honor.  I don't believe there's any

6    evidence that that's what was said.  It's sort of a

7    pejorative argument.

8           THE COURT:  I'll sustain that.

9    Q.   (By Mr. Moore)  The provision of your membership

10   agreement with respect to your right to transfer it to

11   another lot at the club, could you look at your employment

12   agreements and tell me where in your employment agreement

13   any such provision is contained?

14   A.   I'm sorry, can you repeat the question?

15   Q.   The provision allowing you to transfer this membership

16   to another lot or unit you purchased at the club, could you

17   tell me where in your employment agreement there's any such

18   provision?

19   A.   I'm looking.  I believe it would be 9.2, but let me

20   check.  Unfortunately, I can't -- I don't have glasses with

21   me.

22        Yes, it's in Paragraph 9.2 at the end.

23   Q.   Which exhibit are you looking at?

24   A.   Two.  Maybe I misunderstood the question.

25   Q.   My question was:  Anywhere in these employment

1   agreements, is there a provision that allows you to

2   transfer this membership to another lot that you own?

3       I'm reading Exhibit 2, and it allows you to -- it

4   provides for (quoted as recorded):

5           "The reservation of a residential membership

6   reserved for the new buyer, and he shall be allowed to

7   convert to a national membership for an additional $50,000

8   deposit and no payment of annual dues."

9       I don't see anything relating to transferring to

10  another lot.

11  A.  Okay.  Like I said, it's a standard practice up there

12  that that's what happens.

13  Q.  But it wasn't in either of the employment agreements

14  that you made this provision in, correct?

15  A.  Wait a second.  Actually, it is not in the employment

16  agreement.

17  Q.  Okay.  Referring to Sumpter Exhibit 4, your membership

18  agreement, the last paragraph of -- the last sentence of

19  Paragraph 1(a), am I correct that it says (quoted as

20  recorded):

21          "It is agreed that Member will be reissued

22  Membership No. 9 but without the Pioneer privileges

23  contained in such resigned membership"?

24  A.  Yes.

25  Q.  Okay.  But this membership was issued pursuant to your

1   employment agreement, correct?

2   A.  Correct.  It was just an identifier.

3   Q.  An identifier of your Pioneer rights?

4   A.  No.  It says, it says --

5   Q.  You had a company membership --

6   A.  It says the exact opposite.  It says I'm not a Pioneer,

7   but I'm getting Membership No. 9 as a reissued number

8   because that number had been -- the previous Pioneer had

9   resigned that number.

10  Q.  I see.

11  A.  It's just you've got to have a number.

12  Q.  I see.  Again, with respect to your employment

13  agreements, and in particular Sumpter Exhibit 6, that would

14  be the second amendment executed on August 8th --

15  A.  Okay.

16  Q.  -- do you know why this agreement has a line for the

17  signatories to insert the time they were signing?

18  A.  I can't recall why that was in there.

19  Q.  You don't recall any special importance?

20  A.  Of what?

21  Q.  Well, was there a concern, perhaps, that Mr. Blixseth's

22  takeover of the club might become effective before you

23  could sign this agreement?

24  A.  Well, Mrs. Blixseth took over the club on August 13th

25  and I think this was dated August 8th, so I can't recall.

```
 1   Q.  And all three of you signed at or about 3:55 p.m. at
 2   August 8th, correct?
 3   A.  I think that's what it says.
 4   Q.  Okay.  Now, looking at all the other employment
 5   agreements you signed, do any of them have a, have a line
 6   for the time they were signed?
 7   A.  No.
 8   Q.  Just the date, correct?
 9   A.  Correct.
10   Q.  Now, you mentioned in your direct testimony the various
11   classes under the plan who don't pay dues.  Are you aware
12   of any residential member whose contract is being assumed
13   under the plan who doesn't pay dues going forward?
14   A.  Pioneer and Frontier do not pay dues.
15   Q.  I said "residential".  Are you aware of any
16   residential -- how many residential members are there?  Do
17   you know?
18   A.  Well, I guess we have a difference of opinion.  Because
19   I believe, having been there since the beginning, that
20   Pioneer and Frontier members are, in fact, resident
21   members.  And that's defined by the fact that they own
22   property.
23   Q.  Okay.  And are you aware -- you've been at the club for
24   how long?
25   A.  Since September of '99.
```

1   Q.   And were there different membership agreements that had

2   different names at the top of the agreement?

3   A.   Sure.

4   Q.   Okay.  Now, focusing on documents that say "residential

5   membership" at the top of the agreement, are you aware of

6   any who aren't required to pay dues?

7   A.   I think I've answered this question at least twice.

8   Q.   Well, I'm asking you to do it again --

9   A.   Okay.

10   Q.   -- because, apparently, I didn't understand your

11   answer.

12   A.   Okay.  Well, the answer was:  No, I'm not aware of any,

13   but I'm also not aware of any that might have those

14   provisions.

15   Q.   And there are none of those who are able to convert to

16   a national membership for $50,000, correct?

17   A.   Again, I don't know.  There may be some that can.  I'm

18   not aware of any, but there may be some that can.

19   Q.   Okay.  And you testified that, that there were company

20   members and honorary members who don't pay dues; is that

21   correct?

22   A.   Yes.

23   Q.   Isn't it the case that all of those contracts are

24   rejected under the plan?

25   A.   Yes.

1   Q.   Okay.

2   A.   They had a right to vote.

3   Q.   Okay.  Now, you testified that you reviewed the plan

4   and disclosure statement and drafts thereof; is that

5   correct?

6   A.   Yes.

7   Q.   And you knew that both of those provided that whatever

8   contracts CrossHarbor was going to assume were going to be

9   listed on Schedule 1.87; is that correct?

10  A.   What I understood about 1.87 was that all resident

11  member contracts were going to be assumed.

12  Q.   Did you know that there was a Schedule 1.87?

13  A.   Yes.

14  Q.   Did you see it?

15  A.   Yes.

16  Q.   Did you see names on it?

17  A.   Yes.

18  Q.   Was your name ever on it?

19  A.   No.  But in the preamble, it said:  Our records are

20  incomplete; and as such, and as such resident members may

21  be added to this at some - and, again, I'm paraphrasing

22  now - but at points in the future.

23       And it basically says - I can't remember the line - but

24  it says:  All resident memberships will be assumed.

25       So the fact that you had bookkeeping issues as far as ,

1    you know -- I mean you have two deceased people on two of

2    your schedules.  So two deceased people got to vote.

3    Q.  Let me read you a provision of the disclosure statement

4    and ask you if this is consistent with your recollection

5    (quoted as recorded):

6            "The debtors will endeavor to file a completed

7    list of residents and national members with the plan

8    supplement which is currently due 10 days prior to the

9    confirmation hearing."

10       Do you recall that provision?

11   A.  Yes.

12   Q.  Okay.  And then it goes on to say (quoted as recorded):

13           "Given the state of the membership files, the

14   debtors have requested that all members send their executed

15   membership agreements and postponement agreements to the

16   below-listed address."

17       Do you recall that?

18   A.  Yes.

19   Q.  And do you recall the next sentence (quoted as

20   recorded):  "The debtors will review any agreements

21   promptly received and update Schedule 1.86 as appropriate"?

22       Is that correct?

23   A.  Yes.

24   Q.  Okay.  And you knew the final version of that was due

25   10 days prior to the confirmation hearing, correct?

1  A.  Correct.

2  Q.  Okay.  And notwithstanding your contacts with

3  Mr. Foster and your counsel's contacts with the debtors'

4  counsel asking that the schedule be amended, you knew prior

5  to the confirmation hearing the schedule hadn't been

6  amended; is that correct?

7  A.  Correct.

8  Q.  And neither you nor your counsel chose to go to the

9  confirmation hearing; is that correct?

10  A.  We chose not to go to the confirmation -- from a

11  confirmation standpoint, correct; from our objection

12  standpoint, our objection had to do with not being on the

13  company, on the company membership.

14  Q.  I see.  Well, okay, so you chose -- notwithstanding

15  that objection, you chose not to go to the hearing; is that

16  correct?

17  A.  Well, right.  We took the position that the, that the

18  disclosure statement said you are going to assume all

19  residential memberships, that you have lousy records, and

20  that you would endeavor - "endeavor" is the operative

21  word - to complete those files.

22      You know, CrossHarbor has had my employment agreement

23  since 2007, the club has had an access to my files, and the

24  club has had my resident membership agreement since 2007.

25  And, you know, I mean this is just -- you know, they know

1   that it's valid.  They've never given me a -- they've never

2   said that it's not valid.  They've never -- if the, if the

3   notion here is that somehow silence is consent, that's a

4   hell of a way to run a business.

5   Q.  Okay.  Oh, by the way, with respect to the amendment to

6   your contract five days before Ms. Blixseth took over

7   control of the club, didn't it have another provision that

8   relieved you of your noncompetition obligations to the

9   debtor?

10  A.  Yes.  It was my understanding that the noncompetition

11  clause was not enforceable in the state of Montana and was

12  therefore moot.  And rather than get into a fight about it

13  later, all I was trying to do was take care of that issue.

14          MR. MOORE:  Your Honor, I believe that's all we

15  have.

16          Thank you, Mr. Sumpter.

17          THE WITNESS:  Thank you.

18          THE COURT:  Thank you.  Anyone else have

19  questions for this witness before we go to Mr. Mackey on

20  redirect?

21          Mr. Mackey, it looks look you can proceed.

22          MR. MACKEY:  Thank you.

23                      REDIRECT EXAMINATION

24  BY MR. MACKEY:

25  Q.  Mr. Sumpter, you were questioned about the language in

1   the disclosure statement and the language in the plan.  In

2   the questioning, though, you were not asked about some of

3   the language that's in there, and I want to go over it.

4        First of all, let's talk about the disclosure

5   statement.  On page 65 of the disclosure statement under

6   section, I think it's V(f) --

7   A.  Excuse me, Steve.  I don't have that up here to refer

8   to.

9   Q.  Okay, 1(C)(i).

10              MR. MACKEY:  May I approach a witness with the

11  copy of the disclosure?

12              THE COURT:  You may approach.

13  Q.  (By Mr. Mackey)  Do you have a copy of that in front of

14  you?

15  A.  Yes, I do.

16  Q.  I'm going to read the opening sentence of that

17  provision and ask you what it means to you, quote (quoted

18  as recorded):

19              "The debtors will assume all valid resident and

20  national non-founder's circle membership agreements in good

21  standing."

22              MR. PATTEN:  Objection, Your Honor, the

23  disclosure statement speaks for itself.

24              THE COURT:  Well, obviously, it does.  I'm going

25  to sustain that.

1           MR. MACKEY:  Okay.

2    Q.  (By Mr. Mackey)  What does that mean to you?

3           MR. PATTEN:  Objection, Your Honor, it speaks for

4    itself.

5           MR. MACKEY:  Fine.

6           THE COURT:  Sustained.

7    Q.  (By Mr. Mackey)  Did you understand from that -- well,

8    let me ask you this:  Do you see any language in there that

9    says that any valid resident and national membership

10   agreements in good standing will not be assumed?

11          MR. PATTEN:  Objection, Your Honor, it speaks for

12   itself.

13          THE COURT:  Well, I'm going to sustain that.

14          MR. MACKEY:  Okay.  You know, I'm sort of in

15   agreement with those, Your Honor.  I think it's a legal

16   question like we've put in our brief.  But he was

17   questioned about it on cross-exam, and I allowed it.

18   Perhaps I should have objected.  Let me move on.

19   Q.  (By Mr. Mackey)  Did you look at the Schedule 1.87

20   that's actually in the plan?

21   A.  Yes.

22   Q.  Okay.  And I want to ask you if, to your knowledge, the

23   debtor has done what it says it's going to do in

24   Schedule 1.87.

25   A.  As it relates to me, they had not --

```
1    Q.  As it relates to you.

2    A.  As it relates to me, they --

3    Q.  All right.  Well, let me read it.

4    A.  I'm sorry.

5    Q.  It says (quoted as recorded):  "The debtors' membership

6    files are imperfect and certain of the individuals listed

7    on Schedule 1.87 may not, in fact, possess valid

8    memberships in good standing."

9        And then it says (quoted as recorded):  "And certain

10   individuals not listed on this Schedule 1.87 may, in fact,

11   possess valid memberships in good standing and will be

12   added to this Schedule 1.87 when such memberships have been

13   verified."

14       Has your membership been added to Schedule 1.87 like

15   the plan says will happen?

16   A.  No, it has not.

17   Q.  Is that the reason you filed your motion that's

18   currently before the Court --

19   A.  Yes.

20   Q.  -- to get them to comply with what the plan says they

21   will do?

22   A.  Yes.  And I think the operative word there is "will".

23   Q.  And I believe it's been established:  You never

24   received a ballot for a membership rejection claim?

25   A.  There was no -- I didn't receive it in the resident
```

```
1   membership because it didn't exist; and I didn't receive it
2   in Class 4 because it had never been, it had never been
3   rejected.
4   Q.  You were questioned about whether or not your
5   nonpayment of dues clause could go on forever.  How old are
6   you?
7   A.  Fifty --
8   Q.  Okay.
9   A.  -- and change.
10  Q.  And if you die, do your dues go on forever -- or do the
11  nonpayment of dues go on forever?
12  A.  No.  But I believe if my wife were still alive, she
13  would --
14  Q.  Okay.
15  A.  -- you know, she would get the rights.  But after my
16  wife were to pass away or leave the membership, she
17  wouldn't -- there would be, there would be a reset.
18  Q.  Okay.  Now, you were asked about terminating the
19  company membership and buying a residential membership in
20  July of '09 -- or, excuse me, July 9 of '08.  And you said
21  you had to do -- you would have to do it anyway.  What do
22  you mean by that?  Why would you have had to do that
23  anyway?
24  A.  I think it's actually contemplated in my, in my
25  employment agreement that if I cease -- you know, if I
```

1    cancel or cease to do it and I own a piece of property,

2    that I have to buy a membership.

3    Q.   Okay.  And your employment was going to end, at the

4    latest, when?

5    A.   Whenever the deal between -- or, I'm sorry,

6    October 15th.

7    Q.   Okay.  So, basically, you bought your membership about

8    three months before you were going to have to anyway,

9    correct?

10   A.   Correct.

11   Q.   Do you have any -- I mean why couldn't you wait until

12   October 15th to -- or why didn't you wait until

13   October 15th to switch from your company membership to your

14   residential membership?

15   A.   There was a pending change of control, and I knew that

16   I was not going to stay on board going forward.

17   Q.   Why not just wait until you were being terminated or a

18   day or two before you were going to leave on August 13th?

19   A.   No particular reason.  I had to do it anyway.  It was

20   convenient at that time.  I was in the process of - I hate

21   to bring this up - I was in the process of planning a

22   funeral of somebody, and I had some other things going on

23   that it just made sense to do it.

24   Q.   And I believe you've testified to this, but I want to

25   get it clear again:  Was there any discussion concerning

1    the second amendment, the thing dated August 8, 2008,

2    between you and anybody on behalf of the club, whether it

3    was Mr. Blixseth or anybody else, at the time you undertook

4    and bought and paid for your residential membership in

5    July?

6    A.  No.  It was, you know, a good month apart.  It was more

7    than a month apart.  It was four to -- you know, five - six

8    weeks apart.  The two were just --

9    Q.  By the way, the check --

10   A.  The two were just completely unrelated.

11   Q.  By the way, you were asked about the $250,000 check

12   that was deposited into the firm's bank, the club's bank

13   account?

14   A.  Yes, yes.

15   Q.  Did you give that check to Mr. Blixseth?

16   A.  No.

17   Q.  Who did you give the check to?

18   A.  I either gave it directly to Moses or I gave it to a

19   messenger to take to Moses.

20   Q.  Who's Moses?

21   A.  Excuse me, Moses Moore, the -- I don't know if he's the

22   vice president, but he's the controller of the -- he's the

23   one who runs the accounting department.

24   Q.  And Mr. Moore, is he still employed this?

25   A.  To my knowledge, yes.

1    Q.   With regard to Exhibit No. 6, that's the second

2    amendment to the employment agreement, that's signed on

3    behalf of the club by Mr. Blixseth.

4    A.   Correct.

5    Q.   Is he the only person involved in that transaction on

6    behalf of the club?

7    A.   I had spoken to Dieter Huckestein about it and also

8    Andy Haus, one of the attorneys that was the one who

9    drafted the agreement.

10   Q.   And Andy Haus is employed by whom?

11   A.   One of Tim's other companies.  I mean he's like Mike

12   Doyle, he's in-house counsel.

13           MR. MACKEY:  That's all I have, Your Honor.

14           MR. PATTEN:  Your Honor, may I ask two questions

15   on recross?

16           THE COURT:  I'll allow you two questions.

17                   RECROSS-EXAMINATION

18   BY MR. PATTEN:

19   Q.   Mr. Sumpter, how old is your wife?

20   A.   That's really loaded.  She's the same age as I am.

21   She's 50.

22   Q.   Okay.  What you're asking the Court to do here is to

23   require that your membership agreement that provides for no

24   dues as long as you live and you remain a member of the

25   club or your wife lives and remains a member of the club,

1    that no annual dues be paid.  Isn't that it?

2    A.  I guess in the context of this hearing, that's what I'm

3    asking the Court to do, but basically, contractually, those

4    were the rights that were given to me or negotiated.

5    Q.  That's what we're fighting about here today, isn't it?

6    A.  It seems pretty silly, doesn't it?

7    Q.  No.  But what we're fighting about is to compel

8    CrossHarbor to continue - or its affiliate that acquires

9    the reorganized debtors - to continue a residential

10   membership in which there are no annual dues required to be

11   paid.

12   A.  Yes.  But, again, it's similar to other agreements that

13   are out there that do the same thing.

14   Q.  Other agreements for Pioneer members and honorary

15   members, correct?

16   A.  Memberships all the same, memberships that require land

17   ownership all the same.

18   Q.  Okay.  And you're not able to identify single

19   residential membership of the same class that you're in

20   that has any exclusion of dues --

21        MR. MACKEY:  I'm going to object, Your Honor.

22   This has been asked about a half a dozen times.

23        THE COURT:  Sustained.

24        MR. PATTEN:  Thank you.  That's all I have.

25        THE COURT:  Thank you.  Mr. Sumpter, you may step

1   down.

2               THE WITNESS:  Excuse me, shall I leave the

3   exhibits up here --

4               MR. MACKEY:  Yeah.

5               THE WITNESS:  -- or take them?

6               MR. MACKEY:  Yes.

7               THE COURT:  Mr. Mackey, do you have some other

8   witnesses?

9               MR. MACKEY:  No, I don't, Your Honor.  We rest.

10              THE COURT:  Okay.  Mr. Patten, any witnesses?

11              MR. PATTEN:  I would call Matt Kidd.

12              THE COURT:  Okay.  Mr. Moore, if I could have you

13  get Mr. Kidd, or Mr. Green.

14         If Mr. Kidd has been called as a witness, I will

15  have the clerk swear him.  He can stand and raise his right

16  hand.

17              MATTHEW KIDD, WITNESS, SWORN

18                  DIRECT EXAMINATION

19  BY MR. PATTEN:

20  Q.  Good morning, Mr. Kidd.

21  A.  Good morning.

22  Q.  Please state your name.

23  A.  Matthew Kidd.

24  Q.  Mr. Kidd, what's your employment?

25  A.  I'm the vice president of CrossHarbor Capital Partners.

```
 1   Q.  Do you have a college education?
 2   A.  Yes, sir.  I graduated from the University of Virginia.
 3   Q.  And what degree did you get?
 4   A.  Bachelor of science in commerce.
 5   Q.  When did you get your degree?
 6   A.  2003.
 7   Q.  What has, just briefly, your post-graduation employment
 8   been?
 9   A.  I worked for Wachovia Securities in their real-estate
10   investment banking group for about two years after school;
11   then I worked for a company called Rokoit (phonetic) Land,
12   which is another -- a division of another real-estate
13   private equity sponsor; and then in February of 2008, I
14   joined CrossHarbor Capital Partners.
15   Q.  And you joined CrossHarbor as a vice president?
16   A.  I actually joined as a senior associate and have since
17   been promoted.
18   Q.  Have you been involved since your employment in
19   connection with the CrossHarbor acquisition of the
20   Yellowstone Club?
21   A.  I've been involved with all things -- I've been
22   involved extensively with all things Yellowstone related
23   since I joined the company.
24   Q.  Were you involved in doing or gathering the due
25   diligence work back in early 2008 when CrossHarbor was
```

```
 1    trying to purchase the Yellowstone Club?

 2    A.  Yes.  I would say I was involved toward -- you know,

 3    towards the later stages of the due-diligence process,

 4    joining in 2008, but very well versed in the work that we

 5    did.

 6    Q.  And you've been involved on CrossHarbor's behalf or

 7    with CrossHarbor in this bankruptcy case; is that right?

 8    A.  Yes.

 9    Q.  You've attended bankruptcy hearings in Montana?

10    A.  Yes.  I believe this might be the first that I haven't

11    been at, actually, in person.

12    Q.  Is there a team at CrossHarbor that is responsible for

13    doing the Yellowstone Club due diligence and drafting the

14    plan and those kinds of things?

15    A.  Yes.  It's primarily Sam Byrne, Joe Harris, and myself.

16    Q.  In the course of your work, have you become familiar

17    with the various forms of membership agreements?

18    A.  Yes.

19    Q.  Are you familiar with the Pioneer memberships and the

20    honorary memberships and the residential memberships?

21    A.  Yes.

22    Q.  In the course of your work, have you actually examined

23    the various membership agreements?

24    A.  I have not reviewed every one for every member, but I

25    have reviewed sort of samples of each type.
```

1    Q.  In the course of CrossHarbor's acquisition of the

2    Yellowstone Club in 2008, did it come across any, what I'm

3    going to call "side deals" that had been made between the

4    club and the counterparty to some contract?

5    A.  Yes.

6    Q.  Was that a common occurrence on the part of the

7    Yellowstone Club?

8    A.  It was.  It was very common, I believe, as has been

9    testified, throughout these proceedings.  I would

10   acknowledge that, typically, the, you know, side agreements

11   and sort of various individual, you know, side deals, they

12   were documented either within the purchase and sale

13   agreements of the property or within postponement

14   agreements, both of which -- or all of which are being

15   rejected under our plan.  It's not typical, other than the

16   various classes of memberships, for there to be side deals

17   within the specific membership documents.

18   Q.  We've heard some testimony this morning about

19   postponement agreements.  Can you describe to Judge

20   Kirscher what you mean -- or what you understand a

21   postponement agreement is?

22   A.  Sure.  I'm not sure that there is a standard

23   postponement agreement.

24          MR. MACKEY:  Your Honor, I want to object.  I

25   guess just maybe to save some time, I'd like to object to

1    getting into postponement agreements.  This is a

2    residential membership.  It has nothing to do with

3    postponement agreements.  And it just seems to me to be

4    getting far afield and somewhat irrelevant.

5            THE COURT:  You know, I'm going to allow the

6    witness to answer this one question as to what a

7    postponement agreement is, only because it was discussed in

8    the prior testimony.  And just so there's a record as to

9    what a postponement agreement is, I will allow this

10   question and answer.  But I, depending upon the question,

11   may find that we don't need to go down that path any

12   further.

13           You may answer.

14           THE WITNESS:  Okay, thank you.  To the best of my

15   understanding, there's not a standard or typical

16   postponement agreement.  There are a number of them out

17   there, and they generally, in some form or another, allowed

18   for the delay in payment of the deposit.  And there were --

19   there's various terms for that delay in the payment of the

20   deposit.  Some of the -- some members with postponement

21   agreements are required to pay dues, some members are not.

22   There's sort of not necessarily standard terms with that

23   postponement agreement.  But it's, as I said, it's

24   generally an agreement to delay the payment of the

25   membership deposit.

1        And as I said a few minutes ago, we actually,

2   under the plan, have rejected all postponement agreements,

3   and then we'll work for members who had, you know, some

4   type of valid postponement agreement.  We'll work to put

5   that back in place so that -- you know, in a more

6   standardized form.

7   Q.   (By Mr. Patten)  Do you have knowledge as to why

8   CrossHarbor wants to reject the postponement agreements?

9        MR. MACKEY:  I'm going to object, Your Honor.

10       THE COURT:  Sustained.

11       MR. MACKEY:  Mr. Sumpter paid his deposit, so

12   what does a postponement agreement have to do with --

13       MR. PATTEN:  Your Honor, the relevance here is to

14   show the business rationale for CrossHarbor in rejecting

15   agreements that are, for all practical purposes, the same

16   as the special no-dues provision in Mr. Sumpter's

17   agreement.

18       MR. MACKEY:  It's not the same kind of agreement.

19   Mr. Kidd just testified apparently, that the postponement

20   agreement has to do with paying the deposit.  Mr. Sumpter

21   paid the deposit, so what's -- so there's no relevance.

22       MR. PATTEN:  No.  Here's the relevance, Your

23   Honor:  It's not a matter of, really, contract law; it's a

24   matter of business judgment.  And the reasoning to accept

25   or reject an executory contract assumes, one, to begin

1    with, that there is a valid contract.  So we're not

2    disputing the validity of Mr. Sumpter's membership

3    agreement, but what we're arguing about is whether the --

4    in the exercise of business judgment, that contract can be

5    rejected.  And so the rationale behind the rejection is

6    important, and I would make an offer of proof through

7    Mr. Kidd that the rationale for rejecting the postponement

8    agreements is the very same as the rationale for rejecting

9    Mr. Sumpter's agreement.

10              THE COURT:  Well, I'm going to allow Mr. Kidd to

11   answer the question.

12   Q.  (By Mr. Patten)  Mr. Kidd, do you remember what the

13   question is?

14   A.  Do you mind repeating it, please?

15   Q.  Are you aware of the rationale of CrossHarbor in

16   rejecting the postponement agreements?

17   A.  I would say this is the rationale for rejecting most of

18   the postponement agreements as well as, as I said, the

19   purchase and sale agreements that are out there that still

20   have some sort of, you know, ongoing side-deal obligation

21   of the club:  We've rejected all of those so that we can

22   keep it sort of as clean and -- as clean of a business

23   operation as possible and so that we can make sure that we,

24   you know, have an appropriately functioning club with

25   dues-paying members as appropriate and, you know, eliminate

1    these sort of unknown liabilities and additional hidden

2    costs of the operation.

3    Q.  Are you aware of the particular terms of Mr. Sumpter's

4    residential membership agreement?

5    A.  Yes.  The two primary terms that I am aware of that I

6    would say are not typical of all of the other residential

7    memberships that I'm aware of are allowing free dues and

8    allowing a conversion to a national membership for an

9    additional consideration of only $50,000.  Those two

10   provisions are not in any of the other residential

11   memberships, to the best of my knowledge.

12              MR. MACKEY:  Your Honor, I want to object and ask

13   that that last part be stricken as not responsive to the

14   question.  Because he wasn't asked about what's in the

15   other memberships, and if he had been, I would have

16   objected on the grounds that he testified that he hasn't

17   read every membership agreement; he's reviewed samples of

18   the different types.  So he can't answer the question the

19   way he did.

20              THE COURT:  Sustained.

21   Q.  (By Mr. Patten)  Mr. Kidd, has CrossHarbor looked at

22   all of the -- somebody from CrossHarbor looked at all of

23   the membership agreements?

24   A.  Somebody from CrossHarbor, in conjunction with our

25   attorneys at Goulston & Storrs, has reviewed every

1  membership agreement that we have listed on the assumed

2  contract schedules attached to the plan.

3  Q.  And have the information gathered by the others at

4  CrossHarbor looking at those agreements been provided to

5  you?

6  A.  Yes, they have.

7  Q.  And based on the information as provided to you, are

8  there any other residential membership agreements that

9  contain a provision for no dues?

10          MR. MACKEY:  Objection; hearsay.

11          MR. PATTEN:  Your Honor, it's not hearsay if it's

12  provided to Mr. Kidd in the scope of his employment at

13  CrossHarbor.

14          MR. MACKEY:  Yes, it is.

15          THE COURT:  Well, it may be hearsay.  I'm going

16  to allow it as an exception.

17          MR. PATTEN:  Thank you.

18          THE WITNESS:  I do not -- there are no other

19  residential membership contracts that have that provision.

20  Q.  (By Mr. Patten)  And are there any other residential

21  membership agreements that have the privilege of conversion

22  to a national membership on payment of $50,000?

23  A.  No.

24          MR. MACKEY:  Same objection.

25          MR. PATTEN:  Same response from my end, Your

1   Honor.

2           THE COURT:  What?

3           MR. MACKEY:  I said "same objection".  And

4   Mr. Patten --

5           THE COURT:  Okay.  Your objection is noted for

6   the record.  It's overruled.

7           MR. MACKEY:  Thank you.

8   Q.  (By Mr. Patten)  You can go ahead and answer, Mr. Kidd.

9   A.  Sorry.  My answer was "no".

10  Q.  Has CrossHarbor analyzed the expected income and

11  expense in operating the Yellowstone Club?

12  A.  Yes.

13  Q.  And has it built a financial model of income and

14  expenses?

15  A.  Yes.

16  Q.  Has it built an operational model, if you will, in

17  terms of what lands to subdivide, what memberships to

18  offer, when to offer them, those sorts of things?

19  A.  Yes.  We've built very detailed models involving all of

20  those things.

21  Q.  And were the inclusion of those models into the -- were

22  those models included, in effect, or incorporated into the

23  bankruptcy plan?

24  A.  Yes.  They're the sort of financial foundation for

25  giving us the comfort to move forward with the transaction

1    that we're, you know, doing in this definitive agreement.

2    Q.  And I didn't ask that last question very well,

3    Mr. Kidd, but the plan is premised, in part, on these

4    models that CrossHarbor has built, correct?

5    A.  Yes.

6    Q.  And is the plan premised on all of the residential

7    membership agreements being uniform?

8    A.  Yes, with the exception that some people have made --

9    the one exception to that is that some people have

10   different deposits.  Some people have deposits of 250,000,

11   some people have deposits of 300,000.  That's the only

12   substantial difference that I am aware of.

13   Q.  So the plan and the projections are premised on all

14   residential members paying dues?

15          MR. MACKEY:  I'm going to object to the continued

16   leading questions in this case, including the last one.

17          THE COURT:  I'll sustain as to the leading

18   questions.

19   Q.  (By Mr. Patten)  Are the plans -- the bankruptcy plan

20   and are the CrossHarbor models premised upon all

21   residential members paying dues?

22          MR. MACKEY:  Objection; leading.

23          MR. PATTEN:  It's not leading.  I'm not

24   suggesting the answer in my question, Your Honor.

25          MR. MACKEY:  Yes, you are.  He's going to answer

1    "yes" or "no".

2             THE COURT:  Well, I think it's pretty well laid

3    out for him.  I'm going to sustain.  Why don't you just

4    rephrase the question.

5    Q.  (By Mr. Patten)  Is there a premise in the CrossHarbor

6    model about residential members paying dues?

7             MR. MACKEY:  Objection; leading.

8             MR. PATTEN:  Your Honor, there's nothing leading.

9    I'm asking a question that can be answered "yes" or "no".

10   I'm not suggesting the answer in my question.

11            MR. MACKEY:  Yes, you are, because he's going to

12   say "yes", I assume.

13            THE COURT:  Well, just a moment.

14            MR. PATTEN:  Well, I hope he says "yes".  That's

15   the --

16            THE COURT:  Just a moment, gentlemen.  Gentlemen,

17   direct your comments to the bench.

18            MR. PATTEN:  I apologize, Your Honor.

19            MR. MACKEY:  I apologize.

20            THE COURT:  Well, Mr. Patten, I'm going to

21   sustain it.  I'm going to let you rephrase it, if you would

22   like.

23   Q.  (By Mr. Patten)  Is there a model that CrossHarbor has

24   developed?

25            MR. MACKEY:  Objection -- you know, I'll withdraw

1    it on this one.

2           THE COURT:  What model has CrossHarbor -- just a

3    moment.

4           What model has CrossHarbor developed for this

5    club?

6           THE WITNESS:  We've developed extensive financial

7    models with projections, as I testified to a minute ago,

8    various revenues and expenses for the club in its, you

9    know, real-estate and membership operations moving forward.

10          THE COURT:  Thanks.

11          THE WITNESS:  And those, those models are based

12   on, as outlined in the plan, the rejection of all

13   postponement agreements and side deals contained within

14   purchase and sale agreements such that we can more

15   clearly -- so we can have more clearly defined comfort in

16   the expenses of the Yellowstone Club.

17          Suffice it to say that, particularly in the early

18   years, we project significantly more expenses than

19   revenues.  So to the extent that we can minimize those

20   expenses and do everything in our ability to do that, we'll

21   be in a better position.  The club will be in a better

22   financial and -- financial position in moving forward for

23   all parties.

24          THE COURT:  Thank you.  Mr. Patten.

25   Q.  (By Mr. Patten)  Has CrossHarbor determined to reject

1  the Sumpter residential membership agreement?

2  A.  I'm sorry, Andy, could you ask that one more time?  I

3  couldn't hear you.

4  Q.  Has CrossHarbor determined to reject the Robert Sumpter

5  membership agreement?

6  A.  As it exists today, yes.

7  Q.  What is the reason for that decision?

8  A.  We are, we are attempting to eliminate any member

9  receiving free dues to the extent that that's appropriate.

10  And we're not comfortable with conversion to an actual

11  membership for a consideration of only $50,000.

12  Q.  Has that decision been made because Mr. Sumpter is a

13  former employee of the club?

14  A.  No, that's not the reason.

15  Q.  Is that decision made in the exercise of the

16  CrossHarbor business judgment?

17  A.  Yes.

18          MR. PATTEN:  Excuse me for a minute.

19          Thank you, Mr. Kidd.  That's all I have.

20          THE COURT:  Anyone else have any questions for

21  this witness other than Mr. Mackey?

22          Mr. Mackey.

23                    CROSS-EXAMINATION

24  BY MR. MACKEY:

25  Q.  Good morning, Mr. Kidd.  Perhaps it's afternoon where

1   you are.

2       You did look at some residential memberships; is that

3   correct?

4   A.   Yes.

5   Q.   Do you know approximately how many?

6   A.   I myself have read 5 or 10 of them.  And I know

7   firsthand others here at Goulston & Storrs have read every

8   page of every one of them that we have listed on our

9   assumed contract schedule.

10  Q.   How many residential membership contracts are there?

11  A.   Approximately, somewhere between -- probably 220 and

12  240, something in there.

13  Q.   And of the 5 or 10 that you read, they were all signed

14  by either Tim Blixseth or Michael Doyle on behalf of

15  Mr. Blixseth; is that correct?

16  A.   I believe that's right.

17  Q.   So Mr. Sumpter's residential contract is not

18  nonstandard, if you will, in that regard, is it?

19  A.   You know, I truthfully didn't, didn't focus on who

20  signed them and wouldn't have considered that to be a major

21  determination of whether or not they were standard.

22  Q.   Well, let me put it this way:  You testified that they

23  were all signed by Tim Blixseth or Michael Doyle on his

24  behalf.  You would agree that Mr. Sumpter's agreement is

25  therefore consistent, as far as the signatories go, with

1    those others that you reviewed, correct?

2    A.  As far as the signatories, I won't disagree.

3    Q.  Pardon me?  You'll agree?

4    A.  Yes.

5    Q.  Okay.  And Mr. Sumpter's residential agreement, as far

6    as it being a residential agreement, requires him to still

7    own land there, does it not?

8    A.  I believe it does.

9    Q.  And that's the same as the other residential contracts

10    that you reviewed, correct?

11    A.  I believe that's right.

12    Q.  And, truthfully, as we sit here today, other than what

13    you've been told by other apparently unidentified people at

14    CrossHarbor -- oh, now I forget the question I was going to

15    ask.  Let me move on.

16       Did you say that CrossHarbor is rejecting all or most

17    of the postponement agreements?

18    A.  We are rejecting all of the postponement agreements.

19    Q.  Okay.  Now, did you read Mr. Sumpter's agreement in its

20    entirety?

21    A.  I truthfully did not read every word of every line, but

22    I read, I read it substantially.

23    Q.  Were you involved in the preparation of the financial

24    disclosure statement?

25    A.  Yes.

1              MR. MACKEY:  Your Honor, I left my copy of it on

2      the stand.  Can I run up and grab it?

3              THE COURT:  You certainly may.

4      Q.  (By Mr. Mackey)  And would it be correct that you're

5      acquainted, also, with the financial projections that are

6      contained in the financial disclosure statement right

7      towards the very end?

8      A.  Yes.  I believe there's a set that was prepared by FTI,

9      as well, but I'm generally familiar with it.

10     Q.  And I don't want to put you at too much of a

11     disadvantage.  If you've got a copy handy and need to look

12     at it, by all means, say so, and I'll let you retrieve it.

13     But in the consolidated cash-flow analysis for the years

14     2009 through 2017, do you recall that it shows a net total

15     cash flow after that period of time of a positive

16     $608,561,132?

17     A.  I don't have it in front of me, and I don't recall

18     specifically what the numbers were or which line you're

19     referring to.

20     Q.  Okay.  And what are the current, what are the current

21     membership dues --

22     A.  Eighteen thousand --

23     Q.  -- residential membership -- pardon?

24     A.  Eighteen thousand dollars for the 2009 calendar year.

25     Q.  Okay.  And do you know, are they going to change?

1  A.   Yes.   We haven't -- yes.

2  Q.   Okay.   You started to say something; you haven't.   Is

3  there a provision for that somewhere?  Did you reference

4  that somewhere, in the disclosure statement or elsewhere?

5  A.   I don't remember if we did or not.

6  Q.   Do you know what they're going up to?  I assume they're

7  going up.

8  A.   Yes.   We have not set additional dues levels for the

9  future.

10  Q.   Okay.   For some reason, the number $30,000 is sticking

11  in my head.   Are you aware if that's a number that's been

12  discussed, or is it a lower number or a higher number?

13  A.   It's really too early to say for sure, but that, that

14  number sounds on the high side from what we would project

15  for, you know, additional increases from where we are today

16  in the early years.

17  Q.   Okay.   You say it's a little on the high side.   What

18  would be not on the high side?

19  A.   Somewhere between 18 and 30.

20  Q.   Okay.   So in the eight years that's shown on that

21  projection, $18,000 times eight years is $144,000.   Do you

22  agree with my math on that?

23  A.   I'm sorry, what was the math again?

24  Q.   Eighteen thousand dollars a year for eight years.

25  A.   Okay.

1    Q.  Are we on the same number, $144,000?

2    A.  Sounds right.

3    Q.  So $144,000 would be the difference if Mr. Sumpter paid

4    $18,000 a year dues on this final ending figure of

5    $608,561,132; is that right?

6    A.  As I said, I don't have the disclosure statement in

7    front of me.  I'm not sure what exact number you are

8    referencing in that 600-and-whatever number, but I'll agree

9    with you on the 144.

10   Q.  Okay.  And if it's 30,000 a year, it would be $240,000,

11   correct?

12   A.  Correct.

13   Q.  And Mr. Sumpter -- do you have a calculator there,

14   handy?

15   A.  Do I?

16   Q.  Yeah.

17   A.  No.

18   Q.  Is there one available there in the room?

19   A.  I don't think there is.

20   Q.  Okay.

21   A.  I can get one, if you'd like.

22   Q.  Yeah, would you have somebody get one, please?

23            MR. MACKEY:  Your Honor, may we have him get a

24   calculator?

25            THE COURT:  He may.

1          MR. MACKEY:  While we're doing that, Your Honor,

2    may I ask him another question?

3          THE COURT:  Certainly.

4    Q.  (By Mr. Mackey)  Mr. Kidd, how did you make your

5    revenue projections if you don't know what the dues

6    memberships are going to be, the membership dues are going

7    to be?

8    A.  We have assumptions in the model, but we haven't set

9    them definitively.

10   Q.  Well, what was your assumption in the model?

11   A.  Somewhere between 18 and 30.

12   Q.  That's the best you can do?

13         THE COURT:  Is that a question?

14   Q.  (By Mr. Mackey)  Is that the best you can do?

15   A.  We have annual increases in the model, as well.  It

16   changes on an annual basis.

17   Q.  Okay.  Over the eight years?

18   A.  Yes.

19   Q.  Are those every year or every couple of years?

20   A.  At times, every year; at times, every other year.

21   Q.  Okay.  Would it be, would it be fair -- or would it be

22   accurate to say that the dues that you used in the model

23   then go from are a low of $18,000 to some number perhaps

24   less than $30,000, which is a little on the high end, over

25   that eight-year period?

1    A.   Something like that.

2    Q.   So, certainly, if we used 30,000 for the whole period

3    of time for the dues that Mr. Sumpter would not be paying,

4    the $240,000 would certainly be on the high end of what the

5    lost revenues or the avoided revenues are, correct?

6    A.   As it relates to the operating cash flows.

7    Q.   Yes.

8    A.   Yes.

9    Q.   Do you have your calculator now?

10   A.   I do.

11   Q.   Would you divide 240,000 by 608,561,130 --

12   A.   I don't know what your $608 million number is, so I'm

13   not prepared to -- I'm not sure what that number is.  I

14   don't have the financials in front of me.

15   Q.   Okay.  Well, the financial disclosure statement has

16   been judicially recognized by the Court, and this is from

17   the consolidated cash-flow analysis in the financial

18   disclosure statement that was filed.  I'll represent that

19   to you.  Okay?  And the record will bear me out on that.

20        So here's the math I want you to do:  I want you to

21   divide 240,000 by $608,561,132.

22   A.   I'm sorry, six what?

23   Q.   608,561,132.

24   A.   It's a small number.

25   Q.   How small a number, Mr. Kidd?  What is it?

1   A.   I might have mistyped a key in there somewhere, but

2   it's less than .000004.

3   Q.   Four-one hundredths of 1 percent, correct?

4   A.   Something like that.  Although, you -- in terms of --

5   Q.   Let me, let me, let me ask you --

6   A.   -- Mr. Sumpter's membership agreement, you are missing

7   the difference between --

8   Q.   Well, you're -- hold it, hold it.

9   A.   -- the rights to convert to a national member --

10  Q.   Your --

11          THE COURT:  Just a moment, just a moment here.

12          THE WITNESS:  Okay.

13          MR. MACKEY:  I'm going to move to --

14          THE COURT:  You can't with talking over each

15  other.

16          MR. MACKEY:  I'm going to move to --

17          THE COURT:  You can't talk over each other.

18          MR. MACKEY:  I'm going to move to strike, Your

19  Honor.  He's answered the question, and what he's adding is

20  not responsive to the question.

21          THE COURT:  Well, it's in the record.  I'll give

22  it what weight it's due.

23          MR. MACKEY:  Thank you.

24  Q.   (By Mr. Mackey)  Now, you said that you've read samples

25  of the various agreements.  I take it you've also read --

1    and I guess you've said this:  You've read the honorary,

2    the new honorary contracts that are being offered, the new

3    Pioneer, the Frontier, the new company memberships that are

4    available going forward, correct?

5    A.  Yes.  We looked at every membership class that exists

6    and came up with a plan to treat them as we deemed most

7    appropriate under the plan.

8    Q.  And it is correct, isn't it, that the Pioneer

9    membership contracts require no payment of dues from those

10   people until it's taken -- until there's an equity buyout

11   by the members?  Isn't that right, at least in the ones you

12   looked at?

13   A.  That's true.  Although, there was other consideration

14   that they -- other changes that were made to their, to

15   their contracts, as well.

16   Q.  Now, the honorary memberships, those likewise don't

17   require the payment of dues until the equity buyout,

18   either, do they?

19   A.  No, they don't.  As I said, we looked at every class of

20   membership that exists and decided how to treat them all

21   appropriately according to that class.  And that includes

22   residential members paying dues.

23   Q.  And the company memberships, those don't require the

24   payment of dues, either, do they?

25   A.  All the company members are being rejected under the

1   plan, and we've not decided the terms under which to enter

2   into new company memberships.

3   Q.  So it's still open to possibility that some of the

4   company memberships won't have dues; is that correct?

5   A.  We don't even know if we're going to have company

6   memberships.

7   Q.  Okay.  The honorary memberships didn't have to pay a

8   deposit, did they, in the past?

9   A.  I don't believe so.

10  Q.  And the new honorary, the new honorary memberships,

11  those aren't requiring the payment of those deposits, are

12  they?

13  A.  I don't believe so; although, they do -- you know, they

14  promote the club and have historically promoted the club so

15  that they've -- you know, the consideration that they have

16  received in terms of waiver of deposits has been in return

17  for, you know, promoting the club in their role as, you

18  know, successful Americans, or whatever the case may be.

19  Q.  You are aware that Mr. Sumpter's residential membership

20  that is at issue here today arises by virtue of a provision

21  that was in his employment contract made way back in -- not

22  "way back"; made back in 2007.  Are you aware of that?

23  A.  Yes.

24  Q.  So are you aware of what Mr. Sumpter did to aid in the

25  development of the club?

1    A.   Not extensively, no.

2    Q.   The Pioneer members, they -- under the proposed

3    contracts, they're entitled to get their deposits back

4    early, aren't they?

5    A.   They are, at 650 memberships.  The Pioneer members put

6    capital at risk in the early years of the club to ensure

7    that it could be developed and be a sustainable enterprise.

8    So the consideration that they get as their member -- as

9    members reflects their role in that regard.  But as I

10   mentioned, as I mentioned, there are significant changes

11   being made to their contracts under the plan.

12   Q.   But one of those changes does not include eliminating

13   their right to an early refund, does it?

14   A.   It delays it.  It delays the return of their, of their

15   deposit.

16   Q.   For how long?

17   A.   I believe the contracts that are in place today allow

18   for the return of the deposit at either 400 or 450 members.

19   We're delaying it to 650 members, which is a substantial

20   period of time.

21   Q.   Well, it's only seven years, is it not?  Because you've

22   got in your financial disclosure statement an entry showing

23   that the membership deposits to the Pioneer and the

24   Frontier club are being made in the 2016; isn't that right?

25   A.   It's whenever we project to have 650 residential

1    members.

2    Q.   And the Frontier members are also still getting their

3    return, too, at 650 members -- or getting their deposit

4    return, too, correct?

5    A.   Yes.  And they're also paying dues on an annual basis.

6    Q.   But the Pioneer members aren't, are they?

7    A.   No, they're not.

8    Q.   And you talked about the consideration for the, for

9    the -- that the Pioneer and the Frontier members have given

10   to the club in the past as well as the honorary members.

11   You don't deny that Mr. Sumpter gave consideration in terms

12   of his sweat and labor and service to the company for 10

13   years, do you?

14           MR. MOORE:  Object, Your Honor.  Mr. Kidd has no

15   basis for personal knowledge of that.

16           MR. PATTEN:  And I want to object that it's not

17   relevant.

18           THE COURT:  Well, I'm going to overrule and allow

19   him to answer it if he has personal knowledge.

20   Q.   (By Mr. Mackey)  You testified that you knew

21   Mr. Sumpter's residential agreement was provided for in his

22   employment agreement, correct?

23   A.   Yes.

24   Q.   Okay.  And you understand an employment agreement to be

25   a contract whereby somebody hires somebody else to work for

1  them, correct?

2  A.  Yes.

3  Q.  And Mr. Sumpter worked for them, didn't he?

4  A.  I understand that Mr. Sumpter was an employee of the

5  Yellowstone Club.

6  Q.  Do you know how long he was an employee of the

7  Yellowstone Club?

8  A.  I'm not sure, off the top of my head.

9          MR. MACKEY:  That's all I have.

10          THE COURT:  Thank you.  Redirect?

11                REDIRECT EXAMINATION

12  BY MR. PATTEN:

13  Q.  Mr. Kidd, can you describe specifically how the Pioneer

14  memberships were changed?

15  A.  The primary sort of financial driver in the way they

16  were changed was delaying the return of their membership

17  deposit from the point in time when there are either 400 or

18  450 members - I can't remember off the top of my head - to

19  650 members.

20      I believe we also clarified that the -- you know, there

21  would be a defined period of time when the -- where there

22  would be free dues as well as some other changes to

23  defining that the, the agreement was for that member and

24  either one spouse or child, and some other sort of, you

25  know, minor provisions that were changed, as well.

1  Q.  Were these changes incorporated into the CrossHarbor

2  business and financial models?

3  A.  Yes, they were.

4          MR. PATTEN:  Thank you, that's all.

5          THE COURT:  That will conclude the --

6          MR. MOORE:  Your Honor?

7          THE COURT:  Pardon?

8          MR. MOORE:  Your Honor, it's Paul Moore.  Can I

9  just ask a couple of questions?  I'll be very brief.

10          THE COURT:  Okay.

11                  CROSS-EXAMINATION

12  BY MR. MOORE:

13  Q.  Mr. Kidd, I believe you testified on direct that in any

14  event, Mr. Sumpter would be required to own land to have

15  his membership; is that correct?

16  A.  I believe I did testify that to have his residential

17  membership.

18  Q.  But isn't it the case that his agreement provides that

19  if he sells his property, he has the option to either

20  transfer the membership to a new lot or to convert to the

21  national membership for $50,000?

22  A.  Yes, for only --

23          MR. MACKEY:  I'm going to object, Your Honor.

24  The document's in evidence.

25          THE COURT:  Pardon, Mr. Mackey?

1              MR. PATTEN:  I'm going to object.  The document's

2    in evidence.  It's cumulative evidence.

3              THE COURT:  Well, I'm going to sustain.  We've

4    already talked about it, and it's in the document.

5    Q.  (By Mr. Moore)  Okay.  With respect to the questions

6    you were asked about, the disclosure statement and

7    information about dues payments by members and the like,

8    didn't the disclosure statement have something attached to

9    it called the "statement of principles"?

10   A.  Yes.

11   Q.  And did that address the obligations of the members and

12   the dues that members would be expected to pay going

13   forward?

14   A.  It did.

15   Q.  And what did it say?

16   A.  It said that dues are going to be raised and that we

17   would endeavor to ensure that all residential members paid,

18   paid dues.

19             MR. MOORE:  No further questions.

20             THE COURT:  Thank you.  That will conclude

21   Mr. Kidd's testimony.

22             Next witness?

23             MR. PATTEN:  Your Honor, we have no further

24   witnesses.

25             THE COURT:  Okay.  Parties rest on this matter?

1    Okay.

2              MR. MACKEY:  Your Honor, my client stepped out to

3    go to the bathroom.  May I chat with him real briefly, run

4    out and find him?

5              THE COURT:  I will allow you to do that.

6              MR. MACKEY:  Thank you.  I'll just step out real

7    fast and chase him down.

8              THE COURT:  And given that, why don't we take

9    about a five-minute recess, anyway.  We'll come back at

10   10-to-12.

11             (A brief recess was taken.)

12             THE COURT:  Please be seated.  Mr. Mackey.

13             MR. MACKEY:  We have no rebuttal, Your Honor.

14             THE COURT:  Okay.  That will conclude the

15   hearing, then, on the Sumpter motions.

16             Mr. Warner and Mr. Chehi, where are we with

17   Highland?

18             MR. CHEHI:  Your Honor, if I could, perhaps, put

19   this in a bit of a larger context, and that, I think, will

20   give you clarity on where we are with the parties.  There's

21   not been a resolution reached with Highland, but there has

22   been a resolution reached by the requisite lenders in

23   respect of their direction to the agent as to the position

24   to be taken on the issues raised by Highland's objection

25   and also that had been addressed by the Normandy objection

1   with respect to the exchange of mutual releases under the

2   plan.  And so I just want to -- I'm going to just walk

3   through and try to briefly summarize where we are and what

4   the positions are.  And I'll, of course, let Highland's

5   counsel speak for himself.

6           I'm not go to address your objection.  You're

7   going to summarize that and characterize it in your own

8   way.

9           But I'm going to explain where we've been over

10  the last week, or so, since the Highland objection was

11  filed late Friday of Memorial Day weekend.

12          The first and most important point, Your Honor,

13  is that the agent and the requisite lenders want the Court

14  to know that confirmation of the plan today is a high

15  priority for the agent and the lenders.  And we have and

16  request -- we hope and request that the Court will, indeed,

17  enter a confirmation order today.

18          Second, we want Your Honor to know that the agent

19  has spent considerable time and resources attempting to

20  resolve the outstanding issues on a consensual basis.  And

21  in this regard, the agent and its counsel has had

22  discussions with numerous lenders over the past week and

23  very intensive discussions over the last days preceding the

24  weekend and today in hopes of building a consensus among a

25  number of the prepetition lenders comprising requisite

1    lenders who would be holders of in excess of 50 percent of

2    the loan under the prepetition credit agreement.  Those 50

3    percent holders are defined as requisite lenders in the

4    prepetition credit agreement, and they are the ones from

5    whom Credit Suisse, as agent under the credit agreement,

6    does and must take direction as to the matters that are at

7    issue with respect to the settlement term sheet, the plan,

8    and the like.

9         These discussions that the agent had with various

10   lenders made some progress late last week and led to some

11   agreements, but not enough to be able to report to the

12   Court any earlier than now that the requisite lenders had

13   indicated some specific direction.  And we had, indeed,

14   entered into some agreements with, I believe there were at

15   least two lenders, which confirmed with them as of, I

16   believe it was Friday, if I'm getting my days straight -

17   it's a bit of a haze because we've been at this around the

18   clock, more or less, as it was a couple weeks ago with the

19   rest of this case - that they confirmed and agreed that the

20   mutual releases in the plan were mutual releases as between

21   the prepetition agent and the prepetition lenders and were

22   intended as such and should operate as such.

23        The agent, then, also went back to the steering

24   committee, which are the larger lenders holding larger

25   petitions - and the steering committee, as a whole, holds

1  well in excess of 50 percent of the loan - for a discussion

2  with them about how to -- how the agent should respond at

3  today's hearing to the positions taken by Highland as well

4  as the position taken, I believe it was Friday by Normandy,

5  which was a position exactly opposite to that of Highland.

6  And, of course, letting Highland speak for itself, I'll

7  just say, they say, generally speaking, there were no

8  releases as between the prepetition agent and the

9  prepetition lenders.  And Normandy made it clear,

10  abundantly clear on Friday that their material

11  understanding was that there were, indeed, mutual releases.

12  And that's what the lenders, as a whole, in Class 3 and

13  Class 8 were voting upon when they voted to approve in the

14  resolicitation that Your Honor ordered, the terms of a

15  modified plan consistent with the term sheet.

16         And so we had these diametrically opposed view of

17  the world and actually had a, you know, somewhat lengthy

18  call yesterday with the steering committee to address these

19  issues.  And the agent then distributed in advance of the

20  hearing for discussion purposes and then, following the

21  hearing, requested ballots from all of the lenders on the

22  steering committee as to what their view would be.

23         And we will be able to hand up a form of this

24  ballot which laid out several different alternatives of

25  positions, one being that there should -- that the agent

1    should be directed to make and propose no changes to the

2    terms of the plan and the settlement term sheet and should

3    oppose any amendments to the plan that might be proposed by

4    others, including Highland and Normandy.

5         There was another option on the ballot, which was

6    to, in effect, take -- give the agent direction to

7    essentially adopt the position taken by Highland, that

8    there were releases under the plan but they didn't apply

9    between the agent and the lenders.

10        The third position or option, or one of them, was

11   that the Normandy view of the world was the way to view the

12   releases.

13        And then there was even an option checking the

14   box for everybody to vote that there was an acknowledgment

15   and agreement that the various reimbursement obligations

16   under the credit agreement continued fully.

17        As a result of all of that and in connection

18   with, also, a proposal by the agent to the various

19   significant holders of debt - again, there's numerous

20   holders of the loan in this case, and it's impossible to

21   deal with everybody all at once and simultaneously - but

22   dealing with the steering committee-sized type lenders, the

23   agent ended up proposing an agreement, a somewhat modified

24   form of agreement that had been proposed earlier in the

25   process in the last few days.

1        And this modified agreement provides an important

2    part that the -- each of the lenders who agreed with Credit

3    Suisse to this agreement - and there was agreement reached,

4    and we'll be able to report that and provide copies of that

5    today, Your Honor, and accompanying ballots - each of

6    Credit Suisse and lenders comprising in excess of the

7    requisite-lender amount reached agreement that they

8    acknowledge and agree that they're bound by the terms of

9    the settlement term sheet, including the full and complete

10   mutual releases contained in Paragraph 5(g) of the

11   settlement term sheet.

12       It was also agreed that the requisite lenders who

13   entered into these agreements with us support our reply in

14   opposition to Highland's objection and the positions that

15   were taken there.  There was agreement that these

16   agreements between the requisite lenders and the agent

17   would be fully disclosed to the Court.  And, you know,

18   we're doing that sort of in summary form here, but we're

19   making available copies of these agreements.

20       And, importantly, in Paragraph 2 of the agreement

21   - the form of agreement that was reached which numerous

22   lenders comprising in excess of the requisite lender amount

23   - Credit Suisse and those requisite lenders agreed that

24   they intended and agree that the exchange of mutual

25   releases between Credit Suisse and the prepetition lenders,

1    as defined in the settlement term sheet and provided for in

2    Paragraph 5(b) of the settlement term sheet, are full and

3    complete mutual releases between Credit Suisse and the

4    prepetition lenders with respect to any and all acts or

5    omissions on or before the confirmation date, as defined in

6    the settlement term sheet, relating to the Yellowstone Club

7    or the debtors, as set forth in the term sheet.

8              And so, in effect, these agreements confirm

9    the -- a view and a position by the requisite lenders that

10   has been directed and communicated to the agent and is

11   being taken on behalf of all lenders, all the prepetition

12   lenders, for purposes of confirmation of the plan and the

13   issues raised by the mutual releases.

14             And, again, to repeat, the position that's being

15   taken is that there should be no amendments to the plan as

16   proposed by Highland because that, in our view, could very

17   well require resolicitation, and no one wants

18   resolicitation - people want to confirm a plan today - and

19   that there's no ambiguity in the fact -- in the terms of

20   the mutual release.

21             There were mutual releases.  That terminology is

22   what it is.  And to the extent people ultimately have any

23   concerns about how those mutual releases would be enforced

24   in particular situations, particular potential litigations

25   in the future, which are hypothetical at this point, Your

1    Honor, that will be a time for a future hearing between the

2    parties involved, whoever they might be; and the tribunal

3    that might be involved in the future, whoever that might

4    be.  And there's no need to take an unambiguous term,

5    "mutual releases", that have been agreed to by the parties

6    and have been voted upon by the overwhelming majority of

7    the Class 3 and Class 8 prepetition lenders with, as we

8    understand it -- and I'm not in charge of the balloting and

9    haven't seen all the details.  We think that the only

10   Class 3 and Class 8 lenders voting on the plan who voted to

11   reject the plan on the resolicitation a week, or so, ago

12   were the Highland lenders.  Everybody else who voted, voted

13   to accept the plan in an overwhelming amount, and that

14   included the language of the mutual releases.  And now we

15   have clarity from the requisite lenders and direction from

16   them that they agree that the language is not ambiguous and

17   the Court shouldn't change it, and issues about what that

18   all means can be left for a later day.

19            The agreements that were reached with the various

20   requisite lenders also addressed the reimbursement

21   obligations under the prepetition credit agreement and, in

22   short, there was a settlement and a resolution of some of

23   those matters to the extent that Credit Suisse has agreed

24   with those particular lenders that it will not be seeking

25   reimbursement under Section 9.2(c) of the credit agreement

1    for certain amounts that it would otherwise have rights to

2    seek reimbursement for, including amounts incurred in

3    connection with the adversary litigation in this case, Your

4    Honor, the trial, and the like.  There were professional

5    fees, obviously, incurred.  Those amounts will not be part

6    of the reimbursement obligation of those parties that have

7    entered into these agreements.  There was an additional

8    amount and a combination made in the aggregate $2 million

9    for purposes of a diminution in the pro rata reimbursement

10   obligation of the requisite lenders.  And with that, there

11   was also a confirmation in these agreements of the mutual

12   releases.  And, again, we have all these agreements and

13   will submit those into evidence today, Your Honor.

14          But this is our position.  And we think it's

15   actually a useful position, a helpful and happy position

16   because we were concerned that we might come in here today

17   without any further direction, but we have that.  And I

18   think I need not speak anymore.  You know, I'm happy to

19   address the Court in argument.

20          We're happy to put on Mr. Yankauer, who actually

21   came here today because this was significantly important.

22   There was an issue about whether he was being compelled to

23   come or not, and he was not compelled to come but made

24   himself available because these issues are important.

25          People want to get done with the case today.  We

1    want to put on evidence and testimony and make him

2    available for cross-examination on issues which, frankly,

3    Your Honor, we don't think need a whole lot of

4    investigation at this point because the terms of the plan

5    and the terms of the settlement agreement are unambiguous.

6    And, as our papers show, the parole evidence rule applies,

7    and there's no need to get behind the four corners of the

8    document.  We can leave that to other courts, other

9    tribunals, and other disputes, as and when they arise, to

10    determine what a mutual release means and as it may be

11    applied to a particular claim or cause of action that might

12    hypothetically be asserted by somebody - who knows who -

13    later in the future.

14         THE COURT:  Well, with that, I'll let Mr. Warner

15    make comment, but it looks like we just need to get to some

16    submission of some testimony here.

17         I do have a question, and Mr. Warner may be able

18    to address it; and Mr. Chehi may, as well.  And I'm not

19    sure, it may have an impact.  But under the agreements with

20    the agent and, I guess, then, with the steering committee,

21    is there provision or agreement that basically specifies

22    that in the event of dispute between any of the lenders,

23    that there's a majority rule?

24         MR. WARNER:  Your Honor, the answer is "no".  And

25    I think that when the Court hears the testimony, what it

1   will hear is the function, methodology, procedures used by

2   a steering committee.  A steering committee only exists

3   when the agent is looking for direction to take on behalf

4   of all lenders in a syndicated debt.  This is a

5   $300 million debt.  There are a handful of lenders that sit

6   on the steering committee that, when they vote, they vote

7   at a simple majority.  And you'll this in the testimony

8   today.  But that is only for direction to the agent, not

9   for authority in, for instance, very obvious, voting on a

10  plan of reorganization.  In other words, each lender votes

11  on the plan of reorganization notwithstanding what the

12  steering committee may advise or instruct the agent to do.

13  So when the agent is instructed by the steering committee

14  to support the plan, that doesn't mean that every lender is

15  thereby automatically agreed to have supported it.  If that

16  were the case, you would never solicit votes from each of

17  the lenders.

18           And as pointed out by Mr. Chehi, we clearly voted

19  "no" on this plan.  Each of the 11 Highland entities voted

20  "no" because they have a legal right notwithstanding what

21  the steering committee may advise on a simple majority the

22  agent do in support.

23           We'll hear more today with respect to the credit

24  agreement, with respect to the authority.  But,

25  essentially, if what the Court's premise is -- premise

1   would hold true, you would eliminate the voting agreement,

2   the two-thirds - one-half situation.

3          THE COURT:  Well, but, in fact, that's been

4   satisfied per class, correct?

5          MR. WARNER:  Oh, sure.  It doesn't mean, though,

6   that the plan -- and as we get into things -- and I hope I

7   have an opportunity -- I'd like to take an opportunity to

8   make some opening statements, as Mr. Chehi has just done.

9          THE COURT:  Well, this is your chance.  You've

10  got about five minutes to do it.

11         MR. CHEHI:  Your Honor, I'd just like to reserve

12  on the issue about the credit agreement.

13         And the question Your Honor asked, I could answer

14  that now and then recede and allow him to make his

15  presentation.

16         THE COURT:  Okay, thank you.

17         MR. CHEHI:  All right, let me just walk through.

18  Your Honor, we moved into evidence, and I believe Highland

19  did, as well, for purposes of the exhibits today, the

20  actual prepetition credit agreement which appears, for

21  purposes of the record today, as Credit Suisse

22  Exhibit No. 1, which was submitted again by Highland for

23  purposes of today's hearing.  And we adopted that.  And

24  unless there's any dispute about it, we're going to move

25  that into evidence for today's hearing.  It's been moved

1    into evidence in prior proceedings before this Court.

2           We disagree with Highland's position about what

3    the authority of the agent is in these types of

4    circumstances to bind the prepetition lenders.  And it's

5    actually, you know, fairly clear, I think, to us.  You

6    know, everyone is going to disagree on this, but that's the

7    nature of these cases.  There's going to be disagreements

8    after you confirm this plan until the cows come home about

9    a lot of issues, I'm sure, between Highland and Credit

10   Suisse and maybe others, but we don't need to wrap them all

11   up today.  But what we can do is talk about what the credit

12   agreement does say.

13          Section 7 of the credit agreement - and if Your

14   Honor has it in front of you or on the screen - it's

15   page 76 of the credit agreement.

16          THE COURT:  Just a moment, Mr. Chehi.  I was

17   looking for it, and when I pulled up Exhibit -- which

18   exhibit did you say?

19          MR. CHEHI:  This is Exhibit No. 1, our

20   Exhibit No. 1, which is the credit agreement.  And it was

21   submitted by Highland, I believe.  Which exhibit was

22   that -- we're going to look for it momentarily.  I believe

23   11, if Your Honor looks at that, for the Highland exhibits.

24          THE COURT:  Okay.

25          MR. CHEHI:  Did you find it?

1          THE COURT:  I did find it.

2          MR. CHEHI:  Very good.  Again, we're going to

3     talk now about the contract, the prepetition contract,

4     which really is what decides what the rights of the agent

5     are, what the rights of the parties are, how the agent

6     acts, how it should act in these circumstances when you

7     have a credit agreement and default.

8              And that's quite different, that's quite

9     different than the bankruptcy code regimen for confirming a

10    plan and getting one-half by number, two-thirds by amount

11    of the members of a creditor class to accept or reject a

12    plan.  And, of course, the whole business in bankruptcy is

13    that once you get those bankruptcy votes and the plan is

14    accepted by those requisite majorities, you have the

15    ability to bind dissenter.  Because bankruptcy, as most

16    things, is not -- doesn't result in absolute consensus and

17    perfection, but it's a mechanism for getting past, you

18    know, the inability to reach full consensus and thereby

19    bind dissenters and get on with the world and re-adjust

20    things.

21             Well, the credit agreement, in some senses,

22    addresses the same issues, and that is, you know,

23    indicated, generally speaking, by several of the cases that

24    we cited in our motion:

25             The Beel case in New York state, which is a

1   relatively recent New York state Court of Appeals Case

2   addressing, you know, dissent by a particular member of a

3   lender constituency and its rights to sort of act

4   independently of the whole.

5           And, as well, the Delta Air Lines bankruptcy case

6   where -- which is very similar to this case, if you read

7   it, about how a settlement was reached by a trustee for

8   bondholders, which is the effective equivalent of an agent

9   for lenders here.  And pursuant to the terms of the

10  credit -- the indenture in that case, the Court looked at

11  those provisions and recognized that the trustee was

12  authorized to act and implement and agree to, on behalf of

13  all of the bondholders, a settlement that included a

14  variety of things similar to here, including releases.  And

15  people complained about that, and the Court overruled the

16  objection of the dissenting bondholder.

17          Well, here, our credit agreement is much the

18  same.  And, again, going back to page 76 of the credit

19  agreement, we have the very end of Section 7 of the credit

20  agreement.  And Section 7 of the credit agreement relates

21  to events of default and what happens.  And we have an

22  event of default, there's no question about that.  And if

23  you look at the various subsections of Section 7, generally

24  it talks about what constitutes events of default.  We

25  don't need to worry about that because we know we're there.

1    And then you get to page 76 at the very end before

2    Section 8, and you have the bold words "then", T-H-E-N.  It

3    says "then", meaning upon an event of default, certain

4    things happen.

5          And if you go down to the last sentence of that

6    "then" paragraph, that ultimate paragraph, it says the

7    following.  And I'm going to -- you can read, all of the

8    words.  There's defined terms.  But it basically says

9    (quoted as recorded):

10         "Upon an event of default, the credit agreement,

11    you know, authorizes the agent, as directed by the

12    requisite lenders" - and then important words - "on behalf

13    of the lenders" - meaning all of them; not just on behalf

14    of the requisite lenders, but on behalf of all of the

15    lenders - "to exercise" - quote - "any and all rights and

16    remedies and" - quote - "all rights, powers, and remedies

17    available to agent or lenders - and, again, "or lenders",

18    that means all of them or any of them - "at law, in equity,

19    or otherwise, including without limitation" - and they mean

20    rights and powers - "under the other loan documents."  And

21    by "the other loan documents", they mean, you know, the

22    collateral documents, the ancillary credit agreement type

23    documents.

24         And so we have a very, very broad grant of

25    authority that can be exercised by Credit Suisse, as agent

1    in this case, on behalf of all of the lenders if they're so

2    directed by the requisite lenders.  Now, that's not the

3    only provision that gives Credit Suisse the authority to do

4    what it's done here, enter into the settlement term sheet

5    and, you know, authorize, in effect, those terms for

6    purposes of the modified plan.

7          Also on page 76 of the credit agreement is

8    Section 8.1.  And Section 8.1 provides that the lenders

9    appoint - that's the lenders, not the requisite - the

10    lenders appoint Credit Suisse as administrative agent and

11    collateral agent.  You know, there's two different types of

12    roles there:  One is with respect to the collateral, the

13    other is administering the loan.

14          And so this paragraph talks, you know, sometimes

15    in the plural of agents, and the like, but we'll just, you

16    know, summarize it here properly.  It says (quoted as

17    recorded):

18          "The lenders appoint Credit Suisse, as agent, and

19    authorizes Credit Suisse in such capacities" - the two

20    agent capacities, quote - "to take such actions on its

21    behalf and to exercise such powers as are delegated to

22    Credit Suisse in such capacities" - meaning the agent

23    capacities - "by the terms of" - and what it means is this

24    credit agreement and other loan documents - "together with

25    such actions and powers as are reasonably incidental

```
 1    thereto."

 2            So where you have Section 7 being a credit

 3    agreement, contractual authorization of very broad remedial

 4    powers -- which, as in the Delta case, the Court comments

 5    that, you know, these broad remedial powers that are given

 6    to agents in these types of circumstances or trustees for

 7    bondholders in these circumstances, it includes the ability

 8    to settle things.  And settlements obviously involve

 9    releases and, therefore, as in the Delta case, there were

10    releases.  There are releases in this case.  Let's not kid

11    ourselves about it; things don't get settled unless there's

12    some sort of contractual finality, at least, to the

13    parties' respective rights and obligations at end of the

14    day.  And that's where we are.  There may be disputes later

15    on about what it means, but the contract here, the credit

16    agreement, gives the agent the rights to, you know, broadly

17    involve itself in and bind the lenders and act for them in

18    this process.

19            And page 76, also in 8.1, says that the lenders,

20    by participating in this loan, are authorizing Credit

21    Suisse to act as an agent and to do those things that are

22    authorized under the credit agreement, according to its

23    terms.  And that means:  Do what the requisite lenders tell

24    them to do in this context.

25            And then further, Your Honor, on page 78, it's
```

1   Section 8.3 of the document, Section 8.3 provides further

2   that (quoted as recorded):

3            "The agent shall not have any duty, shall not

4   have any duty to take any discretionary action or exercise

5   any discretionary powers except discretionary rights and

6   powers expressly contemplated by the credit agreement or

7   other loan documents that the agents" - "the agents"

8   meaning, you know, whoever they are - "are required to

9   exercise as directed in writing by the prepetition

10  lenders."

11           So what this effectively says when you read it

12  is:  The agent doesn't have a duty to do discretionary

13  things unless among the discretionary things that it's

14  authorized to do - i.e. some of these remedial things, you

15  know, entering into the settlements and the like - it's

16  directed by the requisite lenders to undertake to do

17  something of the sort which would otherwise be

18  discretionary.  And that's exactly what the agent has done

19  in this case.  It is obligated to do what it did because

20  the requisite lenders authorized and directed it.  And that

21  means authorizing and directing the settlement term sheet

22  and again today, Your Honor, authorizing and directing the

23  agent to take a position on what those mutual releases are

24  all about and how they're to be read.  And they are to be

25  read as mutual releases as between the prepetition agent

1    and the lenders.

2           And so whatever Highland is going to tell you

3    about how our reading of the credit agreement somehow is

4    unfair and it keeps them from, you know, exercising their

5    right to dissent from or not be bound by the actions of the

6    group here, directed -- you know, the actions by the agent

7    on behalf of the lenders, including the Highland lenders,

8    it's not so.  The contract provides the authorization, and

9    the case law provides it, as well.

10          THE COURT:  Thank you.  Mr. Warner.

11          MR. WARNER:  Your Honor, I forgot a lesson I

12   learned early on in this case, and that was to never

13   surrender the podium to Mr. Chehi.

14          THE COURT:  Well, here's your -- (inaudible,

15   audio cuts out.)

16          MR. WARNER:  The Court was now going to say

17   something?

18          Now that he's gone for 15 or 20 minutes, I'd sure

19   like an opportunity.  Let me respond to the Court's

20   question in a little bit more detail, and then let me give

21   you some opening arguments.  And we can get to evidence

22   when the Court's ready.

23          Mr. Chehi points to the credit agreement, which

24   is in evidence.  Both of us have put it in.  It's the same

25   document, so I assume nobody has any problem admitting the

1  document.  And so at this point, just for ease, I'd like to

2  make sure that Exhibit 11, which is Highland's exhibit

3  number; and Exhibit 1, which is Credit Suisse's exhibit

4  number, the same item, is admitted.

5          MR. CHEHI:  No objection, Your Honor.

6          THE COURT:  Exhibit 11 and 1 are admitted.

7          EXHIBITS 11 and 1 ADMITTED INTO EVIDENCE

8          MR. WARNER:  All right.  Now, if I can, Your

9  Honor, let me point out why -- while I appreciate

10  Mr. Chehi's lengthy analysis of the credit agreement, I'll

11  point out a couple things.  First, when you hear the

12  testimony of how the -- and, I apologize, I'm looking at

13  the screen, and I'm not really sure where I'm supposed to

14  be looking.

15          When you look at the credit agreement and you

16  hear the testimony, you'll understand the workings of the

17  steering committee and their vote.  But more importantly,

18  what I want to point out is:  All of the provisions that

19  Mr. Chehi just pointed out - 7.14, 8.1, 8.3 - all of those

20  deal with the agent handling and dealing with the loan with

21  the borrower.  In other words, the agent is supposed to

22  take the requisite direction of the lenders and deal with

23  the borrower.  It doesn't say -- nowhere in this document

24  does it say that the agent can take the requisite -- the

25  instruction of the requisite lender and affect other

1    lenders.  In fact, that's actually what was looked at in

2    Delta.  And if the Court looks at the Delta decision, it

3    will see that really what happened there was it was

4    releases that the agent was giving and dealing with, with

5    the debtor, the borrower under the credit agreement; not

6    intra-creditor.

7            And what we are going to focus on today in the

8    evidence and the testimony is two sets of objections -- or

9    two sets of releases that are inappropriate, inappropriate

10   under law, inappropriate because they're ambiguous,

11   inappropriate because they weren't intended.  And we'll get

12   through that in a moment.  But if you look at it, the first

13   release is lender to lender.  If we read this the way

14   Mr. Chehi wants us to read it, theoretically, the 51

15   percent of the lenders that compose the requisite lender

16   could instruct the agent not to bill those 51 for anything,

17   no expenses, but foist on the 49 that didn't vote all the

18   agent's expenses.  There's no logic to that, and that's why

19   this provision that he's cited is not being read right.

20           It needs to be read as the cases have read it,

21   and that is:  What you really have is the agent has the

22   authority on behalf of the requisite lenders, and therefore

23   all lenders, to negotiate and deal with the debtor, the

24   borrower under the credit agreement.  The debtors can enter

25   into a settlement with the agent, who can bind, but that

 1   settlement doesn't affect the relationship of lender/lender

 2   or lender/agent.  And we're going to focus on that in a

 3   moment.  So while I appreciate Mr. Chehi, I don't agree.

 4          Let me point out that what we heard earlier from

 5   Mr. Chehi almost sounded to me like it was a judicial

 6   omission of an ambiguity.  And all we're here today to say

 7   to the Court is, "Judge, there's an ambiguity in the

 8   language.  It's not final.  It is presented to this Court

 9   as part of confirmation, and this Court has an opportunity

10   to clean it up and address it."

11          And we're going to get into the ambiguity.  But

12   let me just point out that Mr. Chehi used the words

13   "diametrically opposed views of the world".  That was a

14   quote.  And when you have diametrically opposed views of

15   the world, you must have an ambiguity in the document.  But

16   it's not just two views.  We're going to point out that

17   there's actually four views, that there are at least four

18   views of the problem.  Let me walk the Court through.

19          Further, Mr. Chehi says you're going to hear

20   about recent agreements.  Well, what he didn't say, and

21   maybe he intends to later, we're going to have recent

22   agreements that are going to be presented today.  I'm not

23   sure whether they're signed or in draft, or what.  But the

24   agent has waived in excess of $7 million of professional

25   fees that its incurred in order to encourage various

1   lenders that have previously said to this Court there is an

2   ambiguity.

3          Let me give you the first example:  Normandy Hill

4   filed an objection on Friday.  The objection said:  We

5   disagree with Highland.

6          But look how they disagreed.  Highland says:  The

7   intent is not to have lender/lender or lender/agent

8   releases.  All the other releases - CrossHarbor's, Debtor -

9   those are all normal, we understand them.  They're part of

10   this overall confirmation; lender/lender, lender/agent

11   wasn't.  This is Highland.

12          Normandy comes in and says:  No, no, no, wait.

13   We read it differently.  What we read is there is a full

14   release of all lenders by the agent and full release of the

15   agent by all lenders.

16          But Normandy goes on to say:  Including all the

17   legal fees we might owe the agent as our agent.

18          Now, the Court will see credit agreement has a

19   provision that deals with legal fees, and it's a pro rata

20   distribution among lenders to pick up their piece of the

21   legal fees.  What the Court's going to hear in testimony is

22   legal fees amount so far to probably in excess of

23   $12 million to $13 million.

24          Normandy read this release as saying:  Wait a

25   minute, I don't have to pay my pro rata share.  So that's

1    View 2.

2              View 3, you're going to hear testimony from

3    Credit Suisse itself that says:  Wait a minute, our view is

4    full releases - agent/agent, agent/lender, lender/agent -

5    but not the legal fees.  "We carved that out", says CS.  So

6    now there's three views.

7              We're then going to get to the debtors' view.

8    And the debtors' view in their papers is very clear:  We

9    didn't propose a plan, can't propose a plan that violates

10   Ninth Circuit law which prohibits inter-creditor,

11   nondebtor, nondebtor parties releases.

12             Clearly, the debtor says:  We didn't intend it

13   because those aren't there.

14             So then we say:  Okay.  Well, what's Mr. Chehi

15   going to show us later today?  He's going to show us a

16   settlement agreement that he gave me a draft of 30 minutes

17   - 40 minutes ago.  The first time I've seen it.

18   Apparently, it was circulated on Friday, it's been

19   circulated and modified since then.

20             But let me tell you what this says.  This is

21   going to be signed by Credit Suisse - not sure in which

22   capacity - and a particular lender, because it has a blank

23   line for lender's name.  But in it, it says (quoted as

24   recorded):

25             "The parties hereby waive and forever release all

1    actual and potential threatened losses, claims, damages,"

2    on and on and on.

3            Well, now wait a minute.  If Credit Suisse's

4    opinion and reading of the current version of the release

5    language is they get a release from everybody, why do they

6    need a new document that they're going to present to the

7    Court now that would incorporate a further release?

8            And, as the Court will see, it talks about these

9    huge legal fees that might be waived.  So what are we

10   looking at?  Are these bought-off agreements?  What are

11   they?  I have no idea.  But at the end of the day is, what

12   it's all demonstrated is what Highland's been saying from

13   its objection.  There's an ambiguity in the language.

14           Now, you're going to hear the debtors say:  Wait

15   a minute, let the Court kick it.  We'll have some other

16   Court decide it when it's right.  Let's just live with the

17   four corners, the words "mutual release".

18           Well, first of all, as we can recognize, we could

19   fight about it later.  But the problem with doing that is

20   severalfold.  One, the structure of the settlement has a

21   trapdoor.  And the trapdoor says:  If you fight about the

22   settlement later, you don't get what the debtor proposes to

23   give you.

24           Now, remember what the debtors' view is:  There

25   is no release between lender/lender or lender/agent;

1    third-party releases, that's not there.

2           And the debtor is also going to, as I will point

3    out to you -- that the strict reading of language says:

4    Party A, the debtors; Party B, the committee; Party C,

5    CrossHarbor; Party D, the agent and lenders.  It doesn't

6    make party "D" and "E" - agent, "D"; lenders, "E" - it's

7    one group.

8           As this Court can imagine, when you're sitting

9    there negotiating a settlement, the agent doesn't say, "Oh,

10   by the way, I need to get a release from my own lenders, my

11   guys that I'm supposed to protect.  This is a settlement to

12   make a plan get confirmed."

13          So if we leave it to the end, we get to this

14   trapdoor.  What happens is if Highland objects to the

15   treatment under the plan by saying, "There is no release,

16   it never was, I didn't give one to the agent," then I lose

17   my distribution as a member of Class 3 and Class 8.  Now,

18   that's the debtors' plan.  Debtor doesn't want me to lose

19   that distribution.  The debtor is giving me my treatment;

20   Class 3, Class 8.  That's what creditors voted on.

21   Notwithstanding I voted "no" - what I voted "no" on was the

22   plan - because the plan gets confirmed by a class voting

23   "yes", I'm stuck with the treatment of the class.  But I

24   can't be stuck with losing my treatment because later on, I

25   say to Credit Suisse, "You said let leave this open for

1    later argument.  Now when I raise it, all I've got to do is

2    raise it and, guess what, I don't get what I'm supposed to

3    under the plan."

4         So we really have that problem, but let me to

5    something very fundamental.  I don't want the Court to

6    think that I'm standing here saying "destroy confirmation".

7    It's absolutely the farthest thing from the mind of

8    Highland.  We would like to see the plan confirmed.  Okay?

9         However, it can't be confirmed with the ambiguity

10   that I've now pointed that the evidence will show.  And so

11   the Court really can't let a plan go forward that has the

12   ambiguity as to who gets what.  That's the question:  Who

13   gets what?  Does the lender get a release?  Does a lender

14   to a lender get a release?

15        We don't know, because I've pointed out very

16   simply -- and Mr. Chehi has made my case by telling the

17   Court there is diametrically opposed views.

18        The ambiguity was brought to the attention of

19   Credit Suisse last week when we filed our objection.

20   Credit Suisse said, "Sorry, it's too late.  I cannot

21   address this now.  You're out of luck."  And they basically

22   said, "You had the opportunity to tell us about it."

23        Well the answer is:  It wasn't too late last

24   week; and, more importantly, it's not too late today.  We

25   haven't confirmed the plan.

1           The debtor told you what it believes.  Now, while

2      resolicitation is not my objective, the Court needs to keep

3      in mind that we now have at least four - and I'm going to

4      point to three other views in declarations that have been

5      filed - that said there was no release.  So when you take

6      one hand, Credit Suisse saying "full release except for

7      legal fees"; and the other hand, someone saying "no

8      releases at all," inter-creditor, intra-creditor,

9      lender/lender, lender/agent, you must have an ambiguity

10     that can clearly be cleaned up by someone saying "this is

11     what it is, and people have to focus on it".

12          Now, we've brought the ambiguity to their

13     attention, and they basically blew us off, end of story,

14     "not interested".  But so what happens?  Last night -- I'm

15     sorry, yesterday afternoon, they send a steering committee

16     letter that says:  Give us instruction.

17          And the instruction didn't come until this

18     morning.  And the instruction says:  Keep fighting Highland

19     but, oh, by the way, I'll sign this release that's now

20     being circulated confirming that, retroactively, I intended

21     a release for me, lender/lender, learned/agent.

22          Because that's what this says.  It says:  I now

23     acknowledge that I intended that.  Why?  I just got all my

24     legal fees, or a big chunk of them, waived.

25          Let's look at the law for a moment.  Ninth

1    Circuit is pretty clear.  There is no absolute --

2    absolutely no way for this debtor to force me to give a

3    release to other lenders.  There is no way for this debtor

4    to force me to give a release to my agent, especially when

5    you add on top of it, "A", it wasn't intended, or at least

6    there's clearly not a meeting of the minds and now is at

7    time to deal with it; "B", I received no consideration from

8    my agent; "C", this is not the forum to deal with 9019-type

9    motions, settlements.  This is the forum to deal with the

10   settlement between the debtor and the agent representing

11   the lenders, it is the forum to deal with CrossHarbor

12   making a bid to buy the assets of the company and asking

13   for its settlement and it's release so that the transaction

14   can happen.  All normal.  But never is this intended to see

15   this lender/lender or lender/agent release.  I can't be

16   forced to give that.  The Ninth Circuit doesn't require it.

17   Okay?  It actually says I can't.

18          What we intend to do with respect to evidence,

19   Your Honor, is we're going to call Mr. Yankauer from Credit

20   Suisse as a witness; we will then call Mr. Morgan as a

21   witness; I suspect Credit Suisse will call Mr. Yankauer,

22   and we will cross-examine him on what his testimony is on

23   essentially his direct from his counsel; and we may call

24   Mr. Morgan as rebuttal after that.  It's really two

25   witnesses, but they may go on twice.

1          We have exhibits.  We think what the Court will

2     ultimately conclude is, by shrugging its shoulders and

3     saying, "There is clearly an ambiguity.  The agent can't

4     now, at this late stage, come in and say, 'I've solved the

5     ambiguity because the requisite lender told me to fight

6     with Highland.  And I've given up, by this document, a lot

7     of money that they may owe me, and I've settled,' and they

8     now confirm the release exists."

9          Thank you, Your Honor.

10         THE COURT:  Okay.  Call your first witness.

11         MR. CHEHI:  Well, Your Honor, let's hold off one

12    moment on that, and I'll tell you why.  Because the law of

13    contracts applies to this issue, which are the terms of the

14    plan, the terms of the settlement term sheet that, you

15    know, the parties have agreed to.  And the law of the

16    contracts in Montana and elsewhere are that, absent

17    ambiguity, there's no -- the parole evidence rule applies,

18    and that one does not bring in evidence, external evidence

19    outside of the document, to show ambiguity, prove up

20    ambiguity, and then make your case that way.  If that were

21    the rule, then every time one would have a contractual

22    dispute or a dispute about the terms of a reorganization

23    plan or a term sheet, somebody who's a dissenter would come

24    running in and say, "Oh, Your Honor, I think that's not

25    exactly what was meant."

 1           And so the law is relatively clear.  We've cited

 2    it at pages, I think, 5 and 6 of our reply, talking about,

 3    you know, the Montana cases and cases in other areas, that,

 4    you know, it bars the evidence that Highland wants to put

 5    on today to show ambiguity.  And, in fact, the cases are

 6    very clear that, you know, where the language of an

 7    agreement is clear and unambiguous, the Court's duty is to

 8    apply the language as written.  And the fact that parties

 9    reach different conclusions about release terms does not

10    make release language ambiguous.

11           And that's the Rich v. Ellingson case.  That's a

12    Montana case in 2007, I believe, at 174 P.3d at 495.

13           Further, another Montana case, a 2009 case - and

14    I think this is a Montana Supreme Court case; maybe I'm

15    wrong about that, but it appears to be - Dollar Plus

16    Stores, quote (quoted as recorded):  "Ambiguity does not

17    exist simply a party claims that it exists."

18           And then you have the Phelps case in Montana,

19    2007, another, I assume, Montana Supreme Court case (quoted

20    as recorded):

21           "A conclusion of ambiguity" - I'm quoting - "a

22    conclusion of ambiguity is not compelled by the fact that

23    the parties to a document or their attorneys have or

24    suggest opposing interpretations of a contract or even

25    disagree as to whether the contract is reasonably open to

1       just one interpretation."

2               And our view, Your Honor, is that it would be

3       contrary to long-established, what I would call "hornbook

4       law" and the law of contracts, and the parole evidence

5       rule, and the like, that where you have an unambiguous

6       contract term, there is no need and, indeed, the Court

7       should not put on evidence -- allow a party to put on

8       evidence to prove ambiguity.

9               They may not like the fact that the term "mutual

10      releases" was used.  They don't like the fact that it could

11      mean, and reasonably could mean, and does mean that there

12      were mutual releases exchanged between the agent and the

13      lenders, but that's what the document says.  And, indeed,

14      they're the only ones at this point who are saying it's

15      ambiguous.

16              They refer to Normandy's position, but, here, let

17      me just quote Paragraph 3 from Normandy's objection, page 2

18      (quoted as recorded):

19              "The prepetition agent filed a response to

20      Highland's objection arguing that the mutual release is

21      legitimate, unambiguous, and fully unenforceable.

22      Highland's objections should be overruled."

23              It wanted clarification, Normandy wanted

24      clarification that the term should be read in a manner that

25      it would like to see it read at the end of the day.  And

1   the fact of the matter is, is that you have a term "mutual

2   release".  The parties will end up dealing with what

3   "mutual release" means in later contexts.  And from the

4   point of view of the agent, at the direction of the

5   requisite lenders, it's abundantly clear to them - and

6   that's the position that's being taken - that the mutual

7   release covers a release as between the agent and the

8   lenders.  And that's the direction we've been given.  We

9   don't think that that is inconsistent by any means with

10  what the term sheet provides for.  And the fact that you

11  have, again, a supermajority of all of the lenders voting

12  to accept the plan with those terms, accept the settlement

13  term sheet with those terms, is a pretty good conclusion

14  that people were not confused about the fact that there

15  were mutual releases being delivered.

16          And, again, getting into parole evidence today is

17  going to just lead to a squabble about what Highland

18  believes was intended or what somebody else believes was

19  intended.  But, you know, the law also is that even if you

20  were to get behind the four corners of the document, Your

21  Honor, one doesn't start to admit evidence of parties'

22  intentions that were not expressed during the negotiate of

23  the -- what in this case were highly negotiated terms.

24  Highland did not raise that issue, no one raised those

25  issues.

1         Highland, you know, raises the issue after the

2    fact, after the vote has been taken, after all of the plan

3    is essentially ready to be confirmed because it doesn't

4    like the outcome and its the loan dissenter.  And so now

5    it's going to come back and tell you that there's an

6    ambiguity so that we can somehow, you know, force

7    Highland's perspective and objectives on the balance of the

8    parties in the case.

9         And, frankly, Your Honor, again, bankruptcy is

10    about dealing with dissenters.  Highland is the dissenter.

11    It's the only dissenter, as far as I know, among the

12    prepetition lender group that is cognizable because, you

13    know, they filed an objection.  We've taken a position that

14    it's late.  But I'll tell you one thing, that these little

15    affidavits and declarations of these very small - I think

16    less than 1 percent - owners of the loan that apparently

17    are asking Highland's counsel to stand up here today and

18    assert that their position is that they're opposed to it

19    and what their intent was, then we're going to have, you

20    know, people trying to put into evidence these affidavits

21    of intention of parties that aren't even in the courtroom

22    today.

23         And, again, that is why there's a parole evidence

24    rule.  Those affidavits that were attached to the Highland

25    supplemental objection are nothing more than utter hearsay

1    for purposes of the hearing today, and they shouldn't be

2    taken into dispute.  And then when you get done with all of

3    this, what you're saying is you've got one party here,

4    Highland, standing up against the agent, who's acting on

5    behalf of all of the other lenders at the direction of the

6    requisite lenders, on a position, a lender position on

7    clear language, "mutual releases", being exchanged, and

8    they want to upset that.  It doesn't wash because we would

9    be in the impossible mission of then trying to analyze each

10   and every dispute that might arise in the future brought on

11   by Highland or somebody else as to whether or not this,

12   that, or the other thing falls within the ambit of "mutual

13   release".  That's something for the parties to resolve, if

14   it ever occurs, at the time it occurs.

15           And we would object, Your Honor, to any testimony

16   today and Highland calling anybody to show ambiguity in the

17   document because we don't believe that the terms are

18   ambiguous.

19           MR. WARNER:  Your Honor, with all due respect,

20   two minor comments.

21           Even if the Court says it's not ambiguous, the

22   Court, the debtor, no party can force on a nondebtor party

23   to give a release to another nondebtor party, bottom line.

24   Ninth Circuit law:  We can't be forced to do it.  And we

25   shouldn't be forced or punished with the booby trap that we

1       talked about in Section 9.

2              Finally, this is a confirmation hearing.

3       Mr. Chehi talks about parole evidence as if to say, "Six

4       months ago there was an agreement.  Let's now look back at

5       what that agreement meant."  I understand parole evidence.

6       This is not -- this is today.  We are at a confirmation

7       hearing to decide if this plan is ambiguous because of the

8       language written by them.  Whether it is or isn't

9       ambiguous, I still can't be forced to give the release.

10             So with that, Your Honor, I'd like to call

11      Mr. Yankauer to the stand.

12             THE COURT:  I'm going to look at this.  We're

13      going to take a break.  It's quarter-to-one.  We'll

14      reconvene at one-thirty.

15             MR. CHEHI:  Your Honor, one --

16             THE COURT:  Pardon?

17             MR. CHEHI:  One point I would like to make:  My

18      colleague here mentioned that this is, you know, the first

19      time the Court is addressing these issues about the term

20      sheet.  You know, this is the time for people to have

21      objected.

22             Your Honor, you might recall that there was a

23      confirmation hearing scheduled on May 18th in this case.

24      And you know what?  That confirmation hearing went on.

25      Highland and its counsel were fully informed and noticed of

1    that hearing, just like everybody else in the case, and

2    they had their opportunity to show up here on May 18th when

3    the terms the settlement term sheet had been finalized,

4    had been produced to the Court, had been actually handed up

5    to the Court, discussed, distributed, even before it was

6    filed publically because the parties, at Your Honor's

7    direction, had worked, you know, tirelessly over the course

8    of days to come up with a resolution of these cases.  And

9    that's what was come up with.

10           And Your Honor actually approved, under 9019,

11   under those circumstances, in the connection with the

12   confirmation hearing that had already commenced, exactly

13   that.  And so for Highland now to come in and say, "This is

14   sort of you know, unfair," that, you know, "No one had an

15   opportunity to put on evidence and dispute this, that or

16   the other thing," they had their opportunity; they just

17   didn't bother to show up.

18           And they were involved in all of the steering

19   committee meetings and had an opportunity and were on

20   notice of what happened on numerous occasions in the days

21   leading up to the conclusion of that term sheet, and they

22   were silent.  They were silent at least here in court.  And

23   if they were silent and didn't get their views expressed in

24   court, Your Honor, they should be cut off just like anybody

25   else is.  You know, we have to have some finality to the

1    process.

2            MR. WARNER:  With that, Your Honor, I'll make two

3    final comments.  One, the hearing on confirmation on the

4    18th was on the debtors' second amended plan of

5    reorganization.  The term sheet had not actually been filed

6    until following the hearing.  It wasn't finalized until

7    late hours of the evening or early the next morning.  In

8    fact, what the Court said is, "Go resolicit this class

9    because this class is affected by this."  And that's where

10   we are today.  So this is the confirmation hearing on a

11   third amended plan.  This is the confirmation in which,

12   built in, is the settlement agreement.

13           THE COURT:  We're in recess until 1:45.

14           MR. WARNER:  Thank you, Your Honor.

15           (The lunch recess was taken.)

16           THE COURT:  Good afternoon.  Please be seated.

17   This is continuation of the matter in Yellowstone Club.

18   The pending matter we have is concerning the "release"

19   language.

20           Given the lunch hour and my walk to Staggering Ox

21   to get some lunch, basically I think I've come to a

22   resolution as to what I'm going to do here.  Based upon the

23   arguments that have previously been made by counsel, the

24   record, and the facts before me, and the prior confirmation

25   hearing we had a couple weeks ago, I'm not going to take

1  any more evidence on the dispute between Credit Suisse and

2  Highland and Normandy.  I'm going to conclude that the

3  provision states what it states.

4          As it relates to Mr. Sumpter - and I'm not sure

5  if Mr. Mackey and Mr. Sumpter are still in the courtroom or

6  not - but in looking at that, as well, I'm going to deny

7  Mr. Sumpter's motion.

8          And I'm going to go ahead and approve

9  confirmation.

10          I'll do all of this with orders that I hope to

11  get out this afternoon, and that will conclude this portion

12  of the case.

13          And with that, we'll be in recess.

14

15                    *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3      I certify that the foregoing is a correct transcript

4   from the electronic recording of the proceedings in the

5   above-entitled matter, all done to the best of my skill and

6   ability.

7

8      _____    _____

9      Jonny B. Nordhagen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25