IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

_____

|                                    | )                     |
|------------------------------------|-----------------------|
| In Re:                             | ) Case No. 08-61570   |
|                                    | )                     |
| Yellowstone Mountain Club, LLC,    | )                     |
|                                    | )                     |
|      Debtors. | )                   |
| _____ | )                   |

(Complete caption on next page.)

THE HON. RALPH B. KIRSCHER, presiding

TRANSCRIPT OF PROCEEDINGS

Missoula, Montana
April 29, 2009

Electronic Recording Operator:   Patti Mahoney

Transcript Services:

Proceedings recorded by electronic recording;
transcript produced by reporting service.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

_____

In Re:                                  )
                                        ) Case No. 08-61570
                                        )
Yellowstone Mountain Club, LLC,         )
                                        )
            Debtors.                    )
_____ )
                                        )
CREDIT SUISSE and TIMOTHY L.            )
BLIXSETH,                               ) Adv. Pro. 09-00014
                                        )
            Plaintiffs,                 )
                                        )
vs.                                     )
                                        )
OFFICIAL COMMITTEE OF                   )
UNSECURED CREDITORS,                    )
YELLOWSTONE MOUNTAIN CLUB,              )
LLC, YELLOWSTONE DEVELOPMENT, LLC,      )
BIG SKY RIDGE, LLC and YELLOWSTONE      )
CLUB CONSTRUCTION COMPANY, LLC,         )
                                        )
            Defendants.                 )
_____ )

```
 1                          APPEARANCES

 2

 3      FOR THE DEBTORS:

 4           JAMES A. PATTEN

 5           Attorney at Law

 6           Suite 300, The Fratt Building

 7           2817 Second Avenue North

 8           Billings, MT  59101

 9

10           CONNIE SUE MARTIN

11           TROY GREENFIELD

12           Attorneys at Law

13           Bullivant Houser Bailey, PC

14           1601 Fifth Avenue, Suite 2300

15           ISeattle, WA  98101-1618

16

17           DAVID A. ERNST

18           Attorney at Law

19           Bullivant Houser Bailey, PC

20           300 Pioneer Tower

21           Portland, OR  97204

22

23

24

25
```

```
 1                    APPEARANCES (continued)

 2

 3       FOR THE DEBTORS:

 4            THOMAS L. HUTCHINSON

 5            Attorney at Law

 6            Bullivant Houser Bailey, PC

 7            888 Southwest Fifth Avenue, Suite 300

 8            Portland, OR  97204

 9

10       FOR CREDIT SUISSE:

11            MARK S. CHEHI

12            ROBERT S. SAUNDERS

13            Attorney at Law

14            Skadden, Arps, Slate,

15               Meagher & Flom

16            One Rodney Square, Seventh Floor

17            Wilmington, DE  19801

18

19            EDWARD J. MEEHAN

20            Attorney at Law

21            Skadden, Arps, Slate,

22               Meagher & Flom

23            1440 New York Avenue, Northwest

24            Washington, DC  20005

25
```

```
 1                    APPEARANCES (continued)

 2

 3      FOR CREDIT SUISSE:

 4           SHANE P. COLEMAN

 5           Attorney at Law

 6           Holland & Hart

 7           401 North 31st Street, Suite 1500

 8           Billings, MT  59101

 9

10           JOSEPH LARKIN

11           EVAN R. LEVY

12           JEREMY M. FALCONE

13           GEORGE A. ZIMMERMAN

14           Attorneys at Law

15           Skadden, Arps, Slate,

16              Meagher & Flom

17           Four Times Square

18           New York, NY  10036-6652

19

20      FOR THE UNSECURED CREDITORS COMMITTEE:

21           JAMES H. COSSITT

22           Attorney at Law

23           James H. Cossitt, PC

24           202 KM Building, 40 Second Street East

25           Kalispell, MT  59901-4563
```

```
 1                    APPEARANCES (continued)

 2

 3      FOR TIMOTHY J. BLIXSETH:

 4           JOEL E. GUTHALS

 5           Attorney at Law

 6           Guthals, Hunnes & Ruess, PC

 7           P.O. Box 1977

 8

 9           MICHAEL J. FLYNN

10           Attorney at Law

11           One Center Plaza, Suite 240

12           Boston, MA  02108

13

14           JOSEPH M. GRANT

15           Attorney at Law

16           Grant Law Firm

17           94-A Drew Street

18           Houston, TX  77006

19

20

21

22

23

24

25
```

```
 1                    APPEARANCES (continued)

 2

 3        FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

 4             J. THOMAS BECKETT

 5             DEREK LANGTON

 6             CHRIS P. WANGSGARD

 7             SEAN D. REYES

 8             MARK D. DYKES

 9             Attorneys at Law

10             Parsons, Behle & Latimer

11             201 South Main Street

12             Salt Lake City, UT  84111

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   WITNESS:                                          PAGE:

 3   TIMOTHY L. BLIXSETH

 4        Direct Examination by Mr. Hutchinson   .   .   .   .   82

 5        Cross-Examination by Mr. Wangsgard   .   .   .   .   .  158

 6        Cross-Examination by Mr. Flynn   .   .   .   .   .  185

 7        Cross-Examination by Mr. Coleman   .   .   .   .   .  208

 8        Redirect Examination by Mr. Hutchinson   .   .   .   .  213

 9   MICHAEL DOYLE

10        Direct Examination by Mr. Hutchinson   .   .   .   .  222

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              YELLOWSTONE MOUNTAIN CLUB BANKRUPTCY

 2                      MISSOULA, MONTANA

 3                          -  -  -

 4             BE IT REMEMBERED THAT this matter came on for

 5    hearing on April 29, 2009, in the United States Bankruptcy

 6    Court, District of Montana, The Hon. Ralph B. Kirscher,

 7    presiding:

 8

 9     The following proceedings were had:

10

11             THE COURT:  Good morning.  Please be seated.

12             We'll go over a few administrative matters first.

13    As all of you are aware, we do have issues, potential

14    pandemic flu concerns.  We have people in this courtroom

15    from all over the United States.  You've been through I

16    don't know how many airports.  We do have, as you probably

17    saw in the news this morning, a confirmed death out of

18    Texas of an infant.  So I'm wanting everybody to be

19    cautious.  If any of you feel like you might have

20    something, although it's contagious for three or four days

21    before the symptoms really show, you know, let us know, and

22    we will deal with that as appropriate.  I don't want

23    somebody here feeling sick and spreading this to everybody

24    in the courtroom.  We need to take great preventative

25    measures.  So please let us know if you feel any health
```

1    concerns at all.  Let the CSOs know, let us know.

2              I think you all had access to Wi-Fi, those that

3    wanted it.  You're all up and running?  Okay.

4              For the record, I do call this case:  This is the

5    date and time of the Adversary Proceeding 09-00014; and

6    consolidated with 09-00017; and the main case of

7    Yellowstone Mountain Club, 08-61570.

8              There were a few things filed yesterday, amended

9    witness lists.  There was an amended -- or a motion to

10   dismiss refiled, different grounds.

11             There were two pretrial orders that were filed on

12   Monday.  Apparently, there was some issue about trying to

13   get together on that, and I'm going to deal with that

14   shortly.

15             But let me take up the first matter, the first

16   motion which was filed.  And this was on a motion by Credit

17   Suisse that was filed yesterday.  It was at Docket 253 and

18   254, a motion to strike pretrial brief filed by Credit

19   Suisse.  I'm granting the motion for expedited hearing.

20             I'll take up the motion to strike.  And as it

21   relates to the motion to strike, I am granting this motion.

22   The matters that are contained therein you can put into

23   your post-trial brief as you deem appropriate.  This being

24   a bench trial, some of this stuff -- pretty much the

25   pretrial memos are for my benefit.  If there are issues or

1    facts that people wish to raise, we can take that up

2    without further ado, I think, through the proceedings and

3    through the post-trial briefing.

4         As I mentioned last week, we will also expect

5    parties to submit proposed findings and conclusions and

6    pretrial briefs after the conclusion of the trial.  So you

7    might keep that in mind as we're going through the

8    proceeding.

9         There were a number of amended witness and

10   exhibit lists that were filed yesterday.  Before I get to

11   that, I want to go to the pretrial order.  These are at

12   Dockets 238 and 241, as I recall.  I went through to find

13   out what the differences are.  And on page 6, there were

14   Paragraphs 5 through 10 that were added by Mr. Blixseth

15   that apparently were not agreed to by any of the other

16   parties.  Is that still the same case, or have you all

17   reached resolution on these matters?

18         UNIDENTIFIED SPEAKER:  No resolution, Your Honor.

19         THE COURT:  Well, then we will in about two

20   minutes.  Paragraph 5 on page 6 of Docket 241 - this is

21   Mr. Blixseth's proposed pretrial - the marital settlement

22   agreement is out.

23         Paragraph 6 on page 6 is in, which relates to the

24   loan or a portion of the Credit Suisse loan proceeds to BGI

25   was not a fraudulent transfer.

1           Seven, eight, nine, and ten are out.  Those are

2    claims -- they may be defenses, they may be claims, but

3    they're with parties that aren't even in this lawsuit.

4    CrossHarbor's not a party to this lawsuit, Edra Blixseth is

5    not a party to this lawsuit.  And those items are out.

6           As it relates to marital property settlement

7    agreement, those are claims that Mr. Blixseth can certainly

8    raise in his State Court litigation.

9           And as it relates to the hacking issue, the

10   violation of 18 USC 1030 and the civil action that's

11   allowed thereunder - I think it's under 1030(g) - is an

12   item that Mr. Blixseth certainly can bring against any

13   person he feels improperly accessed computers.  And so

14   there will be no prejudice to him on those claims; they

15   just won't be part of this trial.

16          And on page 7, last phrase of Paragraph 4, after

17   the words of "privileged communications" where it goes into

18   in pari delicti, judicial estoppel, it goes on through,

19   again, with references to the marital settlement agreement

20   and 18 USC 1030 and the civil claim thereunder, that last

21   phrase is out.  A period will be inserted after the word

22   "communications", which I think is in the text of Pretrial

23   238.  And I was reading from 241, Docket 241.

24          Down under the elements of claims, counterclaims,

25   defenses, Paragraph V - and this starts at pages 13, 14,

```
 1   15, 16, 17 of Docket 241, which is Mr. Blixseth's proposed

 2   pretrial - has there been any agreement between the parties

 3   as to Items K through T?  There are still issues regarding

 4   those?

 5              UNIDENTIFIED SPEAKER:  Correct, Your Honor.

 6              THE COURT:  Well, "K" is out.

 7         I'm not sure what the dispute is over waiver,

 8   laches -- oh, "M" is out.  That's the marital matter.

 9              "N", "O", "P", "Q", "R", "S", and "T", I'm not

10   quite sure what the objections by parties are to that.

11   They're affirmative defenses, it appears.  We can deal with

12   that through the course of the trial.  If they're not

13   substantiated, they're not substantiated; if they are, I

14   can deal with them as I rule.  I don't know if there's a

15   big issue there.

16         Mr. Blixseth, you're shaking your head "no".

17   There isn't?

18              MR. BLIXSETH:  (Inaudible, out of range of

19   microphone.)

20              THE COURT:  Is that Credit Suisse's position, as

21   well?  There's not consensus there?

22         Mr. Flynn, I'm assuming you're wanting those

23   paragraphs in there.

24              MR. FLYNN:  Of course, Your Honor.

25              THE COURT:  And what about the debtors?
```

1          MS. MARTIN:  It's fine, Your Honor.

2          THE COURT:  So except for "K" and "M", those

3    paragraphs will be inserted.

4          Page 23, Paragraph XI, discovery documents.  And

5    I'm looking at 241, Docket 241.  Actually, there's a typo.

6    That first paragraph should be Paragraph A to be consistent

7    with 238.  "A", "B", and "C" -- well, "A" and "B" are the

8    same as in 238.

9          "C", Credit Suisse to -- and there was also a

10   deletion of Mr. Blixseth in that Paragraph C.

11         And then there was a new paragraph, "D", that

12   relates to:  We'll offer all of Mr. Blixseth's

13   interrogatories, requests for production, requests for

14   admissions to the committee and Debtors and their

15   objections, answers, and responses thereto.

16         Is there a big objection to that?  I'm not sure

17   why there is necessarily an objection to that provision.

18         MR. BECKETT:  No objection, Your Honor.

19         Mr. Blixseth, or I mean -- this could be a long

20   day.

21         UNIDENTIFIED SPEAKER:  It's still early.

22         THE COURT:  Mr. Beckett.

23         MR. BECKETT:  Very briefly, Your Honor.  What

24   happened was that the committee and Credit Suisse and all

25   of the parties had worked well together putting together

1   the final pretrial order.  And we had a deadline, and we

2   received substantial changes from Mr. Blixseth shortly

3   before the deadline.  And so I think there wasn't time to

4   consider all of the changes, and so most were taken out.

5   With respect to the ones you've just mentioned, the

6   committee has no objection.

7           THE COURT:  Okay.  Ms. Martin?

8           MS. MARTIN:  Debtors have no objection --

9   (inaudible, out of range of microphone.)

10          THE COURT:  Mr. Zimmerman.

11          MR. ZIMMERMAN:  No objection.

12          THE COURT:  "D" is in.

13          Then we have three new witnesses that were listed

14  in Mr. Blixseth's proposed pretrial.  They were the three

15  at the end, I'm sure you all know.  There's David Abshier,

16  Christopher Donaldson, and John Hekman.  I don't know who

17  these people are.  I don't know if there's objections to

18  them.  I don't know if they're new people that nobody knows

19  about or if everybody knows about them and we might as well

20  include them.

21          MR. BECKETT:  They're experts, Judge, of the

22  parties that were deposed.

23          THE COURT:  Okay.

24          MR. BECKETT:  Two are committee experts, one

25  expert for Credit Suisse.  That's fine that they're in.

1       THE COURT:  Okay.  Those three are inserted.

2       MR. GRANT:  Judge, if I may interrupt, there was

3  another deposition taken yesterday afternoon and evening

4  after this was turned in that would need to be on this

5  list, as well, a Moses Moore.  We didn't finish him until

6  seven or eight o'clock last night.

7       THE COURT:  Okay.  Mr. Moore is in, Moses Moore

8  is in.  That will be added.  So there will be four added.

9       MR. GRANT:  He's not -- I guess he's already on

10  there, Judge, so we're covered.

11       THE COURT:  He is on there, okay.  With that,

12  that will be -- Mr. Zimmerman?

13       MR. ZIMMERMAN:  Thank you.  Just one point of

14  clarification:  If you're going to use the Blixseth form,

15  which is --

16       THE COURT:  Well, I'm actually using the

17  committee's document and adding the things from

18  Mr. Blixseth's that I just talked about into it.

19       MR. ZIMMERMAN:  Then we're fine.  Thank you.

20       THE COURT:  Okay.  Well, for the record, do you

21  want to, so there's no confusion --

22       MR. ZIMMERMAN:  Okay.  All parties had agreed,

23  and it just, I think, inadvertently was admitted.  On

24  page 16 of the version that everybody but Mr. Blixseth had

25  agreed to, the Legal Issues 1 and 2 were amended to include

1    whether the statute of limitations bars the committees and

2    the debtors breach of fiduciary duty claims and their

3    aiding and abetting breach of fiduciary duty claims.  So

4    the aiding and abetting part was added to both one and two,

5    and I think all the parties have agreed to that.

6                 THE COURT:  Okay.

7                 UNIDENTIFIED SPEAKER:  We agree, Your Honor.

8                 THE COURT:  I'm not sure that I necessarily

9    followed where you were at, Mr. Zimmerman.  Are you looking

10   at Docket 238, the three-party one, or --

11                MR. ZIMMERMAN:  Yes, yes.

12                THE COURT:  Okay.

13                MR. ZIMMERMAN:  It was page 16.  And so long as

14   it's in there, you'll see it when you read it.  And it's

15   fine as is, Paragraphs 1 and 2.

16                THE COURT:  Okay.  So that will be finalized, and

17   I will sign that.  That will be the pretrial order that

18   supercedes all pleadings, subject to motions to conform to

19   the evidence as it's presented at the, I guess, conclusion

20   of the trial.

21                Let me see if I have anything else here.  As it

22   relates to the expedited motion with memorandum to dismiss

23   claims regarding Mr. Blixseth, obviously with the pretrial

24   that I've just gone through, I think I've dealt with some

25   of the issues.  I've also reserved as it relates to any

1  ruling regarding the other motion to dismiss, and I'm going

2  to reserve on this one.  We'll go through the trial, and it

3  will be ruled on at the conclusion.

4          MR. FLYNN:  Your Honor, may I bring up one point

5  with regard to it?  Just two minutes.

6          THE COURT:  Before you do that, Mr. Flynn, just

7  so we've got everyone on the record, would you all

8  introduce yourselves, who you represent?  And then we'll go

9  from there.

10          MR. FLYNN:  I'll only take two minutes, Your

11  Honor.

12          Michael Flynn for Mr. Blixseth.

13          MR. GRANT:  Joe Grant for Mr. Blixseth.

14          MR. GUTHALS:  Joel Guthals for Mr. Blixseth.

15          MR. COLEMAN:  Shane Coleman for Credit Suisse.

16          MR. LARKIN:  Joe Larkin for Credit Suisse.

17          MR. LEVY:  Evan Levy for Credit Suisse.

18          MR. CHEHI:  Mark Chehi of Skadden-Arps for Credit

19  Suisse.

20          MR. FALCONE:  Jeremy Falcone for Credit Suisse.

21          THE COURT:  You're able to speak on your own

22  behalf this time?

23          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

24          MR. ZIMMERMAN:  Thanks to you -- (inaudible.)

25  George Zimmerman for Credit Suisse.

1          MR. BECKETT:  Tom Beckett for the committee.

2          MR. LANGTON:  Derek Langton on behalf of the

3     committee, Your Honor.

4          MR. WANGSGARD:  Chris Wangsgard for the

5     committee, Your Honor.

6          MR. ERNST:  David Ernst for Debtors.

7          MR. PATTEN:  Andy Patten for Debtors.

8          THE COURT:  Okay.  Mr. Cossitt.

9          MR. COSSITT:  Jim Cossitt for the committee.

10          THE COURT:  Okay.

11          MS. MARTIN:  Connie Sue Martin for the debtors.

12          MR. GREENFIELD:  Good morning, Your Honor.  Troy

13     Greenfield for the debtors.

14          MR. HUTCHINSON:  Tom Hutchinson for the debtors.

15          THE COURT:  I'll try to keep your names straight.

16     I've already missed it once this morning, so please indulge

17     me a little bit on that.

18          The other thing:  We do have press here.  I guess

19     I do see CrossHarbor; Mr. Blixseth, I see him.  There are

20     many faces I don't -- that are not familiar to me.

21     Mr. Saunders I believe is in the back.

22          MR. SAUNDERS:  Good morning, Your Honor.  Happy

23     to be here.

24          THE COURT:  Mr. Brown.  I think there's probably

25     some reporters that are here.  Could I just have you stand

1    if you're a reporter and here today on assignment?  Okay,

2    thank you.

3            Others are interested parties.  Mr. Grant, I see.

4    Others are interested parties, I'm assuming, or just

5    wanting to observe.  So if issues come up, we'll try to

6    accommodate it as best we can.  Obviously, it's a full

7    courtroom.  Bring anything that you feel should be brought

8    to my attention through the recorder or through my law

9    clerk, Kelli Harrington.

10           So with that, Mr. Flynn.

11           MR. FLYNN:  Thank you, Your Honor.  Your Honor,

12   we have a witness in the witness list, Gary Peters.  And

13   he's here from Paris.  And we requested yesterday to -- of

14   the committee and of the debtor to take Mr. Peters out of

15   order, and of Credit Suisse.  Credit Suisse has agreed; the

16   debtor and the committee have not.

17           He's here from Paris.  He's got to leave tonight

18   to go back to Paris.  Sometime today, we would like to take

19   him out of order.  I'm estimating an hour and a half on

20   direct, Your Honor; perhaps less in light of Your Honor's

21   ruling on the computer hacking.

22           THE COURT:  Okay.  Mr. Beckett.

23           UNIDENTIFIED SPEAKER:  (Inaudible, out of range

24   of microphone) -- and the debtors, Your Honor.

25           THE COURT:  Yes.

1              UNIDENTIFIED SPEAKER:  One very, very simple

2    point:  Mr. Peters has absolutely nothing to add to this

3    proceeding.  He was not around in 2005, and I don't believe

4    he was around in 2006.  This simply goes to, I believe,

5    Mr. Flynn's case, which is Edra Blixseth and Sam Byrne, and

6    let's throw up some smoke, and so forth.  It has nothing to

7    do with this case.  It would do nothing but interject into

8    our case, which is very clean, very much in a line with the

9    pleadings and a PTO that Your Honor just signed.  It would

10   add nothing to the case.

11             And so we would -- if he chooses to call him in

12   his case, that's his choice, but he shouldn't be allowed to

13   call him in our case.

14             MR. FLYNN:  I'm prepared to make an offer of

15   proof, Your Honor.

16             THE COURT:  I'll allow an offer of proof.

17             MR. FLYNN:  As Your Honor knows, the primary

18   issue before the Court is why we're here, why the club is

19   insolvent, and why we're in bankruptcy.  Mr. Peters will

20   offer direct testimony on that issue.

21             We're here, Your Honor, because CrossHarbor and

22   Mr. Byrne developed a scheme to acquire Porcupine Creek.

23   By acquiring Porcupine Creek for basically $35 million on a

24   30-day note, which they knew Ms. Blixseth could not pay,

25   they effectively took out the asset of BGI of $200 million

1     out of this bankruptcy estate.  Ms. Blixseth then added on

2     through loans - fraudulent and some not so fraudulent -

3     another $15 million onto the -- as mortgages onto Porcupine

4     Creek.  But for that fraudulent conduct, Porcupine Creek

5     would be reachable by this Court to satisfy the BGI note in

6     the amount of $209 million.  But Mr. Byrne has a

7     stranglehold over that property.  In fact, I believe he's

8     filed a notice of foreclosure.

9          Mr. Peters was in the heart of the discussions

10    relating to the deals made between Edra Blixseth and Sam

11    Byrne.  He met Mr. Byrne in Mr. Byrne's office on March 21,

12    the day the divorce court ordered Ms. Blixseth not to

13    communicate or interfere with the sale with Sam Byrne.

14    There was a direct court order by the divorce judge in

15    California.  Notwithstanding that, Ms. Blixseth, for the

16    weeks before that and for the period after that, continued

17    to negotiate with Sam Byrne.  Five days later, Mr. Byrne

18    cratered deal, terminated contract.  And the reason he

19    terminated the contract, Your Honor, is because he did not

20    have the money.

21          Mr. Peters had a conversation with Mr. Byrne on

22    March 21, the same day the divorce court issued the order,

23    where Mr. Peters basically confronted Mr. Byrne and asked

24    him, "Do you have the money to close?"

25          And Mr. Byrne basically waffled.  He give him the

1  names of two potential lenders who were going to loan him

2  the money:  One was WestLB and the other was Credit Suisse.

3  Neither party at that point in time was loaning

4  Mr. Byrne the money.  Mr. Byrne did not close this deal.

5  Notwithstanding everything he put out in the media, he did

6  not close this deal, Your Honor, because he did have the

7  money.  Mr. Byrne has -- Mr. Peters has direct testimony

8  with regard to that issue.

9  Secondly, Ms. Blixseth, when she knew that

10  Mr. Byrne was not going to close - which she knew in

11  advance because she knew he didn't have the money - then

12  made a deal with Mr. Peters.  And the deal was

13  misrepresented to the Montana court in the LeMond case.

14  The deal, Your Honor, was for Mr. Peters and his principals

15  from the Middle East to buy the club for $450 million,

16  including putting down $50 million in cash.  They went into

17  the LeMond case less than a week after the Byrne deal

18  cratered.  And Mr. -- Ms. Blixseth falsely represented in

19  her declaration in the LeMond case that she had $50 million

20  as capital infusion - excuse me, Your Honor - and funding

21  to put into the club.  It was misrepresented.  The $50

22  million was part of a proposed sale.

23  Mr. Peters has numerous e-mails relating to

24  everything I've just disclosed to the Court; the meetings

25  with Byrne, the e-mails back and forth, the meetings with

1    Ms. Blixseth.  And, in fact, Mr. Peters refused to get on

2    the witness stand on a TRO in the LeMond case because he

3    knew Deborah Klar and Ms. Blixseth were misrepresenting the

4    deal to the Court.  He has numerous e-mails relating to

5    this issue.

6            The reason it becomes important is because

7    Ms. Blixseth's fiduciary duty, once the Byrne deal cratered

8    because he didn't have the money, was to take the $450

9    million and solve the bankruptcy issues.  At that time that

10   all this took place as of April 15, 2008, as Mr. Moore

11   testified yesterday, the company was solvent.  All its

12   accounts payable were paid.  In fact, Mr. Moore - Mr. Moore

13   was the bookkeeper - Mr. Moore signed a declaration dated

14   April 15, '08, that all the accounts payable had been paid.

15           I know Your Honor does not want to get into the

16   computer hacking, but they -- through computer hacking into

17   Mr. Blixseth's computer, they found out that all the

18   accounts had been paid by Mr. Blixseth in advance of going

19   into the Montana court in LeMond on a TRO, and they shifted

20   their whole position.  Mr. Peters was part of that whole

21   discussion.  Over the ensuing two months, Mr. Peters

22   negotiated with Ms. Blixseth and came up with a deal for

23   $450 million.  He had the cash, he had the source of money.

24   He gave the source of money to Ms. Blixseth.  Something

25   that Mr. Byrne had never done between June 28, '07, when

1    the letter of intent was signed by Mr. Byrne and January

2    15, '08, when the asset purchase agreement was signed, Your

3    Honor, he never showed the source of funds because he never

4    intended to close.  And Mr. Peters has direct evidence of

5    that, that he never intended to close.

6         He intended to drive down the price of the club,

7    string the deal out until the value of the club and the

8    bonds had decreased to the point where he could get it.

9    And at some point along the way prior to the deal cratering

10   on March 26th, he planned the prepackaged bankruptcy to put

11   the club into bankruptcy.  Mr. Byrne discussed those issues

12   with Mr. Peters, he discussed them with Mr. Blixseth.  They

13   were e-mail -- there's e-mail traffic back and forth on

14   this point.  Mr. Blixseth adamantly opposed putting this

15   club into bankruptcy.

16        With his business judgment, Your Honor, over the

17   prior years, he had always paid the bills, always paid the

18   Credit Suisse loan.  All the accounts were -- perhaps there

19   was a little seasonal cyclical up and down in payments, but

20   basically all the payments had been made.  Through April of

21   '08, everything was current.  But what happened is Byrne

22   couldn't close the deal, Edra Blixseth turned to

23   Mr. Peters, Mr. Peters had the deal ready to go.  But what

24   would have happened is Ms. Blixseth would have lost control

25   of the Yellowstone Club.  And the reason we're here, Your

1    Honor, when all is said and done, when this trial is over,

2    what Your Honor is going to understand more than any one

3    thing is Edra Blixseth's obsession to control the

4    Yellowstone Club that caused this bankruptcy.

5         She had deals she could have made to sell it,

6    paid Credit Suisse, pay all the debts.  She rejected them

7    because she would have lost control.  Sam Byrne offered her

8    an opportunity in a joint venture for her to obtain some

9    control, but he did it through a process of loans which he,

10   which he knew she couldn't pay.  Mr. Peters was in that

11   whole chain of events.  He has e-mails, he has direct

12   testimony through that whole course of events right up

13   through the $35 million loan by Mr. Byrne.  As Your Honor

14   knows, that $35 million loan was a 30-day note.

15   Ms. Blixseth had zero chance of paying that $35 million in

16   30 days, and CrossHarbor and Mr. Byrne knew it.  They did

17   it to get a stranglehold over her so they could put the

18   club into bankruptcy.

19        And the proof, Your Honor, which we were denied

20   in our deposition of Ms. Blixseth -- the deposition was

21   constantly obstructed.  We tried to get into the issue of

22   the five lenders that have loaned money to Ms. Blixseth

23   prior to the $35 million loan on August 14, 2008.  Those

24   loans, I'm telling you, Your Honor, are completely

25   fraudulent.  I've spoken to the banks, I've got some of the

1    bank documents.  I went to Mr. McKay this past Monday, and

2    I explained it to him.  Ms. Blixseth had borrowed

3    $8 million from Wachovia bank in March of '08.  It was a

4    completely fraudulent loan.  The loan applications were

5    falsified.  She had no possibility of paying back the

6    $8 million.  In March of '08, she also borrowed $8 million,

7    as Your Honor knows, from First Bank & Trust because the

8    UCC came in and got a restraining order to prevent her from

9    borrowing more money.  Those loans defaulted within a

10   matter of weeks -- or months.

11          As of the time the $35 million was loaned by

12   Mr. Byrne - and he knew it - those loans were all in

13   default.  She rolled over a note with Western Capital

14   lending in June of '08.  She explicitly lied in the loan

15   application with regard to whether or not there was pending

16   litigation, as she did in the Wachovia loan.  In the

17   Wachovia loan, the money was loaned for her tech company,

18   Blxware.  Well, the tech company had -- was in litigation

19   in Nevada that I was peripherally involved in.  And the

20   tech company had a preliminary injunction against it from

21   borrowing, hypothecating any of its assets.  And yet she

22   borrowed $8 million from them without disclosing that there

23   was a preliminary injunction against the borrowing, let

24   alone the fact that the litigation even existed.

25   Mr. Peters was part and parcel and present when all of that

1    took place.

2         There were other loans.  There was a $9.5 million

3    loan involving American Bank.  And I won't get into the

4    issues at the present time, but that loan is riddled with

5    fraud, Your Honor, just like these others are riddled with

6    fraud.

7         The reason it's important for the Court here

8    today is that Ms. Blixseth had zero chance of paying Sam

9    Byrne $35 million, and he knew it.  Once he got the

10   $35 million mortgage on Porcupine Creek, he did essentially

11   what he did in this court when he primed the $20 million

12   DIP loan.  He got a stranglehold on the bankruptcy, he's

13   now got a stranglehold on Porcupine Creek.  That's at least

14   $35 million taken out of this estate.  And he tried to get

15   a $1.5 million loan on Farcheville, as Your Honor is aware,

16   to get a stranglehold on Farcheville.  So instead of paying

17   $450 million, which he was willing to pay as of January 15,

18   '08, basically he's got control of these assets, Your

19   Honor, for somewhere in the range of $55 million.  That's

20   why we're here.  Mr. Peters was an integral component of

21   all of that.

22        On the issue of proximate cause as to what caused

23   this bankruptcy, Mr. Peters has e-mails, he's got

24   testimonial evidence that will inform this Court as to why

25   we're here.

1          Secondly -- or thirdly, these transactions are

2    riddled with fraud.  This bankruptcy is based on a

3    foundation of Ms. Blixseth's fraudulent lending

4    transactions.  She is the DIP, for all intents and

5    purposes.  In the marital settlement agreement - which I

6    know Your Honor doesn't want to get into, but we do deal

7    with release - she released Mr. Blixseth.  And

8    Mr. Blixseth, as -- she signed on behalf of all the clubs,

9    the debtor entity, completely releasing him.  Mr. Blixseth

10   offered her in May and June, before she made the deal with

11   Sam Byrne, he said, "Look, here's the deal:  You take it or

12   I'll take it.  It's your choice."

13          She made the decision to have control of the

14   club, so she's the one who made this financial --

15   financially riddled fraudulent bed that she's in.  And

16   that's why we're here.  And Mr. Peters probably has more

17   vital testimony and more e-mails that were never produced

18   in this courtroom than anyone else.

19          Thank you, Your Honor.

20          THE COURT:  Thank you, Mr. Flynn.  Well, given my

21   deletion of the - I'll just try to find it again, here -

22   Paragraphs 5, 7, 8, 9, 10, the claims by Mr. Blixseth, and

23   even though as much as I would really like to hear

24   Mr. Peters for a variety of reasons, I'm not going to allow

25   him to testify at this time.

1           MR. FLYNN:  Does that mean, Your Honor, if we can

2    get him back from Paris, I could call him in my case?  I'm

3    not quite unsure where the Court's -- (inaudible, out of

4    range of microphone.)

5           THE COURT:  Yeah.  I was headed to excluding him

6    entirely, and yet as I recall, I think Mr. Greenfield

7    didn't have a problem with he was called in your case.

8           UNIDENTIFIED SPEAKER:  Your Honor, I'm reserving

9    my objection.  If he's called in Mr. Flynn's case, you

10   can better bet that I'll be objecting, based on what I just

11   heard from Mr. Flynn -- (inaudible, out of range of

12   microphone.)

13          THE COURT:  Okay.  Well, I still think his

14   testimony goes to issues that I've taken out of this

15   litigation at this point.  They certainly may survive and

16   be valid issues at a later date in a different forum.  So

17   at this point, I'm going to exclude Mr. Peters completely.

18          UNIDENTIFIED SPEAKER:  Your Honor, you're taking

19   proximate cause out of the case?

20          THE COURT:  No.  Actually, I've added it.  It's

21   still in the pretrial.

22          UNIDENTIFIED SPEAKER:  Thank you.

23          THE COURT:  Your offer of judgment is part of the

24   record.

25          Mr. Peters, just for my own benefit, could I have

1  you stand, please?  Thank you.

2  I mean I think Mr. Peters probably has a wealth

3  of information not only as Mr. Flynn may argue in his offer

4  of proof -- or stated in his offer of proof, but as it

5  relates to other matters that are going on as it relates to

6  Farcheville and some things there as far as prospective

7  sale that -- obviously, it's unrelated to this adversary

8  proceeding, but it's certainly related to the main case as

9  to what the status of everything is.

10  Mr. Chehi.

11  MR. CHEHI:  I'll just stand here.  We'd like to

12  just reserve rights to have Mr. Peters testify in

13  connection with confirmation, with approval of any sale on

14  the types of issue that go to that as Your Honor is

15  recognizing:  Good faith, the motivation of the parties,

16  the relationships between CrossHarbor and Edra Blixseth.

17  And whatever Mr. Peters knows about that we're

18  sure will be material to the good faith and merits of the

19  proposed transactions.

20  THE COURT:  Well, the other, the other problem I

21  have is, you know, I don't want Mr. Peters to be a

22  ping-pong ball and bouncing back and forth between here and

23  France all the time.  I don't think that's realistic or

24  fair to him, either.

25  Mr. Beckett, you kind of had a look like you

```
 1    maybe had a thought.  Maybe you didn't.
 2              MR. BECKETT:  Well, I did, Your Honor, and I'm
 3    trying to recall what it was.
 4              The one issue I would raise, Your Honor, on this
 5    is that it sounds like the Court has excluded him, it
 6    sounds like Mr. Flynn still wants to call him, it sounds
 7    like that may come up again.  But what I didn't hear in
 8    Mr. Flynn's statement was the degree to which Mr. Peters'
 9    testimony is as a result of the recently discovered
10    evidence over the weekend.  And as with Mr. Mack, the
11    committee would like to depose Mr. Peters before he
12    testifies, so that should be part of the calculus if
13    Mr. Flynn intends to bring him back notwithstanding the
14    Court's order.
15              THE COURT:  Well, it may be better that he come
16    for confirmation.
17              MR. FLYNN:  Two quick points, Your Honor.
18              THE COURT:  Mr. Flynn.
19              MR. FLYNN:  As to the recently discovered
20    evidence, we just got the --
21              THE COURT:  If I could have you at the podium,
22    please.
23              MR. FLYNN:  We just got the e-mails, Your Honor,
24    over the weekend.  One thing I omitted from my offer of
25    proof:  Damages.  Mr. Peters' testimony would mitigate
```

1    damages.

2         Had Ms. Blixseth not breached her fiduciary

3    duties and made the correct decisions rather than being

4    under the influence of Mr. Byrne, the damages might be as

5    much as $200 million less if the committee is claiming that

6    the $209 million has got to be returned to the estate.

7    That testimony goes directly to damages.

8         THE COURT:  Mr. Greenfield anything in follow-up?

9         MR. GREENFIELD:  Nothing, Your Honor.

10        THE COURT:  Okay.  I know I've ruled.  It's a

11   tough one because I -- and it's probably more my curiosity

12   as to Mr. Peters' knowledge on the entire reorganization -

13   (inaudible) - necessarily in this case, the adversary.  I

14   have a strong curiosity of what Mr. Peters has

15   informationally because of assets, so it's a really tough

16   call for me to exclude him.  Typically what we would do is

17   include him and allow me to sort out the evidence as it

18   relates to the claims.  But in this case, as it relates to

19   the claims before me in this trial, I'm going to exclude

20   him, as much as I hate to do that.  It sounds as if there

21   are certainly other witnesses here that also establish some

22   of your issues that you offered.  So with that, I'm going

23   to exclude him, as much as I, myself, would like to hear

24   his testimony.

25        With that, are we ready to proceed?  Who wishes

```
 1    to go first?

 2              Mr. Beckett.  And this is on oral argument.

 3              MR. BECKETT:  Thank you, Your Honor.  May it

 4    please the Court, Tom Beckett; Parsons, Behle & Latimer for

 5    the committee.

 6              The Yellowstone Club is a private ski resort for

 7    its members, for their family and for their friends.  It's

 8    located about 21 square miles outside of Big Sky in a steep

 9    canyon where two creeks converge.  The Warren Miller Lodge

10    is located at the confluence of the creeks.  Members join

11    the Yellowstone Club because of the amenities:  The Warren

12    Miller Lodge, 17 ski lifts, the equestrian center, a Tom

13    Weiskopf golf course, kids facilities, etc.

14              The amenities at this time are, for the most

15    part, complete.  The membership role is not complete.  The

16    club will eventually have some 900 members; today, it has

17    340.  It is a real-estate development project that remains

18    incomplete.  And it was even more incomplete in 2005 when

19    Credit Suisse loaned $375 million and took a security

20    interest in most of the debtors' assets, and most of the

21    money went out the door to the owner.

22              For a real-estate development loan, the Credit

23    Suisse loan before the Court is very odd, is very peculiar.

24    And it has several nonstandard terms that I'd like to point

25    out.
```

1          First, its enormity:  $375 million.  Your Honor

2     will not hear a witness in this adversary proceeding

3     testify that the loan was needed.  There's no line item

4     that says:  We need $375 million by the end of the fourth

5     quarter of 2005.

6          It is huge.  It is a term loan, so the interest

7     is owed on the entire amount beginning Day 1.  It's not

8     drawn down in small, necessary amounts; it's drawn all at

9     once.  It's a real-estate development loan with no fair

10    market value appraisal, extraordinarily unusual.  Instead,

11    there was this net total value appraisal which overstated

12    fair market value by a factor of more than two.  Such

13    appraisals cannot be made by banks, to banks in the United

14    States that are subject to American insurance.

15    Consequently, this loan came from the Cayman Islands.

16          There was no interest reserve, no cushion,

17    nothing to protect in the event of something happening, a

18    fight broke out among the owners or a rescue acquisition

19    that didn't close.  There was no buffer.

20          There was a huge distribution of cash to the

21    owner:  290 -- $209 million to the owner and another

22    $80 million for the Yellowstone Club World assets.  And

23    remarkably, although there is a huge distribution to the

24    owner, there's no personal guarantee.  The purpose of a

25    real-estate development loan is to put money into a

1    real-estate development project.  It is to add value to a

2    real-estate development project.  The purpose of the Credit

3    Suisse loan was the opposite.  The purpose of this loan was

4    to take money out of the asset.  Ordinarily, a development

5    loan puts money and value into the property.  This one was

6    designed -- its purpose was to take money and value out.

7    And viewed in that light, the structure of this loan now

8    makes perfect sense.

9         Your Honor, my firm represents the Official

10   Committee of Unsecured Creditors; 11 members, very

11   hardworking, representing two constituencies.

12        One are the club members.  As I said, there are

13   340 club members, and they have each put down a deposit for

14   $250,000.  The total is $88 million.  We'll call it "90".

15   Each of them has also purchased a lot.  That's another 5 or

16   $600 million that they have put into this club.  They are

17   unsecured creditors for the amount of their deposit.  They

18   have put another half a billion dollars in.  And 100 of

19   them have built homes, and so they have enormous exposure

20   in this and substantial unsecured claims.

21        The other constituency of the committee is

22   equally important.  The claim is much smaller, thankfully.

23   But those are the trade creditors.  These are the people

24   who cut the grass, who mind the kids, who supply the heavy

25   equipment, who do the things that keep the club operating.

1    They are the lifeblood of the club.  And the unsecured

2    trade creditors have put in about $10 million of goods and

3    services.  Again, value into the club.

4            The law provides when those who put money into a

5    company are not paid on their claims, they can look back

6    four years for a transaction where somebody took value out

7    of the club and seek to have that transaction avoided.  The

8    transfers we're talking about are the transfers of an

9    enormous amount of money to Mr. Blixseth and the transfer

10   of the property interests, the imposition of the liens on

11   the property by Credit Suisse.  The fraudulent conveyance

12   statute in Montana asks three questions, and I will pose

13   them and identify, to highlight for the Court a little bit,

14   a taste, of the critical evidence on these points.

15           The first question is:  In the transfer, did the

16   debtor receive less than a reasonably equivalent value?

17           If we had, Your Honor, but 15 minutes to try this

18   case, I would direct the Court's attention to page 1 of the

19   credit agreement which says on its face that up to 94

20   percent of the loan proceeds would be used for purposes

21   unrelated to the Yellowstone Club.  There is going to be

22   testimony about the BGI notes.  And I ask Your Honor, when

23   you think of the BGI notes, to ask "why are they notes?"

24   Mr. Cossitt points out they don't have any of the indicia

25   that notes ordinarily have.  There was no credit analysis,

1   there's no security.  These are demand notes from one

2   Blixseth company to another Blixseth company.  They hardly

3   seem like notes at all.  There will be evidence that money

4   was paid, quote, on the notes.  What the committee asks

5   Your Honor to keep in mind is that a -- is that capital, an

6   infusion of capital back into the company when the company

7   needs the money.  And most importantly, with respect to

8   those notes, they weren't even prepared for eight months

9   after the Credit Suisse loan closed.

10          To try and help the Court keep track of all this

11  money, I'd like to describe how I think of three buckets

12  where the money went:

13          Bucket No. 1 is $209 million that went to the

14  owner.

15          Bucket No. 2 is $80 million that went into the

16  Yellowstone Club World assets.  That is Tamarindo, a resort

17  in Mexico; St. Andrews, a golf course in Scotland; and the

18  infamous Farcheville.

19          The third bucket is $86 million.  It's the

20  balance.  And it contains, I think, three parts:

21  $8.5 million for fees to the bank to close the transaction,

22  $24 million for a takeout of an existing financing, and $53

23  million which was reserved for operations.  And that $53

24  million kept the club alive under the burden of this loan

25  for six to eight months.

1          The second question that the law asks is:  Was

2     the debtor engaged or about to engage in a business for

3     which the remaining assets for unreasonably small?

4          John Hekman, an expert for the committee, will

5     testify to this.  The Credit Suisse loan purports to have a

6     loan-to-value ratio in the neighborhood of 35 percent, but

7     that is only when the value in the loan-to-value ratio is

8     this Cayman Islands value, net total value, no discount

9     rate, nothing whatsoever to do with fair market value.  And

10    one of the things that Mr. Hekman did was, if you so will,

11    reverse engineer the net total value appraisal to add an

12    appropriate discount rate that had been used by the fair

13    market value appraisers who were -- worked for Credit

14    Suisse or for the debtor.  And what he found was that

15    applying that, even taking the projections, and so forth,

16    at face value, but applying that discount rate yielded a

17    loan to value when value is fair market value of well into

18    the 80s.  Now, an 80 percent loan-to-market value may not

19    be prohibitive in many situations, but when the loan is

20    this enormous; and when the entity is relatively small; and

21    most important, when almost all of the money is for

22    purposes unrelated to the club, that 80 percent plus

23    loan-to-value ratio is deadly.

24          Brad Foster will testify for the debtors and give

25    the Court something like a sources and uses with respect to

1    the sale of a lot.  For example, if a lot sells after the
2    loan for $2.4 million, $800,000 has to go to repayment of
3    principal, another 830,000 - 850,000 has to go to pay the
4    interest expense for the year, another $600,000 was
5    necessary for the development of that lot, and that leaves
6    between $100,000 and $200,000 to operate the entity, to
7    operate the club.  This leaves the debtor with insufficient
8    assets to sustain its operations.  But for the loan, the
9    debtor would have the 200 -- the $2.4 million less the cost
10   of development and the commission, and the rest of that
11   would be available for the operations of the club.  Again,
12   no buffer, no breathing room.
13        The third question the law asks is:  Did the
14   debtor intend to incur or did incur or reasonably -- or did
15   he believe or reasonably should have believed that he would
16   incur debts beyond his ability to pay?
17        With respect to the subjective and objective
18   question of "knew or should have known", Your Honor, the
19   enormity of this loan, the colossal size of this loan
20   together with the peculiarity of the loan - those aspects
21   that make it nonstandard - together with the fact that the
22   purpose of the loan was to take money out, that should have
23   been -- strike that.  That was a very bright, red flag that
24   there was something wrong with this loan and the debtor
25   knew or should have known it was incurring a debt that it

1    could not pay.

2           The loan was based on an appraisal which included

3    projections, and one of the very important questions for

4    the Court is the adequacy of those projections.  And the

5    evidence will show that these projections were wholly

6    inadequate.  For example, in 2005, the year the loan closed

7    -- and it closed in September 30, 2005, three-quarters into

8    the year.  And the projection for EBITDA that year was $85

9    million.  Ninety days later when the books closed, it

10   turned out that the EBITDA for that year was thirty seven

11   million dollars.  The projection made in the third quarter

12   with respect to that year was off by a factor of three.

13   The significance of that is that the following year in

14   2006, looking back at 2005 with EBITDA of $37 million, the

15   carry expense on the loan itself was $63 million, twice

16   what EBITDA had been -- nearly twice what EBITDA had been.

17   This loan put this club into a position where it could only

18   survive limping along, cannibalizing itself, eating its

19   fingers and toes, selling assets, getting money infusions

20   from the owner until it eventually failed.

21           Your Honor, the unsecured creditors have put

22   money into this project.  They have put money, goods, and

23   services into the project for the purpose of benefitting

24   the project.  They live there.  This loan was designed to

25   take money out of the project.  It hurt it.  And the

1    unsecured creditors, in fairness, have to be repaid before

2    the participants in this transaction.  And the law provides

3    for that.

4            At the end of the day, the damages to the

5    unsecured debtors are going to be -- well, we have 10 for

6    sure and then disputed claims of another 100.  And after

7    all is said and done, those disputed claims will be washed

8    down to 30 - 40.  So the overall damages will be 40 - 50

9    for the unsecured creditors.  And Montana law provides with

10   respect to fraudulent transfer that the lien shall be

11   avoided to the extent necessary to satisfy the creditors'

12   claims.  With respect to fraudulent transfer, that's all

13   we're entitled to ask, that's all we ask.

14           Your Honor, the committee asks this Court to

15   please enter a judgment against the defendants on the

16   fraudulent transfer claim so the unsecured creditors can be

17   paid.

18           Thank you.  Mr. Greenfield will now open with

19   respect to the issues of breach of fiduciary duty and

20   aiding and abetting.

21           THE COURT:  Thank you, Mr. Beckett.

22           Mr. Greenfield.

23           MR. GREENFIELD:  Good morning, Your Honor.  Thank

24   you.  Again, Troy Greenfield, Bullivant Houser Bailey, for

25   the debtor s.

1          Your Honor, in the past six weeks, we've all been

2     living the rocket docket.  We know the effects.  I'm going

3     to try and give you a rocket opening in that 8 to 10

4     minutes you were seeking in your order the other day.

5          Your Honor, Credit Suisse has referred to this

6     loan product as a "gravy train".  And I'll submit this

7     gravy train went wildly off the rails, damaging the

8     Yellowstone Club and many other properties.  And it's time

9     for Credit Suisse to make reparations.  For the past three

10    weeks, we've deposed Mr. Blixseth, many Credit Suisse

11    representatives, and many others.  And we've learned one

12    thing:  That the corporate greed of Credit Suisse coupled

13    with Mr. Blixseth's sense of entitlement is a very, very

14    bad combination and had led the debtors to Your Honor's

15    court.

16         Your Honor, the story is very, very simple.  In

17    2004, Credit Suisse wonder kid, Jeff Barcy, conceptualized

18    a very, very attractive loan product that was going to be

19    dangled in front of owners of luxury mixed

20    residential/recreational projects like the Yellowstone

21    Club.  One of its common marketing techniques was to send

22    out teaser e-mails to these owners.  And those e-mails

23    included reference to the cornerstone, the key hook of this

24    loan product, which was the ability of owners like

25    Mr. Blixseth, to take huge distributions before their

1    projects were complete.  In the case of the Yellowstone

2    Club, Mr. Barcy sent those e-mails.  He was peppering

3    Mr. Blixseth with e-mails.  Mr. Blixseth didn't respond.

4    Eventually, he started peppering Mr. Blixseth's staff,

5    including his secretary.  Eventually, Mr. Blixseth called.

6    The hook had been set.  He was prepared to come in and take

7    a huge distribution.  Who wouldn't?  Who wouldn't want to

8    take $200 million to $300 million off the table out of a

9    loan product such as this?

10           Mr. Barcy and his team quickly jumped on a plane

11   to Bozeman.  The interesting thing that I learned during

12   discovery is that initially, Mr. Blixseth only wanted $150

13   million.  That's it.  The Credit Suisse/Barcy team, they

14   couldn't figure out why that was the case.  Why wouldn't

15   Mr. Blixseth want to take $200 million to $300 million off

16   the table?  The Credit Suisse/Barcy team was disappointed.

17   It's pretty easy to figure out why.  They took a 2 percent

18   loan fee on this loan.  They wanted three, but as I've

19   learned again in this case, money is relative to entities

20   like Credit Suisse and individuals like Mr. Blixseth.

21   Mr. Blixseth proposed a coin toss, "If I win, it's a

22   2 percent loan fee; Mr. Barcy, if you win for Credit

23   Suisse, it's a 3 percent loan fee."

24           They tossed the coin, and I'll use the term

25   "lost" when I refer to Credit Suisse in parenthesis -- or

1    in quotes, because Credit Suisse took its 2 percent loan

2    fee which amounted to $7.5 million on this loan.

3            Your Honor, in a matter of months, the

4    $150 million was ratcheted up to $375 million.  The Barcy

5    team was busy in 2004 and 2005.  Until Mr. Barcy left, I

6    think in October of 2005 - he took a better offer at

7    Hearthstone, which was kind of surprising - he had a bonus

8    in 2004 of $250,000 to $300,000.  But he did leave.  But in

9    that time, 2004 - 2005, he and his team hooked the owners

10   of Lake Las Vegas Resort; Promontory; Tamarack; Turtle Bay;

11   Ginn Resorts; and, of course, the Yellowstone Club.

12           The similarities between those loans and the

13   catastrophic effects on those properties are remarkable:

14           First of all, the loans were funded mid

15   development.

16           As Mr. Beckett said, they were term loans, which

17   was odd in that circumstance.

18           Again, the owners were allowed to take huge

19   distributions, half of the loan proceeds or more.  I was

20   shocked when I deposed Mr. Barcy and he said, "You know

21   what?  Credit Suisse would have let Mr. Blixseth take the

22   entire $375 million as a distribution."

23           The final and very key similarity, Your Honor, is

24   that all of those borrowers that I just referenced went

25   down in flames.

1          This was a toxic loan product that Mr. Barcy and

2    his team was peddling in 2004 and 2005.  There was one

3    glaring difference between the loans for the properties

4    that I mentioned and the loan on the Yellowstone Club.  All

5    the other properties, the owners were allowed to take huge

6    distributions, but in this case, Mr. Blixseth, the final

7    credit agreement read that he could take a distribution or

8    loans.  And the story behind the insertion in the language

9    "or loans" is a story of how Credit Suisse and Mr. Blixseth

10   orchestrated $209 million going off the table into

11   Mr. Blixseth's pocket without having to share with the

12   other equity owners of the Yellowstone Club.  That had a

13   devastating effect on the debtors, on its creditors, and on

14   the Class B equity.

15         Your Honor, at least as early as January 6, 2005,

16   Credit Suisse was fully aware that Mr. Blixseth was not the

17   sole owner of the Yellowstone Club.  You'll see a January

18   6th Credit Suisse internal memo which includes the

19   following statement, quote (quoted as recorded) :

20         "Blixseth made clear that he and the other owners

21   of the Yellowstone Club" - the "partners", as he referred

22   to them - "were eager to proceed with a financing

23   transaction so that they could take a dividend."

24         Up through the August 22 draft of the credit

25   agreement, just like all the other loans I mentioned - Lake

1   Las Vegas Resort, Promontory, Tamarack, Turtle Bay, Ginn

2   Resorts - Mr. Blixseth was just going to take a huge

3   distribution.  You'll hear Mr. Barcy's testimony that not

4   only did he know of the other owners, Credit Suisse knew

5   that they were entitled to share in any distribution.

6            On May 8, 2005, Tim Blixseth approached the Class

7   B shareholders.  He talked about his dream of wanting to

8   own the entire Yellowstone Club, and he pursued to try and

9   buy them out.  But they didn't get sufficient financial

10  information to assess any offers that he was putting on the

11  table, and no deal was done.  So there had to be some other

12  work-around around these Class B equity shareholders.  As

13  mentioned, up to August 22, the credit agreement draft

14  said:  Distribution to Mr. Blixseth.

15           On August 30, Michael Doyle, Mr. Blixseth's

16  personal attorney, sent him a letter in which he expressed

17  a number of opinions.  First of which, the Yellowstone Club

18  operating agreements afforded Mr. Blixseth no way to expel

19  the Class B shareholders; the Class B shareholders were

20  entitled to share in any distribution on a pro rata basis;

21  and, finally, it would make good sense to get rid of the

22  Class Bs.

23           On September 2nd and September 3rd, the two deal

24  guys, Mr. Barcy for Credit Suisse and Mr. Blixseth, were

25  locked together.  They were working out the fine details of

1    this loan.  Again, the August 22 draft of the creditor

2    agreement said:  Distribution to Mr. Barcy.

3          The next draft came out on September 4, the day

4    after Mr. Blixseth had been locked in with Mr. Barcy

5    working out the fine terms of this loan.  The new credit

6    agreement provided that Mr. Blixseth would take a

7    distribution or loans.  We've got this new language that

8    popped into the agreement.  Common sense would dictate that

9    on September 2nd or September 3rd when they were talking

10   about those fine details, they worked out a work-around, a

11   way to get around those Class B equity shareholders.  We

12   sought a straight answer to the question:  Who suggested

13   this new language?

14         Mr. Blixseth testified that it was Credit Suisse.

15   Mr. Doyle, his personal attorney, testified that it was

16   Latham & Watkins, Credit Suisse's counsel.  Mr. Barcy

17   clearly testified that it was Mr. Blixseth or his team.

18         Your Honor, on September 30, 2005, Tim Blixseth,

19   with the substantial assistance of Credit Suisse, reached

20   his fiduciary duties to the Yellowstone Club, causing

21   damages in the amount of $209 million and putting the club

22   on its track to this bankruptcy.  The 209 million went

23   straight off the table, straight into Mr. Blixseth's

24   pocket.  He never had an intention to repay that money,

25   never.  Through various channels, the better part of

1   $142 million went to Mr. Blixseth's purchase of a number of

2   international properties.  Mr. Beckett referred to that

3   earlier.

4          Again, Your Honor, the loan funded September 30,

5   2005.  When the LeMond litigation was filed in May of 2006,

6   Tim Blixseth decided he'd better dress up his distribution

7   and created a number of unsecured demand notes.  There were

8   no scheduled payments, not even interest payments.  The

9   best part is:  Tim Blixseth, as the corporate officer of

10  BGI, would have to make demand upon Tim Blixseth, the

11  individual.

12         Your Honor, the facts as I've outlined them fall

13  squarely within the elements of the claims presented by the

14  debtors and the UCC.  It is absolutely clear Tim Blixseth

15  breached his fiduciary duties with all of his self-dealing.

16  He failed to disclose the Credit Suisse loan and his

17  personal distribution to the other equity owners.  He took

18  in monstrous personal distribution, leaving the Yellowstone

19  Club undercapitalized.  He encumbered the Yellowstone Club

20  assets for his personal gain.  And once he took that

21  209 million, leaving the club undercapitalized, he didn't

22  share with the other equity owners of the club.

23         Your Honor, the damages are very straightforward.

24  Tim Blixseth is jointly and severally liable with Credit

25  Suisse for roughly 203 million, which is the principal

1    balance left on that 209 plus accrued interest; and also

2    about 4.2 million, which is the proportionate share of

3    Credit Suisse's $7.5 million fee that connects directly

4    with the 209 million that went out the door to

5    Mr. Blixseth.  On the Section 876 claim, aiding and

6    abetting against Credit Suisse, Credit Suisse knew Tim

7    Blixseth was breaching his fiduciary duties to the

8    Yellowstone Club entities by taking that distribution.

9    That was the cornerstone of their toxic loan product that

10   they were peddling to all of these properties.  Credit

11   Suisse provided substantial assistance or encouragement to

12   Mr. Blixseth.  It appears they even handed him the "or

13   loans" language.  They give him the work-around for the

14   Class Bs.  The damages against Credit Suisse the same as

15   those against Mr. Blixseth.

16          Your Honor, Mr. Beckett's very ably addressed the

17   issues on fraudulent conveyance.  Your Honor, I thank you,

18   and we look forward to presenting the evidence in this

19   case.

20          THE COURT:  Thank you, Mr. Greenfield.

21          Mr. Zimmerman.

22          MR. ZIMMERMAN:  Good morning.  George Zimmerman

23   of Skadden-Arps, representing Credit Suisse as the

24   administrative agent.

25          Every case at the end of the day boils down to

1   literally a handful of critical facts that are

2   outcome-determinative.  No matter how complicated it is,

3   there's a core of facts that control.  And typically, there

4   are two ways to litigate.  If those core of facts are bad

5   for your side, you do everything you can to obscure those

6   facts to divert the Court's attention.  If those core facts

7   are good for you, you do everything you can to ferret

8   through the noise and the static and to focus the Court

9   like a laser on those controlling facts.  This is a classic

10  case that falls right into that pattern.  And if there's

11  any doubt as to which side has gone for the obscurity

12  point, the debtors and the committees have identified

13  something like 275 exhibits; Credit Suisse has 1/6 of that.

14  They've got 14 fact witnesses; we've got 3.  Because we

15  want to focus not on the monstrous testimony, the corporate

16  greed, the hook, and all the - (inaudible) - you want.  We

17  want to focus on the six or seven key facts.  And the

18  evidence on those facts in the record is completely

19  undisputed.  The only dispute is the lawyers'

20  unsubstantiated rhetoric.

21         Now, before I get to the facts, here's the

22  50,000-foot view, this is their claim:  Credit Suisse made

23  a loan of $375 million in September 2005.  Eventually, we

24  know that the debtors were no longer able to make good in

25  that loan.  Although they paid that loan for three years

1    after the loan was made, which is in and of itself

2    a compelling fact that their own case says is an important

3    to consider, the Asarco case.  Three years they made

4    payments, but ultimately, they were unable to make it, they

5    were forced into bankruptcy.

6             From this and 20/20 hindsight, they will have you

7    conclude that Credit Suisse must have known back then that

8    the loan was doomed to fail.  They must have known as the

9    -- the debtors must have known that they were not going to

10   be able to pay their debts when they became due and they

11   must have known that they were inadequately capitalized to

12   remain a going concern.  That's their case.

13            Here are the seven or eight facts that we submit

14   absolutely demolish that claim, and all of them, there can

15   be no serious dispute.

16            First, we know in late 2007, we saw the greatest

17   collapse in the financial, capital, and real-estate markets

18   in 70 years since the Great Depression, a collapse that

19   nobody could reasonably foresee.  In fact, the committee's

20   own expert conceded he couldn't see that collapse coming.

21            Second, notwithstanding that collapse, the

22   debtors were still able to pay off this loan and stay

23   current on the debts for more than three years after the

24   loan was made.

25            Third, before ever entering into this loan,

1    Credit Suisse commissioned an independent appraisal from a

2    world-renowned appraisal firm, Cushman & Wakefield.  Its

3    the only contemporaneous appraisal.  And what -- and

4    Credit -- and Cushman & Wakefield, unlike the committee's

5    and debtors' experts who were not there at the time, had no

6    agenda and no litigation position to advance when they did

7    their valuation.  And they came up with contemporaneously a

8    total net proceeds that would be generated by -- that would

9    reasonably expect to be generated by the debtor over the

10   next five to seven years of $1.165 billion.  Now, the

11   committee says the $375 million loan is a huge number.  By

12   my math, 1.165 billion is a lot huger than that, it's about

13   triple.  That's the expected proceeds from operations of

14   these debtors.  That's a number that absolutely renders

15   preposterous the notion that back in September '05 anybody

16   could reasonably have believed that the debtors would be

17   unable to pay that debt or that they were inadequately

18   capitalized to continue as a going concern.

19        Now, fourth, they have a whole to do, which I

20   will get to in a minute, that that appraisal was

21   undiscounted and therefore somehow shouldn't count.  I'll

22   address that in a minute.

23        But the fact is:  Cushman & Wakefield's managing

24   director, Christopher Donaldson - who has testified before

25   Your Honor, I believe, two or three times in this case, who

1   you have seen face-to-face, you've qualified as an expert,

2   and you've specifically found him to be a credible expert -

3   he discounted, he did a fair market value, which they say

4   is the holy grail here.  He did a fair market value and

5   concluded that as of September 30, 2005, the fair market

6   value of the debtors was $571 million, which not only

7   is solvent, it was more than enough to satisfy this loan

8   and any other debts the debtors had at the time.

9            Fifth, the committee's own expert, who obviously

10  knew what his mission was, his expert opinion concludes on

11  a fair market value basis that as of September 30, 2005,

12  the debtors were solvent.  He had to come to that

13  conclusion.  And you know how hard he must have tried to

14  come to just the opposite conclusion, and he couldn't do

15  that for them.

16           Sixth, and we -- the national -- the financial

17  statements of the debtors were audited for 2005, 2006, 2007

18  by KPMG, which is obviously a nationally recognized

19  accounting firm who clearly has no agenda other than to do

20  the best job they could.  They gave clean, unqualified,

21  ordered opinions to each of those views for the debtors,

22  which means that there was no serious issue about the

23  debtor not being able to continue as a going concern for

24  the next year.  They could not have issued that opinion

25  unless they made that conclusion.  And what's really

interesting is you now hear from the debtors and the
committees that the $200 million loan that was made to BGI
in return for the note, they say now three years later,
"Obviously, Mr. Blixseth had no intention of paying that
note"; not a shred of evidence for that.  "Obviously, BGI
didn't have the ability to pay that note"; not a shred of
evidence.

         The only evidence that counts is KPMG booked that
$200 million loan to BGI as an asset of the debtors at face
value and certified those financials as being an accurate
depiction of the debtors' financial condition, which they
could not have done if anything they say is true about that
note.  You cannot certify financials with a face note and
get an unqualified opinion if that note -- without
concluding that note was recoverable in full.  But, again,
KPMG didn't have the benefit of the hindsight that is the
underpinning of their entire case.  It ended up after the
bankruptcy for whatever -- Edra Blixseth took control of
the company, I believe, in August '08, two months or three
months late of - (inaudible) - the bankruptcy.  Before she
took control, this debtor was current on all its debts.  I
think $70 million had already been paid down on that BGI
note that they will have you believe is worthless.  On the
contemporaneous evidence, KPMG's audit is devastating on --
(inaudible.)

1        Now, let's talk about actions, because I think

2   you will agree actions speak a lot louder than words.  In

3   late 2007 up through, I believe, March 2008, Cross Harbor

4   was eager to buy substantially all but not all of the

5   debtors' assets, and they did extensive due diligence.  I

6   think the testimony was months of due diligence, millions

7   of dollars in expenses.  They were willing to pay, at the

8   end of '07, $450 million; and in March of '08,

9   $407 million, which the debtors have conceded under oath

10  was more than enough to pay off the loan and all of the

11  debts.  And that was after the collapse in the real-estate

12  market in '08.  So by definition, as of September '05 when

13  the market was robust, the values, by definition, had to be

14  astronomically more than $407 million.

15       Now, after Mr. -- that deal died.  Mr. Blixseth

16  didn't think it was enough.  I think the debtors have a

17  different version.  I don't really care why it died; the

18  deal died.  And after it died, after having conducted all

19  of those -- that due diligence, Cross Harbor went into the

20  secondary market and bid a piece of this loan in March --

21  after March '08.  This fraudulent loan that they've claimed

22  existed, that there was no shot of being paid, Cross

23  Harbor, after millions of dollars of due diligence went out

24  in the market and bought a piece of that loan.

25       And finally, Credit Suisse itself, long after the

1    loan was made, went into the secondary market and put down

2    17 million bucks of its own cash to buy up a piece of this

3    loan.  Do you seriously believe that Credit Suisse would

4    have put -- bought this loan, part of the loan for $17

5    million if they thought that the company was not going to

6    be able to pay its debts as they become due, if they

7    thought that the company was undercapitalized, if they

8    thought that this loan was doomed?  It makes absolutely no

9    sense.  When you put your money where your mouth is, that's

10   compelling.  It's far more compelling than

11   litigation-driven testimony or arguments.  So the

12   contemporaneous actions of the parties, the contemporaneous

13   evidence that was available to the debtors is overwhelming.

14   It's overwhelming.  The only thing they have is hindsight.

15   And the law is crystal clear that in judging the fraudulent

16   transfer case, the Court is prohibited from using hindsight

17   to say, "Well, after the fact, it turned out that they

18   couldn't pay; therefore, they must have been insolvent or

19   they must have known at the time they were going to be

20   unable to pay."  That is just not the law.

21          And one more point:  The testimony will be

22   unequivocally clear, and I think you've already heard it,

23   that at the time in question, Tim Blixseth dominated and

24   controlled the debtors.  The testimony will be clear he was

25   the decision-maker.  Nobody had authority to make any

1    substantive decisions without Mr. Blixseth.  He was the

2    guy.  And the law is crystal clear - and they have no

3    answer to this - that where the dominating shareholder is

4    alleged to have engaged in a breach of fiduciary duty, that

5    wrongful conduct is imputed to both the debtors and the

6    committee, who stands in the shoes of the debtors.  And

7    they are prohibited, as a matter of law, for suing a third

8    party, Credit Suisse, for aiding and abetting a breach of

9    fiduciary duty.

10           Every circuit court case that has looked at this

11   precise issue in bankruptcy, 1st circuit, 2nd, 3rd, 6th,

12   9th, and 11th, have squarely held that if there's a Tim

13   Blixseth out there who dominates and controls, the debtors

14   and the committee standing in their shoes cannot sue, as a

15   matter of law, a third party for aiding and abetting a

16   breach of fiduciary duty.  And I respectfully know that

17   when we moved for summary judgment, it was denied.  That's

18   fair enough.  But you will have -- and that's fine, because

19   you will now -- to the extent you were concerned there

20   might be a factual issue, when this trial is over, that

21   concern will absolutely disappear.  There is no question

22   their entire case is premised on the fundamental notion

23   that Tim Blixseth dominating -- controlled this, these

24   debtors.

25           One last point before I address their two primary

1    red herrings.  To prove that their entire case is based on

2    hindsight, they referenced before Mr. Foster, who they're

3    going to call as a witness.  He was designated by the

4    debtors as their 30(b)(6) witness to bind them in this case

5    as to their position.  He testified nine days ago,

6    testified unequivocally, that the debtors today have no

7    information indicating that at the time, September 30, '05,

8    that they intended to incur debt beyond their ability to

9    pay.  They have no basis to say that there was any

10   information available at that time in September 30, '05, no

11   contemporaneous information available to the debtors that

12   would have indicated to the debtors that they were

13   incurring debts beyond their ability to pay.  And as of

14   nine days ago, Mr. Foster said the debtors to this day

15   believed that after the loan, they were solvent.  That's

16   the debtors' position.

17          And now they came up with an expert who, two days

18   ago, all of a sudden says, "No, the debtors are insolvent."

19   You can't win a case by having contradictory sworn

20   testimony.  Their bound position is the debtors' were

21   solvent.  There wasn't a piece of information available at

22   the time that would have led anybody to conclude that they

23   would have been unable to pay their debts.  The only --

24   that's the debtors' position.  So the debtors are now

25   telling you under oath the entire attack on this

1    transaction is based on sheer hindsight, which is

2    absolutely forbidden as a matter of law from being used.

3          What's their answer?  Two red herrings.  And you

4    heard, I think, both of them this morning.  First, as I

5    indicated, the contemporaneous appraisal by Cushman &

6    Wakefield showed expected net proceeds - the net proceeds,

7    that's after you deduct appropriate expenses - of

8    $1.165 billion, which is -- demolishes any notion that

9    there was an inability to pay debts.

10         They say, "Well, that doesn't count."  That was a

11   bogus appraisal because it wasn't discounted.  And they

12   say, "A U.S. bank under applicable regulations could not

13   make a loan because you have to have a discounted fair

14   market value before you can make a loan."

15         Now, that's a -- I don't know how much they're

16   going to focus on this at trial, but they focused on it a

17   heck of a lot up to today.  It is with the testimony --

18   and, again, the testimony is undisputed.  This loan was not

19   syndicated to U.S. banks; it was syndicated to non-U.S.

20   private equity funds.  They are not subject to this

21   regulation that requires a discount to fair market value.

22   They did not want a discount to fair market value.  They

23   wanted to know:  What are the total net proceeds these

24   operations are going to generate?

25         Because each of them had their own investment

1    criteria, they would then apply whatever discount rate they

2    thought was appropriate to that number.  And the market

3    knew that the Cushman & Wakefield 1.165 net proceeds number

4    was not discounted because the appraisal says so on its

5    face and these syndicated entities had that appraisal in

6    their possession.  And to prove that this whole issue is a

7    nonissue, knowing that it was not discounted, the market

8    ate up this loan.  It was oversubscribed by 400 percent.

9    The market wanted -- actually wanted to buy $1.6 billion of

10   this loan, and it had to be allocated out to only 375

11   million.  It was an overwhelming business proposition based

12   on the contemporaneous evidence that was available at the

13   time.  And in any event, the testimony will show Credit

14   Suisse did, in fact - (inaudible) - internally; did

15   discount that $1.165 billion; and came up with a value of

16   ranges, the low end of which was $550 million, which is

17   more than solvent.

18              And, finally, if you really care about a present

19   discount to value, Mr. Donaldson did that for purposes of

20   this litigation.  He came up with a fair market value of

21   $571 million, which is more than solvent.  And, therefore,

22   this whole issue, they can't deal with that $1.165 billion

23   number.  It's devastating to their position.  So their

24   whole issue that it wasn't discounted and therefore is

25   invalid is absolutely false, and all of the evidence makes

1    that crystal clear.

2         The second red herring:  And all kinds of

3    slanderous innuendo has been hurled at Credit Suisse

4    because this loan was originated by the Cayman Islands

5    branch.  Oh my God.  And their whole theory of the case is

6    that Credit Suisse deliberately selected the Cayman Islands

7    branch.  It's not a subsidiary; it's a branch.  Most of its

8    operations are conducted out of New York.  They selected

9    the Cayman Islands branch because the Cayman Islands branch

10   is not required to have a discounted fair market value.  So

11   that's why they selected the Cayman Islands branch because

12   they wanted to have this bigger valuation.  That's

13   absolutely, demonstrably falls.

14        The testimony is unrebutted that all of Credit

15   Suisse's leverage loans, they all come out of the Cayman

16   Islands branch.  And the reason they do has nothing to do

17   with the appraisals.  They are subject to federal

18   regulation, but there are certain regulations that enable

19   the bank to have less capital on its balance sheet before

20   it enters -- gives a loan.  That's why every leverage loan

21   comes out of the Cayman Islands branch.  It wasn't selected

22   just for this loan, and it has absolutely nothing to do

23   with the appraisal.

24        We know we're going to have six days of trial,

25   Your Honor.  And based on what I've heard already and

1   based, I think, on what you've heard in the past, there's

2   going to be a lot of stuff flying here, a lot of

3   name-calling, a lot of stories.  You're going to sit back

4   and say, "Why am I listening to this?"  And we don't know,

5   and we don't care.  We are confident we are going to try

6   our best to cut through, separate the wheat from the chaff

7   as we know you are going to do.  And we believe, Your

8   Honor, when you focus on the only critical facts that

9   matter, which is what was known to parties at the time,

10  this evidentiary record will compel you to come to know

11  other conclusions than to find in favor of Credit Suisse on

12  all counts.  Thank you very much.

13          THE COURT:  Thank you, Mr. Zimmerman.

14          Mr. Flynn.

15          MR. FLYNN:  I get a second shot here, Your Honor.

16          As Your Honor can see, Mr. Blixseth is here.  As

17  Your Honor will find out as this trial proceeds -- if there

18  is one overriding issue, in fact, that I know Your Honor is

19  going to conclude, it's that Mr. Blixseth is an honest man,

20  he doesn't lie, he keeps his word.  He's a businessman.  He

21  came into Montana with 13,500 acres of raw land.  He built

22  this with his own blood, sweat, and tears with the heavy

23  equipment running in the mud, these trade creditors that

24  Mr. Beckett is talking about working, pounding nails with

25  nail guns, doing all of the work that this courtroom

1    doesn't see.

2            This courtroom has got 60 lawyers, or

3    thereabouts, involved in this proceeding all looking back

4    at the people in the trenches fighting the battles and

5    doing the work.  Seven million, or so, of those people have

6    not been paid after Mr. Blixseth turned it over to

7    Ms. Blixseth.  Mr. Blixseth, more than anyone else in this

8    courtroom, wants those people paid, but that's not why

9    we're here.  This committee is not being controlled by

10   those people.  If the committee was controlled by those

11   people, the case would be over.  It's being controlled by

12   the LeMond plaintiffs, and I'm sure Your Honor knows it.

13   They want more money.  The committee in this case has

14   trumped up and fabricated these proceedings and these

15   claims when all of the legal defenses - and, Your Honor

16   knows, Your Honor knows in your gut - all the legal

17   defenses in this case are sound, just as Mr. Zimmerman

18   said.

19           This retrospective thinking, Monday-morning

20   quarterbacking to arrive at some type of barnyard equities

21   that, because Mr. Blixseth, after spending nine years of

22   his life to build this all at his own cost, all at his own

23   risk, all with his own money except for a couple small

24   Class B shareholders -- which is now driving this

25   litigation.  Even though Your Honor has stayed the other

1    Class B suit, this litigation is being driven -- and the

2    bulk of the evidence, I will submit, Your Honor, is going

3    to come in about the LeMond case, notwithstanding the

4    parole evidence rule which apparently they just believe

5    they can run roughshod over.  Everything prior to the

6    September 30, '05 agreement is barred by the parole

7    evidence rule, yet that is the bulk of their argument about

8    Mr. Blixseth's thinking.

9         Well, let's look at what Mr. Greenfield said.  He

10   said he never had an intention to repay, never had an

11   intention to repay.  Well, he paid for three years.  And

12   then having the business judgment to know that maybe the

13   real-estate market was declining, particularly in the

14   secondary high-end market, he makes a business deal with

15   Cross Harbor because maybe he has the foresight, the same

16   type of foresight that it took to build the entire club,

17   which incidentally, by our calculation, contributed

18   something like $4 billion, $4 billion during the relevant

19   time frames to the Montana economy.

20        That, Your Honor, is capitalism.  That's the

21   essence of capitalism.  That's what gave all these trade

22   creditors jobs.  To come into this courtroom and have a

23   bunch of lawyers, Your Honor, frankly, try to

24   Monday-morning quarterback a sound business deal and pick

25   it apart just so some, a few of these Class B shareholders

1   can get paid is unjust, it's unfair, and it's depriving

2   these trade creditors from being paid.

3          Mr. Beckett filed a pleading before this Court in

4   which he said that the -- that Mr. Blixseth looted - this

5   was just a week, or so, ago - looted this posh resort in

6   Montana.  Well, that gets spread all over the world, Your

7   Honor.  That appears in somewhere between 100 and 150

8   newspapers all over the world.  Well, as Your Honor knows,

9   notwithstanding the statements of counsel, there was no

10  value taken out of this case -- out of this estate.

11  Mr. Blixseth signed notes for the $209 million.  When he

12  signed the note for the $209 million, Porcupine Creek had

13  an appraised value of roughly 200 million to $240 million.

14          With regard to the argument, Your Honor, that it

15  was a distribution, which one of these gentlemen said, it

16  was a loan.  It is a real simple reason they discovered it

17  was a loan before September 30, even though it's all barred

18  by the parole evidence rule.  And the real simple reason

19  is, is:  As the term sheets went along throughout the

20  summer of '05, every single term sheet starting with $150

21  million had an allocation to take money out of the, out of

22  the loan.  The reason, Your Honor, is -- they had to do it

23  a loan, is loan structure enhancement and because no

24  auditor would audit the club if the capital accounts were

25  already undercapitalized the day they made the loan at

1    $209 million.  It had to be a loan.  And they discovered

2    the week before that they had to be -- that the

3    distribution of the $209 million had to be a loan.

4    Mr. Mack is going to come in and testify and I believe any

5    other accountants who come in would testify the only way

6    you could, you could meet the compliance requirements for

7    the loan, for the entire $375 million, was to make the

8    $209 million a loan versus a distribution.  This fantasy

9    that it was designed to somehow keep the "B" shareholders,

10   Your Honor, is part of the LeMond case.  It's got nothing

11   to do with this case, and Your Honor shouldn't even allow

12   it into evidence.  Because the reality is, is simple

13   economics.  It had to be a loan.

14          Now, so Mr. Blixseth spends his life building

15   this entity.  He realizes that maybe the market's

16   declining, and so he protects the club by making a deal

17   with Mr. Byrne for 4 -- originally, for $510 million on

18   June 28, '07.  That, after due diligence, comes down to

19   roughly $450 million after they sell 56 -- 31 lots for

20   about $56 million.  So now we're down to about

21   $450 million.  And for roughly, what, eight months, June of

22   '07 to March of -- nine months, March of '08, the deal is

23   going to go through.  But as I told Your Honor before,

24   Mr. Byrne didn't have the money.  It's that simple.  He

25   couldn't close the deal.  He was going to string it out

1    because he wanted to drive it into bankruptcy.  And

2    Mr. Byrne's own e-mails to Mr. Blixseth and his

3    conversations with Mr. Blixseth represent that fact.

4         Now, no intention to repay.  That's why he

5    developed the international concept for the club and spent

6    money buying these foreign resorts, because he knew, as a

7    businessman, that he had to reach a bigger market.  He knew

8    he had to go international, Your Honor, and that is why

9    Yellowstone Club World was created.

10        The fact that some of this -- these monies went

11   to him personally is again, Your Honor, a total red

12   herring.  If Your Honor builds a business or anyone in

13   America builds a business and wants to take money out of

14   the business when they basically own everything from "A" to

15   "Z", they're absolutely still entitled in this country to

16   do so.  Mr. Blixseth built it, he owned it, he was

17   absolutely entitled to take this money out, and it was part

18   of his business vision to go international.

19        The concept that some 60 lawyers retrospectively,

20   Your Honor, can come into this courtroom after, what, 10

21   years of labor and hard work, come in here and try to pick

22   the transaction apart when there is no legal basis

23   whatsoever other than to pile fantasy on top of fantasy

24   does an injustice to the entire system.  Now, this Court is

25   faced with a real challenge.  This Court justifiably has

1    driven this bankruptcy - and I understand the Court's

2    position - justifiably driven this bankruptcy toward

3    confirmation of a plan and an auction in order to keep the

4    Yellowstone Club open.  But what the Court must do in

5    looking at the hard, core facts that Mr. Zimmerman

6    mentioned, in looking at even the basic - (inaudible) -

7    equities of the man who built it, what the Court must do is

8    confront the fact that there really are no legitimate

9    claims here to set aside this loan because it's all based

10   on pure capitalism, complete responsibility of Mr. Blixseth

11   for three years to pay every part of the note.

12          He paid some $35 million in interest, he paid the

13   note down from $375 million to $307 million.  And when he

14   forecast that maybe the market would slump -

15   notwithstanding what the debtor is saying, that he was

16   doing these sales and bulk sales - well, that was the

17   business of the company.  He's a developer.  The business

18   of the company was to sell lots, and if he could sell them

19   in bulk, to sell them in bulk.  That was the deal he made

20   with Mr. Byrne.  Mr. Byrne and Ms. Blixseth cheated, and

21   that's why we're here.  The deal was fair, it was fair all

22   along.  Mr. Blixseth's use of the money was entirely legal

23   and appropriate.

24          And if there's one thing Your Honor's going to

25   conclude at the end of this trial is that Mr. Blixseth is

1    an honest man.

2         THE COURT:  Thank you, Mr. Flynn.  Before we

3    commence with the testimony and the exhibits, let's take

4    about a 10-minute break, and we'll begin.

5         We'll be in recess.

6         (A brief recess was taken.)

7         THE COURT:  We do have a couple of matters that

8    need to be taken care of right now.

9         Mr. Patten, you're one of them.

10        MR. PATTEN:  Thank you, Your Honor.  This is a

11   housekeeping matter in the main case.  I apologize, I don't

12   have the docket numbers, but there is a pending motion for

13   the debtors to enter into a real-estate lease for an office

14   in Bozeman.  Credit Suisse has -- the Court -- the motion

15   was granted, Credit Suisse asked that it be vacated and

16   asked for 10 days to think it through some more.  I've

17   agreed with Mr. Chehi that that time period can be extended

18   to May 11th because he's tied up in these proceedings.

19   That will give us time to get through this, and he can then

20   decide --

21        THE COURT:  And, apparently, you had a

22   stipulation to that effect, some written stipulation?

23        MR. CHEHI:  There was a stipulation, I think,

24   entered earlier this week or late last week.  And it

25   continued the objection deadline through, I think,

1    Wednesday of this week.  We thought we'd take it out to the

2    11th to give us time to, you know, work through the issues

3    on that and also the trial here.

4              THE COURT:  Okay.  That stipulation is approved.

5    It will be extended through May 11th.

6              MR. PATTEN:  Thank you, Your Honor.

7              MR. CHEHI:  Thank you, Your Honor.

8              THE COURT:  There was one other matter that came

9    up, as well.  And this relates to a scheduled 2004 exam of

10   Ms. Blixseth scheduled for this Friday.  I assume that's

11   scheduled for Butte.  I don't know the location without

12   looking.  And there were apparently Colorado counsel that

13   was wondering, apparently -- Mr. Deschenes had requested

14   that be moved to a different date.  Colorado counsel was

15   objecting because they need to get on a plane, I guess, in

16   the next day, or so, to get here to conduct that.

17             The question I have for counsel is:  Is

18   Ms. Blixseth scheduled to testify between now and -- or on

19   Friday, if you know?

20             UNIDENTIFIED SPEAKER:  She is scheduled to

21   testify.  I can't peg the exact time, but would I assume

22   perhaps tomorrow afternoon or maybe even Friday, depending

23   on how these witnesses proceed.

24             THE COURT:  Okay, okay.  That 2004 exam will be

25   moved over the objection of Colorado counsel.  They're

1    going to have to get another date.

2           Also, there was a question regarding exhibits.

3    And just to expedite the process, obviously the Court has

4    two sets, my law clerk has one set.  I have obviously one

5    set, I think, up here.  And the question came as to how to

6    deal with the witness exhibits because there was a thought

7    that we probably never clarified that, in fact, one of the

8    sets to the Court was for the witness.  That will be

9    resolved, I think, fairly easily, because as you call your

10   witness and you have the exhibits you want, I will hand the

11   witness the book from my collection up here.  I think it's

12   easier, quicker, and that will be the way we'll handle

13   those.

14          Now, are there other housekeeping matters that --

15          MR. HUTCHINSON:  Your Honor, Tom Hutchinson.

16          One solution that we came up with after you had

17   offered to provide your set was:  We have working sets, our

18   own sets of these documents.  They're not marked on.

19   They're our exhibits.  And we have a person available to

20   hand the witness the exhibit.  My paralegal knows which

21   exhibits are coming up.  It will be fast.  And that way,

22   the Court will have a set as well.

23          THE COURT:  Okay.

24          MR. HUTCHINSON:  Will that be okay?

25          THE COURT:  Is there any objection to that

1    process?

2              UNIDENTIFIED SPEAKER:  No, Your Honor.

3              THE COURT:  Okay.  We'll proceed on that basis.

4    Now, do you need extra seating to accommodate that?  There

5    is a chair right up here, an extra chair behind the witness

6    stand that you can put anywhere.  It's a folding chair.

7              MR. HUTCHINSON:  Can we see how it works from

8    here to start?  And then we can change as we need to.

9              THE COURT:  Okay, very good.  I had to ask this

10   earlier, and maybe we don't need to deal with it:  Was

11   there a stipulation as to exhibits, or do we have contested

12   exhibits that we'll need to take up?

13             MR. FLYNN:  No stipulation, Your Honor.

14             THE COURT:  They're all admitted?

15             MR. FLYNN:  We are going to -- I think from

16   Mr. Greenfield's opening, we're going to get -- be getting

17   to the parole evidence rule.  So I mean I don't like to

18   object.

19             THE COURT:  You know, we can sort a lot of those

20   objections out.

21             MR. FLYNN:  Yeah.  There's one objection, and

22   then we can go from there.

23             THE COURT:  Okay, very good.  Mr. Hutchinson,

24   would you like to call your first witness?

25             MR. HUTCHINSON:  Debtors call Mr. Tim Blixseth.

1           THE COURT:  Okay.  If Mr. Blixseth could come

2    forward to the podium to be sworn, please.  And then I'll

3    have him seated in the witness stand.

4               TIMOTHY L. BLIXSETH, WITNESS, SWORN

5           THE COURT:  Come up here.  Also, no one had made

6    the motion.  I'm assuming there is not the need, unless I

7    guess I decide there is -- Rule 615.  There's no exclusion

8    of witnesses?

9           UNIDENTIFIED SPEAKER:  Yes, Your Honor, we would

10   make that motion.

11          THE COURT:  Okay, it's been requested.  It will

12   be granted.  That means that all witnesses that are

13   presently in the gallery will need to leave the courtroom.

14   Any witnesses that will be called during this trial need to

15   leave the courtroom, and you will be called back in as

16   needed.

17          Also, with the exclusion, I will admonish all

18   attorneys or other parties that may still be in the gallery

19   not to visit with any of those prospective witnesses about

20   anything that goes on in this courtroom and any of the

21   testimony that's discussed or the exhibits.  If I find out

22   there's anything other than that, it will be an immediate

23   sanction.  So I think everybody's clear.  Everybody knows

24   615, so okay.

25          I guess with that, not that many left.  I guess

1    we don't have that many witnesses.

2         MR. HUTCHINSON:  Your Honor, there's something

3    that I'd like to --

4         THE COURT:  Yes, Mr. Hutchinson.

5         MR. HUTCHINSON:  -- request to the Court, though.

6         We have potentially two different people who

7    could be the corporate representative of the debtor

8    companies.  And that person, as I understand the rule,

9    would be allowed to stay during the entirety of the

10   proceedings just like a party representative is entitled to

11   stay.

12        THE COURT:  That's right, the party

13   representative can for the legal entity.

14        MR. HUTCHINSON:  So may I have 45 seconds to sort

15   out who is going to be the corporate representative for the

16   debtors in connection with this case?

17        THE COURT:  Yes, yes.

18        MR. HUTCHINSON:  I just need to have a quick

19   conversation about that.

20        THE COURT:  Please confer.  Mr. Zimmerman.

21        MR. ZIMMERMAN:  Just a point:  I'm not quite sure

22   of what's going on here because they've already designated

23   and we deposed a 30(b)(6) representative on a number of

24   issues to bind the debtor.  So if there's --

25        THE COURT:  Well, then whoever what was is the

1  person.

2            MR. ZIMMERMAN:  Okay.

3            THE COURT:  And if there's somebody else, that

4  person should be excluded.  I think it's pretty easy.

5            MR. HUTCHINSON:  If only it were that easy, Your

6  Honor.

7            THE COURT:  Well, it will be that easy.

8            MR. HUTCHINSON:  Well, let me just give you one

9  additional fact, which is:  There were two people who were

10  designated at the corporate representative because there

11  were a number of different topics.  And Mr. Foster was able

12  to speak to some, and we offered Edra Blixseth as to

13  others.  There's a dispute, I know, on the Credit Suisse

14  part that we provided that notice to them too late, but I

15  did provide notice to them at the beginning of what turned

16  out to be a 10-hour deposition that we were going to

17  designate Ms. Blixseth as responsive designee to certain

18  topics on the 30(b)(6).  And so we have actually two

19  witnesses who -- two individuals who have been designated

20  by the debtors as 30(b)(6).

21            And I think I can sort this out if I can get just

22  a moment to confer with those two people and my colleagues.

23            THE COURT:  Okay.

24            MR. GRANT:  Judge, let me respond to that.

25            THE COURT:  Mr. Grant.

1        MR. GRANT:  We noticed Ms. Blixseth's deposition.

2   We - Mr. Blixseth - noticed her individually, her

3   individual deposition.  We started that deposition, and it

4   was sometime into that deposition - and I can go through

5   the transcript and show you when; it was one, two, three,

6   breaks in, whatever - that he amounts unilaterally that,

7   "By the way, this is also the 30(b)(6) deposition of Edra

8   Blixseth which we're producing her for a number of items.

9   So you can take her for that today as well or forget about

10  it, and then you can have Mr. Foster on Monday."

11       Now, we didn't agree to that, and it was sprung

12  on us in the middle of her deposition.  Credit Suisse

13  didn't agree to that, and they objected, as well.  And so

14  her deposition when it was taken was stopped by the fellow

15  right here at a seven-hour limit, which is the limit we

16  were using on all the depositions.  But he had seven hours

17  to take her personal deposition, and that's what we did.

18  But it was in the middle of that that they tried to say,

19  "And, oh, by the way, you're going to do her 30(b)(6),

20  too," with no notice, no agreement.

21       That's how it happened.  She wasn't made

22  available at any other time, and nobody agreed that it was

23  a dual deposition.  It would have been a very different

24  deposition and we would have gone into a second day because

25  it's two different depositions with very, very different

1    subject matters.

2              MR. COLEMAN:  Your Honor.

3              THE COURT:  Mr. Coleman.

4              MR. COLEMAN:  If I may add to that from Credit

5    Suisse's standpoint, two points:  One, we were -- the

6    timing of this is such that we had already discussed taking

7    a 30(b)(6) deposition by Credit Suisse of the debtors.

8    Additionally, Mr. Blixseth's lawyers had noticed up Edra

9    Blixseth's personal deposition.  We were at least an hour,

10   hour and a half into Ms. Blixseth's deposition on a

11   different day and a different location than the scheduled

12   30(b)(6) deposition when we were informed that, in fact,

13   she would also be the 30(b)(6) representative.  But we were

14   also informed that she would be the 30(b)(6) representative

15   for only certain issues and that Mr. Foster would be the

16   30(b)(6) deponent, I believe, on at least two or three of

17   these issues.

18             THE COURT:  Thank you.  Mr. Hutchinson.

19             MR. HUTCHINSON:  It was at the first break.  And

20   my practice is to break at least every hour, so I think it

21   was an hour into the deposition.  Mr. Blixseth's never

22   noticed a 30(b)(6) deposition of anyone.  There was never a

23   request made after her deposition was concluded

24   individually to reopen her deposition as a 30(b)(6)

25   deponent, despite the fact that we had another week to do

1   so.  And we notified them, we notified all parties at

2   Mr. Foster's deposition again that Ms. Blixseth was

3   designee on certain topics, Mr. Foster on others.

4           Again, if I could have a few moments, we may be

5   able to sort this out.

6           THE COURT:  Thank you.  Take a moment.

7           Mr. Beckett.

8           MR. BECKETT:  I thought I'd just give them a

9   little time by addressing the Court on another issue.

10          Mr. Brown is in the courtroom.  He is the

11  chairman of the committee.

12          THE COURT:  Oh, I was going to ask, I was going

13  to ask about that.

14          MR. BECKETT:  Yeah.  He's the chairman of the

15  committee, and we'd like him to stay.  I think it's No. 2.

16          THE COURT:  He is still the chairman of the

17  committee?

18          MR. BECKETT:  Yes, sir.

19          THE COURT:  Mr. Zimmerman.

20          MR. ZIMMERMAN:  Mr. Brown isn't a 30(b)(6),

21  though, right?

22          MR. BECKETT:  No.

23          MR. ZIMMERMAN:  Oh, okay.

24          THE COURT:  I'm going to allow him to be present.

25  Under 615, parties can designate a person, representative.

1          MR. GRANT:  And is Mr. Brown designated?

2    Because, Your Honor, it's very important.  We asked

3    repeatedly for depositions of a representative, a corporate

4    representative of the UCC, and we were told by Mr. Beckett

5    that they didn't have to provide a 30(b)(6) representative

6    because the creditors committee was just suing on behalf of

7    various individuals.  They didn't give us a representative.

8    We asked for several people on the committee for

9    depositions.  They said they had no control over them, they

10   couldn't produce them, or - (inaudible, out of range of

11   microphone) - was one.

12         THE COURT:  Well, here's what the rule says - and

13   we're going to cut through this and get on with testimony;

14   Mr. Blixseth is sitting here patiently waiting for us to

15   begin - this rule does not authorization exclusion of a

16   party who is a natural person, or an officer or employee of

17   a party which is not a natural person designated as its

18   representative by its attorney, or a person who's present

19   and is shown by a party to be essential for the

20   presentation of the party's cause, or a person authorized

21   by statute to be present.

22         It falls either under two or three.  And, you

23   know, is it essential that that person be present because

24   of the presentation of the party's cause or has the person

25   being designated as its representative by its attorney?

1    Those are the two standards.  It's pretty straightforward.

2              MR. ZIMMERMAN:  May I?

3              THE COURT:  Mr. Zimmerman.

4              MR. ZIMMERMAN:  I hesitate to incur your wrath,

5    Your Honor, but I do want to make the point that was just

6    made.  We specifically asked for a representative of the

7    committee that we could depose, and they did not designate

8    Mr. Brown or anybody else.  Now they want to designate him

9    after the fact as a representative.  Does that mean that

10   during the break in this trial, we're allowed to take his

11   deposition as a representative?  I don't think so.  And,

12   frankly, I don't want to at this point.

13             THE COURT:  Well, I could see it following under

14   two, but what about three?

15             MR. ZIMMERMAN:  He was proffered not as

16   essential; he was proffered as a designated representative.

17   If you're now going to have - (inaudible) - all of a

18   sudden, he's essential?  He's not essential, he's not

19   essential.  So with all due respect, he should not --

20   having deliberately refused both counsel's request for a

21   designated witness, I don't think it's appropriate for now

22   after the fact that he be designated.

23             THE COURT:  Mr. Brown's excluded.

24             Now, do we have a resolution on Debtors' side?

25             UNIDENTIFIED SPEAKER:  You said he is?  He is or

```
 1    he's not excluded?
 2            THE COURT:  He is excluded.
 3            UNIDENTIFIED SPEAKER:  Thank you, Judge.
 4            MR. HUTCHINSON:  Yes, we do, Your Honor.  The
 5    debtors designate Edra Blixseth as the representative of
 6    the debtor companies.  She is the --
 7            THE COURT:  And that's consistent with your
 8    earlier designation, correct?
 9            MR. HUTCHINSON:  Yes, it is.
10            THE COURT:  Okay.  And then Mr. Foster is out.
11            MR. HUTCHINSON:  Yes.
12            MR. ZIMMERMAN:  Sorry.
13            THE COURT:  Mr. Zimmerman.
14            MR. ZIMMERMAN:  Sorry.  Mr. Foster was explicitly
15    designated, I believe, for three topics in our 30(b)(6).
16    And his -- as I hinted and referred to in my opening, we
17    believe his binding testimony is devastating.  You can't
18    de-designate him now.  Edra Blixseth was designated for
19    certain topics, Mr. Foster was designated for the topics
20    that we -- that Credit Suisse really cares about.  So if
21    they're trying to de-designate Mr. Foster as a 30(b)(6),
22    that won't work; otherwise, we don't care.
23            THE COURT:  I don't think that's what they're
24    doing.
25            MR. ZIMMERMAN:  Okay.
```

```
 1                    THE COURT:  I think they're trying to figure out
 2       who their debtor representative is going to be in this
 3       court.
 4                    MR. ZIMMERMAN:  Okay.  I just wanted to -- the
 5       language may have been a little loose.  And I apologize.
 6                    THE COURT:  There's no, there's no
 7       decertification of any designation.
 8                    MR. HUTCHINSON:  That's correct, Your Honor;
 9       simply corporate representative.
10                    MR. ZIMMERMAN:  Then we're fine.
11                    THE COURT:  I think we are.  You may proceed.
12                    MR. HUTCHINSON:  Thank you, Your Honor.
13                    THE COURT:  Did everybody look around the
14       courtroom to make sure that the witnesses are excluded that
15       everyone thinks should be excluded?
16                    UNIDENTIFIED SPEAKER:  Just in case, Your Honor.
17                    THE COURT:  Okay.
18                    UNIDENTIFIED SPEAKER:  You may change your mind.
19                    THE COURT:  I've been known to change my mind.
20       I've been also known not to change my mind.  So are we
21       ready?
22                    MR. HUTCHINSON:  Yes, Your Honor.
23                    THE COURT:  Mr. Hutchinson.
24                    MR. HUTCHINSON:  Thank you, Your Honor.
25                              DIRECT EXAMINATION
```

```
1   BY MR. HUTCHINSON:

2   Q.  Mr. Blixseth, if you would state your name for the

3   record.

4   A.  Timothy Lee Blixseth.

5   Q.  Mr. Blixseth, would you please describe for me your

6   role with regard to the debtor companies during the time

7   period between the formation of the companies in 1999 and

8   the time that you no longer had any role in the debtor

9   companies?

10  A.  From 1999 through August 12th, I believe, of '08, I

11  served as president of BGI, Inc., an Oregon corporation,

12  which was the -- I believe the manager of the debtor

13  companies.

14  Q.  In that role, were you familiar with the financial

15  condition and activities of the debtor companies?

16  A.  Yes.

17  Q.  Can you describe for me what your memory is of the

18  financial condition of the debtor companies during the year

19  2005 in terms of debt, cash flow, income, revenue, whatever

20  you can remember about those financial metrics?

21  A.  Could you be a bit more specific?  Because to ask me

22  that, that's a big general question.

23  Q.  Sure.  What's your memory of the debt position of the

24  debtor companies in 2005?

25  A.  Well, again, at the end of the year?  The beginning of
```

1    the year?  So I can answer your --

2    Q.  During the entire year.

3    A.  Well, in 2005, that's when we took the Credit Suisse

4    loan in September 30th.  So we had debt as of September

5    30th.

6    Q.  And how much debt did the company have as of September

7    30, 2005?

8    A.  Well, it had the 375 million and probably some leases

9    and ancillary debt, things like that.

10   Q.  How about the day before the loan?

11   A.  I think there was 19 million or 20 million - I could be

12   wrong in the number - with American Bank.

13   Q.  And for how long of a period of time did the debtor

14   companies carry this $19 million or $20 million debt

15   leading up to the Credit Suisse loan in September of '05?

16   A.  Well, the 19 wasn't a constant number; it was a number

17   that ballooned up and down with the seasonal construction

18   season and sales.  So it could have gone to $30 million or

19   $40 million.

20   Q.  For how long of a period of time prior to 2005 was the

21   company incurring or carrying that amount of debt?

22   A.  Well, I don't recall exactly the amount that we

23   carried, but throughout the inception of the club, you

24   know, I had fairly low cash flow.  And so we incurred debt

25   and paid it off, and we borrowed more and we paid it off.

1    So it was just varying amounts probably from starting --

2    maybe right after we started the club.

3    Q.  And is the type of debt that the debtors were carrying

4    what's known as a revolving line of credit or a revolving

5    debt changed over time?  It wasn't a term amount that was

6    fixed?

7    A.  It was a combination.

8    Q.  Explain to me what you mean by that.

9    A.  Well, for instance, on the Warren Miller Lodge, we had

10   a separate construction loan in that, which was, I think,

11   up to $20 million.  And that was strictly tied onto that

12   particular asset.  And then we would have -- from time to

13   time, we would have a revolving line that you could draw up

14   and down on.

15   Q.  And just so we're clear about this for purposes of our

16   questions here and your testimony, the Warren Miller Lodge

17   is not subject to the Credit Suisse security agreement,

18   right?

19   A.  That's correct.

20   Q.  It's carved out.

21   A.  Correct.

22   Q.  So none of the Warren Miller Lodge debt that the

23   company was carrying would have been paid off at the time

24   that the Credit Suisse loan was funded, right?

25   A.  I think that's correct, yes.

1  Q.  So excluding the Warren Miller Lodge and just looking

2  at the debtor companies from a debt-only perspective

3  leading up to the Credit Suisse loan, is it your testimony

4  that over the years up to that, there was a revolving line

5  of credit that fluctuated between, I think you said, a high

6  of 40 and -- what was the low?

7  A.  Well, it could have been as low as 4 - 5 million in

8  some years.  And when we had equipment or airplanes or

9  things like that, it could have gone up to 40, 50, maybe

10  even 60 million.

11  Q.  What was your understanding of the value of the assets

12  of the debtor companies right before the Credit Suisse loan

13  was funded?

14  A.  They were valuable.  You're asking me exact -- what

15  they're worth?

16  Q.  What was your understanding of the value of the assets

17  of the debtor companies at the time the Credit Suisse loan

18  was funded?

19  A.  Well, I know that there was an appraisal done for 1.1

20  billion, or so.

21  Q.  Do you know anything else about the value of the assets

22  of the debtor companies at the time of the Credit Suisse

23  loan other than the work that was done by Cushman &

24  Wakefield in connection with that loan?

25  A.  Oh, sure.  We have financial projections.  And the guys

1    in the financial end of it - Bob Sumpter and Chris

2    Campbell, people like that - they had projected out if the

3    market continued to go as it was going, what the company

4    would be worth.

5    Q.   And what were those projections as of the Credit Suisse

6    loan?

7    A.   They ranged anywhere from like 1.3 billion; I think in

8    the high, $2 billion.

9    Q.   Is that what you would consider to be the fair market

10   value of the assets of the debtor companies at the time of

11   the Credit Suisse loan?

12   A.   That's a little bit of a tough question for me because

13   fair market value, is it fair market value today on the

14   spot if you write a check or fair market value over the

15   life of the project?  I'm trying to get an accurate

16   question answered to you.

17   Q.   Sure.  Well, what I want to know is I want to know if

18   you tried to sell the assets of the debtor companies on the

19   open market to a willing buyer and a willing -- you're a

20   willing seller, what would that price have been at the time

21   of the Credit Suisse loan?

22   A.   We had some -- I had some internal thoughts about that.

23   And I think the original number that I had told people I

24   would sell the club for was 800 million.

25   Q.   So at the time of the Credit Suisse loan, to your

1   recollection, there was a club -- a debtor company, the

2   three Yellowstone Club LLCs worth fair market value of 800

3   million.  And you're going to -- and that has debt of

4   somewhere between 10 and 40 million; is that right?

5   A.   In my mind, I thought the club was worth somewhere

6   around the $800 million number if you, if you put it up for

7   sale.

8   Q.   And then how about other liabilities of the club at the

9   time of the Credit Suisse loan?  What do you think were the

10  total liabilities, not including the debt that we've talked

11  about?

12  A.   Well, on our balance sheet, I think we had the

13  membership deposits as a liability, and I think we had

14  equipment leases and probably a myriad of small things that

15  were on the balance sheet.  I'd have to go back and look at

16  the balance sheet.

17  Q.   What do you think those total up to?

18  A.   Well, if you take the membership deposits and if you

19  add them to that, that's probably -- gosh, maybe well over,

20  maybe well over 100 million, probably.

21  Q.   So is it fair to say, then, fair market value of 800 in

22  your estimation and then debt and liabilities of about 150

23  million?  Is that fair?

24  A.   Well, that would be on the high side, I think, but I

25  stand to be corrected by the numbers, which I don't

1   remember.

2   Q.  The debt and the liabilities would be on the high side?

3   A.  Well, you said 150 million.  I'm saying that -- I don't

4   want to go on record saying that it was 150 million.  "That

5   would be on the high side" would be my answer.

6   Q.  Okay.  How is it that these debtor companies came to

7   take out a loan in the amount of $375 million from Credit

8   Suisse?  How did that happen?

9   A.  Well, I believe we were contacted by Credit Suisse.  I

10  think it might have even been a year earlier or eight or

11  nine months earlier.  And they explained the program that

12  they had for our kind of assets.  And as time progressed,

13  we became interested and we started dialogue.

14  Q.  Credit Suisse contacted you?

15  A.  Yes.

16  Q.  You didn't contact them?

17  A.  No.

18  Q.  They approached you about a loan product that they had.

19  And do you remember what they said about that loan product?

20      I think you described it in your deposition testimony

21  as a cornerstone of the product.  Do you remember what that

22  was?

23  A.  Well, I think in banker talk, which is what they talked

24  in, I think they called the it an "equity recapitalization

25  loan".  I think that's the term they used.

```
1   Q.  Do you remember at the very beginning of this
2   discussion with Credit Suisse about the loan that there was
3   a discussion on Credit Suisse's part that you could take
4   this loan and then either make a distribution or loan that
5   money out to some other company and that that was one of
6   the things that you could do with the proceeds?
7   A.  I'm sorry, at what time period?
8   Q.  At the very beginning.
9   A.  Oh, I don't think we talked about that in those terms,
10  no.
11  Q.  You don't think you talked about it in which particular
12  terms?  That Credit Suisse mentioned that it could be
13  either a distribution or a loan at the beginning?
14  A.  I don't think that was the topic of that early
15  conversation at all.
16          MR. HUTCHINSON:  I've got a clip of the
17  deposition testimony - and it's very short - that I'd like
18  to be able to show for impeachment purposes.
19          THE COURT:  Okay.
20          MR. HUTCHINSON:  This would be Clip A.
21          THE COURT:  Which hillside are we looking at?
22          MR. HUTCHINSON:  Well, Your Honor?
23          THE COURT:  Would it be a Montana hillside, or --
24          MR. HUTCHINSON:  Your Honor?
25          THE COURT:  Yes.
```

1          MR. HUTCHINSON:  Before I do that, I want to make

2    sure that I've laid the proper foundation.

3          So please don't show the video yet.

4    Q.  (By Mr. Hutchinson)  Mr. Blixseth, do you remember at

5    some point there being a coin toss with regard to the

6    amount of fee that Credit Suisse would receive for the

7    loan?

8    A.  I do.

9    Q.  Do you know about when that happened?

10   A.  Well, I thought it was going to be when the snow was

11   off the ground, but in recollection, I -- it was on a road

12   in the intersection of Vandaside (phonetic) Road and

13   the main Yellowstone Club road.  And I said in a deposition

14   that I thought it was -- had to be after the snow was off

15   the ground because there was no snow on the ground where we

16   stood.  But I went back and looked, and I think that was

17   probably in the summer, now in retrospect.

18   Q.  Okay.  So do you think that that was early in the

19   negotiations or late in the negotiations?

20   A.  I would, I would think it's got to be fairly late in

21   the negotiation if we were flipping a coin.

22   Q.  Do you think that the discussion happened about

23   changing the terms from distribution to "or loan" by the

24   time the coin toss happened?

25   A.  I don't recall.

1              MR. HUTCHINSON:  I'd like to play my segment of

2      the deposition for impeachment purposes now, Your Honor.

3              THE COURT:  Okay.  I think you're going to need

4      to restart it here, if you're wanting to do the voice.

5              (The following is an excerpt from recorded

6      testimony):

7              UNIDENTIFIED SPEAKER:  I think from an altitude

8      standpoint, is where I was coming from, is that the general

9      terms of their proposed financing and the cornerstone of

10     their financing product was that - (inaudible, out of range

11     of microphone) - loan.  And of that, whatever that amount

12     turned out to be, that loan, the cornerstone was that the

13     sponsors, the owners, the authorized individuals or

14     entities had an opportunity to either dividend or to borrow

15     a certain percentage of the loan proceeds from --

16     (inaudible.)

17             (Audio ends.)

18 BY MR. HUTCHINSON:

19 Q.   Does this refresh your memory, Mr. Blixseth, that your

20     testimony when you were deposed that was two weeks ago, or

21     so, was that the cornerstone of the product that you were

22     being sold by Credit Suisse was a product that would allow

23     you, as the owner, to take either a distribution or a loan

24     as a way of getting cash out of the company in connection

25     with the loan proceeds?  Does that refresh your

1    recollection?

2    A.  It does refresh it.  And I remember that as we got

3    towards the end of the loan, that -- or towards making the

4    loan, that that became a real prevalent part of it and that

5    each of the loans that they've told us about - Lake Las

6    Vegas and the other loans - they said that each of the

7    different sponsors had different kind of vehicles for which

8    they took either equity or loans out.  And so that was my

9    understanding.

10   Q.  And who told you that from Credit Suisse, that the

11   sponsors of these other similar loans were either taking

12   distributions or loans?

13   A.  Well, the whole Credit Suisse team did.  We had

14   meetings.

15   Q.  Are you aware of any evidence that any of the other

16   sponsors of those similar loans did anything other than

17   take a distribution out?

18   A.  Well, not, not firsthand.

19   Q.  Are you aware that the -- do you know who Jeff Barcy

20   is?

21   A.  Sure.

22   Q.  Who is Jeff Barcy?

23   A.  Jeff Barcy was the Credit Suisse, kind of lead guy.

24   Q.  The lead negotiator on the Credit Suisse side of the

25   loan, correct?

1    A.   He appeared to be the lead guy that came out, yes.

2    Q.   And do you know that Mr. Barcy has been deposed and

3    that he has testified that he was involved in these other

4    similar loans?  Do you know that?

5    A.   I haven't read his, his testimony, so I don't know

6    that.

7    Q.   And are you aware that Mr. Barcy has said that there

8    weren't any other "or loans" allowed in these other

9    agreements, that they were all distributions?  Are you

10   aware of that?

11   A.   I'm not aware of that, no.

12   Q.   But you have a specific memory of Mr. Barcy saying it

13   could be a distribution or a loan during the process of

14   these negotiations, right?

15   A.   Towards the last month of the negotiations, we got down

16   to specifics and our teams negotiated with them.  And we

17   were advised by our accounting team that it was impossible

18   to take any money out of this company, the debtors'

19   company, as a distribution, that it would have to be a loan

20   and it would be better for the company.

21        So Credit Suisse came to me -- came to our team; not to

22   "me", I should say, to our team and said, "We'd like to

23   have you buy what's now become a very famous thing called a

24   'credit deferred swap'."

25        And they explained it to me.  I didn't know what it

1    was.  And I guess it's like mortgage insurance.  And I

2    said, "No, I don't want to do that, but we'll make it a

3    loan guaranteed by BGI."

4        And they said that would be good enough, that actually

5    is a good credit enhancement right there.

6    Q.  So the reason that we're going through this is because

7    I want to get the sequence down and I want to get your

8    memory down and I want to get your testimony about when the

9    "or loan" language first came up and first became part of

10   the discussions.  At your deposition, it appeared as though

11   it was part of the discussions from the beginning, and now

12   and later in your deposition, it sounds like your memory is

13   -- and that came up at the end.  Is that --

14            MR. FLYNN:  I object, Your Honor.  There was

15   nothing in what I just saw that had anything to do with

16   timing.

17            THE COURT:  Sustained.  There wasn't anything as

18   to timing.

19            MR. HUTCHINSON:  Well, the coin, the coin flip

20   had to do with timing and --

21            THE COURT:  Which you established earlier that it

22   must be late, late in the negotiations and toward the time

23   of the loan creation, correct?

24            MR. HUTCHINSON:  Well, what I remember is that it

25   was before they had started talking about the "or loan".  I

1    can ask the witness and maybe establish the foundation I

2    need, Your Honor.

3              THE COURT:  If you would, please.

4              MR. HUTCHINSON:  Okay.

5    Q.  (By Mr. Hutchinson)  When is it that your accountants

6    told you that you had to do a loan and you couldn't do a

7    distribution?

8    A.  I'd say in the final 30 days prior to September 30,

9    2005.

10   Q.  Before or after the coin flip?

11   A.  I don't remember if it was before or after.

12   Q.  The final 30 days would have been between September 1st

13   and September 30th, right?

14   A.  And I stand to be corrected, but it was fairly close to

15   the time we finalized the loan that the accounting firm

16   advised me that you could not take a distribution.

17   Q.  And what is it that your accounting firm told you about

18   why you couldn't -- and I'm assuming this is George Mack.

19   Is that right?

20   A.  That's correct.

21   Q.  What did Mr. Mack tell you about why you couldn't take

22   a distribution?

23   A.  He told me that if we took a distribution, that we

24   would have a negative capital account to the point where he

25   didn't think that an audit firm could -- would or could

1    audit the debtor companies.  And I took his advice.

2    Q.  Did he tell you this in writing anywhere?

3    A.  I don't believe so.  I think it was in a conversation

4    we had.

5    Q.  Did you just remember this information?

6    A.  Absolutely not.

7    Q.  You were aware of this information at the time of your

8    deposition, correct?

9    A.  I remember that it had to be a loan because of several

10   reasons.  One was the accounting reason; and, one, it was

11   much safer, probably, for the debtor companies.

12   Q.  You didn't mention the accounting reason in your

13   deposition, did you?

14   A.  I don't remember if I did or not.

15   Q.  Did you tell any of your legal advisors that there was

16   an accounting reason that you needed to take a loan as

17   opposed to a distribution?

18   A.  I don't think we would have told them that.  That

19   wasn't in their lane, it wasn't their bailiwick.

20   Q.  A decision about whether or not to take a loan or a

21   distribution in the amount of $209 million was not in the

22   lane of the lawyers?

23   A.  It was in the lane of the accounting department and the

24   outside accountants, because that's what they do.  And on

25   page 1 of the Credit Suisse agreement, it was very clear

1   that it was going to be taken out -- it could be taken out

2   one way or the other.  So the lawyers knew that.

3   Q.  Did you tell any of your lawyers why the term was

4   changed from just "distribution" to "distribution or loan"?

5   A.  I don't recall telling them that.

6   Q.  One of the defenses that you've asserted in this case

7   is advice of counsel; is that correct?

8   A.  That's correct.

9   Q.  And one of the issues that's raised when a party

10  asserts advice of counsel is the information that was

11  disclosed to the lawyers.  And so I want you to tell this

12  Court everything that you can remember about your

13  discussions with the lawyers regarding "distribution or

14  loan" language in the credit agreement.

15  A.  I don't believe that I had a specific conversation with

16  them about that.  When we hired the law firm, which we were

17  required to do, we hired them to opine or give us an

18  opinion to the entirety of the agreement.  And I assumed

19  that page 1 they looked at and thought was fine.

20  Q.  So you gave them the agreement and said, "Opine on

21  this," and you didn't tell them, "The accountants are

22  telling me I have to take a loan instead of a

23  distribution."  Is that your testimony?

24  A.  I don't believe we had that dialogue.

25  Q.  Did you tell any of the lawyers -- and just so we have

1    the record clear here, the lawyers that are working for you

2    at this point are Michael Doyle and his firm, correct?

3    A.   That's correct.

4    Q.   And then also Stephen Brown and his firm, right?

5    A.   The Garlington firm, yes.

6    Q.   Right.  Did you tell any of these lawyers that you were

7    engaging in negotiations with the "B" shareholders to buy

8    back their shares at the time that this provision was

9    changed to show -- changed from "distribution" to

10   "distribution or loan"?

11   A.   I think I had some dialogue with Mike Doyle about it,

12   yes.

13   Q.   Tell me everything you can remember saying to Mike

14   Doyle about that.

15   A.   If my recollection is correct, I think I said, "This

16   would be a good opportunity to try and buy the 'B' shares

17   back."

18       And so I sent the "B" shareholders an e-mail saying

19   that I had a chance to get a loan and -- or the company

20   did, and that if they wanted to, they could -- we'd pay

21   them "X" dollars for their shares.  It looked like a pretty

22   good opportunity to make a $750,000 investment and triple

23   it or quadruple it.

24   Q.   Well, have you read the deposition testimony of

25   Mr. Doyle?

```
 1   A.   I have not.

 2   Q.   Are you aware that Mr. Doyle doesn't recall being

 3   informed of the fact that you were actively negotiating

 4   with the "B" shareholders to buy back their shares at the

 5   same time you were working towards a loan with Credit

 6   Suisse that would provide a distribution of $209 million?

 7   A.   I'm not aware of what he testified.

 8   Q.   Okay.  You weren't hiding that fact from him?

 9   A.   Of course not.

10        MR. FLYNN:  Your Honor, I would object and move

11   to strike.  I believe it misstates Doyle.  We'll have to

12   see, but just for the sake of the record, I --

13        THE COURT:  I'll overrule.

14        MR. HUTCHINSON:  I'd like to show the witness

15   Debtors Exhibit 50, please.

16   Q.   (By Mr. Hutchinson)  Mr. Blixseth, I've handed you a

17   document that is dated January 6, 2005.  And it's a memo

18   that was written by Jeff Barcy.  And what I'm going to

19   direct your attention to is a statement that's attributed

20   to you.  And it's at the end of the second paragraph.  And

21   what it says is (quoted as recorded):

22        "Blixseth made it clear that he and the other

23   owners of the Yellowstone Club (the partners) were eager to

24   proceed with financing -- with a financing transaction so

25   that they could take a dividend."
```

1       Do you see that?

2   A.  I do see it.

3   Q.  Do you remember telling Mr. Barcy --

4           MR. FLYNN:  Objection.  The prior question was

5   about just before the loan transaction, which would be

6   September.  This is in January.  That was the basis of my

7   prior objection.  I believe Mr. Doyle's testimony is in the

8   January -- (inaudible, out of range of microphone.)  I

9   believe he's misstating the - (inaudible) - of the record,

10  Your Honor.

11          MR. HUTCHINSON:  I'm simply asking the witness

12  about an exhibit and pointing out the date of the exhibit.

13  I'm not trying to connect those two things right now.

14          THE COURT:  Well, I'm going to overrule at this

15  point.

16  Q.  (By Mr. Hutchinson)  All I want to know, Mr. Blixseth,

17  is:  Do you recall in January of 2005 having a meeting --

18  let's start with just having a meeting or having a

19  discussion with Jeff Barcy at Credit Suisse.

20  A.  I did have a conversation with Jeff Barcy from Credit

21  Suisse, and I don't remember the date.

22  Q.  Do you have any reason to believe that you didn't have

23  a conversation with him on or about January 6, 2005?

24  A.  Well, I can only go by the document, by his recount of

25  the meeting.  So we probably had one.

1  Q.  Your memory is not different than that?

2  A.  Like I said, I don't remember.  We had a lot of

3  meetings together.

4  Q.  Do you remember telling Mr. Barcy that there were other

5  owners who were eager for a dividend?

6  A.  I don't ever remember saying that.  I think when I

7  referred to "other owners", that meant my ex-wife, who was

8  technically one of the, one of the partners in the deal.

9  Q.  You didn't mean the "B" shareholders?

10  A.  I did not.

11  Q.  You told Mr. Barcy that there were other owners who

12  wanted to dividend.  And the "other owners" that you're

13  talking about is your ex-wife, correct?

14  A.  I don't recall the conversation, having that

15  conversation with Jeff Barcy that I said the other owners

16  were eager.  You asked me that in the deposition, and I

17  answered the same thing, is that I don't recall having that

18  conversation.

19  Q.  Credit Suisse knew that there were -- or strike that.

20      You told Credit Suisse that there were other owners,

21  including "B" shareholders, correct?

22  A.  I'm not sure if I told them or Chris Campbell or Bob

23  Sumpter, but I think they were aware.

24  Q.  They were aware of that?  No question in your mind

25  about that?

1    A.   I think they knew.

2    Q.   You didn't hide that fact from them?

3    A.   I would have no reason to hide it.

4    Q.   What percentage of the debtor companies did the "B"

5    share members own?

6    A.   I believe that they had, I think, 10 or 12 percent of

7    the "B" nonvoting shares, if I'm not mistaken.

8    Q.   And what was your understanding of their rights with

9    regard to participating in a return of capital or cash that

10   was going is to be distributed out of the Credit Suisse

11   loan?

12   A.   I don't have a -- I didn't have an understanding that

13   they were entitled to part of a loan.  Because a loan's a

14   loan; it's not a distribution.  And they had been -- they

15   had then gotten distributions for taxes, pari passu with me

16   and BGI and -- over the past years.  But I, I did not

17   think, because it wasn't -- at the end when we got the loan

18   put together, it was going to be a loan; it was not going

19   to be a distribution.

20        MR. HUTCHINSON:  What was your understanding in

21   May of 2005 about whether or not the -- do you have an

22   objection?

23        I'm sorry, I thought Mr. Flynn was saying

24   something.

25        MR. FLYNN:  I was -- (inaudible, out of range of

```
 1   microphone) -- apparently.
 2             MR. HUTCHINSON:  Okay.  I'm sorry about that.
 3             THE COURT:  Please proceed.
 4   Q.  (By Mr. Hutchinson)  What was your understanding in May
 5   of 2005 with regard to whether or not the "B" members were
 6   entitled to participate in a distribution that would be
 7   made from the proceeds of the Credit Suisse loan?
 8   A.  My understanding - and I got refreshed because I read
 9   both debtor companies' rules and regulations last night -
10   is that it was at the sole discretion of the "A" members,
11   which BGI controlled 100 percent of the "A" members.  So
12   there was no mandate, there was no requirement.  It was up
13   to the discretion of the manager of the LLCs to distribute
14   it or not distribute it.  And I was told many times by the
15   accounting team this agreement doesn't even provide for
16   their tax distribution if the "A" members decided not to.
17   That was my understanding.
18   Q.  I'm not sure that that was responsive to my question,
19   so let me ask my question again:  Assuming that there was a
20   distribution in the amount of $209 million made to the
21   debtor companies out of the Credit Suisse loan, what was
22   your understanding in May of 2005 as to the "B"
23   shareholders' right to participate in that distribution?
24   A.  It's a bit of a hypothetical for me because, as I said,
25   at that time, my understanding was that I did not have to
```

1    make a distribution as - (inaudible) - the "A" shares.

2    Q.   Thank you.

3             MR. HUTCHINSON:  I'd like to have the witness

4    shown Exhibit D-270.

5             THE COURT:  Did you want to offer D-50?

6             MR. HUTCHINSON:  I don't right now, Your Honor.

7             THE COURT:  Okay.

8             MR. HUTCHINSON:  Thank you.

9             THE COURT:  What was that number, Mr. Hutchinson?

10            MR. HUTCHINSON:  270, D-270.

11   Q.  (By Mr. Hutchinson)  Mr. Blixseth, I've handed you --

12   or you've been handed a document that's been identified for

13   the record as D-270.  And it's a letter on Blixseth Group,

14   Inc. letterhead dated May 25, 2005, from you to the "B"

15   shareholders regarding the buyback of the "B" shares.  Do

16   you recognize this letter?

17   A.   I do.

18   Q.   You wrote it?

19   A.   I signed it.

20   Q.   Did somebody else write it for you?

21   A.   A secretary probably typed it.

22   Q.   Who decided on what the letter would say?

23   A.   Well, let me rephrase that.  I'm not sure if this came

24   out of my office or came out of -- you know, it might have

25   come out of Mike Doyle's office on my -- our letterhead.

1    So I can't say.  I don't know for sure where it came from.

2    Q.  Mike Doyle's office was sending out correspondence on

3    your letterhead in May of 2005?

4    A.  I don't recall, but it could have been generated out of

5    that office.

6    Q.  You don't have an independent recollection of writing

7    this?

8    A.  I do not, no.

9    Q.  And do you remember authorizing anyone to send out

10   communications to Michael Snow?  Michael Snow is a

11   "B" shareholder, right?

12   A.  That's correct.

13   Q.  Do you remember authorizing anyone to send out

14   communications on your behalf with regard to buying back

15   the "B" shares in May of '05?

16   A.  I know we sent a letter, a similar letter, I think, to

17   all of the "B" shareholders identical to this one.  And I

18   don't recall if it came from my office or if it came from,

19   from someone else.

20   Q.  Did you review and approve it before you signed it?

21   A.  I'm sure I did.

22         MR. HUTCHINSON:  We'd offer Exhibit 270, Your

23   Honor.

24         THE COURT:  Any objection?

25         MR. FLYNN:  Irrelevant, Your Honor.

```
 1              THE COURT:  D-270 is admitted.

 2           EXHIBIT D-270 ADMITTED INTO EVIDENCE

 3    BY MR. HUTCHINSON:

 4    Q.  Mr. Blixseth, in this document, there's a statement

 5    that appears at the paragraph that starts with -- it's

 6    about -- it's the fifth paragraph down.  Would you read

 7    that into the record, please?

 8    A.  (Quoted as recorded):  "As I bring our children," is

 9    that the --

10    Q.  Yes; yes, sir.

11    A.  (Quoted as recorded):  "As I bring our children into

12    the business, I find a need to attempt to reacquire the

13    remaining 10 'B' units in order to do some estate planning

14    as well as involve the children in the ownership of the

15    club."

16    Q.  And how about the next paragraph, please.

17    A.  (Quoted as recorded):  "I've arranged the financing

18    that would allow me to repurchase these outstanding shares

19    that will take the financing only -- on only if I can

20    reacquire all the outstanding 'B' shares."

21    Q.  The financing that you're referring to in this letter

22    is the Credit Suisse loan, isn't it?

23    A.  Yes, it is.

24    Q.  And you were writing to the "B" shareholders and

25    telling them that you wanted to buy back their shares but
```

1   you would only do the financing if you could buy their

2   shares back, right?

3   A.   In May, that was my position.

4   Q.   Did you tell them that you were going to take a

5   $209 million distribution out of the Credit Suisse loan?

6   A.   I don't think I could have possibly done that, because

7   I think at the time in May, there was not a $375 million

8   loan in the books.

9   Q.   How much was it in May?

10  A.   I don't recall.  It started out at 150 and went to 200

11  or 230.  I don't remember in May what it was.

12  Q.   It was at least 100, wasn't it?

13  A.   Well, it started out at 150, so it would have to be at

14  least 150.

15  Q.   A $150 million distribution?

16  A.   No, no, no.  Sorry.  Not a distribution; the total

17  amount of the proposed loan from Credit Suisse.

18  Q.   What was the distribution?

19  A.   I don't remember on that one.

20  Q.   The documents will reflect what the loan amount is.

21  Does it -- would it surprise you if the amount of the

22  distribution was always in excess of $100 million?  Is that

23  consistent with your memory?

24  A.   Well, I don't recall -- when the proposed loan was 150

25  million, I don't recall what the amount that was in the

1    proposed loan document was to be a distribution or loan.

2    Q.  Whatever the distribution was that was in the documents

3    as of May 2005, you didn't tell the "B" shareholders that

4    you were going to take a distribution out of the Credit

5    Suisse loan, did you?

6    A.  Well, it wasn't set that I was going to take a

7    distribution out of that at that time.

8            MR. FLYNN:  Your Honor, can I have a standing

9    objection of parole evidence, irrelevance, and best

10   evidence?

11           THE COURT:  You may, for the record.

12           MR. FLYNN:  Thank you.

13   Q.  (By Mr. Hutchinson)  Mr. Blixseth, didn't you write

14   this letter to the "B" shareholders so that could buy back

15   their shares before the Credit Suisse loan proceeds came in

16   and you wouldn't have to share the distribution with them?

17   A.  Absolutely not.

18   Q.  Why is that not the reason you wrote this?

19   A.  Because I could not have -- I wouldn't have been in

20   position to buy them out before the loan proceeds closed.

21   Q.  You didn't --

22   A.  And that's one reason.

23   Q.  You didn't have the money at the time the loan proceeds

24   closed but for receiving the money from the loan; is that

25   right?

```
 1   A.   I would not have bought out these gentlemen that are in

 2   the deal, the "B" shareholders, the 10 guys, if I had not

 3   have gotten the loan.

 4   Q.   Let's look at Exhibit D-263-D.

 5           MR. HUTCHINSON:  Would you please hand that to

 6   the witness?

 7           THE WITNESS:  Thank you.

 8   Q.   (By Mr. Hutchinson)  263-D.  Do you recognize this

 9   letter, Mr. Blixseth?

10   A.   Yeah, I've seen this letter before.

11   Q.   It's a letter dated July 14, 2005, before the loan from

12   Mack Roberts, your accountant, right?

13   A.   That's correct.

14   Q.   Was he also the CFO of the company at the time?

15   A.   I don't believe at that time.

16   Q.   When did he become the CFO?

17   A.   He would have come, I think, sometime after the death

18   of Denise Tuohy, our controller.

19   Q.   You authorized Mr. Roberts to write this letter --

20   sorry, Mr. Mack, to write this letter on your behalf?

21   A.   (Inaudible) -- this letter was:  I had made the offer

22   to buy the "B" shareholders out and made a proposal.  I

23   think it was equal to probably 3.5 to $4 million per share.

24   And when one or two of them didn't agree, we said, "Fine,

25   we'll -- why don't we get the place appraised.  Let's get
```

1    your share appraised."

2        And so I asked Mr. Mack, I believe, to go out and talk

3    to people and try to get a real present value, what's a

4    non-voting "B" share worth today?  I think this is a

5    derivative of that conversation.

6    Q.  You authorized Mr. Mack to tell the "B" shares that

7    your offer was a tremendous value?

8    A.  Oh, I thought it was.

9    Q.  You authorized Mr. Mack to tell you that -- or to tell

10   the "B" shareholders that, that you had decided for various

11   reasons, to own 100 percent of your dream.

12   A.  I don't recall if I said specifically what that

13   question is, but he knew I was trying to buy the B's back.

14   Q.  By this point, July of 2005, you knew that you were

15   going to get a distribution out of this loan, didn't you?

16   A.  No, that's not true.

17   Q.  Okay.  Did you know that you were going to receive cash

18   in the form of either a loan or a distribution by July

19   2005?

20   A.  Well, we didn't even know if the loan would be funded

21   if it had -- people would buy the loan.  Until the loan was

22   consummated, I wouldn't know if we were going to get the

23   deal done or not.

24   Q.  What were the terms that you were being offered in July

25   of 2005?

1   A.   From Credit Suisse?

2   Q.   Yes.

3   A.   I don't remember exactly in July of 2005 what the terms

4   were.   Whatever latest draft was, probably.

5   Q.   Isn't it true that in July 2005, Credit Suisse was

6   offering you a distribution or a loan out of the proceeds

7   in excess of $100 million?

8   A.   I don't remember if it was 100 million or 125 million

9   or $150 million at that point.

10   Q.   Something in excess of 100 million, correct?

11   A.   I don't remember what it was.   Sorry.

12   Q.   Okay.   Did you tell Mr. Roberts to inform the

13   "B" shareholders that you were negotiating a loan with

14   Credit Suisse that was going to provide to you a

15   distribution or a loan, cash off the table, in the amount

16   of -- in excess of $100 million?

17   A.   I don't think that that was discussed specifically like

18   that.   I think he knew there was a loan in the works, and

19   it was a good opportunity for the guys that came in early

20   to put $750,000 up in a really pioneering effort to get

21   four or five times their money.

22   Q.   Did you seek any legal advice with regard to what the

23   fiduciary duties are that a manager of an LLC owes to the

24   "B" shareholders?

25   A.   The only legal advice that I probably effectively

1   sought was when we hired the Garlington firm and Mike

2   Doyle's firm to advise us on the paperwork on the Credit

3   Suisse loan that there could be a loan or distribution and

4   to make sure that that's all kosher and correct.

5   Q.  Did you ask any lawyer at any time prior to September

6   30, 2005, what your obligations of disclosure were to the

7   "B" shareholders?

8   A.  I don't think so.

9          THE COURT:  Mr. Hutchinson?

10          MR. HUTCHINSON:  Yes.

11          THE COURT:  How far into the examination are we

12   at this point?

13          MR. HUTCHINSON:  I'm probably about 25 percent

14   in.

15          THE COURT:  Okay.  We are going to recess.

16          You may step down, Mr. Blixseth.

17          THE WITNESS:  Thank you.

18          THE COURT:  And you'll be called after we come

19   back from lunch.  We'll reconvene at 1:15.

20          (The lunch recess was taken.)

21          THE COURT:  Please be seated.  We will reconvene

22   in the Adversary Proceeding 09-0014.  Mr. Blixseth has

23   resumed the witness stand, is under oath.

24          I'll just remind you that you're still under oath

25   from the earlier swearing in.

1            Mr. Hutchinson, you may proceed -- oh, before you

2     do, just so there's not panic with all the people with the

3     laptops, I was just informed by the IT person that sometime

4     between now and three, probably, your Wi-Fi will be fine,

5     it's just that you won't have connectivity to the internet.

6     So nothing will move.  You'll try to do something and

7     nothing will happen.  He doesn't know how long it will be

8     down.  Apparently, some people are coming over and they

9     need to reset some things.  And it could be moments; it

10    could be 30 minutes.  So just so you don't go into a heart

11    attack, or anything, when nothing seems to be working.

12            So, Mr. Hutchinson, please proceed.

13            MR. HUTCHINSON:  Thank you, Judge.

14    BY MR. HUTCHINSON:

15    Q.  Good afternoon, Mr. Blixseth.  Do you remember having

16    conversations with anyone about whether or not the credit

17    agreement with Credit Suisse should have a loan or

18    distribution as it relates to the $209 million?

19    A.  I believe I talked to the guys that were running the

20    financial part of it, which was I think Bob Sumpter and

21    Chris Campbell.

22    Q.  Anyone else?

23    A.  Not that I recall.

24    Q.  Well, I thought I heard you earlier this morning

25    testify that you talked to Mr. Mack about that.

1    A.  Well, besides Mr. Mack.  I've already testified to

2    that.

3    Q.  You talked to Mr. Mack about whether or not the Credit

4    Suisse credit agreement should allow for a distribution in

5    the amount of 209 million or a distribution or a loan --

6    A.  Right.

7    Q.  -- in the amount of 209, right?

8    A.  Roughly the 30 days, or so, before the loan.

9    Q.  Okay.  And that was when Mr. Mack told you that you

10   needed to do a loan because that was better for the

11   financial position of the company, right?

12   A.  He told me that we, that we needed to make it a loan

13   because of the capital accounts.  And I also felt it was

14   better to make it a loan for the company's sake because it

15   basically was an interest hedge on $209 million on a loan.

16   Q.  Do you remember me asking you that specific question in

17   your deposition and you didn't mention Mr. Mack at all?

18   A.  Well, I probably didn't remember then.

19   Q.  So since your deposition and today, you've remembered

20   that it's Mr. Mack who told you that it would be better to

21   do a loan instead of a distribution?

22   A.  Well, I went back and read about 5,000 papers of all

23   your exhibits, and, you know, it jogged a lot of my memory.

24   But whether I remembered that day or didn't remember that

25   day, the fact is that I did have a conversation with

1    Mr. Mack, and he did tell me that it could not be a

2    distribution, it had to be a loan.

3    Q.  Nothing in writing?

4    A.  I don't think so.

5    Q.  None of the 5,000 pages have one piece of paper from

6    Mr. Mack saying that, did they?

7    A.  Not in the 5,000, no.

8            MR. HUTCHINSON:  I'd like to show a short

9    question-and-answer on this point for impeachment purposes,

10   Your Honor.

11           THE COURT:  Okay.  You know, and I'm hopeful this

12   works better than it did the last time, because we're

13   having a really hard time hearing it for the recording.

14   And if we do have that problem, it may be that we'll just

15   have to go to the deposition document.

16           MR. FLYNN:  Judge, could we have the page and

17   line before he, before he shows it --

18           THE COURT:  That would be helpful.

19           MR. FLYNN:  -- so we've got optimal completeness

20   here?

21           MR. HUTCHINSON:  Sure.  It's 197, line -- page

22   197, line 1 through 12.

23           Hold on, hold on.  Your Honor, I'm waiting for

24   them.

25           THE COURT:  I understand.

1          MR. HUTCHINSON:  Okay.

2          MR. FLYNN:  (Inaudible, out of range of

3   microphone.)

4          THE COURT:  You may proceed.

5          MR. HUTCHINSON:  Thank you.

6          (The following is an excerpt from recorded

7   testimony):

8   BY UNIDENTIFIED SPEAKER:

9   Q.  Do you remember having conversations with anyone about

10  whether or not the credit agreement with Credit Suisse

11  should have "loan or distribution" in it as the -- as it

12  relates to the 209 million?

13  A.  The document speaks for itself.  And - (inaudible, out

14  of range of microphone) - Credit Suisse after our

15  conversation, which I just recited to you about credit

16  default swaps versus -- you know, and BGI prior to

17  September 30, 2005, they - (inaudible) - front page that it

18  could be either as a - (inaudible) - or a distribution,

19  whatever term you would like - (inaudible) - or a loan at

20  the manager's discretion.

21          (Audio ends.)

22  BY MR. HUTCHINSON:

23  Q.  So Credit Suisse put that term in, right?  Is that

24  correct?

25  A.  It was in the contract, yes.

1   Q.  Credit Suisse put in the term "or loan".  And when I

2   asked you if you talked to anyone, you didn't tell me you

3   talked to Mr. Mack.  You were under oath in your

4   deposition, right?

5   A.  I didn't remember that I talked to Mr. Mack at that

6   time.  And I remembered since then, I tried to recreate the

7   events.  And I remember that I said there that I went to

8   Credit Suisse, and I -- when the first part of that tape

9   started, I was talking about credit default swaps.  I had

10  explained that Credit Suisse and I think Chris Campbell, or

11  someone, had a conversation.  I didn't have the

12  conversation.  And they wanted us to take something called

13  "CDS", which is "credit differed swaps", a pretty famous

14  term now.  And they wanted about $2.5 million a year.

15      And I said, "That doesn't sound good to me."  And I

16  said, "Fine, we'll make it a loan."

17      And Credit Suisse said, "That's probably good enough

18  for credit enhancement that BGI is going to make it a

19  loan."

20  Q.  Have you talked to Mr. Mack since your deposition?

21  A.  I have spoken to Mr. Mack, yes.

22  Q.  And what did Mr. Mack say about this conversation?

23  A.  I didn't talk to Mr. Mack about my deposition.

24  Q.  What did he say about the conversation that you had

25  with him that you're remembering today that you didn't

1   remember at your deposition about him telling you, "You

2   need to do this as a loan, not a distribution"?

3   A.   I talked to Mr. Mack on the telephone on several

4   occasions, probably every other day.  And he asked how the

5   deposition went.

6        And I said, "You know, the deposition went fine."

7        And he said that -- and that conversation was that you

8   guys had canceled his deposition, or something.  And I

9   don't know if that's -- I'm just being hearsay, here.

10       And he made a comment to me.  He said, "It had to be a

11  loan, because you couldn't do it."

12       And I went, "Oh, I forgot we had that conversation."

13       That's what we talked about.

14  Q.   Did he tell you when you had this conversation that you

15  forgot until today?

16  A.   No, we didn't talk about the "when".

17  Q.   Do you think this conversation happened before or after

18  the Credit Suisse loan?  Can you date the conversation?

19  A.   I believe it was in the last 30 days before the loan,

20  somewhere 30 to 45 days before the loan came about.

21  Q.   And your memory is that all the way up until 30 days

22  before the loan, there was a distribution planned.  And

23  then 30 days before the loan, it changed to "distribution

24  or loan", right?

25            MR. FLYNN:  Objection, Your Honor.

1           THE COURT:  Pardon, Mr. Flynn?

2           MR. FLYNN:  Objection, Your Honor.  He just

3    completely misstated the record.  He introduced a document

4    as D-50 that said "distribution or loan" back in May.

5           THE COURT:  I'm going to overrule and allow to go

6    forward.

7           THE WITNESS:  I'm sorry, the question was?

8    Q.  (By Mr. Hutchinson)  All the way up until 30 days

9    before the loan, there was no discussion about anything

10   other than a distribution to you; isn't that right?

11   A.  We really didn't dwell on that until then.  The main

12   thing was to get a finalized loan, and then we would figure

13   out the details.  And that's what we had accountants for

14   and attorneys for.

15   Q.  Okay.  And then the "or loan" you're now testifying

16   came up because Mr. Mack told you 30 days before it needed

17   to be a loan, correct?

18   A.  I relied on my accounting, outside accounting firm,

19   Mack Roberts.  And they recommended -- or they didn't

20   "recommend"; they said it has to be a loan because of

21   negative capital accounts.  And I made this decision, the

22   sole decision, that it would be better for the company if

23   the company had $209 million owed to it by its parent and

24   had interest accruing and coming in overall for the

25   company.  It would have been a lot better tax-wise,

1    dollar -- out of pocket would have been a lot better had it

2    been a distribution because then the company started -- or

3    ended paying a lot more in interest than it would of the

4    taxes.

5    Q.  Where did Mr. Mack tell you this?  On the phone or in

6    person?

7    A.  You know, I don't recall if it was on the phone or in

8    person.

9    Q.  How many other conversations did you have with Mr. Mack

10   regarding the loan?

11   A.  I don't recall the number.  I didn't recall the number

12   when you deposed me.  I didn't know that I -- I forgot I

13   called -- even talked to the guy.

14   Q.  I know that you have talked to Mr. Mack and Mr. Mack

15   has told you about this conversation, but it sounds like

16   your testimony today is that that has refreshed your memory

17   about that conversation.  Is that accurate?

18   A.  That's accurate.

19   Q.  Okay.  Let's look at some other documents that were in

20   existence around this time.  We'll start with D-263-A.

21   A.  Thank you.

22             MR. FLYNN:  263-A?

23             MR. HUTCHINSON:  263-A.

24             UNIDENTIFIED SPEAKER:  263-A.

25   Q.  (By Mr. Hutchinson)  And, Mr. Blixseth, this is -- I

1   don't need to spend a lot of time on it; I'm just trying to

2   get some time parameters, here.  This is an August 22nd

3   version of the credit agreement that was being exchanged

4   between your lawyers and the lawyers representing Credit

5   Suisse.  And if you look back the page that has the

6   recitals on it, which is the second-to-last page of this

7   exhibit, you'll see in the "recital" section, it says that

8   the general purpose of the loan is for a distribution to

9   affiliates and owners.  Do you see that?

10   A.   I do.

11   Q.   So as of August 22nd, we've got distribution to

12   affiliates to owners.  And now let's go to Exhibit 263-C.

13   A.   Thank you.

14   Q.   And Exhibit 263-C is from September 4, and it's the

15   same credit agreement, a different version of it.  And if

16   you look to the second-to-last page of Exhibit 263-C, what

17   you'll see is that there's been a change that says (quoted

18   as recorded):  "Distribution or loans up to a dollar

19   amount."

20        Do you see that?

21   A.   Yes, I do.

22   Q.   Now, do you remember anything happening between August

23   22nd and September 4th other than your conversation with

24   Mr. Mack that --

25   A.   Well, I --

1    Q.   -- I'm sorry, that had to do with the change from

2    "distribution", to "distribution or loan"?

3    A.   Well, as I think I said earlier, that Credit Suisse

4    came back to our team and wanted us to buy credit differed

5    swaps to enhance the credit, apparently to help sell the

6    bonds.  And we said, "No."  And so we agreed -- we said,

7    "Look, we'll just -- we'll absolutely make this a loan.  We

8    have to make it anyway."

9         And so that conversation occurred with Credit Suisse.

10   Q.   Do you remember there being a memo that was dated

11   August 30, 2005, that Mr. Doyle wrote to you?  Do you

12   remember that?

13   A.   I'd have to look at it and see.

14              MR. HUTCHINSON:  What's the number?

15              UNIDENTIFIED SPEAKER:  263-F.

16   Q.   (By Mr. Hutchinson)  263-F.  Do you remember receiving

17   this memo, 263-F?

18   A.   May I read it?  May I read it?

19   Q.   You may read it.

20              THE COURT:  You may read it, certainly.

21   Q.   (By Mr. Hutchinson)  I showed you this in your

22   deposition.  Do you recall seeing it and reading it then?

23   A.   Well, I think so.

24   Q.   And this is a -- 263-F is a memo from your lawyer.

25   Mr. Doyle was your primary lawyer at the time, wasn't he?

1    A.   He was one of the lawyers.

2    Q.   He's described himself as the head of the legal team

3    for the debtor companies in connection with the Credit

4    Suisse loan.  Do you agree with that characterization?

5    A.   I'd call him the quarterback of the team, yeah.

6    Q.   He's testified that you've paid his firm in excess of

7    $200,000 a year for a number of years leading up to the

8    Credit Suisse loan.  Is that what you remember?

9    A.   I don't know how much we paid him.

10   Q.   He's currently your in-house counsel; is that correct?

11   A.   That's correct.

12   Q.   Works for you and no one else?

13   A.   Well, I don't know if he -- he had outside clients to

14   begin with, and I don't know, as I said in my deposition,

15   if he still does not or not.

16   Q.   He signs letters as general counsel to your company?

17   A.   He does.

18   Q.   Mr. Doyle writes to you, and it appears from this that

19   you asked him whether or not you could kick out

20   "B" members.  Do you remember asking him that?

21   A.   I think I had to -- we had a problem with -- I had a

22   problem with the one particular "B" member, and I asked him

23   what my rights were.

24   Q.   And if you look down to the third-from-the-last

25   paragraph, what you'll see is that Mr. Doyle was also

1    telling you that if you make a distribution, you've got to

2    make the distribution to the "B" members.  That's what he's

3    telling you in this August 30, 2005 memo, right?

4    A.  Well, as I read it, he says (quoted as recorded):  "If

5    you make a distribution from net cash flow."

6       That's as I read it.

7    Q.  What does that mean to you?

8    A.  Well, that's the net cash flow after you sell lots and

9    you pay your ski lift operators and you pay your light

10   bill.  That's your -- that cash flow, your profit.

11   Q.  Well, why don't you read the last sentence of that

12   paragraph.  Read that into the record, please.

13   A.  Out loud?

14   Q.  Yes, please.

15   A.  Is that the one that starts with:  The result?

16   Q.  No.  It starts with:  You could, you could not --

17   A.  I'm sorry, I'm lost.

18   Q.  Okay.  The third paragraph from the bottom.

19   A.  Okay.  (Quoted as recorded):  "You cannot simply", is

20   that what you would like?

21   Q.  No.  It says --

22   A.  Sorry.

23   Q.  It says (quoted as recorded):  "You cannot make a cash,

24   a cash distribution just to the 'A' members and not make a

25   proportionate cash distribution to the 'B' members."

1      Do you see that?

2  A.  Okay, that's a -- oh, the third, I'm sorry.  I didn't

3  count this last sentence as a paragraph.  (Quoted as

4  recorded):

5          "You cannot make a cash distribution to just 'A'

6  members and not make a proportional cash distribution to

7  Class B members."

8  Q.  Right.  Do you remember getting that advice?

9  A.  I must have.  It went to me.

10  Q.  And you see in the next paragraph what he says is that

11  (quoted as recorded):  "It only makes good sense to get rid

12  of all the Class B members as soon as reasonably possible."

13      Do you see that?

14  A.  Let me see.  Okay.

15  Q.  Do you see that it says that?

16  A.  I've lost it.  Are we in the fourth paragraph -- or the

17  fourth one up or the second-to-the-last?

18  Q.  We're in second-to-last.

19  A.  Okay.

20  Q.  Count the last sentence as a paragraph.

21  A.  Okay.  Okay, I've got it now.  Sorry.

22  Q.  (Quoted as recorded):  "The only thing that makes good

23  sense is to get rid of the 'B' members as soon as

24  reasonably possible."

25      Right?

1   A.   Right, buy them out.

2   Q.   Did this have anything to do with the change in the

3   credit agreement from "distribution" to "distribution or

4   loan"?

5   A.   No.

6   Q.   Nothing?

7   A.   No.

8   Q.   Okay.  Let's go to 263-B.

9          THE COURT:  What was that number again?

10         MR. HUTCHINSON:  263-B.

11         THE COURT:  Okay, thanks.

12  Q.   (By Mr. Hutchinson)  I'm just going to ask you about

13  the first, well, the first line of this e-mail that's dated

14  September 4, the same day as the credit agreement that for

15  the first time shows the words "or loan" in addition to

16  "distribution".  And what it says is that (quoted as

17  recorded):  "This does not include everything that Tim and

18  Jeff have discussed in the past couple of days."

19      And the "Tim" is you, right?

20  A.   I assume so.

21  Q.   And the "Jeff" is Mr. Barcy --

22  A.   I assume so.

23  Q.   -- of Credit Suisse, your counterpart?  Yes?

24  A.   I assume so.

25  Q.   And it says that you guys have negotiated for a couple

1  of days.  Do you remember what you negotiated about?

2  A.  I don't.

3  Q.  Do you remember what you told him about wanting to

4  change the term or needing to change the term from

5  "distribution" to "distribution or loan"?

6  A.  I don't recall that, no.

7  Q.  Do you remember telling Mr. Barcy that you needed to

8  have the approval or the authorization of the "B" share

9  members before you could make a distribution?

10  A.  I don't recall that conversation.

11  Q.  Let's now look at Exhibit 266.

12       MR. FLYNN:  Sorry.  You said "266"?

13       MR. HUTCHINSON:  Yes, 266.

14  Q.  (By Mr. Hutchinson)  Mr. Blixseth, Exhibit 266 is an

15  e-mail, and it's dated February 5, 2005 -- I'm sorry.

16       MR. FLYNN:  Are you talking about D-266?

17  Q.  (By Mr. Hutchinson)  I misspoke.  It's dated September

18  5, 2005.  Do you remember sending an e-mail to your wife,

19  who at the time was your business partner, and telling her

20  that the B's are nosing around?

21  A.  I don't recall sending it, but I've seen this document

22  several times before.

23  Q.  Do you have any doubt that this came from you?

24  A.  I probably don't doubt it, no.

25  Q.  You don't deny that you said these things in an e-mail?

```
 1   A.  Well, I can tell you that my -- I am suspect a lot

 2   lately, because there's been some hacking into my e-mails.

 3   And this probably isn't one of them.  So now I'm not going

 4   to agree that every e-mail that you put in front of me is

 5   one I wrote, frankly.

 6   Q.  Okay.  But you've seen this one enough and you don't

 7   have any doubt that this one is one that you wrote, right?

 8   A.  I think I wrote --

 9   Q.  Okay.

10   A.  I was a party to this one here.

11   Q.  Okay.  And so on September 5, 2005, what you're saying

12   is (quoted as recorded):

13        "The B's are now starting to nose around and we

14   must make sure not to make any distributions to BGI because

15   they would be entitled to their equal share.  Loans are

16   okay, and operating agreement."

17       Do you remember saying that?

18   A.  Yeah, we weren't going to make any distributions.  I

19   wrote it.

20   Q.  Because you were going to have to share $26 million

21   with the "B" members, and you didn't think they deserved

22   it; isn't that right?

23   A.  No, that's not right.  It was my option, as the "A",

24   100 percent shareholder, to determine in the company

25   distributions or loans.  And we had made -- already made
```

1   the decision that this was going to be a loan.  And it had

2   no bearing on that.  It was already -- we had made the

3   decision by the time the loan came down - or close, in

4   September - that it was going to be a loan.  And when you

5   have people starting to threaten you with, you know,

6   "Deposit $10 million in my checking account by Friday or

7   I'm going to sue you," and they're a "B" shareholder,

8   several weeks go by like that, of course you get a little

9   defensive and you send out an e-mail like this saying:

10  We'd better make sure everything we're doing is correct.

11  Q.  And the thing that you were doing that you believe is

12  correct is you were changing the loan terms so that you

13  could avoid a distribution to the B's and instead make a

14  loan to yourself.

15  A.  Absolutely untrue.

16  Q.  Okay.  After this loan closed, you transferred

17  $209 million from the debtor companies to BGI, right?

18  A.  Yes.

19  Q.  And then you transferred $190 million to yourself,

20  right?

21  A.  BGI loaned me, the community, $190 million, more or

22  less.

23  Q.  When were there loan papers drawn up with regard to the

24  loan that was made from the debtor companies to BGI?

25  A.  Well, I know now, of course, because we've gone over

1    it, but it was sometime, it was sometime in the first half

2    of '06 when we -- our first big audit was going to be June

3    30th, our certified audit.  So we had to make sure that

4    everything was -- the T's were crossed, the I's were

5    dotted.

6         Because when I started the company, it was with a

7    pickup truck and a hammer, and we had really no accounting

8    to speak off.  We started -- we hired a local bookkeeper

9    with no professional training, Denise Tuohy, and we had to

10   get more and more sophisticated.  And all of a sudden, now

11   we're having to have audits and things like that.  So our

12   old practices of, you know, just saying, "It's a loan we

13   put on there, and then the interest accrues," we had to

14   make sure we were absolutely documented.

15        In fact, today, there's a $13 million loan that I

16   loaned to Yellowstone Club World that does not have a note,

17   but it's -- we're going to file a proof of claim.  And I'm

18   assuming it's still a loan because I loaned it $13 million.

19   We didn't have a note.

20   Q.  Didn't have any notes for the $55 million that you had

21   taken out of the company before the Credit Suisse loan --

22   A.  As I --

23   Q.  -- either, right?

24   A.  I'm sorry.

25   Q.  It's okay.

1    A.   I said, Mr. Hutchinson, the way we did business,

2    standard operating practices, when BGI in their early days

3    provided all of the funds and all of the money and the

4    guarantees for the companies - or we wouldn't even be here

5    today - we didn't have notes.  The tables were turned where

6    BGI was owed money.

7    Q.   Isn't it true, Mr. Blixseth, that the only time that

8    you created a note in favor of the debtor companies

9    obligating BGI to pay money back, pay $209 million back,

10   was after there had been a demand filed on you by the

11   LeMond plaintiffs and Mr. Doyle met with Mr. Brown's firm

12   and reported that the lawyers were dismayed that there were

13   no notes?  Isn't that when the notes were created?

14   A.   It was somewhere around that proximity, but it wasn't

15   the sole reason.

16   Q.   Why don't we look at that document.  It's 263-G.

17            MR. FLYNN:  I believe for the record, Your Honor,

18   it's also Exhibit 5 in our exhibits.

19            THE COURT:  Okay.

20   Q.   (By Mr. Hutchinson)  You remember I showed you this in

21   your deposition, Mr. Blixseth?  It's a May 6, 2006 memo

22   from Mr. Doyle to you.  And at the end of the third

23   paragraph --

24   A.   I've got May 8th.

25   Q.   May 8th, thank you.  At the end of the third paragraph,

1  it states that (quoted as recorded):

2          "They were a bit dismayed when I had to tell them

3  that this loan was not evidenced by a promissory note."

4     Do you see that?

5  A.   I do.

6  Q.   Did you seek any legal advice from anyone with regard

7  to the transfer of the $209 million from the debtor

8  companies to BGI?

9  A.   I believe that was covered under the opinion letter by

10  an outside firm and our attorneys because that was part and

11  parcel of the loan that that -- the fact that they didn't

12  say -- which it was Mike Doyle's job was to say through all

13  the years, was, "Look, I'm going to look at these

14  documents.  And if something's wrong, I'm going to tell

15  you."

16     And that's why we went to outside counsel, too.  So I

17  assume when no one said to me, "There's something wrong

18  with it," there was nothing wrong with it.

19          MR. GRANT:  Your Honor, for the record --

20          THE COURT:  Mr. Grant --

21          MR. GRANT:  -- he misread even the portion of the

22  paragraph that he did.  So for both - (inaudible) - of

23  completeness, could we read the two sentences?

24          THE COURT:  Absolutely.

25  Q.  (By Mr. Hutchinson)  Why don't you go ahead and do

1    that, Mr. Blixseth.

2    A.  This would be the third paragraph down?

3    Q.  Third paragraph down.

4    A.  Would you like me to read it?

5    Q.  I believe your counsel would.

6           THE COURT:  Please, please read it.

7           THE WITNESS:  Out loud?

8           THE COURT:  Sure.

9           THE WITNESS:  (Quoted as recorded):  "The

10   consensus of everyone on the telephone conference was that

11   the main bitch in the complaint involved the $209 million

12   loan from the Yellowstone Club, Yellowstones to BGI.  It

13   was the Montana attorneys' opinion that such loans are

14   allowed under the operating agreement; although, they were

15   a bit dismayed when I had to tell them that this loan was

16   not evidenced by a promissory note."

17   Q.  (By Mr. Hutchinson)  Did you ask any lawyer prior to

18   this time to give you advice about whether you needed to

19   have any documentation in connection with transferring

20   $209 million out of the debtor companies to BGI?

21   A.  I think my answer will still be the same, is that:  We

22   had legal counsel.  That's what they did.  That's what

23   accountants were for and lawyers were for, to tell us --

24   and that was part and parcel on the front page of the

25   Credit Suisse document so everyone knew.  And when we got

1   the "bless you", if you will, to sign the contract, that

2   was glaring in your face that that could be done.  And so I

3   didn't -- I got the advice from the, from the attorneys

4   that I just said.  I assumed that that's what we could do.

5   That's why we had them.

6   Q.  You can't point to any conversation where you

7   specifically asked for that advice, can you?

8   A.  I don't recall ever having that specific advice because

9   I figured if you hire lawyers and they review a document

10  and they give you an opinion, it doesn't say:  "If I give

11  you an opinion, I'll give you an opinion on everything

12  except this paragraph" and qualify it.

13      That wasn't the case.  I wasn't -- that's what I relied

14  on the lawyers for.

15  Q.  When you hire lawyers, you also need to tell them

16  what's going on before they can give you good advice.  Did

17  you tell them that you were taking $209 million out of the

18  debtor companies?

19          MR. FLYNN:  Your Honor, objection.  The document

20  speaks for itself.  It's right in the document.

21          THE COURT:  Repeat your question.

22  Q.  (By Mr. Hutchinson)  Did you tell any lawyer after

23  September 30, 2005, in advance of this May memo that you

24  were taking $209 million out of the debtor companies and

25  transferring it to BGI?

1          THE COURT:  Just a moment before you answer that.

2          I'm going to overrule your objection and allow

3     him to answer.

4          MR. FLYNN:  One further objection, Your Honor:

5     Your Honor has the redacted portion of the declaration of

6     Mr. Blixseth both involving a conversation as recently as

7     April - (inaudible, out of range of microphone) - on this

8     precise subject.  The question was:  Did you ever tell

9     anyone or did you ever speak to anyone, any lawyer?

10         And Your Honor has that redacted -- (inaudible,

11    out of range of microphone.)

12         THE COURT:  Well, I'm going to overrule and allow

13    him to answer.

14         THE WITNESS:  So if I got it right, I think the

15    question was:  After September 30th?

16    Q.  (By Mr. Hutchinson)  After the loan closed and before

17    this May '06 memo, did you ask any lawyer for advice about

18    transferring $209 million from, from the debtor companies

19    to BGI?

20    A.  I don't believe after September 30th I consulted any

21    attorneys anymore about the loan.

22    Q.  Didn't ask them if you needed to disclose it to the

23    B's?

24    A.  I don't believe I spoke to anybody after September

25    30th.

1   Q.   Didn't ask them if it was in the best interest of the

2   company and consistent with your fiduciary duty as a

3   manager of the company?

4   A.   I didn't consult anyone.

5   Q.   Who did you negotiate the terms of the loans with?

6   A.   When we decided that we had to make it a loan, it was

7   my feeling that we wanted to make the loan cover the same

8   amount of interest that Credit Suisse would be charging so

9   it wasn't a burden on the company.  So we kind of, the team

10  kind of decided that that would be the, the thing.  And

11  when -- probably, I think during that second half of '06

12  when the note was actually created -- although we started

13  paying interest from September 30th.  It was accruing and

14  we ended up paying interest, but I don't know the exact

15  date that it was decided.  But the team did.

16  Q.   Let's look at 263-K.

17  A.   Thank you.

18  Q.   263-K was an exhibit to your deposition.  It's a

19  promissory note dated September 30, 2005.  This is the one

20  that was not executed on that date but executed sometime

21  after May 8, 2006, right?

22  A.   I believe that's correct.

23  Q.   And it's a promissory note where you're signing on

24  behalf of BGI.  Do you see your signature on the second

25  page?

1   A.   Yes.

2   Q.   Promising to pay $209 million back to the debtor

3   companies, right?

4   A.   Correct.

5   Q.   Who did you negotiate the terms with?

6   A.   I was a manager of the debtor companies, and I was the

7   president of the parent company.  And I decided that this

8   was the interest rate.  And I believe we may have had some

9   team conversations, but the buck stops with me.  I decided

10  that we were going to cover the interest rate and the

11  terms.

12  Q.   And you decided that there would be no security?

13  A.   It was my view that since all of the "A" shares were

14  held by the borrower, if you will, and the borrower had

15  substantial assets, that the promissory note itself was

16  pretty well secured, in my mind.  Because I knew what the

17  assets were of the parent, and they far exceeded the

18  $209 million.

19  Q.   No personal guarantee on this note?

20  A.   BGI is a separate corporation entity.  It's an Oregon

21  sub-S corporation.  And I was not personally borrowing the

22  money from --

23  Q.   You decided that, right?

24  A.   Yeah, I decided that, sure.

25  Q.   Okay.  What did you do with the 209 that went to BGI?

1   A.   I think about 190 million was loaned to me as the

2   shareholder.

3   Q.   And what lawyers did you consult with in connection

4   with the transfer of $190 million out of BGI to you

5   personally to determine whether or not that was in the best

6   interest of the debtor companies and consistent with your

7   fiduciary duty to the owners of the debtor companies?

8   A.   Well, at that point, I didn't consult anyone because I

9   felt that it was covered under the $209 million front page

10  of the Credit Suisse loan.

11  Q.   You didn't tell anybody you were doing that, did you?

12  A.   Well, it's not a matter of not telling somebody.

13  You're making it sound like it's sneaky.  I was a manager,

14  and I did what I felt was an appropriate business decision

15  at that time.

16  Q.   You transferred $190 million of money that came from

17  the Credit Suisse loan to BGI and then to yourself.  And is

18  there one document that you can point to in the form of a

19  resolution or any other contemporaneous document evidencing

20  your intention to pay that money back to BGI?

21  A.   Well, I think there was a note for $190 million to BGI

22  at some point.

23  Q.   And that was created in August of 2008, wasn't it?

24  A.   I don't know when it was created, but --

25  Q.   It was created during your divorce, wasn't it?

1    A.  You know, I don't know when it was created.  But just

2    like the other conversations and notes, where I come from

3    is a little bit of the old west.  If I give -- if you come

4    up to me and you say, "Mr. Blixseth, I want to give you --

5    I want you to loan me $1,000 on Monday," and two Mondays go

6    by, and I say, "Mr. Hutchinson, I should get a note for

7    that $1,000 just in case you get hit by the bus" doesn't

8    make the loan -- when you sign that note that day, that

9    doesn't mean that you loaned money the two Mondays

10   afterwards; you borrowed it the two Mondays earlier.

11   That's the way I looked at it.  We paid interest.

12   Q.  Isn't it true, Mr. Blixseth, that you told your wife

13   when you took the $209 million out of the debtor companies

14   that you had no intent to pay it back?

15   A.  Absolutely untrue and a lie.  Anybody who says that is

16   lying.

17   Q.  Isn't it true that you and your professionals either

18   collectively or independently talked about this and decided

19   that you would find a way to not have to repay that money?

20   A.  No, absolutely not.

21   Q.  Let's look at 272.

22   A.  Thank you.

23          THE COURT:  You know, Mr. Hutchinson, are you

24   going to offer these exhibits?

25          MR. HUTCHINSON:  I am, Your Honor.  And what I'd

1    like to do is maybe -- I thought it would go a little

2    faster if I could get through the questioning and then at

3    the end, offer them in.

4              THE COURT:  Okay, very well.

5              MR. HUTCHINSON:  Okay, thank you.

6    Q.  (By Mr. Hutchinson)  272 is an e-mail dated November

7    14, 2005.  And it's a letter, apparently a communication

8    from Mr. Mack's firm, that says that the offer to buy back

9    the "B" shares is now withdrawn.  Do you remember doing

10   that, withdrawing that offer?

11   A.  At some point, I withdrew it, yes.

12   Q.  This is six weeks after the, the loan proceeds were

13   received.  Do you remember doing it at that time or

14   earlier?

15   A.  I don't recall the time frame.  It was sometime after

16   the loan.

17   Q.  Sometime shortly after the loan and after you received

18   $209 million of loan proceeds, you withdrew the offer to

19   repurchase the "B" shares, right?

20   A.  I withdrew it because my condition was that we wanted

21   to get all the "B" shares back and not have two or three

22   outstanding "B" shares.  And we couldn't quite get there.

23   Q.  Let's look at 263-N.

24   A.  Thank you.

25   Q.  Do you recognize 263-N?

1    A.   I think you showed this to me in the deposition.

2    Q.   This is an agreement.  And you recognize your signature

3    on the last page of the agreement?

4    A.   I do.

5    Q.   How many times do you sign this agreement?

6    A.   Five times.

7    Q.   And you're signing this agreement in your capacity as

8    the manager of these five different entities, right?

9    A.   No.  The BGI, I'm the president.  The rest are --

10   Q.   The other four, you're the manager?

11   A.   No.  The other three are managers, and the top one is

12   president, I think.

13   Q.   Okay.  So twice as president, three times as manager?

14   A.   That's correct.

15   Q.   Were there any negotiations that took place in

16   connection with this agreement?

17   A.   This agreement was my idea, and it was to serve as a

18   hedge, an additional hedge to -- if the Yellowstone Club

19   World did well - which we had hoped at that time it would,

20   and we sold a lot of memberships, deposits - that I would,

21   I would have Yellowstone Club World be bound to loan BGI

22   $209 million or whatever portion that was unpaid back to

23   the -- these debtor companies at 4 percent interest.

24   Q.   There's nothing in this agreement that evidences or

25   obligates BGI to repay the debtor companies any money, is

1    there?

2    A.  Well, I don't know without reading the whole thing -

3    (inaudible) - term, but that was the intent -- or was the

4    state of mind at the time.

5    Q.  Are you aware of anything in this agreement that

6    obligates or obligated you personally to repay the

7    $190 million you had taken out of BGI?

8    A.  I don't think that I'm a personal party of this

9    agreement.  I don't believe it mentions me.

10   Q.  There are two other promissory notes that I'd like for

11   you to look at and identify, 263-L, 263-J --

12   A.  Thanks.

13   Q.  -- both dated September 30, 2005, one in the amount of

14   55.7 million; and the other one, 7.8 million.

15            MR. FLYNN:  Your Honor, what exhibit are we

16   talking about?  Is he doing two at once, or what?

17            THE COURT:  263-L and 263-J.

18            MR. FLYNN:  Okay.  Which one are we talking about

19   first?

20            THE COURT:  Mr. Hutchinson.

21            UNIDENTIFIED SPEAKER:  We can only pull one up at

22   a time.

23            THE COURT:  Okay.  Mr. Hutchinson.

24   Q.  (By Mr. Hutchinson)  We're talking about 263-J, 55. -

25   if you round up - 8 million dollars.  This is a note.  You

1    recognize your signature signing on behalf of BGI, correct?

2    A.   That's correct.

3    Q.   Obligating BGI to pay $55.8 million to the debtor

4    companies, right?

5    A.   That's correct.

6    Q.   Same terms as the $209 million note, correct?

7    A.   Well, I'd have to get out and examine the 209 to make

8    sure.

9    Q.   It's a demand note payable when you demand it on

10   yourself, right?

11   A.   Well, I wouldn't say "demand it on myself".  If I had

12   gotten hit by a bus and been deceased, my estate or whoever

13   took over the company would be obligated to this.

14   Q.   But as long as you're in control of both of these

15   companies, the demand is in your control, right?

16   A.   I guess you could say that.

17   Q.   No security, correct?

18   A.   The security, to me, was in the promise to pay.

19   Q.   Let's look at 263-L, $7.8 million.  Do you recognize

20   your signature on behalf of BGI --

21   A.   I do.

22   Q.   -- obligating BGI to pay the debtor company 7.8 million

23   under the same terms:  No security demand note, payable

24   when you make demand?

25   A.   I don't think the terms are the same, Mr. Hutchinson.

1    I think that the interest rate commenced on December 31,

2    2004, on D-263-L, the time the loan was made; and I think

3    on D-263-J, that the commencement date on the interest rate

4    was January 1 2005.

5    Q.   Other than the interest rate, are there any differences

6    you're aware of?

7    A.   The start dates of the interest rate.

8    Q.   Okay.  Other than that, no differences?

9    A.   Same type of note.

10   Q.   Okay.  You've mentioned Yellowstone Club World.  Was

11   there a written business plan that was created for

12   Yellowstone Club World?

13   A.   Oh gosh, there might have been.  I don't recall if we

14   had a business plan or not.

15   Q.   Do you recall providing to Credit Suisse, in connection

16   with the loan in September of 2005, a written business plan

17   for the Yellowstone Club World?

18   A.   I don't know if I supplied one.  I don't know if one

19   existed.  I know that we had discussions about it.  And

20   that was one of the reasons that we were doing what we were

21   doing, was to launch that.

22   Q.   How much revenue did Yellowstone Club World generate?

23   A.   Yellowstone Club World - (inaudible) - about -- I can't

24   say that.  It had some rentals from the early members that

25   were joined and from stays at the visits, and things like

1   that.

2   Q.  How many members were there?

3   A.  There was only eight members.

4   Q.  And what did the members pay to become members?

5   A.  A 1.5 million deposit.

6   Q.  I asked you questions at your deposition about BSR, Big

7   Sky --

8   A.  Ridge.

9   Q.  -- Ridge --

10  A.  Hm-hmm.

11  Q.  -- thank you, and what consideration Big Sky Ridge

12  received in connection with its granting of a security

13  interest and agreement to pay back $375 million.  Do you

14  remember those questions?

15  A.  I do.

16  Q.  Can you point to any consideration that BSR received

17  for the loan?

18  A.  Let's see, Big Sky Ridge was at that point, through

19  contract, part and parcel of the Yellowstone Club because

20  it was property that was owned with third parties, not with

21  the club.  And because of the proximity of that roughly 300

22  acres, the deal was made that it would be included in the

23  Yellowstone Club.  It would be -- and the land, if it

24  wasn't in Yellowstone Club, was worthless, basically.  So

25  because it had pretty good proximity to the club and we

1    could access the roads and ski lifts, Big Sky Ridge owners

2    at that time, we agreed to -- with me, as the manager, that

3    we would include that property which turned out to be a

4    great boom for the club.  And because it was basically

5    worthless, if it was just a piece of property we couldn't

6    get access to -- and that's why Big Sky sold it to my

7    partners, then, and me, we had a -- the deal I worked out

8    was that Yellowstone Club, if they would include Big Sky

9    Ridge in the club, they would get 40 percent off the top of

10   any sales of lot.  So hypothetically, if you had

11   $2 million, you had $800,000 that went to the club.  In

12   addition to that, Big Sky Ridge got -- they had to pay

13   $200,000 to the Yellowstone Club for recoupment of

14   infrastructure.  That was the deal on Big Sky Ridge.

15   Q.  Isn't it true that Big Sky Ridge was part of the club

16   before the Credit Suisse loan?

17   A.  Yeah, I think it was.

18   Q.  And Big Sky Ridge was part of the club after the Credit

19   Suisse loan, right?

20   A.  Well, Yellowstone Mountain Club bought half-interest in

21   Big Sky ridge for $17 million from me because I was the

22   individual owner.  It had nothing to do with Yellowstone

23   Club at that time; it was a piece of property.  We bought

24   1,000 acres - (inaudible) - to the club.  And so what we

25   decided was best for revenue to bring that into the club, I

1   thought it was better to have Yellowstone Club own my half.

2   But it had a fair market value then.  It had at least what

3   I thought to be fair market value.  We started out to be

4   awfully low.

5       So I traded my interest, my half-interest in Big Sky

6   Ridge to Yellowstone Development, $17 million.  And so as a

7   result of that, Yellowstone Mountain Club owned half of Big

8   Sky Ridge, still subject to the 40 percent on top of that

9   that had to be paid to the club and the $200,000-per-lot

10  recoupment.  So in the Credit Suisse loan, they said, and

11  we agreed, that it had to be part of the loan because the

12  club owned half of it.

13  Q.  Was there any money that came out of the Credit Suisse

14  loan that went to BSR?

15  A.  I don't think so.

16  Q.  And BSR was obligated to pay back the 375 million,

17  right?

18  A.  It was on the, it was on the loan document, yes.

19  Q.  And you can't point to any consideration that BSR

20  received other than what you've just described?  Which you

21  can do again if you want to, but I don't think is

22  responsive to the question.

23      Any consideration that BSR received from the Credit

24  Suisse loan?

25  A.  Well, an indirect -- or maybe direct compensation would

1    be that when the loan was funded, that the Yellowstone

2    Development had a lot of cash, $142 million after the

3    $209 million loan to BGI, that would allow it to more

4    rapidly develop BSR, and ski lifts, and the roads, and the

5    water, and the sewer.  So indirectly, I guess did get a

6    benefit -- or directly.

7    Q.  Do you have any records that document the transfer of

8    that money between those two entities?

9    A.  I'm sorry, I don't understand the question.

10    Q.  Well, are there any financial records or any other

11    documents that show that benefit that you just described?

12    A.  Oh, sure, sure.

13    Q.  What?

14    A.  On the -- in the books and records Yellowstone -- or

15    the debtor companies and BGI, there would be -- or I'm

16    sorry, not "BGI"; "BSR", there would be plenty of records

17    of that; when lots were sold, how the money was

18    distributed.  When Yellowstone Development got its

19    40 percent off the top plus it got its half of the half --

20    or it's got half of what was left after that.  I'm sorry.

21    So there's probably records, in answer to your question.

22    Q.  I won't debate this with you anymore.

23        With regard to the $190 million that was transferred to

24    you from the Credit Suisse loan proceeds, you used how much

25    of that money to buy a boat with?

```
 1    A.   Twelve million dollars.

 2    Q.   And how much did you use to buy an island in the Turks

 3    and Caicos?

 4    A.   The boat was to be used in Yellowstone Club World.  And

 5    the property in Turks and Caicos, I think the original --

 6    the actual deeded was 12 or 13 million.  And then there was

 7    a consulting agreement with the seller, and he had some

 8    convoluted -- a bunch of corporations that we had to buy.

 9    So it's probably, all total, 28 million for that.

10    Q.   You also brought a ranch in Cody, Wyoming?

11    A.   That's correct.

12    Q.   What else did you buy with that money?

13    A.   Oh gosh.  My ex-wife, I think, and her biological

14    children, I think they got about 40 million.  She spent, I

15    think, I'm guessing maybe 20 on some high-tech, start-up

16    company; and then we invested with her son.  And I think it

17    was all about 40 -- and paid off Porcupine Creek.  So I

18    think about 40 million went to her benefit.

19    Q.   All of those properties that you used the Credit Suisse

20    loan proceeds to buy are in your name?

21    A.   I don't think so, no.

22    Q.   Whose name are they in?

23    A.   Well, there is the Turks and Caicos property.  I had to

24    buy the corporation, so it's still in the corporation name,

25    to the best of my knowledge.
```

1    Q.   Who owns the corporation?

2    A.   I think it's a limited liability partnership that owns

3    that.

4    Q.   And who owns the limited liability partnership?

5    A.   I think -- and I'd have to go back.  Because I just got

6    married March 14th, and the four or five months before

7    that, I hired an accounting firm to do some estate planning

8    because I'm getting remarried.  So they came up with quite

9    a few different protections for me.  And we formed the

10   family trust, and then I think I've got part of the

11   interest in that, I think the trust has an interest.  But I

12   don't really -- I haven't gone over it to see exactly who

13   owns what.  But I control it, basically, except for the

14   trust.

15   Q.   You control the bank accounts from which the money was

16   disbursed to purchase those items, correct?

17   A.   I'm sorry, I didn't follow you.

18   Q.   $190 million came out and went into bank accounts that

19   you controlled, correct?

20   A.   That's correct.

21   Q.   And you're the one who directed that the money be spent

22   the way that it was spent?

23   A.   Well, except for maybe 10 million, or so; or 15 million

24   of it.

25   Q.   Have you transferred any of those properties that were

1    bought with the Credit Suisse loan proceeds back to the

2    debtor companies?

3    A.   Let's see, I -- you were talking about money I borrowed

4    from BGI, which I owe to BGI; but now you're talking about

5    the debtor company.  I'm a little bit lost.  Did I transfer

6    property back to the debtor company?

7    Q.   Right.  Did you transfer a property back to BGI in

8    repayment of your loan so BGI could transfer it back to the

9    debtor companies in repayment of BGI's loan?

10   A.   No.  I was, I was relieved of that $190 million,

11   $180 million note on the settlement of the divorce.  My

12   ex-wife executed a new note and replaced my note to assume

13   that obligation as part of the MSA.

14   Q.   So what happened at the conclusion of the MSA was that

15   you no longer owed money to BGI, right?

16   A.   That's correct.

17   Q.   And the money that you owed to BGI was now owed to BGI

18   by your ex-wife?

19   A.   That's correct.

20   Q.   And the money that BGI owed to the debtor companies, as

21   far as you know, has been repaid in what amount?

22   A.   Well, I don't know if she's paid any of it.

23   Q.   Well, what did you pay on that?

24   A.   Interest.

25   Q.   Interest only?

```
 1    A.  I think it was interest only, yeah.

 2    Q.  So you wouldn't dispute that the unpaid balance on the

 3    note that BGI owed to the debtor companies was $203 million

 4    at the time that you no longer controlled those companies?

 5    A.  I'm sorry, I didn't quite get the question.  The amount

 6    of money that was owed from who to who?

 7    Q.  From BGI --

 8    A.  Okay.

 9    Q.  -- to the debtor companies.

10          MR. FLYNN:  Your Honor, wait.  This isn't so much

11    of an objection, but he's opening the MSA.  So we're happy

12    to have the MSA open, but given Your Honor's ruling this

13    morning --

14          THE COURT:  The MSA is not going to be a part of

15    this.

16          MR. FLYNN:  Well, then I'd move to strike all of

17    it.

18          THE COURT:  I'm going to overrule.

19    Q.  (By Mr. Hutchinson)  So my last question for you on

20    this point is:  You're not disputing that in excess of $200

21    million was still owed to the debtor companies from BGI at

22    the time of your no longer having control of the companies.

23    A.  I don't know the exact amount, but it was probably

24    pretty close to that.  And when I stopped having control

25    over company and we settled the divorce, if you will, she
```

1  bought the stock -- or got the stock in BGI and fully

2  acknowledged -- and acknowledged that note was still -- I

3  don't know if it was 203 or 205 million, but she took over

4  the obligation of that company.

5          MR. FLYNN:  Your Honor, a standing objection on

6  this?

7          THE COURT:  It's in the record.

8  Q.  (By Mr. Hutchinson)  Do you remember giving an

9  interview to a book writer named Robert Frank sometime in

10  2006 - 2007 with regard to your business affairs?

11  A.  I remember that we did talk to a Robert Frank and put

12  something in a book.

13  Q.  And he wrote a chapter about you in this book called

14  the "Richistan".  Have you read this?

15  A.  You know, I've never read the chapter.  I've heard

16  about it, but I've just never read it.

17  Q.  Do you remember telling Mr. Frank that you learned

18  never to have -- sorry, that you learned to never again

19  have any debt, that debt is the thing that kills you?  Do

20  you remember telling him that?

21  A.  I might have told him that.  I don't recall the

22  conversation, but pretty much -- it may have happened.  I

23  don't remember.

24          MR. HUTCHINSON:  I don't have any further

25  questions, Your Honor.  Thank you.

1            THE COURT:  Okay.

2            MR. HUTCHINSON:  I'd like to introduce those

3   exhibits, though, if I could.  May I approach the --

4            THE COURT:  You may approach.

5            THE WITNESS:  Sorry if I mixed them up.  There's

6   one out of order there, Mr. Hutchinson.

7            MR. HUTCHINSON:  So should we take these in

8   order, Your Honor, or --

9            THE COURT:  Yes.

10            MR. HUTCHINSON:  Okay.  So 263-L is the

11   $7.8 million promissory note.  We'd offer that.

12            THE COURT:  Just a sec here.  Any objection?

13            MR. FLYNN:  Yes, Your Honor.  I won't keep

14   objecting.  We object to all of them except D-50 --

15   (inaudible, out of range of microphone.)

16            THE COURT:  Any other objections?

17            MR. HUTCHINSON:  May I move on to the next one,

18   Your Honor?

19            THE COURT:  You may.

20            MR. HUTCHINSON:  D-263-J, which is the

21   $55 million note; D-263-N, which is the agreement; D-272;

22   D-263-K, which is the $208 million note; D-263-G, which is

23   the memo from Mr. Doyle; D-266, it's an e-mail from

24   Mr. Blixseth; D-263-B is an e-mail from Jeremy Rogers;

25   D-263-F is another memo from Mr. Doyle; D-263-D, a letter

 1    from Mack Roberts; D-263-C which is the September 4, 2005

 2    version of the credit agreement.

 3              THE COURT:  Which one was that again,

 4    Mr. Hutchinson?

 5              MR. HUTCHINSON:  D-263-C.

 6              THE COURT:  "C", thank you.

 7              MR. HUTCHINSON:  D-263-A, which is the August

 8    22nd version of the credit agreement; D-270, which is the

 9    letter from Mr. Blixseth.  And I don't know if I covered

10    this one already, which is D-272.

11              THE COURT:  You did.

12              MR. HUTCHINSON:  Okay.

13              THE COURT:  Okay.  So just for this purpose only

14    I will omit the "D", but it's 263-L, 263-J, D-50, 263-N,

15    272, 263-K, 263-G, 266, 263-B, 263-F, 263-D, 263-C, 263-A,

16    270.  I think that is all of them.

17              Any other objection other than what you've

18    raised, Mr. Flynn?

19              MR. FLYNN:  No, Your Honor, just the grounds of

20    the relevance and hearsay.

21              THE COURT:  Okay.  The exhibits are admitted.

22              MR. HUTCHINSON:  Thank you, Your Honor.

23              THE COURT:  The objections are noted.

24     DEBTORS' EXHIBITS 263-L, 263-J, D-50, 263-N, 272, 263-K,

25      263-G, 266, 263-B, 263-F, 263-D, 263-C, 263-A, and 270

1          ADMITTED INTO EVIDENCE

2          THE COURT:  Now, Mr. Beckett, you have no

3   questions for --

4          MR. WANGSGARD:  (Inaudible, out of range of

5   microphone) -- Your Honor.  (Inaudible) -- Committee 222,

6   please.

7          UNIDENTIFIED SPEAKER:  Chris -- (inaudible, out

8   of range of microphone.)

9          THE COURT:  Could you restate the exhibit number?

10         MR. WANGSGARD:  Committee 222, Your Honor.

11         THE COURT:  Two twenty-two?

12         MR. WANGSGARD:  Yes, disbursement authorization.

13                  CROSS-EXAMINATION

14   BY MR. WANGSGARD:

15   Q.  Good afternoon, Mr. Blixseth.

16   A.  Good afternoon.

17   Q.  Have you had a chance to look at Committee Exhibit 222?

18   A.  I have.

19   Q.  And it's true, isn't it?  You signed it.

20   A.  I believe I signed it, yes.

21   Q.  The second page.  You signed it on behalf of each of

22   the three debtor companies?

23   A.  That's correct.

24         MR. WANGSGARD:  I want to offer 222, Your Honor.

25         THE COURT:  Any objection?

1          UNIDENTIFIED SPEAKER:  No, Your Honor.

2          THE COURT:  Exhibit 222 is admitted.

3        COMMITTEE'S EXHIBIT 222 ADMITTED INTO EVIDENCE

4    BY MR. WANGSGARD:

5    Q.  And it's true, isn't it, Mr. Blixseth, that what this

6    is, is an authorization that you've executed on behalf of

7    these three companies for -- to Credit Suisse to disburse

8    funds, correct?

9    A.  I believe that's correct.

10   Q.  And then if we go to the third and fourth pages of the

11   exhibit, we see the details on the funds that are

12   authorized -- that are being authorized to be disbursed; is

13   that correct?

14   A.  That's correct.

15   Q.  All right.  And it begins, does it not, with, first of

16   all, the source of funds for the disbursement, a

17   $375 million term loan, correct?

18   A.  Correct.

19   Q.  And then below that, it's true, isn't it, we had some

20   specific breakouts as to how that -- those term loan funds

21   will be used.  Do you agree?

22   A.  Yes.

23   Q.  And the first item we see is $7.5 million to Credit

24   Suisse's payment of its arrangement fee; is that correct?

25   A.  That's correct.

1   Q.   The next item is 100,000 to Credit Suisse in payment of

2   its first annual administration fee, correct?

3   A.   Correct.

4   Q.   And the next item is $45,077.89 to Credit Suisse for

5   payment of its out-of-pocket expenses, correct?

6   A.   That's correct.

7   Q.   And the next item we see is to Credit Suisse for

8   payment of SynTrack, $10,000.  Do you recall what SynTrack

9   was?

10  A.   I don't know.  I do not.

11  Q.   Might I suggest that it was placing offering documents

12  on the internet in the way that they were available?  Does

13  that refresh your memory?

14  A.   I don't have any clue what that is.

15  Q.   In any event, whatever it is, $10,000 was disbursed to

16  Credit Suisse to pay for it, correct?

17  A.   Correct.

18  Q.   And another $380 was disbursed to Credit Suisse for

19  something called "CUSIP", correct?

20  A.   Correct.

21  Q.   And 70,500 additional was disbursed to Credit Suisse

22  for payment of clear par settlement, correct?

23  A.   Correct.

24  Q.   Do you recall what clear par settlement referred to?

25  A.   I have no idea.  I've never seen this before.

1   Q.  And we also that an additional 15,500 was disbursed to

2   Credit Suisse, payment of Cushman & Wakefield appraisal,

3   correct?

4   A.  Correct.

5   Q.  We see disbursement to Latham & Watkins, LLP, payment

6   of estimated legal fees incurred to date, 325,000.  It's

7   true, isn't it, that Latham & Watkins is the law firm which

8   represented Credit Suisse in connection with the

9   $375 million loan transaction?

10  A.  I know it's one of the firms.  I don't know if there's

11  more.  I know it did represent them.

12  Q.  Do you understand this payment, disbursement, $325,000

13  to be attributable to work done by Latham & Watkins in

14  connection with the $375 million Credit Suisse loan?

15  A.  Yeah, I have to take it for what the document says.

16  Q.  Proceeding to the next page, we see, do we not,

17  disbursement to Security Title of Montana, payment of title

18  fees, endorsements, and recording costs, $581,368.60,

19  correct?

20  A.  Correct.

21  Q.  And it's correct, isn't it, that that was for the title

22  work in connection with the, the collateral that was being

23  pledged to Credit Suisse in connection with this loan?

24  A.  It appears to be, yes.

25  Q.  All right.  And we see authorization to disburse

1  $19,758,458.93 to American Bank in repayment in full of the

2  existing indebtedness, correct?

3  A.  Correct.

4  Q.  Directing your attention to that entry, a repayment in

5  full of whose existing indebtedness?

6  A.  I believe that's the amount that I said earlier in the

7  day that I think that the club had left on its -- the

8  debtors had on their line of credit with that bank or group

9  of banks.

10 Q.  All right.  And then we see an entry of $4,483,452.05

11 to Silver Ridge in repayment in full of existing

12 indebtedness.  And it's true, isn't it, that that payment

13 was for a half-interest in Big Sky Ridge?

14 A.  The Silver Ridge payment was to a gentleman named

15 Mr. Wayne Primm to -- he had an interest in Big Sky Ridge.

16 And his interest needed to be cleared off, I believe, to

17 get free and clear title on it so his interest was gone.

18 Q.  Okay.  And so it's true, isn't it, that what this

19 $4,493,000 disbursement represents is to pay him -- to pay

20 Mr. Primm or his companies 3.5 million plus interest,

21 correct?

22 A.  I don't know -- I mean I don't remember, but he had

23 some money -- I think it was 3.5 million, yeah, that I

24 think about it.

25 Q.  And then plus interest --

1   A.  Right, right, right.

2   Q.  -- to bring it to the total that's shown here.

3       And that's the same 50 percent interest in Big Sky

4   Ridge which you then sold to one of the debtor companies

5   for 17 million, correct?

6   A.  That is not correct.

7   Q.  That is not the same interest?

8   A.  No.

9   Q.  Now, we also -- then we see disbursement is made to

10  Yellowstone Mountain Club, $342,110,262.53, correct?

11  A.  That's correct.

12  Q.  All right.  Now let's go look at Committee Exhibit 213,

13  please.

14  A.  Thank you.

15  Q.  Now, it's true, isn't it, Mr. Blixseth, that this is an

16  e-mail to you from a man named Patrick "Rate".  Is that how

17  his name was pronounced?

18  A.  "Ratte".

19  Q.  "Ratte", okay.  He was an employee of BGI at this time,

20  was he not?

21  A.  Yes, sir.

22  Q.  And what were his duties?

23  A.  Patrick is more like a controller.

24  Q.  Okay.

25  A.  That's a, that's a good title.

1    Q.   And this e-mail appears to have been sent -- is that

2    your e-mail address indicated as the recipient?

3    A.   It says to Tim Blixseth, yes.

4    Q.   Right.

5    A.   That would be my address.

6    Q.   And the subject is "loan proceed disbursement", and

7    then there's some sheets that break that out; is that

8    correct?

9    A.   Well, I haven't reviewed those.  I will if you'd like

10   me to.

11   Q.   Are you satisfied that this is an e-mail with some --

12   satisfy yourself, please --

13   A.   Okay.

14   Q.   -- that what I have handed you as Exhibit 213 is an

15   e-mail which came from Mr. Ratte to you explaining loan

16   proceed disbursement.

17   A.   Okay, I've looked at it.

18   Q.   And are you satisfied that that's what this is?

19   A.   It appears to be, yes.

20           MR. WANGSGARD:  I offer Exhibit 213, Your Honor.

21           THE COURT:  Any objection?

22           MR. GRANT:  I have to look at it sideways, Judge.

23           THE COURT:  Okay.

24           MR. GRANT:  Yes, we have an objection, Judge.  He

25   has represented this is an e-mail from Patrick Ratte and

1    everything connected with it is part of the e-mail.  When

2    you go to, for instance, the fourth page, it's a different

3    e-mail from a different individual, or it appears to be a

4    collection of documents pieced together into one exhibit

5    from different people with different exhibits.  So before

6    it's admitted -- he hasn't even laid a foundation as to any

7    of the rest of the documents here.

8                THE COURT:  Sir?

9                MR. WANGSGARD:  I thought that the witness

10   testified with reasonable clarity, Your Honor, that it

11   appears to be an e-mail received from Mr. Ratte.

12               THE COURT:  Yeah, he did testify to that.

13               MR. WANGSGARD:  And I asked him to satisfy

14   himself that the whole document was so described.

15               MR. GRANT:  Your Honor, may he have the

16   opportunity to look at the whole document?  And --

17               THE COURT:  He did.

18               You may have an opportunity to look at the entire

19   document.

20               THE WITNESS:  Your Honor, may I say something?  I

21   probably spoke too soon because I -- I don't see Patrick

22   Ratte.  At least on this copy, I don't see any e-mail

23   address from Patrick Ratte.  It probably came from him, but

24   technically, I don't --

25               THE COURT:  On page 1?

 1              THE WITNESS:  On page 1, yes.

 2   Q.  (By Mr. Wangsgard)  Sir, if you look at the bottom of

 3   each page, there's an indication --

 4   A.  Oh, there it is.

 5   Q.  -- American Online, Patrick Ratte.  Agreed?

 6       Tuesday March 27, 2007.  Do you see legend on the

 7   bottom --

 8   A.  I do now, yes.  Thank you.

 9   Q.  -- of each page of the exhibit?

10       Are you satisfied this was an e-mail to you from

11   Mr. Ratte?

12   A.  It appears to be.

13              THE COURT:  Two thirteen is admitted.

14        COMMITTEE'S EXHIBIT 213 ADMITTED INTO EVIDENCE

15   BY MR. WANGSGARD:

16   Q.  Let's go to the second page, Mr. Blixseth.  And do you

17   see in the upper left-hand corner, there's an entry which

18   says that the funding amount was $342,110,263.53.  Do you

19   see that as funding amount, the top-left part of the

20   exhibit?

21   A.  Yes, I do.

22   Q.  All right.  And then right below that, it's true, isn't

23   it, that we see that proceeds retained in YDI were

24   $133,110,262.53, correct?

25   A.  Well, your eyes are better than mine, because I can't

1   really read this copy.  But it probably is right.

2          THE COURT:  I'm not sure that I can read it

3   myself.  So, Mr. Blixseth, do you -- (pause.)

4          THE WITNESS:  I can't, I can't read what the

5   numbers are.  Sorry.

6          THE COURT:  Okay.

7          MR. WANGSGARD:  Could we see Exhibit 218, please?

8   It's a little bit better copy.

9          THE COURT:  Okay.

10          MR. WANGSGARD:  Not much.

11          THE WITNESS:  Thank you.

12   Q.  (By Mr. Wangsgard)  Satisfy yourself, please,

13   Mr. Blixseth, that the first page of Exhibit 218 is a

14   little bit better copy of the second page of Exhibit 213.

15   A.  Much better.

16   Q.  And are you satisfied that it's the same spreadsheet?

17   A.  It appears to be the same.

18          MR. WANGSGARD:  I offer 218, Your Honor.

19          THE COURT:  Any objection?

20          MR. WANGSGARD:  More specifically, the first

21   page.

22          THE COURT:  The first page of 218.

23          MR. WANGSGARD:  I'm a little unsure what the

24   second page is, what I don't claim anything for it.

25          THE COURT:  Okay.

1          MR. FLYNN:  Objection, Your Honor; irrelevant.

2     And do you want to hear the basis of the "irrelevant"?

3          THE COURT:  Sure.

4          MR. FLYNN:  Mr. Blixseth's lawyer, his

5     accountant, Latham & Watkins, all the Credit Suisse

6     lawyers, everybody - and as Your Honor knows, Mr. Brown,

7     Steve Brown - as of Saturday April 11th, said all of this

8     money could have been given to the Red Cross.  This is all

9     completely irrelevant.  He had the legal advice of lawyers

10    and he had accounting advice.  His entire team of

11    Mr. Sumpter, Mr. Campbell, Mr. Doyle, they all told him

12    this loan was okay.  And as Your Honor knows and as the

13    witness will testify, he could have given the money -- he

14    could have gone to Las Vegas and bet it at a blackjack, at

15    a blackjack table; he could have given it all to the Red

16    Cross.  It was his money.  This is all completely

17    irrelevant, Your Honor.

18         THE COURT:  I'm going to overrule because I'd

19    like to see where the money went.

20         MR. FLYNN:  I understand.

21         THE COURT:  Page 1 of 218 is admitted.

22     COMMITTEE'S PAGE 1 of EXHIBIT 218 ADMITTED INTO EVIDENCE

23    BY MR. WANGSGARD:

24    Q.  Okay.  Mr. Blixseth, let's see if we can read those

25     entries a little better.  The retained in YDI, those

1    numbers, are they a little better for you now?  Let's work

2    from the first page of Exhibit 218, please.

3    A.   Okay, I'm with you.

4    Q.   And then if we track down, the next entry that we see

5    is $100 million for an eight-month CD in U.S. Bank.  Do you

6    see that entry?

7    A.   I think mine reads six months, but I could be wrong.

8    Q.   Okay.  In any event, for a CD in U.S. Bank.  Agreed?

9    A.   It appears to be correct.

10   Q.   Was $100 million of the proceeds used to purchase --

11   obtain a CD with U.S. Bank in the amount of $100 million?

12   A.   I believe it was.

13   Q.   All right.  The next entry is $30 million to American

14   Bank also for a CD.

15   A.   Yes.

16   Q.   Was that something that was done with the loan

17   proceeds?

18   A.   It appears to be, yes.

19   Q.   And then there's an entry which says that -- then in

20   the checking amount of YDI, $3,110,262.53 were left; is

21   that correct?

22   A.   That's correct.

23   Q.   All right.  Then we see, we see entries to PDNB.  It's

24   true, isn't it, that is Pacific -- what's the name of that

25   again, that bank?

```
1    A.   Palm Desert National Bank.

2    Q.   All right, Pacific desert national bank.  And so we see

3    a $17 million CD purchased from that bank; is that correct?

4    A.   It appears to be correct, yes.

5    Q.   Oh, I'm sorry.  And we'll go back in a minute to the --

6    (inaudible.)  Let's go one earlier than that.  At First

7    Bank, we see a CD in the amount of 25 million, correct?

8    A.   That's correct.

9    Q.   All right.  And was such a CD purchased with the loan

10   proceeds?

11   A.   I believe so.

12   Q.   And --

13   A.   Did you miss one up here, the 209 million?  Or did I

14   miss it?

15   Q.   Which one are you referring to, sir?

16   A.   Remaining balance loan to BGI.

17   Q.   Right.

18   A.   Oh, okay, sorry.

19   Q.   A 209 million loan to BGI.  And we will walk through

20   that.  I want to go down the other entries first before we

21   leave that exit -- before we leave exhibit -- well,

22   actually, let's talk about where the 209 million went.  And

23   those entries are to the left of the 209 million entry, are

24   they not?

25        And the first of those is the 25 million CD.  And
```

```
 1    that's with First Bank?

 2    A.  That's correct.

 3    Q.  And it's true, isn't it, that that 25 million came out

 4    of the 209 million?

 5    A.  I believe that's correct.

 6    Q.  All right.  And then we also see another $11,939,495.24

 7    payoff to First Bank.  And it's true, isn't it, that payoff

 8    also came out in the 209 million?

 9    A.  I believe that's correct.

10    Q.  Okay.  Continuing down, then, when we get over to --

11    now we come to entries for the Pacific desert national

12    bank, correct?

13    A.  Palm Desert National Bank.

14    Q.  Palm Desert, thank you.  And that's -- a $17 million CD

15    was purchased?

16    A.  Correct.

17    Q.  And $14,016,227.87 went into a money market account of

18    some sort?

19    A.  Yes.

20    Q.  And it's true, isn't it, that that money market account

21    was in your name?

22    A.  I believe it was.

23    Q.  All right.  It's also true, isn't it, that some of

24    these proceeds were used to pay off debt incurred under a

25    line of credit to build the residence at Porcupine Creek?
```

1    A.   That's correct.

2    Q.   Are you able to identify which entry went to pay that

3    off?

4    A.   First Bank & Trust, $11,939,495.24.

5    Q.   And that was simply the brick-and-mortar construction

6    cost on the residence at Porcupine Creek, correct?

7    A.   I don't know if I could testify that it was the cost.

8    That was the amount that was owed.

9    Q.   Okay.  That was the debt that was outstanding at this

10   time?

11   A.   That was the debt, right.

12   Q.   And that was paid off in full?

13   A.   That's correct.

14   Q.   All right.  Now, we see a $4,133,623.50 payoff to Palm

15   Desert National Bank, correct?

16   A.   Correct.

17   Q.   Now, if we go back to Exhibit 213 and look at its fifth

18   page, I think Mr. Ratte sent you a breakout of those

19   proceeds.  Will you see if you can find that?  There's a

20   control number.  It has a number of -- a couple of control

21   numbers on it.  There's one, D1845.

22        Were you able to find that page?

23   A.   I did.

24   Q.   All right.  And it's true, isn't it, that here there's

25   a text line that says (quoted as recorded):

1          "Tim, this was the number you gave me over the

2     phone.  And when I called PDNB for a breakout, it matched

3     exactly.  Patrick."

4         Do you recall receiving this from Mr. Ratte?

5     A.  I don't recall receiving it, but I probably sure did.

6     Q.  Okay.  And it's true, isn't it, that here Mr. Ratte

7     reports to you, then, that the breakdown he's reporting he

8     got from Palm Desert National Bank shows $3,169,118.75,

9     Desert Ranch, correct?

10    A.  It does.

11    Q.  And it's true, isn't it, that Desert Ranch was a

12    real-estate development project of yours, correct?

13    A.  Desert Ranch is a generic name for several pieces of

14    property out in the desert.  We call it "Desert Ranch", but

15    it's not really all linked together.

16    Q.  But it was a housing development you intended to

17    develop in the Palm Springs area; isn't that true?

18    A.  That's correct.

19    Q.  And it's true, isn't it, that none of the debtor

20    companies have any interest in that property, correct?

21    A.  That's correct.

22    Q.  Now, we also see here on, I believe it's the fifth page

23    of Exhibit 213:  $78,629.54, Edra's condo.

24        Do you recall what that payment refers to?

25    A.  Oh gosh, I think Edra had a loan at PDNB for a condo

1   that she owned.  And I think this was a payoff of that

2   condominium.

3   Q.  It's true, isn't it, that the Yellowstone LLCs didn't

4   own any part of Edra's condo?

5   A.  I'm sure they did not.

6   Q.  All right.  Now, there's an entry here under Palm

7   Desert National Bank breakdown, $402,546.02, for a line.

8   Do you recall what that referred to?

9   A.  I'd have to assume it was a line of credit, but I don't

10  recall exactly what this was for.

11  Q.  Are you comfortable saying the line of credit was

12  something personal to either you or your wife?

13     And more to the point, are you comfortable saying that

14  this line of credit had nothing to do with the business of

15  the Yellowstone LLCs?

16  A.  I can't say.  I mean I'm not sure.  From time to time,

17  we did letters of credit for the benefit of the Yellowstone

18  Club.  And I don't think this is it, but I stand to be

19  corrected.

20  Q.  As you sit here today, you really can't say what

21  that --

22  A.  I can't say.

23  Q.  -- line of credit was used for.  Is that a fair

24  statement?

25  A.  Fair statement.

1    Q.  All right.  And the final entry in that breakout is

2    $482,329.19, Edra's line.  Would you agree with me that

3    Edra's -- there was no Yellowstone, LLC business purpose

4    for whatever had been used to accumulate that debt or -- on

5    Edra's line?

6    A.  I can't really say that because she was on the -- kind

7    of the design business.  And I'm not sure if -- you'd have

8    to ask her that because I can't speak for her line.

9    Q.  All right.  But as we sit here today, you can't

10   identify a business purpose related to any of the debtor

11   companies for that line, paying off that line of credit,

12   can you?

13   A.  No, no.

14   Q.  All right.  Let's go back now, please, to the first

15   page of Exhibit 218.  And I direct your attention about in

16   the middle of the page of five different payoffs to

17   American Bank.  It's true, isn't it, that those five

18   payoffs were made on individual loans in your name?

19   A.  I would have to check.  I don't know if they were all

20   in my individual account or not.

21   Q.  All right.  Do you know whether you were released from

22   a personal guarantee when any of the loans with American

23   Bank were paid off with the loan proceeds?

24   A.  What was the first word?  Do I know I was which?

25   Q.  Do you know if you were released from --

1    A.  Oh, "released".  Sorry.

2    Q.  -- a personal guarantee in connection with the

3    transaction in which any of the -- these loan payments were

4    made to American Bank?

5    A.  I'd have to check the loan documents to see if, if I

6    was personally guaranteeing any or all of those.

7    Q.  You might have been?

8    A.  Sure could have been.

9    Q.  And then at U.S. -- under -- below the American Bank

10   payoffs, we see another $100 million -- and this is the one

11   $100 million -- no, this is the second $100 million CD,

12   isn't it?  This is a three-month CD from U.S. Bank?

13   A.  It appears to be.

14   Q.  And in whose name was that CD taken?

15   A.  Well, it says -- the initials say Tim and Edra, and I

16   don't, I don't think she was on that.  I think that was in

17   my name, but I can't remember.

18   Q.  And then continuing down, we see yet another $5 million

19   CD purchased from Pacific Western Bank, also apparently in

20   the names of Tim and Edra; is that correct?

21   A.  Correct.

22   Q.  And we see a payoff to Pacific Western Bank,

23   $2,971,443.02.  And it's true, isn't it, that that was a

24   personal line of yours that was paid off?

25   A.  I believe that was a personal line of credit, yes.

1    Q.  All right.  And then under Union Bank, we see a

2    $160,765.83 payoff.  It's true, isn't it, that that was for

3    a rental house which you owned?

4    A.  One of those two amounts I believe were for -- was to

5    pay off a rental house we had.  And then I think one of the

6    other ones might be -- the other one might be a -- to pay

7    off a rental house that Matthew Crocker, Edra's son, that

8    we had agreed to do a trade on.  And I believe that paid

9    off that house, if I'm not mistaken.

10   Q.  All right.  But in either event, these payoffs were not

11   related to business obligations of any of the debtor

12   companies, were they?

13   A.  Well, yes, I believe -- and forgive me for not knowing

14   which one, but either the 160 or the 175 paid off this

15   particular piece of property, rental property, that Matthew

16   Crocker, my then wife's son, had agreed to -- he wanted a

17   lot at the Yellowstone Club to build a spec house on that

18   was a very difficult lot and wouldn't sell.  So I believe,

19   if my memory is correct, it's Lot 178.  And I reached an

20   agreement with him to take the equity in that house and a

21   condominium in Bozeman, Montana.  Because we get people

22   that get snowbound down in Bozeman, and I thought that

23   would be a good place for them to be spend the night.  And

24   we have people coming to Porcupine Creek.  So the idea was,

25   from my perspective, to have a place outside the gates.  So

1   that was a business related to the club.

2   Q.  All right.  To Commercial Bank, we see a payoff in the

3   amount of $2,007,930.55.  And that was an account in your

4   name, I believe.  Is that true?

5   A.  I believe that's correct, yes.

6   Q.  All right.  Are you able to state today what that

7   payoff was for?

8   A.  I think that was a personal line of credit that I had

9   borrowed on behalf of us; in other words, a married couple.

10  Q.  All right.  And then we see some entries to GECC.  Is

11  that General Electric Capital?  What does "GECC" represent?

12  A.  I think that means "General Electric Credit

13  Corporation".

14  Q.  All right.  And it's true, isn't it, that each of these

15  entries, one in the amount of 1,403,547 and the other in

16  the amount of 2,484,774, each of those was a payoff on the

17  airplane, correct?

18  A.  That's correct.

19  Q.  And it's true, isn't it, that both airplanes were owned

20  by Yellowstone Aviation & Marine, LLC?

21  A.  I think they were, but I'm not certain.

22  Q.  And it's true, isn't it, that you were at that time the

23  sole owner of that company?

24  A.  I believe so.

25  Q.  All right.  And, finally, we see to World Savings a

1   payoff in the amount of $272,590.  And it's true, isn't it,

2   that that payoff was for the rental house which you own

3   personally?

4   A.  You know, as I sit here, that could have been Matthew

5   Crocker's house.  I'm not sure.  I don't remember which one

6   of these is which for that house.

7   Q.  All right.  Now let's go back to the $133 million

8   retained by -- in YDI.  Again, that's up at the top

9   left-hand corner.  And it's true, isn't it, that that is a

10  piece of the loan proceeds which the Credit Suisse loan

11  document allowed to be used by unrestricted subsidiaries?

12  A.  I think that's correct.

13  Q.  All right.  And it's true, isn't it, then, that

14  pursuant to the five-party agreement, which Mr. Hutchinson

15  asked you about, then about $28 million was used to

16  purchase this Farcheville castle, correct?

17  A.  I don't know if it was 28 or not.  It was in euros, and

18  I can't remember the exact amount.

19  Q.  Does that amount seem approximately correct?

20  A.  It could have been 25 or 24.  I'm not sure.  That 28

21  doesn't sound correct, but I could be wrong.

22  Q.  True, isn't it, that about 40 million was used to

23  purchase this Tamarindo property?

24  A.  That's correct.

25  Q.  True, isn't it, that about $12 million was used to

1    acquire an interest in the St. Andrews property, but that

2    $12 million was a down payment in an agreement which called

3    for a total commitment of at least 25 million; is that

4    correct?

5    A.  I know the 12 million was a down payment, and I think

6    the 25 is fairly close.

7    Q.  All right.  Directing your attention to the

8    $55.7 million note which Mr. Hutchinson discussed with you,

9    do you have that one in mind?

10   A.  I remember the note he talked about, yes.

11   Q.  All right.  Now, it's true, isn't it, that that note

12   offset multiple withdrawals you had made from Yellowstone

13   Development going back to 2003?

14   A.  That note represented multiple loans from YDI to BGI.

15   Q.  Okay.  Would you agree that it would be a fair

16   statement to say that that note covered the balance on what

17   you might -- we might commonly refer to as a "drawing

18   account" with that company over that period of time?

19   A.  I'm not quite up to speed with what you mean, sir.

20   Q.  Let's go with your language.  Tell us again how you

21   characterized what that loan represented.

22   A.  That note represented -- well, let me back up.  For

23   several years, BGI would either guarantee or advance money

24   to the Yellowstone companies.  And for a lot of years, it

25   was one way.  And most of those years, we never had any

1    notes; we just had a general entry that we accounted for at

2    the end of the year.  And then when things turned around

3    and we were doing better, under the operating agreements, I

4    believe the operating agreements provided that loans could

5    be transacted between the parent and the subsidiary

6    companies.  And that $55 million, if I recall right, was an

7    accumulation of loans that had gone from YDI to its parent,

8    BGI.

9    Q.  Directing your attention back to the Big Sky Ridge

10   transaction, I asked you about Mr. Wayne Primm, but in

11   point of fact, your Big Sky Ridge transaction involved

12   Mr. Dolan, did it not?

13   A.  Mr. Dolan was an owner of -- part owner of Big Sky

14   Ridge, yes.

15   Q.  All right.  And so you purchased a 50 percent interest

16   from Mr. Dolan for what amount?

17   A.  I don't think it worked that way.  I think --

18   Q.  What did you purchase from Mr. Dolan?

19   A.  I think he purchased half-interest.

20   Q.  All right.  And is that the same half-interest, then,

21   that was subsequent sold for 17 million?

22   A.  Let me see, his half-interest was sold back years later

23   from the inception of the company on another transaction as

24   part payment.  So I'm trying to think if the club bought

25   his half-interest -- no, the club actually -- the

1   Yellowstone Club, mountain club, I believe acquired my

2   personal half-interest in Big Sky Ridge, that's right, for

3   17 million.

4   Q.  All right.  And you had paid how much for that

5   interest?

6   A.  Well, when we bought the property, it was part of a

7   1,000-acre purchase, more or less, for $10 million.  And

8   this was a piece of that deal.

9   Q.  Fair to say that for the -- that you had paid about 3.5

10  million for the same interest which you subsequently sold

11  to the club for 17 million?

12  A.  Well, there was a lot of water under the, water under

13  the bridge that, that had gone down that -- the property

14  had -- we had gotten subdivided, and we had created, I

15  think, somewhere around 80 - 90 lots in the club.  And so

16  we were going to do something like 150 million or $200

17  million of business out of that piece of land that we had

18  bought.  And the club got the half-interest, so --

19  Q.  But it's true, isn't it, that you sold -- that the club

20  got its half-interest for 17 million, correct?

21  A.  That's correct, that's correct.

22  Q.  Now, early in your testimony when Mr. Hutchinson asked

23  you about earlier contacts from Credit Suisse about this

24  loan, my notes indicate that your answer will show us that

25  you said that Credit Suisse described their product as an

1    equity recapitalization loan.

2        Directing your attention to that phrase, the question

3    is:  What did you understand "equity recapitalization" to

4    mean in the context of the loan being offered by Credit

5    Suisse?

6    A.  Well, that was a term that they used.  And I had never

7    done one of these things before, so I thought it was a

8    banker term.  And that's an internal term, I think, that

9    Credit Suisse used for that product.

10   Q.  In common language, didn't you understand it to mean

11   it's an opportunity to take value or money out of the club?

12   A.  Well, certainly, by their term, "equity

13   recapitalization" would mean that you would recap it like a

14   home equity loan.  You could take -- you could borrow money

15   against your asset.

16   Q.  And that's what happened.  Fair statement?

17   A.  Fair statement.

18              MR. WANGSGARD:  No further questions.

19              THE COURT:  You know, Mr. Zimmerman, are you

20   planning to ask questions of this witness?

21              MR. ZIMMERMAN:  Not at this time.  We're going to

22   defer to Mr. Blixseth 's counsel.

23              THE COURT:  Okay.  Let's take about a 10-minute

24   break.

25              MR. FLYNN:  One issue, Judge.

```
 1              THE COURT:  Yes, Mr. Flynn.
 2              MR. FLYNN:  I only intend to ask a few questions
 3    and then reserve the right to call Mr. --
 4              THE COURT:  Certainly, you may do that.
 5              And you'll have some redirect?  I'll ask Mr. --
 6              MR. HUTCHINSON:  Not much.
 7              THE COURT:  Okay.  Well, let's still take a
 8    10-minute break.
 9              Mr. Blixseth, you can step down.
10              (A brief recess was taken.)
11              THE COURT:  Please be seated.  We will once again
12    reconvene.
13              Mr. Blixseth, I remind you you're still under
14    oath.  This is continuation of the Adversary Case 09-00014.
15              Just for everyone's benefit, the pretrial order
16    that I previously talked about this morning has been
17    compiled, I've signed it, it is in the process of being
18    docketed.  Just so you know that.  If you wish to look at
19    it, make sure it's what we said it was.  Hopefully it is;
20    and if not, I'm sure you'll bring it to my attention.
21              So, Mr. Flynn, you may proceed.
22              MR. FLYNN:  Thank you, Your Honor.  Will Your
23    Honor put Exhibit 1 of the Credit Suisse exhibits in front
24    of Mr. Blixseth?  It's the credit facility agreement, Your
25    Honor.
```

```
 1           THE COURT:  Yes.  Just a second, let me get
 2   focused here.  Are you going to stay in Volume I?
 3           MR. FLYNN:  Yes, Your Honor.  I hope to be very
 4   short.
 5           THE COURT:  Okay.  I'm going to hand you the
 6   whole -- (inaudible.)
 7                   CROSS-EXAMINATION
 8   BY MR. FLYNN:
 9   Q.  Do you have Exhibit 1 in front of you, Mr. Blixseth,
10   which is titled:  Credit agreement dated as of September
11   30, 2005 --
12   A.  I do.
13   Q.  -- among Yellowstone Mountain Club, etc.?
14   A.  I do.
15   Q.  As of the date September 30, 2005, had you read it?
16   A.  No, I hadn't.
17   Q.  And as of that date, did you have a team of people that
18   were working on this loan transaction?
19   A.  Yes.
20   Q.  And who were they?
21   A.  Internally, there was a gentleman named Chris Campbell,
22   who was an ex-Wall Streeter from Smith Barney, who had done
23   a lot of these deals.  He was kind of the point guard.
24       There was Bob Sumpter.  I think it's S-U-M-P-T-E-R.
25   And Bob was vice president of real estate, pretty savvy in
```

 1    the financial world.

 2        And then we had Mike Doyle and his law firm; and then

 3    we had Steve Brown and Garlington law firm; and George

 4    Mack, obviously, in the accounting department -- or the

 5    outside accounting firm.

 6    Q.  And do you recall the name of Mr. Doyle's law firm at

 7    the time?

 8    A.  I think it was called "Doyle and Gartland".

 9    Q.  And do you recall how many lawyers approximately were

10    in that law firm?

11    A.  You know, I don't know.  There were several, but I

12    can't tell you how many.

13    Q.  Do you recall how many lawyers were in the Garlington

14    law firm back at that time?

15    A.  I don't know.  There was a lot more in their firm

16    than -- maybe 20, I would guess.

17    Q.  Okay.  Would you turn toward -- and it should be --

18    down of the lower right-hand corner, there's some numbers.

19    It should be GLR 000447.

20             THE COURT:  I know the feeling.

21             THE WITNESS:  Unfortunately.

22    Q.  (By Mr. Flynn)  I apologize in advance for making you

23    do this, Mr. Blixseth.

24    A.  Where is the number, sir?

25    Q.  Down in the lower right-hand corner.

```
 1            THE COURT:  And the number again, Mr. Flynn?
 2    GLR --
 3            MR. FLYNN:  GLR000447, Your Honor.
 4            THE COURT:  Okay.
 5            THE WITNESS:  I've got a YRCBC, a lot of zeros,
 6    and a seven, unless I'm not looking at it right.
 7            MR. FLYNN:  Maybe the best thing to do would
 8    be --
 9            THE COURT:  You may approach and help him.
10            MR. FLYNN:  Thank you, Your Honor.
11    Q.  (By Mr. Flynn)  We'll put you on the right page.
12    A.  That's what I got handed.
13    Q.  This is what you have lawyers for, right, Mr. Blixseth?
14            THE COURT:  It moves the proceeding along.
15            MR. FLYNN:  Thank you.
16    Q.  (By Mr. Flynn)  Now, you'll see on that page, sir --
17            THE COURT:  We're still on Exhibit 1?
18            MR. FLYNN:  Yes, Your Honor.
19            THE COURT:  Okay.
20            MR. FLYNN:  And we're on the recitals page, Your
21    Honor.
22            THE COURT:  Okay.
23    Q.  (By Mr. Flynn)  You'll see under -- on that page,
24    Mr. Blixseth, it says "recitals".
25    A.  Yes.
```

1    Q.  And then it says "A", it's the very first recital

2    (quoted as recorded):

3            "Whereas the borrower desires that the lenders

4    extend certain senior term loans to the borrower hereunder

5    the proceeds of which will be used.

6            "One, for distribution or loans up to

7    $209 million to members in the bar are, for purposes

8    unrelated to the Yellowstone development."

9        Did I read that correctly, sir?

10   A.  Yes.

11   Q.  Okay.  Now, during the negotiate for the loan and up

12   until the loan was executed on September 30, was that

13   consistent with your understanding - understanding that

14   there were different amounts involved - that there would be

15   proceeds distributed to the borrower for purposes unrelated

16   to Yellowstone development?

17   A.  I don't think "distributed" was my final -- I believe

18   that it could either be borrowed or distributed.

19   Q.  Right, for distribution or loans.

20   A.  Right.

21   Q.  Is that correct?

22   A.  Correct.

23   Q.  Where did you get that understanding?

24   A.  Well, when this agreement was -- I guess you go way

25   back where the legal team and our team would go with the

1    drafts as the -- each draft came out, and they would haggle

2    back and forth apparently with the Credit Suisse lawyers,

3    as all negotiations do.  Then they got to this, which is

4    the agreement, the agreement that counts, I think.  And so

5    the team looked this over.  And at some point in time, the

6    legal team said it's good to go, and my team said it's good

7    to go and it's time to -- the rest -- you know, you get the

8    bond sold, and it's time to sign.

9            MR. FLYNN:  Now, would you turn to page -- may I

10   approach again, Your Honor?

11           THE COURT:  You may approach.

12           MR. FLYNN:  It's probably easier for me to find

13   it, in the interest of expedition.  And this is on page 33

14   of the actual document.

15           THE COURT:  Still on Exhibit 1?

16           MR. FLYNN:  Yes, Your Honor, Exhibit 1 of the

17   Credit Suisse exhibits.

18           THE COURT:  Yes.

19   Q.  (By Mr. Flynn)  Mr. Blixseth, do you see that Paragraph

20   2.6 on what is numbered page 33 entitled:  Use of proceeds?

21   A.  Yes, I do.

22   Q.  And I will read into the record (quoted as recorded):

23           "'A', loan.  The proceeds of the loans, loans

24   made to the borrower shall be applied.

25           "One, pursuant to Section 6.5(iii) for

1    distributions or loans up to $209 million to members of the

2    borrower for purposes unrelated to the Yellowstone

3    development."

4        Did I read that correctly, sir?

5    A.   Yes, you did.

6    Q.   And when you executed this document, was that your

7    understanding?

8    A.   That's correct.

9    Q.   If anyone in your legal team or your consulting team or

10   anyone from Credit Suisse or any of their lawyers or bond -

11   (inaudible) - or consultants had told you that it was a

12   breach of fiduciary duty or illegal for any purpose to do

13   this loan and take the $209 million out of the company,

14   would you have done it?

15   A.   Absolutely not.

16   Q.   Okay.

17            MR. FLYNN:  Now, sir, Your Honor, I'd like to

18   turn to Mr. Blixseth's Exhibit 4, which is the Garlington,

19   Lohn & Robinson legal opinion.  And I think I've got an

20   extra copy.

21            THE COURT:  Let me just track them down here.

22            MR. FLYNN:  I think I've got it here.  If the

23   Court wants, I've got on extra copy for the Court, too, if

24   it's too difficult to chase down.

25            THE COURT:  I think you just have one volume, as

```
 1    I recall now, right?
 2            MR. FLYNN:  I think, Your Honor, unlike the
 3    10,000 pages we're surrounded by --
 4            THE COURT:  Which exhibit are we on?
 5            MR. FLYNN:  Number 4.
 6            THE COURT:  Four.
 7            MR. FLYNN:  And the record will reflect I've
 8    handed Mr. Blixseth a copy of what is Exhibit 4.  And that
 9    is the Garlington, Lohn & Robinson legal opinion dated
10    September 30, 2005, signed by Stephen R. Brown.
11    Q.  (By Mr. Flynn)  Do you have that document,
12    Mr. Blixseth?
13    A.  I do.
14    Q.  Would you turn to page 2 of that document?
15        And under "opinion", that document reads (quoted as
16    recorded):
17             "It is our opinion that as of the date of this
18    letter" - and I'll skip down to Paragraph 2 because the
19    first paragraph is just the organized under the state of
20    Montana - "each loan party has the requisite power and
21    authority to execute, deliver, and perform its obligations
22    under the loan documents."
23         Did I read that correctly, sir?
24    A.  Yes, sir.
25    Q.  And was that consistent with your understanding that
```

1  you could take out of the Yellowstone Club $209 million

2  without breaching your fiduciary duties or violating any

3  laws?

4  A.  Yes.

5  Q.  And then I'll skip down to No. 5.  And that reads

6  (quoted as recorded):

7          "Execution and delivery by the loan parties in

8  performance of their respective obligations under the loan

9  documents does not violate any of their organizational

10  documents, violate any laws."

11      Did I read that correctly, sir?

12  A.  Yes.

13  Q.  And is that consistent with your understanding that you

14  didn't breach any fiduciary duty laws in the state of

15  Montana in connection with this loan transaction?

16  A.  Yes.

17  Q.  Now, as of that date, was Stephen R. Brown your lawyer,

18  Mr. Blixseth?

19  A.  He represented the club and me personally, also.

20  Q.  And then at some point in time, sir, did he come to

21  represent you in connection with the litigation involving

22  Mr. LeMond?

23  A.  He did.

24  Q.  And do you know approximately when that was?

25  A.  Oh, it's -- I tried to block that one out of my mind.

1    Q.  Okay.

2    A.  I think it was in '07, I think.  I'm not sure.

3           MR. FLYNN:  Okay.  Your Honor, I'd like to turn

4    to now Exhibit 5 of Mr. Blixseth's exhibits.  And I've got

5    an extra copy for him.

6           May I approach, Your Honor?

7           THE COURT:  You may approach.

8           MR. HUTCHINSON:  Your Honor, I'd like to

9    interpose an objection.  I'm being told that we've not

10   received this document - (inaudible, out of range of

11   microphone) - production or -- (inaudible.)  So we have not

12   seen it.  We - (inaudible) - an opportunity to look at it

13   before.

14          THE COURT:  You may certainly look at it.

15          MR. FLYNN:  Your Honor, may I respond?

16          THE COURT:  Yes.

17          MR. FLYNN:  They used it.  I got it from them.

18   They used it in Mr. Blixseth's deposition.

19          MR. HUTCHINSON:  We couldn't know that unless we

20   saw it.

21          THE COURT:  Well, certainly, if you'd like to

22   look at it, come forward.  You may approach and take a look

23   at it.

24          UNIDENTIFIED SPEAKER:  Can - (inaudible) - look

25   at it, as well?

1          THE COURT:  You may.  I mean it's been sitting

2  here for a week, so --

3          MR. FLYNN:  And it was delivered to them, Your

4  Honor.

5          THE COURT:  -- so it's been someplace.

6          MR. FLYNN:  Here's another copy, George.

7          UNIDENTIFIED SPEAKER:  It was delivered to them

8  yesterday afternoon, Judge, all three of them.

9          UNIDENTIFIED SPEAKER:  We've got no objection.

10          THE COURT:  Do you want to offer Exhibit 1 of the

11  Credit Suisse exhibits as well as Exhibit 4 of

12  Mr. Blixseth's and now this exhibit, unless you've

13  identified it and --

14          MR. FLYNN:  Yes, Your Honor.  I'll offer them

15  now.

16          THE COURT:  Any objection?

17          UNIDENTIFIED SPEAKER:  No objection, Your Honor.

18          THE COURT:  Exhibit 1 of Credit Suisse is

19  admitted, Exhibit 4 of Tim Blixseth is admitted, and

20  Exhibit 5 of Tim Blixseth is admitted.

21              CREDIT SUISSE'S EXHIBIT 1 AND

22      BLIXSETH'S EXHIBITS 4 and 5 ADMITTED INTO EVIDENCE

23          THE COURT:  You may proceed after he's had an

24  opportunity to review it.

25          MR. FLYNN:  Thank you, Your Honor.

```
 1              THE COURT:  Do I have the right exhibit?  Isn't
 2    Exhibit 5 already admitted as one of yours?  I think it is.
 3              MR. FLYNN:  It's already in.
 4              THE COURT:  It's already in.  I mean we talked
 5    about the language in Paragraph 3 previously.
 6              MR. FLYNN:  Right.
 7              UNIDENTIFIED SPEAKER:  It's in under a different
 8    number.
 9              THE COURT:  It is.  It's under one of your
10    numbers, as well.  Okay.
11              THE WITNESS:  All right, I've looked at it.
12    BY MR. FLYNN:
13    Q.  Now, this is an e-mail from Michael Doyle.  And that's
14    your lawyer, right?
15    A.  Correct.
16    Q.  And it's to you.  And it's cc'd to Stephen R. Brown and
17    someone named Schulherck (phonetic) at Mackroberts.com; is
18    that correct?
19    A.  Correct.
20    Q.  And at this time, was Stephen R. Brown your lawyer?
21    A.  He was.
22    Q.  And this document reads (quoted as read):
23              "Dear Tim, at 1:30 p.m. West Coast time today, we
24    had a conference call with Steve Brown; two senior
25    litigation people from his law firm; and George Mack, CFO."
```

1      And this is Mr. Mack who is at this point in time the

2 CFO of the -- of BGI and the Yellowstone Club entities?

3 A.  Yeah, of the Yellowstone Club companies.

4 Q.  Then it reads (quoted as recorded):  "The attorneys had

5 read over the complaint."

6      And I believe that's referring to the LeMond complaint.

7 Is that your understanding?

8 A.  I think so.

9 Q.  (Quoted as recorded):  "The second appraisal from

10 Cushman & Wakefield, and listened to me tell about the

11 background of how we got to where we are today.  We

12 discussed several factual inaccuracies in the complaint and

13 just what the true motivation of the complaint seems to

14 be."

15      And then beginning on the third paragraph (quoted as

16 recorded):

17          "The consensus of everyone on the telephone

18 conference was that the main bitch in the complaint

19 involved the $209 million loan from the Yellowstones to

20 BGI."

21      Was it your understanding that the main thrust of the

22 LeMond suit against you involved the $209 million?

23 A.  Yes.

24 Q.  And this document, by the way, is dated May 8, 2006, so

25 some nine months after the execution of the loan where

1    Stephen R. Brown is still acting as your lawyer, correct?

2    A.   Correct.

3    Q.   (Quoted as recorded):  "It was the Montana attorneys'

4    opinion that such loans are allowed under the operating

5    agreement; although, they were a bit dismayed when I had to

6    tell them that the loan was not evidenced by a promissory

7    note."

8        Now, did you participate in the conference call that's

9    referenced in the first paragraph?

10   A.   No.

11   Q.   And after the conference call, I take it that you got

12   this e-mail.  Is that correct?

13   A.   I believe that's correct, that afternoon.

14   Q.   And do you have any memory of reading this e-mail?

15   A.   I vaguely remember scanning it -- or scanning over it

16   when it came across --

17   Q.   And with regard to the Paragraph 3 that I read into the

18   record - not No. 3, but the third in sequence - is that

19   Montana attorneys' opinion that such loans are allowed

20   under the operating agreement, is that consistent with your

21   continued understanding that taking out the $209 million of

22   the club did not constitute a breach of fiduciary duty

23   under Montana law?

24   A.   Yes, it did.

25   Q.   Then we'll go down to the fifth paragraph (quoted as

1    recorded):

2           "The consensus of everyone on the telephone

3    conference was that you should authorize me to get back to

4    the attorneys for the plaintiffs offering to provide the

5    financial information that they have requested."

6        And these are basically four of the Class B's, is that

7    correct, LeMond and --

8    A.  I believe that's who they're referring to.

9    Q.  (Quoted as recorded):  "That they have requested

10   together with that portion of the Credit Suisse agreement

11   that allows for the $209 million either to be used for

12   loans or for distributions to members.  They already have

13   the two Cushman & Wakefield appraisals."

14       And was that, sir, consistent with your understanding,

15   that taking out the $209 million, regardless of how you

16   spent it, did not constitute a breach of fiduciary duty

17   under Montana law?

18   A.  That's true.

19   Q.  Now, sir, then Mr. Brown represented and defended you

20   personally in the LeMond case on those precise issues; to

21   wit, the $209 million that you took out of the Yellowstone

22   Club?  Is that correct?

23           UNIDENTIFIED SPEAKER:  Objection; leading.

24           THE COURT:  I'll sustain and let you rephrase.

25           MR. FLYNN:  Okay.

```
1    Q.   (By Mr. Flynn)  What was your understanding,

2    Mr. Blixseth, with regard to Mr. Brown's representation of

3    you in connection with the Yellowstone Club?

4    A.   Well, Mr. Brown and the Garlington firm represented

5    us - (inaudible) - us in the litigation that the LeMond, et

6    al. parties have brought against us primarily centering

7    around the loan of 209 million.

8    Q.   Okay.  Now, and during that period of time, did you

9    have repeated conversations with Mr. Brown relative to that

10   issue during the course of the litigation?

11   A.   We had many conversations.  Obviously, we were in the

12   heat of the battle about the litigation, yeah.

13   Q.   Okay.  Now, let's fast-forward a little bit.  In the

14   summer -- or strike that.

15       In the spring of 2008 into the summer of 2008 while

16   your marital dissolution proceedings were, were transpiring

17   in the California Superior Court, did Mr. Brown provide you

18   advice or Mr. Kolodny advice with regard to certain aspects

19   of your marital proceedings?

20   A.   Mr. Brown was involved pretty heavily in that

21   transaction.

22   Q.   Okay.  And with regard to other issues into the fall of

23   2008, did you consistently and often have telephone

24   conversations with Mr. Brown --

25   A.   I did.
```

1    Q.  -- as your lawyer?

2    A.  I did.

3    Q.  And did those conversations involve, in part, the

4    litigation in LeMond and the $209 million?

5    A.  I think it did on a few occasions.

6    Q.  Okay.  Now, let's bring it up to just a couple of weeks

7    ago, April 11, 2009.

8              MR. FLYNN:  And, Your Honor, I don't want to

9    waive the privilege on this, so the issue would be either

10   clearing the courtroom or figuring out some way to do it

11   with a nonwaiver, a stipulated nonwaiver from all the

12   parties for all purposes.  Because I want to just get into

13   the part of the conversation that Your Honor --

14   (inaudible.)

15             THE COURT:  Well, would this be covered under the

16   new rule?

17             MR. FLYNN:  Your Honor, you've lost me.

18             THE COURT:  Like, if I can find it, under 502

19   under the privileges.  It's not covered under that?  Okay.

20             MR. FLYNN:  Oh, it's an attorney-client

21   privileged communication.

22             THE COURT:  I know.  But, you know, they've just

23   added 502 to kind of deal with, you know, more or less

24   inadvertent waivers that might have arisen during probably

25   discovery versus trial proceedings.

1            Is there any objection to Mr. Flynn's request?

2            MR. HUTCHINSON:  I'm not sure what we're being

3    asked to stipulate to.

4            THE COURT:  Okay.  Would you rephrase it,

5    Mr. Flynn?

6            MR. FLYNN:  The stipulation, Your Honor, would be

7    a nonwaiver for all purposes by Mr. Blixseth of his right

8    to assert the attorney-client privilege at any time for any

9    purpose.

10            THE COURT:  At subsequent times.

11            MR. FLYNN:  At subsequent times, in connection

12    with conversation that he had with Stephen R. Brown on or

13    about April 11, 2009.

14            MR. HUTCHINSON:  From the debtors' perspective,

15    Your Honor, there's been an assertion of

16    advice-of-counsel defense in this case.  And it's my

17    understanding under the law that once that assertion has

18    been made, that there's a waiver and an allowance of

19    parties to inquire into attorney-client communications in

20    order to discover and develop evidence of whether there was

21    full and complete disclosure in connection with the advice

22    that was given.  It sounds like this is the continuation of

23    the advice that was given in that same subject matter.  And

24    so our position would be that it's waived and that there's

25    no need for any stipulation to be entered into.

1               UNIDENTIFIED SPEAKER:  Your Honor, the committee

2       endorses the position Mr. Hutchinson has articulated.

3               THE COURT:  Okay.  Mr. Zimmerman, any position?

4               MR. ZIMMERMAN:  We're going to sit this one out,

5       Judge.

6               THE COURT:  I was going to make a comment, but I

7       won't.

8               MR. FLYNN:  If I may respond, Your Honor.

9               THE COURT:  Mr. Flynn.

10              MR. FLYNN:  Normally, the advice-of-counsel

11      defense would be restrictive potentially to a particular

12      time frame.  Here we have an overriding problem, as Your

13      Honor notes from our motion, to dismiss based on the

14      compromise and the taint that's permeated these entire

15      proceedings because of Mr. Brown's involvement as chairman

16      of the committee.  That taint, Your Honor, complicates or

17      overrides the potential issues relating to the conversation

18      that he had on April 11th.  And the reason it does is, in

19      our view, the taint is established as a matter of record,

20      as Your Honor has seen in our memos.  And I won't go

21      through all of that.

22              But the taint, because it now permeates the

23      proceedings, entitles us to protect -- we have no idea what

24      Mr. Brown -- there's 367, or so, privileged log entries

25      between Mr. Beckett and other members of the debtors and

1    the committee.  We have no idea at this stage of the

2    proceedings what happened in connection with those

3    communications, what they involve, etc.

4            What we do know, Your Honor, is that in the

5    answers to interrogatories, Mr. Brown gave information in

6    violation of at least three Montana rules of professional

7    conduct to Mr. Hutchinson.  Even in the negative, by saying

8    that he didn't know about the use of the proceeds, that is

9    giving information to an adverse party and using

10   information under Montana Professional Conduct 1.9.  Under

11   1.7 and 1.6, it's revealing information.  So in the face of

12   the record, Your Honor, we've got a taint.  We don't know

13   about these other 367 conversations.  And as Your Honor

14   knows, we believe we're entitled to discovery on them.

15           In order to move forward quickly, I don't want to

16   waive the privilege because of the taint that's already

17   occurred without knowing what Mr. Brown has said either in

18   connection with this conversation that he had with

19   Mr. Blixseth on the 11th.  He could have gone back to

20   Mr. Beckett, to Mr. Hutchinson and said, "Here's the

21   conversation I had with Mr. Blixseth ."  And at this point,

22   we don't know.  That's why I need the stipulation.

23   Otherwise, it would probably be within the realm of the

24   advice-of-counsel defense.  But that's the problem I've

25   got.  And I don't want to waive it.

1           THE COURT:  Well, I've got on one side, parties

2     saying there is no problem.  You're wanting to preserve it

3     and --

4           MR. FLYNN:  I apologize for putting the Court in

5     this dilemma, but I have to protect our rights, Your Honor.

6           MR. HUTCHINSON:  May I be heard, Your Honor?

7           THE COURT:  Mr. Hutchinson.

8           MR. HUTCHINSON:  The questions that have been

9     asked of Mr. Blixseth during the course of his examination

10    today have been in the nature of:  What advice were you

11    given?  Who gave you the advice?

12          He's been allowed to testify about all of those

13    things without any objection from Mr. Blixseth's counsel.

14    That is, in and of itself, a basis for waiver because there

15    is a knowing allowance of the witness to testify about

16    things that would otherwise be covered by privilege.

17    Coupled with the advice-of-counsel defense, it seems to me

18    that there has been a waiver.

19          And I'm not sure I understand exactly what

20    Mr. Flynn's concerns are with regard to this very narrow

21    issue of the conversation that took place on the 11th and -

22    (inaudible) - is entitled to some special privilege -

23    (inaudible) - but I suppose that we could enter into some

24    kind of stipulation with regards to only that communication

25    and agree that testimony about that communication is not -

1    (inaudible) - an independent basis for a waiver that

2    doesn't already exist.

3              MR. FLYNN:  Restricting that conversation to the

4    stipulation is agreeable, Your Honor.

5              THE COURT:  Okay.  So ordered.

6    Q.  (By Mr. Flynn)  Mr. Blixseth, you're aware that

7    Mr. Brown testified under oath on April 10th?

8    A.  I am.

9    Q.  And you read his deposition?

10   A.  I did.

11   Q.  And what was your reaction, sir, when you read his

12   deposition?

13   A.  I was pretty shocked, but I felt sorry for Steve.

14   Q.  And on the evening -- April 10th was a Friday, is that

15   correct, if you recall?

16   A.  That's correct.

17   Q.  In that evening, did you get a phone call?

18   A.  Mr. Brown left a -- or he called on my cell phone

19   during dinner, and I did not speak to him.  But I had a

20   missed call from his cell phone.

21   Q.  And do you recall what he said in that voice message?

22   A.  He didn't leave a voice message.  It was just a missed

23   call with his cell number.

24   Q.  And the following -- that evening, did you have any

25   conversation with him?

1    A.   I did not.

2    Q.   In the following day, did you have any conversation

3    with Mr. Brown?

4    A.   Yes, I did.

5    Q.   How many conversations did you have?

6    A.   Two or three.

7    Q.   And did he call you, or did you call him?

8    A.   I called him at his office at his private line on

9    Saturday and said that I had seen his number on my cell and

10   I was returning his call.

11   Q.   Now, where were you when you called Mr. Brown?

12   A.   I was in Palm Desert, California.

13   Q.   And when you called him, were you on a speakerphone?

14   A.   I was.

15   Q.   And was there anyone else present?

16   A.   My son, Bo Blixseth, was in my office at the time.

17   Q.   And what was said in the first conversation?

18   A.   I said, "Steve, I'm returning your call."

19        And he said, "Have you heard about my deposition?"  or

20   something like that.

21        And I hadn't really read the deposition that much.  And

22   we talked.  And he said, "I'm really sorry."  He said, "I

23   really am on this committee to protect you," and that's a

24   quote, "and get the truth out."

25        That was what Mr. Brown said to me, which -- and that

1    hadn't been the first -- I mean that's what he said to me.

2        Then I said, "Well, let me talk to my counsel, other

3    counsel."

4        So in an hour or two, I had called him back, and I

5    had -- well, maybe two hours, and I had read his

6    deposition.

7        And I said, "I'm really disappointed, Steve, you know,

8    that you gave up my" -- (inaudible.)

9        And we went back and forth.  And he said, "Well, did

10   you talk to Mr. Flynn about this?"  But he says, "Is

11   Mr. Flynn okay talking to me?"

12       And I said, "Well, you're my attorney."

13       And he didn't answer.

14   Q.  Okay.  Was there further conversation, either in that

15   conversation or in a subsequent one, about the use of the

16   proceeds, the $209 million?  And if so, what was that

17   conversation?

18   A.  Yes, there was.

19   Q.  And what was that, sir?

20   A.  I said to Steve, I said, "Steve, you guys gave me

21   advice.  Everybody said it was okay to borrow that money.

22   And it's a loan, and you know it's a loan and it was okay."

23   And I said, "Would you have the same opinion -- do you have

24   that same opinion today that you had on September 30th?"  I

25   asked him that.

1      And he said, "Yes, I do."

2  Q.  And was there any further conversation about how the

3  loan proceeds could be used?

4  A.  I think I said to Steve, "If I had given -- if I had

5  taken the $209 million loan in BGI and given it to the Red

6  Cross, that would have been all right, wouldn't it?"

7      And he said, "Yes, it would be."

8  Q.  Now, that advice that you received from your lawyer,

9  Steve Brown, on or about April 11, 2009, is that consistent

10  with your understanding that when you allocated the

11  $209 million and spent it, that it did not constitute a

12  breach of fiduciary duty under any Montana laws?

13  A.  Yes.

14          MR. FLYNN:  That's all I have.  Thank you, Your

15  Honor.

16          THE COURT:  Okay.

17          MR. FLYNN:  With a right to recall.

18          THE COURT:  You do have the right to recall.

19          MR. FLYNN:  Thank you, Your Honor.

20          THE COURT:  Mr. Coleman.

21                  CROSS-EXAMINATION

22  BY MR. COLEMAN:

23  Q.  Mr. Blixseth, we've not met.  My name is Shane Coleman

24  from Billings.  I represent -- I'm one of the attorneys for

25  Credit Suisse in this matter.  I think we spoke briefly

1  during your deposition last week or the week before, if you

2  recall that.

3      I just want to follow up on a couple of things that you

4  said.  First of all, I want to put some dates around some

5  of the events that we talked about.  What was the time

6  period during which you controlled the Yellowstone Club?

7  A.  Well, I think it was probably from the inception.  And

8  I'm going to guess in the late '90s through August 12,

9  2008.

10  Q.  Okay.  And when we say -- when we talk about the

11  Yellowstone Club, you understand I'm referring to those

12  debtor entities in this case?

13  A.  Yes, sir.

14  Q.  And during this period when you controlled the

15  Yellowstone Club, you were its manager?

16  A.  I was president of BGI, which was the manager of the

17  debtor entities.

18  Q.  The sole manager of the debtor entities?

19  A.  Yes.

20  Q.  Okay.  You were president of BGI.  Did you also own

21  shares in BGI?

22  A.  I did.

23  Q.  One hundred percent of the shares in BGI --

24  A.  Yes, sir.

25  Q.  -- directly or indirectly?

1   A.   Yes.

2   Q.   And BGI held, as I believe you testified, 100 percent

3   of the "A" class shares of the Yellowstone Club entities;

4   is that correct?

5   A.   That's correct.

6   Q.   And that means 100 percent of the voting shares of the

7   Yellowstone Club?

8   A.   That's correct.

9   Q.   Okay.  As manager of BGI acting -- or as president of

10  BGI acting as manager of the Yellowstone Club entities, you

11  were responsible for ultimately making financial decisions

12  for the club?

13  A.   That's correct.

14  Q.   And you did that -- I think you testified - tell me if

15  I'm wrong - but that the buck stopped with you; is that

16  correct?

17  A.   That's what I said.

18  Q.   Okay.  You would make those decisions alone or in

19  consultation with your advisors, but ultimately, you were

20  the one making those decisions?

21  A.   The financial decisions really came down -- comes down

22  in any business to the person that controls it.  And, of

23  course, those financial decisions are, a lot of times,

24  based on your legal team, your accounting team, and your

25  management team.

1   Q.  All of whom you relied upon?

2   A.  That's correct.

3   Q.  Okay.  At what point, then -- you gave us a date, but

4   describe generally the circumstances at which you no longer

5   controlled the debtor entities.

6   A.  I was locked in a very bitter divorce proceeding, and

7   my ex-wife had tried to get control of the debtor entities

8   in the family court in Riverside, California.  And she was

9   rebuffed a couple of times, and I think there were two

10  restraining orders issued against her not to meddle in the

11  business, if you will.  And so she and the Liner law firm

12  from Los Angeles filed an intervention into the LeMond

13  suit, basically went public and said that I should be

14  removed as manager and that the company was going broke.

15  And, of course, it was can kind of a self-fulfilling

16  prophesy, I guess.  But that really devastated the sales.

17      I think - I stand to be corrected - but I think we had

18  about $50 million in sales in escrow; and I think in a week

19  or two, we had zero.  So that hurt us badly.  And then they

20  threatened to -- when they were denied by Judge Tucker in

21  Virginia City on the intervention order -- or motion,

22  they - "they" meaning my ex and her legal team - they vowed

23  to file in Federal Court some other kind of action.  So --

24          MR. HUTCHINSON:  Judge, I'm sorry to interrupt,

25  but I don't believe this is responsive to the question that

1    was asked, which is control of the company, the dates they

2    controlled the company.

3              THE COURT:  I sustain.

4              MR. COLEMAN:  I don't think it is, either, Your

5    Honor.

6    Q.  (By Mr. Coleman)  And I apologize, my question was

7    perhaps a little too broad.  I want to more narrowly focus

8    on ultimately in connection with the divorce proceedings,

9    there's something we've heard referred to as the "MSA".

10   You're familiar with that?

11   A.  Yes, I am.

12   Q.  Is it the MSA -- is it the "marital settlement

13   agreement"?  Is that the name of it?

14   A.  That's correct.

15   Q.  Is it the MSA that ultimately divested you of control

16   of the Yellowstone Club?

17   A.  That's correct.

18   Q.  Did it likewise divest you of control of BGI?

19   A.  Yes, it did.

20   Q.  And that was the 2008 date that you gave us when both

21   of divestitures were effective?

22   A.  I believe it was August 12, 2008, or August -- yeah, it

23   was the 12th.

24   Q.  Okay.  And so that we're clear for the record, because

25   I understand we're not getting into matters of the MSA,

1    were the debtor entities parties to the MSA?

2            MR. HUTCHINSON:  Your Honor, we're going to

3    object on the grounds of relevancy based on your ruling

4    this morning with regard to the PTO.

5            THE COURT:  I'm going to sustain.  I'm not sure

6    that Mr. Blixseth knows -- or it looks like he's puzzled

7    with trying to respond.

8            MR. COLEMAN:  And that was all I'm trying to

9    clarify, whether or not he knows and we're not getting into

10   the details of it.

11           THE COURT:  Okay.

12   Q.  (By Mr. Flynn)  Shifting gears, then, to one other

13   topic, in any of your discussions with Credit Suisse with

14   respect to this loan, did you ever mention that the

15   proceeds of the Credit Suisse loan would not be distributed

16   to the Class B shareholders?

17   A.  I don't think that conversation ever happened -- or a

18   conversation like that.

19           MR. COLEMAN:  Nothing further, Your Honor.

20           THE COURT:  Okay.  Mr. Hutchinson, redirect, I

21   believe.

22           MR. HUTCHINSON:  Thank you, Your Honor.

23                   REDIRECT EXAMINATION

24   BY MR. HUTCHINSON:

25   Q.  You were asked questions by Mr. Flynn about the timing

1    of the insertion of the words "or loans" in the agreement.

2    And I want to direct your attention to Exhibit 263-A.

3              MR. HUTCHINSON:  May I approach, Your Honor?

4              THE COURT:  You may approach.

5              MR. FLYNN:  Your Honor, I object.  I didn't ask

6    about the timing.  I accept it's September 30th.

7              THE COURT:  Well, I'm going to overrule and allow

8    him to ask the question regarding the document.

9    Q.  (By Mr. Hutchinson)  I am simply trying to make it

10   clear on the record so then we have a clear record because

11   my understanding of Mr. Flynn's questioning was that there

12   was some question as to the timing of when the words "or

13   loan" appeared in the credit agreement.

14       The exhibit that you've just been handed is the August

15   22, 2005 version of the credit agreement.  And I would like

16   for you to look at that again and confirm for me that the

17   words "or loan" do not appear anywhere in that credit

18   agreement.

19             UNIDENTIFIED SPEAKER:  Your Honor, what is the

20   exhibit number?

21             THE COURT:  263-A.

22             MR. HUTCHINSON:  263-A, yes, Your Honor.

23   Q.  (By Mr. Hutchinson)  And we're on the second-to-last

24   page of that agreement, Mr. Blixseth.  Recital A sets out

25   the proceeds, proceeds which can be used as.  And the only

1    word that appears there is "distribution".  There's no "or

2    loan".  Do you see that?

3    A.  I do.

4    Q.  Okay.  So as of August 22, 2005, the "or loan" had not

5    been made part of the agreement, right?

6    A.  Well, I can't say if that's true or not because I don't

7    know if our guys had talked to Credit Suisse or not; and

8    whether this draft came out, if they revised it.  I can't

9    tell you if it was or wasn't just because this draft

10   doesn't have it.

11        THE COURT:  Wasn't this subject to the testimony

12   that we had earlier regarding, then, the memo on August

13   30th and then the subsequent, what, September 5th agreement

14   revision?

15        MR. HUTCHINSON:  Yes, Your Honor.

16        THE COURT:  Fourth or fifth.

17        MR. HUTCHINSON:  Yes.  We've covered this this

18   morning, and I don't want to cover it again.  I simply want

19   to make the point that the August 21st has no "or loans"

20   language in it.  And I think I've done that, so I'm ready

21   to move on.

22        THE COURT:  I think we did that this morning.

23        MR. HUTCHINSON:  Okay.

24   Q.  (By Mr. Hutchinson)  Would you look at Blixseth

25   Exhibit 4, please?  Do you have that in front of you?  I

1    believe it's the opinion letter from the Garlington firm.

2    A.  Yes, I have it.

3    Q.  Can you point -- well, first of all, do you remember

4    seeing this document at any time prior to the September 30,

5    2005 credit agreement?

6    A.  I don't recall if I saw it or not.  I know that it was

7    in the works because Mike Doyle was the captain of the

8    legal team, if you will.  I know it was a -- there was

9    probably closing documents, I think.

10   Q.  Do you remember reading it on September 30, 2005?

11   A.  I'm trying to -- I had so many documents in front of me

12   there.  I tried to read the tops of each piece of paper.  I

13   didn't read the entire loan agreement.  Obviously, I've

14   testified to that.  But I can't sit here today and say I

15   absolutely read every word in this document.

16   Q.  Well, you did testify that you didn't read the credit

17   agreement before you signed it, right?

18   A.  Well that's a little thicker, sir, than this one.  That

19   was pretty thick.

20   Q.  And are you prepared to testify today that you have a

21   specific memory of reading this opinion letter before you

22   entered into the credit agreement?

23   A.  I don't have a specific memory that I read this entire

24   agreement.  I do have a specific memory that the captain of

25   the team, Mike Doyle, and the people in the team advised me

1    that the opinion letter that was required to the deal from

2    Montana counsel was prepared and was ready to sign.

3    Q.  Do you know if Credit Suisse required the opinion

4    letter or if your lawyer required the opinion letter?

5    A.  It seems to me that it was a requirement of the loan,

6    if my memory serves me correct.

7    Q.  So Credit Suisse required the opinion letter?

8    A.  I believe that's the way it was.

9    Q.  And since you're not sure that you read the whole

10   thing, you can't be sure that you relied on this when you

11   signed the loan documents, right?

12   A.  I wouldn't make that assumption, sir.

13   Q.  Why not?

14   A.  Because I new generally from altitude what this

15   document was supposed to provide for us.  It was supposed

16   to provide a legal opinion that everything we were going to

17   sign in that big stack of papers was kosher and we had the

18   right to do it, that it was legal and lawful in the state

19   of Montana.

20   Q.  Do you know whether or not this opinion letter opined

21   upon whether or not it was a breach of your fiduciary duty

22   to transfer money out of the debtor companies to BGI for a

23   distribution or a loan?

24   A.  Well, since on page -- first, page 1 of the loan

25   agreement, it's glaringly in your face that that could be

1    done, you could loan the money.  I assume that everyone

2    that gave -- or whoever was behind this letter had read the

3    same thing I had and that if there had been something wrong

4    with it, they would have said, "Hey, you can't do it."

5    Q.  Show me on the opinion letter where it says that the

6    transfer of money out of the debtor companies to BGI and

7    then to you personally to spend how you wish is not a

8    breach of your fiduciary duty.  Where does it say that?

9    A.   It doesn't address it.  It addresses the entirety, in

10   my view -- are you asking me what I -- what I read into it

11   was that it addressed the entire agreement.  And it didn't

12   say I - (inaudible) - opinion letter, but except for

13   Paragraph 5, I took it that it took the entirety of the

14   agreement.

15   Q.  Where does it say in there that the transfer of money

16   from the debtor companies to BGI and then to you is not a

17   fraudulent transfer or conveyance?

18        MR. FLYNN:  Objection, Your Honor, a legal

19   conclusion.

20   Q.  (By Mr. Hutchinson)  No.  Where does it say it in the

21   document?

22        THE COURT:  Well, I'm going to overrule and allow

23   him to answer if he knows.

24        THE WITNESS:  So the question again, sir?

25   Q.  (By Mr. Hutchinson)  Can you point to me any place in

1   that document where it says that the transfer of money from

2   the debtor companies to BGI and then to you personally in

3   the amount of $200 million is not a fraudulent conveyance

4   or transfer?

5   A.  Well, without wasting the Court's time, I've been --

6   I've seen this document before, obviously, and there's

7   no -- it doesn't address it in there.

8   Q.  It doesn't say that, does it?

9   A.  No.

10  Q.  With regard to the LeMond litigation that you were

11  questioned about and Mr. Flynn's direction to you of the

12  opinion of counsel that transferring the money as a loan as

13  opposed to a distribution, the 209 million was not a

14  violation of Montana law, how much did you pay in

15  settlement of the LeMond case which claimed that you had

16  breached your fiduciary duty?

17  A.  We reached a settlement for $38 million.

18  Q.  When you spoke to Mr. Brown after his deposition took

19  place, you testified that you spoke to him on the

20  speakerphone with your son present, correct?

21  A.  That's correct.

22  Q.  Did you tell Mr. Brown that you were on speakerphone?

23  A.  I'm always on speakerphone at my office.

24  Q.  Did you tell Mr. Brown that there was someone else

25  present when he was communicating with you?

```
 1    A.   No.
 2    Q.   Do you believe Mr. Brown was communicating with you as
 3    your individual personal attorney at that time?
 4    A.   He was still my attorney because we had a -- I'm sorry.
 5    Yes, I did.
 6    Q.   I'm sorry.
 7    A.   Yes, I did believe that.
 8    Q.   You believed he was your personal lawyer?
 9    A.   Yes.
10    Q.   Not the lawyer for any company that you have, but your
11    personal individual lawyer, right?
12    A.   Yes.
13    Q.   And that communication took place in the presence of a
14    third party who was not Mr. Brown's client, your son,
15    right?
16    A.   That's correct.
17    Q.   And you didn't expect that that communication was going
18    to be confidential between you and Mr. Brown; you knew
19    there was a third party who was not his client that was
20    present during that conversation, right?
21    A.   My son happened to be sitting in my office, and I
22    answered the speakerphone -- I put it on the speakerphone.
23    Q.   You've testified a couple of times today that you could
24    do what you want with the $209 million and that if you
25    wanted to, you could give it to the Red Cross, and that
```

1   would have been perfectly legal and within your authority

2   as owner of the debtor companies; is that right?

3   A.   Well, the debtor companies wouldn't have had the

4   209 million; BGI would have.

5   Q.   And you could have given that money to the Red Cross

6   from BGI?

7   A.   From what I understood from the legal opinion and from

8   what the document said, the $209 million could have been

9   borrowed or dividend and used unrelated to the Yellowstone

10  Club entities.

11  Q.   You didn't give the money to the Red Cross, though, did

12  you?

13  A.   Obviously not.

14  Q.   You gave the money to yourself, didn't you?

15  A.   I borrowed a portion of that from BGI.

16          MR. HUTCHINSON:  No further questions, Your

17  Honor.  Thank you.

18          THE COURT:  Thank you.  Any additional questions?

19          UNIDENTIFIED SPEAKER:  No questions, Your Honor.

20          UNIDENTIFIED SPEAKER:  Nothing, Your Honor.

21          THE COURT:  Okay.  Mr. Blixseth, I have a

22  question regarding the opinion letter that was issued,

23  Exhibit 4 that you've already testified to.  Do you have

24  any personal knowledge of whether that was a form letter

25  that was provided by representatives of Credit Suisse to

1   Mr. Brown to put on to Montana letterhead?

2           THE WITNESS:  I don't have any knowledge of -- if

3   that was or not.

4           THE COURT:  Okay, thank you.  You may step down.

5           THE WITNESS:  Thank you.

6           THE COURT:  Mr. Hutchinson.

7           MR. HUTCHINSON:  Your Honor, our next witness

8   would be Michael Doyle.

9           THE COURT:  Okay.  How long do you think

10  Mr. Doyle's testimony is going to take?

11          MR. HUTCHINSON:  Probably an hour.

12          THE COURT:  Well, let's get started.  We will

13  break at five, so if that has any impact.  We might as well

14  get his testimony started.

15          MR. HUTCHINSON:  Okay.

16          THE COURT:  So if you could bring in Mr. Doyle,

17  please, whoever would like to.

18          Mr. Doyle, if I could have you come to the

19  podium, please.  I'll have you sworn.

20              MICHAEL DOYLE, WITNESS, SWORN

21          MR. HUTCHINSON:  May I proceed?

22          THE COURT:  You may proceed.

23              DIRECT EXAMINATION

24  BY MR. HUTCHINSON:

25  Q.  Good afternoon, Mr. Doyle.

```
 1    A.   Good afternoon.

 2    Q.   You and I have met before.

 3    A.   Hm-hmm.

 4    Q.   My name is Tom Hutchinson.  I represent the debtors.

 5    Would you please state your name for the court record?

 6    A.   Michael William Doyle.

 7    Q.   Mr. Doyle, what do you do for a living?

 8    A.   I'm an attorney.

 9    Q.   And for whom do you work?

10    A.   I work as in-house counsel for Blixseth Group of

11    Washington, LLC.

12    Q.   Can you provide the Court with a very brief summary of

13    your background and work history as an attorney?

14    A.   I graduated from the University of California at

15    Berkeley School of Law in 1969.  I then worked for the

16    Contra Costa County public defender office for three years.

17    I then moved to New Zealand where I - thanks very much - I

18    was a law professor at the University of Auckland School of

19    Law.  I did that for six years.  I came back to the United

20    States, moved to Oregon, and I was in private practice in

21    Oregon for, I want to say, close to 27 years.  And then in

22    March of 2007, I moved to Seattle and began working for

23    Blixseth Group of Washington.

24    Q.   During the time that you were in private practice, you

25    had your own law firm, didn't you?
```

1    A.   Yes.

2    Q.   And you were a partner in that law firm for a period of

3    how many years?

4    A.   Twenty-five.

5    Q.   And the law firm in which you were a partner provided

6    legal services to Mr. Blixseth's companies over the course

7    of a pretty extended period of time, right?

8    A.   Since 1986.

9    Q.   And you formed Mr. Blixseth's companies, such as BGI?

10   A.   Yes.

11   Q.   You formed the Yellowstone Clubs?

12   A.   Yes.

13   Q.   You formed the debtor companies?

14   A.   Yes.

15   Q.   Prepared the operating agreements, filed the articles

16   of organization, did all the legal work for those entities,

17   right?

18   A.   That's correct, most of the legal work.

19   Q.   Most of the legal work, right.  Because at some point

20   very early in the existence of these Yellowstone companies,

21   there was an amendment to the operating agreement that you

22   prepared -- strike that.

23        There was an amendment to the operating agreement, and

24   it was prepared by someone else, right, the amendment?

25   A.   Now, you're talking about the second amendment?

1  Q.  I'm talking about the amendment that added the

2  "B" shares.

3  A.  Yes, that was drafted by someone else.

4  Q.  But that was relatively early in the existence of these

5  companies.  There were "B" shares almost the entire time

6  that these companies existed, correct?

7  A.  I think the B's came in maybe a year, or so, after the

8  formation of the companies --

9  Q.  Okay.

10  A.  -- the Yellowstones.

11  Q.  We'll get back to that in a minute.  I just want to go

12  through some of the initial background first.

13  Your firm was earning, during the years 2000 through

14  2005, about $200,000 a year from the legal work provided to

15  the Mr. Blixseth's companies?

16  A.  From what years?

17  Q.  2000 to '05.

18  A.  You know, I -- it would be a guess, and I can't tell

19  you.  It was a substantial client of ours.

20  Q.  It was one of your big three clients, top three

21  clients?

22  A.  Yes.

23  Q.  Over the years, it became a bigger and bigger client

24  for you?

25  A.  Yes.

1   Q.   And, currently, you're in-house counsel for

2   Mr. Blixseth's company, right?

3   A.   Hm-hmm.

4   Q.   Do you have any other clients?

5   A.   No.

6   Q.   Do you have an employment contract with Mr. Blixseth

7   such that you're guaranteed you're going to be working

8   there for some period of time?

9   A.   I have a contract with the --

10  Q.   How long does that contract last?

11  A.   Five years.

12  Q.   Okay.  It was --

13  A.   March of 2007.

14  Q.   2007.  Mr. Blixseth decided not to renew it.  He could

15  not renew it, right?

16  A.   That's correct.

17  Q.   Do you recall about when the first work you did was on

18  this Credit Suisse loan?

19  A.   It was, I believe, in early June 2005.

20  Q.   And tell me what -- one moment, please.

21       Tell me, as best you can remember, what the division of

22  labor and the responsibility was from your perspective as

23  the lawyer working on the Credit Suisse loan for

24  Mr. Blixseth's companies.

25  A.   Well, we -- when I found out about the loan, I believe

```
 1    Tim called me, and I got a term sheet - it was the first
 2    document I remember getting - along with a due diligence
 3    list of items that had to be prepared.  And so I formed
 4    what I call our deal team which consisted of myself and two
 5    other lawyers in our law firm; and Steve Brown with the
 6    Garlington firm; Bob Sumpter, who was a vice president of
 7    development at Yellowstone Club; and Chris Campbell.  So we
 8    had that group that we got together and worked on this
 9    deal, the entire team.
10    Q.  Would you think it's a fair characterization that you
11    were the head of the legal team from the Blixseth side
12    working on the Credit Suisse loan?
13    A.  Yes.
14    Q.  And in your position as head of the team, I want you to
15    describe for me the division of labor and responsibility
16    from the legal-work standpoint with regard to the Credit
17    Suisse loan.
18    A.  Well, there were some matters.  We went through the due
19    diligence list, which I think you have.  And I remember
20    calling Steve Brown and going over that list with him as to
21    what he would be responsible for and then what the entire
22    team would be responsible for, and the credit agreement and
23    the opinion letter and all of those matters.
24    Q.  Okay.  Anything else that you can remember about the
25    division of responsibility for the legal work?
```

1    A.   Well, just that there were certain specific items that

2    were related, I call, to environmental matters,

3    entitlements, title issues that dealt specifically with

4    Montana law and the situation that Steve had been dealing

5    with.  And so he was to be in charge of getting that

6    information for the, for the lender.

7    Q.   Okay.  So what you've testified to just now is that

8    Mr. Brown's responsibility in connection with this legal

9    work for the Credit Suisse loan was environmental matters,

10   title work, and you mentioned one other thing.

11   A.   What I said was:  Specifically, those items were in his

12   basket of things that he was to do, but we all were

13   responsible for the entire deal.  So there were things that

14   were particular that he knew about better than anybody

15   else.  And it included, of course, the opinion letter and

16   the entire credit agreement.

17   Q.   What do you remember about the opinion letter that was

18   prepared by Mr. Brown's firm?  Was that created by

19   Mr. Brown's firm, or was that a form that was provided by

20   Credit Suisse and then given to Mr. Brown?

21   A.   The latter, as far as I know.

22   Q.   Credit Suisse prepared the form, sent it to you and/or

23   Mr. Brown, and the opinion was prepared from their form?

24   A.   Yes.  Steve took their -- the form that they wanted,

25   the opinion letter in, and he then modified it to meet the

1    Montana circumstances -- or his firm, what his firm is

2    willing to do.

3    Q.  Well, with the exception of the environmental and the

4    entitlement and the Montana mortgage issues, were there any

5    other specific issues that you remember telling Mr. Brown

6    that you are responsible for in connection with this Credit

7    Suisse loan?

8    A.  The opinion letter.

9    Q.  The opinion letter?

10   A.  Yeah.

11   Q.  Generally not any more specific than that?  Just, "We

12   need an opinion letter"?

13   A.  Well, no, it was the opinion letter that had to -- that

14   Credit Suisse was after.  They had to have -- they had a

15   specific opinion letter that they needed to be able to meet

16   the terms of the loan.

17   Q.  They needed one from Montana and then one from New

18   York, right?

19   A.  Yes, that's correct.

20   Q.  And they provided the form and Mr. Brown did the

21   Montana opinion letter?

22   A.  Well, he did the opinion letter that was written by his

23   firm.

24   Q.  Do you recall any conversations with Mr. Brown where

25   you specifically told him that he is responsible for

1    opining upon whether or not this loan and the use of the

2    loan proceeds constitute a breach of fiduciary duty?

3    A.   That wasn't specifically discussed with Steve Brown.

4    What he was told was that he was to write this opinion

5    letter, which covered all aspects of the loan, and that it

6    was his responsibility because there were aspects in the

7    opinion letter about Montana law.

8    Q.   Do you believe that Mr. Brown's opinion letter, which

9    has been marked as Blixseth Exhibit 4 - and may even be

10   there at the witness stand for you to review right now, if

11   you need to - do you believe that that opinion letter says

12   that there is --

13             THE COURT:  Just a moment.  I'm not sure if

14   you're wanting him to review it or not.

15             THE WITNESS:  This is Exhibit No. 1.

16             UNIDENTIFIED SPEAKER:  I think I left some copies

17   up there.  I'm not sure whether they're still there or not.

18             THE COURT:  I'm not sure if they are, either.

19   Q.   (By Mr. Hutchinson)  Do you believe that Mr. Brown's

20   opinion letter opines upon whether or not it is a breach of

21   Mr. Blixseth's fiduciary duty to transfer $209 million out

22   of the debtor companies to BGI for any purpose in the form

23   of either a loan or a distribution?

24   A.   Well, the letter doesn't specifically say "breach of

25   fiduciary duty".  I mean what the opinion letter says is

```
1    that the forms and the documents are all legally

2    enforceable and there's nothing wrong with this

3    transaction.  That's what he's opining about.

4    Q.  So he's not opining upon whether or not it would be a

5    breach of Mr. Blixseth's fiduciary duty to have been

6    involved in negotiations to buy back the "B" shares and

7    then to have changed the loan terms to call for a loan in

8    addition to a distribution?  That's not what this opinion

9    letter does, does it?

10   A.  You know, I didn't write the letter, so you should ask

11   him.

12   Q.  Well, you're the head of the legal --

13   A.  Yes.

14   Q.  -- team, right?

15   A.  Yes.

16   Q.  And you were the one who had Mr. Brown write this

17   opinion, weren't you?

18   A.  That's correct.

19   Q.  And you -- Mr. Blixseth has testified that he relied on

20   you to review this opinion and to make sure that this

21   opinion made clear that everything was appropriate.

22   A.  That's correct.

23   Q.  Do you know whether this opinion opines upon whether or

24   not it was a breach of fiduciary duty to transfer that

25   money out as a loan as opposed to a distribution?
```

```
1   A.   If that was the case, the opinion letter should have

2   said straight-out that that's the case.  And by not saying

3   that, it is saying that there's nothing wrong with the loan

4   the way it's structured.

5   Q.   Are you talking about the ABA Accord that applies to

6   opinion letters that are written in situations like this?

7   A.   I don't know what that ABA Accord is.

8   Q.   Then what are you basing your statements on?  Are you

9   basing those statements on Montana law, on Oregon law, on

10  your expertise as a business lawyer?

11       What do you base the statement that you just made on,

12  which is that if it wasn't going to be that opinion, it

13  needed to be called out?

14  A.   Common sense.

15  Q.   Okay.  Anything besides common sense?

16  A.   Well, no.  If you write an opinion letter, you take on

17  certain responsibilities.  And those responsibilities, it

18  seems to me, is to make sure and check out that what you

19  say in the letter is correct.  And if you were opining

20  about the legal enforceability and appropriateness of the

21  loan, then you have to check out and make sure that that's

22  all correct.  And so if there was something wrong with it,

23  then he would have stated that in the opinion or said --

24  called up me and said, "Mike, I can't give an opinion like

25  this because of these facts."
```

```
 1    Q.  And it's important for somebody who's writing an

 2    opinion letter like this to know all of the facts, isn't

 3    it?

 4    A.  It's up to them, sure.

 5    Q.  It's important for them to rely on other people and

 6    their legal team to communicate all the information that

 7    they have that might be relevant to the opinion that

 8    they're writing, right?

 9    A.  I would expect that person to ask for all the

10    information.

11    Q.  Well, wouldn't you expect that that person could assume

12    that the head of the legal team would communicate the

13    information that was necessary for them to base their

14    opinion?

15    A.  Sure.  And we -- that's exactly what I did.

16    Q.  Okay.  So why don't we have you look at Exhibit 263-F,

17    which has been previously admitted.  Do you recognize

18    Exhibit 263-F?  We talked about it in your deposition.

19    It's an August 30, 2005 memo that you wrote.

20    A.  Yes.

21    Q.  Now, sometime before August 30, 2005, Mr. Blixseth

22    approached you about kicking out a "B" share member, right,

23    and asked you, "Can I kick him out and how do I do it?"

24    right?

25    A.  I don't remember him calling me, but somehow that topic
```

1    came up, yes.

2    Q.  Well, that's what you're responding to, clearly, from

3    this memo, right?

4    A.  Correct.

5    Q.  That you can't kick him out for no reason; you have to

6    have a reason, they have to do something improper.  That

7    was your conclusion, right?

8    A.  Right.

9    Q.  And you also talk about in this letter that if you make

10   a distribution to the "B" shareholders -- sorry, strike

11   that.  That if you make a distribution to yourself, then

12   you have to make a distribution to the "B" shareholders as

13   well, right?

14   A.  Correct.

15   Q.  You've got to share with them on a pro rata basis,

16   right?

17   A.  That's right.

18   Q.  And there were 12 percent "B" shareholders, right?

19   A.  Hm-hmm.

20   Q.  So if he's taking out 200 million, he's got to pay them

21   24 million, right?

22   A.  If he did it by a distribution, that's correct.

23   Q.  Right.  Did you tell Mr. Brown that you wrote this

24   August 30th letter to Mr. Doyle -- to Mr. Blixseth opining

25   upon what he had to do with the distribution?

```
 1    A.   No.
 2    Q.   Did you tell Mr. Brown that Mr. Blixseth was looking
 3    for what legal grounds there would be to kick out "B" share
 4    members?
 5    A.   It had nothing to do with the opinion letter.
 6    Q.   You think that this memo had nothing to do with the
 7    Credit Suisse loan, right?
 8    A.   Right.
 9    Q.   Nothing to do with the fact that on August 22nd, the
10    credit agreement says "distribution", and you give this
11    opinion on the 30th, and the next version of the agreement
12    on September 4 says "distribution or loan".  And this had
13    nothing to do with the credit agreement, right?
14              MR. FLYNN:  Same, same objection on the parole
15    evidence, best evidence.  Standing objection -- (inaudible,
16    out of range of microphone.)
17              THE COURT:  It will be noted for the record.
18              MR. FLYNN:  Thank you, Your Honor.
19              THE WITNESS:  Any connection it has with the
20    credit agreement is you talk about distributions or loans.
21    And in that sense, there's a connection.
22    Q.   (By Mr. Hutchinson)  Did you tell Mr. Brown that there
23    was this -- and just so we're clear, you were the person
24    who was on the point of the negotiations in terms of how
25    these papers were going to end up.  You were doing red
```

```
 1    lines, Credit Suisse was doing red lines.  You were

 2    exchanging those.  That wasn't Mr. Brown who was doing

 3    that, right; that was you?

 4    A.  Mr. Brown was on the team that got the red lines as

 5    they went along and we circulated them to everybody, and he

 6    was involved in the discussions.

 7    Q.  Who made the changes?

 8    A.  Now, let me -- excuse me, let me just finish.

 9    Q.  I'm sorry.  Go ahead.

10    A.  The people I dealt with were the lawyers for Credit

11    Suisse.  I didn't have direct contact with Credit Suisse.

12    Those negotiations were by other people.

13    Q.  Understood.

14    A.  Okay.

15    Q.  And thank you for that clarification.  The point that

16    I'm trying to make is this, though:  When there were

17    changes made back and forth between these documents, you

18    were the one who made the changes on behalf of the Blixseth

19    team, right?

20    A.  The changes that you're talking about did not come from

21    me.

22    Q.  I understand that.

23    A.  Right.

24    Q.  I'm not asking about those in particular; I'm asking

25    about in general.
```

1    A.   Yeah, we would take a red line from the Credit Suisse -

2    the lawyers, Latham & Watkins - and we would discuss it

3    amongst our team and go through and say, "Well, we can

4    accept this, we can't accept that, we'll change this."  And

5    so we would come back with a version to them, with a new

6    red line that -- our law firm would make the red lines.

7    Q.   You did that; not Mr. Brown's firm?

8    A.   My law firm did that, right.

9    Q.   Right.  Did you at any point in time tell Mr. Brown

10   that there had been a change made to allow for not only a

11   distribution but a distribution or a loan?

12   A.   He was sent the red line that made those changes.

13   Q.   But did you tell him, "This is a change that was made.

14   You should take a look at this because it could affect your

15   opinion"?

16   A.   No, I didn't have to tell him that.  I mean this goes

17   to what I'm saying.  He's to look at all the changes.

18   Q.   You didn't think it was important to point that out to

19   him?

20   A.   No, it was not important to point it out to him.

21   Q.   Just like you didn't think it was important to point

22   out this August 30th memo, right?

23   A.   No, I didn't think the memo needed to be pointed out to

24   him.

25              MR. HUTCHINSON:  I've got just a couple more

1   questions on this, and then I can finish up, Your Honor, if

2   you want to stop at five.

3           THE COURT:  Yes.  We've got a couple of minutes.

4           MR. HUTCHINSON:   Okay.

5   Q.  (By Mr. Hutchinson)  Do you remember at any time being

6   asked to give advice to Mr. Blixseth with regard to the use

7   of the Credit Suisse loan proceeds?

8   A.  As by whom?

9   Q.  By anyone.

10  A.  I wasn't asked about that.

11  Q.  You were never asked to give advice about the use of

12  the Credit Suisse loan proceeds, correct?

13  A.  Correct.

14  Q.  Okay.  Do you remember giving any advice to

15  Mr. Blixseth with regard to whether or not it was legal and

16  appropriate and in accordance with his fiduciary duty for

17  him to transfer $209 million out of the debtor companies to

18  BGI in the form of a loan?

19  A.  No.  If I thought there was a problem with any of that,

20  I would raise it with Tim.  And that's exactly my

21  relationship we've had over the years.  He doesn't have to

22  ask me each time, "Is this -- is there anything wrong with

23  this?"

24      That's what I'm supposed to be there for is to keep him

25  out of trouble and to make sure that what he does is

1    appropriate.  And if there's something that he suggests

2    doing or kicking around ideas and I think that there is

3    something wrong about it or something not appropriate, then

4    I would tell him and I would raise that with him.

5    Q.  And in order for you to make that determination, you

6    need to know the facts, right?

7    A.  Well sure.

8    Q.  Now, we've looked at a couple of letters that were sent

9    out, one by Mr. Blixseth in May of 2005 - and you looked at

10   them in your deposition - one by Mr. Mack that was sent out

11   in July of 2005, both before the credit agreement was

12   signed, right?

13   A.  Correct.

14   Q.  And those letters were letters to the "B" shareholders

15   asking to buy back their shares, right?

16   A.  Right.

17   Q.  You didn't see those, did you, before the credit

18   agreement was signed?

19   A.  No.  I stayed out of Tim's negotiations with the B's.

20   It's something that had been ongoing for years.  And he

21   talked about buying them out, and so forth.  I knew in

22   general that he was talking about buying them out, but I

23   was not involved in the negotiations.

24   Q.  And you don't know of any other documents besides these

25   two with regard to buyback of the B's, do you?

1   A.  Well, there was the confidentiality agreement that Greg

2   LeMond refused to sign.

3   Q.  That came later, right?

4   A.  Yeah.

5   Q.  Any other documents that existed before the credit

6   agreement besides these two that you're aware of where

7   Mr. Blixseth is asking to buy back the B's?

8   A.  I recall our firm drafting, I believe, a purchase sale

9   agreement to buy back "B" shares, but --

10  Q.  When?

11  A.  Well, I don't remember when, but it was in that period

12  of time when he was getting serious about buying the B's.

13  Q.  In what period of time?  In the 2000 --

14  A.  In the period of time you've been talking about, in

15  2005.

16  Q.  In 2005, you drafted a purchase agreement for the

17  repurchase of the "B" shares, is that right, before the

18  loan?

19  A.  I believe so.

20  Q.  Did you tell Mr. Brown that you did that?

21  A.  No.  It was not any of Mr. Brown's business.  It wasn't

22  part of the deal.

23          MR. HUTCHINSON:  This is a good time to stop.

24          THE COURT:  I'm going to stop there with the

25  proceedings for the day.

```
1              Mr. Doyle, you may step down.

2              THE WITNESS:  Okay, thank you.

3              THE COURT:  You will be recalled tomorrow

4    morning.

5              THE WITNESS:  Who do I give this back to?

6              THE COURT:  Why don't you leave it there.  And

7    whatever attorney wants it will come up and get it.

8              You can leave whatever things you want here.  It

9    will be locked up as soon as you leave.  I will ask that

10   you kind of move out as quickly as you can, gather your

11   things that you need for this evening, so that the Court

12   security officers can, you know, secure the building.

13             UNIDENTIFIED SPEAKER:  Your Honor, may I raise

14   one point?

15             THE COURT:  You may.

16             UNIDENTIFIED SPEAKER:  We excluded witnesses

17   under 615, and there are three expert witnesses that will

18   be called by the UCC and the debtors.

19             THE COURT:  Okay.

20             UNIDENTIFIED SPEAKER:  And 615, as we all know,

21   is intending to preclude witnesses, fact witnesses from

22   fabricating their testimony.  I would ask that the experts

23   be allowed to sit in and listen.  And that will save time

24   because they'll be referenced to testimony from other

25   individuals who have testified regarding the financial
```

```
1    condition of the company, and so forth.

2              Can the experts be admitted into the courtroom

3    during -- (inaudible, out of range of microphone.)

4              THE COURT:  Is there any objection to that by any

5    parties?

6              UNIDENTIFIED SPEAKER:  No, Your Honor.

7              THE COURT:  That will be fine.

8              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

9              THE COURT:  We'll be in recess.  We will

10   reconvene at nine tomorrow morning.

11

12                        *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3       I certify that the foregoing is a correct transcript

4    from the electronic recording of the proceedings in the

5    above-entitled matter, all done to the best of my skill and

6    ability.

7

8    _____    _____

9    Jonny B. Nordhagen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25