UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**YELLOWSTONE MOUNTAIN CLUB, LLC**,

Debtor.

Case No. **08-61570-11**

# MEMORANDUM of DECISION

At Butte in said District this 14th day of October, 2010.

In this Chapter 11 bankruptcy, after due notice, a hearing was held September 20, 2010, in Billings on the Yellowstone Club Liquidating Trust's Motion for Summary Judgment of Robert Sumpter Proof of Claim No. 741 filed August 12, 2010, at docket entry no. 1932, together with Robert Sumpter's objection thereto. Robert L. Sterup of Billings, Montana appeared at the hearing on behalf of the Yellowstone Club Liquidating Trust ("YCLT") and Stephen C. Mackey of Billings, Montana appeared on behalf of Robert Sumpter ("Sumpter").

### STATEMENT OF UNCONTROVERTED FACTS

YCLT provided the following Statement of Uncontroverted Facts:

1. Sumpter formerly was employed by YMC as director of development. Exh. D Sumpter dep. p. 10-12. Prior to 2008, Sumpter had a YMC "Company Membership." Exh. D Sumpter dep. p. 13. Sumpter also owned an unimproved YMC lot – Lot 327 – which he received

1

at no cost as part of his compensation. Exh. D, Sumpter dep. p. 11-12.

2. In the days immediately preceding the August 2008 transfer of YMC ownership to Edra Blixseth, Sumpter exchanged his Company Membership for a Resident Membership. Sumpter dep. p. 14-16. At that time Sumpter made payment to YMC of a Resident Membership deposit in the amount of $250,000.00. Exh. D, Sumpter dep. p. 14-16. Sumpter also executed a "Membership Agreement for Resident Member" (hereinafter "Resident Membership Agreement") which provided:

> Membership in the Club permits the members to use the Club Facilities referred to in the Yellowstone Mountain Club Membership Plan in accordance with the Membership Plan Rules and Regulations . . . .
>
> If Resident Member sells the residential unit or lot in the Yellowstone Mountain Club community, the member must resign the membership in the Club. Resident Members are reminded that the Covenants, Conditions and Restrictions of the Club require that a Member make Club approval of the buyer's membership in the Club a condition of closing a sale to a third party buyer . . . .
>
> A Yellowstone Club membership may not be assigned, transferred, sold, encumbered or hypothecated, except where specifically allowed by the Yellowstone Club Membership Plan. Any attempted assignment, transfer, sale, pledge, encumbrance or hypothecation shall be void and of no force or effect.

Exh. B, p. 2 sec. D.

3. As a long-time YMC employee, Sumpter was thoroughly familiar with terms of the Resident Membership Agreement. Exh. D, Sumpter dep. p. 20-21. Sumpter read and understood the contract before he signed it.

Q. Well, I take it you knew what the agreement said when you signed it?

A. Yes.

Q. I take it you read and reviewed the agreement before you signed it?

>
> A. Yes.
>
> Q. Did you consult with counsel?
>
> A. No.
>
> Q. Did you have an opportunity to do so?
>
> A. Yes.
>
> Q. Anybody prevent you from doing so?
>
> A. No.
>
> Q. Satisfied you understood the terms?
>
> A. Yes.

Exh. D, Sumpter dep. p. 84.

    4. As a Resident Member, Sumpter further was subject to, and bound by, YMC's Rules and Regulations and Membership Plan. Exh. D, Sumpter dep. p. 85. As with the Resident Membership Agreement, the Membership Plan provided: "A Yellowstone Club membership may not be assigned, transferred, sold, encumbered or hypothecated, except where specifically allowed by this Membership Plan. Any attempted assignment, transfer, sale, pledge, encumbrance or hypothecation shall be void and of no force or effect." Exh. C, p. 9.

    5. Subsequent to Sumpter's execution of the Resident Membership Agreement, YMC filed bankruptcy. The Reorganized Debtor has chosen to not assume Sumpter's club membership as is its right under the Third Amended Plan of Reorganization [Dkt 995] (the "Plan").

    6. As Sumpter has acknowledged, he knew when he became a Resident Member that his Resident Membership Agreement precluded sale of the Membership:

3

Q. Turn to the fourth paragraph in section D (Resident Member Agreement).

A. (Witness complying.) Okay.

Q. Do you see that it says there, "...Club membership may not be assigned, transferred, sold, encumbered or hypothecated, except where specifically allowed by the . . . Membership Plan"?

A. Yes.

Q. You understood that that applied to your membership as well, correct?

A. Correct.

Q. You understood you couldn't sell your membership to anybody, correct?

A. Correct.

Exh. D, Sumpter dep. p. 86-87.

7. As Sumpter further has acknowledged, since YMC's inception no YMC lot owner has ever had authority to sell or transfer a membership with sale of a YMC lot.

Q. Has it been the case since 1999 that buyers of lots at YMC have been required to apply for membership and be accepted into membership as a condition of the purchase?

A. On developer lots, yes. . .

Q. But for every sale that was consummated, it's true that the purchaser applied for and was accepted into membership?

A. Correct.

Q. So those purchasers did not have a membership at the time they initially signed the buy/sell for the lot?

A. Yes.

Exh. D, Sumpter dep. p. 51-52.

Q. Let's talk about the world as it existed when you made these agreements. At that

      time, the seller of the lot, an existing YMC member, could not sell the membership to the buyer of the lot for a profit, true?

  A.    Correct.

Exh. D, Sumpter dep. p. 57.

    8. That Sumpter's Resident Membership Agreement "reserved" a membership likewise is immaterial since, as Sumpter has acknowledged, even when he was still a Resident Member any buyer of Lot 327 would have been required to seek and obtain YMC membership as a condition to the lot purchase.

  Q.    You're talking about the language in the contract about reserving –

  A.    Correct.

  Q.    – the membership?

  A.    Correct. For the next person in, if you will.

  Q.    That next person would still need to be approved by the Club for membership, though, right?

  A.    Correct.

Exh. D, Sumpter dep. p. 89.

    9. The Resident Membership Agreement executed by Sumpter provided for a straightforward remedy in the event that Sumpter's resident membership was terminated. The contract provided:

> The Club promises to pay to Member at Yellowstone Mountain Club, the membership deposit actually paid for the membership (the "Membership Deposit"), without interest, payable one (1) installment on the anniversary date thirty (30) years from the date of acceptance of this Membership Agreement by the Club (the "Maturity Date") or earlier as provided in this Agreement.

> A member who resigns from the Club will be repaid the Membership Deposit, without interest, within thirty (30) days after the membership has been reissued by the Club to a new member . . .
>
> In the event of a recall of a membership, the Club will refund the Membership Deposit to the affected member within thirty (30) days.

Exh. B, p. 1 sec. C.

10. As the long-time director of development at YMC, Sumpter was thoroughly familiar with these terms.

> Q. Under typical circumstances, when does a resident member typically get entitled to a refund of the membership deposit?
>
> A. In the case of us, it was at 30 years . . .
>
> Q. For a typical resident member, would resignation also trigger a refund?
>
> A. Resignation of the membership?
>
> Q. Yeah.
>
> A. Yes.
>
> Q. Okay. How about recall of the membership?
>
> A. Mm, yes...

Exh. D, Sumpter dep. p. 21-22.

11. YCLT does not dispute that Sumpter is entitled to the refund of his $250,000.00 membership deposit based upon the Reorganized Debtor's election to recall Sumpter's Resident Membership.

## STATEMENT OF GENUINE ISSUES

In response to YCLT's statement of uncontroverted facts, Sumpter provided the following Statement of Genuine Issues:

1. The option to convert his membership to a National Membership in addition to the option to transfer Resident Membership had value which is lost forever.

   a. It was unique to Mr. Sumpter's contract. (Transcript, 6/1/09, p. 94)

   b. The National Membership has certain advantages. (Sumpter Dep., pp. 42-43)

   c. The National Membership has greater value. (Documents, p. 41)

   d. He only had to pay $50,000 in addition to his initial deposit in order to obtain a National Membership. (Membership Agreement, Ex. B to YCLT Decl. Of Counsel)

   e. He had been able to retain his dues free benefits even as a National Member. (Id.)

2. There will be an eventual conversion to an ownership of his membership rather than simply a "right to use" the Club facilities. (Discovery Documents; Sumpter Dep., pp. 57-58)

   a. The Confirmed Plan includes this provision as shown in Exhibit VII to the Disclosure Statement. (Disclosure Statement)

   b. The conversion will occur in approximately 2017. (Discovery documents)

   c. This equity conversion is part of the investment aspect of the club membership. (Sumpter Dep., pp. 24-25, 29)

   d. The interest is transferable after equity conversion. (Sumpter Dep., pp 45-46)

3. The lost opportunity to realize gain after the equity conversion is between $400,000 and $700,000. (Sumpter Dep., p.41)

   a. Evidence exists to show an expected deposit of at least $700,000 for the National Membership by the time of the equity conversion. (Discovery)

   b. He also would recognize gain on his Resident Membership as shown by its rising

deposit requirement and in the Debtors' Disclosure Statement. (Sumpter Dep., pp. 107-109; Disclosure Statement, Ex. IV)

4. The Memberships increase in value is reflected by the increasing amount of the required deposit. (Sumpter Dep., pp. 107-109)

    a. The deposit for the Resident Membership had already increased from $250,000 to $300,000 by the time Robert Sumpter left his employ at the Club in August, 2008. (Sumpter Dep., pp. 25, 27-28)

    b. Evidence shows that the Resident Memberships are expected to increase to $500,000 by the time of the equity conversion. (Disclosure Statement Ex. IV, Sumpter Dep., pp. 107-109)

5. Mr. Sumpter can only mitigate the loss of his Resident Membership or his National Membership Option by acquiring a new Membership that will cost him a substantial sum of money.

    a. He can only get a dues paying membership. ((Sumpter Dep., p. 19)

    b. The necessary outlay of money on an annual basis for dues will cost Mr. Sumpter approximately $816,000 over his lifetime. (Sumpter Dep., pp. 30-31)

    c. The annual dues are increasing in amount as shown by the increase from $18,000 in June, 2009 to $22,000 now. (Sumpter Dep., p. 31)

    d. He would have had a dues free membership under either his Resident Membership or his available National Membership. (Sumpter Membership Agreement).

    e. His Resident Membership cost/deposit has already risen $50,000 since he acquired his Resident Membership. (Sumpter Dep., pp. 25, 27-28)

8

  f.  National Membership require a $700,000 deposit. (Discovery)

## SUMMARY JUDGMENT

Summary judgment is governed by F.R.B.P. 7056. Rule 7056, incorporating FED.R.CIV.P. 56(c), states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "The proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial." *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373 (9th Cir. BAP 1997) (quoting *Grzybowski v. Aquaslide "N' Dive Corp. (In re Aquaslide "N" Dive Corp.)*, 85 B.R. 545, 547 (9th Cir. BAP 1987)). The manner in which this burden is proven depends on which party has the burden on a particular claim or defense at the time of trial.

> If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence–using any of the materials specified in Rule 56(c)–that would entitle it to a directed verdict if not controverted at trial. Such an affirmative showing shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial or to submit an affidavit requesting additional time for discovery. If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 330-34, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986) (Brennan dissent) (citations omitted). *See also Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

*Companies, Inc.*, 210 F.3d 1099, 1102-06 (9th Cir. 2000) (discussing burdens for withstanding summary judgment).

When seeking summary judgment, the moving party must initially identify those portions of the record before the Court which it believes establish an absence of material fact. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987). If the moving party adequately carries its burden, the party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial." *Kaiser Cement Corp. v. Fischback & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986), *cert. denied*, 469 U.S. 949 (1986); FED. R. CIV. P. 56(e). *See also Frederick S. Wyle Prof'l. Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985) ("the opponent must affirmatively show that a material issue of fact remains in dispute"). That is, the opponent cannot assert the "mere existence of some alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, "[a] party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

To demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge and the facts set forth therein must be admissible into evidence. *Aquaslide*, 85 B.R. at 547. All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party. *Liberty Lobby,* 477 U.S. at 247-48, 106 S.Ct. at 2509. However, "[d]isputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv.*, 809 F.2d at 630 (citing *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510). "A 'material' fact is one that is relevant to an element of a claim or

10

defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense." *Id*.

If a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied. *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 202 (1986). Thus, the Court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, viewed along with the undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence. *T.W. Elec. Serv.*, 809 F.2d at 631. In the absence of any disputed material facts, the inquiry shifts to whether the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552-53.

## DISCUSSION

The record in this case, specifically Proof of Claim No. 741 filed by Sumpter on August 17, 2009, shows that Sumpter is asserting an unsecured claim of $4,316,000 for breach of contract damages under 11 U.S.C. § 365(g) consisting of:

| | |
|---|---|
| Membership deposit refund | $250,000.00 |
| Membership Deposit increase | $250,000.00 |
| Dues | $816,000.00 |
| Diminution of land value | $2,300,000.00 |
| Conversion to National membership | $700,000.00 |
| Total Claim | $4,316,000.00 |

In its Memorandum in support of the motion for summary judgment, YCLT concedes that

"Sumpter is entitled to refund of his $250,000.00 membership deposit based upon the Reorganized Debtors' election to recall Sumpter's Resident Membership." Dkt. 1933, p. 8. In addition, Sumpter has withdrawn $2.3 million of his claim identified as "Diminution of Land Value Without Reserved Membership." Sumpter's Brief Opposing Liquidating Trust's Motion for Summary Judgment, dkt. 1958, p. 3. Thus, at issue in YCLT's objection to Proof of Claim No. 741 and the pending motion for summary judgment is whether $1,766,000 of Sumpter's claim should be allowed.

Under the Bankruptcy Code, a debtor may assume or reject executory contracts. 11 U.S.C. § 362(a). If a debtor rejects an executory contract prior to assumption, such rejection "constitutes a breach . . . immediately before the [petition date]." 11 U.S.C. § 362(g)(1). A claim arising from a § 365 rejection shall be allowed or disallowed pursuant to the provisions of 11 U.S.C. § 502(g)(1).

> Rejection does not, . . ., cause an executory contract to vanish or become unenforceable against the debtor, and is not a matter of the "debtor reject[ing] its obligation." It is the estate's decision to decline the asset, leaving the liabilities of the debtor intact to form the basis of a claim.
>
> ***
>
> Rejection establishes that the estate will not become obligated on the contract; it does not affect the continued existence of the debtor's obligations, which form the basis of the non-debtor's claim.

Andrew, Executory Contracts in Bankruptcy: Understanding "Rejection," 59 U. Colo. L. Rev. 845, 888 (1988). *See also In re Bergt*, 241 B.R. 17 (Bankr. D. Alaska 1999). Additionally,

> [r]ejection's effect is to give rise to a remedy in the non-debtor party for breach of the rejected contract, typically a right to money damages assertable as a general unsecured claim in the bankruptcy case. Rejection has absolutely no effect upon the contract's continued existence; the contract is not cancelled, repudiated, rescinded, or in any other fashion terminated.

Michael T. Andrew, EXECUTORY CONTRACTS REVISITED: A REPLY TO PROFESSOR WESTBROOK, 62 U. Colo. L. Rev. 1, 16 (1991).

In this case, under the terms of the Debtors' confirmed Third Amended Joint Plan of Reorganization, the Debtors rejected Sumpter's Residential Membership. By Debtors rejecting Sumpter's Residential Membership under 11 U.S.C. § 365(a), a breach occurred under § 365(g)(1), thus allowing Sumpter to file a rejection claim under § 502(g)(1).

Sumpter's rejection damages, however, are governed and limited by the Membership Agreement. Under Montana law, "[t]he construction and interpretation of a contract is a question of law." *Ophus v. Fritz*, 2000 MT 251, ¶ 19, 301 Mont. 447, ¶ 19, 11 P.3d 1192, ¶ 19. When interpreting a contract Montana courts give priority to the parties' intent. *Id*, ¶ 20. To determine the parties' intent, the court examines the contractual language and interprets clear and unambiguous terms according to their ordinary and usual meaning. *Id.*; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 202(3)(a)(1981) ("Unless a different intention is manifested, . . . where language has a generally prevailing meaning, it is interpreted in accordance with that meaning."). If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity. *Morning Star Enterprises v. R.H. Grover*, 247 Mont. 105, 111, 805 P.2d 553, 557 (1991).

Sumpter's Resident Membership Agreement provided for recall of Sumpter's membership to the Yellowstone Club:

> The Club reserves the right, in its sole discretion, . . . to recall any membership at any time for any or no reason whatsoever . . . .

The Resident Membership Agreement also provided an express remedy in the event

Sumpter's Resident Membership Agreement was recalled:

> In the event of a recall of a membership, the Club will refund the Membership deposit to the affected member within thirty (30) days.

Sumpter's Membership Agreement further stated that "[m]embership is not an investment in Yellowstone Mountain Club . . . . A member only acquires a revocable license to use the Club Facilities in accordance with the terms and conditions of the Membership Plan and the Rules and Regulations . . . and [the] Membership Agreement." Agreement, dkt. 1935, Exh. B, para. D.[1]

Sumpter's membership, described as a privilege, a revocable license and a non-investment, could be recalled by the Club at anytime and for any or no reason whatsoever. The Debtors' rejection of Sumpter's Membership Agreement is nothing more than a recall of the Membership Agreement. Indeed, Webster's Dictionary defines "recall" as "to call back" or "the act of revoking[.]" Sumpter's damages are limited by the plain language of his Membership Agreement. Sumpter's allowable damages under § 502(b) are $250,000, which corresponds to the amount specified in the agreement if the Club recalled or revoked the membership.

Sumpter's claim for damages above and beyond his $250,000 membership deposit is simply speculative and not provided for under the Membership Agreement. Accordingly, the Court will enter a separate order providing as follows:

IT IS ORDERED that Yellowstone Club Liquidating Trust's Motion for Summary Judgment of Robert Sumpter Proof of Claim No. 741 filed August 12, 2010, at docket entry no. 1932, is GRANTED; the Yellowstone Club Liquidating Trust's objection to Sumpter's Proof of

---

[1] The Membership Plan also states; "Memberships should not be viewed as an investment and no member should expect to derive any economic profits from membership at the Club." Membership Plan, dkt. 1935, Exh. C, p. iii.

Claim No. 741 is SUSTAINED; and Proof of Claim No. 741 filed by Robert Sumpter shall be allowed as an unsecured nonpriority claim in the amount of $250,000.

BY THE COURT

/s/ Ralph B. Kirscher
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana