## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**YELLOWSTONE MOUNTAIN CLUB, LLC**,

Case No. **08-61570-11**

Debtor.

# MEMORANDUM of DECISION

At Butte in said District this 25th day of February, 2011.

In this Chapter 11 bankruptcy, after due notice, a hearing was held January 18, 2011, in Butte on Timothy L. Blixseth's ("Mr. Blixseth") Amended Motion to Disqualify Bankruptcy Judge Kirscher (With Exhibits) filed November 30, 2010, at docket entry no. 2042. Mr. Blixseth's Motion is accompanied by an Amended Affidavit of Timothy L. Blixseth in Support of Motion to Disqualify. *See* docket entry no. 2043. Mr. Blixseth filed a Supplemental Affidavit on January 17, 2011, at docket entry no. 2117. Mr. Blixseth also filed his Amended Motion and Amended affidavit on December 14, 2010, in Adversary Proceeding Nos. 09-00014, 09-00018, 09-00064. 10-00015, and 10-00088. Mr. Blixseth was represented at the January 18, 2011, hearing by Michael J. Flynn ("Mr. Flynn") of Boston, Massachusetts, Christopher J. Conant of Denver, Colorado and Patrick T. Fox of Helena, Montana. Mr. Blixseth's other counsel of record in these proceedings include Benjamin A. Schwartzman, Brent Bastian, Wade L.

1

Woodard, Thomas A. Banducci and Jennifer Schrack Dempsey of Boise, Idaho, Joel E. Guthals

of Billings, Montana, Philip H. Stillman of Encinitas, California, and Daniel D. Manson and

Gregory C. Black of Butte, Montana. At the conclusion of Mr. Flynn's oral argument, the Court

took the matter under advisement.

## BACKGROUND

Mr. Blixseth and his former spouse, Edra Blixseth ("Ms. Blixseth"), were the founders of

Yellowstone Mountain Club, LLC ("YMC"), Yellowstone Development, LLC ("YD"), Big Sky

Ridge, LLC, and Yellowstone Club Construction Company, LLC. The four aforementioned

limited liability companies comprise the Yellowstone Club and will be referred to generally as

the Debtors or the Yellowstone Club entities. Through the Yellowstone Club entities, Mr.

Blixseth and Ms. Blixseth began development in the late 1990's of the Yellowstone Club; an

exclusive and private ski and golf community located in Big Sky, Montana.

Mr. Blixseth was the sole managing member of Big Sky Ridge, LLC from its inception to

August 12, 2008. From their inception to August 12, 2008, YMC and YD were controlled by

Mr. Blixseth through his holding company, Blixseth Group, Inc. ("BGI"). Since August of 2001,

BGI owned 82.6532 percent of the Class A stock in YMC and YD, and Blixseth Family

Investments, LLC owned 5.1020 percent of Class A stock. The Class B Members, or Class B

Shareholders--consisting of twelve individuals or entities unrelated to Mr. Blixseth or Ms.

Blixseth–collectively owned the remaining 12.25 percent of YMC and YD.

BGI, an Oregon sub-S corporation, was owned solely by Mr. Blixseth as President and

CEO from 1999 to August 12, 2008. Mr. Blixseth and Ms. Blixseth separated in December of

2006, and effective August 12, 2008, Ms. Blixseth and Mr. Blixseth agreed, pursuant to a June

2

26, 2008, confidential Marital Settlement Agreement ("MSA"), that Ms. Blixseth would receive

BGI and the Yellowstone Club entities.

To finalize the MSA, Ms. Blixseth was required to make a cash payment to Mr. Blixseth.

Ms. Blixseth originally secured a commitment for funding but that commitment would not allow

Ms. Blixseth to consummate the MSA in mid-August of 2008.  Ms. Blixseth thus approached

Samuel T. Byrne ("Byrne"), the founder and managing partner of CrossHarbor Capital Partners,

LLC ("CrossHarbor") and CIP Yellowstone Acquisition LLC ("CIP"), asking for a 15-day loan

so she could finalize the MSA.   Ms. Blixseth and Byrne reached an agreement whereby CIP

would loan Ms. Blixseth $35 million ("CIP Loan").  The CIP Loan was intended to be a

short-term bridge loan that would provide Ms. Blixseth time to secure longer-term financing.

Ms. Blixseth was not able to secure long-term financing and defaulted on the CIP Loan.

Subsequently, Ms. Blixseth caused the Yellowstone Club entities to seek protection under

Chapter 11 of the Bankruptcy Code on November 10, 2008.  Various creditors filed an

involuntary Chapter 11 bankruptcy petition on behalf of BLX  on September 21, 2009.  *See*

Bankruptcy Case No. 09-61893.  Ms. Blixseth filed a voluntary Chapter 11 bankruptcy petition

on March 26, 2009.  *See* Bankruptcy Case No. 09-60452.  Ms. Blixseth's case was converted to

Chapter 7 of the Bankruptcy Code on May 29, 2009.

Mr. Blixseth and Ms. Blixseth were also the founders of Big Springs Realty, LLC and

Yellowstone Club World, LLC, both of which were awarded to Ms. Blixseth in August of 2008

under the couple's June 26, 2008, MSA.  Ms. Blixseth caused Big Springs Realty, LLC to file a

voluntary Chapter 7 bankruptcy petition on June 5, 2009.  *See* Bankruptcy Case No. 09-61079.

An involuntary Chapter 7 bankruptcy petition was filed against Yellowstone Club World, LLC

on January 25, 2009.  *See* Bankruptcy Case No. 09-60061.  This Court generally refers to all the aforementioned bankruptcies as the Yellowstone Club related bankruptcies.

Mr. Blixseth made his first appearance in these proceedings on November 12 or 13, 2010, when one of Mr. Blixseth's counsel of record, Joel E. Guthals of Billings, Montana, appeared at a hearing on the Debtors' request for joint administration and on the Debtors' request for an interim order approving debtor-in-possession financing.  However, Mr. Blixseth did not take an active role in the Debtors' bankruptcies until February 2009 when he filed an objection to the Debtors' proposed bidding and solicitation procedures regarding the sale of 100% of the equity interests in the Debtors.  Subsequently, Mr. Blixseth sought to intervene in Adversary Proceeding 09-14 in March of 2009.

The remainder of the facts are set forth fairly extensively in the Court's Memorandum of Decision dated August 16, 2010, found at docket entry no. 575 in Adversary Proceeding 09-14.  Rather than recite the facts once again, the Court instead incorporates by reference that Memorandum of Decision.

## MR. BLIXSETH'S CONTENTIONS

In the Amended Motion filed November 30, 2010, and for the following reasons, Mr. Blixseth requests that I disqualify myself from all matters in which Mr. Blixseth is a litigant:

> 1.  Without considering the evidence, Judge Kirscher has pre-judged that the Yellowstone Club bankruptcy petition was filed and plan was proposed in good [sic;]

> 2.  Judge Kirscher has invited and entertained ex parte advocacy against Mr. Blixseth's counsel and Mr. Mr. Blixseth[;]

> 3.  Judge Kirscher had ex parte communications in a hotel with Cross Harbor [sic] Capital Partners LLC concerning Cross Harbor's agenda for the

4

Yellowstone Club bankruptcy, which depends upon successful litigation against Mr. Blixseth;

4. Judge Kirscher's law clerk has engaged in ex parte communications with one of Mr. Blixseth's adversaries, urging his adversary to finalize a settlement with Mr. Blixseth before Mr. Blixseth could renege;

5. Numerous times Judge Kirscher ruled on important motions against Mr. Blixseth before Mr. Blixseth had an opportunity to file a response permitted under the rules;

6. Judge Kirscher entered a $40 million judgment against Mr. Blixseth before Mr. Blixseth had an opportunity to respond to the motion to reconsider upon which the $40 million judgment was based;

7. Judge Kirscher has made impermissible and disparaging comments about Mr. Blixseth and his attorneys, including one comment that essentially compared Mr. Blixseth's meritorious summary judgments to garbage and unworthy of the Judge's time. Such statements do not uphold the integrity of the judiciary or avoid the appearance of impartiality;

8. After learning that Mr. Blixseth would be moving this Court to reassign him, Judge Kirscher appears to have retaliated against one of Mr. [sic][;]

9. Judge Kirscher is so invested in the success of the Yellowstone Club bankruptcy case that he is "boxed in" to ruling against Mr. Blixseth no matter the merits of the claims against him;

10. Judge Kirscher has demonstrably pre-judged adversary proceedings against Mr. Blixseth[;]

11. Judge Kirscher sitting as a trier of fact cannot reasonably be expected to provide Mr. Blixseth a fair trial; he has consistently maligned Mr. Blixseth's credibility and found Mr. Blixseth culpable for the demise of the Yellowstone Club.

Amended Motion to Disqualify, docket entry no. 2042, pp 2-3.  In support of the foregoing allegations, Mr. Blixseth filed an Amended Affidavit of Timothy L. Blixseth.  Only the following paragraphs from Mr. Blixseth's Amended Affidavit arguably pertain to me, my conduct or my rulings:

7.     On June 10, 2010, I received a phone call from Mr. Amsden regarding my settlement with his client, Ross Richardson as Trustee for YCW. During that phone conversation, Mr. Amsden related to me that Mr. Richardson had talked on the phone with Terry Healow who is one of Judge Kirscher's law clerks. During this conversation between Mr. Richardson and Mr. Healow, Mr. Healow asked Mr. Richardson if he had finalized his settlement with me. Mr. Richardson responded by saying that the settlement was almost complete but that a few matters needed to be addressed before it could be finalized. In response, Mr. Healow told Mr. Richardson to hurry up and get it finalized before I could "renege."

* * *

16.    The bankruptcy auction for the Yellowstone Club assets occurred around May 13th 15th of 2009. The auction for the sale of the Club assets occurred at the Billings Crowne Plaza Hotel. The bidders at the auction were Credit Suisse and CrossHarbor (Byrne's company). However, also present and participating in the auction were the Debtor (i.e., the Yellowstone Club which was effectively controlled by Byrne), and the Unsecured Creditors Committee. Judge Kirscher rented a room at the hotel to facilitate ex parte communications between the bidders. The auction itself was not public. Instead it was conducted in closed door negotiations between CrossHarbor and Credit Suisse, with the Unsecured Creditors Committee being allowed to participate to some limited extent. Although my local counsel Joel Guthals, was present at the hotel, he was not allowed to participate in the auction, had no participation in the bidders' ex parte communications with Judge Kirscher, and was otherwise locked out from the negotiations. Even though the negotiations were "closed door", Judge Kirscher nevertheless met with the CrossHarbor and Credit Suisse at the hotel during their negotiations to resolve bidding issues as they arose. Immediately following these closed door negotiations with CrossHarbor and Credit Suisse, Judge Kirscher approved the Plan of Reorganization for the Yellowstone Club and sale of the Club's assets to CrossHarbor on May 18, 2009 with no formal notice to me, or other interested parties. The altered Plan substantially affected creditors' rights.

18.    During the initial phase of AP-14, I raised the obvious problem that Stephen R. Brown, Esq. of the law firm Garlington, Lohn & Robinson in Missoula, Montana was at the time of the filing of the Yellowstone Club bankruptcy, my counsel in Montana. Yet, Mr. Brown was also a voting member and chairman of the Yellowstone Club Unsecured Creditors Committee, which was suing me in AP-14 for the recovery of $209 million. Further, Mr. Brown in his capacity as a member of the UCC had turned over to the UCC and its counsel over 400 email communications between his firm and me or my other attorneys which could potentially contain attorney-client privileged discussions. When Mr. Brown

turned over these emails to the UCC, Mr. Brown failed to inform me of this as required by the ABA Model Rules of Professional Conduct. When I learned of this disclosure, I raised before Judge Kirscher the gross problem that my current counsel had turned over to my adversary, the UCC, over 400 potentially privileged communications. Instead of Judge Kirscher allowing me to review these communications, Judge Kirscher reviewed these documents *in camera* without giving me a chance to review them and determine what Judge Kirscher reviewed or opinions he potentially formed by this *in camera* review. To date, Judge Kirscher has never given me the opportunity to review these potentially attorney-client privileged documents.

* * *

20.     Despite the new lawsuit against me seeking hundreds of millions in damages filed on the eve of trial implicating numerous new defenses and required discovery, the bankruptcy court merely continued the trial for one week then subsequently and scurrilously accused me of delaying tactics by insisting on my due process rights, and most significantly refused to accept my pre-trial order with the new defenses to the one week old law suit.

* * *

23.     . . . The court had previously deprived us of critical defenses by excluding the [Marital Settlement Agreement] MSA and Releases from my proposed Pre-Trial Order. The other side's lawyers argued that the releases were not in their Pre-Trial Order and Judge Kirscher commented that he specifically recalled not including the Releases in the PTO. My attorney directed Judge Kirscher to where the Releases were inadvertently left in the UCC's Pre-Trial Order as a trial exhibit. Judge Kirscher paused to thumb through his copy of the PTO and upon discovering that the Releases were included, he leaned back in his chair, gave a glaring stare at the Debtor's attorney, Andy Patten, and then threw the PTO across his desk with great force saying "Yes, it's still in" as if he had relied upon the manipulation of the UCC and the Debtor keeping my critical affirmative defenses out of the PTO. The manner in which Judge Kirscher showed disgust with having the Releases included in the PTO inadvertently, gave the appearance that his intent and the intent of the Debtor's and the UCC was to deprive me a critical affirmative defense in a lawsuit in which I was sued literally only few days before trial commenced.

Mr. Blixseth's Supplement Affidavit, like the Amended Affidavit, alleges that this Court

denied Mr. Blixseth due process and that the Court failed to address whether the Yellowstone

7

Club bankruptcies were filed in good faith.  Mr. Blixseth similarly argues that the Court deprived Ms. Blixseth's bankruptcy estate of $100 million and that the Court used a states secrets privilege and a Nevada protective order to conceal Ms. Blixseth's on-going fraud.

APPLICABLE LAW

Two provisions of the U.S. Code address recusal, 28 U.S.C. § 144 and 28 U.S.C. § 455. In 1974, § 455 was amended to read in pertinent part:  "(a) Any . . . judge . . . shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.  (b) He shall also disqualify himself in the following circumstances:  (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge or disputed evidentiary facts concerning the proceeding . . . ."  The other provisions of §455, (b)(2) through (b)(5), objectively and specifically set forth the "interest" and "relationship" grounds of recusal covered by § 455 prior to the 1974 amendment.  Subsection (b)(1) duplicated the grounds of "bias or prejudice" for recusal contained in § 144, without the procedural requirements.   Subsection (a) is a "catchall" provision covering "interest and relationship" and "bias and prejudice" requiring an objective evaluation.  *See generally Liteky v. U.S.*, 510 U.S. 540, 114 S.Ct. 1147, 1153-54, 127 L.Ed.2d 474 (1994).  The test for disqualification under either §§ 455(a) or 455(b)(1) is "whether a reasonable person with knowledge of all the facts would conclude that [his] impartiality might reasonably be questioned."  *In re Focus Media, Inc.*, 378 F.3d 916, 929 (9th Cir. 2004), quoting *United States v. Wilkerson*, 208 F.3d 794, 797 (9th Cir. 2000); and *In re Goodwin*, 194 B.R. 214, 222 (9th Cir. BAP 1996).  Given the 1974 amendment, courts have concluded that § 144 only applies to district court judges.  *Goodwin*, 194 B.R. at 221.  *See also* FED. R. BANKR. P. 5004(a) ("A bankruptcy judge shall be governed by 28 U.S.C. § 455, . . .").  The consequence of § 144

8

not applying is that "the judge is not required to take the factual allegations as true." *Goodwin*, 194 B.R. at 222. The obligation to recuse, if warranted, is juxtaposed with the corresponding obligation to not recuse and to serve on assigned cases when no reason to recuse exists. *Hinman v. Rogers*, 831 F.2d 937, 339-40 (10th Cir. 1987). Given the foregoing, I will consider the cases presented by Mr. Blixseth and discuss whether they apply to the pending motion.

Mr. Blixseth, in his amended motion, seeks my disqualification under 28 U.S.C. § 455(a), which reads: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Relying on *United States v. Furst*, 886 F.2d 558, 582 (3rd Cir. 1989); *United States v. Balistrieri*, 779 F.2d 1191, 1199 (7th Cir. 1985), *cert. denied sub nom. DiSalvo v. United States*, 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986); *United States v. Ritter*, 540 F.2d 459, 462 (10th Cir. 1976), *cert. denied*, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976); *United States v. Dodge*, 538 F.2d 770 (8th Cir. 1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1119, 51 L.Ed.2d 547 (1977); *Parrish v. Board of Comm'rs. of Alabama State Bar*, 524 F.2d 98 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); and *People v. Julien*, 47 P. 3d 1194, 1199 (Colo. 2002), Mr. Blixseth argues in his Amended Motion that "the factual allegations made in support of the motion are true [sic] are assumed as true." Amended Motion, p.7. While the above-cited cases are instructive, they are distinguishable.

In *Furst*, the defendant sought recusal of the presiding judge under § 455 because of ex parte communications with defense counsel. The presiding judge denied the defendant's request for recusal. On appeal and after noting that § 455 does not establish any form of procedure for consideration of recusal motions, the Third Circuit looked first to the procedures established

9

under 28 U.S.C. § 144:

> 28 U.S.C. § 144[1] sets forth a procedure by which a party may seek a judge's recusal.  Thus, we will look to section 144 and our case law under that recusal provision for guidance as to procedure.  *Cf.  Johnson v. Trueblood*, 629 F.2d 287, 290 (3d Cir.1980) ( "both statutes require the same type of bias for recusal"), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981); *id.* (" § 455(a) was intended only to change the standard the district judge is to apply to his or her conduct").[2]  This seems particularly appropriate as Furst's attorney's affidavit filed with the motion for disqualification complied with the procedure set forth in section 144, and so, had the motion merely included a reference to section 144, we would have analyzed the motion directly under that section.

*Furst*, 886 F.2d at 582.  However, the presiding judge in *Furst* acknowledged his ex parte

communications with defendant's counsel and thus, the Third Circuit concluded:

> As a result of the extent to which the district court confirmed the underlying facts upon which the recusal motion relied, we need not resolve the issue of whether a judge need accept as true the allegations presented in a motion for disqualification under section 455 which asserts a basis as to which section 144 is applicable and which includes an affidavit sufficient under section 144. It is

---

[1]  Section 144 states:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of an adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

[2]  The major benefit that a party receives by filing a motion for disqualification under section 455 instead of section 144 is that section 455(a) obviates the need to assert actual bias-if it is shown that the judge's impartiality might reasonably be questioned recusal is required.  To the extent that Furst's motion asserted only actual bias under section 455(b) he would have received no discernable benefit from filing under this section.

> sufficient that we state that where the basic underlying facts as set forth in the affidavit supporting a recusal application are not in dispute, the district court should not minutely examine the movant's characterization of them, and weigh the court's memory of what happened against that of the affiant. We think it simply inappropriate in the circumstances here for the court to have made a credibility assessment of itself. Consequently, we hold that the district judge improperly considered the truth of the asserted grounds for his recusal.

*Id*. at 583.

In this case, Mr. Blixseth's Amended Motion does not reference 28 U.S.C. § 144 and more importantly, Mr. Blixseth's Amended Motion is not accompanied by a certificate of counsel of record stating that it is made in good faith. Under the facts of this case, it is not clear whether the *Furst* Court would apply the § 144 take-as-true requirement to Mr. Blixseth's § 455(a) motion.

The discussion of § 144 and § 455 by the court in *Balistrieri* is more relevant. In addressing § 144, the court in *Balistrieri* first noted that a judge is allowed to pass only on the timeliness and sufficiency of a party's affidavit. "[I]n passing on the legal sufficiency of the affidavit, the judge must assume that the factual averments it contains are true, even if he knows them to be false." 779 F.2d at 1199. However, the factual averments, to be accepted as true, must be more than

> mere conclusions, opinions, or rumors. *United States v. Haldeman*, 559 F.2d 31, 134 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). They must be stated with particularity, *id*. at 131, and must be definite as to times, places, persons, and circumstances. *Id*. at 134. The factual averments must show that the bias is personal rather than judicial, *United States v. Patrick*, 542 F.2d 381, 390 (7th Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977), and that it stems from an extrajudicial source-some source other than what the judge has learned through participation in the case. *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966).

*Id.*  The *Balistrieri* Court went on to conclude that the judicial interpretations of "personal bias or prejudice" under § 144 were equally applicable to § 455(b)(1), even though § 455(b)(1) is not a reenactment of § 144.  The court in *Balistrieri* specifically found that a judge was not required to take all factual averments in an affidavit as true under § 455(b)(1), but rather, "the judge is free to make credibility determinations, assign to the evidence what he believes to be its proper weight, and to contradict the evidence with facts drawn from his own personal knowledge."  *Id.* at 1202.

The Court in *Balistrieri* provided little guidance with respect to § 455(a) other than its holding that an application for a writ of mandamus was a party's sole avenue of recourse when a judge denied a motion under § 455(a).  779 F.2d at 1205.  The court reasoned that § 455(a) was "not  intended to protect litigants from actual bias in their judge but rather to promote public confidence in the impartiality of the judicial process.*"  Id.* at 1204.  The court therefore concluded that denial of a motion under § 455(a) was not reviewable on appeal because § 455(a) did not affect a substantial right of the appellant.  *Id.*  Rather, "if a judge proceeds in a case when there is (only) an appearance of impropriety in his doing so, the injury is to the judicial system as a whole and not to the substantial rights of the parties. The parties in fact receive a fair trial, even though a reasonable member of the public might be in doubt about its fairness, because of misleading appearances."  *Id.* at 1204-05.

In *Ritter*, the government appropriately filed a mandamus petition under §§ 144 and 455(a).  540 F.2d 459.  The court in *Ritter* first noted that § 144 "allows a party to request disqualification of a district judge when he has a personal bias or prejudice either against him or in favor of any adverse party.  It also prescribes procedure.  The filing of the affidavit does not bring about the disqualification. The trial court determines its sufficiency. The review is,

12

however, restricted to its legal sufficiency and does not include the truth of the allegations. There must be facts, however, to establish personal bias. Section 455(a) is broader. It applie[s] to any judge and includes that he 'shall disqualify himself in any proceeding in which his impartiality might be reasonably questioned.'" *Ritter*, 540 F.2d at 461-62. The court continued:

> Under the broader standard of revised Section 455(a), disqualification is appropriate not only where there is actual or apparent bias or prejudice, but also when the circumstances are such that the judge's "impartiality might be reasonably questioned." *See* 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction, Section 3549. Thus, the grounds for disqualification set out in Section 144 "personal bias or prejudice either against (a party) or in favor of any adverse party" are included in Section 455. Moreover, the language of Section 455(a) allows a greater flexibility in determining whether disqualification is warranted in particular situations. 13 Wright, Miller & Cooper, Section 3542.

*Id*. at 462. Although the Tenth Circuit found that the government had failed to show actual bias, the Tenth Circuit did find that given the broad language of § 455(a), disqualification of the presiding judge was appropriate because based upon all the facts, it was not reasonably likely that the matter could be tried with the impartiality that litigants have a right to expect.

*U.S. v. Dodge* dealt in part with a trial judge's denial of a request to recuse himself. 538 F.2d 770. The court in *Dodge* considered the appeal under both § 144 and § 455. Without providing any meaningful discussion, but instead citing only to the applicable language of §§ 144 and 455, the court in *Dodge* accepted the truth of the facts recited in the affidavits and concluded that allegations that the trial judge had recused himself in the trials of two other defendants arising from the same incident, that the judge had made derogatory comments about certain Indian spectators at an earlier civil trial, that the judge had made derogatory comments about certain members of a group to which the particular defendant belonged, that the judge had made allegedly improper rulings in other prosecutions arising out of the same incident, and that the

13

judge had failed to grant temporary injunctive relief sought by an Indian organization during the time of the incident, did not indicate that the judge possessed a personal bias or prejudice against the moving defendant sufficient to require the judge to recuse himself.

The first topic of discussion in *Parrish* was § 144.  Similar to every case this Court has read on § 144, the court in *Parrish* recognized that,

> [t]he threshold requirement under the § 144 disqualification procedure is that a party file an affidavit demonstrating personal bias or prejudice on the part of the district judge against that party or in favor of an adverse party.  Once the affidavit is filed, further activity of the judge against whom it is filed is circumscribed except as allowed by the statute. In terms of the statute, there are three issues to be determined: (1) was the affidavit timely filed; (2) was it accompanied by the necessary certificate of counsel of record; and (3) is the affidavit sufficient in statutory terms?  *See generally* 13 Wright, Miller & Cooper, Federal Practice and Procedure ss 3541-53 (1975).
>
> We are concerned only with the third issue. As we said in *Davis v. Board of School Commissioners of Mobile County*, 5 Cir., 1975, 517 F.2d 1044:
>
>> "Once the motion is filed under § 144, the judge must pass on the legal sufficiency of the affidavit, but may not pass on the truth of the matters alleged.  *See Berger v. United States*, 1921, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481; *United States v. Roca-Alvarez*, 5 Cir., 1971, 451 F.2d 843, 847-48; *United States v. Townsend*, 3 Cir., 1973, 478 F.2d 1072."
>
> 517 F.2d at 1051.

*Parrish*, 524 F.2d at 100.

After concluding that the factual bases alleged for recusal were legally insufficient under § 144, the court in *Parrish* proceeded to examine § 455.  In discussing § 455(a), the court wrote:

> There are now several standards in § 455.  Some go to specific conduct, but one, set out in § 455(a), is general and does not rest on the personal bias and prejudice stricture of §§ 144 and 455(b)(1).  As we noted in *Davis, supra*, 517 F.2d at 1052, the language of § 455(a) was intended to displace the subjective "in the opinion of the judge" test for recusal under the old statute, and the so-called "duty to sit decisions". We also noted that § 455(a) was intended to substitute a

> "reasonable factual basis reasonable man test" in determining whether the judge
> should disqualify himself. *See* 13 Wright, Miller & Cooper, Federal Practice and
> Procedure s 3542 (1975). *See also*, Frank, Commentary on Disqualification of
> Judges-Canon 3c, 1972, Utah L.Rev. 377, 379. Note, Disqualification of Judges
> and Justices in the Federal Courts, 86 Harv.L.Rev. 736, 745-50 (1973).

*Parrish*, 524 F.2d at 103.  Applying the reasonable man test, the *Parrish* Court concluded that "a

reasonable man would not infer that [the presiding judge]'s 'impartiality might reasonably be

questioned'." *Id*.

Finally, Mr. Blixseth relies on *People v. Julien* to support his contention that the factual

allegations made in support of his motion must be assumed as true.  The issue in *Julien* was two-

fold.  First, "whether the trial judge's previous employment with the district attorney's office

constituted an appearance of impropriety mandating reversal of the defendant's judgment of

conviction where the judge had no involvement in the defendant's case while employed with the

district attorney" and second, "[w]hether, assuming there was an appearance of impropriety, the

trial judge's failure before trial to disclose to the defendant his previous employment with the

district attorney's office and to recuse himself when a motion to recuse was filed before

sentencing constituted harmless error." *Julien*, 47 P.3d at 1195.  Resolution of the issue

involving prior governmental association turned in part on the language of Canon 3 of Colorado's

Code of Judicial Conduct, which language was identical to the American Bar's Association's

Model Code of Professional Responsibility and Code of Judicial Conduct.  In construing

Colorado's Code of Judicial Conduct, the court in *Julien* looked to cases interpreting § 455(a)

and (b)(3).

The second issue in *Julien* dealing with disqualification was governed by C.R.S.A. § 16-

6-201, which read:

15

> A motion for change of judge on any ground must be verified and supported by the affidavits of at least two credible persons not related to the defendant, stating facts showing the existence of grounds for disqualification. If the verified motion and supporting affidavits state facts showing grounds for disqualification, the judge must enter an order disqualifying himself. After disqualifying himself, the judge may require a full hearing upon the issues raised by the affidavits and shall request that another judge conduct the hearing. The other judge shall make findings of fact with regard thereto, and such findings shall be included as a part of the trial court record.

*Julien*, 47 P.3d at 1199.  The court in *Julien* noted that:  "In ruling on the disqualification motion, a judge must accept as true the factual statements contained in the motion and affidavits. *People v. Botham*, 629 P.2d 589, 595 (Colo.1981). The judge must determine as a matter of law whether they allege legally sufficient facts for disqualification.  *S.S. v. Wakefield*, 764 P.2d 70, 73 (Colo.1988)."  *Id*.  Although the presiding judge in *Julien* had been employed by the district attorney's office five weeks before his assignment to the moving party's case, the court in *Julien* found that the record did not support disqualification of the presiding judge where the moving party did not contend that the presiding judge had any actual bias or prejudice against him or any disqualifying interest in the case.  *Id.* at 1200.  C.R.S.A. § 16-6-201 requires that a motion for disqualification be verified and supported by the affidavits of at least two credible persons not related to the defendant.  Section 455, unlike C.R.S.A. § 16-6-201, does not require that Mr. Blixseth file any affidavits, particularly affidavits of unrelated persons.  If anything, C.R.S.A. § 16-6-201 is more similar to § 144, which requires that a motion for disqualification be accompanied by a certificate of counsel stating that the motion is made in good faith.  This Court fails to see *Julien's* relevance to this case.

Instead, this Court agrees with the court's observation in *United States v. Eisenberg*, 734 F.Supp. 1137, 1160 (D. N.J. 1990), that the procedural requirements of § 144 and § 455 differ.

This is so because § 455 does not contain the same procedural safeguards as § 144. *State of Idaho v. Freeman*, 507 F.Supp. 706, 715 (D. Ida. 1981) (In discussing § 21 of the Judicial Code of 1911, which was the predecessor to § 144, the court noted that it appeared "that Congress intended the perjury statute available against a false affidavit and disciplinary proceedings against the attorney to be sufficient to deter trivial and speculative allegations."). As the foregoing discussion illustrates, this Court is not required to accept all facts in Mr. Blixseth's Amended and Supplemental Affidavits as true. *In re American Ready Mix, Inc.*, 14 F.3d 1497 (10th Cir. 1994), *cert. denied*, 513 U.S. 818, 115 S.Ct. 77, 130 L.Ed.2d 31 (1994) (Under § 455, "factual allegations do not have to be taken as true," and "[t]here is as much obligation for a judge not to recuse when there is no occasion ... to do so as there is ... to [recuse] when there is."); *Goodwin*, 194 B.R. at 221("the requirement of section 144 that the judge assume that the facts asserted in the affidavit are true and examine them only to determine their legal sufficiency" does not apply to bankruptcy judges). However, even if the Court did accept all allegations as true, which it does not, Mr. Blixseth's alleged facts are not legally sufficient for recusal because the applicable factual averments in Mr. Blixseth's Amended and Supplement Affidavits are either based upon heresay or reflect Mr. Blixseth's personal conclusions and opinions.

The Ninth Circuit Court of Appeals notes that although "section 455 is stated in terms of a self-enforcing obligation upon the judge, it may be invoked by a party." *Klenske v. Goo (In re Manoa Finance Co., Inc.)*, 781 F.2d 1370, 1373 (9th Cir. 1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987). The test for determining whether a judge should recuse "himself under section 455(a) is 'whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant

17

doubt about the judge's impartiality.'" *U.S. v. Torkington*, 874 F.2d 1441, 1446 (11th Cir. 1989), quoting *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir.1988).  The Tenth Circuit Court of Appeals in *Frates v. Weinshienk*, 882 F.2d 1502, 1504 (10th Cir. 1989) further instructs that:

> A bankruptcy judge may preside over both the administrative and adversarial portions of a bankruptcy case. *See* 28 U.S.C. § 157.  But recusal is necessary if there is evidence of actual bias, if the bankruptcy judge by words or actions reasonably appears to have prejudged adversarial proceedings over which he is to preside, or if the judge appears "boxed in" by prior rulings such that he will be forced to reach a certain result in an adversarial proceeding regardless of the merits.  We do not, however, read our cases or any other authorities to require a judge who approves a Chapter 11 reorganization plan automatically to disqualify himself from presiding over adversarial proceedings that will affect the total recovery of the bankrupt's creditors.

The Court also recognizes that "familiarity with defendants and/or the facts of a case that arises from earlier participation in judicial proceedings is not sufficient to disqualify a judge from presiding at a later trial."  *Steering Committee v. Mead Corp. (In re Corrugated Container Antitrust Litigation)*, 614 F.2d 958, 965 (5th Cir. 1980) (footnote omitted), *cert. denied*, 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980).  In many ordinary litigation situations judges make preliminary decisions on offers of evidence, or make decisions otherwise affecting the parties, that familiarize the judge with the facts in that case or in related cases in which the judge must rule.  The Bankruptcy Code and 28 U.S.C. § 157, by permitting the presiding judge in a reorganization to preside over adversary proceedings affecting the assets, contemplate that bankruptcy judges will encounter situations similar to the case *sub judice* with some frequency.  In such situations, the Ninth Circuit Court of Appeals suggests "that judges sitting in bankruptcy be especially solicitous in maintaining both the appearance and reality of impartiality when

18

adjudicating matters with which they have had close involvement, erring on the side of recusing themselves when appropriate." *Manoa*, 781 F.2d at 1373.

The foregoing comports with the Supreme Court of the United States' decision in *Liteky*, 510 U.S. 540, wherein the Supreme Court addressed the question of whether the so-called extrajudicial source doctrine applied by lower courts under § 144 also applied to motions brought under § 455(a). In *Liteky*, the Supreme Court concluded that the "extrajudicial source" doctrine, to the extent it exists, does indeed apply to § 455(a). *Id.* 510 U.S. at 554. In reaching its decision, the Supreme Court explained:

> The fact that an opinion held by a judge derives from a source outside judicial proceedings is not a necessary condition for "bias or prejudice" recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice. Nor is it a sufficient condition for "bias or prejudice" recusal, since some opinions acquired outside the context of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading) will not suffice. Since neither the presence of an extrajudicial source necessarily establishes bias, nor the absence of an extrajudicial source necessarily precludes bias, it would be better to speak of the existence of a significant (and often determinative) "extrajudicial source" factor, than of an "extrajudicial source" doctrine, in recusal jurisprudence.
>
> The facts of the present case do not require us to describe the consequences of that factor in complete detail. It is enough for present purposes to say the following: First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *See United States v. Grinnell Corp.*, 384 U.S., at 583, 86 S.Ct., at 1710. In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support

19

a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration-even a stern and short-tempered judge's ordinary efforts at courtroom administration-remain immune.

510 U.S. at 554-56, 114 S.Ct. at 1157.

Lastly, the Ninth Circuit Court of Appeals held in *United States v. Studley*, 783 F.2d 934, 939 (9th Cir.1986), "that a [§ 144] motion for recusal filed weeks after the conclusion of a trial is presumptively untimely absent a showing of good cause for its tardiness." Section 455 does not contain such time limitations. Furthermore, I do not regard Mr. Blixseth's delay as fatal because a recusal motion should be permitted at any time it becomes apparent that a judge is biased or suffers from the appearance of bias. Mr. Blixseth's delay, though, suggests that Mr. Blixseth did not regard my prior rulings as greatly debilitating to his position.

As noted previously, after reviewing the applicable law under § 455(a), the Court disagrees with Mr. Blixseth's position that the Court must accept his factual averments as true. Rather, the Court may assign to the evidence what it believes to be its proper weight. I may also contradict the evidence with facts drawn from my own personal knowledge. After reviewing Mr. Blixseth's Amended and Supplemental Affidavits, I conclude that recusal is not necessary. The matters about which Mr. Blixseth complains occurred in the course of these proceedings and do

20

not show that I relied upon knowledge acquired outside these proceedings or that I have a deep-seated and unequivocal antagonism that would render fair judgment impossible. *See Liteky*, 510 U.S. at 556, 114 S.Ct. at 1158.

DISCUSSION

Mr. Blixseth's complaints fall into four general categories: (1) ex parte communications; (2) the Stephen Brown emails; (3) favoritism toward Ms. Blixseth and Byrne; and (4) denial of Mr. Blixseth's due process. Mr. Blixseth's complaints regarding ex parte communications fall into three separate sub-categories: that my law clerk, Terry Healow, had an ex parte communication with Ross Richardson, and that during such communication, Mr. Healow used a word that shows bias against Mr. Blixseth; that I held ex parte meetings with parties involved in the Yellowstone Club bankruptcy; and that I and my staff have had numerous email communications with attorneys involved in this case which show that I have a close, personal relationship with said attorneys, which relationship precludes me from entering fair and unbiased decisions.

Ex Parte Communications.

Mr. Blixseth first argues that on June 10, 2010, he received a phone call from Mr. Amsden regarding Mr. Blixseth's settlement with his client, the Chapter 7 Trustee in the Yellowstone Club World bankruptcy, Ross Richardson. During that phone conversation, Mr. Amsden apparently relayed to Mr. Blixseth the fact that my law clerk, Terry Healow, had telephoned Mr. Richardson inquiring as to whether Mr. Richardson had finalized a settlement with Mr. Blixseth. Mr. Blixseth asserts that Mr. Richardson advised Mr. Healow that the settlement was almost complete but that a few matters needed to be addressed before it could be

21

finalized.  In response, Mr. Healow allegedly told Mr. Richardson to hurry up and get the settlement finalized before Mr. Blixseth could "renege."

First, it is not clear from Mr. Blixseth's Affidavit and the attached Exhibit A whether my law clerk Terry Healow used the word "renege" in his conversation with Mr. Richardson, or whether that is Mr. Blixseth's interpretation of what was relayed to him through Mr. Amsden. Second, I do not recall asking Mr. Healow to place a call to Mr. Richardson and I similarly do not recall waiting for any settlement involving the Yellowstone Club World bankruptcy estate and Mr. Blixseth.

There are essentially five bankruptcies (one consisting of the four Yellowstone Club entities; the second being BLX Group, Inc.; the third being Ms. Blixseth's personal bankruptcy; the fourth being Big Springs Realty, LLC; and the fifth being Yellowstone Club World, LLC) and 28 associated Adversary Proceedings.  In an attempt to refresh my recollection, I reviewed the applicable cases and do not see anywhere in the records where the Court would have been anticipating the receipt of a settlement between the trustee of Yellowstone Club World bankruptcy and Mr. Blixseth at or around June 12, 2010, the date Mr. Amsden and Mr. Blixseth were exchanging text messages.  While the Court has not reviewed the docket in each of the 36 separate cases, the Court has reviewed the dockets in Yellowstone Mountain Club, LLC and Yellowstone Club World, LLC, including its 3 associated adversary proceedings.  The Court sees nothing in the Yellowstone Mountain Club bankruptcy that would prompt me to inquire about a stipulation between Mr. Blixseth and Mr. Richardson.  Two of the adversary proceedings tied to the Yellowstone Club World bankruptcy do not involve Mr. Blixseth.  In the third adversary proceeding, adversary proceeding no. 09-00086, it appears the Honorable John L. Peterson

22

conducted a mediation on February 11, 2010, and May 5, 2010.  As noted earlier, the Court sees

no reason why it would have anticipated a settlement in Adversary Proceeding 09-86, and in fact,

the Court entered a Memorandum of Decision and Order on June 9, 2010, granting Mr.

Blixseth's motion to dismiss for lack of subject matter jurisdiction thereby dismissing a third

party complaint filed against Mr. Blixseth.  It was not until June 29, 2010, when Mr. Richardson

and Mr. Blixseth filed a joint motion to vacate deadlines, that the parties mentioned a settlement

in that matter.  Learning of a settlement on June 29, 2010, would not have prompted a telephone

call from the Court on or before June 12, 2010.

Finally, the Court can find nothing in 09-60061, the main Yellowstone Club World

bankruptcy case, that would have prompted a telephone call to the parties in early June of 2010.

The Court entered an Order on June 1, 2010, setting a telephonic status conference for June 2,

2010, on several matters, including Mr. Richardson's February 12, 2010, motion for order

approving a settlement with Mr. Blixseth.  I reviewed the transcript of the June 2, 2010, hearing

and see nothing in that transcript which would indicate that I was waiting for a further settlement

from Mr. Richardson and Mr. Blixseth.  To the contrary, I orally ruled on that date that

CrossHarbor did not have standing to object to Mr. Richardson's proposed settlement with Mr.

Blixseth.  Following the June 2, 2010, hearing and in accordance with my June 2, 2010, oral

ruling, the Court entered a Memorandum of Decision and Order on June 10, 2010, overruling

CrossHarbor Capital Partners' objection to Mr. Richardson's settlement with Mr. Blixseth,

granting Mr. Richardson's motion for order approving settlement, and approving the

"Memorandum of Understanding" between Mr. Richardson and Mr. Blixseth.

Furthermore, another law clerk in my Chambers, Kelli Harrington, has assisted me almost

exclusively on this case.  I would not generally ask one law clerk to make an inquiry about a case in which another law clerk is or was assisting me.  Given the fact that Mr. Healow has not generally assisted me with the Yellowstone Club bankruptcies and given the date of the text messages between Mr. Amsden and Mr. Blixseth and their proximity to a May 2010 mediation that was conducted by the Honorable John L. Peterson, I determined that perhaps Mr. Healow made the referenced telephone call to Mr. Richardson's office at the direction of Judge Peterson, and not me.  To confirm my suspicions, I posed such question to Mr. Healow and he specifically recalled placing a telephone call to Mr. Richardson regarding the whereabouts of a settlement.  However, the call was placed at the request of Judge Peterson, and not me.[3]

Next, Mr. Blixseth asserts: "The bankruptcy auction for the Yellowstone Club assets occurred around May 13[th] 15th of 2009.  The auction for the sale of the Club assets occurred at the Billings Crowne Plaza Hotel.  The bidders at the auction were Credit Suisse and CrossHarbor (Byrne's company).  However, also present and participating in the auction were the Debtor (*i.e.*, the Yellowstone Club which was effectively controlled by Byrne), and the Unsecured Creditors Committee.  Judge Kirscher rented a room at the hotel to facilitate ex parte communications between the bidders.  The auction itself was not public.  Instead it was conducted in closed door negotiations between CrossHarbor and Credit Suisse, with the Unsecured Creditors Committee being allowed to participate to some limited extent.  Although my local counsel Joel Guthals,

---

[3]  Mr. Healow advised me that he placed the telephone call to Mr. Richardson from his work phone in the Butte Federal building.  However, as a result of that one call, Mr. Blixseth subpoenaed not only Mr. Healow's calls for the January 18, 2011, hearing, but also requested that Mr. Healow produce his cell phone records and various email communications.  The subpoena was administratively denied as it was not in compliance with the Subpoena Regulations Adopted by the Judicial Conference.

was present at the hotel, he was not allowed to participate in the auction, had no participation in

the bidders' ex parte communications with Judge Kirscher, and was otherwise locked out from

the negotiations.  Even though the negotiations were 'closed door', Judge Kirscher nevertheless

met with CrossHarbor and Credit Suisse at the hotel during their negotiations to resolve bidding

issues as they arose.  Immediately following these closed door negotiations with CrossHarbor

and Credit Suisse, Judge Kirscher approved the Plan of Reorganization for the Yellowstone Club

and sale of the Club's assets to CrossHarbor on May 18, 2009 with no formal notice to me, or

other interested parties.  The altered Plan substantially affected creditors' rights."

A little background adds context to Mr. Blixseth's above claim.  At a hearing held April

4, 2009, the Court approved the Debtors' Disclosure Statement and scheduled the hearing on

confirmation of the Debtors' Amended Joint Plan of Reorganization for May 18, 2009, in Butte.

The confirmation hearing was scheduled for May 18, 2009, to accommodate not only the Court's

schedule but also the Debtors' expiring debtor-in-possession financing.  Before confirmation

could occur, the Court had to resolve at least a portion of the issues in Adversary Proceeding 09-

00014.  Phase one of the trial in Adversary Proceeding 09-00014 commenced on  April 29, 2009,

and concluded on May 5, 2009.  The Court then granted the parties in Adversary Proceeding 09-

00014 until May 11, 2009, to file post-trial briefs.  Thereafter, on May 12, 2009, the Court

entered a partial and interim order equitably subordinating Credit Suisse's claim.  The Court's

partial and interim order left unresolved the issues involving Mr. Blixseth, the issues regarding

valuation of Debtors' assets and the question of whether Credit Suisse, whose collateral was

subsequently valued on May 12, 2009, at $232 million, could credit bid at an auction of Debtors'

assets.

25

The Court's May 12, 2009, partial and interim order in Adversary Proceeding 09-00014 and the Court's valuation order of that same date, set off a frenzy of activity, particularly as an auction of either Debtors' assets or 100% of the Debtors' equity was scheduled for May 13, 2009.  The minute entries of the so-called closed meetings that allegedly took place at the Crowne Plaza Hotel can be found at docket entry nos. 1047 for May 12th, 1048 for May 13th, 1049 for May 14th and 1054 for May 15th.  Those hearings, which Mr. Blixseth refers to as closed meetings, which included much of the actual bidding process between CrossHarbor and Credit Suisse, were held in the Federal Courthouse in Billings, not the Crowne Plaza Hotel.  I must concede, however, that because my duty station is not in Billings and because I do not live in Billings, I did rent a hotel room at the Crowne Plaza Hotel, which is two blocks from the Federal Courthouse.  I rented a room so I would have a place to sleep and shower and not a single person, other than myself, visited the room which I rented at the Crowne Plaza Hotel.  Thus, Mr. Blixseth's statement that hearings were held in the Yellowstone Club entities' bankruptcies on May 12, 13, 14 and 15, 2009, is correct.  Mr. Blixseth is also correct that I rented a room at the Crowne Plaza Hotel.  However, Mr. Blixseth's contention that I rented a room at the Crowne Plaza Hotel to facilitate ex parte communications with parties involved in this bankruptcy proceeding is simply false.

The transcripts show that the parties were using a conference room at the Hotel to facilitate bidding.  However, they lost access to that conference room and the ongoing negotiations concerning bidding naturally moved to the Federal courthouse in Billings where I was conducting ongoing hearings in the case.  I recall during a recess from a hearing at the courthouse, I believe on May 13th, while I was visiting with court security officers that I greeted

Mr. Blixseth's counsel, Mr. Guthals, as he was walking through the lobby on the 5th floor of the courthouse. Mr. Guthals informed me that he was leaving the courthouse as none of the bidding parties wished to consult with him. I do not recall if Mr. Guthals returned. I also do not recall Mr. Blixseth personally attending any of the hearings during that week. The exchange between Mr. Guthals and myself occurred while parties were negotiating and determining who would be qualified bidders in various courtrooms and conference rooms at the courthouse. I was not involved in those meetings or discussions. From time to time the various parties would provide an update on their progress so I could plan when we would continue with any auction or required hearing. Also, they were attempting to keep me informed as to whether they were making any progress resolving contested issues involving confirmation.

The transcripts of the hearings held May 12th through May 15th show that the auction of the Debtors' assets was a collaborative effort between the Debtors, the Official Committee of Unsecured Creditors and the Ad Hoc Committee of Yellowstone Club Members. *See* docket entry nos. 1047, 1048, 1049 and 1054. Parties were working virtually around the clock to determine the extent of Credit Suisse's credit bid, to qualify bidders and to conclude an auction of the Debtors' assets prior to the May 18, 2009, confirmation hearing date.[4]

The long hours were taking a toll and patience was wearing thin. During that time, the parties would think they were on the brink of a global resolution, only to discover that they might be at an impasse. In fact, counsel for Credit Suisse commented on May 14th that there had to be an alternative to not reaching a resolution. The credit versus cash bidding process reached

---

[4] The hearing on confirmation of the Debtors' joint Chapter 11 plan was scheduled pursuant to an Order entered April 7, 2009.

another impasse on May 15th when neither Credit Suisse nor CrossHarbor would move from their

respective positions.  At that time, I suggested that perhaps I should have a brief talk with Byrne

from CrossHarbor and Mr. Yankauer from Credit Suisse to see whether a resolution was at all

possible and whether the attorneys for the parties involved or the parties themselves were the

obstacles to some resolution.  I inquired on the record if there was any objection to me talking

with Byrne and Yankauer on a limited basis and all parties present at the hearing voiced their

lack of objection.  It was apparent during my brief discussion with Byrne and Yankauer that the

parties were close to a resolution, but at the same time, they were still very far apart.  Court

reconvened only to take another recess so the parties could further negotiate and try to reduce to

writing any agreement in principle.  When the Court once again reconvened, the remaining issues

between Credit Suisse and CrossHarbor related to one, Credit Suisse obtaining authority from its

lender groups to reach a resolution with CrossHarbor and two, the terms of a note from

CrossHarbor to Credit Suisse.

Unfortunately, the parties did not come to a meeting of the minds and finally, late on

Friday, May 15, 2009, at about 7:00 p.m. if my memory serves me correctly, and after the parties

had gone back and forth numerous times in clearly an adversarial process and tone, I instructed

all the parties to gather their belongings and leave the Billings courthouse.  I immediately left

Billings to return to Butte, fully expecting that nothing would be resolved by Monday, May, 18,

2009.

During those four long days and because the parties were working almost around the

clock, it became clear that the bidding parties might need the Court's assistance outside normal

business hours.  I did not want to give the parties information about where I was staying or how

they could contact me, so I advised the parties in open court that they could contact me through Ms. Harrington if they had an emergency.  As previously noted, the bidding process had to be concluded so the Court could move forward with confirmation on Monday, May 18, 2009.  On the evening of either May 13th or May 14th, or perhaps both, the parties involved in the bidding process, through Ms. Harrington, contacted me after hours to provide a status update regarding their negotiations and to notify the Court whether the bidding process could be concluded by May 15.  I met with the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Yellowstone Club Members and the two qualified bidders, CrossHarbor Capital Partners and Credit Suisse, at the Crowne Plaza Hotel.  Any meeting was very brief and did not in any way involve Mr. Blixseth.  My brief presence at the meeting obviously was not effective because we continued with bidding and auction issues through May 15th, when the auction was to have been completed on May 13th.  In fact, when I left the courtroom late on May 15th, I was not convinced that any auction or any discussion of global resolution would occur prior to the confirmation hearing scheduled for May 18th.

The meeting did not and could not have involved Mr. Blixseth because Mr. Blixseth did not seek to qualify himself as a bidder, was not a qualified bidder and was thus not involved in the actual bidding process.  Because Mr. Blixseth was not part of the bidding process and was not involved in the last minute bidding negotiations, my brief meeting with the bidding parties was not ex parte:

> The prohibition against ex parte contacts is based upon notions of procedural due process. *Guenther v. Commissioner of Internal Revenue*, 889 F.2d 882, 884 (9th Cir.1989). Procedural due process requires that a party be provided notice and an opportunity to respond. *Id*. If the party has no right to notice or an opportunity to respond, then it follows that the communication is not ex parte.

*Goodwin*, 194 B.R at 222.

Moreover, the facts asserted by Mr. Blixseth with regard to the so-called ex parte communication do not establish bias or prejudice by the undersigned toward Mr. Blixseth. Mr. Blixseth's apparent displeasure with the fact that the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Yellowstone Club Members, Credit Suisse, and CrossHarbor Capital Partners did not include him in all aspects of the actual bidding process between Credit Suisse and CrossHarbor Capital Partners, does not now bootstrap the parties' request for guidance from the Court during the bidding process into a demonstration of prejudice. Such allegation by Mr. Blixseth is simply false.

Mr. Blixseth filed a Supplemental Affidavit on January 17, 2011. In the Supplemental Affidavit, Mr. Blixseth once again takes issue with this Court's alleged ex parte communications with various partes. In support of his claims of bias and prejudice, Mr. Blixseth filed a host of email communications between myself and various parties and Ms. Harrington and various parties.

Many of the emails are wholly unrelated to the Yellowstone Club bankruptcies or any of the related proceedings. For instance, the first string of email communications relate to the status of two adversary proceedings stemming from the Brenda Burkhartsmeier bankruptcy and two other bankruptcy proceedings. The email communication is between all counsel involved in those cases and is not ex parte communication. As stated earlier, neither the Kuntz nor the Burkhartsmeier bankruptcies have any connection to the Yellowstone Club cases.

The next string of emails was initiated by the individual in charge of organizing continuing legal education seminars for the Bankruptcy Law Section of the State Bar of Montana.

30

The email appears to have gone to all individuals who were doing presentations at the Montana Bankruptcy CLE held October 21 and 22, 2010, in Missoula, Montana. Each year, I and several other bankruptcy judges participate in the CLE. The next email communications are between me and Andy Patten regarding an article I wrote for the Bankruptcy Law Section's newsletter.

Next are emails between myself, Andy Patten and Doug James concerning the case of *Lehman Commercial Paper, Inc. v. Moonlight Basin Ranch, LP*, Adversary Proceeding No. 10-9. The email communications are administrative in nature and include counsel for the plaintiff and the defendant in that matter. The communications are not ex parte. Furthermore the communications have nothing to do with the Yellowstone Club bankruptcies.

The following string of emails relate once again to the preparation of the Bankruptcy Law Section newsletter, which is prepared by Andy Patten and other members of his firm. The next email is from Andy Patten to Ms. Harrington. The email is administrative in nature and merely transmits a proposed order concerning a matter in the case of *In re Glacier Stone Supply, Inc.*, Case No. 10-61638. It appears the email was sent to not only my law clerk, but also other interested parties in that case. The same holds true for the email that follows.

The next email was sent by my law clerk, Kelli Harrington, to Andy Patten. It appears that Mr. Patten was inquiring about my availability for a hearing regarding a new case. Counsel, including Mr. Blixseth's counsel, have been known to call my law clerks inquiring as to my availability to hold expedited hearings in various matters. This email appears to be a response to such an inquiry.

The next emails once again relate to either the 2009 Montana Bankruptcy CLE or my submission for the 2009 bankruptcy newsletter. The next emails are once again administrative

emails, generally pertaining to the submission of proposed orders in accordance with Mont. LBR 9013-1(i).  When motions contain unique language, such as property descriptions, my law clerks often call or email counsel and request that a proposed order be filed in accordance with our Local Rules.

In the midst of the foregoing email exchange is an email from Ms. Harrington to a person in Andy Patten's office.  At the beginning of the hearing on confirmation of Debtors' Chapter 11 plan held May 18, 2009, the Court was advised that bidding parties had, over the weekend and in the hours leading up to the confirmation hearing, reached a global settlement.  The parties had a single copy of an executed term sheet, which executed term sheet the parties presented to the Court.  At the request of Mr. Patten, the Court emailed a copy of the signed settlement term sheet to his office so that someone other than just the Court had a copy of the executed term sheet.

The next email string involves my law clerk's inability to locate a deposition.  The email was not ex parte as it includes most if not all counsel involved at that time in Adversary Proceeding 09-14, including Mr. Blixseth's counsel of record; Michael Flynn at mike@mjfesq.com and Joel E. Guthals at jeguthals@ghrtlawfirm.com.   The next emails are between Andy Patten and Judge Peterson.  I was not privy to those emails until Mr. Blixseth filed them on January 11, 2011.

As for the remaining emails, they, like numerous of the earlier emails, involve administrative, as opposed to substantive matters.  In most instances, it appears parties are trying to either schedule emergency hearings or my law clerk is trying to obtain proposed orders.  None of the emails contain inappropriate ex parte communications and I certainly do not find any bias or prejudice in the emails.

As discussed above, the emails, in and of themselves, do not establish bias or prejudice. However, the argument at the January 18, 2011, hearing shows that Mr. Blixseth seeks to show that I favor in-state counsel to the detriment of out-of-state counsel:

> And particularly with a small local bankruptcy bar here in Montana, it's -- that basically makes its living off this Court's ruling, it makes the task even more difficult, particularly understanding that this Court has under -- has had a distinguished reputation. And the parties, the attorneys that have to argue this are essentially attorneys from outside Montana, except for Mr. Fox, who does not practice before this Court.

The problem with such argument is that almost all parties involved in this case have or had out-of-state counsel, including the Debtors, the unsecured creditors' committee, CrossHarbor and Credit Suisse. Moreover, Mr. Blixseth has Montana counsel who have been active in this case, namely, Joel E Guthals of Billings, Montana and Daniel D. Manson of Butte, Montana. In addition, Mr. Blixseth has produced emails between me and Debtors' local counsel, Mr. Patten, seeming to suggest that we have some relationship beyond that of judge and attorney. If one were to look, one could undoubtedly find emails between myself and Mr. Blixseth's attorney, Joel E. Guthals, because in the past, Mr. Guthals, like Mr. Patten, has been an active participant in the Montana Bankruptcy CLE. My relationship with Mr. Patten is exactly the same as my relationship with Mr. Guthals; purely professional.

The Stephen R. Brown emails.

Mr. Blixseth claims that during the initial phase of Adversary Proceeding 09-14, he raised his concern that Stephen R. Brown, Esq. of the law firm Garlington, Lohn & Robinson in Missoula, Montana, was at the time of the filing of the Yellowstone Club bankruptcy, Mr. Blixseth's counsel in Montana. Yet, Mr. Brown was also a voting member and chairman of the

Yellowstone Club's unsecured creditors committee, which was suing Mr. Blixseth in Adversary Proceeding 09-14 for the recovery of $209 million. Brown testified, without contradiction from Mr. Blixseth, that Mr. Blixseth had encouraged Brown to be on the unsecured creditors' committee. Notwithstanding his prior encouragement, Mr. Blixseth argues that Mr. Brown, in his capacity as a member of the unsecured creditors' committee, turned over to the unsecured creditors' committee and its counsel over 400 email communications between his firm and Mr. Blixseth or Mr. Blixseth's other attorneys which could potentially contain attorney-client privileged discussions.

Mr. Blixseth's counsel conceded at a hearing held December 2, 2010, that the emails referenced in Mr. Blixseth's Amended Affidavit are in fact emails between Mr. Brown as a member of the unsecured creditors' committee and the committee's counsel. This Court previously found that Mr. Brown had not disclosed any information protected by Mr. Blixseth's attorney-client privilege. Rather, the Court found that the emails contained information that was protected by the unsecured creditors' committee's attorney-client privilege. As set forth in an Order entered by this Court on December 6, 2010, in Adversary Proceeding 09-14, "Mr. Blixseth has not cited any legal authority which would permit this Court to violate the Official Committee of Unsecured Creditors' attorney-client privilege without the Official Committee of Unsecured Creditors' consent." The Court stands by such ruling.

<u>Favoritism toward Ms. Blixseth and Byrne.</u>

In his brief and at the hearing held January 18, 2011, Mr. Blixseth's counsel argued extensively that this Court's bias and prejudice is evident by the leniency this Court has showed toward Ms. Blixseth. Mr. Blixseth's argument is interesting because this Court has basically had

only one opportunity in which it was required to rule for or against Ms. Blixseth.  That one

instance arose when the Office of the United States Trustee filed a motion to convert Ms.

Blixseth's  Chapter 11 bankruptcy to one under Chapter 7 of the Bankruptcy Code.  Over Ms.

Blixseth's vigorous objection, this Court did in fact convert Ms. Blixseth's case to Chapter 7 on

May 29, 2009.  Over Ms. Blixseth's objection, this Court has also entered orders extending the

deadline for the Chapter 7 trustee in Ms. Blixseth's bankruptcy to object to entry of Ms.

Blixseth's discharge.  Pursuant to a stipulation filed January 5, 2011, Ms. Blixseth and the trustee

resolved Ms. Blixseth's then pending objection, agreeing that the trustee would have through

January 21, 2011, to file a complaint objecting to Ms. Blixseth's discharge.

Mr. Blixseth also argues that this Court has turned a blind eye to the fact that the

Yellowstone Club bankruptcies were filed in bad faith.  In support of such contention, Mr.

Blixseth cites to the transcript of April 29, 2009, from Adversary Proceeding 09-14, to a

statement of uncontroverted facts filed July 2, 2010, by Mr. Blixseth in Adversary Proceeding

09-18, and a memorandum that Mr. Blixseth filed in Adversary Proceeding 09-18 on January 22,

2010.  Mr. Blixseth, however, fails to acknowledge that he called not a single witness to rebut the

witness testimony presented by the Debtors at the May 18, 2009, confirmation hearing.  Also

notable is that fact that Mr. Blixseth sought neither the dismissal nor conversion of either Ms.

Blixseth's bankruptcy or the Yellowstone Club bankruptcies for bad faith.

Mr. Blixseth next maintains that this Court has entered rulings to protect Ms. Blixseth,

even though Ms. Blixseth has committed millions of dollars of fraud on numerous parties.  More

specifically, Mr. Flynn argues that Ms. Blixseth committed over $50 million of bank fraud which

this Court ignored.  As examples, Mr. Blixseth referred to Ms. Blixseth's loans with Western

Capital Partners and Wachovia Bank.  Mr. Flynn characterized Ms. Blixseth's loan with Wachovia as "one of the most fraudulent loans in my 40 years of litigating, having represented bank presidents and CEOs and white-collar criminals."  Mr. Flynn represented that "they" pledged nonexistent technology as collateral for the Wachovia loan.  Mr. Flynn then asserts Ms. Blixseth pledged certain noise filtering technology software technology to Wachovia Bank in March of 2008 in violation of a Federal preliminary injunction.

Whether Ms. Blixseth pledged non-existent technology or whether she pledged technology in violation of an injunction, Wachovia Bank filed an adversary complaint against Ms. Blixseth on June 10, 2009, seeking to except the Wachovia obligation from Ms. Blixseth's discharge under 11 U.S.C. § 523(a)(2).  *See* Adversary Proceeding 09-00034.  Wachovia Bank and Ms. Blixseth eventually stipulated to the dismissal of that action on November 18, 2009. This Court entered three orders in that action: an order setting a pretrial scheduling conference, an order setting trial and an order approving the parties' stipulation for dismissal.

Before leaving this particular matter, the Court must comment on Mr. Blixseth's assertion that Ms. Blixseth's deposition testimony from the trial in Adversary Proceeding 09-14 sets forth the facts surrounding the bogus software.  At the trial in Adversary Proceeding 09-14, Ms. Blixseth testified in person on May 4, 2009.  Ms. Blixseth was not asked any questions about any software, bogus or otherwise, and because Ms. Blixseth testified in person, the Court had no reason to allow Ms. Blixseth's deposition testimony into evidence.

Continuing with Ms. Blixseth's fraud, Western Capital Partners filed an adversary complaint against Ms. Blixseth on November 30, 2009, seeking to except its debt from Ms. Blixseth's discharge under 11 U.S.C. § 523(a)(2).  *See* Adversary Proceeding 09-00100.  Mr.

Flynn argues that this Court is bootstrapped by prior rulings casting Ms. Blixseth's credibility in

a favorable light, such as the Court's September 27, 2010, twenty-six page Memorandum of

Decision in Adversary Proceeding 09-00100 wherein the Court denied Western Capital Partners'

request for summary judgment.  The Court's discussion on the matter is as follows;

> In the pending matter, WCP has two hurdles to overcome: (1) all
> reasonable doubt as to the existence of genuine issues of material fact must be
> resolved against WCP; and (2) exceptions to discharge under § 523 are narrowly
> construed.  Additionally, the Court does not consider WCP's motion in a vacuum,
> but rather, undertakes this case after having over 22 months of time on task with
> the Yellowstone Club and the associated proceedings, including Debtor's
> bankruptcy case.

> The Court has heard a lot of testimony over the past 22 months about
> Debtor and her ex-spouse's long and bitter divorce.  Debtor and Timothy L.
> Blixseth separated in December of 2006 and following the separation, Debtor
> claims she was "frozen out" of various business affairs for about two years, or
> until approximately mid-August of 2008, when Debtor was awarded various
> assets, including BLX Group, Inc. – which owned the ultra exclusive Yellowstone
> Club -- under the terms of a Marital Settlement Agreement.

> Debtor has testified previously that she believed that her share of the
> marital assets were worth well in excess of $100 million between December of
> 2006 and August of 2008.   The 2007 Loan Agreement at issue in this Adversary
> Proceeding and a modification of the Loan Agreement made in June of 2008 were
> all done during a period of time when Debtor was frozen out of the majority of the
> marital business dealings.  Such fact precludes this Court from making a summary
> ruling that Debtor possessed the requisite intent to deceive WCP under either §
> 523(a)(2)(A) or § 523(a)(2)(B).

> Moreover, WCP contends that it relied on certain representations made by
> Debtor.  However, Debtor counters that WCP has not fully responded to discovery
> propounded in January of 2010.  Debtor asserts that WCP has delayed responding
> to all Debtor's discovery requests on grounds WCP has information showing it
> knew Debtor's true financial position, but nevertheless proceeded to make the
> loan and modification at issue.  The foregoing allegations raise a material issue of
> fact as to whether WCP relied on any statements made by Debtor.  Such
> conclusion is buttressed by the fact that one of WCP's attorneys, Christopher J.
> Conant, also serves as counsel for Debtor's ex-spouse.

Finally, Debtor asserts that WCP has received payments in excess of $41 million toward the $13 million Loan Agreement. Under such scenario, WCP may already be fully compensated, thus putting WCP's damages at zero.

In sum, after construing § 523(a)(2) narrowly, the Court cannot determine beyond a reasonable doubt that Debtor made any statements, whether oral or in writing, with the intent to deceive WCP. The Court similarly cannot conclude that WCP relied on statements made by Debtor. Finally, WCP has not shown that any of its alleged damages were the proximate result of statements made by Debtor. WCP has simply failed to satisfy its burden of proof at this stage of the litigation.

This Court disputes Mr. Blixseth's contention that it made any credibility finding in the above ruling. In said ruling, this Court merely denied Western Capital Partners' request for summary judgment. The Court did not dismiss Western Capital Partners' complaint nor did it enter any type of ruling that precluded Western Capital Partners from pursuing its claim against Ms. Blixseth.

The Western Capital Partners adversary proceeding, however, never made it to trial. Rather, Western Capital Partners filed a joint motion to dismiss its action against Ms. Blixseth on October 26, 2010, which the Court granted. Mr. Blixseth's counsel, Christopher J. Conant, should know that said action was dismissed by agreement of the parties because he was one of Western Capital Partners' counsel of record in that proceeding.

At the January 18, 2011, hearing Mr. Flynn also referred to another action involving Western Capital Partners as a "charade": "most recently on the timeliness issue, occurred before this Court on October 12th with Mr. Cotner and Mr. Samson where this Court unilaterally, arbitrarily, without giving Mr. Cotner or myself an opportunity to be heard, piled double layers of hearsay and then issued findings that Ms. Mr. Blixseth is credible and believable on the issue of the bank frauds and the technology frauds and that Mr. Cotner was misled by me." Mr. Flynn

obviously makes reference to a hearing held October 12, 2010, in Adversary Proceeding 09-00105 and the Court's resulting order entered October 25, 2010.  Contrary to what Mr. Flynn argues, Mr. Cotner, who was retained as counsel by the Chapter 7 trustee in Ms. Blixseth's bankruptcy, was heard at the October 12, 2010, hearing and the Court's subsequent Order of October 25, 2010, makes not a single credibility finding as to Ms. Blixseth.  Rather, that Order sets forth how Mr. Cotner came to file an amended counterclaim and amended third-party complaint that Mr. Cotner now believes contains numerous inaccuracies.  The Court Order of October 25, 2010, found at docket entry no. 147 speaks for itself.  In the above noted passage from the transcript of the January 18, 2011 hearing when Mr. Flynn makes reference to "Mr. Cotner or myself", I believe Mr. Flynn meant to say Mr. Conant and not Mr. Cotner.

As far as other matters involving Ms. Blixseth, other parties, including the Yellowstone Club World trustee, Source Capital, Palm Desert National Bank, Casa Captiva, Mr. Blixseth, Mr. Blixseth's attorney, Michael Flynn, and Mr. Blixseth's sons, Beau and Morgan Blixseth, have filed dischargeability complaints against Ms. Blixseth.  Stipulations were reached in the Source Capital and Casa Captiva actions, and Palm Desert National Bank dismissed its action.  Similarly, Ms. Blixseth and the Yellowstone Club World trustee just recently entered into a stipulation for dismissal of Adversary Proceeding 09-44.  The adversary proceeding commenced by Beau and Morgan Blixseth has not yet gone to trial.  Finally, both Mr. Blixseth and Mr. Flynn advised this Court during the respective pretrial scheduling conferences that they intended to voluntarily dismiss their actions against Ms. Blixseth.  True to their representations, Mr. Blixseth and Mr. Flynn filed motions to dismiss their adversary proceedings against Ms. Blixseth on February 24, 2010.  This Court entered orders granting the motions to dismiss on March 16,

39

2010.  Ms. Blixseth's discharge was, subject to Beau and Morgan Blixseths' still pending

adversary proceeding, entered on February 8, 2011.  As the facts demonstrate, other than the

United States Trustee's motion to convert, this Court has not been presented with an instance

where it had to rule either for or against Ms. Blixseth.

 Having made few, if any credibility findings as to Ms. Blixseth, the Court fails to see how

it disrupted a criminal investigation, of which I would have no knowledge nor should I have any

knowledge, as Mr. Blixseth alleges.  Similarly, this Court fails to understand how it used a states

secrets privilege or a Nevada protective order to conceal and gloss over Ms. Blixseth's ongoing

fraud.  My knowledge of the Nevada secrecy order is limited to the facts presented to the Court

by the parties in preparation for and at the October 12, 2010, hearing.

 <u>Denial of Mr. Blixseth's due process</u>.

 Finally, Mr. Blixseth contends that this Court has denied him due process.  Under this

umbrella Mr. Blixseth asserts that this Court has precluded him from presenting facts relating to

Ms. Blixseth's spoliation of evidence.  The Court's Order of January 22, 2010, entered at docket

entry no. 546 in Adversary Proceeding 09-14 speaks for itself.  The Court would simply note that

in that Order, the Court instructed that the matter needed "to be brought before the Court in the

correct proceeding with service upon the appropriate parties." The Court noted therein that  Mr.

Blixseth had "wholly failed to show any misconduct by YCLT or the Debtors in th[at] case.  This

Court agrees with YCLT that a first party defendant is not, and should not be, responsible for the

actions of a third party spoliator who is not a party to the litigation before the Court."

 Next, Mr. Blixseth claims this Court denied him due process in Adversary Proceeding 09-

14 because he was given only weeks to defend himself.  In a Memorandum of Decision entered

40

June 11, 2009, at docket entry no. 292 in Adversary Proceeding 09-14, the Court explained why it was not persuaded by Mr. Blixseth's argument.  Mr. Blixseth intervened into Adversary Proceeding 09-14, knowing at the time that the proceeding was scheduled for trial on an expedited bases.  Moreover, Mr. Blixseth fails to mention that he called not a single witness in his defense at phase one of the trial in Adversary Proceeding 09-14.  Having mounted a minimal defense after six days of trial, the Court entered its June 11, 2009, Memorandum of Decision suggesting to Mr. Blixseth that his trial tactics at the trial in April and May of 2009 were not particularly effective.  The Court thus proceeded to leave the record open and continued the trial to February 24, 2010.  That continuance was for the sole benefit of Mr. Blixseth.  For the reasons discussed, the Court finds no bias or prejudice in Mr. Blixseth's statement that "the bankruptcy court merely continued the trial for one week then subsequently and scurrilously accused me of delaying tactics by insisting on my due process rights[.]"

Mr. Blixseth also avers that: "The court had previously deprived us of critical defenses by excluding the [Marital Settlement Agreement] MSA and Releases from my proposed Pre-Trial Order.  The other side's lawyers argued that the releases were not in their Pre-Trial Order and Judge Kirscher commented that he specifically recalled not including the Releases in the PTO.  My attorney directed Judge Kirscher to where the Releases were inadvertently left in the UCC's Pre-Trial Order as a trial exhibit.  Judge Kirscher paused to thumb through his copy of the PTO and upon discovering that the Releases were included, he leaned back in his chair, gave a glaring stare at the Debtor's attorney, Andy Patten, and then threw the PTO across his desk with great force saying "Yes, it's still in" as if he had relied upon the manipulation of the UCC and the Debtor keeping my critical affirmative defenses out of the PTO.  The manner in which Judge

41

Kirscher showed disgust with having the Releases included in the PTO inadvertently, gave the appearance that his intent and the intent of the Debtor's and the UCC was to deprive me a critical affirmative defense in a lawsuit in which I was sued literally only few days before trial commenced."

My frustrations in Adversary Proceeding 09-14 were numerous, but those frustrations were directed at all parties, not just Mr. Blixseth, and they do not equate to bias or prejudice.  For instance, the original parties in Adversary Proceeding 09-14 consisting of the Debtors, the unsecured creditors' committee and Credit Suisse had requested that trial in that matter be set on an expedited basis because the Debtors' financing was scheduled to mature on April 30, 2009. The Court's calendar was quite full and after some rearrangement, the Court set April 22, 2009, as the date trial was to commence in Adversary Proceeding 09-14.  However, after all the parties were seated in the courtroom on April 22, 2009, the Court was advised that not all the parties had provided paper copies of their exhibits to Mr. Blixseth.[5]  The Court's calendar was very full in May and June of 2009 and any continuance of the trial in Adversary Proceeding 09-14 left the Court with very little time to issue its ruling in Adversary Proceeding 09-14 prior to the scheduled May 18, 2009, confirmation hearing.  However, to give the parties time to produce their exhibits to Mr. Blixseth in hard copy and with the understanding that the debtor-in-possession financing would be extended for a short period of time, the Court continued the first phase of trial in Adversary Proceeding 09-14 to April 29, 2009.  Thus, the Court was upset when trial finally started on April 29, 2009, and it became apparent that the parties did not know what

---

[5]  The exhibits were available to Mr. Blixseth by electronic means, but Mr. Blixseth's counsel stated they were unable to retrieve the electronic version of the exhibits.

was and was not in the final pretrial order prepared by the parties and submitted to the Court for approval.  But as noted earlier, that frustration does not equate to bias or prejudice and it certainly does not equate to bias or prejudice toward Mr. Blixseth.

Mr. Blixseth then argues that this Court entered its August 16, 2010, ruling in Adversary Proceeding 09-14 on the eve of trial in Adversary Proceeding 09-18, effectively "precluding Mr. Blixseth from establishing at trial why the B shareholder claim against him failed both legally and factually and therefore why he should not be required to satisfy their $22 million claim either through being included within a judgment in AP-14, or in AP-18."  Entry of my decision in Adversary Proceeding 09-14 was driven solely by my workload.  The second phase of the trial in Adversary Proceeding 09-14 concluded on February 26, 2010.  I generally strive to enter rulings within 60 days after matters are deemed submitted and ready for decision.[6]  In the case of Adversary Proceeding 09-14, post-trial briefs and proposed findings of fact and conclusions of law were submitted on March 19, 2010.  Thus, I would have generally tried to have a decision entered by mid-May of 2010.  However, the parties had advised me that they planned to participate in a mediation in early May of 2010.  I thus turned my efforts to other matters, with the hopes that the mediation would resolve the issues in Adversary Proceeding 09-14.

I later learned from the parties at a status conference held June 2, 2010, that the mediation

_____

[6]  The 60-day period is consistent with Mont. LBR 901-2, which reads:

In the event a Judge has under advisement any matter, including, but not limited to, a motion or decision in a bench trial, for a period of more than sixty (60) days, each party affected by the undecided matter shall send to the Judge a letter particularly describing the matter under advisement and stating the date the matter was taken under advisement.  As long as the matter remains under advisement, at intervals of forty-five (45) days thereafter, each affected party shall send a similar letter to the Judge.

did not resolve Adversary Proceeding 09-14.  So, I and my law clerk once again turned our efforts to the decision in Adversary Proceeding 09-14 with the tacit understanding that summer vacations would be put on hold until the decision in Adversary Proceeding 09-14 was completed. To that end, my law clerk scheduled her summer family vacation for the week of August 16, 2010, and the two of us worked on drafting the decision.  As the record reflects, the decision in Adversary Proceeding was entered on August 16, 2010, the same date that Ms. Harrington started her summer vacation.  Contrary to what Mr. Blixseth may believe, workload and the scheduling of time off were the only factors that determined when the decision was entered in Adversary Proceeding 09-14.

Mr. Blixseth's final complaint stemming from Adversary Proceeding 09-14 is that this Court amended its judgment against Mr. Blixseth, without giving Mr. Blixseth an opportunity to respond.  The Court agrees that Mr. Blixseth did not have any opportunity to respond to the Yellowstone Club Liquidating Trust's motion to alter or amend the judgment and that the Court entered an judgment against Mr. Blixseth for a specific dollar amount.  The Yellowstone Club Liquidating Trust was seeking judgment against Mr. Blixseth in the amount of $286.4 million. The Court ultimately entered an amended judgment in the amount of $40,067,962.43.  Such amount is a moving target because the Yellowstone Club Liquidating Trustee was still in the process of liquidating claims when Mr. Blixseth filed his motion for recusal.  The judgment against Mr. Blixseth is necessarily decreased as claims are either disallowed or reduced.  The Court considered the amended judgment as nothing more than a more definitive embodiment of its original judgment wherein Mr. Blixseth would pay "that amount of money required to pay all allowed: (1) claims of Class 1 (priority non tax claims), Class 2 (other secured claims), Class 4

(general unsecured claims, except claims attributable to the First Lien Lender, if any), Class 5 (convenience claims), Class 6 (intercompany claims), Class 9 (pioneer/frontier member rejection claims), Class 10 (American bank claims), Class 11 (allowed Prim secured claims), Class 12 (honorary member rejection claims), Class 13 (founder's circle member rejection claims), Class 14 (company member rejection claims) and those claims that Mr. Blixseth identifies as "not classified" on Exhibit A attached to his Post-Trial Brief filed March 19, 2010, at docket entry no. 571, and (2) YCLT for the fees and costs it has incurred, and will incur, objecting to and liquidating such claims."

Moreover, entry of a judgment in a specific amount in Adversary Proceeding 09-14 paved the way for the Court to enter an Order on October 20, 2010, in Adversary Proceeding 10-15 denying the Yellowstone Club Liquidating Trust's request for a preliminary injunction wherein the Yellowstone Club Liquidating Trust sought an order enjoining Mr. Blixseth, and two of his entities, Desert Ranch, LLLP and Desert Ranch Management, LLC, from transferring any assets in an amount or of a value in excess of $5,000.00.  There, the Court reasoned:

> What the pending Adversary Proceedings show is that: (1) Plaintiff in this matter has a $40,067,962.43 judgment against Mr. Blixseth; and (2) Mr. Blixseth stipulated to the entry of an injunction which prohibits Mr. Blixseth from selling, transferring, disposing of, encumbering or otherwise liquidating, or causing any entity owned or controlled by him to sell, transfer, dispose of, encumber or otherwise liquidate, property valued at $40 million without prior order of the Court.
>
> . . . The Plaintiff's judgment of $40,067,962.43 is, as Mr. Blixseth's counsel stated, in perfect congruity with the stipulated injunction already in place.

Mr. Blixseth next takes issue with a decision entered by the Court on August 4, 2010, in Adversary Proceeding 09-18 wherein the Court denied four motions for summary judgment filed

45

by Mr. Blixseth.  As the Court explained, it was 69 pages into drafting that decision when it elected to scrap the 69-pages and opted instead to issue a four page memorandum.  The Court had a firm grasp on the facts and was fully convinced that there were disputed issues of material fact that precluded summary judgment.

In addition to the above allegations, Mr. Blixseth's counsel made the additional argument at the January 18, 2011, hearing that "[t]here's a January 14 or 15 e-mail from, I think it was Matthew Kidd to Sam Byrne saying: How did your meetings with Ron Burkle, the governor, and Mr. Byrne go?  There's an e-mail in August of 2008 when Ms. Blixseth and Mr. Byrne knew they were taking control of the Yellowstone Club involving a meeting with, with Governor Schweitzer."  Mr. Flynn clearly implies that Ron Burkle, whom I have never heard of, Governor Schweitzer, whom I have never met, and Mr. Byrne, who I would recognize only from his appearances in my courtroom, met and somehow exerted pressure on me.  This Court has not and will not succumb to any pressure, political or otherwise.  This Court is an independent and unbiased member of the Federal judiciary.  To the best of my ability, I strive to enter decisions that are based solely on the facts presented and the applicable law.

Applying the applicable law to the facts presently before me, I conclude that my disqualification in this case is neither required nor appropriate because Mr. Blixseth has not established actual bias nor has he shown any facts which establish an appearance of such impartiality as to require recusal.

It appears that Mr. Blixseth's ultimate goal is to upset what has already been done in the cases in which he is involved.  Such is not the appropriate consequence of a recusal motion, particularly where Mr. Blixseth's remedies are adequately addressed through the appellate

process.  Therefore, consistent with the foregoing, the Court will enter separate orders in this case and in Adversary Proceeding Nos. 09-00014, 09-00018, 09-00064. 10-00015, and 10-00088 providing as follows:

IT IS ORDERED that Timothy L. Blixseth's Amended Motion to Disqualify Bankruptcy Judge Kirscher (With Exhibits) filed November 30, 2010, at docket entry no. 2042, together with the same Amended Motion filed December 14, 2010, in Adversary Proceeding Nos. 09-00014, 09-00018, 09-00064. 10-00015, and 10-00088 are DENIED.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

47