## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **YELLOWSTONE MOUNTAIN CLUB, LLC,** | Case No. **08-61570-11** |
| Debtor. | |
| In re | |
| **YELLOWSTONE DEVELOPMENT, LLC,** | Case No. **08-61571-11** |
| Debtor. | |
| In re | |
| **YELLOWSTONE CLUB CONSTRUCTION COMPANY, LLC,** | Case No. **08-61573-11** |
| Debtor. | |
| In re | |
| **BIG SKY RIDGE, LLC,** | Case No. **08-61572-11** |
| Debtor. | |

## MEMORANDUM of DECISION

At Butte in said District this 30th day of September, 2011.

The Court is tasked with writing yet another chapter in the Yellowstone Club bankruptcy saga, which has been ongoing for almost three years.  If this were a book, the reader would most likely read the chapters of the saga in sequence and in a relatively compressed period of time.

1

But this is not a novel and one cannot thumb through a prior chapter to glean a forgotten fact. Thus, the Court directs the reader to prior chapters (Memoranda of Decision and Orders) that provide some insight as to why another chapter is necessary. Relevant facts may be found in this Court's Memorandum of Decision and Order entered in this case at docket entry nos. 1025 and 1026. One may also look at the Memoranda of Decision, Order and Judgment found at docket entry nos. 292, 293, 575 and 582 in related Adversary Proceeding 09-00014, *Timothy L. Blixseth v. Marc S. Kirschner, Trustee of the Yellowstone Club Liquidating Trust*. Along these same lines, the Court also granted various requests for judicial notice found at docket entry nos. 2203, 2209, 2224 (including its attached Exhibit A summarizing the claims processed or prosecuted by the Liquidating Trustee under the plan), 2228 and 2240.

The matter presently before the Court stems from a Memorandum of Decision and Order entered by the Court in the above-referenced Chapter 11 bankruptcy cases on June 2, 2009, at docket entry nos. 1025 and 1026 approving the Yellowstone Club Settlement Term Sheet and confirming the Debtors' Third Amended Joint Plan of Reorganization filed May 29, 2009, at docket entry no. 995. Timothy L. Blixseth ("Blixseth") appealed this Court's June 2, 2009, Order to the United States District Court for the District of Montana on three separate grounds: (1) whether this Court erred in approving the Plan's exculpatory clauses and releases in favor of third parties in the Plan; (2) whether this Court erred in determining the Plan was proposed in good faith when the question of the Debtors' bad faith remained as an unresolved factual issue in a pending adversary proceeding; and (3) whether this Court erred in approving the settlement incorporated into the Plan without a motion to approve the settlement, notice of motion, and hearing as required under F.R.B.P. 9019(a). In a Memorandum and Order entered November 2,

2

2010, United States District Judge Sam E. Haddon declined to rule on the issue of good faith, stating "determination of this issue on the present record is premature and unnecessary at this time." On the other two questions presented, Judge Haddon reversed and remanded. First, Judge Haddon held this Court erred when it proceeded to confirmation of the Debtors' Plan without appropriate notice and opportunity for all parties to object to a certain settlement that was incorporated into the Plan. Judge Haddon also reversed and remanded, so this Court could, "to the extent feasible . . . explicitly identify and delineate those persons or representatives determined to be within the scope of the release parameters of Section 524(e) and to state the reasons why it reached such conclusions."

 In an Order entered May 27, 2011, this Court scheduled a hearing for July 11, 2011,

 1.  To consider whether Debtor's Third Amended Joint Plan of Reorganization filed May 29, 2009, at docket entry no. 995 was proposed in good faith,

 2.  To identify and delineate those persons or representatives who are properly within the scope, under 11 U.S.C. § 524(e), of the exculpation and limitation of liability clause set forth in Section 8.4 of Debtor's Third Amended Joint Plan of Reorganization, and

 3.  To further consider approval of the Settlement Term Sheet found at docket entry no 947-12.

 Upon motion of Blixseth, the Court entered an Order on June 16, 2011, continuing the July 11, 2011, hearing to July 25, 2011. By separate Order entered July 27, 2011, this Court vacated further hearing on whether the Debtors' plan was proposed in good faith, concluding nothing in Judge Haddon's November 2, 2010, Memorandum and Order required this Court to revisit the issue of good faith.

3

At the hearing held July 25 and 26, 2011, in Missoula, Blixseth was represented by Michael J. Flynn of Boston, Massachusetts ("Flynn"), Philip H. Stillman of Miami Beach, Florida ("Stillman"), Christopher J. Conant of Denver, Colorado and Patrick T. Fox of Helena, Montana; Debtors were represented by James A. Patten of Billings, Montana ("Patten") and Richard Birinyi and Larry Ream of Seattle, Washington; Credit Suisse, Cayman Island Branch ("Credit Suisse"), was represented by Evan Levy, Mark McDermott and Sean Marlaire of New York, New York and Richard J. Orizotti of Butte, Montana; the Ad Hoc Group of Class B Unit Holders was represented by Clark Whitmore of Minneapolis, Minnesota and Ronald A. Bender of Missoula, Montana; CrossHarbor Capital Partners LLC ("CrossHarbor"), New CH YMC Acquisition LLC, CrossHarbor Institutional Partners LP and CIP Yellowstone Lending LLC were represented by Paul D. Moore ("Moore") and Barry D. Green of Boston, Massachusetts and Benjamin P. Hursh of Missoula, Montana; Robert Sumpter ("Sumpter") was represented by Stephen Mackey of Billings, Montana; Normandy Hill Capital, LP was represented by Robert G. Burns of New York, New York and Quentin M. Rhoades of Missoula, Montana; Marc S. Kirschner, Trustee ("Liquidating Trustee") of the Yellowstone Club Liquidating Trust ("YCLT"), was represented by John Turner of Amarillo, Texas, Brian Glasser of Charleston, West Virginia and Shane Coleman and Charles Hingle of Billings, Montana; attorney Thomas L. Hutchinson was represented by Robert F. James of Great Falls, Montana; attorney J. Thomas Beckett ("Beckett") was represented by Trent M. Gardner of Bozeman, Montana; the law firm of Garlington, Lohn & Robinson was represented by Dale Cockrell of Kalispell, Montana; Creditor Liquidity LP was represented by Dean A. Stensland of Missoula, Montana; Debtors' attorney Patten was represented by Mike McMahon of Helena, Montana; and Big Sky Shuttle, Inc. was

4

represented by Jon Binney of Missoula, Montana. Patten, Matthew Kidd, Stephen R. Brown

("Brown"), Larry Ream, and Beckett testified. The Court agreed to admit the transcript of

Ronald Greenspan's ("Greenspan") – the Debtors' chief restructuring officer -- Rule 2004

examination as part of the record.[1]

    As noted earlier, certain matters are, at the direction of Judge Haddon's November 2,

2010, Memorandum and Order, once again before this Court. Judge Haddon's Memorandum

and Order is clear, unambiguous and, in this Court's opinion, quite narrow. First, Judge Haddon

held this Court erred when it proceeded to confirm the Debtors' Third Amended Joint Plan of

---

[1]  Counsel for CrossHarbor represented at the hearing that the parties had agreed prior to the hearing that Greenspan's Rule 2004 examination transcript could be admitted into evidence and used for all purposes. Blixseth's counsel disagreed, arguing Blixseth did not agree that Greenspan's Rule 2004 examination transcript could be used at hearing for every purpose. Greenspan lives in California and was not available at the time of the July 25th hearing. Additionally, CrossHarbor's counsel, Moore, sent various parties an email on July 19, 2011, that reads:

> "Since it appears that our colloquy yesterday concerning signing the deposition and its admission at the hearing on Monday was not memorialized by the court reporter, Phil and I just spoke regarding confirming it by this email. We ordered the transcript on an expedited basis agreed that, since Ron will be travelling [sic] to New York on Sunday, he will attempt to review and sign it, and make any corrections before he leaves, in which case Andy will provide us changes at or before the hearing. If Ron is unable to do so, we all agreed that the deposition can nevertheless be used at the hearing on Monday as if signed by Mr. Greenspan.

> Andy-Let us know if this differs in any way from your recollection, and Phil, feel free to advise if I got it wrong in any way. Otherwise, just reply all to this email confirming our agreement"

Patten responded on July 19, 2011: "That is my recollection and understanding." Stillman did not respond, prompting Moore to send another email the following day asking Stillman "did you confirm email yesterday?" Stillman responded: "I didn't, but I do." The email exchange clearly establishes that Blixseth's counsel was agreeable to using Greenspan's deposition for all purposes at the hearing scheduled for July 25, 2011.

Reorganization without appropriate notice and opportunity for all parties to object to the

Yellowstone Club Settlement Term Sheet ("Settlement Term Sheet") filed May 22, 2009, at

docket entry 947-12, which Settlement Term Sheet was incorporated into the Debtors' Third

Amended Joint Plan of Reorganization.  The Court's Orders of May 27, 2011, and June 16, 2011,

setting approval of the Settlement Term Sheet for hearing on July 25, 2011, satisfy any notice

required by F.R.B.P. 2002 and F.R.B.P. 9019.

## I.    The Settlement Term Sheet.

In response to this Court's notice and presumably in an effort to satisfy F.R.B.P. 9019,

Debtors, CrossHarbor and New CH YMC Acquisition, LLC filed on June 10, 2011, a Joint

Motion for Order Pursuant to Bankruptcy Rule 9019 Authorizing and Approving the

Yellowstone Club Settlement Term Sheet *Nunc Pro Tunc* ("Rule 9019 Motion").  Sumpter (dkt

2186), Red Rock Investments, LLC (dkt 2189), Creditor Liquidity, LP (dkt 2196), K & L Gates

LLP (dkt 2197) and Blixseth filed objections to the Debtors, CrossHarbor and New CH YMC

Acquisition, LLC's Rule 9019 Motion.

Sumpter objects to approval of the Settlement Term Sheet on three grounds.  First,

Sumpter argues that the Settlement Term Sheet vacates the Court's Partial and Interim Order in

Adversary Proceeding 09-00014.  Second, Sumpter takes issue with the composition of YCLT's

liquidating trust board.  Finally, Sumpter raises several arguments that challenge the Settlement

Term Sheet's treatment of Class 4 claims.  In particular, Sumpter argues the Settlement Term

Sheet "is not fair and equitable or in the best interests of the estate" because of the treatment of

Class 4 creditors who were not designated as trade creditors: "the unpaid, unsecured claim

holders are now partially put into the fourth tranche on a *pari passu* basis with Credit Suisse and

subordinate to the purchaser of the Trade Creditor claims." Red Rock Investments, LLC and K & L Gates LLP's skeletal objections echo Sumpter's objection that the Settlement Term Sheet provides for disparate treatment of Class 4 creditors. Creditor Liquidity, LP also objects to approval of the Settlement Term Sheet on grounds it violates the requirements of 11 U.S.C. § 1123(a)(4). In addition, Creditor Liquidity, LP argues the Settlement Term Sheet inequitably modified the Debtors' Second Amended Plan, the plan upon which ballots were cast. Finally, Creditor Liquidity, LP argues the Settlement Term Sheet does not result in each holder of an impaired class receiving or retaining equal or greater value than the holder would have received under a Chapter 7 liquidation in violation of 11 U.S.C. § 1129(a)(7)(A).

The Court notes that none of the aforementioned parties appeared at the duly noticed confirmation hearing held May 18, 2009. Moreover, Red Rock Investments, LLC, K & L Gates LLP and Credit Liquidity, LP did not, prior to these additional proceedings, oppose confirmation of the Debtors' plan and more importantly, were involved in subsequent proceedings that ratified the confirmation process and preclude said parties from taking a contrary position at this time. For instance, Red Rock Investments, LLC, through counsel, entered into a Stipulation dated May 27, 2010, with the Liquidating Trustee of YCLT, which Stipulation was intended "to completely resolve all claims of Red Rock in the Consolidated Cases and all objections to the Red Rock Claim by [YCLT]." Specifically, the parties stipulated post-confirmation that "Red Rock['s] Claim shall be allowed as a Class 4 General Unsecured Claim, pursuant to 11 U.S.C. § 502, in the Consolidated Cases in the amount of $136,174.00. The balance of the Red Rock Claim shall be denied. Red Rock shall have no further claims in the Consolidated Cases." In an Order entered May 28, 2010, the Court approved the stipulation between the Liquidating Trustee and

7

Red Rock Investments, LLC.

Similarly, on December 21, 2009, the Liquidating Trustee objected to Proof of Claim No.

632 filed by K&L Gates LLP.  The Liquidating Trustee and K&L Gates LLP subsequently

entered into a stipulation on March 29, 2010, wherein they agreed:

> 3. The Trustee has reviewed the Claim, the supporting and opposing arguments and related documentation and has conferred with the Claimant and its counsel. The Trustee has determined, and the Claimant does hereby agree, (a) the Claim shall be allowed in the amount of $91,640.03 and (b) the balance of the Claim, in the amount of $10,182.23 shall be deemed withdrawn and disallowed. Allowance of the Claim in part and withdrawal of the remainder of the Claim as set forth in the proceeding sentence shall fully settle the Claim on its merits.

> 4. In addition, the Trustee and the Claimant agree that the Claim shall be treated as a Class 4 claim, without prejudice to Claimant's rights to seek payment of such Claim from the Trade Creditor Fund established under the confirmed Plan.

> 5. Pursuant to Section 7.7.6 of the Third Amended Plan of Reorganization (Dkt. 995), the Trustee is "authorized to compromise and settle any Disputed Claim and to execute all necessary documents, including a stipulation of settlement or release, in [his] sole discretion, without notice to any party, and without the need for Bankruptcy Court's [sic] approval." Accordingly, this Stipulation shall be filed without notice of the right to object or a request for Court approval.

> 6. Nevertheless, the Trustee and Claimant believe the settlement proposed herein is fair, reasonable and adequate. F.R.Bankr.P., Rule 9019; *Martin v. Kane (In re A&C Properties)*, 784 F. 2d 1377, 1380-81 (9th Cir. 1986).

The Court approved the stipulation between Marc S. Kirschner and K&L Gates LLP by Order

entered March 29, 2010.

While Creditor Liquidity, LP did not, like Red Rock Investments, LLC or K & L Gates

LLP, enter into any agreement with the Liquidating Trustee, it did not appear in this case until

June 9, 2009, when it filed a Notice of Transfer of Claim, giving notice that it was the transferee

of a claim held by Border States Electric Supply, Inc.  Creditor Liquidity, LP filed similar notices on: (1) June 30, 2009, giving notice that it was the transferee of a claim held by Advanced Chemical Solutions; (2) July 13, 2009, giving notice that it was the transferee of a claim held by Cypress Hotel & Spa LLC; (3) July 16, 2009, giving notice that it was the transferee of claims held by PFG Ventures d/b/a Proforma Infosystems, Robert Marx, Fastenal Company, Brower Timing Systems and Okner Supply Co.; (4) July 17, 2009, giving notice that it was the transferee of claims held by Overland West, Inc., S. Claus Commercial, Ralph Dunning Design, Inc., and Smith & Tweed; and (5) July 28, 2009, giving notice that it was the transferee of a claim held by Hagen O'Connell LLP.  Creditor Liquidity, LP purchased the claims of the above-referenced creditors after this Court confirmed Debtors' Third Amended Joint Plan of Reorganization. Creditor Liquidity, LP purchased said claims with full knowledge of the terms of the confirmed Third Amended Joint Plan of Reorganization.  Additionally, on July 31, 2009, the Official Committee of Unsecured Creditors ("Committee") of Yellowstone Mountain Club, LLC, and its filed affiliates (collectively, the "Debtors"), and the  "CrossHarbor entities," which included YC Holdings LLC, sought entry of an Order allowing certain "trade creditor claims."  Creditor Liquidity, LP filed an objection to the request to allow certain trade creditor claims arguing "it would be an abuse of discretion for the Committee not to identify the claims of Boulder [sic] and Hagen to be paid from the Trade Creditor Fund."  Following a hearing held September 15, 2009, the Court entered an Order on September 17, 2009, overruling Credit Liquidity, LP's objection and holding "the Committee shall not be obligated to pay Liquidity, LP any amount on its claims."  Creditor Liquidity, LP did not appeal the Court's September 17, 2009, Order and such Order is now final.

Even if the Court sustained the pending objections of Creditor Liquidity, LP, Red Rock Investments, LLC and K & L Gates LLP to approval of the Rule 9019 Motion, the parties would still be bound by the prior Orders of this Court entered September 17, 2009, May 28, 2010, and March 29, 2010.  Creditor Liquidity, LP, Red Rock Investments, LLC and K & L Gates LLP's objections to the pending Rule 9019 Motion are nothing more than attempts to circumvent the effects of other final Orders entered by this Court.  Because of the final and binding Orders discussed above, the Court deems it appropriate to overrule the objections to approval of the Rule 9019 Motion lodged by Creditor Liquidity, LP, Red Rock Investments, LLC and K & L Gates LLP.

Sumpter's opposition to approval of the Rule 9019 Motion suffers from a similar defect in that Sumpter entered into a stipulation of settlement and allowance of claim with the Liquidating Trustee dated February 1, 2010, which stipulation of settlement provides in relevant part:

> 3. The Trustee has reviewed the Claim, the supporting and opposing arguments and related documentation and has conferred with the Claimant and his counsel. The Trustee has determined, and the Claimant does hereby agree, (a) the Claim shall be allowed in the amount of $393,908.20 and (b) that portion of the Claim for penalties under state law, totaling $434,343.90, shall be deemed withdrawn. Except as provided in paragraph 4(c), allowance of the Claim in part and withdrawal of the remainder of the Claim as set forth in the proceeding sentence shall fully settle the Claim on its merits.

> 4. Notwithstanding anything in this Stipulation to the contrary, Claimant may (a) maintain and assert his Class 1 priority claim of $10,950 against the Disbursing Agent, (b) may assert claims or causes of action, if any, against third parties other than the Debtors, and (c) may assert in this case a claim, subject to the Trustee's right to object, for the then-current market value of the 2004 Porsche Cayenne in this case if he is determined not to be the lawful owner of said vehicle in Adversary Proceeding No. 09-00098; provided, such claim must be asserted by written notice not less than 30 days prior to final distribution by the Trustee.

10

    5. In addition, the Trustee and the Claimant agree that the Claim shall be treated as a Class 4 claim. The Trustee does not oppose payment of the Claim from the Trade Creditor Fund.

    6. Pursuant to Section 7.7.6 of the Third Amended Plan of Reorganization (Dkt. 995), the Trustee is "authorized to compromise and settle any Disputed Claim and to execute all necessary documents, including a stipulation of settlement or release, in [his] sole discretion, without notice to any party, and without the need for Bankruptcy Court's [sic] approval." Accordingly, this Stipulation shall be filed without notice of the right to object or a request for Court approval.

    7. Nevertheless, the Trustee and Claimant believe the settlement proposed herein is fair, reasonable and adequate. F.R.Bankr.P., Rule 9019; *Martin v. Kane (In re A&C Properties)*, 784 F. 2d 1377, 1380-81 (9th Cir. 1986).

The above settlement was approved by the Court on February 2, 2010. Sumpter's claim to the 2004 Porsche Cayenne was resolved in a Memorandum of Decision and Judgment entered June 20, 2010, in Adversary Proceeding No. 09-00098. Sumpter did not appeal that decision. Finally, the Court entered a Memorandum of Decision and Order on October 14, 2010, granting Sumpter a separate unsecured nonpriority claim in the amount of $250,000. Sumpter appealed the Court's October 14, 2010, decision. In a Memorandum and Order entered March 31, 2011, Judge Haddon affirmed this Court's October 14, 2010, decision.

While the Court has entered post-confirmation decisions involving Sumpter, such decisions do not necessarily preclude Sumpter from pursuing his objections to approval of the Rule 9019 Motion. However, Sumpter's arguments fail to consider another post-confirmation decision this Court entered in Adversary Proceeding 09-00014 wherein the Court determined that Blixseth was required to pay: "(1) all allowed claims of Class 1 (priority non tax claims), Class 2 (other secured claims), Class 4 (general unsecured claims, except claims attributable to the First Lien Lender, if any), Class 5 (convenience claims), Class 6 (intercompany claims), Class 9

11

(pioneer/frontier member rejection claims), Class 10 (American bank claims), Class 11 (allowed

Prim secured claims), Class 12 (honorary member rejection claims), Class 13 (founder's circle

member rejection claims), Class 14 (company member rejection claims) and those claims that

Blixseth identifies as "not classified" on Exhibit A attached to his Post-Trial Brief filed March

19, 2010, at docket entry no. 571, and (2) YCLT for the fees and costs it has incurred, and will

incur, objecting to and liquidating such claims."  Based upon a subsequent pleading, the Court

entered an amended judgment concluding that the sum of all claims previously mentioned was

$40,067,962.43.  Sumpter should receive payment in full of all his allowed claims when Blixseth

pays the foregoing judgment.

 Blixseth raises four objections to approval of the Rule 9019 Motion.  Blixseth first argues

the Debtors are no longer debtors-in-possession and therefore, are precluded from filing the

pending Rule 9019 Motion.  Blixseth next argues Judge Haddon's Memorandum and Order of

November 2, 2010, requires the Debtors to "amend the Plan, revise the Disclosure Statement, and

set a confirmation hearing, at which time the settlement can potentially be incorporated into a

Fourth Amended Plan."  Third, Blixseth asserts that the existing Settlement Term Sheet can not

be approved because Judge Haddon rejected this Court's approval "of an 'extraordinarily broad'

exculpation clause contrary to 11 U.S.C. § 524(e)[.]  Finally, Blixseth argues the Debtors "failed

to meet their burden of demonstrating that the Settlement Term Sheet is reasonable, equitable

and in the best interests of the estate and its creditors[.]"

 Relevant exhibits identified by the parties with respect to the Rule 9019 Motion included

CrossHarbor's Exhibits 16, 32, 33, 41, 45, 52, 58, 59, 60, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73,

74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 96, 99, 106, 107, 109, 110, 112,

113, 114 and 118, Sumpter's Exhibits 2, 3, 5, 7, 8, 9, 11, 12, 13, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 29, Exhibits 1000, 1001 and 1002, along with docket entry 299 in Adversary Proceeding 09-00014 and docket entry nos. 908, 1049 and 1411 in this case.  The Court also took judicial notice of the documents filed at docket entry nos. 2199-1, 2199-3, 2240-1 and 2240-2 in this case.

The Court has no doubt that this Court's June 2, 2009, Confirmation Order and the Third Amended Joint Plan of Reorganization have been substantially consummated.[2]  Given the substantial consummation of the Debtors' Third Amended Joint Plan of Reorganization, the Debtors are admittedly no longer debtors-in-possession.  In an email dated June 28, 2011, Stillman asked the Debtors' counsel "[w]ho is actually acting as the DIP currently?"  Patten responded that "there is no dip, there is a reorganized debtor."  Blixseth's Exhibit 1001.  Based upon the foregoing and relying on Judge Haddon's Memorandum and Order, Blixseth argues that neither a debtor in possession nor a trustee exists to file and prosecute the pending Rule 9019 Motion.  This Court disagrees.

First, the Settlement Term Sheet was part of and incorporated into the Debtors' Third Amended Joint Plan of Reorganization.  The Settlement Term Sheet with the attached Credit Agreement was filed as a standalone and complete pleading on May 28, 2009, at docket entry no. 985.  Further consideration of the Settlement Term Sheet is before this Court as a result of Judge Haddon's decision entered November 2, 2010.  Consequently, the Rule 9019 Motion filed on

---

[2]  Substantial consummation is defined in 11 U.S.C. § 1101 as "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan."

June 10, 2011, is irrelevant and unnecessary.  Blixseth's argument that no party exists to file the

Rule 9019 Motion, or defend confirmation for that matter, elevates form over substance.

Blixseth also maintains that Patten is no longer the Debtors' counsel and has no authority

to act on the Debtors' behalf.  Debtors filed an application to employ Patten and the law firm of

Patten, Peterman, Bekkedahl & Green on November 10, 2008, to serve as attorneys for the

Debtors.  Absent an objection, the Court entered an Order on November 26, 2008, approving the

Debtors' employment of Patten and the law firm of Patten, Peterman, Bekkedahl & Green.

Patten is still listed as the Debtors' counsel of record in this case.  The Debtors, who were the

debtors-in-possession prior to substantial consummation of the Third Amended Joint Plan of

Reorganization are now the Reorganized Debtors, as that term is defined in ¶ 1.107 of the Third

Amended Joint Plan of Reorganization, and are entitled to representation.  As one would expect,

the Reorganized Debtors are represented at this time by the same attorney who represented them

from their petition date through substantial consummation of the Plan.

As noted above, the Settlement Term Sheet was part of the Debtors' Third Amended

Joint Plan of Reorganization.  As such, the Court's June 2, 2009, Memorandum of Decision and

Order not only approved the Settlement Term Sheet, but also confirmed the Debtors' Third

Amended Joint Plan of Reorganization.  Unfortunately, while concluding that the Settlement

Term Sheet was proposed in good faith and not by any means forbidden and that its provisions

were reasonable and represented an appropriate compromise of disputed matters and should be

approved pursuant to the provisions of Bankruptcy Rule 9019, the Court did not provide any

meaningful discussion to support such ruling.  Nevertheless, this Court did consider all "factors

relevant to a full and fair assessment of the wisdom of the proposed compromise." *Protective*

14

*Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424

(1968).

In reaching its June 9, 2009, decision, the Court considered the factors articulated in

*Martin v. Kane (In re A&C Properties)*, 784 F.2d 1377, 1381 (9th Cir. 1986):

> (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

As explained in *A & C Properties*:

> The purpose of a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims.  The law favors compromise and not litigation for its own sake, and as long as the bankruptcy court amply considered the various factors that determined the reasonableness of the compromise, the court's decision must be affirmed.

*Id*. at 1380-81 (citations omitted).  Considering all relevant factors, this Court found that the

Settlement Term Sheet was "fair and equitable" as required by *In re A&C Properties*.

As aptly explained by the proponents of the Settlement Term Sheet, the fact that the

settlement was finally reached in the early hours of May 18, 2009, the date of the confirmation

hearing, after around the clock negotiations during the preceding 48 hours, is symptomatic of the

obstacles and disputes that had to be resolved if the Debtors were to achieve a successful

reorganization.[3]  Indeed, when the multi-day auction was concluded on the evening of Friday,

---

[3]  Blixseth makes some incorrect declarations with respect to the Settlement Term Sheet.
For instance, in a Reply Brief filed July 5, 2011, Blixseth's counsel argues "the Settlement Term
Sheet had not even been finalized at the conclusion of the May 18, 2009 hearing," and then later
maintains in the same Reply Brief that when the parties announced their settlement at the May
18, 2009, hearing, it "was still not even reduced to writing[.]"  The foregoing assertions are
incorrect.  I recall, and the record confirms, that the Debtors, Committee, CrossHarbor and Credit

May 15, 2009, without declaring either Credit Suisse or CrossHarbor the successful bidder, no assurances existed that the Debtors' plan would be confirmed on Monday, May 18, 2009, and in fact, it was quite possible the Debtors' cases could be converted to chapter 7. Absent a resolution, the Debtors faced numerous obstacles to confirmation, including issues under Sections 1111(b) and 1129 of the Bankruptcy Code that could have proven insurmountable absent a consensual resolution of Credit Suisse's claims. In Greenspan's words, confirmation without the global settlement: "[W]ould have been extremely difficult, if not impossible." Furthermore, absent confirmation of a plan by late May of 2009, the Debtors would have no further access to debtor in possession financing. As Greenspan testified:

> For all practical purposes, we had none. We did not have rights to cash collateral, we had no more DIP capacity, and we had operating and administrative expenses that very substantially exceeded our recurring income.

Absent the settlement, the Debtors in all likelihood would not have survived as going concerns. In the face of those daunting threats to confirmation, and indeed to the Debtors' very existence as going concerns, the settlement forged a consensual resolution among all of the Debtors' principal constituencies. Among other things, the Settlement Term Sheet paved the way to confirmation of the Debtors' Third Amended Join Plan of Reorganization which: (i) increased payments by CrossHarbor for payment of administrative expenses and to Credit Suisse; (ii) doubled the amount of the Trade Creditor Fund from $7.5 million to $15 million; and (iii) provided a $2 million increase, from $375,000 to $2.375 million, in the funding of the Yellowstone Club Liquidating Trust. Credit Suisse, likewise, made substantial concessions critical to confirmation

---

Suisse presented the Court with a fully executed copy of the Settlement Term Sheet at the May 18, 2009, hearing.

of the Plan, including accepting an $80 million note in satisfaction of its $232 million secured claim and agreeing to a "waterfall" that subordinated its remaining unsecured deficiency claim to up to $27 million of other claims, an amount significantly greater than that provided under this Court's Interim and Partial Order.

As discussed above, rather than an exhaustive investigation or a mini-trial on the merits, this court need only find that the settlement was negotiated in good faith and is reasonable, fair and equitable. *A & C Properties*, 784 F.2d at 1381. The testimony elicited with respect to the Settlement Term Sheet prior to the Hearing, at earlier hearings before this Court, and during Greenspan's deposition demonstrates that the Settlement Term Sheet was, and remains, fair and equitable. The Court, therefore, once again approves the Settlement Term Sheet in all respects.

## II. Identification and delineation of those persons or representatives within the scope of ¶ 8.4 of the Debtors' Third Amended Joint Plan of Reorganization.

In addition to requiring proper notice under the Bankruptcy Rules, Judge Haddon reversed and remanded confirmation of the Debtors' Third Amended Joint Plan of Reorganization so this Court could, "to the extent feasible . . . explicitly identify and delineate those persons or representatives determined to be within the scope of the release parameters of Section 524(e) and to state the reasons why it reached such conclusions." Relevant exhibits identified by the parties with respect to the exculpation clause found in the Debtors' Third Amended Joint Plan of Reorganization included CrossHarbor's Exhibits 1, 2, 3, 4, 5, 32, 44, 50, 56, 118, the Debtors' Exhibits 1 and 3, Beckett and Parsons Behle & Latimer's Exhibit 1, along with the Orders and pleadings found at docket entry nos. 220, 494, 591, 596, 1186, 1224, 1612 and 1702 in this case, and docket entry no. 292 in Adversary Proceeding 09-00014.

A recurring argument raised by Blixseth in written pleadings and during oral argument is

that this Court could not conduct the hearing as scheduled because, according to Blixseth, some

party would have to file a "mysterious and as-yet undisclosed new exculpation clause[.]"

Blixseth argues in an objection to the July 25, 2011, hearing, that Debtors were required to first

submit a new disclosure statement and further amended plan: "Because at the very least, ¶ 8.4 of

the Third Amended Plan must be changed, the Third Amended Plan can no longer be the

operative plan for the Court to confirm."  Objection of Timothy Blixseth to July 25, 2011

Hearing, dkt 2198, p.5.  Continuing, Blixseth asserts: "Instead of "patching up" the existing,

defective Plan, a new plan must be proposed that complies with the appellate court's mandate."

*Id.*, p.7.  In that same Objection , p.6., Blixseth offers the following argument in support of his

contention that the Debtors' Third Amended Joint Plan of Reorganization is a nullity that cannot

be modified:

> Section 1127(b) also prohibits modification of a substantially
> consummated plan.  *In re Joint Eastern & Southern Dist. Asbestos Litig.*, 982
> F.2d 721, 747 (2nd Cir. 1992).  The modification required by the District Court
> can only be considered a material one, given that the Third Amended Plan is
> premised on the Term Sheet and the exculpation clause. The Court need only look
> at Credit Suisse's own words in responding to Highland Capital's Objection to the
> Yellowstone Term Sheet, p. 4 [Docket No. 966], stating that alteration of the
> "highly negotiated" material terms of, among things, the scope of the exculpation
> clause would require resolicitation of creditors.
>
> Although the issue normally arises in the context of determining the
> equitable mootness of an appeal – an exclusively appellate remedy already
> rejected by both the District Court and the Ninth Circuit – courts have has been
> repeatedly held that modifying the scope of releases is a prohibited material
> change in a confirmed plan.  In *[In re Delta Airlines, Inc.*, 374 B.R. 516 (S.D.N.Y.
> 2007], as here, the releases were an integral part of the entire Settlement and
> cannot be undone in isolation from other portions of the plan that were not
> reversed.  *In re Delta Air Lines, Inc.*, 374 B.R. at 524.  In *In re Specialty Equip.
> Cos.*, 3 F.3d 1043, 1049 (7th Cir. 1993), the court refused to nullify non-debtor
> releases because such a remedy "would amount to imposing a different plan of
> reorganization on the parties."  Similarly, in *In re Metromedia*, 416 F.3d 136 (2nd

Cir. 2005), the court prohibited an appeal which would have eliminated releases which were essential to the bargain between the parties. *See also, In re Enron Corp.*, 326 B.R. at 503 (finding appeal of exculpation provision moot where the bankruptcy court found the provision necessary for the negotiation of the reorganization plan); *In re Texaco Inc.*, 92 B.R. 38, 45-50 (S.D.N.Y. 1988) (finding appeal seeking to sever and rescind releases moot because releases were part of an "integrated settlement" and their rescission would "undermine the entire reorganization"). The underlying theme of these cases is that altering one important component of an approved plan is tantamount to "imposing a different plan of reorganization on the parties" and therefore requires a new, Fourth Amended Plan to be properly proposed for confirmation.

After much deliberation, I see nothing in the record that requires this Court to, as Blixseth suggests, put the tooth paste back in the tube. First, as Blixseth correctly acknowledges, the Debtors' plan is substantially consummated and the Court sees no conceivable or equitable way to put the parties back to their pre-confirmation position. *See In re BearingPoint, Inc.,* 453 B.R. 486, 495 (Bankr. S.D.N.Y. 2011) ("the Trustee is also correct in pointing out that the request for modification of the Confirmation Order here would have no adverse effect on creditor expectations under the plan, or raise issues as to the unscrambling of eggs that often are a concern (typically considered in mootness analysis) in modifying confirmation orders after the fact"); and *In re Public Service Co. of New Hampshire*, 963 F.2d 469, 475 (1st Cir.1992) ("unraveling the substantially consummated ... reorganization plan would work incalculable inequity to many ... who have extended credit, settled claims, relinquished collateral and transferred or acquired property in legitimate reliance on the unstayed order of confirmation").

Second, the exculpation clause was not a last minute provision added to the Debtors' Third Amended Joint Plan of Reorganization without notice to all parties. Debtors filed their first Chapter 11 Plan on February 13, 2009, at docket entry no. 384. The Plan filed February 13th contained the following Exculpation and Limitation of Liability clause:

19

None of (a) the Debtors or the Reorganized Debtors, (b) the Committee, (c) the individual members of the Committee in their capacities as such, (d) the DIP Lender, any other lenders of (or participants in) the DIP Loan and any agent thereof, (e) the Current Equity Owners, (f) CrossHarbor Capital Partners and all affiliates thereof, (g) the Acquirer, and (h) with respect to each of the foregoing Persons, each of their respective directors, officers, employees, agents (including Edra Blixseth, as managing member of the Current Equity Owners), representatives, shareholders, partners, members, attorneys, investment bankers, restructuring consultants and financial advisors in their capacities as such (collectively, the "Exculpated Parties"), shall have or incur any liability to any Person for any act or omission in connection with, relating to or arising out of the Chapter 11 cases, the formulation, negotiation, implementation, confirmation or consummation of this Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document entered into during the Chapter 11 Cases or otherwise created in connection with this Plan; provided, however, that nothing in this Section 8.4 shall be construed to release or exculpate any Exculpated Party from willful misconduct or gross negligence as determined by a Final Order or any breach of the Definitive Agreement or any documents entered into in connection therewith.

Debtors' First Amended Joint Plan of Reorganization filed March 3, 2009, at docket entry

no. 516, and Debtors' Second Amended Joint Plan of Reorganization filed April 3, 2009, at

docket entry no. 691 contained the same exculpation clause found in the Plan filed February 13,

2009, except that the acronym "LLC" was added as follows: "(f) CrossHarbor Capital Partners

*LLC* and all affiliates thereof[.]" The exculpation clause was finally amended in the  Third

Amended Joint Plan of Reorganization filed May 29, 2009, at docket entry no. 995 to read as

follows:

None of (a) the Debtors or the Reorganized Debtors, (b) the Committee, (c) the individual members of the Committee in their capacities as such, (d) the DIP Lender, any other lenders of (or participants in) the DIP Loan and any agent thereof, (e) the Current Equity Owners, (f) CrossHarbor Capital Partners and all affiliates thereof, (g) the Acquirer, *(h) the First Lien Lenders and the First Lien Agent, and (i)* with respect to each of the foregoing Persons, each of their respective directors, officers, employees, agents (including Edra Blixseth, as managing member of the Current Equity Owners), representatives, shareholders, partners, members, attorneys, investment bankers, restructuring consultants and financial advisors in their capacities as such (collectively, the "Exculpated

20

Parties"), shall have or incur any liability to any Person for any act or omission in connection with, relating to or arising out of the Chapter 11 cases, the formulation, negotiation, implementation, confirmation or consummation of this Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document entered into during the Chapter 11 Cases or otherwise created in connection with this Plan; provided, however, that nothing in this Section 8.4 shall be construed to release or exculpate any Exculpated Party from willful misconduct or gross negligence as determined by a Final Order or any breach of the Definitive Agreement or any documents entered into in connection therewith.

The latter amendment to ¶ 8.4 was specifically highlighted in a redline version of the Third Amended Joint Plan of Reorganization filed May 22, 2009, at docket entry no. 945-1.

Blixseth first objected to confirmation of the Debtors' Second Amended Joint Plan of Reorganization on May 11, 2009, at docket entry no. 860. In that objection, Blixseth joined the previously filed objections of Credit Suisse and also objected on grounds the Debtors' Second Amended Plan was not filed in good faith. Credit Suisse subsequently resolved and withdrew its objections to confirmation, leaving Blixseth with his good faith objection. However, on May 24, 2009, Blixseth filed a response to the Debtors' post-confirmation hearing report arguing that ¶ 8.4 of the Debtors' Plan was unlawful and contrary to Ninth Circuit law:

> The Court will recall the reason stated for these exculpatory provisions—that threats were made to Mr. Greenspan about legal action against to be taken against him and other members of the Debtors' professional team. *He testified that the threats were made by Credit Suisse*. Now after the Debtors having settled with Credit Suisse and delivered mutual releases, the exculpatory language not only remains in the Plan, but *includes* Credit Suisse.

> The Ninth Circuit prohibits such non-debtor third party releases. *Resorts International, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401-2 (9th Cir. 1995) ("*Lowenschuss*"). The Third Amended Plan is not confirmable with these exculpatory provisions. The Ninth Circuit in *Lowenschuss* stated that "this court has repeatedly held, without exception, that Section 524(e) [of the Bankruptcy Code] precludes bankruptcy courts from discharging the liabilities of non-debtors." *Lowenschuss*, 67 F.3d at 1401-2. *In re American Hardwoods*, 885 F.2d 621 (9th Cir. 1989); *Underhill v. Royal*, 769 F.2d 1426 (9th Cir. 1985).

21

Blixseth's response filed May 24, 2009, at docket entry no. 956, p.12.

Contrary to Blixseth's argument, the exculpation clause, which was a "highly negotiated" component of the resolution between the Debtors, the Committee, Credit Suisse and CrossHarbor, does not violate Ninth Circuit precedent.  The Ninth Circuit, in *In re American Hardwoods, Inc.,* 885 F.2d 621, 626 (9th Cir. 1989), and *Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394 (9th Cir. 1995), held that under § 524(e), a bankruptcy court does not have the authority to permanently enjoin a creditor from continuing with and enforcing a state court judgment against non-debtor guarantors.[4]  The ruling articulated in *American Hardwoods,* as reiterated in *Lowenschuss*, is not implicated here.

In *American Hardwoods*, a chapter 11 debtor sought to permanently enjoin a creditor from enforcing a state court judgment against the debtor's guarantors, who also happened to be the debtor's president and vice president.  The Ninth Circuit held that the bankruptcy court lacked jurisdiction and power to permanently enjoin a creditor, beyond confirmation of the plan, from enforcing a state court judgment against the nondebtor guarantors.  In reaching its decision, the Ninth Circuit explained:

> Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 105 empowers the court to enjoin preliminarily a creditor from continuing an action or enforcing a state court judgment against a nondebtor prior to confirmation of a plan*. In re A.H. Robins Co.*, 828 F.2d 1023,

---

[4]  In bankruptcy, a discharge is an involuntary release by operation of law of asserted and non-asserted claims by a creditor against an entity who has filed a petition under the Bankruptcy Code and who has abided by its rules.  *In re Arrowmill Development Corp*., 211 B.R. 497, 504 (Bankr. D.N.J. 1997).  Upon confirmation of a plan, a Chapter 11 debtor receives a discharge of its debts which arose before confirmation. 11 U.S.C. § 1141(d)(1).  Subsection § 524(e) limits the scope of the discharge.  A "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity, for such debt." 11 U.S.C. § 524(e).

1026 (4th Cir.1987), *cert. denied*, 485 U.S. 969, 108 S.Ct. 1246, 99 L.Ed.2d 444 (1988); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1002–03 (4th Cir.) ( *Piccinin* ), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). Furthermore, section 105 permits the court to issue both preliminary and permanent injunctions after confirmation of a plan to protect the debtor and the administration of the bankruptcy estate. *See Burstein–Applebee*, 63 B.R. at 1020–21 (principals of debtor permanently enjoined from continuing state court action against creditors' committee); *In re Askew*, 61 B.R. 87, 89 (Bankr. S.D.Ohio 1986) (creditor permanently enjoined from continuing state court action regarding discharged debt).  American, however, points to no case, and we are aware of none, in which a court permanently enjoined, past confirmation of a plan, a creditor from enforcing a state court judgment against a nondebtor guarantor of a contract liability.  Deutsche argues, and the district court held, that its power under section 105(a) to order the relief sought by American ends at confirmation of the plan.

*American Hardwoods*, 885 F.2d at 624-25.  The analysis in *American Hardwoods* focused on § 105 of the Bankruptcy Code, which the Court concluded "does not authorize relief inconsistent with more specific law."  *Id.*, at 625, citing with approval *In re Golden Plan of California, Inc.*, 829 F.2d 705, 713 (9th Cir.1986); and *Johnson v. First National Bank of Montevideo, Minnesota*, 719 F.2d 270, 273 (8th Cir.1983), *cert. denied* 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984).  The Court rejected the semantic distinction between a permanent injunction and a discharge and viewed a permanent injunction of actions against the debtor's guarantors as being contradictory to the specific provisions of § 524(e).  The Court in *American Hardwoods* thus concluded the court had no power to issue the injunction sought by the debtor:

As we succinctly explained in *Underhill v. Royal*, 769 F.2d 1426 (9th Cir.1985):

Generally, discharge of the principal debtor in bankruptcy will not discharge the liabilities of codebtors or guarantors.... [Section 524(e) ] of the 1978 Bankruptcy Reform Act was a reenactment of Section 16 of the 1898 Act which provided that "[t]he liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt." Act of July 1, 1898, ch. 541, § 16, 30 Stat. 550 (formerly codified at 11 U.S.C. § 34 (1976)).

In addition, the Bankruptcy Act of 1898, as amended, provided that

23

> a corporation's discharge in bankruptcy "shall not release its officers, the members of its board of directors or trustees or of other similar controlling bodies, or its stockholders or members, as such, from any liability under the laws of a State or of the United States." Act of June 22, 1938, ch. 575, § 4(b), 52 Stat. 845 (formerly codified at 11 U.S.C. § 22(b) (1976)). Thus, under the old Act, stockholders or directors could remain liable for substantive violations despite discharge of the corporate entity. 1A J. Moore COLLIER ON BANKRUPTCY ¶ 16.14, at 1551 (14th ed. 1978).

> *Id*. at 1432; *see also id*. ("The bankruptcy court 'has no power to discharge the liabilities of a bankrupt's guarantor.' "), *quoting Union Carbide Corp. v. Newboles*, 686 F.2d 593, 595 (7th Cir.1982); *id*. (" 'The bankruptcy court can affect only the relationships of debtors and creditor. It has no power to affect the obligations of guarantors.' "), q*uoting R.I.D.C. Industrial Development Fund v. Snyder*, 539 F.2d 487, 490 n. 3 (5th Cir.1976), *cert. denied*, 429 U.S. 1095, 97 S.Ct. 1112, 51 L.Ed.2d 542 (1977). Section 524(e), therefore, limits the court's equitable power under section 105 to order the discharge of the liabilities of nondebtors[.]

*Id*. at 625-26. At that time, the Ninth Circuit reasoned, in dicta, that adoption of the rationale discussed in in *Menard–Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694 (4th Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989), would not dictate a different result because the facts in *American Hardwoods* were distinguishable from the unusual facts found in *A.H. Robins*. *Id*. at 626. In so stating, the Ninth Circuit enumerated five factors which it considered critical to the *A.H. Robins* holding:

> (1) the reorganization plan, which included the injunction, was approved by over 94% of the claimants ..., (2) the plan provided for full payment of creditors' claims, ...; (3) the injunction affected only about 1.5% of the claimants, ...; (4) it was "essential" to the plan that claimants "either resort to the source of funds for them in the Plan ... or not be permitted to interfere with the reorganization and thus with all other creditors, ...; and (5) "the entire reorganization hing[ed] on the debtor being free from indirect claims such as suits against parties who would have indemnity or contribution claims against the debtor."

*American Hardwoods*, 885 F.2d at 626.

Six years later, in *In re Lowenschuss*, 67 F.3d 1394, the Ninth Circuit again revisited the

24

scope of § 524(e) and reiterated "that bankruptcy courts do not have the equitable power under § 105(a) to discharge the liabilities of nondebtors through chapter 11 plan confirmation, contrary to the provisions of § 524(e).  *Id.* at 1401-02.  The Ninth Circuit clarified that in *American Hardwoods*, it "expressly declined to adopt the approach set forth in *In re A.H. Robins*[.]"

This court is bound by, and does not dispute the legal precedent established in *Lowenschuss*, *American Hardwoods*, and *Underhill*, that liabilities of nondebtors cannot be discharged through a plan.  Such legal precedent, however, is inapplicable here because, unlike in *Lowenschuss*, *American Hardwoods*, and *Underhill*, ¶ 8.4 of the Debtors' Third Amended Joint Plan of Reorganization is not a broad sweeping provision that seeks to discharge or release nondebtors from any and all claims that belong to others.

Blixseth's counsel disputes that ¶ 8.4 contains a temporal component.[5]  During direct examination, Beckett described the temporal component of the exculpation clause as follows: "generally with respect to the exculpation, it was negotiated carefully.  And the idea was not to overreach but to capture the time period from the filing of the petition generally until the consummation -- confirmation of the plan."  The temporal limitation of the exculpation clause was further discussed during Flynn's questioning of Beckett:

> FLYNN.      So please indicate to the Court where the time limitation is in the --
> that you were concerned about.
>
> BECKETT.   Yes. Docket No. 995, page 40 -- or it says, upper right, "48 of 58,"
> Section 8.4. About eight lines down on the left is the definition of
> "exculpated party." And so let's just -- "exculpated parties." Let's
> just start with that (quoted as recorded):  "The exculpated parties

---

[5]  Blixseth also argued in a Reply Brief filed July 5, 2011, that "[a]s written, Section 8.4 releases the Exculpated Parties from liability for pre and post-petition conduct which violates not only Section 524(e) by also Mr. Blixseth's due process rights."

25

shall have or incur – none of the exculpated parties shall have or incur any liability to any person for any act or omission in connection with, relating to, or arising out of the Chapter 11 cases."

Now, let's just stop right there for a second. That doesn't give you any dates, okay, but that's the typical language which is intended to define that we're not talking about anything that happened a year before the bankruptcy, we're not even talking about things probably that happened two days before the bankruptcy, and we're not talking about stuff that happens after confirmation or consummation.

We're talking about things that arise and relate to the Chapter 11 cases. Then continuing (quoted as recorded): "Or" - I think is implied there - "the formulation, negotiation, implementation, confirmation, or consummation of this plan, the disclosure statement, or any contract, instrument, release, or other agreement or document entered into during the Chapter 11 case or otherwise created in connection with this plan."

And my, my point is that the doctrine of quasi-judicial immunity really pertains to a professional's activities, you know, during the pendency of the bankruptcy case, and that's really the best way here that lawyers have found over the years to define that temporal duration. So all I'm saying is that we're talking about what happened during the case, and that's how we say it.

FLYNN.      In fact, there is no, as you put it, "temporal" recitation in 8.4 by date or time limit, is there, Mr. Beckett?

BECKETT.    Yes, there is.

FLYNN.      No, other than this language that you've stated --

BECKETT.    Other, other than --

FLYNN.      -- there's no recitation of a specific "60-day," "90-day," "from the date of filing the petition until the date of the confirmation of the plan." There is no such language, is there, sir?

BECKETT.    You know, I can't change my testimony. There is, but I understand, we're arguing about how that time period is defined. I'm saying it's defined there; you're saying it's not defined by dates and times or

26

specific duration.  You're right.

The Court agrees with Beckett's observation that ¶ 8.4 only protects those acts that occurred in connection with the Debtors' Chapter 11 cases between November 10, 2008, and July 17, 2009. Acts falling outside the foregoing dates are not protected.

The exculpation clause is also narrow in scope.  The following colloquy between Beckett and Flynn highlights the limited scope of the exculpation clause:

> FLYNN.        The term that's used in 8.4, "relating to" or "arising out of the Chapter 11 cases," that's a very broad term, is it not, Mr. Beckett?
>
> UNIDENTIFIED SPEAKER: Objection; vague.
>
> THE COURT: I'm going to overrule and allow him to answer if he is able.
>
> BECKETT.      You know, I think, I think it comes from 28 U.S.C. § 1334(b), is my recollection. And I think that there are hundreds of cases defining what "related to," "arising under," or "in connection" -- or not "in connection"; with -- what that means. I think it's an exacting phrase.

Blixseth disagrees that the exculpation clause is limited in scope, arguing ¶ 8.4 impermissibly releases claims belonging to both the Debtors and Blixseth.  Blixseth's belief that Debtors are seeking to impermissibly release claims belonging to the Debtors is evidenced by Blixseth's motions for derivative standing filed July 19 and 20, 2011, wherein Blixseth seeks leave of this Court to pursue alleged claims belonging to the Debtors against Credit Suisse and CrossHarbor.  Notwithstanding what claims ¶ 8.4 may or may not release, 11 U.S.C. § 1123(b)(3)(a) permits a plan to settle or adjust any claim belonging to the debtor or to the estate. Subsection 524(e) does not come into play with respect to any claims belonging to the Debtors or the bankruptcy estates that may have been released by ¶ 8.4 of the Plan against Credit Suisse or CrossHarbor.

27

Blixseth's counsel also elicited testimony at the hearing held July 25th and 26th suggesting that ¶ 8.4 of the Debtors' Plan impermissibly releases claims Blixseth may have against certain of the parties, including CrossHarbor, Credit Suisse and Brown.  After Blixseth intervened in Adversary Proceeding 09-00014, he steadfastly maintained that the Debtors' bankruptcy filings were orchestrated by his ex-spouse, Edra, and CrossHarbor.  Blixseth likewise contends he has claims against Credit Suisse stemming from a 2005 loan agreement between Blixseth, on behalf of the Debtors, and Credit Suisse

Finally, Blixseth takes issue with the actions of Brown, who admittedly served as counsel for both the Debtors and Blixseth prior to November 10, 2008.  Brown is a partner in the law firm of Garlington, Lohn & Robinson.  Garlington, Lohn & Robinson was owed in excess of $300,000 by the Debtors on their petition date.  Because of the substantial unsecured claim owed Garlington, Lohn & Robinson, Brown agreed to and in fact did serve as chairman of the Committee.

Blixseth contends Brown breached Blixseth's attorney-client privilege when Brown divulged information, protected by Blixseth's attorney-client privilege, to the Committee. Blixseth complains that ¶ 8.4 of the Debtors' Plan now exculpates Brown and that Blixseth is foreclosed from pursuing a claim against Brown for breach of Blixseth's attorney-client privilege.  Blixseth also takes issue with advice Brown provided to Credit Suisse in 2005 with respect to the Credit Suisse loan transaction and advice Brown provided to Blixseth prior to August 2008 in connection with Blixseth's marital settlement agreement.

While the Court cannot anticipate every claim Blixseth may have against the parties involved in this case, the specific claims discussed during testimony are outside the scope of the

release provision at issue. The release provision in this case is narrow in both scope and time, and applies only to an "act or omission in connection with, relating to or arising out of the Chapter 11 cases, the formulation, negotiation, implementation, confirmation or consummation of this Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document entered into during the Chapter 11 Cases or otherwise created in connection with this Plan[.]" For instance, any claim Blixseth may have stemming from Brown's advice with respect to Blixseth's marital settlement agreement or the Credit Suisse loan transaction is clearly outside the scope of the exculpation clause. Moreover, while not specifically before the Court, this Court would find any question as to whether Brown breached Blixseth's attorney-client privilege as separate and distinct from the Debtors' confirmation process. The aforementioned acts took place prior to the Debtors' petition date and have no connection whatsoever with the chapter 11 bankruptcy process.

Larry Ream[6], by way of background, explained during his testimony that exculpation clauses are intended to "prevent parties – who are disappointed subsequent to the completion of a Chapter 11 case, from suing professionals and others that are directly involved in the process of reorganization. But they are limited, and they are intended solely to preclude litigation related to or acts and conduct related to the process of the reorganization itself." Larry Ream explained specifically what was not covered by the exculpation clause: "willful misconduct is not exculpated, nor are gross -- conduct that constitutes gross negligence, nor is there anything within our exculpation clause . . . that affects . . . 524(e) and the discharge provision."

---

[6] Larry Ream was employed to represent the Debtors' in this bankruptcy case and was the person who drafted the Debtors' plans.

The parties in this case, including the Debtors, Credit Suisse, CrossHarbor, Blixseth and others, all had a lot at stake.  According to Larry Ream, "[a]ll of the interested parties in this case had significant issues and important positions, and they were all taken vigorously."  The vigorous jockeying by the parties created an oftentimes contentious environment.  Attorney Larry Ream referenced two pre-confirmation threats made by Credit Suisse against various of the professionals involved in this case, wherein Credit Suisse alleged that the Debtors and their professional were mismanaging this case and allowing value to dissipate.

In another situation and prior to Blixseth's active involvement in either this case or any associated adversary proceeding, Beckett, who served as lead counsel for the Committee, sent Flynn a courtesy email to advise Flynn and Blixseth that Blixseth was named in a complaint the Committee had drafted, but not yet filed.  Flynn responded to Beckett by email on February 7, 2009: "I strongly urge you NOT to file a lawsuit that will generate publicity that will potentially kill the deal that Tim has put together to insure full payment to the unsecured creditors comprised of the vendors, workers, contractors."  Attached to Flynn's email to Beckett was correspondence between Blixseth and Flynn in which Blixseth told Flynn if the UCC filed its complaint and thereby killed Blixseth's almost completed deal, Flynn was instructed to "commence legal action against each and every person responsible, regardless of who they are."  As a result of Flynn's email, the Committee removed Blixseth's name from the Complaint, leaving Credit Suisse as the sole named Defendant.  However, Blixseth never proposed a deal to provide full payment to the unsecured creditors and in fact, subsequently requested leave to intervene in the Debtors and Committee's action against Credit Suisse.  That action evolved into an action between Blixseth and the Liquidating Trustee.  The Court eventually entered Judgment against Blixseth directing

him to provide sufficient funds to pay the unsecured creditors.

As shown above, numerous parties were threatening others with lawsuits, and notwithstanding the exculpation clause, Blixseth, in 2009, filed a separate action against CrossHarbor in California.  In addition, prior to the July 25th hearing, Blixseth filed a complaint against: (1) Stephen Brown and his law firm, Garlington, Lohn & Robinson, PLLP; (2) James A. Patten and his law firm Patten, Peterman, Bekkedahl & Green, PLLC; (3) J. Thomas Beckett and his law firm Parsons, Behle & Latimer; (4) Thomas L. Hutchinson and his law firm Bullivant, Houser, Bailey, PC; (5) Samuel T. Byrne; and (6) CrossHarbor Capital Partners, LLC.  As the record demonstrates, litigation and the threat of litigation is and was plentiful in this case.

An exculpation clause in this case was certainly advisable given the litigious posture of the parties.  The only issue was who could legally be included in such a clause.  During cross-examination, counsel for Sumpter specifically asked Beckett what "should an exculpation clause be?"  Beckett responded:

> In my view, it should be at least as broad as the quasi-judicial immunity. The quasi-judicial immunity is there. It needs to be reduced to writing. And it is almost in the nature - it's a poor, poor reference - but it's almost in the nature of an oath where the purpose of it is to remind people of the paramount importance of repose in a bankruptcy case.
>
> Professionals and the people they represent in the cases – professionals, on behalf of the people they represent in cases, battle each other tirelessly for a period of time. And things are said, and feelings are hurt, and "oxes" are gored. And there needs to be repose at the end of the case. And the professionals, and the debtor, and the committee members, and the acquirer, the DIP lender, whoever else is put in there by contract need to know at the end of the case that everything about their behavior has been exposed, has been vetted, has been considered, and it's over.
>
> The reorganized company - in this case, the Yellowstone Club - and those of us who participated in this case need to go back to doing what we like to do: Working on other cases, selling lots and making people happy at the club, and

31

Credit Suisse is back in its business of making loans. There needs to be that repose, and for me that's the most important thing, "This is the end of it, we're done."

Beckett continued by providing additional justification for inclusion of the exculpation clause in Debtors' Third Amended Joint Plan of Reorganization:

Professionals ought to be able to do the best they can in a bankruptcy case, get a result, and then move on knowing that they're not subject to liability.

My own view has another component to it, which is that, I agree, exculpation clause -- claim -- clauses are very common, and their function is like a stoplight at the end of a long straightaway. And it's really important when a plan is filed that it have an exculpation clause in it because if the plan isn't confirmed, the exculpation clause is not yet in effect, but you have a long period of time before -- reasonably, a reasonable period of time before the plan is confirmed for people to think about the effect of the exculpation clause. And that exercise about thinking of the effect of the exculpation clause causes everybody to say, "Do I have some claim to bring?"

Because this Court, when this Court gives professionals like us authority to do things, it is this Court that should review the propriety of what we have done. And the existence of a pending exculpation clause has the function, the very important function of causing everyone to bring up everything they have to bring up before the case is confirmed, before the plan is confirmed and the exculpation clause is in effect. And so everyone brings up all the complaints they have about each other before that in this court and resolve them all. And then with that, then you have that repose, and professionals can go about their next case without being sued.

\* \* \*

I think it's also true that there is a doctrine of quasi-judicial immunity which is parallel to the exculpation clause. I don't know the intersection of those two.

This Court agrees that the exculpation clause in this case does nothing more than provide quasi-judicial immunity to the Debtors, the Committee and their professionals.

Beckett also explained why it was necessary to include Credit Suisse and CrossHarbor:

Every party was doing something very important and giving up something very important and making very important agreements to undertake going forward. And it was,

32

it was very clear that every single party there had a deal point that they were to be within the exculpation clause of whatever plan came out of the term sheet.

It was, it was a deal point, and it was a reasonable deal point, and -- absolutely. CrossHarbor was acquiring the reorganized debtor, the plan assets. CrossHarbor was paying up to $15 million for unsecured creditor claims.  Credit Suisse was standing down on its appeal, which would have destroyed the plan -- or there would be no plan if Credit Suisse appealed. Credit Suisse was getting something in return.

The Court agrees that CrossHarbor should be included in the exculpation clause because of its involvement in this case by providing debtor in possession financing and because it served as the stalking horse bidder.  Credit Suisse is also an expected candidate for coverage because it was, coming into this case, by far the largest creditor with a claim of $375 million.  Credit Suisse was also seeking to appeal a partial and interim order entered by this Court on May 12, 2009.  Credit Suisse had the ability to single-handedly disrupt the entire confirmation process.

In support of his position, Blixseth's counsel invited the Court to review *In re Lighthouse Lodge, LLC*, (slip opinion) 2010 WL 4053984 (Bankr. N.D.Cal. 2010), for "a very good analysis of just how limited these exculpation clauses need to be."  *Lighthouse Lodge* provides support for approval of the instant exculpation clause.  In *Lighthouse Lodge,* the court endorsed a bifurcated approach to examining release clauses contained in chapter 11 plans.  *Id.* *8. According to the court in *Lighthouse Lodge*, the first prong of the analysis treats the release as "a settlement or adjustment of claims belonging to the debtor and the estate within the meaning of § 1123(b)(3)(A)" and examined such settlement or adjustment of claims under the factors articulated in *A & C Properties*, 784 F.2d 1377 (9th Cir. 1986).  *Id.*, quoting *Edgewood Centre v. Flash Island, Inc. (In re Whispering Pines Estates, Inc.)*, 370 B.R. 452 (1st Cir. BAP 2007).  The second part of the analysis looks at the release as "'a release (or limitation of liability, or grant of immunity) of a party responsible for implementing the plan.'"  *Id.*  In reaching its decision to

33

endorse the bifurcated approach, the court in *Lighthouse Lodge* explained,

> Section 1103(c) grants to official creditors' committees broad authority in formulating a plan of reorganization and performing "such other services as are in the interest of those represented." 11 U.S.C. § 1103(c). Section 1103(c) also gives rise to "an implicit grant of limited immunity." *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr.S.D.N.Y.1992).  Hence, a plan may contain a release provision insulating a committee and its members from liability except from gross negligence or willful misconduct. *See Vasconi & Associates, Inc. v. Credit Manager Association of California*, 1997 WL 383170, *4 (N.D.Cal.1997); *In re PWS Holding Corp*., 228 F.3d 224, 246–47 (3rd Cir.2000);

> This release of liability except from gross negligence or willful misconduct has been extended to plan proponents other than a committee. *In In re WCI Cable, Inc.*, 282 B.R. 457 (Bankr.D.Or.2002), the bankruptcy court was confronted with objections to the various release, exculpation, injunction and indemnification provisions in the debtor's plan. One of the exculpation provisions sought to limit the liability of the debtors, who were the plan proponents, "for any of their actions or omissions to act with respect to the [debtors'] bankruptcy proceedings, except for willful misconduct or gross negligence." *Id*., at 477. Because the provision would release the debtors and their officers, members, directors, employees, representatives, attorneys, accountants, financial advisors, agents, among others, the bankruptcy court observed that "[d]ifferent liability standards may be appropriate and/or applicable under the Bankruptcy Code to these different entities and individuals in various circumstances in performing their respective functions postpetition in bankruptcy, and the lines separating actions protected by immunity from actionable conduct are neither clearly nor easily drawn." *Id.*, at 478. The court also pointed out that unlike a creditors' committee, these parties did not have statutory immunity. *Id.*, at 478. Nevertheless, noting that the debtors had a legitimate concern because the cases were bitterly contested, the court approved the exculpation clause on the condition that the exculpation exceptions were extended to cover negligence and breaches of fiduciary duty, in addition to gross negligence and willful misconduct as already stated in the release. *Id.*, at 479–80.

> Other courts have approved exculpation provisions that limited liability to gross negligence, willful misconduct, or breach of fiduciary duty. *See In re PWS Holding Corp., supra* (approved exculpation provision releasing debtors, reorganized debtors, committee, and their officers, directors, employees, advisors, professionals or agents from liability except from willful misconduct or gross negligence); *In re Western Asbestos Co.*, 313 B.R. 832, 846–47 (Bankr.N.D.Cal.2003) (approved release provision in favor of debtors, committee, futures representative, and their respective agents except for willful misconduct); *In re Firstline Corp.*, 2007 WL 269086 (Bankr.M.D.Ga.2007)(approved

34

> exculpation clause for the debtor, trustee, the committee and its members, and their respective advisors, attorneys, consultants or professionals with exception for gross negligence, willful misconduct, or breach of fiduciary duty); *In re Enron Corp.*, 326 B.R. 497 (S.D.N.Y.2005)(bankruptcy court approved exculpation provision in favor of debtors, creditors' committee, employee committee, trustees, and their respective officers, employees, attorneys, and agents that excluded gross negligence or willful misconduct).

*Id*. at *7.  The court went on to approve a release provision, provided it was amended to add exceptions to cover gross negligence or willful misconduct.  *Id.* at *9.

Applying that *Lighthouse Lodge* analysis to the facts of this case, this Court finds, for the reasons discussed earlier, that any release of claims by the Debtors was, and remains, fair and equitable and indeed, permissible under 11 U.S.C. § 1123(b)(3)(A).  As for release of liability, the Court finds that the specific facts of this case compel approval of the exculpation clause as drafted and originally approved in the Third Amended Joint Plan of Reorganization.  The Debtors, Committee, Credit Suisse and CrossHarbor were all major stakeholders in this case and each party was vigorously negotiating issues they deemed signification and positions important to the respective parties.  The Plan in this case was originally proposed almost exclusively by the Debtors.  However, during the countless hours of negotiations between 5:00 p.m. on Friday, May 15, 2009, and 9:00 a.m. on Monday, May 18, 2009, it is clear that the Third Amended Joint Plan of Reorganization and the incorporated Settlement Term Sheet became a collaborative effort of the Debtors, Committee, Credit Suisse and CrossHarbor, who all became, in essence, plan proponents.  Because the Settlement Term Sheet and exculpation clause were the cornerstones of the Plan and were highly negotiated, the ruling in *Lighthouse Lodge* would suggest that the plan proponents, namely the Debtors, the Committee, CrossHarbor and Credit Suisse, should be released pursuant to ¶ 8.4 of the Plan.

Unlike the exculpation clauses in *American Hardwoods* and *Lowenschuss*, the exculpation clause in the Debtors' confirmed Third Amended Joint Plan of Reorganization does not implicate 11 U.S.C. § 524(e). The exculpation clause in the case *sub judice* is not barred by Ninth Circuit Law. The exculpation clause is temporal in nature and covers those parties who were closely involved with drafting the Settlement Term Sheet, which became the cornerstone of the Debtors' Third Amended Joint Plan of Reorganization. As the testimony clearly shows, without the Settlement Term Sheet, it is doubtful the Debtors could have achieved confirmation of a Chapter 11 plan, and indeed it is very likely the Debtors' bankruptcies would have been converted to Chapter 7 and the assets liquidated.

Given the foregoing discussion, this Court need not correct an existing judgment or enter a new ruling and the Debtors need not start the confirmation process anew. The Court adopts in total and ratifies its earlier ruling on approval of the Settlement Term Sheet. The Rule 9019 Motion is technically irrelevant and unnecessary. The matter came before the Court, irrespective of the Rule 9019 Motion, as a result of Judge Haddon's ruling and to the extent feasible, this Court has defined the scope of the exculpation clause and the parties covered thereby.

### III. Blixseth's pending Motion for Relief From Order Confirming Third Amended Plan of Reorganization.

Also pending is Blixseth's Motion for Relief From Order Confirming Third Amended Plan of Reorganization filed at docket entry no. 2054, together with the objections by the Liquidating Trustee at docket entry no. 2164, the Debtors, CrossHarbor and New CH YMC acquisition, LLC at docket entry no. 2184 and the Ad Hoc Group of Class B Unit Holders at docket entry no. 2191. Blixseth subsequently filed a related Motion to Strike YCLT's Opposition to Motion for Relief From Order Confirming Third Amended Plan of Reorganization

36

on June 10, 2011, at docket entry no. 2167.

In the motion for relief, Blixseth requests that the Court void in its entirety and *nunc pro tunc* all downstream effects of the Debtors' Third Amended Joint Plan of Reorganization. Blixseth argues that such request is proper because the "Plan has now been reversed by the U.S. District Court for multiple 'plain errors' including the denial of Mr. Blixseth's fundamental due process rights." For the reasons discussed earlier in this Memorandum of Decision, the Court denies Blixseth's Motion for Relief From Order Confirming Third Amended Plan of Reorganization. Blixseth's motion to strike is similarly denied.

The Court would note that in a supplemental brief filed August 8, 2011, at docket entry no. 2295, Blixseth relies solely on *Stern v. Marshall*, 131 S. Ct. 2594, 2608, 2615, 2620 (2011) and *In re BearingPoint*, 453 B.R. 486, in support his request for relief from the Order confirming the Debtor's Third Amended Joint Plan of Reorganization. More to the point, Blixseth contends this Court lacks the constitutional authority to approve the Debtors' plan because "the Exculpation Clause approved by order of this Court acted as a final order dismissing all common law causes of action against the Exculpated Parties." For reasons discussed below, the Court finds it has authority to enter binding decisions with respect to confirmation of a chapter 11 plan.

## IV.    Subject matter jurisdiction.

As just mentioned, Blixseth argues this Court lacks subject matter jurisdiction to hear the matters set on July 25 and 26, 2011, based upon the United States Supreme Court's recent ruling in *Stern v. Marshall*, 131 S.Ct. 2594. The "jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute." *Battleground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124, 1130 (9th Cir. 2010) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300,

37

307 (1995)).  A bankruptcy court's jurisdiction is, generally, prescribed by 28 U.S.C. § 1334(b).

In addition to granting jurisdiction to bankruptcy courts over bankruptcy cases, the statute

provides that  "the district courts [and by reference pursuant to 28 U.S.C. § 157, the bankruptcy

courts] shall have original but not exclusive jurisdiction of all civil proceedings arising under

title 11, or arising in or related to cases under title 11."

        In recent years, various courts of appeal have articulated the limits on bankruptcy court

jurisdiction over matters arising after confirmation of a debtor's reorganization plan.  *See, e.g., In*

*re Resorts Int'l, Inc.*, 372 F.3d 154, 166-67 (3d Cir. 2004) ("the essential inquiry appears to be

whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold

bankruptcy court jurisdiction over the matter"); *Bank of La. v. Craigs Stores of Tex., Inc.*, 266

F.3d 388, 390-91 (5th Cir. 2001) (post-confirmation bankruptcy jurisdiction limited to matters

pertaining to implementation or execution of the plan).  The Ninth Circuit has adopted the "close

nexus" test of *Resorts Int'l* for measuring post-confirmation related to bankruptcy court

jurisdiction.  *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1194 (9th Cir. 2005) (reasoning that

while this test "recognizes the limited nature of post-confirmation jurisdiction, [it] retains a

certain flexibility . . . .").  In *Resorts Int'l,* the Third Circuit considered what it perceived to be

problems in its existing precedent, *Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984).  In *Pacor*, the

court had held that "the test for determining whether a civil proceeding is related to bankruptcy is

whether the outcome of that proceeding could conceivably have any effect on the estate being

administered in bankruptcy."  *Id*. at 994.  The *Pacor* test, however, proved less than useful in

determining related to jurisdiction after confirmation of a plan because the bankruptcy estate no

longer exists.  In *Resorts Int'l*, the court shifted the emphasis to whether "there is a close nexus to

38

the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Id*. Although the Third Circuit never precisely defined what it meant by "close nexus," it cited numerous case examples of a nexus that would support jurisdiction. *In re Resorts Int'l, Inc.*, 372 F.3d at 161, citing *Donaldson v. Bernstein*, 104 F.3d 547, 552 (3d Cir. 1997) (post-confirmation proceeding concerning the reorganized debtor's failure to pay unsecured creditors according to terms in the plan); *U.S. Tr. v. Gryphon at the Stone Mansion*, 216 B.R. 764 (W.D. Pa. 1996), *aff'd* 166 F.3d 552 (3d Cir. 1999) (dispute interpreting attorney fee provision in the plan); *Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.)*, 86 F.3d 364, 372-73 (4th Cir. 1996) (dispute over calculation of attorney fees that could affect treatment of remaining claims under the plan)). However, the import of the *Resorts Int'l* analysis is even more revealing by its citation of example cases where the facts did not establish a sufficiently close nexus to support bankruptcy jurisdiction. *In re Resorts Int'l, Inc.*, 372 F.3d at 168 citing *Falise v. Am. Tobacco Co.*, 241 B.R. 48, 52 (E.D.N.Y. 1999) (dispute between a plan liquidating trust and tobacco manufacturers would have "no impact on any integral aspect of the bankruptcy plan or proceeding"); *Grimes v. Graue (In re Haws)*, 158 B.R. 965, 970 (Bankr. S.D. Tex. 1993) (in an action by trustee against partner of the debtor, trustee failed to prove how any damages received from the defendant were "necessary to effectuate the terms of the plan.")). In short, under *Resorts Int'l,* as a condition for bankruptcy court post-confirmation jurisdiction, the outcome of a dispute must produce some effect on the reorganized debtor or a confirmed plan. Indeed, immediately following its review of this case law, the Third Circuit concluded "where there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan

39

or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate." *Id.* at 168.

The Ninth Circuit most recently visited related to jurisdiction after confirmation in a chapter 11 case in *In re Ray*, 624 F.3d at 1124. In *Ray*, the bankruptcy court had approved the sale of a parcel of property owned by the debtor and his nondebtor co-owner, free and clear of the first refusal rights previously granted by them to Battle Ground Plaza, LLC. After the debtor's plan was confirmed and the bankruptcy case was closed, Battle Ground Plaza sued the reorganized debtor, the nondebtor co-owner, the purchaser, and the purchaser's successor in state court for breach of its contractual right of first refusal. Because the sale was originally authorized under a bankruptcy court order, the state court, in its words, "remanded" the action to the bankruptcy court, and stayed proceedings in state court pending the bankruptcy court's determination whether it retained jurisdiction over the transaction and dispute. *In re Ray*, 624 F.3d at 1129. The bankruptcy court assumed jurisdiction and proceeded to construe the sale order and resolve the parties' claims.

When the dispute finally reached the Ninth Circuit, the court decided that the bankruptcy court lacked jurisdiction to decide a dispute between two nondebtors over the meaning of the bankruptcy court's sale order entered in a since-closed chapter 11 bankruptcy case. Applying *Valdez Fisheries*, the court concluded that, because the claims were all based upon Washington law, could exist entirely apart from the bankruptcy proceeding, and could not impact the closed bankruptcy case, the state court, not the bankruptcy court, should construe the sale order and adjudicate the parties' rights. *Id*. at 1134-35.

This Court distills an important lesson from these decisions for application of the close

40

nexus test as developed in *Resorts Int'l*, and as adopted and refined by the Ninth Circuit. In particular, to support jurisdiction, there must be a close nexus connecting a proposed post-confirmation proceeding in the bankruptcy court with some demonstrable effect on the debtor or the plan of reorganization. Applying the Ninth Circuit case law to the facts of this case, it is clear that consideration of the Settlement Term Sheet and defining the scope of the exculpation clause in the Debtors' Third Amended Joint Plan or Reorganization directly impact the Debtors, the bankruptcy estates and implementation of the Debtors' Third Amended Joint Plan of Reorganization. This Court's retention of jurisdiction in this instance is appropriate, notwithstanding the decision in *Stern v. Marshall*. Therefore, Blixseth's standing objection to this Court's subject matter jurisdiction is overruled.

For the reasons discussed above, the Court will enter a separate order providing as follows:

IT IS ORDERED that Blixseth's Request for Judicial Notice filed July 22, 2011, at docket entry no. 2268 is granted.

IT IS FURTHER ORDERED that the Court adopts and ratifies its Memorandum of Decision and Order entered June 2, 2009, approving the Settlement Term Sheet and confirming the Debtors' Third Amended Joint Plan of Reorganization.

IT IS FURTHER ORDERED that Blixseth's Motion for Relief From Order Confirming Third Amended Plan of Reorganization filed at docket entry no. 2054, is denied.

IT IS FURTHER ORDERED that Blixseth's Motion to Strike YCLT's Opposition to Motion for Relief From Order Confirming Third Amended Plan of Reorganization Filed at Docket No. 2164 filed June 10, 2011, at docket entry no. 2167, is denied.

IT IS FURTHER ORDERED the Joint Motion for Order Pursuant to Bankruptcy Rule 9019 Authorizing and Approving the Yellowstone Club Settlement Term Sheet *Nunc Pro Tunc* filed by the Debtors, CrossHarbor Capital Partners, LLC and New CH YMC Acquisition, LLC on June 10, 2011, at docket entry no. 2165 is denied as moot.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana